ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 1 7 2009

CLERK, U.S. DISTRICT COURT
By _____
Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION,       §
                                          §
            Plaintiff,                    §
                                          §
v.                                        §        COMPLAINT
                                          §
STANFORD INTERNATIONAL BANK, LTD.,        §
STANFORD GROUP COMPANY,                   §    3-09CV0298-L
STANFORD CAPITAL MANAGEMENT, LLC,         §
R. ALLEN STANFORD, JAMES M. DAVIS, and    §
LAURA PENDERGEST-HOLT                     §
                                          §
            Defendants.                   §

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.      The Commission seeks emergency relief to halt a massive, ongoing fraud orchestrated by R. Allen Stanford and James M. Davis and executed through companies they control, including Stanford International Bank, Ltd. ("SIB") and its affiliated Houston-based investment advisers, Stanford Group Company ("SGC") and Stanford Capital Management ("SCM").  Laura Pendergest-Holt, the chief investment officer of a Stanford affiliate, was indispensable to this scheme by helping to preserve the appearance of safety fabricated by Stanford and by training others to mislead investors.  For example, she trained training SIB's senior investment officer to provide false information to investors.

2.      Through this fraudulent scheme, SIB, acting through a network of SGC financial advisors, has sold approximately $8 billion of self-styled "certificates of deposits" by promising high return rates that exceed those available through true certificates of deposits offered by traditional banks.

3.    SIB claims that its unique investment strategy has allowed it to achieve double-digit returns on its investments over the past 15 years, allowing it offer high yields to CD purchasers. Indeed, SIB claims that its "diversified portfolio of investments" lost only 1.3% in 2008, a time during which the S&P 500 lost 39% and the Dow Jones STOXX Europe 500 Fund lost 41%.

4.    Perhaps even more strange, SIB reports identical returns in 1995 and 1996 of exactly 15.71%. As Pendergest-Holt – SIB investment committee member and the chief investment officer of Stanford Group Financial (a Stanford affiliate) – admits, it is simply "improbable" that SIB could have managed a "global diversified" portfolio of investments in a way that returned identical results in consecutive years. A performance reporting consultant hired by SGC, when asked about these "improbable" returns, responded simply that it is "impossible" to achieve identical results on a diversified investment portfolio in consecutive years. Yet, SIB continues to promote its CDs using these improbable returns.

5.    These improbable results are made even more suspicious by the fact that, contrary to assurances provided to investors, at most only two people – Stanford and Davis – know the details concerning the bulk of SIB's investment portfolio. And SIB goes to great lengths to prevent any true independent examination of those portfolios. For example, its long-standing auditor is reportedly retained based on a "relationship of trust" between the head of the auditing firm and Stanford.

6.    Importantly, contrary to recent public statements by SIB, Stanford and Davis (and through them SGC) have wholly-failed to cooperate with the Commission's efforts to account for the $8 billion of investor funds purportedly held by SIB. In short, approximately 90% of

SIB's claimed investment portfolio resides in a "black box" shielded from any independent oversight.

7.     In fact, far from "cooperating" with the Commission's enforcement investigation (which Stanford has reportedly tried to characterize as only involving routine examinations), SGC appears to have used press reports speculating about the Commission's investigation as way to further mislead investors, falsely telling at least one customer during the week of February 9, 2009, that his multi-million dollar SIB CD could not be redeemed because "the SEC had frozen the account for two months." At least one other customer who recently inquired about redeeming a multi-million dollar CD claims that he was informed that, contrary to representations made at the time of purchase that the CD could be redeemed early upon payment of a penalty, R. Allen Stanford had ordered a two-month moratorium on CD redemptions.

8.     This secrecy and recent misrepresentations are made even more suspicious by extensive and fundamental misrepresentations SIB and its advisors have made to CD purchasers in order to lull them into thinking their investment is safe. SIB and its advisers have misrepresented to CD purchasers that their deposits are safe because the bank: (i) re-invests client funds primarily in "liquid" financial instruments (the "portfolio"); (ii) monitors the portfolio through a team of 20-plus analysts; and (iii) is subject to yearly audits by Antiguan regulators. Recently, as the market absorbed the news of Bernard Madoff's massive Ponzi scheme, SIB has attempted to calm its own investors by claiming the bank has no "direct or indirect" exposure to Madoff's scheme.

9.     These assurances are false. Contrary to these representations, SIB's investment portfolio was not invested in liquid financial instruments or allocated in the manner described in its promotional material and public reports. Instead, a substantial portion of the bank's portfolio was

placed in illiquid investments, such as real estate and private equity. Further, the vast majority

SIB's multi-billion dollar investment portfolio was not monitored by a team of analysts, but rather

by two people – Allen Stanford and James Davis. And contrary to SIB's representations, the

Antiguan regulator responsible for oversight of the bank's portfolio, the Financial Services

Regulatory Commission, does not audit SIB's portfolio or verify the assets SIB claims in its

financial statements. Perhaps most alarming is that SIB has exposure to losses from the Madoff

fraud scheme despite the bank's public assurances to the contrary.

10.    SGC has failed to disclose material facts to its advisory clients. Alarmingly, recent

weeks have seen an increasing amount of liquidation activity by SIB and attempts to wire money

out of its investment portfolio. The Commission has received information indicating that in just

the last two weeks, SIB has sought to remove over $178 million from its accounts. And, a major

clearing firm – after unsuccessfully attempting to find information about SIB's financial

condition and because it could not obtain adequate transparency into SIB's financials– has

recently informed SGC that it would no longer process wires from SGC accounts at the clearing

firm to SIB for the purchase of SIB issued CDs, even if they were accompanied by customer

letters of authorization.

11.    Stanford's fraudulent conduct is not limited to the sale of CDs. Since 2005, SGC

advisers have sold more than $1 billion of a proprietary mutual fund wrap program, called Stanford

Allocation Strategy ("SAS"), by using materially false and misleading historical performance data.

The false data has helped SGC grow the SAS program from less than $10 million in around 2004 to

over $1.2 billion, generating fees for SGC (and ultimately Stanford) in excess of $25 million. And

the fraudulent SAS performance was used to recruit registered financial advisers with significant

books of business, who were then heavily incentivized to re-allocate their clients' assets to SIB's CD program.

12.    Moreover, SIB and Stanford Group Company have violated Section 7(d) of the Investment Company Act of 1940 by failing to register with the Commission in order to sell SIB's CDs. Had they complied with this registration requirement, the Commission would have been able to examine each of those entities concerning SIB's CD investment portfolio.

13.    By engaging in the conduct described in this Complaint, defendants Stanford, Davis, Pendergest-Holt, SIB, SGC, and Stanford Capital, directly or indirectly, singly or in concert, have engaged, and unless enjoined and restrained, will again engage in transactions acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] or, in the alternative, have aided and abetted such violations.  In addition, through their conduct described herein, Stanford, SGC, and Stanford Capital have violated Section 206(1) and (2) of the Investment Advisers Act of 1940 ("Adviser's Act")  [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and Davis and Pendergest-Holt have aided and abetted such violations.  Finally, through their actions, SIB and SGC have violated Section 7(d) of the Investment Company Act of 1940 ("ICA") [15 U.S.C. § 80a-7(d)].

14.    The Commission, in the interest of protecting the public from any further unscrupulous and illegal activity, brings this action against the defendants, seeking temporary, preliminary and permanent injunctive relief, disgorgement of all illicit profits and benefits defendants have received plus accrued prejudgment interest and a civil monetary penalty.  The Commission also seeks an asset freeze, an accounting and other incidental relief, as well as the

appointment of a receiver to take possession and control of defendants' assets for the protection of defendants' victims.

## JURISDICTION AND VENUE

15.     The investments offered and sold by the defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)].

16.     Plaintiff Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] to temporarily, preliminarily, and permanently enjoin Defendants from future violations of the federal securities laws.

17.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

18.     Defendants have, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. Certain of the transactions, acts, practices, and courses of business occurred in the Northern District of Texas.

## DEFENDANTS

19.     Stanford International Bank, Ltd. purports to be private international bank domiciled in St. John's, Antigua, West Indies.  SIB claims to serve 30,000 clients in 131 countries and holds $7.2 billion in assets under management. SIB's Annual Report for 2007 states that SIB has 50,000 clients.  SIB's multi-billion portfolio of investments is purportedly monitored by the SFG's chief financial officer in Memphis, Tennessee.  Unlike a commercial bank, SIB does not loan money.  SIB sells the CD to U.S. investors through SGC, its affiliated investment adviser.

20.     Stanford Group Company, a Houston-based corporation, is registered with the Commission as a broker-dealer and investment adviser.  It has 29 offices located throughout the U.S.   SGC's principal business consists of sales of SIB-issued securities, marketed as certificates of deposit.  SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by R. Allen Stanford ("Stanford").

21.     Stanford Capital Management, a registered investment adviser, took over the management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007. Stanford Group Company markets the SAS program through SCM.

22.     R. Allen Stanford, a U.S. citizen, is the Chairman of the Board and sole shareholder of SIB and the sole director of SGC's parent company.  Stanford refused to appear and give testimony in the investigation.

23.     James M. Davis, a U.S. citizen and resident of Baldwin, Mississippi and who offices in Memphis, Tennessee and Tupelo, Mississippi, is a director and chief financial officer of SFG and SIB.  Davis refused to appear and give testimony in this investigation.

24.     Laura Pendergest-Holt, is the Chief Investment Officer of SIB and its affiliate Stanford Financial Group.  She supervises a group of analysts in Memphis, Tupelo, and St. Croix who "oversee" performance of SIB's Tier II assets.

## STATEMENT OF FACTS AND ALLEGATIONS
## RELEVANT TO ALL CAUSES OF ACTION

### A.     The Stanford International Bank

25.     Allen Stanford has created a complex web of affiliated companies that exist and operate under the brand Stanford Financial Group ("SFG").  SFG is described as a privately-held group of companies that has in excess of $50 billion "under advisement."

26.     SIB, one of SFG's affiliates, is a private, offshore bank that purports to have an independent Board of Directors, an Investment Committee, a Chief Investment Officer and a team of research analysts.  While SIB may be domiciled in Antigua, a small group of SFG employees who maintain offices in Memphis, Tennessee, and Tupelo, Mississippi, purportedly monitor the assets.

27.     As of November 28, 2008, SIB reported $8.5 billion in total assets.  SIB's primary product is the CD.  SIB aggregates customer deposits, and then re-invests those funds in a "globally diversified portfolio" of assets.  SIB claims its investment portfolio is approximately $8.4 billion.  SIB sold more than $1 billion in CDs per year between 2005 and 2007, including sales to U.S. investors.  The bank's deposits increased from $3.8 billion in 2005, to $5 billion in 2006, and $6.7 billion in 2007.  SIB had approximately $3.8 billion in CD sales to 35,000 customers in 2005.  By the end of 2007, SIB sold $6.7 billion of CDs to 50,000 customers.

28.     For almost fifteen years, SIB represented that it has experienced consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993):



29.     In fact, since 1994, SIB has never failed to hit targeted investment returns in excess of 10%.  And, SIB claims that its "diversified portfolio of investments" lost only $110 million or 1.3% in 2008.   During the same time period, the S&P 500 lost 39% and the Dow Jones STOXX Europe 500 Fund lost 41%.

30.     As performance reporting consultant hired by SGC testified in the Commission's investigation, SIB's historical returns are improbable, if not impossible.  In 1995 and 1996, SIB reported identical returns of 15.71%, a remarkable achievement considering the bank's "diversified investment portfolio."  According to defendant Pendergest-Holt -- the chief investment officer of SIB-affiliate SFG – it is "improbable" that SIB could have managed a "global diversified" portfolio of investments so that it returned identical results in consecutive years.  SGC's performance reporting consultant was more emphatic, saying that it is "impossible" to achieve identical results on a diversified investment portfolio in consecutive years.  SIB continues to promote its CDs using these improbable, if not impossible, returns.

31.    SIB's consistently high returns of investment have enabled the bank to pay a consistently and significantly higher rate on its CD than conventional banks. For example, SIB offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed rate CD based on an investment of $100,000.  On November 28, 2008, SIB quoted 5.375% on a 3 year CD, while comparable U.S. Banks' CDs paid under 3.2%.  And recently, SIB quoted rates of over 10% on five year CDs.

32.    SIB's extraordinary returns have enabled the bank to pay disproportionately large commissions to SGC for the sale of SIB CDs.  In 2007, SIB paid to SGC and affiliates $291.7 million in management fees and commissions from CD sales, up from $211 million in 2006 and $161 million in 2005.

33.    SIB markets CDs to investors in the United States exclusively through SGC advisers pursuant to a claimed Regulation D offering, filing a Form D with the SEC.  Regulation D permits under certain circumstances the sale of unregistered securities (the CDs) to accredited investors in the United States.  SGC receives 3% based on the aggregate sales of CDs by SGC advisers.  Financial advisers also receive a 1% commission upon the sale of the CDs, and are eligible to receive as much as a 1% trailing commission throughout the term of the CD.

34.    SGC promoted this generous commission structure in its effort to recruit established financial advisers to the firm.  The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to United States investors, and aggressively expanded its number of financial advisers in the United States.

35.    SIB purportedly manages the investment portfolio from Memphis and Tupelo. SIB's investment portfolio, at least internally, is segregated into 3 tiers: (a) cash and cash equivalents ("Tier 1"), (b) investments with "outside portfolio managers (25+)" that are

monitored by the Analysts ("Tier 2"), and (c) unknown assets under the apparent control of

Stanford and Davis ("Tier 3").  As of December 2008, Tier 1 represented approximately 9%

($800 million) of the Bank's portfolio.  Tier 2, prior to the Bank's decision to liquidate $250

million of investments in late 2008, represented 10% of the portfolio.  And Tier 3 represented

81% of the Bank's investment portfolio.  This division into tiers is not generally disclosed to

actual or potential investors.

     **B.**     **SIB's Fraudulent Sale of CDs**

         *1.*     *SIB Misrepresented that Its Investment Portfolio is Invested Primarily in "Liquid" Financial Instruments.*

36.     In selling the CD, SIB touted the liquidity of its investment portfolio.  For

example, in its CD brochure, SIB emphasizes the importance of the liquidity, stating, under the

heading "Depositor Security," that the bank focuses on "maintaining the highest degree of

liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a

well-diversified portfolio of highly marketable securities issued by stable governments, strong

multinational companies and major international banks."  Likewise, the bank trained SGC

advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to

provide security to SIB clients."  Davis and Pendergest-Holt were aware, or were reckless in not

knowing, of these representations.

37.     In its 2007 annual report, which was signed and approved by Stanford and Davis,

SIB represented that its portfolio was allocated in the following manner: 58.6% "equity," 18.6%

fixed income, 7.2% precious metals and 15.6% alternative investments.  These allocations were

depicted in a pie chart, which was approved by Davis.  The bank's annual reports for 2005 and

2006 make similar representations about the allocation of the bank's portfolio.  Davis and

Stanford knew or were reckless in not knowing of these representations.



38.     SIB's investment portfolio is not, however, invested in a "well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."   Instead, Tier 3 (i.e., approximately 90%) consisted primarily of illiquid investments – namely private equity and real estate.  Indeed, it SIB's portfolio included at least 23% private equity.  The bank never disclosed in its financial statements its exposure to private equity and real estate investments.  Stanford, Davis and Pendergest-Holt were aware, or were reckless in not knowing, that SIB's investments were not allocated as advertised by SIB's investment objectives or as detailed in SIB's financial statements.

39.     Further, on December 15, 2008, Pendergest-Holt met with her team of analysts following SIB's decision to liquidate more than 30% of its Tier 2 investments (approximately $250 million).  During the meeting, at least one analyst expressed concern about the amount of liquidations in Tier 2, asking why it was necessary to liquidate Tier 2, rather than Tier 3 assets, to increase SIB's liquidity.   Pendergest-Holt told the analyst that Tier 3 was primarily invested in private equity and real estate and Tier 2 was more liquid than Tier 3.  Pendergest-Holt also stated that Tier 3 "always had real estate investments in it."  Pendergest's statements contradicts

what she had previously stated to SIB's senior investment adviser, knowing, or reckless in not

knowing, that the senior investment advisor would provide this misrepresentation to investors.

### 2. SIB Misrepresented that Its Multi-Billion Dollar Investment Portfolio is Monitored By a Team of Analysts

40.    Prior to making their investment decision, prospective investors routinely asked

how SIB safeguarded and monitored its assets.  In fact, investors frequently inquired whether

Allen Stanford could "run off with the [investor's] money."  In response to this question, at least

during 2006 and much of 2007, the bank's senior investment officer – as instructed by

Pendergest-Holt – told investors that SIB had sufficient controls and safeguards in place to

protect assets.

41.    In particular, the SIO was trained by Ms. Pendergest-Holt to tell investors that the

bank's multi-billion portfolio was "monitored" by the analyst team in Memphis.  In

communicating with investors, the SIO followed Pendergest's instructions, misrepresenting that

a team of 20-plus analysts monitored the bank's investment portfolio.  In so doing, the SIO never

disclosed to investors that the analyst only monitor approximately 10% of SIB's money.  In fact,

Pendergest-Holt trained the SIO "not to divulge too much" about oversight of the Bank's

portfolio because that information "wouldn't leave an investor with a lot of confidence."

Likewise, Davis instructed him to "steer" potential CD investors away from information about

SIB's portfolio.  As a result, both Davis and Pendergest-Holt knew, or were reckless in not

knowing, of these fraudulent misstatements.

42.    Contrary to the representation that responsibility for SIB's multi-billion portfolio

was "spread out" among 20-plus people, only Stanford and Davis know the whereabouts of the

vast majority of the bank's multi-billion investment portfolio.  Pendergest-Holt and her team of

analysts claim that they have never been privy to Tier 1 or Tier 3 investments.  In fact, the SIO

was repeatedly denied access to the Bank's records relating to Tier 3, even though he was responsible, as the Bank's Senior Investment Officer, for "closing" deals with large investors, "overseeing the Bank's investment portfolio" and "ensuring that the investment side is compliant with the various banking regulatory authorities." In fact, in preparing the Bank's period reports (quarterly newsletters, month reports, mid-year reports and annual reports, Pendergest and the Analyst send to Davis the performance results for Tier 2 investments. And Davis calculates the investment returns for the aggregated portfolio of assets.

> 3. *SIB Misrepresented that its Investment Portfolio is Overseen by a Regulatory Authority in Antigua that Conducts a Yearly Audit of the Fund's Financial Statements.*

43.     SIB told investors that their deposits were safe because the Antiguan regulator responsible for oversight of the Bank's investment portfolio, the Financial Services Regulatory Commission (the "FSRC"), audited its financial statements. But, contrary to the Bank's representations to investors, the FSRC does not verify the assets SIB claims in its financial statements. Instead, SIB's accountant, C.A.S. Hewlett & Co., a small local accounting firm in Antigua is responsible for auditing the multi-billion dollar SIB's investment portfolio. The Commission attempted several times to contact Hewlett by telephone. No one ever answered the phone.

> 4. *SIB Misrepresented that Its Investment Portfolio is Without "Direct or Indirect" Exposure to Fraud Perpetrated by Bernard Madoff.*

44.     In a December 2008 Monthly Report, the bank told investors that their money was safe because SIB "had no direct or indirect exposure to any of [Bernard] Madoff's investments." But, contrary to this statement, at least $400,000 in Tier 2 was invested in Meridian, a New York-based hedge fund that used Tremont Partners as its asset manager. Tremont invested approximately 6-8% of the SIB assets they indirectly managed with Madoff's investment firm.

45.    Pendergest, Davis and Stanford knew about this exposure to loss relating to the Meridian investment. On December 15, 2008, an Analyst informed Pendergast, Davis and Stanford in a weekly report that his "rough estimate is a loss of $400k . . . based on the indirect exposure" to Madoff.

5.    *Market Concerns About SIB's Lack of Transparency*

46.    On or about December 12, 2008, Pershing, citing suspicions about the bank's investment returns and its inability to get from the Bank "a reasonable level of transparency" into its investment portfolio informed SGC that it would no longer process wire transfers from SGC to SIB for the purchase of the CD. Since the spring of 2008, Pershing tried unsuccessfully to get an independent report regarding SIB's financials condition. On November 28, 2008, SGC's President, Danny Bogar, informed Pershing that "obtaining the independent report was not a priority." Between 2006 and December 12, 2008, Pershing sent to SIB 1,635 wire transfers, totaling approximately $517 million, from approximately 1,199 customer accounts.

**D.    From at least 2004, SCM misrepresented SAS performance results.**

47.    From 2004 through 2009, SCM induced clients, including non-accredited, retail investors, to invest in excess of $1 billion in its SAS program by touting its track record of "historical performance." SCM highlighted the purported SAS track record in thousands of client presentation books ("pitch books").

48.    For example, the following chart from a 2006 pitch book presented clients with the false impression that SAS accounts, from 2000 through 2005, outperformed the S&P 500 by an average of approximately 13 percentage points:

| Calendar Year Return (As of July 2006) | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|
| SAS Growth | 12.09% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% |
| S&P 500 | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% |

SCM used these impressive, but fictitious, performance results to grow the SAS program from less than $10 million in assets in 2004 to over $1 billion in 2008.

49.    SGC also used the SAS track record to recruit financial advisers away from legitimate advisory firms who had significant books of business. After arriving at Stanford, the newly-hired financial advisors were encouraged and highly incentivized to put their clients' assets in the SIB CD.

50.    The SAS performance results used in the pitch books from 2005 through 2009 were fictional and/or inflated. Specifically, SCM misrepresented that SAS performance results, for 1999 through 2004, reflected "historical performance" when, in fact, those results were fictional, or "back-tested", numbers that do not reflect results of actual trading. Instead, SCM, with the benefit of hindsight, picked mutual funds that performed extremely well during years 1999 through 2004, and presented the back-tested performance of those top-performing funds to potential clients as if they were actual returns earned by the SAS program.

51.    Similarly, SCM used "actual" model SAS performance results for years 2005 through 2006 that were inflated by as much as 4%.

52.    SCM told investors that SAS has positive returns for periods in which actual SAS clients lost substantial amounts. For example, in 2000, actual SAS client returns ranged from negative 7.5% to positive 1.1%. In 2001, actual SAS client returns ranged from negative 10.7%

to negative 2.1%. And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%. These return figures are all gross of SCM advisory fees ranging from 1.5% to 2.75%. Thus, Stanford's claims of substantial market out performance were blatantly false. (e.g., a claimed return of 18.04% in 2000, when actual SAS investors lost as much as 7.5%).

53.    SGC/SCM's management knew that the advertised SAS performance results were misleading and inflated. From the beginning, SCM management knew that the pre-2005 track record was purely hypothetical, bearing no relationship to actual trading. And, as early as November 2006, SCM investment advisers began to question why their actual clients were not receiving the returns advertised in pitch books.

54.    In response to these questions, SGC/SCM hired an outside performance reporting expert, to review certain of its SAS performance results. In late 2006 and early 2007, the expert informed SCM that its performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points. Moreover, the expert informed SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the SAS performance results over actual client performance. Finally, in March 2008, the expert informed SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.

55.    Despite their knowledge of the inflated SAS returns, SGC/SCM management continued using the pre-2005 track record and never asked Riordan to audit the pre-2005 performance. In fact, in 2008 pitch books, SCM presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" along side the audited 2005 through 2008 figures. According to SCM's outside consultant, it was "[grossly misleading]" to present audited performance figures along side back-tested figures.

56.     Finally, SGC/SCM compounded the deceptive nature of the SAS track record by blending the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance.  A sample of this misleading disclosure used in 2008 and 2009 follows:

| Calendar Year Return As of March 2008 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | YTD | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
| SAS Growth | -7.44% | 12.40% | 14.66% | 8.82% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% | 22.59% |
| S&P 500 | -9.44% | 5.49% | 15.79% | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% | 21.04% |

| Annualized Returns (not annualized if less than 1 year) | | | | | | |
|---|---|---|---|---|---|---|
| | YTD | 1 year | 3 years | 5 years | 7 years | Since inception |
| SAS Growth | -7.44% | 0.80% | 9.36% | 15.31% | 11.03% | 12.30% |
| S&P 500 | -9.44% | -5.08% | 5.85% | 11.32% | 3.70% | 2.45% |

57.     Other than the fees paid by SIB to SGC for the sale of the CD, SAS was the second most significant source of revenue for the firm.  In 2007 and 2008, approximately $25 million in fees from the marketing of the SAS program.

## CAUSES OF ACTION

## FIRST CLAIM
## AS TO ALL DEFENDANTS

### Violations of Section 10(b) of the Exchange Act and Rule 10-5

58.     Plaintiff Commission repeats and realleges paragraphs 1 through 57 of this Complaint and incorporated herein by reference as if set forth verbatim.

59.     Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate

commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

60.    As a part of and in furtherance of their scheme, defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    Defendants made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

62.    For these reasons, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### SECOND CLAIM
### AS TO STANFORD, DAVIS, AND PENDERGEST-HOLT

### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

63.    Plaintiff Commission repeats and realleges paragraphs 1 through 57 of this Complaint and incorporated herein by reference as if set forth verbatim.

64.    If Stanford, Davis, and Pendergest-Holt did not violate Exchange Act Section 10(b) and Rule 10b-5, in the alternative, Stanford, Davis, and Pendergest-Holt, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in connection

with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.

65.    For these reasons, Stanford, Davis, and Pendergest-Holt aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
## AS TO ALL DEFENDANTS

### Violations of Section 17(a) of the Securities Act

66.    Plaintiff Commission repeats and realleges paragraphs 1 through 57 of this Complaint and incorporated herein by reference as if set forth verbatim.

67.    Defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

68.    As part of and in furtherance of this scheme, defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.    Defendants made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

70.    For these reasons, Defendants have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM
### AS TO STANFORD, SGC, AND STANFORD CAPITAL

### Violations of Sections 206(1) and 206(2) of the Advisers Act

71.    Plaintiff Commission repeats and realleges paragraphs 1 through 57 of this Complaint and incorporated herein by reference as if set forth verbatim.

72.    Stanford, SGC, and Stanford Capital, directly or indirectly, singly or in concert, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]: (a) have employed, are employing, or are about to employ devices, schemes, and artifices to defraud any client or prospective client; or (b) have engaged, are engaging, or are about to engage in acts, practices, or courses of business which operates as a fraud or deceit upon any client or prospective client.

73.    For these reasons, Stanford, SGC, and Stanford Capital have violated, and unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FIFTH CLAIM
### AS TO STANFORD, DAVIS, AND PENDERGEST-HOLT

### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

74.    Plaintiff Commission repeats and realleges paragraphs 1 through 57 of this Complaint and incorporated herein by reference as if set forth verbatim.

75.    Based on the conduct alleged herein, Stanford, Davis, and Pendergest-Holt, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in

connection with the violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] alleged herein.

76.    For these reasons, Stanford, Davis, and Pendergest-Holt aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### SIXTH CLAIM
### AS TO SIB AND SGC

### Violations of Section 7(d) of the Investment Company Act

77.    Plaintiff Commission repeats and realleges paragraphs 1 through 57 of this Complaint and incorporated herein by reference as if set forth verbatim.

78.    SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

79.    SGC, directly or indirectly, singly or in concert with others, acted as an underwriter for SIB, an investment company not organized or otherwise created under the laws of the United States or of a State that made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or

otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

80.    For these reasons, SIB and SGC have violated, and unless enjoined, will continue to violate Section 7(d) of the Investment Company Act [15 U.S.C. § 80a-7(d)].

## **RELIEF REQUESTED**

Plaintiff Commission respectfully requests that this Court:

### **I.**

Temporarily, preliminarily, and permanently enjoin: (a) Defendants from violating, or aiding and abetting violations of, Section 10(b) and Rule 10b-5 of the Exchange Act; (b) Defendants from violating Section 17(a) of the Securities Act; (c) Stanford, Davis, Pendergest-Holt, SGC, and Stanford Capital from violating, or aiding and abetting violations of, Sections 206(1) and 206(2) of the Advisers Act; and (d) SIB and SCG from violating Section 7(d) of the Investment Company Act.

### **II.**

Enter an Order immediately freezing the assets of Defendants and directing that all financial or depository institutions comply with the Court's Order. Furthermore, order that Defendants immediately repatriate any funds held at any bank or other financial institution not subject to the jurisdiction of the Court, and that they direct the deposit of such funds in identified accounts in the United States, pending conclusion of this matter.

### **III.**

Order that Defendants shall file with the Court and serve upon Plaintiff Commission and the Court, within 10 days of the issuance of this order or three days prior to a hearing on the Commission's motion for a preliminary injunction, whichever comes first, an accounting, under

oath, detailing all of their assets and all funds or other assets received from investors and from one another.

## IV.

Order that Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

## V.

Order the appointment of a temporary receiver for Defendants, for the benefit of investors, to marshal, conserve, protect, and hold funds and assets obtained by the defendants and their agents, co-conspirators, and others involved in this scheme, wherever such assets may be found, or, with the approval of the Court, dispose of any wasting asset in accordance with the application and proposed order provided herewith.

## VI.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents, and the taking of depositions on 72 hours' notice.

## VII.

Order Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

## VIII.

Order civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(e) of

the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of the Advisers Act

[15 U.S.C. §  80b-9(e)] for their securities law violations.

**IX**.

Order that Stanford, Davis, and Pendergest-Holt immediately surrender their passports to

the Clerk of this Court, to hold until further order of this Court.

**X**.

Order such further relief as this Court may deem just and proper.

For the Commission, by its attorneys:

February 16, 2009                                          Respectfully submitted,

STEPHEN J. KOROTASH
Oklahoma Bar No. 5102
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
DAVID B. REECE
Texas Bar No. 24002810
MICHAEL D. KING
Texas Bar No. 24032634
D. THOMAS KELTNER
Texas Bar No. 24007474

U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)

*SEC v. Stanford International Bank, Ltd., et al.*                                          25
COMPLAINT

ORIGINAL

# CIVIL COVER SHEET

3 09CV0298-L

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFF

SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS

STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, and LAURA PENDERGEST-HOLT

RECEIVED
FEB 17 2009

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: St. John's Antigua, West Indies
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEY (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
David B. Reece
U.S. Securities & Exchange Commission, Burnett Plaza, Ste. 1900,
801 Cherry Street, Unit #18, Fort Worth, TX 76102-6882
(817) 978-6476

ATTORNEYS (If known) CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☒ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☒ 850 Securities Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395FF) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONSL STATUTUES UNLESS DIVERSITY.)

Section 17(a) of the Securities Act of 1933, [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934, [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], Sections 206(1) and 206(2) of the Investment Advisors Act of 1940, [15 U.S.C. §80b-6(1) and §80b-6(2)] and Section 7(d) of the Investment Company Act of 1940 [15 U.S.C. §80a-7(d)].

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23
26 USC 7609

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND ☐ YES ☒ NO

## VIII. RELATED CASE(S) (See Instructions):

IF ANY
JUDGE _____
DOCKET NUMBER _____

DATE 2/16/09

SIGNATURE OF ATTORNEY OF RECORD