## ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 1 7 2009

CLERK, U.S. DISTRICT COURT
By _____
            Deputy
```

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Case No.: |
| v. | § | |
| | § | **3-09CV0298-L** |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT, | § | |
| | § | |
| Defendants. | § | |

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## EX PARTE TEMPORARY RESTRAINING ORDER,
## PRELIMINARY INJUNCTION AND OTHER EMERGENCY RELIEF

## I.    PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission submits this Memorandum of Law in

Support of its Motion for *Ex Parte* Temporary Restraining Order, Preliminary Injunction and

Other Emergency Relief to halt a massive, ongoing fraud orchestrated by Robert Allen Stanford

and James M. Davis and executed through companies they control, Antiguan-based Stanford

International Bank, Ltd. ("SIB"), and its affiliated Houston-based investment advisers, Stanford

Group Company ("SGC") and Stanford Capital Management ("SCM").

### *Certificates of Deposit*

Acting through a network of SGC financial advisers, SIB has sold approximately $8

billion of so-called "certificates of deposit" to investors by promising high interest rates.  SIB

claims that it offers high yields because of its unique investment strategy, which has purportedly

enabled the bank to achieve double-digit returns on its investments over for past 15 years. As further described below, the bank's claims are improbable and unsubstantiated.

Further, SIB and its advisers have misrepresented to CD purchasers that their deposits are safe because the bank: (i) re-invests client funds primarily in "liquid" financial instruments (the "portfolio"); (ii) monitors the portfolio through a team of 20-plus analysts; and (iii) is subject to yearly audits by Antiguan regulators. Recently, as the market absorbed the news of Bernard Madoff's massive Ponzi scheme, SIB told investors that the bank had no "direct or indirect" exposure to Madoff's scheme.

These assurances are false. SIB's investment portfolio was not invested in liquid financial instruments or allocated in the manner described in its promotional material and public reports. Instead, a substantial portion of the bank's portfolio was invested in illiquid investments, such as private equity and real estate. Further, the vast majority SIB's multi-billion dollar investment portfolio was not monitored by a team of analysts, but rather by two people – Allen Stanford and James Davis. And contrary to SIB's representations, the Antiguan regulator responsible for oversight of the bank's portfolio, the Financial Services Regulatory Commission, does not audit SIB's portfolio or verify the assets SIB claims in its financial statements. Finally, SIB has exposure to losses from the Madoff fraud scheme despite the bank's public assurances to the contrary.

SGC has also failed to disclose material facts to its advisery clients. In December 2008, SGC's clearing broker advised SGC that it would no longer facilitate wire transfer requests to SIB on behalf of existing clients who desire to purchase SIB CDs. The clearing broker decided to stop transferring money to the bank because of suspicions about the bank's purported investment returns and the overall lack of "transparency" into the bank's portfolio of

investments.   SGC never disclosed to clients that Pershing refused to transfer client funds to SIB.

During the past several weeks, the Securities and Exchange Commission subpoenaed SIB bank records and witnesses in an effort to account for the $8 billion of investor funds held by the bank.  Among others, the SEC issued subpoenas to Stanford, Davis, and O.Y. Goswick, a SIB board member residing in Texas, who is purportedly responsible for "investments."  None of these witnesses appeared for testimony or produced a single document.  Further, SIB represented that Juan Rodriquez, SIB's president who resides in Antigua, would voluntarily appear in the United States to give sworn testimony to the SEC and account for investor funds.  Mr. Rodriguez failed to appear for testimony.  The SEC did, however, take sworn testimony from Stanford Financial Group's Chief Investment Officer and SIB investment committee member (Laura Pendergest-Holt) and a former Senior Investment Officer (the "SIO").  Neither Ms. Pendergest-Holt nor the SIO could account for the $8 billion entrusted to the bank by its clients.  In fact, Pendergest-Holt and the former SIO could only identify Stanford and Davis as people having knowledge and access to the vast majority of SIB's portfolio.

### Stanford Allocation Strategy

Stanford's fraudulent conduct is not limited to the sale of CDs.  Since 2005, SGC advisers have sold more than $1 billion of a proprietary mutual fund wrap program called Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data.  The false data has helped SGC grow the SAS program from less than $10 million in around 2004 to over $1 billion, generating fees for SGC/SCM (and ultimately Stanford) in excess of $25 million.  And the fraudulent SAS performance was used to recruit

registered financial advisers with significant books of business, who were then heavily incentivized to re-allocate their clients' assets to SIB's CD program.[1]

### *Emergency Relief Is Appropriate*

The SEC has learned that Allen Stanford, on or about February 6, 2009, imposed a "two-month moratorium" on CD redemptions, and instructed SGC advisers that the bank would not honor redemption requests from clients. Moreover, at least one SGC financial adviser misrepresented to a client that the Commission had frozen CD-related accounts for two months. [App. 672-73, 1118]. Finally, last week, SIB's counsel notified the Commission that he was withdrawing as counsel. [App. 1121]. In so doing, SIB's counsel advised the Commission that he and his law firm "disaffirm all prior oral and written representations" regarding Stanford Financial Group and its affiliates. [App. 1122].

The fraudulent scheme is ongoing. SIB is continuing to sell CDs. And SGC/SCM is continuing to sell SAS. Moreover, the vast majority of investor funds have not been accounted for and remain under the control of the Defendants. Investor funds and bank assets need to be located, secured and marshaled by a Receiver for the benefit of investors. Emergency relief is, therefore, necessary and appropriate in this matter.

To protect investors and to halt this fraudulent scheme, the Commission seeks: (1) an *ex parte* temporary restraining order and preliminary injunction against future violations by Defendants; (2) an immediate freeze of all assets of Defendants; (3) an order requiring Defendants to provide an immediate accounting; (4) a repatriation order; (5) an order that Stanford and Davis surrender their passports; (6) an order prohibiting the destruction of records;

---

[1] In addition to the antifraud violations described above, SIB, SGC and SCM violated Section 7(d) of the Investment Company Act, which prohibits foreign investment companies and their underwriters from selling securities in the U.S. without registering with the Commission. Had SIB complied with the law and registered as an investment company, SIB would have been subject to examination by the Commission.

(7) an order expediting discovery; and (8) the appointment of a Receiver to take control of the assets of the Defendants to marshal and preserve assets for the benefit of the investors defrauded by the Defendants.

## II.    **DEFENDANTS**

**Stanford International Bank, Ltd.** purports to be private international bank domiciled in St. John's, Antigua, West Indies. [App. 527, 859, 887]. SIB claims to serve 30,000 clients in 131 countries and holds $7.2 billion in assets under management. [App. 538].[2]   SIB's multi-billion portfolio of investments is managed by the SFG's chief financial officer in Memphis, Tennessee. [App. 058, 388, 936]. Unlike a commercial bank, SIB does not loan money. [App. 50, 668, 862, 1011, 1017]. SIB sells the CD to U.S. investors through SGC, its affiliated investment adviser. [App 668].

**Stanford Group Company,** a Houston-based corporation, is registered with the Commission as a broker-dealer and investment adviser. [App. 585]. SGC has offices located throughout the U.S., including Dallas, Texas. [App. 928, 945]. SGC's principal business consists of sales of SIB-issued securities, marketed as "certificates of deposit." [App. 590, 668]. SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by Robert Allen Stanford ("Stanford"). [App. 46, 586, 942].

**Stanford Capital Management**, a registered investment adviser [App. 585], took over the management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007. Stanford Capital Management markets the SAS program through SGC. [App. 679].

**Robert Allen Stanford,** a U.S. citizen, is the Chairman of the Board and sole shareholder of SIB and the sole director of SGC's parent company. [App. 46, 76, 586, 881-82].

---

[2]      SIB's Annual Report for 2007 states that SIB has 50,000 clients [App. 859].

**James M. Davis,** a U.S. citizen and resident of Baldwin, Mississippi and who offices in Memphis, Tennessee and Tupelo, Mississippi, is a director and chief financial officer of SFG and SIB. [App. 80, 881-82].

**Laura Pendergest-Holt** is the Chief Investment Officer of SIB-affiliate Stanford Financial Group and a member of SIB's investment committee.  [App. 31, 74-75, 524].  She supervises a group of analysts in Memphis, Tupelo, and St. Croix who "oversee" performance of SIB's "Tier II" assets.  [App. 80-81].

## III.   STATEMENT OF FACTS

### A.   The Stanford Empire

Allen Stanford has created a web of affiliated companies that exist and operate under the brand Stanford Financial Group ("SFG").  [App. 926-37].  According to the company's website, SFG is a privately-held group of companies that has in excess of $50 billion "under advisement." [www.stanfordfinancial.com].

SIB, one of SFG's affiliates, is a private, offshore bank that purports to have an independent Board of Directors, an Investment Committee, a Chief Investment Officer and a team of research analysts.  [App. 524, 882, 895].  While SIB is domiciled in Antigua, a small group of SFG employees who maintain offices in Memphis, Tennessee, and Tupelo, Mississippi, purportedly monitor the bank's assets.  [App. 80-81, 388].

SIB is operated by a close-nit circle of Stanford's family, friend and their confidants.  For example, Davis was Stanford's college classmate at Baylor University in the 1970s.  SIB's Board of Directors includes Davis, Stanford, Stanford's father James A. Stanford, and O.Y. Goswick, a Stanford family friend from Mexia, Texas, whose business experience includes cattle-ranching and car sales.  [App. 882, 899].  SIB's investment committee, which is purportedly responsible

for the management of the bank's multi-billion dollar portfolio of assets, is comprised of Stanford, Stanford's father, Davis, Goswick and Laura Pendergest-Holt. [App. 524]. Pendergest-Holt, who became acquainted with Davis at their church in Baldwin, Mississippi, joined SFG in 1997, after graduating from Mississippi State University with a master's degree in mathematics. [App. 73]. Prior to joining SFG, Pendergest-Holt had no experience in the financial services or securities industries. [App. 73].[3] Based on these relationships, and the fact that Stanford is the sole shareholder of SIB and SGC, it appears that Stanford is subject to little or no independent oversight.

### B. **Stanford International Bank**

As of November 28, 2008, SIB reported $8.6 billion in total assets. [App. 541]. SIB's primary product is the CD. [App. 74, 403, 590, 668-70].[4] SIB aggregates customer deposits, and then purportedly re-invests those funds in a "globally diversified portfolio" of assets.

For almost fifteen years, SIB represented that it has experienced consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993):

---

[3] Further, Ken Weeden holds the title of Managing Director-Research and Investments. He supervises a group of "analysts" that work in Memphis and Tupelo. Weeden reports to Pedergest-Holt, who is Weeden's sister-in-law. [App. 588]. Davis' son, and at least one of his college classmates, are research analysts whose responsibilities include, in part, oversight of a small portion of SIB's portfolio of assets.

[4] SIB sold more than $1 billion in CDs per year between 2005 and 2007, including sales to U.S. investors. The bank's deposits increased from $3.8 billion in 2005, to $5 billion in 2006, and $6.7 billion in 2007. [App. 856]. SIB markets CDs to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement. In connection with the private placement, SIB filed a Form D with the Commission. [App. 668, 906-12].



[App. 345, 670, 1030].

Since 1994, SIB claims that it has never failed to hit targeted investment returns in excess of 10%.  [App 407, 590].  And, SIB claims that its "diversified portfolio of investments" lost only $110 million or 1.3% in 2008.  [App. 541].  During the same time period, the S&P 500 lost 39% and the Dow Jones STOXX Europe 500 Fund lost 41%.  *Id.*

SIB's historical returns are improbable, if not impossible.  After reviewing SIB's returns on investment over ten years, a performance reporting consultant hired by Stanford characterized SIB's performance as "not possible – almost statistically impossible."  [App. 159-150].  Further, in 1995 and 1996, SIB reported identical returns of 15.71%, a remarkable achievement considering the bank's "diversified investment portfolio."  [App. 345, 670]   According to Pendergest-Holt, it is "improbable" that SIB could have managed a "globally diversified" portfolio of investments so that it returned identical results in consecutive years.  [App. 106].  Likewise, the above-referenced performance reporting consultant believes that it is "impossible" to achieve identical results on a diversified investment portfolio in consecutive years.   [App.

151]. Nonetheless, SIB continues to promote its CDs using these improbable/implausible returns. [App 345, 590, 670].

SIB's consistently high returns of investment have enabled the bank to pay a significantly higher rate on its CD than conventional banks. [App. 531, 533]. For example, SIB offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed rate CD based on an investment of $100,000. [App. 668]. On November 28, 2008, SIB quoted 5.375% on a 3-year Flex CD, while comparable U.S. Banks' CDs paid under 3.2%. [App. 541].

SIB's extraordinary returns have also enabled the bank to pay disproportionately large commissions to SGC for the sale of SIB CDs. [App. 591, 669].[5] SGC receives a 3% fee from SIB on sales of CDs by SGC advisers. [App. 591]. Financial advisers receive a 1% commission upon the sale of the CDs, and are eligible to receive as much as a 1% trailing commission throughout the term of the CD. [App. 591, 669]. SGC promoted this generous commission structure in its effort to recruit established financial advisers to the firm. [App. 669]. The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to United States investors, and aggressively expanded its number of financial advisers in the United States. *Id.*

SIB purportedly managed the investment portfolio from Memphis and Tupelo. SIB's investment portfolio, at least internally, was segregated into three tiers: (a) cash and cash equivalents ("Tier 1"), (b) investments with "outside portfolio managers (25+)" that are monitored by the Analysts ("Tier 2"), and (c) unknown assets under the apparent control of Stanford and Davis ("Tier 3"). [App. 31, 586]. As of December 2008, Tier 1 represented approximately 9% ($800 million) of the bank's portfolio. [App. 586]. Tier 2, prior to the bank's

---

[5] In 2007, SIB paid to SGC and affiliates more than $291 million in management fees and commissions from CD sales, up from $211 million in 2006. [App. 869-870].

decision to liquidate $250 million of investments in late 2008, represented approximately 10% of the portfolio. [App. 586]. And Tier 3 represented 80% of the bank's investment portfolio. [App. 586].

C.   **SIB's Fraudulent Sale of CDs**

1.   ***SIB Misrepresented that Its Investment Portfolio is Invested Primarily in "Liquid" Financial Instruments.***

In selling the CD, SIB touts the liquidity of its investment portfolio. [App. 85, 352]. For example, in its CD brochure, SIB emphasizes the importance of liquidity, stating, under the heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." [App. 528].[6]

In its 2007 annual report, which was signed and approved by Stanford and Davis [App. 881], SIB represented that its portfolio was allocated in the following manner: 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. [App. 871]. These allocations were depicted in a pie chart [App. 871], which was approved by Stanford and Davis. [App. 881].

---

[6]      Likewise, the bank trained SGC advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." [App. 1040].



[App. 871]

SIB's investment portfolio is not, however, invested in a "well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Instead, a significant portion of the bank's portfolio is invested in illiquid investments – namely private equity and real estate. [App. 97, 588]. In fact, in 2008, the bank's portfolio included at least 23% private equity. [App. 1123-24]. The bank never disclosed in its financial statements its exposure to private equity and real estate investments.[7] [App. 504, 871].

Further, on December 15, 2008, Pendergest-Holt met with her team of analysts by teleconference following the bank's decision to liquidate more than 30% of its Tier 2 investments (approximately $250 million). [App. 587-88]. During the meeting, at least one analyst expressed concern about the amount of liquidations in Tier 2, asking why it was necessary to liquidate Tier 2, rather than Tier 3 assets, to increase SIB's liquidity. *Id.*

---

[7]     One of the bank's analysts candidly admitted that including private equity and real estate in the Equity allocation "does not make sense." [App. 589].

Pendergest-Holt told the analyst that Tier 3 was primarily invested in private equity and real estate and that Tier 2 was "more liquid" than Tier 3.[8]  [App. 97, 587-88].

### 2. SIB Misrepresented that Its Multi-Billion Dollar Investment Portfolio is Monitored By a Team of Analysts

Prior to making their investment decision, prospective investors routinely asked how SIB safeguarded and monitored its assets. [App. 37]. In fact, investors frequently inquired whether Allen Stanford could "run off with the [investor's] money." *Id.* In response to this question, at least during 2006 and much of 2007, the SIO told investors that SIB had sufficient controls and safeguards in place to protect assets. *Id.* In particular, the SIO was trained by Pendergest-Holt to tell investors that the bank's multi-billion portfolio was "monitored" by the analyst team in Memphis. *Id.* In communicating with investors, the SIO followed Pendergest-Holt's instructions, misrepresenting that a team of 20-plus analysts monitored the bank's investment portfolio. *Id.* In so doing, the SIO never disclosed to investors that the team of analysts only monitor approximately 10% of SIB's money. *Id.* In fact, Pendergest-Holt trained the SIO "not to divulge too much" about oversight of the bank's portfolio because that information "wouldn't leave an investor with a lot of confidence." *Id.* Likewise, Davis instructed the SIO to "steer" potential CD investors away from information about SIB's portfolio. [App. 37, 43].

Contrary to the bank's representation that responsibility for SIB's multi-billion portfolio was "spread out" among 20-plus people, even Pendergest-Holt and the SIO did not know the whereabouts of the vast majority of SIB's investment portfolio. [App. 356]. In fact, the only people that Pendergest and the SIO could identify as knowing the whereabouts of the bulk of SIB's portfolio were Stanford and Davis. [App. 31, 98, 588]. According to Pendergest-Holt, she

---

[8]        Pendergest-Holt also stated that Tier 3 always included real estate.  [App. 588].  Pendergest-Holt's statements contradict what she had previously stated to SIB's senior investment adviser.  [App. 40, 45].

and her team of analysts have never been privy to Tier 1 or Tier 3 investments. [App. 86, 586]. Similarly, the SIO did not have access to the bank's records relating to Tier 3, even though he was responsible, as the bank's Senior Investment Officer, for "closing" deals with large investors, "overseeing the bank's investment portfolio" and "ensuring that the investment side is compliant with the various banking regulatory authorities." [App. 32, 359]. In fact, in preparing the bank's periodic reports (quarterly newsletters, month reports, mid-year reports and annual reports), Pendergest and one of the analysts send to Davis the performance results for Tier 2 investments. [App. 64]. And Davis calculates the investment returns for the aggregated portfolio of assets. *Id.*

### 3. SIB Misrepresented that its Investment Portfolio is Overseen by a Regulatory Authority in Antigua that Conducts a Yearly Audit of the Fund's Financial Statements.

SIB told investors that their deposits were safe because the Antiguan regulator responsible for oversight of the bank's investment portfolio, the Financial Services Regulatory Commission (the "FSRC"), audited its financial statements. [App. 391] But, contrary to the bank's representations to investors, the FSRC does not audit or verify the assets SIB claims in its financial statements. [App. 675]. Instead, SIB's accountant, C.A.S. Hewlett & Co., a small local accounting firm in Antigua is responsible for auditing the multi-billion dollar SIB's investment portfolio.[9] [App. 675, 512, 881]

### 4. SIB Misrepresented that Its Investment Portfolio is Without "Direct or Indirect" Exposure to Fraud Perpetrated by Bernard Madoff.

In a December 18, 2008, letter to investors and a December 2008 Monthly Report, the bank told CD investors that their money was safe because SIB "had no direct or indirect exposure to any of [Bernard] Madoff's investments." But, contrary to this statement, *at least*

---

[9]     The Commission attempted several times to contact Hewlett by telephone. No one ever answered the phone.

$400,000 in Tier 2 was invested in Meridian, a New York-based hedge fund that used Tremont Partners as its asset manager. Tremont invested approximately 6-8% of the SIB assets they indirectly managed with Madoff's investment firm. [App. 1110]. Pendergest-Holt, Davis and Stanford knew about this Madoff exposure. Pendergest-Holt and an analyst were personally notified by Meridian of the Madoff exposure. [App. 1122-1124]. On December 15, 2008, the analyst confirmed the Madoff exposure through a weekly report (entitled "Laura Report") that was typically sent to Pendergest-Holt, Davis and Stanford. The report estimated "a loss of $400k . . . based on the indirect exposure" to Madoff. [App. 1125-1126].

### 5. *Pershing Transparency*

On or about December 12, 2008, Pershing, citing suspicions about the bank's investment returns and its inability to get from SIB "a reasonable level of transparency" into its investment portfolio, informed SGC that it would no longer process wire transfers from SGC to SIB for the purchase of the CD. [App. 675]. Since the spring of 2008, Pershing tried unsuccessfully to get an independent report regarding SIB's financials condition. *Id.* On November 28, 2008, SGC's President, Danny Bogar, informed Pershing that "obtaining the independent report was not a priority." *Id.* Between 2006 and December 12, 2008, Pershing sent to SIB 1,635 wire transfers, totaling approximately $517 million, from approximately 1,199 customer accounts. *Id.*

### C. **SGC and SCM Misrepresented SAS Performance Results.**

From 2004 through 2009, SGC and SCM induced clients, including non-accredited, retail investors, to invest in excess of $1 billion in its SAS program by touting its track record of "historical performance." [App. 679]. SCM highlighted the purported SAS track record in thousands of client presentation books ("pitch books"). [App. 679-681]. For example, the following chart from a 2006 pitch book presented clients with the false impression that SAS

accounts, from 2000 through 2005, outperformed the S&P 500 by an average of approximately

13 percentage points [App. 757]:

| Calendar Year Return *As of July 2006* | | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
| SAS Growth | 12.09% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% |
| S&P 500 | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% |

SCM used these impressive, but fictitious, performance results to grow the SAS program to over

$1 billion in 2008. [App. 679].[10]

The SAS performance results used in the pitch books from 2005 through 2009 were

fictional and/or inflated. Specifically, SCM misrepresented that SAS performance results, for

1999 through 2004, reflected "historical performance" when, in fact, those results were fictional,

or "back-tested", numbers that do not reflect results of actual trading.   [App. 9-12; App. 682-

685].  Instead, SCM, with the benefit of hindsight, picked mutual funds that performed extremely

well during years 1999 through 2004, and presented the performance of those top-performing

funds to potential clients as if they were actual returns earned by the SAS program.[11]  [App.  10-

---

[10]      SGC also used the SAS track record to recruit financial advisers away from legitimate advisory firms who had significant books of business.  [App. 594; 681]  After arriving at Stanford, the newly-hired financial advisors were encouraged and highly incentivized to put their clients' assets in the SIB CD.  [App. 669-670].

[11]      On occasion, the pitch books included disclaimers describing the back-tested performance as hypothetical. These disclaimers were wholly insufficient because they (i) appeared in only some of the pitch books, (ii) were buried in small text at the back of the document, and (iii) did not adequately dispel the misleading suggestion that the advertised performance represented actual trading.  [App.  800-801]

11].   Similarly, SCM used "actual" model SAS performance results for years 2005 through 2006 that were inflated by as much as 4%.[12] [App.  577-582; 681-684; 757].

SCM's management knew that the advertised SAS performance results were misleading and inflated. [*e.g.,* App. 10-13]. From the beginning, SGC/SCM management knew that the pre-2005 track record was purely hypothetical.  [*Id.*].  And, as early as November 2006, SCM investment advisers began to question why their actual clients were not receiving the returns advertised in pitch books. [App. 12-15; 597]. In response to these questions, SCM hired an outside performance reporting expert, to review certain of its SAS performance results.  [App. 111].  In late 2006 and early 2007, the expert informed SCM that its performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points. [App. 122-126].  Moreover, the expert informed SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the SAS performance results over actual client performance.[13]  [App. 123, 152].  Finally, in March 2008, the expert informed SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.[14]  [App. 140-145].

---

[12]     SCM told investors that SAS has positive returns for periods in which actual SAS clients lost substantial amounts. [App. 682-683].  For example, in 2000, actual SAS client returns ranged from negative 7.5% to positive 1.1%.  In 2001, actual SAS client returns ranged from negative 10.7% to negative 2.1%. [*Id.*]. And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%.  [*Id.*] These return figures are all gross of SCM advisory fees ranging from 1% to 2.75%.  [App. 842]  Thus, Stanford's claims of substantial market out performance were blatantly false.  (e.g., a claimed return of 18.04% in 2000, when actual SAS investors lost as much as 7.5%). [App. 682-683].

[13]     During sworn testimony, the expert characterized this "bad math" problem as "fishy," and could not provide any innocent explanation as to why the supposed mathematical errors worked consistently to the favor of the SAS models. [App. 123].

[14]     Despite being informed in early 2007 that its 2006 performance results were materially inflated, SCM continued using inflated results for 2005 until in early 2008 it received irrefutable evidence of the inflated 2005 results. SCM did not inquire into the accuracy of the pre-2005 numbers until the SEC exam staff in early 2009 asked SCM management pointed questions about pre-2005 performance. [App. 131; 681; 684].

Despite their knowledge of the inflated SAS returns, SCM management continued using the pre-2005 track record and never asked the performance expert to audit the pre-2005 performance. [App. 131; 577-582; 681; 684]. In fact, in 2008 pitch books, SCM presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" along side the audited 2005 through 2008 figures. [App. 794]. SCM's outside consultant testified that it was "misleading" to present audited performance figures along side back-tested figures. [App. 154].

Finally, SCM compounded the deceptive nature of the SAS track record by blending the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance. [App. 682; 794]. A sample of this misleading disclosure used in 2008 and 2009 follows:

| Calendar Year Return As of March 2008 | YTD | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 12.40% | 14.68% | 8.82% | 16.16% | 32.84% | -3.33% | 4.32% | 18.04% | 22.59% |
| S&P 500 | -9.44% | 5.49% | 15.79% | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% | 21.04% |

| Annualized Returns (not annualized if less than 1 year) | YTD | 1 year | 3 years | 5 years | 7 years | Since Inception |
|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 0.80% | 9.36% | 15.31% | 11.03% | 12.30% |
| S&P 500 | -9.44% | -5.08% | 5.85% | 11.32% | 3.70% | 2.45% |

Other than the fees paid by SIB to SGC/SCM for the sale of the CD, SAS was the second most significant source of revenue for the firm. In 2007 and 2008, SGC/SCM received approximately $25 million in fees from the marketing of SAS. [App. 680].

## IV.   LEGAL DISCUSSION AND ARGUMENT

Because the Commission is "not … an ordinary litigant, but … a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2nd Cir. 1975). "[W]hen 'the public interest is involved in a proceeding of this nature, [the district court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989), *citing FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982). For example, the Commission does not need to show irreparable injury or a balance of equities in its favor. *Id.*; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2nd Cir. 1990). Nor does the Commission need to demonstrate the lack of an adequate remedy at law, as private litigants must. *See SEC v. Cavanagh*, 155 F.3d 129, 132 (2nd Cir. 1998); *SEC v. Scott*, 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), aff'd *sub nom., SEC v. Cayman Islands Reins. Corp.*, 734 F.2d 118 (2nd Cir. 1984).

Moreover, the ancillary remedy of a freeze order requires a lesser showing than that needed to obtain injunctive relief. *See SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("courts may order a freeze even where the SEC has failed to meet the standard necessary to enjoin future violations"). For example, to obtain an asset freeze, the Commission need not show a reasonable likelihood of future violations. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978). Instead, when there are concerns that defendants might dissipate assets, a freeze order requires only that the court find some basis for inferring a violation of the federal securities laws. *Unifund Sal*, 910 F.2d at 1041. Similarly, it is well-established that the Court has the authority to grant any form of ancillary relief where necessary and proper to effectuate

the purposes of the federal securities laws. *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984), *cert. denied*, 471 U.S. 1053 (1985). Included in the court's equitable powers is the authority to appoint receivers. *See, e.g., SEC v. First Fin. Group*, 645 F.2d 429, 439 (5th Cir. 1981).

### A.     The Defendants Violated the Antifraud Provisions of the Securities Act and Exchange Act.

#### 1.     *Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder.*

Section 17(a) of the Securities Act prohibits the employment of a fraudulent scheme or the making of material misrepresentations and omissions in the offer or sale of a security. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit the same conduct, if committed in connection with the purchase or sale of securities.[15] A violation of these provisions occurs if the alleged misrepresentations or omitted facts were material. Information is material if there is a substantial likelihood that the omitted facts would have assumed significance in the investment deliberations of a reasonable investor. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).

Establishing violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder requires a showing of *scienter*. *Aaron v. SEC*, 446 U.S. 680 (1980). However, actions pursuant to Sections 17(a)(2) and (3) of the Securities Act do not require such a showing. *Id.* *Scienter* is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). *Scienter* is established by a showing that the defendants acted intentionally or with severe recklessness. *See Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965

---

[15]     Even if the investments offered do not exist, the antifraud provisions of the federal securities laws still apply. *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995).

(1981). Stanford, Davis, Pendergest-Holt, and the Stanford corporate defendants violated these antifraud provisions.[16]

### 2. *Defendants' Fraud Was in Connection with Offer or Sale of Security.*

There is little doubt here that the defendants fraud was in connection with the offer, sale or purchase of securities.

### a. Defendants' Clients Sold Other Securities in Order to Purchase CDs.

First, even the "scratch the surface" level of evidence able to be compiled in advance of this emergency motion confirms that defendants fraudulent behavior, statements and omissions concerning SIB's CD program coincided with significant – and successful – efforts to lure investors to convert (*i.e.* sell) their existing securities holdings into investments in SIB's CDs. From August 2008 through December 2008 alone, approximately 50 SGC clients liquidated approximately $10.7 million in stocks, bonds, and other similar securities and invested that money in SIB's CDs. [App. 593]. This sampling, particularly when viewed in light of the heavy incentives SGC gave to its advisers to push SIB's CDs, strongly suggests that the fraudulent behavior outlined above coincided directly with the selling of, at least, millions of dollars in investments that are quintessential securities, such as stock. Accordingly, there can be no serious dispute that Defendants fraudulent conduct was in connection with the offer or sell of securities. *See SEC v. Zandford*, 535 U.S. 813, 825 (2002) (holding that the "in connection with" element is satisfied by "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide").

---

[16]    To the extent the Court concludes that Stanford, Davis and Pendergest-Holt should not be held directly liable for violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the evidence demonstrates that they are liable for aiding abetting violations of those provisions.

### b.      The CD is a security.

In addition to fraud in connection with the *selling* of securities, the defendants' fraud was also in connection with the purchase of securities, i.e., SIB's CDs.  In fact, SIB itself admits that "[b]y making this offering  to Accredited Investors in the United States, SIBL and its officers are subject to certain laws of the United States, including the anti-fraud provisions of the U.S. federal securities laws and similar state laws."  [App. 888]

The Supreme Court has emphasized that all notes – including products such as the "certificate of deposits" sold in this case – are presumed to be securities.  *Reves,* 494 U.S. at 64. This presumption may be rebutted only by a showing that the note bears a strong resemblance to certain enumerated non-securities such as "the note delivered in consumer financing, the note secured by a mortgage on a home, the short term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.  *Reves*, 494 U.S. at 65.  To determine whether such resemblance exists, the Supreme Court has applied a "family resemblance test," instructing that it is necessary to analyze the following four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) the existence of factors which would reduce the risk of the instrument.  *Id.*  Notably, no one factor by itself is dispositive.  *Id.*

A comparison of the instruments deemed to be securities in *Reves* to the current CDs demonstrates that there should "be little difficulty in concluding that the notes at issue here are 'securities:'" *Reves*, 494 U.S. at 67.

| Factor | *Reves* | SIB |
|---|---|---|
| Motivation of Parties | "the Co-Op sold the notes in an effort to raise capital for its general business operations and purchasers bought them in order to earn a profit in the form of interest." *Reves*, 494 U.S. at 67-68. | SIB sold the notes in an effort to raise capital for its general business operations and purchasers buy them in order to earn a profit in the form of interest. |
| Plan of distribution | Notes were "offered and sold to a broad segment of the public, and that is all we have held necessary to establish the requisite 'common trading' in an instrument." | Notes were offered to a broad segment of the public. |
| Public's Reasonable Expectation | "Advertisements for the notes characterized them as 'investments' … and there were no countervailing factors that would have led a reasonable person to question this characterization." *Reves*, 494 U.S. at 68-69. | SIB provides to its U.S. investors, among other things, a document titled "Disclosure Statement U.S. Accredited **Investor** Certificate of Deposit Program.  This document prominently features a page labeled, "SECURITIES INVESTMENT STATEMENT," and refers to the purchase as "an investment decision." |
| Whether some factor such as the existence of another regulatory scheme "significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." | "notes here would escape federal regulation entirely if the [Securities] Acts were held not to apply." *Reves*, 494 U.S. at 69. | Absent securities laws, no federal regulation over fraudulent statements and omissions made in sale of CDs appears to apply. |

Importantly, the *Reves* Court held that if the seller's purpose is to finance substantial investments and the buyer is interested primarily in the profit the instrument is likely to generate, the instrument is likely to be a security. *Id*. at 66.  That is precisely the situation here.  Likewise, when the issuer solicits individuals, as compared to solicitations of sophisticated institutions, that indicates "common trading" and weighs in favor of finding the instrument a security.  Again, that is the case here, where SIB, acting through its affiliated investment adviser and broker-dealer routinely solicits individuals via retail investments.  [App. 593, 668].  Third, the public would reasonably view these instruments as securities investments, particularly where SIB itself

describes them repeatedly as investments and advises clients that the offering of the CDs is subject to the antifraud provisions of the federal securities laws. Importantly, in *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998), the D.C. Circuit Court held that courts should consider instruments to be securities on the basis of public expectations, "even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not securities as used in that transaction."[17]

The only factor that arguably weighs against the conclusion that the CDs are securities concerns the existence of some other risk-reducing system, given that SIB is subject to some regulatory oversight by the Financial Services Regulatory Commission of Antigua. To put it simply, this putative oversight is irrelevant.[18]

First, unlike some earlier lower court decisions, in *Reves*, the United States Supreme Court made it clear that its fourth factor considered the existence of alternate *federal* regulatory system, such as FDIC protection. 494 U.S. at 69. (citation omitted and emphasis added). For example, in evaluating this factor after *Reves*, the Tenth Circuit noted that regulation by a state is not enough. See *also Holloway v. Peat, Marwick, Mitchell & Co.*, 900 F.2d. 1485, 1488 (10th Cir. 1990), *cert. denied*, 498 U.S. 958 (1990) (holding that the Supreme Court in *Reves* clearly required an alternative *federal* regulatory system); *see also Bradford v. Moench*, 809 F. Supp.

---

[17]     In *Stoiber*, the D.C. Circuit Court noted that the Supreme Court in *Reves* described this factor as "a one-way ratchet" that "allows notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are. It does not, however, allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws." 151 F.2d at 751.

[18]     The Commission has noted elsewhere certain facets of the FSRC's regulatory role. The question is not whether the FSRC carries out those prescribed responsibilities, but whether that oversight – as designed – "virtually guarantees" the full recovery of deposits. In evaluating that question, it is worth noting how the administrator and chief executive of the FSCR was quoted late last week in the press, when he described his agency's new approach to overseeing SIB's activities: "it's not a Friday afternoon cocktail *anymore* …." (emphasis added).

1473, 1483 (D. Utah 1992) (following *Holloway* decision and holding Utah regulatory system cannot serve as risk reducing factor).[19]

As the Supreme Court made clear in *Marine Bank*, a certificate of deposit does not invariably fall outside the definition of a 'security' and "each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank*, 455 U.S. 551 n.11 (1982). Here, the factual setting weighs strongly in favor of subjecting SIB's CDs to the federal securities laws. There simply is nothing here suggesting that the regulatory oversight provided by Antigua comes close to providing the "virtual guarantee" of repayment the holder of the particular CD at issue in *Marine Bank* or *Wolf* had, in contrast to an ordinary long-term debt holder who assumed the risk of the borrower's insolvency. Here, SIB's CDs have no FDIC protection, or any insurance protection from any Antiguan regulatory or government authority.[20]

Indeed, SIB itself admits in various offering documents that its customers assume the risk of SIB's insolvency, stating in substance that "the ability of SIB to repay principal and interest

---

[19]     The Commission recognizes that several circuits, including the Fifth Circuit, have concluded – prior to *Reves* and under significantly different circumstances – that certain certificates of deposit should not be considered "securities" under the Securities Act and Exchange Act. *See Wolf v. Banco Nacional de Mexico*, S.A., 739, F.2d 1458 (9th Cir. 1984), *cert. denied*, 469 U.S. 1108 (1985); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985); *Tafflin v. Levitt*, 865 F.2d 595 (4th Cir. 1989), *aff'd on other grounds*, 493 U.S. 455 (1990 (Pre-Reves)) (holding that certificates of deposit which were regulated by the banking system of Mexico or a state in the United States were not securities.). Due to the emergency nature of this request and because, regardless of how the Court applies Reves to SIB's CDs, it is clear that defendants fraudulent conduct was, as discussed above, in connection with the selling of securities, the Commission has not extensively addressed why those pre-Reves cases do not control here. Likewise, we have not addressed here the question of whether SIB's products could be considered "investment contracts" covered by the federal securities laws. Should the Court wish additional briefing on that issue, the Commission is prepared to provide it.

        It should be noted, however, that the Commission – the primary agency responsible for determining whether the securities laws cover certain instruments – has applied the Securities Act to instruments the offering party claimed were similar to certificates of deposits, despite the existence of certain oversight by a foreign regulator. *See In the Matter of State Bank of Pakistan*, Admin Proc. File No. 3-7727, 1992 SEC Lexis 1041 (May 6, 1992)

[20]     This lack of refund guarantee is only exacerbated by SIB's attempts to lull investors with various claims of "insurance" that do not provide protection to the investor.

---

on the CD Deposits is dependent on our ability to successfully operate by continuing to make consistently profitable investment decisions" and "you may lose your entire investment." [App. 890]. This is precisely the sort of risks the antifraud provisions and other protections of the federal securities laws were designed to address.

### 3. *Defendants Misrepresentations and Omissions Were Material.*

The misrepresentations to and information withheld from investors in this case concern, among other things, the disposition of offering proceeds, the security of investment principal, the returns associated with the investment, and the liquidity of the investment. These issues go to the core of an individual's investment decision. There is a substantial likelihood that these false representations and omissions would have assumed actual significance in the investment deliberations of a reasonable investor. They are therefore material. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (misleading statements and omissions concerning the use of money raised from investors were material as matter of law); *see also United States v. Siegel*, 717 F.2d 9, 14-15 (2d Cir. 1983) (holding that failure to disclose the misappropriation of more than $100,000 was a fact which would be important to a stockholder in his decision making).

### 4. *The Defendants Acted With Scienter*

In making their material misstatements and omissions, the Defendants acted with *scienter*, which is a mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder, et al.*, 425 U.S. 185, 193 (1976).[21] Here, the misrepresentations go to the core of the investment model marketed to investors. Selling investments marketed as highly

---

[21]     A violation of Section 17(a)(1) of the Securities Act also requires a showing of scienter. However, the U.S. Supreme Court has held that scienter need not be shown in order to establish violations of Sections 17(a)(2) and (3) of the Securities Act. *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

liquid, but which were in fact heavily invested in illiquid private equity and real estate, while knowing that only two people actually knew the portfolio allocation and kept that information under lock and key is, at a minimum, severely reckless. Indeed, this action speaks of a high degree of *scienter*. Moreover, the actions of controlling individuals, and therefore their *scienter*, are attributable to the controlled company. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1094 (2d Cir. 1971).

> **B.     Stanford, SGC and SCM Violated, and Davis and Pendergest-Holt Aided and Abetted Violations of, the Antifraud Provisions of the Investment Advisers Act of 1940.**

Through their deceitful and fraudulent conduct in selling the CDs and SAS, Defendants violated the antifraud provisions of the Investment Advisers Act. This is true, even if the Court, for the sake of argument, determines that the defendants' fraud was not in connection with the offer, sale or purchase of securities for purposes of Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act.

> *1.     Section 206 Imposes a Fiduciary Duty on Defendants Prohibiting Defendants Fraudulent Conduct*

Sections 206(1) and 206(2) of the Advisers Act (15 U.S.C. §§ 80b-6(1) & 80b-6(2)), prohibit an investment adviser from defrauding any client or prospective client by, directly or indirectly, employing any device, scheme, or artifice to defraud or engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client. While *scienter* is required to establish a violation of Section 206(1), negligence alone is sufficient to establish fraud liability under Section 206(2). *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963); *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981). Unlike the antifraud provisions of the Securities Act and the Exchange Act, Sections 206(1) and 206(2) of the Advisers Act do not require that the

activity be "in the offer or sale of any securities" or "in connection with the purchase or sale of any security." SEC v. Lauer, 2008 WL 4372896, *24 (S.D. Fla. September 24, 2008); Advisers Act Release No. 1092, 6 Fed. Sec. L. Rep. (CCH) ¶ 56,156E, at 44,057-7 to 44,058 (Oct. 8, 1987).

Instead, Section 206 establishes federal fiduciary standards to govern the conduct of investment advisers. *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 17 (1979). The fiduciary duties of investment advisers to their clients include the duty to act for the benefit of their clients, the duty to exercise the utmost good faith in dealing with clients, the duty to disclose all material facts, and the duty to employ reasonable care to avoid misleading clients. *SEC v. Capital Gains Research Bureau, Inc. et al.*, 375 U.S. 180, 194 (1983). An adviser has "an affirmative obligation to employ reasonable care to avoid misleading [his or her] clients." *Id. Scienter* is required to establish a violation of Section 206(1) but is not a required element of Section 206(2). *SEC v. Steadman*, 967 F.2d 636, 643 fn.5 (D.C. Cir. 1992) (Section 206(2) violation only requires proof of negligence, not *scienter*).

### 2. *Stanford, SGC and SCM are Investment Advisers Subject to Heightened Fiduciary Duties.*

The definition of an investment adviser in Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), includes "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." SGC/SCM do exactly that on a daily basis. Likewise, Stanford, as control person of both of those entities, satisfies the statutory definition of an investment adviser. *See In re Jay Deforest Moore, et al.*, Investment Advisers Act Rel. No 1548  (Jan. 19, 1996), 61 SEC Docket 544, 545 (charging individual with

direct violations of Sections 206(1) and (2) of the Advisers Act because he "exercised exclusive control over" the firm and, therefore, was the firm's alter ego).

Likewise, Davis and Pendergest-Holt aided and abetted the Adviser Act violations. Aiding and abetting liability requires a showing of: (1) a primary violation; (2) knowledge or a general awareness of the aider and abettor of having played a role in an overall activity that was improper; and (3) knowing and substantial assistance by the secondary violator of the conduct that constitutes the violation. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94-95 (5th Cir. 1975); *In the Matter of Glen Copeland*, (CCH) ¶83,903, at 87,732 (July 5, 1985); *Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir.), *cert. denied*, 449 U.S. 919 (1980). Recklessness satisfies the knowledge requirement, especially as to fiduciaries. *See In the Matter of Kemper Financial Services, Inc.*, Investment Company Act Rel. No. 21113 (June 6, 1995); *SEC v. Washington County Utility District*, 676 F.2d 218, 226 (6th Cir. 1982); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44-47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1039.

Both Davis and Pendergest-Holt knew of the representations made to clients as to the securities that would be purchased to support their CD investment, and in fact, actually trained them to mislead investors. There is no doubt both Davis and Pendergest-Holt knowingly provided substantial assistance to the fraud violations of SBI, SCM and Stanford.

### 3.    *Each of the Defendants Acted with Scienter*

As described in detail above, the defendants intentionally misled their clients. For example, knowing the importance to which investors would assign to the issue of exposure to the Madoff fund, the defendants voluntarily undertook to assure investors that SIB "had no direct or indirect exposure" to any Madoff investments. Pendergest-Holt, Davis and Stanford knew when this statement was made that it was false. In the market environment of December 2008, it is

hard to imagine a more material breach of an investment adviser's heightened duty of care owed to clients.

C.    **SIB and SGC Failure to Register as an Investment Company Violated Section 7(d) of the Investment Company Act of 1940.**

Section 7(d) of the Investment Company Act of 1940 prohibits investment companies organized under the laws of foreign jurisdictions from making a public offering of securities in the United States, except by entry of an order from the Commission permitting registration. *See Investment Funds Institute of Canada* (1996 SEC No. Act. Lexis 334 (March 4, 1996). Both SIB and SGC (acting as SIB's underwriter) were bound by this requirement and failed to register, which was intended to, and had the effect of, shielding SIB's CD program from Commission oversight.

SIB qualifies as an "investment company" under either a "traditional" or an "inadvertent" investment company analysis. The "traditional" investment company is defined by ICA Section 3(a)(1)(A) as any issuer that holds itself out as primarily engaged, or proposes to be primarily engaged, in the business of investing, reinvesting or trading in securities. SIB's primary business is to manage the deposits of its customers, not any commercial banking activity. Moreover, these customer deposits are invested primarily in securities.[22] [App. 867].

Likewise ICA Section 7(d), in addition to prohibiting SIB's offering, prohibits SGC's activities as an underwriter for SIB. SGC acted as an underwriter pursuant to ICA Section 2(40) because of its activities in connection with the sale of SIB's CDs.

---

[22]    Alternatively, SIB also qualifies as an "inadvertent" investment company pursuant to ICA Section 3(a)(1)(C)'s definition of "any issuer which is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposed to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis." In every year since 2004, equity investments have accounted for at least 48 percent of SIB's total assets.

## V.  **APPROPRIATE RELIEF**

### A.  **Injunctive Relief**

In analyzing the need for injunctive relief, courts focus on whether there is a reasonable likelihood that the defendant, if not enjoined, will engage in future illegal conduct. *See, e.g., SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir. 1990); *SEC v. Bonastia*, 614 F.2d 908 (3d Cir. 1980); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100-101 (2d Cir. 1978). In determining the likelihood of future violations, the totality of the circumstances is to be considered. *Murphy*, 626 F.2d at 655. In granting or denying injunctive relief, courts have considered the following factors: (1) the egregious nature of the defendant's actions; (2) the isolated or recurrent nature of the violations; (3) the degree of *scienter* involved; (4) the sincerity of the defendant's assurances, if any, against future violations; (5) the defendant's recognition of the wrongful nature of his conduct;[23] and (6) the likelihood that the defendant's occupation will present opportunities (or lack thereof) for future violations.[24] Additionally, other courts consider the defendant's age and health. *See SEC v. Youmans*, 729 F.2d 413 (6th Cir. 1984); *SEC v. Wash. County Util. Dist.*, 676 F.2d 218, 227 n.19 (6th Cir. 1982); *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied*, 434 U.S. 834 (1977).

Preliminary and permanent injunctive relief against Defendants are appropriate. Their violations were not merely technical in nature, but, rather, lie at the very heart of the remedial statutes.

---

[23]    This consideration is limited in other circuits by *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1219 (D.C. Cir. 1989), in which the Court of Appeals said that "'lack of remorse' is relevant only where defendants have previously violated court orders, *see SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972), or otherwise indicate that they do not feel bound by the law, *see SEC v. Savoy Indus.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978)."

[24]    *See SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982); *see also, SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 100-101 (2d Cir. 1978).

Moreover, Section 20(a) of the Securities Act and Section 21(d)(1) of the Exchange Act authorize the Commission to seek emergency relief when it appears that a person is engaged or is about to engage in acts or practices in violation of the federal securities laws. 15 U.S.C. § 77t(a), 15 U.S.C. § 78u(d)(1). Defendants fraud is ongoing. A temporary restraining order is appropriate under the circumstances.

**B.      Ancillary Relief**

*1.      Asset Freeze*

An order freezing assets is appropriate to ensure that sufficient funds are available to satisfy any final judgment the Court might enter against the Defendants and to ensure a fair distribution to investors. *See, e.g., Manor Nursing Ctrs.*, 458 F.2d at 1106 (freeze of assets pending transfer to trustee); Unifund, SAL, 910 F.2d at 1041-42. An asset freeze as to each defendant's assets is appropriate to assure satisfaction of whatever equitable relief the court ultimately may order and to preserve investor funds. *Id.*; *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978). Additionally, an asset freeze "facilitate(s) enforcement of any disgorgement remedy that might be ordered" and may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *See SEC v. Unifund Sal*, 910 F.2d 1028, 1041 (2d Cir.) *reh'g. denied,* 917 F.2d 98 (1990). It is well recognized that an asset freeze is sometimes necessary to ensure that a future disgorgement order will not be rendered meaningless. *See, e.g., United States. v. Cannistraro*, 694 F. Supp. 62, 71 (D.N.J. 1988), *modified*, 871 F.2d 1210 (3d Cir. 1989); *SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987); *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 881 (S.D. Fla. 1974).

The ancillary remedy of a freeze order requires a lesser showing than that needed to obtain injunctive relief. *See SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y.

2001) ("courts may order a freeze even where the SEC has failed to meet the standard necessary to enjoin future violations"). For example, to obtain an asset freeze, the Commission need not show a reasonable likelihood of future violations. *CFTC v. Muller*, 570 F.2d at 1300. This lower standard results from the recognition that injunctive relief raises the possibility of future liability for contempt; an asset freeze only preserves the *status quo*. *Unifund Sal*, 910 F.2d at 1039. Accordingly, when there are concerns that defendants might dissipate assets, a freeze order requires only that the court find some basis for inferring a violation of the federal securities laws. *Unifund Sal*, 910 F.2d at 1041.

Here, there is a clear basis for fearing dissipation of funds. It appears that $250 million has been liquidated from Tier 2 since December 2008, and the Commission has learned of significant attempts to liquidate the portfolio within the last week. Moreover, not only is there "some basis for inferring a violation of the federal securities laws," for the reasons set out above, the Commission is more than likely to succeed on the merits of its case for antifraud violations.

### 2. *Defendants Should Be Ordered to Preserve Relevant Evidence.*

The Commission seeks an order prohibiting the movement, alteration, and destruction of books and records and an order expediting discovery. Such orders are appropriate to prevent the destruction of key documents and to ascertain what additional expedited relief may be necessary.

### 3. *Expedited Discovery Is Appropriate.*

The Federal Rules of Civil Procedure give District Courts discretion to permit expedited discovery. Defendants are usually given until at least 45 days after the service of a summons and complaint to respond to document requests, Fed. R. Civ. P. 34(b), and 30 days after such service to appear for a deposition, Fed. R. Civ. P. 30(a) or respond to interrogatories, Fed. R. Civ. P. 33(a). But each of these Rules provides that the Court, in its discretion, may shorten these

periods. *See also Gibson v. Bagas Restaurants, Inc.*, 30 Fed. R. Serv. 2d 792, 87 F.R.D 60 (W.D. Mo. 1980) (accelerated discovery is allowable within the discretion of the Court). Moreover, where urgent relief is sought and expedited discovery is needed to accomplish that result, a court may grant accelerated discovery. *See Notaro v. Koch*, 35 Fed. R. Serv. 2d 580, 95 F.R.D. 403 (S.D.N.Y 1982). Expedited discovery is required in this case to enable the Commission more fully to develop the evidence prior to the conduct of a preliminary injunction hearing. The Commission should have the opportunity to supplement a complete evidentiary record prior to the preliminary injunction hearing. Also, expedited discovery is vital to determining the scope of the fraud and the whereabouts of investor funds. Accordingly, the Commission requests depositions on notice of 3 days, with notice provided as noted below.[25]

### 4. *Alternative Service and Notice Provisions*

Rule 4(f)(3) of the Federal Rules of Civil Procedure provides that the Court may authorize alternative means for service of process in foreign countries. The Commission respectfully requests that the Court authorize service upon the defendants by serving them, in the manner described in the Commission's proposed order, by providing notice and service of process on each Defendant by e-mail transmission and by facsimile.

### 5. *Accounting*

The Commission seeks an order requiring Defendants and Relief Defendants to make an immediate accounting. An accounting will enable the Commission to determine more accurately the scope of the fraud and disposition of investor funds. It will help ensure the proper distribution of the assets. *See SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *Manor Nursing Ctrs.*, 458 F.2d at 1105-06. An accounting is particularly justified

---

[25] This is particularly important here because Defendants have not produced any documents during the investigation, and have failed to comply with lawfully issued subpoenas.

because of Tyler's use of investor funds and the Relief Defendants' receipt of property traceable to Tyler's illicit conduct and to investor funds.

### 6.      *Appointment of a Receiver*

As noted above, the defendants in this case have made every effort to deny access to the records and data necessary to enforce the federal securities laws. In addition, many of the funds appear to be easily transferrable outside the United States. A receiver is necessary here to marshal, liquidate and distribute assets to the victims of the defendants' scheme and especially warranted in light of the Defendants' efforts to shield relevant financial data and other key documents from independent review, the recent effort to remove operations from the United States, and recent large liquidations and lying to investors seeking to redeem their CDs.

### 7. *An Order For Passport Surrender Are Appropriate.*

An order for repatriation of funds and records sent offshore and still under the control of the defendants is appropriate. There is evidence that funds and records have been transferred overseas. In addition, based on the defendants' frequent foreign travel, the fact that Stanford maintains vast holdings (including residential real estate) in foreign locales, and Stanford's self-proclaimed dual residency, the Commission seeks an order requiring the defendants to surrender their passports to the court. These orders will ensure the efficacy of whatever equitable relief might ultimately be granted. *See R.J. Allen & Assocs., Inc.*, 386 F. Supp. at 881.

### 8.      *A Repatriation Order is Necessary.*

The Commission also seeks a repatriation order requiring the Defendants to return to identified accounts in the United States, all trading proceeds that may be located outside this Court's jurisdiction. Such equitable relief is appropriate where the Commission is seeking disgorgement in its prayer for relief. *SEC v. R.J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 880-

881 (S.D. Fla. 1974).

Respectfully submitted,

STEPHEN J. KOROTASH
Oklahoma Bar No. 5102
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
DAVID B. REECE
Texas Bar No. 242002810
MICHAEL D. KING
Texas Bar No. 24032634
D. THOMAS KELTNER
Texas Bar No. 24007474

U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)