**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| Plaintiff, | § | **FIRST AMENDED** |
| | § | **COMPLAINT** |
| **v.** | § | |
| | § | Case No.: 3:09-cv-0298-N |
| | § | |
| **STANFORD INTERNATIONAL BANK, LTD.,** | § | |
| **STANFORD GROUP COMPANY,** | § | |
| **STANFORD CAPITAL MANAGEMENT, LLC,** | § | |
| **R. ALLEN STANFORD, JAMES M. DAVIS, and** | § | |
| **LAURA PENDERGEST-HOLT,** | § | |
| | § | |
| Defendants, | § | |
| **and** | § | |
| | § | |
| **STANFORD FINANCIAL GROUP, and** | § | |
| **THE STANFORD FINANCIAL GROUP BLDG INC.,** | § | |
| | § | |
| Relief Defendants. | § | |
| | § | |

Plaintiff Securities and Exchange Commission alleges:

<u>SUMMARY</u>

1.      For at least a decade, R. Allen Stanford and James M. Davis, through companies they control, including Stanford International Bank, Ltd. ("SIB") and its affiliated Houston-based investment advisers, Stanford Group Company ("SGC") and Stanford Capital Management ("SCM"), executed a massive Ponzi scheme. In carrying out the scheme, Stanford and Davis misappropriated billions of dollars of investor funds and falsified SIB's financial statements in an effort to conceal their fraudulent conduct.

2.      Laura Pendergest-Holt, the chief investment officer of Stanford Financial Group ("SFG") and a member of SIB's investment committee, facilitated the fraudulent scheme by

misrepresenting to investors that she managed SIB's multi-billion investment portfolio of assets and employed a sizeable team of analysts to monitor the portfolio.

3.  By year-end 2008, SIB had sold approximately $8 billion of self-styled "certificates of deposits" (the "CD") by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.

4.  Contrary to SIB's public statements, Stanford and Davis, by February 2009, had misappropriated at least $1.6 billion of investor money through bogus personal loans to Stanford and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled by Stanford.

5.  In an effort to conceal their fraudulent conduct and maintain the flow of investor money into SIB's coffers, Stanford and Davis fabricated the performance of the bank's investment portfolio. Each month, Stanford and Davis decided on a pre-determined return on investment for SIB's portfolio. Using this pre-determined number, SIB's internal accountants reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn. SIB's financial statements, which were approved and signed by Stanford and Davis, bore no relationship to the actual performance of the bank's investment portfolio.

6.  In addition to sales of the CD, SGC and SCM advisers, since 2004, have sold more than $1 billion of a proprietary mutual fund wrap program, called Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data. The false data enabled SGC/SCM to grow the SAS program from less than $10 million in 2004 to over $1.2 billion in 2009 and generate fees for SGC/SCM (and ultimately Stanford) in excess of $25 million. The fraudulent SAS performance results were also used to recruit registered financial advisers with significant

books of business, who were then heavily incentivized to re-allocate their clients' assets to SIB's CD program.

7.  By engaging in the conduct described in this Complaint, Defendants directly or indirectly, singly or in concert, have engaged, and unless enjoined and restrained, will again engage in transactions acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] or, in the alternative, have aided and abetted such violations. In addition, through their conduct described herein, Stanford, SGC, and SCM have violated Section 206(1) and (2) of the Investment Advisers Act of 1940 ("Adviser's Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and Davis and Pendergest-Holt have aided and abetted such violations. Finally, through their actions, SIB and SGC have violated Section 7(d) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7(d)].

## JURISDICTION AND VENUE

8.  The investments offered and sold by the Defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)].

9.  Plaintiff Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] to temporarily, preliminarily, and permanently enjoin Defendants from future violations of the federal securities laws.

10.    This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

11.    Defendants have, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.   Certain of the transactions, acts, practices, and courses of business occurred in the Northern District of Texas.

## DEFENDANTS

12.    Stanford International Bank, Ltd. purports to be a private international bank domiciled in St. John's, Antigua, West Indies.   SIB claims to serve 50,000 clients in over 100 countries, with assets under management of approximately $8 billion.   Unlike a commercial bank, SIB claims that it does not loan money.   SIB sells the CD to U.S. investors through SGC, its affiliated investment adviser.

13.    Stanford Group Company, a Houston-based corporation, is registered with the Commission as a broker-dealer and investment adviser.   It has 29 offices located throughout the United States.   SGC's principal business consists of sales of SIB-issued securities, marketed as certificates of deposit.   SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by R. Allen Stanford.

14.    Stanford Capital Management, a registered investment adviser, took over the management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007. SCM markets the SAS program through SGC.

15.     R. Allen Stanford**,** a citizen of the U.S. and Antigua, West Indies, is the chairman of the board and sole shareholder of SIB and the sole director of SGC's parent company.  During the Commission's investigation, Stanford refused to produce documents and information accounting for the bank's multi-billion dollar investment portfolio.

16.     James M. Davis**,** a U.S. citizen and resident of Baldwyn, Mississippi, is a director and chief financial officer of SFG and SIB.  Davis maintains offices in Memphis, Tennessee, and Tupelo, Mississippi.   During the Commission's investigation, Davis refused to provide documents and information accounting for the bank's multi-billion dollar investment portfolio.

17.     Laura Pendergest-Holt, is the chief investment officer of SFG and a resident of Baldwyn, Mississippi.  She was appointed to SIB's investment committee on December 7, 2005. She supervises a group of analysts who "monitor" the performance of a small portion of SIB's portfolio.

## STATEMENT OF FACTS

### Stanford International Bank

18.     Stanford controls a web of private affiliated companies that operate under the name Stanford Financial Group.  Stanford is the sole owner of SFG.

19.     SIB, one of SFG's affiliates, is a private, offshore bank located in Antigua.  SIB purports to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts.

20.     The vast majority of the bank's assets are managed exclusively by Stanford and Davis.  Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants.  Accordingly, SIB, and in turn Stanford and Davis, had no independent oversight over SIB's assets.

21.     As of November 28, 2008, SIB reported approximately $8 billion in total assets. SIB aggregated customer deposits, and then purportedly re-invested those funds in a "globally diversified portfolio" of assets.

22.     SIB sold more than $1 billion in CDs per year between 2005 and 2008, including sales to U.S. investors.

23.     SIB marketed the CD to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement.   In connection with the private placement, SIB filed several Forms D with the Commission.

24.     As indicated by the following chart from SIB's training materials, for almost fifteen years, SIB claimed that it has earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993):



25.     SIB sold the CD using these purported returns on investment.

26.     SIB's purportedly high returns on investment allegedly enabled the bank to pay significantly higher rates on the CD than those offered by U.S. banks.   For example, SIB offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed rate CD based on an

investment of $100,000. On November 28, 2008, SIB quoted 5.375% on a 3-year flex CD, while comparable U.S. bank CDs paid under 3.2%.

27.     SIB paid disproportionately large commissions to SGC for the sale of CDs. SGC received a 3% trailing fee from SIB on sales of CDs by SGC advisers. SGC advisers received a 1% commission upon the sale of the CDs, and were eligible to receive as much as a 1% trailing commission throughout the term of the CD.

28.     SGC used this generous commission structure to recruit established financial advisers to the firm. The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to investors.

29.     In 2007, SIB paid SGC and its affiliates more than $291 million in management fees and CD sales, up from $211 million in 2006.

30.     SIB segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) unknown assets managed by Stanford and Davis ("Tier 3"). As of December 2008, Tier 1 represented approximately 9% ($800 million) of SIB's portfolio. Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of the portfolio. And Tier 3 represented approximately 80% of SIB's investment portfolio.

**SIB's Fraudulent Sale of CDs**

***Stanford and Davis Misappropriated Investor Funds and Fabricated SIB's Financial Statements***

31.     In selling the CD to investors, SIB touted, among other things, the CD's safety and security and SIB's consistent, double-digit returns on its investment portfolio.

32.     In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the bank's] certificate of deposit." SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."

33.     Stanford, Davis and Pendergest-Holt approved the use of the brochure.

34.     Contrary to SIB's representations in the brochure about depositor security, SIB made, with Davis's knowledge, at least $1.6 billion in undocumented "loans" to Stanford. These undocumented loans were never disclosed in SIB's financial statements or other communications with investors.

35.     In an effort to conceal their fraud and ensure that investors continued to purchase the CD, Stanford and Davis fabricated the performance of SIB's investment portfolio.

36.     In SIB's Annual Reports, SIB told investors that the bank earned from its "diversified" investments approximately $642 million in 2007, and $479 million in 2006.

37.     SIB's financial statements, including its investment income, are fictional. In calculating SIB's investment income, Stanford and Davis provided to SIB's internal accountants a pre-determined return on investment for the bank's portfolio. Using this pre-determined number, SIB's accountants reverse-engineered the bank's financial statements to reflect investment income that SIB did not actually earn.

38.     Between February 2 and February 6, 2009, Stanford and Davis admitted, during a meeting with a core group of senior employees (including Pendergest-Holt) in Miami, Florida, that they had misappropriated investor funds and falsified SIB's financial statements.

39.     Incredibly, four days after the Miami meetings, Pendergest-Holt made a two-hour presentation to the Commission's staff – and subsequently testified under oath – regarding the

whereabouts of SIB's multi-billion dollar investment portfolio. During her presentation and testimony, Pendergest-Holt denied any knowledge concerning the status of the vast majority of the bank's assets and failed to disclose that Stanford and Davis had misappropriated investor funds.

### SIB Misrepresented That It Received a Capital Infusion

40.     In its December 2008 Monthly Report, SIB told investors that the bank had received a capital infusion of $541 million on November 28, 2008.

41.     This representation was false. SIB did not receive a capital infusion of $541 million. Instead, Stanford contributed to SIB equity interests in two pieces of real estate that the bank already owned. The real estate was valued at approximately $88.5 million when acquired.

42.     By virtue of their positions on SIB's board of directors and investment committee, Stanford and Davis knew that: (i) Stanford did not make a $541 million capital infusion into SIB; (ii) SIB, not Stanford, owned the real estate; and (iii) the real estates value was approximately $88.5 million, not $541 million.

43.     Stanford, Davis and Pendergest-Holt approved the December 2008 Monthly Report.

### Stanford and Davis Misrepresented the Liquidity of SIB's Investments

44.     In its 2006 and 2007 Annual Reports, SIB told investors that the bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." More specifically, as shown below, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments:



Figure 13. FINANCIAL ASSETS

45.     In its CD brochures, SIB emphasized the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."

46.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisers, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."

47.     Stanford and Davis approved and/or signed the Annual Reports, brochure and training materials.

48.     Contrary to SIB's representations regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities."  Instead, significant portions of the bank's portfolio were misappropriated by Stanford used by him to acquire private equity and real estate.  In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Stanford; (ii) private equity; and (iii) over-valued real estate.

***SIB Trained Financial Advisers to Misrepresent that Its Multi-Billion Dollar
Investment Portfolio was Managed by a Global Network of Portfolio Advisers,
Monitored By a Team of Analysts and Audited by Regulators***

49.      Prior to making investment decisions, prospective investors routinely asked how SIB safeguarded and monitored its assets.  Investors frequently inquired whether Stanford could "run off with the money."

50.      In response to this question, at least during 2006 and much of 2007, Pendergest-Holt trained SIB's senior investment officer ("SIO") to tell investors that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.  In communicating with investors, the SIO followed Pendergest-Holt's instructions, telling investors that SIB's investment portfolio was managed by a global network of money managers and monitored by a team of 20-plus analysts.

51.      Neither Pendergest-Holt nor the SIO disclosed to investors that the "global network" of money managers and the team of analysts did not manage any of SIB's investments and only monitored approximately 10% of SIB's portfolio.  In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIB's portfolio because that information "wouldn't leave an investor with a lot of confidence."  Likewise, Davis instructed the SIO to "steer" potential CD investors away from information about SIB's portfolio.

52.      In addition, the SIO, at Pendergest-Holt's direction, told investors that their deposits were safe because the Antiguan regulator responsible for oversight of the bank's investment portfolio, the Financial Services Regulatory Commission (the "FSRC"), audited its financial statements.

53.      Contrary to SIB's representations to investors, the FSRC did not audit or verify the assets SIB claimed in its financial statements.  Instead, SIB's accountant, C.A.S. Hewlett &

Co., a small local accounting firm in Antigua was responsible for auditing SIB's multi-billion dollar investment portfolio.

### Stanford, Davis and Pendergest-Holt Lied to Financial Advisers

54.     On January 10, 2009, Stanford, Davis and Pendergest-Holt spoke to SIB's Top Performer's Club in Miami, Florida.

55.     During the meeting, Davis stated that SIB was "stronger" than at any time in history.  Stanford, Davis and Pendergest-Holt represented that SIB was secure and built on a strong foundation, and that its financial condition was shored up by capital infusions.

56.     But Davis failed to disclose that he had been informed only days earlier by the head of SIB's treasury that, despite their best efforts to liquidate tier two assets, SIB's cash position had fallen from the June 30, 2008 reported balance of $779 million to less than $28 million.

57.     Stanford and Davis failed to disclose to the attendees that: (i) they had invested SIB funds in a manner inconsistent with offering documents and its own financial statements and (ii) the November 28, 2008 capital infusion was a fiction.

58.     During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIB's investment portfolio.  In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIB's investment portfolio and only monitored approximately 10% of the bank's investments.

59.     Significantly, Stanford, Davis and Pendergest-Holt also failed to disclose that on or about December 12, 2008, Pershing, citing suspicions about SIB's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio,

informed SGC that it would no longer process wire transfers from SGC to SIB for the purchase of the CD.

60. Stanford, Davis and Pendergest knew that SGC advisers would use the information provided to them during the Top Performer's Club meeting to sell the CD.

### SIB Misrepresented That It Had No Exposure to Losses From Madoff-related Investments

61. In the December 2008 Monthly Report, SIB told CD investors that the bank "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

62. Contrary to this statement, Stanford, Davis and Pendergest-Holt knew, prior to the release of the Monthly Report, that SIB had exposure to losses from investments with Madoff.

63. On December 12, 2008 and again on December 18, 2008, Pendergest received e-mails from Meridian Capital Partners, a hedge fund with which SIB had invested, detailing SIB's exposure to Madoff-related losses.

64. On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIB had exposure to Madoff-related losses in two additional funds through which SIB had invested. That same day, Davis, Pendergest-Holt and others consulted with Stanford regarding the bank's exposure to Madoff-related losses.

65. Stanford, Davis and Pendergest-Holt never corrected this misrepresentation.

### SGC and SCM's Fraudulent Mutual Fund Sales

66. From 2004 through 2009, SGC and SCM induced clients, including non-accredited, retail investors, to invest in SAS, a proprietary mutual fund wrap program, by touting a fraudulent track record of "historical performance."

67. SGC/SCM highlighted the purported SAS track record in thousands of client presentation books ("pitch books"). For example, the following chart from a 2006 pitch book

presented clients with the false impression that SAS accounts, from 2000 through 2005, outperformed the S&P 500 by an average of approximately 13 percentage points:

| Calendar Year Return As of July 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|
| SAS Growth | 12.09% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% |
| S&P 500 | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% |

68.     SGC/SCM used these performance results to grow the SAS program to over $1 billion in 2008.

69.     SGC/SCM also used the SAS track record to recruit financial advisers with significant books of business away from competitors.  After arriving at Stanford, the newly-hired financial advisers were incentivized to put their clients' assets in the CD.

70.     Other than the fees paid by SIB to SGC/SCM for CD sales, SAS was the most significant source of revenue for SGC/SCM.   In 2007 and 2008, SGC/SCM received approximately $25 million in fees from the marketing of SAS.

71.     The SAS performance results used in the 2005 through 2009 pitch books were fictional and/or inflated.  SGC/SCM misrepresented that SAS performance results, for 1999 through 2004, reflected "historical performance" when, in fact, those results were fictional, or "back-tested," numbers that did not reflect the results of actual trading.

72.     SGC/SCM, with the benefit of hindsight, picked mutual funds that performed extremely well from 1999 through 2004, and presented the performance of those top-performing funds to potential clients as if they were actual returns earned by the SAS program.

73.     SGC/SCM also used "actual" model SAS performance results for 2005 and 2006 that were inflated by as much as 4 percentage points.

74.     SGC/SCM told investors that SAS had positive returns for periods in which actual SAS clients lost substantial amounts.  In 2000, actual SAS client returns ranged from negative 7.5% to positive 1.1%.  In 2001, actual SAS client returns ranged from negative 10.7% to negative 2.1%.  And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%.

75.     SGC/SCM's management knew that the advertised SAS performance results were misleading and inflated.  And they also knew that the pre-2005 track record was purely hypothetical.

76.     As early as November 2006, SGC/SCM investment advisers began to question why their clients were not receiving the returns advertised in the pitch books.  In response to these questions, SGC/SCM hired an outside performance reporting expert to review the SAS performance results.

77.     In late 2006 and early 2007, the expert informed SGC/SCM that its performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points.  Moreover, the expert informed SGC/SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the purported SAS performance results over actual client performance.  Finally, in March 2008, the expert informed SGC/SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.

78.     Despite its knowledge of the inflated SAS returns, SGC/SCM management continued using the pre-2005 track record and never asked the performance expert to audit the

pre-2005 performance. In fact, in 2008 pitch books, SGC/SCM presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" alongside the audited 2005 through 2008 figures. SGC/SCM's outside consultant testified that it was "misleading" to present audited performance figures alongside back-tested figures.

79. Finally, as indicated the chart below, SGC/SCM blended the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance:

Calendar Year Return
As of March 2008

|  | YTD | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 12.40% | 14.68% | 8.82% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% | 22.59% |
| S&P 500 | -9.44% | 5.49% | 15.79% | 4.91% | 10.86% | 28.68% | -22.10% | -11.88% | -9.11% | 21.04% |

Annualized Returns
(not annualized if less than 1 year)

|  | YTD | 1 year | 3 years | 5 years | 7 years | Since Inception |
|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 0.80% | 9.36% | 15.31% | 11.03% | 12.30% |
| S&P 500 | -9.44% | -5.08% | 5.85% | 11.32% | 3.70% | 2.45% |

80. As evidence by its use of fictional and/or inflated performance results in the pitch books, SGC/SCM knowingly misled investors in connection with the sale of SAS.

## CAUSES OF ACTION

### FIRST CLAIM
### AS TO ALL DEFENDANTS
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

81. Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

82. Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

83. As a part of and in furtherance of their scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, financial statements, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84. Defendants made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

85. For these reasons, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

**SECOND CLAIM**
**AS TO STANFORD, DAVIS, AND PENDERGEST-HOLT**
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5**

86. Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

87. If Stanford, Davis, and Pendergest-Holt did not violate Exchange Act Section 10(b) and Rule 10b-5, in the alternative, Stanford, Davis, and Pendergest-Holt, in the manner set

forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.

88.     For these reasons, Stanford, Davis, and Pendergest-Holt aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
## AS TO ALL DEFENDANTS
## Violations of Section 17(a) of the Securities Act

89.     Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

90.     Defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (i) employed devices, schemes or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

91.     As part of and in furtherance of this scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

93.     For these reasons, Defendants have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM
### AS TO STANFORD, SGC, AND STANFORD CAPITAL
#### Violations of Sections 206(1) and 206(2) of the Advisers Act

94.     Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

95.     Stanford, SGC and SCM, directly or indirectly, singly or in concert with others, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]: (i) have employed, are employing, or are about to employ devices, schemes, and artifices to defraud any client or prospective client; or (ii) have engaged, are engaging, or are about to engage in acts, practices, or courses of business which operates as a fraud or deceit upon any client or prospective client.

96.     For these reasons, Stanford, SGC and SCM have violated, and unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FIFTH CLAIM
### AS TO STANFORD, DAVIS, AND PENDERGEST-HOLT
#### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

97.     Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

98.     Based on the conduct alleged herein, Stanford, Davis, and Pendergest-Holt, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] alleged herein.

99.     For these reasons, Stanford, Davis, and Pendergest-Holt aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### SIXTH CLAIM
### AS TO SIB AND SGC
### Violations of Section 7(d) of the Investment Company Act

100.    Plaintiff Commission repeats and realleges paragraphs 1 through 80 above.

101.    SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

102.    SGC, directly or indirectly, singly or in concert with others, acted as an underwriter for SIB, an investment company not organized or otherwise created under the laws of the United States or of a State that made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

103.    For these reasons, SIB and SGC have violated, and unless enjoined, will continue to violate Section 7(d) of the Investment Company Act [15 U.S.C. § 80a-7(d)].

## RELIEF REQUESTED

Plaintiff Commission respectfully requests that the Court:

### I.

Temporarily, preliminarily and permanently enjoin: (i) Defendants from violating, or aiding and abetting violations of, Section 10(b) and Rule 10b-5 of the Exchange Act; (ii) Defendants from violating Section 17(a) of the Securities Act; (iii) Stanford, Davis, Pendergest-Holt, SGC, and SCM from violating, or aiding and abetting violations of, Sections 206(1) and 206(2) of the Advisers Act; and (iv) SIB and SCG from violating Section 7(d) of the Investment Company Act.

### II.

Enter an Order immediately freezing the assets of Defendants and directing that all financial or depository institutions comply with the Court's Order.  Furthermore, order that Defendants immediately repatriate any funds held at any bank or other financial institution not subject to the jurisdiction of the Court, and that they direct the deposit of such funds in identified accounts in the United States, pending conclusion of this matter.

### III.

Order that Defendants shall file with the Court, and serve upon Plaintiff Commission and the Court, within 10 days of the issuance of this Order or three days prior to a hearing on the Commission's motion for a preliminary injunction, whichever comes first, an accounting, under oath, detailing all of their assets and all funds or other assets received from investors and from one another.

## IV.

Order that Defendants be restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of the Court.

## V.

Order the appointment of a temporary receiver for Defendants, for the benefit of investors, to marshal, conserve, protect, and hold funds and assets obtained by the Defendants and their agents, co-conspirators, and others involved in this scheme, wherever such assets may be found, or, with the approval of the Court, dispose of any wasting asset in accordance with the application and proposed Order provided herewith.

## VI.

Order that the parties may commence discovery immediately, and that notice periods be shortened to permit the parties to require production of documents, and the taking of depositions on 72 hours' notice.

## VII.

Order Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

## VIII.

Order civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for their securities law violations.

**IX**.

Order that Stanford, Davis, and Pendergest-Holt immediately surrender their passports to the Clerk of this Court, to hold until further order of this Court.

**X.**

Order such further relief as this Court may deem just and proper.

Respectfully submitted,

 *s/ David B. Reece*
STEPHEN J. KOROTASH
Oklahoma Bar No. 5102
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
DAVID B. REECE
Texas Bar No. 24002810
MICHAEL D. KING
Texas Bar No. 24032634
D. THOMAS KELTNER
Texas Bar No. 24007474
JASON ROSE
Texas Bar No. 24007946

U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)