**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3-09CV0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

**RECEIVER'S CONSOLIDATED
OPPOSITION TO MOTIONS TO INTERVENE**[1]

BAKER BOTTS L.L.P.

Kevin Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER
RALPH S. JANVEY**

---

[1] Receiver Ralph S. Janvey files this Opposition in response to the Motions to Intervene listed in Exhibit A (Appendix at 1-10). This brief also serves as a supplementary report to the Court on the Receiver's extensive activity related to Stanford customer accounts and plans for further analysis of account freeze issues. The Court requested such a report from the Receiver. Additional information about the Receiver's work and the status of the Receivership is posted on the Receiver's website www.stanfordfinancialreceivership.com, some of which is attached as Exhibit D (Appendix at 20-29).

## TABLE OF CONTENTS

I.   SUMMARY ..................................................................................................................... 2

II.  BACKGROUND ............................................................................................................... 3

   A.  The Securities and Exchange Commission's suit alleging a multi-billion dollar
       fraudulent scheme and the Court's resulting orders ........................................................3

   B.  All of the Motions to Intervene relate to accounts frozen by the Court's orders...........4

   C.  A broad account hold was necessary to preserve assets and protect customers, in
       accordance with the Court's orders ................................................................................6

   D.  The Receiver already has made the vast majority of accounts available for release
       and is developing a certification process for those whose accounts are still frozen......7

       1.  The Receiver has made two broad categories of accounts available for release
           — allowing release of approximately 28,000 of the 32,000 customer accounts .....7

       2.  A continued hold on accounts in the exception categories of the March 12
           Order is necessary and appropriate ......................................................................10

           a.  Accounts associated with people who had involvement in the alleged fraud..10

           b.  Accounts that have at least $250,000 in assets and are associated with the
               allegedly fraudulent activities and proceeds ...................................................12

       3.  The Receiver is developing a certification process for those whose accounts
           remain frozen ........................................................................................................13

III. ARGUMENT AND AUTHORITIES................................................................................. 15

   A.  Intervention is not proper ............................................................................................15

       1.  Intervention is not proper for those with accounts likely to be released through
           the certification process ........................................................................................17

           a.  The Movants' interests are adequately represented in this case ......................17

           b.  The disposition of this action — the work of the Receiver — will not
               impair or impede Movants' ability to protect their property interests.............20

               (1)  Movants have an alternative means to protect their interests ................ 21

               (2)  Temporary impairment does not warrant intervention. ......................... 22

c.   Permissive intervention also fails ....................................................................24

2.   Intervention is not proper for those whose accounts will remain frozen..............25

a.   Necessity of continuing the asset freeze over certain accounts ......................26

(1)   Ponzi scheme pays off early investors at expense of later ones ............ 26

(2)   Equity requires restoration of fraudulent proceeds, sharing of losses ... 27

(3)   A temporary asset freeze is an appropriate interim remedy .................. 29

b.   The continued freeze does not justify intervention..........................................30

3.   Movants failed to attach a pleading setting forth claims and/or defenses .............31

B.   Movants have not established that a modification to the Preliminary Injunction is merited .................................................................................................................................32

C.   The other relief requested by the Movants should also be denied...............................33

IV.   CONCLUSION................................................................................................................ 34

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Baker v. Wade,*
  743 F.2d 236 (5th Cir. 1984) ...............................................18

*Bituminous Cas. Corp. v. Garcia,*
  223 F.R.D. 308 (N.D. Tex. 2004) (Godbey, J.) .....................32

*Black Ass'n of New Orleans Firefighters v. City of New Orleans,*
  853 F.2d 347 (5th Cir. 1988) ...............................................33

*Chamberlain Group, Inc. v. Lear Corp.,*
  No. 05 C 3449, 2007 WL 1238908 (N.D. Ill. Apr. 25, 2007)................16

*Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.,*
  725 F.2d 584 (10th Cir. 1984) .........................................21, 22

*Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs.,*
  736 F.2d 384 (7th Cir. 1984) ...........................................21, 23

*Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch,*
  276 F.3d 187 (4th Cir. 2002) ...........................................28, 30

*Commodity Futures Trading Comm'n v. Lofgren,*
  No. 02 C 6222, 2003 WL 21639118 (N.D. Ill. July 9, 2003) ...........23, 30

*Deus v. Allstate Ins. Co.,*
  15 F.3d 506 (5th Cir. 1994), *cert. denied*, 513 U.S. 1014 (1994)..........20

*Fed. Savings & Loan Ins. Corp. v. Dixon,*
  835 F.2d 554 (5th Cir. 1987) ...........................................22, 23

*FTC v. First Capital Consumer Membership Services, Inc.,*
  206 F.R.D. 358 (W.D.N.Y. 2001)......................................30, 31

*FTC v. Med Resorts Int'l., Inc.,*
  199 F.R.D. 601 (N.D. Ill. 2001)............................................32

*Haspel & Davis Milling & Planting Co. Ltd. v. Bd. of Levee Comm'rs of the Orleans Levee Dist.,*
  493 F.3d 570 (5th Cir. 2007) .......................................15, 17, 18

*Johnson v. City of Dallas*,
    155 F.R.D. 581 (N.D. Tex. 1994) .......................................................................18

*Kneeland v. Nat'l Collegiate Athletic Ass'n*,
    806 F.2d 1285 (5th Cir. 1987), *cert. denied*, 484 U.S. 817 (1987).........................................24

*Nat'l Elevator Indus., Inc. v. Int'l Union of Elevator Constructors*,
    647 F. Supp. 976 (S.D. Tex. 1986) ....................................................................32

*Quilling v. 3D Marketing*,
    No. 3:06-CV-293, 2007 WL 631281 (N.D. Tex. Feb. 28, 2007) ..........................................28

*Quilling v. Schonsky*,
    247 Fed. Appx. 583 (5th Cir. 2007).....................................................................28

*Saldano v. Roach*,
    363 F.3d 545 (5th Cir. 2004), *cert. denied*, 543 U.S. 820 (2004)....................................18, 20

*Scionti v. Dornfried*,
    137 F.3d 1351, No. 97-20408, 1998 WL 92454 (5th Cir. Feb. 11, 1998) ...............................33

*SEC v. Amerifirst Funding, Inc.*,
    No. 3:07-CV-1188-D, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008)...............................27, 29

*SEC v. Behrens*,
    No. 8:08CV13, 2008 WL 2485599 (D. Neb. June 17, 2008) ...............................17, 25, 30, 31

*SEC v. Byers*,
    No. 08 Civ. 7104 (DC), 2008 WL 5102017 (S.D.N.Y. Nov. 25, 2008).....................18, 19, 20

*SEC v. Capital Consultants, LLC*,
    397 F.3d 733 (9th Cir. 2005) ............................................................................29

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)..............................................................................28

*SEC v. Chem. Trust*,
    No. 00-8015-CIV, 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000)........................................28

*SEC v. Cherif*,
    933 F.2d 403 (7th Cir. 1991), *cert. denied*, 502 U.S. 1071 (1992).....................................28

*SEC v. Cogley*,
    No. 98CV802, 2001 WL 1842476 (S.D. Ohio Mar. 21, 2001) ............................................32

*SEC v. Cook*,
    No. 3:00-CV-272, 2001 WL 256172 (N.D. Tex. Mar. 8, 2001)......................................18, 28

*SEC v. Credit Bancorp, Ltd.*,
   290 F.3d 80 (2d Cir. 2002).................................................................................................29

*SEC v. Dowdell*,
   No. 3:01CV116, 2002 WL 31357059 (W.D. Va. Oct. 11, 2002)............................................30

*SEC v. Dowdell*,
   No. 3:01CV116, 2002 WL 236687 (W.D. Va. Feb. 15, 2002)................................................23

*SEC v. Elfindepan, S.A.*,
   No 1:00CV742, 2002 WL 31165146 (M.D.N.C. Aug. 30, 2002) ................................. passim

*SEC v. Everest Mgmt. Corp.*,
   475 F.2d 1236 (2d Cir. 1973)..............................................................................................25

*SEC v. Flight Transp. Corp.*,
   699 F.2d 943 (8th Cir. 1983) ..............................................................................................32

*SEC v. Forex Asset Mgmt. LLC*,
   242 F.3d 325 (5th Cir. 2001) .........................................................................................27, 29

*SEC v. Funding Res. Group*,
   233 F.3d 575, No. 99-10980, 2000 WL 1468823 (5th Cir. Sept. 8, 2000)............20, 21, 22, 23

*SEC v. George*,
   426 F.3d 786 (6th Cir. 2005) .........................................................................................27, 28

*SEC v. Hickey*,
   322 F.3d 1123 (9th Cir. 2003) .......................................................................................22, 23

*SEC v. Homa*,
   No. 99 C 6895, 2000 WL 1468726 (N.D. Ill. Sept. 29, 2000)................................................32

*SEC v. Infinity Group Co.*,
   27 F. Supp. 2d 559 (E.D. Pa. 1998) ...................................................................................28

*SEC v. Mutuals.com, Inc.*,
   No. 3:03-CV-2912, 2004 WL 1629929 (N.D. Tex. July 20, 2004).........................................16

*SEC v. Qualified Pensions, Inc.*,
   No. 95-1746, 1998 WL 29496 (D.D.C. Jan. 16, 1998)....................................................18, 30

*SEC v. SBM Inv. Certificates, Inc.*,
   No. 2006-866, 2007 WL 609888 (D. Md. Feb. 23, 2007)......................................................22

*SEC v. Thorn*,
   No. C:01-CV-290, 2001 WL 1678787 (S.D. Ohio Nov. 16, 2001).........................................23

*SEC v. TLC Invs. & Trade Co.*,
    147 F. Supp. 2d 1031 (C.D. Cal. 2001) ................................................................18

*SEC v. Wozniak*,
    No. 92 C 4691, 1993 WL 34702 (N.D. Ill. Feb. 8, 1993).......................................32

*Stallworth v. Monsanto Co.*,
    558 F.2d 257 (5th Cir. 1977) ................................................................................24

*Swann v. City of Dallas*,
    172 F.R.D. 211 (N.D. Tex. 1997) ..........................................................................20

*Tex. Instruments Inc. v. Tessera, Inc.*,
    192 F.R.D. 637 (C.D. Cal. 2000) ...........................................................................16

*United States v. Durham*,
    86 F.3d 70 (5th Cir. 1996) ...............................................................................27, 29

*United States v. Alisal Water Corp.*,
    370 F.3d 915 (9th Cir. 2004) ................................................................................21

*United States v. Cook*,
    573 F.2d 281 (5th Cir. 1978), *cert. denied*, 439 U.S. 836 (1978)..........................27

*Warfield v. Arpe*,
    No. 3:05-CV-1457, 2007 WL 549467 (N.D. Tex. Feb. 22, 2007) .........................28

*Westridge v. Poydras Props., Inc.*,
    No. 94-3340, 1995 WL 120081 (E.D. La. Mar. 20, 1995) ....................................32

*Yazdchi v. Am. Honda Fin. Corp.*,
    No. 3:05CV0737L, 2005 WL 1943611 (N.D. Tex. Aug. 12, 2005).......................32

## STATUTES

15 U.S.C. § 78u.......................................................................................................32

## OTHER AUTHORITIES

FED. R. CIV. PROC. 24 ......................................................................................... passim

FED. R. CIV. PROC. 65 ........................................................................................15, 34

## RECEIVER'S CONSOLIDATED[2]
## OPPOSITION TO MOTIONS TO INTERVENE

Court-appointed receiver for Defendants, Ralph S. Janvey ("Janvey" or "Receiver"), requests that the Court deny the motions to intervene that have been filed to date.[3]

Since the commencement of this litigation on February 16, 2009 and the Court's initial orders freezing Stanford customer accounts, over forty motions for intervention have been filed by Stanford investors ("Movants"). In the meantime, the Receiver has obtained Court approval to release from the Court's initial freeze orders approximately 28,000 out of 32,000 customer accounts originally frozen. As a result, 23 of the motions to intervene asking for release of accounts are now moot.[4] The Receiver is establishing a certification process for facilitating review of the accounts that remain frozen. This process may result in additional accounts being released and available for transfer. Intervention by Movants at this time is both premature and counterproductive to a fair and orderly administration of the Receivership Estate for the benefit of all victims of the Stanford fraud.

---

[2] The Receiver is filing a consolidated response pursuant to the Court's request at the March 2, 2009 preliminary injunction hearing. *Transc. of Proceedings for Prelim. Inj./TRO Hr'g*, 23:8-11 (March 2, 2009) ("I'd appreciate if on the 16th that you . . . file a consolidated response to any of the motions to leave to intervene that are on file now").

[3] As of Sunday, March 15, 2009, 50 Motions to Intervene have been filed and served on counsel for Receiver. Seven of those motions, filed by Universal Weather & Aviation, Inc., Gagosian Gallery, Inc., U.S. Coins, LLC, North Bay Rare Coin Co., Charles M. Gillis, et al., Ernesto Peña, and the IRS raise different issues and will be addressed separately. Two of those motions have been withdrawn. *Allen H. Johnson, Jr.'s Unopposed Motion to Withdraw Motion to Intervene* (Doc. 161); *Sandra Brewer's Motion to Withdraw Motion to Intervene* (Doc. 131). The motions addressed here are the 41 motions listed in Exhibit A (Appendix at 1-10), all of which (in general terms) relate to the interests of those who were Stanford customers. The Receiver reserves the right to file additional responses to the motions to the extent needed to address particularized issues.

[4] After the Court's order last Thursday authorizing release of additional accounts, the Receiver's team worked throughout the weekend to identify those Movants whose accounts were made available for release. Today, Counsel for Receiver notified the attorneys representing those Movants that the Receiver considers the accounts released and available for transfer and their motions moot.

## I.    SUMMARY

By orders entered on March 2 and 12, 2009, the Court approved the Receiver's proposal to release approximately 28,000 out of 32,000 customer accounts from the freeze orders.  The release rendered moot the 23 motions to intervene that are specified in Exhibit B.[5]  (Appendix at 11-15).  In total, over 60 percent of the Movants' accounts already have been made available for release and transfer.   Movants whose motions have not been obviated by the Court's recent orders generally fall into one of two groups:  (1) those with accounts that remain frozen but with additional information from Movants may be eligible to be released; and (2) those with accounts that will continue to be held because the accounts likely are associated with fraudulent proceeds or activities.   Neither group of Movants should be allowed to become parties to this case — the SEC's enforcement action against the Stanford Defendants.

The Receiver is working diligently to develop and propose to the Court a certification process whereby the Movants (and others with accounts that remain frozen) can provide information to the Receiver to aid in the determination of whether the accounts are associated with fraudulent proceeds or activities.   Through the certification process, Movants and other account holders will be able to make a formal request for the release of their frozen accounts. The Receiver will consider the information and determine whether to release the accounts.  For accounts that the Receiver determines should remain frozen, the Receiver will engage in an alternative dispute resolution process to attempt to address the remaining disputes.  For claims not resolved by ADR, the Receiver's proposal will include mechanisms for the Court to consider challenges to the Receiver's determination that such accounts are property of the Receivership Estate.

---

[5] Another six motions were filed for Movants whose accounts have been made available for release, but those motions also are on behalf of some Movants with accounts that are still frozen.  Exhibit C (Appendix at 16-19). Those motions to intervene also are moot to the extent they relate to accounts available for release.

Allowing intervention by Movants at this time would be wasteful of resources. Particularly since the Receiver is still in the process of marshaling assets, and since Stanford customers will soon have available to them a claims certification and review process, intervention is unwarranted. The asset freeze should continue because it is essential to protect assets from being dissipated, and the Receiver should be given more time to review and analyze accounts associated with persons or proceeds involved in the Stanford fraud.

Movants cannot establish the legal requirements for intervention in the SEC's case against Defendants: (1) they cannot demonstrate that the existing parties do not adequately represent them; (2) their legitimate interests, if any, will not be impaired by the Receiver's work; and (3) their motions do not satisfy the procedure required under Federal Rule of Civil Procedure 24. Nor have the Movants justified permissive intervention. Finally, even if intervention is allowed, Movants have failed to justify a change in the March 2 and 12 preliminary injunctions.

## II.     BACKGROUND

### A.     The Securities and Exchange Commission's suit alleging a multi-billion dollar fraudulent scheme and the Court's resulting orders.

On February 16, 2009, Plaintiff Securities and Exchange Commission ("SEC") commenced this lawsuit against R. Allen Stanford; James M. Davis; Laura Pendergest-Holt; and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC (the "Defendants" or "Stanford Defendants"). The SEC alleges, in its First Amended Complaint filed on February 27, 2009, that Defendants perpetrated a $9 billion fraudulent scheme by: (1) promising high return rates on "certificates of deposits" that exceeded those available through true certificates of deposits offered by traditional banks; and (2) selling a proprietary mutual fund wrap program known as Stanford Allocation Strategy ("SAS") using materially false and misleading historical performance data. *Am. Comp.* ¶¶ 3, 6.

The Court found good cause to believe that Defendants violated federal securities laws and entered a Temporary Restraining Order, Order Freezing Assets, Order Requiring an Accounting, Order Requiring Preservations of Documents, and Order Authorizing Expedited Discovery.  On the same day, the Court appointed Janvey to act as receiver over all the assets of the Defendants and all the entities they own or control.  After a hearing on March 2, 2009, the Court ordered an Agreed Preliminary Injunction as to Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC ("Stanford Entities PI") and an Agreed Preliminary Injunction as to Laura Pendergest-Holt.  And after a hearing on March 12, 2009, the Court entered preliminary injunctions as to R. Allen Stanford and James M. Davis.

Important to the Motions to Intervene at hand, the Court's preliminary injunction against the Stanford entities provides "that all banks, savings and loan associations, savings banks, trust companies, securities broker-dealers, commodities dealers, investment companies, other financial or depository institutions, and investment companies that hold one or more accounts in the name, on behalf or for the benefit of the Entity Defendants . . . are hereby restrained and enjoined, in regard to any such account, from engaging in any transaction in securities . . . or any disbursement of funds or securities pending further order of this Court."  *Stanford Entities PI* ¶ V.

**B.** **All of the Motions to Intervene relate to accounts frozen by the Court's orders.**

Just four days after the Court appointed the Receiver, Stanford investors began filing motions seeking to obtain possession of account assets that are frozen by the Court's orders. Exhibit A identifies the motions that are the subject of this Opposition (Appendix at 1-10).

The Movants all claim to have accounts held in custody at Pershing, LLC or J.P. Morgan Clearing Corp.[6]   Defendant Stanford Group Company was the introducing broker for these accounts.   Stanford Group Company is a registered broker-dealer and investment advisor, with 29 offices located throughout the United States.   Based on information known to date, it appears that Stanford Group Company has more than 32,000 customer brokerage accounts at Pershing and J.P. Morgan, with total assets in excess of $6 billion.   To date, pursuant to the Court's orders, the Receiver has made approximately 28,000 (or more than 85 percent) of those accounts available for transfer.

Under the Court's order all assets in accounts held "in the name, on behalf or for the benefit of the Entity Defendants" are frozen.[7]   *Stanford Entities PI* ¶ V.   The Amended Order Appointing Receiver further orders the Receiver to "[c]ollect, marshal, and take custody, control, and possession" of all assets of the Defendants and the entities they own or control. *Receivership Order* ¶ 5.

Movants' accounts are held in Stanford's name as the introducing broker, and are, therefore, covered by the Court's orders, notwithstanding Movants' allegations to the contrary.[8] Stanford exercised significant control over these accounts.   For example, with limited exceptions, Pershing and J.P. Morgan could only execute transactions in the accounts upon

---

[6] A handful of Movants claim to have accounts at Stanford International Bank and/or Stanford Trust Company. *Kennedy Motion* ¶ 2 (claiming to be customers of Stanford International Bank and Stanford Trust Company); *Garcia Motion* ¶ 4 (claiming to be a customer of Stanford International Bank); *Bernstein Motion* ¶ 6 (claiming to be a trustee of trusts held at Stanford Trust Company).   Because the accounts are held directly by Stanford entities, there is no dispute that these assets are frozen pursuant to the Court's order.

[7] One Movant argues that the freeze was improper because it was a "*de facto* attachment" and not proper under Texas state law. *Ahders Motion* ¶ 17.   This is wrong.   As later discussed, federal courts have broad power to mold equitable relief, including freezing assets that contain potentially fraudulent funds.

[8] Some of the Movants request the Court to enter a declaratory judgment that their accounts are not subject to the Court's orders. *Hannay Motion* ¶ 17; *Gratke Motion* ¶ 14; *Houston Foundation Motion* ¶ 16; *Houston Trust Motion* ¶ 14; *R.L. Nen Motion* ¶ 15; *R.A. Nen Motion* ¶ 14.   For the reasons discussed herein, the Court should find that the accounts are properly frozen under the Court's orders and deny those requests.

Stanford's instructions — not upon the instructions of the Movants.  *Fully Disclosed Clearing Agreement of Pershing LLC*, ¶ 12.1 (Exhibit E, Appendix at 30-63); *see also Bear Stearns Letter Agreement*[9]  ¶ 11(b) (stating that Stanford Group Company is solely responsible for the conduct of the accounts held at J.P. Morgan) (Exhibit F, Appendix at 64-78).

## C.  A broad account hold was necessary to preserve assets and protect customers, in accordance with the Court's orders.

From the day the Court issued its orders, the Receiver was tasked with running Stanford Group Company and protecting the customers' assets.[10]  It was impossible to accomplish both without freezing all the assets and shutting down operations.  Accordingly, the Receiver requested a hold as to all Stanford accounts held in the custody of third parties, including Pershing and J.P. Morgan.  Without this hold, brokers and investment managers — the Stanford employees who in many cases had discretionary authority to control customer accounts — could have transferred millions of dollars from customer accounts.  The Receiver had to take away this ability immediately to protect the customers from anyone who may be involved in the alleged fraud.

Holding the accounts was also the only way to secure proceeds associated with fraudulent products or activities.  At the time, there was no information available to allow the Receiver to readily identify specific accounts associated with fraudulent products or activities.  The Receiver immediately began to attempt to locate information that would allow him, in an automated fashion, to correlate CDs or proceeds from CDs with accounts.  This task, however, has proven difficult, and only recently has the Receiver been able to develop a limited set of data to allow for such a correlation.

---

[9] Bear Stearns was acquired by and is now named J.P. Morgan.

[10] The Receiver's efforts to date are more fully explained in the statements provided by the Receiver at www.stanfordfinancialreceivership.com.

Keeping the customer accounts active and continuing to operate Stanford Group Company also was not an option. The Receiver had to abide by the Court's injunction prohibiting Stanford Group Company from engaging in any transaction in securities, specifically transactions involving the CDs and SAS program at the core of the SEC's allegations. The Receiver could not continue operations and still ensure that the operations would be conducted in accordance with the Court's orders and applicable regulations (which are vast in this highly regulated industry). The Receiver also soon discovered that Stanford had very little cash readily available in comparison to over $165 million in unpaid bills and a multi-million dollar payroll accruing each week. Freezing the accounts and ceasing the operations of Stanford Group Company allowed the Receiver to preserve the status quo of the estate and protect against what would have been the inevitable onslaught of customer demands for the assets before the Receiver could determine which accounts are associated with the fraudulent activities or proceeds.

**D.      The Receiver already has made the vast majority of accounts available for release and is developing a certification process for those whose accounts are still frozen.**

Though the broad account hold was necessary, the Receiver immediately went to work developing information necessary to identify categories of customer accounts and determine which accounts should be made available for release and which should remain frozen. The Receiver's ultimate goal is to allow the prompt release and transfer of all accounts not associated with the alleged fraud. Accordingly, as he has identified those categories of accounts not likely to be associated with the fraud, the Receiver has been requesting that the Court release these accounts from the freeze orders and providing instructions to account holders on how to transfer their accounts to new brokerage firms.

1.    **The Receiver has made two broad categories of accounts available for release — allowing release of approximately 28,000 of the 32,000 customer accounts.**

To date, the Receiver has made two broad categories of accounts available for release from the freeze orders.[11]  First, based on the Receiver's request, on March 5, 2009, the Court authorized the release of Stanford customer accounts located at Pershing that had less than $250,000 in assets as of month-end February 2009, unless they (1) are owned by shareholders and directors of the Defendants, certain employees of Stanford, and all entities owned or controlled by the Defendants; (2) are owned for the benefit of Defendants; (3) contain investment assets that are managed by Defendants; (4) secure unpaid balances owed by customers or non-purpose loans made to customers; or (5) are related to accounts in categories 1 through 4 by social security number, address or other similar indicators.  *Order Authorizing Release of Certain Customer Accounts* (March 5, 2009).   The accounts made available for release under these standards totaled approximately 12,000 and contained aggregate assets of approximately $500 million.

Just a week later, after developing additional information, the Receiver made a second request for release of assets, and on March 12, 2009, the Court authorized a broad release of approximately 16,000 additional accounts containing aggregate assets of approximately $4.1 billion.  *Second Order Authorizing Release of Certain Customer Accounts* (March 12, 2009).  The Order makes available for release all Stanford Group Company customer accounts located at Pershing and J.P. Morgan[12] not previously released under the Court's March 5, 2009 Order,

---

[11] In addition to the releases, on February 23, 2009, the Receiver announced that mutual fund and 529 plan assets of Stanford clients held outside of Stanford's custodial relationships with Pershing and J.P. Morgan were not within the scope of the account hold.  The Receiver found that these accounts were typically held directly in the name of the customer by the mutual fund.

[12] The Receiver also has been diligently analyzing the accounts being held at Stanford Trust Company to determine whether they can be released.  Two Movants have accounts at STC.  *Kennedy Motion* ¶ 2; *Bernstein Motion* ¶ 6.

except those accounts that (1) are owned by an individual Defendant or by any person who, based on records available to the Receiver, had any of the following relationships to any Defendant or to any entity owned or controlled by the Defendants: shareholder, member of the board of directors, member of senior management (as determined by the Receiver in his sole discretion) or registered representative or financial advisor who earned commissions or fees based on certificates of deposit or owed loans to Stanford Group Company; (2) are owned for the benefit of the individual Defendants or Stanford companies; (3) had at least $250,000 in assets as of February 27, 2009 and the Receiver has determined, by utilizing electronic data reasonably available to him through his investigation, may contain proceeds from the allegedly fraudulent products or activities; (4) secure unpaid balances owed by customers or non-purpose loans made to customers; or (5) are related to accounts in categories 1 through 4 by social security number or tax identification number, when available.

Thus, through the Receiver's efforts and without the involvement of any intervenor, approximately 28,000 accounts have been released from the Court's freeze orders and made available for transfer to other brokerage firms.[13]  As directed by the Court's orders, the Receiver has published on the receivership website information concerning the specific steps customers

---

The review of the trust accounts and activity is nearing completion, and in the next several weeks, a process will be developed to transfer the assets and identify a successor trustee(s). Because of the issues relating to trusts, including finding a successor trustee(s) and abiding by instructions left in wills and other trust documents, transferring these accounts will be substantially more complicated and time consuming than transferring the brokerage accounts.  As with the Pershing and J.P. Morgan accounts, however, the Receiver will establish a claims procedure for Movants to seek relief if their accounts remain frozen.

[13] Because of the financial condition of the Stanford entities, the Receiver has determined that Stanford Group Company will not be able to continue operating as a broker-dealer.  Indeed, all Stanford brokers, registered representatives and financial advisors were terminated as of March 6, 2009.  Accordingly, the Receiver has devised a plan to transfer the released accounts.  The Receiver notified customers that they would not be able to gain access to their accounts through Stanford Group Company and worked extensively with clearing agents, brokers, and other interested parties, including but not limited to Pershing, to determine the most expeditious process for allowing customers to transfer their accounts to other institutions so they could have access to and control over their accounts upon release.

with released accounts must follow to transfer their accounts to other brokers and thereby gain access to assets in their accounts.  These approximately 28,000 accounts, more than 85 percent of the original total of accounts, contain almost $4.6 billion worth of assets.

### 2. A continued hold on accounts in the exception categories of the March 12 Order is necessary and appropriate.

The Receiver's intent is to limit the hold of accounts to those that may be associated with the fraud[14] because they either:  (1) are associated with people who potentially had involvement in the alleged fraud; or (2) potentially contain assets associated with fraudulent activities or proceeds  (and  have  a  balance  greater  than  $250,000).[15]   The  Receiver  has  identified approximately 3,500 accounts that fit into one of these two categories.  As described below, the Receiver is developing a certification process by which those with accounts that remain frozen can present additional information to the Receiver to assist in his evaluation of the accounts.  In the meantime, it is necessary and appropriate to hold these accounts.

### a. Accounts associated with people who had involvement in the alleged fraud.

The first two exception categories in the March 12 Order are accounts owned by or for the benefit of those who had involvement in the alleged fraud.  A continued hold on these accounts is consistent with and fundamental to carrying out the Court's Receivership Order to take "possession of the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located . . . of the Defendants and all

---

[14]  The Court has already made findings of fact and conclusions of law that Mr. Stanford engaged in fraudulent conduct "including misappropriating investor funds, and making material misrepresentations and omissions concerning, among other things, SIB's certificate of deposit program, the nature and liquidity of SIB's assets, the existence of related party transactions, purported loans from SIB to Stanford, purported capital infusions into SIB, and the SAS program."  *Preliminary Injunction and Other Equitable Relief as to R. Allen Stanford* ¶ 11.

[15]  Owners of accounts in the fourth exception category in the March 12 order (accounts that contain assets that secure non-purpose and other loans) are no longer covered by the freeze order once the loans are repaid.  The Receiver is encouraging the customers to repay the loans, which will allow the assets to be released.

entities they own or control . . . ."  *Receivership Order* ¶ 1.  The named Defendants are the persons and entities directly alleged to be carrying out the fraud, and a significant portion of all of the Defendants' income (which was undoubtedly used to fund their Pershing and J.P. Morgan investment accounts) is directly connected to the fraudulent products and activities.[16]

It also appears that monies associated with alleged fraudulent activities may have been used to fund entities owned or controlled by the named Defendant companies, thereby necessitating the continued hold on accounts held by those entities as well.  The Stanford Group consists of nearly 200 businesses that are owned or controlled, directly or indirectly, by the named Defendants in this case.  The relationships between and among these entities are extremely complex: many of the companies own portions of other entities; their officers, directors, and key employees often overlap; and based on the Receiver's investigation to date, it appears that significant sums of money were transferred on a regular basis between these entities.  The likelihood that the related entities' accounts hold assets associated with fraudulent activities or products is high, and it will require additional time for the Receiver to fully analyze and decipher these relationships and identify assets associated with the fraud.

The hold also continues as to accounts of those directly involved in the operations of the Stanford entities, including shareholders, members of the board of directors, members of senior management, or registered representatives or financial advisors who earned commissions or fees based on certificates of deposit or owed loans to Stanford Group Company.  Accounts held by these persons are more likely to contain assets associated with the alleged fraud because whether they received shareholder dividends, salaries, or commissions, all of these people received assets potentially generated by entities involved in the alleged fraud — including registered

---

[16] The accounts of Defendants held through other Stanford entities will also continued to be frozen.

representatives and financial advisors who sold the fraudulent CDs and were paid significant commission income for those sales.[17]

A continued hold on these accounts is further justified because many of these persons were in decision-making positions and had influence over the business activities of the Stanford entities. As such, they had a much greater opportunity, and a higher likelihood, of benefiting personally from the fraudulent products and activities. At a minimum, these persons were far more knowledgeable about the activities of the Stanford entities involved in the fraud than any other class of persons with investment accounts through Stanford.

**b.      Accounts that have at least $250,000 in assets and are associated with the allegedly fraudulent activities and proceeds.**

The Receiver also will continue to hold accounts in the third category of accounts excepted from the Court's March 12 Order releasing accounts. The Receiver located information that allows him to identify accounts that are associated with fraudulent proceeds, and he used this information as the basis for his March 12 motion. The Receiver has used three types of data to identify accounts that potentially are associated with fraudulent proceeds:

- The Receiver used information on wire transfers between Pershing and Stanford International Bank dating back to March 2006. Stanford International Bank is the entity that sold the allegedly fraudulent CDs and maintained the CD investment portfolio. Any account associated with these wire transfers has a high probability of being associated with the allegedly fraudulent CDs, and may well contain interest payments or proceeds from redemptions.

- The Receiver used a client-mapping database that allowed him to identify persons who both owned a CD and had an account at either Pershing or J.P. Morgan. These customers are more likely to have sold or received interest payments on the allegedly fraudulent CDs.

- The Receiver also used information that identified persons who held CDs in accounts at Stanford Trust Company who also had accounts at either Pershing or J.P. Morgan.

---

[17] It appears that Stanford used an elaborate and sophisticated incentive program in order to motivate brokers both to sell SIB CD's to bring in new money and to minimize redemptions of SIB CD's previously sold.

Again, these customers are more likely to have sold or received interest payments on the allegedly fraudulent CDs.

Given the amount of assets in these accounts, the Receivership Estate has much more to lose if fraud-tainted assets are released improvidently.  While the Receiver recognizes that some of the holders of these accounts will suffer hardship as a result of the continued freeze, a release of these accounts would be inconsistent with the Receiver's duty to "conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate."  *Receivership Order* ¶ 5(g).

> **3.      The Receiver is developing a certification process for those whose accounts remain frozen.**

Though the Receiver has identified approximately 3,500 accounts associated with the fraudulent activities or proceeds, the Receiver needs more data and time to determine the extent to which the accounts continuing to be held contain fraudulent proceeds.  Accordingly, in addition to continuing his own investigation, the Receiver is developing a certification process to allow those whose accounts remain frozen to provide information to the Receiver and request relief.

The certification process will require the account holder to provide a name, address, account number, and other identifying information and to answer questions regarding the use of their accounts.  These questions will seek information regarding:

- the account holder's ownership of CDs issued by Stanford International Bank;

- the receipt of a redemption of any portion of the principal of a CD issued by Stanford International Bank or the receipt of an interest payment on such a CD; and

- transfers or receipt of funds from Stanford International Bank.

The Receiver is in the process of developing an on-line application that account holders can use to provide the Receiver with the requested information.  The Receiver is working

diligently on this application and the related process and will bring a proposal to the Court as soon as he can responsibly do so.  This on-line application can be established and made available within a week after it is approved by the Court.

After receiving the requisite information, the Receiver will, within a reasonable time, do one of three things:  (1) agree to make the account available for release, (2) deny the request for release, or (3) ask for more information before making a determination.  If the Receiver denies the request for release, the certification process will allow the account holder to seek further review of that denial.  The Receiver anticipates he will offer an alternative dispute resolution process for accounts not released.  The Receiver's proposal also will include mechanisms for consideration by the Court of whether and in what amount assets in these accounts may be used by the Receivership Estate as part of distribution to claimants.

This certification process will allow Movants the same relief they seek by intervening — an opportunity to demonstrate that their accounts are not associated with the fraud and seek release.  The certification process will be far more efficient than allowing thousands of account holders to intervene in the SEC's enforcement action.  And following the certification process, Movants and Receiver will have the ability to litigate their claims to the Court if the Receiver denies release.  It will detrimentally slow the certification process if some are allowed to bypass the procedure and require the Receiver to respond to their requests ahead of those going through the certification process.  In this circumstance, intervention is both unnecessary and not legally proper.

### III.    ARGUMENT AND AUTHORITIES

**A.    Intervention is not proper.**

All of the Motions offer essentially the same reason as to why intervention is proper: the action has affected their property interests in their accounts.[18] This is not a sufficient basis for intervention. Rather, a movant seeking intervention on the basis of a property interest must meet certain requirements, including:

- the applicant's interest must be inadequately represented by the existing parties to the suit; and

- the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest.

FED. R. CIV. PROC. 24(a); *Haspel & Davis Milling & Planting Co. Ltd. v. Bd. of Levee Comm'rs of the Orleans Levee Dist.*, 493 F.3d 570, 578 (5th Cir. 2007) (citing *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984)).[19] If a movant fails to satisfy any one of the requirements, it precludes intervention as a matter of right. *Id.* (citing *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)).

Though some of the Movants also seek permissive intervention under Rule 24(b), permissive intervention is also inappropriate. Federal Rule of Civil Procedure 24(b) gives a court discretion to allow intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact." In exercising its discretion, however, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the

---

[18] Some of the Movants plead that they are intervening pursuant to Federal Rule of Civil Procedure 65. Rule 65, however, does not provide a mechanism by which a party can intervene in an action. To the extent Movants are referring to Rule 65(b)(4), this section no longer applies as the Court now has issued preliminary injunctions.

[19] Two other requirements are also needed before intervention is proper: (1) the application for intervention must be timely, and (2) the movant must have an interest relating to the property or transaction that is the subject of the action. *Haspel & Davis*, 493 F.3d at 578. Timeliness is not at issue here, and the "interests" of the Movants is addressed in footnote 22.

original parties' rights."  FED. R. CIV. PROC. 24(b).  For either intervention as a matter of right under Rule 24(a) or permissive intervention under Rule 24(b), the motion for intervention "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  FED. R. CIV. PROC. 24(c).

The Movants whose accounts are still frozen can be properly divided into two categories: (1) those whose accounts will be released through the certification process; and (2) those whose accounts will remain frozen because of the likelihood that the accounts are associated with the alleged fraud.  Intervention is inappropriate for both categories because the Movants fail to satisfy the requirements of Rule 24.[20]  Their pleading that the action directly affects their rights in property is insufficient.  Many of the Movants do not assert that:  (1) their interests are inadequately represented; or (2) the disposition of the action will impair or impede their property interests.  And none of the Movants can establish that these requirements are met on the facts at hand.  Only a handful of Movants even claim permissive intervention, and those that do fail to establish that it is appropriate.  Allowing intervention would unduly delay and complicate the SEC enforcement action.  Further, none of the Movants submit any pleading that sets forth claims or defenses for which intervention is sought.

Movants' inconvenience, however understandable and real, is shared with thousands of other customers but does not warrant intervention.  For both investors unaffected by the fraud and investors who are victims of the fraud, the Court should deny intervention.

---

[20] Movants are required to meet the requirements of Rule 24 even if they only seek to intervene for the limited purpose of modifying the Stanford Entities PI.  *See SEC v. Mutuals.com, Inc.*, No. 3:03-CV-2912, 2004 WL 1629929, at *1-2 (N.D. Tex. July 20, 2004) (requiring entity seeking to intervene for limited purpose of seeking discovery stay to meet all Rule 24 elements); *Tex. Instruments Inc. v. Tessera, Inc.*, 192 F.R.D. 637, 641 (C.D. Cal. 2000) (requiring entity seeking to intervene for limited purpose of opposing motion for preliminary injunction to meet all Rule 24 elements), *vacated on other grounds*, 231 F.3d 1325 (Fed. Cir. 2000); *Chamberlain Group, Inc. v. Lear Corp.*, No. 05 C 3449, 2007 WL 1238908, at *6 n.3 (N.D. Ill. Apr. 25, 2007) (same).

### 1.    Intervention is not proper for those with accounts likely to be released through the certification process.

The certification process being developed by the Receiver will provide the Movants with the opportunity to seek the release of their accounts.  If what the majority of the Movants plead is true — that their accounts have not been tainted by the fraud — then their accounts will be made available for release.  Allowing Movants whose accounts may be released as a result of the certification process to intervene is pointless and counterproductive.  The most efficient way to handle their requests is through the certification process.  The Movants are just a small percentage of the account holders at Pershing and J.P. Morgan.  And Movants' attempts to cut in line and shortcut the certification process should be rejected.  As one court has held:  "'it is best to consider the question of who owns which assets after they have been marshaled by the Receiver not while the process is ongoing.'"  *SEC v. Behrens*, No. 8:08CV13, 2008 WL 2485599, at *3 (D. Neb. June 17, 2008) (quoting *SEC v. Novus Tech., LLC,* No. 2:07CV0235, 2008 WL 115114 at *4 (D. Utah Jan. 10, 2008)).

### a.    The Movants' interests are adequately represented in this case.

The Receiver provides adequate representation for any interest the Movants have in this litigation.   A party seeking to intervene in an action bears the burden of establishing the inadequate representation requirement of Rule 24.  *Haspel & Davis*, 493 F.3d at 578.  To meet this burden, the proposed intervenor "must show that the representation of his interest by existing parties to the suit may be inadequate."  *Saldano v. Roach*, 363 F.3d 545, 553 (5th Cir. 2004) (internal quotations omitted), *cert. denied*, 543 U.S. 820 (2004).  When the proposed intervenor "has the same ultimate objective as a party to the suit, the existing party is presumed to

adequately represent the party seeking to intervene unless that party demonstrates adversity of interest, collusion, or nonfeasance."[21]  *Haspel & Davis*, 493 F.3d at 578-79 (citations omitted).

The Movants fail to carry their burden of establishing inadequate representation.  Many of the Movants make no allegations whatsoever relating to inadequate representation.  None allege "adversity of interest, collusion, or nonfeasance."  *See id.*  Nor could they.  Their interests are adequately represented by the Receiver, who shares the same "ultimate objective" as they do. *See SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1041-42 (C.D. Cal. 2001); *SEC v. Byers*, No. 08 Civ. 7104 (DC), 2008 WL 5102017, at *1 (S.D.N.Y. Nov. 25, 2008); *see also SEC v. Cook*, No. 3:00-CV-272, 2001 WL 256172, at *2 (N.D. Tex. Mar. 8, 2001) (holding that "a receiver represents not only the entity in receivership, but also the interests of its creditors" because "the very purpose of receivership is to secure the assets of the corporation for ultimate payment to the creditors").

Here, the Receiver's objective is to preserve and return investors' assets to the maximum extent possible.  Courts have held that a receivership is adequate to protect the interests of parties like Movants.  *E.g., TLC Invs. & Trade Co.*, 147 F. Supp. 2d at 1042-43 (denying a request from 700 investors in a Ponzi-type scheme to intervene in an SEC enforcement action because the investors seeking to intervene had the same interests as the other investors, and they all had the same goal as the receiver — to maximize the distributions to the individual investors); *Byers*,

---

[21] Here, adequate representation is presumed on two grounds:  (1) because the Receiver has the same ultimate goal as Movants and (2) because of the involvement of the SEC as Plaintiff in the litigation.  When a government entity is a party, it is presumed that the government adequately represents the interests of the public.  *Baker v. Wade*, 743 F.2d 236, 241 (5th Cir. 1984) (holding that "[a] presumption of adequate representation also arises when the representative is a governmental body or officer charged by law with representing the interests of the absentee"); *Johnson v. City of Dallas*, 155 F.R.D. 581, 586 (N.D. Tex. 1994) (holding that "where, as here, the existing representative in the suit is the government, there is a presumption of adequate representation which may be overcome by the intervenor only upon a showing of adversity of interest, the representative's collusion with the opposing party, or nonfeasance by the representative"); *see also SEC v. Qualified Pensions, Inc.*, No. 95-1746, 1998 WL 29496, at *4 (D.D.C. Jan. 16, 1998) (holding that the SEC adequately represented putative intervenors' interests because, "[a]fter all, the SEC exposed the fraud at the core of . . . this suit . . . [and] is statutorily commissioned to represent the interests of individual investors in the public at large, such as applicants").

2008 WL 5102017, at *1 (denying an investor's motion to intervene in an enforcement action because "[a]lthough not all the investors and creditors share the same interests, it is in all their interests to maximize the value of the assets under the receivership" and that is what the court charged the receiver with doing).

The Receiver adequately represents the Movants' interests.  The Receiver has been in constant contact with Pershing and J.P. Morgan.  The Receiver has hired forensic experts who are working with Pershing and J.P. Morgan to identify brokerage accounts not associated with the fraudulent activities or proceeds.  This process has already resulted in approximately 28,000 customer accounts being approved for release and transfer.  For those accounts that remain frozen, the Receiver has taken steps to maintain the status quo and protect the interests of all Stanford account holders.  Moreover, during the pendency of the freeze, assets in brokerage accounts are safely held in accounts protected by the Securities Investor Protection Corporation. The Receiver's certification process will allow him to hear and respond to Movants' requests in an organized and efficient manner.  The Receiver was appointed to protect the interests of investors, and he is working diligently to do so, because one of the Receiver's primary goals is to increase the pool of money available to satisfy investor claims.

The most efficient way to handle this massive and far-reaching Receivership is to allow the Receiver to do what he was charged to do — maintain control, preserve the assets, and develop a mechanism to respond to claims.  Allowing all the investors to intervene in the enforcement action would destroy any hope for an efficient distribution of assets.  *SEC v. Byers*, 2008 WL 5102017, at *1 (holding that "it would not be efficient or effective to permit individual creditors to intervene as parties").

**b.      The disposition of this action — the work of the Receiver — will not impair or impede Movants' ability to protect their property interests.**

To the extent Movants have legitimate claims to the asserted accounts,[22] the Receiver's work will not impair those interests; indeed, the disposition of this action should serve to preserve or further such interests.[23]    Federal Rule of Civil Procedure 24(a)(2) requires the movant to establish that "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest."   FED. R. CIV. PROC. 24(a)(2); *also Swann v. City of Dallas*, 172 F.R.D. 211, 214 (N.D. Tex. 1997) (citing *United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 413 (5th Cir. 1991)).   "Intervention generally is not appropriate where the applicant can protect its interests and/or recover on its claim through some other means."  *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 526 (5th Cir. 1994), *cert. denied*, 513 U.S. 1014 (1994) (citing *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124-25 (5th Cir. 1970), *cert. denied*, 400 U.S. 878 (1970)).

---

[22] Arguably, most of the Movants do not have an "interest relating to the property or transaction that is the subject of the action," as that requirement is used in Rule 24.  At its core, the SEC's lawsuit is about the Stanford Defendants' fraud.  To satisfy Federal Rule of Civil Procedure 24(a)(2), Movants would have to demonstrate that they have "an interest that is related to the property or transaction that forms the basis of the controversy."  *Saldano*, 363 F.3d 545 at 551 (citations omitted).  The "property" at issue in the underlying lawsuit is the proceeds from the "certificates of deposit and other investment products."  Most of the Movants directly disavow any interest in the proceeds from the fraudulent scheme by claiming that their accounts do not hold any of the proceeds from the Stanford CDs or the SAS program.  Because these Movants disavow any interest in the subject of the underlying action — the proceeds from the fraudulent scheme — they have not met the requirements of Rule 24.  *See SEC v. Funding Res. Group*, 233 F.3d 575, No. 99-10980, 2000 WL 1468823, at *4 n. 8 (5th Cir. Sept. 8, 2000) (finding that intervention was not proper even when the movants claimed an interest in assets subject to a freeze order because a movant "may not bootstrap an impairment caused by the enforcement action of an interest not at issue in the enforcement action into a right to intervene under Rule 24(a)(2)").

[23] Though some of the Movants allege that their interests are being impaired because of the declining value of the securities held in their accounts, this argument lacks merit.  The Receiver has notified all account holders that they can liquidate their assets despite the asset freeze.  Press Statement, Stanford Financial Group Receivership (Feb. 20, 2009), http://www.stanfordfinancialreceivership.com/documents/press_statement.PDF ("[c]urrently, brokerage and advisory account customers can contact their representatives or the Houston headquarters to give instructions to sell securities that are in their accounts").  If Movants are legitimately concerned about the declining value of their securities while the suit is pending, they can liquidate those securities at once.

**(1)** **Movants have an alternative means to protect their interests:
the Receiver is developing a certification process.**

Here, Movants have an alternative means of protecting their interests — they can use the
certification process that is being formulated by the Receiver.  *See Commodity Futures Trading
Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 725 F.2d 584, 586 (10th Cir. 1984) (affirming denial
of motion to intervene by a creditor on the basis that the receiver was in the process of
marshaling the assets and setting up claim procedures); *Commodity Futures Trading Comm'n v.
Heritage Capital Advisory Servs.*, 736 F.2d 384, 386-87 (7th Cir. 1984) (affirming denial of
motion to intervene when the creditor could, among other things, assert its claim in the claims
procedure established by the receiver); *also SEC v. Funding Res. Group*, 233 F.3d 575, No. 99-
10980, 2000 WL 1468823, at *4 n. 9 (5th Cir. Sept. 8, 2000) (noting in affirming the denial of a
motion for intervention that a procedure for distributing the receivership funds would ensue);
*United States v. Alisal Water Corp.*, 370 F.3d 915, 924 (9th Cir. 2004) (affirming the denial of
motion to intervene when the intervenor did not file a timely motion and noting that regardless
the claim procedures established by the receiver allowed the intervenor to protect its assets
without need of intervention).

The Amended Order Appointing Receiver directs the Receiver to "[m]aintain full
control" of and "preserve" the Defendants' assets and grants the Receiver the authority to
contract and negotiate with claimants.  *Receivership Order* ¶ 5.  As outlined above, the Receiver
is formulating an orderly procedure for dealing with claims like those asserted by Movants.  That
procedure, when formulated, will be presented to the Court for approval before implementation.

The Receiver will continue to work as quickly as possible to release more accounts
through the certification process, and neither the interests of the account holders at large, nor
judicial efficiency, will be furthered by Movants' intervention.  As held by the Tenth Circuit, the

claims process is "preferable to having [Movants], and possibly numerous other persons, intervene and become full-fledged parties to the litigation started by the government." *Chilcott Portfolio Mgmt., Inc.*, 725 F.2d at 586.

### (2)   Temporary impairment does not warrant intervention.

A temporary freeze of accounts while the certification process is proceeding is not a sufficient impairment of interest to warrant intervention.  Other courts have so held.  *See, e.g., Funding Res. Group*, 2000 WL 1468823, at *4.

In this case, the magnitude of the alleged fraud, the complexity of Defendants' organization, and the sheer volume of accounts impacted by Defendants' activities made it impossible for the Receiver to effectively marshal and protect the Receivership Estate without casting a wide net.  The Receiver needs the freedom to fully examine the remaining approximately 3,500 accounts and identify the extent to which they are associated with fraudulent products or activities.  Freezing a large number of customer accounts so the Receiver has the opportunity to properly scrutinize each of them protects the interests of both the public and individual customers, as well as the effectiveness of other provisions of the Preliminary Injunctions and Amended Order Appointing Receiver.  *See SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003); *Fed. Savings & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987); *SEC v. SBM Inv. Certificates, Inc.,* No. 2006-866, 2007 WL 609888, at *19 (D. Md. Feb. 23, 2007) (refusing to grant permission to investors to sell assets under a freeze order because any harm the investors "may suffer as a result of the inability to sell [the] assets . . . [was] outweighed by the irreparable harm some investors [would] suffer if no assets remain[ed] when the time [came] for repayment of their investments"); *SEC v. Thorn*, No. C:01-CV-290, 2001 WL 1678787, *5-6 (S.D. Ohio Nov. 16, 2001) (finding continuation of asset freeze over accounts owned and controlled by individual investors proper when it was unclear whether

enough funds existed to cover all the accounts and the SEC was still determining account ownership).[24]

Though the Movants take issue with the breadth of the Court's order freezing the assets, most of the Stanford accounts have now been made available for release, and the temporary impairment caused by the order is necessary while the Receiver attempts make a final determination of whether the accounts that remain frozen contain assets associated with the alleged fraud.[25]   The Fifth Circuit has held that the temporary "impairment" caused by the freezing of assets is not sufficient to support intervention.  *See Funding Res. Group*, 2000 WL 1468823, at *4 and n. 8 (recognizing that the appointment of a receiver and an asset freeze impaired the proposed intervenor's ability to recover funds but holding that they could not "bootstrap an impairment caused by the enforcement action of an interest not at issue in the enforcement action into a right to intervene").

If some Stanford customers are allowed to withdraw assets now — before a determination through the certification process of whether their accounts contain assets associated with the alleged fraudulent activities and proceeds — the risk is high that assets

---

[24] *See SEC v. Dowdell*, No. 3:01CV116, 2002 WL 236687, at *4 (W.D. Va. Feb. 15, 2002) (finding that it was within the court's broad equitable power to freeze "any and all accounts at any financial institution in the name of any one or more of the [] Defendants, and any and all accounts at any financial institution in which any one or more of the [] Defendants [had] signatory authority or a beneficial interest"); *see also Heritage Capital*, 736 F.2d 384 (in which district court appointed receiver to take control over all of investment firm's assets, and temporarily enjoining the disbursement of those assets); *Commodity Futures Trading Comm'n v. Lofgren*, No. 02 C 6222, 2003 WL 21639118, *1 (N.D. Ill. July 9, 2003) (in action initiated after CFTC discovered improprieties in only one commodity pool, court froze the assets in that commodity pool *and another* managed by defendants).

[25] A court has broad and flexible power to mold equitable relief to the particular circumstances of each case. *Dixon*, 835 F.2d at 563 (holding that because the receiver was concerned "with the savings of many depositors, the investments of numerous stockholders, and, in fact, the stability of financial institutions themselves, equity's powers to aid [the receiver] in its endeavors are even broader than for private claims").  These broad powers allow courts to shape equitable remedies as needed to suit the particularized facts of each case and include the ability to enjoin non-parties when necessary to protect the public interest.  *Hickey*, 322 F.3d at 1131 (holding that the district court was authorized to freeze the assets of a non-party "so long as doing so was necessary to protect and give life to" other orders entered against the defendants).

properly belonging in the Receivership Estate for the benefit of all the victims of fraud will be forever lost.

### c.   Permissive intervention also fails.

With little explanation, some of the Movants make an alternative assertion of permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B).[26]  Rule 24(b) permits a court to allow a party to intervene who "has a claim or defense that shares with the main action a common question of law or fact."  This, however, is only a threshold requirement, and even if it is met, a "court must exercise its discretion in deciding whether intervention should be allowed." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 269 (5th Cir. 1977); *also Kneeland v. Nat'l Collegiate Athletic Ass'n*, 806 F.2d 1285, 1289-90 (5th Cir. 1987), *cert. denied*, 484 U.S. 817 (1987).  In deciding whether to grant permissive intervention, the "court may consider, among other factors, whether the intervenors' interests are adequately represented by other parties, and whether intervention will unduly delay the proceedings or prejudice existing parties." *Kneeland,* 806 F.2d at 1289 (internal citations omitted).

Movants fail to meet the threshold requirement of having "a claim or defense that shares with the main action a common question of law or fact." *See* FED. R. CIV. PROC. 24(b)(1)(B). They fail to allege any claims or defenses that they seek to assert in the SEC's enforcement action against the Defendants.  Regardless, even if there is a claim or defense with a common question of law or fact, as previously discussed, the Receiver adequately represents their interests.  And allowing the intervention of thousands of similarly situated investors would cause unnecessary delay in the adjudication of the underlying dispute between the SEC and the Defendants. *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1973) (affirming denial

---

[26]*Paschal/Shapley Motion* ¶ 5; *Rupert Motion* ¶ 13; *Hunton Motion* ¶ 4; *BH1 Memorandum of Law* ¶ 12; *Sigma Motion* ¶ IV; *Wyly Motion* ¶ 5; *Hannay Motion* ¶ 13; *Monday Motion* ¶ 5; *Gratke Motion* ¶ 10; *Houston Foundation Motion* ¶ 12; *Houston Trust Motion* ¶ 10; *R.L. Nen Motion* ¶ 11; *R.A. Nen Motion* ¶ 10.

of motion to intervene in an SEC enforcement action because it would substantially increase the SEC's workload, add additional issues to the enforcement action, and complicate efforts to secure a consent decree); *SEC v. Behrens*, No. 8:08CV13, 2008 WL 2485599, at *3 (D. Neb. June 17, 2008) (finding that allowing an individual investor to intervene in an SEC action would impede settlement "to the detriment of all investors"). This delay is unnecessary. The most efficient way to proceed is to allow the Receiver to continue his investigation and for Movants to seek the release of their accounts through the certification process.

### 2. Intervention is not proper for those whose accounts will remain frozen.

Though the Receiver has made more than 85 percent of the Stanford accounts available for transfer and likely will release more through further investigation and the certification process, some accounts will continue to be held because they contain proceeds alleged to be fraudulent. The Receiver has a duty to retain assets in such accounts. In the J. Prudhomme Motion, for example, the Prudhommes acknowledge that one of their accounts "shares in the SAS product referenced in the Amended Complaint." *J. Prudhomme Motion* ¶ 3 (Doc. 85). In the Matejek Motion, Mr. Matejek states that "some of the accounts contain investments [sic] products offered by the Defendants (e.g. the SIB CD or SAS)." *Matejek Motion* ¶ 1 (Doc. 90). In the Denison Motion, the Denisons recognize that one of their accounts "previously contained a Stanford certificate of deposit." *Denison Motion* ¶ 8, n. 3 (Doc. 129). And in the Garcia Motion, Mr. Garcia notes that one of his accounts contain funds "as Certificate of Deposit." *Garcia Motion* ¶ 1 (Doc. 145). To the extent that these accounts (and others that contained the CDs, the SAS product, or proceeds from either) received funds associated with the alleged fraud,[27] the Receiver needs the freeze of the accounts to continue until he can marshal all the

---

[27] Accounts held at Stanford International Bank, the entity that sold the alleged fraudulent products and maintained the CD investment portfolio, appear, by definition, to contain fraudulent proceeds. Two Movants have accounts

assets and develop a process by which to compensate all the victims of the fraud fairly, including the innocent Movants.[28]

####    a.    Necessity of continuing the asset freeze over certain accounts.

Continuing the asset freeze over certain customer accounts ensures the Court's ability to craft an appropriate final remedy.  As previously discussed, the only accounts that will remain frozen indefinitely are those tainted by the Defendants' fraud.  The law is clear that assets connected to the fraud are properly deemed assets of the Estate.  As such, the Court's retention of temporary control of these accounts is well within its authority.

####    (1)    Ponzi schemes pay off early investors at expense of later ones.

As set forth at length in its amended complaint, the SEC has alleged that Defendants operated "a massive Ponzi scheme." *Am. Comp.* ¶ 1.  The SEC alleges that Defendants lured investors by promising high return rates that greatly exceed those offered by commercial banks in the United States.  *Id.* ¶ 3.  Instead of being placed in legitimate investments, Defendants allegedly used the investor funds to make personal "loans" to Stanford and to fund businesses controlled by Stanford.  *Id.* ¶ 4.  In order to maintain the flow of investor money into the scheme, Defendants allegedly fabricated the performances of their investment portfolio.  *Id.* ¶ 5.  In a typical Ponzi scheme, the money received from new investors is then distributed to the earlier investors to conceal and extend the fraud.  Thus, whatever phony "returns" are paid to the earlier investors come at the direct expense of the later investors.  *See United States v. Cook*, 573 F.2d 281, 282, 282 n.3 (5th Cir. 1978), *cert. denied*, 439 U.S. 836 (1978).

---

with Stanford International Bank, and for the reasons stated herein, intervention is not proper.  *Kennedy Motion* ¶ 2; *Garcia Motion* ¶ 4.

[28] As previously discussed, the Movants can use the certification process to seek relief if they believe their accounts did not receive tainted funds.  If, for example, Movants have accounts where funds were used to purchase a CD but the account never received any redemptions or interest payments from the CD, they can seek release of that account.  Assuming they can verify that the account did not receive tainted funds, the Receiver will release the account.

In such cases, the job of the court-appointed receiver is to unwind the fraud, trace the money contributed by investors to wherever it has come to rest, and draw that money back into the estate for the benefit of all victims.  That process of unwinding the fraud necessarily includes recovering from early investors whatever proceeds of the fraud that have been paid to them in the form of interest, dividends, redemptions, or commissions.  Ultimately, the recovered assets are divided among the victims, typically in proportion to their investments.  *See, e.g., SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 327 (5th Cir. 2001) (upholding pro rata distribution plan); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming district court's approval of pro rata distribution plan); *SEC v. Amerifirst Funding, Inc*., No. 3:07-CV-1188-D, 2008 WL 919546, at *5 (N.D. Tex. Mar. 13, 2008) (approving plan that distributed receivership assets pro rata).

### (2)    Equity requires restoration of fraudulent proceeds, sharing of losses.

Courts administering receiverships have routinely held that non-parties like the Movants have no legitimate right to retain proceeds received from an illegitimate fraudulent scheme.  Such proceeds are considered property of the receivership estate because the assets are traceable to the fraudulent activity, and thus, the non-party has no legitimate claim to ownership of the assets.  *See SEC v. George*, 426 F.3d 786, 798-99 (6th Cir. 2005) (upholding disgorgement order against investors who "received ill-gotten funds and had no legitimate claim to those funds"); *Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch*, 276 F.3d 187, 191-92 (4th Cir. 2002) (noting that federal courts "may order equitable relief" against third party who "(1)

has received ill-gotten funds; and (2) does not have a legitimate claim to those funds"); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (same).[29]

It is, therefore, well settled that the Receivership Estate can bring suit against beneficiaries of the scheme to bring proceeds of the fraud back into the Estate.  *See, e.g.*, *Quilling v. Schonsky*, 247 Fed. Appx. 583, 586 (5th Cir. 2007) (affirming summary judgment against innocent recipient of proceeds of fraud); *Quilling v. 3D Marketing*, No. 3:06-CV-293, 2007 WL 631281, at *3 (N.D. Tex. Feb. 28, 2007) (same); *SEC v. Cook*, No. 3:00-CV-272, 2001 WL 256172, at *2 (N.D. Tex. Mar. 8, 2001) (granting summary judgment for receiver in case to recover commissions paid from proceeds of Ponzi scheme).  Claims will lie even against unwitting participants, such as investors, who receive proceeds from the scheme. *See, e.g.*, *Warfield v. Arpe*, No. 3:05-CV-1457, 2007 WL 549467, at *10-12 (N.D. Tex. Feb. 22, 2007) (holding that court had personal jurisdiction over investors in receiver's suit to recover proceeds of fraud; personal jurisdiction exists wherever assets of estate can be found).[30]

It is important for the Receiver to maintain control of all the possibly tainted assets because the end result may be a pro rata distribution of those assets.  Cash, securities, and other assets that an investor transferred to an entity that defrauds investors in a Ponzi scheme can be included in the entity's receivership estate for purposes of pro rata distribution to the victims. *See Durham*, 86 F.3d at 73 (affirming district court's approval of pro rata distribution plan even

---

[29] *See also SEC v. Elfindepan, S.A.*, No 1:00CV742, 2002 WL 31165146, at *4 (M.D.N.C. Aug. 30, 2002) (same); *SEC v. Chem. Trust*, No. 00-8015-CIV, 2000 WL 33231600, at *11 (S.D. Fla. Dec. 19, 2000) (temporary asset freeze and subsequent disgorgement ordered against innocent depositary because "[i]t is not necessary for the person holding the property to have done anything wrong in order for that person to be required to return the property to its rightful owner"); *see also SEC v. Cherif*, 933 F.2d 403, 414 & n.11 (7th Cir. 1991) (describing remedies available against innocent third parties in enforcement action), *cert. denied*, 502 U.S. 1071 (1992).

[30] *See also George*, 426 F.3d at 798 (upholding disgorgement order against investors who "received ill-gotten funds and had no legitimate claim to those funds"); *SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559, 561-63 (E.D. Pa. 1998) (holding that federal court has subject matter jurisdiction over receiver's claim against investors to recover proceeds of fraud). The receivership estate can recover both interest payments and principal.  *See George*, 426 F.3d at 799.

though the majority of funds were traceable to specific claimants); *Forex Asset Mgmt.*, 242 F.3d at 327 (upholding pro rata distribution plan over objection of investor who claimed his investment could be traced and should not be distributed to other investors).[31]   The fact that assets are traceable to a particular investor creates no superior claim to the money.  *See Durham*, 876 F.3d at 70 (approving pro rata distribution and rejecting investors' tracing argument because "merely fortuitous fact that the defrauders spent the money of the other victims first" does not give investor priority).

### (3)   A temporary asset freeze is an appropriate interim remedy.

In this case, there is evidence that assets in the frozen accounts may have come — not from legitimate investments — but from money belonging to other innocent victims of the Defendants' schemes.   Indeed, some of the Movants *admit* that they have participated in the schemes alleged by the SEC to be fraudulent.   The releases and the certification process, described above, are intended to identify such tainted accounts objectively and efficiently. Stanford customers cannot have any "right" to such assets that is superior to the rights of the other investors.

The Receiver agrees, however, that the Movants whose assets are determined by the Receiver to be associated with the fraudulent activities or proceeds should have the opportunity to challenge that determination, and the Receiver will develop and propose to the Court a process for adjudicating such disputes.   The certification process is a necessary first step towards a process of final adjudication of the status of funds paid to investors and brokers, where such funds are proceeds associated with fraudulent activity.   The Court should maintain the freeze

---

[31]*Also Amerifirst Funding,* 2008 WL 919546, at *5 (approving plan that pooled assets of investors in several fraudulent schemes and distributed funds pro rata so that losses were shared equally); *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 747 (9th Cir. 2005) (noting that, in equitable distribution, whether legal documents identified by investors established them as the title holders of assets is irrelevant); *SEC v. Credit Bancorp, Ltd*., 290 F.3d 80, 88-89 (2d Cir. 2002) (collecting cases imposing pro rata distribution).

until final determinations are made on this issue. *See, e.g.*, *SEC v. Kimberlynn Creek Ranch*, 276 F.3d 187, 191-92 (4th Cir. 2002) (affirming lower court's freeze of assets in possession of third parties but traceable to fraud); *SEC v. Dowdell*, No. 3:01CV00116, 2002 WL 31357059, *3-4 (W.D. Va. Oct. 11, 2002) (granting receiver's motion for temporary injunction against defendant's children, who were innocent recipients of proceeds of the fraud).

### b.     The continued freeze does not justify intervention.

The fact that the freeze will continue over these accounts, however, does not change the intervention analysis; intervention still fails.  The Receiver is an adequate representative for accounts holders who are victims of the fraud just as he is for those who were not, and their interests still will not be impaired by the disposition of the SEC litigation. *E.g., Commodity Futures Trading Comm'n v. Lofgren*, No. 02 C 6222, 2003 WL 21639118, *2 (N.D. Ill. July 9, 2003) (denying an investor's attempt to intervene in an SEC enforcement action when the investor's interest would not be impaired by the disposition of the CFTC action because the investor could, among other things, assert his claim in the claims procedure established by the receiver and supervised by the court or obtain court review of any decision made by the receiver);[32] *SEC v. Behrens*, No. 8:08CV13, 2008 WL 2485599, at *3 (D. Neb. June 17, 2008); *FTC v. First Capital Consumer Membership Services, Inc.*, 206 F.R.D. 358, 364 (W.D.N.Y. 2001).[33]

Courts have held that the mere fact that some investors may not receive 100 percent of their assets because the accounts are tainted by the alleged fraud does not make intervention

---

[32] The court also noted that because the receiver had not yet made a determination as to the distribution of the investor's funds, any claim relating to the distribution of the funds was not yet ripe for contest. *Id.* at *2 n. 1.

[33] *See also SEC v. Qualified Pensions, Inc.*, No. 95-1746, 1998 WL 29496, at *4 (D.D.C. Jan. 16, 1998) (finding that the SEC was an adequate representative even though it proposed a plan that included disbursing some assets pro rata).

proper.  *Id.*  In *SEC v. Behrens*, the court denied an investor's motion to intervene in an SEC enforcement action despite the investor's argument that neither the SEC nor the receiver adequately represented her interests because they would attempt a pro rata distribution of the frozen assets of all of the investors.  2008 WL 2485599, at \*1.  Similarly, in *FTC v. First Capital Consumer Membership Services, Inc.*, the court rejected a party's attempt to avoid a pro-rata distribution by intervening in the matter.  206 F.R.D. at 366.  The court held that it "may be that [the intervenor's] claims will or will not be paid in full, depending on the final identification of the total pool of claims, and the verification of [its] claims through an appropriate claims review process," but this is not sufficient justification to allow intervention.  *Id.* at 365.

These cases demonstrate that even for those accounts affected by the fraud, intervention is still inappropriate.  If the Court disagrees, however, the Receiver requests the Court to limit their intervention to matters relating solely to the claims process and to refuse a broad-based intervention into the SEC's enforcement action.[34]

### 3.	Movants failed to attach a pleading setting forth claims and/or defenses.

All of the Movants' attempts to intervene fail on another ground.  Federal Rule of Civil Procedure 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  Movants included no such pleading.  Although courts have excused the requirements of Rule 24(c) when the claims or defenses are apparent from the motion to intervene, Movants' claims or defenses are not apparent from their brief motions.[35]  *Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 311 n.4 (N.D. Tex. 2004)

---

[34] The Receiver suggests, for example, that any intervention be limited to participation in the Court's approval of the claim process or becoming a party solely for purposes of appeal of decision by the Receiver regarding their account(s).

[35] This pleading requirement is especially important here because section 21(g) of the Securities Exchange Act bars certain claims from being joined with an SEC action.  *See* 15 U.S.C. § 78u ("no action for equitable relief instituted by the Commission pursuant to the securities law shall be consolidated or coordinated with other actions not brought

(Godbey, J.) (motion granted subject to Intervenors curing failure to comply with Rule 24(c) because the defenses movant sought to assert were "abundantly clear from Intervenors' motion").  None of the Movants explain what claim, if any, they want to assert and against whom they would assert it.[36]  Under these facts, failure to attach the pleading required by Rule 24(c) merits dismissal.  *See Yazdchi v. Am. Honda Fin. Corp.*, No. 3:05CV0737L, 2005 WL 1943611, at *2 n. 4 (N.D. Tex. Aug. 12, 2005) (denying motion to intervene in part because "even under a liberal construction of [the] Motion to Intervene, he has failed to satisfy Rule 24(c)"); *FTC v. Med Resorts Int'l, Inc.*, 199 F.R.D. 601, 606 (N.D. Ill. 2001) (holding that "total dereliction of the Rule warrants dismissal of the motion"); *Westridge v. Poydras Props., Inc.*, No. 94-3340, 1995 WL 120081, at *1 (E.D. La. Mar. 20, 1995) (denying motion to intervene in part because of failure to comply with Rule 24(c)); *Nat'l Elevator Indus., Inc. v. Int'l Union of Elevator Constructors*, 647 F. Supp. 976, 981 (S.D. Tex. 1986) (denying motion to intervene upon finding that there was no reasonable excuse for the proposed intervenors' failure to comply with Rule 24(c)).

**B.     Movants have not established that a modification to the Preliminary Injunction is merited.**

Even if Movants were allowed to intervene, their requested relief should be denied — they have not demonstrated that a change in the preliminary injunctions is justified.  The general

---

by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission").  Some courts, in fact, have found that section 21(g) acts as a complete bar to intervention.  *SEC v. Cogley*, No. 98CV802, 2001 WL 1842476, at *3 (S.D. Ohio Mar. 21, 2001) ("this Court comes to the inescapable conclusion that Section 21(g) bars intervention"); *SEC v. Homa*, No. 99 C 6895, 2000 WL 1468726, at *2 (N.D. Ill. Sept. 29, 2000) (holding that Section 21(g) "plain[ly] and unambiguous[ly]" barred intervention; *SEC v. Wozniak*, No. 92 C 4691, 1993 WL 34702, at *1 (N.D. Ill. Feb. 8, 1993) (holding that Section 21(g) "blocked [intervenors] from entering this lawsuit by an impenetrable wall"); *but see e.g., SEC v. Flight Transp. Corp.*, 699 F.2d 943, 950 (8th Cir. 1983) (refusing to find that section 21(g) barred intervention in SEC actions).

[36] Because Movants have not adequately plead the claims or defenses they seek to assert in this proceeding, the Receiver is not able to respond to their substantive allegations.  If the Court allows Movants to intervene, the Receiver requests a further opportunity to address whether modification of the PI is appropriate.

rule is that in order to modify a preliminary injunction, a party must demonstrate "that changed circumstances make the continuation of the order inequitable." *Black Ass'n of New Orleans Firefighters v. City of New Orleans*, 853 F.2d 347, 354 (5th Cir. 1988) (citing *Merrell-National Labs., Inc. v. Zenith Labs., Inc.,* 579 F.2d 786, 791 (3d Cir. 1978)); *also Scionti v. Dornfried*, 137 F.3d 1351, No. 97-20408, 1998 WL 92454, at *1 (5th Cir. Feb. 11, 1998) (finding that the district court properly denied dissolution of the preliminary injunction since the movant failed to "present any change in the operative facts or relevant decisional or statutory law warranting such relief").  Movants fail to point to any change in circumstances since the March 2 and 12, 2009 grants of preliminary injunctions that warrant changes to the injunction.  Indeed, there have been none.  The preliminary injunctions were warranted when issued, and they remain warranted today.  Without the requisite showing of changed circumstances, Movants' efforts to modify or dissolve the preliminary injunctions must fail.

## C.     The other relief requested by the Movants should also be denied.

In addition to the requests to intervene and modify the Court's preliminary injunctions, two Movants make additional requests.  *Kennedy Motion* ¶¶ 15-16; *Dearmand Motion* ¶¶ 13-14. The Kennedys ask the Court to enter an expedited reporting scheduling for the Receivership. The Dearmand parties ask the Court to enter an order requiring the Receiver to post a $50 million bond.  If the Court denies intervention, the Movants have no standing to make these requests.  Regardless, both requests should be denied.

The Kennedys filed their motion on February 23, 2009.  Since that time, the Receiver has posted over fifteen updates and status reports on the Receivership website.  Without having a Court order mandating him to do so, the Receiver is providing frequent substantive updates to those affected by the asset freeze, and the Receiver will continue to do so.  An order setting arbitrary deadlines will put form ahead of substance and will only slow the Receiver's work on

marshaling the assets and developing a claims process.  Accordingly, the Receiver requests that this motion be denied.

The Dearmand parties request for bond is also unnecessary.  The Court already decided this issue and held that the "Receiver shall not be required to post a bond unless directed by the Court."  *Receivership Order* ¶ 2.  The only legal support cited for their request is Federal Rule of Civil Procedure 65, which governs the bond required from a party seeking a TRO not from a court-appointed receiver.  Instead of a bond requirement, the Court ordered the Receiver to "well and faithfully perform the duties of his office; to timely account for all monies, securities, and other properties which may come into his hands; and to abide by and perform all duties set forth" in the Amended Order Appointing Receiver.  *Id.*  The Receiver has every intention of abiding by the order, and a bond is simply unnecessary.

## IV.    CONCLUSION

The result of Defendants' alleged fraudulent investment scheme is that thousands of Stanford customers are currently being inconvenienced by the orders freezing Defendants' assets.  The Receiver, however, already has made approximately 28,000 customer accounts available for release and is establishing a certification process to hear the requests for those whose accounts are still frozen.  The Court appointed the Receiver to handle claims like those asserted by Movants, and that process remains the most efficient way to proceed.  Allowing intervention by Movants or others will only frustrate the objective of giving fair treatment to all those harmed by the massive fraud perpetrated by Defendants.  Further, Movants have not demonstrated a sufficient legal basis to modify the preliminary injunction or to grant the other relief sought.  The motions to intervene should be denied.

Dated:  March 16, 2009                     Respectfully submitted,


                                           BAKER BOTTS L.L.P.


                                           By: /s/ Timothy S. Durst
                                               Kevin Sadler
                                               Texas Bar No. 17512450
                                               kevin.sadler@bakerbotts.com
                                               Robert I. Howell
                                               Texas Bar No. 10107300
                                               robert.howell@bakerbotts.com
                                               David T. Arlington
                                               Texas Bar No. 00790238
                                               david.arlington@bakerbotts.com
                                               1500 San Jacinto Center
                                               98 San Jacinto Blvd.
                                               Austin, Texas 78701-4039
                                               (512) 322-2500
                                               (512) 322-2501 (Facsimile)

                                               Timothy S. Durst
                                               Texas Bar No. 00786924
                                               tim.durst@bakerbotts.com
                                               2001 Ross Avenue
                                               Dallas, Texas 75201
                                               (214) 953-6500
                                               (214) 953-6503 (Facsimile)

                                           **ATTORNEYS FOR RECEIVER
                                           RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On March 16, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Timothy S. Durst
Timothy S. Durst