**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CASE NO. 3-09-CV-0298-N** |
| **STANFORD INTERNATIONAL BANK, LTD.; STANFORD GROUP COMPANY; STANFORD CAPITAL MANAGEMENT, LLC; R. ALLEN STANFORD; JAMES M. DAVIS; and LAURA PENDERGEST-HOLT,** | § § § § § § | |
| **Defendants.** | § § § | |

---

## APPENDIX TO RESPONSE OF HUNTON & WILLIAMS LLP IN OPPOSITION TO RECEIVER'S MOTION TO COMPEL

---

**CLOSED**

**CIVIL**

**CASE**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

### Case Number: 02-22568-CIV-MORENO

KADIR OVERSEAS, LTD. and JORGE
BASTIDA GALLARDO,

      Plaintiffs,

vs.

STANFORD INTERNATIONAL BANK, LTD.
and STANFORD GROUP COMPANY,

      Defendants.

_____/

FILED by ___ D.C.

JUL - 9 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

## ORDER DENYING MOTION TO REMAND AND GRANTING MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

THIS CAUSE came before the Court upon Plaintiffs' Motion to Remand Cause to State

Court for Lack of Jurisdiction **(D.E. No. 21)**, filed on **October 30, 2002**, Defendants' Motions to

Dismiss Amended Complaint with Prejudice and Motions to Strike Certain Claims for Relief **(D.E.**

**Nos. 30 & 31)**, filed on **January 2, 2003**, Defendant Stanford International Bank, Ltd.'s Motion to

Dismiss for Lack of Personal Jurisdiction **(D.E. No. 33)**, filed on **January 2, 2003**, Defendant

Stanford International Bank, Ltd.'s Motion to Quash Service of Process **(D.E. No. 34)**, filed on

**January 2, 2003**, Defendant Stanford International Bank, Ltd.'s Motion to Dismiss for Improper

Venue, *Forum Non Conveniens* and Comity **(D.E. No. 35)**, filed on **January 2, 2003**, Defendant

Stanford Group Company's Stipulation of Submission to Antiguan Jurisdiction **(D.E. No. 50)**, filed

on **March 28, 2003**, Defendant Stanford International Bank, Ltd.'s Notice of Filing Supplemental

Authority in Support of Motion to Dismiss for Improper Venue, *Forum Non Conveniens* and Comity

1

(**D.E. No. 55**), filed on **June 4, 2003**, and the Declaration of Rep Poppell (**D.E. No. 58**), filed on

**July 2, 2003**.

THE COURT has considered the motions, the responses, the stipulation, the notice, the

declaration and the pertinent portions of the record, and being otherwise fully advised in the premises

and in open court, it is

**ADJUDGED** that the Motion to Remand is DENIED. Based upon the facts available in the

record, the Court finds that it lacks personal jurisdiction over Defendant Stanford International Bank,

Ltd. *See* Fla. Stat. §§ 48.181 & 48.193. Because Plaintiffs are unable to assert a cause of action in

Florida courts against the only non-diverse Defendant, the Court has removal jurisdiction based upon

diversity of citizenship. *See Insinga v. LaBella*, 845 F.2d 249, 254 (11th Cir. 1988). It is further

**ADJUDGED** that the Motion to Dismiss for *Forum Non Conveniens* is GRANTED

consistent with the reasoning articulated by the Honorable Jose E. Martinez in the related case of

*Mendez v. Stanford Int'l Bank, Ltd.*, Case No. 02-22567-CIV-MARTINEZ.[1] *See* Defendant Stanford

International Bank, Ltd.'s Notice of Filing Supplemental Authority in Support of Motion to Dismiss

for Improper Venue, *Forum Non Conveniens* and Comity (**D.E. No. 55**), filed on **June 4, 2003**.

Finally, it is

**ADJUDGED** that all other pending motions are DENIED as moot with leave to refile if

---

[1]While the Court finds that *forum non conveniens* is dispositive of the remaining issues in this
case, the Court notes that the substituted service of process as to Defendant Stanford International Bank,
Ltd. fails to comport with Fla. Stat. § 48.181, that the Court does not have long-arm jurisdiction over
Defendant Stanford International Bank, Ltd. pursuant to Fla. Stat. § 48.193 and that Counts I and III of
the Amended Complaint for breach of fiduciary duty and negligence are vulnerable to dismissal based
upon Florida's economic loss rule.

02-22568-CIV-MORENO

appropriate.

DONE AND ORDERED in Chambers at Miami, Florida, this 9 day of July, 2003.


_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE


Copies provided to:

Jose A. De Armas, Esq.
  Alvarez, Armas & Borron, P.A.
  3211 Ponce de Leon Blvd., Ste. 302
  Coral Gables, FL 33134

Walfrido J. Martinez, Esq.
  Hunton & Williams
  2500 Barclays Financial Center
  1111 Brickell Avenue
  Miami, FL 33131

## LATIN AMERICAN
# Herald Tribune



Home  |  About us  |  Who's Who  |  Contacts  |  Help

Search:

**HOME | Business (Click here for more)**

## Stanford Financial: Statement of the U.S. Receiver Janvey

**Venezuela Links**
- Venezuelan Embassies & Consulates Around The World
- Sites/Blogs about Venezuela
- Venezuelan Newspapers
- Facts about Venezuela
- Government Links
- Embassies in Caracas
- Venezuela Tourism

**Colombia Links**
- Government Links
- Colombian Embassies & Consulates Around the World
- Media
- Embassies in Bogota
- Sites/Blogs about Colombia
- Educational Institutions

**Audio**
- Audio Content

**Video**
- Video Content



STATEMENT ON THE STATUS OF THE RECEIVERSHIP
March 2, 2009

What follows is a more detailed statement of the summary report that Receiver Ralph S. Janvey presented to the Court this morning in Dallas during a hearing in SEC v. Stanford International Bank, Ltd., et al. The Receiver will be providing additional information concerning the Receivership in the coming days, as well as a formal statement to be filed March 16, 2009 as directed by the Court.

1. On February 16, 2009, I became Receiver for the assets of Defendants Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, and all entities owned or controlled by them (collectively, "Stanford"). Since that date, I have been engaged in carrying out the Court's mandate to identify and secure the far-flung holdings and business operations of Stanford.

**Efforts to Obtain Control of Receivership Estate**

2. Immediately upon my appointment as Receiver, I retained experts to assist and advise me in carrying out the duties assigned to me by the Court. I have engaged two international law firms; a business restructuring advisor with substantial broker dealer experience; forensic, accounting and information technology experts; a brokerage operations specialist; and a security consultant to coordinate security personnel to maintain the physical security of Stanford facilities. For the reasons detailed below, my retention of these experts is necessary to perform the tasks delegated to me by the Court.

3. Defendants own and control a large, global network of financial services companies. Although our work is yet in its preliminary stages, it is clear that the Stanford group of companies is extraordinarily complex.

- **There are at least 175 Stanford entities. According to internal Stanford records, even that number may be incomplete. One organizational chart for the Stanford operations spans 25 pages, and we find new and contradictory records daily.**

- **Stanford has operations at more than 100 discrete locations, with offices throughout the U.S. (including Texas, Georgia, Maryland, Louisiana, Florida, Massachusetts, North Carolina, Mississippi, Colorado, Arkansas, Virginia, Tennessee, New York, California, Washington, D.C., and Pennsylvania), Canada, Europe, Latin America, and the Caribbean.**

- **The Stanford entities include a vast array of diverse businesses, such as securities brokerage, investment advisory services, gold coins and bullion, trust and fiduciary services, financial planning, merchant banking, venture capital, real estate development (including hotels, clubs and golf courses), investment banking, institutional securities research, securities trading, insurance strategies, commercial banking and alternative investments.**

It is likely that the final picture we develop will be even more complex than what we see now.

4. The Estate includes a number of foreign companies and assets across a wide array of industries. Some foreign governments are actively attempting to secure companies and assets in their jurisdictions.

The government of Antigua, in particular, has an interest in the disposition of Stanford companies, as they employ over 10% of the local population. Accordingly, the Antiguan government has taken a number of actions affecting Stanford assets, including appointing two receivers (the "Vantis Receivers") for the Stanford International Bank and Stanford Trust Company, and has convened its parliament for the expressed purpose of seizing property owned by Stanford for the benefit of its citizens. Separately, the East Caribbean Central Bank, a consortium of entities from several countries, has announced that it has created a new entity to carry on Bank of Antigua's operations.

It is our understanding that Mexico, Panama, Colombia, Ecuador, and Venezuela also have taken steps to secure Stanford assets. The Defendants' foreign-owned companies have been placed on notice of the Court's Order Appointing Receiver and TRO and that they are subject to both. My advisors and I are analyzing the situation in these and other jurisdictions and will take such actions as are necessary to secure Receivership assets while minimizing interruptions of normal day-to-day operations.

5. Nevertheless, my advisors and I have made significant progress in securing Stanford's assets and operations.

- **We developed information about Stanford and its assets, including interviewing persons with knowledge about financial records and assets.**

- **We have identified and interviewed the key personnel in Stanford's major operational departments, including treasury, accounting, information technology, human resources, risk management, real estate, building operations, aviation, security, private equity investments, broker-dealer operations, compliance, legal, and Latin American operations.**

- **We have identified major "control" locations throughout the U.S. and taken steps to secure at least 30 locations and the assets and business records at those locations, including establishing mail receipt and**
- **document protocols, and ceasing operations.**

- **As necessary, we have changed the locks at certain Stanford offices, installed security personnel, moved gold coin and bullion to lock boxes in safe locations, and locked down documents and data. To date, we have imaged more than 300 hard drives used by Stanford employees.**

- **We have served over 120 affiliated entities and known control persons worldwide with the TRO and Order Appointing Receiver, and employees have been notified of the Receivership and given instructions about how to proceed in the short term.**

- **We also have served more than 70 domestic and international depository institutions with the TRO and Order Appointing Receiver, ceased electronic transfers from those institutions, and begun arranging for the**
- **recovery of Stanford assets in their possession.**

- We have attempted to cease all known transfers of assets while we inventory Stanford's holdings.

- We are coordinating with authorities in foreign jurisdictions to secure overseas locations, identify assets, and share information.

- We have called for elected officials who received campaign contributions from Allen Stanford or Stanford affiliates to return those monies to the Receivership Estate for the benefit of defrauded Investors, and some have agreed to do so.

- We are in the process of requesting the return of legal retainers from several law firms and continue to identify and contact firms with retainer balances.

- We are assessing Stanford's significant ongoing financial obligations to third parties.

- We are reviewing Stanford's employee base and payroll information and will have an announcement early this week on these issues.

- We are overseeing pre-existing and new litigation.

- We have established a website (www.stanfordfinancialreceivership.com) and an email address (info@stanfordfinancialreceivership.com) for the Receivership Estate to convey information to the public and to individual investors about the status of the Receivership and to permit orderly communications from various constituencies about the Receivership.

6. Based on our preliminary investigation, the liquidity situation and overall financial condition of the Stanford entities can only be described as dire. According to unaudited financial statements as of December 31, 2008, Stanford has amassed tens of millions of dollars in unpaid bills, and to date the Receivership accounting team has been able to identify only a limited amount of available cash on hand.

Evidence is also mounting that the assets of the Estate will be only a fraction of the amount needed to satisfy the anticipated claims against the Estate.

**Efforts to Implement the Court's Order Freezing Assets**

7. Our efforts to secure the assets of the Receivership Estate have necessarily been broad in scope because the Order issued by the Court was broad in scope. Contrary to the suggestions in some of the motions to intervene, the inability of Stanford customers to access their accounts has not resulted from action by the Receivership. Rather, the Court's Temporary Restraining Order accomplished that, and appropriately so. In paragraph 6 of the Order, the Court specifically restrained all transactions in all accounts held "in the name, on behalf or for the benefit of Defendants." Such an Order was, in my view, required to prevent the Defendants from taking assets from accounts they held or managed for customers. My advisors and I are working on an emergency basis to implement the measures necessary to ensure that Stanford is in full compliance with the terms of the Order.

8. Stanford Group Company, one of the specific Receivership entities referenced in the motions to intervene, is a registered broker dealer and investment advisor headquartered in Houston, Texas, with 29 offices located throughout the United States. Stanford was the introducing broker for accounts held in custody at Pershing LLC and JP Morgan Clearing Corp., meaning that these accounts were, by definition, held on behalf of Stanford. At the time the Order was issued, there was no information available to allow the Estate to make distinctions among these accounts. Thus, the safest and most appropriate way to implement the Court's order was to freeze all accounts at Pershing and JP Morgan that were introduced by Stanford.

9. As our investigation progresses, I will seek authority from the Court to release any accounts that we determine should not be covered by the Order. On the second day of

the Receivership, my advisors and I began to develop the information necessary to determine which accounts can be released. My advisors and I are working closely with Pershing and JP Morgan Clearing to develop and test protocols for searching electronic data, thereby obviating the need to review accounts manually. Given the size and scope of Stanford's operations and the complexity of the interrelationships among Stanford entities, these protocols will take additional time to implement.

10. Moreover, we know that a significant percentage of Stanford customers invested in products or schemes that the SEC alleges to be fraudulent. For example, many customers who purchased the allegedly fraudulent certificates of deposit from Stanford received interest payments or were able to cash out CDs for full value prior to the date of the Order Appointing Receiver and the TRO. Based on the allegations in the SEC's complaint, these customers were paid, not from actual returns on any underlying investments, but from money contributed by new victims of the fraud. The proceeds such customers received may still be in their accounts or may have been used to purchase legitimate securities now held in the brokerage accounts.

While many of these customers may have been innocent of the fraud, the Receivership Estate may, as required by the Court's Order, seek to reclaim these proceeds or the securities purchased with the proceeds, so that this value can be shared equitably by all victims of the fraud, as well as those who cashed out their CDs before the date of the Order. The number of brokerage accounts affected by these products could number in the thousands.

**Progress Toward Releasing Accounts**

11. Despite the complexities, our efforts already have resulted in the identification and release of an entire category of accounts. As described on the Receivership website, we have determined that mutual fund assets of Stanford clients held outside of Stanford's custodial relationships with Pershing and J.P. Morgan are typically held directly in the name of the client by a mutual fund. While Stanford Group Company may provide investment advice to the owners of these accounts, it does not transact in these accounts, does not provide custody for these accounts, does not maintain books and records pertaining to the assets, and does not provide the client with individual transaction statements or periodic holdings statements.

Assets in retirement plan accounts invested in a m
ual fund or 529 plan accounts are examples of these types of accounts. As announced on February 23, 2009, mutual fund companies have been informed by the Investment Company Institute that assets held in such direct accounts are not subject to any freeze under the Order. Accordingly, the Order will not restrict customers from accessing these accounts.

12. I expect to make similar determinations regarding other categories of accounts as our investigation progresses. In particular, my advisors and I are analyzing the potential release of accounts that have less than $100,000 in assets, with certain exceptions. I am quite conscious of the hardship that the account freeze is imposing on some investors, and I believe that, particularly in the case of relatively smaller accounts, the hardship should be weighed against the benefits of the freeze, considering both the likelihood that an account is tainted by the fraud and the amount potentially recoverable by the Estate if it is tainted. I will make a recommendation to the Court on a release of accounts by March 16.

While our analysis to determine the specific parameters of the release is not yet complete, I expect this release would not apply to accounts owned by Stanford shareholders, directors, and certain employees; accounts owned for the benefit of Stanford companies; accounts managed by Stanford companies; accounts that secure unpaid loans made by Stanford companies; and perhaps other categories for which there is a high likelihood the accounts were tainted by fraudulent products or activities.

The exceptions also may include other accounts that are related to the owner of one of those accounts by social security number, address or other similar indicators. Even if such accounts are released, of course, the Estate would still be entitled to pursue claims against the owners of the accounts if they participated in the fraud or received the proceeds of fraudulent products or activities.

Simultaneously, the receiver is evaluating the most timely and efficient method to transfer released accounts so that clients have access to their assets.

13. Identifying the precise accounts that fall within the categories described above is complicated by many factors, including the following:

- **Our preliminary estimate is that Stanford Group Company has approximately 35,000 customer brokerage accounts, with total assets in excess of $6 billion held in the custody of Pershing and JP Morgan Clearing. These accounts may be customer controlled, managed by independent third-party investment managers, or managed by Stanford affiliated investment advisors.**

- **Defendants had approximately 3,000 employees worldwide who had varying levels of authority to act on behalf of Defendants, and also may have had access to the information and assets of the Defendants and their customers.**

- **Individual customers had the ability to invest their assets in more than 20 different types or styles of investment programs through a variety of different Stanford entities: Stanford Group Company, Stanford Capital Management, and Stanford Trust Company. These diverse activities were not consistently tied together operationally or in the record keeping system.**

- **Once we have determined the accounts held under the control of, on behalf of, or for the benefit of Defendants, we then have to insure that we have identified all related accounts across the various entities. The account identification process is being accomplished through the use of electronic data management techniques that are dependent upon information that we continue to collect on a daily basis from outside sources, as well as on the reconstruction of Stanford's internal records.**

**Protecting Customers' Assets**

14. Even as my advisors and I are analyzing data and formulating strategies to identify accounts that can be released, we have taken steps to maintain the status quo and protect the interests of all investors. I have retained broker dealer experts to assist me in the management of this business. We have centralized control of brokerage accounts in the Houston headquarters and limited the ability of brokers and money managers to effect transactions. I have authorized a small team of closely supervised Stanford Group Company employees to execute customers' instructions to sell holdings in their accounts. Although many investors are still unable to access their accounts temporarily, their assets are safely custodied at Pershing and J.P. Morgan Clearing, members of the Securities Investor Protection Corporation. Similar efforts aimed at preserving the assets on hand and protecting the interests of investors are underway at
other Stanford entities. Our objective is to ensure that we protect investors' assets to the fullest
extent possible while we complete our investigation.

Conclusion

15. In light of the dire financial condition of Stanford – and the growing likelihood that claims will far exceed assets – I believe that the only way to assure a fair distribution to every defrauded investor is temporarily to prohibit withdrawals from the accounts (except as described in paragraphs 11 and 12 above). If some Stanford customers were allowed to withdraw funds now, before any determination has been made about whether their accounts contain assets that can be traced to fraudulent products or schemes, the risk is high that money the Estate would otherwise be entitled to recover for the benefit of all victims of the fraud will be moved forever beyond the reach of the Receivership.

The effect would be to give the early withdrawing investors an advantage over other victims of the fraud, as the amount available to satisfy claims by the other investors would be diminished further. It is critical to my work on behalf of every defrauded investor to ensure that all available assets of the Estate remain within the Court's control.

16. I take very seriously my responsibility as the Receiver. All of the actions I have taken and will take are aimed at maximizing the recovery by innocent claimants. As described above, the Receivership is making every effort to locate and pre serve assets. Our goal is to increase the pool of money available to satisfy investor and creditor claims. We are working diligently to devise a plan to ensure that equitable distributions are made to all claimants.

**That plan includes:**

- **Making provisions for releasing customer accounts not tainted by the Defendants' schemes in an orderly manner;**

- **Developing an efficient claims procedure that allows remaining investors to receive their fair share of Stanford assets;**

- **Devising mechanisms for determining which claims are legitimate; and**

- **Protecting against attempts by some to use the legal process to jump ahead of everyone else in line.**

17. I recognize that customers whose accounts are frozen may be experiencing hardship, and it is my intention to resolve these issues and release accounts as quickly as possible.







[ Home ]       [ About Us ]       [ Who's Who ]       [ Contacts ]       [ Help ]

Copyright Latin American Herald Tribune - 2008 © All rights reserved



HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL    804 • 788 • 8200
FAX    804 • 788 • 8218

STACY M. COLVIN
DIRECT DIAL: 804-788-8379
EMAIL: scolvin@hunton.com

FILE NO: 99999.000310

March 31, 2009

**VIA FACSIMILE AND INTERNATIONAL COURIER**

Mr. Nigel Hamilton Smith
Stanford International Bank, Ltd. (Antigua)
London West End Office
66 Wigmore Street
London
W1U 2SB
Tel: 020 7467 4000
Fax: 020 7467 4040

Re:    *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*
       Case No. 3-09-cv-00298-N (N.D. Texas)

Dear Mr. Smith:

I serve as Deputy General Counsel of Hunton & Williams LLP ("H&W"). I understand that you have been appointed the Antiguan Receiver for Stanford International Bank, Ltd. (Antigua) ("SIBL"). As you undoubtedly know, the United States District Court for the Northern District of Texas, Dallas Division, has appointed a United States Receiver for Mr. Stanford, personally, as well as all Stanford related entities, both in the U.S. and abroad. The U.S. Receiver has demanded that H&W produce to the Receiver all files related to any of these entities and Mr. Stanford personally.

H&W has in the past served as legal counsel to SIBL in connection with certain litigation and corporate matters. To date, we have not received any request from you for SIBL's client files. Given the potential for competing interests between you and the U.S. Receiver, H&W informed U.S. Receiver's counsel that H&W would not turn over to him the files for SIBL, absent further order from the Court. Enclosed please find a copy of H&W's letter to the Receiver's U.S. counsel.

Enclosed you also will find a copy of the U.S. Receiver's Motion to Compel H&W to turn over these files. We will file our response to the Motion to Compel on Friday, April 3, 2009. We do not know whether the Court will schedule an oral argument or whether it will make a decision solely on the pleadings. We do not know if you are already aware of these proceedings, but write to ensure that you have notice in the event that you wish to appear and have your position considered by the U.S. court.



Mr. Nigel Hamilton Smith
March 31, 2009
Page 2

If you have any questions, do not hesitate to contact me.

Sincerely,

Stacy M. Colvin

Stacy M. Colvin

Enclosure

cc:     Kevin Sadler, Esq.
        Robert M. Rolfe, Esq.



HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL      804 • 788 • 8200
FAX      804 • 788 • 8218

STACY M. COLVIN
DIRECT DIAL: 804-788-8379
EMAIL:  scolvin@hunton.com

FILE NO: 99999.000310

March 31, 2009

**VIA FACSIMILE AND INTERNATIONAL COURIER**

Mr. Ramon Martinez Stagg
Urbanización Obarrio
Samuel Lewis Avenue and 54th Street
Torre (Building) Generali, 19th Floor
Panama, Republic of Panama

Re:    *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*
       Case No. 3-09-cv-00298-N (N.D. Texas)

Dear Mr. Stagg:

I serve as Deputy General Counsel of Hunton & Williams LLP ("H&W").  I understand that
you have been appointed as the Panamanian Receiver for Stanford International Bank
(Panama) S.A. ("SIBP").  As you undoubtedly know, the United States District Court for the
Northern District of Texas, Dallas Division, has appointed a United States Receiver for Mr.
Stanford, personally, as well as all Stanford related entities, both in the U.S. and abroad.  The
U.S. Receiver has demanded that H&W produce to the Receiver all files related to any of these
entities and Mr. Stanford personally.

H&W has in the past served as legal counsel to SIBP in connection with certain matters.  To
date, we have not received any request from you for SIBP's client files.

Given the potential for competing interests between you and the U.S. Receiver, H&W
informed the U.S. Receiver's counsel that H&W would not turn over to him the files for SIBP
absent further order from the Court.  Enclosed please find a copy of H&W's letter to the U.S.
Receiver's counsel.

Enclosed you also will find a copy of the U.S. Receiver's Motion to Compel H&W to turn over
these files.  We will file our response to the Motion to Compel on Friday, April 3, 2009.  We
do not know whether the Court will schedule an oral argument or whether it will make a
decision solely on the pleadings.  We do not know if you are already aware of these
proceedings, but write to ensure that you have notice in the event that you wish to appear and
have your position considered by the U.S. court.

If you have any questions, do not hesitate to contact me.

ATLANTA   AUSTIN   BANGKOK   BEIJING   BRUSSELS   CHARLOTTE   DALLAS   HOUSTON   LONDON
LOS ANGELES   McLEAN   MIAMI   NEW YORK   NORFOLK   RALEIGH   RICHMOND   SAN FRANCISCO   SINGAPORE   WASHINGTON
www.hunton.com



Mr. Ramon Martinez Stagg
March 31, 2009
Page 2

Sincerely,

*Stacy M Colvin*

Stacy M. Colvin

Enclosure

cc:    Kevin Sadler, Esq.
       Robert M. Rolfe, Esq.

13



HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL     804 • 788 • 8200
FAX     804 • 788 • 8218

STACY M. COLVIN
DIRECT DIAL: 804-788-8379
EMAIL:  scolvin@hunton.com

FILE NO: 99999.000310

March 31, 2009

**VIA FACSIMILE AND INTERNATIONAL COURIER**

Mr. Marco Sanchez
Interventor
Empresas Stanford
c/o Superintendencia de Compañías
Calle Roca 660 y Amazonas
Quito, Ecuador

Mr. Marco Sanchez
Interventor
Empresas Stanford
Avenida 12 de Octubre N24-562
Torre B, Piso 6
Quito, Ecuador

Re:    *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*
       Case No. 3-09-cv-00298-N (N.D. Texas)

Dear Mr. Sanchez:

I serve as Deputy General Counsel of Hunton & Williams LLP ("H&W"). I understand that
you have been appointed Receiver for Stanford Trust Company Administradora de Fondos y
Fideicomisos, S.A., (Ecuador) ("STCE"). As you undoubtedly know, the United States District
Court for the Northern District of Texas, Dallas Division, has appointed a United States
Receiver for Mr. Stanford, personally, as well as all Stanford related entities, both in the U.S.
and abroad. The Receiver has demanded that H&W produce to the U.S. Receiver all files
related to any of these entities and Mr. Stanford personally.

H&W has in the past served as legal counsel to STCE with respect to issues related to the
Lehman Brothers bankruptcy proceeding. To date, we have not received any request from you
for STCE's client files.

Given the potential for competing interests between you and the U.S. Receiver, H&W
informed the U.S. Receiver's counsel that H&W would not turn over to him the files for STCE
absent further order from the Court. Enclosed please find a copy of H&W's letter to the U.S.
Receiver's counsel.

ATLANTA   AUSTIN   BANGKOK   BEIJING   BRUSSELS   CHARLOTTE   DALLAS   HOUSTON   LONDON
LOS ANGELES   McLEAN   MIAMI   NEW YORK   NORFOLK   RALEIGH   RICHMOND   SAN FRANCISCO   SINGAPORE   WASHINGTON
www.hunton.com



**HUNTON&
WILLIAMS**

Marco Sanchez
March 31, 2009
Page 2

Enclosed you also will find a copy of the U.S. Receiver's Motion to Compel H&W to turn over these files. We will file our response to the Motion to Compel on Friday, April 3, 2009. We do not know whether the Court will schedule an oral argument or whether it will make a decision solely on the pleadings. We do not know if you are already aware of these proceedings, but write to ensure that you have notice in the event that you wish to appear and have your position considered by the U.S. court.

If you have any questions, do not hesitate to contact me.

Sincerely,

*Stacy M Colvin*

Stacy M. Colvin

Enclosure

cc:     Kevin Sadler, Esq.
        Robert M. Rolfe, Esq.

# C/M/S/ Cameron McKenna

**CMS Cameron McKenna LLP**

Mitre House
160 Aldersgate Street
London EC1A 4DD

Tel +44(0)20 7367 3000
Fax+44(0)20 7367 2000
www.law-now.com
DX 135316 BARBICAN 2

Tel +44(0)20 7367 3524
daniel.hennis@cms-cmck.com

Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond Virginia 23219-4047
United States of America

**FAO:  Stacy M. Colvin**

Your Ref:   99999.000310
Our Ref:    PRW/DAHE/MIT6.22b/101248.00021

2 April 2009
**By email and post**

Dear Ms Colvin

**Stanford International Bank Limited (in receivership) ("SIB")**
**Stanford Trust Company Limited (in receivership) ("STC")**

Thank you for your letter of 31 March 2009.

I confirm that we act on behalf of the joint receiver-managers of SIB and STC, as appointed by the High Court in Antigua (the "Receivers").  I enclose a copy of the Court Order making that appointment with this letter.

As you set out in your letter of 17 March 2009 to Kevin Sadler at Baker Botts, SIB is a Stanford related entity organised, registered and regulated outside of the United States.  As SIB is an Antiguan company and the Receivers have been appointed by the High Court of Antigua, we confirm that the Receivers are the appropriate party to provide you with instructions regarding the property and/or files that you hold for or on behalf of SIB.  I therefore request that you provide us with copies of all files, papers, information or any other property that you hold in respect to SIB and STC.  The Receivers undertake to pay reasonable copying costs, so long as they are agreed in advance.

At this stage the Receivers do not intend to appear in the courts of the United States, though request that you update us on any developments that occur.

(22714749.01)

CMS Cameron McKenna LLP is a limited liability partnership registered in England and Wales with registration number OC310335.  It is a body corporate which uses the word "partner" to refer to a member or an employee or consultant with equivalent standing and qualifications. A list of members and their professional qualifications is open to inspection at the registered office, Mitre House, 160 Aldersgate Street, London EC1A 4DD. Members are either solicitors or registered foreign lawyers.  Regulated by the Solicitors Regulation Authority.

CMS Cameron McKenna LLP is a member of the CMS alliance of independent European law firms.

CMS offices and associated offices: Amsterdam, Berlin, Brussels, London, Madrid, Paris, Rome, Vienna, Zurich, Aberdeen, Algiers, Antwerp, Arnhem, Beijing, Belgrade, Bratislava, Bristol, Bucharest, Budapest, Buenos Aires, Casablanca, Cologne, Dresden, Dusseldorf, Edinburgh, Frankfurt, Hamburg, Kyiv, Leipzig, Ljubljana, Lyon, Marbella, Milan, Montevideo, Moscow, Munich, New York, Prague, Sao Paulo, Sarajevo, Seville, Shanghai, Sofia, Strasbourg, Stuttgart, Utrecht, Warsaw and Zagreb. www.cmslegal.com

The members of CMS are in association with The Levant Lawyers with offices in Beirut, Abu Dhabi, Dubai and Kuwait.

Notice: the firm does not accept service by e-mail of court proceedings, other processes or formal notices of any kind without specific prior written agreement.

# C⁄M⁄S⁄ Cameron McKenna

We look forward to hearing from you shortly.

Yours sincerely

**Daniel Hennis**
**CMS Cameron McKenna LLP**

17

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

Claim No. ANUHCV2009/0110

In the Matter of Stanford International Bank Limited.
-And-
In the Matter of Stanford Trust Company Limited.
-And-
In the Matter of the International Business Corporations Act, 1982, CAP.222
of the Laws of Antigua and Barbuda
-And-
In the Matter of an Application for the Appointment of a Receiver-Manager of Stanford
International Bank Limited and Stanford Trust Company Limited

BETWEEN:

THE FINANCIAL SERVICES REGULATORY COMMISSION
Applicant/Claimant

-And-

STANFORD INTERNATIONAL BANK LIMITED
STANFORD TRUST COMPANY LIMITED
Respondents/Defendants

**ORDER**

BEFORE The Honourable Justice David Harris, (In Chambers)

DATED the 26th day of February, 2009

ENTERED the 26th day of February, 2009

UPON THE APPLICATION filed herein on the 26th day of February, 2009

AND UPON READING the Affidavits of Peter Nicholas Wastell and Paul A. Ashe
filed on the 26th day of February, 2009.

AND UPON HEARING Charlesworth O. D. Brown, Counsel for the Applicant/Claimant,
Jasmine Wade appearing with him.

IT IS ORDERED THAT:

1. The Respondents/Defendants be and are hereby restrained by themselves, their
agents, servants or otherwise from:-

**18**

    a. disposing of or otherwise dealing with any of their assets.

    b. entering into any agreement or arrangement to sell, transfer or otherwise dispose of any of their assets.

    c. carrying on of transacting business of any kind whatsoever under the licence granted by the Applicant/Claimant without the consent, management and supervision of the Applicant/Claimant.

2. The Respondents/Defendants do account for all their assets now or previously in their possession or under the control of any entity on their behalf.

3. The Respondents/Defendants do provide the Applicant/Claimant with:-

    a. a comprehensive list of all transactions, agreements, arrangements and undertakings and copies of documents evidencing the same.

    b. All accounts, documents and information to enable the Applicant/Claimant to trace, if necessary, any or all of the assets of the Respondents/Defendants.

    c. A comprehensive list of all its creditors, customers, employers, employees and other persons or entities to whom they have outstanding obligations and the extent of their obligations in respect of any or all of their assets.

4. Messrs Peter Nicholas Wastell and Nigel Hamilton-Smith be and are hereby appointed Joint Receivers–Managers of the Respondents/Defendants pursuant to Section 220 of the International Business Corporations Act (the Act ) with such powers as the Court may determine.

5. The Joint Receivers–Managers do take immediate steps to stabilize the operations of the Respondents/Defendants unless ordered to do otherwise by further order of the Court.

6. The Joint Receivers–Managers do execute their duties in accordance with the Act and otherwise only in accordance with this order and the directions of the Court.

7. The Joint Receivers–Managers do prepare and file in Court a Monthly Interim Report and Financial Statement in respect of the affairs of the Respondents/Defendants within 30 days of the date of this order and thereafter at regular intervals on the fifth day of each ensuing month.

8. The Joint Receivers–Managers upon the completion of their duties do prepare and file Final Accounts including a Financial Statement with recommendations as to the further conduct of the affairs, if any, of the Respondents/Defendants.

9. The Joint Receivers–Managers do take into their custody and control all the property, undertakings and other assets of the Respondents/Defendants pursuant to Section 221 of the Act and comply with all the other parts of the Section.

10. The Joint Receivers–Managers do open and maintain bank accounts within the jurisdiction or in such jurisdictions as they consider appropriate in their names as Joint Receiver-Managers of the Respondents/Defendants for the monies of the corporations coming under their control.

11. Subject to Section 220 of the Act, the Receivers–Managers do exercise, perform and discharge their duties independently or jointly and in so doing they shall be deemed to act as agents for the Respondents/Defendants without personal liability.

12. Without prejudice to the provisions of Section 373 of the Act, the Joint Receiver-Managers be and are hereby authorized to disclose information concerning the management, operations, and financial situation of the Respondents/Defendants as they consider appropriate in the performance of their functions PROVIDED ALWAYS THAT
(1) no disclosure of customer specific information is authorized without further or other order of the Court; and

(2) no disclosure of information is permitted under this Order to any foreign governmental or regulatory body unless such disclosure is subject to mutual disclosure obligations.

For the purposes of this Order, customer specific information means information of sufficient detail to enable a recipient of the information to identify the customer in question, the customer's address or other location, and/or the amount of such customer's credit balances or other investments in the Respondents/Defendants.

13. The remuneration of the Joint Receivers–Managers be fixed on a time- cost basis at the rates agreed between the Applicant/Claimant and the Joint Receivers–Managers.

14. The Joint Receivers–Managers be reimbursed for all reasonable and necessary expenses as may be incurred by them during the course of the receivership from the assets of the Respondents/Defendants.

15. The costs of this Application and all related proceedings be met from the assets of the Respondents/Defendants.

16. The Joint Receivers–Managers be directed from time to time on matters relating to their duties as the Court may determine on the application of the Applicant/Claimant or on the application of the Joint Receivers-Managers or on the application of the Respondents/Defendants.

17. That the Applicant do serve the Defendants/Respondents with the Fixed Date Claim Form, Affidavits thereto, the Notice of Application and this Order.

18. That the return date be fixed for the 9th day of March, 2009.

19. That this Order remains in full force and effect until further order.

BY THE COURT

REGISTRAR

**AND TAKE NOTICE that if you the Directors and Officers of the Respondents /Defendants fail to comply with the terms of this order, proceedings may be commenced against you for contempt of court and you may be liable to be imprisoned.**

Westlaw.

2001 WL 36101533 (M.D.N.C.)                                                                 Page 1

For Opinion See Fed. Sec. L. Rep. P 93254 , 2005 WL 1726609 , 2005 WL 1729224 , 2002 WL 31165146 , 206 F.R.D. 574 , 169 F.Supp.2d 420

United States District Court, M.D. North Carolina.
UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
ELFINDEPAN, S.A.; Southern Financial Group; Tracy Calvin Dunlap, J.R.; Barry Lowe; James L. McCall; Strategic Asset Funds, S.A.; Edmund Menden; Michael Menden and Michael Zieglmeier, Defendants, andC.R.C.C. LLC and Patrick Wilson, Relief defendants.
No. 1:00CV00742.
February 6, 2001.

First Amended Complaint for Permanent Injunction and other Relief

Eric N. Miller, Gerald T. Balacek, Kurt Gresenz, Attorneys for Plaintiff, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-0808, (202) 942-7275 (Miller).
Plaintiff United States Securities and Exchange Commission ("Commission") alleges the following:

## SUMMARY OF THE ELFINDEPAN FRAUD

1. From as early as March 1999 to the present, defendants Elfindepan S.A. ("Elfindepan"), Southern Financial Group ("Southern Financial"), Tracy Calvin Dunlap, Jr. ("Dunlap"), and Barry Lowe ("Lowe") defrauded investors nationwide in connection with the unregistered offer and sale of the securities of Elfindepan, a supposed Costa Rican financial company. Defendants have raised at least $13.5 million from the investing public in at least nine states.

2. In connection with these offerings, defendants knowingly and recklessly made, and caused others to make, numerous materially false and misleading statements to investors. Among other things, defendants promised investors highly favorable returns on investments (as much as 40-50% per month), without any reasonable basis for such claims, and falsely stated that the investments were secure, including false claims that Elfindepan investments were associated with the International Monetary Fund and the World Bank. Investors were told that Elfindepan had been in business for 23 years, when in fact the company was less than a year and a half old.

3. Defendants knowingly or recklessly failed to disclose certain material facts to investors regarding Elfindepan. Defendants have omitted to disclose that funds are in fact being disbursed inconsistent with Elfindepan's supposed business purpose. Investors have not been told that proceeds from later investors are being used to pay early investors and distributors, in classic "Ponzi" or pyramid scheme fashion. Investors have not been told that Dunlap has complete control of Elfindepan's finances, and has paid substantial amounts of investor money to his family members, and to support his personal living expenses. While defendants claim Elfindepan provides loans to businesses and individuals, and engages in factoring for companies with large receivables and cash flow problems, defendants failed to disclose any of the risks incumbent in such activities and therefore in investing in Elfindepan. Defendants have failed to provide investors any detailed information about Elfindepan and its business, including any financial information.

4. The defendants have publicly solicited investors through a website posted on the internet, through organized investor meetings, and through personal contacts by individuals acting as agents or "distributors" of Elfindepan. Investors were solicited and encouraged to invest moneys from their IRA and other retirement accounts. Defendants

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2001 WL 36101533 (M.D.N.C.)                                                                            Page 2

Southern Financial, Dunlap and Lowe facilitated these transfers, and failed to disclose to investors that monies were not held in IRA custodial accounts.

5. Three such Elfindepan distributors were defendants Edmund Menden, Michael Menden and Michael Zieglmeier. Edmund Menden, acting alone and with Michael Menden and Michael Zieglmeier, offered and sold the fraudulent Elfindepan investments. All three were complicit in the fraud, participating in the aforementioned misrepresentations and omissions of material fact as part of their sales efforts on Elfindepan's behalf.

6. Defendants and their affiliates have offered and sold the securities of Elfindepan without filing a registration statement with the Commission, or otherwise being exempt from registration.

## SUMMARY OF THE MCCALL FRAUD

7. Defendant James L. McCall ("McCall"), is an associate of Dunlap's. Acting on his own (through several interchangeable front companies) and in concert with Dunlap and Elfindepan, McCall also defrauded innocent investors. Like Dunlap and Elfindepan, McCall employed misrepresentations and omissions of material fact to sell unregistered securities promising guaranteed rates of return as high as 15% per month. McCall perpetrated what is commonly referred to as a "Prime Bank" scheme.

8. McCall's fraud is inextricably intertwined with that of Dunlap and Elfindepan. McCall and Dunlap together hosted sales meetings with prospective investors, "explaining" their bogus investment products and soliciting investor funds. In correspondence, McCall told his investors that their funds were invested with Dunlap and Elfindepan.

9. McCall's promotional brochures and paperwork also announced his affiliation with Dunlap and Elfindepan. McCall's investors were issued "EZ Cards," a Visa debit card issued by Elfindepan, and could purportedly elect to have their investment income paid into their Elfindepan EZ Card accounts. New McCall investors became shareholders of Elfindepan, and the forms McCall required them to fill out were on Elfindepan letterhead. McCall maintained an office in Elfindepan's office suite in Costa Rica and information concerning the investors he defrauded (names, dates, amounts, etc.) was kept on Elfindepan's computer system in Costa Rica. McCall (operating through his various entities) and the Elfindepan scheme are tentacles of the same fraud.

## SUMMARY OF THE STRATEGIC ASSET FUNDS FRAUD

10. Defendant Strategic Asset Funds, S.A. ("SAF") is a Panama corporation formed by Dunlap in May 2000. Dunlap is the President of the corporation. Dunlap, operating through SAF, perpetrated a variation of his Elfindepan scam exclusively over the internet. In particular, he posted a fraudulent solicitation on an investment website, repeating the substance of his Elfindepan scam. In this unregistered public offering, Dunlap promised to pay investors guaranteed returns through SAF of up to" 30% monthly for a 12 month return of 360%."

11. Over 860 innocent investors invested over $6.5 million in Dunlap's SAF scheme between mid-May and mid-July 2000. Dunlap deposited their funds in a bank account he opened in the name of SAF. Although Dunlap represented to investors that their investment returns would begin to payout in August 2000, to date no investor has been paid anything. To the contrary, Dunlap closed the SAF account in mid July 2000, did not invest any of the money as promised and transferred most of it out of the country.

## THE RELIEF DEFENDANTS

12. Relief defendants C.R.C.C. LLC (CRCC) and Patrick Wilson ("Wilson") received $7 million from Dunlap. The $7 million are proceeds of Dunlap's Elfindepan scam, transferred to CRCC and Wilson from an Elfindepan bank account holding funds misappropriated from investors. C.R.C C. and Wilson are not entitled to the funds and would

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

be unjustly enriched at the expense of defrauded investors if allowed to keep them.

### VIOLATIONS

13. Defendants, directly or indirectly, violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77(e) and (c), 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### JURISDICTION

14. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

15. Each of the defendants, directly or indirectly, has used the means or instrumentalities of interstate commerce, or of the mails, in connection with the acts alleged herein, certain of which occurred in the Middle District of North Carolina.

16. This Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

17. Unless permanently restrained and enjoined by this Court, each defendant will continue to engage in the acts, transactions, practices, and courses of business alleged herein, and in acts, transactions, practices, and courses of business of similar purport and object.

### DEFENDANTS

18. ELFINDEPAN, S.A. is a Costa Rican corporation controlled by Dunlap and Lowe, with offices in Greensboro, North Carolina and Costa Rica. Elfindepan has raised at least $13.5 million through the offer and sale of unregistered securities in the form of investment contracts and common stock in Elfindepan. Sales of Elfindepan's unregistered securities are ongoing.

19. TRACY CALVIN DUNLAP, JR., age 57, a U.S. citizen purportedly residing in Costa Rica, is the founder and control person of Elfindepan. Prior to founding Elfindepan, Dunlap worked in the textile manufacturing business.

20. SOUTHERN FINANCIAL GROUP is a trust located in Greensboro, North Carolina, controlled by defendants Dunlap and Lowe. Southern Financial Group shares office space with Elfindepan, and is the primary vehicle for transferring funds from investor IRA and retirement accounts to the commingled, non-custodial accounts of Elfindepan.

21. BARRY LOWE is a plumber and pipe fitter residing in Greensboro, North Carolina. Lowe maintained the Greensboro offices of Elfindepan and Southern Financial, and processed the paperwork converting funds from customer IRA and retirement accounts to Elfindepan accounts.

22. JAMES L. MCCALL, age 67, is a retired chiropractor that claims to be an "Estate Engineer" and "Tax Consultant." He resides in Lafayette, Indiana. McCall, operating through various affiliated entities, offered and sold unregistered and fraudulent securities to the general public.

23. STRATEGIC ASSET FUNDS, S.A. is a corporation formed by Dunlap in Panama in May 2000. Dunlap is the President of the corporation. Its purported place of business was in North Carolina with its bank account in South

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Carolina. Dunlap perpetrated a second securities fraud through SAP.

24. EDMUND MENDEN Edmund Menden, age 66, is a registered securities broker and an insurance salesman who resides in Edina, Minnesota. Until recently, he was a registered representative of Fortis Investors, Inc., a broker-dealer doing business in Minnesota. Fortis terminated its relationship with Edmund Menden upon learning of his involvement with the activities alleged herein. Edmund Menden sold the bogus investment products offered by McCall, Dunlap and their affiliated entities.

25. MICHAEL MENDEN, age 42, is the son of Edmund Menden. He resides in Eden Prairie, Minnesota. Michael Menden is a former insurance salesman who claims to earn his living by selling products through network and multi-level marketing activities. Michael Menden was recruited by his father to sell the bogus investment products offered by McCall, Dunlap and their affiliated entities.

26. MICHAEL ZIEGLMEIER lives in the Minneapolis St. Paul area. He was the business partner of Michael Menden in the network and multi-level marketing activities referenced above. Zieglmeier also worked in partnership with Michael Menden in the sale of the bogus investment products offered by McCall, Dunlap and their affiliated entities.

27. C.R.C.C. LLC is a limited liability company registered in Wyoming. It apparently operates as an investment company of some sort or another. Its principal place of business is given as San Diego, California, although its principal runs the company's affairs from Georgia. CRCC and its principal received $7 million in proceeds from Dunlap's Elfindepan scam.

28. PATRICK WILSON is a principal and the de facto control person of C.R.C.C. He orchestrated the transaction by which C.R.C.C. received the $7 million from Dunlap and Elfindepan and was solely responsible for the subsequent disposition of the funds.

FIRST CAUSE OF ACTION

[Violations of Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), against defendants Elfindepan, Southern Financial, Strategic Asset Funds, Tracy Calvin Dunlap, Jr., Barry Lowe, James L. McCall, Edmund Menden, Michael Menden and Michael Zieglmeier.]

29. Paragraphs 1 through 28 are re-alleged and incorporated herein by reference.

30. Elfindepan purports to be a consortium of Central American stock corporations. It was started by Dunlap in January 1999 with $700, and incorporated by Dunlap in January 1999 in Costa Rica, where it claims to maintain its principal offices. Dunlap is its President. Elfindepan also maintained an office in Greensboro, North Carolina, staffed by Lowe. SAP purports to be a Panama corporation. It also was formed by Dunlap, in May 2000. Dunlap is its President. SAF claims to operate from an address in Statesville, North Carolina. Southern Financial is a trust formed by Dunlap, based in Greensboro, North Carolina. Dunlap controls every significant aspect of Southern Financial, SAF and Elfindepan's operations. Neither Elfindepan. Southern Financial nor SAF has ever registered any securities offerings with the Commission.

SOLICITATION OF INVESTORS

31. Beginning as early as March 1999, the defendants began soliciting investors to purchase the unregistered securities of Elfindepan. The solicitations were made during face-to-face meetings with individuals and with groups, through telephone conversations and over the internet

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

32. The unregistered securities took the form of investment contracts in Elfindepan, and common stock in Elfindepan. Certain investors were offered the option of accessing their Elfindepan accounts through a debit card issued by a Costa Rican bank.

33. Dunlap organized a series of "distributors" or affiliates to offer and sell the unregistered securities of Elfindepan. These "distributors" have aided defendants in the sale and solicitation of investments in Elfindepan in at least nine states. Many of these individuals appear to be early investors themselves, and, consistent with the scenario typical of Ponzi or pyramid scheme frauds, at least one of these early investors has realized large returns on his investment. Edmund Menden, Michael Menden and Michael Zieglmeier were such distributors.

34. Defendants and other Elfindepan "distributors" or affiliates have attempted to prevent investors from disclosing information about the company by requiring signature of nondisclosure agreement pursuant to which investors agree not to discuss Elfindepan's business with third parties without written permission of the Elfindepan representative.

35. SAF. Dunlap's other front company, offered and sold securities unregistered securities to the general public over the internet. These securities were variations of those Dunlap offered through Elfindepan. SAF began soliciting investors in May 2000, extending through at least July 2000.

## FALSE REPRESENTATIONS AND OMISSIONS

36. The defendants made, or caused others to make, numerous false and misleading representations in connection with the offer or sale of the securities of Elfindepan. As described below, the most significant of the misrepresentations and omissions related to: (1) Elfindepan's business; (2) guaranteed investment returns; (3) safety of the investment; and (4) the use of investor funds.

37. *Misrepresentations and omissions about Elfindepan's business.* Through its website and marketing brochure, and in the personal solicitations, defendants represented that Elfindepan's primary business -- 46% according to a pie graph found in these materials -- is to provide short-term loans to companies awarded government contracts which are required to complete one-third of the projects prior to receipt of any government finnding. Marketing materials state that Elfindepan also engages in factoring, or the business of financing accounts receivable -- 35% according to the chart. The materials explain that these are loans made to companies with large receivables and cash flow problems. The remaining 19% of Elfindepan's business purports to consist of loans to private individuals who are waiting "an average of six months" for banks to approve their mortgage loans. Thus, while a bank is analyzing the viability of the mortgaged asset and the reliability of the individual, Elfindepan, according to these materials, is ready to make the loan.

38 Although all of these described loans are traditionally risky ventures -- whose upside potential of higher interest rates is offset by correspondingly greater risk of loss of principal -- defendant's written material provide no discussion of the risk associated with these businesses. In fact. Elfindepan's written materials provide no detail at all of financial performance or results of operations other than generic descriptions of their purported busines.

39. Some of the misstatements in the written materials are unequivocal. The marketing brochure claims "23 years of satisfied customers," a clear impossibility since Elfindepan. by Dunlap's own testimony, has only been in existence since January of last year. The brochure also falsely claims that Elfindepan has paid out over $60 million to investors.

40. The oral representations by defendant Dunlap and individuals working in concert with him are even more fanciful. Actual and potential investors have been told, among other falsehoods, that Elfindepan: (1) participates in a "currency trading" program; (2) makes loans to third world countries guaranteed by the International Monetary Fund

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and the World Bank; (3) loans money to large well-known financial institutions; (4) maintains investors funds in a secure bank account, where it is somehow "scanned" by international financial institutions and used as collateral for loans to aid developing countries (nowhere in the sales material or oral presentations is that term described); and (5) provides highly profitable loans in connection with third world disaster relief projects.

41. *Misrepresentations and omissions about Elfindepan's guaranteed investment returns.* Elfindepan's website represents that the rate of return on investment is "currently a guaranteed 15%." Both the website and marketing brochure display a large chart showing calculations of returns based on a 15% annual return calculation. The brochure represents to investors that "Interest rates are locked in for a year by contract." In today's interest rate environment, a guaranteed annual return of 15% absent extraordinarily high risk is clearly fraudulent.

42. The defendants go much further in oral presentations, however, promising investors returns ranging from 15% annually, 15% monthly, 70% annually, to as much as 40- 50% monthly (or as much as 600% annually). One investor, in a private meeting with Dunlap and an Elfindepan "distributor" or affiliate, was guaranteed a 70% annual return on a $1 million investment. Another investor was told that any investment over $1 million would see a 50% annual return. An investor who invested $15,000 was told that he would earn 7% per month (or 84% annually) on his investment. Dunlap told still another investor that an investment greater than $10 million would earn a 40-50% monthly return (480-600% annually).

43. Upon request, Elfindepan and its distributors provide account statements that reflect an investors' principal investment and accrued interest. Several investors have received such statements purporting to show investment gains.

44. *Misrepresentations and omissions about the safety of the Elfindepan investments.* Elfindepan's marketing brochure notes that the first characteristic of Elfindepan is to "Provide investment vehicles that are secure." In oral representations, the defendants represented and caused others to represent that Elfindepan was a secure investment. On at least two occasions, Dunlap falsely told investors that principal funds invested with Elfindepan never left the bank, statements clearly in conflict with bank records reflecting large withdrawals and transfers of funds out of the Elfindepan accounts to various locations and payees.

45. To at least one investor, Dunlap represented that Elfindepan was in the business of making loans to third world countries and that such loans were guaranteed by the IMF and/or the World Bank. Again, a misrepresentation easily dissolved, since the IMF's own public release, dated November 18, 1996, warns "financial transactions and operations are carried out directly with its member countries and only through a fiscal agency designated by each member for this purpose (such as the member's Central Bank or Ministry of Finance)." The IMF release also states that the IMF "does not operate through other agents and it does not endorse the activities of any bank, financial institution, or other public or private agency." In addition, Elfindepan "distributors" told one investor that an investment in Elfindepan is safer than the stock market. To further highlight and misrepresent the safety of an Elfindepan investment, the website and brochure offer investors the option of accessing their accumulated interest at ATMs worldwide with an Elfindepan EZ card -- a VISA debit card issued through Elfindepan and a Costa Rican bank.

46. Defendants told investors that Elfindepan was an appropriate investment for IRA funds and encouraged them to withdraw funds from IRA custodial accounts and "roll them over" into an Elfindepan account. Defendants Lowe and Dunlap facilitated the "rollover" through Southern Financial Group by providing the necessary documentation and transferring the liquidated IRA funds to Elfindepan accounts. Although investors are led to believe that the rollover is a legitimate transfer to another IRA custodial account, Southern Financial Group is not an IRA custodian. Formerly tax-deferred IRA investments are instead commingled with Elfindepan funds in a manner that clearly jeopardizes the tax status of those funds. Despite having taken in several million dollars in IRA and retirement funds, defendants are unable to locate any documents identifying the investors, and the timing and amount of the investments. Defendant Dunlap, meanwhile, keeps the interest earned on those funds.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

47. *Misrepresentations and omissions about the distribution of Elfindepan investment funds.* Contrary to representations about Elfindepan's business, the records of the two known financial institutions where Elfindepan maintains accounts: the Rock Hill Bank and Trust of South Carolina and the Offshore Reserve Fund in New York, reveal four things: (1) funds leave these accounts. These are not, as defendants have represented, secure bank accounts left untouched to collect interest; (2) funds are being used for purposes inconsistent with representations made by defendants about the nature of Elfindepan's business. The bank records contain no hint of, for example, lending to recipients of government contracts, loans for foreign financial institutions, loans based on receivables; (3) at least some of the funds are being used to pay early Elfindepan investors. At least $348,000 was sent to an early Elfindepan investor, nearly doubling the amount of his principal investment. The payment of early investors from the proceeds of subsequent investors is a classic insignia of a Ponzi or pyramid fraud, which inevitably collapse when there are insufficient later investors to pay early investors; and (4) at least some of the funds are being used by Dunlap personally -- over $125,000 was wired from an Elfindepan bank account in June 2000 for the benefit of three of Dunlap's children.

48. *Material omissions about SAF's business.* According to SAF's written offering materials. SAF "was created fro the purpose of offering secure, private yield funds for the asset growth of its members worldwide." It purports to be "a private organization located in Costa Rica." SAF does not identify exactly what kind of company it is, who its principals are, what specific business it is in, what investments it will make with investor funds, or how it will pay the high returns it promises. Nowhere does it inform investors that its sole purpose is to steal their money. In all material respects, SAF's position as to its business constitutes fraud.

49. Dunlap claimed that SAF would be utilizing "the expertise and assistance of an established and proven [company] with 23 years of satisfied customers and over 60 Million currently paid out in interest." i.e., Elfindepan. In particular, in its promotional brochure Elfindepan holds itself out as having "23 Years of satisfied customers ... 60 Million currently paid out in interest...." As alleged elsewhere, these representations are demonstrably false.

50. *Misrepresentations about SAF's guaranteed investment returns.* SAF makes the following promises in its written offering materials:

"Strategic Asset Funds will offer its members a safe, private, vehicle in which to diversify their portfolios while offering a high yield, 20% to 30% monthly over a 12 month period. Strategic Asset Funds will be utilizing a 4 tier payment structure.
1. $1,000 to 4,999 deposit earns 20% monthly for a 10 month return of 200%
2. $5,000 to 19,999 deposit earns 20% monthly for a 12 month return of 240%
3. $20,000 to 49,999 deposit earns 25% monthly for a 12 month return of 300%
4. $50,000 deposit and up earns 30% monthly for a 12 month return of 360%

These promises are so patently absurd and fraudulent that Dunlap and SAF do not even try to explain how they will pay these returns, much less identify the specific investments they will make with investor funds that will generate such rates of return.

51. *Misrepresentations and omissions about the safety of the SAF investments.* SAF uses adjectives like "safe" and "secure" to characterize its investments, stating in its offering materials that investments are insured with a $1 million fidelity bond and are protected against employee theft. In addition funds will be ... secured by a CD." These representations are demonstrably false. Investor funds were neither safe nor secure, as Dunlap closed the SAF account and dissipated the funds in a matter of days, most of which are outside the jurisdiction of United States courts. There is not now and never was a fidelity bond or certificate of deposit guaranteeing investor funds against loss or theft.

52. *Misrepresentations and omissions about the distribution of SAF investment funds.* Dunlap and SAF represented

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

as follows in their written offering materials: "[SAF] is diligently working to begin accepting funds on or about May 1, 2000.... Traditionally it takes 30 to 40 days to finalize the fidelity bond[,] secure the CD, and initiate the program. This move[s] the actual program start date to a period between July 1st and July 10, 2000. Your monthly disbursements will begin 30 days thereafter." Thus, despite the promise to begin payouts by mid August 2000, to date no investor has been paid anything.

53 In approximately a six or seven week period beginning in May 2000, Dunlap raised more than $6.5 million from over 860 investors by means of his SAF scam, depositing the misappropriated funds in a bank in South Carolina. Despite his representations, Dunlap did not invest any of the funds. To the contrary, on or about July 18, 2000, Dunlap closed the SAF bank account and dissipated the funds in a matter of days. Of the approximate $6.5 million raised, Dunlap wired (1) $4 million to an account in Canada, which was immediately wired to an account in Switzerland, (2) $1.5 million to an individual in Texas, purportedly in satisfaction of a debt or obligation, (3) $85,000 as gifts to his children, and (4) approximately $600,000 to another account he controlled (an Elfindepan bank account).

54. *McCall's Misrepresentations and Omissions.* McCall operation is a "Prime Bank" scheme. In classic "Prime Bank" fashion, a recent offering document claims to be an investment vehicle where the principal investment is "fully secured" by a "Bank Endorsed Guarantee." Other investors have been told that McCall and his affiliated entities invest with various unnamed world banking institutions and "international traders" which are able to pay the huge monthly guaranteed rates of return, another hallmark of a "Prime Bank" scheme. Promised returns range from 11% monthly (promised in written materials) to 15% monthly (promised by McCall in person).

55. When pressed for details of specific investments or investment contacts, McCall refuses to provide further information. Just like Dunlap, Elfindepan and SAF, he has in all respects failed to identify where he invests, how he invests, what specific investments he makes, or who can verify the existence of his investments.

56. *McCall's Interchangeable Front Companies.* McCall operates through over a dozen interchangeable front companies, switching between them to avoid scrutiny by state and federal regulators. These entities include Acorn Enterprise Group, Acorn Group Limited, Acorn Enterprises Limited. Acorn Investment Enterprises, Global Asset Management Group and Global Asset Management, S.A., Consultorias Okama, S.A., International Asset Management Corporation, S.A., Georgia Trust, HISway Financial Associates, HISway Financial Inc., HISWAY International Ministries and Spirit Enterprises. The entities designated as "S.A." are purportedly Costa Rican corporations. All of the entities are based in Lafayette, Indiana at McCall's home address. The HISway entities are purportedly religious organizations that, in addition to pursuing various international ministries with funds solicited from investors, are also able to pay their investors the same guaranteed high monthly rates of return. McCall holds himself out as a "Steward" of the HISway entities. None of these entities is registered with the Commission.

57. *McCall's Misrepresentations Concerning Investor Returns.* Despite repeated pleas by investors to get their investments returned, McCall has ignored their correspondence and avoided their telephone calls. He has engaged in a strategy of delay to put off increasingly suspicious investors, utilizing a repeating cycle of oral and written promises of imminent payment followed by excuses why payment did not happen. This pattern has continued from at least May 2000 to the present. One such excuse for nonpayment is McCall's claim that he transferred investor funds offshore to avoid Commission interference.

58. Other investors have been sent checks in payment on their investments, but the checks were returned because the bank account was either closed or lacked sufficient funds. Still other investors have received partial payments only after threatening McCall with criminal prosecution. Even so, the checks they received contained a myriad of releases and disclaimers in an effort to avoid liability.

59. *McCall's Nexus to the Dunlap and Elfindepan fraud.* McCall's fraud is inextricably intertwined with that committed by Dunlap and Elfindepan. In late 1999 and early 2000, McCall began introducing his investors to Dunlap

and Elfindepan. In various domestic sales meetings in this time period, McCall told his investors and distributors that their money was invested with Dunlap and Elfindepan. According to correspondence from McCall to his investors, "I will no longer have control of operations. I have contracted with Elfindepan, S.A. (Mr. T.C. Dunlap. the Director. He's been in this business for almost twenty years.), with whom we are also now associated, to manage our operations in Costa Rica." McCall's promotional materials and paperwork also announced his affiliation with Dunlap and Elfindepan. McCall's investors were issued "EZ Cards," a Visa debit card issued by Elfindepan, and could purportedly elect to have their investment income paid into their Elfindepan EZ Card accounts. New investors became shareholders of Elfindepan and the forms McCall required them to fill out were on Elfindepan letterhead.

60. According to a McCall distributor, McCall (operating through his various entities) and Elfindepan are one and the same. McCall maintains an office in Elfindepan's office suite in Costa Rica. Further, information concerning McCall's investors (names, dates, amounts, etc.) is stored on Elfindepan's computer system in Costa Rica. The extent of McCall's fraud is presently unknown as he refused to answer the Commission's questions based on the Fifth Amendment.

61. Defendants, directly or indirectly, have knowingly or recklessly engaged in the acts and practices described herein in the First Cause of Action. By reason of the foregoing Dunlap and Elfindepan have violated, are violating, and unless enjoined, will continue to violate the provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CAUSE OF ACTION

Violations of Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a) and (c)) against defendants Elfindepan, Southern Financial, Strategic Asset Funds, Tracy Calvin Dunlap, Jr., Barry Lowe, James L. McCall, Edmund Menden, Michael Menden and Michael Zieglmeier.]

62. Paragraphs 1 through 61 are re-alleged and incorporated herein by reference.

63. Defendants are offering, selling and distributing unregistered securities of Elfindepan and SAF in the form of investment contracts and common stock. The various McCall offerings (through his interchangeable front companies) also constitute unregistered securities in the form of investment contracts.

64. In the offer and sale of the securities of Elfindepan, SAF and McCall, the defendants, and other persons under their control or acting in concert with them, engaged in general, nationwide solicitations of investors, predominantly through a website posting, face-to- face meetings and/or telephone solicitations. Representatives of the defendants also made presentations to prospective investors in Minnesota, Washington, South Carolina and North Carolina, and at least five other states. The unregistered securities of Elfindepan, SAF and McCall were sold and distributed nationwide to the investing public.

65. Investors were solicited and allowed to purchase Elfindepan, SAF and McCall securities without regard to their financial condition or financial sophistication.

66. The defendants did not provide investors any financial statements or other detailed financial information with respect to their investments.

67. No registration statements have been filed with the Commission or have been in effect as to the offer or sales of the securities of Elfindepan, SAF or McCall, and no exemption from registration was available, for the offers, sales, and distributions of these unregistered securities.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

68. By reason of the foregoing, Elfindepan, SAF, Dunlap and McCall violated, are violating and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## THIRD CAUSE OF ACTION

[Constructive Trust against relief defendants CRCC and Wilson]

69. Paragraphs 1 through 68 are re-alleged and incorporated herein by reference.

70. In the perpetration of the fraudulent securities schemes detailed above, defendants Elfindepan, Southern Financial, SAF Dunlap, Edmund Menden, Michael Menden, Michael Zieglmeier and McCall violated the federal securities laws. Dunlap maintained a bank account in South Carolina in the name of Elfindepan. He deposited into this account the funds he misappropriated from U.S. investors in connection with his fraudulent investment scheme through Elfindepan.

71. $7 million in funds traceable to the wrongful acts of the defendants are directly traceable to relief defendants CRCC and Wilson. In particular, on or about May 23, 2000, Dunlap transferred $2 million from his Elfindepan account to a CRCC brokerage account at Morgan Stanley Dean Witter controlled by Wilson. On or about June 16, 2000, Dunlap transferred S5 million from the Elfindepan account to a CRCC bank account at Washington Mutual.

72. CRCC and Wilson would be unjustly enriched at the expense of defrauded investors if allowed to keep the funds. They are holding the funds for the benefit of Dunlap and Elfindepan, who in turn misappropriated them from innocent investors by means of fraud, and received the funds with the understanding they were to be returned at some point in the future.

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

I.

As to defendants SAF, McCall, Edmund Menden, Michael Menden and Zieglmeier,[FN1] issue a temporary restraining order, preliminary and permanent injunctions, and other emergency and preliminary relief, restraining and enjoining these defendants, and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, from engaging in transactions, acts, practices, courses of business, and conduct of similar purport and object, in connection with transactions which, directly or indirectly, constitute violations, or aiding and abetting violations, of the provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

> FN1. Defendants Elfindepan, Southern Financial, Dunlap and Lowe are already subject to the preliminary injunction entered against them on August 17, 2000.

II

As to defendants SAP, McCall, Edmund Menden, Michael Menden and Zieglmeier, issue a temporary restraining order, preliminary and permanent injunctions, and other emergency and preliminary relief, restraining and enjoining defendants, and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, from engaging in transactions, acts, practices, courses of business, and conduct of similar purport and object, in connection with transactions which, directly or indirectly, constitute violations, or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

aiding and abetting violations, of the provisions of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

### III.

Enter an order requiring all defendants and relief defendants to account for and to disgorge all proceeds (with pre-judgment interest) resulting from the transactions complained of herein. In the alternative, or in addition thereto, the Commission requests that the Court order the equitable remedy of rescission.

### IV.

Enter an order directing defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act of 1933 and Section 21(d) of the Securities Exchange Act of 1934.

### V.

Enter an order finding that the named relief defendants are constructive trustees of any and all funds entrusted to them by the defendants, requiring them to disgorge the full amount of such funds, including interest for the time of their holding such funds.

### VI.

Grant all further relief, legal or equitable, that the Court believes is warranted under the circumstances.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. ELFINDEPAN, S.A.; Southern Financial Group; Tracy Calvin Dunlap, J.R.; Barry Lowe; James L. McCall; Strategic Asset Funds, S.A.; Edmund Menden; Michael Menden and Michael Zieglmeier, Defendants, C.R.C.C. LLC and Patrick Wilson, Relief defendants.
2001 WL 36101533 (M.D.N.C. ) (Trial Pleading )

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 02-22567-CIV-MARTINEZ/DUBE


JUAN ALBERTO ZEPEDA MENDEZ and RADON
TRADING, LTD.,

     **Plaintiffs,**

**vs.**

STANFORD INTERNATIONAL BANK, LTD. and
STANFORD GROUP COMPANY,

     **Defendants.**

_____/


## DECLARATION OF FRANCISCUS P. VINGERHOEDT

1.    My name is Franciscus P Vingerhoedt.  I serve as Stanford International Bank, Ltd.'s ("Stanford Bank") President and CEO.

2.    Stanford Bank is a bank organized under the laws of Antigua.

3.    Stanford Bank provides banking services to international clients from its offices located at 4000 Airport Boulevard, St. John's, Antigua, West Indies.  This is the only office maintained by Stanford Bank.  It is the office from which Stanford Bank conducts all of its business.

4.    All accounts maintained by Stanford Bank are maintained at 4000 Airport Boulevard, St. John's, Antigua, West Indies.

5.    All Stanford Bank client transactions are processed at the offices located at 4000 Airport Boulevard, St. John's, Antigua, West Indies.

6.    All of Stanford Bank's corporate and business activities are conducted in Antigua.

7.    Stanford Bank is a member of the Stanford Financial Group, an international network of affiliated companies that together form a powerful resource of financial opportunities -- from international private banking to brokerage and investment advisory services, trust administration, commercial banking and real estate investment.  Although independent, each company within the Stanford Financial Group works in cooperation with other Stanford affiliates to provide a coordinated wealth management program for more than 34,000 investors in 60 countries..


**EXHIBIT A**

34

8.      Defendant Stanford Group Company ("Stanford Group") is also a member of the Stanford Financial Group, and thus, Stanford Bank and Stanford Group are independent, but affiliated entities.

9.      Stanford Bank is not a subsidiary of Stanford Group.

10.     Stanford Group is not a subsidiary of Stanford Bank.

11.     Stanford Group does not provide any accounting services to Stanford Bank.

12.     Stanford Group does not manage any of Stanford Bank's bank accounts or other financial accounts.

13.     Stanford Group and Stanford Bank have separate management policies, bank accounts, corporate books and records, income tax reports and financial statements.

14.     Stanford Bank's books and records are maintained at 4000 Airport Boulevard, St. John's, Antigua, West Indies.

15.     Stanford Group does not exercise day-to-day control over the business of Stanford Bank.

16.     All bank account holders at Stanford Bank have an independent client relationship with Stanford Bank, even if they may also be clients of other Stanford Financial Group affiliates.

17.     Stanford Bank is not licensed, registered or otherwise qualified to do business in Florida, or anywhere else in the United States.

18.     Stanford Bank does not, and has never, operated, conducted, engaged in, or carried on any business or business venture in Florida, or anywhere else in the United States.

19.     Stanford Bank does not have, and has never had, an office or branch in Florida, or anywhere else in the United States.

20.     Stanford Bank does not have, and has never had, an office address or telephone number in Florida, or anywhere else in the United States.

21.     Stanford Bank does not own property or real estate in Florida, or anywhere else in the United States.

22.     Stanford Bank does not have a registered agent for service of process in Florida, or anywhere else in the United States, except as required by the USA Patriot Act.

23.     Stanford Bank has no employees that reside in Florida.

24.     Stanford Bank is not required to pay taxes in Florida, or anywhere else in the United States.

25.     Stanford Bank, as an Antiguan corporation, is subject to and regulated by Antiguan law.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

    Executed on December 11, 2002.

Franciscus P. Vingerhoedt