IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION,          §
                                             §
            Plaintiff,                        §
                                             §
v.                                           §       Case No.: 3-09-CV-0298-N
                                             §
STANFORD INTERNATIONAL BANK, LTD.,           §
STANFORD GROUP COMPANY,                      §
STANFORD CAPITAL MANAGEMENT, LLC,            §
R. ALLEN STANFORD, JAMES M. DAVIS, and       §
LAURA PENDERGEST-HOLT,                        §
                                             §
            Defendants.                       §

---

## APPENDIX TO RECEIVER'S REPLY TO RESPONSE OF HUNTON & WILLIAMS LLP IN OPPOSITION TO RECEIVER'S MOTION TO COMPEL

---

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § | |
| Plaintiff, | § § | |
| v. | § § | Case No.: 3-09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, and LAURA PENDERGEST-HOLT, | § § § § § § | |
| Defendants. | § | |

## DECLARATION OF KARYL VAN TASSEL

STATE OF TEXAS   §

HARRIS COUNTY   §

1.      "My name is Karyl Van Tassel. I am competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.      On February 16, 2009, the Court appointed Ralph S. Janvey the Receiver for Stanford International Bank, Ltd. ("SIBL"), Stanford Group Company ("SGC"), Stanford Capital Management, LLC, R. Allen Stanford ("Stanford"), James M. Davis ("Davis"), and Laura Pendergest Holt ("Holt") and all entities owned and controlled by any of them. (All corporations and other legal entities owned by Stanford, Davis or Holt are collectively referred to as the "Stanford Entities"; each such entity, in the singular, is referred to as a "Stanford Entity.") On the same day, Receiver Janvey retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities.

3.      Save where otherwise appears, the facts and matters which I state in this declaration are from my own personal knowledge gained from my work and that of FTI's team in analyzing the assets of SIBL and other Stanford Entities. Where I rely on information from others or from records, it is true to the best of my knowledge and belief and it is from the source stated. The information contained herein is based on current information acquired to date. Additional information continues to be discovered and analyzed.

1

4.      A copy of my resume is included in the Appendix at 6-18.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, and a Senior Managing Director of FTI Consulting, Inc.  I have 23 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful termination.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

5.      I have reviewed the Appendix to the Receiver's Reply to Response of Hunton & Williams LLP in Opposition to Receiver's Motion to Compel (hereinafter "Appendix").  The documents contained in the Appendix at 19-40 are true and accurate copies of documents found during this investigation in the records of the Stanford Entities or are accurate compilations of data gathered during the investigation.

- March 22, 2007 Form U-2 Uniform Consent to Service of Process, Appdx. at 19-21.

- March 26, 2004 Letter to Texas State Securities Commissioner, with attachments, Appdx. at 22-32.

- June 30, 2008 Stanford Financial Group schedule listing Tier 3 merchant banking assets, Appdx. at 33.

- Internal Stanford schedule listing past uses of SIBL funds supporting the Robert Allen Stanford note receivable liability to SIBL in the amount of $1.844 billion, Appdx. at 34.

- CD investor wiring instructions, Appdx. at 35-36.

- February 1, 1996 Stanford Financial Joint Marketing Agreement, Appdx. at 37-40.

6.      In the course of FTI's investigation on behalf of Receiver Janvey, we have interviewed numerous present and former Stanford Entity employees and have examined the Stanford Entities' accounting and other records located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands ("USVI"); and other Stanford locations within and outside the U.S. We have also obtained and reviewed information and data from Davis's home, which is located in Mississippi.  SIBL, and more than 140 other Stanford Entities, were owned virtually 100%, directly or indirectly, by Stanford.  As discussed in more detail below, the evidence indicates that SIBL, and other Stanford Entities, were operated as a single scheme to perpetrate a massive fraud.  SIBL's balance sheet as of December 31, 2008 reflected total outstanding certificates of deposit ("CDs") of approximately $7.4 billion (shown as a liability) and investments of approximately $8.3 billion (shown as an asset).  The $8.3 billion figure was grossly overstated.

7.      SIBL was principally in the business of selling various types of CDs.  It appears that during its last year, and probably for longer than that, SIBL assets were inadequate

2

to cover the amount of SIBL's liabilities on its issued and outstanding CDs as those liabilities came due. Our preliminary analysis of 2008 cash flows, with limited bank information, indicates that funds from current sales of SIBL CDs were used to make interest and redemption payments on pre-existing CDs. It appears that most CD proceeds not used to pay interest, redemptions and current operating expenses were either placed in illiquid investments (such as private equity deals) or diverted to other Stanford Entities "on behalf of shareholder" -- i.e., for the benefit of Robert Allen Stanford. The terms of some SIBL CDs permitted partial redemptions before maturity upon customer demand. CD redemptions increased in late 2008 and early 2009 to the point that continuing CD sales could no longer cover the redemptions and normal operating expenses. This caused such a rapid depletion of liquid assets, that the scheme began to collapse. By the time the Receivership was instituted, SIBL had already suspended some redemptions and the broader Stanford group of companies had stopped paying many payables.

8.     Robert Allen Stanford is the chairman and a director of SIBL. Stanford is sole owner of Stanford International Bank Holdings, Ltd., which is sole owner of SIBL. Stanford is U.S. citizen with a U.S. residence.

9.     James M. Davis is chief financial officer and a director of SIBL. Davis is a U.S. citizen with a U.S. residence.

10.     Laura Pendergest-Holt is a member of SIBL's investment committee. Holt is U.S. citizen with a U.S. residence.

11.     Six of the seven SIBL directors are U.S. citizens. Neither of the two non-U.S. directors are Antiguans.

12.     SIBL's multi-billion portfolio of cash and investments was actually managed and controlled by Stanford and Davis, apparently with assistance from Holt, from various locations within the U.S. It appears that major cash transfers were directed and controlled by Stanford, Davis, and Holt.

13.     SIBL "head office functions" such as managing investments, directing fund flows, devising investment strategy, and managing legal and human resources were directed from the U.S.

14.     Essential support functions for SIBL were provided from the U.S. by employees of other Stanford entities. These functions included treasury services, accounting, legal, and payroll. They were provided by Stanford entity employees in Texas, Tennessee, Mississippi, Florida and the U.S. Virgin Islands.

15.     SIBL's investments were divided into three tiers, each managed differently, although all ultimately controlled by Stanford, Davis and, at least to the extent of Tier 2 assets, Holt.

16.     Tier 3 was by far the most significant financially and was controlled entirely from the U.S. There is no indication that SIBL managers and employees in Antigua had significant involvement in investment activities.

17.     Approximately $1.2 billion of Tier 3 value (as apparently valued by Stanford and/or Davis or others acting in concert with them) was in merchant banking assets, many of which have headquarters in the U.S.  These investments were managed out of Stanford's Miami offices and reported to Davis. Appdx. at 33.

18.     Records indicate that another $1.8 billion in Tier 3 assets consisted of notes receivable from Robert Allen Stanford.  Appdx. at 34.

19.     Tier 2 principally consisted of investments placed with a variety of investment firms or funds located in the U.S. and Europe, together with a small amount of cash or cash equivalents.  It was managed by Holt, the Chief Investment Officer for Stanford Group Company, from within Mississippi, Tennessee, and Texas.  Holt reported to Davis and Stanford.

20.     Tier 1, the smallest tier in dollar value, consisted of cash and cash equivalents.  It was primarily managed from Houston by Patricia Maldonado, Stanford Financial Group Company Treasurer, who worked at Davis's direction.

21.     SGC provided SIBL with financial consulting and advisory services, including management of SIBL's merchant banking portfolio.

22.     Substantially more CD sales, by dollar amount, were generated from the U.S. than from any other country, including Antigua.  During 2008, almost one-half of CD sales were generated by Stanford brokers located in the U.S.

23.     It appears that more CDs, by total value, are held by U.S. residents than by residents of any other country.

24.     Checks in U.S. or Canadian dollars for the purchase of CDs were bundled and sent frequently from Antigua to Trustmark Bank in Houston, Texas for deposit there.  The checks deposited at Trustmark include checks from Latin American residents.

25.     U.S., Latin American, and Canadian CD customers could also wire payment in U.S. or Canadian dollars to SIBL accounts at Toronto-Dominion Bank.  Appdx. at 35-36.  Toronto-Dominion wire transferred SIBL funds to a Stanford account at Bank of Houston, in Houston, Texas.

26.     As of December 31, 2008 SIBL listed as assets on its balance sheet approximately $172 million in notes receivable from clients.  My analysis indicates that approximately $100 million of the total outstanding loan balances are owed by U.S. residents.

27.     SGC's principal business consisted of sales of SIBL's CDs.

28.     Financial advisors who received commissions for the sale of CDs reside in Florida, Texas, Colorado, Louisiana, Tennessee and other locations throughout the United States.

29.     SIBL records, including records of investments, cash balances, and client information, were kept in the U.S.

30.     SIBL invested directly in the following U.S. portfolio companies/funds, among others: Elandia Solutions, Inc.; Forefront Holdings, Inc.; Reignmaker Communications;; Louisiana Ventures, Health Systems Solutions, Inc.; and US Farm and Ranch Company.  Appdx. at 33.

31.     SIBL and Stanford Bank (Panama), S.A. own brokerage accounts with Charles Schwab that are domiciled in the U.S.

32.     Of the Pershing brokerage accounts that remain subject to the asset hold, more than 90 are owned by residents of this district.

33.     Robert Allen Stanford is the sole owner, CEO, and only director of Stanford Development Company (Grenada).

34.     Robert Allen Stanford is the sole owner, Chairman, and director of Stanford Development Company Limited.

35.     Robert Allen Stanford is the sole owner of Stanford International Holdings (Panama) S.A., which is the sole owner of Stanford Bank (Panama), S.A. (formerly Stanford International Bank (Panama), S.A.).

36.     Robert Allen Stanford is the sole owner of Stanford Trust Company Administradora de Fondos y Fideicomisos S.A. (Ecuador).  Davis is Chairman of the Board of Directors.  Holt is a principal.

37.     The evidence adduced by the Receiver's investigation indicates that SIBL, and more than 140 other Stanford Entities, were owned and controlled 100%, directly or indirectly, by Stanford.  These entities were operated as a single scheme to perpetrate a massive fraud.

38.     I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED on April 17, 2009.

Karyl Van Tassel



# Karyl M. Van Tassel, CPA

Senior Managing Director—Forensic and Litigation Consulting
Karyl.vantassel@fticonsulting.com

1001 Fannin
Suite 1400
First City Tower
Houston. TX 77002
Tel: (713) 353-5445
Fax: (713) 353-5459

**Certifications**

Certified Public Accountant

**Professional Affiliations**

American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

**Education**

B.S. in Business Administration,
Emphasis in Accounting,
University of Northern Colorado

Karyl Van Tassel is a senior managing director in the FTI Forensic and Litigation Consulting practice and is based in Houston. Ms. Van Tassel has twenty-three years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services. Ms. Van Tassel has been designated as an expert on valuations of closely held businesses, other economic damage claims and forensic accounting issues and has performed detailed financial analyses in a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations. She has also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

Prior to joining FTI, Ms. Van Tassel was a partner in KPMG's Forensic Dispute Advisory Services practice. Prior to that she was a member of the litigation and bankruptcy consulting divisions of two national accounting firms as well as a regionally based firm, where she provided financial advisory services to the legal and insurance professions and private industry. She has also provided audit and tax services to auto dealerships, construction clients and governmental agencies. In addition, she has provided accounting services and investment analysis to a financial institution.

## Professional Experience

### Forensic Accounting

- Retained by court appointed receiver to investigate and track $85 million of funds embezzled by the CFO of a Texas energy company. Searched the company records to determine the amount of the embezzled funds, and determine the various schemes used to remove the funds from the company. After tracing the amount removed from the company, then traced assets through multiple shell companies and personal bank accounts, utilizing accounting information and electronic data obtained through email, hard drive and server sources. Worked with receiver on monetizing assets recovered.

- Involved in various investigatory matters related to compliance with Foreign Corrupt Practices Act (FCPA), including assisting a monitor appointed under a deferred prosecution agreement of a company to analyze accounting and internal control procedures. Prepared work plan for compliance testing and directed site visits, conducted interviews and assisted in preparing report of findings. As a result of our work, have reported to head of enforcement at the Department of Justice. With the three year term of the monitorship, have ongoing responsibilities for follow up with the company and oversight of responses to monitor's requests and reported findings, as well as follow up site visits for each year.

- Retained by the audit committee on matters related to allegations of round trip trading in the energy industry. Assisted in providing multidisciplinary teams to extract data, analyze trades, document risk management practices and analyze appropriate accounting treatment, including potential restatement. Reports provided to audit committees to assist them in responding to SEC inquiries and investigations.





### Karyl M. Van Tassel

- Retained by company to perform analysis of costs incurred for provider of energy in submitting a claim in the refund of overpayments related to the California power settlements. Reviewed regulatory filings to determine if costs and methodologies complied with FERC guidelines and state mandates. Analyzed source documents as well as documenting the methodology utilized for compiling the information.

- Retained by counsel for a special committee of a publicly traded software company to investigate allegations of potential backdating of stock options. Led a team of accounting and electronic evidence personnel to assist in acquiring and analyzing written and electronic information related to the stock option process and individuals involved. Worked extensively with counsel analyzing accounting issues related to measurement dates and the appropriate accounting of stock grants for new hires, new account acquisition, employee ranking, compensation in lieu of cash, and sales incentive plans. Analyzed appropriate accounting treatment and estimate of annual financial impact based upon alternative measurement dates. Reported results to Board of Directors and auditors of the company.

- Retained by the audit committee of an electronics company to investigate allegations by the SEC related to revenue recognition issues, overstatement of inventory and property, plant and equipment and self-dealing by top level executives. Company eventually settled with the SEC and announced restated financial statements

- Retained by the audit committee of Fortune 500 company to analyze historical accounting issues related to accounting for long-term construction contracts. Issued report and had meetings with the SEC to discuss findings and accounting issues.

- Analyzed historical rates of return for a variety of mutual funds and equity investments to determine the impact of various investing options related to the assets of a trust. Compared actual returns to several indices to determine the difference and the potential damages allegedly incurred by the trust.

- In a securities matter related to the mining industry, analyzed the impact of the accounting and financial disclosures on the stock of a company. Analyzed various returns on equity investments for guideline companies in the industry as well as equity indices to measure impact of announcements and disclosures on the company stock.

- Retained by a hospital chain to analyze billings to Medicaid and insurance providers to determine if billings were appropriate based upon contractual provisions and consistent with the patients file and diagnosis. Worked with multidisciplinary team to consisting of computer specialists to retrieve data, database specialists to analyze information and medical personnel to review medical files.

- Retained to analyze various factors and transactions in matters asserting alter ego claims. Involved in a variety of matters where we provided detailed analyses of corporate governance, financial operational and control factors to determine the extent to which the information would indicate the existence of separate entities.

- Involved in analyzing various complex financial and accounting transactions regarding alleged improprieties in a variety of industries, either for internal investigations or litigation.

- Analyzed accounting treatment of revenues and related party disclosures for a defendant in a securities matter. Software company allegedly had overstated revenues by inappropriate application of accounting principles and improperly disclosed various related party





Karyl M. Van Tassel

transactions.

- Analyzed and traced assets between various related and affiliated companies, which involved complex accounting treatments. Traced cash and other assets to offshore companies. Testified in hearing for contempt of court regarding the disposition of certain cash receipts subsequent to the issuance of a temporary restraining order that limited the transfer of assets.

- Analyzed the alleged fraudulent activities of two major auto body repair shops for an insurance company. Determined the overall profitability of the auto body repair shops compared to the industry as a whole. From a large production of documents, also determined the availability of financial documents from the body shops, and their relationship to and substantiation of the results of inspections performed on vehicles after the repairs were completed. Assisted the economist in regards to the total business conducted over a 15-year period and extrapolated sample results to the entire population.

- Reconstructed the trust accounts of a real estate company after a fire suspected to be caused by arson. Determined amounts had been misappropriated for the personal use of various brokers. Analysis used in criminal investigation.

- Analyzed the accounts of a real estate developer accused by a family trust of misappropriation of funds. Analysis included complex transactions between 22 related partnerships. Included database extractions of various computers and synthesizing thousands of records to determine ultimate disposition of proceeds from investments.

- Retained by a lender to the defendant in a case involving an alleged ponzi scheme in the computer hardware industry. Analysis included determining the flow of transactions in the company between actual business operations and alleged fraudulent activities. Utilized large-scale database application to track transactions within the company, to the bank and to the potential investors. Analyzed the companies banking transactions to determine if the bank had allowed a "float" on the account, which the trustee alleged to be an additional loan to the company from the bank. Engagement resulted in settlement with company trustee.

- Analyzed the billings of a construction company related to the renovation and partial construction of a residence. Analyzed application of percentage of completion in monthly billings to determine overcharges throughout a three-year construction period.

- Analyzed the costs of producing a compact product for shipping hazardous materials. Determined if improper allocations were made based upon cost accounting theories, resulting in overcharging to clients.

### Contract Disputes

- Analyzed the payments made under a treaty whereby client ceded obligations under a reinsurance agreement in the variable annuity business. The allegations involved whether the contract was wrongfully terminated if underpayment of premium had not been made by insurance company to reinsurer. The issues involved included obtaining an understanding of the payment terms for the reinsurance coverage over an extended period on reinsurance of the guaranteed minimum death benefit of variable annuity life insurance policies. Led a multidisciplinary team working with large volumes of transactions data. Team included data analysis and electronic discovery specialists for the extraction of data over an extended





time period with millions of transactions. Also, worked with actuaries to understand variables assumed in their analysis of the book of business and with underwriters to understand policies and procedures. Testified in arbitration that client had not underpaid over the period of time at issue in the matter.

- Analyzed the economic damages in a breach of contract and tort matter between client insurance company and a third party administrator. Analyzed the damages alleged by plaintiff's damage expert and provided rebuttal analysis of damages. Issues in the damage calculation related to valuation of a book of business for dread disease policies and calculation of amounts owed under a contract.

- Analyzed the economic damages sustained by an investor in a failed joint venture in a urea plant in Columbia. Opinion included a valuation of the business enterprise as of the date of the alleged breach, involving various analyses of the urea market, the prospective operation results and ability to attract lenders.

- Analyzed the lost profits sustained by a petrochemical company related to an alleged breach of a joint venture/operations agreement. Issues related to imbalance in the manufacturing facility due to inappropriate levels of various feedstock to the plant. Inability to maintain contracted levels of product forced inefficient plant operations, decreasing profitability.

- Analyzed the lost profits to a large engineering firm related to the inability to complete the construction of a polystyrene plant in the Middle East due to the Gulf War. Analysis involved analyzing the percentage of completion methods and determining profit at time of invasion, compared to projected profit had the event not occurred. Claim was submitted to the neutral arbitrators in Switzerland.

- In a breach of contract dispute, analyzed the economic losses sustained by the creator and distributor of personal care products. Analysis included working with a marketing expert to determine effects of demographic differences of consumers on buying habits and its impact on the subject company's profits and long-term viability.

- Analyzed the economic damage claim of a producer of accounting software. Provided testimony with regard to the out-of-pocket costs incurred for an internally developed product, which was used to replace the component, which the defendant did not deliver. Also analyzed the lost profit damages under a first to market theory.

- Analyzed the lost profits of a used car dealership related to a breach of contract. Analyzed industry margins compared with subject and other market conditions.

- Analyzed the economic damages of an exclusive distributor of sporting good products due to product defects. Calculated the economic impact to the distributor over an eight-year period, including lost profits, carrying costs of inventory and other incremental costs. Project necessitated analyzing the performance of over forty products and determining the cause factors impacting the diminution of profits.

- Provided rebuttal analysis of a $20 million claim for lost profits in a construction claim for an Arkansas highway project. Addressed the issues of causation as well as analyzing the underlying assumptions of the lost profit claim. The indirect claim for lost profits was dismissed on summary judgment, in part based upon our financial analysis of the causation issue.





Karyl M. Van Tassel

- Determined the lost profits allegedly sustained by a provider of programming to the hotel industry, related to a breach of the right of first refusal for a satellite transponder. Coordinated industry experts in various areas including hotel/motel management, advertising, consumer demands, economic trends, cable programming and venture capital availability to analyze the feasibility of the programmer's claim.

- Calculated the economic damages, including lost profits and incremental expenses, in the largest asbestos case in Colorado for a major suburban shopping mall.

- In a contract dispute, determined the value of the restaurant operations included as part of a major Colorado ski resort. Analyzed market trends and restaurant industry comparables for use in the valuation. Also used industry information to benchmark against actual results, to determine management effectiveness.

- Analyzed the value of a franchise fast food establishment related to a breach of contract. Engagement included analyzing various offering circulars for franchises to determine relevant value drivers for similar franchises. Analyzed demographic data related to California communities included in franchise agreement.

- Analyzed a lost profit claim related to a chain of fast food restaurants in a breach of contract matter. Analyzed store-by-store financial metrics to determine average store results compared to subject stores. Analyzed economic and demographic trends in areas adjacent to subject stores.

**Insurance Claims**

- Analyzed the claim by a hospital related to the flooding of the facility. Engagement involved detailed analysis of the impacted departments and the financial impact of substituting less profitable services for higher margin services due to inability to provide full service medical operations. Also analyzed specific incremental staff costs incurred during the flood and cleanup period.

- Analyzed and assisted in preparing the claim of a large food manufacturer related to an explosion and fire in its primary manufacturing facility. Claim exceeded $100 million, which was settled expeditiously.

- Assisted risk management officer in analyzing a claim related to a fire at a resort community. Claim involved business interruption for a variety of resort functions as well as property losses.

- Assisted in preparing the claim for a large training facility related to computer outages from lightening strikes. Analyzed business interruption claim and collateral losses. Claim eventually was settled in litigation.

- Assisted in claim related to a power outage for several business related to extended power outages related to a major train derailment.

**Intellectual Property**

- Analyzed the economic damages sustained by a construction product manufacturer due to an alleged patent infringement. Also analyzed the lost profits of the defendant company in a counterclaim for breach of contract. Analyzed market potential for the product, impact of





noninfringing substitutes, marketing and distribution channels and other factors impacting sales volume and expenses.

- Analyzed the economic damages sustained in a patent infringement matter by an inventor in the sporting goods industry. Detailed analysis including addressing Georgia Pacific factors related to determining a reasonable royalty. Opinion included market royalty rates, royalty rates on other company products, incremental gross profit on patented property, and profit split method.

- On a consulting basis, analyzed the damages of a producer and global marketer of rubber-based products. Allegations included patent infringement trademark infringement, copyright violations, theft of trade secrets and fraud. Claim for damages exceeded $1 billion. Working for the defendant, analysis included impact of market and distribution channels on lost profits as well as reasonable royalty calculation.

- Analyzed the economic damages of one of the largest software companies in the world related to a patent infringement case. Analysis included determining product gross profitability for those alleged to have infringed the property. Also assisted in analyzing the appropriate royalty rate and allocating the revenue to the patented and nonpatented features of the product. Case settled for $100,000,000 less than claim.

- Analyzed the damages in a patent infringement matter related to modular cells for prison units. Engagement included a detailed analysis of a reasonable royalty, based in part upon the Georgia Pacific factors. Reasonable royalty was based upon market derived data, established rates by licensor and licensee, prior licensing history between the parties and analytical analysis of various profit measures.

- Analyzed value of patented technology for various biomedical devices held by a company for a potential acquisition. Analyzed the patented and nonpatented products to determine synergies and purchase drivers between the products since only a portion of the portfolio of products was to be purchased. Also considered impact of governmental approval process on value of patented properties that were still in clinical trials. Determined range of values based upon reasonable royalties obtained in the market place and from other analytical measures.

- Analyzed the value of patented technology in a laser devise used for noninvasive surgeries and dental work for a transfer to an off-shore entity for tax purposes. Engagement included analyzing the profit stream from the laser device as well as market derived rates.

- Analyzed the range of reasonable royalty for physicians developing a drug for cancer treatment. Patented property was related to improving efficacy of radiation treatments. Using analytical data and market derived rates, assisted in negotiating license with a biotechnology company.

- Analyzed the economic losses in a matter involving the alleged infringement of trademarks for a line of personal beauty products. Testified for the defendant in deposition regarding the economic damages sustained as well as presented counter claim testimony. Issues included analyzing relevant markets for personal care products, product survey information regarding product characteristics influencing buyers decisions, internet advertising, and product distribution channels for impact on damage analysis. Case resolved in settlement.

- Analyzed the lost profits sustained by the developer of a sporting good product resulting





### Karyl M. Van Tassel

from an alleged trademark infringement. The economic damages were calculated both as the lost profits of the developer of the product based upon its own historical results as well as analyzing the profits of the alleged infringing entity. Also analyzed damages related to the cost of corrective advertising in conjunction with an advertising expert.

- Testified for the defendant in an injunction hearing regarding the nature of the advertising revenue as the primary source of income, the overlap in advertising between the "webzine" and magazine and the potential impact on economic damages. Case related to an alleged trademark infringement by a "webzine" of a magazine title.

- Analyzed damages of plaintiff related to disparagement of Ameritech Corporation's management of the alarm company post-acquisition. The case related to the alleged infringement of a trademark for a burglar alarm company purchased by the plaintiffs. Analyzed detail records of clients for overlap caused by clients subscribing to the defendant company due to disparaging information supplied to Ameritech clients in violation of a noncompete agreement as well as infringing use of trademarks.

- Performed royalty examinations for a multinational software company. Supervised multilingual and disciplinary teams to perform royal "audits" in several countries and domestically. Developed regular maintenance program for ongoing audits of contracts on a scheduled basis. Resulted in recovery in excess of $10,000,000, and assisted in favorable renegotiations with joint venture partners.

- Performed a royalty examination in a dispute between a software producer and distributor. Calculated the economic damages allegedly sustained by the software producer due to the alleged under reporting of software sales. Testified in arbitration regarding the results of our findings.

- Performed royalty examinations of five different licensees under contract "audit" rights for a developer of software. Worked with clients and licensees to resolve disputes, recovery of more than $1,500,000, and renegotiation of contracts.

**Post Acquisition Disputes**

- In a post-acquisition dispute, analyzed the results of certain long-term contracts obtained as part of a purchase of an international engineering firm. Analyzed the accounting treatment and financial results of the contracts, both pre- and post-acquisition, and the impact on the valuation of the business.

- Analyzed the lost profits due to alleged fraudulent misrepresentations in a purchase of a restaurant chain. Analysis included store-by-store data of prospective revenue and profitability, compared to those actually achieved. Analyzed market and economic trends in regions in which the restaurants operated to determine impact on profitability and sales from issues unrelated to the alleged misrepresentations.

- Served as an arbitrator in a dispute involving the closing balance sheet working capital provisions of a purchase agreement. In the medical insurance industry, analyzed the proposed adjustments to working capital including accounts receivable, reserves for losses and contingent liabilities.

- Prepared a claim of working capital adjustment related to the closing-balance sheet provisions of a purchase agreement in the computer storage industry. Analysis included





inventory accounting, accounts receivable and deferred revenue.

- Analyzed the propriety of accounts receivables included in the representations and warranties in the purchase of an environmental services company. Allegations involved intentional overstatement of accounts receivable later determined to be uncollectible by the purchaser.

### Telecommunications

- Analyzed the economic damages of a company that terminates traffic for other telecommunications companies who provide a variety of services to end-users. In a contract dispute with one of its clients, analyzed the lost profits as well as the diminution in the value of the business. Analysis included determining network capabilities in regions covered by the agreement during peak and off-peak time periods to determine availability of volume due to switching constraints.

- Analyzed the economic damages asserted in a class action matter against a RBOC. Analysis included detailed records for thousands of customers asserting held order claims over a six-year time period. Downloaded data records related to customer orders, service delivery, billing and customer data. Analyzed relevant tranches of class participants and related damages.

- Analyzed payments made by a major telecommunications company to a switching vendor over a five-year period of time. Based upon contract terms, worked with the company's engineers to determine how the provisioned switching products impacted the billing requirements under the contract. Analysis related to whether charges made by switching vendors were in excess of contract terms. Analysis resulted in multi-million dollar settlement with vendor.

- Analyzed payments made by a major telecommunications company to a single source construction vendor. Issues related to the propriety of charges incurred compared to services delivered over a period of several years. Analysis was used for negotiating a new contract with the contractor.

- In a contract dispute assisted in analyzing the viability of a "C-Block" license holders' business plan and the reasonableness of the company valuation. Researched "C-Block" license auction values and results of operation of "C-Block" auction recipients.

- Oversaw an engagement in which 200 competitive local exchange carrier (CLEC) contracts were analyzed to extract compliance issues for billing and provisioning by a major telecommunications company. Results provided service representatives with information for communication with CLEC's.

### Miscellaneous

- Prepared analyses of lost wage claims, lost profit claims and incremental costs incurred in various personal injury matters. Based upon the opinions of rehabilitation specialists and career counselors, prepared damage analysis based upon the estimated reduction in worklife expectancy, decreased earnings potential or incremental costs incurred related to the alleged injuries.





- Analyzed value of businesses conveyed in pre-bankruptcy transactions related to claims of fraudulent conveyance.

- Assisted in economic analyses related to wrongful termination matters, including lost wage and benefit claims.

- Valued the stock of closely held businesses in a dissenting shareholder action, lender liability matter, condemnation proceeding and various marital dissolutions.

- Valued the stock of a closely held chain of restaurants for the purpose of spinning off certain restaurants to form a new company.

- Valued the stock of the largest oyster processing company in the world for a Northwest financial institution. The bank had acquired the company through foreclosure and required the valuation as part of its internal procedures required to sell the entity to an outside party.

- Valued a 50 percent ownership interest in an alarm monitoring company for a buyout of the partial owner's interest.

## Speaking Engagements

Addressed various state and local bar associations as well as other continuing legal education providers on the following matters:

- Valuation Intricacies

- Financial Statement Analysis and Presenting Financial Data at Trial

- Use of Economic Experts in Commercial Litigation and Case Management

- Valuation Issues in Fraudulent Conveyance Matters

- Valuation in a Cram Down Bankruptcy Proceeding

- Valuation of Businesses in Mergers and Acquisitions

- Valuation of Intellectual Property

- Valuation Issues for Biotechnology

## Publications

- Coauthor of "Calculation of Economic Damages in Commercial Litigation," Totaltape Publishing Company, Tampa, Florida, 1990.

- "Valuing Intellectual Property: The Science and the Art," The Colorado Lawyer, August, 1997.

## Education

University of Northern Colorado—B.S. in Business Administration, emphasis in Accounting

F T I



Karyl M. Van Tassel

## Summary of Testimony

| Case | Case Number | Type of Testimony | Law Firm Client | Year |
|------|-------------|-------------------|-----------------|------|
| Edward Malo vs. Breckenridge Spa and William Benkelman | U.S. District Court of Colorado 92-M-2537 | Deposition | Bradley Campbell Carney & Madsen | 1994 |
| Asolo SpA, et al. vs. Giancarlo Tanzi | U.S. District Court of Colorado 93-Z-1778 | Deposition, Trial | Hale & Dorr | 1995 |
| LittleWing Co., Ltd. vs. Mesch & Associates d/b/a StarPlay Productions | AAA Arbitration | Arbitration | Holme Roberts & Owen LLC | 1995 |
| TLB, INC., an Ohio corporation, vs. Platinum Software, a California company | U.S. District Court of Colorado 95-WY-621 | Deposition, Trial | Coghill & Goodspeed, P.C. | 1996 |
| Primedia Intertec Corporation vs. Technology Marketing Corporation | U.S. District Court of Kansas 98-2384-KHV | Trial | Locke Reynolds Boyd & Weisell Sonnenschein Nath & Rosenthal | 1998 |
| Mountain Ocean, Ltd. d/b/a Everybody Ltd. vs. For Every Body, Inc. | U.S. District Court Of Colorado | Deposition | Jones, Waldo, Holbrook & McDonough, P.C. | 1999 |
| Prism Management Enterprises, Inc. vs. Crane Leake Casey Ehlers & Eggleston, P.C. | District Court, La Plata County 97-CV-412 | Deposition, Arbitration | Jacobs Chase Frick Kleinkopf & Kelley, LLC | 1999 |





Karyl M. Van Tassel

| Case | Court | Type | Firm | Year |
|---|---|---|---|---|
| Ameritech Corporation v. Jackson Burglar Alarm | U.S. District Court of Colorado 98-N-2432 | Deposition | Holme Roberts & Owen | 1999 |
| The Quizno's Corporation v. Robert W. Mitelhaus | AAA Arbitration | Arbitration | Preeo, Silverman & Green | 1999 |
| Gulf Communications, LLC v. Business Telecom, Inc., d/b/a BTI Telecommunications Services | 398CV2444-6 U.S. District Court for Northern District of Texas, Dallas Division | Deposition | Kyle & Mathis | 1999 |
| Southwest Recreation Industries, Inc. v. Fieldturf, Inc. and Fieldturf International, Inc. | A-00CA063-SS U.S. District Court for the Western District of Texas, Austin Division | Deposition | Brown, Todd & Heyburn PLLC | 2000 |
| Anthony G. Petrello and Cynthia Petrello v. Renaissance Builders, Inc. and Chandler Robinson | 199-51358 The District Court of Harris County, Texas 270th Judicial District | Deposition | Fulbright & Jaworski LLP | 2001 |
| Omagro De Columbia, L.D.C. vs. MCN Energy Enterprises, Inc., formerly named MCN Investment Corporation | 67-180286-99 The District Court of Tarrant County, Texas 67th Judicial District | Deposition and Trial | Shannon, Gracey, Ratliff & Miller | 2001 |
| Blitz Holdings Corp. v. Interamericas Financial Holdings Corp. | Civil Action No. H-00-2247 United States District Court for the Southern District of Texas Houston Division | Contempt Hearing | Wilshire Scott & Dyer | 2001 |
| Hartford Life Insurance Company And Hartford Life & Annuity Insurance Company v. Connecticut General Life Insurance Company | Arbitration | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2002 |
| National Health Insurance Company vs. National Plan Administrators, Inc. Hartford Life Insurance | GN – 101679, In the District Court, Travis County, Texas 53rd Judicial District | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2003 |



**16**



Karyl M. Van Tassel

*Company, and CRS*
*Marketing Agency, Inc.*

| | | | | |
|---|---|---|---|---|
| *SOURCECORP, Incorporated, SOURCECORP DMS, Inc. and Information Management Services, Inc. v. Steve Shill, Rita Shill, Robin Meyer, and Mark Meyer* | No. 76Y1160016303ARN, American Arbitration Association | Testimony, Arbitration | Steptoe & Johnson, LLP | 2004 |
| *David Graben and Frank Strickler v. Western Reserve Life Assurance Company of Ohio; Intersecurities, Inc., and Timothy Hutton* | 03-08-648 The District Court of Wise County, Texas 271st Judicial District | Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2005 |
| *Rodney Montello, et al v. Alcoa Inc., Reynolds Metals Company, Bon L. Campo and Tredegar Corporation* | The U.S. District Court of Southern District of Texas Victoria Division Civil Action No: V-02-84 | Deposition | Baker Botts LLP | 2006 |
| *Bencor, Inc. v. The Variable Annuity Life Insurance Company* | AAA Arbitration | Arbitration | Akin, Gump, Strauss, Hauer & Feld LLP | 2006 |
| *Highland Crusader Offshore Partners, L.P. et al v. Motient Corporation* | Cause No. 05-07996 In the District Court, Dallas County, Texas E-101st Judicial District | Deposition | Fulbright & Jaworksi LLP<br><br>Lackey Hershman L.L.P. | 2007 |
| *Gascoigne Melotte Holdings LLC (U.S.A.), Boumatic LLC (U.S.A.), Boumatic-Melotte SPRL (Belgium) v. Punch* | In the International Chamber of Commerce Court of Arbitration | Arbitration | Baker Botts LLP | 2008 |

F T I



Karyl M. Van Tassel

*Technix N.V. (The Netherlands), et al*

F T I

**18**

## FORM U-2 UNIFORM CONSENT TO SERVICE OF PROCESS

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned STANFORD INTERNATIONAL BANK LIMITED (a corporation), organized under the laws of Antigua and Barbuda, for purposes of complying with the laws of the States indicated hereunder relating to either the registration or sale of securities, hereby irrevocably appoints the officers of the States so designated hereunder and their successors in such offices, its attorney in those States so designated upon whom may be served any notice, process or pleading in any action or proceeding against it arising out of, or in connection with, the sale of securities or out of violation of the aforesaid laws of the States so designated; and the undersigned does hereby consent that any such action or proceeding against it may be commenced in any court of competent jurisdiction and proper venue within the States so designated hereunder by service of process upon the officers so designated with the same effect as if the undersigned was organized or created under the laws of that State and have been served lawfully with process in that State.

It is requested that a copy of any notice, process or pleading served hereunder be mailed to:

STANFORD INTERNATIONAL BANK LIMITED

No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, WEST INDIES

Place an "X" before the names of all the States for which the person executing this form is appointing the designated Officer of each State as its attorney in that State for receipt of service of process:

| | | | |
|---|---|---|---|
| X ALABAMA | Secretary of State | X FLORIDA | Department of Banking and Finance |
| X ALASKA | Administrator of the Division of Banking and Corporations, Department of Commerce and Economic Development | X GEORGIA | Commissioner of Securities |
| X ARIZONA | The Corporation Commission | GUAM | Administrator, Department of Finance |
| X ARKANSAS | The Securities Commissioner | X HAWAII | Commissioner of Securities |
| X CALIFORNIA | Commissioner of Corporations | X IDAHO | Director, Department of Finance |
| X COLORADO | Securities Commissioner | X ILLINOIS | Secretary of State |
| X CONNECTICUT | Banking Commissioner | X INDIANA | Secretary of State |
| X DELAWARE | Securities Commissioner | X IOWA | Commissioner of Insurance |
| X DISTRICT OF COLUMBIA | Dept. of Insurance and Securities Regulation | X KANSAS | Secretary of State |

**19**

| X   KENTUCKY | Director, Division of Securities | X   OHIO | Secretary of State |
|---|---|---|---|
| X   LOUISIANA | Commissioner of Securities | X   OREGON | Director, Department of Insurance and Finance |
| X   MAINE | Administrator, Securities Division | X   OKLAHOMA | Securities Administrator |
| X   MARYLAND | Commissioner of the Division of Securities | X   PENNSYLVANIA | Pennsylvania does not require filing of a Consent to Service of Process |
| X   MASSACHUSETTS | Secretary of State | X   PUERTO RICO | Commissioner of Financial Institutions |
| X   MICHIGAN | Administrator, Corporation and Securities Bureau, Department of Commerce | X   RHODE ISLAND | Director of Business Regulation |
| X   MINNESOTA | Commissioner of Commerce | X   SOUTH CAROLINA | Securities Commissioner |
| X   MISSISSIPPI | Secretary of State | X   SOUTH DAKOTA | Director of the Division of Securities |
| X   MISSOURI | Securities Commissioner | X   TENNESSEE | Commissioner of Commerce and Insurance |
| X   MONTANA | State Auditor and Commissioner of Insurance | X   TEXAS | Securities Commissioner |
| X   NEBRASKA | Director of Banking and Finance | X   UTAH | Director, Division of Securities |
| X   NEVADA | Secretary of State | X   VERMONT | Commissioner of Banking, Insurance, Securities & Health Administration |
| X   NEW HAMPSHIRE | Secretary of State | X   VIRGINIA | Clerk, State Corporation Commission |
| X   NEW JERSEY | Chief, Securities Bureau | X   WASHINGTON | Director of the Department of Licensing |
| X   NEW MEXICO | Director, Securities | X   WEST VIRGINIA | Commissioner of Securities Division |
| X   NEW YORK | Secretary of State | X   WISCONSIN | Department of Financial Institutions, Division of Securities |
| X   NORTH CAROLINA | Secretary of State | X   WYOMING | Secretary of State |
| X   NORTH DAKOTA | Securities Commissioner | | |

Dated this 22 day of March, 2007.
(SEAL)

By      Juan Rodriguez-Tolentino
        President

**20**

## CORPORATE ACKNOWLEDGMENT

State or Province of **TEXAS**)ss

County of **HARRIS**) ss.

On this 22nd day of March, 2007, before me **Richard A. LaMothe** the undersigned officer, personally appeared **Juan Rodriguez-Tolentino** known personally to me to be the **President** of the above named corporation and acknowledged that he, as an officer being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as an officer.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.



_Richard A. LaMothe_
Notary Public/Commissioner of Oath

My Commission Expires_October 3, 2007_

21



STANFORD FINANCIAL GROUP

March 26, 2004

REBECCA HAMRIC
Attorney

**VIA CMRRR #7001 2510 0000 5184 9270**

Securities Commissioner
State Securities Board
State of Texas
P. O. Box 13167
Austin, Texas 78711-3167

      Re:    Stanford International Bank Ltd.
            Accredited Investor Certificate of Deposit Private Placement Offering
            Third Amendment
            Your File No. 14027

Dear Sir/Madam:

     Enclosed please find an executed copy of the third amended Form D Notice for the above-mentioned offering, which we have filed with the SEC. Also included is an updated Form U-2, Uniform Consent to Service of Process.

     As stated in the original filing, Stanford International Bank believes that these certificates of deposit are not a "security" as defined under U. S. and State of Texas Securities laws, but is nevertheless offering this product solely to accredited investors in the United States.

     Please feel free to contact the undersigned if you have any questions or comments.

Yours truly,

*Rebecca Hamric*

Rebecca Hamric

Enclosures

cc:   Juan Rodriguez-Tolentino
       President, Stanford International Bank

STANFORD FINANCIAL GROUP COMPANY • 5050 Westheimer • Houston, Texas 77056 USA
(713) 964-5147 • (713) 964-5242 Fax • rhamric@stanfordeagle.com

22

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM D

NOTICE OF SALE OF SECURITIES
PURSUANT TO REGULATION D,
SECTION 4(6), AND/OR
UNIFORM LIMITED OFFERING EXEMPTION

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0076 |
| Expires: May 31, 2002 |
| Estimated average burden hours per response... 1 |

| SEC USE ONLY | | |
| --- | --- | --- |
| Prefix | | Serial |
| DATE RECEIVED | | |

Name of Offering (check if this is an amendment and name has changed, and indicate change.)
**STANFORD INTERNATIONAL BANK, LTD. – CERTIFICATE OF DEPOSIT PROGRAM (for U.S. Accredited Investors only)**

Filing Under
(Check box(es) that apply):          [ ] Rule 504      [ ] Rule 505      [X] Rule 506    [ ] Section 4(6)      [ ] ULOE
Type of Filing: [ ] New Filing [X] Amendment

---

**A. BASIC IDENTIFICATION DATA**

1. Enter the information requested about the issuer

Name of Issuer ( [ ] check if this is an amendment and name has changed, and indicate change.)
**STANFORD INTERNATIONAL BANK LIMITED**

Address of Executive Offices (Number and Street, City, State, Zip Code) Telephone Number (Including Area Code)
**No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.          (268) 480-3700**
Address of Principal Business Operations (Number and Street, City, State, Zip Code) Telephone Number (Including Area Code)
(if different from Executive Offices)
**(SAME)**

Brief Description of Business
**Private Financial Institution chartered under the laws of the Republic of Antigua and Barbuda to engage in international business of investing client deposits**

Type of Business Organization

[ ] corporation                    [ ] limited partnership, already formed          [X] other (please specify):

[ ] business trust                 [ ] limited partnership, to be formed           **International business corporation**

---

Month Year

Actual or Estimated Date of Incorporation or          [12] [85]                    [X] Actual [ ] Estimated
Organization:
Jurisdiction of Incorporation or Organization: (Enter two-letter U.S. Postal Service abbreviation for State:
CN for Canada; FN for other foreign jurisdiction) [F] [N]

**GENERAL INSTRUCTIONS**
**Federal:**
*Who Must File:* All issuers making an offering of securities in reliance on an exemption under Regulation D or
Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

**23**

*When to File:* A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

*Where to File:* U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

*Copies Required:* Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of manually signed copy or bear typed or printed signatures.

*Information Required:* A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

*Filing Fee:* There is no federal filing fee.

**State:**

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix in the notice constitutes a part of this notice and must be completed.

### ATTENTION

> **Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption state exemption unless such exemption is predicated on the filing of a federal notice.**

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

### A. BASIC IDENTIFICATION DATA

2. Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer;
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [ ] Executive Officer | [X] Director | [ ] General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
**STANFORD, JAMES A.**
Business or Residence Address (Number and Street, City, State, Zip Code)
**No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.**

| Check Box(es) that Apply: | [ ] Promoter | [X] Beneficial Owner | [X] Executive Officer | [X] Director | [ ] General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)
**STANFORD, R. ALLEN**
Business or Residence Address (Number and Street, City, State, Zip Code)
**No. 11 PAVILION DRIVE,** ...

24

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [X] Executive Officer | [ ] Director | [ ] General and/or Managing |

Full Name (Last name first, if individual)
RODRIGUEZ-TOLENTINO, JUAN
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [X] Executive Officer | [ ] Director | [ ] General and/or Managing Partner |

Full Name (Last name first, if individual)
VAN BERGEN, HARRY E.
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [ ] Executive Officer | [X] Director | [ ] General and/or Managing Partner |

Full Name (Last name first, if individual)
ALLEN, KENNETH C.
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [X] Executive Officer | [X] Director | [ ] General and/or Managing Partner |

Full Name (Last name first, if individual)
DAVIS, JAMES M.
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [ ] Executive Officer | [X] Director | [ ] General and/or Managing Partner |

Full Name (Last name first, if individual)
GOSWICK, O.Y.
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [ ] Executive Officer | [X] Director | [ ] General and/or Managing Partner |

Full Name (Last name first, if individual)
WINTER, ROBERT S.
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

| Check Box(es) that Apply: | [ ] Promoter | [ ] Beneficial Owner | [ ] Executive Officer | [X] Director | [ ] General and/or Managing Partner |

Full Name (Last name first, if individual)
BLACKMAN, COURTNEY N.
Business or Residence Address (Number and Street, City, State, Zip Code)
No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, W.I.

## B. INFORMATION ABOUT OFFERING

| | Yes | No |
|---|---|---|
| 1. Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering?........ | [ ] | [X] |

Answer also in Appendix, Column 2, if filing under ULOE.

2. What is the minimum investment that will be accepted from any individual?...................... $50,000

| | Yes | No |
|---|---|---|
| 3. Does the offering permit joint ownership of a single unit?......................................... | [X] | [ ] |

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)
STANFORD GROUP COMPANY
Business or Residence Address (Number and Street, City, State, Zip Code)
5050 WESTHEIMER, HOUSTON, TEXAS 77056
Name of Associated Broker or Dealer
(SAME)
States in Which Person Listed Has Solicited or Intends to Solicit Purchasers
(Check "All States" or check individual States) .................                [X] All States

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| [AL] | [AK] | [AZ] | [AR] | [CA] | [CO] | [CT] | [DE] | [DC] | [FL] | [GA] | [HI] | [ID] |
| [IL] | [IN] | [IA] | [KS] | [KY] | [LA] | [ME] | [MD] | [MA] | [MI] | [MN] | [MS] | [MO] |
| [MT] | [NE] | [NV] | [NH] | [NJ] | [NM] | [NY] | [NC] | [ND] | [OH] | [OK] | [OR] | [PA] |
| [RI] | [SC] | [SD] | [TN] | [TX] | [UT] | [VT] | [VA] | [WA] | [WV] | [WI] | [WY] | [PR] |

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

1. Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if answer is "none" or "zero". If the transaction is an exchange offering, check this box ¨ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | Aggregate Offering Price | Amount Already Sold |
|---|---|---|
| Debt ........................................................................ | $_____ | $_____ |
| Equity ...................................................................... | $_____ | $_____ |
| [ ] Common [ ] Preferred | | |
| Convertible Securities (including warrants) ............................ | $_____ | $_____ |
| Partnership Interests ...................................................... | $_____ | $_____ |
| Other (Specify Certificates of Deposit). | $200,000,000 | $120,476,815 |
| Total ........................................................................ | $_____ | $_____ |

Answer also in Appendix, Column 3, if filing under ULOE.

2. Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

|  | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors ............................................ | _____ | $_____ |
| Non-accredited Investors ...................................... | _____ | $_____ |
| Total (for filings under Rule 504 only) ................................ | N/A | $ N/A |

Answer also in Appendix, Column 4, if filing under ULOE.

3. If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C-Question 1.

| Type of offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505 .......................................................... | _____ | $_____ |
| Regulation A ..................................................... | _____ | $_____ |
| Rule 504 .......................................................... | _____ | $_____ |
| Total ............................................................... | N/A | $ N/A |

4. a. Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the issuer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees ........................................... | [ ] | $_____ |
| Printing and Engraving Costs .................................... | [X] | $      50,000 |
| Legal Fees ......................................................... | [X] | $     150,000 |
| Accounting Fees ................................................... | [ ] | $_____ |
| Engineering Fees .................................................. | [ ] | $_____ |
| Sales Commissions (specify finders' fees separately) ................ | [ ] | $_____ |
| Other Expenses (identify) _Referral fees to Licensed Agents...... | [X] | $   6,000,000 |
|                       Invested into Investors' CD Accounts | [X] | $192,800,000 |
| Total ............................................................... | [X] | $199,000,000 |

b. Enter the difference between the aggregate offering price given in response to Part C - Question 1 and total expenses furnished in response to Part C - Question 4.a. This difference is the "adjusted gross proceeds to the issuer." ...........    $1,000,000

5. Indicate below the amount of the adjusted gross proceeds to the issuer used or proposed to be used for each of the purposes shown. If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate. The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C - Question 4.b above.

**27**

|  | Payments to Officers, Directors, & Affiliates | Payments To Others |
|---|---|---|
| Salaries and fees ................................................ | [ ] $_____ | [ ] $_____ |
| Purchase of real estate ...................................... | [ ] $_____ | [ ] $_____ |
| Purchase, rental or leasing and installation of machinery and equipment ...................................................... | [ ] $_____ | [ ] $_____ |
| Construction or leasing of plant buildings and facilities........ | [ ] $_____ | [ i $_____ |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) ...................................................... | [ ] $_____ | [ ] $_____ |
| Repayment of indebtedness ............................................. | [ ] $_____ | [ ] $_____ |
| Working capital ................................................................ | [ ] $_____ | [ ] $_____ |
| Other (specify):  overhead expense | [ ] $_____ | [X] $1,000,000 |
| _____ | [ ] $_____ | [ ] $_____ |
| Column Totals .................................................... | [ ] $_____ | [X] $1,000,000 |
| Total Payments Listed (column totals added) ............................. | [X] $1,000,000 | |

28

## D. FEDERAL SIGNATURE

The issuer has duly caused this notice to be signed by the undersigned duly authorized person. If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) Stanford International Bank Limited | Signature | Date 2/13/04 |
|---|---|---|
| Name of Signer (Print or Type) Juan Rodriguez-Tolentino | Title of Signer (Print or Type) President | |

| ATTENTION |
|---|
| Intentional misstatements or omissions of fact constitute federal criminal violations. (See 18 U.S.C. 1001.) |

## E. STATE SIGNATURE

| | Yes | No |
|---|---|---|
| 1. Is any party described in 17 CFR 230.262 presently subject to any of the disqualification provisions of such rule? .................................................................................... | [ ] | [X] |

See Appendix, Column 5, for state response.

2. The undersigned issuer hereby undertakes to furnish to any state administrator of any state in which this notice is filed, a notice on Form D (17 CFR 239,500) at such times as required by state law.

3. The undersigned issuer hereby undertakes to furnish to the state administrators, upon written request, information furnished by the issuer to offerees.

4. The undersigned issuer represents that the issuer is familiar with the conditions that must be satisfied to be entitled to the Uniform limited Offering Exemption (ULOE) of the state in which this notice is filed and understands that the issuer claiming the availability of this exemption has the burden of establishing that these conditions have been satisfied.

The issuer has read this notification and knows the contents to be true and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

| Issuer (Print or Type) Stanford International Bank Limited | Signature | Date 2/13/04 |
|---|---|---|
| Name of Signer (Print or Type) Juan Rodriguez-Tolentino | Title (Print or Type) President | |

*Instruction:*
Print the name and title of the signing representative under his signature for the state portion of this form. One copy of every notice on Form D must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

29

## FORM U-2 UNIFORM CONSENT TO SERVICE OF PROCESS

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned STANFORD INTERNATIONAL BANK LIMITED (a corporation), organized under the laws of Antigua and Barbuda, for purposes of complying with the laws of the States indicated hereunder relating to either the registration or sale of securities, hereby irrevocably appoints the officers of the States so designated hereunder and their successors in such offices, its attorney in those States so designated upon whom may be served any notice, process or pleading in any action or proceeding against it arising out of, or in connection with, the sale of securities or out of violation of the aforesaid laws of the States so designated; and the undersigned does hereby consent that any such action or proceeding against it may be commenced in any court of competent jurisdiction and proper venue within the States so designated hereunder by service of process upon the officers so designated with the same effect as if the undersigned was organized or created under the laws of that State and have been served lawfully with process in that State.

It is requested that a copy of any notice, process or pleading served hereunder be mailed to:

STANFORD INTERNATIONAL BANK LIMITED

No. 11 PAVILION DRIVE, ST. JOHN'S, ANTIGUA, WEST INDIES

Place an "X" before the names of all the States for which the person executing this form is appointing the designated Officer of each State as its attorney in that State for receipt of service of process:

| State | Officer | State | Officer |
|-------|---------|-------|---------|
| _X_ ALABAMA | Secretary of State | _X_ FLORIDA | Department of Banking and Finance |
| _X_ ALASKA | Administrator of the Division of Banking and Corporations, Department of Commerce and Economic Development | _X_ GEORGIA | Commissioner of Securities |
| _X_ ARIZONA | The Corporation Commission | ___ GUAM | Administrator, Department of Finance |
| _X_ ARKANSAS | The Securities Commissioner | _X_ HAWAII | Commissioner of Securities |
| _X_ CALIFORNIA | Commissioner of Corporations | _X_ IDAHO | Director, Department of Finance |
| _X_ COLORADO | Securities Commissioner | _X_ ILLINOIS | Secretary of State |
| _X_ CONNECTICUT | Banking Commissioner | _X_ INDIANA | Secretary of State |
| _X_ DELAWARE | Securities Commissioner | _X_ IOWA | Commissioner of Insurance |
| _X_ DISTRICT OF COLUMBIA | Dept. of Insurance and Securities Regulation | _X_ KANSAS | Secretary of State |

**30**

| X  KENTUCKY | Director, Division of Securities | X  OHIO | Secretary of State |
|---|---|---|---|
| X  LOUISIANA | Commissioner of Securities | X  OREGON | Director, Department of Insurance and Finance |
| X  MAINE | Administrator, Securities Division | X  OKLAHOMA | Securities Administrator |
| X  MARYLAND | Commissioner of the Division of Securities | X  PENNSYLVANIA | Pennsylvania does not require filing of a Consent to Service of Process |
| X  MASSACHUSETTS | Secretary of State | ___PUERTO RICO | Commissioner of Financial Institutions |
| X  MICHIGAN | Administrator, Corporation and Securities Bureau, Department of Commerce | X  RHODE ISLAND | Director of Business Regulation |
| X  MINNESOTA | Commissioner of Commerce | X  SOUTH CAROLINA | Securities Commissioner |
| X  MISSISSIPPI | Secretary of State | X  SOUTH DAKOTA | Director of the Division of Securities |
| X  MISSOURI | Securities Commissioner | X  TENNESSEE | Commissioner of Commerce and Insurance |
| X  MONTANA | State Auditor and Commissioner of Insurance | X  TEXAS | Securities Commissioner |
| X  NEBRASKA | Director of Banking and Finance | X  UTAH | Director, Division of Securities |
| X  NEVADA | Secretary of State | X  VERMONT | Commissioner of Banking, Insurance, Securities & Health Administration |
| X  NEW HAMPSHIRE | Secretary of State | X  VIRGINIA | Clerk, State Corporation Commission |
| X  NEW JERSEY | Chief, Securities Bureau | X  WASHINGTON | Director of the Department of Licensing |
| X  NEW MEXICO | Director, Securities | X  WEST VIRGINIA | Commissioner of Securities Division |
| X  NEW YORK | Secretary of State | X  WISCONSIN | Department of Financial Institutions, Division of Securities |
| X  NORTH CAROLINA | Secretary of State | X  WYOMING | Secretary of State |
| X  NORTH DAKOTA | Securities Commissioner | | |

Dated this 30ᵗʰ day of January, 2004.
(SEAL)

By   Juan Rodriguez-Tolentino
     President

**31**

CORPORATE ACKNOWLEDGMENT

State or Province of **TEXAS**)ss

County of **HARRIS**) ss.

On this 30th day of January, 2004 before me **Lucienne Figueroa** the undersigned officer, personally

appeared **Juan Rodriguez-Tolentino** known personally to me to be the **President** of the above

named corporation and acknowledged that he, as an officer being authorized so to do, executed the

foregoing instrument for the purposes therein contained, by signing the name of the corporation by

himself as an officer.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.

LUCIENNE D. FIGUEROA
MY COMMISSION EXPIRES
June 21, 2004
(SEAL)

Notary Public/Commissioner of Oath

My Commission Expires June 21, 2004

**32**

Stanford Financial Group Receivership
Investment Analysis

Unless Otherwise Stated
All Values as of June 30, 2008

| Investment | Pro-Forma Valuation | Invested Amount SIBL | Invested Amount SVCH | Invested Amount SFG | Total Invested Amount |
|---|---|---|---|---|---|
| Elandia Solutions Inc. | $ 371,722,790 | $ 109,505,561 | $ 50,076,178 | $ - | $ 159,581,738 |
| American Leisure Grp. LTD | 150,700,000 | 66,387,641 | - | - | 66,387,641 |
| Forefront Holdings, Inc. | 40,000,000 | 38,193,425 | 10,845,570 | 6,115,000 | 55,153,995 |
| Spring Creek Ranch et al | 50,000,000 | - | 41,578,442 | - | 41,578,442 |
| Health Sys Solutions, Inc | 80,000,000 | 11,001,601 | 16,006,223 | - | 27,007,824 |
| DGSE Companies, Inc. | 64,000,000 | - | 24,743,522 | - | 24,743,522 |
| USFR Media Group | 70,000,000 | 4,220,412 | 20,251,593 | - | 24,472,005 |
| The Ultimate Gift Experience[1] | 40,000,000 | - | $14,233,085 | - | 14,233,085 |
| Phoenix Bay, Inc. | 18,000,000 | - | 13,630,000 | - | 13,630,000 |
| Hisense Broadband Multimedia | 79,000,000 | 9,217,500 | - | - | 9,217,500 |
| Golden Financial Services | 8,600,000 | - | 8,630,443 | - | 8,630,443 |
| Senesco Technologies, Inc. | 31,000,000 | - | 8,084,567 | - | 8,084,567 |
| Caribbean Leisure Mktng LTD | 7,000,000 | - | 7,813,174 | - | 7,005,174 |
| State Petroleum | 7,000,000 | 7,000,000 | - | - | 7,000,000 |
| Luminetx Corporation | 56,000,000 | 6,416,261 | - | - | 6,416,261 |
| Dealer Advance Inc. | 6,227,000 | - | 6,227,251 | - | 6,227,251 |
| Reignmaker Communications | 2,790,000 | 6,070,134 | - | - | 6,070,134 |
| Greystone Pharmaceuticals | 5,890,000 | - | 5,889,393 | - | 5,889,393 |
| GoAntiques, Inc.[2] | 38,000,000 | - | 4,852,967 | 300,000 | 5,152,967 |
| Tree Top Kids, Inc. | 26,400,000 | 4,000,000 | - | - | 4,000,000 |
| KineMed Inc. | 7,200,000 | - | 4,000,000 | - | 4,000,000 |
| Cognigen Networks Inc. | 3,784,000 | - | 3,784,394 | - | 3,784,394 |
| Third Miracle | 2,577,000 | - | 2,576,625 | - | 2,576,625 |
| Panasteel Building Materials, Inc. | 2,450,000 | 2,450,000 | - | - | 2,450,000 |
| Running the Sahara | 1,600,000 | - | 1,600,000 | - | 1,600,000 |
| Majestic Inc. | 1,323,000 | 1,322,834 | - | - | 1,322,834 |
| The List | 500,000 | - | 500,000 | - | 500,000 |
| Midway CC Hotel Partners | 15,300,000 | - | 15,300,000 | - | 15,300,000 |
| Mountain Partners | 7,850,000 | 7,383,243 | - | - | 7,363,243 |
| Catalyst Investments II | 6,400,000 | - | 6,000,010 | - | 6,000,010 |
| Washington Nationals | 7,300,000 | 5,878,367 | - | - | 5,878,367 |
| ACON Project Milagro | 7,161,000 | 4,773,947 | - | - | 4,773,947 |
| Louisiana Ventures | 4,000,000 | 3,350,500 | - | - | 3,550,500 |
| ACON Bastion Partners II | 8,265,000 | 5,509,778 | - | - | 5,509,778 |
| AquaAgro | 3,800,000 | - | 3,600,000 | - | 3,600,000 |
| ACON Bastion Partners III | 3,879,000 | 2,586,207 | - | - | 2,586,207 |
| Memphis Bio-Med Venture II | 7,500,000 | - | 2,100,000 | - | 2,100,000 |
| Panorama | 2,200,000 | - | 2,284,977 | - | 2,284,977 |
| Datex[3] | 500,000 | 500,000 | - | - | 500,000 |
| Infinity Israel-China Fund Partners | 150,000 | - | 150,000 | - | 150,000 |
| SUBTOTAL | $ 1,241,268,790 | $ 295,767,411 | $ 274,958,415 | $ 6,415,000 | $ 577,140,826 |

Notes:
1. Total invested amount does not agree to the Investment Portfolio Summary Information for the Quarter Ended June 30, 2008. The amount per the Summary is $14.63M.
2. Total invested amount does not agree to the Investment Portfolio Summary Information for the Quarter Ended June 30, 2008. The amount per the Summary is $5.233M.
3. The detail tabs do not denote the investing entity for the invested amount. As such the entire balance, through 6/30/2008, of invested funds is included in the SIBL column

Attorney Work Product

1

Privileged & Confidential



Shareholder Funding by Regions (Incl. Airlines)

Legend: Other Affiliated Companies · North America · Airlines · Caribbean · Europe · Latin America · Global · DIVD & Other Holding co.

Shareholder Funding by Month
2007-2008

## Shareholder Funding, Assumption of debt and Notes Payable Acct.
### As of 12/31/08 (Preliminary)
In US dollars

| Company | Assumption of debt to DIC / Reserve for Future Cap. Total 2004-2007 | 2008 | NPV Balance Q1-Q4 2008 NPP | Total notes / Funding Adjust. | Total Balance | % |
|---|---|---|---|---|---|---|
| **Other Affiliated Companies** | | | | | | 24.9% |
| Stanford Financial Group Co. | $229,076,912 | $9,574,608 | $238,396,420 | $23,164,418 | $250,415,940 | |
| Stanford Financial Group, Ltd. | 76,409,843 | 0 | 76,409,843 | 24,399,628 | 100,814,471 | 4.9% |
| Stanford Development Corporation | 12,819,311 | 871,200 | 13,690,511 | 7,176,700 | 15,023,258 | 1.3% |
| Stanford Venture Capital Holdings, Inc. | 293,370,509 | 8,344,034 | 301,614,549 | 589,544 | 249,015,503 | 1.2% |
| Stanford American Samoa Holding, Ltd | 110,500 | | 110,500 | 24,379,214 | 110,500 | 0.0% |
| Intex Advertising | 6,132,746 | 0 | 6,132,746 | | 6,132,746 | 0.5% |
| Devonshire International Management Ltd | 501,000 | 0 | 501,000 | | 501,000 | 0.0% |
| **North America** | | | | | $169,670,227 | 8.3% |
| Stanford Group Holdings, Inc. | 112,158,337 | 57,500,000 | 169,650,337 | | 169,650,337 | 16.4% |
| **Airlines** | | | | | $231,414,547 | 16.4% |
| Caribbean Sun Airlines Inc. | 123,943,515 | 0 | 123,943,515 | 30,406,500 | 123,947,515 | 12.3% |
| Caribbean Star Airlines, Ltd. | 143,911,841 | 563,300 | 144,475,841 | | 144,475,841 | 1.3% |
| Caribbean Aircraft Leasing (BVI), Ltd. | 41,218,750 | 0 | 41,218,750 | | 41,218,750 | 4.1% |
| Caribbean Airlines Services, Inc | 1,185,036 | 0 | 1,185,036 | | 1,185,036 | 0.1% |
| Caribbean Airlines Services, Ltd | 1,290,848 | 0 | 1,290,848 | | 1,290,848 | 0.1% |
| CSA Holdings | 17,545,417 | 1,747,128 | 19,282,543 | 161,000 | 19,452,545 | 1.9% |
| **Caribbean** | | | | | $471,576,531 | |
| Stanford Development Company Ltd. | 245,472,265 | 24,675,162 | 270,147,227 | 30,406,500 | 450,553,757 | |
| Sun Printing & Publishing, Ltd. | 11,345,340 | 0 | 11,345,340 | | 11,345,340 | 1.1% |
| Stanford Eagle | 18,971,188 | 1,247,900 | 20,219,088 | | 20,219,088 | 2.0% |
| Stanford 20/20 Ltd | 21,445,135 | 2,328,432 | 23,971,767 | | 23,971,767 | 2.3% |
| The Sticky Wicket Ltd | 4,393,513 | 0 | 4,393,513 | | 4,393,513 | 0.4% |
| Stanford Aerospace | 4,391 | 0 | 4,391 | | 4,391 | 0.0% |
| Stanford Group Antigua, Ltd | 4,694,378 | 0 | 4,806,378 | | 4,806,378 | 0.5% |
| Stanford Aviation, Ltd | 1,779,089 | 399,810 | 2,178,899 | 287,500 | 2,493,399 | 0.2% |
| SS Asia Inc | 1,160,429 | 0 | 1,160,429 | | 1,160,429 | 0.1% |
| Stanford Caribbean Ltd | | | | | | |
| Pure House | 656,906 | 0 | 656,906 | | 656,906 | 0.0% |
| **Europe** | | | | | $48,826,883 | 2.4% |
| Stanford Group Suisse | 31,636,903 | 14,312,397 | | 2,654,879 | $115,920,337 | |
| **Latin America** | | | | | $115,920,337 | 5.9% |
| Stanford Group Mexico | 13,408,479 | | 13,408,479 | 0 | 13,408,479 | 6.5% |
| Stanford Group Peru | 4,772,394 | | 4,772,394 | | 4,772,394 | 4.7% |
| Stanford Int'l Holdings Panama | 12,454,229 | 18,400,000 | 31,027,229 | | 31,039,229 | 3.0% |
| Dreyart Holdings Ltd | 0 | 2,320,000 | 2,320,000 | 1,400,000 | 3,720,000 | 2.0% |
| Stanford Trust Quito | 854,865 | 0 | 854,865 | | 854,865 | 0.3% |
| Stanford Casa de Valores | 594,133 | 1,000,000 | 1,594,135 | | 1,594,785 | 0.3% |
| 5 Koro Ecuador | 630,923 | 4,050,000 | 4,680,000 | | 4,680,000 | 0.4% |
| SG Venezuela A.I. | 4,343,394 | 0 | 4,343,394 | | 4,343,394 | 0.4% |
| Stanford Holdings Venezuela | 33,442,905 | 0 | 33,442,905 | | 33,442,905 | 3.3% |
| Torre Las Mercedes | 21,491,139 | 0 | 21,491,139 | | 21,491,139 | 2.1% |
| Stanford Corporate Services Vz | 14,921,923 | 2,009,000 | 16,923,913 | | 16,923,913 | 1.5% |
| **DIVD & Other Holding co.** | | | | | $114,102,490 | 1.4% |
| STG Global Management, LLC | 4,335,411 | 23,155,314 | 27,690,905 | 30,039,700 | 97,090,825 | |
| Stanford Corporate Services, LLC | 0 | | 0 | 4,656,600 | 4,656,600 | 4.6% |
| Stanford Rail Estate Acquisition, LLC | 4,069,493 | 13,194,708 | 17,264,199 | 3,974,400 | 4,974,400 | 4.7% |
| Christiansted Downtown Holdings, LLC | 0 | 11,194,140 | 11,194,140 | 489,700 | 11,683,840 | 1.0% |
| The Bahamia Club, LLC | 689,854 | 32,400 | 722,254 | 655,300 | 1,413,554 | 0.1% |
| Stanford 20/20, LLC | 7,702,201 | 5,000,000 | 12,702,201 | 195,900 | 12,895,001 | 1.2% |
| Stanford Caribbean Investment, LLC | 316,133 | 1,231,641 | 1,847,594 | 1,427,000 | 3,275,594 | 0.3% |
| Stanford Caribbean, LLC | 0 | | 0 | | | 0.0% |
| Stanford Pro | 0 | | 0 | | 0 | 0.0% |
| Stanford Corporate Venture, Ltd (DIVI) | 16,417 | 3,700,000 | 3,716,417 | 0 | 3,716,417 | 0.3% |
| Stanford Corporate Services, Ltd (DIVI) | 11,399 | | 11,399 | 0 | 11,399 | 0.0% |
| Stanford Corporate Venture, Ltd | 467 | | 467 | 0 | 467 | 0.0% |
| Stanford Group Ltd | 3,062,163 | 120,440 | 3,193,613 | 0 | 3,193,613 | 0.3% |
| Stanford Group Ltd | 3,062,163 | 120,440 | 3,193,613 | 0 | 3,193,613 | 100.0% |
| | $1,634,433,044 | $209,863,519 | $1,844,496,563 | $322,172,866 | $2,034,085,493 | |

Less Capital Markets Assets — $327,539,000
Net asset assumption to date — $1,706,426,433
Total 2008 SFR Funding (a-b) — $322,036,385

Note 1: Column includes adjustments to PIC/MP due to investments transferred to SBL, to reduce RAS NIR and other A/R RAS netting against PIC/MP.
Note 2: Re-capitalization was completed 11/08.
Note 3: Amount includes the 2004 transfer of assets to SBL, for $310.2 million and 2008 transfer of investments to SBL, for $17.4 reducing the KB RAS

# ADDITIONAL DEPOSITS

**STANFORD | Stanford International Bank Ltd.**

No. 11 Pavilion Drive, P.O. Box 3300, St. John's, Antigua, West Indies • Tel: 268.480.3700 • Fax: 268.480.3737
www.stanfordinternationalbank.com • A member of the Stanford Financial Group.

Bank clients can make additional deposits to their accounts in one of the following ways:

1. Send personal or bank cheques:

   · The cheque should be made out in favour of Stanford International Bank Ltd. followed, in parentheses, by the name
   or number of the account to be credited,

   or

   by indicating in the reference section on the front of the cheque, the name or number of the account to be credited,

   or

   by indicating on the back of the cheque, the name or number of the account to be credited.

   · Cheques made out in your favour may also be deposited.

2. Send a wire transfer:

   · Please inform your financial consultant before sending funds in this manner.

   · The instructions you provide your bank should include the following:

   For US Dollars —

   "Please wire US$ _____ (Amount)

   TO:   THE TORONTO-DOMINION BANK
         International Banking Center, Toronto, Ontario, Canada
         SWIFT: TDOM CA TT

         To be deposited to the account of:

         STANFORD INTERNATIONAL BANK LTD. (#0360012161670)
         SWIFT: SIBP AG AG

   REF: _____
                        (Your Name)

        _____"
                        (Account Number)

(continued on reverse)

**35**

**For Canadian Dollars —**

"Please wire CDN$ _____ (Amount)

TO: THE TORONTO-DOMINION BANK
International Banking Center, Toronto, Ontario, Canada
SWIFT: TDOM CA TT

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (#0360012161573)
SWIFT: SIBP AG AG

REF: _____
(Your Name)

_____
(Account Number)

**For British Pounds —**

"Please wire GBP _____ (Amount)

TO: HSBC BANK PLC
London, United Kingdom
SWIFT: MIDLGB22XXX

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58180160)
SWIFT: SIBP AG AG

REF: _____
(Your Name)

_____
(Account Number)

**For Euros —**

"Please wire Euros _____ (Amount)

TO: HSBC BANK PLC
London, United Kingdom
SWIFT: MIDLGB22XXX

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58293136)
SWIFT: SIBP AG AG

REF: _____
(Your Name)

_____
(Account Number)

# STANFORD FINANCIAL JOINT MARKETING AGREEMENT



This Joint Marketing Agreement (the "Agreement") effective as of February 1, 1996, between Stanford International Bank Ltd., a bank organized under the laws of Antigua and Barbuda (the "Bank"); and Stanford Group Company, Inc., a duly licensed broker-dealer organized under the laws of the State of Texas (the "Broker").

WHEREAS, the Bank and the Broker are affiliated through common ownership; and

WHEREAS, the Broker wishes to offer to its customers from time to time products available through the Bank; and

WHEREAS, the Bank and the Broker wish to set forth in this Agreement the terms and conditions under which they and their officers and representatives will cooperate in the joint marketing of certain products:

NOW, THEREFORE, in consideration of the premises and for further valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Broker and the Bank agree as follows:

1.     The Bank will from time to time inform the Broker of those products which the Bank has available for sale to customers of the Broker. Once a product has been so designated, it shall not be withdrawn unless it ceases to be offered altogether to customers of both the Bank and the Broker, or unless the party seeking to withdraw such products shall give not less than thirty (30) days prior written notice to the other party that such product will no longer be available to the other party's customers. Once a product has been designated as available to the Broker's customers, the Bank will be responsible for ensuring, at its own expense, that the Broker has available to it adequate and sufficient promotional materials, information and purchase/subscription forms relating to that product in order to properly market it to its customers.

2.     The parties, each at its own expense, will cooperate in providing any necessary training to each other's officers and representatives concerning products which may be jointly marketed. Similarly, the parties will cooperate in establishing such internal procedures and coordination between themselves, their officers and their representatives, to ensure that the joint marketing is carried out effectively.

3.     Unless otherwise agreed by the parties in writing with respect to any particular jointly marketed product, the parties will not share in any gains or losses which may result from the sale of a particular product, such gains and losses being the sole responsibility of the party whose product it is. However, the parties agree that, to the extent permitted by applicable law, an officer or representative of one party introducing his or her customers to a product belonging to the other party, assuming that a referral fee or commission is being offered in connection with such product by such other party, will be entitled to either receive that fee or commission from

that party or to share in any such fee or commission which that party may pay to its own officers or representatives relating to that product. The amount of such fee or commission and the frequency of its payment will be set as to each separate product by the parties by mutual agreement from time to time, and communicated to their respective officers and representatives. The parties will cooperate with each other at all times, and will exchange any necessary information, to assure the proper allocation and payment of fees and commissions among their respective officers and representatives.

4.     Each party will bear its own development and administrative expenses relating to any product jointly marketed hereunder, and will also be responsible for ensuring that any product which it offers to the other party for joint marketing under this Agreement, and any promotional materials and purchase/subscription forms for such product, comply with all applicable laws in the jurisdictions where the first party itself will offer that product. It will be the responsibility of the other party to review such product and its promotional materials and purchase/subscription forms to make sure that they comply with applicable laws in any jurisdiction where such other party intends to market the product. The parties will cooperate in good faith in making any reasonable adjustments to products, materials or forms which may be necessary to assure compliance with applicable laws in jurisdictions where the products are to be marketed.

5.     Each party represents and warrants to the other that is has taken all corporate and internal action necessary in connection with its execution, delivery and performance of this Agreement, and that it will at all times possess all licenses and governmental approvals necessary under applicable law to offer any product jointly marketed hereunder. Each party will be responsible for obtaining and maintaining all licenses and governmental approvals which may be required for the performance of its functions hereunder, and for assuring compliance by its own officers and representatives with all applicable laws in the marketing of any product hereunder, and with appropriate internal marketing, sales and administrative procedures relating to any such product.

6.     In connection with any product jointly marketed hereunder, each party hereby grants to the other a license to use any logo, trademark or trade name relating to such product, such license to expire automatically at such time as the licensed party shall cease selling that product hereunder.

7.     This Agreement does not create an agency, partnership or joint venture between the parties, and neither party shall hold itself out as constituting the other party's agency, joint venturer or partner. Neither party shall be liable to any customer of the other party, or to any third party, for any action taken or not taken by such other party to this Agreement, or by any officer, employee or representative of such other party. No party will have any authority to legally bind or obligate the other party in any manner whatsoever.

8.     The purchase by a customer of any product jointly marketed hereunder shall be subject in all instances to acceptance or rejection by the party whose product it is, acting in its sole discretion.

9.    Each party selling another party's products hereunder to a customer shall at all times be responsible for screening such customer and for obtaining and maintaining current, adequate know-your-customer information for such customer, and shall make such information available to the other party upon demand.  Each party shall be responsible for obtaining from its customers any waiver of confidentiality or privacy laws or rights necessary for this purpose.

10.    Each party shall keep confidential any information relating to the other party or its business, not generally available to the public, that the first party may acquire in connection with this Agreement.

11.    This Agreement set forth the entire agreement between the parties.   This Agreement is for the exclusive benefit of the parties, and no other person (including without limitation any officer or representative of a party to this Agreement) shall be entitled to claim any right or benefit hereunder, or to seek to enforce this Agreement.

12.    Each party (the 'Indemnifying Party') will indemnify and hold the other party (the 'Indemnified Party') harmless upon demand from any claims, causes of action, losses, damages, costs and expenses (including without limitation the fees and expenses of legal counsel) arising from or caused by (i) the failure of the Indemnifying Party to properly perform any of its functions or obligations hereunder, or (ii) any process, investigation, subpoena or other legal action or proceeding which may be served upon or brought against the Indemnified Party relating to any customer of the Indemnifying Party to whom any products of the Indemnified Party may be marketed hereunder; provided, however, that such indemnification will not apply if such process, investigation, subpoena or legal action or proceeding against or involving the Indemnified Party is instigated by a complaint from, or brought by, such customer.

13.    This Agreement shall remain in effect until January 31, 1997, and shall thereafter be automatically extended for successive one (1) year periods unless terminated by written notice from either party to the other at least thirty (30) days prior to the expiration of the then-current period.   Immediately upon termination of this Agreement, each party shall cease marketing the other party's products and shall return to the other party any promotional materials, information or purchase/subscription forms relating to such products.

14.    This Agreement is governed by the laws of Texas.   For any dispute in any way relating to this Agreement, the parties submit to final and binding arbitration under the auspices of the American Arbitration Association (AAA), to be conducted by a single arbitrator in accordance with the then-current AAA rules for international commercial arbitration.   The arbitration will be conducted in Miami, Florida in the English language.   Judgment on the arbitrator's award may be entered by any court of competent jurisdiction.

STANFORD INTERNATIONAL BANK LTD.     STANFORD GROUP COMPANY, INC.


By: _R. Allen Stanford_              By: _Ellen P. McCorkle_
    Name:                                Name: ELLEN P. McCORKLE
    Title: PRESIDENT / CEO               Title:
                                         Executive Vice President
                                                    COO