**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § | |
| Plaintiff, | § § | |
| v. | § § | Case No.: 3-09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § | |
| Defendants. | § § | |

**RECEIVER'S MOTION TO APPROVE PROCEDURES
FOR SALES OF REAL PROPERTY, ACCEPT CB RICHARD ELLIS'S FEE
PROPOSAL, AND CONDUCT SALES OF REAL PROPERTY BY PUBLIC AUCTION
PURSUANT TO PROPOSED REAL PROPERTY SALES PROCEDURES**

## I.    INTRODUCTION

Ralph S. Janvey, as Receiver for Defendants and all Stanford-controlled entities, respectfully moves the Court for an order approving proposed procedures for the sale of real property (the "Real Property Sales Procedures"), accepting the fee proposal of CB Richard Ellis ("CBRE") relating to its consulting and brokerage services related to the Receivership, and authorizing the Receiver to sell real property owned by the Receivership Estate under U.S. jurisdiction (the "Real Property"), including the Real Property located in the continental United States and the U.S. Virgin Islands, at public auction pursuant to those procedures.[1]  The Receiver needs to sell the Real Property in order to carry out his obligation to preserve the assets and minimize expenses of the Receivership Estate.[2]  The Real Property Sales Procedures will assist the Receiver by allowing him to maximize the sales proceeds received in exchange for the Real Property while selling such property in an efficient and cost-effective manner.

---

[1]    The relief sought in this motion applies to assets of the corporate defendants.
[2]    As defined in the Receivership Order.

## II.     BACKGROUND

A.     **Complaint and Entry of Receivership Order**

On February 16, 2009, the Securities and Exchange Commission (the "Commission") commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC. (the "Defendants"). The Commission alleges, in its First Amended Complaint filed on February 27, 2009, that Defendants perpetrated a multi-billion-dollar fraudulent scheme by (1) promising high return rates on "certificates of deposit" that exceeded those available through true certificates of deposit offered by traditional banks and (2) selling a proprietary mutual fund wrap program known as Stanford Allocation Strategy using materially false and misleading historical performance data. Am. Comp. (Doc. 48) ¶¶ 3, 6.

The Court found good cause to believe that Defendants violated federal securities laws. Accordingly, on February 17, 2009, the Court entered an order appointing Ralph S. Janvey Receiver over all the assets of the Defendants and all the entities they own or control. Order Appointing Receiver (Doc. 10). On March 12, 2009, the Court entered an Amended Order Appointing Receiver that contained changes not material to this motion (the "Receivership Order"). Amended Order Appointing Receiver (Doc. 157).

## III.     ARGUMENT AND AUTHORITIES

A.     **Receiver's Power to Sell Property of the Receivership Estate.**

A common-law equity receiver has the power to dispose of property of the receivership estate when it appears that a receivership is continuing an enterprise that does not show evident signs of working out for the benefit of the creditors. *See Jones v. Village of Proctorville*, 290 F.2d 49, 50 (6th Cir. 1961). Courts appointing a receiver "should see that the business is

liquidated as economically and speedily as possible, unless its continuance is demonstrably beneficial to creditors." *Id.* (citing *Kingsport Press, Inc. v. Brief English Systems*, 54 F.2d 497, 501).

With respect to sales of real property by a receiver, section 2001 of the Judicial Code provides for sale by public auction or private sale. 28 U.S.C. § 2001. Section 2001(a) permits a public sale of realty in the district wherein the receiver was first appointed, at the courthouse of the county, parish or city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such county, parish or city, as the court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more ancillary districts. *Id.* § 2001(a). Section 2002 governs notice of a public sale of realty and provides for such notice to be published once a week for at least four weeks prior to the sale in at least one newspaper regularly issued and of general circulation in the county, state or judicial district of the United States where the realty is situated. *Id.* § 2002. Where, as here, the realty is situated in more than one county, state, district or circuit, the notice is to be published as the court directs. *Id.*

Section 2001(b) of the Judicial Code authorizes private sales of real property, but only after (1) a hearing on notice to interested parties; (2) the court's appointment of three disinterested appraisers; and (3) ten-days' newspaper publication of the terms of the sale before confirmation of any private sale. *Id.* § 2001(b). Moreover, no private sale shall be confirmed at a price less than two-thirds of the appraised value or if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a ten per cent increase over the price offered in the private sale. *Id.*

B.   **Proposed Real Property Sales Procedures**

The Receiver seeks Court authorization to adopt the Real Property Sales Procedures proposed by this Motion, which are consistent with the requirements for sales of realty set forth in sections 2001 and 2002 of the Judicial Code, and to sell the Real Property in accordance with such procedures. Implementation of the Real Property Sales Procedures will enable the Receiver to sell the Real Property in an orderly, efficient, and equitable manner and to maximize the proceeds received from such sales. The Receiver believes that adoption of the Real Property Sales Procedures and the sale of the Real Property pursuant thereto is in the best interests of the Receivership Estate. The Receiver's proposed Real Property Sales Procedures consist of the following:

1.   <u>Stalking Horse Contract</u>. The Receiver shall negotiate a purchase and sale agreement with a proposed buyer out of the proposals he has received (a "<u>Stalking Horse</u>"), subject to higher and better offers. If the Receiver deems it necessary, the agreement may provide for the payment of a break-up fee to the Stalking Horse, in the event the property under contract to the Stalking Horse is sold to a third party and such sale is consummated. The stalking horse concept and bidding protections, such as break-up fees, are commonly used in bankruptcy cases where, as in this instance, a public auction is required. The stalking horse bidder reaches an agreement with the debtor to purchase assets prior to the auction of those assets. Because this bid will be exposed to higher and better bids at auction, the agreement typically provides for a break-up fee to compensate the stalking horse bidder for setting the floor at the auction and exposing its bid to competing offers. Bankruptcy courts allow payment of break-up fees because the stalking horse provides a benefit to the debtor's estate if there is a higher bid for the assets, which is also the only instance in which the fee is paid. *See, e.g.,* 3 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY § 363.02[6] (15th ed. 2008); Paul B. Lackey, *An Empirical*

*Survey and Proposed Bankruptcy Code Section Concerning the Propriety of Bidding Incentives in a Bankruptcy Sale of Assets*, 93 COLUM. L. REV. 720 (1993).

    2.    <u>Posting of Notice of Public Auction</u>.  The Receiver shall post a notice of the proposed sale on the Receivership website at http://www.stanfordfinancialreceivership.com for at least four weeks prior to the sale.  A form of notice of the proposed sale (the "<u>Notice</u>") is attached hereto as **<u>Exhibit A</u>**.  The Receiver shall also contact all of the persons or entities that CBRE has identified as potentially interested in acquiring the Real Property.  These means of providing notice of the proposed sale will be far less expensive, but just as effective as publication of the Notice in newspapers for four weeks.  The Receivership Estate includes properties in various counties in Texas, Michigan, Tennessee, North Carolina, and Mississippi, and in the U.S. Virgin Islands.  Thus, the Receiver would have to publish advertisements regarding more than 50 different parcels of Real Property in at least a dozen newspapers for four weeks.  Given the need to preserve the Receivership Estate, such expenditures are hard to justify, when it is likely that the Notice of the Receivership website, coupled with the marketing efforts of CBRE, will identify potential bidders.

    3.    <u>Competing Offers</u>.  Any entity (each, a "<u>Potential Bidder</u>") that wishes to participate in the bidding process for the sale of any of the Real Property must make a competing offer (a "<u>Competing Offer</u>") on the terms and conditions substantially the same in all respects to the terms and conditions set forth in the purchase and sale agreement with the Stalking Horse and in accordance with the procedures set forth herein.  A Competing Offer must be submitted to the Receiver in the form of (a) a purchase and sale agreement showing the modifications from the purchase and sale agreement with the Stalking Horse; (b) a clean, executed copy of the purchase and sale agreement; and (c) any other bid package requirements contained herein.  The

Competing Offer must contain conditions to closing no less favorable than the conditions contained in the purchase and sale agreement with the Stalking Horse.

4. <u>Submission of Competing Offers</u>. Competing Offers should be submitted to the Receiver at least five business days prior to the date of the public auction (the "<u>Bid Deadline</u>") via the following facsimile numbers and/or electronic mail addresses: (a) Robert P. Wright at fax: 713.229.7737 or email: bob.wright@bakerbotts.com; and (b) Charles Gordon at fax: 713.881.0997 or email: charles.gordon@cbre.com. Any Potential Bidder that does not submit a Competing Offer by the Bid Deadline may, in the Receiver's sole discretion, be prohibited from participating in the public auction.

5. <u>Accredited Bidders</u>. Each Potential Bidder satisfying the requirements set forth in this paragraph shall be an Accredited Bidder. Prior to receipt by a Potential Bidder of any information regarding any of the Real Property to be sold, each Potential Bidder must: (a) execute a confidentiality agreement; and (b) deliver financial information acceptable to the Receiver in his sole discretion demonstrating such Potential Bidder's ability to timely close a proposed transaction and such other information as is requested by the Receiver.

6. <u>Qualifying Bids</u>. The Receiver shall determine when a Competing Offer submitted by an Accredited Bidder constitutes a "Qualifying Bid," and in making that determination may consider the extent to which the Competing Offer complies with the following (the Receiver having the right to waive compliance as to any thereof in his sole discretion):

    (a)    such Competing Offer is received by the Receiver no later than the Bid Deadline;

(b) such Competing Offer is in writing and sets forth the material terms and conditions for such Competing Offer;

(c) such Competing Offer is on terms and conditions substantially similar to or better than those contained in the purchase and sale agreement with the Stalking Horse;

(d) the cash to be paid pursuant to such Competing Offer exceeds, by an amount to be determined by the Receiver, the total of (i) the purchase price to be paid by the Stalking Horse and (ii) the break-up fee to be paid to the Stalking Horse;

(e) the Competing Offer contains no financing contingencies or due diligence contingencies of any kind or any other conditions precedent to the Accredited Bidder's obligation to purchase the Real Property;

(f) such Competing Offer remains open and irrevocable and unchangeable (except to increase the purchase price at the public auction) until it is either (i) accepted as the highest and best bid at the public auction and, if so selected, through the closing of the sale of the Real Property or (ii) rejected at the close of the public auction upon such Competing Offer not having been selected as the highest and best bid;

(g) such Competing Offer is accompanied, on or before the Bid Deadline, by a Good Faith Deposit (as defined below) equal to five percent of the bidder's Competing Offer;

(h) such Competing Offer is not subject to the approval of the Accredited Bidder's board of directors or any other approval body of such Accredited Bidder; and

(i) such Competing Offer contains evidence that the Accredited Bidder submitting it has cash on hand and/or has received debt and/or equity funding commitments sufficient, in aggregate, to finance the purchase contemplated thereby, including, without limitation, either an unconditional lending commitment from a recognized banking institution in

the amount of such Competing Offer or the posting of an unconditional, irrevocable letter of credit from a recognized banking institution issued in favor of the Receiver in the amount of such Competing Offer.

7. <u>Qualified Bidders</u>. Each of (a) any Accredited Bidder that submits a Qualifying Bid to the Receiver in accordance with the terms of the Real Property Sales Procedures and (b) the Stalking Horse shall be a "Qualified Bidder."

8. <u>Good Faith Deposit</u>. The cash deposit submitted by each Qualified Bidder in conjunction with its Qualifying Bid (each, a "<u>Good Faith Deposit</u>"), pursuant to these Real Property Sales Procedures, shall be held in trust by the Receiver and shall not be interest-bearing. The Good Faith Deposit of the Successful Bidder (as defined below) shall be applied against the purchase price of the Real Property. The Good Faith Deposits of Qualified Bidders (other than the Successful Bidder) shall be returned within five Business Days after the conclusion of the public auction. If the Successful Bidder fails to consummate the sale because of a breach or failure to perform on the Successful Bidder's part, the Good Faith Deposit of such Successful Bidder shall be forfeited to the Receiver as liquidated damages. Such forfeiture shall not be the Receiver's sole remedy against such Successful Bidder for breach and failure to consummate the sale, however, and in the alternative the Receiver shall have all other rights and remedies, at law or in equity, against such Successful Bidder, including the remedy of specific performance.

9. <u>The Public Auction</u>. The Receiver will conduct a public auction at a date and time, and in a location, to be determined by the Receiver in his sole discretion. The Receiver may, but is not required to, take into consideration the convenience of the parties that have expressed an interest in purchasing the particular parcel or parcels of Real Property, the location of the Real Property, and other factors.

10. <u>Conduct of Auction</u>.  During the public auction, bidding shall begin initially with the highest Qualifying Bid, and subsequently continue in minimum increments that shall be specified by the Receiver prior to the commencement of bidding.  The public auction will continue until no other Qualified Bidder wishes to increase its Qualifying Bid to more than the minimum increment greater than the previous Qualifying Bid.

11. <u>Evaluation of Bids at Auction</u>.  The Qualified Bidder that submits the highest and best bid, as determined by the Receiver in his sole discretion, shall be deemed the "<u>Successful Bidder</u>."  The highest and best bid may be determined by considering, among other things:

(a) the number, type and nature of any changes to the purchase and sale agreement of the Stalking Horse (or, if the sale is pursuant to paragraph 15, a form of purchase and sale agreement satisfactory to the Receiver) requested by each Qualified Bidder;

(b) the purchase price;

(c) the likelihood that a Qualified Bidder can, and will, close the proposed transaction;

(d) the net benefit to the Receivership Estate, taking into account the Stalking Horse's rights to the breakup fee (as described in paragraph 13 below); and

(e) such other factors as the Receiver may deem relevant in his sole discretion.

Immediately following the close of the public auction, the Successful Bidder, if it has not already done so, shall complete and sign all agreement(s), contract(s), instrument(s) or other document(s) evidencing and containing the terms and conditions upon which the highest and best bid was made.

12. <u>Amendment of Real Property Sales Procedures</u>. The Receiver may: (a) impose at or before the public auction such other and additional terms and conditions as he deems appropriate, and (b) adjourn the public auction to a later date and time.

13. <u>Closing the Sale and Payment of Breakup Fee</u>. Upon the conclusion of the public auction, the Receiver shall, without need for further Court approval, proceed to close the sale with the Successful Bidder. If an entity other than the Stalking Horse is the Successful Bidder, immediately upon the Receiver's consummation of a sale to the Successful Bidder, the Receiver shall be obligated to immediately use the first proceeds from such sale to pay to the Stalking Horse the amount, if any, set forth in the purchase and sale agreement with the Stalking Horse as the breakup fee to cover, *inter alia*, all of the Stalking Horse's costs and out-of-pocket expenses (including attorney's fees) in connection with its due diligence and the preparation and negotiation of the purchase and sale agreement. Except as provided in this paragraph with respect to the Stalking Horse, no other Qualified Bidder, Accredited Bidder, Potential Bidder or other party-in-interest shall be entitled to any breakup fee, expense reimbursement of its costs, expenses or professional fees incurred in connection with the sale and competitive bidding process for any Real Property, including formulation and submission of any bid or any due diligence efforts, or breakup, termination or similar fee or payment.

14. <u>Bulk Sales or Individual Sales</u>. The Receiver, in his sole discretion, may sell the Real Property in individual parcels or may combine several parcels into one or more bulk sales.

15. <u>Real Property with *De Minimis* Value</u>. If the Receiver determines that a certain parcel of the Real Property is worth $100,000 or less, the Receiver may (without a Stalking Horse) post the Notice and notify Potential Bidders as described in paragraph 2 above as to such parcel, conduct the public auction as described in paragraph 9 above, and then complete and sign

all agreement(s), contract(s), instrument(s) or other document(s) evidencing and containing the terms and conditions upon which such parcel of the Real Property shall be sold to the bidder submitting the highest and best bid as determined by the Receiver.

16.　<u>Private Sales</u>.  If the best interests of the Receivership Estate will be conserved thereby, the Receiver may seek Court approval to sell certain parcels of the Real Property by private sale, pursuant to 28 U.S.C. § 2001(b).

17.　<u>Sales Free and Clear</u>.  The Receiver's sale of Real Property shall be free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances, if any, to attach to the proceeds of such sale.

18.　<u>Report of Sales Results</u>.  The Receiver shall, when reporting on the Estate generally, report on the results of all sales that closed prior to the date of the report.

**C.　Fees of CBRE**

The Receivership Order authorizes the Receiver to enter into such agreements in connection with the administration of the Receivership Estate, including the employment of consultants, as the Receiver judges necessary to perform the duties set forth in such order and to compensate such consultants from the Receivership Assets.

Pursuant thereto, the Receiver has retained CBRE to provide consulting and brokerage services related to the Receivership, as described in greater detail in **Exhibit B** attached hereto. To assist the Receiver in connection with marketing the larger commercial properties, CBRE will distribute informational memoranda (and confidentiality agreements required to receive the offering memoranda) to potential buyers it identifies.  The offering memoranda (which discloses more sensitive financial and property information) will then be distributed to potential bidders who sign the confidentiality agreement, and to various lenders that CBRE is aware are actively financing similar transactions.  CBRE will then systematically narrow the field of buyers to the

best prospects by engaging in diligence and thorough follow-up both in person and by telephone with potential bidders. Once offers are received, CBRE will assist the Receiver in evaluating the offers and selecting the best offer to act as the Stalking Horse bid. Typically two weeks will be sufficient to complete contract negotiations, with approximately 30 days thereafter for due diligence. Smaller properties will be listed through a local agent, and CBRE will manage the follow-up transaction closing in cooperation with the local broker.

The Receiver seeks approval to pay CBRE fees in connection with the marketing and sales of the Real Property, pursuant to the fee structure set forth in CBRE's fee proposal, which is included in **Exhibit B**.

### IV.    CONCLUSION AND REQUEST FOR RELIEF

The Receiver requests that the Court grant this motion in all respects, and specifically (1) authorize the Receiver to adopt and follow the Real Property Sales Procedures described in this Motion; (2) authorize the Receiver to sell the Real Property, free and clear of liens, claims and encumbrances (with such liens, claims and encumbrances, if any, to attach to the sales proceeds), at public auction pursuant to the Real Property Sales Procedures, without need for further Court order; (3) approve the Receiver's payment of fees to CBRE pursuant to the fee structure set forth in CBRE's fee proposal; and (4) grant such other relief the Court may deem just and equitable.

Dated: May 18, 2009

Respectfully submitted,

BAKER BOTTS L.L.P.

By: /s/ Kevin M. Sadler
    Kevin M. Sadler, Lead Attorney
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Robert I. Howell
    Texas Bar No. 10107300
    robert.howell@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    1500 San Jacinto Center
    98 San Jacinto Blvd.
    Austin, Texas 78701-4078
    Tel: 512.322.2500
    Fax: 512.322.2501

    Timothy S. Durst
    Texas Bar No. 00786924
    tim.durst@bakerbotts.com
    2001 Ross Avenue
    Suite 600
    Dallas, Texas 75201-2980
    Tel: 214.953.6500
    Fax: 214.953.6503

**ATTORNEYS FOR RECEIVER
RALPH S. JANVEY**

## CERTIFICATE OF CONFERENCE

      Counsel for the Receiver conferred with the parties to this case. Counsel for the Receiver conferred with David B. Reece, counsel for the SEC in this action, who stated that the SEC does not oppose this motion or the relief sought herein. Counsel for the Receiver conferred with John Volney, counsel for Laura Pendergest-Holt in this action, who stated that Ms. Holt does not oppose this motion or the relief sought herein. Counsel for the Receiver conferred with Paul Flack, counsel for R. Allen Stanford, who stated that he is authorized to state Mr. Stanford's position on this motion and that Mr. Stanford is opposed to this motion and the relief sought herein. Counsel for the Receiver conferred with the Examiner appointed in this action, who stated that pending further review and due diligence by the Examiner with respect to the relief requested, the Examiner in not in a position to agree to the relief requested.

                                                                     /s/ Kevin M. Sadler
                                                                      Kevin M. Sadler

## CERTIFICATE OF SERVICE

      On May 18, 2009 I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                                                                     /s/ Kevin M. Sadler
                                                                       Kevin M. Sadler