IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3-09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § | |
| | § | |
| Defendants. | § | |

---

## RECEIVER'S MOTION FOR APPROVAL OF SECOND INTERIM FEE APPLICATION AND BRIEF IN SUPPORT

---

BAKER BOTTS L.L.P.
910 Louisiana
Houston, Texas 77002-4995
(713) 229-1234
(713) 229-1522 (Facsimile)

THOMPSON & KNIGHT LLP
1722 Routh Street
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Facsimile)

### ATTORNEYS FOR RECEIVER
### RALPH S. JANVEY

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I.    Summary of Receiver's major undertakings ......................................................... 1

II.   Request for Approval of Fees through May 31, 2009 ........................................... 3

      A.   The Court should approve the payment of all reasonable and
           necessary professional fees and expenses. .................................................. 4

      B.   The fees and expenses are reasonable and necessary in light of the
           extraordinary complexity and difficulties of this case. ............................. 6

           1.   Krage & Janvey L.L.P. ...................................................................... 7

           2.   Baker Botts l.l.p. ................................................................................ 9

           3.   Thompson & Knight llp ("T&K") ..................................................... 22

           4.   FTI Forensic and Litigation Consulting, Inc. ("FTI") .................. 24

           5.   Ernst & Young ("EY") ..................................................................... 26

           6.   Financial Industry Technical Services, Inc. ("FITS") .................. 29

           7.   Strategic Capital Corporation ("SCC") ......................................... 30

           8.   Pierpont Communications Inc. ("Pierpont") ................................. 31

           9.   3-4 South Square .............................................................................. 32

           10.  Roberts & Co. ................................................................................... 33

           11.  Altenburger ....................................................................................... 34

           12.  Osler, Hoskin & Harcourt llp ("Osler") ....................................... 35

           13.  Liskow & Lewis ................................................................................. 36

           14.  Dudley, Topper and Feuerzeig, llp .................................................. 36

III.  Anticipated Future Workload For Receiver And  Retained Professionals ........... 37

CONCLUSION ...................................................................................................................... 38

### TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Curtis v. Bill Hanna Ford, Inc.*,
    822 F.2d 549 (5th Cir. 1987) ............................................................ 4

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ........................................................ 4, 6

*SEC v. Aquacell Batteries, Inc.*,
    No. 6:07-cv-608, 2008 WL 276026 (M.D. Fla. Jan. 31, 2008) ..................................... 37

*SEC v. Fifth Ave. Coach Lines, Inc.*,
    364 F. Supp. 1220, 1222 (S.D.N.Y. 1973) ................................................. 5, 6

*SEC v. Megafund Corp.*,
    Civil Action No. 3:05-CV-1328-L, 2008 WL 2839998 (N.D. Tex. June 24, 2008) .......... 5

*SEC v. W.L. Moody & Co., Bankers (Unincorporated)*,
    374 F. Supp. 465 (S.D. Tex. 1974), ..................................................... 5, 37

*SEC v. W.L. Moody & Co.*,
    519 F.2d 1087 (5th Cir. 1975) ............................................................. 5

**RECEIVER'S MOTION FOR APPROVAL OF SECOND INTERIM FEE APPLICATION
AND BRIEF IN SUPPORT**

Ralph S. Janvey, the Court-appointed Receiver in this action, seeks the Court's approval to pay invoices for interim fees and expenses of $7,601,969.19 to the fourteen firms that have rendered professional services on behalf of the Receivership Estate for the seven-week period of April 13 through May 31, 2009. These fees and expenses are consistent with the Receiver's projections in the first interim fee application despite many unanticipated additional expenses.

The firms providing these services (including the Receiver's firm) have continued to discount their fees by 20% each (representing an overall reduction of $1,735,825.71 for this period) for the benefit of the Stanford investors and other claimants. The work of the professionals is described in detail in this motion and is supported by the attached invoices. The information contained in the invoices demonstrates the necessity for the professionals' services and the reasonableness of their fees and expenses for a case of this complexity and difficulty.

## I.    SUMMARY OF RECEIVER'S MAJOR UNDERTAKINGS

During the first 8 weeks of the Receivership, the Receiver's team was able to secure the Stanford offices, all known assets, financial accounts, records, and data in the U.S. (and many outside the U.S.). *See* Order Appointing Receiver (Doc. 10) ¶ 5(b), (g), (k) ("[T]he Receiver is specifically directed and authorized to … [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership estate, wherever situated," "[p]erform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate", and "[p]romptly provide the United States Securities and Exchange Commission and other governmental agencies with all

information and documentation they may seek in connection with its regulatory or investigatory activities.")

Although the security of the Estate was a continuing priority during the period covered by this application as well, the risk that a co-conspirator might transfer millions in client funds with the push of a button no longer existed.  Likewise, large numbers of professionals were no longer being dispatched to Stanford offices across the country to effect simultaneous office closures.  From that point forward, the Receiver's team possessed a great deal more information, of much higher quality and reliability.  These facts permitted the Receiver's team to plan and execute many of its duties in a more deliberate and selective manner.  As a result, fees and expenses have been reduced, as expected, by more than 55% per week as compared to the initial fee application.  The major tasks of the professionals during the period covered by this application included:

- Continuing to search for and secure cash for the Estate from a variety of potential sources, and determining how unaccounted-for funds were dispersed.

- Participating in litigation or appeals in Antigua, Canada, Switzerland, and England to the extent assets in those locations are subject to risk of loss to adverse claims.

- Securing and centralizing hard copy files, documents and electronic records.

- Developing and implementing plans to sell or monetize Estate assets, including real estate, private equity investments, aircraft, coin and bullion, and other assets.

- Releasing additional frozen Stanford Group Company and Stanford Trust Company customer accounts, where appropriate, through processes approved by the Court.

- Cataloging potential claims against the Estate, including by collecting and processing claims through the Receiver's online procedure.

- Developing and implementing plans to initiate litigation to recover value for the Estate as appropriate.

- Responding to claims and litigation initiated by others.

- Assisting, reporting to and responding to governmental and regulatory agencies as appropriate, including inquiries from the SEC, Department of Justice, FBI, U.S. Attorney's Office, Postal Inspectors, and Department of Labor in connection with their investigations.

- Communicating with this Court, customers, current and former employees, creditors, other constituents of the Estate, and the public, individually when appropriate, through the Receivership website, and through the press.

- Working with the Examiner appointed by this Court on April 20, 2009 on all material issues.

- Working with receivers in other jurisdictions.

- Closing operations of Stanford Group Company, Stanford Capital Management, Stanford Trust Company, and Stanford Coins & Bullion.

- Continuing the legally-required winding-down of Stanford employee benefit plans and arrangements.

These efforts have permitted the Receiver to secure $81.1 million of cash on hand as of July 30, 2009 in an Estate bank account under the sole control of the Receiver. The Receiver also has segregated $17.9 million in CD proceeds from customers who have agreed to the stipulated partial release of their brokerage accounts. This money is in an escrow account pending this Court's adjudication of clawback claims against these customers. The Receiver has also identified more than six hundred million dollars in additional CD proceeds that are subject to clawback claims against Stanford customers and financial advisors.

## II.     REQUEST FOR APPROVAL OF FEES THROUGH MAY 31, 2009

The Amended Order Appointing Receiver directs and authorizes the Receiver to retain and compensate professionals in connection with the administration of the Receivership Estate:

> [T]he Receiver is specifically directed and authorized to perform the following acts and duties:
>
> ***
>
> Enter into such agreements in connection with the administration of the Receivership Estate, including, but not limited to, the employment of such managers, agents, custodians, consultants, investigators, attorneys, and accountants as Receiver judges necessary to perform the duties set forth in this Order and to compensate them from the Receivership Assets.

Amended Order Appointing Receiver (Doc. 157) ¶ 5(h).

The Amended Order Appointing Receiver directs the Receiver to "[f]ile with this Court requests for approval of reasonable fees to be paid to the Receiver and any person or any entity retained by him and interim and final accountings for any reasonable expenses incurred and paid." *Id.* ¶ 5(m).  Accordingly, the Receiver files this Motion and requests that the Court approve the fees and expenses billed by the retained professionals for work from April 13 through May 31, 2009.

**A.    The Court should approve the payment of all reasonable and necessary professional fees and expenses.**

Courts examining a request for fees and expenses incurred by a receiver must determine whether the time spent, services performed, expenses incurred, and hourly rates charged are reasonable and necessary under the factors set forth by the Fifth Circuit.[1] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)

---

[1]    These factors, often referred to as the *Johnson* factors, are: (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney was precluded from other employment by the acceptance of this case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or the circumstances imposed time limitations; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the attorney-client relationship; and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  In applying the *Johnson* factors, "the district court must explain the findings and the reasons upon which the award is based.  However, it is not required to address fully each of the 12 factors."  *Curtis v. Bill Hanna Ford, Inc.*, 822 F.2d 549, 552 (5th Cir. 1987) (citation omitted).

This examination of reasonableness and necessity should take into account all circumstances surrounding the receivership. *See SEC v. W.L. Moody & Co., Bankers (Unincorporated)*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, *SEC v. W.L. Moody & Co.*, 519 F.2d 1087 (5th Cir. 1975). Because all receiverships are different, a court's analysis of the fees and expenses must be tailored to the particular case. *Id*. Recent cases in this district focus primarily on the complexities of the case, the difficulties encountered by the receiver, and the results obtained for defrauded investors. *See SEC v. Megafund Corp.*, Civil Action No. 3:05-CV-1328-L, 2008 WL 2839998, at *2 (N.D. Tex. June 24, 2008). The characteristics cited in the following cases, which this case shares, support an award of the fees and expenses requested herein.

The complexity and difficulty associated with the receivership are highly relevant factors in determining the reasonableness of professional fees. *See SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973) (awarding interim fees and expenses to law firm for role in receivership and noting that it involved wide variety of complex legal matters requiring the time, competence, and diverse resources of a law firm of high caliber). Courts examine the credentials, experience, reputation, and other professional qualities required to carry out the Court's orders when assessing the reasonableness of the rates charged for services to a receivership. *See W.L. Moody & Co.*, 374 F. Supp. at 481 (holding that a court should give "considerable weight" to "a receiver's abilities, as required by the tasks of the receivership"). When the receivership commands full time and prevents the professionals from accepting other engagements, the fee award should reflect it. *See id*. at 483-84, 486 (discussing as a factor in determining reasonable compensation the fact that the receiver "devoted more than full time" to the matter and was prevented "from undertaking any other full time assignment"). The court

should consider the usual and customary fees charged and the evidence presented to support the application for fees. *See Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. at 1222 (fees awarded in full because based on law firm's usual hourly rate and supported by meticulous records).

All of the factors considered in these cases weigh heavily in favor of approving the request for fees and expenses in this case. This case is one of the largest and most complex of its kind, it requires a wide variety and depth of knowledge in both domestic and international law, and requires full time attention from teams of professionals.

**B.      The fees and expenses are reasonable and necessary in light of the extraordinary complexity and difficulties of this case.**

The Receiver requests approval of fees and expenses for the firms identified herein, which have provided the services summarized below, in the amounts noted (which reflect billings for work from April 13 through May 31, 2009). As noted above, these firms have agreed to substantial discounts of their customary fees, and the amounts requested reflect those discounts. As a result, the fees charged by the firms to the Receivership Estate have been reduced by 20% each for a total discount of $1,735,825.71 for this period, bringing the total discount of charges to more than $6.7 million. These discounts reflect substantial reductions of the rates the firms understood they would receive at the outset of this engagement. *See Johnson*, 488 F.2d at 717-19 (fee quoted to client is factor for court to consider in calculating fee award).

The time spent, services performed, hourly rates charged, and expenses incurred were reasonable and necessary, and indeed essential, for the Receiver to perform his Court-ordered duties. Each of these professional firms was selected because it possesses special expertise required to fulfill the Court's orders. *See id*. at 718.

The case law requires that the request for fees be supported by sufficient evidence, but does not require that the Receiver or professional firms calculate the total amount

of time devoted to particular issues or matters during the period covered by an application. Because the law does not require the firms to segregate their fees in this manner, and because it was not possible to do so due to the exigent and emergency nature of the work required in the first two months of the Receivership simply to gain control of assets and secure the Estate, they did not undertake to do so for the first interim fee application. To do so after the fact, for $19 million in professional services supported by over a hundred pages of invoices would not be possible and would be unduly burdensome. However, in response to prior objections by the SEC and Examiner, firms working on a variety of different matters instituted billing conventions that permitted them to calculate, prospectively, the amount of time devoted to particular issues such as brokerage accounts, Latin American operations, or aviation, now that the receivership activities can be undertaken in a more proactive and measured way.. That data is summarized in this application and is reflected in the firms' invoices.

1.    KRAGE & JANVEY L.L.P.

During the period covered by this application, the Receiver and other professionals at Krage & Janvey addressed day-to-day operational and administrative needs of the Estate as well as strategic decisions to maximize assets and reduce claims against the Estate. The Receiver and other members of his firm directed, supervised, and coordinated the activities and team members in the fulfillment of the duties charged by the Court. Their services fall into the following eight categories and the percentages indicate the approximate proportion of total fees related to each category:

(1) Preservation and liquidation of assets (38%): Krage & Janvey has been responsible for the supervision and ultimate decision-making, subject to Court approval, regarding the preservation and disposition of property owned and leased by the Estate, including personal property ranging from yachts to aircraft to electronic files, and real property located

throughout the U.S. and abroad.  This required the resolution of issues related to insurance, storage, transport, liquidation, security, and chain of custody for all property.  In addition, Stanford offices in Tennessee and the United States Virgin Islands were finally closed, and the contents thereof disposed of or shipped to Stanford's headquarters in Houston.  The Virgin Islands office closing also raised legal issues attendant to very protectionist employment statutes.

(2) Administration (27%):  During the period covered by this application, Krage & Janvey responded to over 150 email inquiries daily regarding the team's actions which were required by the Amended Order Appointing Receiver.  During this period, Krage & Janvey supervised the movement of operations from leased property to owned property in order to reduce monthly expenses.  Such day-to-day operational concerns also included issues related to accounts payable, banking, insurance, wire transaction processes, liens on real and personal property, and payroll.

(3) Foreign litigation supervision (11%):  Krage & Janvey continued to exercise significant oversight over foreign litigation by directing the actions of foreign counsel, and reviewing, editing and executing court filings.  There were several filing deadlines and hearings in foreign courts regarding the Antiguan liquidators' efforts to secure control and possession of Estate assets in Switzerland, Canada, Antigua and the United Kingdom.

(4) Communications (8%):  On April 23rd, the Receiver filed an Interim Report, consisting of 58 pages addressing the activities undertaken to date and the status of the receivership.  He continued to communicate with all interested parties by approving for the web site disclosures on all material topics.  Krage & Janvey responded to elevated correspondence and email from claimants with unusual circumstances and the Receiver granted interviews to Bloomberg, Reuters and the Houston Chronicle.

(5) Examiner coordination (7%):  Krage & Janvey attorneys met with the Examiner, and worked on a daily basis to address his requests with regard to individual account reviews as well as with regard to material actions taken by the Receiver.

(6) Litigation supervision (5%):  Krage & Janvey receives all pleadings filed in this case and select pleadings from related cases filed in other U.S. jurisdictions.  The Receiver and his colleagues review every pleading drafted on behalf of the Receivership and make substantive edits to them before filing.  Motions regarding, among other things, bankruptcy, discovery, clawback claims, the continuation of the Court-ordered freeze of Pershing accounts, and the filing of an interlocutory appeal to the Fifth Circuit warranted attention from Krage & Janvey attorneys.

(7) Claims analysis (5%):  Krage & Janvey spent considerable time analyzing the proper characterization and treatment of fourteen types of employee claims and several types of coin and bullion claims.  They also addressed numerous ad-hoc creditor and insurance claims during this period.

(8) Addressing bankruptcy claims (< 1%):  Krage & Janvey has addressed motions filed in this Court related to Chapter 7 and Chapter 15 of the Bankruptcy Code.

The fees charged by Krage & Janvey include all compensation being paid for Mr. Janvey's services as the Receiver as well as for the services of the firm's lawyers during the applicable period.  A bill for Krage & Janvey's services from April 13 through May 31, 2009 is attached as Exhibit A, Appdx. 1-38.  The Receiver requests approval of payment to Krage & Janvey for $210,964.00 in fees and $15,576.68 in expenses.

**2.    BAKER BOTTS L.L.P.**

Baker Botts continued in its role as lead counsel to the Receiver, advising on day-to-day operational and administrative needs of the Estate as well as strategic decisions to

maximize assets and reduce claims against the Estate.  Baker Botts' services fall into the following categories and the percentages indicate the approximate proportion of total fees related to each category (though many of the tasks described below were relevant to more than one category):

(1) Litigation (*SEC v. Stanford*) (26%):  As the Receiver's lead trial counsel, Baker Botts has primary responsibility for analyzing and responding to all court filings in the SEC's civil suit.  During the period covered by this application, the Antiguan Liquidators filed their petition for recognition under Chapter 15, the Examiner filed his Report & Recommendation No. 1 recommending a release of all frozen accounts, and the Receiver filed his first Interim Status Report and first complaint for clawbacks against 66 former Stanford financial advisors.  The issues raised by these pleadings required a significant investment of resources for legal research and analysis, factual investigation, and drafting.  In this same period, more than 120 court papers were filed in the SEC's case.  Baker Botts attorneys reviewed each pleading, advised the Receiver of the legal issues raised, and drafted all necessary responses and replies.  Baker Botts negotiated and filed the first of many stipulated partial releases, completed briefing on a motion to compel, filed motions to approve procedures for the sale of real property and the release of trust accounts, and drafted responses to many motions to intervene or for other relief from the Court's orders.  Baker Botts also prepared a response to an interlocutory appeal to the Fifth Circuit filed by Stanford account holders.

(2) Cross border receivership (12%):  Baker Botts has diligently pursued efforts to secure in excess of approximately $300 million in assets in foreign jurisdictions pursuant to the Receiver's duties under the Amended Order Appointing Receiver, and such efforts continue.  The Antiguan liquidators have sought to seize control of receivership assets in Canada, the UK and

Switzerland; the Receiver has had to defend his rights to those assets and to recognition in those countries. Baker Botts is actively involved in appealing the Antiguan court order that appointed the Liquidators.

Baker Botts lawyers have worked with lawyers in these foreign jurisdictions to provide factual information and evidence developed through many hundreds of hours of investigation by lawyers and forensic accountants, and drafted briefs and affidavits. This period of time included work on pleadings and evidence for a hearing that was held June 10-12 in London. It also included work on pleadings and evidence for hearings in Ontario, Quebec and Alberta. Baker Botts has coordinated and reviewed filings in various jurisdictions which must be responsive to different legal standards and the different factual contexts in each country.

The firm has also worked with Canadian regulators in regard to the Antiguan Liquidators "wiping" bank data from computers and removing it from the country and has worked with U.S. regulators to support their actions in the U.K. In Antigua, Baker Botts has tracked actions by the government, the Antiguan Liquidators and Stanford employees, as well as court proceedings, which affect the Estate, its assets, records, and value, and has intervened where possible.

(3) Receivership corporate (10%): Baker Botts has continued to serve as day-to-day legal counsel to the Receiver. This work has included assisting the Receiver in coordinating efforts of other members of his team, including Strategic Capital Corporation, FTI Consulting, Inc., Ernst & Young LLP, Financial Industry Technical Services, Inc., CB Richard Ellis, Pierpont Communications Inc. and several law firms. The firm's lawyers have participated in daily meetings and telephone calls with the Receiver, other members of his team, Stanford creditors, current and former Stanford employees and other parties with claims against the

Receivership Estate regarding requests for information from the Receiver, the status of claims and other issues. The firm's lawyers have reviewed findings and analysis regarding the operation of the Receivership, recommended courses of action regarding same, and have reviewed correspondence to the Receiver and coordinated responses thereto. Baker Botts lawyers have assisted with the daily operations of the Receivership by reviewing and coordinating payment of expenses and other obligations of the Receiver as well as pre-Receivership obligations of Stanford entities; reviewed security measures at Stanford's headquarters in Houston as well as at the branch offices; and negotiated various contracts for services needed by the Receivership.

Baker Botts has developed and implemented several strategies for reducing costs and monetizing assets, including assisting in development of protocols for the closure of the Stanford office at 5051 Westheimer and the related move to 5050 Westheimer as well as the final closure of numerous domestic Stanford offices. Baker Botts has reviewed executory contracts and assessed the Receiver's rights to terminate with respect thereto; supervised and coordinated the return of hundreds of thousands of dollars in political contributions made by Stanford's political action committee; and reviewed offers to purchase various Estate assets. In order to satisfy the duties to acquire control over Estate records and respond to government requests for information, Baker Botts has coordinated the centralization of millions of business records.

(4) Real estate (7%):  The Estate owns and leases a significant amount of commercial and residential real property throughout the U.S. Baker Botts attorneys have had primary responsibility for analyzing legal documents to establish ownership and identify the terms of mortgages and leases, evaluating these properties, advising the Receiver of their most

advantageous disposition and drafting instruments or court papers to effectuate the Receiver's instructions or seek appropriate Court orders.

In regard to real property owned by the Estate, Baker Botts has, among other things:

- Developed a proposed protocol for sale designed to maximize offers and thus value to the Estate;

- Negotiated listing and consulting agreements with CB Richard Ellis to establish brokerage arrangements to market and sell properties;

- Drafted a form contract to be used in connection with sales;

- Reviewed loan documents related to several properties owned by Davis Holdings and Davis-Pendergest Holdings to determine whether properties are under water and therefore do not merit the expenditure of funds to maintain or market them for sale;

- Coordinated payment of property taxes, insurance, maintenance and other activities necessary to preserve value to the Estate;

- Engaged consultants to contest real property taxes on five properties in Texas and Florida, where we have been advised that such taxes are unduly high;

- Coordinated management and leasing activities of Stanford in its capacity as landlord of the St. Croix properties related to the continuing occupancy by building tenants;

- Coordinated management and leasing activities of Forefront Golf facility between J.S. Development LLC, as landlord, and Dynamic Brands, as tenant.

In regard to real property leased by the Estate, Baker Botts has, among other things:

- Implemented a lease rejection process and applied it to forty four leases;

- Negotiated and drafted settlement agreements with twenty nine landlords; and

- Negotiated amounts to be paid to landlords as an administrative expense for the period of the Receiver's occupancy of the leased premises and coordinated payment of cash settlements.

In regard to office fixtures, equipment, and furniture owned by the Estate, Baker Botts has, among other things:

- Coordinated with CB Richard Ellis to identify liquidators and third party purchasers in various markets in an attempt to attain value when possible, despite landlords' administrative liens;

- Negotiated an asset purchase agreement with Oppenheimer & Co. for the sale of personal property in Atlanta, Dallas, and Memphis; and

- Worked to identify potential purchasers for pre-fabricated steel, trailers and a generator located on the Virgin Islands Port Authority ground lease site.

(5) Brokerage & Trust (7%): Baker Botts attorneys with expertise in the operation of brokerage and trust companies continued to analyze new information as it became available regarding these aspects of the Stanford network. They negotiated a stipulation with Pershing that permitted the Receiver to collect $9.3 million for the Estate.

Baker Botts attorneys collaborated with the Receiver and other professionals to develop and implement Stanford Trust Company ("STC") customer account release and transfer protocols and procedures, which required attention to various tax matters specific to IRA and trust accounts and documentation of STC customer claims against the Estate related to the purchase of SIBL CDs. Baker Botts initiated communication with STC customers through direct correspondence and the Receiver's website, to communicate the status of accounts and account release and transfer procedures, and also responded to numerous STC customer emails and phone calls.

Following the release of trust accounts, Baker Botts attorneys reviewed trust instruments and successor trustee and account transfer documentation received from customers

to ensure compliance with requirements of trust instruments on a trust by trust basis as required by the law. They also communicated with successor trustee/custodian institutions to facilitate transfer of STC accounts and to obtain required transfer documentation pursuant to transfer protocols.

Baker Botts attorneys engaged in numerous communications with investors in investment funds for which Stanford Capital Management was the general partner, providing investment information, and evaluating successor general partner candidates. To reduce operating expenses and terminate non-essential services, Baker Botts lawyers evaluated contractual relationships between Stanford and various vendors who provided services to the brokerage and trust businesses.

(6) Document production (6%): Baker Botts has worked with the Receiver and his team to provide, as directed by the Receivership Order, the various state and federal authorities – including the SEC; DOJ; United States Attorney for the Southern District of Texas; FBI; United States Postal Inspector; Internal Revenue Service; and Department of Labor – with information and documents as requested in connection with their investigations of the Defendants.

In addition, Baker Botts has coordinated the Receiver's responses related to over 20 securities and banking regulatory agency investigations being conducted by over 15 states as well as international investigations. In responding to these various requests, Baker Botts has assumed responsibility for participating in numerous telephone conferences and meetings with governmental and regulatory agency representatives to receive requests for information; identifying and gathering relevant documentation and information and preparing it for

production; and coordinating with FTI and other members of the Receiver's team to identify electronic and other hard copy records requested.

(7) Labor and employment (5%): Baker Botts has continued to assist the Receiver with the shut-down of the Stanford employee benefit plans. This included the Stanford welfare benefit, supplemental, non-qualified and 401(k) plans. By the end of May (the earliest month possible under the law), all of the Stanford benefit plans had been shut-down, with the exception of the 401(k) plan. Baker Botts is continuing to advise and assist the Receiver with legal requirements associated with the termination of the 401(k) plan. They are also assisting with the preparation of the necessary termination documentation. Baker Botts employment lawyers also assisted Stanford human resource personnel with compliance issues related to the extension of COBRA post-termination continuing medical benefits required under recent changes in the law.

Baker Botts reviewed and responded to the continuing Department of Labor audits and investigations related to the Stanford benefit plans and several wage and hour back-pay claims. In addition, the Department of Labor launched a criminal investigation aimed at determining third-party pension and other plans that may have invested in trust assets in SIBL CDs. In response to Department of Labor requests, Baker Botts reviewed files located in Houston, Baton Rouge and other U.S. locations and prepared and provided relevant account documents.

Baker Botts employment lawyers assisted Baker Botts brokerage and trust attorneys with research of the legal requirements in a number of different jurisdictions to appoint successor trustees for trust accounts in connection with their potential release. They also

reviewed numerous IRAs to determine whether the IRA assets could be released to the IRA holders.

Finally, Baker Botts employment lawyers reviewed numerous outstanding broker loans, under which Stanford had advanced substantial funds. The review involved researching the terms of the loans, which were not consistent for all loans, in order to ascertain the legal rights and remedies the Receiver had to collect all or a portion of the assets distributed under these loan arrangements.

(8) Litigation (general) (5%): In addition to the SEC's civil enforcement action, the Estate is a party to other litigation, both pending at the time of the Receivership and filed thereafter in state and federal courts. Baker Botts has collaborated with Thompson & Knight in regard to several of the pending matters in the U.S., Puerto Rico, and Antigua, supervising local counsel, negotiating with opposing counsel, responding to discovery, and securing stay orders in several cases. Baker Botts has had primary responsibility for managing cases filed against the Receiver, Estate, and employees or agents of the Stanford entities after the Receiver was appointed. During the period covered by this application several new lawsuits were filed outside this District against the Estate or agents of the Estate, bringing the total number of such cases to 30. In each case the Receiver provided the parties with notice of the Receivership and sought to enforce this Court's litigation stay either by agreement or court order. During this period, motions for stay were filed in six new cases.

In addition to managing litigation, Baker Botts has engaged in negotiations with several parties, such as landlords, vendors, and lien holders, in order to avoid litigation, has secured the stay of arbitrations at FINRA, has communicated with states agencies that have issued tax warrants against Stanford entities, and has been the conduit for the Receivership team

to respond to requests for information and documents from the FBI and IRS in connection with related litigation. Baker Botts has also drafted subpoenas and reviewed documents produced by parties who appear to possess Estate assets or information that may lead to the recovery of Estate assets.

(9) Private equity (4%): Baker Botts has continued to work with the Receiver and his team to review and respond to legal issues related to Stanford's private equity holdings. This work has included the review of Stanford corporate records to complete comprehensive listings of private equity holdings, with information regarding ownership, potential current value and loans outstanding; review of information and contracts related to private equity investments and evaluation of rights and responsibilities with respect thereto; communications with portfolio companies and counsel regarding the status of investments; evaluation of various investment holdings for potential sale to third parties; review and negotiation of offers from third parties to purchase certain private equity holdings; and identification of a potential advisor regarding possible engagement to market Stanford's private equity holdings, as well as participation in due diligence sessions with such advisor regarding Stanford's private equity portfolio.

(10) Aviation (3%): Attorneys with expertise in aircraft sales, leasing, financing, and registration analyzed and negotiated successive settlement proposals with a secured lender relating to five of the six Estate aircraft, including an analysis of the impact of indemnities and representations requested of the Receiver and the sales, property, and federal income tax implications of the various proposals. This required legal research, factual investigation, and drafting. Attorneys also addressed, reviewed and analyzed custom bond issues; recommendations and bids from three aircraft brokers with expertise in Latin America regarding the sale of the sixth Estate aircraft; letters of credit and certificates of deposit securing the aircraft

secured loans; International Registry and FAA filing requirements relating to the settlement; and mechanic's liens filed at the FAA. Baker Botts reached agreement as to many elements of a settlement transaction with an aircraft secured lender contemplating the return of the collateral in exchange for payment of a portion of the letter of credit proceeds to the Receiver. Baker Botts supervised the preparation of the aircraft specifications sheets, coordinated with the Estate's Aviation Department concerning ongoing maintenance of the aircraft and proposed inspection of aircraft by potential buyer, and drafted a non-disclosure agreement for potential buyer's signature. Baker Botts also responded to AIG Aviation requests for inspection of the Estate's aircraft hangar and office in connection with its workers compensation review.

(11) Banking (3%): Several bank accounts and investment accounts, in various banks and jurisdictions, hold funds of a range of Stanford entities. Baker Botts has been involved in making sure that funds were frozen and, where appropriate, transferred to the Receiver's accounts. This work has sometimes involved dealing with jurisdictions that do not yet recognize this Court's Receivership Order. In some situations, the work has involved separating Estate property from non-Estate property and working with bank depositories to identify those funds that are subject to the Receiver's control and possession.

(12) Coin & bullion operation (3%): Baker Botts has worked with an expert selected by the Receiver to: analyze Stanford's coin and bullion company operations; analyze customer claims and research applicable law to determine title to coins and bullion held by Stanford Coins and Bullion; prepare the protocol for addressing customer claims and returning coins and bullion to customers, subject to future Court approval; and respond to inquiries from federal and state regulators regarding outstanding coin and bullion claims.

(13) Disclosures and communications (3%):  Baker Botts attorneys provided advice and assistance to the Receiver regarding communications to customers, employees, the media and the public; drafted descriptions of recent developments, public statements by the Receiver and Frequently Asked Questions (FAQs) regarding numerous subjects for posting on the Receiver's website; supervised translation of website materials into Spanish; analyzed reports from the Pierpont firm regarding emails received from customers, employees, the media, regulatory authorities and others that were sent to the email address listed on Receiver's website; participated in and often led the process of developing responses to many of those emails, either by generalized response on the website or by individual response in certain cases; and coordinated these communications, as well as dealings with the news media, with Pierpont and other consultants and experts engaged by the Receiver.

(14) The following categories account for a combined total of less than 6% of the Baker Botts fees for this time period:

Examiner (1%):  Baker Botts attorneys have relied upon and collaborated with other professionals in order to locate and deliver information and documents that are relevant and responsive to inquiries from the Examiner on subjects such as the liquidation of various assets, court proceedings in Switzerland, the account release process, and investors' other concerns. Baker Botts trial attorneys analyzed, drafted and filed a response to the Examiner's Report and Recommendation No. 1.  Portions of the time categorized under other topics also involved coordination and dialogue with the Examiner on those topics and responses to questions and issues raised by him.

Tax (1%):  Baker Botts negotiated with the Department of Division regarding the best method to resolve outstanding tax actions in the Tax Court and before the IRS Office of

Appeals relating to approximately $226.6 million of taxes and penalties which the IRS has asserted and/or proposed against Allen Stanford so as to maximize the funds available in the Estate for ultimate distribution to other claimants and to minimize expenses to defend such tax actions. Baker Botts assisted the Department of Justice in its discovery related to such tax matters, as required by the Amended Order Appointing the Receiver, and also located relevant documents to evaluate such tax matters.

Insurance (1%): Baker Botts reviewed various insurance policies to address coverage issues and considered the response to notices of cancellation of insurance policies on Receivership Estate assets. Baker Botts also considered issues relating to marine and aviation insurance on Estate assets.

Latin America (1%): Baker Botts has worked on matters that affect the possible sale of affiliates either owned by Stanford entities or that were seized by governmental authorities and that may be sold. This has involved the analysis of purchase proposals, negotiations, and the examination of legal requirements and coordination of those requirements (such as office of foreign assets control limitations and Receivership asset sale requirements). Baker Botts has worked with other counsel for the Receiver, including foreign counsel and in house counsel, to respond to inquiries from foreign customers and regulators.

Switzerland (1%): Baker Botts has worked with Swiss counsel in connection with the liquidation by Swiss officials of Stanford's Swiss subsidiary; has also worked with Swiss counsel to respond to the Antiguan Liquidators' efforts to be recognized as the appropriate representative to control assets of various Stanford entities in Switzerland; and has provided information, guidance, and evidentiary information similar to that provided in the U.K. and Canadian proceedings described above.

A bill for Baker Botts's services for April 13 through May 31, 2009 is attached as Exhibit B, Appdx. 39-307.  The Receiver requests approval of payment to Baker Botts for $2,467,198.80 in fees and $106,585.67 in expenses.

3.    THOMPSON & KNIGHT LLP ("T&K")

Thompson & Knight has continued to provide legal expertise, advice, and representation to the Receivership in areas such as finalizing office closures, pre-Receivership litigation, asset preservation, and supervision and implementation of liquidation efforts for assets in Latin America.  T&K's services fall into the following five categories and the percentages indicate the approximate proportion of total fees related to each category.

(1) Latin American Matters (51%):  The Estate has entities, business operations, and assets in Mexico, Venezuela, Ecuador, Panama, Peru, Guatemala and Columbia.  T&K has had primary responsibility for investigating, advising the Receiver on, and executing decisions regarding Latin American litigation, asset analysis and recovery, office closures, legal requirements, and government and regulatory activities.  In particular, T&K has taken steps to secure legal recognition of the Receiver's authority and jurisdiction over Estate assets in Latin America.  The firm's professionals were responsible for the final closure of several offices, which required the negotiation and termination of leases and transfer of physical control to landlords.  Diverse assets including a race horse, furniture, artwork, equipment and vehicles had to be secured, inventoried, appraised, insured, stored, and in some cases, liquidated.  T&K attorneys facilitated and attended shareholders' meetings required for the transfer of authority to the Receiver, prepared legal documents required for the liquidation of regulated Stanford entities, and met with employees and prospective purchasers of assets and operations.  T&K responded to government notices and also represented the Receiver in meetings with government and regulatory officials in Mexico, Ecuador, Panama, Peru and Venezuela.  T&K has advised the

Receiver regarding the impact of, and action required by, foreign laws in each country where assets are located. For example, the closure of offices in Mexico required analysis and negotiation with employees on issues of severance, payroll, taxes, and termination. T&K has taken appropriate action to locate, preserve and maximize Estate assets in the face of government appropriation and sale of the Stanford Bank of Venezuela. Stanford Bank (Panama) S.A. has not been sold, but is under the control and supervision of Panamanian government regulators, with whom T&K professionals are having to coordinate in order to maximize Estate assets.

(2) Office closure and related liquidation of assets (31%): T&K collaborated with other professionals to secure and finally close several domestic Stanford offices in Texas, Florida, Mississippi, Colorado, Georgia, Louisiana, Massachusetts, New York, North Carolina, Arkansas, Pennsylvania and Washington, D.C. These closures required action to supervise and facilitate employee access, vendor access, termination of leases and utilities, transfer of possession to landlords, removal/disposition of assets such as furniture, fixtures, IT, and the transfer of records to the Houston offices. T&K attorneys have provided analysis and advice to the Receiver regarding the value and proper disposition of assets as varied as trademarks, intellectual property, and fixtures at the Stanford Miami air hangar. T&K has also devoted resources to addressing claims such as employees' work-related expenses and vendors' invoices.

(3) General Receivership matters (9%): T&K has also supported the day-to-day operations of the Receivership by providing information and documents for court filings and in response to requests for information from government agencies, such as state securities regulators, the FBI, SEC and DOJ. T&K attorneys have also attended meetings with the Court-appointed Examiner to provide information regarding Stanford's Latin American operations, assets and customers. In addition, T&K has had primary responsibility for the analysis of

existing insurance coverage for all Stanford entities and has counseled the Receiver on the status and advisability of maintaining existing coverages and well as the necessity, or lack thereof, for additional coverages.

(4) Bankruptcy matters (5%): T&K attorneys have conducted legal research, advised the Receiver, and provided substantive input on court papers filed on the Receiver's behalf regarding bankruptcy issues, such as recognition of foreign proceedings under Chapter 15.

(5) General Litigation (3%): T&K has had primary responsibility for supervising litigation that was pending against the Estate at the time the Receivership was instituted (i.e. the trademark lawsuit brought by Stanford University in a California court), including appearing on behalf of the Receiver, securing stays, completing discovery, and negotiating settlements. T&K has also provided guidance regarding new claims asserted and lawsuits filed against the Estate and has provided substantive input on select court papers filed on behalf of the Receiver in this action.

A bill for Thompson & Knight's service is attached for April 13 through May 31, 2009 is attached as Exhibit C, Appdx. 308-63. The Receiver requests approval of payment to Thompson & Knight for $412,489.55 in fees and $17,302.22 in expenses.

**4.     FTI FORENSIC AND LITIGATION CONSULTING, INC. ("FTI")**

FTI continued to provide forensic investigation, accounting, financial and technology support services to the Receivership. FTI's services fall into the following categories and the percentages indicate the approximate proportion of total fees related to each category. Many of the specific tasks described below were relevant to more than one category.

(1) Account review process (45%): FTI collaborated in the development, implementation and performance of the "Self Certification" process for account holders to apply for the release of individual Stanford Group Company accounts. This process has resulted in the

release of approximately 2,000 of those accounts. FTI has also undertaken the review of all relevant money transfers worldwide.

(2) International Receivership matters (16%): FTI assisted with the preparation of affidavits to support the Receivership's claim on the assets of Stanford International Bank, Ltd., and Stanford Trust Company, Ltd. in multiple foreign jurisdictions and reviewed electronic files for evidence in support of those affidavits (such review of data was also relevant to requests from the SEC and DOJ, as well as domestic litigation). FTI also prepared detailed information supporting the Receivership's coordination with outside counsel and regulators to obtain funds located in foreign jurisdictions.

(3) Cash management (13%): FTI continued to supervise and assist with transfer of bank and investment account balances to the Receivership's control and possession.

(4) Government document production (9%): FTI processed and loaded electronic data into its proprietary electronic document review tool to support the investigatory requests of government agencies as required by the Court's order. FTI also provided solutions to review email accounts, user shares, hard drives and other electronic media while maintaining a preservation schedule, and responded to requests from various governmental agencies, including the SEC, DOJ, and IRS.

(5) General Receivership matters (7%): FTI supported Receivership operations by performing daily treasury procedures, preparing a cash flow/forecasting model, and assisting in the accounting function. FTI participated in and conducted interviews of key employees of the various Stanford entities and also traced incoming and outgoing funds in Stanford accounts for the purpose of identifying assets that are owned by the Estate.

(6) General litigation (7%): FTI conducted a review of company email and hard copy documents for use as evidence and assisted with the preparation of declarations for filing in domestic litigation.  FTI also retrieved and analyzed several types of data and transactions for use as evidence.  For example, FTI analyzed real estate and private equity transactions between Allen Stanford and Stanford entities; analyzed specific accounts, cash transfers and transactions to identify the source and ultimate disposition of funds; provided other professionals with key documents for analysis of suspect transactions, and continued to retrieve relevant bank account transactional information from key banking institutions.

(7) Claims against Estate (2%):  FTI has provided information and documents that facilitated the ongoing analysis of claims against the Estate by CD holders, employees, the IRS, vendors, landlords and other claimants.

(8) Coins & bullion (1%):  FTI analyzed account activity in customer accounts held at Stanford Coin and Bullion to assist the Receiver in categorizing and valuing such claims.

(9) Trust matters (1%):  FTI has provided information and documents that facilitated the analysis of accounts held at Stanford Trust Company, Ltd.

A bill for FTI's services from April 13 through May 31, 2009 is attached as Exhibit D, Appdx. 364-452.   The Receiver requests approval of payment to FTI for $1,916,641.20 in fees and $281,227.52 in expenses.

5.    ERNST & YOUNG ("EY")

EY has continued to provide forensic accounting and investigative support services to the Receiver.   EY's services fall into the following categories, with percentages indicating the approximate proportion of total fees related to each category.  Many of the specific tasks described below were relevant to more than one category.

(1) Preparation of financial statements (70%): Even the existence of many Stanford entities was unknown at the beginning of the Receivership.  EY devoted considerable time and resources to investigating the corporate structure within, and relationships among, a number of Stanford entities, and identified 130 which were believed to be operative.  EY continues to research information related to an additional 100+ entities where corporate records have yet to be found.  In order to acquire reliable data regarding the scope, size, and location of Estate assets, EY gathered enough information to prepare combined financial statements and organizational charts for use by other professionals tasked with bringing the Estate under the Receiver's control.  EY also gathered supporting financial detail which will be useful in possibly liquidating assets.  Some of the specific tasks required included the:

- Location and analysis of documents of incorporation for 130+ Stanford entities; creation of diagram for entity tier structure/hierarchy and decision tree matrix;

- Creation of master reconciliation and asset lead sheets;

- Analysis of accounts receivable, inventory, prepaid accounts, liabilities, and intercompany accounts;

- Review and reconciliation of accounts payable;

- Analytical review of 2008 financial statements;

- Analysis of intercompany accounts; and

- Identification of key assets for potential liquidation.

(2) Tax (13%): EY prepared requests for extensions, analyzed notices of delinquent sales and use taxes, amended state sales and use tax returns, reviewed K-1 schedules, and prepared tax returns for the Stanford entities.

(3) Private equity (5%): EY personnel evaluated Stanford entity investments and related party transactions and properly reclassified certain assets.

(4) Real estate (3%): EY analyzed the Estate's fixed assets for mortgage and notes / payable compatibility and conducted research on ten properties that were previously unknown to the Receiver.

(5) The following categories account for a combined total of 9% of EY's fees for this time period: brokerage firm matters (< 1%) (analysis of capital contributions, origins of broker-dealer contributions, and cash accounts); cash management (2%) (investigation of bank records, cash on deposit and all bank signatory authorities); coins and bullion (1%) (analysis of wire transfers, notes receivable, transactions with Dallas Gold & Silver Exchange; identified, quantified, analyzed, and prioritized coin and bullion inventory for possible liquidation); general receivership matters (2%) (provided information and documents for various court pleadings and in response to general inquiries from Receivership team; attendance at meetings with SEC); government document production (2%) (locating and providing information and documents in response to requests from SEC, DOJ, FBI; creation and provision of detailed inventory of assets); international receivership matters (< 1%) (provided information and documents for use in court proceedings in Canada and Switzerland; analysis of overseas real estate transactions; analysis of the Alliance for Development Through Education and Empowerment between Allen Stanford and government of Antigua); Latin American matters (< 1%) (reviewed and analyzed Venezuelan political risk insurance policy and Latin American entity structure; calculated financial impact on Estate as result of sale of Stanford Bank Venezuela to Banco Nacional de Credito; reviewed Bank of Panama incorporation documents); office closure and related liquidation of assets (< 1%) (reviewed inventories to identify key assets and quantified, analyzed and prioritized assets for possible liquidation).

An invoice for EY's professional services from April 13 through May 31, 2009 is attached as Exhibit E, Appdx. 453-81.  The Receiver requests approval of payment to EY for $1,081,050.00 in fees and $78,579.00 in expenses.

6.    FINANCIAL INDUSTRY TECHNICAL SERVICES, INC. ("FITS")

FITS has continued to advise the Receiver on proper procedures and has facilitated the implementation of both the Court's freeze order and subsequent releases of customers' brokerage accounts.  FITS has provided advice to the Receiver on day-to-day operations of the Stanford broker dealer entity and provided analysis of the client base and accounts held by the broker dealer, registered investment advisor, and trust company.  FITS has provided assistance in the development of customer account release criteria and the identification and analysis of customers and assets held in custody at clearing brokers and SEI.  Similarly, in regard to the Latin American brokerage entities, FITS has provided assistance with the implementation of the Court's freeze and analysis of customer accounts.  FITS has provided independent oversight of the daily activities of Stanford Group Company's brokerage operations department and assistance to the Receiver in developing information regarding the historical operation of the brokerage business.  FITS has also provided assistance in the analysis of private limited partnerships managed by Stanford Capital Management and other outside managers.

FITS's services fall into the following six categories and the percentages indicate the approximate proportion of total fees and expenses related to each category.  (1) trust matters (39%); (2) brokerage firm matters (33%); (3) account review process matters (24%); (4) Latin American matters (1%); (5) general Receivership matters (2%); and (6) Examiner matters (1%).

A bill for FITS's services from April 13 through May 31, 2009 is attached as Exhibit F, Appdx. 482-85.  The Receiver requests approval of payment to FITS for $355,430.00 in fees and $51,065.02 in expenses.

7.    STRATEGIC CAPITAL CORPORATION ("SCC")

All services rendered to the Receivership by SCC have been performed by its CEO, Malcolm Lovett.  In the last fifteen years, Mr. Lovett has served as a financial advisor, chief restructuring officer, or independent director in more than twenty complex Chapter 11 cases in the Northern and Southern Districts of Texas.  Prior to this , for approximately 20 years, Mr. Lovett served as a senior executive officer of two New York Stock Exchange Member Firms.

SCC has continued to provide a broad range of services necessary for coordination of the winddown and liquidation of the Stanford financial services operations to the Receivership.  SCC has advised the Receiver on various operational issues, in areas such as accounting matters (e.g. staffing, cash projections, accounts payable, treasury functions, reconciliation, and banking practices), employment (e.g. staffing, benefits, life insurance, unpaid compensation, qualified plans, Antiguan retirement plan, and payroll), real estate (e.g. mortgages, lease negotiations, moving the Stanford headquarters from leased to owned space in Houston, and rent arrearages), asset preservation and liquidation (e.g. private equity, aircraft and equipment) and closing branch offices (e.g. employee access, customer information, security, termination, and records retention).

SCC has coordinated and facilitated the review of large amounts of data and the creation of reports in response to requests from the SEC and Examiner and for use as evidence in litigation.  For example, SCC made significant contributions to the development of protocols for the stipulated partial release of brokerage accounts, and assisted with the generation of data on commissions and loans to financial advisors to support clawback claims.  In regard to Stanford Trust Company, SCC also provided review and comment on its operations, the mechanics and protocols for transferring trust accounts, and staffing.

A bill for SCC's services from April 13 through May 31, 2009 is attached as Exhibit G, Appdx. 486-99.  The Receiver requests approval of payment to SCC for $101,975.20 in fees.

8.    PIERPONT COMMUNICATIONS INC. ("PIERPONT")

Pierpont has continued to assist the Receiver and his team in communicating with all parties affected by the Receivership.  Pierpont has served the Receiver by reviewing, sorting, and forwarding appropriately elevated correspondence to the professionals working for the Receiver all correspondence – more than 1,800 inbound emails from April 13 through May 31, 2009 – received via the Receivership email address.

Pierpont's services fall into the following three categories and the percentages indicate the approximate proportion of total fees and expenses related to each category.  (1) communications (92%); (2) claims against the Estate (4%); and (3) account review process (4%). Pierpont's specific tasks included:

- Reviewing inbound emails to Receivership web site and forwarding emails necessitating action to team members for substantive response;

- Drafting and editing substantive web site content, including questions and answers for the Frequently Asked Questions tab;

- Providing substantive responses to investors with questions regarding account review, claims process, and trust account issues;

- Analyzing ongoing media coverage to ensure the public is correctly informed regarding the Receiver's actions and that public concerns are being addressed; and

- Drafting responses to specific media inquiries.

A bill for Pierpont's services from April 13 through May 31, 2009 is attached as Exhibit H, Appdx. 500-26.   The Receiver requests approval of payment to Pierpont for $53,690.00 in fees and $6,040.12 in expenses.

9.     3-4 SOUTH SQUARE

Stuart Isaacs QC and Felicity Toube have continued to provide expertise and to represent the Receiver regarding the protection of Estate assets in the United Kingdom, particularly in opposing attempts by the Antiguan Liquidators to obtain exclusive possession and control of SIBL assets. These barristers have provided information regarding Stanford's UK assets, analysis of European cases addressing the recognition of foreign insolvency proceedings, and input on strategy for Antiguan and Canadian court proceedings in which similar issues are in dispute.

For proceedings in the United Kingdom, the barristers prepared the Receiver's application for recognition as SIBL's foreign representative, affidavits in support thereof by the Receiver, other professionals, and experts, briefed issues and prepared and filed skeleton arguments (briefs), analyzed the Antiguan Liquidators' application for recognition and evidence in support thereof, and attended hearings regarding procedural issues and other issues affecting the Receivership Estate. The barristers collaborated with the Receiver's Antiguan counsel and assisted with drafting court papers and briefing, and the selection of evidence in support of an application for permission to appeal the Antiguan court's judgment refusing to acknowledge this Court's orders, placing SIBL into liquidation, and appointing the Antiguan Liquidators. The barristers have also provided substantive guidance on drafting affidavits for use in the Canadian proceedings regarding the appeal of the ex parte order recognizing the Antiguan Liquidators as receivers over SIBL's Canadian assets.

Bills for Isaacs and Toube's services from April 13 through May 31, 2009 are attached as Exhibit I, Appdx. 527-53. The Receiver requests approval of payment to Isaacs and

Toube of amounts for fees and expenses equivalent to US $105,748.83[2] and $8,107.15[3] respectively.[4]

    **10.**    **ROBERTS & CO.**

        Sir Clare K. Roberts, the principal of Roberts & Co., has continued to serve the Receiver in Antigua, where court proceedings and government action will determine control and possession of valuable Estate assets owned by SIBL.  The firm has served the Receivership by analyzing and reporting on the Antiguan judgment regarding the liquidation of SIBL; representing the Receiver at meetings with the Deputy Chairman of the Antiguan Financial Services Regulatory Commission, Antiguan Deputy Solicitor General, Deputy Chief Registrar of the Eastern Caribbean Court of Appeal, and Antiguan Labor Commissioner; drafting court papers for filing in Antigua; appearing at Antiguan court hearings; and investigating the location of Estate assets in Antigua, including those owned by Stanford entities other than SIBL.

        A bill for Roberts & Co.'s services for April 13, 2009 through May 31, 2009 is attached as Exhibit J, Appdx. 554-57.  The Receiver requests approval of payment to Roberts & Co. for $33,120.00 in fees and $626.07 in expenses.

---

[2]     Stuart Isaacs, QC and Felicity Toube are members of the 3-4 South Square chambers, which is not a law firm, but an arrangement for sharing office space and administrative staff.  Each has discounted his or her standard professional fees in this case.  At the high end, their combined rate is £1,100 per hour.  After discounting, their combined rate in this case is £875 per hour, which equates to a 20.5% discount.

[3]     The need for predictable and steady cash flow is particularly acute for solo professionals.  Therefore, this fee application includes $7,697.80 in hotel and airfare expenses incurred by Mr. Isaacs for travel in connection with a June 30th hearing in Antigua, which falls outside the period covered by this application.

[4]     Three of the professional firms submitted invoices for fees and expenses in foreign currency.  The exchange rates published by the Wall Street Journal on June 1, 2009 were used to calculate these amounts in U.S. dollars.  Those rates are: (1) .9165 for Canadian dollars (Osler); (2) .9341 for Swiss francs (Altenburger); and (3) 1.6443 for British pounds (3-4 South Square).  *See* http://online.wsj.com/mdc/public/page/2_3021-forex-20090601.html?mod=mdc_pastcalendar

11.    **ALTENBURGER**

Altenburger is a Swiss law firm that has continued to advise the Receiver on the following categories of issues; the percentages indicate the approximate proportion of total fees related to each category for the time period covered by this fee application.

(1) International Receivership matters (83%):    Altenburger has had primary responsibility for communicating with the Swiss Financial Market Supervisory Authority; representing the Receiver in proceedings on Swiss recognition of the Order and Amended Order Appointing Receiver; analyzed and advised the Receiver regarding the Swiss federal prosecutor's investigation of Stanford operations and Antiguan Liquidators' request for recognition of Antiguan bankruptcy proceedings by a Geneva court; analyzed Stanford bank statements; and drafted various Swiss court papers.    The Swiss authorities have not yet adjudicated the Receiver's authority over Estate assets and the Antiguan Liquidator's objections thereto.

(2) Liquidation and sale of real estate of Stanford Group Suisse (Ltd.) (18%):  The firm's lawyers have attended meetings with, and drafted correspondence to, the Swiss federal prosecutor; and assisted in connection with shareholders' meetings for the subsidiary while it has been in liquidation proceedings under Swiss law.  Altenburger has also represented the Receiver in meetings with potential purchasers of assets, and evaluated a proposed purchase agreement that related to a sale by Swiss officials of assets of the company.

A bill for Altenburger's services from April 13 through May 31, 2009 is attached as Exhibit K, Appdx. 558-63.  The Receiver requests approval of payment to Altenburger of amounts for fees and expenses equivalent to US $57,757.27 and US $2,196.07 respectively.

12.    OSLER, HOSKIN & HARCOURT LLP ("OSLER")

Osler continued to serve as the Receiver's local counsel and representative in proceedings in three Canadian provinces.  The Canadian courts have not yet adjudicated the Receiver's authority over significant Estate assets, which include an amount equivalent to approximately US $21 million held by Toronto Dominion Bank.  Osler's services to the Receivership included the following tasks:

- Conducting research, drafting court papers, and preparing oral arguments to support the Receiver's motion to revoke, suspend, and rescind Quebec ex parte order recognizing Antiguan Liquidators as Stanford receivers.

- Conducting research, drafting court papers, and preparing oral arguments to support Receiver's motion to enforce the Amended Order Appointing Receiver and Preliminary Injunctions and petition for recognition of Receivership as foreign main in Ontario.

- Advising the Receiver and drafting documents on the requirements of various Canadian statutes, including the Canadian Bankruptcy and Insolvency Act, Business Records Act, Civil Code of Quebec, Class Proceedings Act, Civil Remedies Act, Income Tax Act, Mutual Legal Assistance in Criminal Matters Act and related treaties.

- Drafting and editing court papers, including affidavits and motions, filed on behalf of the Receiver.

- Conducting legal research on ex parte motions, the obligation of full and frank disclosure in requests for ex parte motions, and requirements for suspending orders pending final judgment.

- Representing the Receiver in argument at hearings.

- Conducting research and advising the Receiver on new court claims filed by investors against SIBL in a Canadian class action in Alberta.

- Conducting research on the effect of Liquidators' wiping and removing data to Antigua under Income Tax Act and legal obligations to maintain data in Canada.

- Investigating SIBL Canadian regulatory filings.

- Analyzing, and advising the Receiver on the effect of, a freeze order obtained by the Ontario Attorney General.

A bill for Osler's services from April 13 through May 31, 2009 is attached as Exhibit L, Appdx. 564-88. The Receiver requests approval of payment to Osler of amounts for fees and expenses equivalent to US $225,674.84 and US $9,756.58 respectively.

13.    LISKOW & LEWIS

During the period covered by this fee application, the Receiver filed, and the Court granted, a motion authorizing the release and transfer of certain Stanford Trust Company accounts and establishing the resignation of the Stanford Trust Company as fiduciary. Receiver's Unopposed Mtn. for Order Authorizing Release of Certain Customer Accts., Doc. 288; Order Granting Receiver's Unopposed Mtn. for Order Authorizing Release of Certain Customer Accts., Doc. 338. For that reason, the need for local counsel in Louisiana and expertise in trust matters has diminished significantly. Liskow & Lewis continued to provide necessary guidance and assistance with regard to regulatory limitations on trust companies, capital maintenance issues, and communications with the Louisiana Office of Financial Institutions, the regulatory agency charged with overseeing the operations and activities of Stanford Trust Company.

A bill for Liskow & Lewis's services from April 13 through May 31, 2009 is attached as Exhibit M, Appdx. 589-92. The Receiver requests approval of payment to Liskow & Lewis for $1,993.80 in fees.

14.    DUDLEY, TOPPER AND FEUERZEIG, LLP

Dudley, Topper and Feuerzeig continued to represent the interests of the Estate in the U.S. Virgin Islands during this period in regard to the storage and sale of a cache of firearms, office equipment, and a dispute regarding a lease agreement. A bill for Dudley, Topper and Feuerzeig's services from April 13, through May 31, 2009 is attached as Exhibit N, Appdx. 593-

98.  The Receiver requests approval of payment to Dudley, Topper and Feuerzeig for $1,173.60 in fees.

### III.   ANTICIPATED FUTURE WORKLOAD FOR RECEIVER AND RETAINED PROFESSIONALS

The fees and expenses in the early weeks of the Receivership necessarily have been substantial but have decreased significantly – the weekly fees and expenses requested in this application are less than half of those requested in the first application.  As the Receivership team acquires more, and more accurate, information regarding the Estate (and has secured assets and records), it has been able to work more knowledgeably and on a more manageable basis, and thus more efficiently.  Such a substantial reduction in fees follows a pattern typical of complex receiverships.  *See SEC v. Aquacell Batteries, Inc.*, No. 6:07-cv-608, 2008 WL 276026, at * 4 (M.D. Fla. Jan. 31, 2008).  ("The first step . . . is, of course, identifying the assets.  The Report indicates that the Receiver (and his professionals) had a particularly difficult time in doing so here, and the fees and expenses claimed reflect that difficulty."); *W.L. Moody & Co.*, 374 F. Supp. at 486 ("The bulk of this legal advice was provided during the first two months of the receivership. . . . Attorneys spent nights, weekends, and holidays working on this project.").

After consulting with each of the primary professionals, the Receiver expects to continue reducing professional fees where it is appropriate to do so consistent with his duties and the amount of work remaining to be performed.  Nevertheless, in addition to the work that still must be performed, the Receiver unquestionably will need to address unforeseen events, crises, and emergencies.  The Receivership anticipates a continuing monthly expenditure of $5,000,000 for the professional team charges for the foreseeable future

In the weeks immediately following the period covered by this application, the Receivership team's major activities and priorities included the following:

- Locating additional assets owned by the Estate;

- Continuing to seek possession and control of Estate assets, by litigation when necessary, for example by asserting claims against relief defendants;

- Seeking Court orders for approval to liquidate assets such as real estate, coin and bullion, and private equity for ultimate distribution to CD holders and other claimants;

- Devising a plan of distribution of Estate assets to CD holders and other claimants; and

- Continuing to assert this Court's exclusive jurisdiction over Estate assets in Canada, Switzerland, the U.K. and Antigua where the Antiguan Liquidators have also asserted the competing right to possession of SIBL assets in those jurisdictions.

The Receiver will continue his efforts to reduce expenses to the Receivership Estate where doing so does not compromise his ability to carry out his duties and responsibilities as directed by the Court.

## CONCLUSION

The relief requested herein is necessary and appropriate to carry out the most basic provisions of the Amended Order Appointing Receiver. Accordingly, the Receiver requests that the Court enter an order approving of the fees and expenses incurred through May 31, 2009.

Dated:  August 4, 2009

Respectfully submitted,

BAKER BOTTS L.L.P.

By: / s/ Kevin M. Sadler

Richard B. Roper, III
Texas Bar No. 17233700
richard.roper@tklaw.com
THOMPSON & KNIGHT LLP
1722 Routh Street
Dallas, Texas  75201
(214) 969-1700
(214) 969-1751 (Facsimile)

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
One Shell Plaza
910 Louisiana
Houston, Texas  77002-4995
(713) 229-1234
(713) 229-1522 (Facsimile)

1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF CONFERENCE

Counsel for the Receiver conferred with the parties to this case.  Counsel for the Receiver conferred with Kevin Edmundson, counsel for the SEC, who stated that the SEC opposes this motion and the relief sought herein.  Counsel for the Receiver conferred with Jeff Tillotson, counsel for Laura Pendergest-Holt, who stated that Ms. Pendergest-Holt takes no position on this motion or the relief sought herein.  Counsel for the Receiver conferred with Ruth Schuster, counsel for R. Allen Stanford, who stated that Mr. Stanford will take a position on the motion and relief sought herein when his counsel has had additional time to evaluate it.  Counsel for the Receiver conferred with John Little, Court-appointed Examiner, who opposes this motion and the relief sought herein.  Counsel for the Receiver conferred with Manuel P. Lena, Jr. counsel for U.S.D.O.J. (IRS) who stated that the IRS takes no position on this motion or the relief sought herein.  The motion, therefore, is opposed.

/ s / Kevin M. Sadler
Kevin Sadler


## CERTIFICATE OF SERVICE

On August 4, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler