# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT, | § | |
| | § | |
|     Defendants. | § | |

---

## APPENDIX TO RECEIVER'S RESPONSE TO WALTON HOUSTON GALLERIA OFFICE, L.P.'S (1) MOTION TO INTERVENE AND (2) MOTION FOR RELIEF FROM RECEIVERSHIP ORDER TO PURSUE COUNTERCLAIMS IN PENDING STATE COURT ACTION

---

BAKER BOTTS L.L.P.
Kevin M. Sadler, Lead Attorney
Texas Bar No. 17512450
Robert I. Howell
Texas Bar No. 10107300
David T. Arlington
Texas Bar No. 00790238
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
Telephone: 512.322.2500
Facsimile: 512.322.2501

Timothy S. Durst
Texas Bar No. 00786924
2001 Ross Avenue, Suite 600
Dallas, Texas 75201-2980
Telephone: 214.953.6500
Facsimile: 214.953.6503

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No.: 3-09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, and LAURA PENDERGEST-HOLT, | § § § § § § | |
| Defendants. | § | |

### DECLARATION OF SAMUEL COOPER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

1.    "My name is Samuel Cooper. I am legally competent to make this declaration. I have personal knowledge and am familiar with the matters stated in this declaration, and all of the facts and statements contained herein are true and correct.

2.    I am a partner with the law firm of Baker Botts L.L.P. Baker Botts is counsel of record for the Receiver, Ralph S. Janvey, in the above-styled cause of action.

3.    Attached as Exhibit 1 is a true and correct copy of Stanford Group Holdings, Inc.'s and The Stanford Galleria Buildings, LP's (collectively "Stanford") Amended Petition filed on October 8, 2007.

4.    Attached as Exhibit 2 is a true and correct copy of Stanford's Response to Defendant's Second Motion for Summary Judgment filed on April 14, 2008.

5.      Attached as <u>Exhibit 3</u> is a true and correct copy of Defendant Walton Houston Galleria Office, L.P.'s Response in Opposition to the Stanford Parties' Motion for Stay of Proceedings filed on April 2, 2009.

6.      Attached as <u>Exhibit 4</u> is a true and correct copy of the Agreed Scheduling Order entered on April 30, 2009.

7.      Attached as <u>Exhibit 5</u> is a true and correct copy of Defendant Walton Houston Galleria Office, L.P.'s Third Request for Production to Plaintiffs served on August 4, 2009.

8.      Attached as <u>Exhibit 6</u> is a true and correct copy of Defendant Walton Houston Galleria Office, L.P.'s First Set of Interrogatories served August 4, 2009.

9.      I declare under penalty of perjury that the foregoing is true and correct."


EXECUTED on August 21, 2009.

_____
Samuel Cooper

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P., | § | |
| Defendant. | § | 113th JUDICIAL DISTRICT |

### AMENDED PETITION

Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP file this amended petition against Walton Houston Galleria Office, L.P.

### Discovery Control Plan

1.    Discovery in this case will be conducted under Texas Rule of Civil Procedure 190.4.

### Jurisdiction and Venue

2.    This court has personal jurisdiction over Walton Houston Galleria Office, L.P., because it conducts business in Texas. This court has subject matter jurisdiction over this case because the amount in controversy exceeds the minimum jurisdictional amount of this court.

3.    Venue is proper in Harris County under Sections 15.002 and 15.011 of the Texas Civil Practice & Remedies Code. All or a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in Harris County, and the real estate at issue is located in Harris County.

HN69995.3



1

**Parties**

4.      Stanford Group Holdings, Inc. is a Delaware corporation. The Stanford Galleria Buildings, LP is a Delaware limited partnership.

5.      Walton Houston Galleria Office, L.P. ("Walton") is a Delaware limited partnership. It has appeared in this case.

**Nature of the Case**

6.      This case is about Walton's fraudulent conduct and breach of its agreements with Stanford. Walton Street Capital, L.L.C., which sponsors the private equity real estate investment funds that beneficially own the three office towers at the Galleria, and whose principals handled the negotiation for the sale of those towers to Stanford, proclaims its "dedication to a disciplined disposition strategy" on its website. The facts of this case, however, reveal a disregard for honesty, fair-dealing and the rule of law in Walton's "disciplined" approach to obtaining the "optimal" return for itself in complete disregard of its representations to and agreements with Stanford.

7.      For nearly a year, Walton lied to Stanford about its intent to sell Stanford the central office building at issue, all the while improving its own position by inducing Stanford first to lease an additional five floors, and then an additional three floors, for a total of ten floors in the building. Walton promised Stanford that once the lease was complete, it would give Stanford the opportunity to buy the building. As subsequent events revealed, Walton never intended to fulfill that or any of its other promises to Stanford. Walton twice breached agreements to execute a Purchase and Sale Agreement for the conveyance of the three Galleria office buildings to Stanford for $150,000,000. This lawsuit seeks redress for Walton's wrongful refusal to honor its word and its agreements with Stanford.

2

HN69995.3

**Facts**

8.    Walton Street Capital, L.L.C. sponsors private equity real estate investment funds that, according to its website, have raised $1.8 billion. The principals of Walton Street have personally invested $151 million in the funds, and are therefore personal beneficiaries of the funds' profits.

9.    In early 1999, Walton Street negotiated the purchase of the Houston Galleria, one of the largest mixed-use real estate complexes in the world. Two of its sponsored funds invested in the acquisition, Walton Street Real Estate Fund II, L.P. and Walton Street Real Estate Fund III, L.P. New companies created by Walton Street, using the Walton funds' equity, acquired 100% of the three office towers for $73 million, 100% of the two hotels for $86 million, and a 33% interest in the retail assets and associated land. This lawsuit involves the three office towers, which are owned by the defendant in this case, Walton Houston Galleria Office, L.P. Those three office towers, Galleria Tower I, Galleria Tower II and Galleria Financial Center, have a combined net rentable area of 1,065,628 square feet.

10.    The Stanford Financial Group is a global network of affiliated companies providing financial services. Its headquarters are located in Houston across from the Galleria. In the summer of 2004, Stanford approached Walton about leasing space in Galleria Tower II to accommodate Stanford's growing requirements for office space. On October 25, 2004, Stanford entered into a 10-year lease with Walton for approximately 24,000 square feet of space in Galleria Tower II. According to Walton, the total lease payments under the ten-year term of lease amounted to $6,488,492.00.

11.    Stanford subsequently approached Walton about the possibility of purchasing Galleria Tower II. At the time, Galleria Tower II was over half vacant, which not only

HN69995.3

3

negatively impacted Walton's cash-flow, but also significantly impacted the value of Galleria Tower II and consequently Walton's portfolio. Therefore, Walton seized this opportunity to fraudulently induce Stanford to lease additional space in Galleria Tower II. Walton's own internal documents reflect Walton's representations to Stanford that Walton would only consider selling the building to Stanford if Stanford leased substantially more space from Walton. In fact, Walton's internal documents show that Walton was aware it was attempting to induce Stanford to lease more space than it actually needed at the time. Walton's representations created a false impression that it was interested in and willing to sell Galleria Tower II to Stanford. As Stanford has learned in this case, however, Walton had no intention of selling the building to Stanford.

12.     Nevertheless, on December 8, 2004, Stanford's representative met with representatives of Walton to discuss Stanford's interest in purchasing Galleria Tower II. Based on Walton's representations that it would only consider selling the building to Stanford if Stanford leased substantially more space, Stanford also discussed leasing over 80,000 additional square feet of space in Galleria Tower II. Walton reiterated, however, that it first wanted to enter into the expanded lease agreement, and after doing so, would then be willing to discuss selling the building to Stanford. At no point did Walton disclose to Stanford that it had no intention of selling the building to Stanford. On the contrary, as an express inducement to lease additional space, Walton specifically offered Stanford the right of first offer to purchase Galleria Tower II, expressly agreeing with respect to the right of first offer that "time was of the essence."

13.     On January 6, 2005, Chip Colvill, a representative of Walton, provided a revised draft of the First Amendment and stated that the right of first offer, with respect to which time was of the essence, had been approved by Walton's upper management. This, in conjunction with other representations made by Walton, created a false impression that Walton had the

HN69995.3

4

present and immediate intent to sell the building to Stanford. Walton, however, had no intention of selling the building, and in fact, had no intention of ever selling Galleria Tower II by itself. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford and no intention of ever selling Galleria Tower II by itself. Had Stanford known that Walton had no intention of selling the building, it would not have leased the additional five floors, which, as Walton admitted it knew, far exceeded Stanford's actual need for space at the time. The First Amendment was subsequently executed by the parties, and as a result Stanford's total liability for lease payments under the First Lease Amendment totaled $21,600,009.00, according to Walton.

14.     Stanford continued to express its interest in purchasing Galleria Tower II. ·In April 2005, Stanford specifically asked representatives of Walton where Walton was in the process of selling the building. Subsequently, on May 9, 2005, Stanford sent a letter to Walton reaffirming its discussions with Walton that Stanford desired to purchase Galleria Tower II, and initiating Stanford's right of first offer under the lease amendment. Under the right of first offer, Walton was therefore obligated to submit to Stanford a "Bid Package" within 60 days. It did not. Instead, as Walton's internal documents reflect, Walton wanted Stanford to lease an additional 50,000 square feet of space in Galleria Tower II. Walton's representatives, however, represented to Stanford that, following the execution of the second amendment to the lease, Stanford would have the exclusive opportunity to purchase the building. Therefore, in reliance on Walton's representations, on July 18, 2005 Stanford executed the Second Amendment to the Lease Agreement adding an additional 50,000 square feet to its leased space, bringing to over 160,000 square feet, or ten floors, the total space leased by Stanford in Galleria Tower II, which was over five times the amount of space that Stanford initially agreed to lease from Walton. Stanford's

HN69995.3

5

liability for lease payments for the additional space under the Second Lease Amendment was $11,507,958.00, according to Walton. Stanford's total liability for lease payments over the term of the lease, which extends through 2016, is, according to Walton, $39,596,459.00, over six times what Stanford would have been obligated to pay Walton under the original lease. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero because Stanford would ultimately be the owner of the building.

15. Stanford became, and remains, the primary tenant in Galleria Tower II, and as of August 2007, its lease comprised over 50% of the net rentable area of the building. Moreover, in reliance on Walton's representations and omissions, Stanford spent in excess of $10,238,062.00 improving the 10 floors it had leased from Walton. In addition, Stanford vacated the premises it had leased prior to moving into Galleria Tower II, and was obligated to pay about $569,997.07 for space that it no longer occupied.

16. Following the execution of the Second Amendment to the Lease Agreement, discussions between Stanford and Walton regarding the purchase of Galleria Tower II, and possibly one of the Galleria hotels (the Westin Galleria), continued. On August 17, 2005, representatives of Stanford met with Howard Brody, a principal in Walton and the asset manager for Walton's Galleria properties, to discuss the purchase. Brody explained that Walton had retained CB Richard Ellis, a commercial real estate brokerage firm, to market the three Galleria office towers. Stanford reminded Brody that, prior to entering into the Second Lease Amendment, Walton had represented to Stanford that it would have the exclusive opportunity to purchase Galleria Tower II. Stanford then asked Walton for the exclusive right to negotiate a purchase of the three office buildings before Walton offered the buildings for sale to any other party; Stanford also reiterated its interest in purchasing the Westin Galleria hotel.

HN69995.3

6

17.    To facilitate Stanford's analysis of the three office buildings, Walton allowed Stanford access to marketing and due diligence materials assembled by Walton.    These marketing materials included an Offering Memorandum, setting forth what Walton considered to be the material information relating to the Galleria office buildings, and a website containing leases, contracts, service agreements, and other legal documents relating to the Galleria office buildings.

18.    In a meeting on August 26, 2005, Brody informed Stanford's representatives that Walton had agreed to give Stanford an exclusive opportunity to purchase all three of the Galleria office buildings.    Brody presented a proposed letter of intent to Stanford and said that although Walton was not interested in selling the Westin Galleria hotel at the time, they would be willing to talk to Stanford about the hotel later, after a deal on the office buildings had been completed. Walton, however, refused to sign the letter of intent unless Stanford agreed to Walton's $150,000,000.00 asking price for the three buildings.

19.    In reliance on Walton's representations, Stanford signed the letter of intent with Walton on September 6, 2005, regarding the proposed purchase and sale of the Galleria office towers (the "Letter of Intent").    In the letter of intent, Stanford agreed to pay and Walton agreed to accept $150,000,000 in cash for the three office buildings.    Stanford also agreed to complete its evaluation of the property (its "due diligence") by September 26, 2005.    The parties agreed to negotiate and execute a Purchase and Sale Agreement on or before September 27, 2005. Walton also decided, however, to solicit bids on the buildings in the event Stanford chose not to enter into an agreement, but the deadline for third-parties to submit bids was after the date by which Stanford and Walton had agreed to execute the Purchase and Sale Agreement.

20.    Because of the very short deadlines to conduct due diligence and sign a Purchase and Sale Agreement, Stanford immediately engaged professional consultants to assist it in the due diligence and negotiation of a Purchase and Sale Agreement. It hired consultants to perform a financial analysis of the properties, to inspect and issue a report on the physical condition of the buildings and their mechanical systems, and to perform an environmental study. Stanford also formed the entity that would enter the Purchase and Sale Agreement, Stanford Galleria.

21.    On September 8, 2005, Stanford hired legal counsel to help with the due diligence and to assist in negotiating and drafting the Purchase and Sale Agreement. Several drafts of the Purchase and Sale Agreement and numerous comments were exchanged between lawyers for Walton and Stanford, and on September 19, 2005, Brody said that the final Purchase and Sale Agreement would be ready for execution early the next week.

22.    By September 21, 2005, Hurricane Rita, a category five hurricane, was predicted to make landfall at Houston, Texas within the next few days. Mandatory evacuations were ordered, and most businesses began making preparations to shut down until the hurricane had passed. In light of this development, Stanford and Walton entered into an amendment to the letter of intent extending the date for Stanford to complete its due diligence from September 26, 2005 to October 4, 2005, and extending the deadline to execute the Purchase and Sale Agreement from September 27, 2005, to October 5, 2005. In the amendment, the parties expressly agreed that the letter of intent "shall remain in effect and is hereby ratified." Separately, Walton extended the deadline for third-party bids to 12:00 noon, Thursday, October 6, 2005, one day after the new deadline for Walton and Stanford to execute a Purchase and Sale Agreement.

HN69995.3

23.     Negotiations between Stanford and Walton regarding the terms of the Purchase and Sale Agreement continued. On September 23, 2005, Brody sent a short letter to Stanford regarding the "open issues on the contract." There were only four. First, Brody reiterated that "[t]his is an 'as-is' deal," meaning Stanford was responsible for conducting its own due diligence. Second, Walton could not be required to obtain Subordination, Nondisturbance & Attornment Agreements from the tenants of the buildings. Third, Walton wanted a cap on liability for any issues arising out of the deal. Fourth, the closing date would need to be arranged so as to minimize the amount of interest Walton would have to pay on its loans that encumbered the buildings. Brody concluded the letter by stating, "Upon reaching a resolution of these items we will send you a revised Purchase Agreement."

24.     The parties continued to work to resolve these issued, but on October 3, 2005, Walton asked to extend the deadlines in the letter of intent because of an intervening Jewish holiday. Stanford agreed, and the parties executed a second amendment to the letter of intent extending the date for Stanford to complete its due diligence to October 5, 2005, and extending the date to execute the Purchase and Sale Agreement to October 6, 2005. The parties expressly agreed in the amendment that the letter of intent "shall remain in effect and is hereby ratified," and in fact Stanford made arrangements that day to wire the $10,000,000.00 deposit to Walton. As Stanford has since learned, however, this extension meant that Walton could review the outside bids on October 6 before the midnight deadline for executing the Purchase and Sale Agreement with Stanford.

25.     On October 5, Walton, Stanford, and their lawyers participated in a telephone conference. During that call, Walton and Stanford agreed on all terms for the sale of the three Galleria office buildings. On the call, Brody instructed Walton's lawyer to prepare a final draft

9

of the Purchase and Sale Agreement, reflecting the agreements reached on the call, for execution. Walton and Stanford agreed to execute the Purchase and Sale Agreement the following day, October 6, the deadline provided by the letter of intent.

26.     Later that day, however, Brody told Stanford that Walton would not execute the Purchase and Sale Agreement, claiming for the first time that Walton needed to resolve a "new" issue concerning the Galleria condominium arrangement in light of Federated Department Stores' decision to close the store currently called Macy's in the Galleria, and re-label its Foley's store in the Galleria as "Macy's." Although Federated's plans had been reported in the *Houston Chronicle* on July 29, 2005, over two months before, and although Walton had obviously known about Federated's plans prior to that public announcement, Brody used Federated's decision as an excuse for Walton's breach of its agreement to sign the Purchase and Sale Agreement. As Stanford has learned in this case, Walton was well-aware of the issues surrounding the Galleria condominium arrangement long before October 5.

27.     During that second call on October 5, Brody claimed that because of the closing of the Macy's store, Walton wanted to make revisions to the Galleria Condominium Documents to permit the development of residential condominiums in the Galleria — revisions that could materially impact Stanford's ownership of the office buildings in a number of ways, including the sharing of utilities from the Galleria central plant, parking availability and location, voting rights within the condominium association, and cost-sharing arrangements. Brody denied that this "new" condominium issue had anything to do with the fact that Walton wanted to wait to see the bids on the Galleria office towers, which were due at noon the next day. Stanford indicated that its initial reaction to the proposed residential development was favorable, and expressed its willingness to discuss the issue further once the Purchase and Sale Agreement was signed. It

10

HN69995.3

objected, however, to Walton's efforts to renege on its agreement to sign the Purchase and Sale Agreement. Stanford, however, reiterated to Walton that all terms and conditions of the sale had been agreed to and that Stanford was ready, willing, and able to perform and that it was prepared to deliver the earnest money immediately. Stanford informed Walton that it would wait for Walton to execute the Purchase and Sale Agreement that the parties had agreed to execute.

28.     The next day, October 6, Stanford waited for the execution copy of the Purchase and Sale Agreement. Around 10:00 p.m., two hours before the midnight deadline to execute the Purchase and Sale Agreement, Walton's lawyer forwarded to Stanford a revised, unexecuted draft of the Purchase and Sale Agreement. Contrary to the terms agreed upon during the October 5 conference call, the new draft contained provisions that had never been discussed, imposing significant restrictions and limits on Stanford's future use and sale of the office buildings, and granting Stanford's blanket consent to any future changes that Walton might wish to make to the Condominium Documents, including changes that could reduce or relocate parking space for the three office buildings, reduce Stanford's voting rights in the condominium association, and impose other burdens on the office properties. The draft also granted Stanford's consent to convert one or both of the Galleria hotels to residential use.

29.     In a conference call on October 7, 2005, Brody apologized for the "timing of events" and stated that Walton still wanted to sell the office buildings to Stanford. Expanding on his excuse for Walton's refusal to perform its agreement to execute the Purchase and Sale Agreement, Brody claimed that a senior partner at Walton, who was apparently Ira Schulman, was insisting that all issues related to the future residential condominium development be resolved before selling the office buildings to Stanford. Brody admitted that Walton had received and was reviewing bids on the properties from interested potential purchasers, but

HN69995.3

11

claimed that none of the bids met or exceeded Stanford's $150,000,000 deal. He promised that Walton would not approach any of the bidders to try to encourage them to increase their bid price, and denied that Walton was delaying the execution of the Purchase and Sale Agreement in order to try to negotiate a better deal on the office buildings with another buyer.

30.    In an effort to amicably resolve the concerns Walton claimed to have about the condominium issue, Stanford and its lawyer participated in a conference call with Brody and Walton's lawyer on the afternoon of October 12, 2005. During that call, Stanford and Walton confirmed their agreement to execute the Purchase and Sale Agreement and agreed (1) that Walton could proceed with the contemplated amendments to the Galleria Condominium Documents, (2) that Stanford had the right to review those amendments and determine if they were acceptable, (3) that Stanford could terminate the Purchase and Sale Agreement if the amendments to the Condominium Documents were not acceptable, and (4) that if Stanford terminated the agreement, Walton would refund Stanford's $10 million deposit.

31.    In a subsequent telephone conference on Thursday, October 20, 2005, Stanford and Walton agreed to language to be inserted into the Purchase and Sale Agreement that would reflect the October 12, 2005 agreement regarding Stanford's right to terminate the Purchase and Sale Agreement and have its deposit returned. Walton and Stanford agreed to execute the Purchase and Sale Agreement containing that language by the close of business the following day, Friday, October 21, 2005, and Stanford promised that it would wire the required $10,000,000.00 deposit.

32.    Once again, however, Walton failed to live up to its agreement, and never executed the Purchase and Sale Agreement. Rather, late Friday afternoon, Brody sent an e-mail to Stanford saying that he was still trying to "sort out a couple of things" and was "hoping to be

in a position" to call Stanford Monday morning. Monday morning, Brody called to say that Walton had decided not to execute the Purchase and Sale Agreement. Stanford responded that they had a deal, that they expected Walton to live up to the deal, and that if Walton refused, Stanford would enforce its rights against Walton under the law. On October 24, 2005, Stanford sent a letter to Walton, stating that it was ready willing and able to perform and that it was ready to deliver the deposit.

33.    On November 1, 2005, Brody sent Stanford a letter denying the agreements and claiming that "there will not be any agreement until Walton Street considers all issues that it, in its sole discretion, considers to be material to the proposed transaction." The letter did not list a single allegedly open issue, however. In other words, Walton Street was admitting what it had concealed from Stanford but that had become clear in the course of events — Walton felt free to add new requirements and conditions, and change any aspect of the deal, even after it had reached an agreement. In response, on November 1, 2005, Stanford again informed Walton that it was ready, willing and able to perform.

34.    Finally, on November 3, 2005, Walton, through counsel, sent a letter to Stanford unilaterally stating that, "[a]s we have repeatedly informed you, Ownership has no intention of *proceeding with any agreement* that does not contain a satisfactory and full treatment of all issues and concerns," (emphasis added) and threatening Stanford if Stanford tried to enforce the agreements it had reached with Walton.

35.    As Stanford has learned during the course of discovery, despite having had two years to do so, Walton has never resolved the so-called condominium issue it raised as an excuse for Walton's breach of its agreement to sign the Purchase and Sale Agreement. In truth, Walton's excuse was simply the culmination of its fraudulent scheme it began in the fall of 2004. While

HN69995.3

13

13

the parties' conduct, viewed objectively, showed that the parties had a deal and had agreed to execute the Purchase and Sale Agreement, it is now clear that, contrary to its numerous representations, Walton never intended to sell Stanford Galleria Tower II, or any building for that matter.

36.    Ira Schulman, the Walton Street partner who Brody used as an excuse for Walton's refusal to abide by its agreement to sign the Purchase and Sale Agreement, once commented in a "sponsor interview" in *The Institutional Real Estate Letter* that, "[e]verybody has to be accountable." This lawsuit is filed to make Walton accountable for its fraudulent conduct and breached agreements.

### First Cause of Action
### Breach of Contract

37.    The Letter of Intent signed by the parties evidenced the essential terms of the parties' agreement. The parties subsequently ratified the letter of intent, thereby making it a binding and enforceable contract to sell the Galleria office buildings. In addition, the parties made the letter of intent binding and enforceable by their conduct following its execution. Walton breached the contract by refusing to sell the Galleria office buildings to Stanford, and Stanford directly and proximately suffered damages as a result.

38.    In the alternative, the Letter of Intent was a binding and enforceable contract to execute a Purchase and Sale Agreement. Walton breached the contract by refusing to execute a Purchase and Sale Agreement, and Stanford directly and proximately suffered damages as a result.

39.    In addition, or in the alternative, during each of the October 5 and October 20 conference calls, Walton and Stanford reached agreement on all outstanding terms regarding the sale of the Galleria office buildings, and agreed to execute a written agreement that reflected

14

HN699953

their agreement. Walton breached those agreements by refusing to execute the Purchase and Sale Agreement, and Stanford has directly and proximately suffered damages as a result.

40.    The agreements on which Stanford bases its claims either comply with or are outside the scope of the statute of frauds, but, because of Walton's fraudulent conduct, Walton is nevertheless estopped from asserting the statute of frauds.

41.    Because real estate is unique and Stanford has no adequate remedy at law, it is entitled to specific performance, and requests that the court order Walton to convey the Galleria office buildings to it, or alternatively, to execute the Purchase and Sale Agreement reflecting the terms of the deal between Stanford and Walton to convey the Galleria office buildings to it. Alternatively, Stanford requests its actual damages in an amount awarded by the jury, as well as pre and post-judgment interest.

42.    Under Chapter 38 of the Texas Civil Practice and Remedies Code, Stanford is entitled to recover its attorney's fees incurred in prosecuting this breach of contract claim, and therefore requests its attorney's fees.

### Second Cause of Action
### Fraudulent Inducement
### (First Lease Amendment)

43.    In order to induce Stanford to enter into the First Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II, which Walton either knew were false or made recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford and that it would sell Galleria Tower II apart from the other Galleria office buildings, when in fact Walton had no intention of selling the building to Stanford

HN69995.3

or of selling Galleria Tower II apart from the other Galleria office buildings. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford or of selling Galleria Tower II apart from the other Galleria office buildings. Moreover, Walton had a duty to disclose that issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, would preclude it from selling the building to Stanford.

44.     Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

45.     In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the First Lease Amendment of $21,600,009.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space, and was obligated to pay approximately $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

46.     In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton has directly benefited from Stanford's entering into the First Lease Amendment through increased rent and the increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched.

HN69995.3

47.    Walton's fraud demonstrates the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary damages, and Stanford is entitled to recover, and requests, exemplary damages from Walton in an amount determined by the jury.

**Third Cause of Action**
**Chapter 27 of the Texas Business & Commerce Code**
**(First Lease Amendment)**

48.    In violation of Chapter 27 of the Texas Business & Commerce Code, and in order to induce Stanford to enter into the First Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II, which Walton either knew were false or made recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford and that it would sell Galleria Tower II apart from the other Galleria office buildings, when in fact Walton had no intention of selling the building to Stanford or of selling Galleria Tower II apart from the other Galleria office buildings. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford or of selling Galleria Tower II apart from the other Galleria office buildings. Moreover, Walton had a duty to disclose that issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, would preclude it from selling the building to Stanford.

49.    Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

17

50.    In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the First Lease Amendment of $21,600,009.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending over $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space, and was obligated to pay about $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

51.    In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton has directly benefited from Stanford's entering into the First Lease Amendment through increased rent and the increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched.

52.    Walton had actual awareness of the falsity of its representations and therefore is liable to Stanford for exemplary damages.

53.    Under Chapter 27 of the Texas Business & Commerce Code, Stanford is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

### Fourth Cause of Action
### Fraudulent Inducement
### (Second Lease Amendment)

54.    In order to induce Stanford to enter into the Second Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II. Walton also falsely represented that it would give Stanford the exclusive opportunity to purchase the building when in fact it had no intention of doing so. Walton either knew that

18

HN69995.3

these representations were false or made them recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford, when in fact Walton had no intention to sell the building to Stanford. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford. Moreover, Walton had a duty to disclose that it would not sell the buildings to Stanford until certain issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, were resolved as it wanted.

55.    Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

56.    In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the Second Lease Amendment of $11,507,958.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending over $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space, and was obligated to pay about $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

57.    In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton had directly benefited from Stanford's entering into the First Lease

19

HN69995.3

Amendment through increased rent and the increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched.

58.    Walton's fraud demonstrates the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary damages, and Stanford is entitled to recover, and requests, exemplary damages from Walton in an amount determined by the jury.

**Fifth Cause of Action**
**Chapter 27 of the Texas Business & Commerce Code**
**(Second Lease Amendment)**

59.    In order to induce Stanford to enter into the Second Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II.  Walton also falsely represented that it would give Stanford the exclusive opportunity to purchase the building when in fact it had no intention of doing so.  Walton either knew that these representations were false or made them recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them.  In addition, Walton's' representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford, when in fact Walton had no intention to sell the building to Stanford.  Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford.  Moreover, Walton had a duty to disclose that it would not sell the buildings to Stanford until certain issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, were resolved as it wanted.

60.    Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

20

61.    In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the Second Lease Amendment of $11,507,958.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending over $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space and was obligated to pay $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

62.    In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton has directly benefited from Stanford's entering into the First Lease Amendment through increased rent and increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched. Walton's fraud demonstrates the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary damages, and Stanford is entitled to recover, and requests, exemplary damages from Walton in an amount determined by the jury.

63.    Walton had actual awareness of the falsity of its representations and therefore is liable to Stanford for exemplary damages.

64.    Under Chapter 27 of the Texas Business & Commerce Code, Stanford is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

**Conditions Precedent**

65.    All conditions precedent to recovery by Stanford have been performed or have occurred.

HN69995.3

21

**Prayer**

Walton pursued its own profit without regard to whether its promises were truthful or its actions legal. Stanford respectfully requests that this Court remedy its losses by ordering Walton to convey the Galleria office buildings to it, or alternatively to execute the Purchase and Sale Agreement, or alternatively, to award it the actual damages it has suffered, including pre and post-judgment interest. In addition to specific performance or, alternatively, damages, Stanford requests its reliance, out-of-pocket, benefit-of-the-bargain, and exemplary damages and attorney's fees.

Respectfully submitted,

David Berg
Texas Bar No. 02187000
**BERG & ANDROPHY**
3704 Travis St.
Houston, Texas 77002
(713) 529-5622
(713) 529-3785 – Fax

Sean Gorman
Texas Bar No. 08218100
Chris Lacy
Texas Bar No. 24046258
**DEWEY & LEBOEUF LLP**
1000 Main Street, Suite 2550
Houston, Texas 77002
(713) 287-2024
(713) 445-2124 – Fax

ATTORNEYS FOR STANFORD GROUP HOLDINGS, INC. AND
THE STANFORD GALLERIA BUILDINGS, LP

HN699953

22

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on opposing counsel, as reflected below, on October 8, 2007.

H. Bruce Golden                        By Hand Delivery and U. S. Mail
Golden & Owens, L.L.P.
1221 McKinney Street
Suite 3150
Houston, Texas 77010

_____
Chris Lacy

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P., | § | |
| Defendant. | § | 113th JUDICIAL DISTRICT |

### PLAINTIFFS' RESPONSE TO DEFENDANT'S
### SECOND MOTION FOR SUMMARY JUDGMENT

Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP (collectively,

"Stanford") file this response to Walton Houston Galleria Office, L.P.'s motion for summary

judgment on Stanford's fraud claims.

### INTRODUCTION

Walton's motion for summary judgment conspicuously ignores the core of Stanford's

fraud claims, and, in doing so, fundamentally distorts them. The core of Stanford's fraud claims

is based not on oral representations that contradict the lease amendments as Walton incorrectly

claims in its motion, but on Walton's failure to disclose that it never intended to sell the central

office building at issue, Galleria Tower II, separate and apart from the other two Galleria office

buildings. As an inducement to lease substantially more space in Galleria Tower II and to incur

a $33 million lease liability, Walton purported to give Stanford the "right of first offer" to

purchase Galleria Tower II. This right of first offer, contained in the very agreement into which

Stanford was fraudulently induced and consistent with the circumstances and negotiations

surrounding the execution of the lease amendment, created the false impression that Walton

would consider selling Galleria Tower II separate and apart from the other Galleria office

buildings. Yet, even as Walton purported to give Stanford the right of first offer, it knew, but



EXHIBIT

tablies

**2**

24

refused to disclose, that in fact it never had any intent to sell Galleria Tower II by itself, rendering the right of first offer utterly worthless.  Under Texas law, Stanford was clearly entitled to rely on non-disclosures regarding representations in the very agreement into which it was fraudulently induced.  Therefore, because Walton's motion for summary judgment does not address the core of Stanford's fraud claims and because, even it had, it could not prevail, Walton's motion must be denied.

## BACKGROUND

Walton Street Capital, L.L.C. sponsors private equity real estate investment funds that have a cost basis value of over $9 billion.  The principals of Walton Street have personally invested $151 million in the funds, and are therefore personal beneficiaries of the funds' profits.  In early 1999, Walton Street negotiated the purchase of the Houston Galleria, one of the largest mixed-use real estate complexes in the world.  Two of its sponsored funds invested in the acquisition, Walton Street Real Estate Fund II, L.P. and Walton Street Real Estate Fund III, L.P.  New companies created by Walton Street, using the Walton funds' equity, acquired 100% of the three office towers for $73 million, 100% of the two hotels for $86 million, and a 33% interest in the retail assets and associated land.  This lawsuit involves the three office towers, which are owned by the defendant in this case, Walton Houston Galleria Office, L.P.  Those three office towers, Galleria Tower I, Galleria Tower II ("GTII") and Galleria Financial Center, have a combined net rentable area of 1,065,628 square feet.

The Stanford Financial Group is a global network of affiliated companies providing financial services. Ex. A, Affidavit of Mauricio Alvarado at ¶ 3.  Its headquarters are located in Houston directly across from the Galleria at 5050 Westheimer, a building owned by Stanford ("5050 Westheimer"). *Id.*  In the summer of 2004, Stanford approached Walton about leasing

2
**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**SECOND MOTION FOR SUMMARY JUDGMENT**

space in Galleria Tower II for its accounting department. *Id.* Stanford then entered into 10-year lease with Walton for approximately 24,000 square feet of space in Galleria Tower II. Ex. B, Lease Agreement. The total lease payments under the ten-year term of the lease amounted to $6,488,492.00. *Id.*

a.    **Walton devises its scheme to induce Stanford to lease six times more space**

Stanford subsequently learned that a major tenant in Galleria Tower II had vacated the property. Ex. A, Affidavit of Mauricio Alvarado at ¶ 4. The location of Galleria Tower II with respect to Stanford's headquarters—directly across the street—made Galleria Tower II an ideal location for Stanford's operations. *Id.*  While Stanford did not have a current need for the amount of space available in Galleria Tower II, it anticipated that in the future it would. *Id.* Stanford, however, preferred to own as opposed to lease large amounts of commercial space, and therefore approached Walton about purchasing Galleria Tower II. *Id.*

Walton represented to Stanford that it was interested in and willing to sell Galleria Tower II to Stanford. Ex. A, Affidavit of Mauricio Alvarado at ¶ 5. In fact, following a meeting between Stanford and Walton's representatives, a Walton representative sent an e-mail to Stanford stating, "Stanford is a first-class organization and we, indeed, will be very proud to have [Stanford] be part of the Galleria complex." Ex. C, December 9, 2004 e-mail from Chip Colvill to Mauricio Alvarado, et al. Walton, however, represented to Stanford that it was not willing to discuss the sale of Galleria Tower II unless Stanford first agreed to lease substantially more space. Ex. A, Affidavit of Mauricio Alvarado at ¶ 5. As Howard Brody, the Walton principal responsible for the sale of the buildings, stated in response to a question about Stanford's interest in purchase the building, **"[I] don't want to go down that road until they sign for more space."** Ex. D, November 26, 2004 e-mail from Howard Brody to Chip Colvill.

As an inducement to lease additional space, Walton specifically agreed to give Stanford the right of first offer to purchase Galleria Tower II, but only on the express condition that Stanford leased at least an additional 112,000 square feet. Ex. E, First Lease Amendment at § 5.33. **Walton was well-aware that this far exceeded the amount of space that Stanford actually needed at the time by nearly six-fold.** Ex. F, November 30, 2004 e-mail from Chip Colvill to Howard Brody. Nevertheless, Walton insisted that it would only consider selling the building to Stanford if Stanford entered into the expanded lease agreement. Ex. A, Affidavit of Mauricio Alvarado at ¶ 5. On January 6, 2005, Chip Colvill, a representative of Walton, provided a revised draft of the First Amendment, and stated that the right of first offer, with respect to which time was of the essence, had been approved by Walton's upper management. Ex. G, January 6, 2005 e-mail from Chip Colvill to Mauricio Alvarado, et al. This, in conjunction with other representations made by Walton, created the impression, which Stanford now knows was false, that Walton had the present and immediate intent to sell the building to Stanford. Ex. A, Affidavit of Mauricio Alvarado at ¶ 6. **As Ira Schulman, a Walton principal, member of the Walton investment and management committee, and Howard Brody's boss, now admits, "[Walton] had no intention of selling the building at that point in time [in December 2004]…and we had no plans to sell the building in the immediate future."** Ex. H, Deposition of Ira Schulman at 183:21-25. In fact, Walton had no intention of ever selling Galleria Tower II by itself. The First Amendment was subsequently executed by the parties; Stanford's total liability for lease payments under the First Lease Amendment was $21,600,009.00. Ex. E, First Lease Amendment.

HN71496.1

**b.**    **Walton continues its scheme to induce Stanford to lease** *additional* **space**

Stanford continued to express its strong desire to purchase Galleria Tower II. In early May 2005, Stanford specifically inquired with representatives of Walton if Walton was in the process of selling the building. Ex. A, Affidavit of Mauricio Alvarado at ¶ 7. Walton's real estate agent, Chip Colvill, sent an e-mail to Brody stating that Stanford "wants to meet with me on Monday at 10 a.m. [Stanford] wants to know where we are on selling them the building and the hotel." Ex. I, May 6, 2005 e-mail from Chip Colvill to Howard Brody. On May 9, 2005, Stanford sent a letter to Walton reaffirming its discussions with Walton that Stanford desired to purchase Galleria Tower II, and initiating Stanford's right of first offer under the lease amendment. Ex. J, May 9, 2005 letter from Mauricio Alvarado to Howard Brody. Under the right of first offer, Walton was obligated to submit to Stanford a "Bid Package" within 60 days. It did not. Ex. E, First Lease Amendment at § 5.33.

Instead, Walton wanted Stanford to lease an additional 50,000 square feet of space in Galleria Tower II before it would discuss the specific terms of the sale with Stanford. Ex. A, Affidavit of Mauricio Alvarado at ¶ 7. In response to an e-mail from Walton's real estate agent regarding Stanford's desire to purchase the building, Brody flat-out stated, **"We should get the lease done first,"** referring to the second amendment to the lease. Ex. K, May 6, 2005 e-mail from Howard Brody to Chip Colvill. Subsequently, emphasizing Walton's desire to have Stanford occupy Galleria Tower II, Colvill represented to Stanford that "technically [Stanford] did not yet have the right to buy the building since they are not yet in occupancy of 5 full floors." Ex. L, May 18, 2005 e-mail from Chip Colvill to Howard Brody. Walton's real estate agent, however, represented to Stanford that, following the execution of the second amendment to the lease, Stanford would have the exclusive opportunity to purchase the building. Ex. A, Affidavit

of Mauricio Alvarado at ¶ 7; *see also* Ex. M, Deposition of Mauricio Alvarado at 84:15-25. But as Ira Schulman once again admitted in this case, however, **"[Walton] at that time in [May] 2005 had no plans to sell the Galleria office buildings."** Ex. H, Deposition of Ira Schulman at 225:23-226:1.

In reliance on Walton's representations and omissions, on July 18, 2005 Stanford executed the second amendment to the lease agreement ("Second Lease Amendment") adding an additional 50,000 square feet to its leased space, bringing to over 160,000 square feet, or ten floors, the total space leased by Stanford in Galleria Tower II, which was over five times the amount of space that Stanford initially agreed to lease from Walton in October 2004. Ex. A, Affidavit of Mauricio Alvarado at ¶ 8. Stanford's liability for lease payments for the additional space under the Second Lease Amendment equaled $11,507,958.00. Ex. N, Second Lease Amendment. Stanford's total liability for lease payments over the term of the lease, which extends through 2016, is $39,596,459.00, over six times what Stanford would have been obligated to pay Walton under the original lease. Ex. A, Affidavit of Mauricio Alvarado at ¶ 8. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero, because Stanford would ultimately be the owner of the building. *Id.* As Mauricio Alvarado testified in his deposition:

> At the time and prior to this—entering into this lease, we had expressed to Walton our desire to purchase the Galleria II building. And this amendment, as well as the second amendment, was done in anticipation of our purchasing the building.

Ex. M, Deposition of Mauricio Alvarado at 61:17-21.

Stanford became, and remains, the primary tenant in Galleria Tower II, and as of August 2007, its lease comprised over 50% of the net rentable area of the building, a fact that Walton has prominently trumpeted as it has attempted to sell the property to *other* parties. Ex. O, Offering

Memorandum at 2.9. Moreover, in reliance on Walton's representations and omissions, Stanford spent out of its own pocket $10,238,062.00 improving the 10 floors it had leased from Walton, money it would not have spent had it known the truth. Ex. A, Affidavit of Mauricio Alvarado at ¶ 8.

c.   **Walton's conduct confirms that it never had any intent to sell Galleria Tower II by itself**

Following the execution of the Second Amendment to the Lease Agreement, discussions between Stanford and Walton regarding the purchase of Galleria Tower II, and the possible purchase of one of the Galleria hotels (the Westin Galleria) continued. Ex. A, Affidavit of Mauricio Alvarado at ¶ 9. On August 17, 2005, representatives of Stanford met with Howard Brody, a principal in Walton and the asset manager for Walton's Galleria properties, to discuss the purchase. *Id.* Brody explained that Walton had retained CB Richard Ellis, a commercial real estate brokerage firm, to market the three Galleria office towers. *Id.* Stanford reminded Brody that, prior to entering into the Second Lease Amendment, Walton had represented to Stanford that it would have the exclusive opportunity to purchase Galleria Tower II. *Id.* Stanford then asked Walton for the exclusive right to negotiate a purchase of the three office buildings before Walton offered the buildings for sale to any other party; Stanford also reiterated its interest in purchasing the Westin Galleria hotel. *Id.*

In a meeting on August 26, 2005, Brody informed Stanford's representatives that Walton had agreed to give Stanford an exclusive opportunity to purchase all three of the Galleria office buildings. Ex. A, Affidavit of Mauricio Alvarado at ¶ 10. Brody presented a proposed letter of intent to Stanford and said that although Walton was not interested in selling the Westin Galleria hotel at the time, they would be willing to talk to Stanford about the hotel later, after a deal on the office buildings had been completed. *Id.* Walton, however, refused to sign the letter of

HN71496.1

intent unless Stanford agreed to Walton's $150,000,000.00 asking price for the three buildings, which exceeded the valuation of the buildings by Walton's own real estate agent by $35 million. Ex. P, Deposition of Mary Carolan at 120:7-10.

In reliance on Walton's representations, Stanford signed a letter of intent with Walton on September 6, 2005, regarding the purchase and sale of the Galleria office towers (the "Letter of Intent"). Ex. A, Affidavit of Mauricio Alvarado at ¶ 10; *see also* Ex. Q, Letter of Intent. In the Letter of Intent, Stanford agreed to pay and Walton agreed to accept $150,000,000 in cash for the three office buildings. Ex. Q, Letter of Intent. Stanford also agreed to complete its evaluation of the property (its "due diligence") by September 26, 2005. *Id.* The parties agreed to negotiate and execute a Purchase and Sale Agreement on or before September 27, 2005. *Id.*

Because of the very short deadlines to conduct due diligence and sign a Purchase and Sale Agreement, Stanford immediately engaged professional consultants to assist it in the due diligence on the buildings. Ex. A, Affidavit of Mauricio Alvarado at ¶ 12. *Id.* It hired consultants to perform a financial analysis of the properties, to inspect and issue a report on the physical condition of the buildings and their mechanical systems, and to perform an environmental study. *Id.* Stanford also formed the entity that would enter the Purchase and Sale Agreement, Stanford Galleria. *Id.* On September 8, 2005, Stanford hired legal counsel to help with the due diligence and to assist in negotiating and drafting the Purchase and Sale Agreement. Several drafts of the Purchase and Sale Agreement and numerous comments were exchanged between lawyers for Walton and Stanford, and on September 19, 2005, Brody said that the final Purchase and Sale Agreement would be ready for execution early the next week.

**d.    The parties twice amend and ratify the Letter of Intent**

By September 21, 2005, Hurricane Rita, a category five hurricane, was predicted to make landfall at Houston, Texas within the next few days. Ex. A, Affidavit of Mauricio Alvarado at ¶ 13. Mass evacuations began, and most businesses began making preparations to shut down until the hurricane had passed. *Id.* In light of this development, Stanford and Walton entered into an amendment to the letter of intent extending the date for Stanford to complete its due diligence from September 26, 2005 to October 4, 2005, and extending the deadline to execute the Purchase and Sale Agreement from September 27, 2005, to October 5, 2005. *Id.* In the amendment, the parties expressly agreed that the letter of intent **"shall remain in effect and is hereby <u>ratified</u>."** Ex. R, First Amendment to Letter of Intent. Separately, Walton extended the deadline for third-party on the buildings bids to 12:00 noon, Thursday, October 6, 2005, one day after the new deadline for Walton and Stanford to execute a Purchase and Sale Agreement.

Negotiations between Stanford and Walton regarding the terms of the Purchase and Sale Agreement continued. On September 23, 2005, Brody sent a short letter to Stanford regarding the "open issues on the contract." Ex. S, September 23, 2005 letter from Howard Brody to Mauricio Alvarado. There were only four. First, Brody reiterated that "[t]his is an 'as-is' deal," meaning Stanford was responsible for conducting its own due diligence. Second, Walton could not be required to obtain Subordination, Nondisturbance & Attornment Agreements from the tenants of the buildings. Third, Walton wanted a cap on liability for any issues arising out of the deal. Fourth, the closing date would need to be arranged so as to minimize the amount of interest Walton would have to pay on its loans that encumbered the buildings. Brody concluded the letter by stating, "Upon reaching a resolution of these items we will send you a revised Purchase Agreement." *Id.*

9
**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**SECOND MOTION FOR SUMMARY JUDGMENT**

The parties continued to work to resolve these issues, but on October 3, 2005, Walton asked to extend the deadlines in the letter of intent because of an intervening Jewish holiday. Ex. A, Affidavit of Mauricio Alvarado at ¶ 14. Stanford agreed, and the parties executed a **second** amendment to the letter of intent extending the date for Stanford to complete its due diligence to October 5, 2005 and extending the date to execute the Purchase and Sale Agreement to October 6, 2005. Ex. T, Second Amendment to Letter of Intent. The parties expressly agreed in the amendment that the letter of intent "**shall remain in effect and is hereby ratified**," *id.*, and in fact Stanford made arrangements that day to prepare to wire the $10,000,000.00 deposit to Walton, as required by the Letter of Intent. Ex. A, Affidavit of Mauricio Alvarado at ¶ 14. As Stanford has since learned, however, this extension meant that Walton could review the third-party bids on October 6 before the midnight deadline for executing the Purchase and Sale Agreement with Stanford.

On October 4, Stanford's lawyer informed Walton that Stanford had coordinated to have the $10 million deposit sent to Walton. Ex. U, October 4, 2005 e-mail from Darren Inoff to Stephanie Silvers, et al. The next day, on October 5, Walton, Stanford, and their lawyers participated in a telephone conference. During that call, Walton and Stanford agreed on all terms for the sale of the three Galleria office buildings. Ex. A, Affidavit of Mauricio Alvarado at ¶ 15. On the call, Brody instructed Walton's lawyer to prepare a final draft of the Purchase and Sale Agreement, reflecting the agreements reached on the call, for execution. *Id.* Walton and Stanford agreed to execute the Purchase and Sale Agreement the following day, October 6, the deadline provided by the letter of intent. *Id.*

Later that day, however, Brody told Stanford that Walton would not execute the Purchase and Sale Agreement, claiming for the first time that Walton needed to resolve a "new" issue

concerning the Galleria condominium arrangement in light of Federated Department Stores' decision to close the store currently called Macy's in the Galleria, and re-label its Foley's store in the Galleria as "Macy's." Ex. A, Affidavit of Mauricio Alvarado at ¶ 16. Although Federated's plans had been reported in the *Houston Chronicle* on July 29, 2005, over two months before, and although Walton had obviously known about Federated's plans prior to that public announcement, Brody used Federated's decision as an excuse for Walton's breach of its agreement to sign the Purchase and Sale Agreement. As Stanford has learned in this case, Walton was well-aware of the issues surrounding the Galleria condominium arrangement long before October 5. Stanford, however, reiterated to Walton that all terms and conditions of the sale had been agreed to, that Stanford was ready, willing, and able to perform, and that it was prepared to deliver the earnest money immediately. Ex. V, October 5, 2005 e-mail from Mauricio Alvarado to Howard Brody. Stanford informed Walton that it would wait for Walton to execute the Purchase and Sale Agreement that the parties had agreed to execute.

The next day, October 6, Stanford waited for the execution copy of the Purchase and Sale Agreement. Ex. A, Affidavit of Mauricio Alvarado at ¶ 17. Around 10:00 p.m., two hours before the midnight deadline to execute the Purchase and Sale Agreement, Walton's lawyer forwarded to Stanford a revised, unexecuted draft of the Purchase and Sale Agreement. *Id.* Contrary to the terms agreed upon during the October 5 conference call, the new draft contained provisions that had never been discussed, imposing significant restrictions and limits on Stanford's future use and sale of the office buildings, and granting Stanford's blanket consent to any future changes that Walton might wish to make to the Condominium Documents, including changes that could reduce or relocate parking space for the three office buildings, reduce Stanford's voting rights in the condominium association, and impose other burdens on the office

11
**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**SECOND MOTION FOR SUMMARY JUDGMENT**

properties. *Id.* The draft also granted Stanford's consent to convert one or both of the Galleria hotels to residential use. *Id.*

In an effort to amicably resolve the concerns Walton claimed to have about the condominium issue, Stanford and its lawyer participated in a conference call with Brody and Walton's lawyer on the afternoon of October 12, 2005. Ex. A, Affidavit of Mauricio Alvarado at ¶ 18. During that call, Stanford and Walton confirmed their agreement to execute the Purchase and Sale Agreement and agreed (1) that Walton could proceed with the contemplated amendments to the Galleria Condominium Documents, (2) that Stanford had the right to review those amendments and determine if they were acceptable, (3) that Stanford could terminate the Purchase and Sale Agreement if the amendments to the Condominium Documents were not acceptable, and (4) that if Stanford terminated the agreement, Walton would refund Stanford's $10 million deposit. *Id.*

In a subsequent telephone conference on Thursday, October 20, 2005, Stanford and Walton agreed to language to be inserted into the Purchase and Sale Agreement that would reflect the October 12, 2005 agreement regarding Stanford's right to terminate the Purchase and Sale Agreement and have its deposit returned. Ex. A, Affidavit of Mauricio Alvarado at ¶ 19. Walton and Stanford agreed to execute the Purchase and Sale Agreement containing that language by the close of business the following day, Friday, October 21, 2005, and Stanford promised that it would wire the required $10,000,000.00 deposit. *Id.*

Once again, however, Walton failed to live up to its agreement, and never executed the Purchase and Sale Agreement. Ex. A, Affidavit of Mauricio Alvarado at ¶ 20. Rather, late Friday afternoon, Brody sent an e-mail to Stanford saying that he was still trying to "sort out a couple of things" and was "hoping to be in a position" to call Stanford Monday morning. *Id.*

Monday morning, Brody called to say that Walton had decided not to execute the Purchase and Sale Agreement. *Id.* Stanford responded that they had a deal, that they expected Walton to live up to the deal, and that if Walton refused, Stanford would enforce its rights against Walton under the law. On October 24, 2005, Stanford sent a letter to Walton, again stating that it was ready, willing and able to perform, and that it was ready to deliver the deposit. Ex. W, October 24, 2005 letter from Mauricio Alvarado to Howard Brody.

On November 1, 2005, Brody sent Stanford a letter denying the agreements and claiming that "there will not be any agreement until Walton Street considers all issues that it, in its sole discretion, considers to be material to the proposed transaction." Ex. X, November 1, 2005 Letter from Howard Brody to Mauricio Alvarado. In other words, Walton Street was admitting what it had concealed from Stanford but that had become clear in the course of events — Walton felt free to add new requirements and conditions, and change any aspect of the deal, even though it had agreed to sign the Purchase and Sale Agreement. In response, on November 1, 2005, Stanford again informed Walton that it was ready, willing and able to perform. Ex. Y, November 1, 2005 letter from Mauricio Alvarado to Howard Brody.

Finally, on November 3, 2005, Walton, through counsel, sent a letter to Stanford unilaterally stating that, "[a]s we have repeatedly informed you, Ownership has no intention of *proceeding with any agreement* that does not contain a satisfactory and full treatment of all issues and concerns," (emphasis added) and threatening Stanford if Stanford tried to enforce the agreements it had reached with Walton. Ex. Z, November 3, 2005 letter from Walton to Stanford.

As Stanford has learned during the course of discovery, despite having had two years to do so, Walton has never resolved the so-called condominium issue it raised as an excuse for

13
**PLAINTIFFS' RESPONSE TO DEFENDANT'S
SECOND MOTION FOR SUMMARY JUDGMENT**

Walton's breach of its agreement to sign the Purchase and Sale Agreement. In truth, Walton's excuse was simply the culmination of its fraudulent scheme it began in the fall of 2004. While the parties' conduct, viewed objectively, showed that the parties had by their conduct made the letter of intent a binding agreement to convey the buildings, and had agreed to execute the Purchase and Sale Agreement, it is now clear that, contrary to its numerous representations, Walton never intended to sell Stanford Galleria Tower II, or any building for the matter, to Stanford.

### WALTON'S MOTION FAILS AS A MATTER OF LAW BECAUSE IT RELIES ON A MISCHARACTERIZATION OF STANFORD'S CLAIMS AND OF TEXAS LAW

**a.      Walton's motion does not address the core of Stanford's fraud claims**

Walton's sole basis for its motion for summary judgment is its claim that, under Texas law, "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." Walton's Motion at 16. Walton then mischaracterizes Stanford's claims in an attempt to fit those claims within what Walton asserts is Texas law. Walton, however, fundamentally distorts Stanford's fraud claims. Stanford bases its fraud claims not on oral representations that contradict the lease amendments but on Walton's failure to disclose at the time Stanford entered into the lease agreements that in fact Walton never intended to sell GTII separate and apart from the other Galleria office buildings, an issue which Walton's motion ignores.

Texas law is clear that a party may be liable for fraud based on concealing or failing to disclose information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). A party must disclose material facts when it makes a representation that creates a substantially false impression. *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex.App.-Texarkana 2000, pet. denied); *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied);

HN71496.1

*Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 635-36 (Tex.App.-San Antonio 1993, writ denied). In this case, Walton repeatedly represented to Stanford that it was interested in and willing to sell Galleria Tower II to Stanford. Ex. A, Affidavit of Mauricio Alvarado at ¶ 5. Walton, however, represented to Stanford that it was not willing to discuss the sale of Galleria Tower II unless Stanford first agreed to lease substantially more space. Ex. A, Affidavit of Mauricio Alvarado at ¶ 5. As Howard Brody, the Walton principal responsible for the sale of the buildings, stated in response to a question about Stanford's interest in purchase the building, "[I] don't want to go down that road until they sign for more space." Ex. D, November 26, 2004 e-mail from Howard Brody to Chip Colvill.

As an inducement to lease additional space, Walton specifically agreed to give Stanford the right of first offer to purchase Galleria Tower II, but only on the express condition that Stanford leased at least an additional 112,000 square feet. Ex. E, First Lease Amendment at § 5.33. Walton was well-aware that this far exceeded the amount of space that Stanford actually needed at the time by nearly six-fold. Ex. F, November 30, 2004 e-mail from Chip Colvill to Howard Brody. Nevertheless, Walton insisted that it would only consider selling the building to Stanford if Stanford entered into the expanded lease agreement. Ex. A, Affidavit of Mauricio Alvarado at ¶ 5. On January 6, 2005, Chip Colvill, a representative of Walton, provided a revised draft of the First Amendment, and stated that the right of first offer, with respect to which time was of the essence, had been approved by Walton's upper management. Ex. G, January 6, 2005 e-mail from Chip Colvill to Mauricio Alvarado, et al. This right of first offer, consistent with the circumstances leading up to the execution of the First Lease Amendment, created the impression that Walton had the present and immediate intent to sell the building to Stanford

separate and apart from the other Galleria office buildings.    Ex. A, Affidavit of Mauricio Alvarado at ¶ 6.

Even as Walton was negotiating the right of first offer, however, it was plainly discussing internally its plan not sell GTII separate and apart from the other Galleria office buildings. Ex. GG, January 3, 2005 e-mail from Howard Brody to Chip Colvill. Walton's subsequent efforts to sell all three Galleria office buildings as a package shortly after Stanford executed the First Lease Amendment further evidenced Walton's intent not to sell GTII separate and apart from the other Galleria office buildings. *See supra* at 7-13. In fact, shortly after Walton induced Stanford into the First Lease Amendment, Walton flew its real estate agent, CBRE, to Chicago to discuss selling all three buildings together, and the agent immediately began valuing all three buildings. Ex. P, Deposition of Mary Carolan, at 98:13-99:14; 100:8-101:14; 105:20-23; 126:17-127:1. Moreover, Walton's real estate agent testified that Walton had never intended to sell Galleria Tower II by itself. *Id*. at 181:7-25.

Walton makes much of the fact in its motion that the right of first offer consumes three-and-one-half pages of the First Lease Amendment and lays out specific procedures for negotiating the purchase of GTII, but this in fact emphasizes the significance of Walton's failure to disclose that it never had any intent to sell GTII by itself. Plainly stated, the right of first offer was worthless because Walton knew, and refused to disclose to Stanford, that it never intended to sell GTII separate and apart from the other Galleria office buildings, and in fact that it was preparing to sell all three office buildings as a package.

Walton does not, nor could it, claim in its motion that Stanford is not entitled under Texas law to rely on Walton's non-disclosures regarding representations *contained in the very agreement into which Walton induced Stanford.* Every case on which Walton relies necessarily

implies Walton's right to do so. *See* Walton's Motion at 13-17. Moreover, applying a recent decision by the Fourteenth District Court of Appeals, a Texas federal district court in *Whitney Nat'l Bank v. Air Ambulance By B&C Flight Mang't, Inc.* recently addressed this very issue, expressly holding that the plaintiff in that case was entitled to rely on statements made a part of the agreement into which the plaintiff was fraudulently induced. 2007 WL 3145799 (S.D. Tex. 2007). Clearly, Stanford was entitled to rely on Walton's non-disclosure. Therefore, even if Walton had addressed this issue in its motion—which it did not—Walton's motion would nonetheless fail.

b.     **Walton ignores Texas Supreme Court precedent**

Yet, even based on its mischaracterization of Stanford's fraud claims, Walton's motion still fails. In reciting what it claims to be the law in Texas on the issue of the enforceability of waiver-of-reliance provisions, Walton conspicuously ignores the two leading Texas Supreme Court cases in this area: *Prudential Insurance Co. of America v. Jefferson Associates, Ltd.,* 896 S.W.2d 156, 160-62 (Tex.1995) and *Schlumberger Technology Corp. v. Swanson*, 959 S.W. 2d 171 (Tex. 1997). The *Prudential* court set forth two exceptions to the enforceability of waiver-of-reliance language in a contract. *See Prudential Ins. Co. of Am.*, 896 S.W.2d at 162. One of these exceptions is inducement of the complaining party to enter into the contract by the fraudulent representation or concealment of information by the party seeking to enforce the contractual language. *See id.* In other words, under *Prudential*, a waiver-of-reliance provision is not enforceable if the complaining party was fraudulently induced into the contract. The *Schlumberger* court indicated that both exceptions from Prudential are still valid but also held that under the circumstances shown by the record in *Schlumberger*, fraudulent inducement did

not prevent enforcement of the waiver-of-reliance language in the release at isue between Schlumberger and the Swansons. *See Schlumberger*, 959 S.W.2d at 179-81.

In *Schlumberger*, the Swanson brothers sued Schlumberger, alleging that it had fraudulently induced them to sell their interest in a mining project at an undervalued price. According to the Swansons, during negotiations for the buy-out of their interest in the mining project, in which the Swansons claimed to have an interest, Schlumberger represented to them that the project was neither technologically feasible nor commercially viable. Schlumberger disputed the validity of the Swansons' interest in the sea-diamond project, but agreed that it would buy out their interests. In connection with the buy-out, the Swansons, who were represented by counsel, signed a release, which the Court held barred the Swansons' claims for fraudulent inducement and fraud.

The *Schlumberger* court described the circumstances in which waiver-of-reliance language would negate proof of fraudulent inducement as follows:

> The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding. Because the parties were attempting to put an end to their deal, and had become embroiled in a dispute over the feasibility and value of the project, we conclude that the disclaimer of reliance the Swansons gave conclusively negates the element of reliance.

*Id.* at 179-80. The *Schlumberger* court found it significant that, throughout the negotiations that led to the execution of the release, the parties disagreed about the value of the Swansons' interest. *See id.* at 180. The *Schlumberger* court stated that the sole purpose of the release was to end the dispute as to the value of the commercial project once and for all. *See id.* Noting that the Swansons unequivocally disclaimed reliance upon representations by Schlumberger about the project's value, the *Schlumberger* court concluded that, in light of this language and in this context, the Swansons must have intended to forego reliance on any representations about the

HN71496.1

value of the project, given that this was the very dispute the release was supposed to resolve. *See id.* In so concluding, the *Schlumberger* court emphasized that a waiver-of-reliance clause will not always bar a fraudulent-inducement claim, noting that the *Prudential* case had identified some circumstances in which an as-is clause would not preclude a fraudulent-inducement claim.

The Fourteenth District Court of Appeals, applying *Schlumberger* and *Prudential*, reversed a trial court's granting of a summary judgment on the basis of a waiver-of-reliance provision. *Warehouse Assoc. Corp. Centre II, Inc. v. Celotex Corp.*, 192 S.W.3d 225 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The case arose out of the sale of real property under a contract that contained as-is and waiver-of-reliance provisions. After the sale, the buyer discovered asbestos in the soil on the property and brought suit against the seller and its employees alleging common law fraud, statutory fraud, and negligent misrepresentation. The main issue on appeal was whether the trial court correctly granted summary judgment based on the contract's as-is and waiver-of-reliance provisions. After thoroughly analyzing *Schlumberger* and *Prudential*, the court concluded that "[u]pon careful consideration of the entire opinion in *Schlumberger*, we conclude that the decisive factor in the case was the contracting parties' mutual intent to definitively resolve a long-running dispute in which they had been embroiled." *Id.* at 234. The court ultimately held that "[b]ecause the Contract's purpose was not to definitively end a dispute in which Celotex and Warehouse Associates had been embroiled, this case does not fall within the scope of *Schlumberger*, and therefore, the two *Prudential* exceptions provide the legal standard." *Id.*

In this case, Walton relies heavily on language in the original lease that was signed on October 25, 2004 to support its position that Stanford's fraud claims fail as a matter of law, but Walton's fraud occurred after October 25, 2004. Under *Schlumberger*, the disclaimer of reliance

must be specific to the disclaimed representations, and, therefore, clearly any language in the original lease is not effective to disclaim reliance on statements made *after* the lease was executed.[1] *See Schlumberger*, 959 S.W. 2d at (Tex. 1997) (holding that disclaimer of reliance must be specific as to representations).  Walton also relies on the merger clauses in the lease amendments, but neither lease amendment disclaims reliance on any pre-contractual statements, let alone non-disclosures. *See id.; see also Warehouse Assoc.* at 234.  Equally as important, as in *Warehouse Associates*, the leases did not resolve a long-standing dispute.  On the contrary, the lease amendments represented the continuation and expansion of a relationship.  Clearly, the bare, boilerplate merger clauses in the lease amendments would not be sufficient under *Schlumberger* or *Warehouse Associates* to preclude reliance on pre-contractual representations or non-disclosures, especially in light of the fact that the false impression created by Walton leading up to the execution of the lease amendments is clearly *consistent* with the false impression created by the right of first offer in the First Lease Amendment.  In short, while Walton ignores the crux of Stanford's fraud claims in its motion, even based on its mischaracterization of Stanford's claims, its motion nonetheless fails.

## Conclusion

Walton's motion for summary judgment does not address the core of Stanford's fraud claims, and for this reason alone it should be denied.  Yet, even had Walton addressed Stanford's actual fraud claims, under Texas law Stanford was clearly entitled to rely on non-disclosures relating to representations contained in the very agreement into which it was fraudulently induced.  For these reasons, Walton's motion for summary judgment should be denied.

---

[1] Significantly, Walton identifies no case enforcing a disclaimer of reliance provision on statements made *after* the disclaimer was executed.

HN71496.1

Respectfully submitted,



David Berg
Texas Bar No. 02187000
**BERG & ANDROPHY**
3704 Travis St.
Houston, Texas 77002
(713) 529-5622
(713) 529-3785 - Fax

Sean Gorman
Texas Bar No. 08218100
Chris Lacy
Texas Bar No. 24046258
**DEWEY & LEBOEUF, LLP**
1000 Main Street, Suite 2550
Houston, Texas 77002
(713) 287-2024
(713) 445-2124 – Fax

**ATTORNEYS FOR STANFORD GROUP HOLDINGS, INC.
AND THE STANFORD GALLERIA BUILDINGS, LP**

HN714496.1

**44**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on opposing counsel, as reflected below, on April 14, 2008.

H. Bruce Golden                       By Certified Mail, Return Receipt Requested
Golden & Owens, L.L.P.
1221 McKinney Street
Suite 3150
Houston, Texas 77010



Chris Lacy

HN714496.1

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
|        Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P., | § | |
|        Defendant. | § | 113th JUDICIAL DISTRICT |

## ORDER DENYING WALTON'S MOTION FOR SUMMARY JUDGMENT

The Court has considered Walton Houston Galleria Office, L.P.'s Traditional Motion for

Summary Judgment on Stanford's Fraudulent Inducement and Statutory Fraud Claims, the

Response filed by Stanford, and argument of counsel, and finds that Walton's traditional motion

for summary judgment should be and hereby is DENIED.

Signed this ____ day of _____, 2008.

_____
Honorable Patricia Hancock
Presiding Judge

HN71496.1

23

**46**

**GOLDEN & OWENS, L.L.P.**
ATTORNEYS AT LAW
1221 McKINNEY STREET
SUITE 3150
HOUSTON, TEXAS 77010-2010

TELEPHONE  (713) 223-2600
TELECOPIER (713) 223-5002



April 2, 2009

**BY MESSENGER**

Mr. Delton Arnic
Clerk, 113th Judicial District Court
201 Caroline, Suite 1030
Houston, Texas  77002

   Re: Cause No. 2005-72230; *Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP, Plaintiffs v. Walton Houston Galleria Office, L.P., Defendant*; in the 113th Judicial District Court of Harris County, Texas.

Dear Mr. Arnic:

   Enclosed for filing are the original and one copy of the following:   (1) Walton's Response in Opposition to the Stanford Parties' Motion for Stay of Proceedings; (2) Affidavit of Jay Weaver in support of Walton's Response in Opposition to the Stanford Parties' Motion for Stay of Proceedings; and (3) proposed Order Denying Plaintiffs' Motion for Stay of Proceedings.

   Please acknowledge receipt and filing of these papers by placing your file mark on the enclosed copies and return same to me via our messenger.

   By copy of this letter, I am forwarding a copy of these papers to Plaintiffs' counsel of record, as indicated below.

   Thank you for your assistance.

        Very truly yours,

        H. Bruce Golden

HBG/sb

Enclosures

**EXHIBIT**
**3**

47

**GOLDEN & OWENS, L.L.P.**

Mr. Delton Arnic
Clerk, 113th Judicial District Court
April 2, 2009
Page 2


c:    Mr. David Berg
Berg & Androphy
3704 Travis Street
Houston, Texas  77002
**BY MESSENGER**

Mr. Sean Gorman
Dewey & LeBoeuf, LLP
1000 Main Street, Suite 2550
Houston, Texas  77002
**BY MESSENGER**

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
|      Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P. | § | |
|      Defendant. | § | 113TH JUDICIAL DISTRICT |

## WALTON'S RESPONSE IN OPPOSITION TO THE STANFORD PARTIES' MOTION FOR STAY OF PROCEEDINGS

Defendant Walton Houston Galleria Office, L.P. ("Defendant" or "Walton") now files its Response in Opposition to the Motion of Plaintiffs, Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP ("Stanford") for a stay of proceedings ("Motion for Stay"), and respectfully urges the Court to deny Stanford's requested stay.

### INTRODUCTION

1.    Stanford filed this action over three years ago.  On February 11, 2009, Stanford joined in the filing of an Agreed Scheduling Order—signed by the Court on February 12, 2009—scheduling remaining pre-trial deadlines and re-confirming the trial setting of May 26, 2009.  Yet now, with just two months before trial, Stanford seeks to stay this action for 120 days from February 16, 2009, effectively continuing the trial date and delaying the resolution of this litigation indefinitely.  Walton respectfully submits that Stanford's request should be denied, especially given the severe prejudice that Walton will suffer if Stanford's requested relief is granted.  In the alternative, any stay entered by the Court should provide for the adjudication of a motion for summary judgment on Stanford's claim for specific performance.

2.    Walton's business is at a critical juncture. Walton's existing loans on the Houston Galleria office buildings which are the subject of this suit (the "Galleria Office Complex"), in the amount of $81 million, mature in early December 2009. Walton needs to refinance this credit facility, a process which typically requires several months to complete. Walton cannot obtain adequate refinancing while Stanford's *lis pendens*, and this litigation, cloud Walton's title to the Galleria Office Complex. Further delay in the resolution of this case perpetuates the *lis pendens* and, consequently, impairs Walton's ability to obtain adequate refinancing for the Galleria Office Complex, thereby placing Walton at risk of foreclosure.

3.    This harm to Walton is not balanced by any benefit that Stanford's receivership estate will obtain as a result of the requested stay. In fact, Stanford's motion does not identify a single benefit to the estate. Rather, Stanford's motion is based on the Receiver's desire for additional time for his "review and assessment" of Stanford's claims against Walton. Walton submits that the Receiver has had ample opportunity to perform his review given that the Receiver was appointed nearly seven weeks ago. The Receiver is also represented in this action by the same counsel who have been representing Stanford for the last three years. Thus, Stanford's assertion that the Receiver needs more time to consider the claims at issue does not warrant the stay Stanford seeks or the continuance of the trial setting.

4.    Finally, Stanford's Motion for Stay cannot be read in isolation. Stanford has been placed into receivership and has had its assets frozen as a result of SEC allegations of fraudulent activity.[1]  Stanford should not be permitted to leverage the fact of this receivership to prolong this meritless litigation and the *lis pendens* on the Galleria Office Complex. Indeed, Stanford's collapse alone will cause Walton substantial economic hardship. Stanford is Walton's largest

---

[1] Walton reserves its right to seek relief from the District Court for the Northern District of Texas presiding over Stanford's receivership proceedings.

tenant in the Galleria Office Complex and its refusal to honor its existing lease will result in millions of dollars of damages. Walton should not be forced to suffer additional financial harm resulting from a delay in the disposition of this litigation.

5.      For these reasons, staying this case and continuing the trial date is prejudicial to Walton and provides no benefit to the Receivership estate. Walton respectfully requests that the Court deny Stanford's Motion for Stay and preserve the May 26, 2009 trial setting.

6.      Although Walton opposes Stanford's Motion for Stay, Walton's chief concern is that the specific performance aspect of this litigation be resolved as expeditiously as possible so that Walton may obtain refinancing on the Galleria Office Complex. Accordingly, Walton suggests, in the alternative, that any scheduling or stay order that the Court enters provide Walton with leave to file, and a prompt hearing on, a motion for summary judgment on the Receiver's claim for specific performance. It is axiomatic that a plaintiff seeking specific performance must establish that it is ready, willing, and able to pay for the subject real estate. Stanford cannot meet this burden. Indeed, the recent appointment of the Receiver and his public reports regarding Stanford's "dire" financial condition make crystal clear that the Receiver has no basis to continue with prosecution of a claim of specific performance, requiring a cash payment to Walton for the Galleria Office Complex of at least $150 million. Stanford should, therefore, not be permitted to continue to cloud Walton's title when its claims may be resolved on summary judgment.

### APPLICABLE STANDARD FOR DECISION

7.      The Motion for Stay has provided no legal basis for, or precedent supporting, the relief Stanford seeks. However, it is well recognized that the decision to stay a proceeding is a determination generally left to the discretion of the court. *See, e.g., Taiwan Shrimp Village*

3

*Assoc. v. U.S.A. Shrimp Farm Development, Inc.*, 915 S.W.2d 61, 68 (Tex. App.—Corpus Christi 1996, writ denied).

8.    Furthermore, by its Motion for Stay, Stanford seeks, in effect, to continue the trial date.  But a motion to continue a trial date requires Stanford to establish "sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. The decision whether to grant a motion for continuance is within the sound discretion of a trial court and is reviewed for an abuse of discretion. *Pandozy v. Shamis*, 254 S.W.3d 596, 601-02 (Tex. App.—Texarkana 2008, pet. stricken) ("the trial court did not clearly abuse its discretion" by denying a motion for continuance which did not include any supporting affidavits). *See also Fritsch v. J.M. English Truck Line*, 246 S.W.2d 856, 860 (Tex. 1952) (trial court did not abuse discretion by overruling eleventh-hour request to continue agreed trial date due to unavailability of witness).

9.    In the present case, where Walton will be harmed from the stay and Stanford cannot point to any cognizable harm from proceeding, equity requires that Stanford's requested stay be denied.  The Supreme Court's decision in *Wheeler v. Williams*, 312 S.W.2d 221 (Tex. 1958), although in a different context, is instructive.  The receiver in that action sought to stay an action pending in the Bexar County court in favor of an action subsequently filed in the Travis County court.  The receiver's motion was overruled and the receiver appealed.  The Supreme Court denied the receiver's appeal, holding that the filing of a parallel suit in Travis County did not divest the Bexar County court of jurisdiction.  The Court further found that:

> [T]here is nothing in this record that remotely indicates the prosecution of the Bexar suit would in any legal manner interfere with the Receiver in his possession, custody, control and disposition of the property.

*Id.* at 227.  The decision in *Wheeler* thus suggests that a stay should not be granted where, as here, there is no harm to the receivership estate.

4

## ARGUMENT

I.    **Stanford's Motion For Stay Threatens Imminent Harm To Walton.**

10.    Stanford filed this suit for specific performance on November 9, 2005. At that time, Stanford also filed a *lis pendens* based on its request for specific performance. This *lis pendens* created a cloud on Walton's title. *See R.I.O. Systems, Inc. v. Union Carbide Corp.,* 780 S.W.2d 489, 493 (Tex. App.—Corpus Christi 1989, writ denied). As the court noted in *Manders v. Manders,* 897 F. Supp. 972, 975 (S.D. Tex. 1995), where a *lis pendens* is in effect, "[f]or all practical purposes, it would be *virtually impossible to sell or mortgage the property* because the interest of a purchaser or mortgagee would be subject to the eventual outcome of the lawsuit." (quoting *Beefy King International, Inc. v. Veigle,* 464 F.2d 1102, 1104 (5th Cir. 1972) (emphasis added).)

11.    Stanford's *lis pendens* remains in place to this day, and unless promptly removed, unfairly threatens Walton's investment in the Galleria Office Complex.

*Imminent Harm to Walton*

12.    Granting the stay places Walton at risk of foreclosure. The current loans on the Galleria Office Complex, totaling $81 million, mature on December 9, 2009. Walton needs to obtain refinancing for these loans. But, in the current environment, it is exceedingly difficult for the owners of office buildings—even prime office properties—to obtain financing. *See* Affidavit of Jay Weaver ("Weaver Aff.") at ¶ 5, attached hereto as Exhibit 1. Walton has thus consulted with advisors at CBRE/Melody ("CBRE"), one of the leading commercial mortgage banking and servicing firms in this country. (*Id.* at ¶ 7.)

13.    Walton's advisors at CBRE have explained that lenders are viewing commercial properties with "extreme scrutiny and caution." *See* Weaver Aff., Ex. A. The difficulties of

5

obtaining financing in this unprecedented commercial lending market are exacerbated by Stanford's *lis pendens*. Even in the best of times, a *lis pendens* constitutes a barrier to refinancing because a lender will almost never make a mortgage loan that is subject or subordinate to a claim of a party asserting a *lis pendens*. (Weaver Aff., Ex. A.) However, in the current economic climate, the *lis pendens* on the Galleria Office Complex almost certainly precludes any possibility of refinancing the Galleria Office Complex. (*Id.* at ¶¶ 10 and 12, Ex. A.) If Walton does not refinance the existing loan, it is at risk of default and foreclosure. (*Id.* at ¶ 11.)

14.    Nor can Walton simply re-let the space Stanford currently occupies. Stanford is the largest tenant in Tower 2 of the Galleria Office Complex and the space it leases has been customized for Stanford. In order for Walton to be able to re-let this space, it will be necessary for Walton to expend millions of dollars in new tenant build-out costs, leasing costs, and commissions. (Weaver Aff. at ¶ 9.) But, without the ability to obtain new financing, it is economically impracticable for Walton to pour millions of dollars into an office complex that it might well lose to foreclosure.

### *The Proposed Stay Vacates The Trial Date And Exacerbates The Harm to Walton.*

15.    Because of Walton's pressing need to remove the *lis pendens* and establish its uncontested title to the Galleria Office Complex, Walton is committed to resolving this case at trial on May 26, 2009. Although presented as a Motion for Stay, Stanford's motion functions as a motion to continue the trial date because the proposed stay would remain in effect until approximately mid-June.

16.    Continuing the trial date will only further prejudice Walton's ability to refinance the existing loans on the Galleria Office Complex. If the stay is granted, the parties will not be

6

54

able to resume pretrial activities until the expiration of the stay in mid-June and, as a consequence, the trial could not commence immediately upon expiration of the stay.

17.    Thus, granting the stay would have the effect of further impairing Walton's ability to refinance. Further, as the maturity date for Walton's existing loans approaches, Walton's ability to negotiate commercially-reasonable credit terms for its refinancing will diminish correspondingly. Consequently, if the May 2009 trial date is continued, it likely will be virtually impossible for Walton to refinance its existing credit facility before its maturity date.

## II.    The Denial Of The Stay Poses No Prejudice To The Receivership Estate.

18.    In contrast to the severe prejudice a stay will cause Walton, denying the stay poses no risk of prejudice to the Receiver. Stanford's Motion for Stay tacitly concedes this point. The motion has not identified any potential harm to the receivership entities that will result if the stay is not granted. Nor does the motion identify any benefit to the estate if the stay is granted.

19.    Instead, Stanford's request for a stay is based on Stanford's assertion that the Receiver needs additional time to evaluate Stanford's alleged claims in this case. This assertion cannot justify the imminent harm to Walton, particularly since the Receiver has the benefit of Stanford's existing counsel's experience and familiarity with this case.[2]

## III.    Walton Should Be Permitted To Move For Summary Judgment On Stanford's Claim For Specific Performance and To Vacate The *Lis Pendens*.

20.    The stay should be denied in its entirety, but if the Court is inclined to grant the stay, Walton proposes that the Court's order expressly provide for Walton to file, and the Court to adjudicate, a motion for summary judgment on Stanford's claim for specific performance. Walton anticipates that the resolution of that motion will establish that Stanford has no right to

---

[2] Nor does this unverified assertion establish that Stanford is entitled to a continuance of the trial date. *See* Tex. R. Civ. P. 251 (request for continuance must be supported by affidavit).

7

specific performance and will allow Walton to vacate the *lis pendens* and, thus, avoid the irreparable harm that a blanket stay of the proceedings would cause.

### Stanford Has The Burden Of Proving It Is Ready, Willing, And Able To Perform.

21.    "A decree of specific performance is not a matter of right even to enforce terms of a contract, but is 'a matter of grace' in the discretion of the court." *Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d 73, 79 (Tex. App.—Austin 2003, pet. denied). Specific performance is an equitable remedy that rests within the sound discretion of the court. *Id.* at 78. That discretion is to be applied under explicit and well-established requirements:

> [T]he remedy of specific performance is not merely a judicial fiat issuing from and governed by the judge's personal conscience, or his emotional feeling about what is "fair," "just," and "right" in the totality of the circumstances. Instead, the equitable remedy is issuable only under and according to rules that are quite explicit and well-established. It is the enforcement of these rules that produces "equity."

*Wilson v. Klein*, 715 S.W.2d 814, 819 (Tex. App.—Austin 1986, writ ref'd n.r.e.).

22.    Fundamental to the equitable remedy of specific performance is the strict and absolute requirement that a plaintiff must *plead and prove* that *at all relevant times*, it has been and *remains* ready, willing and able to purchase the property in question. Thus, in October of last year, the Texas Supreme Court stated in *DiGiuseppe Development Co. v. Lawler*, 269 S.W.3d 588 (Tex. 2008): "[W]e hold that an *essential element* in obtaining the equitable remedy of specific performance is that the party seeking such relief must *plead and prove* he *is* ready, willing, and able to timely perform his obligations under the contract." *Id.* at 603 (emphasis added). Expanding on its holding, the Court quoted Williston on Contracts with approval:

> "[T]o be entitled to specific performance, the *plaintiff must show* that it has substantially performed its part of the contract, and *that it is able to continue performing* its part of the agreement. The *plaintiff's burden* of proving readiness, willingness and ability *is a continuing one that extends to all times relevant to the contract and thereafter*."

8

*Id.* at 594 (emphasis added).

### *Recent Events Confirm No Evidence Supports Stanford's Claim For Specific Performance.*

23. Because Stanford now seeks a stay which will delay the resolution at trial of both its claim for specific performance and the removal of the *lis pendens* on the Galleria Office Complex, this is a critical time for Stanford to demonstrate that it is ready, willing, and able to purchase this property pursuant to the terms of the alleged contract between Walton and Stanford. Indeed, the only legitimate justification for the continuing effect of a *lis pendens* filed by a party seeking specific performance would be that party's continuing readiness, willingness, and ability to perform.

24. The alleged consideration that Stanford claimed it was willing to pay for Galleria Office Complex was $150 million cash, plus additional cash amounts to Walton in payment for various leasing costs, capital expenditures and the like. But there is no evidence that Stanford is ready, willing, and able to complete a $150 million purchase pursuant to the terms of the alleged contract between Walton and Stanford.

25. To the contrary, the Receiver has stated publicly and has represented in federal court that "the liquidity situation and overall financial condition of the Stanford entities can only be described as *dire*" and that "[e]vidence is also mounting that *the assets of the Receivership estate will be only a fraction of the amount needed to satisfy the anticipated claims against the estate.*" (Receiver's Statement of March 6, 2009, attached hereto as Exhibit 2) (emphasis added). In essence, Stanford has admitted publicly what Walton proposes to establish on summary judgment — *Stanford is not "ready, willing and able"* to pay in excess of $150 Million in cash for the Galleria Office Complex. *See* Exhibit 2, where the Receiver reports termination of 85% of US workforce and states:

9

> As previously announced, the Receiver's investigation to date indicates that the liquidity situation and *overall financial condition of the Stanford entities can only be described as dire.* According to unaudited financial statements as of December 31, 2008, *Stanford has amassed tens of millions of dollars in unpaid bills, and to date the receivership accounting team has been able to identify only a limited amount of available cash on hand. Evidence is mounting that the assets of the Receivership estate will be only a fraction of the amount needed to satisfy the anticipated claims against the estate.* (emphasis added).

26.    Similarly, on March 16, 2009, the Receiver stated that it had "discovered that *Stanford had very little cash readily available in comparison to over $165 million in unpaid bills* and a multi-million dollar payroll [then] accruing each week." (Receiver's Consolidated Opposition to Motions to Intervene in *SEC v. Stanford* at p. 7, attached hereto as Exhibit 3) (emphasis added). Further, the receivership entities face over $8 billion in claims from just the investors who were defrauded into purchasing the certificates of deposits sold by Stanford. (SEC Complaint, filed on Feb. 17, 2009 at ¶ 2.)

27.    In sum, far from being ready, willing, and able, to purchase the Galleria Office Complex, Stanford is in financial shambles. In light of its inability to perform, Stanford should not be permitted to delay the resolution of its meritless claim for specific performance.

28.    Accordingly, Walton requests that, were this Court to impose any form of stay in these proceedings (which Walton respectfully submits it should not), at a minimum, such stay should be crafted so as to allow adjudication of Walton's motion for summary judgment on Stanford's claim for specific performance.

10

WHEREFORE, for all of the foregoing reasons, Defendant Walton Houston Galleria Office, L.P. respectfully urges that the Court deny the Motion for Stay of Plaintiffs Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, L.P., and that Walton have such other and further relief to which Walton is justly entitled. A form of Order reflecting this requested relief accompanies this Response for the Court's consideration.

Respectfully submitted,

GOLDEN & OWENS, L.L.P.

By: _____

H. Bruce Golden
State Bar No. 08081500
Randall C. Owens
State Bar No. 15380700
Joe B. Gulley III
State Bar No. 24032382

1221 McKinney Street, Suite 3150
Houston, Texas 77010
Telephone: (713) 223-2600
Telecopier: (713) 223-5002

ATTORNEYS FOR DEFENDANT,
WALTON HOUSTON GALLERIA OFFICE, L.P.

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing WALTON'S RESPONSE IN OPPOSITION TO THE STANFORD PARTIES' MOTION FOR STAY OF PROCEEDINGS has been served on the below-listed counsel of record by hand delivery on this 2nd day of April, 2009:

Mr. David Berg
Berg & Androphy
3704 Travis Street
Houston, Texas 77002

Mr. Sean Gorman
Dewey & LeBoeuf, LLP
1000 Main Street, Suite 2550
Houston, Texas 77002

H. Bruce Golden

12

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P. | § | |
| Defendant. | § | 113TH JUDICIAL DISTRICT |

### AFFIDAVIT OF JAY WEAVER

| | |
|---|---|
| STATE OF ILLINOIS | § |
| | § |
| COUNTY OF COOK | § |

Before me the undersigned authority, on this day personally appeared Jay Weaver, a person whose identity is known to me. After I administered an oath to him, upon his oath he stated:

1.    My name is Jay Weaver. I am over the age of twenty-one; have never been convicted of a crime; am of sound mind; and am fully competent and capable to make this affidavit. I have personal knowledge of each of the facts stated in this affidavit, and each of the statements of fact set forth herein is true and correct to the best of my knowledge, information and belief.

2.    I am a managing principal of Walton Capital Advisors, L.L.C., the sole member of Walton Street Capital, L.L.C.

3.    Walton Street Capital, L.L.C. is a private company that sponsors private equity real estate investment funds. Through two of its real estate investment funds, an affiliated entity of Walton Street Capital, L.L.C. (along with an unaffiliated pension fund) owns the three office



buildings (the "Galleria Office Complex") that are part of the condominium project commonly known as the Houston Galleria. That affiliated owner is Walton Houston Galleria Office, L.P., the Defendant in this suit.

4.      The current loans on the Galleria Office Complex, totaling $81 million, mature on December 9, 2009, and Walton needs to obtain financing for the indebtedness on those buildings.

5.      I am very familiar with the current lending environment for the refinancing of large commercial properties. It is extremely difficult for the owners of office buildings—even prime office properties—to obtain financing today, even without litigation or claims potentially affecting title.

6.      In recognition of this poor market, Walton already has engaged in efforts aimed at procuring the necessary refinancing for the Galleria Office Complex before year's end. Over the past few months, Walton has participated in general discussions with a number of lenders to gauge their interest in refinancing the Galleria Office Complex. The response generally has been poor and the one lender with whom serious discussions took place immediately lost interest upon news of the SEC action against Stanford and the appointment of the Receiver.

7.      To assist Walton in attempting to locate potential sources of financing for the Galleria Office Complex, Walton has engaged CBRE/Melody. CBRE/Melody is the real estate investment banking arm of CB Richard Ellis and is one of the largest commercial mortgage banking and servicing firms in the country. It offers debt and equity financing consulting services across the globe.

8.      Above and beyond the overall problems with the credit market for commercial real estate, Stanford's spectacular failure will further impair Walton's ability to refinance the Galleria Office Complex. Stanford is Walton's largest tenant in the Galleria Office Complex,

-2-

and Stanford's refusal to honor its existing lease will result in a loss of over $4 Million in rental revenue over the next twelve months.

9.      Additionally, re-leasing to other tenants will cost Walton millions of dollars to re-tenant and reconfigure the space, which was heavily customized in accordance with Stanford's requests.

10.     Based on my experience, it is my belief and understanding, as confirmed by CBRE/Melody, that under the present circumstances, it will be an extremely difficult task to refinance the debt on the Galleria Office Complex. In my experience, this task of refinancing is made virtually impossible in current market conditions by the existence of the *lis pendens*.

11.     Failing to obtain refinancing for the Galleria Office Complex would be catastrophic and would place Walton at imminent risk of foreclosure and loss of its accrued interests in a multimillion dollar asset. Moreover, the loss of the Galleria Office Complex to foreclosure would cause Walton significant reputational damages that could impact its other properties affiliated with the Galleria Office Complex as well as its ability to access and consummate future unrelated transactions.

12.     Attached to this Affidavit as Exhibit "A," is a letter from CBRE/Melody that further confirms, in the opinion of John Clifford (Vice-Chairman of CBRE/Melody), that the existence of the *lis pendens* in this case, in combination with the credit market crisis, the gaping hole in the tenancy of the Galleria Office Complex as a result of Stanford's financial collapse, and the receivership of Stanford, almost certainly precludes the refinancing of the Galleria Office Complex.

- 3 -

_____

Jay Weaver

SWORN TO AND SUBSCRIBED BEFORE ME on the ___2nd___ day of April, 2009.

_____

Notary Public, State of Illinois

My Commission Expires: ___9|16|09___

OFFICIAL SEAL
IRENE SUTHAROJANA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/16/09

- 4 -



**CBRE | MELODY**
CB RICHARD ELLIS | **Capital Markets**

John G. Clifford
Vice Chairman

Tel: 847.518.2354
john.clifford@cbre.com

Wednesday, April 1, 2009

Mr. Jay Weaver
Walton Street Capital
900 North Michigan Avenue
19th Floor
Chicago, IL 60611

**Re:    $81 Million Refinance - Galleria Office Complex
         Houston, Texas**

Dear Jay:

Thank you for the opportunity to refinance the $81 million loan maturing on December 9, 2009 on the above referenced property. As you are aware, the current lending environment for commercial properties is unprecedented, and it is exceedingly difficult for the owners of office buildings to obtain financing. Even for prime office properties, the appetite among potential lenders for new loans or refinancing transactions is extremely limited. In the present environment, lenders are viewing commercial properties and the conditions affecting commercial properties with extreme scrutiny and caution.

The collapse of Stanford Group Holdings, Inc. and its affiliates has left a gaping hole in the tenancy of the Galleria Complex. With Stanford's vacating of approximately 160,000 SF in Tower II, the total occupancy of the buildings will decrease from the current 88% to 73% and the in-place cashflow will drop to approximately $6 million. In addition to the lost income and tenancy, the cloud on title to the Galleria Complex that exists by virtue of the *lis pendens* filed by Stanford constitutes an insurmountable hurdle to refinancing.

In the best of times, the existence of a *lis pendens* is a barrier to obtaining financing. A lender will almost never make a mortgage loan that is subject or subordinate to the claim of a party asserting a *lis pendens*. Based on our review and analysis of the asset, the combination of a credit market in crisis, a gaping hole in the tenancy of the Galleria Complex, the receivership imposed upon Stanford and the existence of the *lis pendens* precludes any possibility of refinancing.

Best Personal Regards,

John Clifford

CBRE Melody & Company
6133 North River Road, Suite 900 • Rosemont, Illinois 60018 • USA
Tel 847.518.2350 • Fax 847.518.2492 • www.cbre.com/capitalmarkets



EXHIBIT
A

65

# STANFORD FINANCIAL GROUP RECEIVERSHIP

## Statement Regarding Stanford Financial Group Employees

On March 6, 2009 the Receiver for the Stanford Financial Group notified approximately 1,000 employees in Stanford's U.S. offices that their employment has been terminated. These employees constitute approximately 85% of Stanford's U.S. employees.

The Receiver has the duty of conserving and preserving the value of the receivership estate, which includes the various Stanford entities. After a review of the circumstances, the Receiver concluded that continuing employment for these employees is not in the interest of conserving and preserving the value of the estate because there are insufficient resources to continue to compensate all present employees.

Stanford Financial Group and its affiliates are permanently reducing their workforce at certain U.S. facilities and locations, and the Receiver expects that most of Stanford's businesses and operations will be discontinued or wound down. A small number of U.S. employees will be retained to assist with the process of winding down operations and settling the receivership estate. Most of these are employed at Stanford's Houston headquarters.

All the employment separations are effective today, March 6, 2009. Regular salary and benefits will be discontinued immediately. With a few exceptions, employees provided with the separation of service notice will be paid on March 13 for the period from February 16 through and including March 6. Employees will not receive any severance compensation or bonus.

The Receiver will provide a list of FAQ's to help answer potential questions on the Receivership's website at www.stanfordfinancialreceivership.com during the week of March 9, 2009.

Decisions regarding Stanford's employees in locations outside the U.S. will be made and announced in the next few weeks.

As previously announced, the Receiver's investigation to date indicates that the liquidity situation and overall financial condition of the Stanford entities can only be described as dire. According to unaudited financial statements as of December 31, 2008, Stanford has amassed tens of millions of dollars in unpaid bills, and to date the receivership accounting team has been able to identify only a limited amount of available cash on hand. Evidence is also mounting that the assets of the Receivership estate will be only a fraction of the amount needed to satisfy the anticipated claims against the estate.

The Receiver was appointed by a Federal district court on February 16, 2009 to take possession of all assets of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, and all entities and assets they control.

# # #

EXHIBIT
2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3-09CV0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

### RECEIVER'S CONSOLIDATED
### OPPOSITION TO MOTIONS TO INTERVENE[1]

BAKER BOTTS L.L.P.

Kevin Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

### ATTORNEYS FOR RECEIVER
### RALPH S. JANVEY

---

[1] Receiver Ralph S. Janvey files this Opposition in response to the Motions to Intervene listed in Exhibit A (Appendix at 1-10). This brief also serves as a supplementary report to the Court on the Receiver's extensive activity related to Stanford customer accounts and plans for further analysis of account freeze issues. The Court requested such a report from the Receiver. Additional information about the Receiver's work and the status of the Receivership is posted on the Receiver's website www.stanfordfinancialreceivership.com, some of which is attached as Exhibit D (Appendix at 20-29).

RECEIVER'S CONSOLIDATED OPPOSITION TO MOTIONS TO INTERVENE

EXHIBIT
3

Keeping the customer accounts active and continuing to operate Stanford Group Company also was not an option. The Receiver had to abide by the Court's injunction prohibiting Stanford Group Company from engaging in any transaction in securities, specifically transactions involving the CDs and SAS program at the core of the SEC's allegations. The Receiver could not continue operations and still ensure that the operations would be conducted in accordance with the Court's orders and applicable regulations (which are vast in this highly regulated industry). The Receiver also soon discovered that Stanford had very little cash readily available in comparison to over $165 million in unpaid bills and a multi-million dollar payroll accruing each week. Freezing the accounts and ceasing the operations of Stanford Group Company allowed the Receiver to preserve the status quo of the estate and protect against what would have been the inevitable onslaught of customer demands for the assets before the Receiver could determine which accounts are associated with the fraudulent activities or proceeds.

**D.    The Receiver already has made the vast majority of accounts available for release and is developing a certification process for those whose accounts are still frozen.**

Though the broad account hold was necessary, the Receiver immediately went to work developing information necessary to identify categories of customer accounts and determine which accounts should be made available for release and which should remain frozen. The Receiver's ultimate goal is to allow the prompt release and transfer of all accounts not associated with the alleged fraud. Accordingly, as he has identified those categories of accounts not likely to be associated with the fraud, the Receiver has been requesting that the Court release these accounts from the freeze orders and providing instructions to account holders on how to transfer their accounts to new brokerage firms.

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP, | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P., | § | |
| Defendant. | § | 113TH JUDICIAL DISTRICT |

## ORDER DENYING PLAINTIFFS' MOTION FOR STAY OF PROCEEDINGS

On this day came on to be heard the Motion of Plaintiffs, Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP., for Stay of Proceedings. Plaintiffs and Defendant, Walton Houston Galleria Office, L.P., appeared by and through their respective counsel of record. The Court, after considering Plaintiffs' Motion and Defendant's Response, the pleadings, applicable authorities and arguments of counsel, finds and concludes that Plaintiffs' Motion should be Denied. Accordingly, it is

ORDERED that Plaintiffs' Motion for Stay is in all respects DENIED.

SIGNED this _____ day of _____, 2009.


_____
The Honorable Patricia Hancock
Judge Presiding

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P. | § | |
| Defendant. | § | 113TH JUDICIAL DISTRICT |

*FILED*
Loren Jackson
District Clerk
Time: _____
APR 2 2 2009
By _____
Harris County, Texas
Deputy

## AGREED SCHEDULING ORDER

08/01/09    Plaintiffs' expert witness designations/disclosure deadline.

09/01/09    Defendant's expert witness designations/disclosure deadline.

08/14/09    Motions for summary judgment will not be set for hearing or submission prior to this date.

09/18/09    Discovery completion deadline and deadline for amendment and supplementation of responses to discovery and disclosure requests (except as to expert depositions and related expert disclosures, which will be completed as soon as practicable).

10/19/09    Trial.

SIGNED this 30½ day of _April_, 2009.

_Patricia Hancock_
The Honorable Patricia Hancock,
Judge Presiding

**EXHIBIT**
tabbies*
**4**

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| OFFICE TOWERS, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| WALTON HOUSTON GALLERIA | § | HARRIS COUNTY, TEXAS |
| OFFICE, L.P., | § | |
| | § | |
| Defendant/Third-Party Plaintiff. | § | |
| | § | 113TH JUDICIAL DISTRICT |

### DEFENDANT WALTON HOUSTON GALLERIA OFFICE, L.P.'S
### THIRD REQUEST FOR PRODUCTION TO PLAINTIFFS

TO:    Plaintiffs, Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP, by
and through their attorneys of record, David Berg, Berg & Androphy, 3704 Travis Street,
Houston, TX 77002, and Sean Gorman, LeBoeuf, Lamb, Greene & MacRae LLP,
1000 Main Street, Suite 2550, Houston, TX 77002; and

Ralph S. Janvey, as Receiver for Plaintiffs, appointed by the United States District Court
for the Northern District of Texas to take possession of all the assets and records of
Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital
Management, LLC, R. Allen Stanford, James M. Davis, and Laura Pendergest-Holt, and
all entities they own or control, by and through its attorneys of record, Kevin M. Sadler,
Baker Botts L.L.P., One Shell Plaza, 910 Louisiana, Houston, TX 77002-4995,
Timothy S. Durst, Baker Botts L.L.P., One Shell Plaza, 910 Louisiana, Houston, TX
77002-4995, Richard B. Roper, III, Thompson & Knight LLP, 1722 Routh Street,
Suite 1500, Dallas, TX 75201.

Pursuant to Rule 196 of the Texas Rules of Civil Procedure, Defendant Walton Houston

Galleria Office, L.P., requests the production of all documents in the possession, custody, or

control of Stanford Group Holdings, Inc., the Stanford Galleria Buildings, LP, and Ralph S.

Janvey, as Receiver for Plaintiffs, that are described in Exhibit "A" attached hereto. Defendant

requests that Plaintiffs and Ralph S. Janvey, as Receiver for Plaintiffs, serve written responses to

this Request for Production and that the requested documents be produced within thirty (30) days

**EXHIBIT**
**5**

after the service of these requests on the offices of Dobrowski LLP, 1010 Lamar, Suite 1350

Houston, Texas 77002. Defendant requests that Plaintiffs continue to supplement the responses

to these requests for production as required by Texas Rules of Civil Procedure.


Respectfully submitted,

DOBROWSKI L.L.P.


By:_____
    Lee M. Larkin
    State Bar No. 11950500
    Paul J. Dobrowski
    State Bar No. 05927100
    Gerard Harrison
    State Bar No. 00787651
    1010 Lamar, Suite 1350
    Houston, Texas 77002
    Telephone: (713) 659-2900
    Facsimile: (713) 659-2908

    KIRKLAND & ELLIS LLP
    Jeffrey L. Willian, P.C.
    James H. Mutchnik, P.C.
    Micah E. Marcus
    S. Maja Fabula
    300 N. LaSalle St.
    Chicago, IL 60654
    (312) 862-2000
    (312) 862-2200

    ATTORNEYS FOR DEFENDANT,
    WALTON HOUSTON GALLERIA
    OFFICE, L.P.

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on opposing counsel and all known counsel of record on August 2, 2009, as follows:

Kevin M. Sadler
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana
Houston, TX  77002-4995

Timothy S. Durst
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana
Houston, TX  77002-4995

Richard B. Roper, III
Thompson & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201

COUNSEL FOR RALPH S. JANVEY, AS RECEIVER FOR PLAINTIFFS

Mr. David Berg
Berg & Androphy
3704 Travis Street
Houston, TX  77002

Mr. Sean Gorman
Dewey & LeBoeuf, LLP
1000 Main Street, Suite 2550
Houston, TX  77002

COUNSEL FOR THE PLAINTIFFS

_____
Lee M. Larkin

3

**EXHIBIT A:**

**DEFINITIONS:**

1.    "A.J. Rincon" means A.J. Rincohn, also known as A.J. Rincon, also known as Juan Alberto.

2.    "Communications" means every contact of any nature, whether oral or written, from one Person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other Documents Concerning such contacts.

3.    "Concerning" means relating to, referring to, reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, directly or indirectly, expressly or implicitly, in whole or in part, the subject matter of the Request.

4.    "Document" shall have the full meaning ascribed to it by Rule 192.3 of the Texas Rules of Civil Procedure, and is to be considered in the broadest possible sense and means, without limitation, any written, printed, typed, photostatic, photographed, recorded or otherwise reproduced communication or representation whether comprised of letters, words, numbers, pictures, video, sounds or symbols, personal notes, or any combination thereof, however prepared, transmitted or preserved (including electronically), and including, without limitation, depositions, exhibits to depositions and responses to Requests for Production. This definition includes copies of duplicates of documents contemporaneously or subsequently created which have any nonconforming notes or other markings. Without limiting the generality of the foregoing, "document" includes, but is not limited to, correspondence, memoranda, notes, e-mails, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers of all kinds, summaries, statistical statements, financial statements, prospectuses, journal entries, ledgers, trial balances, branch office reconciliations, analytical records, valuation material of any kind, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meetings or of other communications of any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, phonograph recordings, video recordings, films, types, discs, data cells, drums, print-outs of information stored or maintained by electronic data processing or word processing equipment, all other data compilations from which information can be obtained (by translation, if necessary, by you through detection devices into usable form) including, without limitation, electromagnetically sensitive storage media such as floppy disks and hard disks or drives, and any preliminary versions, drafts or revisions of any of the foregoing. "Document" also includes any label, heading, title or other identification of the file drawer, folder, file, or the like, in which the document is located.

5.    "First Amendment" shall refer to the amendment to Original Lease agreement between Stanford and Walton for space within the Galleria Office Tower II, signed January 10, 2005.

4

6.    "Galleria Office Towers" shall refer to the three Galleria Office buildings: Galleria Tower I, Galleria Tower II, and Galleria Financial Center.

7.    "Galleria Tower II" shall refer to the Houston Galleria Tower building owned by Walton wherein Stanford leased space.

8.    "Negotiations" shall mean any communications or discussions, whether in written or oral form.

9.    "Original Lease" shall refer to the October 25, 2004 Lease agreement between Stanford and Walton.

10.    "Plaintiff" shall mean Stanford Group Holdings, Inc. and/or The Stanford Galleria Office Towers, LP, and each of their present and former predecessors, successors, subsidiaries, divisions, partnerships, limited partnerships, joint ventures, affiliates and any other related entity acting or purporting to act on their behalf, including but not limited to the Receiver.

11.    "Potential Purchase" shall refer to the negotiations in the summer and fall of 2005 between Walton and Stanford for the potential purchase by Stanford of any portion of the Galleria Office Towers.

12.    "SEC" means U.S. Securities and Exchange Commission.

13.    "Second Amendment" shall refer to the July 18, 2005 amendment to Original Lease agreement between Stanford and Walton.

14.    "Stanford," "You," or "Your" shall mean Plaintiff Stanford Group Holdings, Inc. and/or Plaintiff The Stanford Galleria Office Towers, LP, Stanford International Bank, Ltd. ("SIB"), Stanford Group Company ("SGC"), and Stanford Capital Management ("SCM") and each of their present and former predecessors, successors, subsidiaries, divisions, partnerships, limited partnerships, joint ventures, affiliates, employees, agents, representatives, and any other related entity acting or person purporting to act on their behalf, including but not limited to the Receiver.

15.    "Third Party" means any entity and any person not an employee, officer, or director of either You or of Plaintiff.

16.    "Walton" means Walton Houston Galleria Office, L.P.

17.    "Receiver" means Ralph S. Janvey in his capacity as the receiver of the assets and records of SIB, SGC, SCM, R. Allen Stanford, James M. Davis and Laura Pendergest-Holt and of all entities they own or control pursuant to the Order Appointing Receiver, dated February 17, 2009, entered in the action *Securities Exchange Commission v. Stanford International Bank, Ltd.*, No. 3-09CV0298-N (N.D. Tex.). This term shall also include current and former employees, attorneys, agents, representatives, consultants and all other persons acting for the Receiver or on the Receiver's behalf.

5

## INSTRUCTIONS:

1.    The time period covered by these requests shall be January 1, 2004 to the present except as otherwise specified in a particular Request. The Documents or information to be provided shall include all Documents prepared, sent, dated, received or which came into existence at any time during the applicable time period.

2.    These requests cover all Documents in Your possession, custody or subject to Your control, wherever located, including those You have effective power to obtain. If You are unaware of the existence of any Documents responsive to a particular Request, Your response should expressly indicate so. These Requests are to be liberally construed.

3.    Any responsive Document, or any portion of any Document, withheld by reason of a claim of privilege or other basis should identify in writing by: (a) date; (b) author; (c) recipient; (d) general subject matter; and (e) the basis upon which it is being withheld from production.

4.    All Documents should be produced in their entirety without redaction and should include all attachments and enclosures. Documents that are attached to each other should not be separated.

5.    The use of the single form includes the plural and vice versa; the masculine includes the feminine and vice versa; and verb tenses include the past, present and future.

6.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed to be outside of its scope.

7.    Each paragraph is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular request.

8.    These requests shall be deemed continuing in nature to the extent permitted by the Texas Rules of Civil Procedure.

9.    If you have any questions regarding any aspect of these Requests, please contact the undersigned counsel for Walton Houston Galleria Office, L.P.

## REQUEST FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1:

Produce all documents, including but not limited to Communications, concerning Stanford's decision to lease space within Galleria Tower II from Walton.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 2:

Produce all documents, including but not limited to Communications, concerning Stanford's intended and/or actual use of the Galleria Tower II premises.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 3:

Produce all documents, including but not limited to Communications, concerning the negotiations between Stanford and Walton prior to the execution of the Original Lease.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 4:

Produce all documents, including but not limited to Communications, concerning the negotiations between Stanford and Walton relating to the Original Lease, First Amendment, and/or Second Amendment.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 5:

Produce all documents, including but not limited to Communications, concerning the potential purchase of the Galleria Office Towers by Stanford.

### RESPONSE:

**REQUEST FOR PRODUCTION NO. 6:**

Produce all documents concerning the source of funds for all payments made by Stanford in connection with the Original Lease, First Amendment, and Second Amendment, including but not limited to payments made for improvements to the leased premises; payments of Stanford's rental obligations; and/or any other payments for which Stanford is seeking damages in this action.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:**

Produce all documents concerning the source of funds for the Potential Purchase of the Galleria Office Towers and/or payment of earnest money deposit in connection with such purchase, including but not limited to: (i) internal, external and third party communications; (ii) communications with potential lenders; (iii) all documents provided to potential lenders; (iv) all proposals and/or term sheets received from potential lenders; and (v) internal analyses of funds available for the Potential Purchase.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:**

Produce all Communications to and from A.J. Rincon, and all documents within A.J. Rincon's files, concerning: (i) negotiations for the Original Lease, First Amendment, and Second Amendment; (ii) leasing space in the Galleria Office Towers; (iii) use of leased space in the Galleria Office Towers; (iv) Communications, negotiations, and/or other discussions with Walton and/or its agents; (v) Communications, negotiations, and/or other discussions with Darren Inoff or other counsel acting on Stanford's behalf; (vi) Potential Purchase of the Galleria Office Towers; (vii) sources of the funds for the Potential Purchase of the Galleria Office Towers; (viii) the Galleria Office Towers; (ix) Stanford's decision to file the complaint in this action; (x) Stanford's payment of rent for the Galleria Office Towers; and/or (xi) the preparation and/or audit of Stanford's financial statements attached hereto as Exhibits 1-4.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:**

Produce all Communications to and from Mauricio Alvarado, and all documents within Mauricio Alvarado's files, concerning: (i) negotiations for the Original Lease, First Amendment, and

Second Amendment; (ii) leasing space in the Galleria Office Towers; (iii) use of leased space in the Galleria Office Towers; (iv) Communications, negotiations, and/or other discussions with Walton and/or its agents; (v) Communications, negotiations, and/or other discussions with Darren Inoff or other counsel acting on Stanford's behalf; (vi) Potential Purchase of the Galleria Office Towers; (vii) sources of the funds for the Potential Purchase of the Galleria Office Towers; (viii) the Galleria Office Towers; (ix) Stanford's decision to file the complaint in this action; (x) Stanford's payment of rent for the Galleria Office Towers; and/or (xi) the preparation and/or audit of Stanford's financial statements attached hereto as Exhibits 1-4.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:**

Produce all Communications to and from R. Allen Stanford, and all documents within R. Allen Stanford's files, concerning: (i) negotiations for the Original Lease, First Amendment, and Second Amendment; (ii) leasing space in the Galleria Office Towers; (iii) use of leased space in the Galleria Office Towers; (iv) Communications, negotiations, and/or other discussions with Walton and/or its agents; (v) Communications, negotiations, and/or other discussions with Darren Inoff or other counsel acting on Stanford's behalf; (vi) Potential Purchase of the Galleria Office Towers; (vii) sources of the funds for the Potential Purchase of the Galleria Office Towers; (viii) the Galleria Office Towers; (ix) Stanford's decision to file the complaint in this action; (x) Stanford's payment of rent for the Galleria Office Towers; and/or (xi) the preparation and/or audit of Stanford's financial statements attached hereto as Exhibits 1-4.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

Produce all Communications to and from Robert Kramer, and all documents within Robert Kramer's files, concerning: (i) negotiations for the Original Lease, First Amendment, and Second Amendment; (ii) leasing space in the Galleria Office Towers; (iii) use of leased space in the Galleria Office Towers; (iv) Communications, negotiations, and/or other discussions with Walton and/or its agents; (v) Communications, negotiations, and/or other discussions with Darren Inoff or other counsel acting on Stanford's behalf; (vi) Potential Purchase of the Galleria Office Towers; (vii) sources of the funds for the Potential Purchase of the Galleria Office Towers; (viii) the Galleria Office Towers; (ix) Stanford's decision to file the complaint in this action; (x) Stanford's payment of rent for the Galleria Office Towers; and/or (xi) the preparation and/or audit of Stanford's financial statements attached hereto as Exhibits 1-4.

**REQUEST FOR PRODUCTION NO. 12:**

Produce all documents utilized by Stanford in the preparation of the financial disclosures attached hereto as Exhibits 1-4.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 13:**

Produce all documents relating to board of directors meetings or executive meetings during which there were discussions about: (i) Stanford's leasing space in Galleria Tower II; (ii) Stanford's Potential Purchase of the Galleria Office Towers; and/or (iii) Stanford's decision to initiate this action, including but not limited to Communications, Board of Directors minutes, Board of Directors consents, notes, presentations, and drafts of presentations to Stanford's Board of Directors or executives.

**RESPONSE:**



**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents showing Stanford was and/or is ready, willing and able to perform the Potential Purchase of the Galleria Office Towers.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 15:**

Produce documents concerning Stanford's solvency, including but not limited to any analyses and/or reports prepared by the Receiver.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 16:**

Produce all documents to support the statement within the April 23, 2009 Report of the Receiver at pp. 6-7 of Exhibit 5 hereto that "Stanford's financial statements show that the low third party revenue and high cost structures of the U.S. broker dealer and related financial operations were not capable of sustaining freestanding operations without the revenue they received upon their sale of [SIB] CDs, as well as the infusion of investment capital, all or most substantially all of

10

which was derived from CD sales," including but not limited to analyses and other reports by Receiver.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:**

Produce all financial records, operational data, and other Documents relied upon to support the statement within the April 23, 2009 Report of the Receiver at p. 8 of Exhibit 5 hereto that "[a]nalysis of Stanford's financial records and operational data revealed that all the major Stanford U.S. financial businesses depended upon continued CD sales and/or other allegedly fraudulent activities," including but not limited to analyses and other reports by Receiver.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:**

Produce all documents relied upon to support the statement within the April 23, 2009 Report of the Receiver at p. 9 of Exhibit 5 hereto that "the lack of financial viability is further explained by what appears to have been manipulation of financial records of the Stanford companies, in an apparent attempt to hide the true financial condition of the businesses from regulators and other outsiders," including but not limited to analyses and other reports by Receiver.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:**

Produce all materials provided to and received from Ernst & Young as part of Ernst & Young's analysis of the accuracy of the balance sheets of Stanford and the Receiver's suggestion within the April 23, 2009 Report of the Receiver at p. 26 of Exhibit 5 hereto that the work to date suggests that the value of virtually all non-cash assets listed on the December 31, 2008 balance sheets is substantially overstated, including but not limited to analyses and other reports by Receiver.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:**

Produce all documents upon which the Receiver has relied to support its statement within the April 23, 2009 Report of the Receiver at pp. 28 of Exhibit 5 hereto that "this preliminary analysis

suggests that the aggregate amount of such unaccounted for cash may be in the range of $1 billion," including but not limited to analyses and other reports by Receiver.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 21:**

Produce all documents listed in Plaintiffs' Privilege Log dated Oct. 12, 2006; Plaintiffs' Amended Privilege Log dated Nov. 11, 2006; and Plaintiffs' Supplemental Log dated April 11, 2007.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 22:**

Produce all documents provided to the SEC, Internal Revenue Service, Federal Bureau of Investigation, the United States Attorney's Office, the Florida Office of Financial Regulation, the Texas State Securities Board, the Financial Industry Regulatory Authority, and/or any other third-party that concern: the Original Lease, First Amendment, Second Amendment, the Galleria Office Towers, Stanford's efforts to purchase the Galleria Office Towers, the financial statements attached hereto as Exhibits 1-4, Stanford's decision to implement this action, and/or Stanford and/or the Receiver's decision to continue this action.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 23:**

Produce all Communications to and from the SEC, Internal Revenue Service, Federal Bureau of Investigation, the United States Attorney's Office, the Florida Office of Financial Regulation, the Texas State Securities Board, the Financial Industry Regulatory Authority, and/or any other third-party that concern Stanford's production of the documents referenced in Request No. 23 and Stanford's assertion of privilege and Stanford's assertion of any attorney-client or work product privilege with respect to any such documents.


**REQUEST FOR PRODUCTION NO. 24:**

Produce all documents comprising factual statements, disclosures, admissions, or affidavits by current or former Stanford employees concerning Stanford's business activities conducted in Galleria Tower II.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 25:**

Produce all documents comprising factual statements, disclosures, admissions, or affidavits by, and/or notes from the interviews of: R. Allen Stanford, A. J. Rincon, Robert Kramer, James Davis, and/or Mauricio Alvarado.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 26:**

Produce all documents concerning Your claim for damages.

**RESPONSE:**

13

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| OFFICE TOWERS, LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| WALTON HOUSTON GALLERIA | § | HARRIS COUNTY, TEXAS |
| OFFICE, L.P., | § | |
| | § | |
| Defendant/Third-Party Plaintiff | § | |
| | § | 113TH JUDICIAL DISTRICT |

## DEFENDANT, WALTON HOUSTON GALLERIA OFFICE, L.P.'S
## FIRST SET OF INTERROGATORIES

TO:  Plaintiffs, Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP, by and through their attorneys of record, David Berg, Berg & Androphy, 3704 Travis Street, Houston, TX 77002, and Sean Gorman, LeBoeuf, Lamb, Greene & MacRae LLP, 1000 Main Street, Suite 2550, Houston, TX 77002; and

Ralph S. Janvey, as Receiver for Plaintiffs, appointed by the United States District Court for the Northern District of Texas to take possession of all the assets and records of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, and Laura Pendergest-Holt, and all entities they own or control, by and through its attorneys of record, Kevin M. Sadler, Baker Botts L.L.P., One Shell Plaza, 910 Louisiana, Houston, TX 77002-4995, Timothy S. Durst, Baker Botts L.L.P., One Shell Plaza, 910 Louisiana, Houston, TX 77002-4995, Richard B. Roper, III, Thompson & Knight LLP, 1722 Routh Street, Suite 1500, Dallas, TX 75201.

Pursuant to Rule 197 of the Texas Rules of Civil Procedure, Defendant, Walton Houston Galleria Office, L.P. hereby serves these Interrogatories to Plaintiffs, Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP, and Ralph S. Janvey, as Receiver for Plaintiffs, the answers to which shall be made under oath within thirty (30) days after service of these Interrogatories and in accordance with the Texas Rules of Civil Procedure.

EXHIBIT

6

Respectfully submitted,

DOBROWSKI L.L.P.

By: _____
    Lee M. Larkin
    State Bar No. 11950500
    Paul J. Dobrowski
    State Bar No. 05927100
    Gerard Harrison
    State Bar No. 00787651
    1010 Lamar, Suite 1350
    Houston, Texas 77002
    Telephone: (713) 659-2900
    Facsimile: (713) 659-2908

    KIRKLAND & ELLIS LLP
    James H. Mutchnik, P.C.
    Jeffrey L. Willian, P.C.
    Micah E. Marcus
    S. Maja Fabula
    300 N. LaSalle St.
    Chicago, IL 60654
    (312) 862-2000
    (312) 862-2200

    ATTORNEYS FOR DEFENDANT,
    WALTON HOUSTON GALLERIA OFFICE, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on opposing counsel by hand delivery and all known counsel of record on August 4, 2009, as follows:

Mr. Kevin M. Sadler
Mr. Timothy S. Durst
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana
Houston, TX 77002

Mr. Richard B. Roper, III
Thompson & Knight LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201

COUNSEL FOR RALPH S. JANVEY, AS RECEIVER FOR PLAINTIFFS

Mr. David Berg
Berg & Androphy
3704 Travis Street
Houston, TX 77002

Mr. Sean Gorman
Dewey & LeBoeuf, LLP
1000 Main Street, Suite 2550
Houston, TX 77002

COUNSEL FOR PLAINTIFFS

Lee M. Larkin

**86**

## DEFINITIONS

1.     "Communications" means every contact of any nature, whether oral or written, from one Person to another, whether in form of facts, ideas, inquiries or otherwise, and any evidence of such contact, including without limitation any correspondence, memoranda, notes, diaries, daily calendars, electronic mail messages, computer files, electronic or magnetic media, or other Documents Concerning such contacts.

2.     "Concerning" means relating to, referring to, reflecting, describing, evidencing, constituting, containing, alluding to, germane to, mentioning, analyzing, setting forth, summarizing, characterizing, directly or indirectly, expressly or implicitly, in whole or in part, the subject matter of the Request.

3.     "Document" shall have the full meaning ascribed to it by Rule 192.3 of the Texas Rules of Civil Procedure, and is to be considered in the broadest possible sense and means, without limitation, any written, printed, typed, photostatic, photographed, recorded or otherwise reproduced communication or representation whether comprised of letters, words, numbers, pictures, video, sounds or symbols, personal notes, or any combination thereof, however prepared, transmitted or preserved (including electronically), and including, without limitation, depositions, exhibits to depositions and responses to Requests for Production. This definition includes copies of duplicates of documents contemporaneously or subsequently created which have any nonconforming notes or other markings. Without limiting the generality of the foregoing, "document" includes, but is not limited to, correspondence, memoranda, notes, e-mails, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers of all kinds, summaries, statistical statements, financial statements, prospectuses, journal entries, ledgers, trial balances, branch office reconciliations, analytical records, valuation material of any kind, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meetings or of other communications of any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, phonograph recordings, video recordings, films, types, discs, data cells, drums, print-outs of information stored or maintained by electronic data processing or word processing equipment, all other data compilations from which information can be obtained (by translation, if necessary, by you through detection devices into usable form) including, without limitation, electromagnetically sensitive storage media such as floppy disks and hard disks or drives, and any preliminary versions, drafts or revisions of any of the foregoing. "Document" also includes any label, heading, title or other identification of the file drawer, folder, file, or the like, in which the document is located.

4.     "First Amendment" shall refer to the amendment to Original Lease between Stanford and Walton for space within the Galleria Office Tower II, signed January 10, 2005.

5.    "Galleria Office Towers" shall refer to the three Galleria Office buildings:  Galleria Tower I,  Galleria Tower II, and Galleria Financial Center.

6.    "Galleria Tower II" shall refer to the Houston Galleria Tower building owned by Walton wherein Stanford leased space.

7.    "Negotiations" shall mean any communications or discussions, whether in written or oral form.

8.    "Original Lease" shall refer to the October 25, 2004 Lease Agreement between Stanford and Walton.

9.    "Plaintiff" shall mean Stanford Group Holdings, Inc. and/or The Stanford Galleria Office Towers, LP, and each of their present and former predecessors, successors, subsidiaries, divisions, partnerships, limited partnerships, joint ventures, affiliates and any other related entity acting or purporting to act on their behalf, including but not limited to the Receiver.

10.    "Potential Purchase" shall refer to the negotiations in the summer and fall of 2005 between Walton and Stanford for the potential purchase by Stanford of any portion of the Galleria Office Towers.

11.    "SEC" means U.S. Securities and Exchange Commission.

12.    "Second Amendment" shall refer to the July 18, 2005 amendment to Original Lease Agreement between Stanford and Walton.

13.    "Stanford," "You," or "Your" shall mean Plaintiff Stanford Group Holdings, Inc. and/or Plaintiff The Stanford Galleria Office Towers, LP, Stanford International Bank, Ltd. ("SIB"), Stanford Group Company ("SGC"), and Stanford Capital Management ("SCM") and each of their present and former predecessors, successors, subsidiaries, divisions, partnerships, limited partnerships, joint ventures, affiliates, employees, agents, representatives, and any other related entity acting or person purporting to act on their behalf, including but not limited to the Receiver.

14.    "Third Party" means any entity and any person not an employee, officer, or director of either You or of Plaintiff.

15.    "Walton" means Walton Houston Galleria Office, L.P.

16.    "Receiver" means Ralph S. Janvey in his capacity as the receiver of the assets and records of SIB, SGC, SCM, R. Allen Stanford, James M. Davis and Laura Pendergest-Holt and of all entities they own or control pursuant to the Order Appointing Receiver, dated February 17, 2009, entered in the action *Securities Exchange Commission v. Stanford International Bank, Ltd.*, No. 3-09CV0298-N (N.D. Tex.).    This term shall also include current and former employees, attorneys, agents, representatives, consultants and all other persons acting for the Receiver or on the Receiver's behalf.

## INSTRUCTIONS

1.     The time period covered by these requests shall be January 1, 2004 to the present except as otherwise specified in a particular Request.

2.     The use of the single form includes the plural and vice versa; the masculine includes the feminine and vice versa; and verb tenses include the past, present and future.

3.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed to be outside of its scope.

4.     Each paragraph is to be construed independently and not by or with reference to any other paragraph for purposes of limiting the scope of any particular request.

5.     These requests shall be deemed continuing in nature to the extent permitted by the Texas Rules of Civil Procedure.

6.     If you have any questions regarding any aspect of these Requests, please contact the undersigned counsel for Walton Houston Galleria Office, L.P.

## INTERROGATORIES TO PLAINTIFFS

### INTERROGATORY NO. 1:

Identify and describe (a) all assets of the Estate in the Receiver's possession, including the actual value of such assets and describe and identify all claims against those assets; (b) identify which assets of the Estate in the Receiver's possession Stanford intends to use so that it is ready, willing and able to perform the Potential Purchase of the Galleria Office Towers.

### RESPONSE:


### INTERROGATORY NO. 2:

Identify and describe in detail, all financial support of any type that Stanford obtained prior to filing the present lawsuit, on which it intended to rely to pay the purchase price for the Galleria Towers, including the names of those providing such backing, the amount of the financial support, the nature of the financial support, and the dates such commitments were obtained.

### RESPONSE:


### INTERROGATORY NO. 3:

Identify all funds and amount thereof, in the possession of the Estate that were not generated by Stanford's fraudulent investment schemes.

### RESPONSE:


### INTERROGATORY NO. 4:

Describe with specificity how Stanford would obtain sufficient funds to meet the immediate earnest money cash payment obligation of $10,000,000 and the $150,000,000 purchase price if the Court ordered specific performance of the alleged agreement for the sale of the Galleria Towers to Stanford.

### RESPONSE:

**INTERROGATORY NO. 5:**

Identify those Stanford employees who had offices in Galleria Tower II or who were permitted access to offices in Galleria Tower II.

**RESPONSE:**


**INTERROGATORY NO. 6:**

Identify those Stanford employees who were engaged in, supported, or were aware of Stanford's sale of fraudulent investments.

**RESPONSE:**


**INTERROGATORY NO. 7:**

Identify those Stanford employees who were not engaged in, supported, or were aware of Stanford's sale of fraudulent investments.

**RESPONSE:**


**INTERROGATORY NO. 8:**

With respect to Plaintiffs' assertions set forth in Paragraph 11 of Plaintiffs' Amended Petition that "Walton's own internal documents reflect Walton's representations to Stanford that Walton would only consider selling the building to Stanford if Stanford leased substantially more space from Walton;" that "Walton's internal documents show that Walton was aware it was attempting to induce Stanford to lease more space than it actually needed at the time;" that "Walton's representations created a false impression that it was interested in and willing to sell Galleria Tower II to Stanford;" and that "Walton had no intention of selling the building to Stanford," identify: (a) the individuals who allegedly induced Stanford to lease more space than it needed, (b) the statements that these individuals allegedly made to Plaintiffs, (c) how such alleged statements were made including, without limitation, whether such alleged statement was a written or oral communication, (d) the dates when such alleged statements were made, (e) Plaintiffs' employees or agents who received the alleged communication, and all other persons in whose presence the alleged statements were made, and (f) the documents allegedly evidencing Walton's intent to induce Stanford to lease space under false pretenses that Stanford did not need.

**RESPONSE:**


**INTERROGATORY NO. 9:**

     With respect to Plaintiffs' assertions set forth in Paragraphs 13 and 14 of Plaintiffs' Amended Petition that Stanford leased five floors of unnecessary space under the First and Second Amendments, solely on the belief that Walton intended to sell the Galleria Towers to Stanford, please provide the (a) date on which Stanford began occupying and the date that Stanford began building out the space leased under the First Amendment, (b) the dates on which the first Stanford employees began using this space; (c) the date on which the space covered by the First Amendment was occupied by Stanford and the date that Stanford began using the space; and (d) the date on which the space covered by the Second Amendment was occupied by Stanford and the date that Stanford began using the space.

**RESPONSE:**


**INTERROGATORY NO. 10:**

     With respect to Plaintiff's allegation in Paragraph 16 of Plaintiff's Amended Petition that "prior to entering into the Second Lease Amendment, Walton had represented to Stanford that it would have the exclusive opportunity to purchase Galleria Tower II," identify (a) the individuals who allegedly made such representation, (b) how such alleged statements were made including, without limitation, whether such alleged statement was a written or oral communication, (c) the dates when such alleged statements were made, (d) Plaintiffs' employees or agents who received the alleged communication, and all other persons in whose presence the alleged statements were made, and (e) and any documents or communications reflecting such representations.

**RESPONSE:**


**INTERROGATORY NO. 11:**

     With respect to Plaintiff's allegation in Paragraph 30 of Plaintiff's Amended Petition that "Stanford and its lawyer participated in a conference call with Brody and Walton's lawyer on the afternoon of October 12, 2005. During that call, Stanford and Walton confirmed their agreement to execute the Purchase and Sale Agreement," (a) identify all persons present on the conference call, (b) Walton's representative who Plaintiff alleges agreed on behalf of Walton to execute the Purchase and Sale Agreement; (c) the actual statement or statements made by the Walton representative that Plaintiff alleges constitutes such agreement; (d) Plaintiff's representatives present on the conference call who received the statements; and (e) any contemporaneous

documents or communications reflecting statements or agreements made during the conference call.

**RESPONSE:**

**INTERROGATORY NO. 12:**

With respect to your allegation in Paragraph 37 of Plaintiff's Amended Petition that "the parties . . . . ratified the letter of intent, thereby making it a binding and enforceable contract to sell the Galleria office buildings," (1) identify all acts that you contend gave rise to a ratification of the letter of intent; and (2) describe the legal basis for your assertion that ratification of a letter of intent creates a contract in this case.

**RESPONSE:**

**INTERROGATORY NO. 13:**

For each request to admit that is not fully admitted, explain in detail the basis for the refusal to admit.

**RESPONSE:**

**INTERROGATORY NO. 14:**

With respect to Plaintiff's allegations that Walton made intentionally or recklessly false and material representations and omissions about its intent and willingness to sell Galleria Tower II, or created a false impression of its intent, describe (a) each such representation including who made them, who received them, the content of such representation, the dates on which they were made, and Plaintiff's acts in reliance on them; and (b) the statements you allege created a false impression of Walton's intent, how the statements created a false impression, who made the statements, who received them, the content of such representation, the dates on which they were made, and Plaintiff's acts in reliance on them.

**RESPONSE:**

**INTERROGATORY NO. 15:**

With respect to your allegation in Paragraph 65 that "All conditions precedent to recovery by Stanford have been performed or have occurred," identify the true and accurate

93

financial statements Stanford provided to Walton as a condition of purchasing the Galleria Towers.

**RESPONSE:**


**INTERROGATORY NO. 16:**

Identify all documents that have been shared, offered, proffered and/or provided to the SEC, Internal Revenue Service, Federal Bureau of Investigation, the United States Attorney's Office, the Florida Office of Financial Regulation, the Texas State Securities Board, the Financial Industry Regulatory Authority that concern: the Original Lease, First Amendment, Second Amendment, the Galleria Office Towers, Stanford's efforts to purchase the Galleria Office Towers, the financial statements attached hereto as Exhibits 1-4, Stanford's decision to implement this action, and/or Stanford and/or the Receiver's decision to continue this action.

**RESPONSE:**


**INTERROGATORY NO. 17:**

Identify all documents on the privilege logs produced in this case that have been shared, offered, proffered and/or provided to the SEC, Internal Revenue Service, Federal Bureau of Investigation, the United States Attorney's Office, the Florida Office of Financial Regulation, the Texas State Securities Board, the Financial Industry Regulatory Authority, and/or any other third-party.

**RESPONSE:**