**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 03:09-CV-298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

_____

**APPENDIX IN SUPPORT OF RECEIVER'S RESPONSE TO MOTION TO MODIFY
RECEIVERSHIP ORDER TO RELEASE ACCOUNTS OF FORMER FINANCIAL
ADVISORS AND BRIEF IN SUPPORT (DOCS. 648, 649)**

_____

BAKER BOTTS L.L.P.
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 03-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., Et | § | |
| AL. | § | |
| | § | |
| Defendants. | | |

---

## DECLARATION OF
## KARYL VAN TASSEL

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.     A copy of my resume is attached as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 24 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have

also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.    The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver.

3.    I use the following acronyms or short-hand terms to refer to certain entities in this declaration:

- Stanford Entities — all legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB — Stanford International Bank, Limited.

- STCL — Stanford Trust Company Limited, an Antigua trust company.

- SFG — Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies."

- SGH — Stanford Group Holdings, Inc., a U.S. holding company incorporated in Delaware.

- SFGC — Stanford Financial Group Company, a U.S. entity incorporated in Florida.

- SFGGM — Stanford Financial Group Global Management, LLC, a U.S. entity incorporated in the U.S. Virgin Islands.

- SGC — Stanford Group Company, a U.S. broker-dealer entity incorporated in Texas.

- STC — Stanford Trust Company, a Louisiana trust company.

- SEI — SEI Private Trust Company.

### SEC ACTION AND FTI'S INVESTIGATION

4.    On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford

Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income of the various Stanford Entities; and (c) trace those funds to determine how they were allocated and disbursed throughout the Stanford Entities.

5.      As part of our work, we have interviewed numerous present and former Stanford Entity employees. These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in **KVT-2**. In addition, we have examined the available accounting and other records relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S. We have also reviewed extensive SIB customer records, including but not limited to paper and electronic records documenting SIB CD purchases, interest payments and redemptions.

6.      FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are located. These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and the Bank of Houston. In addition, FTI has gathered and reviewed electronic and other

data from Pershing, LLC and JP Morgan Clearing Corp., both of which hold SGC customer accounts, and SEI, which holds STC accounts.

FACTUAL BACKGROUND

7.     Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC.  These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

8.     Stanford, along with a close band of confidantes, controlled SFG (of which SIB was a part).  These confidants included Jim Davis, CFO of both SFG and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFGC.

9.     SIB was nothing like a typical commercial bank.  It did not offer checking accounts and did not, in the normal course, make loans.  It had one principal product line — certificates of deposit — and one principal source of funds — customer deposits from CD purchases.  SIB offered three types of certificate of deposit accounts; Fixed CDs, Flex CDs, and Index-Linked CDs.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

10.     Most, and perhaps all, of the Stanford Entities were part of the scheme alleged by the SEC or derived benefit from it.  The Stanford Entities that were most closely involved with the sale and redemption of SIB CDs were (a) SIB, which issued the CDs and made purported interest and redemption payments to investors; (b) SGC, the broker-dealer whose financial advisors marketed and sold the CDs to investors; (c) STC, where customer accounts were established to hold the purchased SIB CDs as well as purported interest and redemption payments from SIB CDs; and (d) SFGC and SFGGM, companies that provided a broad range

of services, such as human resources, marketing, accounting and legal services, to SIB and SGC. Customer funds intended for the purchase of SIB CDs were deposited into SIB accounts and then disbursed among the many other Stanford Entities and related accounts.

11.     Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was disseminated from Stanford, Davis, Holt and others working under them to Stanford financial advisors, intending for the brokers to use that misinformation to induce potential investors to purchase SIB CDs.

12.     CD redemptions increased in late 2008 and early 2009 to the point that continuing CD sales could no longer cover purported redemptions, interest payments and normal operating expenses. This caused a rapid depletion of liquid assets. By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many of the Stanford Entities had stopped paying many payables.

13.     At the inception of the U.S. Receivership on February 16, 2009, the total principal amount of outstanding SIB CDs was approximately $7.2 billion (U.S.), according to SIB records. This $7.2 billion reflects a liability on the books of SIB, as it is owed to the investors. Although the SIB financial statements reflect investments valued at $8.3 billion (classified as assets) as of December 31, 2008, based on my analysis to date, the combined assets of all Stanford Entities (SIB included) for which we have financial records have a total value of less than $1 billion. SIB is insolvent and apparently has been for a considerable time.

14.     Our analysis of cash flows for 2008 through February 17, 2009 indicates that funds from sales of SIB CDs were used to make purported interest and redemption payments on pre-existing CDs. Redemptions of principal and payments of interest on CDs should

generally be paid from earnings, liquid assets or reserves. In this case, CD sale proceeds were used because sufficient assets, reserves and investments were not available to cover the liabilities for redemptions and interest payments. Although SIB received some returns on investments, these amounts were miniscule in comparison to the obligations.

15.    It appears that most CD sale proceeds not used to pay interest, redemptions and current CD operating expenses, including commissions, bonuses, Performance Appreciation Rights Plan ("PAR") payments and up-front forgivable loans to financial advisors who sold the CDs, were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" — *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, *etc.*).

16.    SIB investments (which are over 90% of all assets as of December 31, 2008) were divided into three tiers, each managed differently, although all ultimately controlled by Stanford, Davis and, at least to the extent of Tier 2 assets, Holt.

17.    Tier 1, the smallest tier in dollar value, consisted of cash and cash equivalents. Stanford accounting records indicate that as of February 18, 2009, SIB Tier 1 totaled $31.8 million.

18.    Tier 2 principally consisted of investments placed with a variety of investment firms or funds located in the U.S. and Europe, together with a small amount of cash or cash equivalents. According to SIB's weekly summary reports, Tier 2 had a total value of approximately $345 million at February 9, 2009, down substantially from $889 million at December 31, 2007. The documents indicate there were approximately $29 million in further liquidations between February 10, 2009 and February 17, 2009. Tier 2's precipitous decline in

reported value over the thirteen months leading up to the Receivership was due to a combination of declining market values and numerous liquidations ordered by Davis and Stanford and implemented by Holt and her staff.

19.    Tier 3, by far the most significant financially (as valued by Stanford and Davis) and the most secret, was managed by Stanford and Davis, apparently with assistance and participation by Holt and others working under them.    They kept its value and composition secret from regulators, investors, creditors, auditors and others.    Stanford Tier 3 records do indicate, however, that $1.8 billion in value consisted of notes receivable from Allen Stanford.    It appears this amount corresponds to funds that Stanford, with the assistance of Davis and possibly others, diverted from SIB.    These funds were used for various purposes, including transfers to 51 other Stanford Entities.    (*See* **KVT-3**, an internal Stanford schedule listing past uses of SIB funds supporting Allen Stanford's note receivable liability to SIB in the amount of $1.844 billion.).    This receivable appears to be uncollectible, as Mr. Stanford's recent press statements indicate he does not have the $1.8 billion to pay the loan made to him.

20.    Approximately $1.2 billion of Tier 3 value (as apparently valued by Stanford and/or Davis or others acting in concert with them) was in merchant banking assets.    These consisted mostly of equity and debt investments in private and public companies (*see* **KVT-8,** a Stanford Financial Group schedule dated 30 June 2008 listing Tier 3 merchant banking assets), which was contrary to representations made to investors about SIB's investment portfolio.    Early indications are that the fair value of these merchant banking assets was — and remains — only a small fraction of the $1.2 billion value that Stanford and Davis assigned to them for financial reporting purposes.

21.    In addition, Tier 3 records assigned $3.174 billion of value to real estate. However, those same records list only two assets in this category: real estate holding companies that own properties in Antigua known as Pelican Island and Asian Village. The two properties were purchased (via the purchase of their holding companies) in 2008 for a combined $63.5 million. I have seen no evidence — such as appraisals or other similar valuations — that would support this extraordinary and highly improbable increase in value, particularly in a period that generally is regarded as a global real estate downturn.

22.    SIB investment earnings amounts were provided monthly by Jim Davis and persons working at his direction and under his supervision. I have reviewed internal Stanford documents from which I concluded that earnings were "pegged" at whatever amount was needed to give SIB the appearance of acceptable financial performance and capital ratios for regulatory purposes, as well as continuing to induce investors. In other words, earnings — at least for the last three years and probably longer — were fictitious "plugged" numbers.

23.    Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009 to alleviate a severe cash flow crisis, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.

24.    Based on FTI's analysis to date, I have reached the following conclusions, which are all to a reasonable degree of certainty, and all of which were determined using reliable practices and methodologies, described herein, that are standard in the fields of finance and accounting:

- The substantial majority of funds received or utilized by the Stanford Entities, and in particular SIB, SGC, SFGC and SFGGM, was proceeds from the sale of SIB CDs;

- The substantial majority of funds used to pay purported CD interest and redemption payments to investors on pre-existing CDs was proceeds from sales of new SIB CDs;

- The schedules attached hereto as exhibits **KVT-4, KVT-5** and **KVT-6** reflect the identity of certain persons and entities holding SIB CD accounts with identified purported CD interest and/or redemption payments from SIB or who otherwise received purported CD interest and/or redemption payments from SIB, and the amounts of payments identified;

- Exhibit **KVT-4** further identifies the Pershing, SEI and JP Morgan accounts currently frozen under the Court's orders determined to be associated with the persons and entities listed on that schedule based on the customer records and other information available;

- Exhibit **KVT-5** further identifies the amounts, which total $18.5 million in the aggregate, transferred by the persons and entities listed on that schedule to the Receiver's segregated escrow account pending final adjudication of rights to those funds;

- Exhibit **KVT-6** identifies persons and entities holding SIB CD accounts with identified purported CD interest and/or redemption payments from SIB or who otherwise received purported CD interest and/or redemption payments from SIB (and the amounts of payments identified) and who do not have any accounts currently frozen at Pershing, JP Morgan or SEI and have not transferred any funds to the Receiver's segregated escrow account; and

- The substantial majority of funds used to pay CD commissions, loans, PAR payments and bonuses to financial advisors who sold SIB CDs was proceeds from sales of new SIB CDs.

### OVERVIEW OF SIB BANK ACCOUNTS

25.    Based on our review of the activity in multiple SIB bank accounts, the primary operating accounts for CD activity utilized by SIB were Toronto Dominion account no. 0360-01-2161670 ("TD 1670"), Trustmark account no. 300-310-1707 ("Trustmark 1707"), Trustmark account no. 300-310-1558 ("Trustmark 1558") and Bank of Houston account no. 8706 ("BOH 8706").    SIB also transferred substantial amounts of money between its operating accounts and two money market accounts, Trustmark account no. 1097 ("Trustmark 1097") and BOH account no. 8284 ("BOH 8284").    These money market accounts were

essentially used as short-term holding locations for the funds from the SIB operating accounts, earning nominal amounts of interest, until those funds were needed by SIB. As explained further below, the overwhelming majority of the funds deposited into all of the aforementioned SIB operating and money market accounts was proceeds from the sale of SIB CDs.

26.    The above accounts were used for a variety of purposes. For example, the TD 1670 and Trustmark 1558 accounts were used to make purported CD interest and redemption payments to investors. The TD 1670 account was also used, along with the Trustmark 1707 and BOH 8706 accounts, for the purchase or funding of Tier 2 and Tier 3 investments, payments for services rendered to other Stanford Entities and capital contributions or loans to other Stanford Entities. In 2008 alone, approximately $474 million was transferred from the TD 1670 account to the BOH 8706 account, which in turn distributed roughly $450 million among the various Stanford Entities.

### SUBSTANTIAL MAJORITY OF FUNDS FOR STANFORD ENTITIES CAME FROM CD SALE PROCEEDS

*Deposits of CD Sale Proceeds*

27.    The SIB CDs were SIB's only product line. Although SIB provided a limited number of other financial products (*e.g.* credit card services and loans), these were offered only to CD holders and acted as incentives for the purchase of CDs.

28.    Based on FTI's review of SIB CD sale records, the majority of CD purchasers paid for their CDs with U.S. dollars, and those funds were deposited into SIB's Trustmark 1707 and TD 1670 accounts. Customers who purchased SIB CDs by wire transfer were instructed to wire their funds directly to SIB's TD 1670 account. (*See* **KVT-7**, CD investor wiring instructions). Investors who paid by check sent their checks to SIB in Antigua, where

those denominated in U.S. Dollars were bundled and sent regularly to Trustmark in Houston for deposit into SIB's Trustmark 1707 account. If any SIB CD sales proceeds were actually paid by investors at SIB's offices in Antigua, it was likely a small amount relative to overall sales. Further, as stated above, SIB would promptly send investor checks denominated in U.S. Dollars to Houston for deposit into the Trustmark 1707 account.

29.     Based on our review of 2008-2009 data for the Trustmark 1707 and TD 1670 accounts, and comparing that to SIB's CD sales records for the same time period, my team and I have been able to confirm that the funds from investors who purchased SIB CDs in U.S. dollars were in fact deposited into these accounts.

30.     Because the wire transfer data from the TD 1670 account and the SIB customer account records are both in electronic form, we were able to electronically match the wire transfers into the TD 1670 account to records of specific CD purchases, CD nos., transaction dates or amounts or other criteria contained in the SIB CD customer account records. Based on this analysis, we have determined that, for the time period of January 1, 2008 through February 17, 2009, approximately $1.7 billion in SIB CD sale proceeds were deposited into the TD 1670 account.

31.     With regard to CD purchases in U.S. Dollars made by check, the data available from Trustmark does not allow for electronic matching with SIB's CD sale records. Instead, FTI has been able to review images of checks provided by Trustmark and then search the SIB CD sale records for transactions in those same amounts. By doing so for checks representing approximately 33% of the commercial deposits reflected on the Trustmark 1707 account statements provided by Trustmark for the time period of January 1, 2008 through February 17, 2009, we have been able to confirm, with only one exception, that each of these checks

corresponds to a specific purchase identified in the SIB CD sale records.[1]  Based on this analysis, we have determined that between January 1, 2008 and February 17, 2009, approximately $384 million in SIB CD sale proceeds were deposited into SIB's Trustmark 1707 account.

32.    In addition to the SIB CD sale proceeds that were deposited directly into the TD 1670 and Trustmark 1707 accounts, there were some small additional amounts of CD sale proceeds that were deposited in other accounts initially and then transferred over to the TD 1670 and Trustmark 1707 accounts.

(a)    Investors who purchased CDs in Canadian dollars were instructed to wire those funds to SIB's Toronto Dominion account no. 0360-01-2161573 ("TD 1573"). (**KVT-7**). Performing an analysis similar to that performed on the wire transfers into SIB TD 1670, FTI has been able to electronically match the wire transfers into the TD 1573 account to records of specific CD purchases, CD nos., transaction dates or amounts or other criteria contained in the SIB CD sale records. Based on this analysis, we have determined that, for the time period of January 1, 2008 through February 17, 2009, over $5 million in SIB CD sale proceeds were deposited into the TD 1573 account. Correspondingly, Toronto Dominion's records reflect that approximately $10 million was transferred into the TD 1670 account and another approximately $10 million into the Trustmark 1707 account from the TD 1573 account. These transfers included not only the $5 million in deposits referenced above but likely deposits of CD sale proceeds into the TD 1573 account that occurred prior to January 1, 2008.

(b)    Investors who purchased CDs in British pounds or Euros were instructed to wire those funds to SIB accounts at HSBC Bank PLC in London. (**KVT-7**). Although HSBC has not provided any account data to the Receiver, we have been able to determine that over $36 million was transferred from HSBC accounts to the TD 1670 account between January 1, 2008 and February 17, 2009.

---

[1] Though we have been unable to confirm that the one check identified as an "exception" was used to purchase a CD, circumstantial evidence indicates that it was. The data required to reach a definitive conclusion, however, was not available for this transaction.

*SIB's CD Operating Accounts Were Funded Almost Exclusively from CD Sale*

*Proceeds*

33.     Based on the analysis described above, and additional analysis of data relating to SIB's primary operating accounts — TD 1670, Trustmark 1707, BOH 8706 and Trustmark 1558 — I have determined that the overwhelming majority of funds received by SIB came directly or indirectly from CD sale proceeds.

34.     The deposits into the SIB Trustmark 1707 account between January 1, 2008 and February 17, 2009 totaled approximately $497 million.[2] The approximately $384 million in checks for CD purchases that were deposited into the account comprised 77% of the deposits into that account between January 1, 2008 and February 17, 2009. Based on the following, I have concluded that up to an additional $94 million or 19%, for a total of 96%, of the deposits into the Trustmark 1707 account during that time period also consisted primarily of SIB CD sale proceeds.

> (a)     Approximately $55 million, or 11% of the deposits into the Trustmark 1707 account were funds from the liquidation of Tier 2 investments  Based on my review of the data relating to the Tier 2 investments, it appears that the vast majority of those investments were funded by monies from the TD 1670 account. Further, the vast majority of the liquidations occurred when the investments were in loss positions. Accordingly, any deposits from the Tier 2 investments would have consisted primarily of the CD sale proceeds that were originally invested rather than investment returns.

> (b)     Approximately $29 million, or 6%, of the deposits into the account were from SIB's BOH 8706 and TD 1670 accounts,

---

[2] This amount does not include approximately $337 million in deposits from the Trustmark 1097 account. The Trustmark 1097 account was a short term money market investment account that was funded almost exclusively from the Trustmark 1707 account and used to hold those funds until they were needed by SIB. At that time, the funds were transferred back into the Trustmark 1707 account. Based on my review of the Trustmark 1097 account records, these funds earned only nominal amounts of interest.

which as discussed below, were funded primarily from CD sale proceeds.

(c)    Approximately $10 million, or 2%, of the deposits into the account were transfers from SIB account TD 1573, which was the account into which CD purchase money in Canadian Dollars was deposited, as described above.

(d)    The other deposits into this account — approximately $19 million or just 4% of the total — were from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

35.    The deposits into the SIB TD 1670 account between January 1, 2008 and February 17, 2009 totaled approximately $2.4 billion. The approximately $1.7 billion in wire transfers for CD purchases that were deposited into the account comprised 71% of the deposits into that account between January 1, 2008 and February 17, 2009. Based on the following, I have concluded that up to an additional 26% or $619 million, for a total of 97%, of the deposits into the TD 1670 account during that time period also consisted primarily of SIB CD sale proceeds.

(a)    Approximately $318 million, or 13%, of the deposits into the account were from SIB's Trustmark 1707 account, which as described above, is funded almost exclusively by proceeds from the sale of SIB CDs.

(b)    Approximately $154 million, or 6% of the deposits into the account were funds from the liquidation of Tier 2 investments. As described above (*See* ¶34(a) above), such funds primarily consisted of proceeds from the sale of SIB CDs.

(c)    Approximately $127 million, or 5%, of the deposits into the account were from SIB's BOH 8706 operating account, which as discussed below, was funded primarily from SIB CD sale proceeds.

(d)    Approximately $20 million, or 1%, of the deposits into the account were transfers from HSBC Bank accounts and the TD 1573 account, which were the accounts into which CD purchase

money in non-U.S. currency, were deposited, as described above.[3]

(e)     the other deposits into this account — approximately $82 million or 3% of the total — are from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

36.    The total deposits into the SIB BOH 8706 account between January 1, 2008 and February 17, 2009 were approximately $801 million.[4]  Based on the following, I have concluded that up to $710 million or 89%, of the deposits into the BOH 8706 account during that time period consisted primarily of SIB CD sale proceeds.

(a)     Approximately $505 million, or 63%, of the deposits into the account were from SIB's TD 1670 account or Trustmark 1707 account, which as described above, are funded almost exclusively by proceeds from the sale of SIB CDs.

(b)     Approximately $205 million, or 26%, of the deposits into the account were funds from the liquidation of Tier 2 investments. As described above (*See* ¶34(a) above), such funds primarily consisted of proceeds from the sale of SIB CDs.

(c)     The other deposits into this account — approximately $91 million or 11% of the total — were from other Stanford Entities (funded primarily by CD sale proceeds), unidentified sources or sources on which FTI's analysis is ongoing.

37.    The total deposits into the SIB Trustmark 1558 account between January 1, 2008 and February 17, 2009 were approximately $127 million.[5]  Based on FTI's review of

---

[3] Another $26.5 million, or 1%, of the deposits into the TD 1670 account was from HSBC accounts. These funds also likely originated from CD purchase money originally denominated in non-U.S. currencies, as described in the wiring instructions attached hereto as exhibit **KVT-7.**  Because HSBC has not provided the necessary records, we are unable to confirm that this is the case.

[4] This amount does not include approximately $457 million in deposits from the BOH 8284 account. The BOH 8284 account was a short term money market investment account that was funded exclusively from the BOH 8706 account and used to hold those funds until they were needed by SIB. At that time, the funds were transferred back into the BOH 8706 account.  Based on my review of the BOH 8284 account records, these funds earned only nominal amounts of interest.

[5] This amount does not include additional deposits consisting of funds originally paid out of the Trustmark 1558 account that were returned for various reasons (*i.e.*, rejected by recipients, *etc.*).

records from Trustmark relating to this account, 99% of the deposits during this time period were transfers from SIB's Trustmark 1707 account. As discussed in paragraph 34 above, the Trustmark 1707 account was funded almost exclusively from the CD sale proceeds. Accordingly, the overwhelming majority of funds in the Trustmark 1558 account consisted of SIB CD sale proceeds.

### PROCEEDS FROM SALES OF NEW CDs WERE USED TO MAKE PURPORTED CD INTEREST AND REDEMPTION PAYMENTS ON PRE-EXISTING CDs

38.     Based on FTI's analysis to date, I have concluded that the overwhelming majority of the funds used to make purported SIB CD interest and redemption payments was proceeds from the sale of new SIB CDs to investors. Although SIB received some returns on investments, these amounts were miniscule. Moreover, there were not sufficient assets to cover these payments, illustrated by the fact that liquidating Tier 2 allowed SIB to maintain payments for only a short period of time.

39.     Based on SIB CD transaction records reviewed by FTI, SIB made purported principal and interest redemption payments in U.S. Dollars to investors totaling approximately $2 billion from January 1, 2008 through February 17, 2009.

40.     For interest and redemption payments made by wire transfer in U.S. Dollars, SIB used its TD 1670 account. FTI has reviewed the outgoing wire transfer records from the TD 1670 account and electronically matched those records to the CD related payment records from SIB. Based on this analysis, we have been able to confirm that approximately $1.87 billion, or 92%, of all redemption payments made by SIB in U.S. Dollars were made by wire transfer to investors from the SIB's TD 1670 account. Because the funds deposited into SIB's TD 1670 account were almost exclusively proceeds from the sale of new CDs to investors, the

payments made from the TD 1670 account to investors were likewise almost exclusively CD sale proceeds.

41.     SIB also made some purported interest and redemption payments to investors in U.S. Dollars by checks written from its Trustmark 1558 account.    FTI has reviewed approximately 300 checks written to investors from the Trustmark 1558 account.    By comparing those checks to records of specific payments in SIB's records, we have determined that between January 1, 2008 and February 17, 2009, checks totaling $92 million, or 94% of the sample set of purported CD interest and redemption payments selected,[6] were written from SIB's Trustmark 1558 account.    Because the overwhelming majority of the funds deposited into SIB's Trustmark 1558 account was proceeds from the sale of new CDs to investors, the overwhelming majority of payments made from the Trustmark 1558 account to investors was primarily proceeds from the sale of new SIB CDs to investors.

### IDENTIFICATION OF INVESTORS WHO RECEIVED PURPORTED CD INTEREST AND REDEMPTION PAYMENTS

42.     Attached as exhibits **KVT-4, KVT-5** and **KVT-6** to this declaration are schedules identifying certain investors holding SIB accounts with identified purported CD interest or redemption payments from SIB or who otherwise received purported CD interest or redemption payments from SIB, along with the amounts of payments identified.    The investors listed in **KVT-4** also have Pershing, JP Morgan or SEI accounts that are currently frozen by the Court's orders.    The investors listed in **KVT-5** do not have any accounts that are currently frozen under the Court's orders.    Instead, their accounts were released and they agreed, by stipulations filed with the Court, to transfer funds equal to the amount of purported

---

[6] The sample selected totaled 78% of the population of purported CD interest and redemption payments made by SIB denominated in U.S. Dollars for the period January 1, 2008 through February 17, 2009.

SIB CD redemptions or interest payments they received to the Receiver's segregated escrow account until the rights to those funds are fully adjudicated. The investors listed in **KVT-6** do not have any accounts that are currently frozen under the Court's orders and have not transferred any funds to the Receiver's segregated escrow account.

43.    The schedules contained in exhibits **KVT-4, KVT-5** and **KVT-6** were developed by the FTI team through a detailed review and analysis of the SIB records of CD interest and redemption payments from SIB customer accounts. If a payment was made from an SIB customer account, the customer(s) who held that account were identified as recipient(s) of the purported CD interest or redemptions. Once the customer(s) were identified, the SIB customer records were searched electronically for certain common identifiers, such as name, address, *etc.*, to identify all other SIB accounts associated with the customer(s). If the names on each of the customer accounts appeared to be the same, the purported interest and redemption payments were added together into one line item entry on the schedule. If the names on the accounts did not appear to be the same, they are listed as separate entries on the schedules. If we determined through review of available records that someone other than the SIB account holder received purported CD interest or redemption payments, they are included on the appropriate schedule.

44.    Once the customers who received purported CD interest or redemption payments from SIB were identified, the FTI team also reviewed Pershing, JP Morgan and SEI customer account records to determine whether those previously identified SIB customers also had Pershing, JP Morgan or SEI accounts that are subject to the Court's freeze orders. Similar to how related SIB accounts were identified, the Pershing, JP Morgan and SEI account records were searched electronically for common identifiers — again name, social

security number, tax identification number, address, *etc.* — to identify any Pershing, JP Morgan or SEI accounts associated with those customers. Those identified accounts, to the extent they are still frozen by the Court's orders, are listed on exhibit **KVT-4**.

45.    Many of the customers listed on exhibits **KVT-4** and **KVT-5**, and perhaps some of those listed on exhibit **KVT-6**, had other Pershing, JP Morgan or SEI accounts that were previously subject to the Court's freeze orders but have since been released. Some of those accounts were released pursuant to the Court's orders dated March 5, March 12, or April 23. Other Pershing, JP Morgan and SEI accounts associated with the customers listed on exhibits **KVT-4** and **KVT-5** have been released through the account application review process approved by the Court in its March 27 and May 27 orders and subsequent modifications thereto. As of the date of this declaration, all Pershing, JP Morgan and SEI accounts associated with the customers listed on exhibit **KVT-4** have been released, except those accounts necessary to satisfy an order of disgorgement from this Court being requested by the Receiver. All Pershing, JP Morgan or SEI accounts associated with customers listed on exhibit **KVT-5** have been released, but funds equal to the amount of proceeds received by the customers identified in **KVT-5** have been transferred to the Receiver's segregated escrow account pending adjudication of rights to those funds.

46.    The investors listed on exhibit **KVT-4** received approximately $373 million in purported CD interest and redemption payments in the aggregate. Comparing these amounts and the amounts contained in the Pershing, JP Morgan and SEI accounts associated with those customers, there is approximately $295 million in the Pershing, JP Morgan and SEI accounts that are available to satisfy any claims by the Receiver for the recovery of CD proceeds. The investors listed on exhibit **KVT-5** received approximately $18.5 million in purported CD

interest and redemption payments in the aggregate.  Such amount has been transferred by the investors to the Receiver's segregated escrow account pending final adjudication of rights to those funds.  The investors listed on exhibit **KVT-6** received approximately $494 million in purported CD interest and redemption payments in the aggregate.  There are no frozen Pershing, JP Morgan or SEI accounts that have been identified as associated with these customers, and they have not transferred any funds to the Receiver's segregated escrow account.

### PROCEEDS FROM SALES OF NEW CDs WERE USED TO PAY COMMISSIONS, PAR PAYMENTS AND BONUSES AND MAKE LOANS TO FINANCIAL ADVISORS

47.     Based on a review of accounting and payroll records of SGC, the FTI team and I have determined that many of the financial advisors who marketed and sold SIB CDs to customers received up-front forgivable loans as part of their compensation package when they began work.  For the years 2007, 2008 and 2009 (prior to February 17), loans were made to financial advisors in the approximate aggregate amounts of $12.9 million, $35.8 million and $2.76 million respectively.

48.     Many of the financial advisors further received commission, PAR payments and bonus payments associated with SIB CD sales, typically in the range of 1% to 3% percent of the cumulative value of the CDs they sold.  For the years 2007 and 2008, SGC made commission, PAR payments and bonus payments to financial advisors in the approximate aggregate amounts of $31 million and $38 million respectively.

49.     Based on our analysis and review of the records and information referenced herein, I have concluded that the substantial majority of funds used to pay the loans, bonuses,

PAR payments and commissions to financial advisors was proceeds from the sale of the SIB CDs.

50.    The loans, bonuses, PAR payments and commissions to financial advisors were funded primarily from two Trustmark bank accounts held in the name of SGC, specifically Trustmark account no. 300-310-7357 ("Trustmark 7357") and Trustmark account no. 300-008-7916 ("Trustmark 7916")(collectively, the "Trustmark 7357/7916 accounts"). These were the primary operating accounts used by SGC. Loans were paid directly to the financial advisors from the Trustmark 7357/7916 accounts.  Commissions, PAR payments and bonuses first passed through SGC's payroll account, which was funded exclusively by the Trustmark 7357/7916 accounts, and were then paid to the financial advisors by SGC's third party payroll services provider, ADP.

51.    The SGC Trustmark 7357/7916 accounts, in turn, were funded directly or indirectly from SIB's operating accounts — TD 1670, Trustmark 1707 and BOH 8706 — which, as detailed above, were funded almost exclusively from SIB CD sale proceeds.

52.    One of the primary funding sources for the SGC Trustmark 7357/7916 accounts from which loans, bonuses, PAR payments and commissions were paid was referral fees paid by SIB as compensation for the sale of CDs.  Over the course of 2007 through February 17, 2009, an aggregate total of $172.3 million in referral fees was transferred directly from SIB's TD 1670, Trustmark 1707 and BOH 8706 operating accounts to the SGC Trustmark 7357/7916 accounts.  Based on our interviews with personnel from the various Stanford Entities, FTI learned that these referral fees were, in part, intended to fund commission and bonus payments and loans to financial advisors who sold SIB CDs.  The

amount of referral fees paid by SIB to SGC between 2007 and 2009 far exceed the amounts of commissions, PAR payments, bonuses and loans paid to financial advisors during that time.

53.    The conclusion that proceeds from the sale of SIB CDs were used to fund commission and loan payments is further confirmed by the fact that another significant source of funding into the Trustmark 7357/7916 accounts was capital contributions that originated from SIB's TD 1670, Trustmark 1707 and BOH 8706 operating accounts.  Although many of these capital contributions passed through other Stanford Entities and their accounts before landing in the Trustmark 7357/7916 accounts, they are traceable back to the SIB accounts and therefore to proceeds from the sales of SIB CDs.

54.    For example, in 2008 alone, funds in the amounts of $396 million and $77 million respectively were transferred from the SIB BOH 8706 account and the TD 1670 account into the operating account of SFGGM, BOH 8870.  During the same time period, a capital contribution in the amount of $47.5 million was made from SFGGM's BOH 8870 account to SGH's operating account, Trustmark account no. 300-310-2150 ("Trustmark 2150").  Finally, a capital contribution went from the Trustmark 2150 account to the SGC Trustmark 7357/7916 accounts in the amount of $46.5 million.  There are many other examples of smaller capital contributions making their way into SGC's Trustmark 7357/7916 accounts that are traceable back to SIB's accounts.  In addition, based on FTI's analysis of records available for the accounts that funded the Trustmark 7357/7916 accounts, I have concluded to a reasonable degree of certainty that a majority of the funds deposited into these accounts came from sources traceable to the SIB accounts that were funded almost exclusively by proceeds from the sale of SIB CDs.

Executed this **27**day of July, 2009.

_____
Karyl Van Tassel

# KVT-1



# Karyl M. Van Tassel, CPA

Senior Managing Director—Forensic and Litigation Consulting
Karyl.vantassel@fticonsulting.com

1001 Fannin
Suite 1400
First City Tower
Houston, TX 77002
Tel: (713) 353-5445
Fax: (713) 353-5459

**Certifications**
Certified Public Accountant

**Professional Affiliations**
American Institute of Certified
Public Accountants

Texas Society of Certified Public
Accountants

**Education**
B.S. in Business Administration,
Emphasis in Accounting,
University of Northern Colorado

Karyl Van Tassel is a senior managing director in the FTI Forensic and Litigation Consulting practice and is based in Houston. Ms. Van Tassel has twenty-three years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services. Ms. Van Tassel has been designated as an expert on valuations of closely held businesses, other economic damage claims and forensic accounting issues and has performed detailed financial analyses in a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations. She has also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

Prior to joining FTI, Ms. Van Tassel was a partner in KPMG's Forensic Dispute Advisory Services practice. Prior to that she was a member of the litigation and bankruptcy consulting divisions of two national accounting firms as well as a regionally based firm, where she provided financial advisory services to the legal and insurance professions and private industry. She has also provided audit and tax services to auto dealerships, construction clients and governmental agencies. In addition, she has provided accounting services and investment analysis to a financial institution.

## Professional Experience

### Forensic Accounting

- Retained by court appointed receiver to investigate and track $85 million of funds embezzled by the CFO of a Texas energy company. Searched the company records to determine the amount of the embezzled funds, and determine the various schemes used to remove the funds from the company. After tracing the amount removed from the company, then traced assets through multiple shell companies and personal bank accounts, utilizing accounting information and electronic data obtained through email, hard drive and server sources. Worked with receiver on monetizing assets recovered.

- Involved in various investigatory matters related to compliance with Foreign Corrupt Practices Act (FCPA), including assisting a monitor appointed under a deferred prosecution agreement of a company to analyze accounting and internal control procedures. Prepared work plan for compliance testing and directed site visits, conducted interviews and assisted in preparing report of findings. As a result of our work, have reported to head of enforcement at the Department of Justice. With the three year term of the monitorship, have ongoing responsibilities for follow up with the company and oversight of responses to monitor's requests and reported findings, as well as follow up site visits for each year.

- Retained by the audit committee on matters related to allegations of round trip trading in the energy industry. Assisted in providing multidisciplinary teams to extract data, analyze trades, document risk management practices and analyze appropriate accounting treatment, including potential restatement. Reports provided to audit committees to assist them in responding to SEC inquiries and investigations.





Karyl M. Van Tassel

- Retained by company to perform analysis of costs incurred for provider of energy in submitting a claim in the refund of overpayments related to the California power settlements. Reviewed regulatory filings to determine if costs and methodologies complied with FERC guidelines and state mandates. Analyzed source documents as well as documenting the methodology utilized for compiling the information.

- Retained by counsel for a special committee of a publicly traded software company to investigate allegations of potential backdating of stock options. Led a team of accounting and electronic evidence personnel to assist in acquiring and analyzing written and electronic information related to the stock option process and individuals involved. Worked extensively with counsel analyzing accounting issues related to measurement dates and the appropriate accounting of stock grants for new hires, new account acquisition, employee ranking, compensation in lieu of cash, and sales incentive plans. Analyzed appropriate accounting treatment and estimate of annual financial impact based upon alternative measurement dates. Reported results to Board of Directors and auditors of the company.

- Retained by the audit committee of an electronics company to investigate allegations by the SEC related to revenue recognition issues, overstatement of inventory and property, plant and equipment and self-dealing by top level executives. Company eventually settled with the SEC and announced restated financial statements

- Retained by the audit committee of Fortune 500 company to analyze historical accounting issues related to accounting for long-term construction contracts. Issued report and had meetings with the SEC to discuss findings and accounting issues.

- Analyzed historical rates of return for a variety of mutual funds and equity investments to determine the impact of various investing options related to the assets of a trust. Compared actual returns to several indices to determine the difference and the potential damages allegedly incurred by the trust.

- In a securities matter related to the mining industry, analyzed the impact of the accounting and financial disclosures on the stock of a company. Analyzed various returns on equity investments for guideline companies in the industry as well as equity indices to measure impact of announcements and disclosures on the company stock.

- Retained by a hospital chain to analyze billings to Medicaid and insurance providers to determine if billings were appropriate based upon contractual provisions and consistent with the patients file and diagnosis. Worked with multidisciplinary team to consisting of computer specialists to retrieve data, database specialists to analyze information and medical personnel to review medical files.

- Retained to analyze various factors and transactions in matters asserting alter ego claims. Involved in a variety of matters where we provided detailed analyses of corporate governance, financial operational and control factors to determine the extent to which the information would indicate the existence of separate entities.

- Involved in analyzing various complex financial and accounting transactions regarding alleged improprieties in a variety of industries, either for internal investigations or litigation.

- Analyzed accounting treatment of revenues and related party disclosures for a defendant in a securities matter. Software company allegedly had overstated revenues by inappropriate application of accounting principles and improperly disclosed various related party






Karyl M. Van Tassel

transactions.

- Analyzed and traced assets between various related and affiliated companies, which involved complex accounting treatments. Traced cash and other assets to offshore companies. Testified in hearing for contempt of court regarding the disposition of certain cash receipts subsequent to the issuance of a temporary restraining order that limited the transfer of assets.

- Analyzed the alleged fraudulent activities of two major auto body repair shops for an insurance company. Determined the overall profitability of the auto body repair shops compared to the industry as a whole. From a large production of documents, also determined the availability of financial documents from the body shops, and their relationship to and substantiation of the results of inspections performed on vehicles after the repairs were completed. Assisted the economist in regards to the total business conducted over a 15-year period and extrapolated sample results to the entire population.

- Reconstructed the trust accounts of a real estate company after a fire suspected to be caused by arson. Determined amounts had been misappropriated for the personal use of various brokers. Analysis used in criminal investigation.

- Analyzed the accounts of a real estate developer accused by a family trust of misappropriation of funds. Analysis included complex transactions between 22 related partnerships. Included database extractions of various computers and synthesizing thousands of records to determine ultimate disposition of proceeds from investments.

- Retained by a lender to the defendant in a case involving an alleged ponzi scheme in the computer hardware industry. Analysis included determining the flow of transactions in the company between actual business operations and alleged fraudulent activities. Utilized large-scale database application to track transactions within the company, to the bank and to the potential investors. Analyzed the companies banking transactions to determine if the bank had allowed a "float" on the account, which the trustee alleged to be an additional loan to the company from the bank. Engagement resulted in settlement with company trustee.

- Analyzed the billings of a construction company related to the renovation and partial construction of a residence. Analyzed application of percentage of completion in monthly billings to determine overcharges throughout a three-year construction period.

- Analyzed the costs of producing a compact product for shipping hazardous materials. Determined if improper allocations were made based upon cost accounting theories, resulting in overcharging to clients.

**Contract Disputes**

- Analyzed the payments made under a treaty whereby client ceded obligations under a reinsurance agreement in the variable annuity business. The allegations involved whether the contract was wrongfully terminated if underpayment of premium had not been made by insurance company to reinsurer. The issues involved included obtaining an understanding of the payment terms for the reinsurance coverage over an extended period on reinsurance of the guaranteed minimum death benefit of variable annuity life insurance policies. Led a multidisciplinary team working with large volumes of transactions data. Team included data analysis and electronic discovery specialists for the extraction of data over an extended

 F T I



Karyl M. Van Tassel

time period with millions of transactions. Also, worked with actuaries to understand variables assumed in their analysis of the book of business and with underwriters to understand policies and procedures. Testified in arbitration that client had not underpaid over the period of time at issue in the matter.

- Analyzed the economic damages in a breach of contract and tort matter between client insurance company and a third party administrator. Analyzed the damages alleged by plaintiff's damage expert and provided rebuttal analysis of damages. Issues in the damage calculation related to valuation of a book of business for dread disease policies and calculation of amounts owed under a contract.

- Analyzed the economic damages sustained by an investor in a failed joint venture in a urea plant in Columbia. Opinion included a valuation of the business enterprise as of the date of the alleged breach, involving various analyses of the urea market, the prospective operation results and ability to attract lenders.

- Analyzed the lost profits sustained by a petrochemical company related to an alleged breach of a joint venture/operations agreement. Issues related to imbalance in the manufacturing facility due to inappropriate levels of various feedstock to the plant. Inability to maintain contracted levels of product forced inefficient plant operations, decreasing profitability.

- Analyzed the lost profits to a large engineering firm related to the inability to complete the construction of a polystyrene plant in the Middle East due to the Gulf War. Analysis involved analyzing the percentage of completion methods and determining profit at time of invasion, compared to projected profit had the event not occurred. Claim was submitted to the neutral arbitrators in Switzerland.

- In a breach of contract dispute, analyzed the economic losses sustained by the creator and distributor of personal care products. Analysis included working with a marketing expert to determine effects of demographic differences of consumers on buying habits and its impact on the subject company's profits and long-term viability.

- Analyzed the economic damage claim of a producer of accounting software. Provided testimony with regard to the out-of-pocket costs incurred for an internally developed product, which was used to replace the component, which the defendant did not deliver. Also analyzed the lost profit damages under a first to market theory.

- Analyzed the lost profits of a used car dealership related to a breach of contract. Analyzed industry margins compared with subject and other market conditions.

- Analyzed the economic damages of an exclusive distributor of sporting good products due to product defects. Calculated the economic impact to the distributor over an eight-year period, including lost profits, carrying costs of inventory and other incremental costs. Project necessitated analyzing the performance of over forty products and determining the cause factors impacting the diminution of profits.

- Provided rebuttal analysis of a $20 million claim for lost profits in a construction claim for an Arkansas highway project. Addressed the issues of causation as well as analyzing the underlying assumptions of the lost profit claim. The indirect claim for lost profits was dismissed on summary judgment, in part based upon our financial analysis of the causation issue.



F T I

27



Karyl M. Van Tassel

- Determined the lost profits allegedly sustained by a provider of programming to the hotel industry, related to a breach of the right of first refusal for a satellite transponder. Coordinated industry experts in various areas including hotel/motel management, advertising, consumer demands, economic trends, cable programming and venture capital availability to analyze the feasibility of the programmer's claim.

- Calculated the economic damages, including lost profits and incremental expenses, in the largest asbestos case in Colorado for a major suburban shopping mall.

- In a contract dispute, determined the value of the restaurant operations included as part of a major Colorado ski resort. Analyzed market trends and restaurant industry comparables for use in the valuation. Also used industry information to benchmark against actual results, to determine management effectiveness.

- Analyzed the value of a franchise fast food establishment related to a breach of contract. Engagement included analyzing various offering circulars for franchises to determine relevant value drivers for similar franchises. Analyzed demographic data related to California communities included in franchise agreement.

- Analyzed a lost profit claim related to a chain of fast food restaurants in a breach of contract matter. Analyzed store-by-store financial metrics to determine average store results compared to subject stores. Analyzed economic and demographic trends in areas adjacent to subject stores.

### Insurance Claims

- Analyzed the claim by a hospital related to the flooding of the facility. Engagement involved detailed analysis of the impacted departments and the financial impact of substituting less profitable services for higher margin services due to inability to provide full service medical operations. Also analyzed specific incremental staff costs incurred during the flood and cleanup period.

- Analyzed and assisted in preparing the claim of a large food manufacturer related to an explosion and fire in its primary manufacturing facility. Claim exceeded $100 million, which was settled expeditiously.

- Assisted risk management officer in analyzing a claim related to a fire at a resort community. Claim involved business interruption for a variety of resort functions as well as property losses.

- Assisted in preparing the claim for a large training facility related to computer outages from lightening strikes. Analyzed business interruption claim and collateral losses. Claim eventually was settled in litigation.

- Assisted in claim related to a power outage for several business related to extended power outages related to a major train derailment.

### Intellectual Property

- Analyzed the economic damages sustained by a construction product manufacturer due to an alleged patent infringement. Also analyzed the lost profits of the defendant company in a counterclaim for breach of contract. Analyzed market potential for the product, impact of



28




Karyl M. Van Tassel

noninfringing substitutes, marketing and distribution channels and other factors impacting sales volume and expenses.

- Analyzed the economic damages sustained in a patent infringement matter by an inventor in the sporting goods industry. Detailed analysis including addressing Georgia Pacific factors related to determining a reasonable royalty. Opinion included market royalty rates, royalty rates on other company products, incremental gross profit on patented property, and profit split method.

- On a consulting basis, analyzed the damages of a producer and global marketer of rubber-based products. Allegations included patent infringement trademark infringement, copyright violations, theft of trade secrets and fraud. Claim for damages exceeded $1 billion. Working for the defendant, analysis included impact of market and distribution channels on lost profits as well as reasonable royalty calculation.

- Analyzed the economic damages of one of the largest software companies in the world related to a patent infringement case. Analysis included determining product gross profitability for those alleged to have infringed the property. Also assisted in analyzing the appropriate royalty rate and allocating the revenue to the patented and nonpatented features of the product. Case settled for $100,000,000 less than claim.

- Analyzed the damages in a patent infringement matter related to modular cells for prison units. Engagement included a detailed analysis of a reasonable royalty, based in part upon the Georgia Pacific factors. Reasonable royalty was based upon market derived data, established rates by licensor and licensee, prior licensing history between the parties and analytical analysis of various profit measures.

- Analyzed value of patented technology for various biomedical devices held by a company for a potential acquisition. Analyzed the patented and nonpatented products to determine synergies and purchase drivers between the products since only a portion of the portfolio of products was to be purchased. Also considered impact of governmental approval process on value of patented properties that were still in clinical trials. Determined range of values based upon reasonable royalties obtained in the market place and from other analytical measures.

- Analyzed the value of patented technology in a laser devise used for noninvasive surgeries and dental work for a transfer to an off-shore entity for tax purposes. Engagement included analyzing the profit stream from the laser device as well as market derived rates.

- Analyzed the range of reasonable royalty for physicians developing a drug for cancer treatment. Patented property was related to improving efficacy of radiation treatments. Using analytical data and market derived rates, assisted in negotiating license with a biotechnology company.

- Analyzed the economic losses in a matter involving the alleged infringement of trademarks for a line of personal beauty products. Testified for the defendant in deposition regarding the economic damages sustained as well as presented counter claim testimony. Issues included analyzing relevant markets for personal care products, product survey information regarding product characteristics influencing buyers decisions, internet advertising, and product distribution channels for impact on damage analysis. Case resolved in settlement.

- Analyzed the lost profits sustained by the developer of a sporting good product resulting



29

 

Karyl M. Van Tassel

from an alleged trademark infringement. The economic damages were calculated both as the lost profits of the developer of the product based upon its own historical results as well as analyzing the profits of the alleged infringing entity. Also analyzed damages related to the cost of corrective advertising in conjunction with an advertising expert.

- Testified for the defendant in an injunction hearing regarding the nature of the advertising revenue as the primary source of income, the overlap in advertising between the "webzine" and magazine and the potential impact on economic damages. Case related to an alleged trademark infringement by a "webzine" of a magazine title.

- Analyzed damages of plaintiff related to disparagement of Ameritech Corporation's management of the alarm company post-acquisition. The case related to the alleged infringement of a trademark for a burglar alarm company purchased by the plaintiffs. Analyzed detail records of clients for overlap caused by clients subscribing to the defendant company due to disparaging information supplied to Ameritech clients in violation of a noncompete agreement as well as infringing use of trademarks.

- Performed royalty examinations for a multinational software company. Supervised multilingual and disciplinary teams to perform royal "audits" in several countries and domestically. Developed regular maintenance program for ongoing audits of contracts on a scheduled basis. Resulted in recovery in excess of $10,000,000, and assisted in favorable renegotiations with joint venture partners.

- Performed a royalty examination in a dispute between a software producer and distributor. Calculated the economic damages allegedly sustained by the software producer due to the alleged under reporting of software sales. Testified in arbitration regarding the results of our findings.

- Performed royalty examinations of five different licensees under contract "audit" rights for a developer of software. Worked with clients and licensees to resolve disputes, recovery of more than $1,500,000, and renegotiation of contracts.

**Post Acquisition Disputes**

- In a post-acquisition dispute, analyzed the results of certain long-term contracts obtained as part of a purchase of an international engineering firm. Analyzed the accounting treatment and financial results of the contracts, both pre- and post-acquisition, and the impact on the valuation of the business.

- Analyzed the lost profits due to alleged fraudulent misrepresentations in a purchase of a restaurant chain. Analysis included store-by-store data of prospective revenue and profitability, compared to those actually achieved. Analyzed market and economic trends in regions in which the restaurants operated to determine impact on profitability and sales from issues unrelated to the alleged misrepresentations.

- Served as an arbitrator in a dispute involving the closing balance sheet working capital provisions of a purchase agreement. In the medical insurance industry, analyzed the proposed adjustments to working capital including accounts receivable, reserves for losses and contingent liabilities.

- Prepared a claim of working capital adjustment related to the closing-balance sheet provisions of a purchase agreement in the computer storage industry. Analysis included

 F T I




Karyl M. Van Tassel

inventory accounting, accounts receivable and deferred revenue.

- Analyzed the propriety of accounts receivables included in the representations and warranties in the purchase of an environmental services company. Allegations involved intentional overstatement of accounts receivable later determined to be uncollectible by the purchaser.

**Telecommunications**

- Analyzed the economic damages of a company that terminates traffic for other telecommunications companies who provide a variety of services to end-users. In a contract dispute with one of its clients, analyzed the lost profits as well as the diminution in the value of the business. Analysis included determining network capabilities in regions covered by the agreement during peak and off-peak time periods to determine availability of volume due to switching constraints.

- Analyzed the economic damages asserted in a class action matter against a RBOC. Analysis included detailed records for thousands of customers asserting held order claims over a six-year time period. Downloaded data records related to customer orders, service delivery, billing and customer data. Analyzed relevant tranches of class participants and related damages.

- Analyzed payments made by a major telecommunications company to a switching vendor over a five-year period of time. Based upon contract terms, worked with the company's engineers to determine how the provisioned switching products impacted the billing requirements under the contract. Analysis related to whether charges made by switching vendors were in excess of contract terms. Analysis resulted in multi-million dollar settlement with vendor.

- Analyzed payments made by a major telecommunications company to a single source construction vendor. Issues related to the propriety of charges incurred compared to services delivered over a period of several years. Analysis was used for negotiating a new contract with the contractor.

- In a contract dispute assisted in analyzing the viability of a "C-Block" license holders' business plan and the reasonableness of the company valuation. Researched "C-Block" license auction values and results of operation of "C-Block" auction recipients.

- Oversaw an engagement in which 200 competitive local exchange carrier (CLEC) contracts were analyzed to extract compliance issues for billing and provisioning by a major telecommunications company. Results provided service representatives with information for communication with CLEC's.

**Miscellaneous**

- Prepared analyses of lost wage claims, lost profit claims and incremental costs incurred in various personal injury matters. Based upon the opinions of rehabilitation specialists and career counselors, prepared damage analysis based upon the estimated reduction in worklife expectancy, decreased earnings potential or incremental costs incurred related to the alleged injuries.



**31**



Karyl M. Van Tassel

- Analyzed value of businesses conveyed in pre-bankruptcy transactions related to claims of fraudulent conveyance.

- Assisted in economic analyses related to wrongful termination matters, including lost wage and benefit claims.

- Valued the stock of closely held businesses in a dissenting shareholder action, lender liability matter, condemnation proceeding and various marital dissolutions.

- Valued the stock of a closely held chain of restaurants for the purpose of spinning off certain restaurants to form a new company.

- Valued the stock of the largest oyster processing company in the world for a Northwest financial institution. The bank had acquired the company through foreclosure and required the valuation as part of its internal procedures required to sell the entity to an outside party.

- Valued a 50 percent ownership interest in an alarm monitoring company for a buyout of the partial owner's interest.

## Speaking Engagements

Addressed various state and local bar associations as well as other continuing legal education providers on the following matters:

- Valuation Intricacies

- Financial Statement Analysis and Presenting Financial Data at Trial

- Use of Economic Experts in Commercial Litigation and Case Management

- Valuation Issues in Fraudulent Conveyance Matters

- Valuation in a Cram Down Bankruptcy Proceeding

- Valuation of Businesses in Mergers and Acquisitions

- Valuation of Intellectual Property

- Valuation Issues for Biotechnology

## Publications

- Coauthor of "Calculation of Economic Damages in Commercial Litigation," Totaltape Publishing Company, Tampa, Florida, 1990.

- "Valuing Intellectual Property: The Science and the Art," The Colorado Lawyer, August, 1997.

## Education

University of Northern Colorado—B.S. in Business Administration, emphasis in Accounting



 Karyl M. Van Tassel

## Summary of Testimony

| Case | Case Number | Type of Testimony | Law Firm Client | Year |
|------|-------------|-------------------|-----------------|------|
| Edward Malo vs. Breckenridge Spa and William Benkelman | U.S. District Court of Colorado 92-M-2537 | Deposition | Bradley Campbell Carney & Madsen | 1994 |
| Asolo SpA, et al. vs. Giancarlo Tanzi | U.S. District Court of Colorado 93-Z-1778 | Deposition, Trial | Hale & Dorr | 1995 |
| LittleWing Co., Ltd. vs. Mesch & Associates d/b/a StarPlay Productions | AAA Arbitration | Arbitration | Holme Roberts & Owen LLC | 1995 |
| TLB, INC., an Ohio corporation, vs. Platinum Software, a California company | U.S. District Court of Colorado 95-WY-621 | Deposition, Trial | Coghill & Goodspeed, P.C. | 1996 |
| Primedia Intertec Corporation vs. Technology Marketing Corporation | U.S. District Court of Kansas 98-2384-KHV | Trial | Locke Reynolds Boyd & Weisell Sonnenschein Nath & Rosenthal | 1998 |
| Mountain Ocean, Ltd. d/b/a Everybody Ltd. vs. For Every Body, Inc. | U.S. District Court Of Colorado | Deposition | Jones, Waldo, Holbrook & McDonough, P.C. | 1999 |
| Prism Management Enterprises, Inc. vs. Crane Leake Casey Ehlers & Eggleston, P.C. | District Court, La Plata County 97-CV-412 | Deposition, Arbitration | Jacobs Chase Frick Kleinkopf & Kelley, LLC | 1999 |

 F T I

10



Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| Ameritech Corporation v. Jackson Burglar Alarm | U.S. District Court of Colorado 98-N-2432 | Deposition | Holme Roberts & Owen | 1999 |
| The Quizno's Corporation v. Robert W. Mitelhaus | AAA Arbitration | Arbitration | Preeo, Silverman & Green | 1999 |
| Gulf Communications, LLC v. Business Telecom, Inc., d/b/a BTI Telecommunications Services | 398CV2444-6 U.S. District Court for Northern District of Texas, Dallas Division | Deposition | Kyle & Mathis | 1999 |
| Southwest Recreation Industries, Inc. v. Fieldturf, Inc. and Fieldturf International, Inc. | A-00CA063-SS U.S. District Court for the Western District of Texas, Austin Division | Deposition | Brown, Todd & Heyburn PLLC | 2000 |
| Anthony G. Petrello and Cynthia Petrello v. Renaissance Builders, Inc. and Chandler Robinson | 199-51358 The District Court of Harris County, Texas 270th Judicial District | Deposition | Fulbright & Jaworski LLP | 2001 |
| Omagro De Columbia, L.D.C. vs. MCN Energy Enterprises, Inc., formerly named MCN Investment Corporation | 67-180286-99 The District Court of Tarrant County, Texas 67th Judicial District | Deposition and Trial | Shannon, Gracey, Ratliff & Miller | 2001 |
| Blitz Holdings Corp. v. Interamericas Financial Holdings Corp. | Civil Action No. H-00-2247 United States District Court for the Southern District of Texas Houston Division | Contempt Hearing | Wilshire Scott & Dyer | 2001 |
| Hartford Life Insurance Company And Hartford Life & Annuity Insurance Company v. Connecticut General Life Insurance Company | Arbitration | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2002 |
| National Health Insurance Company vs. National Plan Administrators, Inc. Hartford Life Insurance | GN – 101679, In the District Court, Travis County, Texas 53rd Judicial District | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2003 |

F T I

www.fticonsulting.com



Karyl M. Van Tassel

*Company, and CRS
Marketing Agency, Inc.*

| | | | | |
|---|---|---|---|---|
| *SOURCECORP, Incorporated, SOURCECORP DMS, Inc. and Information Management Services, Inc. v. Steve Shill, Rita Shill, Robin Meyer, and Mark Meyer* | No. 76Y1160016303ARN, American Arbitration Association | Testimony, Arbitration | Steptoe & Johnson, LLP | 2004 |
| *David Graben and Frank Strickler v. Western Reserve Life Assurance Company of Ohio; Intersecurities, Inc., and Timothy Hutton* | 03-08-648 The District Court of Wise County, Texas 271st Judicial District | Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2005 |
| *Rodney Montello, et al v. Alcoa Inc., Reynolds Metals Company, Bon L. Campo and Tredegar Corporation* | The U.S. District Court of Southern District of Texas Victoria Division Civil Action No: V-02-84 | Deposition | Baker Botts LLP | 2006 |
| *Bencor, Inc. v. The Variable Annuity Life Insurance Company* | AAA Arbitration | Arbitration | Akin, Gump, Strauss, Hauer & Feld LLP | 2006 |
| *Highland Crusader Offshore Partners, L.P. et al v. Motient Corporation* | Cause No. 05-07996 In the District Court, Dallas County, Texas E-101st Judicial District | Deposition | Fulbright & Jaworksi LLP  Lackey Hershman L.L.P. | 2007 |
| *Gascoigne Melotte Holdings LLC (U.S.A.), Boumatic LLC (U.S.A.), Boumatic-Melotte SPRL (Belgium) v. Punch* | In the International Chamber of Commerce Court of Arbitration | Arbitration | Baker Botts LLP | 2008 |

F T I




Karyl M. Van Tassel

*Technix N.V. (The Netherlands), et al*

**KVT-2**

Stanford Financial Group Receivership

| Employee Name | Department | Location | Job Title | Business Card Title | Supervisor Name |
|---|---|---|---|---|---|
| Maldonado, Patricia C. | SFGC Treasury | US TX Houston | Manager | Manager | Davis, James M |
| Holt, Laura L. | SFGC Research and Trading | US TN Memphis | Chief Investment Officer | Chief Investment Officer | Davis, James M |
| Lopez, Gilbert | SFGC Accounting | US TX Houston | Chief Accounting Officer | Chief Accounting Officer | Davis, James M |
| Amadio, Henry | SFGC Accounting | US TX Houston | Accounting Mgr | Accounting Manager | Lopez, Gilbert |
| Jackson, Kerry | SGC Corporate Finance | US TX Houston | Sr VP | Senior Vice President / Controller | Weiser, Charles M. |
| Groves, Denise | SFGC Treasury | US TX Houston | Treasury Analyst | Treasury Analyst | Maldonado, Patricia C. |
| Palilan, Tarrie J. | SFGC Treasury | US TX Houston | Sr Treasury Analyst | Senior Treasury Analyst | Maldonado, Patricia C. |
| Weiser, Charles M. | SGC Corporate Finance | US TX Houston | Executive VP | Chief Financial Officer | Bogar, Daniel T. |
| Pi, Osvaldo | SGC Merchant BK | US FL Miami | Managing Director | Managing Director | Bogar, Daniel T. |
| Varkey, Johnson (John) | SFGC IT | US TX Houston | Chief Information Officer | Chief Information Officer | Bogar, Daniel T. |
| Collinsworth, Mark P | SFGC Research and Trading | US TN Memphis | Managing Director | Managing Director-Global Asset Allocation | Holt, Laura L. |
| Palmiden, Frederic A. | SFGC Research and Trading | US TN Memphis | Research Analyst | Senior Investment Officer - Western Europe | Holt, Laura L. |
| Leal, Oscar | SFGC Accounting | US TX Houston | Supervisor Corporate Accounting | Supervisor Corporate Accounting | Amadio, Henry |
| Ward, Pamela J. | SFGC Human Resources - North America | US TX Houston | Director | Director of Human Resources - North American Region | Bogar, Daniel T. |
| Severtson, Anne M. | SFGC Accounting | US TX Houston | Business Systems Mgr | Business Systems Manager | Lopez, Gilbert |
| Davis, Rhonda L. | SGC Compliance | US TX Houston | Chief Compliance Officer | Chief Compliance Officer, SGM | Young, Bernard E. |
| Weeden, Kenneth | SFGC Research and Trading | US MS Tupelo | Managing Director/Research and Inv | Managing Director- Global Regional Research and Investments | Holt, Laura L. |

37

**KVT-3**





Shareholder Funding by Regions (Incl. Airlines)

Shareholder Funding by Month 2007-2008

Shareholder Funding, Assumption of Debt and Notes Payable Acct.
As of 12/31/08 (Preliminary)

38

# KVT-4

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 1 | RODRIGO RIVERA ALCAYAGA | NJL022799, NJL009309 | $ 721,004 |
| 2 | TOCHAS TRUST | NJL022799, NJL009309 | 100,152 |
| 3 | TOCHAS TRUST AND RODRIGO ALCAYAGA | NJL022799, NJL009309 | 515,629 |
| 4 | JONATHAN LARKIN STOCK TRUST AND JONATHAN LARKIN | 5LW401871 | 262,926 |
| 5 | ATP TOUR, INC. | NMY118075 | 3,438,706 |
| 6 | JOSEPH R. BECKER AND LOLINE BECKER | NJG005253, NJG003340, NMW013542 | 372,225 |
| 7 | JOEL HENRY ORY | NMW025280 | 104,549 |
| 8 | PATRICIA A. THOMAS | NJL028432, NJL028374 | 3,761,189 |
| 9 | STEVEN RIGER AND LINDA RIGER | NMZ001312 | 317,729 |
| 10 | RAY A. BALLANTYNE | NMY120550 | 183,435 |
| 11 | RAY A. BALLANTYNE AND KAREN BALLANTYNE | NMY120550 | 915,748 |
| 12 | GERARD A. DOWD | NJB010175 | 134,800 |
| 13 | HANNAH K. PECK | 0C9605175 | 122,395 |
| 14 | PECK FAMILY TRUST | 0C9605175 | 8,941 |
| 15 | STEPHEN M. BINGHAM | NJL003195 | 107,271 |
| 16 | DAVID A. RUBIN | NMY116863 | 8,455 |
| 17 | DAVID A. RUBIN AND DAWN L. RUBIN | NMY116863 | 370,333 |
| 18 | DEBRA S. GIBBS | NMY136036 | 234,000 |
| 19 | CAMILLE C. WOOD | NMW004764 | 181,305 |
| 20 | ARTHUR J. ORDOYNE | NJG005865 | 301,706 |
| 21 | AARON FOLSE | NJG002342, STSGC40612 | 603,925 |
| 22 | TERRY FOLSE | NJG002342, STSGC40612 | 53,992 |
| 23 | CHRIS SWINDELL | NJG006343, NMW014755 | 192,352 |
| 24 | JEFFREY J. CAMPBELL | NM4011943 | 189,828 |
| 25 | MICHAEL E. STAID | STSGC40951, NMW012767 | 561,656 |
| 26 | WILLIAM C. DAWSON | NMW012080, NMW002800 | 421,497 |
| 27 | LUISA DE LICHI AND JAIME LICHI COHEN AND REBECA LICHI COHEN AND JACOBO LICHI COHEN AND SARA LICHI COHEN | NMY008714 | 10,537 |
| 28 | MATEO LICHI S. AND LUISA DE LICHI AND JAIME LICHI COHEN AND REBECA LICHI COHEN AND JACOBO LICHI COHEN AND SARA LICHI COHEN | NMY008714 | 143,003 |
| 29 | MATEO LICHI S. AND LUISA DE LICHI AND JAIME LICHI COHEN AND REBECA LICHI COHEN AND JACOBO LICHI COHEN AND SARA LICHI COHEN AND EDITH BOGUSKY BEAUJON | NMY008714 | 92,826 |
| 30 | MARTHA J. WITMER | NJG007259 | 284,149 |
| 31 | MYRNA PLATKIN | NJJ002042 | 132,541 |
| 32 | JOHN S. WATTS JR | NJB014201 | 1,054,866 |
| 33 | ALISON LEFFLER | NNC010084 | 106,734 |
| 34 | FRED R. DEMAREST | NJG006277 | 115,625 |
| 35 | JUDITH H. MCCUTCHEON TRUST AND JUDITH H. MCCUTCHEON | NJH310421 | 104,184 |
| 36 | CARROLL D. LEU | NJE260504 | 117,351 |
| 37 | ROBERT J. BRUNO | NMW015158 | 582,264 |
| 38 | ROBERT J. WINTERS AND DARLENE P. WINTERS | NJM027888 | 257,680 |
| 39 | TIMOTHY A. JOHNSON | NMY018887, NMY018861 | 852,446 |
| 40 | PAULA MARLIN | NNC011041 | 663,504 |
| 41 | PHILIP M. ZIMMERMAN AND JENNIFER B. ZIMMERMAN | NMW018517 | 260,031 |

Notes:
1. Accounts with a prefix of "S" are Stanford Trust Company Accounts.
2. The entries on this schedule correspond to the names on the SIBL accounts that received CD proceeds. A given name may appear more than once on this schedule because that name is on more than one SIBL account.

**39**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 42 | KATHLEEN C. DUGGAN AND GEORGE T. DUGGAN | NM4013899 | 293,905 |
| 43 | ROGER LEE HECKMAN | NJL029042 | 14,394 |
| 44 | ROGER LEE HECKMAN AND BRENDA G. HECKMAN | NJL029042 | 222,127 |
| 45 | WYLLY M. GUTERMAN | NJK511669 | 249,873 |
| 46 | JAMES R. CALVIN | NJG008307 | 180,000 |
| 47 | GAINES D. ADAMS | NJJ060586, NJJ002331 | 455,273 |
| 48 | DONNA W. ALLBRITTON | NJJ060404 | 184,221 |
| 49 | JOHN F. THOMPSON | NMY125369 | 969,955 |
| 50 | PETER A. THEVENOT | NJG001203 | 179,338 |
| 51 | DON PARKINSON AND MARILYN PARKINSON | NJD001065, NJB063273, NJA012347, NJA001365 | 19,045 |
| 52 | MARILYN PARKINSON | NJD001065, NJB063273, NJA012347, NJA001365 | 121,254 |
| 53 | INVHERNAR, INC. AND RODRIGO HERNANDEZ | NWR005112 | 420,684 |
| 54 | DORRIS AND LULA BURCHETT TRUST AND DORRIS BURCHETT AND LULA BURCHETT | NJM010991 | 314,618 |
| 55 | BARBARA MILLER OSTROW | NJM028126, NJJ005748 | 102,439 |
| 56 | HENRY A. MENTZ III | NMY100297 | 706,709 |
| 57 | JAMES H. STEGALL | NJG006574 | 163,374 |
| 58 | JAMES H. STEGALL AND CAROL H. STEGALL | NJG006574 | 41,862 |
| 59 | EUGENE D. GAUTHREAUX | NJJ010854 | 104,314 |
| 60 | SUE CHRIS GAUTHREAUX | NJJ010854 | 174,200 |
| 61 | PHYLLIS ETCHEISON TRUST AND PHYLLIS ETCHEISON | NJV002790 | 110,000 |
| 62 | KAVBEL CORP LIMITED | NMY106229 | 124,990 |
| 63 | RA AND FARALL D. CANNING TRUST A AND RA CANNING AND FARALL D. CANNING | NMX011776, NMX011750 | 813,206 |
| 64 | RA AND FARALL D. CANNING TRUST C AND RA CANNING AND FARALL D. CANNING | NMX011776, NMX011750 | 548,942 |
| 65 | MICHAEL A TEAGUE | NMW013716 | 116,732 |
| 66 | JONATHAN IVESTER | NJH001053 | 174,308 |
| 67 | BONNIE CAPSUTO AND ALLEN CAPSUTO | NJB013856 | 1,276,115 |
| 68 | AYG INVESTMENT, LTD. | NMY100313 | 224,328 |
| 69 | CARL M. WEBB III | NMY102947 | 125,392 |
| 70 | DICK COPELAND REV TRUST AND DICK COPELAND | 5LW400121 | 65,048 |
| 71 | DICK COPELAND TRUST AND DICK COPELAND | 5LW400121 | 70,082 |
| 72 | EFRAIN DOS SANTOS MARQUEZ | NWR004347 | 320,937 |
| 73 | PHILIP M. PELTZ | NMW008740, NMW001703 | 123,085 |
| 74 | YOLANDA A. VALDES | NMY011692 | 7,637 |
| 75 | YOLANDA A. VALDES REVOCABLE TRUST AND YOLANDA A. VALDES | NMY011692 | 318,127 |
| 76 | DAVID TOPP AND DORA TOPP | NMY013722, NMY011676 | 598,648 |
| 77 | SHANNON S. BUNDICK | STSGC41087, NMW030181 | 405,289 |
| 78 | BENNIE M. O'REAR | NMW003626 | 132,148 |
| 79 | BENNIE M. O'REAR AND CLAUDIA P. O'REAR | NMW003626 | 54,794 |
| 80 | CHARLES B. THOMSEN AND LOIS ANN THOMSEN | NJL010638 | 646,590 |
| 81 | D. LEE SEAGER | NJL007592 | 105,803 |
| 82 | LINDA R. SEAGER | NJL007592 | 34,608 |
| 83 | JESUS GALARZA MARTIN AND MARIA ESPERANZA MARTELO DE GALARZA | NMY002311 | 252,375 |
| 84 | RENEE LEVINE | NJG002193 | 104,083 |
| 85 | DAVID M. BLAKE AND DIANE M. BLAKE | NMZ015718 | 123,233 |
| 86 | THOMAS W. SCHERER AND VIRGINIA A. SCHERER CRUT, THOMAS W. SCHERER AND VIRGINIA A. SCHERER | NJJ010847, NJJ010821 | 58,968 |
| 87 | VIRGINIA A. SCHERER | NJJ010847, NJJ010821 | 72,910 |
| 88 | DENNIS L. KIRBY | STSGC40214, NMW022782 | 580,959 |
| 89 | HOWARD BISSELL III | NJK510299 | 287,463 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 90 | EARL L. CROSBY | NMW003592 | 175,276 |
| 91 | CATHERINE M. BRENNAN | NNC060394 | 282,381 |
| 92 | WILLIAM RONALD VAN DELL AND LORI G. VAN DELL | NMX010992 | 241,477 |
| 93 | MARK D. BUCKMAN | NJM022053 | 566,514 |
| 94 | EUGENE L. CROXTON JR. | NMW003550 | 161,805 |
| 95 | LEJEUNE T. MILLS AND GILBERT C. MILLS | NMW012304 | 381,354 [3] |
| 96 | KENNETH R. BIRD AND TERESA MICHELLE LAMKE | NMW003618 | 213,748 |
| 97 | DR. RICHARD RATHBONE PR | NMW002537 | 300,000 |
| 98 | GRACE CHEN LEBLANC | NMY135897 | 144,542 |
| 99 | GORDON C. GILL | NMY126359 | 278,986 |
| 100 | VAHLE, INC. | NMY116723 | 124,016 |
| 101 | BRIAN U. LONCAR AND SUE A. LONCAR | 88761041 | 222,518 [4] |
| 102 | MABEL PINO | NJG002375 | 495,386 |
| 103 | SUNNER TRADING LIMITED | NJL027210 | 550,847 |
| 104 | ALBERTO LOPEZ ESPINOSA AND ANA LUISA DE LA ROSA DE LOPEZ | NMY107227 | 231,831 |
| 105 | SHARON J. WITMER AND WALTER BRUCE STONE | NJG005196 | 383,875 |
| 106 | WALTER BRUCE STONE | NJG005196 | 3,500 |
| 107 | RISIA TOPP WINE | NMY013839 | 223,911 |
| 108 | BURNELL WILLIAMS | NJG006210, STSGC40224 | 200,739 |
| 109 | ERIKA TERESA HERRO | NJL028549 | 339,364 |
| 110 | TIMOTHY R. AND SANDRA E. MOORE FAMILY L. P AND TIMOTHY R. MOORE AND SANDRA E. MOORE | NMY019984 | 131,097 |
| 111 | MELVIN WIDES REVOCABLE TRUST AND MELVIN WIDES | 0C9403746 | 261,290 |
| 112 | EISEMANN DEFINED BENEFIT PLAN | NJL026501 | 35,764 |
| 113 | EISEMANN LIMITED | NJL026501 | 107,717 |
| 114 | MICHAEL L. EISEMANN AND LINDA G. EISEMANN | NJL026501 | 136,680 |
| 115 | BETTE JO HEASLIP | NMW015091 | 703,433 |
| 116 | TERRY N. TULLIS | STSGC40336, NMW023418 | 449,245 |
| 117 | HUTCH INVESTMENTS LLC | 5LW001481 | 308,452 |
| 118 | CINDY DOLESHEK | NM4013717 | 161,759 |
| 119 | GARY W. MCKILLIPS AND ANNE H. MCKILLIPS | NJB011249 | 537,739 |
| 120 | FRANK MASSAD AND JO ANN MASSAD | NMY021691 | 107,793 |
| 121 | LYDA D. TYMIAK | NMZ019033, NJV003731 | 394,124 |
| 122 | LYDA D. TYMIAK FAMILY TRUST AND LYDA D. TYMIAK | NMZ019033, NJV003731 | 176,422 |
| 123 | SAMUEL R. MOORE AND MARTHA W. MOORE | NNC010092 | 218,045 |
| 124 | RONALD R. MARSTON | NJG001484 | 474,012 |
| 125 | RONALD R. MARSTON AND SUSAN D. MARSTON | NJG001484 | 257,907 |
| 126 | JOHN BUSCEME AND VIRGINIA B. BUSCEME | NJG001179 | 5 |
| 127 | JOHN C. BUSCEME | NJG001179 | 448,235 |
| 128 | MARK STEPHENS AND JO LYNN STEPHENS | NMW008021 | 198,743 |
| 129 | DIVO MILAN HADDAD | NWR002184 | 560,133 |
| 130 | INFINITUM TRUST AND DIVO MILAN HADDAD | NWR002184 | 1,961,857 |
| 131 | MARIA DE LOURDES MARTINEZ DE SIDNEY AND MARIE ROCHELLE SIDNEY MARTINEZ | NWR002184 | 19,161 |
| 132 | MARIE ROCHELLE SIDNEY MARTINEZ | NWR002184 | 9,372 |
| 133 | MARIE ROCHELLE SIDNEY MARTINEZ AND DIVO MILAN HADDAD | NWR002184 | 8,984 |

Notes:

3. Lejeune T. Mills and Gilbert C. Mills have executed a stipulation. They have transferred to the Receiver's escrow account only $101,353.96 of the SIBL proceeds amount; their Pershing account also remains held.

4. Figures based on SGC accounts residing at JPMorgan.

**41**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 134 | ALFREDO PARRA DAVILA | NMY006759 | 515,000 |
| 135 | STEVEN SILVERMAN TRUST AND STEVEN SILVERMAN | 5LW003446 | 209,033 |
| 136 | BARRY L. RUPERT AND CAROL S. RUPERT | NJH001244 | 186,410 |
| 137 | LOUISE A. HARDIN LIVING TRUST AND LOUISE A HARDIN | NJJ110498 | 115,667 |
| 138 | ANGELO A. PATERNOSTRO AND MARY ANN PATERNOSTRO | NJG004355 | 607,835 |
| 139 | THERESA M. JAMAIL | NMY021659 | 376,554 |
| 140 | SCOTT L. CLARK REV TRUST AND SCOTT L. CLARK | NJK510802 | 1,155,041 |
| 141 | ROBERT APPELMAN | NM2003470, NM2002712 | 442,908 |
| 142 | ABM REVOCABLE TRUST AND ALVARO BUENDIA | NM2011846 | 321,845 |
| 143 | ALVARO BUENDIA | NM2011846 | 22,313 |
| 144 | CLAUDIA GALLAGHER AND CLAUDE MAYALL AND ANNE MAYALL | NMY103515 | 121,837 |
| 145 | RAMON MALCA | NMY060913 | 153,659 |
| 146 | BRUCE E. MCLEOD | NJG004009, NMW001398 | 773,174 |
| 147 | AMARA TRUST | NMZ023324 | 399,949 |
| 148 | DOCTORS DIAGNOSTICS IMAGING | NJV003129 | 177,421 |
| 149 | ERIC A. ORZECK | NMY011999, NJL009465, NJL005695 | 465,412 |
| 150 | DEWAYNE WASHINGTON REV TRUST AND DEWAYNE WASHINGTON | 5LW401798 | 260,868 |
| 151 | NANCIANN EAMES | NMY136721, NMY136317, NMY136283, NMY136002, NMY120881 | 145,080 |
| 152 | RICHARD D. EAMES | NMY136721, NMY136317, NMY136283, NMY136002, NMY120881 | 193,230 |
| 153 | RICHARD DENNIS EAMES AND NACIANN EAMES | NMY136721, NMY136317, NMY136283, NMY136002, NMY120881 | 198,935 |
| 154 | JANE M. PRIDGEN AND ROBERT GRAY MATLOCK | NJM029942 | 185,772 |
| 155 | JASON SCOTT GRAHAM | NJG003886 | 921,005 |
| 156 | ROBERT E. GRAHAM | NJG003936 | 1,005,511 |
| 157 | GROVEMILL HOLDINGS LIMITED | NJL027491 | 384,954 |
| 158 | EDWARD F. BLIZZARD AND CYNTHIA H. BLIZZARD | NMY010272 | 516,631 |
| 159 | FRANCIS NEZIANYA | NMW015497 | 301,636 |
| 160 | WILLIAM S. FLORES JR. AND MARY G. FLORES | NJE260256 | 100,000 |
| 161 | ELECTRI INTERNATIONAL | NJV002881 | 100,329 |
| 162 | RICHARD AND DARLENE MCBRIDE | NJV002881 | 4,604 |
| 163 | HMS AND B, LTD | NJL021551 | 175,000 |
| 164 | DARIO FALLAS AND PAOLA FALLAS | NMZ006394 | 107,546 |
| 165 | HECTOR JOSE PEREZ MORA AND RAFAEL JESUS PEREZ PERDOMO | NMZ006394 | 78,000 |
| 166 | HECTOR PEREZ MORA | NMZ006394 | 298,772 |
| 167 | RONALD B. YOKUBAITIS AND CAROLYN M. YOKUBAITIS | NJH310512 | 100,000 |
| 168 | EMMA LEE LEFEBVRE | NMW019440 | 205,982 |
| 169 | LARRY N. SMITH | STSGC40765 | 485,679 |
| 170 | MURPHY BUELL | STSGC41108 | 417,216 |
| 171 | ROSA MARIBEL OYERVIDES | NWR002663 | 5,036,240 |
| 172 | CHARLES L. WHITE | STSGC40438, NMW024820 | 558,814 |
| 173 | MELVIN MICHEL MARGULES BENHAMOU | NWR005906 | 792,024 |
| 174 | MELVIN MICHEL MARGULES BENHAMOU AND ESTELLE ESTHER BENHAMOU | NWR005906 | 131,047 |
| 175 | EDWARD C. DWECK | NM2003553 | 1,138,693 |
| 176 | ALLEN SCHWARTZ | STSGC40370, NMZ017011, NMZ010511 | 134,775 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 177 | THE ANTHONY JOSEPH ANTINORI TRUST AND ANTHONY JOSEPH ANTINORI; AND STEVEN JAMES ANTINORI IN HIS CAPACITY AS TRUSTEE OF THE ANTHONY JOSEPH ANTINORI TRUST | NMY114819, NJL027673, NJL027665 | 1,107,109 |
| 178 | THE STEVEN JAMES ANTINORI TRUST AND STEVEN JAMES ANTINORI | NMY114819, NJL027673, NJL027665 | 3,973,548 |
| 179 | MARIA GUADALUPE MENDOZA AND GUILLERMO HOLMQUIST | NMY001305 | 8,504 |
| 180 | MARIA GUADALUPE MENDOZA ROMERO | NMY001305 | 842,001 |
| 181 | MARIA SOCORRO CELIA ROMERO DE MENDOZA AND MARIA GUADALUPE MENDOZA | NMY001305 | 64,500 |
| 182 | ADRIANA RAMOS | NMY108266 | 96,666 |
| 183 | AYALA TRUST | NMY108266 | 288,000 |
| 184 | EDUARDO SERRANO BERRY | NMY108266 | 430,000 |
| 185 | HECTOR TROCATT AND ADRIANA RAMOS | NMY108266 | 9,802 |
| 186 | JOSE ANTONIO VIGORENA | NMY108266 | 177,500 |
| 187 | JOSE ANTONIO VIGORENA AND ADRIANA RAMOS | NMY108266 | 530,000 |
| 188 | JAMIE COHEN BENREY AND SUSANA PEREZ DE COHEN | NWR003364 | 2,398,317 |
| 189 | GENE CAUSEY | NJG006350, STSGC40170, NMW042665, NMW030769, NMW009649 | 613,289 |
| 190 | KENNETH W. DOUGHERTY | STSGC40400, NMW024275 | 641,527 |
| 191 | TERESA MEMUN DE ALFIE | NWR008272 | 276,091 |
| 192 | FRANKLIN HOWARD STANSEL | NJL028952 | 202,442 |
| 193 | VINETA P. STANSEL AND HOWARD STANSEL | NJL028952 | 256,161 |
| 194 | WESTERN INTERNATIONAL ADVISOR CORP, LTD. S.A. | NWR007696 | 46,010 |
| 195 | WESTERN INTERNATIONAL ADVISOR CORP, LTD. | NWR007696 | 332,906 [5] |
| 196 | WESTERN INTERNATIONAL FINANCIAL CORP, LTD. S.A. | NWR007696 | 58,010 [6] |
| 197 | WESTERN INTERNATIONAL FINANCIAL CORP, LTD. | NWR007696 | 196,896 [7] |
| 198 | ABRAHAM DIAMANT | NWR001475 | 584,785 |
| 199 | LUIS MIGUEL HERNAIZ VIGIL | NMY123166, NMY123125, NJL001199 | 704,735 |
| 200 | ROSA M. HERNAIZ | NMY123166, NMY123125, NJL001199 | 912,618 |
| 201 | HERMAN A. STONE | NJK512733 | 715,241 |
| 202 | PACESETTER ADJUSTMENT COMPANY | NMW011892, NMW011074, NMW001083, NJG007838 | 2,443,956 |
| 203 | KRIMICH LTD. | NWR007431 | 2,634,000 |
| 204 | MARIA TERESA SAN SEBASTIAN DE VALLE AND JOSE MARIA VALLE ESCAMEZ | NWR007431 | 200,000 |
| 205 | JULIO C. RUIZ AND NELLYFER FERRER | NWQ002102 | 4,808,251 |
| 206 | MELVIN S. TAUB AND CAROL TAUB | NJF001535 | 1,065,959 |
| 207 | KEVIN A. MCKENZIE AND DENISE T. MCKENZIE | NNC010100 | 806,974 |
| 208 | DON G. LANDERS | NJG005584, NMW040636, NMW028243, NMW002347 | 803,134 |
| 209 | MALCOLM SPILLERS | STSGC41141, NMW031056 | 589,591 |
| 210 | CYNTHIA R. MORIARTY | NMY118240, NJL021262, NJL007345 | 451,101 |
| 211 | MARY JANE BAXTER AND WILLIAM A. BAXTER | 5LW400592 | 468,862 |
| 212 | CELINA TRUST | NYQ001654 | 1,090,910 |

Notes:

5. This amount includes $42,010 transferred from SIB accounts in the name of Western International Advisor Corp. Ltd. to Pershing accounts in the name of Lukas Corp. This amount is also reflected in the proceeds amount for Lukas Corp.

6. This amount includes $15,000 transferred from SIB accounts in the name of Western International Financial Corp. Ltd. S.A. to Pershing accounts in the name of Gatita Blanca. This amount is also reflected in the proceeds amount for Gatita Blanca.

7. This amount includes $32,010 transferred from SIB accounts in the name of Western International Financial Corp. Ltd. to Pershing accounts in the names of Gatita Blanca and Lukas Corp. This amount is also reflected in the proceeds amounts for Gatita Blanca and Lukas Corp.

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 213 | ANTHONY G. PARKER | STSGC40210-1, STSGC40210 | 1,003,163 |
| 214 | SALT POND ASSOCIATES | NMZ018753 | 38,077 |
| 215 | SETTLER'S HILL L.P. AND MARY HOLMES | NMZ018753 | 1,585,423 |
| 216 | THE AMH TRUST AND MARY L. HOLMES | NMZ018753 | 570,233 |
| 217 | THE JLH TRUST | NMZ018753 | 23,469 |
| 218 | THE JLH TRUST AND THE JNH TRUST | NMZ018753 | 569,231 |
| 219 | THE JNH TRUST | NMZ018753 | 569,877 |
| 220 | THE KEH TRUST | NMZ018753 | 570,526 |
| 221 | THE MAH TRUST | NMZ018753 | 570,573 |
| 222 | THE TCH TRUST | NMZ018753 | 885,244 |
| 223 | THOMAS R. HOLMES AND MARY L. HOLMES | NMZ018753 | 518,910 |
| 224 | WATKINS FAMILY LTD. PARTNERSHIP | NJJ004709, NJJ010227, NJM011890 | 2,158,527 |
| 225 | SINGAPORE PUNTAMITA PTE., LTD. | NWR006581 | 7,907,121 |
| 226 | JAMES E. BROWN SR. | STSGC40551, NMW025470 | 590,387 |
| 227 | CARLOS LANDEROS GALLEGOS AND MARIA DE JESUS LANDEROS GALLEGOS | NWR008439 | 268,000 |
| 228 | DENNIS CHILDRESS | STSGC40392, NMW023574 | 646,426 |
| 229 | THOMAS W. SLAUGHTER | STSGC40109 | 634,482 |
| 230 | CHARLES E. SMITH | STSGC40584, NMW025645 | 486,996 |
| 231 | BREWER & PRITCHARD, PC | NMY015594, NMY015578, NMW008953, NJL028671, NJL028531, NJL021775 | 774,586 |
| 232 | THOMAS PRITCHARD | NMY015594, NMY015578, NMW008953, NJL028671, NJL028531, NJL021775 | 84,410 |
| 233 | HARDEE M. BRIAN AND BETTY JO BRIAN | NMW039612 | 600,504 |
| 234 | YOUNG FAMILY CEMETARY TRUST | NMW039612 | 15,000 |
| 235 | ANDREW BYRON WINKLE | NJL023631 | 167,001 |
| 236 | ANDREW BYRON WINKLE AND ROCIO DEL CARMEN WINKLE | NJL023631 | 228,147 |
| 237 | ANNA SANDRA SANTORO TEPEDINO AND VALENTINA MASTROPASQUAS AND ROSA TEPEDINO DE SANTORO | NJL023631 | 38,000 |
| 238 | ALBERTO JAVIER BOTELLO REED | NWR008231, NWR002531 | 1,758,109 |
| 239 | SILVIA GUADALUPE TAMEZ DE BOTELLO | NWR008231, NWR002531 | 3,295,520 |
| 240 | JOSE ANTONIO MONROY CARRILLO | NMY108969 | 1,054,440 |
| 241 | ADRIANA ZARAGOZA DELGADO | NJL026667, NJL026642 | 3,190,440 |
| 242 | NICHOLAS J. LANZA JR. | NMY060087, NMY011221, NJL010141, NJL010067 | 193,955 |
| 243 | NICHOLAS J. LANZA JR. AND BRENDA C. LANZA | NMY060087, NMY011221, NJL010141, NJL010067 | 789,137 |
| 244 | ARCHIE SMITH | STSGC41086, NMW030041 | 510,999 |
| 245 | RICHARD S. FEUCHT | STSGC40209, NMW022790 | 486,119 |
| 246 | RICHARD S. FEUCHT AND JOAN A. FEUCHT | STSGC40209, NMW022790 | 63,745 |
| 247 | ELSIE M. PEREZ | NMZ023183 | 375,171 |
| 248 | ANGEL SALVADOR SCOTTI MATA AND TERESA BAVIELLC DE SCOTTI | NWR005583, NWR005575 | 1,017,775 |
| 249 | MARIANO JOSE SCOTTI MATA | NWR005583, NWR005575 | 1,004 |
| 250 | MARIANO JOSE SCOTTI MATA AND MARIANO JOSE SCOTTI | NWR005583, NWR005575 | 1,053,047 |
| 251 | ROBERT B. CRAWFORD JR. AND JODIE F. CRAWFORD | NMW015729 | 322,198 |
| 252 | DONNA M. VINES | STSGC41328, NMW011389 | 346,143 |
| 253 | DOROTHY M. SELIB TRUST AND DOROTHY M. SELIB | STCI10015, STBR10056, STBR10055 | 126,627 |
| 254 | MARTHA J. CRUMPLER JOHNSON | STSGC20071 | 329,726 |
| 255 | BENTON B. JOHNSON TEST TR II AND BENTON B. JOHNSON | STSGC20072 | 493,871 |
| 256 | JOHN F. LYNCH | STSGC41080, NMW041766 | 3,865,596 |
| 257 | ANTONIO G. PENDAS | STSGC40286 | 253,139 |
| 258 | MATTHEW DELLA POLLA AND NURIA PENDAS | STSGC40286 | 35,000 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 259 | KENNETH G. WILKEWITZ | STSGC40167 | 112,314 |
| 260 | DANIEL JOSEPH DAIGLE AND JILDA ANN DAIGLE | STSGC40767 | 206,065 |
| 261 | JILDA A. DAIGLE | STSGC40767 | 76,599 |
| 262 | JOSEPH W. STRENGTH | STSGC41060 | 525,341 |
| 263 | PHILLIP E. LANKFORD JR. | STSGC40193 | 628,592 |
| 264 | JOHN E. WILSON | STSGC41160 | 405,074 |
| 265 | CLAUDE M. NEEDHAM | STSGC40132 | 393,458 |
| 266 | ROBERT SOULE | STSGC40189 | 457,234 |
| 267 | SANDRA F. HARRELL | STSGC40156 | 404,588 |
| 268 | JOSEPH A. CHUSTZ | STSGC41151 | 598,797 |
| 269 | LARRY W. PERKINS | STSGC41127 | 427,641 |
| 270 | LAURA JEANETTE N. LEE | STSGC40137 | 525,006 |
| 271 | JUANITA QUINEALTY | STSGC40685 | 119,446 |
| 272 | CHARLES R. SANCHEZ AND MAMIE C. SANCHEZ | STSGC40268 | 74,261 |
| 273 | CHARLES R. SANCHEZ SR. | STSGC40268 | 368,347 |
| 274 | MAMIE C. SANCHEZ | STSGC40268 | 74,502 |
| 275 | CHERYL B. WATTS | STSGC40276, STSGC40275 | 83,688 |
| 276 | THURSTON WATTS JR. | STSGC40276, STSGC40275 | 136,172 |
| 277 | THURSTON WATTS JR. AND CHERYL B. WATTS | STSGC40276, STSGC40275 | 713,574 |
| 278 | TARRAL E. DAIGLE | STSGC40155 | 407,361 |
| 279 | RICHARD A. DEVALL | STSGC40346, STSGC40334 | 323,730 |
| 280 | RICHARD DEVALL AND SUE M. DEVALL | STSGC40346, STSGC40334 | 112,175 |
| 281 | SUE M. DEVALL | STSGC40346, STSGC40334 | 116,967 |
| 282 | MONTY M. PERKINS | STSGC40410 | 129,492 |
| 283 | CHARLIE L. MASSEY | STSGC40145 | 390,809 |
| 284 | WILLIAM E. ENSMINGER | STSGC40238 | 154,846 |
| 285 | ARISTIDE TRELOAR | STSGC40208 | 650,430 |
| 286 | MICHAEL J. DRAGO | STSGC40114 | 593,268 |
| 287 | JIMMY QUEBEDEAUX | STSGC40538 | 330,756 |
| 288 | JUDITH P. SIMMONS | STSGC41198 | 422,749 |
| 289 | AUDREY LETARD | STSGC40435, STSGC40163 | 73,263 |
| 290 | JUDY A. VARNADO AND PATRICIA A. ALLISON AND AUDREY A. LETARD | STSGC40435, STSGC40163 | 192,008 |
| 291 | PATRICIA A. ALLISON | STSGC40435, STSGC40163 | 78,919 |
| 292 | GWENDOLYN E. FABRE | STSGC40758 | 355,934 |
| 293 | CLYDE ANDERSON | STSGC40092, NMW020315 | 704,867 |
| 294 | JOHN O. LETARD | NMW027559, NMW002271 | 900,452 |
| 295 | HERMAN J. MILLIGAN JR. | STSGC40387 | 1,259,160 |
| 296 | RONALD W. VALENTINE | STSGC41312 | 347,071 |
| 297 | KERRY R. KLING | STSGC41278 | 544,863 |
| 298 | CHARLES A. JAMES | STSGC41252 | 360,149 |
| 299 | EMOLYN L. WATTS | STSGC40344 | 364,391 |
| 300 | LYNN G. GILDERSLEEVE | STSGC41030 | 53,776 |
| 301 | ROBERT GILDERSLEEVE JR. TRUST AND ROBERT GILDERSLEEVE JR. | STSGC41030 | 10,689 |
| 302 | ROBERT V. GILDERSLEEVE JR. | STSGC41030 | 80,333 |
| 303 | WILLA MAE GILDERSLEEVE | STSGC41030 | 171,597 |
| 304 | WILLA MAE GILDERSLEEVE AND LYNN G. GILDERSLEEVE | STSGC41030 | 163,926 |
| 305 | OLIVIA S. WARNOCK | STSGC40934 | 392,684 |
| 306 | KATHLEEN F. MELILLI | STSGC40284 | 298,965 |
| 307 | JOHN E. TAYLOR | STSGC40601 | 639,110 |
| 308 | ARTHUR R. WAXLEY JR. | STSGC40444 | 616,268 |
| 309 | ROBERT YOUNG JR. | STSGC40820 | 360,477 |
| 310 | DOROTHEA M. YOUNG | STSGC40819 | 124,680 |
| 311 | GLENDA D. THOMAS | STSGC41345 | 682,331 |
| 312 | DOT G. MELDER | STSGC41161 | 70,792 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|-------------|---------------------|
| 313 | JACK W. MELDER | STSGC41161 | 2,200 |
| 314 | JACK W. MELDER AND DOT G. MELDER | STSGC41161 | 433,163 |
| 315 | JOHN D. COOPER | NJG005394, STSGC40347-1 | 619,750 |
| 316 | DARRELL D. COURVILLE | STSGC40105, NMW043226, NMW021297, NMW010324, NMW003857 | 685,960 |
| 317 | DENNIS LANTRIP | STSGC40611 | 477,927 |
| 318 | TROY L. LILLIE JR. | STSGC40384 | 954,310 |
| 319 | ROBERT L. BUSH | STSGC40746 | 826,384 |
| 320 | DOROTHY T. DUNCAN | STSGC40138 | 564,694 |
| 321 | JOHN R. HOLGUIN | STSGC40586 | 660,144 |
| 322 | JOHN G. COHRON | STSGC40249 | 103,321 |
| 323 | JOHN GLEN COHRON | STSGC40249 | 76,844 |
| 324 | BARBARA ANTHONY | STSGC40216-1, STSGC40216 | 345,382 |
| 325 | MICHAEL R. HOLCOMB | STSGC40989 | 278,364 |
| 326 | EDGAR THERON OVERLAND | STSGC41214 | 416,269 |
| 327 | JOHNNIE A. GRIFFITH | STSGC41074 | 504,428 |
| 328 | GARY WOOD | STSGC40515 | 641,620 |
| 329 | AZALEA REST CEMETARY INC. IRREV TRUST, AZALEA REST CEMETARY INC., AND GEORGE B. ANNISON, IN HIS CAPACITY AS TRUSTEE OF AZALEA REST CEMETARY INC. IRREV TRUST | STSGC20113 | 78,985 |
| 330 | GEORGE BUR ANNISON AND DIANE B. ANNISON | STSGC20113 | 1,402,295 |
| 331 | REUEL L. ANDERSON | STSGC20073 | 234,288 |
| 332 | REUEL L. ANDERSON JR. | STSGC20073 | 879,673 |
| 333 | JAMIE/NICKY CARR INS. TRUST AND JAMIE CARR AND NICKY CARR | STSGC20062 | 208,100 |
| 334 | BARBARA RATHBONE AGENCY | STBR10005 | 15,603 |
| 335 | BARBARA V. RATHBONE | STBR10005 | 76,031 |
| 336 | BARBARA V. RATHBONE CRT AND BARBARA V. RATHBONE | STBR10005 | 283,946 |
| 337 | AUBREY O'NEAL CLEMENT | NGW352257 | 8,524,408 |
| 338 | BLUFF CREEK REDI-MIX, INC. | NJG004066, NMW020539, NMW009169 | 114,563 |
| 339 | FLEN ROCK COMPANY, LLC. | NJG004066, NMW020539, NMW009169 | 234,750 |
| 340 | FLENISEN SAND & GRAVEL, INC. | NJG004066, NMW020539, NMW009169 | 107,944 |
| 341 | LYMAN L. FLENIKEN JR. | NJG004066, NMW020539, NMW009169 | 186,097 |
| 342 | CALVIN DARDEN | NJB010258 | 350,000 |
| 343 | GENESIS TODAY, INC. | NMX012329 | 3,500,000 |
| 344 | MARY MENDOZA DE CAPRILES | NMZ006246 | 157,857 |
| 345 | TULIO M. CAPRILES | NMZ006246 | 119,231 |
| 346 | GATITA BLANCA | NWR007415, NWR002135 | 37,010 [8] |
| 347 | LAURA ROZANES LOMBROZO AND MOISES BOGOMOLNY HOP | NWR007415, NWR002135 | 19,112 |
| 348 | LUKAS CORP. | NWR007415, NWR002135 | 392,495 [9] |
| 349 | BELRON INVESTMENTS LIMITED | NMY101303 | 2,105,198 |
| 350 | RICHARD A. ARKIN AND KAREN J. ARKIN | NM2002365 | 227,908 |
| 351 | ROSS D. BRUCE AND MARSHA C. BRUCE | NMW028011 | 564,992 |
| 352 | PEGGY PAYNE MORAGNE | NMW002172 | 401,818 |
| 353 | DAVID BRUCE EZARIK | NJL024720 | 297,613 |
| 354 | DONALD P. GRIFFITH | NMY125864, NJL009259 | 222,778 |
| 355 | LITHOTRIPSY, LTD. | NMY125864, NJL009259 | 175,057 |

Notes:

8. This amount reflects money transferred from SIB accounts in the names of Western International Financial Corp. Ltd. and Western International Financial Corp. Ltd. S.A. to Pershing accounts in the name of Gatita Blanca. This amount is also reflected in the proceeds amounts for Western International Financial Corp. Ltd. and Western International Financial Corp. Ltd. S.A.

9. This amount includes $52,010 transferred from SIB accounts in the names of Western International Financial Corp. Ltd. and Western International Advisor Corp. Ltd. to Pershing accounts in the name of Lukas Corp. This amount is also reflected in the proceeds amounts for Western International Financial Corp. Ltd. and Western International Advisor Corp. Ltd.

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|-------------|---------------------|
| 356 | THE D.P. GRIFFITH FAMILY LIMITED PARTNERSHIP AND D.P. GRIFFITH | NMY125864, NJL009259 | 195,787 |
| 357 | THE K & K GRIFFITH, L.P. | NMY125864, NJL009259 | 276,405 |
| 358 | NEN FAMILY TRUST | 0C9405204 | 1,291,586 |
| 359 | CORPORATE HEALTHCARE MANAGEMENT DEF BEN PL AND CORPORATE HEALTHCARE MANAGEMENT | NMY100123 | 315,637 |
| 360 | PINOT HOLDINGS LIMITED | NMY018622, NJL027517 | 1,083,209 |
| 361 | JULIO SERGIO BUENO Y CADENA AND MARIA ELENA RAMIREZ DE BUENO | NMY119909 | 3,306,667 |
| 362 | MICHAEL A. SPEEG | STSGC40236-1, NMW012247 | 837,380 |
| 363 | JOHN G. DENISON AND KATHY R. DENISON | NJE262369 | 585,734 |
| 364 | DAVID S. CARROLL JR. AND DELAINE D. CARROLL | NJM022699 | 250,000 |
| 365 | GAIL G. MARQUETTE | NMW026858 | 108,783 |
| 366 | NUMA L. MARQUETTE | NMW026858 | 196,875 |
| 367 | PATRICIA W. HIRSCH | NMY112250, NJL021577, NJL007378 | 373,058 |
| 368 | PLATEAU TELECOMMUNICATIONS | NJE212265, NJE212257 | 4,188,567 |
| 369 | ROBERT C. WILLIAMS | NMY129932 | 263,728 |
| 370 | JORGE SOLORZANO Y MOSQUEDA | NMY008755 | 676,720 |
| 371 | ROBERT G. FESSLER 2001 INVESTMENTS TRUST AND ROBERT G. FESSLER | NJF010007, NJF001238, NM2010012 | 13,027,693 |
| 372 | MICHAEL J. TIMMONS | NJM029298 | 540,082 |
| 373 | BYRON A. RATLIFF | NJG004801 | 188,888 |
| 374 | SIDNEY HOLMES | NJL025305 | 125,000 |
| 375 | SIDNEY HOLMES AND VICKI E. HOLMES | NJL025305 | 25,000 |
| 376 | JEFF P. PURPERA JR. | NM4011851, NM4011117 | 597,693 |
| 377 | STEVEN J. BRADING AND SHARON K. BRADING | NJG004215 | 405,895 |
| 378 | BORDEAUX INVESTMENTS I C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 121,752 |
| 379 | BORDEAUX INVESTMENTS III C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 72,435 |
| 380 | BORDEAUX INVESTMENTS IX C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 43,642 |
| 381 | BORDEAUX INVESTMENTS X C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 12,018 |
| 382 | PROVENCE MANAGEMENT STICHTING I AND BORDEAUX INVESTMENTS I C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 7,423,766 |
| 383 | PROVENCE MANAGEMENT STICHTING III AND BORDEAUX INVESTMENTS III C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 4,836,717 |
| 384 | PROVENCE MANAGEMENT STICHTING IX AND BORDEAUX INVESTMENTS IX C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 2,858,196 |

47

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|-------------|---------------------|
| 385 | PROVENCE MANAGEMENT STICHTING X AND BORDEAUX INVESTMENTS X C.V. | NMY136010, NMY135996, NMY135988, NMY135970, NMY020552, NMY020388, NMY020370, NJL029216, NJL029208, NJL029190, NJL029182, NJL029174, NJL029166 | 652,034 |
| 386 | RONALD E. WELLS | STSGC40564, NMW025413 | 544,643 |
| 387 | RONALD E. WELLS SR. AND LUTHER D WELLS | STSGC40564, NMW025413 | 288,992 |
| 388 | JAMES STANLEY HARRIS | NJG007200, NJG007192, NJG007127, NJG007119, NJG007101, NMW014540, NMW003261 | 1,574,390 |
| 389 | CECILIA VAISMAN VDA. DE CZUKERBERG | NWR002218 | 385,444 |
| 390 | SANFORD STEINBERG | STSGC40942 | 171,534 |
| 391 | GERALD S. PASTERNAK | NMZ011311, NMZ011113, NMZ010867, NJV002808 | 335,000 |
| 392 | BBRATSS PRODUCTIONS, INC. | NJG007150, NJG007143, NMW007239, NMW006462, NJG012432, NJG012416 | 108,658 |
| 393 | TIMOTHY RUSSELL RICKETTS AND ROSE S. RICKETTS | NJG007150, NJG007143, NMW007239, NMW006462, NJG012432, NJG012416 | 2,349,367 |
| 394 | GEORGANN MIRE | NJG001336, STBR20016 | 658,465 |
| 395 | JAMES S. COURIER | NJL001496 | 437,728 |
| 396 | TAHSIN YILMAZ KALKAVAN | NJF010106, NJF010098, NJF010072, NJF001071, NJF001014, N13010009 | 287,705 |
| 397 | MONROE J. RATHBONE | NJG001583, STSGC400801, NMW022766 | 1,697 |
| 398 | MONROE J. RATHBONE IV | NJG001583, STSGC400801, NMW022766 | 145,042 |
| 399 | GNOE C.V. | NMY004093, NJL008921, NJL002197 | 270,726 |
| 400 | DANIEL CHERNITZKY LASKY AND MERY MOTOLA COHEN DE CHERNITZKY | NWR003265 | 10,000 |
| 401 | R AND T CHERNY SISTERS INC. | NWR003265 | 1,619,865 |
| 402 | SAMUEL CHERNITZKY LIFSHITZ AND TERESA LASKY DE CHERNITZKY AND ESTEBAN CHERNITZKY LASKY AND DANIEL CHERNITZKY | NWR003265 | 60,000 |
| 403 | JAMES R. LAWSON | NNC010068, NJK560005, NJK511925 | 1,296,913 |
| 404 | ANTHONY J. VENTRELLA | STSGC41266 | 483,222 |
| 405 | RONALD W. PARKER | NMW022808 | 693,782 |
| 406 | JOSEPH R. THIBODEAUX AND SUSAN E. THIBODEAUX | NJG002458 | 189,661 |
| 407 | WALDMAN, LTD. | NMY100529, NJL027194 | 2,069,266 |
| 408 | THOMAS DE FRANCO JR. REVOCABLE TRUST AND THOMAS DE FRANCO JR. | 0C9600382 | 210,752 |
| 409 | RUBEN J. CRUZ | NJB011199 | 161,609 |
| 410 | STEPHEN J. BURNHAM | NJG003274, NJG002649, NJG002631, NMW007817 | 1,436,883 |
| 411 | JAMES D. SIMMONS | NMW024812 | 836,365 |
| 412 | PATRICK JOSEPH BOYLE AND LAURA MARGARET BOYLE | NMY001842 | 836,310 |
| 413 | CHERAY ZAUDERER HODGES | 88761010 | 506,027 [10] |
| 414 | LUTHER HARTWELL HODGES | 88761010 | 125,027 [10] |
| 415 | LUTHER HARTWELL HODGES AND CHERAY ZAUDERER HODGES | 88761010 | 1,849,647 [10] |
| 416 | MICHAEL A. HILLMAN AND DARLENE M. HILLMAN | NMW028623 | 2,207,940 |
| 417 | DELCO FINANCE, INC. | NMY106435 | 452,205 |
| 418 | DELCO FINANCE, INC. AND RIGOBERTO INIGUEZ | NMY106435 | 1,510,000 |
| 419 | ANTONIO SANCHEZ RAMOS | NMY121343 | 528,919 |
| 420 | GOLD WING PARTNERS | NM2010855 | 1,425,427 |
| 421 | ERIC TUCKER | NJM030312 | 156,101 |
| 422 | ERIC TUCKER AND JENNIFER TUCKER | NJM030312 | 91,414 |
| 423 | CURTIS COLLINS | NGW012539 | 1,752,103 |

Notes:
10. Figures based on SGC accounts residing at JPMorgan.

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 424 | ROBERT S. GREER AND ALICE D. GREER | NM4210081 | 1,152,524 |
| 425 | JEAN G. MANCUSO AND LYDIA O. LEMOINE | NJG004397 | 31,866 |
| 426 | WILLIAM A. MANCUSO AND JEAN G. MANCUSO | NJG004397 | 178,427 |
| 427 | DR. CAROLYN VILLARRUBIA | NJL005026 | 154,602 |
| 428 | THE DAVIS REVOCABLE TRUST | NM4014012 | 857,661 |
| 429 | JAMES W. BORING JR. | NMW011702 | 612,235 |
| 430 | DAVID P. JOHNSON | NM4210057 | 749,579 |
| 431 | ELENA TRON DE ZEPEDA CARRANZA | NMY005611 | 2,424,189 |
| 432 | MAURICIO ZEPEDA CARRANZA | NMY005611 | 131,000 |
| 433 | ANASTACIO MOGOLLON TRUST AND ANASTACIO MOGOLLON | NYQ001134 | 502,544 |
| 434 | ARCHIE TRUST | NYQ001134 | 415,000 |
| 435 | YAIR SHAMIR AND ELLA SHAMIR | NJM007856 | 1,119,721 |
| 436 | ROBERT JUAN DARTEZ, LLC | NJG001617, NMW035743, NJG012549, NJG010097 | 1,689,212 |
| 437 | ROBERT L. HOLLIER | NJG003555, NJG003548, NMW014235 | 1,742,552 |
| 438 | MICHAEL WHEATLEY AND BETTY WHEATLEY | NJE260173, NJE211846, NJE211838, NJE211820, NJE210210, NM4010796 | 1,699,536 |
| 439 | ARACELI DOMINGUEZ DE VALERO TRUST AND ARACELI DOMINGUEZ DE VALERO AND RAFAEL DOMINGUEZ JR. | NMZ023639, NMZ023555 | 300,000 |
| 440 | MARIA TERESA DOMINGUEZ TRUST AND RAFAEL DOMINGUEZ AND MARIA T. DOMINGUEZ AND MARIA TERESA DOMINGUEZ NICOLAS | NMZ023639, NMZ023555 | 380,045 |
| 441 | RADOK INVESTMENTS LIMITED | NMY100420, NJL027129 | 452,870 |
| 442 | RICARDO GONZALEZ CABRERA | NWR002879 | 2,391 |
| 443 | RICARDO GONZALEZ CABRERA AND ALEJANDRA HILDA GONZALEZ GARCIA | NWR002879 | 65,559 |
| 444 | RICARDO GONZALEZ CABRERA AND ALFONSO GONZALEZ GARCIA | NWR002879 | 66,358 |
| 445 | RICARDO GONZALEZ CABRERA AND IGNACIO RICARDO GONZALEZ GARCIA | NWR002879 | 29,554 |
| 446 | RICARDO GONZALEZ CABRERA AND IGNACIO RICARDO GONZALEZ GARCIA AND ALFONSO GONZALEZ GARCIA AND RODOLFO GONZALEZ GARCIA | NWR002879 | 4,129,786 |
| 447 | RICARDO GONZALEZ CABRERA AND RODOLFO GONZALEZ GARCIA | NWR002879 | 118,130 |
| 448 | MARTHA H. BAKER | NJE210152 | 213,709 |
| 449 | RICHARD O. HUNTON | NMY135749 | 1,810,254 |
| 450 | ARTHUR TORNO | NM4010481 | 283,946 |
| 451 | MARY E. GERRY | NJG001344 | 432,443 |
| 452 | DENNIS JAMES MIGL | NMY001131 | 121,348 |
| 453 | MISSISSIPPI POLYMERS, INC. | NJI010078 | 556,363 |
| 454 | FELIPE GONZALEZ | NMY013334 | 1,024,545 |
| 455 | BILLIE RUTH MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 171,456 |
| 456 | RONALD B. MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 115,356 |
| 457 | RONALD MCMORRIS AND VIRGINIA MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 723,071 |
| 458 | VIRGINIA H. MCMORRIS | STSGC40252-1, STSGC40252, STSGC40247-1, STSGC40247, NMW009680 | 139,716 |
| 459 | FLEX, LTD. | NJL028515 | 221,596 |
| 460 | NADI HOLDINGS, LTD. | NJL028515 | 56,775 |
| 461 | ROMANO INTERNATIONAL, LTD. | NJL027160 | 393,957 |
| 462 | J. MICHAEL GAITHER | NNC010332 | 765,692 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|-------------|---------------------|
| 463 | KATHY WEISS REVOCABLE TRUST AND KATHY WEISS | NJL010521 | 201,032 |
| 464 | RANDALL E. YOUNGS | NM4063241 | 203,993 |
| 465 | GENEVA SUE PALMER | NJM029843, NJJ002349 | 76,351 |
| 466 | ROBERT E. PALMER | NJM029843, NJJ002349 | 890,037 |
| 467 | J. RUSSELL MOTHERSHED | NJJ110936 | 279,702 |
| 468 | CHARLES E. BAKER | NMY103846 | 410,339 |
| 469 | NORA E. GAY AND RICHARD E. GAY | NM4015183 | 112,338 |
| 470 | WILLIAM C. PROVINE | NMY111898, NMY010389, NJL028002 | 1,949,126 |
| 471 | ROLAND SAM TORN | NMY017897 | 1,035,355 |
| 472 | THE SECOND AMENDED AND RESTATED ROBERT A. HOUSTON REVOCABLE TRUST AND ROBERT A. HOUSTON | NM4015456 | 2,758,146 |
| 473 | MALTON OVERSEAS LTD. | NMY101493, NJL027145 | 1,802,059 |
| 474 | JAIME SOLANO SOTO | NMY122465 | 100,000 |
| 475 | ANGEL DELIO NIEUW | NJV004960 | 20,426 |
| 476 | ANGEL DELIO NIEUW AND MARIA P. C. NIEUW-CAEL | NJV004960 | 438,496 |
| 477 | COUNTRY HILL INVESTMENT, N.A. | NJV004960 | 1,750 |
| 478 | MURFIELD INVESTMENTS INC. | NJV004960 | 174,109 |
| 479 | YOLANDA LORIE | NMW002339 | 278,736 |
| 480 | CHARLES L. FELNER | NJJ006498 | 288,405 |
| 481 | PHILLIP E. MARRETT | NNC010548 | 890,610 |
| 482 | EDITH IRMA WATTS | NMW030918 | 539,225 |
| 483 | PETER MANSUR | NJE261148 | 575,477 |
| 484 | MARY F. MILLS | NMW040545 | 149,152 |
| 485 | MICHAEL C. MOSLEY | NMW040545 | 101,699 |
| 486 | MAPLE LEAF CAPITAL, LLC | NMX990151, NMX090564 | 150,000 |
| 487 | BRILMAR INVESTMENTS LIMITED | NJL027137 | 420,478 [11] |
| 488 | GRACE PEREZ | NMY105700, NMY105312, NMY100933 | 178,301 [12] |
| 489 | KIRKWELL C.V. | NMY102020 | 13,791,011 |
| 490 | DAVID HINOJOSA AND LAURA ANDONEGUI GONZALEZ | NMY135962, NMY100024, NJL029158 | 337,300 |
| 491 | FETZER OVERSEAS LIMITED AND LAURA GONZALEZ DE ANDONEGUI | NMY135962, NMY100024, NJL029158 | 38,238 |
| 492 | INMOBILIARIA EAL | NMY135962, NMY100024, NJL029158 | 170,413 |
| 493 | LAURA GONZALEZ DE ANDONEGUI | NMY135962, NMY100024, NJL029158 | 1,500 |
| 494 | LAURA GONZALEZ DE ANDONEGUI AND LAURA ANDONEGUI GONZALEZ | NMY135962, NMY100024, NJL029158 | 59,500 |
| 495 | VERRET MANAGEMENT CORPORATION | NWR003182 | 1,737,587 |
| 496 | MICHAEL S. ASMER | NMZ016377, NMZ011337, NMZ010057, NJV002337 | 1,029,845 |
| 497 | NANCY E. ENGLE | NJE212844 | 357,024 |
| 498 | JODY L. BOYD AND SHELLEY J. BOYD | NMW014268 | 1,734,336 |
| 499 | THOMAS E. BROWN AND BARBARA BROWN | NMZ020973, NJV004432, NJV004424, NJV003095, NJV003087 | 2,109,254 |
| 500 | GEORGE T. GRAVES III | NM4001076 | 1,225,000 |
| 501 | ALEX FERNANDEZ | NMZ004332 | 410,390 |
| 502 | RENE FERNANDEZ | NMZ004332 | 50,095 |
| 503 | ALGAMA L.T.D. C.A. | NWR004842 | 1,054,650 |
| 504 | INVERSIONES PATRICK ROGER P AND PATRICK PETIOT | NWR004263 | 63,480 |

Notes:

11. The proceeds amount for Brilmar Investments Limited includes $178,301.39 that Brilmar Investments Limited transferred to Grace Perez from its SIB CDs. This amount is also included in Grace Perez's proceeds amount.

12. Grace Perez received $178,301.39 in proceeds from SIB CDs in the name of Brilmar Investments Limited. This amount is also included in Brilmar Investments Limited's proceeds amount.

**50**

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|----|------|-------------|---------------------|
| 505 | PATRICK LORIS ROGER PETIOT | NWR004263 | 662,678 |
| 506 | JAIME SMOLENSKY | NWR001855 | 1,182,231 |
| 507 | VICSAR INVESTMENTS LIMITED | NMZ005198 | 783,191 |
| 508 | DIFFICULTY HOLDINGS LIMITED | NMY101279 | 616,734 |
| 509 | COFFEY OVERSEAS LIMITED | NMY019299 | 1,493,479 |
| 510 | MUDDY WATER HOLDINGS LIMITED | NMY018630 | 1,585,169 |
| 511 | MANUEL LOPEZ MAZUELAS | NWR008249 | 989,303 |
| 512 | LIGIA ESPINEL MARTINEZ | NWR004578 | 217,559 |
| 513 | SUSAN D. SANFORD | NJL028820 | 664,847 |
| 514 | WILLIAM BRUCE JOHNSON AND JENNIFER SAVOIC JOHNSON | NMW003444 | 245,464 |
| 515 | PAUL BYRD AND KYM BYRD | NMW002594 | 2,826,933 |
| 516 | DIANE DUNN | NMW004368 | 245,528 |
| 517 | JOHN M. COLGIN | NMY001859 | 1,490,113 |
| 518 | JOBEL TRUST | NYQ002108 | 434,147 |
| 519 | JOSEBEL TRUST | NYQ002108 | 122,630 |
| 520 | JOTABE TRUST | NYQ002108 | 2,330,946 |
| 521 | NETFIELDIC TRUST | NYQ001142 | 571,643 |
| 522 | CARLOS BUSTAMANTE ALVAREZ AND LUISA FERNANDA ROMO LEROUX | NWR005138 | 396,978 |
| 523 | JOSE LUCIANO MENDEZ ALONSO AND MARIA DEL ROCIO CORONA ODRIOZOLA | NWR003059 | 753,391 |
| 524 | CELIA DANTUS WEBER AND LEOPOLDO BIMSTEIN RIZERMAN AND MIRIAM BIMSTEIN DANTUS | NWR002812 | 6,000 |
| 525 | LABTEC INV. CORPORATION AND LEONOR RODRIGUEZ | NWR002812 | 816,197 |
| 526 | MIRIAM BIMSTEIN DANTUS | NWR002812 | 9,090 |
| 527 | ALBERTO CARLOS CURIS GARCIA | NWQ001039 | 12,367 |
| 528 | CURRICHI FOUNDATION | NWQ001039 | 700,733 |
| 529 | MARIA DE LOURDES GUEVARA DE CURIS AND ALBERTO CARLOS CURIS GARCIA | NWQ001039 | 849 |
| 530 | LUIS G. PEREZ | NMW011082 | 1,942,929 |
| 531 | JOHN D. SANTI IRA | NJM032789 | 799,038 |
| 532 | JAMES M. BATES | NMY114116 | 425,802 |
| 533 | LPC INTERNATIONAL TRUST AND LPC INTERNATIONAL | NWR006268 | 196,591 |
| 534 | DARSHAN SINGH DHALIWAL TRUST AND DARSHAN SINGH DHALIWAL | NMZ023357 | 3,001,596 |
| 535 | RAUL RODRIGUEZ MENDEZ | NJL028614 | 454,582 |
| 536 | VICTOR MANUEL ALFARO ARAUJO AND MARIA DEL CARMEN ESCOBEDO DE ALFARO | NMY102301 | 720,358 |
| 537 | CRAYFORD HOLDINGS LIMITED | NMY019315 | 2,525,195 |
| 538 | CARL MONTE | NM2090048 | 334,041 |
| 539 | CAROLYN CRANSTON | NMY100065, NMY100057, NMY014845, NJL025503 | 149,055 |
| 540 | DAVID MARK KELSO | NMY100065, NMY100057, NMY014845, NJL025503 | 14,134 |
| 541 | THOMAS H. TURNER | NJE211077, NM4011406 | 2,957,505 |
| 542 | DEBORAH S. FORBES | NMW010936 | 10 |
| 543 | GEORGE KENDALL FORBES | NMW010936 | 699,663 |
| 544 | GEORGE KENDALL FORBES AND DEBORAH S. FORBES | NMW010936 | 981,516 |
| 545 | WAYLAND B. ALEXANDER | NMW020679 | 734,912 |
| 546 | JOHN D. NOTTINGHAM JR. AND JUDITH R. LEWIS | NMY131151 | 39,706 |
| 547 | JOHN D. NOTTINGHAM JR. TRUST AND JOHN D. NOTTINGHAM JR. | NMY131151 | 3,583 |
| 548 | THE J.D. NOTTINGHAM LIMITED PARTNERSHIP | NMY131151 | 9,912 |

# KVT-4

| ID | Name | Accounts[1] | SIB CD Proceeds [2] |
|---|---|---|---|
| 549 | THE J.D. NOTTINGHAM LIMITED PARTNERSHIP AND J.D. NOTTINGHAM | NMY131151 | 54,579 |
| 550 | ROBERT H. KLUG | NMY119016 | 279,049 |
| 551 | A.A. BUILDERS LTD. | NWR005211 | 674,210 |
| 552 | DANECO B.V. | NMZ018134, NMZ005966, NMZ005636 | 1,244,875 |
| 553 | DVX CAPITAL | NMZ018134, NMZ005966, NMZ005636 | 1,302,923 |
| 554 | IRM INVESTMENTS, INC. | NMZ018134, NMZ005966, NMZ005636 | 1,422,797 |
| 555 | STICHTING PARTICULIER FONDS EL TRIBUTO | NMZ018134, NMZ005966, NMZ005636 | 637,001 |
| 556 | MARIO BRAUN RUSSEK | NMY121996 | 2,051,958 |
| 557 | TERLINK, INC. | NMY020610 | 3,270,235 |
| 558 | YENZO INVESTMENT, INC. | NMY102004 | 843,542 |
| 559 | SLEEPING DOG HOLDINGS, LTD. | NMY018614 | 1,465,461 |
| 560 | BONNER HOLDINGS, LTD. | NMY020719 | 19,763 |
| 561 | DONEGAN, LTD. | NMY020719 | 1,938,927 |
| 562 | BRIARVALE HOLDINGS, LTD. | NMY101287 | 735,241 |
| 563 | RUBE HOLDINGS, LTD. | NMY118448 | 813,938 |

Total SIBL CD Proceeds    373,000,093 [13]

Notes:

13. This total has been reduced by $267,321.39 to account for the adjustments referenced in footnotes 5-9 and 11.

**KVT-5**

# KVT-5

| ID | Name | | Amount Funded to Receiver's Escrow Account |
|----|------|---|---|
| 1 | ROBERT GILLIKIN AND MARTHA GILLIKIN | $ | 435,094 |
| 2 | THOMAS J. MORAN | | 5,670,425 |
| 3 | JOHN R. PAINTER | | 239,857 |
| 4 | DENNIS J. FERRA AND KAREN S. FERRA | | 227,962 |
| 5 | DANIEL PAUL LANDRY AND DIANNA LYNN LANDRY | | 31,156 |
| 6 | HENRY A. KLEIN | | 58,026 |
| 7 | CARLOS FELIPE PENA | | 303,635 |
| 8 | DAVID JONATHAN DREW | | 1,299,424 |
| 9 | JAY STUART BELL | | 1,288,685 |
| 10 | JOHNNY DAVID DAMON | | 400,070 |
| 11 | GREGORY ALAN MADDUX | | 3,669,735 |
| 12 | BERNABE WILLIAMS | | 1,542,962 |
| 13 | ANDRUW RUDOLF BERNARDO JONES | | 1,033,732 |
| 14 | SUSAN EPSTEIN | | 59,030 |
| 15 | MARVIN WENITSKY | | 35,110 |
| 16 | VALERIE J. KALTMAN | | 62,112 |
| 17 | ROSINE CHAPPELL | | 25,575 |
| 18 | VALERIE DALY HAUSLADEN | | 114,373 |
| 19 | GUIFENA CORP. | | 28,796 |
| 20 | EDWARD L. VAUGHN AND KAREN E. VAUGHN | | 23,102 |
| 21 | WILLIAM A. WELBORN | | 153,052 |
| 22 | JON KARL GOECKEL AND LORETTA B. GOECKEL | | 24,606 |
| 23 | LUSKY INVESTMENT PARTNERSHIP, LP | | 287,820 |
| 24 | MORTIMER F. CURRIER AND KATHERINE F. CURRIER | | 88,141 |
| 25 | LEJEUNE T. MILLS AND GILBERT C. MILLS¹ | | 101,354 |
| 26 | JAMES F. HAUN AND KALEN K. HAUN | | 38,298 |
| 27 | KENNETH MEACHAM | | 34,358 |
| 28 | MARTHA AGUADO DE DONNADIEU AND EMILIO DONNADIEU AGUADO | | 28,286 |
| 29 | VERONA BELLE SPATZ | | 29,243 |
| 30 | ESTATE OF JUSTINE H. SMITH | | 33,502 |
| 31 | SUSAN CREEKMORE HEIM | | 18,142 |
| 32 | RALPH MACDONALD | | 259,894 |
| 33 | WILLIAM K. GREINER | | 15,576 |
| 34 | LINDA MCSPADDEN MCNEIL | | 55,484 |
| 35 | EDUARDO IGARTUA RUILOBA AND LA ESTANCIA C.C. | | 54,051 |
| 36 | BOBBY G. WILKERSON | | 76,005 |
| 37 | GEORGE B. LORMAND, JR. | | 34,163 |
| 38 | ERIC R. GEORGE | | 350,000 |
| 39 | CHRISTOPHER ALLRED | | 115,269 |
| 40 | TERENCE BEVEN AND ELIZABETH BEVEN | | 119,132 |
| | | $ | 18,465,237 |

Notes:

1. Lejeune T. Mills and Gilbert C. Mills have executed a stipulation. They have transferred to the Receiver's escrow account only $101,353.96 of the SIBL proceeds amount, which is $381,353.96; their Pershing account also remains held.

**53**

# KVT-6

# KVT-6

| ID | Name | | SIB CD Proceeds (2008 - 2009)[1] |
|----|------|---|------|
| 1 | GARY D. MAGNESS IRREVOCABLE TRUST, GARY MAGNESS, GMAG LLC AND MAGNESS SECURITIES LLC | $ | 88,200,000 |
| 2 | LIBYAN FOREIGN INVESTMENT CO. | | 54,830,930 |
| 3 | REGIONS BANK AS TRUSTEE FOR LPFA II CITY PLAZA PROJECT SERIES 2008 AND II CITY PLAZA LLC | | 39,108,276 |
| 4 | JUERGEN KURT WAGENTROTZ AND JURGEN KURT WAGENTROTZ ERNST | | 38,465,878 |
| 5 | MICHEL MORENO | | 27,035,583 |
| 6 | ANGLO-ATLANTIC STEAMSHIP CO. LTD. | | 16,276,638 |
| 7 | SALBUR INVERSIONES C.A. | | 15,782,610 |
| 8 | CATALYST PRIVATE EQUITY PARTNERS (ISREAL) II L.P. | | 12,571,955 |
| 9 | BRUCE THOMPSON AND MICHELLE THOMPSON AND BRUCE THOMPSON | | 11,915,092 |
| 10 | COMPANIA MEXICANA DE AVIACION S.A. DE C.V. | | 10,159,050 |
| 11 | ANTONY MANSOUR AND REHAN MANSOUR, ANTONY MANSOUR, JOSEPHINE MERY, FRANCOISE SOLANGE MERY AND JOSEPHINE MERY | | 9,824,067 |
| 12 | BRETT LANDES | | 9,633,275 |
| 13 | FAYHILL INTERNATIONAL | | 9,297,644 |
| 14 | MANSURA ENTERPRISES CV | | 8,351,534 |
| 15 | EDWARD HYLTON JONES AND EDWARD HYLTON JONES AND SHIRLEY GLORIA JONES | | 5,975,887 |
| 16 | GEORGE JOSEPH ROLLAR AND GEORGE JOSEPH ROLLAR AND DOLORES MAY PAYER ROLLAR | | 5,953,512 |
| 17 | WEST MEADOWS LTD. | | 5,914,956 |
| 18 | AMERICAN FAMILY ASSOCIATION INC. | | 5,722,450 |
| 19 | VALNAMEX S.A. | | 5,487,179 |
| 20 | FARISTON OVERSEAS LTD. | | 5,248,300 |
| 21 | JAMES E. RICHARDSON FAMILY TRUST | | 5,097,757 |
| 22 | GALO ENRIQUE VILLAMAR VILLAFUERTE | | 5,062,585 |
| 23 | PERFORMANCE CONTRACTORS INC. | | 5,035,156 |
| 24 | AGNETA LAURIN, HANS LAURIN AND AGNETA LAURIN AND HANS LAURIN | | 5,032,110 |
| 25 | CLAUDIO ENRIQUE HERNANDEZ VILLALOBOS | | 4,950,363 |
| 26 | NUNVAV INC. | | 4,787,138 |
| 27 | RODOLFO ROYE SOUTOU, JONATHAN ROYE FARCHEG AND RODOLFO ROYE SOUTOU, RODOLFO ROYE SOUTOU AND LOURDES FARCHEG DE ROYE AND JONATHAN ROYE AND ALEXANDER ROYE | | 4,734,185 |
| 28 | CORPORACION NACIONAL DE INVERSIONES SA DE CV | | 4,635,831 |
| 29 | INVERSIONES VARMOL TRUST CARE OF DR. JORGE MARIO VARGAS P. AND INVERSIONES VARMOL TRUST | | 4,378,878 |
| 30 | MR INTERNATIONAL GROUP LTD. | | 4,060,329 |
| 31 | ANCAR FUTURE TRUST | | 4,000,587 |
| 32 | EDUARDO A. NAJERA AND EDUARDO A. NAJERA AND JENNIFER M. NAJERA | | 3,992,535 |
| 33 | INTERMEDIA LTD. | | 3,863,952 |
| 34 | RITA MEIER KNUDSON REVOCABLE TRUST | | 3,635,537 |
| 35 | OSCAR HUMBERTO VILLARREAL AGUERO AND OSCAR VILLARREAL | | 3,528,546 |
| 36 | INTERNATIONAL PETROCHEMICAL SALES LIMITED | | 3,463,187 |
| 37 | TRIMECA, TRIMECA TRUST AND TRIMECA (TRABAJOS INDUSTRIALES Y MECANICOS) | | 3,440,378 |
| 38 | ELEVEN TWENTY-TWO LLC | | 3,247,484 |
| 39 | PINGYI HE ORRUILIAN WU DE HE AND PINGYI HE | | 3,237,629 |
| 40 | ARTURO ORTEGA GONZALEZ AND MARIA CAROLINA ORTEGA GONZALEZ AND GERMAN LUIS ORTEGA GONZALEZ AND ARTURO ORTEGA GONZALEZ | | 3,226,241 |
| 41 | TA TRUST | | 3,200,000 |
| 42 | ALGICA S.A. | | 3,186,945 |
| 43 | AIRS LTD. | | 3,167,334 |

## KVT-6

| ID | Name | SIB CD Proceeds (2008 - 2009)[1] |
|----|------|---------------------------------:|
| 44 | NONNA E TRUST | 3,079,824 |
| 45 | DEMETER A.V.V. | 2,985,953 |
| 46 | GLOBAL ADVISORS C.A. | 2,620,147 |
| 47 | NAIRC B.V., NAIRC-NETHERLANDS ANTILLEAN INSURANCE AND NAIRC-NETHERLANDS ANTILLEAN INSURANCE AND REINSURANCE COMPANY | 2,467,127 |
| 48 | ANIROC HOLDING LTD. | 2,073,448 |
| 49 | INMOFYBE S.A. | 1,857,815 |
| | | $    493,803,818 |

Notes:

1. Those outgoing transactions denominated in a foreign currency were converted on the day of transaction using a historical daily conversion rate.

**55**

**KVT-7**



Bank clients can make additional deposits to their accounts in one of the following ways:

1. Send personal or bank cheques:

· The cheque should be made out in favour of Stanford International Bank Ltd. followed, in parentheses, by the name or number of the account to be credited,

or

by indicating in the reference section on the front of the cheque, the name or number of the account to be credited,

or

by indicating on the back of the cheque, the name or number of the account to be credited.

· Cheques made out in your favour may also be deposited.

2. Send a wire transfer:

· Please inform your financial consultant before sending funds in this manner.
· The instructions you provide your bank should include the following:

For US Dollars –

*Please wire US$ _____ (Amount)

TO:    THE TORONTO-DOMINION BANK
       International Banking Center, Toronto, Ontario, Canada
       SWIFT: TDOM CA TT

       To be deposited to the account of:

       STANFORD INTERNATIONAL BANK LTD. (#0360012161670)
       SWIFT: SIBP AG AG

REF: _____
                    (Your Name)

     _____
                  (Account Number)

FOIA - Confidential Treatment Requested by Ralph S. Janvey, as Receiver for R. Allen Stanford, James M. Davis, Laura Pendergest Holt, Stanford Group Co., Stanford Capital Management LLC, Stanford International Bank Limited, Stanford Financial Group, and The Stanford Financial Group BLDG, Inc.

(continued on reverse)

STAN P DOJ_0031499

For Canadian Dollars –

"Please wire CDN$ _____ (Amount)

TO:    THE TORONTO-DOMINION BANK
International Banking Center, Toronto, Ontario, Canada
SWIFT: TDOM CA TT

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (#0360012161573)
SWIFT: SIBP AG AG

REF: _____

(Your Name)

_____ "

(Account Number)


For British Pounds –

"Please wire GBP _____ (Amount)

TO:    HSBC BANK PLC
London, United Kingdom
SWIFT: MIDLGB22XXX

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58180160)
SWIFT: SIBP AG AG

REF: _____

(Your Name)

_____ "

(Account Number)


For Euros –

"Please wire Euros _____ (Amount)

TO:    HSBC BANK PLC
London, United Kingdom
SWIFT: MIDLGB22XXX

To be deposited to the account of:

STANFORD INTERNATIONAL BANK LTD. (Sort code 40-05-15, acct. #58293136)
SWIFT: SIBP AG AG

REF: _____

(Your Name)

_____ "

(Account Number)

FOIA – Confidential Treatment Requested by Ralph S. Janvey, as
Receiver for R. Allen Stanford, James M. Davis, Laura Pendergest
Holt, Stanford Group Co., Stanford Capital Management LLC,
Stanford International Bank Limited, Stanford Financial Group, and
The Stanford Financial Group BLDG, Inc.

STAN P DOJ_0031500

SIB27 ENG

17296 (Replaces 18G2 5823)  07.06 IOM GLF

**KVT-8**

# Investment Portfolio Summary Information
## For the Quarter Ended June 30, 2006

| Tier | Company | Symbol | Exchange | Held | Invested Amount ($000's) | Total | Pro-Forma Estimated Valuation Outlook Low ($000's) | High ($000's) | Fully Diluted Ownership |
|---|---|---|---|---|---|---|---|---|---|
| 4 | Elandia Solutions, Inc. | ELAN | OTC | $15,665 | $195,542 | $195,542 | $331,000 | $331,000 | 56.45% |
| 5 | American Leisure Group, LTD | ALG | AIM | $24,192 | $50,723 | $58,388 | $105,700 | $105,700 | 15.15% |
| 6 | Forelend Holdings, Inc. | FOFH | OTC | $19,736 | $30,962 | $55,154 | $35,000 | $40,000 | 80.91% |
| 7 | Spring Creek, LLC and Related Companies | | | | $31,842 | $41,578 | $50,000 | $50,000 | 50.00% |
| 8 | Health Systems Solutions, Inc. | HSSO | OTC | $8,850 | $27,008 | $27,008 | $53,000 | $60,000 | 60.25% |
| 9 | DOZE Corporate, Inc. | DOC | AMEX | $20,250 | $15,854 | $24,744 | $64,000 | $64,000 | 28.69% |
| 10 | USFR Media Group | | | $4,222 | $4,222 | $24,472** | $36,000 | $50,000 | 33.04% |
| 11 | The Ultimate Gift Experience | | | $14,650 | | $14,650 | $10,000 | $10,000 | |
| 12 | Phoenix Bay, Inc. | | | $13,650 | | $13,650 | $12,000 | $18,000 | 34.13% |
| 13 | Ritmour Broadband Multimedia | | | | $9,216 | $9,216 | $40,000 | $40,000 | 14.45% |
| 14 | Golden Financial Services | | | $2,600 | $2,030 | $2,630 | $8,600 | $8,600 | 40.49% |
| 15 | Siasco Technologies, Inc. | SNT | AMEX | $5,000 | $3,085 | $8,085 | $31,000 | $31,000 | 23.39% |
| 16 | Caribbean Leisure Marketing, LTD | | | $6,813 | $1,000 | $7,813 | $2,200 | $2,200 | 30.00% |
| 17 | Sara Parviews | | | | $7,000 | $7,000 | | | 29.50% |
| 18 | Lumines Corporation | | | | $6,416 | $6,416 | $46,000 | $46,000 | 10.67% |
| 19 | DealerArmour, Inc. | DLAV | OTC | $873 | $5,552 | $5,552 | | | 7.17% |
| 20 | Edgewater Communications | | | $2,790 | $990 | $4,529 | $3,790 | $3,790 | 24.65% |
| 21 | Greystone Pharmaceuticals, Inc. | | | $5,000 | $990 | $5,490 | $5,000 | $5,000 | 4.31% |
| 22 | Globalquest, Inc. | | | $3,107 | $2,153 | $5,233 | $3,100 | $3,100 | 73.02% |
| 23 | Tree Top Kids, Inc. | | | | $4,000 | $4,000 | $24,440 | $24,440 | 43.14% |
| 24 | KfauMed Inc. | | | $4,000 | $4,000 | $4,000 | $7,200 | $7,200 | 5.23% |
| 25 | Cogniare Networks, Inc. | COINW | OTC | | $3,784 | $3,784 | | | 7.91% |
| 11 | Thiel Mande | | | | $2,577 | $2,577 | $2,500 | $2,500 | 45.33% |
| 26 | Panaceuti Building Materials, Inc. | | | $1,450 | $1,000 | $2,450 | $1,450 | $1,450 | 11.65% |
| 27 | Whisper Corporation | | | $650 | $1,233 | $1,883 | | | 41.12% |
| 28 | Beverly Sassoon & Co. | | | $150 | $1,573 | $1,723 | | | 18.02% |
| 11 | Running the Sahara | | | | $1,600 | $1,600 | $1,600 | $1,600 | 50.00% |
| 29 | Majestic | | | $3,318 | | $1,133 | $800 | $1,200 | 50.00% |
| 11 | The Lie | | | | $6 | $500 | $500 | $500 | 25.00% |
| 30 | Milway CC Hotel Partners | | | | $15,300 | $15,300 | $15,300 | $15,300 | 71.83% |
| 30 | Mountals Partners | | | | $7,383 | $7,383 | $7,350 | $7,350 | 5.00% |
| 30 | Cabjed Investments II | | | | $6,000 | $6,000 | $6,000 | $6,000 | 20.00% |
| 30 | Washington National | | | | $5,678 | $5,678 | $7,300 | $7,300 | 4.00% |
| 30 | ACON Project Allegro | | | | $4,734 | $4,734 | $7,161 | $7,161 | 1.50% |
| 30 | Louisiana Venture | | | | $3,510 | $3,510 | $4,000 | $4,000 | 6.70% |
| 30 | ACON Bastion Partners II | | | | $3,510 | $3,510 | $3,255 | $3,255 | 10.75% |
| 30 | AquaX29 | | | | $3,800 | $3,800 | $3,800 | $3,800 | 10.00% |
| 30 | ACON Bastion Partners I | | | | $2,586 | $2,586 | $3,379 | $3,379 | 10.75% |
| 30 | Memphis Bio-Med Venture II | | | | $2,500 | $2,500 | $3,250 | $3,250 | 9.39% |
| 30 | Panorama | | | | $2,285 | $2,285 | $2,200 | $2,200 | <5.0% |
| 30 | Danox | | | $150 | $350 | $500 | | | <5.0% |
| 30 | Infinity Israel-China Fund Partners | | | | $150 | $150 | $150 | $150 | 0.3% |