**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3-09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT, | § | |
| | § | |
| Defendants. | § | |

---

**REPLY IN SUPPORT OF RECEIVER'S MOTION FOR**
**APPROVAL OF SECOND INTERIM FEE APPLICATION**

---

BAKER BOTTS L.L.P.                THOMPSON & KNIGHT LLP
910 Louisiana                    1722 Routh Street
Houston, Texas  77002-4995       Dallas, Texas  75201
(713) 229-1234                   (214) 969-1700
(713) 229-1522 (Facsimile)       (214) 969-1751 (Facsimile)

**ATTORNEYS FOR RECEIVER**
**RALPH S. JANVEY**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ ii

    A.    The "results obtained" by the Receiver are not accurately measured
           by current cash on hand ................................................................................. 2

    B.    Waiting six months to receive payment of fees discounted by 20% and
           expenses advanced on behalf of the Estate does not constitute a "windfall." .............. 7

    C.    The objectors ask the Court to deny fees for activities that the Receiver
           is required to perform under his order of appointment. ............................................... 9

    D.    The evidence submitted in support of the Receiver's application, as well
           as the record in this case, provide ample support for the reasonableness
           and necessity of the fees and expenses. ................................................................. 11

    E.    The SEC and Examiner unreasonably contend that the Receiver and a
           small army of paralegals and clerks should be able to dismantle the
           world-wide infrastructure supporting a "massive Ponzi scheme" that Stanford
           took 20 years to build. ........................................................................................... 14

    F.    Ernst & Young has been instrumental to securing assets, analyzing corporate
           structure, providing litigation support, and tax functions. ....................................... 20

      (1)    Locate, Secure & Monetize Assets ................................................................. 21

      (2)    Analyze Corporate Structure & Determine Existence of Related Financial
             Statements .................................................................................................... 21

      (3)    Provide Litigation Support & Assist in Interaction with Government and
             Regulatory Agencies ..................................................................................... 21

      (4)    Provide Tax Function for the Receivership ...................................................... 22

    G.    The Receiver and professionals seek reimbursement only for actual expenses
           incurred ................................................................................................................. 22

CONCLUSION AND PRAYER FOR RELIEF ....................................................................... 23

CERTIFICATE OF SERVICE ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Broadway Trust Co. v. Dill*,
   17 F.2d 486 (3d Cir. 1927)......................................................................... 6

*Cross v. Leverich Realty Corp.*,
   41 F.2d 797 (D.C.N.Y. 1930)...................................................................... 4

*Northumberland County v. Philadelphia & Reading Coal & Iron Co.*,
   131 F.2d 562 (3d Cir. 1942)........................................................................ 4

*Parsons v. Detroit & Canada Tunnel Co*,
   15 F. Supp. 986 (D.C. Mich. 1936) ............................................................. 4

STATUTES

28 U.S.C. § 959(b)............................................................................................ 6

The SEC and Examiner continue the same pattern of objections raised to the Receiver's first application for payment of fees and expenses; only the tone and decibel level of the objections appear to have changed.  Both object to the Receiver being paid for any work with which they disagree, even if the work is necessary to the Receivership Estate and even if it is required by Court Order.  Both continue to complain about a lack of detail in the voluminous documents submitted which support the work performed and the solution they offer is that the Receiver should submit even more voluminous detail that need not be reviewed by the Court, because another arbitrary 20% reduction in payments will suffice.[1]  Both object to the amount of the bills submitted for approval, but they never attempt to answer the question of how the wind-down of the Stanford fraud empire, 20 years in the making – with its 140+ entities, 3,000+ employees, litigation, assets and liabilities scattered around the world – can be accomplished on the cheap.  A big mess such as what the Receiver confronted in February 2009, requires a big clean up, yet those who oppose payment to the Receiver claim to be shocked that a big clean up produces a big bill.  Such objections ignore the scope and complexity of this Receivership, and barely pay lip service to the legal standards governing the Receiver's request for payment.

The Receiver has had only six months to investigate, take control of, and advise the Court on the condition of the Estate.  Unraveling the legal relationships among the 149 now known Stanford entities and identifying their assets and liabilities – with little more than false books and records and approximately 200 different financial, operational, and accounting systems containing differing financial data as a roadmap – has been incredibly challenging, even for the Receiver's large, highly skilled and experienced team.  Virtually every fact regarding every aspect of the Stanford businesses has to be discovered, tested, and confirmed; no reliable

---

[1] The Receiver and his team have already agreed to discount their fees by more than 20%, which amounts to $6.8 million, in connection with the first two fee applications.

information has been available with the push of a button.  And because everyone who engaged in any business with defendants – not only investors, but every utility company, landlord, tenant, bank, mortgagor, and employee – knows that there will not be enough money to pay all claims in full, the Receiver has had to fight to enforce the Court's injunctions and to wrest control from others of almost every asset he has acquired.

This investigation has revealed that the Estate is comprised, in large part, of grossly overvalued real and personal property, subject to competing claims and legal proceedings in jurisdictions all over the world.  Even acquiring that seemingly basic knowledge took significant skill and resources.  The actions required to dismantle the Stanford network would be absolutely necessary, and costly, whether the remaining assets had $1 billion or $1,000 in net value.  For example, the Receiver has spent more than $17 million winding up mandatory legal compensation commitments to Stanford employees alone in the past six months.  Although *there is* additional value to be realized for victims, it will not be simply relinquished to the Receiver's control; it will require the expenditure of additional resources to capture and repatriate foreign assets and to pursue claims against those who received investors' funds in the form of CD proceeds.  The Order and Amended Order Appointing the Receiver *direct* the Receiver to engage in these activities, for which he and his team should be compensated.

For these reasons, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.

A.    **The "results obtained" by the Receiver are not accurately measured by current cash on hand.**

The SEC and the Examiner make cursory citation to the *Johnson* factors as relevant to the determination of reasonable and necessary fees, but emphasize the "results

obtained" (as evidenced only by cash in the bank) to the exclusion of almost anything else.[2]  The SEC lumps together the Receiver's first two fee applications and contends erroneously that $27.5 million in fees and expenses were incurred to secure $81.1 million that was just sitting "in accounts . . . and therefore did not require complicated or extensive work to secure."  They then argue that payment would constitute a windfall for the Receiver and his team.  This contention lacks any merit.

First, the Receiver has kept the Court apprised of the amount of cash on hand because it is one component of the value of the Estate and is a readily available metric.  However, it fails to reveal the cash inflows to the Estate as well as significant cash expenditures required to wind down the Stanford operations that have been 20 years in the making.  During the first five-and-a-half months of the Receivership, from February through July:

- The Receiver took control of more than $112 million in cash.  Attached for the Court's reference is a table summarizing the cash inflows and outflows from the Estate.  *See* Receipts & Payments, attached at Appdx. 32.

- The Receiver was required to spend more than $31 million on operations and wind down costs unrelated to professional fees and expenses.  *See id.*

- More than $18 million in cash has been paid out on Stanford employee-related expenses alone (including $6.66 million in salaries; $3.46 million in payroll taxes; $4.12 million in employee medical insurance; $1.88 million in 401(k) expenses).  *See id.*

---

[2]    The Examiner's vitriol and implications regarding this issue are startling and unwarranted.  Upon filing his fee applications, the Receiver has provided a value for cash on hand that is more current and recent than the period for which fees are requested.  The first fee application covered the period through April 12 and reported cash on hand as of May 14, one day before the motion was filed.  The second fee application covered the period through May 31 and reported cash on hand as of July 30, four days before the motion was filed.  The Examiner describes this as "sleight of hand to attempt to inflate the extent to which the Estate is 'benefitting' from the Receiver's efforts."  Examiner's Objections, Doc. 739 at 8.  However, if this data had been omitted or the Receiver had provided a figure that was weeks' old, he would undoubtedly have been accused of hiding or failing to possess this basic information on the Estate's finances.

When it requested that defendants be placed in Receivership and assumed that assets of $1 billion would be readily available, the SEC likely did not know that the Receiver would need to spend $31 million in the first five-and-a-half months – $17 million of that on 3,000 employees – just to wind down Stanford operations pursuant to contractual obligations, and federal, state and foreign laws. These costs are not discretionary; they are mandatory and must be paid out of the Estate. *See Northumberland County v. Philadelphia & Reading Coal & Iron Co.*, 131 F.2d 562, 564 (3d Cir. 1942); *Parsons v. Detroit & Canada Tunnel Co*, 15 F. Supp. 986, 1003 (D.C. Mich. 1936); *Cross v. Leverich Realty Corp.*, 41 F.2d 797, 798-99 (D.C.N.Y. 1930).

Second, the suggestion that it has been easy for the Receiver to gain possession and control of assets shows either that the objectors actually pay very limited attention to what the Receiver does on a day to day basis, or they have a limited understanding of what a Receiver must do when faced with a task as daunting as gaining control of the Stanford entities and their assets. Even cash in the Bank was not readily turned over to the Receiver pursuant to the Court's orders. Much of the cash in the United States was on deposit to secure Letters of Credit. Neither the holders of the LOCs, nor the Banks holding the accounts, were willing to transfer those funds to the Receiver's control immediately. Even securing much of the cash on deposit required legal research, claims, demands, negotiations, and compromise over a period of several weeks. The real and personal property over which the Receiver has gained control is often subject to one or more liens, making the liquidation of those assets more complicated, time consuming, and less profitable than if the Estate owned them outright. Moreover, the Receiver is overseeing the

liquidation of luxury items, private equity, and real estate during the worst recession in fifty years.  It is not a seller's market.[3]

Third, cash on hand is not a realistic measure of the Receiver's success because, as James Davis has now admitted, those in charge of the Stanford fraud have been at work for 20 years dissipating investor funds.  Plea Agreement, attached at Appendix, 1-31.  Just by way of example, in 1993, Stanford purchased a new 50' yacht for approximately **$375,000**.  In 2004, he spent approximately **$1.1 million on improvements** to the yacht.  Thus, he spent $1,475,000 of investors' funds on an asset that has a current fair market value of approximately $150,000.  In 1998, Stanford purchased a used 94' yacht for **$3.9 million**.  In 2003, he shipped it to the manufacturer in Holland to be **rebuilt at a cost of at least $13 million**.  This "asset" also costs the Estate $4,100 a month to maintain and has a current fair market value of less than half the $16.9 million in investor funds that Stanford spent on it.  These are but two of many instances in which investor funds were simply wasted on depreciating personal property.

Finally, to measure the results of the Receiver's efforts only by cash on hand is naïve.  The Receiver's team has secured a stay or dismissal (by order or agreement with the parties) of 22 cases in state and federal courts in 13 jurisdictions that were filed in violation of the Order and Amended Order Appointing the Receiver.  Each case stayed or dismissed represents savings of considerable additional defense costs to the Estate.  The Receiver's

---

[3]     For example, the Estate "owned" five aircraft that were financed by VFS Financing, Inc.  Joint Submission, Doc. 472 at 1.  VFS held a security interest in each of the aircraft and certain security deposits posted by Stanford subsidiaries.  VFS was also the beneficiary of four letters of credit (in amounts exceeding the market value of the aircraft) issued by Comerica Bank at the request of the Stanford subsidiaries.  The Stanford subsidiaries were in default of their obligations under the debt documents when VFS threatened litigation against the Estate.  *Id.* at 4.  After months of negotiations, and two independent appraisals of the aircraft, the Receiver and VFS reached a settlement whereby the Estate was relieved of approximately $1 million per month in costs of ownership in luxury items that were eroding in value, and recovered almost $5 million in cash despite the fact that the Estate owed more on the aircraft than they were worth.  Order, Doc. 516.

investigation has uncovered information being used by numerous domestic and international government regulatory agencies, including the U.S. Attorney and the Department of Justice, which recently secured a plea of guilty from defendant James Davis.  Davis has agreed to the entry of a personal money judgment against him.  Appdx. at 21, ¶ 19.  None of the Receiver's activities in satellite litigation, responding to government requests, or analyzing Stanford's personal tax returns, nor many other similar endeavors, will increase the amount of cash under the Receiver's control.  But it is short sighted indeed to ignore the fact that the Receiver is required to engage in these activities by the order appointing him and that they have, or will, render positive "results obtained" for the Estate.

The objectors' narrow focus on cash under the Receiver's control, to the exclusion of all else, ignores the proper legal standards for evaluating the "results obtained," much less the other factors that inform the reasonableness and necessity of the fees and expenses incurred.  Moreover, such a focus minimizes the Receiver's clear obligation to manage, operate and, when appropriate, liquidate the property of the Estate.  *See* 28 U.S.C. § 959(b) (provides that a "receiver or manager appointed . . . shall manage and operate the property in his possession . . . in the same manner that the owner and possessor thereof would be bound to do if in possession thereof."); *Broadway Trust Co. v. Dill*, 17 F.2d 486 n.1 (3d Cir. 1927) (Recognized power of a receiver includes the duty of "closing up of affairs of insolvent corporations.").  This responsibility cannot be ignored merely because there are no quickly realized tangible benefits for the Estate.  On the other hand, there are various viable Estate entities, which must be managed and liquidated in an orderly process to maximize the value of the Estate.  Unwinding of this Estate will never occur spontaneously, but rather by diligent and careful work by the

Receiver and his staff.  For these reasons, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.

**B.     Waiting six months to receive payment of fees discounted by 20% and expenses advanced on behalf of the Estate does not constitute a "windfall."**

For the second time, the SEC cautions that paying the professional fees and expenses of the Receivership would result in a windfall to the Receiver and his team.  To the contrary, these costs are consistent with the Receiver's efforts to execute his Court ordered duties and were anticipated by the SEC.  In March, the SEC met with the Receiver and each of his principal firms at Stanford headquarters in Houston for a formal briefing on the Receiver's strategy and the role of each firm in executing that strategy.  The SEC was apprised of the major tasks to be undertaken, the means being employed to accomplish them, and the personnel required and retained to execute the Receiver's plans for locating and monetizing assets, evaluating claims by and against the Estate, winding down operations, and all other Court ordered duties.  The SEC representatives complimented the Receiver and encouraged him to proceed on the proposed track.  There was no suggestion of changing course, cutting back, or terminating any of the professional firms.  Thus, the Receiver's activities were acceptable, but after they were completed, the SEC balked at the inevitable costs.

On April 23rd the Receiver filed his first Report, which contained a great deal of information regarding the complexity of the Estate and the availability of assets.  Shortly thereafter, on April 28th, the Receiver provided the SEC with a budget through the beginning of June.  As a result, the SEC has been aware of the necessary tasks, and intentions of the Receiver to address such tasks, despite the knowledge of assets recovered to date and challenges the Receiver was facing since April.  In early May, SEC representatives met with members of the Receiver's forensic accounting team in Houston to assess the account review process and why

such review was so time consuming.  They commented that before their visit, they had no idea just "how bad" the account data was.  Thus, the fees and expenses incurred and the results obtained are not a surprise to the SEC, at least not since the first few weeks of the Receivership when it commended the work of the Receiver and his team, received the budget, was apprised of the paucity of readily-available assets and disastrous state of the business records, and agreed to support the Receiver's application conditioned on a 20% discount of fees.[4]  The actual fees incurred have been consistent with that budget.  Moreover the weekly "burn rate" for fees and expenses throughout the Receivership has been reduced significantly.[5]

Finally, every professional firm that has provided services to the Receivership agreed to a significant 20% discount of fees in recognition of the fact that the Estate would be smaller than expected.  Every firm has provided six months of services and advances for expenses without a penny of remuneration thus far.  Not one firm has asked to withdraw from representing the Receiver in the face of not only delay, but strenuous, even shrill objections to their being paid at all.  Each has continued to perform the work requested by the Receiver because they serve this Court and not the SEC, Examiner, or court of public opinion.

For these reasons, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.

---

[4]    The SEC objects that some professionals appear to have billed time for preparing the Receiver's fee applications.  When the Receiver and his team agreed with the SEC to discount fees by 20%, they also agreed that they would not charge the Estate for the considerable professional time related to preparing the fee applications.  However, this time is recorded under "administrative" sub-matters for which the Receiver is not charged.  If there are professionals who have inadvertently coded their time incorrectly, resulting in charges for preparing the fee applications, this will be remedied for the pending applications as well as any future applications.

[5]    From February 16 through April 12, when the Receiver's team was taking control of numerous Stanford offices nationwide, the "burn rate" for fees and expenses was $2.5 million per week.  From April 13 through May 31, the burn rate was $1.1 million per week, a reduction of 56%.  The burn rate for June 1 through July 31 is an estimated $900,000 per week, for a further reduction of 18%.

**C.     The objectors ask the Court to deny fees for activities that the Receiver is required to perform under his order of appointment.**

The Antiguan Liquidators, Robert Allen Stanford, the SEC and the Examiner have all argued that the Receiver's team should not be compensated for executing specific tasks to which they object.  For example, the SEC and Examiner recommend that the Receiver's team be awarded no compensation for enforcing the account freeze and pursuing clawback claims, asserting that the Receiver is unlikely to prevail on the clawback claims, and that if he does prevail there will be no material benefit to the Estate.  But in each instance, the "objectionable" activities are all required by Court order.  The Receiver's duty to pursue these activities has been affirmed more than once:

- In February, this Court ordered the account freeze and directed the Receiver to initiate legal proceedings against persons in possession of assets of the Estate and traceable to the Estate.  Temporary Restraining Order, Doc. 8; Order Appointing Receiver, Doc. 10.

- In March, the freeze and authority to file clawback claims were affirmed by Preliminary Injunction and the Amended Order Appointing Receiver.   Agreed Preliminary Injunction, Doc. 80; Amended Order Appointing Receiver, Doc. 157.

- In June, over objections from the SEC and Examiner, the Court affirmed the freeze for another five weeks to permit the Receiver to assert claims against individual investors.  Order, Doc. 533.  This Court then denied the SEC's request, supported by the Examiner, to strip the Receiver of the authority to pursue clawback claims.  SEC's Emergency Motion, Doc. 613; Examiner's Response in Support, Doc. 622; Order, Doc. 674.

- In August, the Court granted the Receiver's motion to extend the freeze of amounts representing "profit" or "interest" on CDs pending the adjudication of clawback claims against investors.  Case No. 3:09-cv-724, Order, Doc. 35.

- This Court also extended the freeze over amounts representing investors' principal investment for 10 days to permit the Receiver to file an emergency motion with the Fifth Circuit.  *Id.*  The Fifth Circuit has extended the freeze and expedited the Receiver's pending appeal.  Case No. 09-10761, Order entered Aug. 11, 2009.

The Examiner states that this Court has "largely rejected" the viability of clawback claims. Doc. 739, at n.2. To the contrary, the Court has affirmed their viability through its orders more than once, including the continuous freeze on accounts of financial advisors. Order, Doc. 533  Although the SEC contends that clawback claims will confer no "material benefit" on the Estate, the Receiver has identified more than $130 million in CD proceeds to financial advisors and hundreds of millions more in CD proceeds to investors. Even if the Receiver is limited to claims for interest on investors' CDs, they are worth an estimated $60 million[6] – making the legal right to pursue these claims some of the most valuable assets of the Estate. *See* Amended Order Appointing Receiver, Doc. 157.

The SEC and Examiner complain that the Receiver has not previously provided a break down of amounts that investors received as a return on principal versus interest and the Examiner ascribes rather sinister motives to that failure. This is but one more example of a fundamental misunderstanding of the condition of the Estate's books and records and the resources required to collect seemingly "basic" information. This process has been hampered by the fact that Stanford's records are known to be fraudulent. In addition the information that is available is not organized in a way that is conducive to calculating these numbers.

The Estate records do not contain anything like a statement or summary of activity that accurately reflects original principal investment, reinvestment of principal upon maturity, interest payments, and redemption payments for each account or each customer. Account statements mailed to investors contained false investment and revenue values. Plea Agr. at ¶ 17(d). Complicating matters, some investors held multiple accounts at SIBL and

---

[6]    The Receiver's analysis of the principal versus interest paid to investors is ongoing. The current estimate of $60 million was obtained this week and thus has not been available to provide to the SEC and Examiner until now. When the Receiver's analysis is complete this amount will likely be higher.

owned multiple CDs over long periods of time; some reinvested principal and/or interest, others did not; some CD proceeds were transferred to Pershing, others were not. Multiple accounts owned by the same customer are not usually linked to one another in the Estate's records.

The Receiver's team was able, under the pressure of a deadline from the Court, to review records and calculate total CD proceeds paid to hundreds of investors, all of which the Receiver believes the Estate is entitled to clawback under decades of legal precedent. The additional work required to distinguish between payments for the redemption of principal versus interest was not possible given the time constraints, was not necessary to bring claims for the entire amount of CD proceeds to which the Estate is entitled, and would have been an unnecessary expenditure of resources at that time. It is the Court's subsequent order that has made this distinction relevant. After considerable additional forensic accounting work, the Receiver has determined that interest payments to investors total at least $60 million, an amount which certainly justifies the Receiver's decision to incur professional fees and expenses to investigate and pursue such claims.

For these reasons, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.

**D.    The evidence submitted in support of the Receiver's application, as well as the record in this case, provide ample support for the reasonableness and necessity of the fees and expenses.**

The Examiner joins the SEC's objection that the Receiver's evidence in support of the second fee application is insufficient. In particular, they contend that the evidence does not permit an evaluation of the nature of or necessity for services by Financial Industry Technical Services, Inc. ("FITS").[7] They also criticize "lumped" time entries, but contend that

---

[7]    The SEC states that FITS "billed $444,287 for 7 weeks (49 days at $4,297) of work." Doc. 738 at 6. The SEC is citing the customary rate for FITS's professional fees before the 20% discount to the

because of the voluminous nature of fee applications, the Court cannot review specific time entries and should simply cut 20% – $1.52 million – from the amount of fees and expenses sought for the April 13th - May 31st time period.

First, FITS has been working at Stanford headquarters in Houston since the beginning of the Receivership.  The SEC and Examiner have had direct contact with FITS, observed its work first hand, and been the beneficiaries of much of FITS's labor.  SEC representatives spent two days with FTI and FITS professionals in Houston in early May, being apprised of the monumental undertaking required to unravel the entities' financial and customer account information.  Accordingly, the SEC and Examiner should be well aware of the services rendered by FITS.

Second, FITS's invoice does describe the work performed by its professionals to analyze, evaluate, and advise on the day-to-day operations, client base, and accounts held by the Stanford broker dealer, registered investment adviser, and trust company; to assist in the identification of customers with assets held in custody at clearing brokers and SEI; to assist in the development of account release criteria; and to provide oversight of the daily activities of the brokerage operations department and analysis of its historical operations.  Doc. 673, Appdx. 482. Repeating some variation of this description daily for each time keeper would not add any substantive information but only pages to the evidence supporting fees.  FITS's services are set forth in the first and second fee applications in detail; there is no need to identify which accounts they analyzed on a specific day.

Third, the Receiver's first fee application for $19.9 million was supported by the April 23rd Report of the Receiver and a 130-page exhibit with detailed summaries of the

---

Receivership.  In fact, the Receiver requests $355,430 for professional fees by FITS during the period covered by the second application.  Doc. 669.

professionals' services.  The SEC and Examiner were provided with even more lengthy redacted invoices before the application was filed.  They objected that the evidence in support of fees did not categorize the work performed, was too much for anyone to actually read, and too little to provide support for the necessity of the fees and expenses incurred.  They asked that the professionals be required to produce more detailed invoices, but recommended a simple solution that would not require anyone to actually read them – cut the fee award by another $4 million.

Anticipating the same objections to subsequent applications, the Receiver has filed evidence in support of the second fee motion that is more detailed, and thus considerably more voluminous.  Although the categorization of services could not be completed for the first application when the firms were engaged in more triage work, beginning on April 13th, they did so.  The firms performing the bulk of the work have created internal accounting sub-matters so that time can be recorded to particular issues, such as "trust" or "litigation."  Thus the invoices reflect the percentage of time devoted to the major categories of work undertaken.  The Receiver has also submitted the detailed, daily time records for every professional.  As a result, almost 600 pages of invoices have been filed in support of $7.6 million in professional fees and expenses. But the SEC and Examiner now make the same complaints and the same recommendation as they did in June: the invoices do not break out the number of minutes per day that each professional devoted to each discrete task.  The professionals should be ordered to produce new, more voluminous invoices that will contain multiple entries per timekeeper per day to reflect this information, but no one need read them.  The objectors make the unwarranted claim that because the ultimate results to be achieved are unknown, the losses to investors are massive, and the Receiver should not be "rewarded" for pursuing the freeze and clawbacks, the Court should reduce total fees and expenses by 20%.  SEC Response, Doc. 738, at 6.

The Receiver submits that the 600 pages of detailed time records describing the daily activities of his professional team, the 417 filings in this case (including those by the Receiver to realize assets) through May 31st, and the detailed forensic evidence produced in support of clawback claims amply support both the reasonableness and necessity of the requested fees and expenses.  For these reasons, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.[8]

**E.    The SEC and Examiner unreasonably contend that the Receiver and a small army of paralegals and clerks should be able to dismantle the world-wide infrastructure supporting a "massive Ponzi scheme" that Stanford took 20 years to build.**

The SEC objects that the Receiver has overstaffed this case with too many lawyers and other professionals, and suggests that their work should be performed by non-lawyers such as paralegals and clerks.  Doc. 738 at 8.  The Examiner joins this objection but goes even farther, suggesting that the services of Ernst & Young and Pierpont Communications are simply unnecessary.  Doc. 739 at 12-13 & 15-17.  Once again, the objectors' criticisms are divorced from the facts of this case.  The Receiver was tasked with investigating the Estate and preserving or dismantling the business operations – without the benefit of any reliable information or any assistance from the very small group of people who knew how the Stanford companies even functioned.  The Receiver has engaged lawyers to discern the legal relationships, rights, and obligations created by Stanford's network of 149 companies which are subject to the laws of multiple jurisdictions.  He has engaged accountants and technology experts to analyze the data contained in the approximately 200 Stanford financial, operational, and

---

[8]    The Examiner complains that the Receiver's second fee motion does not seek fees and expenses for the month of June.  The preparation of each fee application takes considerable time and of necessity there is a delay between the end of a billing cycle and the filing of an application.  The preparation and filing of the applications are also subject to the other demands on the Receiver's team.  The fee application for June and July is currently being prepared and will be filed as soon as practicable.

accounting systems in order to locate, test, and confirm reliable information that can be used to protect, preserve, and increase the Estate's assets as much as possible.

This 20-year old, $7 billion dollar world-wide fraud was enabled by accountants and lawyers, both inside and outside the Stanford companies, and it will take people with accounting and legal skills to dismantle it. In his plea agreement for mail fraud, conspiracy to commit fraud, and conspiracy to obstruct an SEC investigation, Davis describes the long history of Stanford's Ponzi scheme. Davis has now admitted the following key facts:

- Beginning in at least 1999, Stanford and others falsified SIBL's earnings, revenue, and assets contained in Annual Reports. Plea Agr., ¶ 17(c).

- SIBL investors received account statements by mail, which contained false investment and revenue values. *Id.* ¶ 17(d).

- Only 10% of SIBL's investment portfolio consisted of liquid assets. *Id.* ¶ 17(g).

- By 2008, approximately 80% of SIBL's investment portfolio consisted of illiquid investments, including grossly overvalued real and personal property that SIBL had acquire from Stanford-controlled entities at falsely inflated prices. *Id.* At least $2 billion of undisclosed, unsecured personal loans from SIBL to Stanford were disguised in SIBL's financial statements as "investments." *Id.*

- Davis regularly created "false books and records in which the value of the [SIBL] investment portfolio was further fraudulently adjusted by percentage increases to produce false investments and revenue values. As a result, SIBL's values for revenue and investments were falsified on a routine basis." *Id.* at ¶ 17 (h).

- From at least 2002 through 2008, Davis prepared fictitious SIBL investment reports which were provided to the Antiguan Financial Services Regulatory Commission ("FSRC") on a quarterly basis. *Id.* at ¶ 17(i).

- Employees in SFG's accounting group were given a "secret instruction sheet" directing them to make changes that were necessary to generate false adjusted revenue figures. *Id.* at ¶ 17(l). These employees prepared the false financial statements published in SIBL's annual reports. *Id.* at ¶ 17(m).

- Years of routine false reporting "created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme" whereby CD redemptions could only be accomplished with new infusions of investor funds. *Id.* at ¶ 17(n). By the end of 2008, SIBL's monthly report stated that it held over $7 billion in assets, when it actually held less than $2 billion in assets." *Id.*

- Stanford and Davis bribed Leroy King, CEO of the FSRC, with investor money that was kept in a secret Swiss bank account. *Id.* at ¶ 17(q).

- In June 2005, King provided Stanford with an inquiry from the SEC to the FSRC requesting information on SIBL's investment portfolio. In this confidential letter, the SEC "stated that it had evidence to suggest that SIBL was engaged in a 'possible Ponzi scheme.'" *Id.* at ¶ 17(t). Stanford assisted King in drafting a false and misleading response to the SEC. *Id.* In 2006, King and Stanford again colluded to draft a false and misleading response to an inquiry from the SEC. *Id.* at ¶ 17(w).

- In 2008, Stanford and others recorded a series of related party property sales through business entities controlled by Stanford, falsely inflating a $65 million real estate transaction into a $3.2 billion asset of SIBL. *Id.* at ¶ 17(cc).

- From June 2008 to February 2009, the value of the Tier II assets managed by Holt (comprising only 10% of SIBL's investment portfolio) had decreased in value from approximately $850 million to $350 million. *Id.* at ¶ 17(ii).

In early May, when SEC representatives consulted the Receiver's professionals in Houston, they noted that they had actually been to Stanford's headquarters in 2006 and knew then that it was "a mess" but had no idea just how big a mess until now. So this mess falls to the Receiver and his professionals to sort out and clean up.

And to perform the difficult work of sorting out and cleaning up this mess, the Receiver has selected the various professional firms, including local counsel in certain jurisdictions, to complete the work they were most qualified and capable of doing in the most efficient manner.

For example, although Baker Botts and Thompson & Knight have both been engaged in day to day operations and office closures, there has been a strategy in place to maximize their efficiencies, avoid duplication, and leverage their resources from day one of the Receivership. The law firms closed different Stanford offices, depending on which one had its own office and personnel in closest proximity. They used associates for office closures and other activities as much as possible to reduce costs. Baker Botts has handled post-Receivership litigation and management of the Receivership in the United States and Europe. Thompson & Knight has handled pre-Receivership litigation and management of the Receivership in Latin America, where it has offices and personnel. The team has significant depth and breadth of expertise in international banking, bankruptcy, brokerage, and litigation, and a physical presence in the United Kingdom, Ecuador, Mexico, Venezuela and Peru.

The needs of the Receivership vary from day to day, even hour to hour. The larger professional firms were selected, in part, because they can bring additional capacity and expertise on board on short notice when needed. For example, when a petition for writ of mandamus was filed in the Fifth Circuit in April, that Court required the Receiver to file a response within 24 hours – before the Receiver had even been served with the petition and evidence in support thereof. One of Baker Botts's most skilled and experienced appellate practitioners was pressed into service to draft the response, utilizing previous briefing and research completed in this action; the mandamus was denied the same day the response was filed. For the more routine business of the Receivership, a much smaller core group of professionals have been employed almost full time for the past six months. For example, only 30 timekeepers account for 75% of the hours billed to the Receivership by Baker Botts in the second fee application.

For FTI, 88% of its professional fees are attributable to only 22 individuals. Approximately half of those are accounting professionals who have analyzed the Stanford records and documents secured from other depository institutions to demonstrate that Stanford was operating a Ponzi scheme – that new CD-purchase money funded CD proceeds paid out to financial advisors and other investors and to pay operating costs. The other half are technical data professionals capable of translating complex data into meaningful information, as well as preserving and producing documents to government agencies. The very few FTI professionals who billed less than 10 hours during the period covered by the second application performed discrete tasks, such as preparing hard drives for production, which did not involve any "learning curve." The Receivership was also able to capitalize on FTI's previous experience and knowledge base, by utilizing some of the same professionals who worked on the Madoff case.[9]

Each of the foreign firms has satisfied a specific need to represent the Receivership and assert this Court's jurisdiction over the Estate assets in a particular locale. Having local lawyers admitted to the bar and familiar with the substantive law in Canada, Switzerland, Antigua and the United Kingdom has satisfied the Receiver's duty to assert control and possession of all Estate assets in the most efficient way possible. The alternative, having U.S. attorneys learn the substantive law, be admitted to appear in foreign courts, and travel abroad for every court appearance, would be far more costly without any appreciable benefit to the Estate.

---

[9]    As the SEC and Examiner are undoubtedly aware, the U.S. Department of Justice called FTI personnel as an expert witness at Allen Stanford's bond hearing in the criminal case. FTI did not bill the Estate for the time spent on the day prior to the hearing preparing for testimony, or for attending that hearing. Numerous declarations by FTI personnel have been filed as evidence in this Court, as well as in Canada, Antigua, Switzerland, and the United Kingdom. *See e.g.*, Cause No. 3:09-cv-724, Doc. 18 at 1-25 & exhibits in support thereof.

The Examiner disparages Pierpont's work and questions the need for a communications firm. Pierpont monitors news coverage which provides the Receiver's team with timely information about events of importance to the Estate, including issues in Latin America, the Caribbean, and Europe. In addition, Pierpont has read each of the over 11,000 emails requesting information and elevated appropriate ones for a public or private response by the Receiver.

The Examiner also criticizes the Receiver's team generally and Pierpont specifically for failing to respond to investors' inquiries. More than 20,000 people purchased SIBL CDs and each has been affected, some to a devastating degree, by Stanford's fraud. Undoubtedly, they all have questions and many (including their advisors, relatives, and friends) would like a personal audience with the Receiver or a professional on his team periodically, as issues arise. The staff that would be required to respond individually to each of these inquiries would be several times the size of the Receiver's current team. Even using paralegals and clerks to respond personally to every investor who has contacted the Receiver would be terribly inefficient (and would result in misinformation being given to investors as the information necessary to fully understand the Receivership Estate at any given time is concentrated in as few persons as are necessary to fulfill the order of appointment). At this time, while the Receiver is still gaining control over assets, communicating with most claimants and the public through the Receivership website and issuing press releases on topics of interest are the best uses of limited resources, both human and economic.

For these reasons, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.

F.    **Ernst & Young has been instrumental to securing assets, analyzing corporate structure, providing litigation support, and tax functions**.

The Examiner asserts that there is no need for Ernst & Young (EY) to create accurate financial statements for the Stanford entities because none will continue as a going concern and because the Receiver has cited Texas precedent disregarding corporate separateness when corporations are operated in furtherance of fraud.  This confuses the legal effect of the Stanford fraud with the practical necessity for accurate information about the many Stanford companies, each of which has a separate legal existence, assets, liabilities, rights, and obligations under the law of various domestic and foreign jurisdictions.[10]  Each entity is representative of an asset or assets, and yet financial information is still being discovered.  Moreover, much of the work that EY is doing to gain a complete understanding of the companies will be necessary to prepare required 2009 tax returns.

To support his efforts to identify, preserve and liquidate assets, the Receiver employed EY on February 19, 2009 and identified four major activities EY needed to undertake. Throughout the course of its work, EY has operated with a team of forensic accountants and, subsequent to March 13, 2009, tax accountants to accomplish much of its assignment.  EY has limited its efforts to only that specific work that was necessary, and some work has been either postponed or slowed significantly.  To date, EY has accomplished the following within the Receiver's four main areas of responsibility.

---

[10]    Ernst & Young has now confirmed the separate legal existence of 149 Stanford related entities. For 61 of these entities, EY has found ownership and financial information conclusively linking the entity to Allen Stanford and the other Stanford entities.  For 88 of these entities, there are corporate documents indicating that they were created and are owned by Stanford; although it is reasonable to conclude that these entities are the source of additional assets, liabilities, rights, and obligations of the Estate, so far the Receiver's team has not found financial documents for these entities.  Finally, there is credible evidence that another 133 companies were created but the Receiver's team has not yet found sufficient ownership information showing their relationship to Allen Stanford or other Stanford entities.

(1)     *Locate, Secure & Monetize Assets*

In order to assist the Receiver to execute his duty to locate, secure and monetize assets, Ernst & Young was assigned the following tasks: (i) to identify Estate assets based on financial records and other documentation; (ii) to identify detailed financial information that facilitates the Receiver's ability to recover assets; (iii) to substantiate documentation, ownership, and balances for assets; and (iv) to provide whatever additional documentation can be identified to effect the sale or liquidation of assets.

(2)     *Analyze Corporate Structure & Determine Existence of Related Financial Statements*

In order to assist the Receiver to execute his duty to take control and possession of all Estate records and assets, Ernst & Young was assigned the following tasks: (i) to determine the breadth of the Stanford network and identify all Stanford-related entities; (ii) to locate any financial information related to the entities identified; (iii) to prepare a combined balance sheet to assist the Receiver and his team in identifying assets and unknown entities; (iv) to identify and quantify assets and legal liabilities in foreign jurisdictions; (iv) to identify additional assets for recovery by the Receiver through financial statement analyses; and (v) to prepare the opening balance sheet of the Receivership.

(3)     *Provide Litigation Support & Assist in Interaction with Government and Regulatory Agencies*

In order to assist the Receiver to execute his duties to institute or intervene in litigation to preserve the value of the Estate and to promptly provide governmental agencies with the information they seek, Ernst & Young was assigned the following tasks: (i) to provide assistance with responses to particular requests from regulators and courts; and (ii) to assist with all efforts to recover assets within and without the United States, including the provision of evidence to be used in litigation.

(4)    *Provide Tax Function for the Receivership*

In order to assist the Receiver to execute his duties to assess and compromise any claims against the Estate, Ernst & Young was assigned the following tasks: (i) to lead tax support efforts for the Receivership at the federal, state, local and foreign jurisdictional levels to preserve the Receiver's claims to assets; (ii) to identify and execute the tax return extensions on March 15, April 15 and May 15 for various local, state, and federal filings; (iii) to capture and document accounting information necessary for tax filings; (iv) to develop data that will facilitate future compliance with relevant taxing authorities; and (v) to identify intercompany transfers/activities to assist with determining taxable activities.

Based on previous experience, the Receiver expects that the IRS will require separate tax filings for each separate Stanford entity, at least for 2009. The work that Ernst & Young has completed and in which it is currently engaged will facilitate the efficient completion of 2009 tax returns.

**G.    The Receiver and professionals seek reimbursement only for actual expenses incurred.**

The SEC and Examiner object to the payment of expenses that the Receiver's team have incurred and advanced to the Estate months ago, in particular travel costs, computer research, photocopying, and phone calls. Although a great deal of the work of the Receivership can be performed remotely, not all of it can. The Stanford headquarters are in Houston and there are dozens of Stanford offices, real and personal property throughout the United States, South America, Europe, and the Caribbean. The Receiver's team has been required to go to the locations where the records and assets reside in order to fulfill the Court's order to take exclusive control and possession of the Estate. The SEC filed its civil enforcement action in Dallas, but the criminal case against the defendants is pending in Houston; the attendance of the Receiver's

professionals has been required at court proceedings in both locations. Litigation and government action in South America, Canada, Switzerland, Antigua and the United Kingdom have also required the Receiver to have representatives travel to those locales on occasion to represent the Estate's interests and negotiate with stakeholders.

All costs incurred are billed to the Estate at the rates charged to the professionals by vendors. None of the firms add to those charges, for travel, computer research, photocopying, phone calls, or other expense items before passing them through to the Estate. Two of the firms, Pierpont and Altenburger have a customary practice of charging a flat percentage of fees in lieu of expenses; they have charged that same rate to the Receivership under the terms of their engagement.

Because the expenses for which the Receiver seeks reimbursement are adequately supported by the evidence and have been actually incurred and paid by the professionals in furtherance of duties imposed by the Court's orders, the Receiver's Motion for Approval of Second Interim Fee Application should be granted.

## CONCLUSION AND PRAYER FOR RELIEF

The Receiver respectfully submits that he has executed the duties of his appointment faithfully and that the fees and expenses incurred are reasonable and necessary. The Receiver asks the Court to grant the Motion for Approval of Second Interim Fee Application.

Dated:  September 1, 2009                    Respectfully submitted,

                                             Baker Botts L.L.P.

                                             By: /s/ Kevin M. Sadler
Richard B. Roper, III                            Kevin M. Sadler
Texas Bar No. 17233700                           Texas Bar No. 17512450
richard.roper@tklaw.com                          kevin.sadler@bakerbotts.com
THOMPSON & KNIGHT LLP                            One Shell Plaza
1722 Routh Street                                910 Louisiana
Dallas, Texas  75201                             Houston, Texas  77002-4995
(214) 969-1700                                   (713) 229-1234
(214) 969-1751 (Facsimile)                       (713) 229-1522 (Facsimile)

                                                 Robert I. Howell
                                                 Texas Bar No. 10107300
                                                 robert.howell@bakerbotts.com
                                                 David T. Arlington
                                                 Texas Bar No. 00790238
                                                 david.arlington@bakerbotts.com
                                                 1500 San Jacinto Center
                                                 98 San Jacinto Blvd.
                                                 Austin, Texas 78701-4039
                                                 (512) 322-2500
                                                 (512) 322-2501 (Facsimile)

                                                 Timothy S. Durst
                                                 Texas Bar No. 00786924
                                                 tim.durst@bakerbotts.com
                                                 2001 Ross Avenue
                                                 Dallas, Texas 75201
                                                 (214) 953-6500
                                                 (214) 953-6503 (Facsimile)

                                             **ATTORNEYS FOR RECEIVER
                                             RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On September 1, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the Court-appointed Receiver, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler