**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| Plaintiff, | § | **SECOND AMENDED** |
| | § | **COMPLAINT** |
| **v.** | § | |
| | § | Case No.:  3:09-cv-0298-N |
| | § | |
| **STANFORD INTERNATIONAL BANK, LTD.,** | § | |
| **STANFORD GROUP COMPANY,** | § | |
| **STANFORD CAPITAL MANAGEMENT, LLC,** | § | |
| **R. ALLEN STANFORD, JAMES M. DAVIS,** | § | |
| **LAURA PENDERGEST-HOLT, GILBERTO LOPEZ,** | § | |
| **MARK KUHRT AND LEROY KING** | § | |
| | § | |
| Defendants, | § | |
| **and** | § | |
| | § | |
| **STANFORD FINANCIAL GROUP COMPANY and** | § | |
| **THE STANFORD FINANCIAL GROUP BLDG INC.,** | § | |
| | § | |
| Relief Defendants. | § | |
| | § | |

Plaintiff Securities and Exchange Commission alleges:

<u>**SUMMARY**</u>

1.      For at least a decade, R. Allen Stanford and James M. Davis executed a massive Ponzi scheme through entities under their control, including Stanford International Bank, Ltd. ("SIB") and its affiliated Houston-based broker-dealers and investment advisers, Stanford Group Company ("SGC") and Stanford Capital Management ("SCM"). Stanford and Davis, acting in concert with the other defendants, misappropriated billions of dollars of investor funds and falsified SIB's financial statements in an effort to conceal their fraudulent conduct.

2.      By year-end 2008, SIB had sold more than $7.2 billion of self-styled "certificates of deposits" (the "CD") by touting: (i) the bank's safety and security; (ii) consistent, double-digit

returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.

3.       Contrary to SIB's public statements, Stanford and Davis, by February 2009, had misappropriated billions of dollars of investor money and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled by Stanford.

4.       In an effort to conceal their fraudulent conduct and maintain the flow of investor money into SIB's coffers, Stanford and Davis fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements.  Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn.  Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments.  SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis signed these falsified financial statements.

5.       Laura Pendergest-Holt, the chief investment officer of Stanford Financial Group ("SFG") and a member of SIB's investment committee, facilitated the fraudulent scheme by misrepresenting to investors that she managed SIB's multi-billion investment portfolio of assets and supervised a sizeable team of analysts to monitor the portfolio.

6.       Leroy King, the administrator and chief executive officer of Antigua's Financial Services Regulatory Commission (the "FSRC"), facilitated the Ponzi scheme by ensuring that the FSRC "looked the other way" and conducted sham audits and examinations of SIB's books

and records.  In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine SIB's investment portfolio.  King also provided Stanford with access to the FSRC's confidential regulatory files, including requests by the Commission for assistance in investigating SIB as a possible Ponzi scheme.  King further obstructed the Commission's investigation by allowing Stanford to dictate the substance, and even content, of the FSRC's responses to the Commission that relayed false assurances that there was no cause for concern as to SIB and by withholding information requested by the Commission that would have revealed Stanford's fraud.

7.      In addition to sales of the CD, SGC and SCM advisers, since 2004, have sold more than $1 billion of a proprietary mutual fund wrap program, called Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data.  The false data enabled SGC/SCM to grow the SAS program from less than $10 million in 2004 to over $1.2 billion in 2009 and generate fees for SGC/SCM (and ultimately Stanford) in excess of $25 million.  The fraudulent SAS performance results were also used to recruit registered financial advisers with significant books of business, who were then heavily incentivized to re-allocate their clients' assets to SIB's CD program.

8.      By engaging in the conduct described in this Complaint, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt directly or indirectly, singly or in concert, engaged, and unless enjoined and restrained, will again engage in transactions acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] or, in the alternative, aided and abetted such violations.    Likewise, through his

actions, King aided and abetted, and unless enjoined and restrained, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].  In addition, through conduct described herein, Stanford, SGC, and SCM violated Section 206(1) and (2) of the Investment Advisers Act of 1940 ("Adviser's Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King aided and abetted such violations.  Finally, through their actions, SIB and SGC violated Section 7(d) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7(d)].

## JURISDICTION AND VENUE

9.     The investments offered and sold by the Defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], Section 2(36) of the Investment Company Act [15 U.S.C. § 80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)].

10.     Plaintiff Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] to temporarily, preliminarily and permanently enjoin Defendants from future violations of the federal securities laws.

11.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

12.     Defendants have, directly or indirectly, made use of the means or instruments of

transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein.   Certain of the transactions, acts, practices and courses of business occurred in the Northern District of Texas.

## **DEFENDANTS**

13.     Stanford International Bank, Ltd. purports to be a private international bank domiciled in St. John's, Antigua, West Indies.  SIB claims to serve 50,000 clients in over 100 countries, with assets of more than $7.2 billion.  Unlike a commercial bank, SIB claims that it does not loan money.  SIB sells the CD to U.S. investors through SGC, its affiliated investment adviser.

14.     Stanford Group Company**,** a Houston-based corporation, is registered with the Commission as a broker-dealer and investment adviser.  It has 29 offices located throughout the United States.   SGC's principal business consists of sales of SIB-issued securities, marketed as certificates of deposit.  SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by R. Allen Stanford.

15.     Stanford Capital Management, a registered investment adviser, took over the management of the SAS program (formerly Mutual Fund Partners) from SGC in early 2007. SCM markets the SAS program through SGC.

16.     R. Allen Stanford**,** a citizen of the U.S. and Antigua and Barbuda, West Indies, is the chairman of the board and sole shareholder of SIB and the sole director of SGC's parent company.  During the Commission's investigation, Stanford refused to produce documents and information accounting for the bank's multi-billion dollar investment portfolio.

17.     James M. Davis**,** a U.S. citizen and resident of Baldwyn, Mississippi, is a director and the chief financial officer of SFG and SIB.  Davis maintains offices in Memphis, Tennessee, and Tupelo, Mississippi.  During the Commission's investigation, Davis refused to provide documents and information accounting for the bank's multi-billion dollar investment portfolio.

18.     Laura Pendergest-Holt, is the chief investment officer of SFG and a resident of Baldwyn, Mississippi.  She was appointed to SIB's investment committee on December 7, 2005.  She supervises a group of analysts who "monitor" the performance of a small portion of SIB's portfolio.

19.     Gilberto Lopez, a U.S. citizen and resident of Spring, Texas, worked in SFG's Houston, Texas, office, as the chief accounting officer of SFG and its affiliate, Stanford Financial Group Global Management, LLC ("SFGGM").   In this capacity, he provided accounting services to many entities under Stanford's control, including SIB, SFG and SFGGM.  Lopez is not a CPA.

20.     Mark Kuhrt, a U.S. citizen and resident of Christiansted, St. Croix, U.S. Virgin Islands, is the global controller for SFGGM.  In this capacity, he provided accounting services to many entities under Stanford's control, including SIB, SFG, and SFGGM.  Kuhrt reported at various times to Lopez and Davis, but also directly to Stanford. Kuhrt is not a CPA.

21.     Leroy King, a citizen of the U.S. and of Antigua and Barbuda, West Indies, is the administrator and chief executive officer of Antigua's FSRC.  Educated in the United States, he maintains residences in Antigua and in Atlanta, Georgia, where his wife lives.  King has over 20 years of experience in the United States banking industry.  King also serves on the board of directors of a U.S. registered broker-dealer and investment adviser based in Miami, Florida.

## RELIEF DEFENDANTS

22.     Stanford Financial Group Company, a Florida company owned and controlled by Stanford, holds certain assets, including real estate, on behalf of Stanford and his affiliated entities.  SFG employees also provide accounting, legal, marketing and other services to many entities under Stanford's control, including SIB, SGC and SFGGM.

23.     The Stanford Financial Group Building Inc., a Texas corporation owned and controlled by Stanford, holds certain assets, including real estate, on behalf of Stanford and his affiliated entities.

## STATEMENT OF FACTS

**Stanford International Bank**

24.     Stanford controls dozens of companies that operate under the name Stanford Financial Group.  Stanford is the sole owner of SFG, SIB, SFGGM and dozens of other affiliated companies.

25.     SIB, one of SFG's affiliates, is a private, offshore bank located in Antigua.

26.     The primary product offered by SIB is a self-styled certificate of deposit.  SIB sold more than $1 billion of the CD per year between 2005 and 2008, including sales to U.S. investors.

27.     SIB marketed the CD to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement.   In connection with the private placement, SIB filed several Forms D with the Commission.

28.     SIB paid disproportionately large commissions to SGC as compensation for the sale of the CD.  SGC received a 3% trailing fee from SIB on sales of the CD by SGC advisers.

SGC advisers received a 1% commission upon the sale of the CD, and were eligible to receive as much as a 1% trailing commission throughout the term of the CD.

29.     SGC used this generous commission structure to recruit established financial advisers.   The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to investors.

30.     In 2007, SIB paid SGC and its affiliates more than $291 million in management fees and CD commissions, up from $211 million in 2006.

31.     SIB aggregated customer deposits, and then purportedly reinvested those funds in a "globally diversified portfolio" of assets.   As of November 28, 2008, SIB reported approximately $8.6 billion in total assets and an investment portfolio in excess of $8.4 billion.

32.     In selling the CD, SIB told investors that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) the bank had averaged double-digits returns on its investments for over 15 years; (iii) Stanford had solidified SIB's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) the bank, in early 2009, was stronger than at any time in its history; and (vi) the bank did not have exposure to losses from investments in the Madoff fraud scheme.   These representations were false.

**SIB's Fraudulent Sale of CDs**

***Misappropriation of Investor Funds and Undisclosed Private-Equity Investments***

33.     In selling the CD to investors, SIB touted, among other things, the CD's safety, security and liquidity.

34.     In its CD marketing brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the bank's] certificate of deposit."  SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers" and the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."

35.     In its 2006 and 2007 Annual Reports, SIB told investors that the bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  More specifically, as seen below, SIB represented that its year-end 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments:



36.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisers, in February 2008, that the "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."

37.     SIB's annual reports also represented that "SIB does not expose its clients to the risks associated with commercial loans . . . the Bank's only lending is on a cash secured basis."

38.     Stanford and Davis approved and/or signed the Annual Reports, brochure and training materials.

39.     Contrary to SIB's representations regarding the liquidity and safety of its portfolio, investors' funds were not invested in a "well-diversified portfolio of highly marketable securities."   Instead, Stanford misappropriated a significant portion of the bank's investment portfolio.  And SIB internal records reflect that more than half of the bank's investment portfolio was comprised of undisclosed "Private Equity Real Estate."

40.     By year-end 2008, Stanford had misappropriated more than $1.6 billion from SIB. To conceal the theft, some of the transfers of CD investor money to Stanford were documented, after the fact, as personal "loans."   Stanford's signature appears on at least $720 million in promissory notes to SIB that were recovered from his personal accountant's office, including promissory notes dated December 31, 1999, December 31, 2000, December 31, 2001, December 31, 2002 and December 31, 2003.   Other "loans," particularly those in more recent years, were tracked in internal accounting records.

41.     These promissory notes were typically created after Davis had, at Stanford's direction, wired out billions dollars of SIB investor funds to Stanford or his designees.  Stanford used the money to, among other things, fund his "personal playground," including more than $400 million to fund personal real estate deals (*e.g.*, The Sticky Wicket Restaurant) and more than $36 million to subsidize Stanford 20/20, an annual cricket tournament boasting a $20 million purse.

42.     Lopez and Kuhrt (in addition to Stanford and Davis) were well aware of the more than $1.6 billion in "loans" to Stanford, tracking many of the transfers in a spreadsheet entitled "Shareholder Funding, Assumption of Debt and Notes Payable."   Stanford made few, if any,

payments required by the terms of the promissory notes.  Instead, Stanford and Davis frequently rolled the outstanding loan balances and interest owed by Stanford to SIB into new, larger promissory notes.

43.     Between February 2 and February 8, 2009, Stanford and Davis participated in meetings with a core group of senior executives in Miami, Florida for the purpose of preparing Pendergest-Holt and SIB's president for sworn testimony before the Commission staff.  During these meetings, Stanford and Davis admitted that they had misappropriated investor funds by making these putative loans to Stanford.

44.     During the Miami meetings, Davis and Pendergest-Holt collaborated on a presentation that included a pie chart detailing the allocation of assets in SIB's investment portfolio.  The pie chart reflected, among other things, that SIB's investment portfolio was primarily comprised of (grossly over-valued) real estate (50.7%) and promissory notes payable by Stanford (29.47%).

45.     Four days after the Miami meetings, Pendergest-Holt made a two-hour presentation to the Commission's staff – and subsequently testified under oath – regarding the whereabouts of SIB's multi-billion dollar investment portfolio.  During her presentation and testimony, Pendergest-Holt denied any knowledge concerning the allocation of the vast majority of the bank's assets, despite knowing that more than 80% of SIB's investment portfolio was comprised of undisclosed personal "loans" to Stanford, undisclosed private equity and real estate deals.

46.     The personal "loans" to Stanford were inconsistent with representations that had been made to investors. SIB's annual reports included a section entitled "Related-Party Transactions" that purported to disclose all related party transactions entered into by SIB.   But

SIB's "loans" to Stanford were not disclosed in that section of SIB's annual reports from 2004 through 2008, in its quarterly reports to the FSRC or anywhere else. Stanford, Davis, Lopez and Kuhrt, with full knowledge of the "loans" to Stanford, prepared, reviewed and authorized the filing and dissemination of these false and misleading annual reports.

47.    Contrary to the representations in the bank's annual reports that its "only form of lending is done on a cash-secured basis solely to existing clients," SIB exposed investors to the risks associated with more than $1.6 billion in unsecured personal "loans" to Stanford.

### *Falsification of Financial Statements*

48.    Stanford's misappropriation of investors' assets (and the poor performance of SIB's investment portfolio) created a giant hole in SIB's balance sheet. To conceal their fraudulent conduct and thereby ensure that investors continued to purchase CDs, Davis and Stanford, in concert with Lopez and Kuhrt, fabricated the growth, composition and performance of SIB's investment portfolio to give the appearance that the bank's investments were highly profitable.

49.    In its training materials for the SGC advisers, SIB represented that it earned consistent double-digit annual returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) for almost fifteen years:



**STANFORD INTERNATIONAL BANK**
**Return Vs. Interest Paid To Depositors**

50.     SIB marketed the CD using these purported returns on investment.

51.     SIB claimed that its high returns on investment allowed it to offer significantly higher rates on the CD than those offered by U.S. banks.  For example, SIB offered 7.45% as of June 1, 2005, and 7.878% as of March 20, 2006, for a fixed rate CD based on an investment of $100,000.  On November 28, 2008, SIB quoted 5.375% on a 3-year flex CD, while U.S. bank CDs paid under 3.2%.

52.     In SIB's Annual Reports, SIB told investors that the bank earned from its "diversified" investments approximately $642 million in 2007 (11%), and $479 million in 2006 (12%).

53.     SIB's investment income included in its annual reports was fictional.   In calculating SIB's investment income, Stanford and Davis typically provided to SIB's internal accountants, including Lopez and Kuhrt, a predetermined return on investment for the bank's portfolio.   Using this predetermined return, SIB's accountants, including Lopez and Kuhrt, reverse-engineered the bank's financial statements.   After they calculated the fictional investment income and asset growth and received Stanford and Davis' approval, Kuhrt and Lopez created and booked false accounting entries.

54.     Through their actions, Stanford, Davis, Lopez and Kuhrt caused SIB to report investment income that the bank did not actually earn and, thereby, greatly inflated the value of its investment portfolio.   Specifically, Stanford, Davis, Lopez and Kuhrt prepared and reviewed SIB's financial statements, including the annual reports that were provided to investors and posted on the bank's website.

55.     To hide the fabrication of SIB's double-digit annual returns on investment, Davis, Lopez and Kuhrt developed and implemented an elaborate and complex set of protocols for handling SIB financial information in which: (i) all SIB-related financial and other information was transferred to thumb drives and then deleted from servers located in the United States; (ii) back-up files were kept on a portable hard drive referred to as "the football;"  (iii) paper SIB-related files were regularly flown to Antigua via Stanford's private jets, where they were burned; and (iv) electronic spreadsheets used to prepare the fraudulent financials were protected with passwords that were distributed via text message (to avoid detection on email servers).

56.     Between February 2 and February 6, 2009, Stanford and Davis admitted, following a meeting with a core group of senior executives (including Pendergest-Holt) in Miami, Florida, that they had falsified SIB's financial statements.

### Misrepresentation of Capital Infusions and Bogus Real Estate Transactions

57.     As world financial markets experienced substantial declines in 2008, it became apparent to Stanford and Davis that SIB could not credibly report investment profits in the 11% to 15% range (as it had done in previous years).  Stanford and Davis agreed that SIB would for the first time show a "modest" loss to avoid raising too many red flags.  In other words, they wanted to tell a "more believable lie."

58.     Stanford and Davis knew that reporting a loss would cause SIB to fall below minimum regulatory capital requirements.  Accordingly, Stanford informed Davis and other employees that he, in an effort to assure investors that SIB was financially sound, would contribute capital to the bank in two infusions of $200 million and $541 million.  SIB touted the $541 million capital infusion to investors in a December 2008 report:

> Although our earnings will not meet expectations in 2008, Stanford International Bank Ltd. is strong, safe and fiscally sound. We have always believed that

depositor safety was our number one priority. To further support the Bank's growth and provide a strong cushion for any further market volatility, the Bank's Board of Directors made a decision to increase the Bank's capital by $541 million on November 28, 2008. This contribution brings total shareholder equity to $1,020,029,802 with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%.

59.     Stanford, Davis and Pendergest-Holt approved the December 2008 Monthly Report.

60.     The purported capital infusions by Stanford were backdated, fictitious and engineered to give the appearance that SIB had achieved "desired" levels of capital.

61.     Stanford, Davis, Lopez and Kuhrt considered two alternatives for disguising the fictitious capital contributions.   First, Kuhrt and his subordinates proposed a massive restructuring project in which Stanford would contribute personal holdings, including most of his real estate and global banking interests, to SIB as "capital."  When one of Kuhrt's subordinates complained that the task could not be completed on the required timeline, and that the value of the companies to be contributed to SIB would have to be impaired first because "none of them had ever turned a profit," Stanford, Davis, Kuhrt and Lopez turned to another strategy.

62.     In December 2008, well after Stanford had purportedly infused the $200 million and $541 million in additional capital into SIB, Stanford, Davis, Lopez and Kuhrt concocted another scheme.   Stanford, Davis, Lopez and Kuhrt approved and implemented a scheme whereby they "papered" a series of fraudulent round-trip real estate transactions utilizing undeveloped Antiguan real estate acquired by SIB in 2008 for approximately $63.5 million (or roughly $40,000 per acre).

63.     To give the appearance that the above-referenced capital infusions actually occurred, Stanford, Davis, Kuhrt and Lopez falsified accounting records to give the appearance that:

- SIB sold the Antiguan real estate to several newly-created Stanford-controlled entities at the original cost of $63.5 million (although there is no evidence that Stanford paid SIB the $63.5 million);

- the Stanford-controlled entities, at Stanford and Davis's instruction, immediately wrote-up the value of the real estate to approximately $3.2 billion dollars (or $2 million per acre), thereby exponentially increasing the value of the entities' stock;

- in an effort to satisfy a portion of Stanford's personal debt to SIB, Stanford contributed to SIB $1.7 billion of the fraudulently-inflated stock (using the inflated $2 million per acre valuation);

- Stanford then contributed to SIB additional stock in the real estate holding companies valued at $200 million and $541 million (again using the inflated $2 million per acre valuation) to fund the backdated capital contributions.

64.     These transactions did not infuse real capital into SIB.  In fact, the entire process was fabricated *after* the reported capital contributions allegedly occurred.   Moreover, the purported transactions do not validate the capital infusion claims because the inflation in value of the real estate from $40,000 to $2 million per acre was not justifiable under applicable U.S. or international accounting principles.  SIB did not secure an appraisal and had no other reasonable support for such a drastic increase in value.   And the transactions among Stanford-controlled entities were not the kind of arm's-length transactions required to justify a 5000% increase in value.   Nevertheless, on a mere promise from Stanford that the land would appraise for over $3 billion, Stanford, Davis, Kuhrt and Lopez used $63.5 million of real estate to plug a multi-billion dollar hole in SIB's balance sheet and wipe-out a portion of Stanford's billions in debt owed to SIB.

65.     Stanford, Davis, Kuhrt and Lopez, by virtue of their participation in the purported real estate transactions, knew that: (i) Stanford did not make a $541 million capital infusion into SIB; and (ii) the value of the real estate used to support the purported cash infusion was approximately $63.5 million, not $3.2 billion.

66.     Following Stanford, Davis, Lopez and Kuhrt's creation of the fraudulent capital infusions, the largest segment of the bank's investment portfolio would have been $3.2 billion in over-valued real estate.   Yet, SIB did not disclose the transactions in its December 2008 newsletter, which touted Stanford's purported capital infusion. Moreover, Stanford's real estate investments were wholly inconsistent with SIB's representations to investors regarding SIB's investment portfolio (*i.e.*, marketable securities and no real estate).

### *Misrepresentations Regarding Management of SIB's Investment Portfolio*

67.     Prior to making investment decisions, prospective investors routinely asked how SIB safeguarded and monitored its assets.  Investors frequently inquired whether Stanford could "run off with the money."

68.     In response to this question, at least during 2006 and much of 2007, Pendergest-Holt trained SIB's senior investment officer ("SIO") to tell investors that the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee.   In communicating with investors, the SIO followed Pendergest-Holt's instructions, telling investors that SIB's entire investment portfolio was managed by a global network of money managers and monitored by a team of 20-plus analysts.

69.     Neither Pendergest-Holt nor the SIO disclosed to investors that SIB segregated its investment portfolio into three tiers: (i) cash and cash equivalents ("Tier 1"); (ii) investments

with "outside portfolio managers (25+)" that were monitored by the SFG analysts ("Tier 2"); and (iii) undisclosed assets managed by Stanford and Davis ("Tier 3").  As of December 2008, Tier 1 represented approximately 9% ($800 million) of SIB's portfolio. Tier 2, prior to the bank's decision to liquidate $250 million of investments in late 2008, represented approximately 10% of the portfolio. And Tier 3 represented approximately 80% of SIB's investment portfolio.

70.     Neither Pendergest-Holt nor the SIO disclosed that the bank's Tier 3 assets were managed and/or monitored exclusively by Stanford and Davis.  Likewise, they did not disclose that Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants, thereby eliminating any independent oversight of SIB's assets.

71.      Neither Pendergest-Holt nor the SIO disclosed to investors that the "global network" of money managers and the team of analysts did not manage any of SIB's Tier 3 investments and, in reality, only monitored approximately 10% of SIB's portfolio.  In fact, Pendergest-Holt trained the SIO "not to divulge too much" about the oversight of SIB's portfolio because that information "wouldn't leave an investor with a lot of confidence."  Likewise, Davis instructed the SIO to "steer" potential CD investors away from information about SIB's portfolio.

### *Misrepresentation That SIB Was "Stronger" Than Ever Before*

72.     On January 10, 2009, Stanford, Davis and Pendergest-Holt spoke to SGC's Top Performer's Club (a collection of high performing Stanford financial advisers) in Miami, Florida.

73.     During the meeting, Davis stated that SIB was "stronger" than at any time in its history.  Stanford, Davis and Pendergest-Holt represented that SIB was secure and built on a strong foundation, and that its financial condition was shored up by Stanford's capital infusions.

74.    But Davis failed to disclose that he had been informed only days earlier by the head of SIB's treasury that, despite SIB's best efforts to liquidate Tier 2 assets, SIB's cash position had fallen from the June 30, 2008 reported balance of $779 million to less than $28 million.

75.    Stanford and Davis failed to disclose to the SGC sales force that: (i) Stanford had misappropriated more than $1.6 billion of investor funds; (ii) SIB's annual reports, financial statements and quarterly reports to the FSRC were false; (iii) hundreds of millions of dollars of SIB investors' funds had been invested in a manner inconsistent with the bank's offering documents (*i.e.*, private equity and real estate); and (iv) the purported 2008 capital infusions by Stanford were a fiction.

76.    During her speech, Pendergest-Holt, after being introduced as SFG's chief investment officer and a "member of the investment committee of the bank," answered questions about SIB's investment portfolio.  In so doing, she failed to disclose to attendees that she and her team of analysts did not manage SIB's entire investment portfolio and only monitored approximately 10% of the bank's investments.  She also failed to disclose that SIB had invested investors' funds in a manner inconsistent with the bank's offering documents (*i.e.*, private equity and real estate).

77.    Stanford, Davis and Pendergest-Holt also failed to disclose that on or about December 12, 2008, Pershing, LLC, SGC's clearing broker-dealer, informed SGC that it would no longer process wire transfers from SGC to SIB for the purchase of the CD, citing suspicions about SIB's investment returns and its inability to get from the bank "a reasonable level of transparency" into its investment portfolio.

78.     Stanford, Davis and Pendergest knew that SGC advisers would use the information provided to them during the Top Performer's Club meeting to sell CDs.

### *Exposure to Losses From Madoff-related Investments*

79.     In the December 2008 Monthly Report, SIB told CD investors that the bank "had no direct or indirect exposure to any of [Bernard] Madoff's investments."

80.     Contrary to this statement, Stanford, Davis and Pendergest-Holt knew, prior to the release of the Monthly Report, that SIB had exposure to losses from investments with Madoff.

81.     On December 12, 2008, and again on December 18, 2008, Pendergest-Holt received e-mails from Meridian Capital Partners, a hedge fund with which SIB had invested, detailing SIB's exposure to Madoff-related losses.

82.     On December 15, 2008, an SFG-affiliated employee notified Pendergest-Holt and Davis that SIB had exposure to Madoff-related losses in two additional funds through which SIB had invested.  That same day, Davis, Pendergest-Holt and others consulted with Stanford regarding the bank's exposure to Madoff-related losses.

83.     Stanford, Davis and Pendergest-Holt never corrected this misrepresentation in the December 2008 monthly report.

### *Leroy King's Role in the Fraudulent Scheme*

84.     Leroy King was the administrator and chief executive officer of the FSRC, which is charged with the regulation and supervision of all offshore banks licensed in Antigua, including SIB.

85.     From at least February 2005, and continuing  over a multi-year period, Stanford paid to King thousands of dollars in bribes, using money transferred from SIB to a Stanford-

controlled account at the Bank of Antigua, an onshore Antiguan bank owned and controlled by Stanford.   King caused certain of these bribes to be deposited into U.S. bank accounts.

86.   In addition to the cash payments, Stanford gave to King and his wife significant non-cash benefits, including: (i) use of Stanford's fleet of private jets to travel throughout the United States and the Caribbean; (ii) use of an SIB corporate car; and (iii) 2004 Super Bowl tickets for King and a companion.   Stanford subsequently hired King's Super Bowl companion as a human resources project manager in Houston.

87.   In exchange for the bribes, King facilitated SIB's fraud by obstructing the SEC's investigation into SIB and abdicating the FSRC's oversight responsibilities.

88.   On June 21, 2005, King, in response to an inquiry from the SEC, represented to the SEC staff that the FSRC had examined SIB and based on its examinations had concluded that "any further investigation of 'possible' fraudulent activities of [SIB] was unwarranted."   King continued by saying that "it is the opinion of the FSRC that [SIB] has conducted its banking business to date in a manner the FSRC considers to be fully compliant."   King had no basis for these representations.   In exchange for the bribes from Stanford, King promised that the FSRC would not audit SIB's investment portfolio.   In fact, on at least one occasion in or about May 2003, King removed from an examination of an SIB affiliate an inquisitive FSRC employee that "got too close to the fire."

89.   King also provided Stanford access to the FSRC's confidential regulatory files, including written requests by the Commission's staff for information regarding SIB.   For example, on September 25, 2006, the Commission's staff faxed a letter to King requesting the FSRC's assistance with its investigation of SIB.   That same day, Stanford, Davis, and SFG's

general counsel discussed the Commission letter and outlined for King precisely how they wanted him to respond to the Commission staff's request.

90.     On October 10, 2006, King did as Stanford instructed, sending a letter to the Commission's staff that tracked the response dictated by Stanford, Davis and SFG's general counsel.  King's letter falsely stated: "We wish to assure the SEC that the FSRC's most recent onsite examination conducted just five months ago confirmed [SIB's] compliance with all areas of depositor safety and solvency, as well as all other applicable laws and regulations.  The FSRC has further confirmed through its continuous visits and supervision of [SIB] that there are no other issues or matters of concern with [SIB.]"  In fact, King knew there was no basis for this assurance.

91.     At or around the same time King was responding to the above-referenced inquires, Stanford and King, in concert with others, withheld information from the SEC, citing reliance on inapplicable bank secrecy laws in Antigua.

92.     During the same time period that King was accepting bribes from Stanford, the FSRC's website assured potential investors that the regulator conducted annual on-site examinations of all Antiguan offshore banks (like SIB) to determine their solvency, to review the quality of their investments and to verify the accuracy of their returns.  The FSRC's website also told investors that it performed "continuous off-site supervision in the form of an analysis of quarterly returns and annual audited financial statements, with follow-up on prescribed corrective actions."  King knew that these representations were false with regard to the FSRC's "oversight" of SIB.

93.     King, by virtue of the FSRC's review of SIB's market materials and annual reports, was also aware that SIB touted that the bank was subject to the FSRC's audits,

regulatory inspections, and licensing requirements.  He knew that these representations were false.  Moreover, SIB, SGC and SFG employees regularly told investors that their CDs were safe because of the FSRC's audits, misrepresentations that would have been publicly debunked but for King's misconduct.

**SGC and SCM's Fraudulent Mutual Fund Sales**

94.    From 2004 through 2009, SGC and SCM induced clients, including non-accredited, retail investors, to invest in SAS, a proprietary mutual fund wrap program, by touting a fraudulent track record of "historical performance."

95.    SGC/SCM highlighted the purported SAS track record in thousands of client presentation books ("pitch books").  For example, the following chart from a 2006 pitch book presented clients with the false impression that SAS accounts, from 2000 through 2005, outperformed the S&P 500 by an average of approximately 13 percentage points:

| Calendar Year Return As of July 2006 | | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
| SAS Growth | 12.09% | 16.15% | 32.84% | -3.33% | 4.32% | 18.04% |
| S&P 500 | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% |

96.    SGC/SCM used these performance results to grow the SAS program to over $1 billion in 2008.

97.    SGC/SCM also used the SAS track record to recruit financial advisers with significant books of business away from competitors.  After arriving at Stanford, the newly-hired financial advisers were incentivized to put their clients' assets in the CD.

98.     Other than the fees paid by SIB to SGC/SCM for CD sales, SAS was the most significant source of revenue for SGC/SCM.   In 2007 and 2008, SGC/SCM received approximately $25 million in fees from the marketing of SAS.

99.     The SAS performance results used in the 2005 through 2009 pitch books were fictional and/or inflated.   SGC/SCM misrepresented that SAS performance results, for 1999 through 2004, reflected "historical performance" when, in fact, those results were fictional, or "back-tested," numbers that did not reflect the results of actual trading.

100.     SGC/SCM, with the benefit of hindsight, picked mutual funds that performed extremely well from 1999 through 2004, and presented the performance of those top-performing funds to potential clients as if they were actual returns earned by the SAS program.

101.     SGC/SCM also used "actual" model SAS performance results for 2005 and 2006 that were inflated by as much as 4 percentage points.

102.     SGC/SCM told investors that SAS had positive returns for periods in which actual SAS clients lost substantial amounts.   In 2000, actual SAS client returns ranged from negative 7.5% to positive 1.1%.   In 2001, actual SAS client returns ranged from negative 10.7% to negative 2.1%.   And, in 2002, actual SAS client returns ranged from negative 26.6% to negative 8.7%.

103.     SGC/SCM's management knew that the advertised SAS performance results were misleading and inflated.   And they also knew that the pre-2005 track record was purely hypothetical.

104.     As early as November 2006, SGC/SCM investment advisers began to question why their clients were not receiving the returns advertised in the pitch books.   In response to

these questions, SGC/SCM hired an outside performance reporting expert to review the SAS performance results.

105.    In late 2006 and early 2007, the expert informed SGC/SCM that its performance results for the twelve months ended September 30, 2006 were inflated by as much as 3.4 percentage points.    Moreover, the expert informed SGC/SCM managers that the inflated performance results included unexplained "bad math" that consistently inflated the purported SAS performance results over actual client performance.    Finally, in March 2008, the expert informed SGC/SCM managers that the SAS performance results for 2005 were also inflated by as much as 3.25 percentage points.

106.    Despite its knowledge of the inflated SAS returns, SGC/SCM management continued using the pre-2005 track record and never asked the performance expert to audit the pre-2005 performance.    In fact, in 2008 pitch books, SGC/SCM presented the back-tested pre-2005 performance data under the heading "Historical Performance" and "Manager Performance" alongside the audited 2005 through 2008 figures.    SGC/SCM's outside consultant testified that it was "misleading" to present audited performance figures alongside back-tested figures.

107.    Finally, as indicated the chart below, SGC/SCM blended the back-tested performance with audited composite performance to create annualized 5 and 7 year performance figures that bore no relation to actual SAS client performance:

Calendar Year Return
As of March 2008

|  | YTD | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 12.40% | 14.68% | 8.82% | 16.15% | 32.84% | -3.33% | 4.32% | 16.04% | 22.59% |
| S&P 500 | -9.44% | 5.49% | 15.79% | 4.91% | 10.88% | 28.68% | -22.10% | -11.88% | -9.11% | 21.04% |

Annualized Returns
(not annualized if less than 1 year)

|  | YTD | 1 year | 3 years | 5 years | 7 years | Since Inception |
|---|---|---|---|---|---|---|
| SAS Growth | -7.44% | 0.80% | 9.36% | 15.31% | 11.03% | 12.30% |
| S&P 500 | -9.44% | -5.08% | 5.85% | 11.32% | 3.70% | 2.45% |

108.     As evidence by its use of fictional and/or inflated performance results in the pitch books, SGC/SCM knowingly misled investors in connection with the sale of SAS.

## CAUSES OF ACTION

### FIRST CLAIM
### AS TO
### SIB, SGC, SCM, STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ AND KUHRT
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

109.     Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

110.     SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (i) employed devices, schemes and artifices to defraud;  (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

111.     As a part of and in furtherance of their scheme, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly and indirectly, prepared, disseminated or used contracts, written offering documents, financial statements, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.     SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt made the referenced misrepresentations and omissions knowingly or with severe and gross recklessness.

113.     For these reasons, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### AS TO STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ, KUHRT AND KING
#### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5

114.     Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

115.     If Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt did not violate Exchange Act Section 10(b) and Rule 10b-5, in the alternative, each in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.  Likewise, King, in the manner set forth above, knowingly or with severe recklessness, provided substantial assistance in connection with the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] alleged herein.

116.     For these reasons, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt and King aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**AS TO**
**SIB, SGC, SCM, STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ AND KUHRT**
<u>**Violations of Section 17(a) of the Securities Act**</u>

117.     Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

118.     SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (i) employed devices, schemes or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

119.     As part of and in furtherance of this scheme, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

120.     SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

121.    For these reasons, SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM
## AS TO STANFORD, SGC, AND STANFORD CAPITAL
### Violations of Sections 206(1) and 206(2) of the Advisers Act

122.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

123.    Stanford, SGC and SCM, directly or indirectly, singly or in concert with others, knowingly or recklessly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)]: (i) have employed, are employing, or are about to employ devices, schemes, and artifices to defraud any client or prospective client; or (ii) have engaged, are engaging, or are about to engage in acts, practices, or courses of business which operates as a fraud or deceit upon any client or prospective client.

124.    For these reasons, Stanford, SGC and SCM have violated, and unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FIFTH CLAIM
## AS TO STANFORD, DAVIS, PENDERGEST-HOLT, LOPEZ, KUHRT AND KING
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

125.    Plaintiff Commission repeats and realleges paragraphs 1 through 108 above.

126.    Based on the conduct alleged herein, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance in connection with the violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] alleged herein.

127.    For these reasons, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King aided and abetted and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**SIXTH CLAIM**
**AS TO SIB AND SGC**
**Violations of Section 7(d) of the Investment Company Act**

128.    Plaintiff Commission repeats and realleges paragraphs1 through 108 above.

129.    SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

130.    SGC, directly or indirectly, singly or in concert with others, acted as an underwriter for SIB, an investment company not organized or otherwise created under the laws of the United States or of a State that made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

131.    For these reasons, SIB and SGC have violated, and unless enjoined, will continue to violate Section 7(d) of the Investment Company Act [15 U.S.C. § 80a-7(d)].

## SEVENTH CLAIM
## AS TO RELIEF DEFENDANTS

132.    Plaintiff Commission repeats and realleges paragraphs1 through 108 above.

133.    Relief Defendants each were recipients, without consideration, of proceeds of the fraudulent and illegal CD sales alleged herein. Each of these Relief Defendants profited from the fraud by obtaining illegal proceeds under circumstances in which it is not just, equitable, or conscionable for them to retain the illegal proceeds. Consequently, each of them has been named as a Relief Defendant.

134.    Relief Defendants should disgorge their ill-gotten gains and any other property or assets purchased with such gains.

## RELIEF REQUESTED

Plaintiff Commission respectfully requests that the Court:

## I.

Temporarily, preliminarily and permanently enjoin: (i) SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt, and King from violating, or aiding and abetting violations of, Section 10(b) and Rule 10b-5 of the Exchange Act; (ii) SIB, SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez and Kuhrt from violating Section 17(a) of the Securities Act; (iii) SGC, SCM, Stanford, Davis, Pendergest-Holt, Lopez, Kuhrt and King from violating, or aiding and abetting violations of, Sections 206(1) and 206(2) of the Advisers Act; and (iv) SIB and SCG from violating Section 7(d) of the Investment Company Act.

## II.

Order Defendants and Relief Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount.

## III.

Order civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of the Advisers Act [15 U.S.C. §  80b-9(e)] for their securities law violations.

## IV.

Order such further relief as this Court may deem just and proper.

Dated January 8, 2010                      Respectfully submitted,

  *s/ David B. Reece*
STEPHEN J. KOROTASH
Oklahoma Bar No. 5102
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
DAVID B. REECE
Texas Bar No. 24002810
MICHAEL D. KING
Texas Bar No. 24032634
D. THOMAS KELTNER
Texas Bar No. 24007474
JASON ROSE
Texas Bar No. 24007946

U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)