IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| *Plaintiffs,* | § | Case NO.: 3:09-cv-0298-N |
| | § | |
| v. | § | |
| | § | |
| STANFORD INTERNATIONAL | § | |
| BANK, LTD., ET AL. | § | |
| *Defendants.* | § | |

## **EMERGENCY MOTION FOR PRODUCTION OF DOCUMENTS**

Movant R. Allen Stanford ("Stanford"), upon the specific instruction of Hon.

Nancy Atlas, Judge of the United States District Court for the Southern District of

Texas, makes this Request for Production of Attorney-Client files of R. Allen

Stanford individually, Stanford Financial Group and other Stanford companies,

and with the agreement of the Receiver asks that this Request be considered by the

Court on an emergency basis.

## History and background:

1.    Movant is a party to Case No. 4:09-cv-03712, styled Pendergest-Holt, R.

Allen Stanford, Gilberto Lopez Jr., Mark Kuhrt v. Certain Underwriters

at Lloyd's of London and Arch Specialty Insurance Company, which is

pending in the Court of Judge Atlas.

2.    The action pending in Judge Atlas' court is whether Underwriters at

Lloyds' on a policy of Directors' and Officers' Liability Insurance are

obligated to pay attorneys' fees and expenses necessary to defend

Movant and other officers and directors of Stanford companies against

claims made in numerous jurisdictions and before many tribunals arising

out of their service to the Stanford companies.

3.    Trial of the coverage case has been set in August 2010.

4.    Judge Atlas has ordered that all discovery in that case be conducted on an

expedited basis.

5.    While examining documents produced in other, but related, matters

counsel for Movant discovered that Akin Gump, who are counsel for the

Lloyds' underwriters on the D&O policy, may also be either witnesses in

this case (the coverage case) and in the criminal action or were counsel

for Mr. Stanford, Stanford Financial Group and related entities and may

have a conflict of interest.

6.   R. Allen Stanford wrote Judge Atlas a letter indicating Akin Gump's representation of Stanford Financial Group. "Exhibit A"

7.   It is admitted by Akin Gump that the firm represented Stanford Financial Group in investments funded by Stanford International Bank, which investments were carried in Tier 3 of the SIB investment portfolio. It therefore appears, on the face of the documents, that Akin Gump has knowledge that at least some of the SIB Tier 3 investments either were part of a securities fraud, ponzi scheme, or money laundering scheme as alleged by the government in both this case and in the criminal case pending, or that Akin Gump had given legitimate legal advice that forms the basis of Stanford Business activities and was relied upon by Mr. Stanford to the extent that he asserts good faith reliance upon legal advice. Either way the requested documents are necessary for the coverage case and the criminal case.

8.   Based upon this information, on Friday June 15, 2010 Coverage Counsel for Mr. R. Allen Stanford filed an Emergency Motion to Compel Akin Gump Hauer & Feld LLP ("Akin Gump") to furnish any and all attorney-client files and/or records of R. Allen Stanford, Stanford Financial Group and other Stanford companies under expedited conditions within two days or a reasonable period not to exceed five (5) days. "Exhibit B"

9.   The Motion to Compel was granted by Judge Nancy Atlas. "Exhibit C"

10. Akin Gump then filed an Emergency Motion for Reconsideration of Judge Atlas' Order or, Alternatively, Motion for Protective Order., contending that her Order was inconsistent with orders previously entered by this Court in this action. "Exhibit D"

11. Movant filed a reply.  "Exhibit E."

12. The Receiver, through counsel, appeared and participated in the hearing on Akin Gump's Motion for Reconsideration, also contending that only this Court could release the documents requested in the coverage case pending before Judge Atlas.

13. Judge Atlas, in a telephone conference on June 15, 2010 deferred Movant's request to this Court, and directed that Movant file this motion on an expedited basis.

14. Counsel for the receiver agreed that this Court should consider the Motion on an Emergency basis given the schedule set by Judge Atlas.

## Request

15. Movant therefore requests that this Court release the attorney-client file of R. Allen Stanford individually, Stanford Financial Group, and all other Stanford companies to Mr. Stanford's attorney in the coverage case and criminal case, Robert S. Bennett. Mr. Stanford's Counsel is seeking these files to determine whether Akin Gump or any of its attorneys may have a disqualifying conflict of interest or, alternatively, whether any may be a witness in this matter, the criminal action, or other related

4

matters which, as a matter of law, would also disqualify Akin Gump from representing any party in the coverage case.

16.     Counsel for R. Allen Stanford, is requesting *all* client files regarding R. Allen Stanford personally, Stanford Financial Group and its affiliates to be turned over in its entirety to Robert S. Bennett.  Attorney work product, notes, emails, communications and any other items of Mr. Stanford, Stanford Financial Group or its affiliate companies should be included.  This request includes, but is not limited to the engagements of Akin Gump and Stanford, Stanford Financial Group and affiliated entities', listed by Barry Chasnoff in his Declaration.  "Exhibit F"

June 16, 2010                              Respectfully Submitted,

                                                   /s/  Robert S. Bennett                              .
                                               ROBERT S. BENNETT
                                               Federal ID. No. 465
                                               TBA No. 02150500
                                               BENNETT NGUYEN JOINT VENTURE
                                               515 Louisiana St. Suite 200
                                               Houston, Texas 77009
                                               713.225.6000
                                               713.225.6001 (FAX)

                                               ATTORNEY FOR PLAINTIFF
                                               ROBERT ALLEN STANFORD

## CERTIFICATE OF CONFERENCE

On June 16, 2010 at 8:58AM  Robert S. Bennett contacted counsel for the receiver, Kevin M. Sadler.  Mr. Sadler informed us that he would be willing to confer over whether or not he would turn over documents after having an opportunity to review them.  He will be receiving the documents from Akin Gump either on the evening of June 16, 2010 or on morning of June 17, 2010.  He expects he will have reviewed the documents by Friday, June 18, 2010.  He informed us that if he is not done reviewing the documents turned over by Friday, June 18, 2010 he will communicate this with us.  It is our understanding that Akin Gump will not be turning over the 800,000+ emails they mentioned were in their possession and therefore, we may in the future request emails.  Furthermore, because of the 24 hour deadline for filing this request in this Court issued by Judge Atlas we have not complied with local rule 7.1(d) which requires citing law and authority.  N.D.Tex. (Dallas), Loc. R. 7.1(d).   However, a supplement will be provided.

June 16, 2010

Respectfully Submitted,

     /s/  Robert S. Bennett                             .
ROBERT S. BENNETT
Federal ID. No. 465
TBA No. 02150500
BENNETT NGUYEN JOINT VENTURE
515 Louisiana St. Suite 200

Houston, Texas 77002
713.225.6000
713.225.6001 (FAX)

ATTORNEY FOR PLAINTIFF
ROBERT ALLEN STANFORD

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| *Plaintiffs,* | § | Case NO.: 3:09-cv-0298-N |
| | § | |
| v. | § | |
| | § | |
| STANFORD INTERNATIONAL | § | |
| BANK, LTD., ET AL. | § | |
| *Defendants.* | § | |

## ORDER

Upon consideration of the Plaintiff's Request for Emergency Motion for Production of Documents including Any and All Attorney—Client Files and/or Records of R. Allen Stanford, Stanford Financial Group and its Affiliates from Akin Gump via the Receiver Under Expedited Conditions to Robert S. Bennett, the responses and replies thereto, the evidence submitted by all parties, and the arguments of counsel, the Court is of the opinion that the Request should be GRANTED in its entirety and to be effective immediately.

**SIGNED** at Houston, Texas, this _____ day of _____, **2010**.

_____
David C. Godbey
United States District Judge

R. Allen Stanford
Case No.: 3:09-cv-0298-N
Exhibit: _____A_____

June 2, 2010

Mr. R. Allen Stanford
Federal Detention Center
Houston, Texas

**Honorable Judge Nancy Atlas**
**Southern District of the United States**

**Re:   Prison Confinement, Attorney Payment, Insurance Fraud, and Other Issues**

Dear Hon. Judge Atlas:

Thank you for the opportunity to speak in Your Honor's court last week. Also thank you for Your Honor's position considering my release on bail after 1-year of pretrial incarceration. I hope and pray Your Honor's discussions with Judge Hittner have been positive. I hope to be afforded the opportunity to begin the arduous task of reviewing discovery and preparing for trial with my attorneys of choice, and to defend myself in the three separate but overlapping proceedings that I imminently face.

Mr. Bennett and his team at the Bennett-Nguyen Joint Venture have brought me the binders of invoices that Underwriters' have sent to their office along with additional discovery materials related to the invoices. Being incarcerated in a high-security prison under horrendous conditions, and despite my counsels' best efforts, I still was not able to get much accomplished working every day (including the Memorial Day weekend) for the maximum number of daily hours the FDC allows. For example, to simply review and sign a document to get former counsel to release documents took over 1 ½ hours of lost time, being strip searched twice, going through security checkpoints, and getting guards to bring me to the attorney meeting room. As discussed in my Motion for Release that Mr. Dershowitz and Mr. Weinberg mostly drafted, it is simply impossible for me to be prepared for one, much less three simultaneous trials, under these conditions. I respectfully plead for Your Honor's continued discussion with Judge Hittner for my release on bail, so that at least I have a fighting chance at defending the allegations in a coherent state.

I am also writing you this letter because, based upon the limited amount of invoices and work product I reviewed, (a) I am still perplexed and unclear as to the activities of Underwriters' in continuing to deny payment to my present criminal counsel and request for Your Honor's immediate relief, and (b) I want to confirm my selection of counsel.

**Letter to Judge Atlas re: Underwriters**

EXHIBIT
A

Page | 1

### Underwriters' Bad Faith

I understand that Judge Hittner ruled that Mr. Bennett is now my lead counsel and Mr. Essmyer is still on my criminal team as co-counsel. See "Exhibit A" attached. While this is not exactly what I wanted, that is what has been ordered. Akin Gump (as Underwriter's counsel) still refuses in bad faith to compensate either attorney or their staff for work performed on my case. This runs in direct contravention to Judge Hittner's order and the Fifth Circuit ruling. This also runs in direct opposition to Your Honor's fee schedule that was agreed upon.

As to Mr. Bennett and his staff, Mr. Bennett commented last week in court that he is willing to assist me on the coverage case as Your Honor has requested. This is similar as all the other co-defendants' criminal attorneys, even though I am *pro se*; but he can only do this if he is approved and compensated by Underwriters in the criminal case. The Bennett-Nguyen Joint Venture and their staff have been working on my criminal matter since February 2010 without any payment from Underwriters. They have incurred significant fees and expenses. They have exerted a significant amount of time and effort to advance my criminal defense. They have worked diligently with the hard work of Mr. Weinberg and Mr. Dershowitz on my recent Motion for Release. They have continually brought me documents and discovery to review, despite the limiting FDC rules and my not being allowed Internet access. As I stated in Your Honor's court, the efforts for Mr. Bennett's team has revived my hope that a legal defense team is now in place with the proper motivation on my behalf.

They have repeatedly requested to receive approval and reimbursement under my direction from Underwriters on at least three occasions, and have answered all objections from Underwriters. Even according to the schedule that Your Honor has ordered Underwriters to pay, Underwriters continue to deny their approval and payment in bad faith. To know the amount of work they have done and that they are being denied payment is very frustrating and disheartening to me.

Mr. Bennett has told me that his staff will need to be terminated June 4, 2010 without any immediate financial relief, including all contract attorneys. I trust Your Honor can understand that personnel can only work for a limited amount of time without any compensation that has been ordered to be paid. Thus, most, if not all of his staff working on my case will likely be terminated absent any reimbursement. Therefore I seek Your Honor's immediate relief to compel Underwriters to make payment to Mr. Bennett and his staff at the Bennett-Nguyen Joint Venture. If payment is not made, Mr. Bennett will have no choice but to seek financial relief from the CJA fund, leaving just

him and a secretary as the <u>*ONLY*</u> ones remaining to represent me on the criminal case. I pray that Your Honor will not let this happen.

Even Underwriters' most recent reimbursement denial letter on June 1, 2010 casts dispersions under "reasonable and necessary" shields based upon allegations of insurance fraud, counsel selection and others. See attached as "Exhibit B". These matters have already been placed in front of Judge Hittner, and he has ruled that Mr. Bennett is to be lead counsel. I am aware of Mr. Bennett's personal financial matters and his pending judgment. As was discussed in Your Honor's court, I have no issue with the appropriate sums of money being released as ordered by another court into a receiver's possession. If Mr. Bennett wishes to challenge that other court's order, I leave that up to him and I consent. I merely want my attorneys and staff to continue to vigorously work on my defense. Underwriters' withholding of approval and payment not merely affects Mr. Bennett (and therefore me), but it also affects all the attorneys, paralegals and assistants on his staff that have been so critical and helpful to me. I pray Your Honor consider the overarching impact of Underwriters' continued bad faith denials.

## Surprising Revelations Regarding Akin Gump

What further perplexes me is that I cannot understand how and why Akin Gump can represent Underwriters in this case against covering me and other executives, when Akin Gump has been retained to work on Stanford Financial Group matters over the past decade? Due to the stress and shock of imprisonment, it appears that I was not fully cogent under my mental and physical condition in prison. I therefore did not make the following connection. However, as was recently brought to my attention as a reminder, Mr. Bennett's staff recently came across documents demonstrating that Akin Gump was made and is currently intimately aware of the financial on-goings of Stanford Financial Group throughout the last decade, *serving as outside counsel to Stanford Financial Group, Stanford International Bank, Mr. James Davis (the former CFO), and even representing me.* In fact, from the incomplete records I have reviewed, for 2001-2003 Akin Gump was paid almost $500,000 from Stanford Financial Group and other Stanford companies. There are invoices paid to Akin Gump in 2008 and 2009 for approximately $100,000. Akin Gump were the lead attorneys on documenting, structuring, and closing large deals for Stanford Venture Capital and Stanford International Bank. As the records I reviewed are incomplete, I would guess that the total amount of money paid to Akin Gump for work on Stanford Financial Group was well above these amounts. I venture to say that it will ultimately be in the <u>*millions of dollars*</u>.

To remove any doubt, the limited documents that I reviewed show that Akin Gump worked on at least the following subject matters directly as counsel to Stanford Financial Group. See attached "Exhibits C":

| Akin Gump Attorneys | Representation Matter for Stanford or Stanford Financial Group Companies | Description |
|---|---|---|
| Lester Hewitt John Tang | Caribbean Sun Airline (February 2003) | An affiliated company of Stanford Financial Group, and classified as a tier 3 investment. Akin Gump helped with the Certificate of Incorporation for Caribbean Sun and other formation documentation, executed by James Davis and Yolanda Suarez. John Tang, an attorney from Akin Gump, filed two applications for trademarks for Caribbean Sun. |
| Roger Cepeda Joseph Tiano Rick Rubin Fadi Samman Erica McGrady Jason Tankel | TWS, Blue Sky, AST Roll Out (October 2000-September 2002) | A $3.5 billion telecom and media consolidation deal where Akin Gump represented Stanford and Stanford Venture Capital in the following: investor rights agreements, certificates of designation, affidavits for lost promissory notes, warrant, board resolutions for SFG and SIB, stock purchase agreements, line of credit agreements, general security agreement, LLC operating agreement, request for FCC ownership transfer approval, correspondence on behalf of Stanford to third parties, closed the deal in their office |
| Wynn Segall Tatman R. Savio | 20/20 Cricket and OFAC (November 2007-October 2008) | Stanford retained Akin Gump with a $25,000 retainer agreement on November 27, 2007. The $25,000 was wire transferred on November 30, 2007 to Akin Gump.. <br>• They advised Stanford employees regarding Cuba and their participation in the 20/20 cricket tournament. <br>• On 01/07/08, Stanford 20/20 sent a letter to OFAC and directed any concerns to their counsel Akin Gump. <br>• Mr. Segall sent Stanford 20/20's application to OFAC the same day. <br>• Based on the January 7, 2008 application, Mr. Segall obtained a license from the |

| | | |
|---|---|---|
| | | Department of the Treasury from the OFAC Regulations. This license was an authorization to manage the participation of a Cuban cricket team in the 2008 Stanford Cricket Tournament held in Antigua and Barbuda from approximately January 25- February 24, 2008.<br>• Billing from Akin Gump continued through the beginning of 2008. |
| Orrin Harrison<br>Mary O'Conner<br>Scott Banard<br>Michael Simmons<br>Michael Wilson<br>Barry Greenberg | Broker Solicitation Representation (February 18,2009 – February 26, 2009) | The services that were offered to the brokers post as detailed in an email were:<br>• Gather names of brokers who want to be represented by Akin Gump<br>• Attend the hearing in early March 2009 but not file an appearance<br>• Terminate existing relationships with other associates and law firms elsewhere<br>• Charge a lump sum around $2500 per broker.<br>• If there is an appearance before the SEC they would charge an additional $2500 per person<br>• Determine E&O coverage availability in case they have to make an appearance before the SEC. |
| Michael Anthony "Tony" Nunes (while at Baker Botts originally, most recently with Akin Gump before leaving) | Set up Stanford Financial Group's corporate structure and CD program and Guardian Bank in Antigua (1980's to 2009) | Friend who set up Stanford's Corporate Structure and Stanford International Bank 1980's to 2009. He was originally an associate at Baker Botts then around May 2004 became a partner at Akin Gump's Houston Office. Throughout this time, he was in constant contact with Stanford in not only a social friendly relationship, but in a client counsel relationship. After the civil complaint, Tony Nunes, still a partner at Akin Gump, sent Stanford an email that said "hang in there, I'm in your corner." |

I am not an attorney and do not know the law as it relates to these things. But under The Texas Disciplinary Rules of Professional Conduct, Rules 105, 106 and 108, there appears to be a direct conflict of interest for Akin Gump to represent Underwriters

in a case of alleged money laundering to prevent me (and therefore my counsel) to obtain coverage to defend myself. Having worked on these matters (and probably many others), how can a firm with attorneys who have direct and intimate knowledge of my business, corporate and personal finances use that same confidential information against me to try and prove money laundering, and therefore deny me coverage? How can they even be representing Underwriters in this case? Clearly there must be some ethics issues presented here.

Incredibly, one of Akin Gump's recent attorneys, Mr. Tony Nunes, while he was formerly at Baker Botts, *advised and was instrumental in the formation of Stanford International Bank (formerly Guardian International Bank) and the CD investment program, which is now at the heart of the alleged fraud and money laundering. Even more incredulous is that Baker Botts is the law firm that the SEC receiver hired to liquidate my entire corporate and personal assets worldwide.* How can the very firm and very attorney that set up the entire company at the very beginning now both serve on firms that are trying to break me down and be completely adverse to me? I just cannot understand how this is possible. Even, as recent as February 2009 and throughout the four month period between the SEC action and my criminal indictment, Mr. Nunes even offered for me to stay at his house, constantly assuring me that everything will be okay. To further show their, what I would call "greed', attorneys at Akin Gump were initiating a plan in early 2009 to try and represent the very brokers who worked for Stanford Financial Group, once the SEC action came. Their plan was to charge each broker $2500 to represent them in the matter. The greed in this case by Akin Gump seems to have no bounds.

I really don't understand how something like this can happen. It is clear that this dual representation just cannot be right. On the surface this is very compromising to use my company funds on the one hand in representing me and my companies in our business dealings, while simultaneously using the other hand to try to avoid paying funds for counsel in my defense. *Who knows how much more will be revealed if I were out of prison and could dig deeper into the matter? Maybe this is why I'm still in prison?*

## Were Underwriters' Counsel and My Former Counsel Conspiring to Keep Me Incarcerated?

What's even more astonishing is that during this past week's review, I was able to read a phone conversation transcript between my former criminal counsel, Mr. Kent Schaffer, and Underwriter's counsel, Mr. Neel Lane. See transcript attached as "Exhibit D". I reviewed the transcript and what was astonishingly revealed was what appears to be an actual conspiracy to defraud Underwriters. The words spoken during that phone

conversation are entirely unacceptable, and in my opinion unethical and borders on possibly being criminal. *The attorneys' focus on money and getting paid while I am rotting away in prison is absolutely disgusting.* Mr. Lane even suggested to Mr. Schaffer to file additional lawsuits against Underwriters for denial of payment. They even discussed bringing in Steve Susman, of the Houston firm Susman and Godfrey (who appears related to Mr. Schaffer) to bring the a lawsuit against Underwriters from "kingdom come" following a "heartfelt f*ck you letter" from Mr. Schaffer to Underwriters' at the direction of Mr. Lane, Underwriters' counsel. *The transcript even suggests that Mr. Schaffer should stop working after the payments from Underwriters cease, leaving me to sit in prison. This is absolutely incredible!*

This conversation, as I imagine like many others, took place entirely without my knowledge. What happened to the attorneys' fiduciary duty and responsibility to the client – in both cases, Mr. Lane to the Underwriters and Mr. Schaffer to me? What is further astonishing to me is that nowhere in this transcript is there any discussion by Mr. Schaffer, my then counsel, as to how he was helping in my defense or trying to get me out of prison. I would respectfully request that the Honorable Court immediately review this and provide whatever relief I am entitled.

## Underwriters' Misrepresentation to Your Honor's Court

During the hearing last week, Mr. Chasnoff misled the Court when he stated that he never was notified that he should present invoices for my approval. In fact, Mr. Mike Sydow, while he was my attorney on July 31, 2009 and again on September 2, 2009 sent letters on my behalf to Akin Gump requesting that I review and approve all invoices submitted by my attorneys. See Exhibit "E". To now state to Your Honor that they were unaware that they should have the attorneys' invoices approved is entirely inaccurate.

Akin Gump had every opportunity to allow me to review invoices; but simply chose not to. Due to their own mistake and admission of not allowing me to review the invoices, almost $7 million has gone out the door to attorneys which have not helped advance my defense. Since I never approved any of the invoices that were paid out by Akin Gump in my defense, I would argue that all past payments should not be applied to my policy limits. Akin Gump is now laying blame for their mistake on me for rotating attorneys and running up the attorneys' fees, when it is entirely their fault for not allowing me to approve invoices before they were paid as requested in my notice to them.

This consistent behavior of greed, misdirection, and mischaracterization has been a constant battle for me against the Underwriters, and this directly affects my ability to defend myself due to the affect their non-payment has had on my prior and current

counsel. *All I want is my constitutional right to effective assistance of counsel, attorneys and support staff willing to fight for me, and I want them to be fairly compensated as is my right under the D&O policy. I do not want the issue to be about who got paid, how much and for what. If the work is legitimate as I approve of it, I trust Your Honor will require Underwriters to pay.*

## Who I Want to Defend Me

As to my current choice of counsel, what is clear is that Underwriters do not wish to approve *any new counsel* coming to my criminal defense. As recently as May 28, 2010, in direct contravention of Your Honor's scheduling order, Underwriters denied payment to both Mr. Bennett and his team, and Mr. Essmyer and his team, for whatever "reasonable and necessary" excuse they can base their denial. I continue to not have approved criminal counsel. Even after Judge Hittner's ruling on lead counsel on June 1, based on a conversation between Mr. Barry Chasnoff at Akin Gump and Mr. Bennett, Underwriters still will not provide payment. *If this is not bad faith, I am not sure what bad faith means.*

I wish for the opportunity to clarify why I have had so many attorneys on my case, but I suggest to Your Court that the main reason has to do with Underwriters' bad faith denials through their attorneys at Akin Gump. Akin Gump appears to have in fact become my attorneys due to their controlling the work on my defense and number and type of attorneys that can help me by continuing to deny payment to the attorneys I choose and paying the attorneys that I am not even aware are doing. They continue to do so with full knowledge of my companies and personal finances due to their past representation. How is this possibly fair and allowable under the Texas State Bar? As a matter of public policy, how can a person pay years of high premiums to an insurance company for coverage but only be denied the benefit when requested? If that is the precedent, why do we even have insurance?

I would like to confirm to the Court my desires for counsel. As stated in a letter sent directly to Akin Gump on May 10, 2010 at their request, a copy which was submitted to Your Court in my prior letter, I would like to have Mr. David Chesnoff, as recommended by Mr. Dershowitz, be my lead trial attorney. He will be supported by Mr. Bob Bennett and Mr. Nguyen, along with Mr. Weinberg and Mr. Dershowitz. Mr. Bennett has already accepted the role of lead counsel with Judge Hittner. Mr. Essmyer, while on record as co-counsel will not be playing any active role. I know of no other way to be clearer to Underwriters on whom I want on my criminal defense. These attorneys have proven their value to me and these are the attorneys I want. Underwriters' constant bad faith denials are causing me considerable and irreparable harm in the face of the

the amount of time left for me to mount a defense. I pray to Your Honor for relief in this matter.

I understand that much of this letter is out of the scope of the hearing and I wish for the continued opportunity to work with Your Honor's Court to sort out the "burn rate" on my defense. As I have stated to Your Honor, I believe the amount spent has been obscene relative to the results produced in actually advancing my case. I impress upon the Court that the most that has been done has been in the last 2-3 months since the Bennett-Nguyen team came on board. And while some of this letter is outside of the scope of Your Honor's court, I consider these to such serious issues that I respectfully pray that Your Honor may review and rule in accordance.

Respectfully submitted,

R. Allen Stanford
Inmate #35017-183

R. Allen Stanford
Case No.: 3:09-cv-0298-N
Exhibit: _____B_____

## U.S. District Court

### SOUTHERN DISTRICT OF TEXAS

**Notice of Electronic Filing**

The following transaction was entered by Bennett, Robert on 6/11/2010 at 5:28 PM CDT and filed on 6/11/2010

**Case Name:**       Laura Pendergest-Holt v. Certain Underwriters at Lloyd's of London
**Case Number:**     4:09-cv-03712
**Filer:**           R. Allen Stanford
**Document Number:** 141

**Docket Text:**
**First EMERGENCY MOTION( Motion Docket Date 7/2/2010.), First MOTION to Expedite Production of Attorney-Client files, First MOTION for Production of Documents by R. Allen Stanford, filed. (Attachments: # (1) Exhibit Email from Bob Bennett to Barry Chasnoff, and Neel Lane regarding production of documents. Dated June 9, 2010.) (Bennett, Robert)**


**4:09-cv-03712 Notice has been electronically mailed to:**

Alan M Cohen     alan@vsfirm.com

Barry A Chasnoff     bchasnoff@akingump.com, lwehlend@akingump.com, mmungia@akingump.com, mpena@akingump.com

Daniel McNeel Lane , Jr     nlane@akingump.com, gmturner@akingump.com, jdelgado@akingump.com, mpena@akingump.com

Douglas Paul Skelley     doug@vsfirm.com

Henry James Fasthoff , IV     hfasthoff@stumpfcannon.com, msims@stumpfcannon.com

Kenneth E. Broughton , Jr     kenneth.broughton@haynesboone.com, gina.sheffield@haynesboone.com

Lee Howard Shidlofsky     lee@vsfirm.com

Michael M Essmyer     messmyer@etrlaw.com

Robert Stephen Bennett     bbennett@bennettlawfirm.com

**4:09-cv-03712 Notice has not been electronically mailed to:**

EXHIBIT
B
tabbies®

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAURA PENDERGEST-HOLT,        §
R. ALLEN STANFORD, GILBERTO   §
LOPEZ, JR. and MARK KUHRT,    §
    *Plaintiffs,*            §      CIVIL ACTION NO.: 4:09-cv-03712
                             §
vs.                           §
                             §
CERTAIN UNDERWRITERS AT       §
LLOYD'S OF LONDON and ARCH    §
SPECIALTY INSURANCE           §
COMPANY,                      §
    *Defendants.*            §

**<u>EMERGENCY MOTION TO COMPEL AKIN GUMP HAUER & FELD
LLP TO FURNISH ANY AND ALL ATTORNEY—CLIENT FILES
AND/OR RECORDS OF R. ALLEN STANFORD, STANFORD
FINANCIAL GROUP AND ITS AFFILIATES UNDER EXPEDITED
CONDITIONS WITHIN TWO DAYS OR A REASONABLE PERIOD NOT
TO EXCEED FIVE (5) DAYS TO ROBERT S. BENNETT</u>**

Before the Court is R. Allen Stanford (Stanford) Request for an

EMERGENCY MOTION to compel Akin Gump Hauer & Feld LLP to furnish

any and all attorney-client files and/or records due to its former attorney-client

relationship under expedited conditions within two days or a reasonable period not

to exceed one week, to current counsel Robert S. Bennett.  The files requested

include but are not limited to: documents, emails, communication, attorney work

product, and attorney notes in connection with the representation of R. Allen

Stanford, Stanford Financial Group and its affiliates.

1

## I.    R. ALLEN STANFORD IS ENTITLED TO HIS COMPLETE CLIENT FILE OF HIMSELF, R. ALLEN STANFORD, STANFORD FINANCIAL GROUP, AND ITS AFFILIATES

Mr. Stanford is entitled to receive his entire client file from Akin Gump which includes but is not limited to attorney notes, attorney work product, any and all communications, correspondence, emails between counsel and client, and memorandums.  Furthermore, Mr. Stanford is a client both individually and as the sole shareholder of Stanford Financial Group, and its affiliate companies. Therefore, he is entitled to the files of these corporations, organizations, affiliations, etc. as well as his own personal file.

### A.  Mr. Stanford as a client is entitled to the *entire* file, including but not limited to attorney work product, attorney notes, memorandums, communications, emails, and correspondence.

Under rule 1.16 (d) of the Model Rules of Professional Conduct, "upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . ., surrendering papers and property to which the client is entitled." ABA MODEL R. PROF. CONDUCT 1.16 (d) (2009).  Accordingly, Texas Disciplinary Rules of Professional Conduct 1.14 (b) obligates a lawyer to promptly deliver to a client any funds "or other property" that the client is entitled to receive. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14(b).  Additionally, Texas Disciplinary Rules of Professional Conduct 1.15 (d) provides that at the end of a representation, a lawyer shall . . . surrendering papers to which the client is entitled. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15(d). Together rule 1.14(b) and 1.15(d) indicate that upon request by a client, "the

2

documents in a lawyer's file that are property to which the client is entitled must be transferred to the client upon request . . ." TX Eth. Op. 570, 2006 WL 2038682, at *2 (Tex. Prof. Eth. Comm. May 2006); *See also* ABA/BNA Lawyer's Manual on Professional Conduct, Current Reports: Ethics Opinions, CLIENT FILES: TEXAS LAWYERS USUALLY MUST HONOR CLIENT'S REQUEST TO SEE LAWYER'S NOTES, 22 LMPC 386 (August 9, 2006) ("Emphasizing a lawyer's status as an agent and a fiduciary of the client, the committee found that allowing a lawyer unilaterally to withhold notes created during the representation would put the lawyer's interest above those of the client, thereby undermining the duties attorneys owe their clients. In addition, withholding notes form a client denies the client the full benefit of the services the lawyer agreed to provide. . .").

Furthermore, several cases have found that an attorney must turn over the complete client file and cannot withhold anything, including attorney work product. *See Resolution Trust Corp. v. H---, P.C.*, 128 F.R.D 647, 650 (N.D. Tex. 1989) (holding that the entire contents of a client's file belong to the client including such things as lawyer notes, legal memorandum and other work product, and neither the attorney-client privilege nor work-product doctrines were applicable) ("An attorney is hired to represent the interest of his client, and every service provided by the attorney, including the creation of legal memoranda and attorney's notes . . . is paid for by the client. To allow the attorney to decide which materials may or may not be revealed to the client from its files would deny the client the full benefit of the services for which he paid, often dearly."); *United*

3

*States v. York*, 2010 U.S. Dist. LEXIS 44891, at *2 n. 1 (5th Cir. May 7, 2010)

(citing *Resolution Trust crop. V. H--, P.C.,* 128 F.R.D. 647); *Hebisen v. Texas*, 615

S.W.2d 866, 868 (Tex. App.—Houston [1st Dist.] 1981, no writ) (holding that

"other properties" from rule 1.14 (b) [then Disciplinary Rule 9-102(B) (4)]

includes client's papers and other documents the lawyer had in his file which

require prompt delivery by the lawyer to the client upon the client's request); *In re*

*George*, 28 S.W.3d 511, 516 (Tex. 2000) ("the attorney is the agent of the client,

and the work product generated by the attorney in representing the client belongs

to the client.") (citing rule 1.15 (d) and Hesbien v. State).

Consequently, this request by Mr. R. Allen Stanford through his attorney of

record, Robert S. Bennett, for all client files regarding R. Allen Stanford

personally, Stanford Financial Group and its affiliates to be turned over in its

entirety to Robert S. Bennett should be granted.  Attorney work product, notes,

emails, communications and any other items in Mr. Stanford, Stanford Financial

Group or its affiliate companies should be included and not withheld in

accordance with precedent cited above.  Akin Gump holds such records in a

representative capacity only, and is not to decide which documents to turn over or

not.  Akin Gump being the agent of Mr. R. Allen Stanford is not the owner of the

product produced by them in the course of representing Stanford, Stanford

Financial Group or its affiliates.  Instead, Mr. R. Allen Stanford is the owner of

these files and as such requests the turnover of them in their entirety.

B. <u>Mr. Stanford being the sole shareholder of Stanford Financial Group, is entitled to not only his individual client file, but also to the file of Stanford Financial Group and its affiliates.</u>

Under Model Rule of Professional Conduct 1.13(a), "a lawyer employed or retained by an organization represents the organization acting *through its duly authorized constituents*." ABA MODEL R. PROF. CONDUCT 1.13(a) com. 1 (2009) (emphasis added) ("An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders, and other constituents."). R. Allen Stanford being the sole shareholder and CEO of Stanford Financial Group is duly authorized to request the client file of himself personally, Stanford Financial Group, and its affiliates. *See Farmers' Fund v. Tooker* 207 A.D. 37, 39 (N.Y.A.D. 4 Dept. 1923) ("A corporation must act through its officers or agents. The officers charged by law, by the by-laws or action of the board of directors, with managerial or administrative authority, are thereby clothed with power to bind the corporation."); see *Stinson v. Berry*, 123 N.M. 482, 487 (N.M. App. 1997) ("Directors are the agents of their corporate principal. . .").

II.   **EXPEDITE DISCOVERY IS WARRANTED**

Furthermore, "[Federal Rule of Civil Procedure 34] . . . grants a party access to designated tangible things relevant to an action, and (b)(2) of the Rule allows a court to shorten or enlarge the time for doing so. Thus, the requested relief . . . is certainly within the discretion of the Court pursuant to the Court's discovery powers at law, without requiring the Court to invoke its statutory or inherent equitable powers through an injunction order." *AT&T Mobility LLC v.*

5

*Miranda Holdings Corp.*, No. 08-20637-Civ-Moreno/Torres, 2008 U.S. Dist. LEXIS 111702, at *4–5 (S.D. Fla., May 7, 2008).

Given the fact that the Court has asked for us to file our Motion for Disqualification of Akin Gump within a week and because Akin Gump was put on notice of the possible filing of this motion at the hearing before Judge Atlas on June 3, 2010, good cause exist to expedite the discovery period.  We respectfully ask the Court to use its power under Federal Rule of Civil Procedure 34(b)(2) and grant our motion that the files in their entirety be turned over to Robert S. Bennett within two days or within a reasonable time not to exceed one week.

June 11, 2010                                   Respectfully Submitted,

                                                  /s/  Robert S. Bennett                           .
                                                ROBERT S. BENNETT
                                                Federal ID. No. 465
                                                TBA No. 02150500
                                                BENNETT NGUYEN JOINT VENTURE
                                                515 Louisiana St. Suite 200
                                                Houston, Texas 77009
                                                713.225.6000
                                                713.225.6001 (FAX)

                                                ATTORNEY FOR PLAINTIFF
                                                ROBERT ALLEN STANFORD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHRT, | § | |
| _Plaintiffs,_ | § | CIVIL ACTION NO.: 4:09-cv-03712 |
| | § | |
| vs. | § | |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE | § | |
| COMPANY, | § | |
| _Defendants._ | § | |

## ORDER

Upon consideration of the Plaintiff's Request for Emergency Motion to
Compel Akin Gump Hauer & Feld LLP to Furnish Any and All Attorney—Client
Files and/or Records of R. Allen Stanford, Stanford Financial Group and its
Affiliates Under Expedited Conditions Within Two Days or a Reasonable Period
Not to Exceed Five (5) Days to Robert S. Bennett, the responses and replies
thereto, the evidence submitted by all parties, and the arguments of counsel, the
Court is of the opinion that the Request should be GRANTED in its entirety and to
be effective immediately.

**SIGNED** at Houston, Texas, this _____ day of _____, **2010**.

_____
Nancy F. Atlas
United States District Judge

7

## CERTIFICATE OF CONFERENCE

I certify compliance with the Court's procedures regarding Certificate of Conference. Atlas J, S.D. Tex., (Houston) Loc. R. 6 (A)(2). On June 9, 2010, I contacted Barry Chasnoff to expedite this request and an email documenting this is contained herein. "Exhibit A." A telephone conference regarding the document request was made on June 9, 2010 as well, but no response has been forthcoming.

June 11, 2010

Respectfully Submitted,

_/s/ Robert S. Bennett_____.
ROBERT S. BENNETT
Federal ID. No. 465
TBA No. 02150500
BENNETT NGUYEN JOINT VENTURE
515 Louisiana St. Suite 200
Houston, Texas 77009
713.225.6000
713.225.6001 (FAX)

ATTORNEY FOR PLAINTIFF
ROBERT ALLEN STANFORD

8

Bea Sosa-Morris

| | |
|---|---|
| **From:** | Bob Bennett |
| **Sent:** | Monday, June 14, 2010 9:55 PM |
| **To:** | Chasnoff, Barry |
| **Cc:** | Lane, Neel; Pena, McLean; Mungia, Manuel |
| **Subject:** | RE: Hearing for Contempt for Setting requirements that are unfair and refusing to Pay |

Dear Barry,

The sending of a generic budget in a civil case, is the reason we need to have a contempt action before Judge Hittner who has jurisdiction over the criminal case and the ability to make a determination if CJA funds should be used or not. After spending $10 million dollars or before spending $10 million dollars, no law firm or lawyer or any entity connected with the Stanford criminal case had to prepare a budget. While I am not adverse to doing a CRIMINAL case budget, I am curious as to why six months before trial, you are now just getting around to having this done.

You have constantly refused to provide approval to any witness needed for the criminal trial and this is causing great confusion and delay in the preparation of the criminal trial and needs to be brought to the attention of Judge Hittner. The government to date has probably spent millions on experts ( especially if you include what the Receiver has spent - and those estimates are around $80 million). We can not prepare for trial without experts and maybe the Court will allow us to have CJA funds for these experts.

You have previously received materials about Mike Essmyer's absurdities and you were aware that Judge Hittner appointed me Lead Trial Counsel for the criminal case after receiving all the materials concerning these false allegations. You have written that you would investigate "acts" of alleged insurance fraud and it takes about 20 minutes to read Mike Essmyer's statements and determine that there were not "acts". Additionally, you could have called and interviewed numerous witnesses to these "acts" and you have consistently refused to do that because you knew the witnesses would have told you the allegations were not true.

Again, we would like to see the budget that Dick DeGuerin prepared or Kent Schaffer prepared. The fact that you sent us a civil trial form budget and not a single completed budget from anyone connected to the case is proof positive that you approved spending $10 million and no one submitted a budget. These issues and the CJA budget need to be place in front of Judge Hittner and we plan to do that as soon as possible.

Finally, the continuing actions to control the defense by selecting the counsel that Mr. Stanford has to use and by controlling what experts are not selected or used, in essence makes you the trial counsel for Mr. Stanford. You are calling all the shots for the criminal case. He was your client and he continues to be your client by your actions in refusing to approve his counsel of choice and leaving him to hang in the wind by not approving of the experts he has chosen or the expenditures he finds necessary to defend himself in the criminal case.

Very truly yours,

Bob Bennett

---

**From:** Chasnoff, Barry [mailto:bchasnoff@AKINGUMP.COM]
**Sent:** 2010-06-14 7:10 PM
**To:** Bob Bennett
**Cc:** Lane, Neel; Pena, McLean; Mungia, Manuel
**Subject:** RE: Hearing for Contempt for dragging down the criminal case and blocking Mr Stanford's criminal due process rights.

Bob,

We write to address the numerous inaccuracies in your email below and to provide you a sample budget as we told you we would do during our earlier conversation.

To start, Underwriters have not, and would not, disregard any order from any court. As you are well aware, the coverage dispute concerning the payment of Mr. Stanford's *reasonable and necessary* fees is presently before Judge Atlas—not Judge Hittner. Indeed, the Fifth Circuit ordered as much. Judge Atlas made clear to us during her June 3 hearing that her previous orders "didn't tell the carrier to pay any particular lawyer . . . [and] didn't tell the carrier that they had to pay on fees that they dispute." H'rg Transcript at 127.

Judge Atlas did, however, indicate that she was "encourag[ing] the carrier to look hard at the [insurance fraud] materials," which she asked the parties jointly to request from Judge Hittner. H'rg Transcript at 126. Underwriters received a copy of those sealed materials *this morning*, and, consistent with Judge Atlas' orders, have begun their review and analysis. Underwriters will notify you whether or not they consent to your representation of Mr. Stanford after they have had a reasonable amount of time to consider and evaluate those documents.

In the meantime, Underwriters are providing you with a sample litigation budget as you requested. In the event Underwriters consent to your representation of Mr. Stanford, we will

need you to provide a litigation budget. We will also need you to provide a budget for any expert that you want approved. Please let us know if you have any questions.

Finally, nothing in this email should be construed as a waiver of any of the rights that Underwriters may have under any applicable policy, nor as an admission of liability on the part of Underwriters. Underwriters expressly reserve their rights under all policies.

---

**From:** Bob Bennett [mailto:Bob@bennettlawfirm.com]
**Sent:** Monday, June 14, 2010 1:13 PM
**To:** Chasnoff, Barry; Lane, Neel; Pena, McLean
**Subject:** RE: Hearing for Contempt for dragging down the criminal case and blocking Mr Stanford's criminal due process rights.

Dear Barry,

We are trying to follow up our 10:15 am telephone conference of this morning with what you still wanted to have for Mr. Stanford's insurance company and your client, Lloyd's of London, to acquire so that approval will be forthcoming for the Bennett-Nguyen Joint Venture. Our approval is important so we can determine where we are in the criminal case. You have ignored Judge Hittner's ruling of June 1st that I am to be Lead Trial Counsel for the Criminal case and thus compensated. You have ignored Judge Atlas' ruling that I am to be coverage counsel for Mr. Stanford in the coverage case with her comments of how the coverage and criminal are related. You have continued to ignore what Judge Hittner ordered, the Fifth Circuit ordered, and what Judge Atlas ordered about making reasonable and necessary payments for fees and expenses. You have caused unbelievable delay in the criminal case. Let me review these issues with you.

MIKE ESSMYER LIBELOUS AND DEFAMATORY STATEMENTS

Judge Hittner has entered an Order to allow you to view what was placed under seal. Prior to the Order, we had provided our response and the affidavits of individuals who attended the meeting where NO acts in furtherance of insurance fraud were committed. We also provided you the names of third parties such as Lee Shidlofsky and Alan Yee who were at the meeting where the alleged acts occurred. As an act of bad faith, you have not interviewed these individuals which shows that you are only stalling and truly not concerned about these false and completely unfounded allegations. You have also not interviewed Dr. Nhan Nguyen, Attorney Ashley Tshe, or former federal public defender Tom Berg. Your refusal to engage in true due diligence on this matter further shows how you are dragging your feet to the detriment of your former client and present insured. We have sent to you all the documents that we believe comprise the Essmyer bs but if there is something that you believe you have not seen or you want to look at again that you may not have, please let me know.

BUDGET FOR THE TRIAL FOR LEAD TRIAL COUNSEL

As we stated in our telephone conference, our search of the files of former attorneys work product has not revealed a single budget that after more than a year, and your expenditure of $10 million dollars of Mr. Stanford's insurance money has produced. Again, we also have not been able to find a single budget that any lawyer, law firm, or expert has been required to prepare prior to getting funded by Lloyds. As we stated in our telephone conference, if you have one, we would like to see it. Please produce a budget that any lawyer or law firm did in the Stanford matter so we can use it for a template.

Notwithstanding no other budget exists and you have not provided any guidance with the budget process, I would estimate that at least $10 million would be needed for pretrial matters and another $30 million for the trial. What is that based on? It is a complete minimum estimate. At the bottom of this email is a recent interview of Jeff Skilling from Fotune Magazine dated today. We have previously sent you information that from reliable sources the cost to Skilling was $50 to $60 million, and it may have been more. Can you honestly say that the money spent on Skilling was not necessary or fair or reasonable? But you have to consider that Skilling was not in prison and could work every day with his counsel. This is a significant factor that increases every aspect of the cost of the trial. You have read the Bond motions and you know what Mr. Stanford has to go through every day to simple have a meeting with his counsel or to sign a letter.

You are also aware of the candid conversation with Akin Gump Partner Neel Lane where he did not challenge that counsel for Mr. Stanford would have to be working full time 6.5 days a week and need at least six (6) full time attorneys.

BUDGET FOR EXPERTS

We have sent you the budget for Dr. Lehrer. What else do you need to approve his budget or approve him working as an expert in the criminal case? Does every expert we want to be approved need a budget? Was this the same for the $10 million that was spent?

PUBLIC FUNDING

Before Judge Hittner, we will also ask for public funding because of your failure to pay what is owed. We have lost significant time preparing for trial because we have had to work on the criminal trial, address the coverage issues, and fight with you over payment. Sooner or later it has to end. We can not go six months without being paid and without having experts to help. It can not be done.

When and if Judge Hittner sets a hearing, we will let you know. Another example of how you have been unfair in this entire process is highlighted by your requesting that Mr. Stanford provide the names of the Akin Gump attorneys who had worked on the Stanford files so you could go talk to them about their representation. We immediately responded and provided these names. Seeking fairness and professional courtesy from you, we asked that you provide the names of the attorneys that you knew were involved with Stanford or related entities. Of course, you have not provided anything. You withhold information, fail to approve experts, require budgets when no one else did them, deny the authenticity of transcribed conversations, and generally make it as difficult as you can for Mr. Stanford to be represented and get a fair criminal trial. The height of all insults is your stating that you former client has engaged in criminal activity. You charged him millions of dollars in legal fees, took as much if not more in premium payments, and now will not even provide a list of the Akin Gump attorneys that represented him or related entities. Maybe there should be room for "harrassing comments and implict threats", when you so dump on your former client by initially denying that you represented him and continue to make per se libelous statements against your former client by stating that he has engaged in ciminal acts or that he is some how involved with criminal property that AKin Gump as counsel for Mr. Stanford set up, advised about, or directly particpated in. This sets a new standard for legal ethics and legal service. Very truly yours,

Bob Bennett

FORTUNE -- When Jeff Skilling, the former Enron CEO, was convicted on 19 counts, the headline of the *Houston Chronicle* read "Guilty! Guilty!" Sentenced to 24-plus years in prison, Skilling had been a wealthy executive who went too far in pursuit of profit and caused financial pain and devastation to thousands of investors, employees, and contractors with his decisions at the helm of Enron. Few if any in the media or public rose to his defense or mourned his imprisonment.

Those wounds from Enron's devastating collapse may soon be reopened. Sometime this month the Supreme Court will decide whether Skilling failed to receive a fair trial because of possible errors in jury selection. The court will also issue a ruling on the constitutionality of the backbone of the prosecution's arguments, centered on the "honest services" statute, which makes it a crime for public officials and business executives not to act in the best interests of their constituents or employers.

- 103
  tweets
- retweet
- 0diggsdigg

- Email
- Print
- Comment

It's easy to imagine the outrage that could be stoked by his release or a retrial, especially in light of all the corporate misdeeds of recent years. What's not easy to know is what Skilling himself thinks about his current predicament.

Which is why I decided to ask him about it.

Two years ago I drove to the Federal Correctional Institution in Waseca, Minn., to meet Skilling. I hadn't met him prior to my visit. I simply wanted to talk with the vilified human being who was held responsible for one of the biggest bankruptcies and corporate scandals in history.

At the time, I had just left a senior executive position for a major company in the health-care industry. Enron's unraveling intrigued me, not only because of its historical significance, but because descriptions of the company's business environment seemed strikingly similar to UnitedHealth Group (UNH, Fortune 500), where I had worked for 11 years.

Both companies had been thought of as bold, innovative, and unafraid to redefine the status quo in their respective industries. Enron CEO Ken Lay's visionary leadership reminded me of Bill McGuire, former CEO and chairman of UnitedHealth.

Lay's successor, Jeff Skilling, had qualities of intensity, management discipline, and financial focus that were strikingly similar to Stephen Hemsley, then president and chief operating officer of UHG. And both companies had deep relationships with Arthur Andersen, the accounting firm that would be brought down in part because of Enron's scandals. I greatly admired United, and in my time there I never witnessed a reason to worry about the company's ethics or business practices.

In March 2006, in the midst of Lay and Skilling's four-month trial, UnitedHealth Group got embroiled in a stock option backdating case. I saw McGuire transformed from a respected health-care CEO into a pariah. He lost the professional respect he'd gained for growing United in value from about $400 million in 1989 to $70 billion in 2006.

Since Skilling was incarcerated a mere 90 minutes from my home, I wrote him a letter to request a meeting. I simply wanted to hear his story, and I wanted him to be able to tell it to me without judgment, in the hopes I could better understand what had transpired at United.

On May 10, 2008, I met with Skilling for four hours and was allowed no means of recording or taking notes. We sat in flimsy white plastic chairs in an open cafeteria-like setting. The room was filled with clusters of inmates and their Saturday visitors.

Dressed in his jailhouse khakis, Jeff was a bit thinner than in his old pictures, but looked physically healthy. Initially he was subdued, pausing before responding to simple questions, as if needing time to process things.

Eventually Skilling opened up. He didn't hesitate to talk about Enron and didn't dodge any of my questions. When I asked about the use of mark-to-market accounting to inflate revenue, he said, "Archelle, let me first explain the basics about how energy is traded." Then he discussed the company's rationale with the clarity of a business school professor.

I saw Skilling become agitated as he described CFO Andy Fastow's criminal actions relative to the "special-purpose entities" that Enron had used to hide its losses. But later, when I asked him whether he was angry with Fastow for cooperating with federal authorities, he just shook his head and -- in his words -- said he understood why certain people compromised their integrity. To him, Fastow's testimony to investigators was simply a way for Fastow and others like him to protect themselves and their families. Skilling's anger shifted in focus, from Fastow to the U.S. government, for what he claims was "prosecutorial abuse."

Ninety minutes into our meeting, Skilling lowered his eyes to the floor. "I apologize for asking," he said, embarrassment in his voice. "Could you buy me a cup of coffee? Inmates aren't allowed to touch money or approach the machines. They could put me in solitary for a week."

As I got his French-vanilla latte and recovered from astonishment that a man who had led a $110 billion company was not allowed to handle two quarters, I took the opportunity to get more personal, asking, "What is life like in jail? What is the scariest part of being here?"

Over the previous 17 months, Skilling said, he had adapted to prison life. "You don't want to get sick in here," he said, as he talked about practicing yoga, walking four miles a

day, and avoiding carbohydrate-heavy meals to stay fit.

Skilling pointed out several inmates in the cafeteria he had befriended, but did not hesitate to admit to how lonely he was. His sister, Sue, lived in Minnesota and visited regularly; the rest of the family was out of state. It was unclear whether his 2002 marriage to Rebecca Carter would survive, since she and Skilling had never experienced married life together without the looming stress of the Enron collapse.

His two oldest children, Kristin and Jeffrey, had recently made their first visit to Waseca, but J.T., his youngest son, didn't feel emotionally prepared to see his dad in jail. Skilling told me his greatest fear regarding a 24-year sentence was missing the opportunity to support his children as they navigated into adulthood.

As quickly as Skilling had become quiet, he shifted back into CEO mode after I asked, "Jeff, you didn't have a good outcome. Looking back, how would you have altered your legal strategy?" His McKinsey-instilled strategic responses sounded like a PowerPoint slide deck for business executives facing down allegations of white-collar crime:

**1) Take the Fifth.**

Contrary to his attorneys' advice, Jeff Skilling did not exercise his Fifth Amendment rights. He wanted to explain Enron's business decisions and couldn't bear the thought of being silent. Skilling said that he didn't regret testifying, but that he "talked too much and educated the prosecution on issues that they would otherwise have had to figure out on their own." In other words, Skilling now sees that testifying may have hurt his chances for an acquittal, but he thought it was a risk worth taking to be able to speak openly about what happened. In retrospect, it wasn't.

**2) Go on a PR offensive.**

During the four years leading up to the trial, Skilling was visible in Congress and in the courtroom, but as a discredited CEO, he wasn't focused on his standing in the public's eyes. Looking back, he regrets not maintaining relationships with key industry advocates in and outside the media. In addition, Skilling wished he had developed a media strategy to influence public opinion and worked to change the reputation of himself and his firm -- something he now believes could have had a positive influence on the outcome of his case.

**3) Avoid sarcasm.**

In May 2001, Skilling famously said, "They're onto us" to a group of Enron executives about a negative analyst report on the company. Five years later he was defending himself by claiming that his comment was sarcasm, not an admission of guilt. Skilling nervously chuckled as he recalled when he was publicly edgy and impatient during the episode, but he quickly got serious and seemed self-reflective when he said, "Sarcasm is easily misinterpreted and can be a tremendous liability."

Skilling was surprisingly self-analytical as he outlined his missteps. Then he shifted his focus once again, telling me about his appeal, filed in the Fifth Circuit Court of Appeals in April 2008. "We're investigating 'honest services,'" he said, explaining that several other Enron-related cases had been overturned based on interpretations of this statute later found to be incorrect.

He talked about spending hours reviewing legal documents and sounded optimistic but then said quietly, "If this doesn't work, I am going to be in here for a long time. You can visit if you want. It's nice to have someone new to talk to." Skilling was moved to Englewood, Colorado later that year, since the Minnesota facility I met him at was to be converted into a women's prison. I have not seen him since. Little did he know that two years later his case would be on the Supreme Court docket. The court will decide whether Skilling gets a new trial as soon as today.

Regardless of the outcome of the appeal, I got to know the Jeff Skilling who is a father, a husband, and an intelligent, driven business executive who decided he'd rather go to jail than not give voice to his side of the Enron tragedy. Was he arrogant? Yes. But that's not a surprise. After all, arrogance springs from the same well of confidence that led him to the big chair at Enron. And if things go his way in the Supreme Court, that arrogance may yet set him free.

*-- Dr. Archelle Georgiou is the president of Georgiou Consulting, a health-care consulting firm based in Minneapolis. She was a senior executive in UnitedHealth Group from 1995 to 2007.* ∎

---

**From:** Chasnoff, Barry [mailto:bchasnoff@AKINGUMP.COM]
**Sent:** 2010-06-14 9:51 AM
**To:** Bob Bennett; 'kagorry@gmail.com'; 'drken@lehecoserv.com'
**Subject:** Re: Hearing for Contempt for dragging down the criminal case and blocking Mr Stanford' criminal due process rights.

I will try one more conversation with you. How about 10:15? Call my office

---

**From:** Bob Bennett
**To:** Chasnoff, Barry; kagorry@gmail.com; drken@lehecoserv.com; Bob Bennett
**Sent:** Mon Jun 14 09:44:03 2010
**Subject:** Re: Hearing for Contempt for dragging down the criminal case and blocking Mr Stanford' criminal due process rights.

That is not all she said and will let you know if we get it set for Wed. You have even refused to approve our experts who are desperately needed for the criminal case. We can go to the hearing first (if we get it set) and then to your office to pick up the documents. Please call if you wish to discuss these matters.
Very truly yours
Bob Bennett

---

Sent from my BlackBerry Wireless Handheld

-----Original Message-----
**From:** Chasnoff, Barry <bchasnoff@AKINGUMP.COM>
**To:** Bob Bennett
**CC:** Lane, Neel <nlane@AKINGUMP.COM>; Pena, McLean <mpena@akingump.com>; Mungia, Manuel <mmungia@AKINGUMP.com>; Pepping, Matthew <mpepping@akingump.com>
**Sent:** Mon Jun 14 09:32:42 2010
**Subject:** Re: Hearing for Contempt

Of course we oppose. The Fifth Circuit took issues of payment from Judge Hittner and gave them to Judge Atlas, who has said on the record that Underwritwrs are entitled to additional information before deciding whether to approve your engagement.

---

**From:** Bob Bennett
**To:** Chasnoff, Barry
**Sent:** Mon Jun 14 09:14:54 2010
**Subject:** Re: Hearing for Contempt

---

6/14/2010

Failure to follow court orders and make payments by May 30th

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Chasnoff, Barry <bchasnoff@AKINGUMP.COM>
To: Bob Bennett
CC: 'ashsummertse@yahoo.com' <ashsummertse@yahoo.com>; 'nhan@healthlawservice.com' <nhan@healthlawservice.com>
Sent: Mon Jun 14 09:11:47 2010
Subject: Re: Hearing for Contempt

Please describe the bases for the contempt motion

From: Bob Bennett
To: Chasnoff, Barry
Cc: ashsummertse@yahoo.com ; nhan@healthlawservice.com ; Bob Bennett
Sent: Mon Jun 14 09:00:03 2010
Subject: Hearing for Contempt

In the criminal case, we plan to request a hearing on our to be filed and heard Motion for Contemp for Wed @ 10 before Judge Hittner. Should you wish to discuss the Contempt Action prior to our filing - please call me at any time.
Very truly yours
Bob Bennett

--------------------------
Sent from my BlackBerry Wireless Handheld

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon any tax advice contained in this communication for the purpose of avoiding United States federal tax penalties. In addition, any tax advice contained in this communication may not be used to promote, market or recommend a transaction to another party.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon any tax advice contained in this communication for the purpose of avoiding United States federal tax penalties. In addition, any tax advice contained in this communication may not be used to promote, market or recommend a transaction to another party.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 is

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 is

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If

R. Allen Stanford
Case No.: 3:09-cv-0298-N
Exhibit: ____C_____

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-3712 |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON AND ARCH | § | |
| SPECIALTY INSURANCE CO., | § | |
| Defendant. | § | |

### ORDER

Plaintiff R. Allen Stanford's Emergency Motion to Compel [Doc. # 141] is hereby GRANTED. It is

ORDERED that Akin, Gump, Hauer & Feld, L.L.P. ("Akin Gump") shall produce to Stanford all attorney-client files and records related to Akin Gump's representation of Stanford, Stanford Financial Group, and its affiliates by June 15, 2010, at 12:00 p.m.

SIGNED at Houston, Texas, this 11th day of June, 2010.





EXHIBIT
C

R. Allen Stanford
Case No.: 3:09-cv-0298-N
Exhibit: _____D_____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAURA PENDERGEST-HOLT,　　　§
R. ALLEN STANFORD, GILBERTO　§
LOPEZ, JR. and MARK KUHRT,　　§
　　　*Plaintiffs*,　　　　　　　　　§
　　　　　　　　　　　　　　　　　§
vs.　　　　　　　　　　　　　　　§　　CIVIL ACTION NO. 4:09-cv-03712
　　　　　　　　　　　　　　　　　§
CERTAIN UNDERWRITERS AT　　　§
LLOYD'S OF LONDON and ARCH　　§
SPECIALTY INSURANCE COMPANY,　§
　　　*Defendants*.　　　　　　　　§

**CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH
SPECIALTY INSURANCE COMPANY'S EMERGENCY MOTION FOR
RECONSIDERATION OF ORDER OR, ALTERNATIVELY, MOTION FOR
PROTECTIVE ORDER**

　　　This Court's Order granting Stanford's Emergency Motion to Compel [Docket

No. 142] requires defendants Certain Underwriters at Lloyd's of London and Arch

Specialty Insurance Company (collectively, "Underwriters"), and their counsel, Akin

Gump Strauss Hauer & Feld, LLP ("Akin Gump" or the "firm"), to take action that

violates the Amended Order Appointing Receiver, issued by the United States District

Court for the Northern District of Texas, or be in contempt of this Court's Order.

　　　As Mr. Bennett and Mr. Stanford were fully aware, but failed to point out in the

Emergency Motion, Mr. Stanford, Stanford Financial Group, its affiliates, and "all

entities [Mr. Stanford] own[ed] or controll[ed]" (collectively, the "Stanford Entities"), are

subject to a receivership order issued by the United States District Court for the Northern



EXHIBIT
D

District of Texas.[1] The Receivership Order empowers the Receiver with "full control" over the Receivership Estate and renders the Receiver "owner" of the Stanford Entities' attorney-client privilege. Stanford's request and this Court's order would have Underwriters and their counsel bypass the broad authority vested in the Receiver by the Northern District of Texas, for it is no longer Mr. Stanford who "owns" the privilege for any Stanford Entity files Akin Gump maintains; rather, that privilege belongs to the Receiver.

Because compliance with this Court's Order is impossible without violating the Receivership Order and because this Court granted Stanford's motion without being informed by Mr. Bennett about the Receivership Order and before Underwriters could bring it to this Court's attention, Underwriters file this Emergency Motion for Reconsideration, or, Alternatively, Motion for a Protective Order pursuant to Federal Rule of Civil Procedure 26(c)(1).

## I.   FACTUAL BACKGROUND

### A.   Stanford's Motion to Compel

We feel it is important that the Court be informed of the events leading up to Mr. Stanford's Emergency Motion in order to fully consider this Motion; therefore, Underwriters set forth the events that preceded the Motion. In a June 9, 2010 email laced

---

[1] App. "A," Amended Order Appointing Receiver ¶ 1, *Secs. & Exch. Comm'n v. Stanford Int'l Bank*, No. 3:09-cv-0298 (N.D. Tex. Mar. 12, 2009) (hereinafter "Receivership Order"). The Order Appointing Receiver was entered on February 17, 2009 and amended on March 12, 2009. The Amended Order Appointing Receiver defines Defendants as "Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, and the Stanford Financial Group Bldg. Inc." *Id.*

with harassing comments and implicit threats, Bennett demanded, for the first time, the

production of all "files and information" related to any Akin Gump representation of

Stanford Financial Group, its affiliates, or Mr. Stanford by Friday, June 11, 2010 at

noon.[2]  Although Bennett had raised Akin Gump's alleged conflict of interest in prior

communications and during the June 3, 2010 hearing before the Court, no request for

documents had been set forth and no live motion concerned this issue.[3]  Upon receipt of

Bennett's email, Akin Gump immediately began the process of re-reviewing firm records

for any representation of Allen Stanford personally or any of the numerous Stanford

Entities.  Although Akin Gump performed a conflicts check prior to Underwriters'

engagement with the firm, which concluded that there was no conflict, Akin Gump began

the process of again reviewing records for potential prior engagement by either Mr.

Stanford or any of the nearly 130 Stanford Entities listed as insureds under the Policy.[4]

The next day, June 10, the Court set a one week period for Mr. Stanford to move

to disqualify Akin Gump.  Counsel from Akin Gump informed the Court during its

telephonic hearing that the firm had initiated the process of retrieving files pertaining to

engagements with any Stanford Entities.  In a telephone conversation with Mr. Bennett,

the undersigned reiterated that we were making an all-out effort to gather the files and

would report the results to him as we progressed.

---

[2] Exhibit A to Stanford's Emergency Motion to Compel Akin Gump Hauer & Feld LLP to Furnish Any and All Attorney-Client Files and/or Records of R. Allen Stanford, Stanford Financial Group and Its Affiliates Under Expedited Conditions Within Two Days or a Reasonable Period Not to Exceed Five (5) Days to Robert D. Bennett, email from Bob Bennett to Barry Chasnoff and Neel Lane, dated June 9, 2010. Mr. Bennett's email concluded, "get me my client's complete file and have it to me by Friday." *Id.*

[3] *See* Docket No. 136.

[4] D&O Policy, Addendum Number 1.

Late on Friday, June 11, Mr. Bennett contacted associate McLean Peña regarding Akin Gump's production of the documents. Ms. Peña explained that Akin Gump expected to provide Mr. Bennett correspondence regarding firm records of representation over the weekend or, at latest, Monday. When advised that Mr. Bennett planned to file a request for the Court to require production of firm files within two days, Ms. Peña stated that Underwriters would likely oppose that motion, but advised Bennett she would discuss the request with Mr. Chasnoff, who was then returning by plane from a hearing before Judge Fitzwater in the Northern District of Texas.[5] Bennett filed this Motion, seeking emergency intervention by the Court, within minutes of that phone call.[6]

Shortly thereafter, Bennett emailed counsel for Underwriters complaining that Underwriters had failed to meet his unilaterally imposed deadline and that the documents demanded were now necessary for Mr. Stanford's *criminal* defense based on the patently absurd and wholly unfounded "hypothetical" that Akin Gump "may have been participants with R. Allen Stanford in the Ponzi scheme" or that "Akin Gump ...was really the mastermind behind it all." None of the government agencies investigating these crimes has ever made such an outrageous claim. With good reason—it is pure slander.

Later that day, and before Underwriters had the opportunity to respond, this Court granted the Motion and ordered Akin Gump to "produce to Stanford all attorney-client

---

[5] As Mr. Bennett is aware, Mr. Lane has been in China.

[6] Docket No. 141. As with prior motions, Bennett did not meaningfully confer.

files and records related to Akin Gump's representation of Stanford, Stanford Financial Group, and its affiliates by June 15, 2010, at 12:00 p.m."[7]

## B.    Akin Gump Has Never Represented Mr. Stanford in his Individual Capacity.

Akin Gump has never represented Mr. Stanford individually—Akin Gump's prior representations only concern various Stanford Entities.  The firm's prior engagements were with Stanford Financial Group, Caribbean Sun Airlines, Inc. and Stanford 20/20 LLC, and consisted of:

Stanford Financial Group:

Intellectual property, patent and trademark matters:

- "Eagle Design" trademark owned by Stanford Financial Group.  Last billed October 2006.

- "Stanford Financial Group" trademark owned by Stanford Financial Group.  Last billed October 2006.

Mergers and acquisitions representation in connection with Stanford Financial Group's investments in four telecommunications companies:

- Blue Sky Communications, Inc.  Last billed March 2003.

- OPM Auction Company.  Last billed December 2003.

- Telecom Wireless Solutions, Inc.  Last billed February 2004.

- America Samoa Telecom, LLC.  Last billed February 2004.

Caribbean Sun Airlines:

Trademark owned by Caribbean Sun Airlines, Inc.  Last billed July 2004.

---

[7] Docket No. 142.

<u>Stanford 20/20 LLC</u>

> Regulatory and compliance engagement.  Assist Stanford 20/20 LLC in
> safeguarding compliance with U.S. sanctions and other trade controls associated
> with Stanford 20/20's effort to have Cuba participate in the Stanford 20/20 Cricket
> Tournament held in Antigua.  Last billed October 2008.

## II.    ARGUMENT AND AUTHORITIES

**A.    Compliance with this Court's Order Will Violate the Receivership Order.**

Although Stanford may have once held an ownership interest in some or all of the

Stanford Entities, the Receiver presently controls these Entities, including their attorney-

client privilege.  Stanford's motion at best ignored, and at worst concealed, the Receiver's

sweeping control, beginning February 17, 2009, over these companies.  In the Amended

Order Appointing Receiver, the Northern District of Texas assumed:

> Exclusive jurisdiction and takes possession of the assets, monies,
> properties, real and personal, tangible and intangible, of whatever kinds and
> description, wherever located, *and the legally recognized privileges (with
> regard to the entities) of the Defendants and all the entities they own or
> control* ("Receivership Assets"), and the books and records, client lists,
> account statements, financial and accounting documents, computers,
> computer hard drives, computer disks, internet exchange servers,
> telephones, personal digital devices or other information sources of or in
> possession of the Defendants, or issued by Defendants and in possession of
> any agent or employee of the Defendants ("Receivership Records").[8]

The Receivership Order grants Receiver Ralph Janvey "complete and exclusive control,

possession, and custody of the Receivership Estate"[9] and "the sole and exclusive power

and authority to manage and direct the business and financial affairs of the Defendants,"[10]

including the right to remove "any officer, director, agent, employee, or independent

---

[8] Receivership Order ¶ 1.
[9] *Id.* ¶ 4.
[10] *Id.* ¶ 6.

contractor of the Receivership Estate."[11]  Upon presentment of the Receivership Order,

"all persons ... shall provide ... all account records and any other Receivership Records

to the Receiver or his agents, in the same manner as they would be provided were the

Receiver the signatory on the account."[12]  Moreover, the Receivership Order prevents any

person who has notice of the order from:

> Transferring ... any contracts, accounting data, correspondence,
> advertising, computer tapes, disks or other computerized records, books,
> written or printed records, handwritten notes ... and *other documents or
> records of any kind that relate in any way to the Receivership Estate* or are
> relevant to this action.[13]

The language of the Receivership Order prevents Akin Gump from producing to

Mr. Bennett or Mr. Stanford any files regarding former representation of any of the

Stanford Entities.  *See also United States v. Shapiro*, No. 06-cr-357, 2007 WL 2914218, at

*6 (S.D.N.Y. Oct. 1, 2007) (holding that the receiver controlled attorney-client and work

product privileges of a corporation because the receiver's "duties most closely resemble

those previously exercised by [corporation in receivership]'s management group").  Akin

Gump cannot, therefore, produce the files requested by Mr. Stanford on behalf of

companies now under the control of the Receiver without the Receiver's express

permission.  Yet if we fail to do so, we will be in violation of this Court's Order.

The undersigned alerted Mr. Bennett to this situation, and urged Mr. Bennett to

contact the Receiver to get his approval.  Mr. Bennett's Emergency Motion makes no

---

[11] *Id.* ¶ 5(a).

[12] *Id.* ¶ 12.

[13] *Id.* ¶ 16 (emphasis added).

mention to this Court of the limitations on Akin Gump's ability to produce the requested documents. However, as Mr. Stanford and his attorneys were previously held in contempt for violating the Receivership Order,[14] Mr. Stanford and Mr. Bennett were without question aware of it when they filed the Motion to Compel. This Court's Order is based on this concealment and the Court for that reason should grant Underwriters' Motion for Reconsideration and deny Mr. Stanford's Motion to Compel.

### III.   Compliance with the Court's Order by 12:00 p.m. on June 15, 2010, Even if the Receiver Consents to Stanford's Request, is Impossible.

As explained above, Mr. Bennett made his first request for documents related to Underwriters' representation of Mr. Stanford and any Stanford Entities on June 9, 2010. Stanford's Motion to Compel demands that Akin Gump produce all "documents, emails, communication, attorney work product, and attorney notes in connection with the representation of R. Allen Stanford, Stanford Financial Group and its affiliates."[15]

Although we probably will have gathered much of the written documentation relating to the matters which were handled for Stanford Entities, Akin Gump cannot provide all of the requested information on such a short notice. In fact, some files already were turned over to the Receiver long before Mr. Stanford's request for documents was sent to Akin Gump. Trademarks are subject to certain renewal obligations and the firm contacted the Receiver and transferred certain intellectual property files so that these renewal obligations, should the Receiver chose to renew the trademark, would not be

---

[14] Docket No. 926, *Secs. & Exch. Comm'n v. Stanford Int'l Bank*, No. 3:09-cv-0298 (N.D. Tex. Dec. 16, 2009).

[15] Docket No. 141 at 1.

neglected.  Certain of the limited engagements with the Stanford Entities are up to ten years old, and reviewing firm electronic archives for electronic records pertaining to these engagements will take many days, if not weeks.

As is clearly evident, the breadth of Stanford's request imposes on Underwriters and Akin Gump a significant burden, both in time and in expense.  Given Stanford's delay in requesting these documents, Underwriters should not be forced to comply with this broad request in the period set forth by the Court's order.  Underwriters reserved their right to deny coverage to Mr. Stanford on May 1, 2009.[16]  Mr. Stanford has been aware— for more than one year—that a potential conflict existed between his interests and those of Underwriters, represented by Akin Gump.  *See Rhodes v. Chi. Ins. Co.*, 719 F.2d 116, 121 n.6 (5th Cir. 1983) ("The reservation of rights letter serves as notice to the insured of the potential conflict of interest."); *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 886 (Tex. App.—Dallas 2001, pet. denied) (insurers issuance of reservation of rights letter creates conflict with insured).  Moreover, Stanford filed *this* suit against Underwriters over seven months ago.  Akin Gump cannot meet the burdensome request for electronic discovery set forth in Stanford's motion in the six day window between Akin Gump's receipt of the request and the deadline ordered for production required by the Court's order.

---

[16] App. "B," Letter from Barry Chasnoff and Neel Lane to Dick DeGuerin and Paul Flack, dated May 1, 2009.

## CONCLUSION

For the foregoing reasons, Underwriters and their counsel, Akin Gump Strauss Hauer & Feld, LLP, respectfully request that this Court grant this Motion to Reconsider and deny Mr. Stanford's Motion to Compel.  Alternatively, Underwriters request that this Court issue a protective order preventing Mr. Stanford from demanding these documents until he receives written consent from the Receiver.

Respectfully submitted,

AKIN  GUMP  STRAUSS  HAUER  &  FELD LLP

By:____ /s/ Barry A. Chasnoff_____
        Barry A. Chasnoff (SBN 04153500)
        bchasnoff@akingump.com
        Daniel McNeel Lane, Jr. (SBN 00784441)
        nlane@akingump.com
        300 Convent Street, Suite 1600
        San Antonio, Texas 78205
        Phone: (210) 281-7000
        Fax: (210) 224-2035

        **Attorneys for Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company**

6474579

10

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all parties listed on this certificate of service will receive a copy of the foregoing document filed electronically with the United States District Court for the Southern District of Texas, Houston Division, on this 13th day of June 2010, via email and/or with notice of case activity to be generated and ECF notice to be sent electronically by the Clerk of Court.

Lee H. Shidlofsky
Visser Shidlofsky LLP
Greystone Plaza
7200 North Mopac Expressway Suite 430
Austin, Texas 78731

Robert S. Bennett
Bennett Nguyen Joint Venture
515 Louisiana St. Suite 200
Houston, Texas 77009

_/s/ Barry A. Chasnoff_____
BARRY A. CHASNOFF

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he conferred with Mr. Robert S. Bennett on June 13, 2010 at 8:15 pm regarding this Motion. The undersigned counsel stated the documents Stanford seeks are subject to the Receivership Order and compliance with this Court's Order would violate the Receivership Order. The undersigned asked Bennett whether he opposed this motion. Mr. Bennett replied at 8:32 pm, stating "this will have a direct impact on the criminal case for my client and will need to back at FDC tomorrow and discuss it with him." The undersigned responded at 8:36 pm and stated he considered Mr. Bennett's failure to address the topic of consent to the motion as Bennett's opposition. Bennett replied at 8:48 and stated it would be an "untruth" to tell the Court Mr. Stanford opposes the Motion without his client reviewing a draft at the FDC. In light of the urgency of this Court's Order granting Stanford's Motion to Compel and the unusual nature of Bennett's request to provide a draft of the opposition, the undersigned has filed this Motion and considers it opposed.

_/s/ Barry A. Chasnoff_____
BARRY A. CHASNOFF

6474579

11

R. Allen Stanford
Case No.: 3:09-cv-0298-N
Exhibit: _____ *E* _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, R. ALLEN STANFORD, GILBERTO LOPEZ, JR. and MARK KUHRT, *Plaintiffs,* | § § § § § § | |
| vs. | § § § | CIVIL ACTION NO.: 4:09-cv-03712 |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and ARCH SPECIALTY INSURANCE COMPANY, *Defendants.* | § § § § § § | |

<u>**RESPONSE TO DEFENDANT'S OPPOSITION TO EMERGENCY MOTION TO COMPEL AKIN GUMP HAUER & FELD LLP TO FURNISH ANY AND ALL ATTORNEY—CLIENT FILES AND/OR RECORDS OF R. ALLEN STANFORD, STANFORD FINANCIAL GROUP AND ITS AFFILIATES UNDER EXPEDITED CONDITIONS WITHIN TWO DAYS OR A REASONABLE PERIOD NOT TO EXCEED FIVE (5) DAYS TO ROBERT S. BENNETT**</u>

Before the Court is Plaintiff R. Allen Stanford's (Stanford) Response to

Defendant's Certain Underwriters at Lloyd's of London and Arch Specialty

Insurance Company's Emergency Motion for Reconsideration of Order or,

alternatively, Motion for Protective Order.



EXHIBIT
E

1

I.    **Factual Background:**

Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") states, "no request for documents had been set forth and no live motion concerned this issue" until a June 9, 2010 email from Mr. Bennett.[1]  However a possible conflict of interest was asserted in Mr. Stanford's May 21, 2010 letter indicating that Mr. Stanford believed Akin Gump were his "attorneys in fact."  "Exhibit A."  Nevertheless, even under Akin Gump's assertions, June 9, 2010 to June 15, 2010 is a period of eight (8) days and more than enough time to comply with this Court's Order.  See "Exhibit B" Additionally, this Court has the discretion to grant expedited discovery.

Furthermore, Akin Gump stated during the telephonic hearing on June 10, 2010 before this Court that it had began the process of retrieving files pertaining to "engagements with any Stanford Entities" and that they are in a sense cooperating by making an "all-out effort to gather the files and would report the results to him [Mr. Bennett] as [Akin Gump] progressed."[2]  The following day, "Mr. Bennett contacted associate McLean Pena regarding Akin Gump's production of documents."[3]  "Ms. Pena explained that Akin Gump expected to provide Mr. Bennett correspondence regarding firm records of representation over the weekend or, at latest, Monday [June 14, 2010]."[4]  See "Exhibit C" Akin Gump cannot take the contrary position that they would be in accordance with the production of

---

[1] Docket No. 144 at 3.
[2] Docket No. 144 at 3.
[3] Docket No. 144 at 4.
[4] Docket No. 144 at 4.

documents *without* a Court order by Monday, June 14, 2010, but cannot be in accordance with production of the documents *with* a Court order by June 15, 2010 at noon.  Therefore, any claim that a Tuesday June 15, 2010 deadline is impossible to meet, is unfounded when Akin Gump previously asserted that they would produce correspondence regarding firm records of representation by Monday, June 14, 2010.[5]  In fact they now argue that it will take "many days, if not weeks" to produce attorney-client work product.[6]  More importantly, the deadline imposed is necessary to avoid any prejudice that may result by allowing Akin Gump to turn over the necessary documents on the eve our Motion to Disqualify is due and force Counsel for Mr. Stanford to file a continuance after this Court emphasized that issues related to any potential disqualification of Akin Gump need to be raised promptly.

II.   **Response to "Akin Gump Has Never Represented Mr. Stanford in his Individual Capacity"**

To fully address the issue of attorney-client representation now and not in our motion would be premature.  However, an attorney-client relationship can be established even without a contract for services or a retainer.  Furthermore, in closely held corporations representation of the corporation can be representation of the shareholder.  *Edwards*, 39 F. Supp. 2d at 732 (citing, *Sackley v. Southeast Energy Group, Ltd.*, 1987 U.S. Dist. LEXIS 10279, 1987 WL 12950 (N.D.Ill.

---

[5] Docket No. 144 at 4.
[6] Docket No. 144 at 9.

1987)).  Many if not all representations by Akin Gump of Stanford's Companies involved direct dealing with Mr. Stanford and his closely held corporations. Furthermore, many of the Stanford Entities that Akin Gump represented, like Stanford 20/20 LLC, were incorporated for a specific reason and not for general business or perpetual existence.  Mr. Stanford believed that Akin Gump was his personal counsel for these matters.

### III.   Judge Atlas Has Already Addressed This Issue

Judge Atlas Ordered in a May 25, 2010 hearing that "all work product of prior counsel for Mr. Stanford, and anyone else if there has been a switch of lawyers, must be turned to current counsel for us in preparation of current counsel defense of the criminal case."[7]  Previous counsel would include Akin Gump since they were put on notice of a possible "in fact attorney" relationship with Mr. Stanford via his Letter filed to this Court.  "Exhibit A."  Akin Gump made no objections even after an opportunity to do so by Judge Atlas.[8]

Nevertheless, in the alternative that Judge Atlas was not referring to Akin Gump, Akin Gump cannot now object to the power of this Court to compel production of produce attorney-client work product, because they did not object when asked to turn over billing and "correspondence."[9]

---

[7] Motion Hearing/Miscellaneous Hearing Pendergrast-Holt v. Certain Underwriters at Lloyd's of London, Case No. h-090CV-3712, (May 25, 2010) at 91.
[8] Id.
[9] Id. 95-97.

The Receivership Order prevents any person from: "transferring . . . other documents or records of any kind that relate in any way to the Receivership Estate." The Receivership Estate includes records . . . in the possession of any agent.[10] If Akin Gump's definition of what needs to be turned over is to include attorney client notes, then it too must of encompassed billing statements. However, Akin Gump showed no objection to turning over billing statements directly to Mr. Stanford. Judge Atlas has already addressed the issue of whether documentation can be given to the plaintiff without going through the receiver.

Moreover, Judge Atlas has the power to confer with Judge Godbey to clarify an order. In fact, Judge Atlas has previously contacted Judge Godbey to clarify one of his Order's in the past.[11]

IV. **Mr. Stanford being the sole shareholder of Stanford Financial Group, is entitled to not only his individual client file, but also to the file of Stanford Financial Group and its affiliates.**

Under Model Rule of Professional Conduct 1.13(a), "a lawyer employed or retained by an organization represents the organization acting *through its duly authorized constituents*." ABA MODEL R. PROF. CONDUCT 1.13(a) com. 1 (2009) (emphasis added) ("An organizational client is a legal entity, but it cannot act except through its officers, directors, employees, shareholders, and other constituents."). R. Allen Stanford being the sole shareholder and CEO of Stanford

---

[10] Receivership Order ¶1.
[11] Motion Hearing/Miscellaneous Hearing Pendergrast-Holt v. Certain Underwriters at Lloyd's of London, Case No. h-090CV-3712, (May 25, 2010) at 27(clarifying Judge Godbey's Order with regards to allowing Mr. Stanford and his lawyers to advocate in the civil coverage case).

Financial Group is duly authorized to request the client file of himself personally, Stanford Financial Group, and its affiliates. *See Farmers' Fund v. Tooker* 207 A.D. 37, 39 (N.Y.A.D. 4 Dept. 1923) ("A corporation must act through its officers or agents. The officers charged by law, by the by-laws or action of the board of directors, with managerial or administrative authority, are thereby clothed with power to bind the corporation."); see *Stinson v. Berry*, 123 N.M. 482, 487 (N.M. App. 1997) ("Directors are the agents of their corporate principal. . .").

In the alternative that the Receiver's power includes the power to receive attorney-client privileged materials, it certainly does not include the power receive attorney-client privileged materials of Mr. R. Allen Stanford's attorney-client relationship with Akin Gump. Akin Gump states in its Motion for Reconsideration that the receiver is entitled to the privileges of the entities, and that it has never represented R. Allen Stanford in his Individual Capacity.[12] However, this goes to the heart of our Motion for Disqualification. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989) (stating that the first prong is to establish the attorney-client relationship). Precedent states that an attorney for a closely held corporation can represent not only the corporation, but can represent the director and/or shareholder as well. *SEC v. Marker*, 1:02CV01109, 2006 U.S. Dist. LEXIS 7233 (M.D. N.C. Feb. 6, 2006) (finding that where an attorney represented both the authorized director and the corporation the receiver's request for attorney-client files was denied as to both

---

[12] Docket No. 144 at 5.

6

representation by the attorney of the director individually, and where he represented the client and the corporation jointly) (distinguished by *United States v. Shapiro* No. 06-cr-357, 2007 WL 2914218 (S.D.N.Y. Oct. 1, 2007). No where in the appointment of the receiver does it indicate that Ralph S. Janvey ("Janvey") has the power over legal privileges of individual directors. Furthermore, Akin Gump represented Mr. Stanford individually as well as Stanford Financial Group and its affiliate entities, as stated above in Stanford's response to Akin Gump's denial of Stanford as a client. For example, the billing statements of Stanford 20/20 LLC that Akin Gump states in its Motion for Reconsideration were addressed to Mr. R. Allen Stanford personally. "Exhibit D" Tony Nunes an attorney for Akin Gump during the representation of Lloyds of Underwriters was the attorney who incorporated then Guardian Bank, now Stanford International Bank. Tony Nunes represented R. Allen Stanford personally, since when he was representing Mr. Stanford the corporation did not even exist yet.

The receiver DOES NOT have the power to waive the attorney-client privilege of Mr. Stanford. Consequently, Akin Gump must turn over Stanford Financial Group and its affiliate entities attorney-client files since they were not only "Stanford Financial Group and its affiliate entities" attorneys at the time of the creation of the work product, but also Mr. R. Allen Stanford's attorneys.

**V.** **Akin Gump denying access to these documents is a delay tactic since R. Allen Stanford is capable of also receiving these documents through an order out of Judge Hittner's court stemming from the right to a complete defense.**

As Akin Gump stated, it is R. Allen Stanford and Counsel's position that these attorney-client documents in the possession of Akin Gump are necessary for the criminal defense.[13] The attorney-client files may contain exculpatory evidence, and/or be used for defense theory of reliance on guidance and direction of attorneys. The Constitution of the United States guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 693 (1986) (stating that, exclusion of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing.). Although this Court is not over the criminal matter, it should not deny Mr. Stanford access to these documents when there is a reasonable argument for compelling production for purposes of judicial efficiency.

Consequently, yes it is our position that these documents are necessary for the criminal defense, and this theory is not based on a "wholly unfound hypothetical," as Akin Gump suggests.[14] For Akin Gump to deny its former client a full defense is more unconscionable then any email filled with "harassing comments," yet advocating for Mr. R. Allen Stanford. See "Exhibit E"

---

[13] Docket No. 144 at 4.
[14] Docket No. 144 at 4.

Moreover, Undue Prejudice would exist if the Court would not allow R. Allen Stanford to receive access to such files, but still hold R. Allen Stanford to the deadline of one week for filing his Motion to Disqualify Akin Gump. The Motion for Reconsideration is being used to delay and/or prejudice our client in presenting its Motion for Disqualification. Akin Gump has had a history of delay and resistance to the wishes of its former client and insured R. Allen Stanford. See "Exhibit F" For example, it refused to provide Stanford's Counsel with a copy of this Motion for Reconsideration so that we could show R. Allen Stanford.[15] Akin Gump has refused to pay legal bills or approve both Counsel and Experts claiming that experts chosen by Counsel change and since there is an instability in Counsel, experts will not be approved. This delay occurs even though this Court has clarified who is current Counsel and Judge Hittner's court has established who is lead counsel and in fact Counsel has been solidified to the extent Judge Hittner will not let previous lead counsel, Mike Essmyer, withdraw.

Because Judge Atlas has already addressed this issue, Mr. R. Allen Stanford and Stanford Financial Group were joint-clients of Akin Gump, Akin Gump is using this Motion to Reconsider to delay and resist as it has a history of doing, and the fact that the Court has an option for compelling production that would serve judicial efficiency purposes, the Court should deny Akin Gump's Motion for Reconsideration.

---

[15] Docket No. 144 at 11 (certificate of conference stating, "unusual nature of Bennett's request to provide a draft of the opposition.")

June 14, 2010                          Respectfully Submitted,

                                         /s/  Robert S. Bennett                    .
                                       ROBERT S. BENNETT
                                       Federal ID. No. 465
                                       TBA No. 02150500
                                       BENNETT NGUYEN JOINT VENTURE
                                       515 Louisiana St. Suite 200
                                       Houston, Texas 77009
                                       713.225.6000
                                       713.225.6001 (FAX)

                                       ATTORNEY FOR PLAINTIFF
                                       ROBERT ALLEN STANFORD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHRT, | § | |
| *Plaintiffs,* | § | CIVIL ACTION NO.: 4:09-cv-03712 |
| | § | |
| vs. | § | |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE | § | |
| COMPANY, | § | |
| *Defendants.* | § | |

## ORDER

Upon consideration of the Plaintiff's Response to Defendant's Certain

Underwriters at Lloyd's of London and Arch Specialty Insurance Company's

Emergency Motion for Reconsideration of Order or, alternatively, Motion for

Protective Order, the responses and replies thereto, the evidence submitted by all

parties, and the arguments of counsel, the Court is of the opinion that the

Defendant's Motion for Reconsideration Doc. 144, is DENIED in its entirety and

to be effective immediately.

**SIGNED** at Houston, Texas, this _____ day of _____, **2010.**


_____
Nancy F. Atlas
United States District Judge

11

R. Allen Stanford
Civil Action No.: 4:09-cv-03712
Exhibit No. A

May 21, 2010

Mr. R. Allen Stanford
Federal Detention Center
Houston, Texas

Honorable Judge Nancy Atlas
Southern District of the United States

Re:    my case against Lloyds of London (Underwriters)

Dear Hon. Judge Atlas:

I am aware of your order allowing my former counsel in the coverage matter, Mr. Lee Shidlofsky, to withdraw from my representation. Because I now have no attorney representing me in this matter, I am writing this letter directly to you to request emergency relief.

Despite my constitutional and due process claims I have made in Judge Hittner's court (see attached), I have no choice at this time other than to represent myself pro se in the coverage matter. I have sought to engage new counsel to represent me, but any new counsel is reluctant to represent me due to the lack of payment from the Underwriters through Akin Gump.

Underwriters are withholding approval of my criminal team (despite Mr. Essmyer's motion to withdraw -- see attached) and they are not getting compensated. Underwriters are only nominally paying, if at all, my attorneys working on the SEC civil matter. And yet, I find myself having to essentially put on a case pro se at this time, that is quasi-criminal in my defense, adjudicating the same elements as my actual criminal trial under a much lower burden of proof, in a civil proceeding, before my actual criminal trial, all the while the government gets to sit in the audience and watch; how this is possible under our constitution in our current judicial system is incredulous. I do not even have internet access to conduct the discovery necessary for any of my three trials.

I must represent myself pro se because I have no choice due to the Underwriters bad faith denials. However, to do so would be placing me in direct contempt of Judge Godbey's court. On 09/28/09 and again on 12/16/09, Judge Godbey enjoined me "and anyone acting in concert with [me], including his attorneys, from taking further steps to seek relief in any court other than this relating to the [D&O] policies...[I] and anyone acting in concert with [me] were [sic] not to take *any* further steps seeking relief in *any* other court relating to the [D&O] policies" (see attached).

Underwriters have thwarted my every attempt to obtain counsel of my choosing, as is my right under a duty to defend and for paying over 25 years in premiums to them. Underwriters are in breach of the policy. Underwriters have stated on record that they do not have the right to choose my attorneys or control my defense. Yet, Underwriters continually deny me the attorneys of my choosing and control my defense through their control and denial of payments through a "reasonable and necessary" shield. My question is: how do Underwriters know what's "reasonable and necessary"? Underwriters have never interviewed me; have never examined the charges against me to determine the best way to defend against them; have never reviewed the law applicable to the charges; have

PLAINTIFF'S
EXHIBIT
A

never examined the evidence likely to be presented against me by the prosecution; have never examined the work of the experts likely to be called by the Government; have never analyzed the weaknesses in the work of those experts, or have never identified any legal defenses that may apply to the Government's case for my benefit. In essence, Underwriters are attempting to control the defense of the case by controlling the staffing of the case without any detailed analysis that would permit them to make a professional, or even an informed, decision for my benefit. *In doing so, arguably Underwriters and their counsel with Akin Gump have controlled my defense so much as to effectively become my criminal defense attorneys in fact.*

I wish to fight the indictment against me. I do not want to do that in your court in a civil case BEFORE my actual criminal case. I am pro se at this time in your court, but cannot even do that at the risk of being in contempt. I have no choice but to respectfully request your immediate and emergent intervention to order the Underwriters to approve and compensate my criminal attorneys and coverage attorneys of my choice. As Mr. Shidlofsky previously stated to you, his compensation is coming from payment through all the defendants' criminal attorneys with their support. I am no longer in that situation. I have no relief.

My co-defendants, through Mr. Shidlofsky, have sought your emergency relief today to have the co-defendants' criminal attorneys assist him in the coverage matter. Currently I have neither a coverage attorney nor any approved criminal attorneys, due to Underwriters' bad faith actions. Mr. Essmyer has filed a motion to withdraw from my criminal matter, and Mr. Bennett has not been approved by Underwriters. I have no relief as a result of Underwriters' effectively controlling my counsel selection and my defenses to all matters through their bad faith denial.

I am aware that you have shortened the case schedule to have the hearing at the end of July. How can I possibly be ready by July to put on a defense pro se (if I can even to that) in a matter of weeks? I DID NOT COMMIT MONEY LAUNDERING. I am at the untenable situation of not having coverage counsel, not having approved criminal counsel, and not being able to represent myself pro se at the risk of being held in contempt, all in a quasi-criminal proceeding with a lower burden of proof in a civil proceeding to take place in just a matter of weeks where I risk losing coverage and therefore full and effective criminal and civil representation, months before my actual criminal proceeding in January 2011, all the while the government can observe and strategize against me. I am sure you can appreciate how unconstitutional of a predicament I am placed and respectfully pray upon the court to provide me emergency relief.


Sincerely,

R. Allen Stanford
R. Allen Stanford
Inmate #35017-183

R. Allen Stanford
Civil Action No.: 4:09-cv-03712
Exhibit No. _B_

## Bob Bennett

| | |
|---|---|
| **From:** | Bob Bennett |
| **Sent:** | 2010-06-09 12:33 PM |
| **To:** | Chasnoff, Barry; Lane, Neel; Ashley Tse; Bob Bennett; Nhan Nguyen |
| **Cc:** | Ruth Schuster; 'David Z. Chesnoff'; Michael Sydow |
| **Subject:** | Approval of Criminal Law Discovery Program and request for document |

Dear Barry and Neal,

Your firm, Akin Gump, did work for R. Allen Stanford and the Stanford entities for over ten (10) years. As the former attorneys for RAS and entities, you have maintained files and information concerning the work you performed for him. Mr. Stanford requests that all these files and information be returned asap to be used in the Criminal Case. As counselors under the guidance of the Texas Rules of Professional Conduct and as attorneys who have endorsed and professed to follow the Texas Lawyer's Creed, I am not going to request specifically every piece of paper in any way connected to RAS and entities. I know that you will apply the highest standards to go through all of your files that are in any way connected with RAS and entities and provide all this information to me as soon as possible. We would like to have the first production by Friday, June 11, 2011 by noon.

These documents can be produced in binders like you did the billing statements or electronically - whatever you prefer. If you withhold any documents or any information ( of course all attorney notes and billing statements and anything related thereto would be provided), we would have no recourse but to contact not only the Court but also the Office of Chief Disciplinary Counsel, if not provided. As you state to the world:"Our lawyers are not satisfied until they have met the highest standards of legal service. In every area of the law, we focus on achieving results that help your business.

Collegiality, commitment, excellence, integrity and intensity form the bedrock of Akin Gump's core values. Our dedication to the advancement of these values guides relationships within the firm and, most importantly, with our clients." We are pleased that you consider highest legal service and integrity as a bedrock to all you do and how you will continue to  do the very best for your clients. That being so, and knowing how you are wanting to provide the highest standard in legal service and want to do the very best to get your client out of jail as soon a possible, we ask that you provide the documents prior to the deadline of noon on Friday. We do not want to have to report you to the Office of Chief Disciplinary Counsel for refusing a request from your client.

Turning now to the November 16, 2009 conversation between Neel Lane and Kent Schaffer. Since Neel is a friend of Jerry but more importantly, Neel  works for the law firm that has a continuing duty to RAS as former counsel to RAS, we would hope that his comments are truthful and made with the bedrock values your firm professes.

PLAINTIFF'S
EXHIBIT
B

That being so, you understand as Neel said:

NEEL LANE: "...you relied on the representation that underwriters would advance defense costs under reservation of rights and you incurred costs and liabilities and expended money and attorney time in reliance on that representation."

We agree with Neel that we have relied on his and others representation and have incurred costs and liabilities. Right now you have stopped the lead trial attorney for Mr. Stanford dead in his tracks because you refuse to fund expenses. You are the reason that he continues to languish in prison because you will not pay for the work that Weinberg and Dershowitz did in helping us on the Motion for Release. There are other just a important aspects to that Motion and other issues that need their attention that they will not do because you will not pay them. I also note that during the same time period that we incurred $700,000.00 + in costs and liabilities, you paid the Cogdell Firm for work on Holt and she was not in jail. HOW UNFAIR!.

Neel Lane: " Yep, I would expect. I would expect that too.

We are pleased that Mr. Stanford's former attorneys are in agreement with Mr. Stanford's former attorney that this case requires full time work, 6.5 days a week. We are following the former attorneys for Mr. Stanford's recommendation and working full time ( we have your permission to work unlimited hours, seven days a week, and around the clock if necessary) and at least 6.5. days a week. How else can we interpret  Mr. Lane's comments but he is in agreement with our billing practices and we appreciate your approval of us working " ...full-time, 6.5. days a week." Lane's agreement that we can work full time and 6.5 days a week means a lot to us.

Neel Lane: "... if you can sue to try and get Alan coverage then fine."  We really do not understand Neel's comment. Do you mean that we need to file a lawsuit before  you will pay for his defense? Please explain that whole paragraph and what you are wanting counsel for RAS to do now.  Why do we have a different situation about this? Do we  need to take Neel's deposition to find out if we need to file a lawsuit.

Neel Lane: " They're going to overwhelm you. Oh , I know." This agreement statement references  Kent's statement that one attorney can not do this.  We agree with Neel and if you look at the 200 attorneys that the Receiver has or the 10 or so attorneys you have on this or the attorneys that were used when  you represented RAS, we are really understaffed. Hence, the request to make sure we have at least 6 full time attorneys in the office at my office working on the case.

SCHAFFER: " I mean it's a full-time job for half a dozen lawyers, so I mean you know..."
Neel Lane: " Yeah, and you're going to be able to tell them and these damn underwriters

you,know."
How else can we interpret this exchange but that you are authorizing us to gear up for at least six attorneys in our office to work on the case. This appears to me to be pre-approval authorization and we will continue to interview and do as you have approved.

In summary, get me my client's complete file and have it to me by Friday.  Send me written approval so that we can continue to represent our client and do all we can do to get him out of the hell-hole he is presently in. Please do not continue to keep us from preparing for the criminal trial.  We are really brothers-in-Arms. We need to work together so that we can seek truth and justice for Mr. Stanford instead of you fighting him in every possible way. You should really stop doing that.
From one Stanford Attorney to Another,
best wishes,
Bob Bennett
Oh, will hear you at 3 today

This letter and all that is in it meets with my approval:

_R. Allen Stanford. As your former
client and your present insured, I insist that you provide all the
information, Mr. Bennett requested immediately. Please do not
continue to delay my ability to properly defend myself by
withholding funding for my lawyers and my experts. A summary of
the rates you paid Patton & Boggs is attached. None of the Patton
Boggs attorneys  did anything more important than what Mr.
Bennett, Mr. Weinberg, and Prof. Dershowitz are doing and have
done for me. I am also asking that all legal bills from this date
forward be submitted to Mr. Bennett and brought to me for review
and signature.  I do not want another $10 million spend without me
knowing anything about it.

R. Allen Stanford
Civil Action No.: 4:09-cv-03712
Exhibit No. _C_

Page 1 of 1

Documents?

Bob Bennett

From: Chasnoff, Barry [bchasnoff@AKINGUMP.COM]
Sent: 2010-06-12 2:13 PM
To: Bob Bennett; Ashley Tse; ashsummertse@yahoo.com; rhan@healthlawservice.com; scott.frase@stcl.edu
Subject: RE: Documents?

I have received and reviewed your numerous emails and your Emergency Motion to Compel (again failing to comply with Judge Atlas' clearly articulated rules). Had you properly conferred, you would have learned that we have been unable to find any record of any engagement of Akin Gump by Mr. Stanford in his individual capacity. We have found some limited engagements of the firm by certain entities in which Mr. Stanford may have had an ownership interest. Those files and records are the property of the Receiver under the Orders entered by Judge Godbey and Judge O'Connor. You therefore need to talk to the Receiver to seek his directive to us to turn those records over to you. In the interim, we are continuing to work on an expedited basis to gather those records so that they are available to comply with a request by the Receiver or an Order by Judge Atlas. By Monday, I hope to have compiled a chart which describes (to the extent permitted by privilege) the engagements for those entities.



I also would like to confer with you on a discovery request which we have in relation to the disqualification motion you have indicated you will file. First, since we have been unable to locate any matters on which the firm represented Mr. Stanford, please identify the matters in which you believe the firm represented Mr. Stanford, so that we can ensure that we have not missed anything. It also would help if Mr. Stanford would indentify any Akin Gump lawyers with whom he worked or communicated. Once you give me this information, I will go to those lawyers and see if they know of any matters. In addition, we would like to depose Mr. Stanford on the limited issue of what confidential information he shared with any lawyer from Akin Gump and who that lawyer is. Please let me know if you will agree to such a deposition.

If you would like to discuss these requests by phone, please let me know a convenient time

From: Bob Bennett [mailto:Bob@bennettlawfirm.com]
Sent: Saturday, June 12, 2010 7:45 AM
To: Chasnoff, Barry; Ashley Tse; ashsummertse@yahoo.com; rhan@healthlawservice.com; scott.frase@stcl.edu
Subject: Documents?

Good morning Barry. Wonder if it was hard to sleep last night as it was for me thinking about our mutual client being in jail. What do you think would be the best strategy to get him out of prison? When will I get my documents that were promised to me yesterday? Will they be here today? Also would like to take your corporate rep on the Stanford matter on Monday. Where and when could that be arranged? Also look over the Stanford documents and let me know the one or two AG attys who did the most work for Stanford and let's arrange that deposition too . Oh, I am seeking approval for fees and expenses for this  The budget should be less than $50,000.00. Let me know as soon as possible the details
Bob Bennett

---------------------------
Sent from my BlackBerry Wireless Handheld

IRS Circular 230 Notice Requirement: This communication is not given in the fo

the information contained in this e-mail message is intended only for the pers

PLAINTIFF'S
EXHIBIT
C

R. Allen Stanford
Civil Action No.: 4:09-cv-03712
Exhibit No. _D_



# AKIN GUMP
## STRAUSS HAUER & FELD LLP
Attorneys at Law

ATTN: SIR R. ALLEN STANFORD
STANFORD 20/20 LLC
STANFORD FINANCIAL GROUP
P.O. BOX 224602
CHRISTIANSTED, ST. CROIX,  00822
VIRGIN ISLANDS (U.S.)

| | |
|---|---|
| Invoice Number | 1171997 |
| Invoice Date | 03/05/08 |
| Client Number | 685827 |
| Matter Number | 0001 |

Re: INTERNATIONAL COMPLIANCE

FOR PROFESSIONAL SERVICES RENDERED THROUGH 02/29/08 :

| Date | User | | Hours |
|---|---|---|---|
| 02/04/08 | WHS | Review license received from OFAC and instructions for transmittal to client. | 0.20 |
| 02/05/08 | WHS | Teleconference with Y. Suarez and serial teleconferences to OFAC re questions on possible Cuban test match. | 0.80 |
| 02/06/08 | WHS | Teleconference with OFAC and DOS contacts re interpretation/guidance on OFAC license. | 0.30 |
| 02/08/08 | WHS | Teleconference with OFAC contact on pending request for guidance re possible Cuba test match. | 0.20 |
| 02/11/08 | WHS | Teleconference with C. David/OFAC re license interpretation and proposed test match with Cuban team; teleconference with Y. Suarez re same. | 0.30 |
| | | Total Hours | 1.80 |

TIMEKEEPER TIME SUMMARY:

| Timekeeper | Hours | | Rate | Value |
|---|---|---|---|---|
| W H SEGALL | 1.80 | at | $560.00 | $1,008.00 |

Current Fees           $1,008.00

Total Amount of This Invoice

Prior Balance Due        $23,722.76

Total Balance Due Upon Receipt      $24,730.76

Robert S. Strauss Building / 1333 New Hampshire Avenue, N.W. / Washington, DC  20036-1564 / 202.887.4000 / fax 202 887 4288 / www.akingump.com



PLAINTIFF'S
EXHIBIT
D

R. Allen Stanford
Civil Action No.: 4:09-cv-03712
Exhibit No. *E*

**Bob Bennett**

| | |
|---|---|
| **From:** | Bob Bennett |
| **Sent:** | 2010-06-11 6:14 PM |
| **To:** | 'Chasnoff, Barry'; Pena, McLean; Mungia, Manuel |
| **Cc:** | Bob Bennett |
| **Subject:** | RE: Refusal to provide response or answers |

Dear Barry and Neel,

It is Friday afternoon and even after the Court Hearing and my previous request, you have provided us nothing in order to prepare for the Motion to Disqualify Akin Gump. The Court noted that you have had knowledge since June 3rd, 2010 that you were counsel for R. Allen Stanford and his entities. You admitted during our recent telephone conference that Akin Gump represented my client. You are the General Counsel for Akin Gump and have stated you are an expert on legal ethics and advise others on legal ethics but here it is a week after we put you on notice that there may be a conflict and we do not have a single document. You know that we have to have our Motion filed next Thursday and we want to work on ourMotion based on our client's files but we can not do that if you refuse to give them to us. You have not even let us know when they will be available.

Barry, why this is important is because under one possible hypothetical Akin Gump may have been participants with R. Allen Stanford in the alleged Ponzi scheme that the United States Attorney's Office has indicted my client for having engaged or having participated in. Or maybe Akin Gump by arranging financing and transferring funds has engaged in wire fraud and mail fraud and other criminal acts. It may be that Akin Gump advised R. Allen Stanford on how to carry out the alleged criminal enterprise and was really the mastermind

PLAINTIFF'S EXHIBIT
E

behind it all.  Or maybe R. Allen Stanford relied on the legal and financial advise of Akin Gump Attorneys and  will need all this material for our defense of reliance on legal advice. You can see where this is going and why getting all these documents, billing information, and the names of the 25 or more Akin Gump attorneys who advised my client over the last decade and half is so important to the criminal case.

   We only have six months to prepare for the criminal trial and if you are withholding  information that is necessary for the defense of my client this could be  huge, catastophic,  and unprecedented.  It may lead to a improper verdict based on yoru lack of cooperation. This is probably what you are not doing but when I talked to Pena McLean today she said you were getting some engagement documents together and not sure what that means. I told her we are filing a Motion to Produce but this is all  is aimed at getting us ready in the criminal case. We have to have all your documents regarding any aspect of the multiple representations over a decade plus period of time immediately for the criminal case.

   While I am on the request for production of documents for the criminal case, I note that you have not responded to my request on how to budget for getting Akin Gump to produce all of our files and then how we should  budget for taking the depositions of all the attorneys in Akin Gump who were involved with Stanford.  You can understand how important this is in the criminal case that we tie these attorneys down to their stories unless they change their testimony at time of trial.  With travel and related expenses, you are looking at probably $25,000.00  for each person. This is just a broad estimate but we need to discuss it and you can provide me the names of the best people to testify and generally what they will say. Since your  law firm, Akin Gump,  represented Stanford on so many deals and  for so long a time, you are in the best position to tell me

who I should depose. Oh, by the way, I will also probably need everyone's personnel file to make sure there is not something else going on such as kick backs or bribes or involvement with some type of foreign corrupt practices act violation. What if in the personnel files of the attorneys there is memo of an attempt to bribe an Antiguan official. I think this is something I need to know. You are now on notice that as of June 1st, I assumed the lead on the criminal case by Order of Judge Hittner so my reponsibilities have greatly increased as has that of my entire group or joint venture. Because my work and responsiblities have increased, I will now be billing at the rate you quoted to represent Mr. Stanford in you engagement contract: one thousand ($1,000.000) dollars an hour. Since this is just a little above you approved for Thomas Boggs @990/hr this seems to be reasonable. Mr. Stanford has no idea what Mr. Boggs did but you paid this Firm $1,004,539.56 with the following rates: Robert D. Luskin2 $850/hr; Theodore Sonde @$820 an/hr; John W. Schryber @830/hr, and none of these individuals were Lead Trial Counsel on the Criminal case. Please explain why you would pay these rates for these indiviuduals and my rate at $1,000.00 is not fair and resonable. The same applies to Mr. Weinberg and Prof. Dershowitz.  Certainly my client thinks what we are asking is fari and reasonable, and  it is. Please let me know any reason that with Judge Hittner seeing all of the Essmyer trash has made me lead trial counsel in the criminal case, you have for thinking this rate is not fair and reasonable.

Again, here we are on Friday afternoon, tried to call you and you were out  of the office, talked to Ms. Pena who was very nice and helpful, but she did not know when I would get my documents. Keep in touch.

Bob Bennett

**Patton Boggs**

<u>PAID</u>
$ 334,625.72
$ 15,979.86
$ 15,979.86
$ 71,295.58
$ 71,295.58
$ 3,716.29
$ 3,716.29
$ 151,775.60
$ 151,775.60
$ 4,355.63
$ 4,355.63
$ 104,539.86
$ 104,539.86

**TOTAL:**     $ 1,04539.96

**Higher Hourly Rates (PAID)**
Thomas Boogs @ 990/hr
Robert D. Luskin @ $850/hr
Theodore Sonde @820/hr
John W Schryber @ 830/hr
Samuel Rosenthal @ $780/hr

R. Allen Stanford
Civil Action No.: 4:09-cv-03712
Exhibit No.  F

Page 1 of 1

**Bob Bennett**

To:      bchasnoff@akingump.com
Subject: Payment

Dear Mr. Chasnoff and Mr. Lane,

   Pro Se Plaintiff, Robert Allen Stanford, has requested that his criminal defense lawyers, the Bennett-Nugyen Joint Venture be paid under the Orders of Judge Hittner, the Fifth Circuit, and Judge Atlas. We were to receive a check on the 30th and we understand you are refusing to obey the Court orders and the language  of the policies. If I have misstated you position, and you are sending the check that is owed, please disregard this communication.

   If you are continuing to refuse to pay my attorneys as a ploy to keep me in jail and to wear-down my defense team, these tacitcs will be brought to the attention of Judge Atlas. This letter is authorized by me and a signed copy will follow.
Very truly yours,

*R. Allen Stanford*

this 1st day of June, 2010

R. Allen Stanford
Inmate #35017-183
Federal Detention Center at Houston
1200 Texas Street
Houston, Texas 77002



Hiring six attorneys to work full time inoffice for Criminal Case                    Page 1 of 2

**Bob Bennett**

To:    Chasnoff, Barry; DZChesnoff@cslawoffice.net; nhan@healthlawservice.com; ashsummertse@yahoo.com; rschuster@thebrewerlawgroup.com; msydow@sydowmcdonald.com; owlmgw@att.net

Cc:    Lane, Neel, Pena, McLean; Mungia, Manuel

Subject: Response to June 9, 2010 letter

Dear Barry,

I want to respond to your recent communication of June 9, 2010. With all the correspondence and letters you have received, it is really unbelievable that you would take the position that you would take the position that Mr. Stanford has not approved or has never asked for your approval on my representation. This smacks of devious insurance company manuvering but I will get a written statement from Mr. Stanford that he asks Underwriters to consent to my represenation. How is this:

Dear Underwriters: Please allow Mr. Bob Bennett to represent me in the matter.
Signed _____ R. Allen Stanford  June 9th, 2010.

Barry and Neel, will this be sufficient for Mr. Stanford to ask the Underwriters to consent to Bob Bennett's presentation in the criminal matter? if it is not, please let me know.

We are in agreement that Akin Gump served as former counsel for R. Allen Stanford and his entities. The only issue is whether you should be disqualified or not and you can make your case to me for not being disqualified at our 3 pm telephone conference. Why don't we agree to record the call?

What is the deal with the conversation? I did not record it and you now have assumed the obligation for reporting Mr. Kent Schaffer to the OCDC. Schaffer said he recorded it and he knew he had a transcript of it that was given to us when we got his files. You got to be out of your gord about admissibility or verifiable. That is such BS.

Hear you at 3 - be persuassive as to why I am not getting my client's files and all his billing from Akin Gump.
Remember those bed-rock values,
Bob Bennett

From: Chasnoff, Barry [mailto:bchasnoff@AKINGUMP.COM]
Sent: 2010-06-09 11:04 AM
To: Bob Bennett, DZChesnoff@cslawoffice.net;
nhan@healthlawservice.com; ashsummertse@yahoo.com;
rschuster@thebrewerlawgroup.com;
msydow@sydowmcdonald.com; owlmgw@att.net
Cc: Lane, Neel; Pena, McLean; Mungia, Manuel
Subject: RE: Hiring six attorneys to work full time inoffice for Criminal Case

Please find attached a letter sent this morning to Bob Bennett

R. Allen Stanford
Case No.: 3:09-cv-0298-N
Exhibit: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHRT, | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:09-cv-03712 |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
| *Defendants.* | § | |

**<u>SUPPLEMENT TO CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON
AND ARCH SPECIALTY INSURANCE COMPANY'S EMERGENCY MOTION
FOR RECONSIDERATION OF ORDER OR, ALTERNATIVELY, MOTION FOR
PROTECTIVE ORDER</u>**

In support of their Emergency Motion for Reconsideration, or, Alternatively,

Motion for a Protective Order pursuant to Federal Rule of Civil Procedure 26(c)(1),

Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company

(collectively, "Underwriters") attach the following declarations:

1.  App. D: Declaration of Barry A. Chasnoff; and

2.  App. E: Declaration of Glen Kaplan.



6474795                                 1

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD
LLP

By:  /s/ Barry A. Chasnoff
     Barry A. Chasnoff (SBN 04153500)
     bchasnoff@akingump.com
     Daniel McNeel Lane, Jr. (SBN
     00784441)
     nlane@akingump.com
     300 Convent Street, Suite 1600
     San Antonio, Texas 78205
     Phone: (210) 281-7000
     Fax: (210) 224-2035

     Attorneys for Certain Underwriters at
     Lloyd's of London and Arch Specialty
     Insurance Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all parties listed on this certificate of service will receive a copy of the foregoing document filed electronically with the United States District Court for the Southern District of Texas, Houston Division, on this 14th day of June, 2010, via email and/or with notice of case activity to be generated and ECF notice to be sent electronically by the Clerk of Court.

Lee H. Shidlofsky
Visser Shidlofsky LLP
Greystone Plaza
7200 North Mopac Expressway Suite 430
Austin, Texas 78731

Robert S. Bennett
Bennett Nguyen Joint Venture
515 Louisiana St. Suite 200
Houston, Texas 77009

     /s/ Barry A. Chasnoff
     BARRY A. CHASNOFF

# APP. D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHRT, | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:09-cv-03712 |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
| *Defendants*. | § | |

**DECLARATION OF BARRY A. CHASNOFF IN SUPPORT OF CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH SPECIALTY INSURANCE COMPANY'S EMERGENCY MOTION FOR RECONSIDERATION OF ORDER OR, ALTERNATIVELY, MOTION FOR PROTECTIVE ORDER**

I, Barry A. Chasnoff, declare as follows:

1) My name is Barry A. Chasnoff. I am over the age of eighteen (18), of sound mind, and am fully capable of making this declaration. I have personal knowledge of all facts stated in this declaration, and all facts herein are true and correct. If called upon to do so, I am competent to testify to these facts.

2) I am lead counsel for Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company (collectively, "Underwriters") in the above captioned matter. I also am a partner and serve as the General Counsel of Akin Gump Strauss Hauer & Feld, LLP ("Akin Gump").

3) When Underwriters approached me about representing them in the insurance related matters arising out of Stanford Financial Group and its affiliates' (the "Stanford Entities") alleged Ponzi scheme, Akin Gump immediately investigated to determine whether any conflict of interest existed. The investigation concluded that no conflicts existed.

4) On June 9, 2010, I received an email request from Plaintiff R. Allen Stanford's counsel, Mr. Robert Bennett, that Akin Gump produce all

documents in its possession arising out of Akin Gump's representation of R. Allen Stanford and the various Stanford Entities.

5)     Upon receipt of the this email, Akin Gump began the process of again reviewing records for potential prior engagement by either Mr. Stanford or any of the nearly one hundred thirty (130) Stanford Entities listed as insureds in the D&O Policy. This was the first step necessary to begin collecting documents responsive to Mr. Bennett's request.

6)     Our review of Akin Gump's records disclosed that Akin Gump never performed any services, entered any engagement, or represented R. Allen Stanford in his individual capacity.

7)     Akin Gump has only represented a few Stanford Entities. The subject matter of these former representations is not related to the matters before this Court, and none of these matters involved the same issues as this case. Akin Gump's past representations are:

    a)     <u>Stanford Financial Group</u>:

       i)     Intellectual property, patent and trademark matters:

          (1)     "Eagle Design" trademark owned by Stanford Financial Group. Last billed October 2006.

          (2)     "Stanford Financial Group" trademark owned by Stanford Financial Group. Last billed October 2006.

       ii)     Representation in connection with Stanford Financial Group's investments in four telecommunications companies:

          (1)     Blue Sky Communications, Inc.: Last billed March 2003.

          (2)     OPM Auction Company: Last billed December 2003.

          (3)     Telecom Wireless Solutions, Inc.: Last billed February 2004.

          (4)     America Samoa Telecom, LLC: Last billed February 2004.

    b)     <u>Caribbean Sun Airlines</u>:

       i)     Trademarks owned by Caribbean Sun Airlines, Inc. Last billed July 2004.

      c)     Stanford 20/20 LLC:

             i)     Regulatory and compliance engagement. Assisted Stanford 20/20 LLC in safeguarding compliance with U.S. sanctions and other trade controls associated with Stanford 20/20's effort to have Cuba participate in the Stanford 20/20 Cricket Tournament held in Antigua. Last billed October 2008.

8)     The Receiver, designated by the United States District Court for the Northern District of Texas, controls all of the various Stanford Entities. I spoke with the Receiver about this request for documents, and the Receiver has not waived attorney-client privilege or otherwise consented to Akin Gump providing its documents related to the above listed representations.

9)     Akin Gump has always understood that the Receiver controls the Stanford Entities, including their attorney-client privilege, and transferred various files to the Receiver. For instance, on January 10, 2010, Akin Gump transferred certain of the Stanford Entities' trademark files to the Receiver's counsel.

10)    In his letter to the Court, Docket No. 131, Mr. Stanford represents that Tony Nunes was a "[f]riend who set up Stanford's Corporate Structure and Stanford International Bank 1980's to 2009. . . . Throughout this time, he was in constant contact with Stanford in not only a social friendly relationship, but in a client counsel relationship." On the contrary, our records reflect that Mr. Nunes never opened a client matter for Mr. Stanford while at Akin Gump. To confirm our records, I spoke with Mr. Nunes, who is no longer with Akin Gump. He confirmed that he never opened any files for R. Allen Stanford or any of the Stanford Entities while at Akin Gump. According to Mr. Nunes, he never met with Mr. Stanford while an attorney at Akin Gump; Mr. Stanford never requested that Mr. Nunes represent him; and Mr. Stanford only contacted him seeking his support of Mr. Stanford's motion to disqualify Baker Botts, filed in the United States District Court for the Northern District of Texas.

11)    I have had the opportunity to review Docket No. 146, Mr. Stanford's Response to Underwriters' Emergency Motion for Reconsideration. In this Response, Mr. Stanford alleges that "[m]any if not all representations by Akin Gump of Stanford's Companies involved direct dealing with Mr. Stanford and his closely held corporations." Resp. at 4. Since receiving Mr. Stanford's document request, the lawyers working on this case interviewed as many attorneys as possible to determine whether the representation was of a Stanford Entity or Mr. Stanford. With one exception, none ever spoke to Mr. Stanford. The one attorney who did

speak to Mr. Stanford is Mr. Wynn Segall, who never met Stanford but spoke to him a few times over the phone. As explained in paragraph 12, below, Mr. Segall was instructed that his primary contact on the Stanford 20/20 matter was Ms. Yolanda Suarez. Thus, this unsworn statement by Mr. Bennett represents yet another falsehood presented to this Court.

12)    Mr. Bennett's Response later states that "Akin Gump represented Stanford individually," and uses the billing statements for Stanford 20/20 as an example. Resp. at 7. Again, this is incorrect. Akin Gump represented Stanford 20/20 as described above in paragraph 7. Julie Hodge signed the engagement agreement, on behalf of Andrea Stoelker, President of Stanford 20/20. A true and correct copy of this engagement letter is attached as Exhibit 1. Shortly after receiving the engagement letter, Stanford 20/20 informed Akin Gump that Yolanda Suarez would be the "primary point person." A true and correct copy of this letter is attached as Exhibit 2.

13)    I declare under penalty of perjury, under the laws of the United States of America, that the foregoing statements made in this declaration are true and correct.

Executed this 14th day of June, 2010, in San Antonio, Texas.

Barry A. Chasnoff

# EXHIBIT 1

# AKIN GUMP
## STRAUSS HAUER & FELD LLP

▬▬▬▬▬▬▬▬ Attorneys at Law

**WYNN SEGALL**
202.887.4573/fax: 202.887.4288
wsegall@akingump.com

November 27, 2007

Sir Allen Stanford
Stanford 20/20 LLC
P.O Box 224602
Christiansted, St. Croix, VI 00822

Re:   Terms of Engagement

Dear Sir Allen:

I am pleased to confirm our representation of **STANFORD 20/20 LLC** in connection with obtaining licensing as may be needed and other actions necessary to safeguard compliance with U.S. sanctions and other trade controls associated with its activities.  The firm appreciates your confidence in us, and we look forward to working with you.

At the beginning of our representation of a client, the firm's policy is to describe the manner in which we will bill for legal services and disbursements.  A clear understanding of those matters helps to maintain a harmonious professional relationship.  I encourage you to consider the matters set forth in this letter carefully and to raise with us any question that you may have now or later about its contents.

We refer matters to those lawyers in this firm who in our judgment can perform the highest quality work, in a timely and efficient manner, and at the lowest cost.  We also employ non-lawyer assistants in tasks where lawyers are not necessary, to facilitate the rapid and efficient performance of services.  While I certainly do not expect that you will find the legal representation by this firm to be in any way unsatisfactory, I do encourage you to discuss any problems or questions with me at any time.

For new clients, our firm requires a retainer payment at the outset of the engagement.  Accordingly, we will require from you a payment in the amount of $25,000 prior to the commencement of work on your behalf.  The retainer will be maintained throughout the engagement and returned upon completion of our services.  We reserve the right to apply the retainer to outstanding statements in the event your account falls into arrears, subject to replenishment of the retainer.

The firm charges for my services at the hourly rate of $560, and for other lawyers in the firm at rates between $335 to $1000 per hour.  Hourly rates for paralegals range from $105 to $210.  The firm may change these rates in the future, in which case the new rates will apply to work done after your receipt of written notice from the firm of those rate changes.  In addition, expenses advanced on your behalf or internal charges for administrative services (which may

**A K I N   G U M P**
**S T R A U S S   H A U E R   &   F E L D** LLP
Attorneys at Law

Sir Allen Stanford
November 27, 2007
Page 2

exceed our direct costs) are added to the statement rendered for the month in which such expenses or charges are recorded in our billing system.

Our standard practice is to bill on a monthly basis. This allows our clients to monitor both current and cumulative fees and expenses. We require that payment of statements be made within 10 days of receipt, and we may suspend or terminate any work in progress if timely payment is not made. We may also withdraw from the representation in a manner consistent with applicable ethical standards.

Attached to this letter is our Statement of Firm Policies (the "Statement") that will apply to our representation of you, provided that to the extent of a conflict between the terms of the Statement and the terms of this letter, the terms of this letter shall control. Please review these policies and let me know if you have any questions concerning them. If the terms described above and in the attached Statement of Firm Policies are satisfactory to you, please so indicate by signing the enclosed copy of this letter and returning the signed copy with the retainer check.

Sincerely,

AKIN GUMP STRAUSS HAUER & FELD LLP

Wyna Segall

Enclosures

**AGREED:**

**CLIENT NAME**

By: _____

   JULIE HODGE, SECRETARY on behalf of ANDREA STOELKER, PRESIDENT

Date: ___DECEMBER 3, 2007___

# EXHIBIT 2



December 3, 2007

Mr. Wynn Segall
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564

Dear Mr. Segall,

We are pleased to confirm the engagement of your services for representation in connection with obtaining licensing as may be needed and other actions necessary to safeguard compliance with U.S. sanctions and other trade controls associated with its activities in an effort to have Cuba participate in the Stanford 20/20 Cricket Tournament held in Antigua, and enclosed the duly signed Engagement Letter.

The retainer amount was sent via wire transfer on Friday November 30, 2007.

Yolanda Suarez will remain your primary point person and we look forward to working very closely with you.

Sincerely,

Julie Hodge

**No. 11 Pavilion Drive, Coolidge, Antigua**
**Tel: 268-480-3551**
**Visit our website at www.stanford2020.com**

# APP. E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHRT, | § | |
|     *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:09-cv-03712 |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
|     *Defendants.* | § | |

## DECLARATION OF GLEN KAPLAN IN SUPPORT OF CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH SPECIALTY INSURANCE COMPANY'S EMERGENCY MOTION FOR RECONSIDERATION OF ORDER OR, ALTERNATIVELY, MOTION FOR PROTECTIVE ORDER

I, Glen D. Kaplan, declare as follows:

1) My name is Glen D. Kaplan I am over the age of eighteen (18), of sound mind, and am fully capable of making this declaration. I have personal knowledge of all facts stated in this declaration, and all facts herein are true and correct. If called upon to do so, I am competent to testify to these facts.

2) I am Director of EDiscovery at Akin Gump Strauss Hauer & Feld, LLP ("Akin Gump").

3) I have searched Akin Gump's document management database for electronic documents related to Akin Gump's past engagements with Stanford Financial Group and its affiliates (the "Stanford Entities"). This search returned 405 electronic documents.

4) It will take a considerable amount of time to identify every email associated with Akin Gump's engagement with any Stanford Entity. Unlike the document management database, emails are not stored according to specific clients and matters. Therefore, in order to locate emails related to Akin Gump's engagement with any Stanford Entity, each attorney's emails must be searched for keywords.

5)    Once the keyword search is completed, an attorney must review the emails to determine if they are relevant. The typical attorney accumulates tens-of-thousands of emails. The keyword search will typically reduce this number by 80%, and the average attorney can review 50 to 80 emails an hour.

6)    I declare under penalty of perjury, under the laws of the United States of America, that the foregoing statements made in this declaration are true and correct.

Executed this 14th day of June, 2010, in Washington, D.C..

Glen D. Kaplan