**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 03:09-CV-0298-N** |
| **STANFORD INTERNATIONAL BANK, LTD.,** *et al.* | § § | |
| **Defendants.** | § § | |

## AGREED MOTION FOR STAY OF PROCEEDINGS RELATED TO AGREED MOTION FOR APPROVAL OF STIPULATION OF SETTLMENT

Nigel Hamilton-Smith and Peter Wastell (collectively, "Liquidators"), Receiver Ralph Janvey, the SEC, and the Examiner, through their respective counsel, respectfully submit this Agreed Motion for Stay of the Proceedings Related to the Agreed Motion for Approval of Stipulation of Settlement (the "Agreed Motion"). The parties believe that a stay is necessary given recent activity in Antigua related to the status of the Liquidators.

The Agreed Motion for Approval of Stipulation of Settlement (the "Settlement Motion") (Docket No. 1086) was filed on May 19, 2010 and one objection was filed on June 9, 2010 (Docket No. 1094). The time period to respond to this objection has not passed.

On June 8, 2010, the Antiguan Court that appointed Liquidators ruled on a motion filed by a creditor (the "Removal Motion") to have Liquidators removed from their position as liquidators, and ordered that Liquidators be replaced by a new liquidator (the "Removal Order"). Liquidators are in the process of seeking a stay of the Removal Order pending an anticipated appeal of the Removal Order. Pursuant to the Removal Order, Liquidators remain in office until such time as the Antiguan Court appoints a new liquidator.

Liquidators have filed a Notice of the Removal Order in the Chapter 15 Action pending before this Court (Case No. 3-09CV0721-N).  A copy of that Notice is attached hereto as Exhibit A.

Liquidators, the Receiver, the SEC and the Examiner agree that, given the Removal Order, a stay of the Settlement Motion is in the best interests of the investors and creditors.  The parties are currently unable to predict how long a stay will be necessary but believe that the stay should be in place until either (a) the anticipated appeal in Antigua is resolved or (b) a new liquidator is appointed and has had sufficient time to consider the Settlement Motion.  The parties will update the Court regarding the status of the proceedings in Antigua, including any stay, appeal or appointment of a new liquidator.

Because the requested stay would also defer the time period to respond to the one objection to the Settlement Motion, counsel for the party that filed an objection to the Settlement Motion was consulted regarding this Agreed Motion, and does not oppose this Agreed Motion.

The parties respectfully move the Court to enter the accompanying Order.

Dated: June 18, 2010.                    Respectfully submitted,


                                         _____/s/ Weston C. Loegering_____
                                         Weston C. Loegering
                                         State Bar No. 12481550
                                         Gregory M. Gordon
                                         State Bar No. 08435300
                                         Craig F. Simon
                                         State Bar No. 00784968
                                         Greg Weselka
                                         State Bar No. 00788644
                                         Daniel P. Winikka
                                         State Bar No. 00794873
                                         JONES DAY
                                         2727 N. Harwood St.
                                         Dallas, Texas 75201
                                         Telephone:  (214) 220-3939
                                         Facsimile:   (214) 969-5100

                                         Attorneys for Nigel Hamilton-Smith and
                                         Peter Wastell as Liquidators of Stanford
                                         International Bank, Ltd.

DLI-6282808v3

BAKER BOTTS L.L.P.

_____/s/ Kevin Sadler_____

Kevin Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

ATTORNEYS FOR RECEIVER
RALPH S. JANVEY

_____/s/ David B. Reece_____

Stephen J. Korotash
Oklahoma Bar No. 5102
J. Kevin Edmunson
Texas Bar No. 24044020
David B. Reece
Texas Bar No. 24202810
Michael D. King
Texas Bar No. 24032634
D. Thomas Keltner
Texas Bar No. 24007474
U.S. Securities & Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Ft. Worth, Texas 76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)

ATTORNEYS FOR U.S. SECURITIES &
EXCHANGE COMMISSION

_____/s/ John J. Little_____

John J. Little
Texas Bar No. 12424230
LITTLE PEDERSON FANKHAUSER
L.L.P.
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573-2300
(214) 573-2323 (facsimile)

THE EXAMINER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_____/s/ Greg Weselka_____

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

```
-------------------------------------------------------------x
                                            :
In re                                       :   Chapter 15
                                            :
Stanford International Bank, Ltd.,          :   Case No. 3-09CV0721-N
                                            :
             Debtor in a Foreign Proceeding.:
                                            :
-------------------------------------------------------------x
```

## NOTICE OF ANTIGUAN AND SWISS ORDERS

Messrs. Nigel Hamilton-Smith and Peter Wastell (collectively, "Liquidators"), acting as the duly-appointed liquidators of Stanford International Bank, Ltd. ("SIB") pursuant to an order of the Eastern Caribbean Supreme Court dated April 15, 2009, respectfully provide notice to this Court of two recent decisions in foreign jurisdictions.

First, on June 8, 2010 and upon motion by a creditor, the Eastern Caribbean Supreme Court ordered that Liquidators be removed from their position as liquidators of SIB (the "Removal Order"). A copy of the Removal Order is attached hereto as Exhibit A. Pursuant to the terms of the Removal Order, Liquidators remain in office because the Removal Order orders them to continue SIB's liquidation until a replacement liquidator has been appointed by the Eastern Caribbean Supreme Court. (Removal Order p. 84.) Liquidators are filing an application to stay the Removal Order pending an anticipated appeal of that order in Antigua. As a result of the Removal Order, Liquidators are filing in the case captioned *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al*, pending in this Court (Case No. 3-09CV298-N), an Agreed Motion for Stay of the Proceedings Related to the Agreed Motion for Approval of Stipulation of Settlement until the appeal of the Removal Order has been

resolved (the "<u>Motion to Stay</u>").  A copy of the Motion to Stay (without its one exhibit – this Notice) is attached hereto as Exhibit B.

Second, on June 8, 2010, FINMA, Switzerland's financial market supervisory authority, issued a decision (the "<u>FINMA Order</u>") (a) recognizing Liquidators as the appropriate foreign representative for SIB, and (b) dismissing a request for recognition filed by Ralph S. Janvey (the "<u>U.S. Receiver</u>").  The U.S. Receiver has 30 days to appeal the FINMA Order to the Federal Administrative Court.  A copy of the FINMA Order is attached hereto as Exhibit C.  Because the FINMA Order is in French and an official English translation is not available, an unofficial English translation of the FINMA Order is attached hereto as Exhibit D.

DLI-6310457v2

Dated:   June 18, 2010                    Respectfully Submitted


                                          /s/ Wes Loegering
                                          Weston C. Loegering
                                          State Bar No. 12481550
                                          Gregory M. Gordon
                                          State Bar No. 08435300
                                          Craig F. Simon
                                          State Bar No. 00784968
                                          Greg Weselka
                                          State Bar No. 00788644
                                          Daniel P. Winikka
                                          State Bar No. 00794873
                                          JONES DAY
                                          2727 N. Harwood St.
                                          Dallas, Texas 75201
                                          Telephone: (214) 220-3939
                                          Facsimile: (214) 969-5100

                                          Attorneys for Nigel Hamilton-Smith and
                                          Peter Wastell as Liquidators of Stanford
                                          International Bank, Ltd.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_____/s/ Greg Weselka_____

## EXHIBIT A

DLI-6310457v2

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV2009/0149

IN THE MATTER OF STANFORD INTERNATIONAL BANK LIMITED (IN LIQUIDATION)

and

IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATION ACT, CAP 222
OF THE REVISED LAWS OF ANTIGUA AND BARBUDA

IN THE MATTER OF AN APPLICATION FOR THE REMOVAL OF THE LIQUIDATORS

ALEXANDER M. FUNDORA

Applicant

NIGEL HAMILTON-SMITH
PETER WASTELL (JOINT LIQUIDATORS)

Respondents

**Appearances:**
Mr. Anthony Astaphan, SC and with him Ms. Nicolette Doherty and Mr. Craig
Christopher, instructed by Mr. Dan Wise of Martin Kenney & Co. of the British
Virgin Islands, for the Applicant.
Mr. Douglas Mendes, SC and with him Mr. Kendrickson Kentish.

------------------------------------

2010: March 2-3
June 8

------------------------------------

<u>DECISION</u>

[1]     **Thomas, J.:**  The Joint Liquidators of Stanford International Bank (SIB) are at the
centre of these proceedings.

**The context of SIB**

[2]     SIB is an International Corporation incorporated in Antigua and Barbuda under the International Business Corporations Act[1] ("the IBC Act") and engaged in International Banking.  It attracted investors from several countries over the years of its operation.  SIB's chairman and sole shareholder is R. Allen Stanford.  SIB is now in the process of liquidation.

[3]     The SIB liquidation is a large multi-jurisdictional process.  In this regard, the evidence is that SIB had some 27,000 investors/creditors from 113 countries who invested in excess of US $7 billion principally in a wide variety of certificates of deposit (CDs).

[4]     It is alleged that SIB is at the centre of a massive Ponzi scheme fraud, which involve many other entities and companies owned or controlled by R. Allen Stanford.

[5]     Ms. Karyl Van Tassel, a certified US Public Accountant, who gave evidence in the proceedings before the English High Court stated in her second affidavit gives this description of the alleged Ponzi scheme:

> "Although S.I.B was part of the fraud, it is also the case that the flow of funds between and among the companies was such that their assets and liabilities will be exceedingly difficult, expensive and time consuming to unscrable... S.I.B was the mouth of the Ponzi scheme... the other Stanford banker dealer entities and [Stanford Trust Company]... all helped feed the scheme. Thereafter, the funds were shunted around the Stanford Financial Group many times among multiple entities."

[6]     Nigel Hamilton-Smith and Peter Wastell were on 19th February, 2009, appointed Receiver-Managers of SIB by the Financial Services Regulatory Commission (FSRC) pursuant to Section 287[2] of the International Business Corporation Act[3] ("the IBC Act").  And on 26th February, 2009, Ralph Janvey was appointed US Receiver by a US Court of all entities owned or controlled by R. Allan Stanford

---

[1] Cap 222 (Revised Laws of Antigua and Barbuda).
[2] Exhibit ADB-6, tab 14 at page 400
[3] Cap 222 (Revised Laws of Antigua and Barbuda).

which are located both in the United States of America and in Antigua and Barbuda.

[7]   On 15th April, 2009, the same persons who were appointed Receiver-Managers were appointed Joint Liquidators of SIB by the High Court upon the application of the FSRC.

[8]   The Joint Liquidators are in the process of having the Order of the High Court of Antigua and Barbuda registered and recognized in the various jurisdictions where SIB has assets.  This quest is being opposed by the US Receiver.

[9]   Thus far, the Joint Liquidators have succeeded in the UK where the High Court granted an Order recognizing and enforcing the Order of the High Court of Antigua.  But in the Province of Quebec, Canada, the Joint Liquidators did not succeed in obtaining a similar Order.  Instead, the recognition was granted to the US Receiver and the appeal to the Quebec Court of Appeal was unsuccessful.

**The Application**

[10]  Before the Court, is an Application made pursuant to the IBC Act and/or the Banking Act[4], ("the Banking Act") and or the inherent jurisdiction of the Court.  The Applicant is Alexander M. Fundora who seeks:

　　1)  the removal of the Joint Official Liquidators of Stanford International Bank Limited ("SIB"), Nigel Hamilton-Smith and Peter Wastell from their roles as Joint Official Liquidators forthwith in accordance with the draft Removal Order *at Annexe* "A" to the said application;

　　2)  the appointment of Marcus A. Wide of Price Waterhouse Coopers LLP, Canada as sole Liquidator of S.I.B with all the powers, duties and responsibilities of a liquidator as contained in the IBC Act and any other relevant legislation and in accordance with the powers, duties and

---

[4] Cap 222 (Revised Laws of Antigua and Barbuda).

responsibilities set out in the draft appointment Order *al Annexe* "B" to the said application.

3) the applicant be awarded his reasonable costs arising from, and incurred in, "the preparation" of both applications to be paid by [the outgoing Joint Liquidators] [out of the Antiguan Estate of S.I.B in Liquidation], such costs to be assessed if not agreed.

[11]    The pleaded grounds of the application are as follows:

1.    The Joint Liquidators have failed to act in the best interests of the Estate and/or the creditors and should accordingly be removed by this Honourable Court.

2.    In summary, the Joint Liquidators have, *inter alia*:
   a)    destroyed, and employed improper practices in relation to computer and electronic data in Canada;
   b)    failed to co-operate with foreign agencies and office holders, notably the U.S. Receiver, the S.E.C. and the Canadian Autorite des Marches Financiers (the "A.M.F.");
   c)    acted outside of the remit of Receiver-Managers;
   d)    demonstrated a disregard for the Canadian jurisdiction and courts; and,
   e)    as a result, occasioned serious harm to the liquidation Estate and the creditors.

3.    A number of instances of the Joint Liquidators' wrongdoing were recognized and censured by the Superior Court (Commercial Chamber) Province Quebec, District of Montreal (the "Canadian Court") in two decisions of Auclair J of 11 September, 2009, in Case No. 500-11-036045-090 (the "Auclair J Judgment" and the "Second Auclair J Judgment").

4.    *Inter alia*, the Canadian Court found, by the Auclair J's judgment, that:

4

a) the Joint Liquidators do "not deserve the trust of the Court" ([37]);

b) the conduct of Mr. Hamilton-Smith personally was "reprehensible" and "in no way offers any assurances for the future of this case" ([37]);

c) the Joint Liquidators were disqualified from acting in Canada (para. [59]);

d) it "did not believe" the Joint Liquidators (para [60]);

e) the Joint Liquidators did "not deserve the confidence of the Court" as they acted with "an absence of good faith" and had questionable motives (paras. [58] and [61]); and,

f) the Joint Liquidators acted "with an absence of respect towards the Canadian public interest, represented by the Court and the regulatory authorities" (para [61]).

5. The Applicant contends that the Joint Liquidators should therefore be removed from office because, *inter alia*:

a) the US Receiver has already taken steps to have the Auclair J Judgments recognized in the US and England. If so recognized, this potentially offers other jurisdictions a reason to prefer recognition of the Receiver over the Joint Liquidators (if they remain in office), meaning that assets which would otherwise come into the Antiguan Estate may be lost;

b) the reputation of the Joint Liquidators will now hinder them as they pursue recognition and asset recovery in other jurisdictions and attempt to work with law enforcement and regulatory authorities globally;

c) the Joint Liquidators have lost the confidence of the jurisdiction where the majority of payments of interest and capital redemptions were made in relation to the alleged fraud;

d) the Joint Liquidators' conduct has already caused loss of around US $20 million from the Antiguan Estate. Any such further losses must be prevented;

e) the risk of recurrence of improper actions is extremely high, given the nature of the ongoing liquidation, involving as it will, similar tasks involving computer data and liaising with foreign regulatory bodies;

f) the gravity of Joint liquidators' actions is so serious that the Joint Liquidators must be removed from office to demonstrate that this Honourable Court will not tolerate or condone its officers acting in such a manner;

g) they have lost the confidence of the creditors of the estate, in particular of creditors totaling over US $77 million;

h) the Joint Liquidators have caused the estate to incur further costs and lose time as a result of the Canadian Court's Order for them to provide a report into their actions in Canada; and,

i) the Joint Liquidators' misunderstanding of their remit is so fundamental, that the risk of further grave errors is high.

6. The Applicant accordingly submits that this Honourable Court should treat the factual findings of Auclair J as *res judicata* and, based on those factual findings, should remove the Joint Liquidators in accordance with the legal test for removal of a liquidator, namely that there is due or sufficient cause.

7. Alternatively, in the event that this Honourable Court is not minded to treat Auclair J's factual findings as *res judicata* the Applicant contends that this Honourable Court should in any event reach the same factual conclusions

6

as Auclair J with regard to the Joint Liquidators' conduct. Based on those factual findings, the Joint Liquidators should nevertheless be removed, applying the legal test for removal of Liquidators to those factual conclusions.

In terms of the appointment of Marcus A. Wide the following is stated:

8. In the event that this Honourable Court grants the Application for the removal of the Joint Liquidators, the Applicant also makes an application that Marcus A. Wide of Price Waterhouse Coopers LLP, Canada, be appointed as sole Official Liquidator.

9. The Applicant contends that Mr. Wide has the requisite experience and integrity to undertake this appointment, and that he is also a suitable choice in terms of cost, as further set out in the written submissions, Consent to Act of Mr. Wide and the Affidavit of Mr. Wide sworn in the earlier petition before the Antiguan High Court of 19th March, 2009.

**ISSUES**

[12]     It is clear that, essentially, the issue for determination is whether or not the application should be granted for the removal and replacement of the Joint Liquidators. But in arriving at that determination, the following issues must also be answered:

1) Whether this Court can consider itself bound by the facts found by the Quebec Courts?

2) Did the Liquidators act improperly in the handling of computer data held on computers in SIB office in Montreal, Canada?

3) Whether Messrs Hamilton-Smith and Wastell acted outside of their remit as Receiver-Managers?

7

4) Did the Receiver-Managers/Liquidators disregard the jurisdiction of the Canadian Courts?

5) Whether this Court is bound by the UNCITRAL model insolvency Laws?

6) Does the applicant have standing to make an application for the removal of the liquidators; and what is the legal test for the removal of a liquidator?

7) Has the Applicant shown due cause?

8) Should the Liquidators be removed?

9) Who should replace the present Liquidators?

8

ISSUE NO. 1

**Whether this Court can consider itself bound by the facts found by the Quebec Courts?**

[13]     This issue involves an overview of the nature and content of the decisions of the Canadian Courts in issue.

[14]     On 6th April, 2009, the Joint Liquidators applied for and obtained an *ex parte* Order before Registrar Flamand of the Superior Court of Quebec recognizing the Antiguan Receivership Order.

[15]     On 16th April, 2009, the US Receiver Janvey, filed and served a motion to revoke and rescind the decision of Registrar Flamand (motion to revoke).  And on 22nd April, 2009, the Joint Receiver Managers filed a motion seeking the appointment of a Foreign Representative, the Recognition of a foreign Order and Judicial Assistance in the Court under Part XIII of the Bankruptcy and Insolvency Act of Canada from the recognition of: (a) the winding-up Order of the Antiguan Court in respect of S.I.B.; (b) their status as Joint Liquidators of S.I.B as being similar to the status of "foreign representative" under the BIA; and (c) their powers as Joint Liquidators.

[16]     Justice Claude Auclair sitting in the Supreme Court of Quebec (District of Montreal), in respect of the motion to revoke, set aside the Order made by Registrar Flamand on the following grounds: (a) it was issued at a time when the Joint Liquidators acted as Receiver-Managers and not as Receiver Managers and not as liquidators; (b) the mandate of Receiver-Managers  was now terminated (c) the Joint Liquidators were not trustees and as such did not have the right to US as Interim Receivers in Canada.

[17]     In this decision, the learned Judge also: (a) recognized the US Receivership Proceedings; (b) recognized Janvey as the Receiver of S.I.B and the then entities; (c) ordered that Ernest A. Young be appointed Interim Receiver.

9

[18]    With respect to the motion seeking the appointment of a Foreign Representative and other matters, Auclair J held that the Joint Liquidators' conduct disqualified them from acting in Canada and precluded them from pursuing the motion as they could not be trusted by the Court. The Court also made the following findings:

a)   the representatives of the Joint Liquidators erased computer data from S.I.B's Montreal Office during the process of taking imaged copies of computer data on servers, desktops and laptops;

b)   the imaged copies of the Montreal computer data were removed from the Canadian Jurisdiction, without permission, making it impossible for the Canadian Court to ever confirm their accuracy;

c)   with regard to the computer data, it was unacceptable for the Joint Liquidators and/or their representatives to argue that it was destroyed to protect confidentiality, when alternatives to deletion of the data, such as secure storage of servers, were readily available;

d)   Mr. Hamilton-Smith's evidence would not be believed by the Court particularly with regard to his claim that he had informed Janvey of the proposal to delete data after imaging it;

e)   the reported termination of S.I.B's Montreal Office lease (and the allegation that the computer hard-drives were justifiably wiped clean to manage the risk of confidential customer data leaking out) was merely a pretext offered after the event by the Joint Liquidators;

f)   the Joint liquidators acted as Receiver-Managers in Canada before seeking or obtaining the necessary permission from the Canadian Court.

g)   the Joint Liquidators failed to disclose all material information to Registrar Chantal Flamand at the *ex parte* hearing before April, 2009. This information included: (i) that Janvey had already been appointed by an American Court as Receiver of S.I.B in the US; (ii) that the Joint liquidators were not licensed trustees in bankruptcy pursuant to the BIA;

10

(iii) that Janvey and the Joint Liquidators were engaged in a dispute over the control and possession of the Canadian assets belonging to the creditors (valued at more than $20 million US);

h) the Joint Liquidators, personally and/or through their representatives repeatedly ignored requests for information from the A.M.F., the US Receiver and the SEC when they did answer requests from the A.M.F., they responded saying that "proceedings should be instituted in Antigua" knowing that these would be dismissed, as no treaty existed between the two countries.

i) the Joint Liquidators obtained the Flamand Order *ex parte* and without notice to the A.M.F., SEC on the US Receiver.

**The doctrine of *res judicata***

[19]   Both sides seek to bring the doctrine of *res judicata* to bear on the case.

[20]   In a leading text[5] on administrative law, the authors explain the principles and distinctions that attend the doctrine in this way:

> "One variety of estoppels *res judicata*. This results from the rule which prevents the parties to a judicial determination from litigating the same question over again, even though the determination is demonstrably wrong. Except in proceedings by way of appeal, the parties bound by the judgment are stopped from questioning it. As between one another, they may neither pursue the same course of action again, nor may they again litigate any issue which was an essential element in the decision. These two aspects are sometimes distinguished as 'cause of action estoppel' and 'issue estoppel.' It is that which presents most difficulty, since an issue 'directly upon the point' has to be distinguished from one which 'came collaterally in question' or which was 'incidentally cognisable.' In any case, there must be a list or issue and there must be a decision."

[21]   In **Halstead v Attorney General of Antigua and Barbuda**, Chief Justice, Sir. Vincent Floissac said that the doctrine applies in the following circumstance:

> "[A] right or cause of action or an issue had arisen or could or should have been raised in previous civil proceedings and that right or cause of action or issue was expressly or impliedly determined on its merit by a final and inclusive judgment of a court or competent jurisdiction. In that case, the parties to the previous civil proceedings and their privies are *inter estoppel per rem judicatam* from relitigating that same adjudicated right or course of action or issue in consequence proceedings unless there are special

---

[5] H.W.R Wade and C.F. Forsyth, Administrative Law, (7th Edition)

11

circumstances entitling one of the parties or privies to re-open that adjudicated right or cause of action or issue in the interest of Justice."

[22]     As explained by Wade and Forsyth[6], *res judicata* law has two limbs:  cause of action estoppel and issue estoppel.  This relates to the ordinary circumstance; and given the present issues, the further question is whether findings of fact by a foreign court would give rise to issue estoppel.  This was answered in the affirmative in **Carl-Zeiss Stifting v Rayner and Keeler (No. 2)** by Lord Reid who said that he saw "no reason in principle why we should deny the possibility of issue estoppel based on a foreign judgment."   The applicable tests were articulated in **Thomas and Agnes Carvel Foundation v Carvel** and another[7] by Levison J as follows:

> "A foreign Judgment will give rise to an issue estoppels in subsequent English proceedings if (i) the judgment is a final and conclusive judgment on the merits of a court of competent jurisdiction; (ii) the issue in question is the same and was necessary for the decision of the foreign court; and (iii) the parties to the English litigation are the same parties (or their privies) as in the foreign litigation."

[23]     These principles are in alignment with what the House of Lords had earlier enunciated in **Arnold v National Westminister Bank PLC**[8].

[24]     In the face of these principles which evoke the doctrine of *res judicata*, in relation to the Canadian judgments, it is the contention of the Applicant that the doctrine applies in relation to the findings of fact.  The grounds are as follows:

a)   The decisions are final in the particular Court despite the appeal launched and no stay was granted -- **Beatty v Beatty [1924]** [1924 1KB 807, 815 – 816].

b)   As to the same parties, the Applicant had the right to intervene in the Canadian proceedings as an interested party – **House of Spring Garden Ltd v. Waite [1990]** 3 WLR 347.  Further or alternatively, the applicant had an interest in the previous litigation and/or its subject matter in accordance with the test laid down in Carl Zeiss (Per Lord Reid at 910) and therefore is also a privy.

---

[6] Op cit, at page 276, supra
[7] [2008] 2 WLR 1234
[8] [1991] 2 A.C 93

12

c) The issues are identical namely the conduct of the Joint Liquidators in relation to computer data in Canada and their behavior with regard to the foreign regulatory bodies.

[25]   For the Respondents, there is no dispute that the Quebec Court is a Court of competent jurisdiction.  And there is also no dispute that the judgments of the Court denying the Respondents' motion that winding-up order issued by the High Court of Antigua and Barbuda  and the liquidators appointed by the Court be recognized as a "foreign proceeding" and "foreign representative", respectively, was final and conclusive on its merits.

[26]   The Respondents however, challenge the findings of fact made by the learned Judge at first instance or the basis that they are not final and conclusive for the following reasons:

1) In the Quebec proceedings, the question for determination was whether the Respondents were guilty of such misconduct as would justify their removal as Liquidators.  As such, the Respondents did not and were not required to put before the Court all such facts and evidence as would bear on that question;

2) There was no cross-examination of witnesses and accordingly  no basis upon which the Court could determine finally and conclusively the facts upon which the applicant in this case seeks to rely;

3) Although the Respondents sought leave to appeal against the findings of fact and the ultimate decision, the Quebec Court of Appeal did not consider those facts and dismissed the Liquidators' applications on other grounds.

[27]   As far as the question whether the issue in question is the same and was necessary for the decision of the foreign Court is concerned, the Respondents say that the issue is the same, namely whether the Respondents were guilty of the

13

conduct attributed to them by the Quebec Court.  However, the further contention
is that the findings of fact made by the Quebec Court were not necessary for the
decision made.

[28]    Finally, on the issue as to whether the parties are the same, the Respondents
submitted that parties in the Quebec litigation are not the same as the parties to
the present application.

### Analysis

[29]    The principle of judicial restraint compels the Court to consider merely the
requirement that the parties must be in both proceedings.

[30]    It will be recalled that the rule in this regard is that a party or its privies would
qualify for the purposes of this rule.  But there are qualifications and exceptions as
shown by **Gleeson v J. Wippel & Co. Ltd.**[9] when Megarry V.C. had this to say:[10]

> "Second it seems to me that the substratum of the doctrine is that a man ought not to be
> allowed to litigate a second time what has already been decided between himself and the
> other party to the litigation.  This is in the interest both of the successful party and of the
> public.  But I cannot see that this provides any basis for a successful defendant to say
> that the successful defence is a bar to the plaintiff suing some third party, or for that third
> party to say that the successful defence prevents the plaintiff from suing him, unless
> there is a sufficient degree of identity between the successful defendant and the third
> party.  I do not say that one must be the alter ego of the other; but it does seem to me
> that, having due regard to the subject matter of the dispute, there must be a sufficient
> degree of identification between the two to make it just to hold that the decision to which
> one was party should be binding in the proceedings to which the other is party.  It is in
> that sense that I would regard the phase 'priority of interest.'"

[31]    In support of their contention that *res judicata* is applicable, the Applicant submits
that on the issue of the same parties, the Applicant had the right to intervene in the
Canadian proceedings as an interested party and therefore falls under the rule
enunciated in **House of Spring Garden Ltd. v Waite** as being a deemed party.
And further or alternatively, the Applicant had an interest in the previous litigation
and or its subject matter in accordance with the test laid down in the Carl-Zeiss
case per Lord Reid at page 910 and therefore also a privy.

---

[9] [1971] 1 WLR 510
[10] Ibid at page 515

14

[32]    For the avoidance of doubt, the headnote in the **House of Spring Garden** case must be quoted to the extent of its materiality:

> "... on the facts, the judge had correctly held that the first and second defendants were estopped from alleging that the prior Irish judgment was obtained by fraud and, since the judgment was a judgment against the defendants jointly and severally, the third defendant even though he did not join in the Irish proceedings to set it aside was well aware of those proceedings and was privy to them and, therefore, in the absence of new evidence affecting the issue of fraud the third defendant was similarly estopped. Nana Ofori Atta II v Nana Abi Brusre II [1958] A.C 95 PC and Carl Zeiss, Stifting v Rayner & Keeler Ltd. (No. 2) [1967] 1 AC 853, H.L (5) applied."

[33]    What the **House of Spring Garden** case illustrates is the application of the legal proposition of 'privy' in the context of estoppel.  To adopt the language of Megarry V.C in the Gleeson case[11] [that does not arise] 'unless there is a sufficient degree of identity between the successful defendants and a third party.' Chief Justice Sir. Vincent Floissac uses similar language in the Halstead case.[12]

[34]    In the case at bar and having regard to the two Canadian decisions, there is no degree of identification between the Applicant and the Respondents in those cases.

[35]    In the first of the two Canadian judgments rendered on September 11, 2009, the "Petitioners" were the present Respondents in the case at bar, A.M.F intervened and the motion was opposed by the US Receiver.

[36]    The Petitioners sought the following reliefs[13]:

    a)  "a recognition of the winding-up Order pursuant to sections 267 and seq. of Part XIII, International insolvencies, of the Bankruptcy and Insolvency Act, R.S.C., 1985, c. B-3 ("the BIA");

    b)  a recognition that their status a Liquidators of Stanford International Bank Limited (in liquidation) ("the Bank") in Antigua and Barbuda granted under the Winding-Up Order is similar to the status of a "foreign representative" to an estate in a "foreign proceeding" pursuant to section 267 and seq. of the BIA;

    c)  a recognition of their powers as Liquidators through the issuance of an order *inter alia*:
        i.  staying any present or future proceedings against the bank or any of its property in Quebec, and generally in Canada, and authorizing the Liquidators to institute or continue any present legal proceedings initiated by the Bank in Quebec, and generally in Canada;

---

[11] [1990] 1WLR 347, supra
[12] [1995] 50 WIR 98, supra
[13] Exhibit "ADB6" to the Affidavit of Andrew D. Blackburn, Tab 3

15

    II.  ordering the turnover to the liquidators of any property, assets and any documents, computer records, electronic records, programs, disks, books of account, corporate records, minutes, correspondence, opinions rendered to the Bank, documents of title, whether in an electronic media or otherwise held in the name of or traceable to the bank and;

    III.  availing the Liquidators of the facility to discover and trace any assets or property of the Bank that are located in Quebec and generally in Canada, (whether such assets or property are possessed in the name of the Bank or have in any way been misappropriated, fraudulently transferred and/or otherwise concealed from the Liquidators);

   d)  any further relief necessary to assist the Liquidators in the due carriage of their duties under the Winding-Up Order and under Sections 267 and seq. of the BIA ..."

[37]    In the second Canadian judgment also rendered on September 11, 2009, the Applicant is Ralph S. Janvey with various 'Stanford entities'[14] as Respondents and L'Authorite Des Marches Financiers (A.M.F.) as Intervener.

[38]    The lack of any degree of identification between the present Applicant and the Respondents in the first Canadian case rests on the fact that although the US Receiver and A.M.F. were not strictly Respondents, there is no commonality of legal purpose. Indeed, the present Respondents then were seeking a certain recognition under a certain Canadian state, being the Bankruptcy and Insolvency Act, R.S.C 1985, c. B-3. ("the BIA")

[39]    In the second Canadian judgment, it is recorded that the Applicant, Janvey, was asking the Court to:

   [a]  "Quash the April 6, 2009 Order of Registrar Flamand;
   [b]  Recognize Janvey as foreign representative of the proceedings instituted abroad pursuant sections 267 BIA and following;
   [c]  Give effect to the American Court Orders appointing Janvey as Receiver;
   [d]  Nominate Ernst & Young, a Canadian Bankruptcy Trustee, interim receiver of the Canadian Assets of the debtors;
   [e]  Order that the interim receiver assist Janvey in his duties in Canada;
   [f]  Any additional remedies which are necessary to the foregoing relief."

[40]    Mr. Fundora then, never sought or was party to any of the foregoing reliefs in either of any of the Canadian cases. And after that long excursion, the short point is that the **House of Spring Garden** case does not assist the Applicant. In that

---

[14] Named are: Stanford International Bank Limited, Stanford International Bank, Ltd. Stanford Trust Company Limited, Stanford Group Company, Stanford Capital Management, LLC, Stanford Financial Group, Stanford Group Bldg. Inc, Bank of Antigua, Robert Allan Stanford, James M. Davis, and Laura Pendergest-Holt and L'Autorite Des Marches Financiers, Intervener.

case, estoppels extended to a defendant who was not a part to certain later proceedings; but all of the defendants had been held to jointly and severally liable which is the fact that satisfies the notion of a sufficient degree of identity.

**Conclusion**

[41]     In **Carl Zeiss Stifting v Rayner & Keeler** (No.2) Lord Upjohn noted that:

> "All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind."

[42]     As noted above, one of the conjunctive requirements that would raise to issue estoppel is if, in this case, the parties are the same in the Canadian proceedings as in these proceedings. In this regard, it is the determination of this Court that the parties are entirely different and given the conjunctive nature of the requirements, it follows that issue estoppel does not arise. And the principle of judicial restraint would also apply so that there is no compulsion to examine the other requirements.

[43]     In the result, it is the further determination of this Court that it is not bound by the findings of fact or otherwise of the Superior Court of Quebec and the Quebec Court of Appeal.

17

ISSUE NO. 2

**Did the Liquidators all improperly in the handling of computer data held on computers in the SIB Office in Montreal, Canada?**

[44]     Given the nature and complexity of this issue, the Court considers it necessary to examine the technical parameters of imaging of computer data and the circumstances in which the Receiver-Managers/Liquidators engaged an IT expert and the sequel thereto.

**Imaging**

[45]     All of the IT experts[15] who gave evidence in these proceedings spent much time debating the issue of imaging or the process; but the Court has no desire to go between these opinions to find truth.  Instead, the Court accepts as a fact that there can be no debate as to fact that imaging is a part of the IT landscape.  In this regard, the Court is guided by the following contained in the analysis and expert opinion of Mark Kirby[16]:  "... using a computer image is a perfectly acceptable methodology for preserving data in an evidential final.  Provided proper procedures are followed the use of a compiled image as evidence is universally accepted.  Courts in the United Kingdom, Australia and the United States of America to name but three jurisdictions."

[46]     On the question of imaging and seizing, Mark Kirby earlier in his said expert opinion deposed thus:

> "4. ACPO[17] guidelines defines computer imaging as 'the process used to obtain all of the data present on a storage media (e.g. hard disk) ... in such a way as to allow it to be examined as if it were the original data' Forensic computing specialists such as those in this case rely upon a mathematical validation to verify that the image of a computer disk drive and relevant files exactly match the contents of the original computer.  Such comparisons help resolve questions that might be raised during litigation about the accuracy of the restored computer image.

> 5. When a computer is 'imaged' the file or files that comprise the image are usually made on a separate hard drive.  The hard drive (containing the files is usually taken back to a forensic computing lab where the image can be analyzed using specialist software, some of which is free and some of which is commercially available.

---

[15]  See for example Affidavit and second Affidavit of Alistair Bruce Keiman, Core Bundle, Tab 11 & 12.
[16]  Exhibit "MK" to the Affidavit of Mark Kirby
[17]  Exhibit "MK" to the Affidavit of Mark Kirby

18

6. Seizing computers usually means unplugging them from a network and electricity supply and taking them away for storage and subsequent analysis at a convenient time.

7. In the early days of forensic computing (the late 1990's) it was regarded as preferable to seize computers and take them away for analysis. However as computers became more and more essential to business the practice of seizure was no longer practical. It was no longer realistic or necessary to deprive businesses of the use of their IT systems when a perfectly acceptable (to the Courts) methodology existed to collect evidence on scene and take it away for examination at a later date.

8. It is my own preference, as well as the considered opinion of the computer forensic specialist community, that business computers should be seized only if there is an overwhelming technical or legal reason for doing so. There are inherent risks in moving computers. Hard drives are mechanical devices and particularly vulnerable to damage when moved. Likewise there are often problems with the computers own internal battery which is meant to save important data such as time and other key data which the computer may need to use when restarting. Temperature and humidity will also have a bearing on a computer in storage."

[47]     On the other hand, Alistair Bruce Kelman, a Barrister and IT Expert, in his affidavit[18] deposes the following at paragraph 19 under the heading: "The Necessity of Imaging Computer Systems":

"19. The fragile nature of computer evidence and the ease with which it can be modified means that particular care has to be taken by the police in a criminal case or private party seeking to rely on such computer evidence in civil litigation, in 'freezing the scene', that is to say preserving the evidence in any case involving computers. The UK Association of Chief Police Officers (the 'ACPO') provided a first edition of a Good Practice Guide for computer based evidence in March 1998.

It has since been revised and is now based around the following four principles:

Principle 1: No action taken by law enforcement agencies or their agents should change data held on computer or storage media which may subsequently be relied upon in Court.

Principle 2: In circumstances, where a person finds it necessary to access original data held on computer to do so and be able to give evidence explaining the relevance and the implications of their actions.

Principle 3: An audit trail or other record of all processes applied to computer based electronic evidence should be created and preserved. An independent third party should be able to examine those processes and achieve the same result.

Principle 4: The person in charge of the investigation (the case officer) has overall responsibility for ensuring that the law and these principles are adhered to."

These four principles apply as much to contentions with disputes as to investigations by the criminal authorities."

---

[18] Sworn to on 23rd October, 2009

19

Engagement of an IT Expert

[48]     James David Coulthard in his first affidavit[19] details the commencement of his
professional involvement with the Liquidators in this way:

> "5. I was instructed on this matter on 20th 2009. My colleague Stephen Hirst and I
> travelled to Antigua with Mr. Dulien to assist the Liquidators (who had been appointed
> receiver-managers of SIB (the "Receiver-Managers') to examine the Antiguan IT System
> of SIB. We worked at the premises of SIB and asserted in gaining an understanding of
> the IT Systems there and how they worked.
>
> 6. I reported directly to Stephen Hirst of Stroz. Another colleague, Byron Lloyd-Jones
> was also present in Antigua.
>
> 7. In early March, 2009, I was instructed by Vantis to travel to Montreal. I arrived in
> Montreal and first visited the offices of SIB there on 5th March, 2009.
>
> 8. Since arriving in Antigua we had requested from the SIB staff and 'IT Manifest; which
> would show the IT equipment which was owned by SIB. However, we never received the
> complete list.   My purposes in travelling to Montreal were: (1) to establish what SIB
> computer equipment was in  the Montreal Office; (ii) to image the computer equipment
> in the office, as directed by the Receivers-Managers; and (iii) to securely erase relevant
> data to prevent access to that data by unauthorized third parties."

[49]     As noted above, the Applicant takes issue with a number of actions by the
Liquidators which essentially relate to: (a) destruction of computer data, (b) failure
to co -operate with certain agencies, (c) acting outside their remit; (d) disregard of
the Canadian jurisdiction, (e) causing the breakdown of trust and corporation and,
(f) overall harm to the estate and the creditors.  The matter of the destruction of
computer data must now be addressed in terms of submissions, analysis and
conclusion.

**Destruction of, and improper practices relating to, computer and electronic data in
Canada.**

[50]     The matters which fell to be considered can be narrowed down to the following: (a)
three servers at the Montreal office of SIB were not imaged and not copied, (b)
four desktops and laptops were not imaged but were securely erased, (c) the e-
mail servers and Blackberry enterprise servers were not imaged; (d) the IT
specialists did not appear to have seen instructed by the Liquidators to search for,
collect and image the Blackberrys and data sticks.

---

[19] Filed on 1st January, 2010

20

[51]  According to the Applicant, the Joint Liquidators provided the following purported explanations for their actions ...:

"(a) the 4 desktops which were erased were not imaged 'as their contents would have been captured by the imaging of the servers' admissions para. 7;

(b) the servers were to be left at S.I.B Montreal's premises and the Joint Liquidators were concerned that the landlord might repossess the premises and/or exercise powers of on the servers (Admissions para. 6)

(c) the date was deleted in advance of a sale of the machines (Hamilton-Smith second Affidavit before the English High Court; para 84, at page 392 of ADB-6 at tab 13)."

[52]  The Applicant goes on to say that: "Taken collectively, the Joint Liquidators' actions in relation to the computer data were at best reckless and at worst undertaken deliberately and in extreme bad faith ...."[20]

[53]  In terms of the evidence, the Applicant refers to IT Expert, Mr. Bruce Kelman's contention that the Joint Liquidators' actions were not in accordance with standard forensic practice and behavior which is to be expected of competent and reasonable Liquidators when dealing with the preservation and examination of IT evidence and records ..."[21] Further, reliance is also placed on Mr. Kelman's expert opinion that the erasing but not imaging of four computers as being 'extraordinary';[22] and his conclusion that it is 'incorrect' to say that the four desktops were erased  but not imaged as 'their contents would have been captured by the imaging of the  servers'. Mention is also made of the Kelman's further conclusion that although  data would probably have been captured by the server, it is not possible to tell whether there is additional data without copying at the machine.[23]

[54]  With respect to 'erasing of hardware when it imaged copies,' 'alternative action' and 'justification', the Applicant identifies the following aspects of Mr. Kelman's evidence.  In terms of the first item, it was described as 'folly of the most extreme kind, with regard to the alternative action to erasing the evidence is that storage at

[20] Paragraph 67 of the Revised written submissions of Alexander Fundora
[21] First and second Affidavit of Bruce Kelman, core bundle 1 at tab 11 & 12.
[22] Kelman's first Affidavit at para. 13
[23] Alistair Kelman's first Affidavit, at para. 13

21

little cost would have sufficed; and with respect to the justification for selling the contention, advanced is that such actions was 'foolish' in this context as the hardware would have been worth an insignificant amount.

[55]    In terms of the matter of Blackberrys and USB devices, Mr. Kelman attached great importance to these items in terms of obtaining information for tracing frauds.[24]

[56]    In addressing the methods of data handling employed by the Liquidators, Mr. Kelman contends that as far as the originals are concerned, these must be retained as the need may arise to return to the original machine.[25]  Mr. Kelman also contends that ACPO standards were broken by the Liquidators and have made the work of investigators more difficult and has led to the loss of very relevant evidence;[26] and at the same time may have potentially affected the admissibility of the evidence and other related issues in future civil and criminal cases.[27]

[57]    The Applicant next highlights what is termed "Direct contradictions in the Joint Liquidators" as revealed in the evidence generally.

[58]    In this regard, the evidence relating to the matter of the repossession of the Montreal Office of SIB as revealed in the Admissions by the Joint liquidators and an e-mail from Walton Peat (Vantis) and Robert Vallieres (A.M.F) dated 3rd March, 2009, are highlighted.  Also in this regard, is the question whether 'all' data was imaged, as stated in the Admissions as opposed to the Capcon Report where it is stated otherwise.[28]

[59]    It is also the contention of the Applicant that Mr. Nigel Hamilton-Smith's evidence contains misleading statements and inaccurate explanations regarding the data destruction.  Essentially, these relate the use of certain words and phrases in that context such as 'secured imaged', all IT equipment had been imaged and safe-

[24] Ibid at paras 16 & 16
[25] Ibid at para 24
[26] Alistair Kelman's first Affidavit, at paras. 19, 55 & 56
[27] Ibid, at paras. 22, 24 & 25
[28] At para 71 of the Revised written submission of Alexander Fundora

22

guarded, 'standard practice in an insolvency situation,' in advance of a sale of the computers, and done in conjunction with Canadian legal advice from Ogilvy Renault'.

[60]    As far as the Respondents' submissions are concerned, they have divided the issue under into "complaints" by the Applicant and addressed them. They are as follows:

    i.    "3 of the servers at the S.I.B Montreal Offices were forensically imaged and then securely erased;
    ii.   4 desktops were securely closed but not imaged;
    iii.  the Liquidators did not instruct the IT Specialist to search for, collect or image Blackberry devices or servers;
    iv.  the Liquidators did not instruct the IT specialist to search for, collect on image Data sticks;
    v.   it was entirely necessary to destroy the original data on the servers. The Liquidators had only to remove the servers from the Office and take them to a safe place;
    vi.  the fear that someone could have authorized access to the original servers was not a justification but a pretext;
    vii.  the Liquidators did not advise the A.M.F., of the Court hearing of the *ex parte* motion or the U.S Receiver that the servers had been erased;
    viii.  the Liquidators removed electronic data from the jurisdiction of the Canadian Courts and regular authorities;
    ix.  the Liquidators' motives were questionable, being 'unspoken and unspeakable';
    x.   the Liquidators acted with an absence of good faith;
    xi.  the actions of the Liquidators were not in accordance with the standard practice or behavior which is to be expected of competent and reasonable liquidators when dealing with the preservation and examination of IT evidence and records."

[61]    *Ab initio,* the Respondents say that they admit to the facts alleged at paragraphs (i), (ii) and (vii) on the basis of the explanation below; but they deny the remaining allegations.

[62]    The Respondents accept that four computers were erased and not imaged and the following reasons are advanced for that action. First, the Montreal Office was merely a sales office. Secondly, the servers in Montreal were disaster recovery only as to enable basic operations to continue in the event of a major incident in Antigua. Accordingly, they were unlikely to have any banking data stored on them. Thirdly, all banking information was routed through the Antiguan servers. It is

23

submitted by the Respondents that it was in these circumstances that the decision was taken to not image these four computers.[29]

[63]   As far as paragraphs (iii) and (iv) (relating the Blackberrys and data sticks) the argument is that these allegations are not supported by any evidence. They say further that the Applicant "impliedly concedes that these allegations are speculative" as it is merely stated that the IT Specialist did not appear to have been instructed by the Joint Liquidators to search for, collect or image Blackberries and data sticks.

[64]   Regarding paragraphs (v), (vi), (vii), (ix) and (x), the submission is that these allegations are "founded" upon the findings of the Quebec Superior Court, while the allegation contained in paragraph (xi) is based upon the evidence of the Applicant's 'alleged expert witness', Mr. Kelman.[30]

[65]   The matter of the estoppel with regard to the judgments rendered by the Quebec Superior Court has already been determined; but despite the fact this Court is of the view that there is evidence upon which a determination can be made with respect to the matters which and concern paragraphs (v), (vi), (viii), (ix) and (x) aforesaid.

[66]   Insofar as paragraphs (v) and (xi) are concerned, these relate to the matter of wiping data instead of preserving the equipment. In this regard, the Respondents submit that they do not accept that the confidentiality of the data stored on the equipment could have been preserved by leaving the equipment on the premises but removing the power leads so that they could be turned on, as Mr. Kelman contends. Additionally, the Respondents' other basis for their decision to wiping the data rather than preserving the hardware are the danger that the landlord of the premises might detrain the equipment; the making of exact copies of the data obviating the need to retain the equipment and the fact that the landlord's attention might be drawn to the removal of the said equipment.

---

[29] Revised written Submissions of the Liquidators, para. 37
[30] Revised written submissions of the Liquidators at para 14.

24

**Analysis and Conclusion**

[67]    At this stage it is necessary to recall that the issue under consideration is the Applicant's contention that the destruction of, and improper practices relating to, computer and electronic data in Canada. In this regard, as noted above, it is the submission of the Applicant that taken collectively, the Joint Liquidators' actions in relation to computer data were at best reckless and at worst, undertaken deliberately in extreme bad faith.

[68]    In the Applicant's submissions, reliance is placed on the evidence of Alistar Bruce Kelman. At paragraphs 10 and 11 of his first Affidavit, he deposes thus:

> "10. For reasons which I set out below I do not consider the above opinions and representations of Vantis concerning the handling of electronic evidence are in accordance with standard forensic practice or behavior which is expected of competent and reasonable Liquidators when dealing with the preservation and examination of IT evidence and records.
>
> 11. Firstly it is folly of the most extreme kind to rely upon just the forensic images and not to preserve the hardware on which the computers are running. As I set out below, there are numerous problems with merely relying on images. Images can become corrupted in the process of transfer and this fact may well not be discovered before the hardware is deleted. Furthermore, in high profile high value cases it is always best to apply the utmost caution. The purported reasons for 'wiping', the preservation of confidentiality while the hardware remained resident in the building, could have been addressed by other means such as the removal of power leads from all computers   so that they could not be turned on while in the building, (and removing the battery packs from laptops for a similar reason). This would have cost nothing.
> Putting the hardware into secure storage so that the landlords did not seize it for non-payment of rent would have been the normal sensible process in accordance with the basic investigation function of 'freezing the scene' that is to say, collecting and preserving evidence pending it's subsequent analysis.
>
> 12. Secondly, the purported justification for erasing the data so that the computers could be sold, thereby raising money in the liquidation is nonsensical. Second-hand computers and servers have   little more than scrap value. Second hand computers come with no warranty or software.
>
> 13. Thirdly, with regard to the desktops and laptops which were not imaged but nevertheless wiped I find this conduct extraordinary. All desktops and laptops should have been imaged, when police arrive at the scene of a crime they gather all evidence in the process of freezing the scene. Vantis argued that the four unimaged machines were also captured by the servers and therefore did not require imaging.  This is incorrect, although the majority of data would probably have been duplicated by the servers it is not possible to tell whether there is additional data on the machine itself without looking at it.  Furthermore, particularly with laptops, the copying of data to the servers is not continuous but only occurs from time to time when the laptop or desktop synchronizes itself with the data on the servers. Typical examples can be emails which have been written on a laptop but await sending in the outbox of the laptop's Microsoft Outlook

25

installation and other records held in draft. The universal normal process is therefore to image desktops/laptops even if they are not 'slave to the server'.

20. It will be noted that in going about their activities Vantis appear to have comprehensively   broken the first three of the ACPO's principles upon which the entire science of forensic computing analysis is based, whether in the criminal or civil arena."

[69]     Mr. Mark Kirby[31] is the counter to Mr. Alistair Bruce Kelman and in his expert report he gives his opinion on imaging as opposed to seizing of computers; and he also gives his opinion on the first and second affidavits of Alistair Bruce Kelman.

[70]     Insofar as imaging and seizing are concerned, it is Mr. Mark Kirby's preference for and considered opinion that business computers should be seized only if there is an overwhelming technical or legal reason for so doing.  He goes on to develop his opinion about the risks involved in moving computers that have been seized and in addressing the specifics in the case presented to him.  His opinion is that: "Based on the documentation supplied to me in this case it is my view that imaging the computers as opposed to removing them to storage in this case was a perfectly acceptable course of action and in accordance with accepted practice."

[71]     In giving his opinion, a specific paragraph of Kelman's first and second Affidavits, Mr. Kirby commented as follows: "With respect to paragraph 10[32], he disagreed and maintained that using a computer image is a perfectly acceptable methodology for preserving data in an evidential format.  And critically he says that: "Provided proper procedure is followed the use of a computer image as evidence is universally accepted in Courts in the United Kingdom, Australia and the United States to name but three jurisdictions."  He also disagrees with paragraph 11[33] of Mr. Kelman's first Affidavit.  This is his response at paragraph 12:

"It is my experience that when dealing with investigations involving business information technology it is actually preferable to leave hardware on site and rely solely on computer images.  I cannot emphasize enough that this practice is commonly accepted by

---

[31] In exhibit "MK1" to the Affidavit of Marc Kirby under curriculum vitae it is stated that the said Marc Kirby is Senior Lecturer, Centre for forensic computing , Cranfield University.  An International expert in Hi Tech crime who created the first multi agency national computer forensic unit of the world.
[32] At paragraph 10 of his first affidavit Mr. Kelman is saying basically that handling of electronic evidence are in accordance with standard forensic practice or behavior
[33] At paragraph 11 of his first Affidavit Mr. Kelman speaks to the failure to preserve the hardware after the images were made.

26

experienced forensic examiners.   Even if computers in this case were seiged, best practice would dictate they be imaged and any evidence would be derived from that image.   From all the paperwork in this case I see no grounds to doubt hat images obtained are a full copy of what was on the computers before they were wiped."

[72]     Commenting on Mr. Kelman's contention that the first three ACPO's principles have been comprehensively broken by Vantis, Mr. Kirby gives this opinion:

"Mr. Kelman's assertion that the ACPO Principles have been broken in this case is incorrect.   The principle that applies in this case is Principle 2 which allows examiners to access live machines provided that they are competent to do so and can explain the consequences of their actions to a Court.   Mr. Coulthard's comments at paragraph 28 of his first Affidavit that he kept handwritten contenpraneous notes exhibited at 'JDC3' to Mr. Coulthard's second Affidavit, and can confirm that he has complied with ACPO Principle 3 by keeping an audit trail of his actions.   I would point out that there is one omission from Mr. Coulthard's contenpraneous notes.   This omission relates to the two attempts to image the servers with the forensic tools 'Rapton' and 'Helix 3, as mentioned at paragraphs 18 and 19 of Mr. Coulthard's first Affidavit, and paragraph 31 of his second affidavit.   Whilst in a perfect world, Mr. Coulthard would have mentioned these actions in his notes, his failure to mention them does not, in my view, amount to a breach of ACPO Principle 3."

[73]     In his "Overall Opinion and Conclusion", Mr. Kirby says that:

"34. I have a great deal of experience in the field of forensic computing.   I teach it to law enforcement students from around the world who attend my courses at Cranfield University.   I have over ten years of experience in carrying out forensic data recovery (and examination) in the UK and many other jurisdictions around the world and I co-authored and updated the ACPO guides from 2001 to 2006.   This experience has led me to the following conclusions which I hope will be of assistance to the Court.

- Mr. Kelman's arguments with respect to the ACPO guides being broken are wrong.
- Mr. Kelman's affidavits indicate that his approach is outdated.   His suggestion that it is best practice to always recover hardware is wrong.   There may be times when it is desirable such as a pedophile case, but by and large in the modern world, it is not always possible or desirable to seize equipment.   This is my view and those of other agencies in the UK who regularly deal with corporate enterprise investigations.
- The ACPO Best Practice guidelines were not broken by Mr. Coulthard.
- The data that Mr. Coulthard recovered in "computer image" format was recovered according to the best practice.   It was verified and thus represents an exact copy of the machines in question.
- I see nothing in any of Mr. Coulthard's Affidavits, to indicate that the evidence he recovered is unreliable."

[74]     It will be recalled that the liquidation of SIB involves some 27,000 creditors who are owed in excess of US$7 billion.   In these circumstances, the matter of civil or criminal proceedings, or both, represent a serious possibility.   This brings into focus the question of the imaging of three servers at the Montreal office of SIB and then they were wiped.

[75]     It is common ground that James David Coulthard, a computer forensic consultant and software developer was employed by the Receiver-Managers/Liquidators through Stroz Friedberg Limited ("Stroz").

[76]     In his first Affidavit in detailing[34] his activities after being "instructed on this matter on 20th February, 2009, "deposed further that his purposes in travelling to Montreal were to: (i) establish what SIB Computer equipment was in the Montreal Office; (ii) to image the computer equipment in the Office as directed by the Receiver-Managers; and (iii) to securely erase relevant data to prevent access to that data by unauthorized third parties.[35]"

[77]     The Respondents have admitted that the three servers were forensically imaged and then securely erased. This leaves the narrower question to be answered, which is, whether the hardware should have been retained. And the experts have advanced what they consider to be cogent reasons to support their view.

[78]     For the Respondents, the accuracy of an imaged copy is such that the retention and that in any event virtualization exists to restore the original document.

[79]     Mr. Coulthard, in his second affidavit paragraph 24, describes the process of virtualization in this way:

> "Briefly, through the virtualization process, digital forensic images that have been taken of data on a computer can be used to restore the data without the need for the original hardware. Virtualization software recreates the original system from the forensic images which can then be examined without resorting to the hardware."

[80]     But while the expert evidence tendered on behalf of the Applicant does not dispute the use of imaging technique, certain problems or potential problems are identified. These include the loss of data because of its fragile nature and technical difficulties that may arise during the process of imaging. The proposition is also advanced that the absence of the hardware may even pose a difficulty with regard to the admission of evidence in this context. This is doubted by Mark Kirby who purports to rule that such evidence is admissible. The immediate response to

---

[34] At paras. 5-8
[35] At para 8

28

this is to say that Mark Kirby has no authority to make such a statement; and if even he had, he would not make it on behalf of what appears to be all courts in England.

[81]    The nature and context of this liquidation has an important bearing on the issue of the relation of the hardware. In particular, the fact of 27 000 customers who are owed an excess of US $7 billion. The Court therefore agrees with the Applicant that the hardware should have been retained for the reasons given by Mr. Kelman. To say as Mr. Martin James Baldock deposes that "the approach with which Mr. Kelman apparently supports ceased to be the usual practice more than five years ago."[36]

[82]    Further, even though virtualization is now available, there is no evidence as to what the process costs as this will be at the expense of the creditors.

[83]    Mr. Mark Kirby in his expert report also says that the hardware should be retained if there is an overwhelming, technical or legal reason for doing so. He later is more specific by maintaining a paedophile case as one circumstance in which such retention is required[37]. At the same time and in the same context, Mr. Alister Bruce Kelman speaks of high profile cases[38]. But in the view of the Court, regardless of the label or description used, this liquidation qualifies as a case where the hardware should have been retained.

[84]    The other aspect of the issue is the matter of the four computers that were not imaged but were erased. Mr. Kelman says that such action does not accord with standard forensic practice and behavior and even describes the action taken as being "extraordinary". These aspects of Mr. Kelman's opinion leave no doubt as to the incorrectness of such action in the experts' opinion.

[85]    The Respondents accept that four computers were erased but not imaged and the following reasons were advanced for the action taken: First, the Montreal Office

---

[36] See Affidavit of Martin James Baldock, sworn on 15th January, 2010 @ para. 7 – Core Bundle, Tab 24
[37] At paras. 8 & 34 of his Expert Report.
[38] At para. 11 of his first Affidavit, supra

was merely a sales office.   Secondly, the servers in Montreal were disaster recovery only so as to enable basic operations to entrance in the event of a major incident in Antigua.   Accordingly, they were unlikely to have any banking data stored on them.   Thirdly, all banking information was routed through the Antigua servers.

[86]   In the circumstances, it is submitted by the Respondents that it was in that context that the decision was taken not to image.

[87]   Mr. Coulthard has made it clear that he acted at all times on the instructions of the Receiver-Managers.   In this connection, he points to the Affidavit of Geoffrey Paul Rowley[39] who deposed as follows at paragraph 9(j);[40]

> "Given the concerns that have been conveyed by our legal advisors that the assets were at risk of being distrained against foe unpaid rent and severe charges (as mentioned in paragraph [9] [f]) and the exhibit to [9] [g] above, it was decided by the receiver that the best course of action after the data was to remove it from the servers which would not remain under the direct context of the recovery managers. That served the dual purpose of ensuring that data on the servers could not be misused and the receiver managers did not need to incur expense in storing the servers to ensure that the data was not misused. Mr. Coulthard was therefore instructed to carry out the deletion process. Mr. Coulthard was familiar with the requirement from his work for the West Yorkshire Police, (which is one of the reasons why he was chosen for the role)."

[88]   The reasons for the non-imaging and erasing must now be addressed in greater detail.

**The Montreal office was merely a sales office.**

[89]   The Court takes the view that while this is a fact in a narrow sense, when looked at in a wider perspective an entirely different picture emerges.   For one thing, the evidence that some payments were made through Canada; and while there were only 224[41] clients from Canada, these two factors must have some significance.   As such, the relatively low figure alone cannot be indicative of whether or not the computer had data.   By the same token, their location in the

---

[39] Geoffrey Paul Rowley is a licensed insolvency practitioner and partner at the company, Vantis Business Recovery Services – see NJHS-1 referred to below.
[40] Affidavit of Geoffrey Paul Rawley in response to the Application of Urgency, being exhibit (NJHS1) to the Affidavit of Nigel Hamilton-Smith filed on 18th January, 2010.
[41] Report to the Antigua High Court by Joint Receiver-Managers on the Stanford International bank Ltd., dated 16th march, 2009 at page 215.

Office cannot reasonably be used as an evidence of the presence or absence of data relevant to the liquidation or other civil or criminal proceedings.

**The computers were for disaster recovery only.**

[90]    While this may be the case, there is no evidence to suggest that this was the only purpose they served in a sales office connected with SIB:  Indeed it is well documented[42] in the evidence as to the part financial advisors played in the sale of certificates of deposit (CDs). Again, the fact that a Liquidation may go beyond the recovery of assets cannot be ignored.

**All the banking information was routed through the Antigua servers.**

[91]    By definition, a sales office cannot be confined to banking information so that in the Court's view this reason falls short of being credible.  On the whole, the Court does not consider the reasons for the non-imaging and erasing of the four computers to be convincing. The Court is fortified by the evidence     relating to the circumstances of erasing and the apparent urgency to vacate the rented premises occupied by    SIB's Montreal Office where the computers lay.

[92]    As noted before, Mr. Coulthard has made it clear that he acted on the instructions of the Respondents and that his primary duties were to image and delete the computer.  He also deposed that it was the Respondent's decision to place the erasing of the four computers on automatic mode so as to save money by not incurring further rents. On this account, Coulthard was suppose to and did leave Montreal on 8th March, 2009.  Importantly, however the self-executing mode was estimated to last not more than a few days[43].  However, on 27th March, Mr. Daniel Roffman, who was hired by the US Receiver to locate collect and preserve data and information relating to SIB, visited the Montreal Office and as part of his account, Mr. Roffman deposed as follows at paragraphs 9 and 13 of his Affidavit[44]:

---

[42] In the said Report also at page 215 it is stated: "We are advised that nearly 100% of the bank's clients were referred to ISB by Stanford Financial advisors."
[43] See "Admissions" at para 8, Core Bundle Tab 19
[44] Affidavit of Daniel E. Roffman, Core Bundle Tab. 18

"9. During the tour of the Montreal Office, Giraldeau took me into the Computer server room of the Montreal Office and I observed a computer monitor on which appeared the message 'Server Erasing is in progress 76%.

Upon seeing the monitor screen, I asked Giraldeau who else had been in the server room. Giraldeau advised me that Vantis employees had entered the server room in order to '... secure the servers.' I requested that Giraldeau allow me to 'image' the hard drive of computers in the space so as to have access to the data contained on those drives. In response to my request, Giraldeau stated that Ogilvy would have to speak to Vantis about this, and invited me to speak with Mr. Himo.

13. Based on my observation of the Montreal Office and my conversations with Giraldeau, it would appear that some electronically stored business records have been compromised or possibly even destroyed."

[93]    In the "Admissions"[45] signed by attorneys on behalf of the Liquidators/Petitioners and the US Receiver, Ralph Janvey, it is stated in part that: "The desktop computers in the guest office, the work room and at the reception were not imaged as their contents would have been captured by the imagery of the servers.[46]"

[94]    That may well be so, but there is no evidence as to certainty before the Court. Added to that, Mr. Kelman deposes the following in relation to the matter of the imaging servers:

"Although the majority of data would probably have been duplicated by the servers it is not possible to tell whether there is additional data on the machine itself without looking at it. Furthermore, particularly with laptops the copying of data to the servers is not continuous but only occurs from time to time when the laptop or desktop synchronizes itself with the data on the servers. There can thus be times where records and data is held locally on the desktop or laptop but has not been synchronized with the servers. Typical examples can be e-mail which have been written on a laptop but await sending in the outbox of the laptop's Microsoft Outlook installation and other records held in draft. The universal process is therefore to image desktops/laptops even if they are a 'slave to the server'.[47]"

[95]    On the question of the storage of the computers, the Respondents submit the following:

"21. In theory, it would have been possible to place the computer equipment into storage. However, this ignores the fact that the Liquidators were advised by their IT consultants that by imaging the servers they were retaining an exact copy of the data, and that therefore there was no need to go to the expense of placing the hardware into storage. In addition, as set out in paragraph 24 of Nick O'Reilly's affidavit, attempting to move the equipment was most likely to come immediately to the Landlord's attention (it owned the whole building) and perhaps prompt the Landlord to take pre-emptive distraint action

---

45 Core Bundle Tab 19
46 Ibid, at para. 7
47 First paragraph at para 13

32

against the assets.  It can further be seen from the report of Mr. Kirby (paragraph 8) that removing sensitive IT equipment would have its own risks:
"There are inherent risks in moving computers. Hard drives are mechanical devices particularly vulnerable to damage when moved. Likewise there are often problems with the computers own internal battery which is meant to save important data such as time and other key data which the computer may need to use when restarting." Given these reasons, the Liquidators did not consider it appropriate in the circumstances to place the IT equipment into storage and instead choose to image and delete I'."

[96]     The matter of outstanding rents with respect to the SIB's Montreal Office and the need to vacate the premises urgently was one of the reasons given for the non-retention of the hardware.  But in the view of the Court, the narrative does not add up because of the following:

1)   In terms of storage of the hardware mention was made of the need for special conditions 'temperature and humidity levels' as prerequisites.

2)   The whole notion avoiding further rents or vacating the Office is contradicted that the computers were still in place on 27th March, 2009 when erasing should have been completed 'within a few days (at most).'

3)   The non-availability of funds is contradicted the Joint Receiver-Managers Report dated March 16th, 2009.  The long title is: "Report to the Antiguan High Court by the Joint Receiver-Managers on Stanford International Bank." Which shows under the "Cash Balances" that SIB held cash in several bank including the Bank of Antigua in the amount of US $9,984,971.[48]  Based on inquiries made about the cash balances, the following is stated in the Report with respect to Bank of Antigua:

"Bank of Antigua have made deductions from the account of US $6,737, 520 in relation to credit card debit card account issued to SIB customers along with a further $500,000 retention of further debts.  The balance has been released to the Receiver-Managers to meet ongoing operational costs of SIB and professional costs that are being incurred by the Receiver-Managers."[49]  The sum shows that US $2,747,451. would have been available to the Receiver Managers prior to the date of the Report being March 16, 2009.  The report further indicated that the monthly salary costs "are in excess of US $180,000."  And there was need to reduce staff levels."

---

[48] At page 218
[49] Ibid

[97]     The sums show that US $2,747,451 would have been available to the Receiver Managers prior to the date of the Report being March 16, 2009. The report further indicated that the monthly salary costs "are in excess of US $180,000." And there was need to reduce staff levels.

[98]     Finally, the Court would address the theoretical difficulties associated with the storage of computers by saying that such difficulties are not insurmountable.

**The matter of the Blackberry devices and data sticks.**

[99]     The essence of this sub-issue is the Applicant's contention that the IT Specialist were not instructed to collect or image the Blackberry devices or servers and data sticks. The Respondents' response to this rests, in part, on what Mr. Coulthard had deposed, which is that at the Montreal Office he searched for but did not find, these devices.[50]

[100]    The matter of the Blackberry devices and the data sticks does not start or end with what Mr. Coulthard has deposed, it goes back to the period he spent in Antigua with the Receiver-Managers. According to Coulthard, he was instructed in the matter on 20th February, 2009 and travelled to Antigua with two colleagues to assist the Liquidators ... to examine the Antiguan IT System of SIB."[51] Coulthard deposes further that: "We worked at the premises of SIB and assisted in gaining an understanding of the IT Systems there and how they worked". And further still, in commenting on Alistair Kelman's observations[52] on "Blackberrys" and "data Sticks" deposed thus:

>    44. "... I note that, as part of the search of the office that I conducted on the day I arrived in Canada, I did not find any Blackberry devices. I therefore did not collect or image any Blackberrys. As I have mentioned above, I am experienced in search and seizure procedures carried out in any career with the police, and I am therefore aware of how to carry out a search of such devices and I did so in this case.
>    45. ... I note that, as part of the search that I conducted of SIB's Montreal Office, I did not find any  data sticks, or USB storage devices, despite going through desk drawers and desks."

---

[50] Affidavit of James David Coulthard, Core Bundle Tab. 25 @ para. 44.
[51] Ibid at para. 5.
[52] Affidavit of Alistair Bruce Kelman, Core Bundle, Tab 11 at para. 9.2.3

[101]   Given the time spent in Antigua in becoming familiar with SIB's system and Coulthard's experience working with the police plus the experience of the Liquidators, the question must be why the matter of Blackberrys and data sticks did not arise in the context of a sales office. But in the Court's view, the matter does not end at this point.

[102]   Mr. Geoffrey Rowley in his affidavit at paragraph 9 (a) – (e), deposes as to the circumstances after the appointment of the receiver of SIB in relation to the Montreal Office:

> (a.) "Shortly after their appointment on the evening of 19th February, 2009 the receiver-managers were made aware of the existence of the SIB branch office located in Canada where 5 employees were based.  The Canadian branch office was principally a sale office for SIB and as a result of the SEC's freezing order in the United States the receivership of SIB, its day-to-day activities had  already ceased.

> (b.) The receiver managers were informed by an employee at the Montreal branch that SIB was  registered with the office of the Superintendent of Financial Institutions ('OSFI') the Canadian Federal regulator.  The receiver-managers were further informed that OSFI had already served notice on SIB's breach in Montreal verifying the terms of its operating license.  It was understood that the effect of the variation was that no further business could be conducted through the branch office and its role was restricted to dealing with customer queries.

> (c.) The receiver-managers subsequently arranged for two members of their team to attend the Montreal branch accompanied by local Canadian Counsel (Ian Ness and Masir Caron, both  partners at Ogilvy Renault LLP) of the two members of the receiver-managers team who attended the premises in Montreal, one, Mr. Nick O'Reilly is a partner at Vantis, as well as being a chartered Certified Accountant and a Licensed Insolvency Practitioner. Mr. O'Reilly is an experienced solvency professional having over 25 years experience in corporate insolvency and fraud cases. Mr. O'Reilly was accompanied by Mr. Matthew Peat, an experienced manager from Vantis.

> (d.) As the Montreal branch of SIB had no further function, the receiver-managers overall strategy  was to mothball its operations and continue to run the receivership out of SIB's principal  premises in Antigua.  The key objective of the visiting team was, therefore, to deal with the employees at the branch office, to preserve any bank records or data held on the computers and servers, and to  ensure that OSFI was appraised of the situation.

> (e.) As planned therefore, the visiting team flew to Canada on 22nd February, 2009 and attended the premises on 23rd February, 2009, where Mr. O'Reilly spoke to the employees, before sending them home ..."

[103]   Without a doubt, the quotation from Mr. Rowley's affidavit is prolix but it serves to make the following points: (1) Mr. O'Reilly, the experienced insolvency practitioner spoke to five employees at the SIB Office along with another experienced manager from Vantis. (2) Also in attendance, were two partners from the law firm of Ogilvy Renault LLP). (3) And in all of this, there is no evidence that the five

35

employees were questioned about Blackberrys and data sticks before they were sent home.

[104]   The Respondents have taken issue with the following conclusions by Mr. Kelman.[53]

> 54. "For reasons which I have set out the failure of Vantis ... to preserve and image the Blackberries and Blackberry Enterprise server, the failure of Vantis to collect and preserve all mobile media by conducting leaving interviews with staff in which such material were handed over ... are very serious matters.

> 56. Vantis' dismissal of the SIB's Montreal staff without leaving interviews and associated magnetic media and mobile phone retention has led to the loss of what is likely to have been very relevant evidence to support or undermine information retained in the imaging process.  It has also destroyed what is normally a fruitful route of inquiry in investigations – the ability to place e-mails, addresses and SMS messages in the context of the life of the staff who are caught up in the investigation."

[105]   The attendant reasoning is that there is no evidence to support such a conclusion.[54]   The evidence is supplied by Nicholas Hugh O'Rilley, a partner at Vantis Business Recoveries, in his affidavit filed on 12th February, 2010, deposed as to the duties he performed with Mr. Peat at the Montreal Office of SIB between 23-24 February, 2009.  Such duties included a meeting with the SIB employees and he goes on to say at paragraph 17 that:

> "As part of these conversations, I asked the employees about the ownership of their mobile phones, and was informed that they were owned personally rather than SIB.  As there was no indication to the contrary, I accepted this to be the case.  There was also no indication that anyone in the office had a Blackberry and this was confirmed from looking through the invoices received at the premises which showed no charges associated with Blackberries."

[106]   **The Liquidators did not advise the A.M.F of the Court hearing of the *ex parte* motion or the US Receiver that the servers had been erased.**

[107]   The Respondents accept this 'complaint' and explain it in this way.[55]

> "While it is accepted that the Liquidators did not inform the A.M.F or the US Receiver immediately, that the data had been erased, it is respectfully submitted that this omission is entirely understandable and excusable given that the Liquidators had been advised by a reputable expert  that that data, while erased from the computers in Montreal, had not been destroyed but instead had been copied to standards acceptable for admissibility in

---

[53] First Affidavit of Alistair Bruce Kelman, Core Bundle, Tab II at para. 84
[54] Revised written submissions of the liquidators, filed February 25, 2010 at para. 15.
[55] Ibid at para. 43

36

a Court of Law. In the Liquidators minds, therefore, they were in possession of exact of the data erased and it is therefore reasonable to expect that it would not occur to them to inform anyone of the erasure."

[108]    In the circumstances the foregoing ends the matter or 'complaint'.

[109]    **The actions of the Liquidators were not in accordance with the standard of forensic practice or behaviour which is to be expected of competent and reasonable Liquidators when dealing with the preservation and examination of IT evidence and records.**

[110]    As noted above, the Respondents say that the above contention or 'complaint' is based on the opinion of Applicant's 'alleged expert,' Mr. Alistair Kelman.

[111]    It is common ground that the ACPO guidelines are used in the area of computer forensics and it is clear to the Court that Mr. Kelman seeks to measure the Liquidators' conduct by reference to the ACPO guidelines. They are consisted by the following four principles:

> "Principle 1: No action taken by law enforcement agencies or their agents should change data held on computer or storage media which may subsequently be relied upon in Court.
>
> Principle 2: In circumstances, where a person finds it necessary to access original data held on Computer to do so and be able to give evidence explaining the relevance and the implications of their actions.
>
> Principle 3: An audit trail or other record of all processes applied to computer based electronic evidence should be created and preserved. An independent third party should be able to examine those processes and achieve the same result.
>
> Principle 4: The person in charge of the investigation (the case officer) has overall responsibility for ensuring that the law and these principles are adhered to."

[112]    The Applicant relies on Mr. Kelman's opinion insofar as the handling of data is concerned. Included are: The need to retain the original hardware. The conclusion that ACPO principles 1-3 have comprehensively broken by the Liquidators. The further conclusion that the Joint Liquidators have made investigation difficult coupled with the loss of "what is likely to have been very

37

relevant evidence." And finally, the actions have potentially affected the admissibility of evidence in future criminal and civil cases.[56]

[113] The Respondents submit the following:

"25. Mr. Mark Kirby is one of the co-authors of the ACPO guidelines which Mr. Kelman claims Mr. Coulthard failed to follow. He is "an international expert in Hi tech Crime who created the first multi-agency national Computer Forensic Unit in the World" (pg. 1 of exhibit MK 1 to his affidavit). He was the head of the UK National Hi-Tech Crime Unit from September 2001 to April 2006 and the Computer Forensics Manager of the UK Serious Organised Crime Agency from April 2006 to May, 2007. He is presently a Senior Lecturer in Forensic Computing and a Research Leader in Forensic Computing at Cranfield University (see his CV at MK1).

26. Having examined all the relevant affidavits, Mr. Kirby concludes that the views expressed by Mr. Kelman that in imaging and wiping the databases Mr. Coulthard failed to follow the best practices and failed to comply with the ACPO guidelines, were plain and simply wrong. With respect to compliance with ACPO guidelines, he concludes:

"Mr. Kelman's assertion that the ACPO Principles have been broken in this case is incorrect. The principle that applies in this case is Principle 2 which allows examiners to access live machines provided they are competent to do so and can explain the consequences of their actions to a Court. Mr. Coulthard's comments at paragraph 28 of his first Affidavit that he kept handwritten contemporaneous notes of his actions. I have seen the contemporaneous notes exhibited at 'JDC3' to Mr. Coulthard's second Affidavit, and can confirm that he has complied with ACPO Principle 3 by keeping an audit trail of his actions." - para 14

"Further in relation to paragraph 55 (of Mr. Kelman's first affidavit), as the person who wrote most of the guides, I can categorically say they were not broken – para. 25.

27. On the question of the alleged need to preserve original hardware, Mr. Kirby says:

It is my own preference, as well as the considered opinion of the computer forensic specialist community, that business computers should be seized only if there is an overwhelming technical or legal reason for doing so. There are inherent risks in moving computers. Hard drives are mechanical devices and particularly vulnerable to damage when moved. Likewise there are often problems with the computer's own internal battery which is meant to save important data such as time and other key data which the computer may need to use when restarting. Temperature and humidity will also have a bearing on a computer in storage." (para 8)

"Paragraph 50 [of Mr. Kelman's 1st affidavit] again refers to the need to keep original equipment. I again disagree. The use of virtual techniques has made this unnecessary when undertaking investigations of business IT." (para 21)

"I have a great deal of experience in the field of forensic computing. I teach it to law enforcement students from around the world who attend my courses at Cranfield University. I have over ten years of experience of carrying out forensic data recovery (and examination) in the UK and many other

---

[56] Revised written submissions of Alexander M. Fundora, filed 26th February, 2010 at para. 70.

jurisdictions around the world and I co-authored and updated the ACPO guides from 2001 to 2006...

... Mr. Kelmans affidavits indicate that his approach is outdated. His suggestion that it is best practice to always recover hardware is wrong. There may be times when it is desirable such as a pedophile case, but by and large in the modern world, it is not always possible or desirable to seize equipment. This is my view and those of other agencies in the UK who regularly deal with corporate enterprise investigations." (para 34)

28. On the question of admissibility to the imaged data in Court Mr. Kirby says:

"I have been presenting forensic evidence to courts in England since 2001. In all of those cases the evidence has been derived from computer image. I am not aware of any Court in the United Kingdom declining to allow computer forensic evidence derived from a properly verified computer image." (para 9)

"Paragraph 53 [of Mr. Kelman's first affidavit] discusses the possibility of the failure of forensic tools in general. In my ten years experience in this field no major forensic tool (free or commercial), including the "FTK Imager" version 2.5.4 used by Mr. Coulthard to image the servers and computers in Montreal, has been discredited in court in the United Kingdom." (para 22)

"I agree that the process of wiping is unlikely to be reversed if it was carried out to international standards. However the court does have the computer images (i.e. the mirror images) that were taken prior to wiping, so there will be no need to attempt to recover data from wiped machines." (para 24)

"I cannot agree with the general sentiments that the computer images obtained by Mr. Coulthard are to be regarded as unreliable. It is my opinion that provided the computer images underwent verification during the imaging process then the evidence that they contain is reliable. It is my view that Mr. Coulthard followed ACPO Principles 2, 3 and 4 and therefore my opinion is that no ACPO procedures were broken." (para 26)

"In paragraphs 20 and 21 Mr. Coulthard explains the verification process and states that all images were verified. This is without doubt the most important part of the process. If the files are verified then in my opinion (and that of any court in the UK where I have used computer image evidence) they are exact copies of all data that was on the equipment at the time the operation was carried out." (para  31)

29. Overall, Mr. Kirby concludes that:

"Based on the documentation supplied to me in this case it is my view that imaging the computers as opposed to removing them to storage in this case was a perfectly acceptable course of action and a in accordance with accepted practice." (Para 10)

"Even if the computers in this case were seized, best practice would dictate they be imaged and any evidence would be derived from that image. From all the paperwork in this case I see no grounds to doubt that the images obtained are a full copy of what was on the computers before they were wiped." (para 12)

[114]    It was noted before that Mr. Kirby expressed the opinion that the Joint Liquidators were not in breach of the ACPO principles by virtue any of Mr. Coulthard's

actions.  However, the Court has already determined that given the nature of this liquidation it gave rise to an exceptional legal circumstance posited by Mr. Kirby or a high-profile case as proffered by Mr. Kellman, for the retention of the hardware, being the four computers that were not imaged but erased.  Additionally, the Court determined that by virtue of the length of time the erasing lasted, there may be a mass of evidence lost.  In this connection, the evidence as that the Liquidators and their IT expert held the view that a mere two additional days were required to complete the erasing.

### Conclusion

[115]   Therefore, having regard to the content of Principle 1 of the ACPO guidelines which forbids the changing of data held on computer on storage media which may be subsequently relied upon in court, it is the determination of this Court that the action of the Joint Liquidators with respect to the erasing of the computer hardware was not in accordance with standard forensic practice and as such they acted improperly.

40

ISSUE NO.3

**Whether Messrs Hamilton-Smith and Wastell acted outside of their remit as Receiver-Managers?**

**Submissions**

[116]    The Applicant contends that at the time of their actions, between 5 and 27 March, 2009, or thereabouts, the Joint Liquidators were Receiver Managers, and that their subsequent appointment as liquidators took place on 15th April, 2009. They say further that by virtue of section 221 (b) of the IBC Act Receiver-Managers are required to take custody of the property of the corporation and take immediate steps to stabilize the operation thereof. This should have been done by 26th February, 2009.

[117]    In contrast, says the Applicant, by virtue of section 308 (1) (a) of the said Act, a liquidator has power to sell, by public auction or private sale, any property of the corporation. The Applicant's submissions continue in this way:[57]

> "That the Joint Liquidators improperly considered their role at the time to be one of liquidation is plain from Mr. Hamilton-Smith's comment at paragraph 84, bullet 3 of his 2nd English Affidavit, where he refers to the preservation of the contents of the servers **"before the information is deleted in advance of a sale of the computers."** He further stated (paragraph 84 bullet 3) that erasing is "standard practice **in an insolvency situation"** (emphasis added). The same was evident from the 16 March, 2009 Report of the Receiver-Managers to the Antiguan Court (See Pages 44 to 55 of Exhibit ADB-5 at Tab 1) which states (page 6) that "we are presently liaising with our lawyers in Canada to deal with the sale of the assets located in the Canada Office...."

> "The Joint Liquidators had no power whatsoever to erase original computer data with a view to sale, when their remit was merely of stabilization of the business. The Joint Liquidators in fact undertook the exact reverse of their duties by destroying property rather than preserving it. The Joint Liquidators acted not only outside the remit of their mandate from the Antiguan Court, but in obvious breach of this Honourable Court's Order and the duties and powers laid down in the Antiguan IBC Act."

[118]    The Respondents deny the allegation that they exceeded their remit as Receiver-Managers and submit the following:[58]

> "The Liquidators, as Receiver-Managers, did not sell any assets. The complaint there arises from a passage in Mr. Hamilton-Smith's affidavit lodged in the UK proceedings in which he said that it is standard practice to preserve data before deletion "in advance of a sale of the computers." (see page 392 Exhibit ADB 6). First of all, it is clear that Mr.

---

[57] At paras. 90 & 91 of the Revised Written Submissions of Alexander M. Fundora, filed 26th February, 2010.
[58] At paras. 81 & 82 of the Revised Written Submissions on behalf of the Liquidators, filed 25th February, 2010.

41

Hamilton-Smith was not saying that he had any immediate plans to sell the equipment. He was referring to what he considered to be standard practice. Secondly, as he explained in paragraphs 28 (c) and 46 of his first affidavit, he was acting on the assumption that there was a real possibility that SIB would soon be put into liquidation when the question of sale would arise. It is difficult to appreciate how any misconduct on the part of the liquidators can be teased out of these circumstances.

The Applicant contends that the Receiver-Managers function was limited to stabilizing SIB's business and this did not include erasing data. The Liquidators are of a different view (see para. 48 of the first Hamilton-Smith affidavit). Mr. Hamilton-Smith is of the view that "the very act of imaging and deleting (and thereby safeguarding) the servers was in order to "stabilize" the operations of SIB to ensure that no information or data was lost to the estate" (see also paragraph 26 of the second Hamilton-Smith affidavit). The Liquidators acted on advice from its IT Specialist that imaging would safeguard the data. It is respectfully submitted that Mr. Hamilton-Smith is correct in law in thinking that safeguarding the data in the way he did was part and parcel of his duties as Receiver-Manager to stabilize the business. But even if he is wrong, he acted in good faith, and it can hardly be suggested that by so acting he is guilty of misconduct justifying his removal."

[119]   That the Receiver-Managers made mention of the sale of computers (receiver-managers) is not in doubt as both parties acknowledge this fact. Where they differ is as to their interpretation of what was said or done in this regard.

[120]   Given the fact that a receiver-manager is a creature of statute, being the IBC Act, the analysis must begin with the relevant sections of that Act.

[121]   Section 287 (1) of the IBC Act provides for the appointment of a Receiver-Manager for a corporation in certain prescribed circumstances. The subsections (2) and (3) of the same section provide that:

"The receiver-manager appointed under subsection (1) may seize the management and content of the business of a corporation under this section by placing a notice to that effect on the premises of the registered office of the corporation and by putting agents of the appropriate official or receiver-manager into the offices of the corporation or by designating officers of the corporation to be officers of the receiver-manager or by both such measures.
(3) A Corporation aggrieved by a seizure under this section may institute proceedings in the Court for the recovery of the administration and control of the corporation, and the Court may make such order in respect thereto as to it seems just and consistent with the purposes of this Act."

[122]   Section 288 of the IBC Act is in these terms:

"288. (1) Within thirty days after a receiver-manager has seized the administration and control of a corporation under this Division, the receiver-manager shall begin proceedings in the Court for the liquidation and dissolution of the corporation under section 300 or for the re-organization of the corporation under this Act, as the circumstances require.

42

> (2) On an application to the Court by a receiver-manager of a corporation under this division for the liquidation and dissolution of the corporation, the court has all the powers of the court under section 304 notwithstanding that the corporation is not able to pay or adequately provide for the discharge of all of its obligations, but subject to section 286 and section 289."

[123]   By way of summary, then, section 287 (2) gives an appointed Receiver-Manager a power to seize the management and control of the business of a corporation and prescribes the manner in which this is to be done.  On the other hand, section 288 places a duty or obligation on a receiver-manager (so appointed) after the seizure to institute proceedings in the High Court either for the dissolution or re-organization of the corporation. And logically, the determination of such an application is a matter entirely for the High Court. Of some significance, too, is the Court's observation that the word 'stabilize' does not feature in the said section. However, by a benevolent construction of the word, it could arguably be a reference to the seizure of the management and context of the business; but it cannot be seen as a word contained in the section 287 of the IBC Act.

[124]   As Receiver-Managers in their Report to the High Court dated 16th March, 2009, they speak in this mode. "We are presently liaising with our lawyer in Canada to deal with the sale of the assets located in the Canada office which is limited to office and IT equipment."[59]

[125]   On 16th March, 2009, the Receiver-Managers were still governed by section 288 (1) of the IBC Act and, as such, their sole concern, after the seizure, was to approach the High Court-nothing more.

[126]   Much later on, in an affidavit filed on 25th January, 2010, Mr. Nigel John Hamilton-Smith deposes at paragraph 28 c that:

> "Mr. Blackburn levels further criticism at the Liquidators for the statement that the servers were deleted to allow a sale, because the Liquidators, at the time Receiver-Managers, did not have the power to sell. This point goes nowhere because the servers were not sold or ordered for sale by the Receiver-Managers. Under the IBCA, our appointment as Receiver-Managers was always likely to last only a matter of 90 days and Mr. Wastell and I acted on the assumption that there was, at the very least, a reasonable probability of SIB being placed into liquidation at the end of the receiver-managership. Accordingly,

---

[59] Exhibit ADB-5 To the first Affidavit of Andrew D. Blackburn, Tab 1 @ page 49

43

we were thinking ahead to that possible liquidation and identifying assets of SIB which
might be available to raise funds for the liquidation (to the extent funding was not readily
available).

Finally, Mr. Fundora's application suggests that there was some kind of nefarious agenda
behind the imaging and deletion of the data in Montreal, but he is unable to identify any
motive for this. In fact, the Liquidators acted, under advice, in what they believed to be
in the best interests of creditors – there was no other motive and none has been
suggested."

[127]   As noted before, the Court interprets the obligation on the receiver-managers as
being limited to seizing the administration and control of the corporation and
within 30 days thereafter instituting proceedings with a view to liquidation or
re-organization.   This is why the limitation of 30 days assumes great
significance.   And there is no discretion in the Receiver-Managers, period.
Once they fail to carry out the mandate of section 288 (1), this lets in the
corporation to institute proceedings which can also be commenced by the
corporation after the seizure.

[128]   In the circumstances, it becomes difficult to understand how the Receiver-
Managers can anticipate the High Court and act on it, especially since at the time
they were yet to be appointed as liquidators.

[129]   Accordingly, the Court finds that the arguments tendered on behalf of the
Respondents are not viable given the statutory context.   Therefore, except for the
word 'stabilize,' the Court agrees with the following submission by the Applicant:

"Plainly, the role of receiver-manager in the circumstances was at most one of
'stabilization' of the business (in the terms of the Antiguan Order paragraph 5) and to
take the assets into custody and control and not to take steps to liquidate and sell off
assets.   The role receiver-manager is one of preservation, either to keep the business
running, or in case a liquidation occurs at some stage in the future.   Indeed, if liquidation
of the assets was within the remit of a receiver-manager, the subsequent appointment of
a liquidator (ant the power to sell) would be pointless."

Conclusion

[130]   It is therefore the determination of the Court that prior to being appointed as
liquidators, the Receiver-Managers exceeded their remit by making preparation for
the sale of assets of the corporation and by deleting data from the corporation's
computers.

44

[131]   As a final note, there is no evidence to indicate the whereabouts of the subject computers which were last at the office by Mr. Roffman on or about 27th March, 2009. This is in spite of the fact that Mr. Nigel Hamilton-Smith sworn an affidavit in this matter as late as 12th February, 2010, and made mention of the issue of SIB's IT equipment in Canada.[60]

**ISSUE NO.4**

**Did the Receiver-Managers/Liquidators disregard the jurisdiction of the Canadian Courts?**

[132]   On this issue, the Respondents place heavy reliance on the advice of their counsel to the effect that the Liquidators did not act unlawfully in taking steps to safeguard the data.[61]   In support Geoffrey Riley deposes as follows:

> "... Even assuming that the Liquidators were wrong in law to act as they did, they acted in good   faith and at all times under the guidance of their lawyers at a hectic   point   in time at the start of   the receivership.   Mr. Hamilton-Smith accepts that with the benefit of hindsight he should have sought recognition first, but given the uncertain state of the law and the need to take quick action, the fact that no loss has occurred, and the absence of advice to obtain recognition the Liquidators cannot be considered to have misconducted themselves (see paragraphs 10, 49 and 50 of the first Hamilton-Smith affidavit and paragraph 22 of his second affidavit). Moreover it is not unusual for receiver-managers in a multi-jurisdictional environment to take steps in advance of seeking recognition (paragraph 20-21 of the second Hamilton-Smith affidavit)."

[133]   Geoffrey Rowley in giving evidence on behalf of the Respondents concedes the point by deposing[62] that: "The early days of the receiver-managers' appointment over SIB ... were very busy and hectic and the decisions regarding the Montreal Office were made in good faith, although, with the benefit of hindsight; it would have been advisable for the receiver-managers to have sought to be recognized by the Canadian Court first."[63]

---

[60] Second Affidavit of Nigel Hamilton-Smith in response to the Application to remove the Liquidators sworn to on 12th February, 2010, Core Bundle II, Tab 1 at paras. 28 & 29.
[61] Revised written Submissions of the Liquidators at para. 87. See also Julie Himo's second Affidavit paras. 8-13, Core Bundle II, Tab 2.
[62] See affidavit of Geoffrey Paul Rowley, as Exhibit NJHS1 to the affidavit of Nigel Hamilton-Smith in Response to the Application to remove the Liquidators at para. 10.
[63] See affidavit of Geoffrey Paul Rowley, as Exhibit NJHS1 to the affidavit of Nigel Hamilton-Smith in Response to the Application to remove the Liquidators at para. 10.

45

[134]    The Applicant in seeking to identify the 'wrongs' committed by the Respondents, submit that they: "(i) undertook actions in Canada without the permission of the Canadian Courts and removed computer material from its jurisdiction without its knowledge or permission, (ii) failed to inform Registrar Flamand of material facts (for example the existence of a U.S. Receiver) on 6th April, 2009 when finally making their *ex parte* application for recognition, and (iii) made untruthful statements and testimony before Auclair J at the hearing leading to the 11th September, 2009, judgment."

[135]    For reasons given before, the Court will not dwell on the matter of hearing before Auclair J. And, as far as the alleged failure to make material facts known to Registrar Flamand is concerned, Mr. Philippe Giraldeau[64] has deposed that:

> "1. I am one of the Canadian legal counsel of the law firm of Ogilvy Renault LLP, having been appointed by Nigel Hamilton-Smith and Peter Nicholas Wastell with regard to the matter of Stanford International Bank Ltd and Stanford Trust Company Ltd. (hereinafter the "Bank");
>
> 2. On Monday, April 6, 2009, I attended, with my colleague Ms. Julie Himo, at the office of the Registrar, Chantal Flamand, of the Commercial Division of the Superior Court of Quebec, district of Montreal, in order to present our client's *Motion seeking the appointment of a foreign representative, the recognition of a foreign order for judicial assistance and for the appointment of an interim receiver;*
>
> 3. In light of my attendance at the above-mentioned hearing with Ms. Himo, I make this affidavit to confirm that I have read Ms. Himo's affidavit dated January 16, 2010 and that the statements Ms. Himo makes at paragraphs 10 to 20 of her affidavit regarding the above-mentioned hearing and Motion are true;
>
> 4. More specifically, I can confirm that Registrar Flamand
>     a.    did indeed review every Exhibit attached to the Motion;
>     b.    asked Ms. Himo about the U.S. proceedings and was informed by Ms. Himo that a U.S. Receiver was appointed as receiver of the Bank, among other entities ..."

[136]    At paragraphs 10 to 20 of her first affidavit, Ms. Julie Himo details the procedure followed at the hearing of the *ex parte* motion filed by the Respondents (as Receiver-Managers) and heard by Registrar Flamand.

[137]    Contextually, paragraphs 19 and 20 are especially significant where Ms. Himo deposes that:

---

[64] See Affidavit of Philippe Giraldeau, Core Bundle 1, Tab 27

"19. I was not given instructions to withhold nor did I withhold any information from the Registrar, including the fact that a U.S. Receiver has been appointed as such in the United States.

20. It was urgent for the Receiver-Managers to seek recognition of their status until such time as the Winding-Up Order appointing them as Liquidators would be issued by the High Court of Antigua because there was a number of urgent issues to be dealt with in Canada, including dealing with the landlord of the premises where the bank operated in Montreal and where the Bank's assets were stored, as alleged at paragraph 24 through 28 of the motion, as well as class action proceedings which had been filed against the bank in the Province of Alberta, Canada, as alleged at paragraph 30 of the motion (see Exhibit R-6 of the motion)."

[138]   Despite the admission by the Respondents and despite the urgency relied on by the Respondents, the Court considers it prudent to identify the statutory context. Part XIII of the Bankruptcy and Insolvency Act[65] deals exclusively with international insolvencies which by its definitions and substantive provisions would apply to the Respondents.

[139]   In particular, the two following definitions are relevant:

" 'foreign proceeding' means a judicial or administrative proceeding commenced outside Canada in respect of a debtor, under a law relating to bankruptcy or insolvency and dealing with the collective interests of creditors generally';
'foreign representative' means a person, other than a debtor, holding office under the law of a jurisdiction outside Canada who, irrespective of the person's designation, is assigned, under the laws of the jurisdiction outside Canada, functions in connection, with a foreign proceeding that are similar to those performed by a trustee, liquidation, administrative or receiver applied by the Court.'"

[140]   Clearly, the Respondents would qualify as a "foreign representative" for the purposes of the BIA. Accordingly, sections 268 (2), (3) (4) and (6) which read thus:

" Limitation or trustee's authority
(2) If a foreign proceeding has been commenced and a bankruptcy order or assignment is made under this Act in respect of a debtor, the Court may, on application and on any term, it considers appropriate, limit the property to which the authority of the trustee extends to the property of the debtor situate in Canada and to any property of the debtor outside Canada that the Court considers can be effectively administered by the trustee.

Power of the Court
(3) The Court may, in respect of the debtor, make such order and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of proceedings under this Act with any foreign proceedings.

---

[65] R.S., 1985, c. B-3

47

**Terms and conditions of orders**
(4) An order of the Court under this part may be made on such terms and conditions as the Court considers appropriate in this circumstances.

**Court not compelled to give effect to certain orders**
(6) Nothing in this part requires the Court to make any order that is not in compliance with the laws of Canada or to enforce any order made by a foreign Court."

[141]   In a futile effect to defending their actions, Mr. Nigel Hamilton-Smith deposed as follows at paragraph 21 of his second affidavit:[66]

"21. In paragraph 87 (c) of his first affidavit, Mr. Blackburn criticizes the Liquidators for only applying for recognition on 6th April, 2009. In any experience, it is quite usual for insolvency practitioners operating in a multi-jurisdictional environment to investigate what assets are available to them in a given jurisdiction before applying for recognition in that jurisdiction. The same *modus operandi* was adopted by the US Receiver, who only applied for recognition in Canada as a response to the Liquidator's application. Our actions in Canada were undertaken in conjunction with Canadian legal advice from Ogilvy Renault; when it became necessary to apply for recognition, I was advised that this was the case and advised my Canadian lawyers accordingly."

[142]   In order to complete the picture, it is appropriate to quote from Ms. Himo's second affidavit where she deposes as to the Respondents' actions and the relevant law:

"8. I am unaware of any principle at law which would lead me to conclude that because the Liquidators were not licensed trustees under the BIA, their actions with regard to the assets and records of the Bank located in Montreal prior to the presentation of the motion were illegal. This is an important issue that I will advise the Liquidators to raise should the Supreme Court of Canada grant their eventual application for leave to appeal;

9. More specifically, section 271 (3) of the BIA merely provides that the court may, on application by a foreign representative, appoint a trustee as interim receiver. Part XIII of the BIA does not require that a foreign representative generally act through a Canadian trustee. At the time of our Motion before Registrar Flamand, no Canadian case law addressed this issue;

10. During the hearing on the motion on April 6, 2009 and in our Motion at paragraphs 24 to 29, I informed Registrar Flamand that the Liquidators already took action to close the Montreal office and that one of the principal reasons the Liquidators were seeking recognition of their appointment was to deal with the landlord of the premises where the bank operated in Montreal and to take precautionary measures to safeguard property located in Canada."

[143]   The legal advice given to the Respondents is of no concern to this Court except to say the basic issue turns on vires or the treatment of a clear prohibition. And it is one thing to investigate what assets are available and it is quite another matter to

---

[66] Second affidavit of Nigel Hamilton-Smith, Core Bundle II, Tab 1.

48

image and erase computer data and then ship out the discs to the United Kingdom – even before the application for recognition which was filed in 6th April, 2009.

**Conclusion**

[144]    It is therefore the determination of the Court that the Respondents disregarded the jurisdiction of the Canadian Courts by undertaking actions in Canada with respect to SIB, otherwise than in accordance with the Bankruptcy and Insolvency Act and removed computer data also without the knowledge or permission of the Courts in Canada.

**ISSUE NO. 5**

**Whether this Court bound by the UNCITRAL model insolvency laws?**

[145]    In proceedings in the UK with respect to SIB, Mr. Justice Lewison in the course of rendering his judgment in the said matter with respect to the UNICTRAL model insolvency laws and said this:

> "On 30 May, 1997, the United Nations Commission on International Trade Law ("UNICTRAL") adopted the text of a model law on cross-border insolvency, which was approved by a resolution of the United Nations General Assembly on 15[th] December, 1997. The model law is not binding in any jurisdiction, although the UN recommends that in the interest of uniformity as few changes to the text as possible be made."[67]

[146]    The Respondents make this the following submission on the issue:

> " 172. The Applicants contend that because of the multi-jurisdictional and international nature of the liquidation, reference should be made to the UNCITRAL model laws. The Respondents' short answer to this point is that none of the UNCITRAL model laws has been ratified or enacted in Antigua and Barbuda. The provisions of the model laws are therefore of academic interest only and are enforceable in an Antiguan Court of law – see Reg. v. Home Secretary, Ex p. Brind [1991] 2 WLR 588."

[147]    In the absence of any statute in Antigua and Barbuda giving effect to the model law, the Court agrees that the UNCITRAL model insolvency laws are not binding.

---

[67] [2009] EWHC 1441 (Ch) at para. 3.

49

[148]    In this context it is appropriate to mention that under the Laws of Antigua and Barbuda, there are two regimes for the incorporation and related matters in relation to companies and corporations.   One is governed by the Companies Act 1995[68] while the other falls under the IBC Act.

[149]    The matter of the English Insolvency Rules 1986 which arose in the case of **Hugh C. Marshall Snr. v Antigua Aggregates and others**[69] concerned the procedure and the law to be followed with respect to a company incorporated under the Companies Act coupled with the absence of insolvency rules being enacted.   In contrast, the issue here relates to the removal of a liquidator which is expressly provided for by section 304 of the IBC Act.   As a consequence, neither the **Hugh C. Marshall Snr.** case nor the English Insolvency Rules 1986 are relevant to this matter.

**Conclusion**

[150]    This Court is not bound by the UNCITRAL model insolvency laws.

---

[68] Act No. 18 of 1995.
[69] Civil Appeal No. 23/1999

ISSUE NO. 6

**Does the Applicant have standing to make an application for the removal of the liquidators; and what is the legal test for the removal of a Liquidator?**

[151]   As far as the matter of standing is concerned, the relevant provision of the IBC Act is section 304. It bears the marginal note "Court Powers" which it grants in wide terms. However, for present purposes the material words are as follows:

> "304. In connection with the dissolution or liquidation and dissolution of a corporation, the Court may, if it is satisfied that the corporation is able to pay or adequately provide for the discharge of all of its obligations,  make any order it thinks fit, including, without limiting the generality of the foregoing:
> (a) an order to liquidate,
> (b) an order appointing a liquidator, with or without bonding, fixing his remuneration and replacing a liquidator ..."

[152]   The section is silent as to who has standing to make an application for the dissolution of liquidation of a corporation. But it cannot be that this opens the floodgates. To begin, who is the applicant?

[153]   In his sixth Affidavit, Mr. Alexander M. Fundora, the Applicant gives his place of residence as 839 South West 72nd Avenue, Unit No. 116 Miami, Florida 33143, United States of America. He deposes further that he is a creditor of S.I.B and that he holds deposits in the form of certificates of deposit with S.I.B totaling US $2,779,526.57 (US $2,484,401.78 in principal).

[154]   Applications for the removal of liquidators is a prominent constituent of company law in its various aspects. Such applications are based on the relevant statutory provisions and over time the courts in varying jurisdictions have, in interpreting these provisions, given ruling as to who has standing.

[155]   The question of *locus standi* arose in the case **of Deloitte & Touche AG v Johnson and Another.**[70] In that case, the Applicant was neither a creditor nor a contribution and this was challenged on the basis of lack of standing. The Privy Council gave this ruling:

---

[70] [1999] 1 WLR, I605

51

"Section 106(1) of Companies law did not limit the category of person entitled to apply for the removal of an official liquidation by the court on due cause being shown, and the plaintiff had the requisite statutory qualification to make the application for the removal of the company's liquidators. Since the plaintiff had alleged that the liquidators had an interest which conflicted with their duty to the company and its creditors, but not that they owed any duty to the plaintiff, only the creditors had a legitimate interest in complaining of such a conflict of interest. Also, since the liquidators were able and willing to continue in Office and the creditors were the only persons with a legitimate interest in having them removed, had not applied for their removal the plaintiff was not entitled to invoke the court's statutory jurisdiction under section 106(1)." [71]

[156]    Lord Millett for the Board concluded on this note:

"Where the court is asked to exercise a statutory power, therefore, the applicant must show that he is a person qualified to make the application. But this does not conclude the question. He must also show that he is a proper person to make the application. This does not mean, as the plaintiff submits, that he "has an interest in making the application or may be affected by its outcome." It means that he has a legitimate interest in the relief sought. Thus even though the statute does not limit the category of person who may make the application, the court will not remove a liquidator of any insolvent company on the application of a contributory who is not also a creditor: see In re Cobenstoke Ltd (No. 2) 1990 B.C.L.C 60. This case was criticized by the plaintiff: Their Lordships consider that it was correctly decided." [72]

[157]    Based on the ruling in the **Deloitte & Touche** case, this Court in **Financial Services Regulatory Commission v Peter Queeley and Hugh Henry**,[73] in construing the said section 304 of the IBC Act ruled that the Applicant Commissioner did not have standing to seek to remove a liquidator.

[158]    In this case, the factual matrix is different in that the uncontradicted fact is that Mr. Alexander M. Fundora, is a creditor of S.I.B., and by virtue of this fact the Court agrees with the Applicant's submission that he has sufficient interest to make the application based on the ruling of the Privy Council in the **Deloitte & Touche AG** case. In any event, it is settled law that only persons with a positive interest in the outcome of a liquidation could apply to show due cause of the removal of a liquidator.[74]

---

[71] Ibid
[72] Ibid at page l6ll
[73] Claim no. ANUMSC2005/0400 per Blenman J.
[74] See: Johnson and Dinan v Deloitte and Touche A.G [1997] CILR 120; 7(3) Halsbury's Laws of England (4th Edition) para. 2376

52

**Legal test for removal**

[159]    The second aspect of the issue concerns the legal test for the removal of a liquidator. This has two aspects: the statutory prerequisites and the grounds for removal.

**Statutory prerequisites**

[160]    Having regard to section 304, as outlined above, the immediate question is whether this Court is satisfied that the corporation (SIB) is able to pay or adequately provide for the discharge of all of its obligations.

[161]    This is necessarily an accounting function, however, there is no accounting statements before the Court. What does exist, is a number of affidavits which speak to matters accounting and the general financial position of SIB. The Court must do the best it can in the circumstances. Of some significance in this regard, is the fact that there were no submissions by either party on the statutory aspect of the issue.

[162]    In Reports[75] to the High Court of Antigua, this identical statement is made:

> "Dividend Prospects for Creditors as all the Court recognition proceedings have either not been adjudicated upon, or the decision is subject to appeal and often assets being land with an anticipated long tail realization period we are still unable at this stage to estimate the level of any distribution to creditors."

[163]    In a further Report[76] to the High Court of Antigua and under the caption: "Conclusion on the Insolvency of SIB," the following is stated:

> "Since our appointment we have been able to establish that SIB has outstanding investor liability balances totaling some $7.2 billion.
>
> It has not been possible to identify assets that total an amount close to the liabilities owing to investors and there will be further liabilities to suppliers such as telephone, utilities, tax authorities, employees, software providers which have yet to be fully established, although our current estimate that such liabilities are in excess of US $1 million.

---

[75] Report to the Antiguan High Court by the Joint liquidators of the Stanford International Bank Limited filed on 9th October, 2009 and 15th January, 2010 at pages 231 and 3 respectively.
[76] Report to the Antiguan High Court by the Joint Receiver-Managers on Stanford International Bank Ltd., at pages 220-221.

> The Receiver-Managers have therefore concluded that SIB is insolvent and is not capable of being re-organized via Receivership. We therefore believe that SIB should be placed into liquidation without delay in order that the appointed liquidators can continue the work required to realize the assets of SIB, agree to creditor claims of SIB and in due course return monies to creditors."

[164]   Extracts from a letter dated 13th May, 2009, from the Liquidators to creditors reveal that the Liquidators advised in these terms: "The records of SIB indicate that as of February 19, 2009, SIB had 27,992 active clients. Including accrued interest to February 19, 2009, the Bank's records indicate a total of US $7.2 billion is owed to depositors. At present we therefore summarize our current estimate of the maximum value of the Bank's assets as follows. Total assets could therefore be below US $1 billion against depositors liabilities of US $7.2 billion."

[165]   In a Report filed on 15th January, 2010, the Liquidators say at page 2 that: "The Liquidators have agreed claims of 7,119 investors totaling US 2.6 billion and the adjudication of claims received and enquiries from investors are being processed on a daily basis. Attached to this report is an analysis detailing the level of usage of the claims system.

[166]   We continue to deal with e-mail enquiries responding to investor queries both in English and Spanish Investors are now able to view their accounts, register their claims and change their address details via the Online Claims Management System."

[167]   Ms. Karyl Van Tassel, a certified public accountant deposed[77]  to a variety of relevant matters:

> " 7. Mr. Hamilton-Smith agrees in paragraph 11 (a) that SIB and other Stanford International Group companies were involved in a massive 'Ponzi' scheme, yet he spends the balance of his affidavit essentially contending that SIB observed corporate formalities.
>
> 12. With more than $7 billion in claims, CD holders will be by far the largest class of claimants by dollar amount; dwarfing all other claims against SIB and other Stanford entities.

---

[77] Second Affidavit of Karyl Van Tassel, Exhibit ADB-6 to the First Affidavit of Andrew D. Blackburn, Tab 14 at para. 7, 12 & 13.

13. There is at present more than $6 billion shortfall between SIB CD proceeds and the prior assets of all Stanford entities combined. I know from those transactions that my team has been able to trace funds left in SIB's accounts and were widely dispersed to many other Stanford entities and from those entities yet further. Based upon our analysis to date roughly $1 billion simply cannot be accounted for. The financial records of these entities are confusing, incomplete and do not begin to tell the story of what happened to all the proceeds. While some additional assets may be traced and separated that will likely not to be feasible as to all."

[168]    In commenting on what Mr. Hamilton-Smith said about SIB holding $10 million at

Bank of Antigua on account, Ms. Van Tassel deposed that:

"(VII) SIB and other Stanford entities experienced extreme cash flow problems during the three months immediate proceeding the receivership tier 2 investment were being liquidated to raise cash yet it appeared that the $10 million in the Bank of Antigua account was not used to any appreciable extent prior to receivership."

[169]    In their Report[78] to the Antigua High Court, the Joint Receiver-Managers, under

the rubric "Operations Undertaken by SIB in Antigua" and "Cash Balances" state

the following:

"The Bank Records indicate that it has $104,421,957 in loans outstanding against clients Certificate of Deposit ("CD"). It is not considered that it will be possible to realize value for these loans since they are collateral against clients' own deposits with the Bank.

The records of the Bank further indicate that as of February 19, 2009 the Bank had 27,992 active clients. Including accrued interest to February 19, 2009 the Bank's records indicate a total of $ 7,206,209,579 as invested by clients and held in the following products:

| [Product] | US $ Million |
|-----------|--------------|
| Fixed CD | 4,952 |
| Flex CD | 1,994 |
| ILCD | 13 |
| Express A/c | 227 |
| Performance A/c | 1 |
| Premium A/c | 19 |
| TOTAL | 7,206 |

Our investigators have established that at the close of business on Wednesday February

18, 2009 SIB's records detained the following cash balances being held.

| Bank | Country | US $ |
|------|---------|------|
| The Toronto Dominion Bank | Canada | 18,918,662 |
| Trustmatic National Bank | United States of America | 1,886,857 |
| HSBC Bank plc, HSBC Bank, | United Kingdom | 5,246,601 |

---

[78] Report to the Antiguan High Court by the Joint Receiver-Managers on Stanford International Bank Ltd., Exhibit ADB-5 of the first Affidavit of Andrew D. Blackburn, Tab 1 at pages 47-48 and 50-51

55

| | | |
|---|---|---|
| Panama S.A. | | |
| Bank of Antigua | Antigua | 9,984,971 |
| Commercial Bank | United States of America | 5,457,680 |
| TOTAL BALANCES | | 46,594,623* [79] |

[170]    The measure of the foregoing will be brought into the equation at the stage of the analysis and conclusion.

**The test for removal**

[171]    Again, as with the matter of *locus standi*, section 304, is silent on the grounds upon which as liquidator may be removed by the Court. The power, 'make any order it thinks fit,' is wide but cannot be unfettered.    A further point is that wording of section 304 differs from other statutory provisions concerning the removal of liquidators. In the circumstances, the decision based on other statutory must provide guidance to the Court.

[172]    An outline of some of the statutory provisions would assist the matter section 106 (1) of the Companies Law (1995 Revision, Cayman Islands provides that; "Any official liquidation may resign or be removed by the Court on due cause shown; and any vacancy in the office of official liquidation appointed by the court shall be filled by the court." Section 93 of the Companies Act 1862, England reads: "Any official liquidator may resign or be removed by the Court on due cause shown." Similarly, section 242 (1) of the Companies Act 1948, England provided that: "A liquidator appointed by the court may resign or, on cause shown, be removed by the Court." And section 304 (2) dealing with voluntary liquidation, reads: "The court may, on cause shown, remove a liquidator and appoint another liquidator." Finally, section 108 (2) of the Insolvency Act 1986, England says that: "The Court may, on cause shown, remove a liquidator and appoint another."

[173]    On a review of the authorities cited and submitted,[80] it is clear that the recurring words for the removal of a liquidator is 'due cause.'    And one of the earliest

---

[79] The said Report reveals that all the Banks except HSBC Bank Panama S.A and Commerce Bank, responded to the confirmation sought as to the account numbers and the balances.

authorities based on the relevant legislation is the case of **In Re Adam Eyton**.[81] And in the context of the Commonwealth Caribbean and, in particular, the Territory of the Cayman Islands, Justice of Appeal Telford Georges (as he then was) in **Johnson and Dinnan v Deloitte Touche** made this ruling on the point:

> "A review of the cases establishes that the process of resolving an application for the removal of a liquidator raises three stages: (a) Does the applicant has the locus standi to apply? (b) Had due cause been shown and (c) If such cause has been shown, should the court exercise its discretion to remove the liquidators?  The issues as to whether or not due cause has been shown and whether the discretion should be exercised are far more frequently canvassed that the issue of standing.  That issue is often controversial, the application being usually made by a creditor or contributory."[82]

[174]   And in the context of the section 304 of the IBC Act, Madam Justice Louise Blenman in **Financial Services Regulatory Commission v Queeley and Henry**[83] after an extensive review of the authorities on the appropriate test came to this conclusive at paragraph 55 of her judgment:

> "The burden is on the applicant to show good cause for removal of a liquidator, I am of the view that the statutory provision confers a wide discretion on the Court which is not dependant on proof of particular breaches of duty by the liquidator."

**Application of the test**

[175]   The *locus classicus* must be the case of In **Re Adam Eyton Limited**.[84]   The headnote to the case reads:

> "The jurisdiction of the Court to remove a liquidator under ss. 93 and 141 of the Companies Act, 'on due cause shown' is not confined to cases where there is  personal unfitness in the liquidator.  Whenever the court is satisfied that it is for the general

[80] 11.  *FSRC v Queeley and Henry* (2006) Claim Number ANUMSC 2005/0400;
12.  UK Insolvency Act 1986 at section 172;
13.  *In Re Adam Eyton* (1887) 36 Ch. D. 299;
14.  UK Insolvency Rules 1986 at page 155, Rule 4. 120-CVL;
15.  *Hugh C. Marshall Snr v Antigua Aggregates Ltd.* Antiguan Court of Appeal, Civil Appeal No. 23 of 1999;
16.  *Deloitte & Touche v Johnson* [1999] 1 WLR 1605;
17.  In Re Marseilles Extension Railway and Land Co. (1867) LR 4 Eq. 692;
18.  Re Keypak Homecare Ltd [1987] BCLC 409;
19.  Shepheard v Lamey [2001] BPIR 939;
20.  Re Buildlead Ltd (in liq.) [2004] (No.2) EWHC 2443 (Ch) [2006], BCLC 9;
21.  SISU Capital Fund Ltd v Tucker [2006] B.C.C. 463;
22.  AMP Music Box Enterprises Ltd v Hoffman [2002] (Ch) [2002] BCC 996;
23.  Re Edennote Ltd. [1996] B.C.C. 718;
24.  Re AMF International Ltd. [1995] BCC 439;
25.  Re A&C Supplies Ltd and Others [1998] 1 BCLC 603.

[81] [1997] CILR 120
[82] Ibid at 146-147
[83] Supra
[84] Supra

57

> advantage of those interested in the assets of the company that a liquidator be removed,
> it has power to remove him, and appoint a new one."

[176]   And Lord Justice Cotton, with whom the rest[85] of the Court agreed, ruled thus:

> "Now in my opinion, it is not necessary, in order to justify the Court under this section in
> removing the liquidator, that there should be anything against the individual.   In my
> opinion, although of course unfitness discovered in a particular person would be a
> ground for removing him, yet the power of removal is not confined to that, and I do not
> think that the late Master of the Rolls in the case of In Re Sir John Moore Gold Mining
> Company [12 Ch.D. 331], which has been cited, intended to give an exhaustive
> definition.   In fact he points out that, and what he says is this: 'I should say that, as a
> general rule they point to some unfitness in the person – it may be from personal
> character, or from his connection with other parties, or from circumstances in which he is
> mixed up – some unfitness in the wide sense of the term.  He does not intend to exhaust
> all the grounds, but, in my opinion, and I believe the rest of the Court agree with me, if
> the court is satisfied on the evidence before them that is against the interest of the
> liquidator, by which I mean all those who are interested in the Company being liquidated,
> that a particular person should be made liquidator, then the Court has power to remove
> the present liquidator, and of course then to appoint some other person in his place."

[177]   Of perhaps importance are these words of Lord Justice Bowen:

> "In many cases, no doubt, and very likely, for anything I know in most cases, unfitness of
> the liquidator will be the general form which the cause will take upon which the Court in
> this class of case acts, but that is not the definition of due cause shewn.  In order to
> define "due cause shewn" you must look wider afield, and see what is the purpose for
> which the liquidator is appointed.  To my mind the Lord Justice has correctly intimated
> that the due cause is to be measured by reference to the real, substantial, honest
> interests of the liquidation, and to the purpose for which the liquidator is appointed.  Of
> course, fair play to the liquidator himself is not to be left out of sight, but the measure of
> due cause is the substantial and real interests of the liquidation.   That should be
> thoroughly understood, I think, as of great importance; and in that sense it seems to me
> this case is of interest because it clears, once and for all, away the misconception upon
> which the argument of the Appellant's counsel was based."

[178]   Learned Senior Counsel on both sides have cited authorities on the narrow
question of the Application of the test of the removal of a liquidator.  However, in
the view of the Court, there can be no dispute in the conclusion that this decisions
on the point subsequent to the **Re Adam Eyton** case are really re-statement of the
principle or variations thereof.

[179]   In this regard, In **Re Buildlead Ltd (No. 2)**[86] Etherton J. expressly acknowledged
that "the torchstone for an appraisal of whether cause has been shown of the
removal of a liquidator is the principle stated by Bowen LJ in Re Adam Eyton."

---

[85] Being Bowen, L.J. and Fry, L.J.
[86] Supra

And in **Shepheard v Lamey**[87] the necessity to prove misfeasance or incompetence was ruled out. Rather, the Claimant only had to establish that there may be a case of misfeasance or incompetence.

### Conclusion

[180]   It is the determination of the Court that the Applicant has standing to make the application of the removal of the Liquidators. It is the further determination of the Court that the test for the removal of a liquidator is due cause.

### ISSUE NO. 7
### Has the Applicant shown due cause?

[181]   The Applicant begins his submissions with certain references to the judgments referred by the Court in Quebec. For reasons given above, this particular submission will not be brought into the equation in terms of findings made therein.

[182]   In terms of the matter 'due cause' it is the Applicant's submission that:

> "The Antiguan High Court has confirmed in *Queeley and Henry* that the correct test was one of 'due cause'. In view of the nature and purpose of liquidation, it must be the case that the benchmark for removal of a liquidator need not reach the standard of misconduct or misfeasance. Due cause includes or ought to include, as shown below, conduct which may adversely affect the ability of liquidators to perform especially in cross-border liquidations, the process of liquidation or affects or may jeopardize creditors."[88]

[183]   The Applicant goes on to detail principles[89] derived from the cases concerning "sufficient cause" or "due cause."

> "127. The following principles set out what constitutes "sufficient cause" or "due cause": [The cases refer to the test for removal under a number of different Insolvency Act Rules, such as voluntary winding up, compulsory, and applications to the court and/or by meeting of creditors. Courts have confirmed that the same principles apply in all cases – see Warren J at [87] in *SISU Capital Fund Ltd v Tucker* [2005] EWHC 2170 (Ch)(See 21 of the Legal Authorities)].
> a.   **Interests of the liquidation**: "cause" is to be measured by reference to the real, substantial, honest interests of the liquidation and to the purpose for which the liquidator is appointed *(Re Adam Eyton Ltd, ex p Charlesworth* (1887) LR 36 ChD per Bowen LJ at p306 and approved in *Queeley and Henry* at [54]);

---

[87] Supra
[88] Revised written Submission of Alexander M. Fundora at para 126
[89] Ibid at para 127

b. **no misconduct necessary:** the words "due cause" do not require anything amounting to misconduct or personal unfitness. It is sufficient if it can be shown that it was on the whole desirable for the liquidator to be removed (per Malins VC in *Re Marseilles Extension Railway and Land Co* (1887) LR 4 Eq 692 at p694 (See Tab 17 of the Legal Authorities) quoted with approval by Millet J in *Re Keypak Homecare Ltd* (1987) 3 BCC 558 at p563 (See Tab 18 of the Legal Authorities);

c. **standard of proof:** in *Shepheard v Lamey* [2001] BPIR 939 at 940 (*See* Tab 19 of the Legal Authorities) Jacob J said that "all one has to find is some good cause why a person should not continue as a liquidator. You do not have to prove everything in sight; you do not have to prove, for example, misfeasance as such; you do not have to show more than there may well be a case of misfeasance or, indeed, incompetence". This was echoed in *Re Buildlead Ltd* (in Liquidation) (No. 2) [2005] BCC 138 at 156 per Etherton J (See Tab 20 of the Legal Authorities) who stated that the court has a wide discretion to remove a liquidator, which is not dependant on the proof of particular breaches of duty by the liquidator (also approved in *Queeley and Henry* at [55]);

d. **the level of skill required:** the court expects a liquidator to be efficient, vigorous and unbiased in his conduct of the liquidation and should have no hesitation in removing him if he has failed to live up to those standards, unless it can reasonably confidently be said that he will live up to those requirements in the future (per Warren J in *SISU Capital Fund Ltd v Tucker* [2005] EWHC 2170 (Ch) at [85] (See Tab 21 of the Legal Authorities);

e. **court's duty to remove:** although removal of a liquidator may necessarily involve criticism or a liquidator, courts should not shy away from this. Indeed, a court has a **duty** to remove a liquidator in appropriate cases as it sends a clear message to liquidators that they have an important function which should be effectively conducted (see AMP Music Box Enterprises Ltd v Hoffman [2002] EWHC 1899 per Neuberger J at p 1001 (See Tab 22 of the Legal Authorities));

f. **regard to wishes of creditors:** the court should have regard to the wishes of the majority of those interested in deciding whether to remove an office holder (See Re Edennote Ltd [1996] BCC 718 (CA) Per Nourse LJ at p725H (See Tab 23 of the Legal Authorities)). A Liquidator will be removed if the creditors no longer have confidence in his ability to realize the assets of the company – but that loss of confidence has to be reasonable before the liquidator will be removed (Re Edennote Ltd [1996] BCC 718Nourse LJ at 725); and,

g. **cost and delay:** the court must also bear in mind that replacement may involve undesirable consequences in terms of cost and delay (see *AMP Music Box Enterprises Ltd v Hoffman* [2002] EWHC 1899 per Neuberger J at pp. 1,001C – 1,002A).

[184]   On the specific issues that go to the matter of due cause, the following submissions are made by the Respondents:

"The Alleged Mishandling of Computer Data

162. The Respondents answer this allegation in some detail in the affidavits of Geoff Rowley, Nigel Hamilton-Smith, James David Coulthard, Nick Kirby and James Martin Baldock. These affidavits reveal that:

60

i)    The Respondents were aware of their legal obligation to maintain the confidentiality of the records of SIB under the laws of Antigua and Barbuda, the place of the bank's incorporation;

ii)   There was a need to preserve data in the Montreal Office of SIB because of ongoing and possible fraud investigations. As Receiver-Managers the Respondents had engaged in the same exercise in Antigua;

iii)  The Montreal office of SIB was occupied under a lease, the landlord was owed rent, and the insolvency of SIB exposed the bank to the risk of the computers and other property being the subject of a distress levy. The Respondents received legal advice that the assurances which they had received from the Landlord were not legally binding;

iv)   The Respondents determined which computers and servers should be imaged, which was a question of both ownership and proportionality.  The three servers not belonging to SIB were not imaged or deleted for this reason. Four computers (located in the mailroom, guest office, at the reception and belonging to the Secretary) were considered unlikely to contain any relevant data and therefore did not justify the cost of imaging and verification.

v)    The Respondents retained and acted on the advice of an experienced IT professional in imaging the data on the servers and deleting the said data from the computers;

vi)   The IT professional consulted acted in accordance with industry standards and employed best practices;

vii)  Only servers owned by SIB were imaged;

viii) No blackberries nor USB memory devices were found at the Montreal office and that is why no such devices were imaged;

ix)   An automatic erasure process was used to erase data from the servers because this was the most cost effective method;

x)    The Liquidators give strict instructions that the imaging and deletion were to be done in according with the standards required by a criminal prosecution and assured that this would be done;

xi)   Mr. Kirby, the author of the industry standards testifies that those standards have been complied with and that the imaged data is admissible in a court of law and;

xii)  All of the imaged data was preserved and has been handed over to the Canadian authorities in compliance with a court order.

163. In short, all of the criticisms made by Mr. Kelman, the Applicant's witness, have been answered with reasonable explanations.  The Liquidators acted at all times upon the advice of professionals and there is no credible independent evidence that their actions have indeed prejudiced the creditors of SIB.

### Did Messrs. Hamilton-Smith and Wastell acted outside of their remit as Receiver-Managers?

61

164. The specific criticism of the Respondents, are raised by Mr. Blackburn, is that while acting in the capacity of Receiver-Managers, the Respondents were contemplating a sale of assets of SIB including the computer servers.

165. This allegation is answered by Mr. Hamilton-Smith who makes it clear that this aspect of the matter has been misconstrued. Clearly the Respondents were contemplating a sale of assets once the company was put into liquidation. It was entirely reasonable for them to have such a sale in contemplation (see paras 46-48 of the first affidavit of Nigel Hamilton-Smith). There is no merit in this allegation.

### Did the Liquidators disregard the jurisdiction of the Canadian Courts?

166. It is alleged that upon filing an *ex parte* motion in the proceedings in Canada, the Respondents failed to serve the AMF with notice of the application. It is also alleged that the Respondents took action in Canada (the removal of the computer data) before their status was recognized by the Canadian Courts. Finally, it is alleged that they made untruthful statements before Auclair J in Quebec proceedings.

167. The affidavits of Nigel Hamilton-Smith, Mdm. Julie Himo and Philippe Giraldeau completely refute these allegations. Mdm. Himo in particular makes it clear that neither she nor the Respondents were aware of an ongoing formal AMF investigation and that this remained the case until 9th July, 2009. She has also deposed that the AMF had not disclosed the investigation order to them (see paras 21-29 of her affidavit).

168. Mdm. Himo explains why this was done (paras 3-9 of her affidavit): there was no reason in law to serve the AMF; she was informed that the US Receiver had been made aware of the attempts by the Respondents to secure the property of SIB in Canada and that the AMF had not disclosed the investigation order. Mr. Hamilton-Smith also explained that there was an urgent need to assume control of the property of SIB, that is, to ensure that the assets were secure and that potentially confidential information was not lost and did not fall into the hands of third parties (see para 53 of the affidavit of Nigel Hamilton –Smith).

169. Mdm. Himo's first affidavit is confirmed by Philippe Giraldeau who also attended the hearing before Registrar Flamand."

Analysis

[185]   The evidence taken as a whole, the findings by the Court, together with the submissions on the matter of the removal of the liquidators, give rise to the following further matters to be considered as grounds for such removal or otherwise of the liquidators:

1)   Destruction of evidence/mishandling of computer data.

2)   Rent.

3)   Acting outside of their remit.

4)   Disregard of the Canadian jurisdiction, including the disregard of the regulatory bodies.

5) Efficiency of the Liquidators.

6) Litigation – the *ex parte* application.

7) Support for retention or removal of liquidators

8) Credibility of the Liquidators

9) Presence on absence of good faith.

[186]   The foregoing must now be analyzed *seriatim*.

**Destruction of evidence/mishandling of computer data.**

[187]   The Court has already found as a fact that non-imaging and erasing of four computers may have resulted in the loss of data. It is also the finding of the Court that the liquidators estimated that the erasing of the four computers under the supervision of Mr. Coulthard would only need a further few days (at most) from 8 March, 2009. But Mr. Roffman has deposed, and remains uncontradicted that on 27 March, 2009, on a visit to the SIB Montreal office, he saw a computer message indicating that the erasing was 76% complete. As concluded, this leads to the reasonable inference that, contrary to the Liquidators estimation, that the computers did not have data, they in fact contained a vast amount of data. With this comes a further inference that such action may have resulted in a loss of evidence which may be relevant to any civil action by the 224 Canadian creditors or any criminal proceedings.

[188]   Indeed, on 6 March, 2009, Bennet James LLP wrote to Nigel Hamilton-Smith, Vantis Business Recovery Services in these terms[90]:

> "Dear Messrs. Hamilton-Smith and Wastell:
>
> Re: Dynasty Furniture Manufacturing Ltd., as representative plaintiff v. Stanford et al Class Proceeding in the Court of Queen's Bench of Alberta, Canada Action No. 0901-    02821
>
> We are solicitors in Canada who have commenced class proceedings in Canada for those Canadians who have investments with Stanford International Bank Ltd. and its affiliated companies. The class proceedings we have commenced also names as defendants Messrs. R. Allen Stanford and James M. Davis, and Mr. Laura Pendergrast-Holt. Attached is a copy of the statement of claim we filed on February 25, 2009 in

---

[90] Exhibit "ADB-5" To the first affidavit of Andrew D. Blackburn at page 250

63

respect of this class proceeding in the Court of · Queen's Bench of Alberta in the Province of Alberta, Canada.

We understand that Vantis PLC, and in particular the Vantis Business Recovery Services Division, has been appointed by the Financial Services Regulatory Commission in Antigua and Barbuda as receivers of Stanford International Bank Ltd. and Stanford Trust Company Ltd.

As class counsel for Canadian investors in this matter, we ask that you contact us should there be any developments that affect or that could affect the rights of the investors we represent.

Yours Truly,
Bennett Jones LLP"

[189]    And at paragraph 1 of the "Plaintiff's" Statement of Claim the following is pleaded:[91]

"The Plaintiff, Dynasty Furniture Manufacturing Ltd. (hereinafter, the "Representative Plaintiff" or "Plaintiff"), is a corporation incorporated pursuant to the laws of Alberta. The Plaintiff invested approximately U.S. $1,000,000 of its own money in the Investment Scheme (as described below). The Plaintiff brings this action on its own behalf and on behalf of all persons other than the Defendants who invested in any of the defendant corporations or who purchased investment products offered or promoted by any of the Defendants (Class Members)."

[190]    The Respondents in their submissions have identified various aspects of the evidence to say that they have addressed the issue. Much of it has already been identified, but the Court must restate the fact that the Respondents contend that they acted in good faith and also that they acted on the advice of an IT expert. However, as noted before, Mr. Coulthard has made it clear in his affidavit that he acted on instructions of the Receiver-Managers/Liquidators.

[191]    As regards the matter of the disposal of the hardware, the two experts differ; but both agree that it should be retained in certain circumstances. Mr. Kirby calls it a compelling legal reason while Mr. Kelman speaks of high-profile cases. The Court therefore concluded that given the nature of these proceedings with US $7 billion in investments and in excess of 27,000 investors, it will fall into either category.

[192]    The Court made no findings on the issue of the Blackberrys and the staff at the Montreal Office as Mr. Kirby made it clear that he did interrogate the staff prior to

---

[91] ADB5 at para 251

64

their departure and they all indicated that the devices they had were personal, but they had no Blackberrys.

### Rent

[193]  Part of the motivation to deleting data was stated or given as the need to stop paying rent for the Montreal Office.  But all of this is contradicted by the finding by the Court that the erasing was supposed to last no more than a further two days from 8 March, 2009, after which, by implication, the office would have been vacated.  But up to 27th March, 2009, it was still occupied.  Further, the evidence reveals that the sum of US $9,984,971 held in an SIB account at bank of Antigua was made available to the Receiver-Managers after certain deductions were made.  This left a sum in excess of US $2 ,747,451 and the rent owed at this time was in the vicinity of Can. $30,000.00. This is not to disregard other obligations.  In any event, further rent was owed at least up to 27th March, 2009.  The critical fact is that in the context of the availability of some funds, the payment of rent  was never a valid or genuine reason given to the importance of securing the computer data.  Even further, there were funds available to pay for the storage of the computer hardware.

### Liquidators acting outside their remit

[194]  This turns on the issue of a contemplated sale of computer hardware prior to their appointment as Liquidators.  The Court concluded such action did not arise as they had specific prescribed duties to perform within thirty days.

[195]  The submission by the Respondents is that such action is reasonable in the circumstances.   The Court disagrees as it amounts to anticipating a decision of the Court regarding the appointment of liquidators. And this is so even though no actual sale may have taken place.

### Disregard of the Canadian Jurisdiction

[196]   Essentially, this relates to the fact that the Receiver-Managers performed duties in Canada which is regulated by the Insolvency and Bankruptcy Act without the necessary recognition required thereunder.  This is admitted so that there is no contest in this regard.  A central part in this issue is the admission as that the discs containing the data/evidence was taken out of the jurisdiction, also without the permission of a Canadian court of Law.  And the fact that it was later return does not give rise to comfort as questions arise as to the content of the discs after they were returned.  Nor is this Court impressed by the fact that the discs were returned in a sealed packet.  What is more is that fact that the Liquidators deposed that they are experienced in cross-border liquidation.

### Efficiency/Inefficiency

[197]   There are two issues that point in this direction.  First, the matter of the erasing of the data that was supposed to last no more than a few days.  This point to the further issue that neither the Liquidators nor Mr. Coulthard had any idea as to the quantum of data stored.  The second relates to the latitude given to the IT expert.  In this regard, in his affidavit seeks to defend the hiring of an IT expert.  He deposes as follows[92]:

> "I do not profess to be a computer expert; nor does my joint liquidator, Mr. Wastell, and it is not for us to comment on these technical issues.  I will say however that I consider our actions in appointing an experienced and expert firm of IT consultants to have been entirely reasonable and I do not see how the making of such an appointment could form the basis of an allegation of misconduct."

[198]   The evidence is that in the 'technical matters' of erasing the remaining four computers, it was the Receiver-Managers who took the view that "the automatic process should be allowed to continue without my being present as it would have been likely to have taken a further two days after 9 March 2009 for the process to be completed, incurring unnecessary costs if I had stayed".[93]  In fact, after a further seventeen days, the erasing was only 76% complete.

---

[92] Core Bundle, Tab 28 at para. 24.
[93] Affidavit of James Coulthard, Core Bundle Tab 25 @ para. 46

66

[199] The question of efficiency is also alluded to by Mr. Allistair Kelman in a letter to Martin Kenny & Co. dated 19th January, 2010, when he said this: "While I can understand why Mr. Coulthard in the interest of efficiency imaged servers and computers simultaneously it is clear that such activities reduced his ability to supervise the imaging process and was established by one of the systems hanging for days during the imaging process.[94]"

### Litigation

[200] The Receiver-Managers/Liquidators have deposed that the US Receiver has opposed them at every turn. Yet they went ahead and sought an *ex parte* order from Registrar Flamand only to have it set outside at the same instance of the said US Receiver. The fact of the matter is that Janvey should have informed and joined as a party. At the bottom of all of this is the loss of US $20 million to the Antigua Estate.

### Support for retention or removal of the Liquidators

[201] The Court accepts Respondents contention[95] that over 2,200 creditors with a combined claim on the SIB estate totaling in excess of US $624 million support the Liquidators. This contrasts with those creditors who are in favour of the Application to remove the Liquidators claim just over US $69 million[96]

### Credibility of the liquidators

[202] This Court had determined that decisions rendered at the Superior Court of Quebec, and by extension that of the Quebec Court of Appeal are not binding.

[203] These decisions are not complimentary to the Liquidators. Rather, they are entirely negative with various conclusions and imputations.

---

[94] Core Bundle 11, Tab 21
[95] See: Revised Written Submission of the Liquidators at para. 156
[96] See affidavits of: D. Raul Ribeiro, Gina De Umana, Gina Maria Umana De Morales, Palma Giselle Tar Levay and Arnold B. Lacayo, all filed on November, 2009.

[204]    Without more, it is open to any Court or any party to any litigation in which SIB is a party to use these decisions to suit their objectives.

### Presence or absence of good faith

[205]    The principle of 'good faith' is at large and is used in a number of contexts especially in the context of civil law.  In the context, of bankruptcy, it has been held that 'in good faith' means "innocent of the knowledge and of the means of knowledge[97]."  In another context, it is said that a thing is done in good faith "where it is done honestly, whether regularly or not.[98]"    Also in **Black's Law Dictionary** 'good faith' is stated to be:

> "... an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage.  Honesty of intention and freedom from knowledge of the circumstances which ought to put the holder upon inquiry.  An honest intention to abstain from taking any unconscientious advantage of another, even though technicalities of law, together with absence of all information; notice or benefit of facts which render transaction unconscientious."

[206]    Also under section 75 (1) of the Registered Land Act of Antigua a charge in exercising his power of sale "shall act in good faith and have regard to the interests of the chargor..."[99]

[207]    Therefore, the question becomes whether the Liquidators can be said to be innocent of knowledge or to have acted honestly?  And can it be said that the Liquidators were imbued knowledge which would put them upon inquiry.

[208]    It has been deposed in a number of instances that certain things were done in good faith.  The matter of the legal advice relating to acting as Receiver-Managers in Canada without the necessary legal recognition under the Insolvency and Bankruptcy Act.  This legal issue is so basic that it hardly needs discussion.  But the fact of the matter is that the Receiver-Managers/Liquidators are not new to

---

[97] See: Stroud's Judicial Dictionary, vol. 2 (E-L) at page 1240
[98] Ibid
[99] In this regard see: Caribbean Banking Corporation and Alpheus Jacobs, HCVAP 2004/010 per Carrington JA (Ag.)

liquidation which they have made clear.  Further, they are licensed insolvency practitioners employed by Vantis Business Recovery Services.

[209]     In that foregoing context, can it be said that the Liquidators had no knowledge or acted honestly? When the later *ex parte* application is coupled with the stated opposition by the US Receiver, the motivation becomes clearer.  Accordingly, it is the Court's conclusion that there was an absence of good faith.

**Conclusion**

[210]     All that can be said at this point is that given the low threshold of the test of 'due cause' based on the principles enunciated in the cases, the Applicant has shown cause.  But whether or not it is sufficient to warrant the removal of the liquidators, must await further consideration of the evidence and the law.

ISSUE NO. 8

**Should the Liquidators be removed?**

[211]   Given the issue to be considered, the Court considers it necessary to re-state or give a summary of the law of removal.

[212]   It is common ground or settled law that a Liquidator may be removed by the Court as authorized by statute.  And the jurisprudence developed established several other principles including the following: removal for due cause (the operation test) is measured by reference to the real substantial, honest interest of the liquidation and the purpose for which the liquidation is appointed;[100] in the context of removal, it is not necessary for the applicant to show that the liquidator had failed to act in an efficient, vigorous and unbiased manner and was likely to continue to do so in the future,[101] it is not necessary to show misconduct or unfitness,[102] it is not necessary to prove everything in sight, it is not necessary to prove misfeasance as such or that there may well be a case of misfeasance,[103] a Liquidator may be removed if in all the circumstances it is desirable to do so,[104] and the Court should not likely remove its own officer and must pay due regard to the impact of such removal of his professional standing and reputation.[105]

[213]   In **AMP Music Box Enterprises Ltd v Hoffman**, Mr. Justice Neuburger (as he then was) gave this succinct summary of the law:

> "The Courts power to remove and replace a liquidator is derived from s. 108 (2) of the *Insolvency* Act 1986 which is pleasantly short.  'The Court may, on cause shown, remove a liquidator and appoint another.'  As a matter of ordinary principle and statutory representation, that seems to me to suggest as follows: (a) the court has a discretion whether or not to remove and replace the liquidators, (b) it will do so on good grounds, (c) it is up to the person seeking the order to establish those grounds, (d) whether good grounds are established will depend on the particular facts of a particular case, (e) in general it is inappropriate to lay down what facts will and what facts will not constitute sufficient grounds."

---

[100] See: Re Adam Eyton Limited, supra
[101] See: Re Buildlead (No. 2), supra
[102] See: Re Keypak Homecare Ltd, supra
[103] See: Re Shepheard v Lamey, supra
[104] See: Re Marselles Extension Railway and Land Co.[1867] LR 4 Eq 692.
[105] Re Edennote Ltd [1996] BCC 718

70

[214]    The Applicant then makes the following submissions to support its case that the

Respondent/Liquidators should be removed based on the legal principles.

*132. Applying the legal principles set out above, it is obvious that the Joint Liquidators can, and should, be removed:

a.    the Joint Liquidators' actions in destroying evidence and treating foreign office holders, courts and regulatory bodies with contempt is manifestly contrary to the test of acting in a manner which is "effective, vigorous and unbiased" set out in *SISU* and *Re Keypak*. There is no basis for this court to conclude that their conduct would suddenly improve in the future;

b.    the risk that foreign courts will refuse to recognize the liquidators also strongly suggests that they can no longer be "effective";

c.    this is an extreme case where the Joint Liquidators have not merely been inefficient, but rather they have offered contradictory evidence under oath and been disbelieved, their motives have been called into question and there has been a finding of bad faith;

d.    even allowing for the fact that a court will not remove its officer lightly (as stated in the *Re Edennote Ltd*) if a court is prepared to remove a liquidator where there is no misconduct (*as in Re Keypak*) then it is submitted that it must do so where there is a court judgment confirming, and/or strong evidence of, misconduct;

e.    as set out in Re Adam Eyton Ltd., cause is to be measured by reference to the purpose of the liquidation. The primary purpose of any liquidation is to make recoveries for the creditors. The loss of US $20 million out of the estate and substantial risk of the further loss of the $335 million in dispute between the Joint Liquidators and Janvey directly contradictory to this primary purpose of making recoveries. The incurring of further costs by the Joint Liquidators is also contrary to the making of recoveries;

f.    the factual findings of the Canadian Court (and indeed the underlying evidence) plainly meet the threshold test (set out in Shepheard) that there "may well" be a case of misfeasance. This threshold is not a high one to surmount;

g.    in light of the Joint Liquidators' actions it is reasonable for the creditors to have, and indeed have, lost confidence (as considered relevant in *Re Edennote Ltd*). *Re A.M.F. International* indicates that this is sufficient by itself for removal;

h.    further, the criticisms are numerous, rather than being one or two isolated instances, and go to the very root of the tasks which should be pursued by a liquidator, namely making recoveries, co-operating with foreign agencies, and recovering evidence for potential future criminal or civil claims;

i.    the liquidators' actions in Canada are akin to the test set out in re Edennote Ltd, namely of actions "so utterly unreasonable and absurd that no reasonable man would have done it."'

j.    a considerable number of creditors support removal, as considered relevant in *Re Keypak* at p563; and,

k.    it is very unlikely that removal would involve greater costs. Indeed, it is more likely to save money. As the table of Mr. Wide's fees demonstrates (see the Affidavit of Mr. Blackburn at paragraph 95), Mr. Wide and PWC's rates are lower than those of Vantis. Further, Mr. Wide's access to localised staff,

71

particularly in the Caribbean, through PWC's global offices, will save money due to lower localized staff rates (than the U.K.) and reduced travel costs."

[215]   The Respondents in their submissions accept that the Court has the authority to remove a Liquidator; but do not accept that in all the circumstances it should exercise its power to do so.  It is further contended that in the exercise of its powers, the Court should be guided by certain propositions enunciated by Mr. Justice Neuberger in **AMP Music Box Enterprises Ltd v Hoffman.**[106]

   i)    "The Court has a discretion whether or not to remove and replace the liquidator;
   ii)   It will do so on good grounds;
   iii)  It is up to the person seeking the order to establish those grounds;
   iv)  Whether good grounds are established will depend on the particular facts of a particular case in and;
   v)   In general it is inappropriate to lay down what facts will and what facts will not constitute sufficient grounds."

[216]   Reference is also made to the case of **Re Buildlead (No.2)** [107] and certain dicta of Mr. Justice Ehterton as to the focus of the law of removal.

[217]   The submissions continue thus:

154. Once a liquidation has been conducted for some time, no doubt there can almost always be criticism of the conduct of the liquidator but it is all too easy for an insolvency practitioner, who has not been involved in a particular liquidation, to say, with the benefit of the wisdom of hindsight, how he could have done better.  It is plainly undesirable to encourage an application to remove a liquidator on such grounds.

155. In almost any case where the court orders a liquidator to stand down, and replaces him with another liquidator, there will be undesirable consequences:
   i)    in terms of costs; and
   ii)   in terms of delay. [AMP at 10001H-1002A]]

156. The Court will take into account the views of creditors, including the loss in confidence of creditors in the liquidator, to the extent that the loss of confidence is reasonable. [Re Edennote Ltd [1996] BCC 718 ("Edennote") at 725G-H) The Liquidators are supported in opposing the Fundora application for their removal by over 2,200 creditors with a combined claim in the estate of SIB totaling in excess of US $ 624 million.  This support was given in knowledge of the Canadian judgment (see affidavits of Mr. Snyder and Gomar).

157. The Court does not lightly remove its own officer and will, amongst other considerations, pay and due regard to the impact of his professional standing and reputation. [Edennote at 725H; Nam Tai Electronics Inc v David Hague and Tele Art Inc Suit no 21 of 2000].

---

[106] [2002] BCC 996 at 1000G-H
[107] Loc cit

72

158. Where the liquidator makes a serious mistake, but he does so acting under advice and honestly such that his integrity and good faith are accepted, it would be wrong to remove him. As Etherton J concluded, in Buildlead (at paragraph 165, with reference to AMP):

"Neuberger J himself emphasized (at para [21]) that it is in appropriate to lay down what facts will and what facts will not constitute sufficient grounds for removal under s.108(2). In that case, he made helpful and practical comments that it should not be seen to be easy to remove a liquidator merely because it can be shown that in one or more respects his conduct has fallen short of the ideal, and it is necessary to bear in mind the expense and disruption of a substitute appointment. Similarly, as I have already said, Nourse LJ in Edennote (at p.398) observed that the creditors' lack of confidence in the liquidator must be reasonable, and the court will pay due regard to the impact of removal on the liquidator's professional standing and reputation. <u>Factors such as those might, taking into account all the circumstances, warrant a refusal to remove a liquidator even where there are reasonable criticisms that can be made of the liquidator's conduct of the liquidation.</u> (Emphasis added.)

159. It is against the backdrop of those authorities and guidance which this Application is to be determined."

[218]   The following are further submissions on behalf of the Respondents:

"160. It is submitted that a consideration of the evidence does not yield any indication of wrongdoing by the Liquidators as alleged. To the contrary the evidence establishes that

    i)    The Liquidators acted lawfully and/or reasonably in imaging and deleting data on the computers at the SIB Montreal office;

    ii)    The Respondents did not act outside their remit as Receiver-Managers and, acting in the best interests of the liquidation, had acted in contemplation of the sale of assets in the eventual liquidation; and

    iii)    The Respondents did not disregard the Canadian jurisdiction and in fact at all times acted in consultation with legal advisors.

161. When considering the factors to be taken into account, it is clear that:

    i)    The Liquidators have been efficient, vigorous and unbiased in their conduct of the liquidation of SIB, as evidenced by the affidavits of Mr. Nigel Hamilton-Smith's and their reports filed in court;

    ii)    The Court can be confident that the Liquidators will live up to the standards expected of them in the future (paragraph 67 of Mr. Hamilton-Smith's affidavit);

    iii)    The Liquidators have been effective and honest (see the affidavits of Mr. Hamilton-Smith); and

    iv)    Even if the Court were to find that the Liquidators' conduct had fallen short of the ideal, it is not sufficient to justify their removal and such a finding would be disproportionate.

### The balancing exercise

[219]   Mr. Justice Neuburger has made the very learned proposition that in the end in the context of the application to remove a liquidator, the Court must perform 'a difficult balancing exercise.'[108] That exercise must now begin.

[220]   The Court has no difficulty with the Respondents' contention as to the manner in which a Liquidator is expected to act. This is in abstract terms. But in concrete terms to say[109] that the Liquidators acted lawfully in imaging data, did not outside of their remit as Receiver-Managers and did not disregard the Canadian jurisdiction and in fact acted on advice at all times, creates an imbalance.

[221]   In reality, the Court found as a fact that they did exactly the opposite with respect to the matters mentioned above and more.   And there is acknowledgement that for example, they acted unlawfully in the Canadian jurisdiction.   It is also accepted by the Respondents that they acted improperly (at least) in sending the discs containing the SIB data outside of Canada. Their consolation is that it was later returned in a sealed packet.

[222]   On the other hand, the authorities generally, including those cited by the Applicant, show a clear preference, as they must, for honesty, acting good faith and actions that are in the interest of creditors. Indeed, the case of **Ince Hall Rolling Mills Co. Ltd. v Douglas Fonge Co.,** [110]from ancient times established quite clearly that the distribution of assets to creditors was "the primary purpose of the liquidation."

[223]   In this context, three cases in particular stand in contrast. They are: **AMP Music Box Enterprises Ltd v Hoffman, Re Keypak Home Care Ltd** and **Re Buildlead (No. 2)**.   In the former, the liquidator was not removed, but in the latter two

---

[108] See: AMP Enterprises v Hoffman, loc cit at para. 23
[109] See: Revised written Submissions of the Liquidators at para. 160.
[110] [1882] 8 QBD 179,184

74

removals were ordered.  The reasoning of the Court in all instances has    some positive benefits in the balancing exercise.

[224]    In **AMP Music Box**, Mr. Justice Neuburger reasoned his non-removal in this way:

> "In my view there are three complaints against the respondents – two specific and one more general – which merit consideration.  The first relates to Rolled Gold, the second to Cavern, and the third to the vigor in pursuing matters more generally.
>
> As to Rolled Gold there are two points.  The first is that, although there have been attempts to chase up Rolled Gold as recorded by Mr. Lawler, what is not clear is when they were made, how strongly they were pursued, what steps have been taken to shake them into giving an answer.  There is a real possibility that there has been a rather more casual, less vigorous, attitude than one would expect.
>
> Secondly, there is Mr. Hoffman's extraordinary statement, describing the complaint as 'bizarre', because Rolled Gold would be a bigger claimant in the liquidation if it had not received a preference.  Either that is frivolous or it shows a worrying lack of understanding of the pari passu principle.  The general body of creditors would clearly be better off with the money available for distribution among all of them, including Rolled Gold, pari passu, rather than being paid exclusively to Rolled Gold, where the money lies at the moment.
>
> So far as Cavern is concerned, there have been some investigations, as evidenced by Mr. Howell and by Mr. Lawler.  At the moment, at least, however, I have some concern about the assignment to Cavern by Fast Forward.  It seems to me that the fact that it is undated, its unexplained origin, and the normal consideration do raise questions which are worthy of investigation.  It is an agreement which I would have thought should have been looked into more fully.  It is fair to say, however, that the existence of the alleged debt to Fast Forward is pretty reasonably substantiated on the evidence.
>
> The third point is general lack of vigour, in the sense that there are a number of references in Mr.  Hoffman's affidavit, and in Mr. Lawler's report, to going to the creditors to obtain funds for further research and investigations, but nothing in that connection appears to have been done.
>
> Those, then, to my mind are the three concerns which should exist after the respondents' conduct  of the liquidation.
>
> **Conclusion**
>
> The question which has to be considered is whether those three concerns in the context of this case justify the removal of the respondents as liquidators and their replacement by Mr. Swaden, who nobody has criticized an inappropriate liquidator if there is to be a replacement.
>
> I have come to the conclusion that I should not order the removal and replacement of the respondents on the facts of this case.  First, this is not a case where the liquidators have done nothing, or virtually nothing.  In the light of the evidence of Mr. Hoffman and the report to Mr. Lawler, it is clear they have done quite a lot.  Secondly, this is not a case where it can be fairly suggested that the liquidators have been biased or lacking in independence, or where there could be a reasonable perception to that effect.  Thirdly, I accept that there are criticisms that can be made of the liquidators.  They should have pushed rolled Gold harder, they should have investigated Cavern's claim in the light of

75

the rather extraordinary assignment which appears to me to call for further questions, and they should have been more active in seeking funding from the creditors to investigate and pursue the aspects mentioned by Mr. Lawler. However, they have not had a great deal of time to deal with matters. They were appointed on 12 April and this application was made on 21 June. It is perfectly true that they have continued to be the liquidators for the five weeks since 21 June, and that their duties have continued, notwithstanding the risk of their replacement. However, they have had to concentrate on dealing with this application. Further, they may have been concerned as to whether they would have been able to recover all their costs, expenses and charges in relation to their work since 21 June. However that should not have been a major concern, in my view.

I think the application has been reasonably made, in the sense that there are legitimate concerns, but, at least on the on the facts and allegations in this case, I am ultimately concerned, not with the past, but with the future. If the liquidators were or even might be reasonably perceived to be biased, unprofessional, or criticisable to the extent established in Keypak, it would be different. However, while there have been failings by the liquidators which might be said to render the applicants' concern not unreasonable, it would be unfair on the liquidators, and much more importantly, unnecessary for the creditors' and company's interests, as well as, unnecessarily expensive and disruptive, if I were to remove the respondents. They have not helped themselves with Mr. Hoffman's (to my mind) silly remark about the Rolled Gold preference, but it would be harsh and disproportionate if I let that factor tip the balance in favour of replacing the liquidators, if I otherwise thought it right not to do so."

[225]   In **Re Keypak Homecare Ltd** Mr. Justice Millett in granting the application to replace the liquidator said this:[111]

"In the present case I approach the matter in this way. There is nothing that can be said against Mr. Edgar so far as his personal integrity concerned. There is no evidence of any misconduct or wrong doing on his part, or of his intimacy or friendship with the directors of the company at all. He is a professional independent and experienced liquidator. But I am not impressed by his performance in the conduct of this liquidation. I take the view that his experience, gained in times when liquidators were accustomed to directors simply removing the stock before liquidation and then paying for them afterwards at forced sale values, has stood him in ill stead. As a result, he has adopted a relaxed and complacent attitude to such conduct, and in my judgment the creditors, who were outraged by what they believed had happened, were perfectly reasonable in the view that Mr. Edgar was not likely to pursue the directors with anything like sufficient vigour. If that was the view they adopted at the meeting, then it has been amply confirmed by all that has taken place since. I, too, take the view that Mr. Edgar is unlikely to pursue the directors with anything like sufficient vigour.

Mr. Edgar may well have a justified feeling that he is being treated a little like Admiral Byng, and that he is being removed from office 'in order to encourage the others.' I do not shrink from that. In an insolvency the stock is not there to be taken by the outgoing directors and traded with for weeks before the commencement of the liquidation and then simply paid for at an artificially low forced sale valuation; and the sooner that liquidators recognize that the better.

In circumstances such as the present, the creditors are entitled to expect either the suspicious matters to be cleared up very shortly after the creditors' meeting, or

---

[111] Loc cit at page 416-417

proceedings to be commenced against the former directors with speed and pursued with vigour. A liquidator who can see from the statement of affairs that there are likely to be insufficient assets to enable him to discharge his duties ought to make the positions clear at the meeting of creditors and insist on being authorized by those present at the meeting of creditors and insist on being authorized by those present at the meeting to take such steps as may be necessary. But simply to stand back and do nothing and then claim that that is justified by the lack of finance is not, in my judgment, good enough.

So for the reasons I have given I propose to remove Mr. Edgar and appoint Mr. Hughes."

[226]   In **Re Buildlead Ltd (No. 2)** in ordering the removal of the Liquidator extracts from the reasoning of Mr. Justice Etherton are as follows:

"156. The burden is on the applicant to show a good cause for removal of a liquidator, but it is well established that the statutory provision confers a wide discretion on the court which is not dependant on the proof of particular breaches of duty by the liquidator. The court's approach is well illustrated by the following judicial statements from a small selection of the authorities.

170. The conduct of Buildlead's liquidation by the liquidators has been unsatisfactory and inappropriate in the respects which I describe in the following paragraphs of this section of my judgment. By reason of that conduct, the understandable consequent loss of confidence of Quickson in the professional judgment of the liquidators, and for the other reasons which I mention below, I consider that the best interests of Buildlead's liquidation are served by the removal of the liquidators, and that they should therefore be removed."

[227]   In summary, then, in **AMP Music Box** the Court accepted that the Liquidators did wrong but they were not found to be biased, unprofessional or criticisable to the extent in *Keypak*, which would have made a difference. However, in *Keypak* the problem the Liquidators had was lack of sufficient vigour in pursuing their duties.

[228]   The lack of vigour in *Keypak* encompassed the following:

   1) No examination of the sales and purchase ledgers.

   2) Failure to investigate whether stock was missing.

   3) No inquiries made of NB Ltd.

   4) No interview of employees of the company to determine exactly what happened in the weeks before the company ceased to trade.

[229]   In none of these key cases, did the question of honesty or questionable integrity arise. And the Liquidator in Keypak may be placed under the rubric of failure to

act in the best interest of creditors as he is mandated by law to do. Now, what of the Joint Liquidators in this instance?

**The Result**

[230]   For present purposes, the balancing all must embrace the following: the issues against the Liquidators, the issues in favour of the Liquidators.

[231]   It has already been determined that the Liquidators violated the Laws of Canada (which they have acknowledge), they also destroyed computer data thereby creating actual or potential legal problems of investors especially those resident in Canada, removed evidence from to SIB without authorization from a Canadian Court. This Court has also determined that they did not act in good faith in the instances in which they claimed to have done so, gave false or misleading statements about rent and distress by the landlord of SIB's rented premises in Montreal, they were inefficient in some respects, generated litigation unnecessarily and acted outside of their remit as Receiver- Managers.

[232]   Against the foregoing, the Liquidators have in their favour the fact that they did do work on the liquidation and the 2200 creditors with US $614 million invested and who opposed the application. Also in their favour, is the finding that to some extent  they did co-operate with AMF. The phrase, to some extent, is used because AMF's real desire was to obtain the list of Canadian investors. And although the Liquidators were constrained by the order of the Antigua High Court, it is the view of this Court that they could have used their 'good offices' to assist given the context. AMF's concern seemed to be a point of reference for the Canadian creditors.

[233]   Also in the equation, is the final status of the assets recovered or identified so far.

[234]   There are also what may be termed the neutral factors, such disruption, and increased expenditure in the event of a removal.

78

[235]   When the factors or the issues in **Keypak** and **Buildlead (No. 2)** are matched with those in this instance, there is really no serious comparison.  In brief, the Liquidator in Keypak was because he did not pursue his duties with vigour.  And in **Buildlead (No. 2)**, the problem was the manner in which the Liquidators conducted their investigation into the issues of inter-company balances and the actions they took in consequence of those inquiries were inappropriate and likely to give rise to a reasonable loss of confidence by the subsidiary company and its directors.

[236]   The Respondents have sought to remind the Court of the following:

> "153. The following considerations are to be taken into account as part of the balancing exercise  referred to in the authorities:
>  i)     A liquidator is expected to be efficient, vigorous and unbiased in his conduct of the liquidation.
>  ii)    If the liquidator fails to live up to those requirements, the Court will consider whether it can be reasonably confident that he will live up to those requirements in the future.
>  iii)   If a liquidator has been generally effective and honest, the court must think carefully before deciding to remove him and replace him.
>  iv)    It should not be seen to be easy to remove a liquidator merely because it can be shown that in one, or possibly more than one, respect his conduct has fallen short of ideal.
>  v)     The court should not encourage applications to remove liquidators by creditors who have not had their preferred liquidator appointed or who are for some other reason disgruntled."

[237]   These submissions are obviously based on the exciting jurisprudence where the turbulence is mild and where there is no disregard of the laws of a country or the destruction of evidence relating to the very liquidation.  Indeed, this Court does not consider that the Liquidators are efficient and vigorous, and is not reasonably confident that they will live up to the requirements in the future.  Further, there is a manifest proclivity for illegality.  Nor can it be said that they have been effective and honest.  Their conduct has fallen short in several instances rather than once or twice.  Their conduct in Canada is of their own making and as such they must bear the professional consequences if and when they arise.  Further still, even though this Court has indicated that it is not bound by the Canadian decisions,

another Court in one of the countries in which SIB may have investments may say otherwise.  These decisions are not complementary to the Liquidators.

[238]    In the final analysis, the positive issues cannot assist the Liquidators.  In other words, the 2200 creditors together with their high level of investments have been considered by the Court.

### Analysis and Conclusion

[239]    It has been shown above that it is prerequisite that before the Court can exercise any of its wide powers under section 304 of the IBC Act including the replacing of a Liquidator.

[240]    The prerequisite is that the Court must be satisfied that the corporation is able to pay or adequately provide for the discharge of all of its obligations.  These would include the payments to the creditors, the liquidation fees, fees for legal advice and legal representation and other connected expenses.

[241]    Based on the accounting evidence before the Court, it is clear that the liquidation have identified approximately $1 billion dollars in the assets of SIB.  Or as they put it, there is a shortfall of $6 billion in the creditors' investment, based on the Liquidators reports and the evidence of Ms. Karyl Van Tassel.

[242]    In this regard, the Court takes the view that this liquidation is multijurisdictional involving some 113 countries and the liquidation has been in progress for just over one year.  Beyond that, it does not appear that the $1 billion does not include real estate held by SIB.

[243]    In all the circumstances and having regard to the evidence available, the Court is satisfied that SIB would be able to adequately provide for the discharge of all of its obligations.  In reality, in any liquidation the expenses incurred must come from the creditors investments or the total assets so that adequate must be construed in

that context. Adequate must mean as much as possible in that context. Adequate does not mean fully in this context.

[244]   The other prerequisite is the matter of good cause shown by the Applicant. This, as the Court has concluded, has been done. This is constituted by the destruction or erasing of data, misleading statements about rent, the guise of protecting creditors' interest, inefficiency, acting outside of their remit as Receiver-Managers, generating liquidation and other issues.

### Conclusion

[245]   The Court has taken into account the state of the SIB estate, the issues for and against the Liquidators, the likelihood of disruption and an initial increase in expenditure in the event of a removal, the likely impact of removal on the professional status of the Liquidators and has come to the conclusion that it is appropriate that they should be removed. The Court places reliance especially on this dictum of Mr. Justice Etherton in **Re Buildlead Ltd (No.2)** when he said: "...It is quite clear from the entire time of authority stretching back to 1867 that, in appropriate circumstances, there may be good cause to remove a liquidator, notwithstanding the failure of the applicant to prove misfeasance as such, even though no reasonable criticism can be made of his conduct." In the final analysis, the Court considers that, notwithstanding the disruption and initial additional expenditure coupled with the rule that the Court should be slow in removing its officers, the liquidators, Mr. Nigel Hamilton-Smith and Mr. Peter Wastell should be removed. Further, in making the order the Court does not consider harsh and disproportionate.

**ISSUE NO. 9**

**Who should replace the present Liquidators?**

[246]   The Applicant is seeking to have Mr. Marcus Wide of Price Waterhouse Coopers LLP, Canada replace the present Liquidators.  In this regard, there is much documents on Mr. Wide's qualification and experience.  But it is common ground that Mr. Wide was previously named in an application[112]  to be appointed as Liquidator instead of those who now hold the office.

[247]   When the two applications are combined, they give the semblance or the reality that Mr. Marcus Wide is the Applicant's preferred Liquidator.  For this there is a prohibition.

[248]   In the circumstances, the Court must adhere to that rule that says that a creditor should not have his preferred Liquidator appointed.[113]  The reality is that this is the second occasion on which Mr. Wide's name is before this Court in these SIB proceedings.  This point is fully embraced and ventilated by the Respondents.[114]

[249]   In the circumstances, it is the determination of the Court that Mr. Marcus Wide's name should be re-submitted by the Applicant with at least two other qualified and experienced insolvency practitioners in order that a further determination may be made as to the replacement.  This must be done within thirty days of the date of this order.

---

[112] ANUHCV No. 2009/0149
[113] Per Neuberger J in AMP Music Box Enterprises v Hoffman [2002] BCC 996, 1001 H
[114] See Revised Written Submissions of the Liquidators at paras. 7-154

**ORDER**

**It is hereby ordered and declared** as follows:

1. This Court is not bound by the findings of fact or otherwise of the Superior Court of Quebec and the Quebec Court of Appeal as they related to these proceedings.

2. The actions of the Liquidators with respect to the erasing of data on the computer hardware was not in accordance with standard forensic practice as such they acted inappropriately.

3. The Receiver-Managers exceeded their remit by making preparation for the sale of the assets of SIB and by deleting data from the computers.

4. The Receiver-Managers/Liquidators disregarded the jurisdiction of the Canadian courts by undertaking actions with respect of SIB otherwise than in accordance with the Bankruptcy and Insolvency Act and removed computer data relating to SIB without the permission of the Courts in Canada.

5. The Court is not bound by UNCITRAL model insolvency laws.

6. The Applicant has standing to make the application for the removal of the Liquidators and the legal test for such removal is due cause.

7. The Applicant has shown due cause based on the legal principles enunciated by the courts.

8. After a consideration of all the circumstances and the law, the Court considers it appropriate that the Liquidators should be removed.

83

9. Mr. Marcus Wide is or has the semblance of the Applicant's preferred liquidator which is prohibited by law. Accordingly, the Applicant must within thirty days of the date of this order re-submit to the Court the names of Marcus Wide together with at least two other suitably qualified and experienced insolvency practitioners in order that a further determination may be made as to the replacement.

10. The present Liquidators of SIB will continue to conduct the liquidation in the interest of all the creditors until such time as the replacement is appointed by this Court.

11. The Applicant is entitled to his costs to be assessed under Part 65.11 of CPR 2000, if not agreed. Such assessment must take place at the end of these proceedings.

**Appreciation**

This has been a long and detailed process, or, as one affiant described it, "long, voluminous and repetitive."[115] In all the circumstances, the Court wishes to place on record its deep appreciation for all the assistance provided by Learned Senior Counsel and Junior Counsel on both sides.

Errol L. Thomas
Judge (Ag.)

---

[115] Affidavit of Geoffrey Paul Rowley In Response To The Application Of Urgency being Exhibit "NJHS1" To The Affidavit Of Nigel John Hamilton-Smith

## EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 03:09-CV-0298-N** |
| **STANFORD INTERNATIONAL BANK, LTD.,** *et al.* | § § § | |
| **Defendants.** | § | |

**AGREED MOTION FOR STAY OF PROCEEDINGS RELATED TO AGREED
MOTION FOR APPROVAL OF STIPULATION OF SETTLMENT**

Nigel Hamilton-Smith and Peter Wastell (collectively, "Liquidators"), Receiver Ralph Janvey, the SEC, and the Examiner, through their respective counsel, respectfully submit this Agreed Motion for Stay of the Proceedings Related to the Agreed Motion for Approval of Stipulation of Settlement (the "Agreed Motion"). The parties believe that a stay is necessary given recent activity in Antigua related to the status of the Liquidators.

The Agreed Motion for Approval of Stipulation of Settlement (the "Settlement Motion") (Docket No. 1086) was filed on May 19, 2010 and one objection was filed on June 9, 2010 (Docket No. 1094). The time period to respond to this objection has not passed.

On June 8, 2010, the Antiguan Court that appointed Liquidators ruled on a motion filed by a creditor (the "Removal Motion") to have Liquidators removed from their position as liquidators, and ordered that Liquidators be replaced by a new liquidator (the "Removal Order"). Liquidators are in the process of seeking a stay of the Removal Order pending an anticipated appeal of the Removal Order. Pursuant to the Removal Order, Liquidators remain in office until such time as the Antiguan Court appoints a new liquidator.

Liquidators have filed a Notice of the Removal Order in the Chapter 15 Action pending before this Court (Case No. 3-09CV0721-N).  A copy of that Notice is attached hereto as Exhibit A.

Liquidators, the Receiver, the SEC and the Examiner agree that, given the Removal Order, a stay of the Settlement Motion is in the best interests of the investors and creditors.  The parties are currently unable to predict how long a stay will be necessary but believe that the stay should be in place until either (a) the anticipated appeal in Antigua is resolved or (b) a new liquidator is appointed and has had sufficient time to consider the Settlement Motion.  The parties will update the Court regarding the status of the proceedings in Antigua, including any stay, appeal or appointment of a new liquidator.

Because the requested stay would also defer the time period to respond to the one objection to the Settlement Motion, counsel for the party that filed an objection to the Settlement Motion was consulted regarding this Agreed Motion, and does not oppose this Agreed Motion.

The parties respectfully move the Court to enter the accompanying Order.

Dated: June 18, 2010.                 Respectfully submitted,


                                      _____/s/ Weston C. Loegering_____
                                      Weston C. Loegering
                                      State Bar No. 12481550
                                      Gregory M. Gordon
                                      State Bar No. 08435300
                                      Craig F. Simon
                                      State Bar No. 00784968
                                      Greg Weselka
                                      State Bar No. 00788644
                                      Daniel P. Winikka
                                      State Bar No. 00794873
                                      JONES DAY
                                      2727 N. Harwood St.
                                      Dallas, Texas 75201
                                      Telephone:  (214) 220-3939
                                      Facsimile:   (214) 969-5100

                                      Attorneys for Nigel Hamilton-Smith and
                                      Peter Wastell as Liquidators of Stanford
                                      International Bank, Ltd.

BAKER BOTTS L.L.P.

_____/s/ Kevin Sadler_____

Kevin Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

ATTORNEYS FOR RECEIVER
RALPH S. JANVEY

_____/s/ David B. Reece_____

Stephen J. Korotash
Oklahoma Bar No. 5102
J. Kevin Edmunson
Texas Bar No. 24044020
David B. Reece
Texas Bar No. 24202810
Michael D. King
Texas Bar No. 24032634
D. Thomas Keltner
Texas Bar No. 24007474
U.S. Securities & Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Ft. Worth, Texas 76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)

ATTORNEYS FOR U.S. SECURITIES &
EXCHANGE COMMISSION

_____/s/ John J. Little_____

John J. Little
Texas Bar No. 12424230
LITTLE PEDERSON FANKHAUSER
L.L.P.
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573-2300
(214) 573-2323 (facsimile)

THE EXAMINER

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_____/s/ Greg Weselka_____

**EXHIBIT C**



Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

# DÉCISION

## de l'Autorité fédérale de surveillance des marchés financiers FINMA

## du 8 juin 2010

dans la cause

## Stanford International Bank (in liquidation)
### 44 Church Street, P.O. Box 2010, St. John's, Antigua, Antigua et Barbuda

concernant

## La reconnaissance d'une mesure de faillite prononcée à l'étranger / ouverture de la faillite ancillaire

à la requête de

**Ralph Steven Janvey**, c/o Krage and Janvey LLP, 2100 Ross Avenue, Suite 2600 Dallas, TX 75201, Etats-Unis, représenté avec élection de domicile dans son Etude par Me Birgit Sambeth Glasner, Etude Altenburger, 11 bis rue Rodolphe-Toepffer, 1206 Genève

et

**Nigel John Hamilton-Smith et Peter Nicholas Wastell**, domicilié c/o Vantis Plc, London West End Office, 66 Wigmore Street, Londres, Royaume-Uni, représentés avec élection de domicile en son Etude par Me Nicolas Pierard, Borel & Barbey, 2, rue de Jargonnant, case postale 6045, 1211 Genève 6

Einsteinstrasse 2, 3003 Berne
Tél. +41 (0)31 327 91 00, Fax +41 (0)31 327 91 01
www.finma.ch

110630/A25490



## En fait

### A. Introduction

(1)  L'Autorité fédérale de surveillance des marchés financiers FINMA a été saisie en date des 19 mai et 28 mai 2009, de deux requêtes en reconnaissance de faillite étrangère portant sur l'établissement Stanford International Bank Limited (in liquidation) (ci-après « SIB »), dont l'actionnaire unique est Robert Allen Stanford.

(2)  La première requête a été déposée par Ralph S. Janvey, appointé *receiver* de SIB par les autorités américaines (ci-après le « receiver Janvey ») et la deuxième par Peter Wastell et John Hamilton-Smith, appointés liquidateurs de SIB par les autorités d'Antigua et Barbuda (ci-après les « liquidateurs Wastell et Hamilton-Smith »).

(3)  Il ressort du dossier remis à la FINMA les faits suivants, les allégués des parties étant repris dans la mesure du nécessaire.

### B. Robert Allen Stanford et le groupe Stanford

(4)  Robert Allen Stanford, né le 24 mars 1950, est citoyen américain et citoyen d'Antigua et Barbuda (dossier 159860 Série B, p. B201 ; ci-après « p. B201). Son lieu de domiciliation n'a pu être clairement établi dans le cadre de la présente procédure, mais il ressort du dossier qu'il partageait son temps principalement aux Iles Vierges Américaines, à Ste. Croix et dans sa résidence d'Antigua. Robert Allen Stanford n'aurait plus vécu aux Etats-Unis depuis une quinzaine d'années (p. B192 [44]), bien qu'il ait été arrêté sur sol américain, en Virginie, en date du 18 juin 2009. A ce jour, il demeure en détention avant jugement (p. B191).

(5)  Robert Allen Stanford était à la tête d'un groupe comptant environ une centaine d'unités qu'il contrôlait directement et indirectement (ci-après le « Groupe Stanford ») (p. 309). Le Groupe Stanford était actif dans 13 états américains, au Canada et une dizaine de pays en Europe et en Amérique du Sud (p. 688). Il offrait une large palette de services financiers et bancaires, y compris le négoce de valeurs mobilières et de métaux précieux, la mise en place de *trusts*, l'émission de produits financiers et des investissements de *private equity* (p. 687). Le Groupe Stanford avait aussi investi dans l'immobilier, ainsi que dans diverses autres industries, telle que l'hôtellerie (p. 686). Il employait environ 3000 personnes, dont un peu moins de la moitié aux Etats-Unis (p. 677).

(6)  Selon les éléments non contestés figurant au dossier, dont la presse internationale s'est largement fait l'écho, il est apparu qu'en réalité, Robert Allen Stanford, au travers du Groupe Stanford, était à l'origine d'une vaste escroquerie de type « boule de neige » portant sur environ 7 milliards de dollars au préjudice de nombreux investisseurs (p. 3339 et p. B132).

(7)  C'est le soupçon de la mise en place de ce vaste *Ponzi scheme* qui a, du reste, conduit la U.S. Securities and Exchange Commission à solliciter des tribunaux américains diverses mesures à l'encontre des sociétés composant le Groupe Stanford (p. 783 à 808), dont SIB. Parallèlement, les autorités compétentes américaines ont également entamé des démarches pénales et ordonné l'inculpation et l'arrestation de Robert Allen Stanford, de ses plus proches collaborateurs et du chef de l'autorité de régulation d'Antigua et Barbuda, Leroy King (p. 1343 à 1372). Selon la presse internationale, Leroy King a été arrêté à Antigua et demeure aujourd'hui en détention en vue d'extradition (dossier 159860, Série C p. 57; ci-après p. C57).



## C. Stanford International Bank Limited (in liquidation)

(8) Selon le receiver Janvey, SIB n'aurait eu d'autres buts et activités que de servir de véhicule et de moyen à Robert Allen Stanford pour mieux opérer son escroquerie gigantesque. SIB, bien que formellement domiciliée à Antigua et Barbuda, était de fait administrée aux Etats-Unis et ne pratiquait aucune activité dans l'Etat de son siège d'incorporation. Ses services bancaires étaient vendus par des entités sises aux Etats-Unis et ses revenus, immédiatement ventilés vers d'autres juridictions qu'Antigua et Barbuda. Pour le receiver Janvey, SIB n'était qu'une façade destinée à mettre en confiance les investisseurs pour mieux les voler. SIB aurait son siège effectif aux Etats-Unis (p. 525 [14 à 22] et p. 139 [31 à 50]).

(9) Ces affirmations sont contestées par les liquidateurs nommés par la juridiction d'Antigua et Barbuda qui expliquent, en substance, que des prestations bancaires étaient bien offertes depuis Antigua et Barbuda, lieu où les relations clientèle étaient créées, documentées et assurées (p. B [131]). SIB comptait ainsi pas moins de 80 collaborateurs à Antigua, (p. B252 [80], qui traitaient, comptabilisaient et conservaient les transactions effectuées par SIB. Les relevés de compte de tous les clients étaient préparés et envoyés depuis Antigua et Barbuda (p. 248 [105]).

(10) <u>Incorporation et activités</u>. SIB a été incorporée à Antigua en date du 7 décembre 1990 (p. B159) sous la raison sociale Guardian International Bank Limited (p. B157) avant de changer de nom en Stanford International Bank Limited le 20 décembre 1994 (p. B160). Selon certificat de licence et en application du droit d'Antigua, SIB était autorisée à mener des activités dite d'« *international banking* » (p. B157). A ce titre, SIB pouvait accepter des dépôts du public (p. B112 [7]), mais uniquement de résidents étrangers à Antigua et Barbuda et en monnaie étrangère à celles de la Caricom (*Caribbean Community*) (p. 1340 et p. B536). SIB était soumise à la surveillance de la Commission de supervision des services financiers d'Antigua et Barbuda (*Financial Services Regulatory Commission of Antigua and Barbuda*), dont le principal directeur, le prénommé Leroy King en charge de SIB, est soupçonné d'avoir été le complice de Robert Allen Stanford (p. 1362 et 1363).

(11) En sa qualité de banque licenciée à Antigua et Barbuda, SIB était autorisée à accepter des dépôts du public, dans les limites explicitées ci-dessus. Ainsi, elle émettait et vendait des certificats de dépôt portant intérêts (p. B375 à B386), offrait des comptes à vue (entre 24 heures et 15 jours ; p. B383), ainsi qu'un service de cartes de crédit (p. B357 et B358). SIB octroyait aussi des prêts et émettait des lettres de crédit (p. 353 à 356). Ces services n'étaient toutefois pas disponibles aux résidents antiguais.

(12) <u>Personnel et tâches</u>. SIB employait environ 93 personnes, dont 88 actifs à Antigua et le reste au Canada œuvrant au sein d'un bureau de représentation (p. B494 et B495 ; p. 843 à 848) pour une masse salariale de USD 3 mios. Dans le même temps, SIB a versé à d'autres entités du Groupe Stanford, la somme de 268 mios. à titre d'honoraires (p. 128 [38]).

(13) Les employés de SIB à Antigua disposaient de manuels, de procédures et instructions précises s'agissant de l'exécution de leurs tâches routinières et plus généralement l'activité de SIB à Antigua, soit l'ouverture de comptes, y compris contrôle de la *compliance* et encaissement des chèques (p. B282 à B393 et p. B978 à B1118). SIB était chapeautée par un conseil d'administration composé notamment de Robert Allen Stanford et son père, James Stanford.



(14) <u>Locaux</u>. SIB occupait un immeuble entier à Antigua, situé à St. Johns, qu'elle louait néanmoins à une autre entité du groupe Stanford, *Stanford Developement Company Ltd* (p. 1391 [38]). Sa brochure publicitaire (non datée) mentionne une adresse à Antigua et indiquait un numéro de téléphone dont le préfixe est celui d'Antigua (p. B887 et p. 1148 et 1161).

(15) <u>Clientèle et flux d'argent</u>. La clientèle de SIB provenait essentiellement d'Amérique du Nord, d'Amérique centrale et d'Amérique du Sud. SIB comptait notamment 37,29% de clients vénézuéliens totalisant 20,98% des dépôts, 15,66% de clients américains totalisant 21,85% des dépôts (p. B625 et B24). Enfin 21,22% de la clientèle était composée de résidents du Mexique, du Pérou, Panama, de Colombie, d'Haïti, du Canada et des Iles Vierges britanniques. Ces chiffres ne prennent pas en compte environ 4'000 relations bancaires ouvertes au nom de Stanford Trust Company Ltd à Antigua et Barbuda, dont la nationalité et le lieu de résidences des bénéficiaires ultimes ne sont pas connus (p. 251 [34 à 36]).

(16) Selon le « *referral manual* » de SIB (p. B363 à B367), seuls les versements de clients effectués par chèque étaient déposés auprès de SIB directement ; les transferts bancaires des clients s'effectuaient sur des comptes ouverts au nom de SIB dans les livres de la Canada Dominion Bank au Canada en cas de versement en USD ou auprès de HSBC Bank plc à Londres en cas de versement en GBP. Il n'est ainsi pas contesté que la plupart des fonds clients n'étaient pas dirigés vers Antigua, mais vers d'autres pays (p. 265).

(17) <u>Actifs en Suisse appartenant à SIB</u>. Il ressort du dossier que SIB disposait de plusieurs comptes ouverts en Suisse, majoritairement, sinon exclusivement à Genève (p. 342). L'ensemble des biens sis en Suisse s'élèverait à environ à 353 mios. (p. 342-43).

## D. Procédure aux Etats-Unis

(18) Par décision du 16 février 2009 (p. 146 à 168), à la requête de la United-States Securities and Exchange Commission (SEC), la United States District Court for the Northern District of Texas Dallas Division (ci-après la « Cour de district du Nord Texas ») a ordonné la nomination d'un « *receiver* » en la personne de Ralph S. Janvey en vue d'administrer l'ensemble des avoirs directement ou indirectement contrôlés par Robert Allen Stanford, SIB, Stanford Group Company, Stanford Capital Management LLC, James M. Davis et Laura Pendergest. Dans sa requête, la SEC faisait valoir que l'instauration du *receivership* était nécessaire en vue de protéger les investisseurs contre la dilapidation de leurs avoirs par Robert Allen Stanford, celui-ci étant soupçonné d'opérer en réalité un *Ponzi scheme* (p. 784 à 808). Ralph S. Janvey était ainsi investi de toute une série de pouvoirs, dont il ressort néanmoins qu'ils étaient limités, matériellement, à des actes de nature conservatoire (en particulier, p. 239 [para 3], p. 238 [para 5], p. 231 [lit. c et para 14]) et temporellement, jusqu'à expiration de la décision ou nouvelle décision (p. 239 [para 4]). Il avait également pour mission de se faire remettre les livres de compte et tous autres documents sociaux ou comptables lui permettant de dresser un inventaire des biens appartenant directement ou indirectement à Robert Allen Stanford (p. 230 à 240). Il était enfin fait interdiction aux défendeurs de s'immiscer dans la gestion des affaires courantes (p. 234 [para 10 et 11]).



(19) Par décision du 12 mars 2009, dont le texte est quasi identique à la première, les pouvoirs du recei-
ver Janvey ont été étendus (p. 216 à 227). Il était notamment autorisé à présenter une requête de faillite
selon le *Chapter 11 du United States Bankruptcy Code* (p. 222 [para 6]) : « *The Receiver shall have the
sole and exclusive power and authority to manage and direct the business and financial affairs of the De-
fendants, including without limitation, the sole and exclusive power and authority to petition for relief un-
der the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code")* ». L'art. 101
dont il est question définit « *petition* » comme toute requête déposée selon les art. 301 à 304 du Ban-
krupty Code. L'art. 303 traite notamment de la faillite non volontaire.]). La faculté de requérir la faillite
était déniée à toute autre personne (p. 220 [para 10 lit. e]).

(20) Selon les deux décisions précitées, l'ensemble des biens appartenant à SIB, où qu'ils soient situés,
étaient mis sous mains de justice (p. 168 [1] et 157 [1]). Il n'en ressort toutefois pas que le receiver a le
pouvoir de distribuer les biens de la masse aux créanciers : tout au plus, qu'il est de son devoir de sau-
vegarder leurs intérêts par une maximisation des avoirs de la masse. La distribution est toutefois possi-
ble sur la base d'un plan *ad hoc*, équitable et approuvé par le juge (p. 316 [22]).

(21) Par acte daté du 15 mai 2009, les liquidateurs Wastell et Hamilton-Smith ont été autorisés à présen-
ter, devant les tribunaux américains, une requête en reconnaissance de la décision de liquidation forcée
émanant des autorités d'Antigua et Barbuda en tant que « *foreign main proceeding* » (p. B1033 à
B1037). Aucun jugement n'a été rendu à l'heure actuelle.

**E.  Procédure à Antigua**

(22) A la requête de la Commission de surveillance des services financiers (« *Financial Services Regula-
tory Commission* »), la Haute Cour d'Antigua et Barbuda (« *High Court of Justice in Antigua and Barbu-
da* ») a prononcé la mise sous administration judiciaire (« *receivership* ») de SIB par décision du 26 fé-
vrier 2009 et nommé Nicholas Peter Wastell et Nigel Hamilton-Smith en tant de *manager-receiver*, char-
gés de sauvegarder les biens de SIB et empêcher leur dilapidation (p. B92 à B96).

(23) Par la suite, la mise en liquidation et dissolution de SIB a été prononcée par décision du 17 avril
2009 par la Haute Cour d'Antigua et Barbuda ; Nicholas Peter Wastell et Nigel Hamilton-Smith ont été
nommés liquidateurs (p. B145 à B154). La mise en liquidation a été déclarée immédiatement exécutoire
(p. B145 [31]). Il ressort de la décision du 17 avril et de ses considérants, que non seulement le receiver
Janvey a présenté ses arguments à la cour par « *amicus curiae* », mais encore que son conseil a pu
participer aux audiences qui ont précédées la décision (p. B154).

(24) Selon la décision précitée, l'ensemble des biens de SIB où qu'ils se trouvent étaient mis sous mains
de justice (p. B152 [4]).Il ressort du texte même de la décision qu'il est du devoir des liquidateurs de col-
lecter l'ensemble des biens de SIB pour les affecter à la satisfaction collective de ses créanciers. Les
biens ainsi réalisés serviront à désintéresser en premier lieu les frais de la masse, ainsi que les anciens
employés de SIB, puis les créanciers selon le rang prévu par la loi, en l'espèce l'International Business
Corporations Act de 1982, et enfin les actionnaires de SIB (p. B78 [7.1 à 7.4] et p. B812 [art. 289]). Il
ressort des textes de loi qu'en cas d'insuffisance de biens, les créanciers sont dédommagés au pro rata
de leur créance, selon le système de priorité des classes toutefois (p. B812 [art. 289 (3)]). L'ensemble
des créanciers, sans égard à leur domicile, peuvent participer à la distribution des biens (p. B820 [16], p.
B812 [art. 280])



(25) Le receiver Janvey a été autorisé à faire appel de cette décision (p. B756 [6]). Il semblerait qu'un créancier de SIB aît aussi annoncé son attention de faire appel, sans qu'il ne soit clairement défini si tel a été le cas (p. B756 [7]). L'effet suspensif n'a pas été accordé au receiver Janvey (p. B756 [6]); celui-ci n'allègue d'ailleurs pas le contraire.

(26) Enfin, par décision du 24 avril 2009, la Haute Cour d'Antigua et Barbuda a, entre autres, rejeté la requête du receiver Janvey pour apparaître en qualité de partie à la procédure (p. B92 à B113).

## F.   Demandes de reconnaissance par devant la FINMA

(27) Receiver Janvey. Par requête du 19 mai 2009 déposée par devant l'Autorité de céans, le receiver Janvey a sollicité l'exequatur de la décision émanant de la Cour de district du Nord Texas et datée du 16 février 2009 (p. 327). Par pli daté du 26 mai 2009, le conseil du receiver Janvey a expliqué qu'il sollicitait également l'exequatur de la décision du 12 mars 2009 (p. 344).

(28) Les copies certifiées conformes et apostillées des décisions précitées ont été versées au dossier (p. 397 à 420), de même qu'un « certificate of effectiveness » signé par un avocat pratiquant au barreau du Texas visant à démontrer le caractère exécutoire des deux décisions, accompagné d'une copie de l'art. 62 du code de procédure civil fédéral américain (« Rules of civil procedure » ; p. 169 à 172).

(29) Liquidateurs Wastell et Hamilton-Smith. Par requête du 27 mai 2009 déposée par devant l'Autorité de céans, les liquidateurs Wastell et Hamilton-Smith ont sollicité l'exequatur de la décision de la Haute Cour d'Antigua et Barbuda du 17 avril 2009.

(30) L'original de la décision précitée, munie de l'apostille de Haye a été déposé au dossier (p. B143 à B155), de même qu'un extrait du droit de procédure applicable et un affidavit visant à démontrer le caractère exécutoire de la décision, ainsi que l'absence d'effet suspensif d'un éventuel appel (p. B89 [6] et p. B69 [42.8]).

(31) Chacune des parties a pu prendre position sur les allégués de l'autre par mémoire du 17 août 2009, un échange d'écriture ayant été ordonné (p. 431 et B136). Le receiver Janvey a complété sa demande et versé de nouvelles pièces au dossier en en date des 28 mai, 4 et 11 juin, 3 et 21 juillet, 28 septembre, 7, 11, 22 décembre 2009, 7 janvier, 4 et 24 mars, 20 avril 2010. Les liquidateurs Wastell et Hamilton-Smith ont déposé une demande d'intervention à la procédure en date du 25 mai 2009 et une demande de reconnaissance en date du 28 mai 2009. Celle-ci a été complétée et de nouvelles pièces versées au dossier en date du 15 juin, 27 juillet, 8 octobre, 3 décembre 2009, 28 janvier, 2 mars, 14 avril et 7 mai 2010.

## G.   Procédure devant le Tribunal de première instance du canton de Genève

(32) Par requête du 4 mai 2009, les liquidateurs Wastell et Hamilton-Smith ont sollicité du tribunal de première instance du canton de Genève, l'exequatur de la décision de liquidation du 17 avril 2009 émise par les autorités d'Antigua (p. B625 à B835). Le receiver Janvey est intervenu auprès du tribunal pour s'opposer à leur demande (p. 481 à 497). Après deux audiences, les liquidateurs ont retiré leur requête (p.479 et 480) sans recueillir l'agrément du receiver américain. Le juge genevois a rayé la cause du rôle par avis du 11 juin 2009 (p. B568 et B569).



**Considérants en droit**

## H. Jonction des causes

(33) La FINMA est saisie de deux requêtes concurrentes visant à la reconnaissance de deux décisions de liquidation portant toutefois sur le même établissement. Les conclusions prises par les parties sont de nature identique.

(34) Même si la jonction des causes n'est pas formellement prévue dans la loi fédérale sur la procédure administrative (PA ; RS 172.021), celle-ci peut-être prononcée conformément au principe d'économie de procédure (Arrêt du Tribunal administratif fédéral C-873/2006 du 16 octobre 2007) et pour éviter le risque que des jugements contradictoires soient prononcés (voir aussi ATF 123 V 214, consid. E. 1: « *Les recours de droit administratif concernent des faits de même nature, portent sur des questions juridiques communes et sont dirigés contre le même jugement, de sorte qu'il se justifie de les réunir et de les liquider dans un seul arrêt* » A cela s'ajoute, que l'art. 31 PA commande que chacune des parties soit entendue sur les allégués importants de l'autre lorsqu'elles défendent les intérêts divergents.

(35) En l'espèce, la jonction permet à la FINMA de mener une seule et même procédure de reconnaissance et est ainsi conforme au principe de l'économie de procédure. Elle permet aussi de s'assurer qu'aucun jugement contradictoire ne sera rendu et que le droit d'être entendu est respecté pour chacune des parties, lesquelles ont pris des conclusions de nature identique, mais paradoxalement, poursuivent, des intérêts divergents.

## I. Compétence ratione materiae

(36) Selon l'art. 37g al. 1 de la loi sur les banques (LB ; RS 852.0), la FINMA est la seule autorité compétente pour prononcer la reconnaissance d'une mesure d'insolvabilité prononcée à l'encontre d'une banque sise à l'étranger.

(37) <u>Banque à l'étranger</u>. La notion de banque étrangère est définie à l'art. 1 al. 1 de l'ordonnance FINMA sur les banques étrangères (OBE-FINMA ; RS 952.111). Selon cette disposition est une banque étrangère : (i) toute entreprise organisée selon le droit étranger et qui dispose à l'étranger de l'autorisation d'exercer une activité bancaire, (ii) fait figurer le terme « banque » dans sa raison sociale, dans la désignation de son but social ou dans ses documents commerciaux ou (iii) exerce une activité bancaire au sens de l'art. 2a de l'ordonnance sur les banques (OB ; RS 952.02). Ces conditions sont alternatives (Bulletin CFB 48 (2006) p. 281/282).

(38) SIB est une entité juridique organisée selon le droit d'Antigua et Barbuda (voir supra ch. 10). Soumise à la surveillance de la *Financial Services Regulatory Commission of Antigua and Barbuda*, elle disposait d'une licence lui permettant de conduire des opérations dite d'international banking et sa raison sociale comporte le mot « banque » (bank). Elle pouvait accepter des dépôts du public (sauf résidents de Antigua et Barbuda) et émettre en contrepartie des certificats portant à intérêts ; elle octroyait des prêts, même si cette activité était réduite (voir ci-dessus ch. 11).

(39) Organisée selon le droit étranger, titulaire d'une licence bancaire, pratiquant une activité bancaire et portant la dénomination « banque » dans sa raison sociale, SIB doit être considérée comme une banque étrangère de l'art. 1, al. 1 OBE-FINMA. A ce titre, il sera relevé que le fait que SIB ait pu servir de véhicule visant à commettre des infractions contre le patrimoine, au sein du Groupe Stanford ne change rien à sa qualité de banque au sens formel.



(40) <u>Mesure d'insolvabilité.</u> La qualification de la décision dont la reconnaissance est sollicitée se fait se-lon le droit du for (Gabrielle Kaufmann-Kohler / Antonio Rigozzi, Commentaire Romand LP, art. 166 LDIP N7). L'art. 37g LB ne se limite pas à prévoir la reconnaissance pour les seules décisions de faillite. Au contraire, il englobe toutes les décisions et mesures ayant trait à l'insolvabilité. Est une décision d'insolvabilité selon l'art. 37g LB, dont l'exequatur peut être requise devant la FINMA, une procédure qui se déroule sous le contrôle d'une autorité ou d'un tribunal, en vue de répondre à une situation de suren-dettement ou d'insolvabilité, dans laquelle, l'égalité des créanciers est préservée, à tout le moins, au sein des classes, et dont le but ultime est soit la continuation de l'entreprise, soit, en cas d'échec, l'exécution générale impliquant l'affectation de l'ensemble des biens du débiteur à la satisfaction collecti-ve des créanciers. Dans l'examen de la qualité de la décision dont est demandée l'exequatur, le contenu du droit étranger est établi d'office, ce en application de l'art. 16 de la loi fédérale sur le droit international privé (LDIP ; RS 29). Les parties ne sont, toutefois, pas dispensées de collaborer à son établissement (ATF 124 I 49, cons. 3b).

(41) <u>Le receivership de droit américain.</u> Le receiver Janvey affirme que le *receivership* est une procédure d'insolvabilité qui a pour but la satisfaction collective des créanciers selon un plan équitable préalable-ment approuvé par un tribunal (p. 334 ; p. 1393 à 1395). Il explique également que selon ses fonctions de *receiver*, il est tenu de liquider les avoirs du Groupe Stanford, inclus SIB, et d'en redistribuer le pro-duit selon un plan approuvé par et sous la supervision du United District Court Judge (p. 314). Ses pou-voirs seraient similaires à ceux d'un *trustee in bankruptcy*, l'institution du *receivership* étant fréquemment utilisée dans le contexte d'entreprises insolvables, car celle-ci présente l'avantage d'être moins coûteuse pour la masse (p. 311-315). A l'appui de ses affirmations, il produit notamment une décision américaine, émanant du 6ème Circuit (cour d'appel), Liberte Capital Group, LLC v. Capwill , 462F.3d 543 (6th Cir. 2006), un mémorandum signé d'un praticien américain (p. 1371-1372) et un affidavit d'un professeur de droit de l'Université du Texas affirmant disposer d'une solide expérience en matière d'insolvabilité (p. 189-214). Les biens mis sous receivership seraient distribués selon un plan respectant le concept de l'égalité des créanciers (p. 1371 et 1372).

(42) Les affirmations du receiver Janvey sont contestées par les liquidateurs Wastell et Hamilton-Smith, selon lesquels le *receivership* américain est une procédure de nature conservatoire dont le but ultime n'est pas la distribution des biens aux créanciers, mais la sauvegarde des biens de la masse (p. B238 à 249). A l'appui de leurs allégués, les liquidateurs Wastell et Hamilton-Smith produisent un affidavit éma-nant d'un avocat pratiquant le droit de l'insolvabilité (p. B859 à B884) et un jugement de la High Court of Justice Chancery Division (juridiction anglaise) pour laquelle le *receivership* instauré par les décisions des 16 février et 12 mars 2009 n'est pas une procédure relative à l'insolvabilité au sens de la loi type de la Commission des Nations Unies pour le droit commercial international sur l'insolvabilité internationale (p. B630 à B658).

(43) Le *receivership* a été ordonné et le receiver Janvey appointé à la requête de la United-States Secu-rities and Exchange Commission (ch. 18), autorité de supervision des négociants en valeurs mobilières. Dans sa requête, celle-ci avait sollicité du juge l'instauration d'un *receivership* en vue de protéger les in-vestisseurs contre la dilapidation de leurs avoirs par Robert Allen Stanford, celui-ci étant soupçonné d'opérer en réalité un *Ponzi scheme* (ch. 18). Du reste, il ressort du texte même de la première décision rendue par les tribunaux du Texas que la mission du receiver Janvey était limitée à des mesures conservatoires visant principalement à sauvegarder les biens appartenant à l'empire Stanford et empê-cher leur dilapidation. Il avait également pour mission de se faire remettre les livres de compte et tous autres documents sociaux ou comptables lui permettant de dresser un inventaire des biens appartenant directement ou indirectement à Robert Allen Stanford (ci-avant ch. 18 et 19).



(44) Le texte de la deuxième décision est quasi identique à la première à ceci près que le receiver est expressément autorisé à présenter une requête de faillite : « *The Receiver shall have the sole and exclusive power and authority to manage and direct the business and financial affairs of the Defendants, including without limitation, the sole and exclusive power and authority to petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code")* ». L'art. 101 dont il est question définit « *petition* » comme toute requête déposée selon les art. 301 à 304 du Bankruptcy Code. L'art. 303 traite notamment de la faillite non volontaire.

(45) Il ne ressort toutefois pas des décisions précitées que le receiver a le pouvoir de distribuer les biens de la masse aux créanciers : tout au plus, qu'il est de son devoir de sauvegarder leurs intérêts par une maximisation des avoirs de la masse. La distribution est toutefois possible sur la base d'un plan *ad hoc*, équitable et approuvé par le juge (ch. 20). Or, même si le receiver Janvey affirme que le plan doit être « équitable », il n'est pas déterminé, ni même déterminable si le principe de l'égalité des créanciers sera respecté.

(46) Ainsi, s'il est possible d'affirmer que le *receivership* est une procédure visant à la satisfaction collective des créanciers d'une entité au moyen de ses biens, sous la supervision d'un tribunal, l'autorité de céans, n'est pas en mesure de constater que le principe de l'égalité des créanciers est respecté. Cette question peut rester ouverte, comme on le verra infra dans le cadre de l'interprétation de l'art. 37g LB (voir ci-dessous ch. 62ss).

(47) <u>La liquidation selon le droit d'Antigua et Barbuda</u>. Les liquidateurs Wastell et Hamilton-Smith allèguent que la procédure de liquidation à Antigua est en tous points similaire à une procédure de faillite en Suisse puisque SIB est dissoute et liquidée, sous la supervision d'une autorité judiciaire, ses biens devant revenir à l'ensemble de ses créanciers sous le contrôle d'un juge, le principe de l'égalité étant au demeurant respectée (p. B127 ; p. B256 à 258). Ils versent au dossier les extraits de loi pertinents (ch. 30). Le receiver Janvey ne prend pas position par rapport à cette question.

(48) Il ressort du texte même de la décision du 17 avril 2009 que la dissolution avec liquidation de SIB est ordonnée et qu'il est du devoir des liquidateurs de collecter l'ensemble des biens de SIB pour les affecter à la satisfaction collective de ses créanciers. Les biens ainsi réalisés serviront à désintéresser en premier lieu les frais de la masse, ainsi que les anciens employés de SIB, puis les créanciers selon le rang prévu par la loi, en l'espèce l'International Business Corporations Act de 1982, et enfin les actionnaires de SIB (ci-avant ch. 24). Il ressort des textes de loi qu'en cas d'insuffisance de biens, les créanciers sont dédommagés au pro rata de leur créance, selon le système de priorité des classes toutefois (ch. 24). L'ensemble des créanciers, sans égard à leur domicile, peuvent participer à la distribution des biens (ch. 24]). La procédure ainsi décrite répond en tous points à la définition de principe d'une mesure d'insolvabilité énoncée plus haut (ch. 40). Il s'agira ainsi pour l'autorité saisie de dissoudre la société et, au travers des liquidateurs, se saisir de ses biens, les réaliser, puis les affecter à la satisfaction collective des créanciers. L'autorité doit désintéresser les créanciers selon un ordre de priorité préétabli qui permettra ainsi de garantir leur égalité au sein des classes. En cas d'insuffisance de biens, les créanciers des premières classes sont désintéressés en priorité sur les classes subséquentes, ceux-ci concourant au marc le franc au sein de leurs classes.

(49) A teneur de ce qui précède, la FINMA est ainsi compétente à raison de la matière pour se saisir de la demande d'exequatur des liquidateurs Wastell et Hamilton-Smith.



### J.  Légitimation active

(50) Selon les art. 37g LB et 166 LDIP, une mesure d'insolvabilité étrangère rendue dans l'Etat du domicile du débiteur est reconnue en Suisse à la réquisition des représentants autorisés ou d'un créancier. Par représentants autorisés, on entend toute personne, qui en vertu de la loi ou de la décision en cause, a le pouvoir d'administrer, de gérer et de disposer des biens du débiteur (voir dans ce sens, Hans Hanisch, Die Vollstreckung von ausländischen Konkurserkenntnissen in der Schweiz, AJP/PJA 1999, p. 17/18 p. 23).

(51) En l'espèce, à teneur des décisions du 16 février et 12 mars 2009, le receiver Janvey a le droit d'administrer et gérer les biens de SIB, ainsi que de les réaliser.

(52) Il en va de même pour les liquidateurs Wastell et Hamilton-Smith à teneur de la décision émanant de la Haute Cour d'Antigua et Barbuda du 17 avril 2009.

(53) Tant le receiver Janvey que les liquidateurs Wastell et Hamilton-Smith sont ainsi compétents pour solliciter l'exequatur des décisions des 16 février et 12 mars 2009 et 17 avril 2009, respectivement. La FINMA entrera ainsi en matière sur chacune des requêtes.

### K.  Exception de l'autorité de la chose jugée

(54) Le receiver Janvey, sous la plume de son conseil, soulève l'exception *res judicata* à l'encontre de la requête déposée par les liquidateurs Wastell et Hamilton-Smith par devant l'autorité de céans. En effet, selon le receiver Janvey, le retrait unilatéral de leur requête par devant les tribunaux du canton de Genève par ces derniers aurait valeur d'un jugement au fond revêtu de l'autorité de la chose jugée ou force de chose jugée au sens matériel (p. 1383). Il explique que le dépôt de l'original de l'assignation en main du greffier emporte introduction de la cause en justice et par là même création du lien d'instance. Dans un tel cas, le retrait unilatéral aurait valeur de désistement d'action muni de l'autorité de la chose jugée (p. 1382).

(55) Conformément au droit fédéral, l'existence d'un premier jugement fait obstacle à l'introduction d'un nouveau procès civil lorsque ce dernier oppose les mêmes parties, qu'il porte sur une même prétention et qu'il se fonde sur le même complexe de faits (principe de l'autorité de la chose jugée ; ATF 119 II p. 89). En principe toutefois, n'acquièrent l'autorité de la chose jugée que les jugements au fond et, exceptionnellement, les jugements de procédure uniquement lorsqu'ils statuent sur la recevabilité (ATF 127 I 133 /139 ; ATF 115 II 187/189). Sont des jugements au fond, les décisions condamnatoires ou formatrices qui mettent fin à des contestations portant sur des droits et obligations, le statut d'une personne ou encore en constatation de droit, en bref qui statuent sur le bien fondé d'une prétention (Fabienne Hohl, Procédure civile, T. I, N 1239 et 1259, 2001). Sont des jugements dit de recevabilité, les décisions qui statuent sur l'existence d'une condition du procès, notamment la compétence *ratione loci*. Un jugement constatant l'absence de compétence *ratione loci* empêche la partie demanderesse de renouveler son action, basée sur les mêmes faits, devant le même tribunal (SJ 2009 I 92 et Adrian Staehelin/Daniel Staehelin/Pascal Grolimund, Zivilprozessrecht, 2007, p. 412).



(56) En l'espèce, il sied de relever que le juge ordinaire n'aurait pas été compétent *ratione materiae* pour se saisir de la demande. Ainsi, même si la procédure aurait suivi son cours, elle se serait soldée par un jugement d'irrecevabilité lequel n'aurait pas empêché la partie demanderesse de renouveler sont action devant la FINMA.

(57) A cela s'ajoute, que dans le cas précis d'une décision de reconnaissance, l'Etat requis permet à une décision étrangère de déployer ses effets sur son propre territoire (ATF 120 II 83/86) renonçant ainsi à une partie de sa souveraineté. La décision de reconnaissance n'est ainsi ni condamnatoire ni constatatoire. Elle n'emporte par non plus de création de droits et obligations (ATF 134 III p. 367, cons. 3.3, JdT 2009 I p. 287, cons. 3.3 ; ATF 129 III 626/635), car elle ne saurait avoir plus d'effets que la décision dont l'exequatur a été requise. En règle générale, le droit suisse accorde la reconnaissance lorsque les conditions en sont remplies (Paul Volken, ZK-IPRG, Art. 25, N 6ss et Art. 27 LDIP N 1 et 54, 2 éd.) et tend à éviter un débat sur sa substance matérielle (ATF 120 II 83, JdT 1995 I 14/16), car il n'appartient pas au juge suisse de se prononcer à nouveau sur la question tranchée par les tribunaux étrangers.

(58) La requête en reconnaissance déposée par les liquidateurs Wastell et Hamilton-Smith auprès du Tribunal de première instance du canton de Genève n'avait ainsi pas pour but de créer de nouveaux droits et obligations pour chacune des parties intéressées, mais bien de faire reconnaître une mesure de droit étranger sur le territoire suisse et lui permettre d'y déployer ses effets. Dans un tel cas, le juge n'était pas appelé à trancher une question de droit matériel, mais bien de décider si les conditions de la reconnaissance étaient remplies *in casu*. Dès lors, peu importe que la procédure se termine par le retrait unilatéral de la requête par les requérants ou par un jugement d'incompétence à raison de la matière, l'autorité de la chose jugée ne peut être invoquée puisque la procédure entamée n'avait ni pour but, ni n'aurait eu pour effet de trancher une contestation matérielle entre deux parties.

(59) L'exception de l'autorité de la chose jugée soulevée par le receiver Janvey est en conséquence rejetée.

## L.  Le principe de l'unité de la faillite et la tension entre la reconnaissance du siège effectif et le siège d'incorporation

(60) Selon l'art. 37g al. 1 et 2 LB, la FINMA décide de la reconnaissance des décisions relatives à l'insolvabilité prononcées à l'étranger. Elle peut aussi reconnaître de telles mesures lorsqu'elles sont prononcées dans l'Etat où la banque a son siège effectif.

(61) La FINMA est saisie, en l'espèce, de deux requêtes concurrentes en reconnaissance de mesures d'exécution forcée, l'une émanant de l'Etat du siège d'incorporation, l'autre de l'Etat du siège effectif d'un établissement bancaire. La reconnaissance de ces deux décisions à la fois ne saurait être prononcée. En effet, le principe de l'unité de la faillite ancré à l'art. 55 de la loi sur la poursuite pour dettes et la faillite (LP ; RS 288.1) prohibe l'ouverture de deux faillites à la fois. Ce principe trouve son corollaire en droit international à l'art. 167 al. 2 LDIP qui empêche l'ouverture de faillites ancillaires simultanées (Henri-Robert Schübbach, Commentaire Romand LP, art. 55, N17). En tant que la reconnaissance de faillite entraîne de plein droit l'ouverture de la faillite ancillaire, la reconnaissance ne sera prononcée qu'à l'égard d'une seule décision étrangère.



(62) Dans ces conditions, il se justifie de procéder à l'interprétation de l'art. 37g al. 1 et 2 pour déterminer quel ordre de priorité sera donné dans un tel cas d'espèce pour traiter des deux requêtes.

(63) Selon les principes d'interprétation reconnus, la loi s'interprète d'abord selon sa lettre ; en cas de doute sur le sens de la norme, le sens véritable de la disposition en cause pourra être dégagée grâce à l'examen des travaux préparatoires (interprétation historique), selon la systématique de la loi (interprétation systématique) et du but et du sens de la loi (interprétation téléologique) (ATF 133 III p. 497, cons. 2.5 et les références citées).

(64) Selon le deuxième alinéa de l'art. 37g LB, la FINMA *peut* prononcer la reconnaissance d'une décision étrangère concernant une banque et émanant de l'Etat de son siège effectif. La compétence de la FINMA de reconnaître une décision émanant du siège effectif est tempérée par l'utilisation de la condition potestative « peut », mais également par l'adjonction dans le texte de l'adverbe « aussi ». Pris dans son sens strictement littéral, la loi offre la *possibilité* à l'autorité de reconnaître une décision émanant de l'Etat du siège effectif, mais ne lui en fait pas l'obligation. Il s'agit donc d'une faculté qui lui est offerte, voire une prérogative. L'ordre des alinéas et le choix des mots permettent ainsi de conclure sans conteste que le législateur partait du principe que c'est uniquement en l'absence d'une décision émanant de l'Etat du siège d'incorporation que serait prise en compte une mesure émanant de l'Etat du siège effectif.

(65) La reconnaissance d'une décision émanant du siège d'incorporation n'est pas expressément mentionnée dans l'alinéa 1 de l'art. 37g LB. Cet alinéa traite en premier lieu de la compétence de la FINMA à prononcer la reconnaissance d'une décision étrangère relative à l'insolvabilité d'un institut bancaire. Introduite par la novelle du 3 octobre 2003, il s'agissait ici de refléter sur le plan international, la solution voulue sur le plan national, à savoir le transfert de la compétence de prononcer la faillite et mener la procédure de liquidation y afférente des autorités cantonales à l'ancienne Commission fédérale des banques (Message concernant la modification de la loi fédérale sur les banques et les caisses d'épargne du 20 novembre 2002, FF 2002 7476/7516 ; ci-après le « Message »).

(66) Sur le plan systématique, il convient de souligner que les art. 37f et 37g LB sont des dispositions qui relèvent tant de la législation bancaire que de la législation de droit international privé. Il s'agit ici de normes spéciales, applicables aux banques uniquement, qui complètent les articles 166ss LDIP sur la faillite internationale et qu'il convient d'interpréter dans ce contexte.

(67) Selon l'art. 166 al. 1 LDIP, sera reconnue en Suisse la décision de faillite rendue dans l'Etat du domicile du débiteur. Pour les sociétés, le siège statutaire vaut domicile conformément à l'art. 21 al. 2 LDIP. A défaut d'une telle désignation ou d'un résultat incompatible avec l'ordre public suisse, le siège d'une société se trouvera là où elle est administrée de fait, étant rappelé que d'une manière générale, la LDIP se montre hostile au critère de rattachement du siège effectif, ce d'autant plus que la réserve du siège fictif fondée sur la théorie de la fraude à la loi a été abandonnée avec son entrée en vigueur (ATF 128 III 346/351 ; ATF 117 II 494, cons. 6c ; Max Keller/Jolanta Kren Kostiewicz, ZK-IPRG, 2 éd., art. 21, N6). C'est ainsi que la LDIP ne prévoit pas la possibilité de reconnaître une décision de faillite rendue dans l'Etat du siège effectif de la société (Paul Volken, ZK-IPRG, Art. 166, 2 éd., N51 ; Arrêt du Tribunal fédéral 5P.472/2004 du 23 février 2005, cons. 5.2) et même si la question reste controversée en matière de faillite internationale (voir Saverio Lembo/Yvan Jeanneret, La reconnaissance d'une faillite étrangère [Art. 166 ss. LDIP]: état des lieux et considérations pratiques, SJ 2002 II 247/256 pour un bref résumé), le Tribunal fédéral s'en tient pour l'instant à la théorie de l'incorporation telle que développée dans l'ATF 117 II 497 et telle que voulue par le législateur. Une telle interprétation de l'art. 37g al. 2 LB, systématique et dans son contexte de norme de droit international privé, permet, ainsi de dégager une règle et son exception pour les instituts bancaires.



La règle est celle de la reconnaissance d'une décision de faillite prononcée par l'Etat du siège d'incorporation et en son absence et de manière exceptionnelle pourra être reconnue une décision émanant de l'Etat du siège effectif. Par souci d'exhaustivité, il sera relevé que l'art. 167 al. 2 LDIP n'est pas applicable, car il s'agit d'une règle de conflit de compétences au niveau interne et non pas sur le plan international.

(68) Cette conclusion est également corroborée par une interprétation historique et téléologique de la norme. En effet, il ressort du Message, reprenant mot pour mot le rapport d'expert y relatif (Assainissement et liquidation de banques, protection des déposants, Rapport de la commission d'experts instituée par le Département fédéral des finances, octobre 2000 p. 76) que le législateur entendait pallier à une lacune de la LDIP en introduisant la possibilité pour l'ancienne CFB de prononcer la reconnaissance d'une décision prononcée par l'Etat du siège effectif également, ce aux fins de promouvoir une meilleure coordination des procédures de faillites transnationales. La pratique avait, en effet, démontré que certaines autorités étrangères, tout comme l'ancienne CFB ouvrait parfois la faillite au siège considéré comme « réel » de la banque (Message p. 7516). L'introduction de cette possibilité n'avait pas pour but de modifier radicalement le système prévu par la LDIP, mais bien de répondre à une nécessité pratique sur le plan international, dans un cas de figure bien précis (soit l'absence de décision émanant de l'Etat d'incorporation). Dès lors, il se justifie également sous cet angle de donner la priorité à une décision prononcée par l'Etat du siège statutaire.

(69) Ceci est d'autant plus vrai que les impératifs de sécurité juridique imposent de permettre aux justiciables de se fonder sur des normes claires et prévisibles, ce qui ne serait pas le cas, si la reconnaissance pouvait être octroyée à *choix* soit à l'Etat du siège statutaire, soit à l'Etat du siège effectif sans qu'un cadre certain ne soit à disposition des autorités et des justiciables pour les guider dans l'examen d'une telle question (ATF 117 II 494, cons. 6c ; Frank Vischer; ZK-IPRG, Art. 157, N12). Ainsi la reconnaissance d'une décision émanant de l'Etat du siège effectif ne saurait être prononcée qu'en l'absence de décision émanant de l'Etat du siège d'incorporation.

(70) Pour le receiver Janvey cependant, le siège de SIB à Antigua est fictif et artificiel, toutes les décisions se prenant aux Etats-Unis, les données des clients y étant du reste conservées (p. 1392 [25 à 28]). SIB n'avait pas le droit de fournir des services bancaires à des résidents d'Antigua et Barbuda. Ses résultats étaient fictivement déterminés par Robert Allen Stanford et son acolyte James Davis et la plupart de ses activités étaient outsourcées (p. 1391 [33 à 39]). SIB n'était pas véritablement surveillée par le régulateur antiguais, puisque son directeur était à la solde de Robert Allen Stanford (p. 1390 [43]). Le gouvernement d'Antigua, lui-même aura reconnu que l'administration effective de SIB avait lieu depuis Houston (p. 2294). Ces circonstances justifieraient selon lui de faire fi du siège d'incorporation et de reconnaître la décision de faillite émanant du siège effectif. En résumé, le receiver Janvey s'appuie sur la théorie dite de la fraude à la loi qui prévalait avant l'entrée en vigueur de la LDIP.

(71) Ainsi que vu plus haut (ch. 67), la LDIP a abandonné la théorie de la réserve du siège fictif (ATF 117 II 494, cons. 6c ; Gabrielle Kaufmann-Kohler/Antonio Rigozzi, Commentaire Romand LP, art. 166 LDIP, N27) pour limiter la reconnaissance, sauf cas exceptionnels, aux décisions rendues dans l'Etat du siège d'incorporation. L'art. 17 LDIP (réserve de l'ordre public) constitue l'un de ces cas exceptionnels (au contraire de la réserve du siège fictif, l'autre étant absence de décision émanant de l'Etat d'incorporation) et permet de faire abstraction du siège statutaire lorsque des principes fondamentaux du droit suisse des sociétés seraient violés par l'application du droit de l'Etat d'incorporation (Frank Vischer, ZK-IPRG, 2 éd., art. 154, N32).



Vischer cite, à titre d'exemple, la reconnaissance d'une décision emportant violation des droits élémen-
taires des actionnaires minoritaires d'une société, mais on pourrait imaginer qu'enfreindrait l'ordre public
suisse, une décision qui exclurait totalement la responsabilité des membres du conseil d'administration,
lesquels ne répondraient pas de leurs actes vis-à-vis des actionnaires ou créanciers. D'une manière gé-
nérale, il convient de se montrer restrictif avec les conditions d'application de la réserve de l'ordre public,
le droit suisse n'ayant pas vocation à se substituer au droit étranger même en cas de différences
d'appréciation (ATF 134 III 661/665 ; ATF 126 II 327/330).

(72) En l'espèce, il ressort de la procédure que SIB n'était pas qu'une simple boîte aux lettres à Antigua,
même s'il est vrai que ses activités étaient restreintes. SIB y disposait de locaux et y employait pas
moins de 80 personnes qui étaient engagées dans des tâches d'administration et de représentation (voir
ci-dessus ch. 10 à 16). Ainsi, l'autorité de céans ne saurait suivre le receiver Janvey lorsqu'il affirme que
le siège de SIB à Antigua n'était qu'apparence: SIB et ses employés exerçaient réellement une activité
de nature bancaire à Antigua, même si celle-ci était limitée au support clientèle, au traitement des chè-
ques et à la compliance. Ainsi, le siège de SIB à Antigua n'était pas fictif comme le prétend le receiver
Janvey, constituant plus qu'une boîte aux lettres. De plus, le fait que les autorités antiguaises reconnais-
sent que SIB était administrée de fait depuis Houston s'explique aisément par le fait que le gouverne-
ment d'Antigua fait l'objet actuellement d'une class action de la part d'une coalition de victimes de Robert
Allen Stanford (p. 1340 [49]) et qu'il cherche à se défendre. De plus, même si SIB était administrée de-
puis les Etats-Unis, il n'en reste pas moins que son siège statutaire se situe à Antigua et qu'elle est
soumise au droit de cet Etat. L'application de l'art. 17 LDIP ne sera ici d'aucun secours pour le receiver
Janvey, car on peine à voir en quoi reconnaître la décision des autorités d'Antigua emporterait violation
de l'ordre public suisse (sur la réserve de l'ordre public, voir aussi ci-dessous ch. 83).

(73) La requête déposée par les liquidateurs Wastell et Hamilton-Smith concluant à la reconnaissance
de la décision du 17 avril émanant des autorités d'Antigua et Barbuda sera donc examinée en premier
lieu. Ce n'est que si sa reconnaissance ne saurait être prononcée, que la requête du receiver Janvey,
fondée sur l'existence d'un siège effectif et sur la réserve du siège fictif, pourrait être examinée et, pour
autant que l'ensemble des conditions posées à la reconnaissance soient remplies, acceptée.

## M. Conditions de la reconnaissance s'agissant de la requête des liquidateurs Wastell et Hamil-ton-Smith

(74) A teneur de l'art. 166 LDIP, applicable en complément des art. 37f et 37g LB, une décision de faillite
étrangère est reconnue pour autant que la reconnaissance ne viole pas l'ordre public suisse, que la réci-
procité soit garantie et que la faillite selon le droit étranger ait une vocation universelle. En application
des art. 29 al. 1 lit. a et b et art. 167 al. 1 LDIP, la demande de reconnaissance doit être accompagnée
d'une expédition complète et authentique de la décision, laquelle doit être au surplus exécutoire.

(75) <u>Expédition complète et authentique de la décision</u>. En application de l'art. 3 de la Convention sup-
primant l'exigence de la légalisation des actes publics étrangers, conclue à La Haye le 5 octobre 1961
(ci-après la « Convention » ; RS 0.172.030.4), la seule formalité qui puisse être exigée pour attester la
véracité de la signature, la qualité en laquelle le signataire de l'acte a agi et, le cas échéant, l'identité du
sceau ou timbre dont cet acte est revêtu, est l'apposition de l'apostille définie à l'art. 4, délivrée par
l'autorité compétente de l'Etat d'où émane le document. L'apostille est apposée sur le document lui-
même selon le modèle annexé à la Convention (art. 4).



Selon les indications qui figurent sur le site officiel de la Conférence de La Haye sur le droit international privée (http://hcch.e-vision.nl/index_fr.php?act=text.display&tid=37), Antigua et Barbuda a déclaré se considérer liée par la Convention en date du 1er mai 1985. Toujours selon les informations disponibles sur ledit site, l'autorité compétente d'Antigua et Barbuda pour délivrer l'apostille est le « Registrar of the High Court of Antigua ».

(76) Les liquidateurs Wastell et Hamilton-Smith ont versé au dossier en date du 16 juin 2009, un exemplaire original de la décision du 17 avril 2009, munie de l'apostille de La-Haye selon le modèle figurant en annexe à la Convention et émanant du Registrar of the High Court (ci-avant ch. 30), si bien que la première condition mise à la reconnaissance est considérée remplie.

(77) <u>Caractère exécutoire</u>. Le caractère exécutoire d'une décision ne se confond pas avec l'autorité de chose jugée ou son caractère définitif (ATF 126 III 101, JdT 2000 II 41/45). Sera exécutoire, toute décision qui produit des effets typiques de faillite (Gabrielle Kaufmann-Kohler/Antonio Rigozzi, Commentaire Romand LP, art. 166 LDIP, N46), tel que le dessaisissement du failli, la création de la masse, la suspension des poursuites ou des procès en cours. L'effet suspensif d'un éventuel recours devra également être pris en compte dans l'appréciation de l'exécutabilité de la décision. En principe, le requérant devra produire une attestation d'exécutabilité, mais le caractère exécutoire d'une décision pourra aussi ressortir du texte de la décision elle-même ou être démontrée par les dispositions légales pertinentes et la jurisprudence y relative (Gabrielle Kaufmann-Kohler/Antonio Rigozzi, Commetaire Romand LP, art. 166 LDIP, N49).

(78) Selon les liquidateurs Wastell et Hamilton-Smith, le caractère exécutoire de la décision ressort directement de son texte (p. B126). Ils expliquent également que selon les règles de procédure applicables, une telle décision est immédiatement exécutoire, un appel n'emportant pas d'effet suspensif, sauf ordonné par la cour (p. B125). Les dispositions topiques ont été versées au dossier (p. B69 et B1051). Selon un affidavit émanant d'un avocat admis au barreau d'Antigua, l'effet suspensif n'a pas été accordé au receiver Janvey lorsqu'il a été autorisé, en date du 22 juillet 2009, à faire appel de la décision de faillite. Le receiver américain, quant à lui, affirme que les liquidateurs Hamilton et Wastell-Smith n'ont pas démontré le caractère exécutoire de la décision (p.1375), deux appels étant pendants ; il n'allègue toutefois pas avoir obtenu l'effet suspensif par rapport à son appel, ni que celui-ci ait été ordonné par rapport à l'appel interjeté par un ancien client de SIB.

(79) En l'espèce, il ressort des règles de procédure civile versées au dossier que la décision est immédiatement exécutoire (art. 42.8 des *Civil Procedure Rules 2000* – p. B69) et qu'un éventuel appel n'emporte pas d'effet suspensif (art. 62.19 (a) des *Civil Procedure Rules* 2000 – p. B1051). Le dispositif de la décision prévoit du reste une prise d'effet immédiate (p. B12 [31]), ce en des termes express (« *This Order shall take effect from the date hereof* »). Le receiver Janvey n'a pas démontré que les deux appels précités auraient reçu l'effet suspensif. L'autorité retiendra, en conséquence, que la décision du 17 avril 2009 émanant de la Haute Cour d'Antigua et Barbuda est exécutoire.

(80) <u>Réciprocité</u>. Selon l'art. 166, al. 1, litt. c LDIP, une décision de faillite ne peut être reconnue en Suisse que si la réciprocité est garantie dans l'Etat dont elle émane. La réciprocité est limitée aux décisions de même nature et, en l'espèce, contre une entité similaire.



(81) Pour établir que la réciprocité est donnée dans le cas d'espèce, les liquidateurs Wastell et Hamilton-Smith ont déposé un avis de droit rédigé à leur requête par l'Institut Suisse de droit comparé (p. B694 à B699), ainsi qu'une attestation émanant du département de justice d'Antigua et Barbuda (*Ministry of Legal Affairs acting through the office of the Attorney General*) (p. B275 à B277). Le receiver Janvey relève que le signataire de cette déclaration est également président de la *Financial Services Regulatory Commission*, autorité ayant procédé à la nomination des liquidateurs antiguais, ce qui pourrait laisser douter de son impartialité (p. 2242). Il explique, plus loin, qu'un jugement étranger ne peut être reconnu à Antigua en l'absence d'un traité avec le pays dont émane la décision, raison pour laquelle, la décision américaine concernant SIB n'a pas été reconnue par la Haute Court d'Antigua (p. 1374) et que cette absence de réciprocité est même vantée sur un des sites officiels du gouvernement d'Antigua (p. 2298).

(82) Il ressort en effet de l'attestation du Ministry of Legal Affairs d'Antigua versée au dossier, que la reconnaissance à Antigua d'une décision de faillite étrangère s'exerce, en premier lieu, sur la base d'un traité international auquel la Suisse n'est pas partie (p. B275), ce que relève également l'Institut suisse de droit comparé (p. B698 [2ème para.]). Toutefois, tant l'attestation précitée que l'avis de droit précisent, qu'en l'absence de traité, les juridictions d'Antigua et Barbuda se réfèreront à la *Common Law* britannique pour décider d'une mesure de reconnaissance. En application de celle-ci, une décision de faillite étrangère rendue à l'égard d'un institut bancaire sera reconnue à la condition que la décision émane de l'Etat du siège d'incorporation de la personne morale considérée et, s'agissant d'une banque, soit soumise à la surveillance des autorités bancaires compétentes (p. B275 et B693 [2ème para]). L'avis de droit et l'attestation, selon un raisonnement dont le cheminement est identique, concluent ainsi tous deux à l'existence de la réciprocité entre la Suisse et Antigua et Barbuda, l'attestation utilisant même les termes express. Certes, le receiver Janvey s'est vu refuser la reconnaissance de la décision émanant de la Cour de district du Nord Texas pour absence de réciprocité (p. 1387 [75]) et a versé au dossier des documents visant à démontrer celle-ci (p. 2298), mais il ne parvient pas à démontrer que la réciprocité n'existerait pas avec la Suisse. En effet, la décision de non reconnaissance prononcée par les juridictions d'Antigua a été rendue dans des circonstances pour le moins exceptionnelles dans la mesure où la même cour était saisie d'une demande de liquidation de SIB émanant des autorités locales et d'une demande de reconnaissance d'une décision émanant d'une autorité étrangère. Ensuite, les affirmations contenues sur le site internet des autorités d'Antigua et Barbuda doivent être comprises comme un « produit d'appel » ne reflétant pas systématiquement la réalité juridique ou étant limitée à des cas précis d'« asset protection » (soit protection du patrimoine contre les exigences des créanciers, des autorités fiscales ou encore des héritiers). En réalité, ce qui est déterminant en l'espèce est le versement au dossier par les liquidateurs Wastell et Hamilton-Smith d'un acte souverain émanant d'une autorité souveraine, dont la FINMA n'a aucune raison de douter du bien-fondé et d'un avis de droit émanant d'un institut fédéral, dont également l'impartialité ne saurait être remise en cause. Sur la base de ces documents et malgré les allégations contraires du receiver Janvey, la FINMA peut conclure à l'existence de la réciprocité entre Antigua et Barbuda et la Suisse.

(83) Absence de violation d'ordre public. La reconnaissance d'une décision étrangère est exclue en cas de violation de l'ordre public. On ne saurait ainsi reconnaître une décision qui heurte de manière fondamentale les conceptions suisses de la justice, soit en raison de son contenu matériel, soit en raison de la procédure dont elle est issue ; à ce titre, on distingue le droit public matériel, du droit public procédural. A ce dernier égard, la LDIP exige le respect des garanties de procédure fondamentales qui découlent directement de la Constitution, soit le droit à un procès équitable et le droit d'être entendu (ATF 126 III 327, cons. 3 et les références citées). Dans l'examen du critère de l'ordre public insérer, plutôt que de s'attacher à la décision elle-même, il conviendra de vérifier si la reconnaissance et l'exécution de la décision *per se* sont compatibles avec l'ordre public suisse (ATF 126 III 101, JdT 2000 II 41/49 ; Commentaire Romand LP, Gabrielle Kaufmann-Kohler/Antonio Rigozzi, art. 166 N54ss).



(84) Selon le receiver Janvey, la reconnaissance de la décision de faillite du 17 avril 2009 à l'égard de SIB emporterait violation de l'ordre public matériel. En effet, seuls les créanciers de SIB seront en mesure de participer à sa liquidation forcée à l'exclusion des autres personnes lésées par Robert Allen Stanford et le Groupe Stanford. SIB faisant partie d'un tout, il se justifierait d'en allouer ses biens à la satisfaction globale de l'ensemble des créanciers du Groupe Stanford (p.1377 et 1378), faute de quoi, les créanciers de SIB seraient indûment avantagés par rapport aux autres.

(85) Cette argumentation ne convainc pas. Même si les sociétés du Groupe Stanford étaient particulièrement imbriquées entre elles, on ne voit pas en quoi la liquidation séparée de chacune d'entre elles violerait l'ordre public matériel suisse, ce d'autant plus que l'ordre juridique suisse ne connaît pas l'institution de la faillite de groupe. Dans un cas similaire en Suisse, chaque société se verrait liquidée de manière autonome, sans qu'on puisse en conclure que certains créanciers soient indûment avantagés par rapport à d'autre. De plus, faire abstraction de la personnalité juridique de SIB reviendrait à faire abstraction du privilège des créanciers bancaires de SIB et les noyer dans la masse des créanciers du Groupe Stanford dont la plupart ne bénéficient d'aucun privilège.

(86) Le receiver Janvey affirme plus loin que la requête des liquidateurs Wastell et Hamilton-Smith poursuit un but exploratoire, incompatible avec l'ordre public, aux fins de connaître les avoirs de SIB en Suisse (p. 1376 [4ème para]). Or, à nouveau, l'argumentation ne convainc pas. Les liquidateurs Wastell et Hamilton-Smith cherchent à obtenir la reconnaissance de la mesure de liquidation prononcée à Antigua conformément au mandat qui est le leur. On relèvera que le receiver Janvey a lui-même déposé des demandes de reconnaissance en Suisse, en Angleterre, au Canada et à Antigua sans qu'on puisse en conclure qu'il poursuit un but exploratoire.

(87) Le receiver Janvey soutient enfin que la décision du 17 avril a été rendue en violation de l'ordre public procédural puisqu'il n'a pas été cité régulièrement, ni pu exercer son droit d'être entendu (p. 1375 et 1376). Le fait qu'il a été autorisé à faire appel de la décision n'a pas pour effet de réparer la violation de son droit d'être entendu, car « compte tenu des circonstances, l'on est en droit d'être relativement pessimiste quant aux véritables possibilités et résultat de cette intervention » (p. 1375).

(88) Or, il ressort de la décision du 17 avril et de ses considérants, que non seulement le receiver Janvey a présenté ses arguments à la cour par « amicus curiae », mais que son conseil a pu participer aux audiences qui ont précédées la décision (voir ci-avant ch. 23). En outre, sa qualité de partie a été examinée par la cour pour être définitivement écartée dans un jugement du 24 avril 2009 (ch. 26). Dans ces conditions, force est de conclure qu'il n'y a pas de violation de l'ordre public procédural, car le receiver Janvey a pu faire valoir ses arguments, participer aux audiences et voir sa demande examinée. On peine à y voir la violation du droit d'être entendu ou du droit d'être cité régulièrement.

(89) <u>Caractère universel</u>. Il ressort du dispositif de la décision du 17 avril 2009 (ch. 24) que l'ensemble des actifs appartenant à SIB, peu importe leur lieu de situation, sont appréhendés par la procédure de faillite et au bénéfice de l'ensemble des créanciers. Les effets de la faillite n'étant pas limités au seul territoire d'Antigua et Barbuda, la condition de la vocation universelle de la procédure de faillite est ainsi remplie.



(90) A teneur de ce qui précède, la décision de faillite prononcée à Antigua le 17 avril 2009 remplit toutes les conditions posées à la reconnaissance en Suisse d'un tel acte. La reconnaissance sera ainsi prononcée.

**N.  Ouverture de la faillite ancillaire, détermination du for et du cercle des créanciers privilégiés**

(91) Lorsque la FINMA reconnaît une mesure de liquidation étrangère conformément à l'art. 37g LB, les dispositions de l'OFB-FINMA sont applicables aux biens en Suisse (art. 10 al. 1 OFB-FINMA). Il s'ensuit que la FINMA prononcera la faillite ancillaire portant sur l'ensemble des biens appartenant à SIB en Suisse.

(92) A teneur de l'art. 10 al. 2 de l'OFB-FINMA, la FINMA doit également fixer le for unique de la faillite ancillaire en Suisse et déterminer le cercle des créanciers privilégiés selon l'art. 37g LB. Le for est celui-ci du lieu de situation des biens appartenant au failli (Bulletin CFB 48 p. 290 [33]).

(93) Il ressort des pièces versées au dossier que SIB dispose de plusieurs comptes en banque ouverts en majorité à Genève (voir ci-dessus ch. 17). S'agissant de créances contre un institut bancaire, on considère que le lieu de situation des biens se trouve là où le compte est ouvert. En vertu de ce qui précède, le for de la faillite est ainsi fixé à Genève.

(94) La FINMA peut décider d'autoriser les créanciers privilégiés étrangers à participer à l'état de collocation de la faillite ancillaire (art. 37g al. 3 LB). Or, dans la mesure où deux Etats revendiquent déjà la souveraineté sur la faillite de SIB et qu'il est possible que deux procédures de collocation et de distribution soient conduites parallèlement, faire participer les créanciers privilégiés étrangers à la faillite ancillaire en Suisse conduirait assurément à une grande incertitude et complexité juridique qu'il convient d'éviter. En conséquence, seuls seront autorisés à participer à l'état de collocation en Suisse, les créanciers domiciliés en Suisse.

**O.  Nomination des liquidateurs**

(95) Lorsque la FINMA ouvre la faillite ancillaire, elle nomme un ou plusieurs liquidateurs dont la tâche est de déterminer l'étendue des biens en Suisse et de procéder à l'état de collocation (art. 33 al. 2 LB). Dans les cas simples, la FINMA peut renoncer à nommer un liquidateur et mener à bien elle-même la procédure de faillite ancillaire.

(96) En l'espèce, il appert que la procédure de faillite ancillaire peut être menée à bien par la FINMA, laquelle se réservera néanmoins la possibilité de nommer un ou plusieurs liquidateurs en cas de nécessité.



**P.  Exécution immédiate**

(97) En application de l'art. 39 let. c en relation avec l'art. 55 PA, la FINMA peut décider de l'exécution immédiate de la présente décision. L'ouverture de la faillite et les effets qui y sont liés ont pour buts la protection et l'égalité de traitement des créanciers. Pour que ces buts soient atteints, il est indispensable que les mesures ordonnées soient valables sans délai. Comme pour l'ouverture de faillite selon la LP, la présente décision doit être immédiatement exécutoire (Flavio Commetta in Commentaire Romand Poursuite et faillite, art. 174, N 15).

**Q.  Frais**

(98) En application de l'art. 5 al. 1 let. a de l'ordonnance sur les émoluments et les taxes de la FINMA (Oém-FINMA ; RS 956.122) en relation avec l'art. 15 LFINMA, toute personne qui provoque une décision de la FINMA est tenue de payer des émoluments. En application de l'art. 8 al. 3 Oém-Finma, l'émolument dû à titre de frais de procédure est fixé à CHF 20'000.- pour chacune des parties, lesquels seront compensés par les avances de frais déjà effectuées.



**l'Autorité de surveillance des marchés financiers FINMA décide :**

1. La décision de la *High Court of Justice Antigua and Barbuda, dated 15the April 2009, entered 17 April 2009* est reconnue en Suisse ;

2. La faillite ancillaire de Stanford International Bank Limited (in liquidation), à Antigua et Barbuda est ordonnée. Celle-ci est ouverte le

    **8 juin 2010 à 8h00**

3. Le for de faillite se situe à Genève ;

4. L'Autorité fédérale de surveillance des marchés financiers FINMA agit comme liquidateur de la faillite ancillaire de Stanford International Bank (in liquidation) et représente la masse en faillite ;

5. Seuls les créanciers-gagistes et les créanciers privilégiés domiciliés en Suisse à moment du prononcé de la décision sont admis à participer à l'état de collocation de la faillite ancillaire ;

6. Les chiffres 1 à 5 du présent dispositif seront publiés le 18 juin 2010, sur le site internet de la FINMA ainsi que dans la Feuille Officielle Suisse du Commerce (FOSC), de même que l'appel aux créanciers ;

7. Les chiffres 1 à 6 du présent dispositif sont immédiatement exécutoires ;

8. La demande de reconnaissance des décisions des 16 février et 12 mars 2009 de la *United States District Court for the Northern District of Texas Dallas Division* est rejetée dans la mesure où elle est recevable.

9. Les frais de procédure de CHF 40'000.- sont mis à la charge de chacune des parties pour moitié et sont compensés avec l'avance de frais déjà exécutée ;


**L'Autorité fédérale de surveillance des marchés financiers FINMA**


Dr. Patrick Raaflaub                       Daniel Roth
Directeur                                  Membre de la direction élargie


110698/A2b490                                                              20/21



Voies de droit

Un recours peut être déposé auprès du Tribunal administratif fédéral (case postale, 3000 Berne 14) dans un délai de 30 jours dès la notification de la présente décision.

Notification à :

**Ralph Steven Janvey,** représenté avec élection de domicile dans son Etude par Me Birgit Sambeth Glasner, Etude Altenburger, 11 bis rue Rodolphe-Toepffer, 1206 Genève (par fax et recommandé avec accusé de réception) ;

**Nigel John Hamilton-Smith et Peter Nicholas Wastell,** représentés avec élection de domicile en son Etude par Me Nicolas Pierard, Borel & Barbey, 2, rue de Jargonnant, case postale 6045, 1211 Genève 6 (par fax et recommandé avec accusé de réception).

Pour information à :

**Bank Julius Bär & Co. AG,** Bahnhofstrasse 36, case postale 666, 8010 Zurich (dispositif uniquement par fax et recommandé) ;

**RBS Coutts Bank AG,** Stauffacherstrasse 1, case postale, 8022 Zurich (dispositif uniquement par fax et recommandé) ;

**SOCIETE GENERALE Private Banking (Suisse) SA,** Rue de la Corraterie 6, case postale 5022, 1211 Genève 11 (dispositif uniquement par fax et recommandé)

**Banque Franck, Galland & Cie SA,** Rue Toepffer 1, case postale 3254, 1211 Genève 3 (dispositif uniquement par fax et recommandé).

Pour information le 18 juin 2010 à :

**Office des faillites de Genève,** chemin de la Marbrerie 13, Case postale 1856, 1227 Carouge (dispositif uniquement par recommandé).

**EXHIBIT D**



Swiss Financial Market Supervisory Authority FINMA

# DECISION

## of the Swiss Financial Market Supervisory Authority FINMA

## dated 8 June 2010

in the case

## Stanford International Bank (in liquidation)
### 44 Church Street, P.O. Box 2010, St. John's, Antigua, Antigua and Barbuda

regarding

## The recognition of a bankruptcy measure pronounced abroad / commencement of the ancillary bankruptcy

at the request of

**Ralph Steven Janvey,** c/o Krage and Janvey LLP, 2100 Ross Avenue, Suite 2600 Dallas, TX 75201, United States, represented with address for service at its Office by Mr. Birgit Sambeth Glasner, Law Firm Altenburger, 11 bis rue Rodolphe-Toepffer, 1206 Geneva

and

**Nigel John Hamilton-Smith and Peter Nicholas Wastell,** residing c/o Vantis Plc, London West End Office, 66 Wigmore Street, London, United Kingdom, represented with address for service at its Office by Mssrs Nicolas Pierard, Borel & Barbey, 2, rue de Jargonnant, case postale 6045, 1211 Geneva 6

Einsteinstrasse 2, 3033 Berne
Tel: +41 (0)31 327 91 00, Fax +41 (0)31 327 91 01
**www.finma.ch**

finma

**In fact**

**A. Introduction**

(1) On 19 May and 28 May two applications for the recognition of foreign bankruptcy was referred to the Swiss Financial Market Supervisory Authority FINMA, relating to the establishment of Stanford International Bank Limited (in liquidation) (hereafter "SIB"), the sole shareholder of which is Robert Allen Stanford.

(2) The first application was filed by Ralph S. Janvey, appointed *receiver* of SIB by the American authorities (hereafter referred to as "receiver Janvey") and the second by Peter Wastell and John Hamilton-Smith, appointed liquidators of SIB by the authorities of Antigua and Barbuda (hereafter the "Wastell and Hamilton-Smith liquidators").

(3) The following facts emerge from the file delivered to FINMA, the allegations of the parties being recorded where necessary.

**B. Robert Allen Stanford and the Stanford group**

(4) Robert Allen Stanford, born on 24 March 1950, is an American citizen and a citizen of Antigua and Barbuda (file 159860 Series B, p. B201; hereafter "p. B201"). His place of residence has not been able to be clearly established within the context of these proceedings; however it emerges from the file that he divided his time mainly between the American Virgin Islands, at Ste. Croix and at his residence in Antigua. Robert Allen Stanford has not lived in the United States for about fifteen years (p. B192 [44]), although be was arrested on American soil, in Virginia, on 18 June 2009. To date, he remains in custody prior to trial (p. B191).

(5) Robert Allen Stanford was at the head of a group including approximately a hundred units which he directly and indirectly controlled (hereafter the "Stanford Group") (p. 309). The Stanford Group was active in 13 American states, in Canada and a dozen countries in Europe and in South America (p. 688). He offered a broad range of financial and banking services, including the trading of securities and precious metals, setting up *trusts,* the issue of financial products and *private equity* investments (p. 687). The Stanford Group also invested in real estate, as well as in various other industries such as the hotel industry (p. 686). It employed approximately 3000 people, a little less than half of whom in the United States (p. 677).

(6) According to the undisputed evidence appearing in the file, which the international press has largely reiterated, it appears that in fact, Robert Allen Stanford, through the Stanford Group, was at the origin of an enormous fraud of the "snowball" type relating to approximately 7 billion dollars to the detriment of many investors (p. 3339 and p. B132).

(7) It is the suspicion of the setup of this vast *Ponzi scheme* which, moreover, led the U.S. Securities and Exchange Commission to request the American courts for various measures against the companies making up the Stanford Group (p. 783 to 808), including SIB. At the same time, the competent American authorities also commenced criminal proceedings and ordered the charging and arrest of Robert Allen Stanford, his closest collaborators and the head of the Antigua and Barbuda regulation authority, Leroy King (p. 1343 to 1372). According to the international press, Leroy King was arrested in Antigua and currently remains in custody with a view to extradition (file 159860, Series C p. 57; hereafter referred to as p. C57).

finma

**C. Stanford International Bank Limited (in liquidation)**

(8) According to the receiver Janvey, SIB had no other aims and activities than to serve as a vehicle and means for Robert Allen Stanford to better operate his gigantic fraud. SIB, although formally domiciled in Antigua and Barbuda, was in fact administered in the United States and did not exercise any activity in the State where its head office was incorporated. Its banking services were sold by entities located in the United States and its income was immediately allocated to jurisdictions other than Antigua and Barbuda. For the receiver Janvey, SIB was merely a façade intended to gain the confidence of investors in order to make it easier to steal from them. SIB had its actual office in the United States (p. 525 [14 to 22] and p. 139 [31 to 50]).

(9) These assertions are disputed by the liquidators appointed by the jurisdiction of Antigua and Barbuda who explain in substance that banking services were actually offered from Antigua and Barbuda, the place where the customer relations were created, documented and provided (p. B [131]). Therefore, SIB included no less than 80 collaborators in Antigua, (p. B525 [80], who processed, kept accounts and retained the transactions carried out by SIB. The bank statements of all customers were prepared and sent from Antigua and Barbuda (p. 248 [105]).

(10) Incorporation and activities. SIB was incorporated in Antigua on 7 December 1990 (p. B159) under the corporate name Guardian International Bank Limited (p. B157) before changing its name to Stanford International Bank Limited on 20 December 1994 (p. B160). According to its licensor's certificate and pursuant to the law of Antigua, SIB was authorised to conduct "*international banking*" activities (p. B157). In this respect, SIB was able to accept deposits from the public (p. B112 [7]), but only from people not resident in Antigua and Barbuda and in currency other than those from the Caricom (*Caribbean Community)* (p. 1340 and p. B536). SIB was subject to surveillance by the *Financial Services Regulatory Commission of Antigua and Barbuda*, the main director of which, the abovementioned Leroy King responsible for SIB, is suspected of having been an accomplice of Robert Allen Stanford (p. 1362 and 1363).

(11) In its capacity as a bank licensed in Antigua and Barbuda, SIB was authorised to accept deposits from the public, within the limits set out above. Consequently, it issued and sold certifications of deposits bearing interest (p. B375 to B386), offered demand deposit accounts (between 24 hours and 15 days; p. B383), as well as a credit card service (p. B357 and B358). SIB also granted loans and issued letters of credit (p. 353 to 356). These services were, however, not available to Antiguan residents.

(12) Employees and tasks. SIB employed approximately 93 people, including 88 active in Antigua and the remainder in Canada working within a representative office (p. B494 and B495; p. 843 to 848) with a wage bill of 3 million USD. At the same time, SIB paid to other entities in the Stanford Group, the sum of 268 million in fees (p. 128 [38]).

(13) The employees of SIB in Antigua had manuals, procedures and precise instructions regarding the execution of the routine tasks and more generally the activity of SIB in Antigua, namely the opening of accounts, including the *compliance* check and cashing cheques (p. B282 to B393 and p. B978 to B1118). SIB was overseen by a board of directors consisting in particular of Robert Allen Stanford and his father, James Stanford.

finma

(14) <u>Premises</u>. SIB occupied a whole building in Antigua, located in St. John's, which it rented from another entity in the Stanford Group, *Stanford Development Company Ltd* (p. 1391 [38]). Its advertising brochure (not dated) refers to an address in Antigua and indicated a telephone number the prefix of which is the one for Antigua (p. B887 and p. 1148 and 1161).

(15) <u>Customers and money flows</u>. The SIB customers were mainly from North America, Central America and South America. In particular SIB included 37.29% Venezuelan customers totalling 20.98% of deposits, 15.66% American customers totalling 21.85% of deposits (p. B625 and B24). Finally 21.22% of the customers were residents of Mexico, Peru, Panama, Columbia, Haiti, Canada and the British Virgin Islands. These figures do not take into consideration 4,000 bank accounts opened in the name of Stanford Trust Company Ltd in Antigua and Barbuda, the nationality and place of residence of the ultimate beneficiaries of which are not known (p. 251 [34 to 36]).

(16) According to the "*referral manual*" of SIB (p. B363 to B367), only payments from customers made by cheque were deposited with SIB directly; bank transfers from customers were carried out to accounts opened in the name of SIB in the books of the Canada Dominion Bank in Canada for payments in USD or with the HSBC Bank plc in London for payments in GBP. Thus it is not disputed that most of the customers' funds were not directed to Antigua, but to other countries (p. 265).

(17) <u>Assets in Switzerland belonging to SIB</u>. It emerges from the file that SIB had opened several accounts in Switzerland, mainly, if not exclusively in Geneva (p. 342). All the assets located in Switzerland amounted to approximately 353 million (p. 342-43).

**D. Proceedings in the United States**

(18) By decision of 16 February 2009 (p. 146 to 168), at the request of the United States Securities and Exchange Commission (SEC), the United States District Court for the Northern District of Texas Dallas Division (hereafter the "District Court of Northern Texas") ordered the appointment of a "*receiver*" in the person of Ralph S. Janvey with a view to administering all the assets directly or indirectly controlled by Robert Allen Stanford, SIB, Stanford Group Company, Stanford Capital Management LLC, James M. Davis and Laura Pendergest. In his application, the SEC claimed that the establishment of a *receivership* was necessary with a view to protecting the investors against the misappropriation of their assets by Robert Allen Stanford, he in fact being suspected of operating a *Ponzi scheme* (p. 784 to 808). Ralph S. Janvey was thus granted a range of powers, from which it emerges that they were, nevertheless, substantially limited, to acts of a preventive nature (in particular, p. 239 [para. 3], p. 238 [para 5], p. 231 [lit. c and para 14]) and in time, until the expiry of the decision or new decision (p. 239 [para 4]). He also had the mission of obtaining the accounts books and any other company or accounts documents allowing him to draw up an inventory of the assets belonging directly or indirectly to Robert Allen Stanford (p. 230 to 240). Finally it was prohibited for the defendants to interfere in the management of the daily business (p. 234 [para 10 and 11]).

finma

(19) By decision of 12 March 2009, the text of which is almost identical to the first, the powers of the receiver Janvey were extended (p. 216 to 227). In particular he was authorised to present a bankruptcy application according to *Chapter 11 of the United States Bankruptcy Code* (p. 222 [para 6]): *"The Receiver shall have the sole and exclusive power and authority to manage and direct the business and financial affairs of the Defendants, including without limitation, the sole and exclusive power and authority to petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 and subsequent (the "Bankruptcy Code")"*. Art. 101 to which it refers defines "*petition*" as any application filed according to articles 301 to 304 of the Bankruptcy Code. Article 303 deals in particular with non voluntary bankruptcy.]). The option to request bankruptcy was denied to any other person (p. 220 [para 10 lit. e]).

(20) According to both abovementioned decisions, all the assets belonging to SIB, no matter where they are located, were ordered to be administered by the court (p. 168 [1] and 157 [1]). However, it does not follow from this that the receiver has the power to distribute the bankruptcy assets to the creditors: at most, it is his duty to protect their interests by maximising the assets in the bankruptcy. Distribution is, however, possible on the basis of a fair *ad hoc* plan approved by the court (p. 316 [22]).

(21) By instrument dated 15 May 2009, the liquidators Wastell and Hamilton-Smith were authorised to present, before the American courts, an application for the recognition of the compulsory liquidation decision from the authorities in Antigua and Barbuda as the "*foreign main proceeding*" (p. B1033 to B1037). No judgement has been delivered to date.

**E. Proceedings in Antigua**

(22) At the request of the *Financial Services Regulatory Commission*, the *High Court of Justice in Antigua and Barbuda* pronounced the *receivership* of SIB by decision of 26 February 2009 and appointed Nicholas Peter Wastell and Nigel Hamilton-Smith as the *manager-receivers,* responsible for protecting the assets of SIB and preventing their misappropriation (p. B92 to B96).

(23) Subsequently, the putting into liquidation and winding-up of SIB was pronounced by decision of 17 April 2009 by the High Court of Antigua and Barbuda; Nicholas Peter Wastell and Nigel Hamilton-Smith were appointed the liquidators (p. B145 to B154). The putting into liquidation was declared immediately enforceable (p. B145 [31]). It emerges from the decision of 17 April and from its recitals, that not only did the receiver Janvey present his arguments to the court by "*amicus curiae*", but that his adviser was also able to participate at the hearings which preceded the decision (p. B154).

(24) According to the abovementioned decision, all the assets of SIB, no matter where they were located, were administered by the court (p. B152 [4]). It emerges from the text of the decision that it is the duty of the liquidators to collect all the SIB assets in order to allocate them to the collective satisfaction of its creditors. The assets realised in this way will serve in the first instance to pay off the costs of the bankruptcy assets, as well as the former employees of SIB, then creditors according to the rank set out in law, in this case the International Business Corporations Act of 1982, and finally the SIB shareholders (p. B78 [7.1 to 7.4] and p. B812 [art. 289]). It emerges from the provisions of the law that in the event there are insufficient assets, the creditors are compensated in proportion with their claim, according to the priority of categories (p. B812 [art. 289 (3)]). All creditors, irrespective of their residence, may participate in the distribution of the assets (p. B820 [16], p. B812 [art. 280])

finma

(25) The receiver Janvey was authorised to give notice of appeal of this decision (p. B756 [6]). It appears that an SIB creditor had also announced his intention to give notice of appeal, without it being clearly defined if this was the case (p. B756 [7]). Suspensive effect was granted to the receiver Janvey (p. B756 [6]): furthermore he did not claim the contrary.

(26) Finally, by decision of 24 April 2009, the High Court of Antigua and Barbuda dismissed the application of the receiver Janvey to appear in his capacity as a party to the proceedings (p. B92 to B113).

**F. Applications for recognition before FINMA**

(27) Receiver Janvey. By petition of 19 May lodged before this Authority, receiver Janvey requested authority to execute the decision issued by the District Court of Northern Texas dated 16 February 2009 (p. 327). By letter dated 28 May 2009, the adviser of receiver Janvey explained that he also requested the authority to execute the decision of 12 March 2009 (p. 344).

(28) The certified copies and marginal notes of the abovementioned decisions were filed in court (p. 397 to 420), as well as a *"certificate of effectiveness"* signed by a lawyer practising at the bar in Texas aiming to demonstrate the enforceable nature of both decisions, together with a copy of art. 62 of the American code of civil procedure (*"Rules of civil procedure"*; p. 169 to 172).

(29) Liquidators Wastell and Hamilton-Smith. By request of 27 May 2009 lodged before this Authority, the liquidators Wastell and Hamilton-Smith requested authority to execute the decision of the High Court of Antigua and Barbuda of 17 April 2009.

(30) The original of the abovementioned decision, together with the marginal note by Haye was filed in court (p. B143 to B155), as well as an extract from the applicable law of procedure and an affidavit aiming to demonstrate the enforceable nature of the decision, as well as the suspensive effect of any appeal (p. B89 [6] and p. B69 [42.8]).

(31) Both parties were able to take a position on the allegations of the other by pleadings of 17 August 2009, an exchange of documents having been ordered (p. 431 and B136). Receiver Janvey added to his application and filed new documents in court on 28 May, 4 and 11 June, 3 and 21 July, 28 September, 7, 11, 22 December 2009, 7 January, 4 and 24 March, 20 April 2010. The liquidators Wastell and Hamilton-Smith filed an application to be joined to the proceedings dated 25 May 2009 and a request for recognition dated 28 May 2009. This was added to and new documents filed in court on 15 June, 27 July, 8 October, 3 December 2009, 28 January, 2 March, 14 April and 7 May 2010.

**G. Proceedings before the Court of first instance of the canton of Geneva**

(32) By application of 4 May 2009, the liquidators Wastell and Hamilton-Smith requested from the court of first instance of the canton of Geneva the authority to execute the liquidation decision of 17 April 2009 issued by the Antigua authorities (p. B825 to B835). The receiver Janvey intervened at the court to object to their application (p. 481 to 497). Following two hearings, the liquidators withdrew their request (p. 479 and 480) without receiving the approval of the American receiver. The court in Geneva struck the case off the list by notice of 11 June 2009 (p. B568 and B569).

finma

**Reasons in law**

**H. Joinder of cases**

(33) Two competing applications were referred to FINMA specifying the recognition of two liquidation decisions relating however to the same establishment. The conclusions reached by the parties are identical.

(34) Even if the joinder of cases is not formally set out in Federal law regarding administrative proceedings (PA; RS 172.021), this may be pronounced in accordance with the principle of procedural economy (Judgement of the Federal Administrative Court C-873/2006 of 16 October 2007) and in order to avoid the risk that contradictory judgements are pronounced (see also ATF 123 V 214, recital E. 1: "*Administrative law appeals involve similar evidence, relate to common legal matters and are directed against the same judgement, so that it is justified to join them and to assess them in a single judgement."* To this it can be added that art. 31 PA requires that each of the parties is heard regarding the allegations of the other if they are defending divergent interests.

(35) In this case, the joinder allows FINMA to conduct one and the same recognition proceeding and is therefore, consistent with the principle of procedural economy. It also makes it possible to ensure that no contradictory judgement is delivered and that the right to be heard is observed for both parties, who have reached identical conclusions, but paradoxically, pursue divergent interests.

**I. Competence of a court ratione materiae**

(36) According to art. 37g subparagraph 1 of the law regarding banks (LB; RS 852.0), FINMA is the only authority competent to pronounce the recognition of an insolvency measure pronounced against a bank located abroad.

(37) <u>Foreign Bank</u>. The notion of a foreign bank is defined in art. 1 subparagraph 1 of the FINMA order regarding foreign banks (OBE-FINMA; RS 952.111). According to this provision a foreign bank: (i) is any enterprise organised according to foreign law and which has foreign authorisation to practise a banking activity, (ii) displays the term "bank" in its corporate name, in the description of its company purpose or in its commercial documents or (iii) practises a banking activity in the sense of art. 2a of the order regarding banks (OB; RS 952.02). These conditions are alternatives (CFB Bulletin 48 (2006) p. 281/282).

(38) SIB is a legal entity organised according to the law of Antigua and Barbuda (see supra ch. 10). Subject to the supervision of the *Financial Services Regulatory Commission of Antigua and Barbuda,* it has a license allowing it to conduct international banking transactions and its corporate name includes the word "bank". It is able to accept deposits from the public (except residents of Antigua and Barbuda) and to issue in return certificates bearing interest; it granted loans, even if this activity was limited (see above ch. 11).

(39) As it is organised in accordance with foreign law, holds a banking license, practises a banking activity and bears the term "bank" in its corporate name, SIB must be considered to be a foreign bank as in art. 1 subparagraph 1 OBE-FINMA. In this respect, it will be established that the fact that that SIB was able to serve as a vehicle aiming to commit offences against the assets, within the Stanford Group, does not in any way change its status as a bank in the formal sense.

finma

(40) <u>Insolvency measure</u>. The definition of the decision for which recognition is requested is made according to the court with jurisdiction (Gabrielle Kaufmann-Kohler / Antonio Rigozzi, French comment LP, art. 166 LDIP N7). Art. 37g LB is not limited to making provision for the recognition for bankruptcy decisions alone. On the contrary, it includes all decisions and measures relating to insolvency. An insolvency decision according to art. 37g LB, for which authority to execute may be required before FINMA, is a procedure which occurs under the control of an authority or a court, with a view to responding to a situation of overindebtedness or insolvency, in which, the equality of the creditors is retained, at the very least, within the categories, and for which the ultimate aim is either to continue the enterprise, or, in the event of failure, the general implementation involving the allocation of all the debtor's assets to the collective satisfaction of the creditors. In the examination of the status of the decision for which authority to execute is requested, the content of the foreign law is automatically established, pursuant to art. 16 of the Federal law regarding international private law (LDIP; RS 29). The parties, however, are not exempt from collaborating in its establishment (ATF 124 I 49, cons. 3b).

(41) <u>Receivership under American law</u>. The receiver Janvey asserts that receivership is an insolvency procedure which has the aim of the collective satisfaction of the creditors according to a fair scheme previously approved by a court (p. 334; p. 1393 to 1395). He also explains that according to his duties as receiver, he is obliged to liquidate the assets of the Stanford Group, including SIB, and to redistribute the proceeds according to a scheme approved by and under the supervision of the United District Court Judge (p. 314). His powers would be similar to those of a *trustee in bankruptcy*, as the setting up of the *receivership* is frequently used within the context of insolvent companies, because this presents the advantage of being less costly for the creditors (p. 311-315). In support of his assertions he produces an American decision, issued by the 6th Circuit (Court of Appeal), Liberte Capital Group, LLC v Capwill, 462F.3d 543 (6th Cir. 2006), a memorandum signed by an American practitioner (p. 1371-1372) and an affidavit by a law professor from the University of Texas asserting that he has sound experience in matters of insolvency (p. 189-214). The assets placed in receivership are distributed according to a scheme observing the concept of the equality of creditors (p. 1371 and 1372).

(42) The assertions of the receiver Janvey are disputed by the liquidators Wastell and Hamilton-Smith, according to who the American *receivership* is a procedure of a preventive nature the ultimate aim of which is not the distribution of the assets to the creditors, but the protection of the bankruptcy assets (p. B238 to 249). In support of their allegations, the liquidators Wastell and Hamilton-Smith produce an affidavit from a lawyer practising insolvency law (p. B859 to B884) and a judgement from the High Court of Justice Chancery Division (English courts) for which the *receivership* established by the decisions of 16 February and 12 March 2009 is not a procedure relating to insolvency in the sense of the standard law of the United Nations Commission for international commercial law on international insolvency (p. B630 to B658).

(43) The *receivership* was ordered and the receiver Janvey appointed at the request of the United States Securities and Exchange Commission (ch. 18), a supervisory authority for traders of securities. In his application, he requested the court to establish a receivership with a view to protecting the investors against the misappropriation of their assets by Robert Allen Stanford, as he was, in fact, suspected of operating a *Ponzi scheme* (ch. 18). Moreover, it emerges from the text of the first decision delivered by the Courts in Texas that the mission of the receiver Janvey was limited to preventive measures aiming mainly to protect the assets belonging to the Stanford empire and to prevent their misappropriation. He also had the mission of obtaining the accounts books and all other company and accounts documents allowing him to draw up an inventory of the assets belonging directly or indirectly to Robert Allen Stanford (above ch. 18 and 19).

finma

(44) The text of the second decision is almost identical to the first except that the receiver is expressly authorised to present a bankruptcy petition: "*The Receiver shall have the sole and exclusive power and authority to manage and direct the business and financial affairs of the Defendants, including without limitation, the sole and exclusive power and authority to petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 and subsequent (the "Bankruptcy Code")*". Art. 101 in question defines "*petition*" as any petition filed according to art. 301 to 304 of the Bankruptcy Code. Art. 303 deals in particular with involuntary bankruptcy.

(45) However, it does not emerge from the abovementioned decisions that the receiver has the power to distribute the assets of the bankruptcy to the creditors: at most, it is his duty to protect their interests by maximising the assets of the bankruptcy. Distribution is, however, possible on the basis of a fair *ad hoc* plan approved by the court (ch. 20). However, even if the receiver Janvey asserts that the plan must be "fair", it is not established or possible to establish if the principle of the equality of creditors will be observed.

(46) Consequently, if it is possible to assert that the receivership is a procedure aiming at collectively satisfying the creditors of an entity by means of its assets, under the supervision of a court, this authority is not in a position to establish that the principle of equality of creditors is observed. This matter may remain open, as will be seen below within the context of the interpretation of art. 37g LB (see below ch. 62ss).

(47) <u>Liquidation according to the law of Antigua and Barbuda</u>. The liquidators Wastell and Hamilton-Smith allege that the liquidation procedure in Antigua is in every way similar to a bankruptcy procedure in Switzerland since SIB is wound up and liquidated, under the supervision of a judiciary power, and as its assets must be paid to all its creditors under the administration of a court, the principle of equality is, in fact, observed (p. B127; p. B256 to 258). They file in court the relevant extracts of the law (ch. 30). The receiver Janvey does not take a position with regard to this matter.

(48) It emerges from the text of the decision of 17 April 2009 that winding-up with liquidation of SIB is ordered and that it is the duty of the liquidators to collect all the assets of SIB in order to allocate them to the collective satisfaction of the creditors. The assets realised in this way will serve to pay off the bankruptcy costs in the first instance, as well as the former employees of SIB, then the creditors according to the rank provided for in law, in this case the International Business Corporations Act of 1982, and finally the SIB shareholders (above ch. 24). It emerges from the provisions of the law that in the event of insufficient assts, the creditors are compensated in proportion with their claim, according to the system of priority of categories (ch. 24). All creditors, without regard to their place of residence, may participate in the distribution of the assets (ch. 24). The procedure described in this way corresponds in every way to the definition of the principle of an insolvency measure set out above (ch. 40). It will be a matter for the authority to which the case to wind up the company is referred and, through the liquidators, to assume jurisdiction for these assets, realise them, then allocate them to the collective satisfaction of the creditors. The authority must pay off the creditors according to a pre-established order of priority which will make it possible to guarantee their equality within the categories. In the event of insufficient assets, the first category creditors are paid off as a priority over the subsequent categories, and they will compete pro rata within their categories.

(49) Under the terms of the above, FINMA is competent with regard to the matter of assuming jurisdiction for the application for the authority to execute by the liquidators Wastell and Hamilton-Smith.

finma

### J. Active legitimation

(50) According to art. 37g LB and 166 LDIP, a foreign insolvency measure delivered in the State where the debtor is resident is recognised in Switzerland at the petition of the authorised representatives or of a creditor. The term authorised representative means any person, who by virtue of the law or of the decision in question, has the power to administer, manage and alienate the debtor's assets (see to this effect, Hans Hanisch, Die Vollstreckung von ausländischen Konkurserkenntnissen in der Schweiz, AJP/PJA 1999, p. 17/18 p. 23).

(51) In this case, under the terms of the decisions of 16 February and 12 March 2009, the receiver Janvey is entitled to administer and manage the assets of SIB, as well as to realise them.

(52) The same applies for the liquidators Wastell and Hamilton-Smith under the terms of the decision issued by the High Court of Antigua and Barbuda of 17 April 2009.

(53) Both receiver Janvey and the liquidators Wastell and Hamilton-Smith are, therefore, competent to request the authority to execute the decisions of 16 February and 12 March 2009 and 17 April 2009, respectively. FINMA took up the case for each of the petitions.

### K. Defence of res judicata

(54) The receiver Janvey, in his adviser's writings, raises the defence of *res judicata* against the petition filed by the liquidators Wastell and Hamilton-Smith before this authority. In fact, according to the receiver Janvey, the unilateral withdrawal of their petition before the courts in the canton of Geneva by the latter would have the value of a judgement on the merits with res judicata or final judgement in the factual sense (p. 1383). He explains that lodging the original of the summons written by the registrar implies commencement of legal proceedings and also creates procedural relationship. In such a case, the unilateral withdrawal constitutes withdrawal of an action provided with res judicata (p. 1382).

(55) In accordance with Federal law, the existence of a first judgement is a hindrance to the commencement of a new civil procedure if the latter divides the same parties, whether it relates to the same claim or whether it is based on the same complex evidence (principle of res judicata; ATF 119 II p. 89). However, in principle only judgements on the merits and exceptionally procedural judgements only when they are deciding on admissibility acquire the defence of res judicata (ATF 127 I 133/139; ATF 115 II 187/189). Condamnatory or formative decisions which put an end to disputes relating to rights and obligations, the status of a person or even application for a declaratory judgement are judgements on the merits, in brief those which decide on the merits of a claim (Fabienne Hohl, Civil Procedure, T.I, N 1239 and 1259, 2001). Decisions on admissibility are decisions which decide on the existence of a procedural condition, in particular the *ratione loci* jurisdiction. A judgement establishing the lack of *ratione loci* jurisdiction prevents the plaintiff from renewing its action, based on the same evidence, before the same court (SJ 2009 I 92 and Adrian Staehelin/Daniel Staehelin/Pascal Grolimund, Zivilprozessrecht, 2007, p. 412).

finma

(56) In this case, it is appropriate to establish that the ordinary court would not have been competent *ratione materiae* to assume jurisdiction for the petition. Therefore, even if the proceedings had continued, it would have resulted in an inadmissible judgement which would not have prevented the plaintiff from renewing its case before FINMA.

(57) In addition, in the specific case of a recognition decision, the requested State allows a foreign decision to deploy it effects on its own territory (ATF 120 II 83/86) therefore, renouncing part of its sovereignty. The recognition decision is, therefore, neither condemnatory nor declaratory. It does not imply creation of rights and obligations (ATF 134 III p. 367, cons. 3.3, JdT 2009 I p. 287, cons. 3.3; ATF 129 III 626/635), because it cannot have more effect than the decision for which authority to execute has been requested. As a general rule, Swiss law grants recognition if the conditions are met (Paul Volken, ZK-IPRG, Art. 25, N 6ss and Art. 27 LDIP N 1 and 54, 2 ed.) and tends to avoid a debate on the material substance (ATF 120 II 83, JdT 1995 I 14/16), because it is not the responsibility of the Swiss court to take another decision regarding a matter settled by foreign courts.

(58) The petition for recognition lodged by the liquidators Wastell and Hamilton-Smith with the Court of First Instance in the canton of Geneva did not, therefore, have the aim of creating new rights and obligations for each of the interested parties, but to obtain recognition of a foreign law measure on Swiss territory and to allow it to deploy its effects there. In such a case, the court was not called on to settle a matter of substantive law, but to decide if the conditions of the recognition were met *in casu*. Consequently, it is of little significance that the proceedings are ended by the unilateral withdrawal of the petition by the applicants or by a judgement of lack of jurisdiction as a result of the matter, the defence of res judicata cannot be relied on because the commenced proceedings did not have the aim, and would not have the effect of settling a substantive dispute between two parties.

(59) The defence of res judicata raised by the receiver Janvey is, consequently, dismissed.

**L. The principle of unity of bankruptcy and the tension between the recognition of the actual head office and the head office where the company is incorporated**

(60) According to art. 37g al. 1 and 2 LB, FINMA decides on the recognition of decisions relating to the insolvency pronounced abroad. I may also recognise such measures if they are pronounced in the State where the bank has its actual head office.

(61) Two competing applications for recognition of compulsory execution have been referred to FINMA in this case, one issued by the State where the company is incorporated, the other by the State of the actual head office of a banking institution. Recognition of these two decisions at the same time cannot be pronounced. In fact, the principle of the unity of bankruptcy established in art. 55 of the Act regarding the pursuit of debts and bankruptcy (LP; RS 288.1) prohibits commencing two bankruptcies at the same time. This principle is a result of international law art. 167 subparagraph 2 LDIP which prevents the commencement of simultaneous ancillary bankruptcy proceedings (Henri-Robert Schübbach, French Comment LP, art. 55, N17). As recognition of bankruptcy leads as of right to the commencement of ancillary bankruptcy proceedings, recognition will only be pronounced regarding a single foreign decision.

finma

(62) Under these conditions, it is justified to adopt the interpretation from art. 37g subparagraph 1 and 2 to assess which order of priority will be given in such a case as this in order to deal with the two petitions.

(63) According to the recognised principles of interpretation, the law can be interpreted in accordance with its letter; in the event of uncertainty regarding the sense of the standard, the real meaning of the provision in question may be established by examining the preparatory documents (interpretation, history), according to the standard practice of the law (systematic interpretation) and the aim and sense of the law (teleological interpretation) (ATF 133 III p. 497, cons. 2.5 and the quoted references).

(64) According to the second subparagraph of art. 37g LB, FINMA *may* pronounce recognition of a foreign decision relating to a bank and issued by the State where its actual head office is located. The jurisdiction of FINMA to recognise a decision from the actual head office is tempered with the use of the condition depending on the discretion of the party "may", but also by the addition in the text of the adverb "also". Taken in its strictly literal sense, the law offers the *option* to the authority to recognise a decision by the State where the actual head office is located, but does not make this an obligation. Therefore, it is a matter of an option which is offered to it, or even a prerogative. The order of the subparagraphs and the choice of words, therefore, make it possible to conclude without dispute that legislation starts from the principle that only in the absence of a decision from the State where the head office is incorporated would a measure by the State where the actual head office is located, be taken into consideration.

(65) Recognition of a decision from the place where the head office is incorporated is not expressly referred to in subparagraph 1 of art. 37g LB. This subparagraph deals in the first instance with the jurisdiction of FINMA to take a decision on the recognition of a foreign decision relating to the insolvency of a banking institution. Introduced by the new decision dated 3 October 2003, it was a matter here of reflecting on an international scale, the desired solution on a national scale, namely the transfer of jurisdiction for pronouncing bankruptcy and conducting the associated liquidation procedure from the cantonal authorities to the former Federal Banking Commission (Message relating to the amendment of the Federal law regarding banks and savings banks dated 20 November 2002, FF 2002 7476/7516; hereafter referred to as the "Message").

(66) On a systematic level, it should be pointed out that art. 37f and 37g LB are provisions that fall under both the banking legislation and also the legislation of international private law. The case in point is a matter of special standards, applicable to banks only, which is added to articles 166ss LDIP regarding international bankruptcy and which should be interpreted within this context.

(67) According to art. 166 subpara. 1 LDIP, a bankruptcy decision delivered in the State where the debtor is resident will be recognised in Switzerland. For companies, the statutory head office is equivalent to domicile in accordance with art. 21 subparagraph 2 LDIP. In the absence of such a designation or a result that is inconsistent with Swiss public policy, the head office of a company is located where it is in fact administered, it being recalled that in general, the LDIP is hostile to the connecting factor of the actual head office, all the more so since the reservation of the fictitious head office based on the theory of fraudulent evasion of the law was abandoned with its entry into force (ATF 128 III 346/351; ATF 117 II 494, cons. 6c; Max Keller/Jolanta Kren Kostiewicz, ZK-IPRG, 2 ed., art. 21, N6). Hence the LDIP does not set out the possibility of recognising a bankruptcy decision delivered in the State where the actual head office of the company is located (Paul Volken, ZK-IPRG, Art. 166, 2 ed., N51; Decision of the Federal Court 5P. 472/2004 of 23 February 2005, cons. 5.2) and even if the matter remains controversial in matters of international bankruptcy (see Saverio Lembo/Yvan Jeanneret, The recognition of a foreign bankruptcy [Art. 166 and subsequent articles LDIP]: inventory and practical considerations, SJ 2002 II 247/256 for a brief summary), the Federal Court sticks to the theory for the time being of incorporation as set out in the ATF 117 II 497 and as required by legislation. Such a systematic interpretation of art. 37g subparagraph 2 LB and within its context of standards of international private law, therefore, allows a rule and its exception to be defined for banking institutions.

The rule is that of recognition of an insolvency decision delivered by the State of the registered office of incorporation, and in its absence and exceptionally a decision of the State of the effective registered office will be able to be recognised.  With a desire to be exhaustive, it will be stated that art 167 para, 2 FAIPL [Federal Act on International Private Law] does not apply because it is a rule of conflict of jurisdiction on a domestic basis and not on an international level.

(68) This conclusion is also corroborated by a historic and teleological interpretation of the standard.  Indeed, it emerges from the Message, transcribing word for word the related expert's report (Streamlining and liquidation of banks, protection of depositors, Report of the Commission of Experts instituted by the Federal Department for Finances, October 2000, p.76), that the legislator intended to fill a gap in the FAIPL by introducing the possibility for the former CFB of also delivering recognition of a decision delivered by the State of the effective registered office, for the purposes of promoting better coordination of transnational insolvency proceedings.  The practice had in fact demonstrated that certain foreign authorities, like the former CFB, would sometimes open insolvency proceedings at the "real" registered office of the bank (Message p.7516).  The introduction of this possibility did not have the aim of radically modifying the system laid down by the FAIPL, but just to respond to a practical need on an international level in a well specified scenario (namely absence of decision from the State of incorporation).  Consequently, it is also justified under this angle to give priority to a decision delivered by the State of the statutory registered office.

(69) This is all the more true since the imperatives of legal safety impose enabling litigants to base their decisions on clear and predictable standards, which would not be the case if recognition could be granted *at the choice* either of the State of the statutory registered office or the State of the effective registered office, without a certain framework being available to authorities and litigants to guide them in the examination of such a question (ATF 117 II 494, recital 6c; Frank Vischer; ZK-IPRG, Art 157, N12).  Thus, recognition of a decision delivered by the State of the effective registered office would only be delivered in the absence of decision from the State of the registered office of incorporation.

(70) For the receiver Janvey however, the registered office of SIB in Antigua is fictitious and artificial, with all decisions being made in the United States and the customer information additionally being kept there (p.1392 [25 to 28]).  He claims that SIB did not have the right to provide banking services to residents of Antigua and Barbuda.  Its results were fictitiously determined by Robert Allen Stanford and his henchman James Davis and most of its activities were outsourced (p.1391 [33 to 39]).  SIB was allegedly not really supervised by the Antiguan regulator, since its director was on the payroll of Robert Allen Stanford (p.1390 [43]).  The government of Antigua itself will have recognised that the effective administration of SIB took place from Houston (p.2294).  These circumstances, in his opinion, would justify treating the registered office of incorporation with disdain and recognising the decision of insolvency delivered by the effective registered office.  In short, the receiver Janvey is drawing on the theory of misuse of the law which prevailed before the FAIPL took effect.

(71) As seen above (ch. 67), the FAIPL abandoned the theory of reservation of fictitious registered office (ATF 117 II 494, recital 6c; Gabrielle Kaufmann-Kohler/Antonio Rigozzi, Commentaire Romand LP, art 166 FAIPL, N27) to limit recognition, except in exceptional cases, to decisions delivered in the State of the registered office of incorporation.  Art 17 FAIPL (reservation of public policy) constitutes one of these exceptional cases (unlike the reservation of fictitious registered office, the other being absence of decision delivered by the State of incorporation) and makes it possible to ignore the statutory registered office when fundamental principles of Swiss company law appear to be breached pursuant to the law of the State of incorporation (Frank Vischer, ZK-IPRG, 2nd ed, art 154, N32).

Vischer cites, for example, recognition of a decision entailing breach of the elementary rights of the minority shareholders of a company, but it could be considered that a decision which would totally exclude the liability of the members of the Board of Directors, such that they would not answer for their acts with regard to the shareholders or creditors, would infringe Swiss public policy. Generally, it should prove to be restrictive with the conditions of application of the reservation of public policy, as Swiss law does not aim to replace foreign law even in the event of differences in assessment (ATF 134 III 661/665; ATF 126 II 327/330).

(72) In this instance, it emerges from the proceedings that SIB was not just a simple PO Box in Antigua, even if it is true that its activities were restricted there.  SIB had premises there and employed no fewer than 80 people there who were working on administrative and representation tasks (see above ch. 10 to 16).  Thus, this authority cannot agree with the receiver Janvey when he declares that the registered office of SIB in Antigua was only a front: SIB and its employees did actually exercise a banking activity in Antigua, even if this was limited to customer support, processing cheques and compliance.  Thus, the registered office of SIB in Antigua was not fictitious as the receiver Janvey claims, constituting more than just a PO Box.  Moreover, the fact that the Antiguan authorities recognise that SIB was in fact administered from Houston can easily be explained by the fact that the government of Antigua was currently subject to a class action by the coalition of victims of Robert Allen Stanford (p.1340 [49]) and that it was seeking to defend itself. Furthermore, even if SIB was administered from the United States, it nevertheless remains that its statutory registered office was based in Antigua and that it is subject to the law of this State. Application of art 17 FAIPL will not give any backup here for the receiver Janvey, because we can scarcely see in what way recognising the decision of the authorities of Antigua would entail breach of Swiss public policy (with regard to the reservation of public policy, see also below ch. 83).

(73)  The petition lodged by the liquidators Wastell and Hamilton-Smith concluding on the recognition of the decision of 17 April delivered by the authorities of Antigua and Barbuda will therefore be examined in the first instance.  It is only if its recognition cannot be delivered that the petition of the receiver Janvey, based on the existence of an effective registered office and on the reservation of the fictitious registered office, could be examined and, while all conditions necessary to the recognition are fulfilled, accepted.

## M. Conditions of recognition with regard to the petition of the liquidators Wastell and Hamilton-Smith

(74) According to art 166 FAIPL, applicable in complement to arts 37f and 37g BL [Banking Law], a foreign decision of insolvency is recognised where the recognition does not breach Swiss public policy, where reciprocity is guaranteed and where the insolvency in accordance with the foreign law is intended to be universal.  Pursuant to art 29 para. 1 letter a and b and art 167 para. 1 FAIPL, the petition for recognition must be accompanied by a full and authentic certified copy of the decision, which must additionally be enforceable.

(75) Full and authentic certified copy of the decision.  Pursuant to art 3 of the Hague Convention Abolishing the Requirement of legalisation for Foreign Public Documents, entered into in The Hague on 5 October 1961 (hereinafter the "Convention"; RS 0 172 030 4), the only formality that can be demanded to certify the veracity of signature, the capacity in which the signatory has acted and, where applicable, the identity of the seal or stamp borne by this deed, is the apposition of the apostille as defined in art 4, issued by the competent authority of the State from where the document is issued.  The apostille is issued on the document itself in accordance with the template to the Convention (art 4).

According to the indications featuring on the official site of The Hague Conference on International Private Law (http://hcch.e-vision.nl/index_fr.php?act=text.display&tid=37), Antigua and Barbuda declared that it considered itself to be bound by the Convention dated 1st May 1985.  Still according to the information available on the said website, the authority of Antigua and Barbuda with jurisdiction to deliver the apostille is the "Registrar of the High Court of Antigua".

(76) The liquidators Wastell and Hamilton-Smith submitted to the case on 16 June 2009 an original copy of the decision of 17 April 2009, complete with the apostille of The Hague in accordance with the template featuring in appendix to the Convention and issued by the Registrar of the High Court (ch. 30 above), such that the first condition for recognition is considered to be fulfilled.

(77) <u>Enforceable nature</u>.  The enforceable nature of a decision must not be confused with its authority of res judicata or its unappealable nature (ATF 126 III 101, JdT 2000 II 41/45).  Any decision which produces typical effects of insolvency shall be enforceable (Gabrielle Kaufmann-Kohler/Antonio Rigozzi, Commentaire Romand LP, art 166 FAIPL, N46), such as disinvestment of the insolvent party, creation of the body of creditors, or suspension of proceedings or trials underway.  The suspensive effect of any appeal must also be taken into account in assessment of the enforceability of the decision.  In principle, the requesting party must produce a certificate of enforceability, but the enforceable nature of a decision may also arise from the text of the decision itself or be demonstrated by the relevant legal provisions and the related case law (Gabrielle Kaufmann-Kohler/Antonio Rigozzi, Commentaire Romand LP, art 166 FAIPL, N49).

(78) According to the liquidators Wastell and Hamilton-Smith, the enforceable nature of the decision emerges directly from its text (p. B126).  They also explain that according to the applicable Civil Procedure Rules, such a decision is immediately enforceable, with an appeal not entailing any suspensive effect except where ordered by the Court (p. B125).  The topical provisions have been submitted to the case (p. B69 and B1051).  According to an affidavit issued by a barrister of Antigua, suspensive effect was not granted to the receiver Janvey when he was authorised, on 22 July 2009, to appeal against the decision for insolvency.  The American receiver declared that the liquidators Wastell and Hamilton-Smith had not demonstrated the enforceable nature of the decision (p.1375), with two appeals pending; he did not however allege having obtained suspensive effect in relation to its appeal, nor that this had been ordered in relation to the appeal lodged by a former customer of SIB.

(79) In this instance, it emerges from the Civil Procedure Rules submitted to the case that the decision was immediately enforceable (art 42.8 of the Civil Procedure Rules 2000 – p.B69) and that an appeal does not entail a suspensive effect (art 62.19 (a) of the Civil Procedure Rules 2000 – p.B1051).  The enacting clauses of the decision additionally stipulate immediate effect (p.B12 [31]), in express terms ("This Order shall take effect from the date hereof".)  The receiver Janvey has not demonstrated that the two aforementioned appeals have received suspensive effect.  Consequently, the authority shall uphold that the decision of 17 April 2009 from the High Court of Antigua and Barbuda is enforceable.

(80) <u>Reciprocity</u>.  According to art 166, para. 1, letter c FAIPL, a decision of insolvency can only be recognised in Switzerland if reciprocity is guaranteed in the State in which it is delivered.  Reciprocity is limited to decisions of the same type and, in this instance, against a similar entity.

(81) To establish that reciprocity is given in this case, the liquidators Wastell and Hamilton-Smith lodged a legal opinion written on their request by the *Institut Suisse de Droit Comparé* (p.B694 to B699), and an attestation from the Ministry of Legal Affairs acting through the office of the Attorney General of Antigua and Barbuda (p.B275 to B277). The receiver Janvey raises that the signatory of this declaration is also chairman of the Financial Services Regulatory Commission, authority having appointed the Antiguan liquidators, which could raise doubt as to its impartiality (p.2242). He later explains that a foreign judgement cannot be recognised in Antigua in the absence of a treaty with the country in which the decision is delivered, which is the reason why the American decision concerning SIB was not recognised by the High Court of Antigua (p.1374), and that this absence of reciprocity is even vaunted on one of the official websites of the government of Antigua (p.2298).

(82) It in fact emerges from the attestation of the Ministry of Legal Affairs of Antigua submitted to the case that the recognition of a foreign decision for insolvency in Antigua is firstly exercised on the basis of an international treaty to which Switzerland is not party (p.B275), which the *Institut Suisse de Droit Comparé* also states (p.B698 [2nd paragraph]). However, both the aforementioned attestation and the legal opinion specify that in the absence of treaty, the courts of Antigua and Barbuda will refer to the British Common Law to decide on a measure of recognition. Pursuant to this, a foreign insolvency decision delivered with regard to a banking institution will be recognised providing the decision is delivered by the State of the registered office of incorporation of the corporate entity in question and, when it relates to a bank, is subject to surveillance by the competent banking authorities (p.B275 and B693 [2nd paragraph]). The legal opinion and the attestation, according to a reasoning developed identically, thus both conclude on the existence of reciprocity between Switzerland and Antigua and Barbuda, with the attestation even using express terms. Admittedly, the receiver Janvey has refused recognition of the decision delivered by the District Court of North Texas owing to absence of reciprocity (p.1387 [75]) and has submitted to the case documents aiming to demonstrate this (p.2298), but he does not manage to demonstrate that the reciprocity does not exist with Switzerland. Indeed, the decision of non-recognition delivered by the courts of Antigua was delivered under circumstances at the very least exceptional insofar as the same Court was referred with a petition for liquidation of SIB from the local authorities and a petition for recognition of a decision delivered by a foreign authority. Next, the declarations on the website of the authorities of Antigua and Barbuda must be understood to be "bait" not systematically reflecting the legal reality or being limited to precise "asset protection" cases (protection of assets against the claims of creditors, tax authorities or heirs). In reality, what is key in this case is the submission to the case by the liquidators Wastell and Hamilton-Smith of a sovereign deed delivered by a sovereign authority, for which FINMA has no reason to doubt the grounds, and a legal opinion delivered by a federal institute whose impartiality is also not questioned. On the basis of these documents, and in spite of the allegations to the contrary by the receiver Janvey, FINMA can conclude on the existence of reciprocity between Antigua and Barbuda and Switzerland.

(83) <u>Absence of breach of public policy</u>. The recognition of a foreign decision is ruled out in the event of breach of public policy. Thus a decision would not be recognised if it fundamentally conflicted with the Swiss conceptions of justice, either owing to its material content or owing to the procedure from which it arises; in this way, material public law can be distinguished from procedural public law. In this latter respect, the FAIPL demands respect for the fundamental procedural guarantees which arise directly from the Constitution, namely the right to a fair trial and the right to be heard (ATF 126 III 327, recital 3 and the references cited). In the examination of the criterion of material public policy, rather than clinging to the decision itself, it should be verified whether the recognition and execution of the decision per se is compatible with Swiss public policy (ATF 126 III 101, JdT 2000 II 41/49; (Commentaire Romand LP, Gabrielle Kaufmann-Kohler/Antonio Rigozzi, art 166 N54ss).

(84) According to the receiver Janvey, recognition of the insolvency decision of 17 April 2009 with regard to SIB allegedly entails breach of material public policy. Indeed, he claims that only the creditors of SIB will be able to participate in its compulsory liquidation, to the exclusion of the other people harmed by Robert Allen Stanford and the Stanford Group. As SIB forms part of a group, it would be justified to allocate its assets to the overall satisfaction of all creditors of the Stanford Group (p.1377 and 1378), in the absence of which the creditors of SIB would be unduly advantaged in relation to the others.

(85) This argument is not convincing. Even if the companies of the Stanford Group were particularly interlinked, it is hard to see how the separate liquidation of each of them would breach Swiss material public policy, all the more since Swiss legal policy does not apply the institution of group insolvency. In a similar case in Switzerland, each company would be liquidated autonomously, without anybody being able to conclude that some creditors were unduly advantaged in relation to others. Moreover, removing the legal personality of SIB would amount to withdrawing the privilege of the banking creditors of SIB and putting them in the body of creditors of the Stanford Group, in which most would not benefit from any privilege.

(86) The receiver Janvey later declares that the petition of the liquidators Wastell and Hamilton-Smith pursues an exploratory aim, incompatible with public policy, for the purposes of finding out the assets of SIB in Switzerland (p.1376 [4th paragraph]). And yet, again, the argument is not convincing. The liquidators Wastell and Hamilton-Smith seek to obtain recognition of the liquidation measure delivered in Antigua in compliance with their mandate. It can be noted that the receiver Janvey himself lodged petitions for recognition in Switzerland, England, Canada and Antigua without anybody being able to conclude that he was pursuing an exploratory purpose.

(87) The receiver Janvey lastly declares that the decision of 17 April was delivered in breach of procedural public policy since he was not regularly summonsed nor could he exercise his right to be heard (p.1375 and 1376). The fact that he was authorised to appeal against the decision did not have the effect of compensating for the breach of his right to be heard because, "*considering the circumstances, one has the right to be relatively pessimistic with regard to the real possibilities and results of this intervention*" (p.1375).

(88) And yet it emerges from the decision of 17 April and its recitals that not only did the receiver Janvey present his arguments at the court by "*amicus curiae*", but that his counsel was able to participate in the hearings preceding the decision (see above ch. 23). Furthermore, his capacity of party was examined by the Court in order to be definitively rejected in a ruling of 24 April 2009 (ch. 26). Under these conditions, it must be concluded that there was no breach of procedural public policy, because the receiver Janvey was able to cite his arguments, participate in hearings and have his petition examined. It is hard to see here any breach of the right to be heard or the right to be regularly summonsed.

(89) <u>Universal nature</u>. It emerges from the enacting clauses of the decision of 17 April 2009 (ch. 24) that all assets belonging to SIB, regardless of their location, were apprehended by the insolvency proceedings to the benefit of all creditors. As the effects of the insolvency were not being limited only to the territory of Antigua and Barbuda, the condition of universal intention of the insolvency proceedings is thus fulfilled.

(90) According to the above, the insolvency decision delivered in Antigua on 17 April 2009 fulfils all the conditions set for the recognition of such a deed in Switzerland.  The recognition will thus be pronounced.

**N. Opening of ancillary insolvency, determination of jurisdiction and the circle of preferential creditors**

(91) When FINMA recognises a foreign liquidation measure in compliance with art 37g BL, the provisions of the OFB-FINMA are applicable to assets in Switzerland (art 10 para. 1 OFB-FINMA). It ensues that FINMA will pronounce the ancillary insolvency proceedings relating to all assets belonging to SIB in Switzerland.

(92) According to art 10 para. 2 of the OFB-FINMA, FINMA must also fix the unique jurisdiction of the ancillary insolvency proceedings in Switzerland and determine the circle of preferential creditors in accordance with art 37g BL.  The jurisdiction is that of the place of location of the assets belonging to the insolvent party (CFB Bulletin 48 p.290 [33]).

(93) It emerges from the documents submitted to the case that SIB has several bank accounts opened mainly in Geneva (see above ch. 17).  With regard to receivables against a banking institution, it is considered that the place of location of the assets is where the account is opened. Pursuant to this, the jurisdiction of the insolvency proceedings is thus fixed in Geneva.

(94) FINMA can decide to authorise foreign preferential creditors to participate in the statement of settlement of interests of the ancillary insolvency proceedings (art 37g para. 3 BL).  And yet, insofar as two States are already claiming sovereignty over the insolvency of SIB and it is possible that two procedures for settlement of interests and distribution can be conducted in parallel, having foreign preferential creditors participate in the ancillary insolvency proceedings in Switzerland would certainly lead to a high level of uncertainty and legal complexity that should be avoided. Consequently, only creditors domiciled in Switzerland shall be authorised to participate in the statement of settlement of interests in Switzerland.

**O. Appointment of liquidators**

(95) When FINMA opens ancillary insolvency proceedings, it appoints one or more liquidators whose task is to determine the extent of the assets in Switzerland and to draw up the statement of settlement of interests (art 33 para. 2 BL).  In simple cases, FINMA may waive the right to appoint a liquidator and conduct the ancillary insolvency proceedings itself.

(96) In this instance, it appears that the ancillary insolvency proceedings can be conducted successfully by the FINMA, which will nevertheless reserve the right to appoint one or more liquidators if necessary.

**P. Immediate execution**

(97) Pursuant to art 39 letter c in relation with art 55 PA, FINMA may decide on the immediate execution of this decision.  Opening of insolvency proceedings and the related effects have the aims of protection and equality of treatment of creditors.  In order for these aims to be achieved, it is essential that the measures ordered are valid without delay.  As for opening insolvency proceedings according to the LP, this decision must be immediately enforceable (Flavio Cometta in Commentaire Romand Poursuite et Faillite, art 174, N 15).

**Q. Costs**

(98) Pursuant to art 5 para. 1 letter a of the FINMA order on emoluments and fees (Oém-FINMA; RS 956 122) in relation with art 15 LFINMA, any person who instigates a decision from FINMA is bound to pay emoluments.  Pursuant to art 8 para. 3 Oém-FINMA, the emolument due by way of procedural costs is fixed at CHF 20,000 for each of the parties, which shall be offset by the advances on costs already paid.

**The *Autorité de Surveillance des Marchés Financiers* FINMA decides:**

1. The decision of the High Court of Justice of Antigua and Barbuda, dated 15th April 2009, entered on 17 April 2009, is recognised in Switzerland;

2. The ancillary insolvency of Stanford International Bank Limited (in liquidation) in Antigua and Barbuda is ordered.  These proceedings were opened on

   **8 June 2010 at 08:00**

3. The jurisdiction of the insolvency is based in Geneva;

4. The *Autorité de Surveillance des Marchés Financiers* FINMA shall act as liquidator of the ancillary insolvency of Stanford International Bank Limited (in liquidation)  and shall represent the body of creditors in insolvency;

5. Only creditor/pledgees and preferential creditors domiciled in Switzerland at the time of delivery of the decision are accepted to participate in the statement of settlement of interests of the ancillary insolvency proceedings;

6. Figures 1 to 5 of these enacting clauses shall be published on 18 June 2010 on the FINMA website and in the *Feuille Officielle Suisse du Commerce* (FOSC), along with the call for creditors;

7. Figures 1 to 6 of these enacting clauses are immediately enforceable;

8. The petition for recognition of the decisions of 16 February and 12 March 2009 of the United States District Court for the Northern District of Texas Dallas Division is rejected insofar as it is admissible;

9. Procedure costs of CHF 40,000 shall be payable half by each of the parties and shall be offset by the advances on costs already paid;

**The *Autorité de Surveillance des Marchés Financiers* FINMA**

Dr Patrick Raaflaub                                  Daniel Roth
Director                                             Member of the extended management

<u>Methods of appeal</u>

An appeal may be lodged with the Federal Administrative Court (case postale, 3000 Berne 14) within a period of 30 days from notification of this decision.

<u>Notification to:</u>

**Ralph Steven Janvey**, represented with election of domicile in his Office by Me Birgit Sambeth Glasner, Etude Altenburger, 11 bis rue Rodolphe-Toepffer, 1206 Geneva (by fax and registered letter with acknowledgement of receipt);

**Nigel John Hamilton-Smith and Peter Nicolas Wastell**, represented with election of domicile in his Office by Me Nicolas Pierard, Borel & Barbey, 2, rue de Jargonnant, PO Box 6045, 1211 Geneva 6 (by fax and registered letter with acknowledgement of receipt).

<u>For information to:</u>

**Bank Julius Bar & Co AG**, Bahnhofstrasse 36, PO Box 666, 8010 Zurich (enacting clauses only by fax and registered letter);

**RBS Coutts Bank AG**, Stauffacherstrasse 1, PO Box, 8022 Zurich (enacting clauses only by fax and registered letter);

**Société Générale Private Banking (Suisse) SA**, Rue de la Corraterie 6, PO Box 5022, 1211 Geneva 11 (enacting clauses only by fax and registered letter);

**Banque Franck, Galland & Cie SA**, Rue Toepffer 1, PO Box 3254, 1211 Geneva 3 (enacting clauses only by fax and registered letter).

<u>For information on 18 June 2010 to:</u>

**Office des Faillites de Genève**, chemin de la Marbrerie 13, PO Box 1856, 1227 Carouge (enacting clauses only by fax and registered letter).