IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, | § | |
| LTD., *et al.*, | § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses the Receiver's emergency motion to enforce the Court's receivership order [1095]. For the reasons that follow, the Court grants the Receiver's motion and holds that the Underwriters must seek leave of this Court before proceeding with deposition of the Receiver's forensic accountant. The Court will promptly grant leave if the Underwriters agree to pay a fair portion — half — of the fees and expenses the Receiver incurred in obtaining the forensic accountant's opinions, or if they will limit their examination to simply authenticating her July 27 Declaration.[1]

---

[1] The July 27 Declaration is the focus of the Underwriters' subpoena duces tecum request. Thus, today's Order is framed in terms of the "July 27 Declaration." However, the Court's holding extends to any of Van Tassel's declarations that appear in the public record.

ORDER – PAGE 1

# I. PROCEDURAL HISTORY

This motion arises from the complex web of interrelated cases arising out of the alleged Stanford Ponzi scheme. The Receiver seeks an order requiring Certain Underwriters at Lloyd's of London (the "Underwriters") to withdraw their subpoena of Karyl Van Tassel, one of the Receiver's retained professionals. The Underwriters are defendants in a lawsuit currently pending the Southern District of Texas (the "Coverage Dispute"). *See Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, Civil Action No. 4:09-CV-3712 (S.D. Tex. filed Nov. 17, 2009).

The Underwriters, issuers of D&O insurance policies to various Stanford entities, provisionally agreed to fund the defenses of various former Stanford executives (the "Former Executives"). But some time after agreeing to fund the Former Executives' defenses, the Underwriters decided to stop paying. They relied on an exclusion in the D&O policy for claims "arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts) of Money Laundering." According to the Underwriters, they based their determination in part on the sworn declaration of the Receiver's forensic accountant, Karyl Van Tassel (the "July 27 Declaration"). *See* Underwriters' Resp. at 3.[2]

---

[2]*See also* App. to Receiver's Mot. for Freeze Order [18], *Janvey v. Alguire*, Civil Action No. 09-CV-724 (N.D. Tex. filed Apr. 20, 2009) [hereinafter "July 27 Declaration"].

When the Underwriters stopped funding, the Former Executives sued them.[3]  In the Coverage Dispute, United States District Judge David Hittner issued a preliminary injunction on January 26, 2010, requiring the Underwriters to fund the Former Executives' defenses pending a final determination as to applicable policy exclusions.  The Underwriters appealed his decision to the United States Court of Appeals for the Fifth Circuit.  The Fifth Circuit affirmed Judge Hittner's order "insofar as it provides for coverage until a court determines otherwise, and remand[ed] for further proceedings on the coverage question." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 576 (5th Cir. 2010).  The Fifth Circuit remanded the case and advised the district court to "proceed as expeditiously as is feasible under the circumstances." *Id.*

The Coverage Dispute, now on remand before United States District Judge Nancy Atlas, is proceeding expeditiously.  Judge Atlas set a discovery deadline of August 2, 2010 and an evidentiary hearing on August 27, 2010.  In attempt to prepare for the hearing, the Underwriters served a subpoena for Van Tassel's oral deposition and production of documents.  The Receiver now asks this Court to order the Underwriters to withdraw their

---

[3]A related proceeding regarding the D&O policies remains pending before this Court. *See Certain Underwriters at Lloyd's of London and Arch Specialty Co. v. Janvey*, Civil Action No. 3:09-CV-1736 (N.D. Tex. 2009).  The Former Executives sued the Underwriters in the Southern District of Texas, in violation of this Court's orders.  However, by Order dated December 16, 2009, this Court deferred to the Judge presiding over the criminal prosecution proceeding in the Southern District of Texas to consider the request for preliminary injunction in the Coverage Dispute, reasoning that resolution of the Coverage Dispute may significantly alter the orderly preparation of the criminal case for trial.

subpoena or, in the alternative, to issue a protective order preventing the deposition of Van Tassel and related document discovery.

The Receiver advances three main arguments in support of his motion. First, he argues that the Underwriters' subpoena violates this Court's receivership order. Second, he argues that the Underwriters' subpoena runs afoul of Federal Rule of Civil Procedure 26(b)(4). Third, he agues that third parties may not compel expert witnesses to testify. The Court addresses each of these arguments in turn.

## II. THE COURT'S RECEIVERSHIP ORDER

### A. The Receivership Order Requires the Underwriters to Seek Leave of This Court Before Deposing the Receiver's Professionals

The Court agrees with the Receiver that the subpoena issued to Van Tassel violates this Court's receivership order. *See* Am. Order Appointing Receiver [157]. Two provisions of the receivership order are relevant. Paragraph 9(a) of this Court's receivership order provides that:

> [c]reditors and all other persons are hereby restrained and enjoined . . . except in this Court, unless this Court, consistent with general equitable principles and in accordance with its ancillary jurisdiction in this matter, orders that such actions may be conducted in another forum or jurisdiction . . . [t]he commencement or continuation, including the issuance or employment of process, of any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action.

*Id.* at 7. Also, Paragraph 10(a) enjoins, "without prior approval of this Court . . . , any act to obtain possession of the Receivership Estate Assets." *Id.* at 8.

ORDER – PAGE 4

The Underwriters' subpoena runs afoul of paragraph 9(a) of the receivership order, which enjoins employment of process on the Receiver's agents. Thus, the Underwriters should not have employed process against the Receiver's forensic accountant in the Southern District of Texas without first seeking leave of this Court. The Underwriters do not argue, nor could they credibly, that Van Tassel does not qualify as an agent of the Receiver. Van Tassel has performed a great deal of work for the receivership, including preparing the July 27 Declaration, which in effect concludes that the Stanford enterprise operated as a Ponzi scheme.[4] Additionally, her firm, FTI Consulting, performs myriad other services for the receivership. These include "responding to governmental and regulatory requests," assistance with the Receiver's asset-recovery litigation, and managing investor claims. *See, e.g.*, Receiver's Sixth Interim Fee Application at 23–31. She is clearly the Receiver's "agent" under paragraph 9(a). Thus, it was improper for the Underwriters to employ process on her without first seeking leave of this Court.[5]

---

[4]Van Tassel concludes that interest payments to investors were funded with sales of CDs to subsequent rounds of investors. *See* July 27 Declaration at 16–17. This is the dictionary definition of a "Ponzi scheme." See BLACK'S LAW DICTIONARY 1180 (8th ed. 2004) (defining "Ponzi scheme" as "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors").

[5]Paragraph 9(a) contains a clear escape valve for situations such as these. It provides that the Court may, "consistent with general equitable principles and in accordance with its ancillary jurisdiction in this matter," grant leave to persons who seek to serve process on the Receiver's agents. And as discussed below, the Court is inclined to grant such leave to the Underwriters, provided certain conditions are met. The Court's order allowing the Coverage Dispute to proceed did not waive this Court's jurisdiction over the Receiver and his agents.

ORDER – PAGE 5

The Underwriters argue that it is untenable to read paragraph 9(a) as enjoining depositions in the Coverage Dispute. They argue that such a reading, stretched to its logical end, would require the parties to the Coverage Dispute to seek leave of this Court before taking virtually all of the planned depositions in that case. First, the Underwriters' qualm here is based on a hypothetical concern: no one is trying to prevent the parties to the Coverage Dispute from deposing ordinary fact witnesses in dispute. But the Underwriters' point is taken. The plain terms of paragraph 9(a) would also enjoin service of process against the Former Executives, who are defendants in this case and plaintiffs in the Coverage Dispute. Accordingly, the Court now clarifies that, with respect to the Coverage Dispute, it will not enforce paragraph 9(a) to the extent its plain terms prevent discovery from ordinary fact witnesses to the Coverage Dispute.[6]

In addition to paragraph 9(a), the Underwriters's subpoena also runs afoul of paragraph 10(a) of the receivership order, which enjoins "any act to obtain possession of the Receivership Estate Assets" without leave of this Court. Van Tassel's knowledge, expertise, and supporting documentation related to the Stanford scheme are receivership assets because her expertise accrued at substantial cost to the receivership estate. Thus, Paragraph 10(a) of the Court's receivership order enjoins the Underwriters from acting to obtain possession of

---

[6]As the Court discusses below, the Receiver's professionals, retained in anticipation of this litigation, are not ordinary fact witnesses with "personal knowledge" of the Stanford enterprise. *See infra* Part III.A. Even if they were "fact witnesses," the Court would still enforce Paragraph 9(a) as to the Receiver's retained professionals for reasons discussed in more detail below. *See infra* Part II.B. The Court now reiterates the receivership order's clear statement of exclusive jurisdiction over the Receiver and his agents.

Van Tassel's expertise.  However, the Court acknowledges that the Receiver has placed several of Van Tassel's declarations, including the July 27 Declaration, into the public record.  Thus, the Court clarifies that, to the extent Van Tassel's fact-findings and conclusions appear in the public domain, they are not receivership assets.

Accordingly, in light of paragraphs 9(a) and 10(a) of the Court's receivership order, the Court holds that the Underwriters must seek leave of this Court before proceeding with deposition of Van Tassel.

### B. The Court Will Grant the Underwriters' Request for Leave, with Certain Conditions

If the Underwriters seek leave of this Court to take Van Tassel's deposition, the Court will promptly grant their motion, provided that they agree to one of two conditions.  First, the Court will grant leave if the Underwriters limit the scope of their discovery to authenticating the July 27 Declaration.  But if the Underwriters seek to do more than authenticate the July 27 Declaration, the Court will grant leave only on the condition that the Underwriters agree to pay the Receiver a fair portion of the fees and expenses he payed to Van Tassel for researching and preparing the declaration, which the Court finds to be one-half.  In either event, the Court will require the Underwriters to compensate Van Tassel for time and expenses incurred preparing for and attending the deposition.  It would not be a proper use of investor money to fund the Underwriters' discovery, even if they seek only to authenticate the public record.

ORDER – PAGE 7

Today's holding reflects an exercise of discretion motivated by several factors. First, the Receiver put the July 27 Declaration into the public record. The Underwriters apparently relied on the July 27 Declaration in making the determination that sparked the Coverage Dispute. Further, the circumstances of the Coverage Dispute are exigent. Judge Atlas is under instruction from the Fifth Circuit to resolve the Coverage Dispute "expeditiously." Also, the Underwriters are under court order to continue paying defense costs unless and until "a court determines otherwise." *See Pendergest-Holt*, 600 F.3d at 576 (affirming the district court's preliminary injunction "insofar as it provides for coverage until a court determines otherwise"). They are paying millions in defense costs pending that determination, and it is likely cold comfort that the Former Executives will be obligated to pay them back if the Underwriters prevail in the Coverage Dispute.

The Court cautions that such an exercise of discretion to allow discovery from one of the Receiver's experts is peculiar to the facts before it. This Court does not condone hijacking another litigant's expert as a general matter. Neither does the Court condone free-riding on other litigants' discovery efforts. Further, the Court will not routinely grant other litigants leave to take discovery from the Receiver's professionals, even if they offer to pay a fair price.

ORDER – PAGE 8

### *C. The Court's Conditions to Allowing the Deposition Are Fair and Reasonable*

The Court enjoys broad discretion over the administration of its receivership.[7]

Today's exercise of that discretion is fair and reasonable for a number of reasons.  First, the

Underwriters will be allowed the discovery they seek.  Whether and what they will have to

pay for it depends on what they want.  The Underwriters insist that they are not trying to

"hijack" the Receiver's expert or "obtain her conclusions for 'free.'"  Underwriters' Resp.

at 6 n.10.  They lean heavily on the fact that she made her conclusions and expert report

available to the public over a year ago.  *Id.* at 6.  The Court agrees that this is significant,

which is why the Underwriters will not have to share in Van Tassel's fees for preparing the

July 27 Declaration if they wish merely to authenticate the reports the Receiver has placed

into the public record.  It would not be fair to make them pay for what is already available

in the public domain.[8]

---

[7]"The federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the S.E.C. to enforce the federal securities laws.'" *S.E.C. v. Safety Fin. Svc., Inc.*, 674 F.2d 368, 372 (5th Cir. 1982) (quoting *S.E.C. v. Wencke* (*Wencke I*), 622 F.2d 1363, 1369 (9th Cir. 1980).  To that end, a receivership court "has power to issue orders barring actions which would interfere with its administration of [the receivership] estate." *Wencke I*, 622 F.2d at 1370; *accord Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985) ("[S]everal courts have recognized the importance of preserving a receivership court's ability to issue orders preventing interference with its administration of the receivership property.").  The power to enjoin litigation that might prejudice the receivership "rests as much on [the Court's] control over the property placed in receivership as on its jurisdiction over the parties to the securities fraud action." *Wencke I*, 622 F.2d at 1369.

[8]The Underwriters may also request, without being subject to fee allocation, documents that Van Tassel appended to her July 27 Declaration.

Despite the Underwriters' urging that they are not trying to get a "free ride" from the Receiver's discovery efforts, their subpoena duces tecum request indicates that they seek to do much more than authenticate the July 27th Declaration. They seek all "work papers, notes, and other materials that she prepared or that were prepared for her in order to draft her expert report, as well as documents showing the materials she reviewed in connection with preparing that report." *Id.* at 6 (citing subpoena to Karyl Van Tassel); *see also* App. to Receiver's Mot. to Enforce Receivership Order at 4 (subpoena to Karyl Van Tassel). Further, as the Underwriters note, "Ms. Van Tassel's conclusions that, in effect, the Stanford entities operated as a Ponzi scheme are directly relevant to the Underwriters' claim that the Executives engaged in acts of Money Laundering." Underwriters' Resp. at 6. The natural inference from the scope of the Underwriters' request is that they intend to use Van Tassel's knowledge of the Stanford enterprise to build their case against the Former Executives.[9]

If the Underwriters intend to use the Receiver's expert to build their own case, it is a fair for them to share in the cost of developing her expertise. First, the Receiver has paid Van Tassel's firm millions of dollars in fees and expenses for preparing her expert

---

[9]The Court is not persuaded by the Underwriters' argument that they seek only "to learn about" the facts on which Van Tassel relied. Their brief indicates that they need to depose her because "previously published conclusions will likely be offered as evidence in the Coverage Action." Underwriters' Resp. at 7. Given that Van Tassel's declaration concludes that the Stanford entities operated as a Ponzi scheme, *see supra* n.4, it seems unlikely that her conclusions will be offered by anyone other than the Underwriters themselves. Thus, there is no indication that the Underwriters' request implicates their right to rebuttal or cross-examination.

conclusions about the nature of the Stanford scheme.[10]  The fruits of her investigation —

knowledge, accumulated documentation, and work papers — are extremely valuable

receivership assets, funded entirely with investor money.  While Van Tassel's declaration

may be in the public domain, the analysis of the raw source documents leading to those

conclusions is not in the public domain.  It would be unfair to the already beleaguered

investors to allow access to the Receiver's experts' work for a $40 witness fee.  Essentially,

the Underwriters seek to steal from the Receiver part of what Stanford previously stole from

the investors.

        Second, the Underwriters seek to depose Van Tassel for their own monetary benefit.

They have potentially $100 million dollars at stake in the Coverage Dispute, and they seek

to use Van Tassel's work in this case to protect that interest.  The cost to the Underwriters

to have their own expert do the same work that Van Tassel has done — only in a couple of

months rather than over the course of a year — would be astronomical and surely more than

Van Tassel cost the Receiver.   Even if the Underwriters' portion of Van Tassel's fees

reaches several million dollars, it would be a relative bargain to them compared to what it

would cost the Underwriters to reproduce that work.  In truth, it is unlikely that they even

---

        [10]The Court does not require the Underwriters to share in all $13 million of Van
Tassel's fees to the receivership.  *See* Examiner's Resp. at 5.  Van Tassel's firm spends a
substantial portion of its time working for the Receiver on things like asset recovery or
managing investor claims.  The Court would not, of course, require the Underwriters to
shoulder a portion of those costs.  The Court leaves it to the Underwriters and the Receiver
to determine in the first instance how much of Van Tassel's fees relate to her conclusions
regarding the Stanford scheme and how much to other services.  If the parties are unable to
resolve that question, then the Court will do so.

ORDER – PAGE 11

*could* get their own forensic accountant to prepare an investigation like the July 27 Declaration before the discovery deadline in the Coverage Dispute. In other words, a forensic accountant capable of unraveling a $7 billion Ponzi scheme is worth millions, but one who can lead you to the same facts and conclusions in under a month might be unobtainable at any price. In addition to the fact that the Underwriters are seeking to avoid potentially $100 million in policy claims, they also can easily afford to pay a fair share of the Receiver's costs. The balance of equities might be different if the Underwriters were an indigent party pursuing a public interest claim — which they most assuredly are not.

Finally, as the Receiver notes, the Underwriters are adverse to the receivership estate in a lawsuit pending before this Court.[11] Thus, in the context of that case, it would be unfair to allow the Underwriters a free peek at the Receiver's expert's conclusions not currently in the public record.[12] This is especially true in light of the fact that the Underwriters can easily afford to pay their fair share of Van Tassel's fees.

In sum, because the Court has jurisdiction over receivership assets and process served on the Receiver's professionals, the Underwriters must seek leave of this Court before they may depose the Receiver's professionals. That said, the Court will exercise its discretion to allow the Underwriters to proceed, provided that they either agree to (1) limit their requests

---

[11]In fact, the Receiver filed this motion both here and in that case. *See Certain Underwriters at Lloyd's of London and Arch Specialty Co. v. Janvey*, Civil Action No. 3:09-CV-1736 (N.D. Tex. 2009).

[12]This is one of the concerns of Federal Rule of Civil Procedure 26(b)(4)(B). *See infra* Part III.B.

ORDER – PAGE 12

to authenticating the July 27 Declaration, or (2) agree to share a reasonable portion of the Receiver's costs — half — of obtaining the July 27 declaration.  In either case, the Underwriters must pay Van Tassel her fees and expenses incurred in preparation for and in giving her deposition.

### III. THE COURT'S EQUITABLE RULING IS CONSISTENT WITH RULE 26(B)(4)'S RULES REGARDING DISCOVERY FROM EXPERTS

The Court's decision here is an exercise of its equitable discretion in overseeing the receivership.  The parties have also argued that Federal Rule of Civil Procedure 26 should control.  While the Court's decision does not rest on Rule 26 or 45, it has looked to the policies embodied in Rule 26(b) to guide the exercise of its discretion.  The Court will thus turn to consideration of that rule.

### A. Van Tassel Is Not a Fact Witness

First, the Court must dispose of the Underwriters' argument that Van Tassel is an ordinary fact witness within Rule 26(b)(1)'s general discovery scope.  The Underwriters argue that Van Tassel is a fact witness because she is being called to testify "concerning the underlying facts that support [her] expert conclusions."  Underwriters' Resp. at 6.  That argument is too facile.  Van Tassel has no contemporaneous personal knowledge of the facts underlying her conclusions regarding the Stanford enterprise.  The advisory committee notes to Rule 26 note that an expert is treated as an ordinary witness for the purposes of Rule 26 when the expert's "information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to the subject matter of the lawsuit."  FED. R. CIV. P.

26(b)(4) advisory committee's note (1970 amendment). The Underwriters present no authority to indicate that an expert who reviews documents in preparation for litigation is "an actor or viewer" with respect to the subject matter of those documents. *See* FED. R. EVID. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Young v. United States*, 181 F.R.D. 344, 346 (W.D. Tex. 1997) (distinguishing between trial experts and employee-experts who "acquire information for trial solely because they were actors or viewers with respect to the occurrences forming the subject matter of the lawsuit" (citing *Dallas v. Marion Power Shovel Co., Inc.*, 126 F.R.D. 539, 540–41 (S.D. Ill. 1989)).

To support their position that Van Tassel is not an expert witness, the Underwriters cite *Wright v. Jeep Corp.*, 547 F. Supp. 871, 874 (E.D. Mich. 1982). However, the *Wright* court did not hold that an expert who testifies about the facts underlying his conclusions is automatically a fact witness. Rather, the court treated an expert as an ordinary witness because he did not fall within the parameters for expert witnesses under Rule 26(b)(4): his "study was not developed in anticipation of litigation and because he ha[d] not been retained by either party." *Id.*

The expert in *Wright* was very differently situated from Van Tassel. The defendant, Jeep Corporation, sought to depose a professor who had done an independent study related to the safety of Jeep vehicles ── before the litigation even began. *Id.* at 873. Further, there was an indication in that case that the plaintiffs intended to introduce the contents of the professor's study against Jeep, leading Jeep to argue that it needed discovery in order to test

ORDER – PAGE 14

the validity of the professor's conclusions. *Id.* Unlike the professor's report in *Wright*, Van Tassel's July 27 Declaration was unarguably developed in anticipation of the Stanford litigation.[13] Further, the Underwriters do not indicate that they believe the Former Executives intend to introduce Van Tassel's conclusions against them (and the Court cannot see why they would, in light of her conclusions). Accordingly, the factors that led the *Wright* court to deem the professor to be an "ordinary witness" are not present in this case.

### B. Rule 26(b)(4) Does Not Prohibit the Underwriters from Deposing Van Tassel

The Receiver argues that the Underwriters' subpoena runs afoul of Rule 26(b)(4). As an initial point, it is not clear that Rule 26(b)(4), regarding discovery from experts, applies in this instance, at least before this Court. However, to the extent Rule 26(b)(4) applies, the Court finds that it does not bar the Underwriters from deposing Van Tassel, although it does require them to pay for the privilege of taking discovery from the nontestifying expert of another party.

Rule 26(b)(4) contains two provisions, one for experts who may testify at trial, and one for experts who are not expected to testify.[14] Neither provision is particularly on point in this situation because both are keyed to the experts of parties to the same litigation. *See*

---

[13]*See* Receiver's Reply at 2 (noting that the Receiver retained Van Tassel *after* the commencement of the S.E.C. proceeding). The Underwriters also argue that, even if Van Tassel's reports were developed in anticipation of litigation, they were not developed in anticipation of litigation with *them*. They do not explain, though, why that distinction makes a legal difference. Further, as discussed below, various district courts have applied Rule 26(b)(4)'s expert witness rules to experts retained in related litigation. *See infra* Part III.B.

[14]Neither party, despite both briefing the Rule 26(b)(4) issue, offers analysis or authority to illuminate which (if either) provision applies.

*generally* FED. R. CIV. P. 26(b)(4) advisory committee's note (1970 amendment). However, some courts have found the protections of Rule 26(b)(4) reach experts retained in "sufficiently related litigation." *See, e.g., In re PolyMedica Corp. Sec. Litig.*, 235 F.R.D. 28, 32 (D. Mass. 2006) (citing *Bio-Technology Gen. Corp. v. Novo Nordisk*, 2003 WL 21057238, at *2 (D. Del. 2003); *Hermsdorfer v. Am. Motors Corp.*, 96 F.R.D. 13, 15 (W.D.N.Y. 1982)); *see also In re Agent Orange Prod. Liability Litig.*, 105 F.R.D. 577, 580 (E.D.N.Y. 1985) ("[I]t is reasonable to interpret Rule 26(b)(4) to reach experts retained by a party for trial preparation in a closely related case that is before the court as part of the same multidistrict litigation.").[15]

Rule 26(b)(4)(A) allows a party to seek discovery from an opponent's expert witness that is expected to testify at trial.[16] The rule exists to allow parties to better prepare for cross-

---

[15]These cases are not on all fours with the facts before the Court today, which is another reason to doubt whether Rule 26(b)(4) governs this dispute. However, to the extent Rule 26(b)(4) applies to experts retained in "sufficiently related" litigation, the Court finds that the Coverage Dispute is sufficiently related to this case (and the Underwriters' suit against the Receiver). As the Underwriters note, "Ms. Van Tassel's conclusions that, in effect, the Stanford entities operated as a Ponzi scheme are directly relevant to the Underwriters' claim that the Executives engaged in acts of Money Laundering." Underwriters' Resp. at 6.

[16]This appears to be the gist of the Receiver's Rule 26 argument. He argues that the Underwriters may not depose his expert because the determination of whether she is a testifying or nontestifying witness is premature. *See* Receiver's Mot. to Enforce Receivership Order at 4 (citing *Perry v. United States*, 1997 WL 53136, at *1 (N.D. Tex. 1997)). It is true that, because discovery has not begun in *Underwriters v. Janvey*, the Underwriters could not serve a bare subpoena on his expert to depose her in that case. However, the *Perry* Court's analysis is inapposite here, because that Court "passed on a determination" of whether exceptional circumstances exist such that a deposition would be allowable under Rule 26(b)(4)(B). *Id.* at *3. Here, the Court agrees with the Receiver that it is premature to determine whether the Underwriters are *entitled* to depose Van Tassel

examination of the other parties' trial witnesses.  *See id.*; *see also* 8A WRIGHT, MILLER &
MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2029, at 18 (3d ed. 2010) [hereinafter
WRIGHT & MILLER] (citing as the reason for the 1970 Amendment the courts' increasing
"appreciation of the importance of expert testimony . . . and the need for discovery if the
views of an expert are to be properly cross-examined or rebutted").  The Court finds that
Rule 26(b)(4)(A) is inapposite.  The Receiver is not a party to the Coverage Dispute, and the
Former Executives have not designated Van Tassel as an expert in that case, nor are they
likely to do so, given her opinions.  Thus, the Underwriters do not seek to depose her so that
they may effectively prepare for cross-examination.  Rather, they seek to depose her and
offer her testimony because they believe it will be favorable to their position in the Coverage
Dispute, possibly to the tune of $100 million.  In other words, they want to make her their
own expert witness in the Coverage Dispute.

        Rule 26(B)(4)(b), which "ordinarily" prohibits a party from taking discovery from an
expert that an opposing party has retained "in anticipation of litigation" but who is not
expected to testify at trial, is closer to the mark in this case.  There were several purposes for
Rule 26(b)(4)(B).  One reflects a concern that parties not exploit their opponents' superior
preparation.  8A WRIGHT & MILLER § 2032, at 94 (citing cases).  Another concern is that "as
a collaborator in the development of pretrial strategy, a non-testifying experts may become
a unique repository of insights into counsel's opinion work product although the expert's

---

under Rule 26(b)(4)(A) in *Underwriters v. Janvey*.  However, this does not speak to the
question of whether exceptional circumstances exist so as to *allow* the deposition under Rule
26(b)(4)(B) in the Coverage Dispute.

ORDER – PAGE 17

opinion is not itself work product." *Id.* A final concern of Rule 26(b)(4)(B) is that litigants not be able to call their opponents' witnesses to "attest to views the [litigants] found congenial." *Id.* These concerns are not present in the Coverage Dispute, where the Receiver is not a party. However, there is a spillover effect in related litigation, in which the Underwriters and the Receiver are directly adverse. Accordingly, the Court finds that, to the extent Rule 26(b)(4) applies in this situation, subsection (B), regarding nontestifying experts, is most germane.

Rule 26(b)(4)(B) provides that "[o]rdinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." FED. R. CIV. P. 26(b)(4)(B). However, on "showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means," a party may depose another party's nontestifying expert witness. FED. R. CIV. P. 26(b)(4)(B)(ii).

Although Rule 26(b)(4)(B) would "ordinarily" shield Van Tassel from the Underwriters' discovery entirely, the Court finds the "exceptional circumstances" contemplated by Rule 26(b)(4)(B) are present here.[17] The terms of Rule 26(b)(4)(B) do not

---

[17]The party seeking discovery has the burden to show that these exceptional circumstances exist. *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1142 (5th Cir. 1980). The Court finds that the Underwriters have carried this burden, despite having staunchly maintained that Van Tassel is a fact witness. The Underwriters have presented facts that establish the exigent circumstances in this case: namely the speed with which the Coverage Dispute must proceed.

define "exceptional circumstances." However, "[c]ourts and commentators have commonly identified two situations where the exceptional circumstances standard has been met." *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 175 F.R.D. 34, 44 (S.D.N.Y. 1997). One of these is "where it is possible to replicate expert discovery on a contested issue, but the costs would be judicially prohibitive." *Id.* (citing *In re Agent Orange*, 105 F.R.D. 577, 580 (E.D.N.Y. 1985)); *accord Fast Memory Erase, LLC v. Spansion, Inc.*, 2009 WL 4884091, at *1 (N.D. Tex. 2009) (citing *Cooper v. Meridian Yachts, Ltd.*, 2008 WL 2229552, at *5 (S.D. Fla. 2008)). The other is whether the subject of the expert's observation is no longer observable. *See Spansion*, 2009 WL 4884091, at *1.

Here, the Court finds that "exceptional circumstances" are present in light of the speed with which the Coverage Dispute must proceed. It would be impracticable — and the Court suspects impossible — for the Underwriters to find an expert who can replicate in a month the findings Van Tassel and her firm have made over the course of more than a year. Further, to the extent it were even possible for the Underwriters to get their own expert and replicate these findings, the cost would likely be astronomical. Finally, in finding that exceptional circumstances exist here, the Court also considers the Fifth Circuit's directive of expediency in the Coverage Dispute. A directive from the court of appeals to proceed with deliberate speed is not one of the two factors courts typically considered in analyzing whether "exceptional circumstances" exist. Here, though, the Court finds it appropriate to weigh the Circuit's directive in determining that exceptional circumstances exist in this case. That directive was not aimed at this Court, but this Court still intends to assist when possible in the expeditious disposition of the Coverage Dispute.

ORDER – PAGE 19

In sum, the Court finds that, to the extent Rule 26 applies to this dispute, the most relevant provision is Rule 26(b)(4)(B)'s nontestifying expert rule.  And because the Court finds that exceptional circumstances exist here, the Court holds that Rule 26(b)(4)(B) does not bar the Underwriters from taking discovery from the Receiver's expert.

### B. To the Extent Rule 26(b)(4) Applies Here, It Would Require the Underwriters to Compensate Van Tassel

As the Court discussed above, it is not clear that the drafters of Rule 26(b)(4) intended for it to apply to situations such as this one.  However, to the extent it does, it would also require the Underwriters to compensate Van Tassel.  When a party seeks discovery under Rule 26(b)(4),

> the court must require that the party seeking discovery: (i) pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (B); and (ii) for discovery under (B), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions.

FED. R. CIV. P. 26(b)(4)(C)(i), (ii).  Rule 26(b)(4)(C)'s "provisions for fees and expenses meet the objection that it is unfair to permit one side to obtain without cost the benefit of an expert's work for which the other side has paid, often a substantial sum."  *See* FED. R. CIV. P. 26(b)(4)(C) advisory committee's note (1970 amendment) (citing cases).

In exercise of its discretion and consistent with Rule 26(b)(4)(C), the Court will place conditions on its approval of the Underwriters' seeking discovery from Van Tassel.  To the extent they seek only to authenticate the July 27 Declaration, they may do so provided that they compensate Van Tassel for her time preparing for and attending the deposition.  And, to the extent they seek more, they must pay "fair portion of the fees and expenses" the

Receiver reasonably incurred in obtaining her "facts and opinions."  The Court has determined that a "fair portion" is half of the fees incurred in her preparation of the July 27 Declaration, for reasons discussed above at length.  This determination is consistent with other district courts' allocation of fees and expenses under Rule 26(b)(4)(C).[18]

## IV. COMPELLED EXPERT TESTIMONY

The Receiver also argues that a litigant may not compel the testimony of an expert who is not the expert of any party to the Coverage Dispute.  He relies on Federal Rule of Civil Procedure 45(c)(3)(B)(ii), which provides that an "issuing court may, on motion, quash or modify the subpoena if it requires . . . disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the

---

[18]There is a dearth of case law on point here.  Rule 26(b)(4)(C) changed in 1993. Before that, courts had discretion to allow an allocation of fees regardless of whether the expert was a testifying or nontestifying expert.  These cases, though decided under the old rule, are instructive.  Prior to 1993, a court's "decision in exercising this discretion depended on whether the discovering party was simply learning about the other party's case or was going beyond this to develop its own case."  8A WRIGHT & MILLER § 2034, at 139. Moreover, several pre-1993 district courts found 50% to be a fair allocation of the expert's fees.  *See, e.g.*, *Dresser Indus. v. Doyle*, 40 F.R.D. 478, 479 (N.D. Ill. 1966); *Fauteck v. Montgomery Ward & Co.*, 91 F.R.D. 393, 399 (N.D. Ill. 1980); *see also* 8A WRIGHT & MILLER § 2034, at 139 (citing pre-1993 "fair portion" cases).

One post-1993 case distinguished *Fauteck* and called into question whether the plain terms of Rule 26(b)(4)(C)(ii) require allocation of expert fees or rather merely the payment of "the cost of compliance with the discovery order."  *See Hines v. Widnall*, 183 F.R.D. 596, 601 (N.D. Fla. 1998).  However, a leading treatise indicates that the rule's requirement of "fair portion" of expenses is distinct from "the cost of compliance with the discovery order":

> If discovery is ordered under Rule 26(b)(4)(B) from an expert who was specially retained but who is not to be used at trial, the information will be of direct value to the discovering party's preparation of his case and the rule requires both that the discovering party compensate the expert for his or her time in responding and that it pay the other party a fair share of the fees and expenses.

8A WRIGHT & MILLER § 2034, at 140.

expert's study that was not requested by a party." However, this Court need not consider this argument, because only an issuing court may quash a subpoena, unless a statute or other law provides an exception. *In re Clients and Former Clients of Baron & Budd, P.C.*, 478 F.3d 670, 671 (5th Cir. 2007) (citing "the rule that only the issuing court may quash, modify, or enforce a subpoena" (citing 9 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 45.50[4], at 45-75 through 45-77 (Matthew Bender 3d ed. 2006)).[19]

The Receiver also cites *Young v. United States*, 181 F.R.D. 344 (W.D. Tex. 1997). The *Young* court noted that, among other things:

> a professional witness may not generally be compelled to testify as an expert . . . , as such testimony is a matter of contract or bargain. . . . [J]ust because a party wants to make a person work as an expert does not mean that, absent the consent of the person in question, the party generally can do so.

*Id.* at 346 (citations omitted). This rule the Receiver quotes concerns whether a professional expert may be compelled to work against her will. However, the Underwriters do not seek to force Van Tassel to form new expert opinions, but rather only to explain opinions she has previously formed. Instead, the Receiver's concerns are more directed to the potential unfairness to the receivership if the Court allows the Underwriters to coopt his professional as their own witness.

## CONCLUSION

For the reasons stated in this Order, the Court grants the Receiver's motion and holds

---

[19]The Court notes that this Order does not operate to quash the subpoena on Van Tassel, issued in the Southern District of Texas. Rather, this Order merely orders the Underwriters to comply with this Court's receivership order, meaning in this case that they must seek leave of this Court before deposing the Receiver's professionals.

that the Underwriters must seek leave of this Court before proceeding with deposition of the Receiver's forensic accountant.  The Court will grant the Underwriters' request if they agree to one of two conditions: (1) they may agree that they will limit their discovery from Van Tassel to authenticating the July 27 Declaration, or (2) they may agree to pay one-half of the fees and expenses the Receiver paid Van Tassel for preparing her July 27 Declaration.  In either case, the Court will require the Underwriters to compensate Van Tassel for time and expenses incurred preparing for and attending the deposition.

Signed July 6, 2010.

David C. Godbey
United States District Judge

ORDER – PAGE 23