IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § | |
| Plaintiff, | § § | |
| v. | § § § | Case No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, and LAURA PENDERGEST-HOLT, | § § § § § § § | |
| Defendants. | § | |

**RECEIVER'S MOTION TO APPROVE RECEIVER'S SETTLEMENT
OF LITIGATION WITH WALTON HOUSTON GALLERIA OFFICE, L.P.**

**I.   INTRODUCTION**

Ralph S. Janvey, Receiver for the assets of Defendants and all Stanford-controlled entities, respectfully moves the Court for an order approving the settlement of litigation with Walton Houston Galleria Office, L.P. ("Walton"). This litigation was initiated pre-Receivership and involves allegations that Walton engaged in fraudulent conduct arising out of 2004 lease negotiations for office space in Galleria Tower II in Houston, Texas. Two Stanford entities are the plaintiffs in the action. Walton has also brought counterclaims alleging various contentions including a claim that Stanford defrauded Walton into entering into the lease and that Stanford breached its lease post-Receivership when it vacated the Galleria Tower II office space. The Receiver believes that a settlement of this litigation for a payment to the Estate of $385,000 is in the best interests of the Receivership Estate, and should be approved by the Court.

## II.     FACTUAL BACKGROUND

On February 16, 2009, the Securities and Exchange Commission (the "Commission") commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC (collectively "Defendants").  The Commission alleges, in its Second Amended Complaint filed on January 8, 2010, that Defendants perpetrated a multi-billion-dollar fraudulent scheme by (1) promising high rates of return on "certificates of deposit" that exceeded those available through true certificates of deposit offered by traditional banks; and (2) selling a proprietary mutual fund wrap program known as Stanford Allocation Strategy using materially false and misleading historical performance data.  Am. Comp. (Doc. 952) ¶¶ 4, 7.

The Court found good cause to believe that Defendants violated federal securities laws.  Accordingly, on February 17, 2009, the Court entered an order appointing Ralph S. Janvey Receiver over all the assets of Defendants and all the entities they own or control.  Order Appointing Receiver (Doc. 10).  On July 19, 2010, the Court entered a Second Amended Order Appointing Receiver that contained changes not material to this motion (the "Receivership Order").  Second Amended Order Appointing Receiver (Doc. 1130).  The Receivership Order charged the Receiver with marshaling and preserving the assets of the Receivership Estate and addressing outstanding claims and liabilities.  Among the active pieces of litigation the Receiver inherited was a dispute between Stanford Group Holding, Inc. and the Stanford Galleria Buildings, LP (collectively "Stanford") and Walton.

Walton Street Capital, L.L.C. sponsors private equity real estate investment funds. In 1999, Walton Street purchased the Houston Galleria, a large mixed-use real estate complex. Following that purchase, Walton Street established Walton Houston Galleria Office, L.P. which

owns, among other properties, three office towers in the Galleria: Galleria Tower I, Galleria Tower II, and the Galleria Financial Center.[1]

In 2004, the headquarters of Stanford Financial Group was located at 5050 Westheimer, directly across from the Galleria. That year, Stanford entered into a lease for 24,000 square feet of space in Galleria Tower II. Stanford and Walton then entered into further discussions about space in the Galleria. As part of its lawsuit, Stanford contends that it was interested in purchasing Galleria Tower II. Stanford alleges that Walton demurred on Stanford's request, claiming that Stanford had to first agree to lease substantially more space. Stanford ultimately agreed to several expansions in the space leased which increased its rental obligations substantially. Stanford alleges that Walton had no intention of selling Galleria Tower II separate and apart from the other Galleria buildings and had instead improperly induced Stanford into the expanded lease.

Discussions between Stanford and Walton regarding the purchase of Galleria Tower II continued until Walton disclosed that it had retained a brokerage firm to sell Galleria Tower II as a package with two other office buildings. Stanford and Walton then proceeded to negotiate and sign a letter of intent for the sale of the three Galleria office towers owned by Walton. Stanford asserts in the litigation that the letter of intent is binding on the parties. Stanford alleges that the letter of intent and other agreements required Walton to sell Stanford the buildings. Walton contends that no agreement was ever reached to sell Stanford the buildings.

Stanford Group Holdings, Inc. and the Stanford Galleria Buildings, L.P. ultimately sued Walton in November 2005. *See* Exhibit 1, App. 1-24. Stanford's lawsuit seeks

---

[1] The allegations of the parties are set forth in Stanford's Amended Petition and Walton's Answer to the Amended Petition and Counterclaims. *See* Exhibit 1, App. 1-24; Exhibit 2, App. 25-47. References to "App." are to the Appendix in support of this Motion, filed concurrently herewith.

**RECEIVER'S MOTION TO APPROVE RECEIVER'S SETTLEMENT**
**OF LITIGATION WITH WALTON HOUSTON GALLERIA OFFICE, L.P.**             **PAGE 3**

recovery for the excess rent and build-out costs it spent based on Walton's misrepresentations that induced Stanford into making those expenditures, and/or for specific performance on the purchase of the office towers. Walton, of course, denies all of these claims.

For its part, Walton sought, and received, leave from this Court to file counterclaims against Stanford. Walton focuses these claims on two issues. First, Walton contends that Stanford's pre-Receivership conduct constitutes fraudulent inducement and concealment concerning the negotiation of the lease agreements. Walton contends that Stanford conducted illegal activities on the leased premises having represented that no such activity would occur. Further, Walton claims that Stanford made representations regarding its financial ability to meet the lease obligations which were also untrue. Walton recites at length information from the Securities & Exchange Commission and the Receiver in support of its position regarding Stanford's misdeeds. As a result of these misrepresentations, Walton claims it lost the ability to rent the space to other tenants and that the modifications to the leased space allegedly demanded by Stanford made the space more difficult to re-lease.

Second, Walton challenges the Receiver's post-Receivership rejection of the lease. According to Walton, the Receiver's rejection of the lease entitles it to all foregone lease payments.

Finally, the two parties to the litigation have a variety of disputes regarding the property at 5051 Westheimer. Walton asserts it has a valid landlord's lien on, and security interest in, the furniture and electronic equipment Stanford placed at the property during the lease term. Stanford rejects this contention. Stanford ultimately agreed—without accepting the validity of Walton's claim—to leave the furniture at 5051 Westheimer pending resolution of the parties' disputes. Stanford did—again by agreement—take various computers and other

electronic equipment with it when it vacated the premises, but Walton did not abandon its claim to this equipment.

The Stanford lawsuit has been pending since 2005. Walton filed its counterclaim in early 2010, and the case is currently set for trial at the end of October 2010. Significant discovery has taken place in Stanford's claims against Walton, but Walton has stated it will require extensive discovery on its claims including numerous depositions.

After extensive negotiations, the parties have agreed to settle the dispute. As part of the settlement, Walton will pay Stanford $385,000, and both sides will execute general releases in favor of the other party. A lis pendens on Walton's property will also be released. Walton will retain the furniture at 5051 Westheimer while the Receivership Estate will retain all electronic and related equipment removed from 5051 Westheimer. The Receiver believes this settlement is in the best interests of the Estate and should be approved by the Court.[2]

### III.   ARGUMENT AND AUTHORITIES

A common-law equity receiver has the power to dispose of property of the receivership estate when it appears that a receivership is continuing an enterprise that does not show evident signs of working out for the benefit of the creditors. *See Jones v. Vill. of Proctorville*, 290 F.2d 49, 50 (6th Cir. 1961). Courts appointing a receiver "should see that the business is liquidated as economically and speedily as possible, unless its continuance is demonstrably beneficial to creditors." *Id.* (citing *Kingsport Press, Inc. v. Brief English Sys.*, 54 F.2d 497, 501 (2d Cir. 1931)). The Receivership Order further gives the Receiver the authority to "contract and negotiate with any claimants against the Receivership Estate . . . for the purpose of settling any claim" and the authority to "[i]nstitute, prosecute, compromise . . .

---

[2] The settlement agreement is located in the concurrently filed Appendix. *See* Exhibit 3, App. 48-62.

such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable." Receivership Order at 5(f) & (i).

Here, the Receiver believes the risks of further litigation support a settlement. Stanford's attorneys at Dewey & LeBoeuf, LLP and Berg & Androphy believe Stanford has a strong case based on the evidence gathered to date. However, there is no guarantee of a positive outcome at trial, nor is there any guarantee that Walton will fail to prevail in its counterclaims. Stanford's exposure to the counterclaims could be substantial. According to Walton, Stanford's total liability on the lease—which runs through 2016—is almost $40 million. Several factors complicate the analysis of the case and support a settlement.

First, there is uncertain witness availability. None of the key witnesses for Stanford are still employed by a Stanford entity. Some do not reside in the court's jurisdiction, and it may be difficult to secure their testimony. The absence of such witness testimony could negatively impact Stanford at trial.

Second, past events at Stanford may be difficult to overcome. While Stanford believes that the conduct that resulted in the appointment of the Receiver is not relevant to a trial of this matter, Walton plainly will attempt to introduce evidence of prior misconduct at trial. Walton has, for example, indicated it will try to take the depositions of R. Allen Stanford and James M. Davis and introduce that testimony at trial. Such evidence could have a negative impact on Stanford's case and expose it to liability on the counterclaims.

Third, damages are uncertain. Stanford believes it has a strong claim to specific performance on Galleria Office Tower II. However, such specific performance would occur at a price set in 2005, and real estate prices have suffered since that time. At time of trial, the $150,000,000 price may well exceed the current value of the building, making a claim for

specific performance unattractive. Stanford does have alternative measures of damages such as the costs it incurred to build out the leased space and the excess rents it was charged. Stanford believes these damages exceed $10 million in build-out costs alone. However, these costs are subject to significant challenges from Walton, and there is no certainty that damages in any meaningful quantity will be awarded.

Fourth, Stanford will face a significant litigation burden going forward. As indicated earlier, Walton intends to pursue significant new discovery in the case. While Stanford would oppose much of that discovery, it is likely that Walton will be granted some latitude to pursue discovery. Such discovery will be expensive and time consuming. Other pretrial and trial activities will be costly as well.[3]

Fifth, there is no question that the Receiver did reject the Galleria Tower II lease. The litigation will revolve around whether the Estate may be sued for such a rejection, Walton's efforts to mitigate any damages, and the costs to Walton of the lease rejection. Discovery will be necessary, as well, on all of these issues.

These factors all create substantial uncertainty as to the outcome of the litigation. By contrast, the settlement provides certainty for the Estate in several respects. Initially, the settlement agreement provides for a certain payment to the Estate of $385,000. Further, the settlement provides for the release of all claims Walton may have against the Estate including its potentially substantial claim for foregone lease payments through 2016. The settlement agreement also allows the Estate the flexibility to handle the retained computers and electronic equipment as it wishes by extinguishing any claim Walton may have to that equipment. Absent such a settlement, the Estate would be obligated to maintain the equipment due to Walton's claims on it.

---

[3] The Dewey law firm is charging at an hourly rate while the Berg firm works on a contingency.

The Estate is, of course, giving up its claim to the lawsuit against Walton and the claim to the furniture. The significant costs and risks attendant to the lawsuit are described above, and the Receiver believes these costs and risks fully support resolving the dispute for a payment of $385,000 in total—$150,000 of which has been specifically allocated to the transfer of the furniture to Walton.[4]

As to the furniture, the Receiver believes securing value for the furniture from Walton is the most efficacious manner to dispose of it. While the furniture may have significant value, that value is best realized by leaving the furniture in place. In fact, the costs of attempting to move, store, and then sell the furniture may exceed its value. For example, while the Receiver reviewed valuations of the furniture up to $250,000, the Receiver could not locate a third party willing to incur the cost of moving the furniture from 5051 Westheimer for resale. Walton is plainly the best-positioned buyer of the furniture and will value it more highly than any other buyer.

## IV.   CONCLUSION AND PRAYER FOR RELIEF

After significant consultation with his team, the Receiver believes that the settlement of the Walton litigation on the terms described above would inure maximum benefit to the Receivership Estate. As a result, the Receiver respectfully requests that the Court approve the settlement and grant him any such other relief that the Court may deem just and equitable.

---

[4]   Approximately $150,000 of this amount will go to pay outstanding invoices of the Dewey firm. The Berg firm will not be entitled to a contingency payment due to the terms of its letter.

Dated:  September 14, 2010          Respectfully submitted,

**BAKER BOTTS LLP**

By: /s/ Kevin Sadler
    Kevin Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Robert I. Howell
    Texas Bar No. 10107300
    robert.howell@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    1500 San Jacinto Center
    98 San Jacinto Blvd.
    Austin, Texas 78701-4039
    (512) 322-2500
    (512) 322-2501 (Facsimile)

    Timothy S. Durst
    Texas Bar No. 00786924
    tim.durst@bakerbotts.com
    2001 Ross Avenue
    Dallas, Texas 75201
    (214) 953-6500
    (214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER
RALPH S. JANVEY**

## CERTIFICATE OF CONFERENCE

On or before September 9, 2010, counsel for the Receiver conferred or attempted to confer with the parties to this case. Counsel for the Receiver conferred with David Reece, counsel for the SEC, who stated that the SEC does not oppose this motion or the relief sought herein. Counsel for the Receiver conferred with John Little, Court-appointed Examiner, who does not oppose this motion or the relief sought herein. Counsel for the Receiver conferred with Ruth Schuster, counsel for R. Allen Stanford, who stated that Mr. Stanford does not oppose this motion or the relief sought herein. Counsel for the Receiver attempted to confer with Jeff Tillotson, counsel for Laura Pendergest-Holt, but did not receive a response regarding Ms. Pendergest-Holt's position on this motion or the relief sought herein. Counsel for the Receiver conferred with Kenneth Johnston, counsel for Trustmark National Bank, who stated that Trustmark does not oppose this motion or the relief sought herein. Counsel for the Receiver conferred with Manuel P. Lena, Jr., counsel for the DOJ (Tax Division), who stated that the IRS does not oppose this motion or the relief sought herein. Counsel for the Receiver attempted to confer with David Finn, counsel for James Davis, but did not receive a response regarding Mr. Davis's position on this motion or the relief sought herein. Counsel for the Receiver attempted to confer with Joe Kendall, counsel for Susan Stanford, but did not receive a response regarding Mrs. Stanford's position on this motion or the relief sought herein. Counsel for the Receiver conferred with Jason Brookner, counsel for HP Financial Services Venezuela C.C.A., who stated that HP takes no position on this motion or the relief sought herein. Counsel for the Receiver attempted to confer with Jack Patrick and Matthew Klecka, counsel for the DOJ (Fraud Division), but did not receive a response regarding the DOJ (Fraud Division)'s position on this motion or the relief sought herein. Counsel for the Receiver attempted to confer with Gregg Anderson, counsel for Mark Kuhrt, but did not receive a response regarding Mr. Kuhrt's position on this motion or the relief sought herein. The motion is, therefore, presumed to be opposed under Local Rule 7.1(b)(3).

/s/ Kevin M. Sadler
Kevin M. Sadler

## CERTIFICATE OF SERVICE

On September 14, 2010 I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler