**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| STANFORD GROUP COMPANY, | § | |
| STANFORD CAPITAL MANAGEMENT, LLC, | § | |
| R. ALLEN STANFORD, JAMES M. DAVIS, and | § | |
| LAURA PENDERGEST-HOLT, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF
RECEIVER'S MOTION TO APPROVE RECEIVER'S SETTLEMENT
OF LITIGATION WITH WALTON HOUSTON GALLERIA OFFICE, L.P.**

Dated:  September 14, 2010                     Respectfully submitted,

**BAKER BOTTS LLP**

By: /s/ Kevin Sadler_____

      Kevin Sadler
      Texas Bar No. 17512450
      kevin.sadler@bakerbotts.com
      Robert I. Howell
      Texas Bar No. 10107300
      robert.howell@bakerbotts.com
      David T. Arlington
      Texas Bar No. 00790238
      david.arlington@bakerbotts.com
      1500 San Jacinto Center
      98 San Jacinto Blvd.
      Austin, Texas 78701-4039
      (512) 322-2500
      (512) 322-2501 (Facsimile)

      Timothy S. Durst
      Texas Bar No. 00786924
      tim.durst@bakerbotts.com
      2001 Ross Avenue
      Dallas, Texas 75201
      (214) 953-6500
      (214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER**
**RALPH S. JANVEY**

**CERTIFICATE OF SERVICE**

On September 14, 2010 I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler

**EXHIBIT 1**

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC. | § | IN THE DISTRICT COURT OF |
| and THE STANFORD GALLERIA | § | |
| BUILDINGS, LP | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WALTON HOUSTON GALLERIA | § | |
| OFFICE, L.P., | § | |
| Defendant. | § | 113th JUDICIAL DISTRICT |

### AMENDED PETITION

Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP file this amended

petition against Walton Houston Galleria Office, L.P.

#### Discovery Control Plan

1.      Discovery in this case will be conducted under Texas Rule of Civil Procedure

190.4.

#### Jurisdiction and Venue

2.      This court has personal jurisdiction over Walton Houston Galleria Office, L.P.,

because it conducts business in Texas. This court has subject matter jurisdiction over this case

because the amount in controversy exceeds the minimum jurisdictional amount of this court.

3.      Venue is proper in Harris County under Sections 15.002 and 15.011 of the Texas

Civil Practice & Remedies Code. All or a substantial part of the events or omissions giving rise

to plaintiffs' claims occurred in Harris County, and the real estate at issue is located in Harris

County.

HN699953



1

**Parties**

4.     Stanford Group Holdings, Inc. is a Delaware corporation. The Stanford Galleria Buildings, LP is a Delaware limited partnership.

5.     Walton Houston Galleria Office, L.P. ("Walton") is a Delaware limited partnership. It has appeared in this case.

**Nature of the Case**

6.     This case is about Walton's fraudulent conduct and breach of its agreements with Stanford. Walton Street Capital, L.L.C., which sponsors the private equity real estate investment funds that beneficially own the three office towers at the Galleria, and whose principals handled the negotiation for the sale of those towers to Stanford, proclaims its "dedication to a disciplined disposition strategy" on its website. The facts of this case, however, reveal a disregard for honesty, fair-dealing and the rule of law in Walton's "disciplined" approach to obtaining the "optimal" return for itself in complete disregard of its representations to and agreements with Stanford.

7.     For nearly a year, Walton lied to Stanford about its intent to sell Stanford the central office building at issue, all the while improving its own position by inducing Stanford first to lease an additional five floors, and then an additional three floors, for a total of ten floors in the building. Walton promised Stanford that once the lease was complete, it would give Stanford the opportunity to buy the building. As subsequent events revealed, Walton never intended to fulfill that or any of its other promises to Stanford. Walton twice breached agreements to execute a Purchase and Sale Agreement for the conveyance of the three Galleria office buildings to Stanford for $150,000,000. This lawsuit seeks redress for Walton's wrongful refusal to honor its word and its agreements with Stanford.

2

HN69995.3

### Facts

8.      Walton Street Capital, L.L.C. sponsors private equity real estate investment funds that, according to its website, have raised $1.8 billion. The principals of Walton Street have personally invested $151 million in the funds, and are therefore personal beneficiaries of the funds' profits.

9.      In early 1999, Walton Street negotiated the purchase of the Houston Galleria, one of the largest mixed-use real estate complexes in the world. Two of its sponsored funds invested in the acquisition, Walton Street Real Estate Fund II, L.P. and Walton Street Real Estate Fund III, L.P. New companies created by Walton Street, using the Walton funds' equity, acquired 100% of the three office towers for $73 million, 100% of the two hotels for $86 million, and a 33% interest in the retail assets and associated land. This lawsuit involves the three office towers, which are owned by the defendant in this case, Walton Houston Galleria Office, L.P. Those three office towers, Galleria Tower I, Galleria Tower II and Galleria Financial Center, have a combined net rentable area of 1,065,628 square feet.

10.     The Stanford Financial Group is a global network of affiliated companies providing financial services. Its headquarters are located in Houston across from the Galleria. In the summer of 2004, Stanford approached Walton about leasing space in Galleria Tower II to accommodate Stanford's growing requirements for office space. On October 25, 2004, Stanford entered into a 10-year lease with Walton for approximately 24,000 square feet of space in Galleria Tower II. According to Walton, the total lease payments under the ten-year term of lease amounted to $6,488,492.00.

11.     Stanford subsequently approached Walton about the possibility of purchasing Galleria Tower II. At the time, Galleria Tower II was over half vacant, which not only

HN699963

3

negatively impacted Walton's cash-flow, but also significantly impacted the value of Galleria Tower II and consequently Walton's portfolio. Therefore, Walton seized this opportunity to fraudulently induce Stanford to lease additional space in Galleria Tower II. Walton's own internal documents reflect Walton's representations to Stanford that Walton would only consider selling the building to Stanford if Stanford leased substantially more space from Walton. In fact, Walton's internal documents show that Walton was aware it was attempting to induce Stanford to lease more space than it actually needed at the time. Walton's representations created a false impression that it was interested in and willing to sell Galleria Tower II to Stanford. As Stanford has learned in this case, however, Walton had no intention of selling the building to Stanford.

12. Nevertheless, on December 8, 2004, Stanford's representative met with representatives of Walton to discuss Stanford's interest in purchasing Galleria Tower II. Based on Walton's representations that it would only consider selling the building to Stanford if Stanford leased substantially more space, Stanford also discussed leasing over 80,000 additional square feet of space in Galleria Tower II. Walton reiterated, however, that it first wanted to enter into the expanded lease agreement, and after doing so, would then be willing to discuss selling the building to Stanford. At no point did Walton disclose to Stanford that it had no intention of selling the building to Stanford. On the contrary, as an express inducement to lease additional space, Walton specifically offered Stanford the right of first offer to purchase Galleria Tower II, expressly agreeing with respect to the right of first offer that "time was of the essence."

13. On January 6, 2005, Chip Colvill, a representative of Walton, provided a revised draft of the First Amendment and stated that the right of first offer, with respect to which time was of the essence, had been approved by Walton's upper management. This, in conjunction with other representations made by Walton, created a false impression that Walton had the

HN69995.3

4

present and immediate intent to sell the building to Stanford. Walton, however, had no intention of selling the building, and in fact, had no intention of ever selling Galleria Tower II by itself. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford and no intention of ever selling Galleria Tower II by itself. Had Stanford known that Walton had no intention of selling the building, it would not have leased the additional five floors, which, as Walton admitted it knew, far exceeded Stanford's actual need for space at the time. The First Amendment was subsequently executed by the parties, and as a result Stanford's total liability for lease payments under the First Lease Amendment totaled $21,600,009.00, according to Walton.

14. Stanford continued to express its interest in purchasing Galleria Tower II. In April 2005, Stanford specifically asked representatives of Walton where Walton was in the process of selling the building. Subsequently, on May 9, 2005, Stanford sent a letter to Walton reaffirming its discussions with Walton that Stanford desired to purchase Galleria Tower II, and initiating Stanford's right of first offer under the lease amendment. Under the right of first offer, Walton was therefore obligated to submit to Stanford a "Bid Package" within 60 days. It did not. Instead, as Walton's internal documents reflect, Walton wanted Stanford to lease an additional 50,000 square feet of space in Galleria Tower II. Walton's representatives, however, represented to Stanford that, following the execution of the second amendment to the lease, Stanford would have the exclusive opportunity to purchase the building. Therefore, in reliance on Walton's representations, on July 18, 2005 Stanford executed the Second Amendment to the Lease Agreement adding an additional 50,000 square feet to its leased space, bringing to over 160,000 square feet, or ten floors, the total space leased by Stanford in Galleria Tower II, which was over five times the amount of space that Stanford initially agreed to lease from Walton. Stanford's

5

HN69995.3

liability for lease payments for the additional space under the Second Lease Amendment was $11,507,958.00, according to Walton. Stanford's total liability for lease payments over the term of the lease, which extends through 2016, is, according to Walton, $39,596,459.00, over six times what Stanford would have been obligated to pay Walton under the original lease. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero because Stanford would ultimately be the owner of the building.

15.    Stanford became, and remains, the primary tenant in Galleria Tower II, and as of August 2007, its lease comprised over 50% of the net rentable area of the building. Moreover, in reliance on Walton's representations and omissions, Stanford spent in excess of $10,238,062.00 improving the 10 floors it had leased from Walton. In addition, Stanford vacated the premises it had leased prior to moving into Galleria Tower II, and was obligated to pay about $569,997.07 for space that it no longer occupied.

16.    Following the execution of the Second Amendment to the Lease Agreement, discussions between Stanford and Walton regarding the purchase of Galleria Tower II, and possibly one of the Galleria hotels (the Westin Galleria), continued. On August 17, 2005, representatives of Stanford met with Howard Brody, a principal in Walton and the asset manager for Walton's Galleria properties, to discuss the purchase. Brody explained that Walton had retained CB Richard Ellis, a commercial real estate brokerage firm, to market the three Galleria office towers. Stanford reminded Brody that, prior to entering into the Second Lease Amendment, Walton had represented to Stanford that it would have the exclusive opportunity to purchase Galleria Tower II. Stanford then asked Walton for the exclusive right to negotiate a purchase of the three office buildings before Walton offered the buildings for sale to any other party; Stanford also reiterated its interest in purchasing the Westin Galleria hotel.

HN699995.3

6

6

6

7

17.    To facilitate Stanford's analysis of the three office buildings, Walton allowed Stanford access to marketing and due diligence materials assembled by Walton.    These marketing materials included an Offering Memorandum, setting forth what Walton considered to be the material information relating to the Galleria office buildings, and a website containing leases, contracts, service agreements, and other legal documents relating to the Galleria office buildings.

18.    In a meeting on August 26, 2005, Brody informed Stanford's representatives that Walton had agreed to give Stanford an exclusive opportunity to purchase all three of the Galleria office buildings.  Brody presented a proposed letter of intent to Stanford and said that although Walton was not interested in selling the Westin Galleria hotel at the time, they would be willing to talk to Stanford about the hotel later, after a deal on the office buildings had been completed. Walton, however, refused to sign the letter of intent unless Stanford agreed to Walton's $150,000,000.00 asking price for the three buildings.

19.    In reliance on Walton's representations, Stanford signed the letter of intent with Walton on September 6, 2005, regarding the proposed purchase and sale of the Galleria office towers (the "Letter of Intent").  In the letter of intent, Stanford agreed to pay and Walton agreed to accept $150,000,000 in cash for the three office buildings.  Stanford also agreed to complete its evaluation of the property (its "due diligence") by September 26, 2005.  The parties agreed to negotiate and execute a Purchase and Sale Agreement on or before September 27, 2005. Walton also decided, however, to solicit bids on the buildings in the event Stanford chose not to enter into an agreement, but the deadline for third-parties to submit bids was after the date by which Stanford and Walton had agreed to execute the Purchase and Sale Agreement.

7

HN699953

7

7

8

20.     Because of the very short deadlines to conduct due diligence and sign a Purchase and Sale Agreement, Stanford immediately engaged professional consultants to assist it in the due diligence and negotiation of a Purchase and Sale Agreement.  It hired consultants to perform a financial analysis of the properties, to inspect and issue a report on the physical condition of the buildings and their mechanical systems, and to perform an environmental study.  Stanford also formed the entity that would enter the Purchase and Sale Agreement, Stanford Galleria.

21.     On September 8, 2005, Stanford hired legal counsel to help with the due diligence and to assist in negotiating and drafting the Purchase and Sale Agreement.  Several drafts of the Purchase and Sale Agreement and numerous comments were exchanged between lawyers for Walton and Stanford, and on September 19, 2005, Brody said that the final Purchase and Sale Agreement would be ready for execution early the next week.

22.     By September 21, 2005, Hurricane Rita, a category five hurricane, was predicted to make landfall at Houston, Texas within the next few days.  Mandatory evacuations were ordered, and most businesses began making preparations to shut down until the hurricane had passed.  In light of this development, Stanford and Walton entered into an amendment to the letter of intent extending the date for Stanford to complete its due diligence from September 26, 2005 to October 4, 2005, and extending the deadline to execute the Purchase and Sale Agreement from September 27, 2005, to October 5, 2005.  In the amendment, the parties expressly agreed that the letter of intent "shall remain in effect and is hereby ratified."  Separately, Walton extended the deadline for third-party bids to 12:00 noon, Thursday, October 6, 2005, one day after the new deadline for Walton and Stanford to execute a Purchase and Sale Agreement.

23.     Negotiations between Stanford and Walton regarding the terms of the Purchase and Sale Agreement continued. On September 23, 2005, Brody sent a short letter to Stanford regarding the "open issues on the contract." There were only four. First, Brody reiterated that "[t]his is an 'as-is' deal," meaning Stanford was responsible for conducting its own due diligence. Second, Walton could not be required to obtain Subordination, Nondisturbance & Attornment Agreements from the tenants of the buildings. Third, Walton wanted a cap on liability for any issues arising out of the deal. Fourth, the closing date would need to be arranged so as to minimize the amount of interest Walton would have to pay on its loans that encumbered the buildings. Brody concluded the letter by stating, "Upon reaching a resolution of these items we will send you a revised Purchase Agreement."

24.     The parties continued to work to resolve these issues, but on October 3, 2005, Walton asked to extend the deadlines in the letter of intent because of an intervening Jewish holiday. Stanford agreed, and the parties executed a second amendment to the letter of intent extending the date for Stanford to complete its due diligence to October 5, 2005, and extending the date to execute the Purchase and Sale Agreement to October 6, 2005. The parties expressly agreed in the amendment that the letter of intent "shall remain in effect and is hereby ratified," and in fact Stanford made arrangements that day to wire the $10,000,000.00 deposit to Walton. As Stanford has since learned, however, this extension meant that Walton could review the outside bids on October 6 before the midnight deadline for executing the Purchase and Sale Agreement with Stanford.

25.     On October 5, Walton, Stanford, and their lawyers participated in a telephone conference. During that call, Walton and Stanford agreed on all terms for the sale of the three Galleria office buildings. On the call, Brody instructed Walton's lawyer to prepare a final draft

of the Purchase and Sale Agreement, reflecting the agreements reached on the call, for execution. Walton and Stanford agreed to execute the Purchase and Sale Agreement the following day, October 6, the deadline provided by the letter of intent.

26.     Later that day, however, Brody told Stanford that Walton would not execute the Purchase and Sale Agreement, claiming for the first time that Walton needed to resolve a "new" issue concerning the Galleria condominium arrangement in light of Federated Department Stores' decision to close the store currently called Macy's in the Galleria, and re-label its Foley's store in the Galleria as "Macy's." Although Federated's plans had been reported in the *Houston Chronicle* on July 29, 2005, over two months before, and although Walton had obviously known about Federated's plans prior to that public announcement, Brody used Federated's decision as an excuse for Walton's breach of its agreement to sign the Purchase and Sale Agreement. As Stanford has learned in this case, Walton was well-aware of the issues surrounding the Galleria condominium arrangement long before October 5.

27.     During that second call on October 5, Brody claimed that because of the closing of the Macy's store, Walton wanted to make revisions to the Galleria Condominium Documents to permit the development of residential condominiums in the Galleria — revisions that could materially impact Stanford's ownership of the office buildings in a number of ways, including the sharing of utilities from the Galleria central plant, parking availability and location, voting rights within the condominium association, and cost-sharing arrangements. Brody denied that this "new" condominium issue had anything to do with the fact that Walton wanted to wait to see the bids on the Galleria office towers, which were due at noon the next day. Stanford indicated that its initial reaction to the proposed residential development was favorable, and expressed its willingness to discuss the issue further once the Purchase and Sale Agreement was signed. It

HN6959953

10

objected, however, to Walton's efforts to renege on its agreement to sign the Purchase and Sale Agreement. Stanford, however, reiterated to Walton that all terms and conditions of the sale had been agreed to and that Stanford was ready, willing, and able to perform and that it was prepared to deliver the earnest money immediately. Stanford informed Walton that it would wait for Walton to execute the Purchase and Sale Agreement that the parties had agreed to execute.

28.    The next day, October 6, Stanford waited for the execution copy of the Purchase and Sale Agreement. Around 10:00 p.m., two hours before the midnight deadline to execute the Purchase and Sale Agreement, Walton's lawyer forwarded to Stanford a revised, unexecuted draft of the Purchase and Sale Agreement. Contrary to the terms agreed upon during the October 5 conference call, the new draft contained provisions that had never been discussed, imposing significant restrictions and limits on Stanford's future use and sale of the office buildings, and granting Stanford's blanket consent to any future changes that Walton might wish to make to the Condominium Documents, including changes that could reduce or relocate parking space for the three office buildings, reduce Stanford's voting rights in the condominium association, and impose other burdens on the office properties. The draft also granted Stanford's consent to convert one or both of the Galleria hotels to residential use.

29.    In a conference call on October 7, 2005, Brody apologized for the "timing of events" and stated that Walton still wanted to sell the office buildings to Stanford. Expanding on his excuse for Walton's refusal to perform its agreement to execute the Purchase and Sale Agreement, Brody claimed that a senior partner at Walton, who was apparently Ira Schulman, was insisting that all issues related to the future residential condominium development be resolved before selling the office buildings to Stanford. Brody admitted that Walton had received and was reviewing bids on the properties from interested potential purchasers, but

11

claimed that none of the bids met or exceeded Stanford's $150,000,000 deal. He promised that Walton would not approach any of the bidders to try to encourage them to increase their bid price, and denied that Walton was delaying the execution of the Purchase and Sale Agreement in order to try to negotiate a better deal on the office buildings with another buyer.

30.    In an effort to amicably resolve the concerns Walton claimed to have about the condominium issue, Stanford and its lawyer participated in a conference call with Brody and Walton's lawyer on the afternoon of October 12, 2005. During that call, Stanford and Walton confirmed their agreement to execute the Purchase and Sale Agreement and agreed (1) that Walton could proceed with the contemplated amendments to the Galleria Condominium Documents, (2) that Stanford had the right to review those amendments and determine if they were acceptable, (3) that Stanford could terminate the Purchase and Sale Agreement if the amendments to the Condominium Documents were not acceptable, and (4) that if Stanford terminated the agreement, Walton would refund Stanford's $10 million deposit.

31.    In a subsequent telephone conference on Thursday, October 20, 2005, Stanford and Walton agreed to language to be inserted into the Purchase and Sale Agreement that would reflect the October 12, 2005 agreement regarding Stanford's right to terminate the Purchase and Sale Agreement and have its deposit returned. Walton and Stanford agreed to execute the Purchase and Sale Agreement containing that language by the close of business the following day, Friday, October 21, 2005, and Stanford promised that it would wire the required $10,000,000.00 deposit.

32.    Once again, however, Walton failed to live up to its agreement, and never executed the Purchase and Sale Agreement. Rather, late Friday afternoon, Brody sent an e-mail to Stanford saying that he was still trying to "sort out a couple of things" and was "hoping to be

12

HN69995.3

in a position" to call Stanford Monday morning. Monday morning, Brody called to say that Walton had decided not to execute the Purchase and Sale Agreement. Stanford responded that they had a deal, that they expected Walton to live up to the deal, and that if Walton refused, Stanford would enforce its rights against Walton under the law. On October 24, 2005, Stanford sent a letter to Walton, stating that it was ready willing and able to perform and that it was ready to deliver the deposit.

33. On November 1, 2005, Brody sent Stanford a letter denying the agreements and claiming that "there will not be any agreement until Walton Street considers all issues that it, in its sole discretion, considers to be material to the proposed transaction." The letter did not list a single allegedly open issue, however. In other words, Walton Street was admitting what it had concealed from Stanford but that had become clear in the course of events — Walton felt free to add new requirements and conditions, and change any aspect of the deal, even after it had reached an agreement. In response, on November 1, 2005, Stanford again informed Walton that it was ready, willing and able to perform.

34. Finally, on November 3, 2005, Walton, through counsel, sent a letter to Stanford unilaterally stating that, "[a]s we have repeatedly informed you, Ownership has no intention of *proceeding with any agreement* that does not contain a satisfactory and full treatment of all issues and concerns," (emphasis added) and threatening Stanford if Stanford tried to enforce the agreements it had reached with Walton.

35. As Stanford has learned during the course of discovery, despite having had two years to do so, Walton has never resolved the so-called condominium issue it raised as an excuse for Walton's breach of its agreement to sign the Purchase and Sale Agreement. In truth, Walton's excuse was simply the culmination of its fraudulent scheme it began in the fall of 2004. While

13

HN69995.3

the parties' conduct, viewed objectively, showed that the parties had a deal and had agreed to execute the Purchase and Sale Agreement, it is now clear that, contrary to its numerous representations, Walton never intended to sell Stanford Galleria Tower II, or any building for that matter.

36.    Ira Schulman, the Walton Street partner who Brody used as an excuse for Walton's refusal to abide by its agreement to sign the Purchase and Sale Agreement, once commented in a "sponsor interview" in *The Institutional Real Estate Letter* that, "[e]verybody has to be accountable." This lawsuit is filed to make Walton accountable for its fraudulent conduct and breached agreements.

### First Cause of Action
### Breach of Contract

37.    The Letter of Intent signed by the parties evidenced the essential terms of the parties' agreement. The parties subsequently ratified the letter of intent, thereby making it a binding and enforceable contract to sell the Galleria office buildings. In addition, the parties made the letter of intent binding and enforceable by their conduct following its execution. Walton breached the contract by refusing to sell the Galleria office buildings to Stanford, and Stanford directly and proximately suffered damages as a result.

38.    In the alternative, the Letter of Intent was a binding and enforceable contract to execute a Purchase and Sale Agreement. Walton breached the contract by refusing to execute a Purchase and Sale Agreement, and Stanford directly and proximately suffered damages as a result.

39.    In addition, or in the alternative, during each of the October 5 and October 20 conference calls, Walton and Stanford reached agreement on all outstanding terms regarding the sale of the Galleria office buildings, and agreed to execute a written agreement that reflected

14

#HN699953

their agreement. Walton breached those agreements by refusing to execute the Purchase and Sale Agreement, and Stanford has directly and proximately suffered damages as a result.

40.     The agreements on which Stanford bases its claims either comply with or are outside the scope of the statute of frauds, but, because of Walton's fraudulent conduct, Walton is nevertheless estopped from asserting the statute of frauds.

41.     Because real estate is unique and Stanford has no adequate remedy at law, it is entitled to specific performance, and requests that the court order Walton to convey the Galleria office buildings to it, or alternatively, to execute the Purchase and Sale Agreement reflecting the terms of the deal between Stanford and Walton to convey the Galleria office buildings to it. Alternatively, Stanford requests its actual damages in an amount awarded by the jury, as well as pre and post-judgment interest.

42.     Under Chapter 38 of the Texas Civil Practice and Remedies Code, Stanford is entitled to recover its attorney's fees incurred in prosecuting this breach of contract claim, and therefore requests its attorney's fees.

**Second Cause of Action**
**Fraudulent Inducement**
**(First Lease Amendment)**

43.     In order to induce Stanford to enter into the First Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II, which Walton either knew were false or made recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford and that it would sell Galleria Tower II apart from the other Galleria office buildings, when in fact Walton had no intention of selling the building to Stanford

15

HN69995.3

or of selling Galleria Tower II apart from the other Galleria office buildings. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford or of selling Galleria Tower II apart from the other Galleria office buildings. Moreover, Walton had a duty to disclose that issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, would preclude it from selling the building to Stanford.

44.   Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

45.   In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the First Lease Amendment of $21,600,009.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space, and was obligated to pay approximately $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

46.   In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton has directly benefited from Stanford's entering into the First Lease Amendment through increased rent and the increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched.

16

HN69995.3

47.     Walton's fraud demonstrates the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary damages, and Stanford is entitled to recover, and requests, exemplary damages from Walton in an amount determined by the jury.

### Third Cause of Action
### Chapter 27 of the Texas Business & Commerce Code
### (First Lease Amendment)

48.     In violation of Chapter 27 of the Texas Business & Commerce Code, and in order to induce Stanford to enter into the First Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II, which Walton either knew were false or made recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford and that it would sell Galleria Tower II apart from the other Galleria office buildings, when in fact Walton had no intention of selling the building to Stanford or of selling Galleria Tower II apart from the other Galleria office buildings. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford or of selling Galleria Tower II apart from the other Galleria office buildings. Moreover, Walton had a duty to disclose that issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, would preclude it from selling the building to Stanford.

49.     Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

17

HN69995.3

**17**

**17**

18

50.     In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the First Lease Amendment of $21,600,009.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending over $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space, and was obligated to pay about $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

51.     In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton has directly benefited from Stanford's entering into the First Lease Amendment through increased rent and the increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched.

52.     Walton had actual awareness of the falsity of its representations and therefore is liable to Stanford for exemplary damages.

53.     Under Chapter 27 of the Texas Business & Commerce Code, Stanford is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

### Fourth Cause of Action
### Fraudulent Inducement
### (Second Lease Amendment)

54.     In order to induce Stanford to enter into the Second Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II. Walton also falsely represented that it would give Stanford the exclusive opportunity to purchase the building when in fact it had no intention of doing so. Walton either knew that

18

HN699953

18

18

19

these representations were false or made them recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford, when in fact Walton had no intention to sell the building to Stanford. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford. Moreover, Walton had a duty to disclose that it would not sell the buildings to Stanford until certain issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, were resolved as it wanted.

55.    Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

56.    In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the Second Lease Amendment of $11,507,958.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero. Moreover, Stanford relied on Walton's representations and omissions in expending over $10,238,062 to improve the leased space. Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space, and was obligated to pay about $569,997.07 for space it no longer occupied. Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

57.    In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct. Walton had directly benefited from Stanford's entering into the First Lease

19

HN69995.3

19

19

Amendment through increased rent and the increased market value of Galleria Tower II. Stanford is entitled to recover all amounts by which Walton has been unjustly enriched.

58.     Walton's fraud demonstrates the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary damages, and Stanford is entitled to recover, and requests, exemplary damages from Walton in an amount determined by the jury.

**Fifth Cause of Action**
**Chapter 27 of the Texas Business & Commerce Code**
**(Second Lease Amendment)**

59.     In order to induce Stanford to enter into the Second Lease Amendment, Walton made numerous false and material representations about its intent and willingness to sell Galleria Tower II. Walton also falsely represented that it would give Stanford the exclusive opportunity to purchase the building when in fact it had no intention of doing so. Walton either knew that these representations were false or made them recklessly, as positive assertions, without knowledge of their truth and with the intent that Stanford rely on them. In addition, Walton's' representations created a false impression that Walton had the present and immediate intent to sell the building to Stanford, when in fact Walton had no intention to sell the building to Stanford. Walton, therefore, had a duty to disclose that in fact it had no intention of selling the building to Stanford. Moreover, Walton had a duty to disclose that it would not sell the buildings to Stanford until certain issues related to the condominium regime, including, but not limited to, disputes with other condominium association owners, were resolved as it wanted.

60.     Walton knew that Stanford was ignorant of the information and did not have an equal opportunity to discover the truth. Walton deliberately remained silent and did not disclose the information to Stanford. By remaining silent, Walton intended that Stanford act without the information. Stanford relied on Walton's deliberate silence.

20

HN69995.3

20

20

61.     In reliance on Walton's representations, deliberate silence, and omissions, Stanford incurred a lease liability under the Second Lease Amendment of $11,507,958.00. Based on Walton's representations and omissions, however, Stanford expected its net lease liability to be zero.  Moreover, Stanford relied on Walton's representations and omissions in expending over $10,238,062 to improve the leased space.  Also in reliance on Walton's representations and omissions, Stanford vacated an existing leased space and was obligated to pay $569,997.07 for space it no longer occupied.  Stanford is therefore entitled to its reliance, out-of-pocket and benefit-of-the-bargain damages in amount to be determined by the jury.

62.     In addition, or in the alternative, Walton has been unjustly enriched by its fraudulent conduct.  Walton has directly benefited from Stanford's entering into the First Lease Amendment through increased rent and increased market value of Galleria Tower II.  Stanford is entitled to recover all amounts by which Walton has been unjustly enriched. Walton's fraud demonstrates the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary damages, and Stanford is entitled to recover, and requests, exemplary damages from Walton in an amount determined by the jury.

63.     Walton had actual awareness of the falsity of its representations and therefore is liable to Stanford for exemplary damages.

64.     Under Chapter 27 of the Texas Business & Commerce Code, Stanford is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

**Conditions Precedent**

65.     All conditions precedent to recovery by Stanford have been performed or have occurred.

HN69995.3

### Prayer

Walton pursued its own profit without regard to whether its promises were truthful or its actions legal. Stanford respectfully requests that this Court remedy its losses by ordering Walton to convey the Galleria office buildings to it, or alternatively to execute the Purchase and Sale Agreement, or alternatively, to award it the actual damages it has suffered, including pre and post-judgment interest. In addition to specific performance or, alternatively, damages, Stanford requests its reliance, out-of-pocket, benefit-of-the-bargain, and exemplary damages and attorney's fees.

Respectfully submitted,

David Berg
Texas Bar No. 02187000
**BERG & ANDROPHY**
3704 Travis St.
Houston, Texas 77002
(713) 529-5622
(713) 529-3785 – Fax

Sean Gorman
Texas Bar No. 08218100
Chris Lacy
Texas Bar No. 24046258
**DEWEY & LEBOEUF LLP**
1000 Main Street, Suite 2550
Houston, Texas 77002
(713) 287-2024
(713) 445-2124 – Fax

**ATTORNEYS FOR STANFORD GROUP HOLDINGS, INC. AND THE STANFORD GALLERIA BUILDINGS, LP**

22

HN699953

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on opposing counsel, as reflected below, on October 8, 2007.

H. Bruce Golden                    By Hand Delivery and U. S. Mail
Golden & Owens, L.L.P.
1221 McKinney Street
Suite 3150
Houston, Texas 77010

_____
Chris Lacy

HN69995.3

23

23

23

**EXHIBIT 2**

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC and THE STANFORD GALLERIA BUILDINGS, LP, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs/Counter-Defendants | § § | |
| v. | § § | |
| WALTON HOUSTON GALLERIA OFFICE, L.P., | § § § | HARRIS COUNTY, TEXAS |
| Defendants/Counter-Plaintiff | § | 113th JUDICIAL DISTRICT |

## WALTON'S COUNTERCLAIM AGAINST STANFORD

1.    Now Comes Defendant Walton Houston Galleria Office, L.P. ("Walton"), and acting as Counter-Plaintiff files its Counterclaims to the Amended Petition of Plaintiffs Stanford Group Holdings, Inc. and The Stanford Galleria Buildings, LP ("Plaintiffs" or "Stanford") now Counter-Defendants, and respectfully says:

2.    Walton requested leave to file these counterclaims against Plaintiffs in Stanford's receivership proceedings, *Securities and Exchange Commission v. Stanford Int'l Bank, et al.*, No. 3:09-cv-00298-N, currently pending in the United States District Court for the Northern District of Texas ("Motion for Leave").

3.    Walton's Motion for Leave was granted by Order, dated March 15, 2010, attached hereto as Exhibit A. Accordingly, Walton now pleads as follows:

### Parties

4.    Counterclaim-Plaintiff Walton Houston Galleria Office, L.P. ("Walton") is a Delaware limited partnership.

5.    Counterclaim-Defendant Stanford Group Holdings, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

6.      Counterclaim-Defendant Stanford Galleria Buildings, LP, is a Delaware limited partnership with its principal place of business in Houston, Texas (together with Stanford Group Holdings, Inc., "Stanford").

### Jurisdiction and Venue

7.      This court has jurisdiction over Stanford for purposes of these Counterclaims, and venue in Harris County is proper for purposes of these Counterclaims, because Stanford has submitted to personal jurisdiction and venue in this matter by filing the Amended Petition.

### Factual Background

8.      The Stanford Financial Group is a network of affiliated companies including Plaintiffs Stanford Group Holdings, Inc. and the Stanford Galleria Buildings, LP, that purported to provide financial services to clientele.   Plaintiffs Stanford Group Holdings, Inc. and the Stanford Galleria Buildings, LP are under common control with Stanford International Bank, Ltd. ("SIB"), Stanford Group Company ("SGC"), and Stanford Capital Management ("SCM"). In fact, Plaintiffs, SIB, SGC, SCM and all other entities making up the Stanford Financial Group were controlled and directly or indirectly owned by Allen Stanford.

9.      Until February 17, 2009, to the outside world, these companies appeared to be independently viable.

10.      In or around the summer of 2004, Stanford approached Walton, seeking to lease space in a building located at the Houston Galleria, commonly referred to as Galleria Tower II, and owned by Walton.

11.      Following extensive negotiations, in which both parties were represented by sophisticated counsel, and Walton's review of Stanford provided financials, Stanford and Walton entered into the Lease Agreement dated October 25, 2004 (the "Original Lease"). The Original

2

Lease was executed by A.J. Rincon as Chief Financial Officer on behalf of Stanford Group Holdings, Inc.

12.     Pursuant to the Original Lease, Stanford committed to rent 23,907 square feet of space at Galleria Tower II and 72 parking spaces for a period of ten years with an expected rental obligation, over the term of the lease, of $5,987,306.

13.     Pursuant to Section 4.07 of the Original Lease, Stanford promised to: (i) "not occupy, use or permit any portion of the Leased Premises to be occupied or used for any business or purpose that is disreputable [or] illegal"; and (ii) comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies exercising jurisdiction thereover..." Stanford's promise was false when made.

14.     Walton agreed to pay $908,466 to enable Stanford to make substantial improvements to the leased premises pursuant to Section 1.02 of the Original Lease and provided other financial benefits to Stanford in reliance on Stanford's commitments, including Section 4.07 of the Original Lease.

15.     Subsequent to entering into the Original Lease, Stanford entered into a lease amendment (the "First Amendment") with Walton. Pursuant to the First Amendment, Stanford agreed to lease an additional 88,717 square feet and 322 spaces, and to extend the lease term by 22 months. Pursuant to the First Amendment, Stanford's expected rental obligation increased by $25,625,754 in excess of the rental obligation Stanford owed under the Original Lease.

16.     Under the First Amendment, Walton agreed to provide $3,016,378, in addition to the amount provided for in the Original Lease, to Stanford in payment for the cost of Stanford's improvements to the leased premises. Walton also agreed to make, at its expense, certain

3

improvements to the ground floor and lower lobbies of Galleria Tower II.  In entering into the First Amendment, Walton relied on Stanford's commitments and representations in the Original Lease and the First Amendment.  The First Amendment incorporated the terms of the Original Lease, including Section 4.07.

17.     In addition, prior to signing the First Amendment, Stanford provided, once more, financial statements at the request of Walton, including financial statements for the Stanford Financial Group and plaintiff Stanford Group Holdings, Inc.  Walton relied upon these financial statements when entering into the First Amendment.

18.     Thereafter, Stanford entered into a subsequent lease amendment, dated July 18, 2005, with Walton (the "Second Amendment").  Pursuant to the Second Amendment, which incorporated Section 4.07, and other provisions, of the Original Lease, Stanford agreed to lease an additional 48,267 square feet of space and an additional 169 parking spaces.  Pursuant to the Second Amendment, Stanford's rental obligation increased by $13,686,628 in excess of the rental obligation Stanford owed under the Original Lease and the First Amendment.

19.     Under the Second Amendment, Walton agreed to allow additional improvements to the leased premises and agreed to contribute $1,450,678 (in addition to the amount provided for in the First Amendment and the Original Lease) to the cost of these lease improvements.

20.     In sum, pursuant to the Original Lease, the First Amendment, and the Second Amendment (collectively, the "Stanford Lease") Stanford promised to pay Walton a total of $45,299,688 throughout the term of the Stanford Lease and Walton agreed to contribute $4,899,152 for the cost of Stanford's improvements to the space.

21.     In connection with its desire to lease space and to make various modifications to the interior structure of Galleria Tower II, Stanford provided financial statements in support of

4

its ability to ultimately pay any obligations that it would incur under the Stanford Lease for space at Galleria Tower II. Stanford represented to Walton that it was a solvent entity with substantial cash and cash equivalents, which it defined as short-term investments with original maturities of three months or less. These funds were purportedly available to satisfy Stanford's payment obligations under the Stanford Lease.

22.     Accordingly, in order to induce Walton to enter into the Original Lease, Stanford represented and agreed that: (i) it was financially capable of complying with the terms of the Original Lease; (ii) it would not use the leased premises for any illegal or disreputable purpose; and (iii) it was currently in compliance, and would continue to comply, with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

23.     Stanford reaffirmed these representations for purposes of inducing Walton to enter into both the First Amendment and the Second Amendment.

24.     Walton relied on these representations in entering into the Original Lease, the First Amendment and the Second Amendment.

25.     Upon information and belief, as Stanford knew or should have known at all relevant times hereto that these representations and promises were false and Stanford was in perpetual breach of these representations as it occupied the leased space and used it for illegal and disreputable purposes. Indeed, Ralph S. Janvey, the Receiver appointed by the Northern District of Texas for all the assets and records of SIB, SGC, SCM, R. Allen Stanford, James M. Davis and Laura Pendergest-Holt and of all entities they own or control has found that "all of [SIB's] financial operations, including CD sales, were controlled and managed from Stanford's offices in the U.S[.]"

26.     In the summer and fall of 2005, Walton and Stanford negotiated a potential purchase by Stanford of the Galleria Tower II and two other office buildings in the Galleria complex, also owned by Walton (the "Galleria Buildings"). Stanford, through Alvarado and as directed by Allen Stanford and with the assistance of counsel, used false pretenses during these negotiations, claiming on several occasions that agreements had been reached when such statements were demonstrably false. The goal of Stanford was to force the acquisition of the Galleria Buildings to further provide the appearance to the outside world of legitimacy and success when, in fact, Stanford was a massive fraud and a Ponzi scheme.

27.     These negotiations were unsuccessful and no agreement to purchase the Galleria Buildings was ever made and no closing occurred. These negotiations are the subject of this action initiated by Stanford against Walton.

28.     When Stanford was unable to negotiate an executed purchase agreement for the Galleria Buildings, despite its express waiver of any extra-contractual representations, Stanford filed this meritless and frivolous suit against Walton alleging that Walton had made representations to Stanford that Walton would sell Galleria Tower II to Stanford if Stanford entered into the Original Lease and its amendments. Stanford further falsely claimed that the parties had actually reached agreement on all sales terms when in fact they were far from any binding agreement.

29.     In connection with its lawsuit, Stanford filed a *lis pendens* on Walton's property, relying on its fraudulent accusations with the intent of tying-up the land and precluding Walton from entering into a deal with any other party.

6

30.   Upon information and belief, if the purchase negotiations between Stanford and Walton had proved successful, Stanford intended to purchase the Galleria Buildings with customer assets obtained in connection with its ongoing fraudulent scheme.

31.   Upon information and belief, the following individuals and entities, among others, participated in the scheme to defraud Walton: Mauricio Alvarado; Robert Kramer; A.J. Rincon; R. Allen Stanford; Stanford Capital Management; Stanford Group Company; Stanford Group Holdings, Inc.; The Stanford Galleria Buildings, LP; and Stanford International Bank, Ltd.

32.   On February 17, 2009, the Securities and Exchange Commission ("SEC") filed a declaratory action (the "Receivership Action") against the Stanford Financial Group seeking to "halt a massive, ongoing fraud orchestrated by R. Allen Stanford and James M. Davis and executed through companies they control, including SIB and its affiliated Houston-based investment advisers, SGC and SCM."

33.   As detailed in the Receivership Action, the Receiver's Report of April 23, 2009, and the SEC's Proposed Amended Complaint of June 29, 2009, SIB, acting through a network of SGC financial advisors, sold approximately $8 billion of its self-styled "certificates of deposits" by promising high return rates that exceed those available through true certificates of deposits offered by traditional banks. This scheme, as described by the SEC and the Receiver, was conducted through a complex, sprawling web of more than 100 companies, all of which were controlled and directly or indirectly owned by Allen Stanford. The core objective of these companies was to sell certificates of deposits issued by SIB.

34.   However, as the Receiver found, "Stanford's financial statements show that the low third party revenue and high cost structures of the U.S. broker dealer and related financial operations were not capable of sustaining freestanding operations without the revenue they

received upon their sale of [SIB] CDs, as well as the infusion of investment capital, all or most substantially all of which was derived from CD sales... Once CD funds entered the Stanford companies, they were disbursed to Allen Stanford or to other Stanford-owned entities or used to purchase private equity and other investments, to pay CD redemptions and interest or to pay other expenses and obligations."

35.    To conceal this fraudulent conduct, SIB fabricated the performance of the bank's investment portfolio, lied to investors about the nature and performance of the portfolio, falsified accounting records, and fabricated financial statements.    Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank's investments.

36.    Allen Stanford also engaged in numerous sham transactions designed to conceal his diversion of capital from the Stanford Financial Group. For example, in 2004, certain private equity investments were transferred to Mr. Stanford from a Stanford entity owned by him. The investments were valued at cost.   Within a matter of a few months, the value of those investments was written up substantially and Mr. Stanford contributed them to SIB to pay off debts he owed to SIB. The Receiver has not found any documentation supporting these write-ups in value.

37.    In addition to the sale of the CDs and the fraudulent transactions by Allen Stanford, SGC and SCM advisers, since 2004, have sold more than $1 billion of a proprietary mutual fund wrap program, called Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data.   SGC/SCM, with the benefit of hindsight, picked mutual funds that performed extremely well from 1999 through 2004, and presented the

8

performance of those top-performing funds to potential clients as if they were actual returns earned by the SAS program.

38.     The false data enabled SGC/SCM to grow the SAS program from less than $10 million in 2004 to over $1.2 billion in 2009 and generate fees for SGC/SCM (and ultimately Stanford) in excess of $25 million.  Other than the fees paid by SIB to SGC/SCM for CD sales, SAS was the most significant source of revenue for SGC/SCM.

39.     The Receiver concluded in his preliminary report on the Stanford Financial Group that "all of the major Stanford U.S. financial businesses depended on continued CD sales and/or other allegedly fraudulent activities."  In essence, from at least as early as 2004 (and likely well before) and continuing into February 2009, Stanford was operating a Ponzi scheme—a fact that most certainly was not disclosed to Walton.  Upon information and belief, Stanford's fraud was continued, perpetrated, and aided and abetted out of its leased premises at Galleria Tower II.

40.     Stanford's conduct, dating back to before 2004, constituted  (among other illegal acts) violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] or, in the alternative, constitutes, aiding and abetting of such violations.  Additionally, Stanford has violated Section 206(1) and (2) of the Investment Advisers Act of 1940 ("Adviser's Act") [15 U.S.C. §§ 80b-6(1) and 80(b)-6(2)] and Section 7(d) of the Investment Company Act of 1940 ("ICA") [15 U.S.C. § 80a-7(d)].

41.     Upon information and belief, the allegations of the SEC and the Receiver in the Receivership Action are true and Stanford was violating numerous state and federal laws at all times relevant to the parties' course of dealing.

9

42.     In addition to charging the Receiver with investigating the assets held by the Receivership Entities, the Receivership Order directed the Receiver to take control and possession of and to operate the Receivership Estate, and to perform all acts necessary to conserve, hold, manage and preserve the value of the Receivership Estate. One such asset of the Receivership Estate was Stanford's leasehold interest in the Stanford Lease.

43.     On April 17, 2009, the Receiver sent a notice to Walton that the Receivership Estate was rejecting its obligations under the Stanford Lease, effective May 1, 2009 (the "Rejection Notice").

### COUNT I
### (Fraudulent Inducement and Concealment— the Original Lease)

44.     Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

45.     To induce Walton to enter into the Original Lease, Stanford provided: (i) false financial disclosures purporting to demonstrate an ability of Stanford to perform pursuant to the terms of the Lease; (ii) false representations that Stanford would not use the leased premises for any illegal or disreputable activity; and (iii) false representations that it was in compliance and would continue to comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

46.     Stanford knew or should have known that these representations to Walton were false.

47.     Stanford made these false representations for purposes of inducing Walton to enter into the Original Lease.

48.     Walton relied on those false representations in agreeing to enter into the Original Lease.

10

35

49.     Stanford defrauded Walton by failing to disclose Stanford's illegal purpose in leasing the property.  Stanford had a duty to disclose the illegal purpose for which it intended to use the leased property because it knew: (1) Stanford's true illegal purpose in leasing the property; (2) that Walton did not know the illegal use Stanford intended; and (3) Walton did not have an opportunity to discover Stanford's illegal purpose.

50.     Walton was damaged by entering into the Original Lease as the contractual obligations thereunder restricted Walton's ability to rent 23,907 square feet to other potential tenants.

## COUNT II
### (Chapter 27 of Texas Business & Commerce Code— the Original Lease)

51.     Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

52.     In violation of Chapter 27 of the Texas Business & Commerce Code, Stanford fraudulently induced Walton to enter into the Original Lease by providing:  (i) false financial disclosures purporting to demonstrate an ability of Stanford to perform pursuant to the terms of the Lease; (ii) false representations that Stanford would not use the leased premises for any illegal or disreputable activity; and (iii) false representations that Stanford was in compliance and would continue to comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

53.     Stanford knew or should have known that these representations provided to Walton were false.

54.     Stanford made its false representations for purposes of inducing Walton to enter into the Original Lease.

55.     Walton relied on those false representations in agreeing to enter into the Original Lease.

11

36

56.     Walton was damaged by entering into the Original Lease as the contractual obligations thereunder restricted Walton's ability to rent 23,907 square feet to other potential tenants.

57.     Stanford had actual awareness of the falsity of its representations and therefore is liable to Walton for exemplary damages.

58.     Under Chapter 27 of the Texas Business & Commerce Code, Walton is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

## COUNT III
### (Fraudulent Inducement and Concealment— First Amendment)

59.     Walton hereby incorporates paragraphs 1-43 as though fully set forth herein.

60.     To induce Walton to enter into the First Amendment, Stanford provided false representations that:   (i) Stanford would not use the leased premises for any illegal or disreputable activity; and (ii) Stanford was in compliance and would continue to comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

61.     Stanford knew or should have known that these representations were false.

62.     Stanford made false representations for purposes of inducing Walton to enter into the First Amendment.

63.     Walton relied on these false representations in agreeing to enter into the First Amendment.

64.     Stanford defrauded Walton by failing to disclose Stanford's illegal purpose in leasing the property. Stanford had a duty to disclose the illegal purpose for which it intended to use the leased property because it knew: (1) Stanford's true illegal purpose in leasing the

12

property; (2) that Walton did not know the illegal use Stanford intended; and (3) Walton did not have an opportunity to discover Stanford's illegal purpose.

65.     Walton was damaged by entering into the First Amendment as: (i) the contractual obligations thereunder restricted Walton's ability to rent 88,717 square feet to other potential tenants; and (ii) Walton was required to make millions of dollars in capital expenditures to the premises to accommodate Stanford's requested modifications to Galleria Tower II—changes that make the property difficult to re-let to another tenant without millions of dollars of subsequent alterations to the premises.

## COUNT IV
### (Chapter 27 of the Texas Business & Commerce Code—First Amendment)

66.     Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

67.     In violation of Chapter 27 of the Texas Business & Commerce Code, Stanford fraudulently induced Walton to enter into the First Amendment by providing false representations that: (i) Stanford would not use the leased premises for any illegal or disreputable activity; and (ii) Stanford was in compliance and would continue to comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

68.     Stanford knew or should have known that these representations were false.

69.     Stanford made its false representations for purposes of inducing Walton to enter into the First Amendment.

70.     Walton relied on these false representations in agreeing to enter into the First Amendment.

71.     Walton was damaged by entering into the First Amendment as: (i) the contractual obligations thereunder restricted Walton's ability to rent 88,717 square feet to other potential

tenants; and (ii) Walton was required to make millions of dollars in capital expenditures to the premises to accommodate Stanford's requested modifications to Galleria Tower II—changes that make the property difficult to re-let to another tenant without millions of dollars of subsequent alterations to the premises.

72.     Stanford had actual awareness of the falsity of its representations and therefore is liable to Walton for exemplary damages.

73.     Under Chapter 27 of the Texas Business & Commerce Code, Walton is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

## COUNT V
### (Fraudulent Inducement and Concealment— Second Amendment)

74.     Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

75.     In order to induce Walton to enter into the Second Amendment, Stanford provided false representations that:  (i) Stanford would not use the leased premises for any illegal or disreputable activity; and (ii) Stanford was in compliance and would continue to comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

76.     Stanford knew or should have known that these representations were false.

77.     Stanford made its false representations for purposes of inducing Walton to enter into the Second Amendment.

78.     Walton relied on these false representations in agreeing to enter into the Second Amendment.

79.     Stanford defrauded Walton by failing to disclose Stanford's illegal purpose in leasing the property.  Stanford had a duty to disclose the illegal purpose for which Stanford

14

39

intended to use the leased property because Stanford knew: (1) Stanford's true illegal purpose in leasing the property; (2) that Walton did not know the illegal use Stanford intended; and (3) Walton did not have an opportunity to discover Stanford's illegal purpose.

80.     Walton was damaged by entering into the Second Amendment as: (i) the contractual obligations thereunder restricted Walton's ability to rent 48,267 square feet to other potential tenants; and (ii) Walton was required to make millions of dollars in capital expenditures to the premises to accommodate Stanford's requested modifications to Galleria Tower II— changes that make the property difficult to re-let to another tenant without millions of dollars of subsequent alterations to the premises.

## COUNT VI
### (Chapter 27 of the Texas Business & Commerce Code— Second Amendment)

81.     Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

82.     In violation of Chapter 27 of the Texas Business & Commerce Code, Stanford fraudulently induced Walton to enter into the Second Amendment by providing false representations that:  (i) Stanford would not use the leased premises for any illegal or disreputable activity; and (ii) Stanford was in compliance and would continue to comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and local government bodies.

83.     Stanford knew or should have known these representations were false.

84.     Stanford made its false representations for purposes of inducing Walton to enter into the Second Amendment.

85.     Walton relied on these false representations in agreeing to enter into the Second Amendment.

15

86.     Walton was damaged by entering into the Second Amendment as:   (i) the contractual obligations thereunder restricted Walton's ability to rent 48,267 square feet to other potential tenants; and (ii) Walton was required to make millions of dollars in capital expenditures to the premises to accommodate Stanford's requested modifications to Galleria Tower II—changes that make the property difficult to re-let to another tenant without millions of dollars of subsequent alterations to the premises.

87.     Stanford had actual awareness of the falsity of its representations and therefore is liable to Walton for exemplary damages.

88.     Under Chapter 27 of the Texas Business & Commerce Code, Walton is entitled to its reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court.

## COUNT VII
### (Breach of Contract— the Stanford Lease)

89.     Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

90.     On April 17, 2009, the Receiver sent the Rejection Notice, rejecting its obligations under Stanford Lease, effective May 1, 2009.

91.     The Receiver's rejection pursuant to the Rejection Notice constitutes a breach of the Stanford Lease.

92.     Walton has been damaged by Stanford's repudiation of its obligations to continue to make its rental payments under the Stanford Lease.

93.     Walton is entitled to recover from Stanford the remaining rent owed under the Stanford Lease.

16

## COUNT VIII
### (Declaratory Judgment)

94.   Walton hereby incorporates paragraphs 1-43 as though fully set-forth herein.

95.   A dispute has arisen between Walton and Stanford as to whether the negotiations between the parties in September and October 2004 gave rise to a valid and enforceable contract between Walton and Stanford for Stanford's purchase of the Galleria Buildings.

96.   Walton, as the party seeking the declaration, has a legally protectible interest in the controversy, namely its ownership rights in the Galleria Buildings.

97.   The issue involved in the controversy is ripe for adjudication.

98.   Walton is entitled to a Declaratory Judgment that no valid and enforceable contract between Walton and Stanford exists regarding Stanford's purchase of the Galleria Buildings was ever reached and that no complete and final writing that contained the final terms of an alleged agreement to sell the Galleria Buildings to Stanford exists.

WHEREFORE, premises considered, Defendant Walton Houston Galleria Office, L.P. prays that Stanford Group Holdings, Inc. and the Stanford Galleria Buildings, LP take nothing by reason of this suit, and that judgment be entered in favor of Walton, as follows:

    a.    Judgment that Stanford defrauded Walton under Texas common law by fraudulent inducement and fraudulent concealment to enter into the Original Lease and the Amendments thereto;

    b.    judgment that Stanford fraudulently induced Walton to enter into the Original Lease in violation of Chapter 27 of the Texas Business & Commerce Code;

    c.    judgment that Stanford fraudulently induced Walton to enter into the First Amendment in violation of Chapter 27 of the Texas Business & Commerce Code;

    d.    judgment that Stanford fraudulently induced Walton to enter into the Second Amendment in violation of Chapter 27 of the Texas Business & Commerce Code;

17

e.   judgment that Stanford has breached the Stanford Lease;

f.   a declaration that no enforceable agreement exists for the sale of the Galleria Buildings to Stanford;

g.   an award of actual and consequential damages against Stanford in an amount to be determined at trial, but not less than $10 million;

h.   exemplary damages;

i.   Walton's reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and court costs;

j.   pre-judgment and post-judgment interest; and

k.   all other relief to which Walton may be entitled.

Respectfully submitted,

**DOBROWSKI L.L.P.**

By: _____
Leo M. Larkin
State Bar No. 11950500
Paul J. Dobrowski
State Bar No. 05927100
Gerard Harrison
State Bar No.  00787651
1010 Lamar, Suite 1350
Houston, Texas 77002
Telephone:  (713) 659-2900
Facsimile:  (713) 659-2908

KIRKLAND & ELLIS LLP
Jeffrey Willian, P.C.
James H. Mutchnik, P.C.
Micah E. Marcus
S. Maja Fabula
300 N. LaSalle St.
Chicago, IL 60654
(312) 862-2000
(312) 862-2200

ATTORNEYS FOR DEFENDANT
WALTON HOUSTON GALLERIA OFFICE, L.P.

18

43

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing been served on all known

counsel of record by Certified Mail – Return Receipt Requested on March 17, 2010, as follows:

Mr. David Berg
Berg & Androphy
3704 Travis Street
Houston, TX  77002

Mr. Sean Gorman
Dewey & LeBoeuf, LLP
1000 Main Street, Suite 2550
Houston, TX  77002

Mr. Samuel L. Cooper
Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002

Lee M. Larkin

19

44

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:09-CV-298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § | |
| Defendant. | § § | |

## ORDER

This Order addresses the Houston Walton Galleria's ("Walton") motion to intervene [640] and motion for relief from the receivership order [639]. The Court grants Walton's motion to intervene for the limited purpose of asserting its motion for relief from the receivership order. Further, for the reasons that follow, the Court grants Walton's motion for relief from the receivership order and permits it to pursue counterclaims in a state court action involving two Stanford entities.[1]

Walton's motion arises from a state court lawsuit involving Stanford-owned companies. In 2005, before this receivership began, Stanford Group Holdings, Inc. and Stanford Galleria Buildings, L.P. (the "Stanford entities") sued Walton in Texas state court for over $30 million in damages arising from a lease agreement. Walton wants to asserts counterclaims against the Stanford entities but is barred from doing so by this Court's

---

[1] The Court also grants Walton's motion to enlarge the page limit for its reply [764].

ORDER – PAGE 1



receivership order, which enjoins litigation against the Stanford entities and "acts to obtain

possession of" receivership assets.  Order Appointing Receiver [157] at 7.  Walton asks the

Court for relief from the litigation injunction so that it may pursue counterclaims against the

Stanford entities in the state court action.

In determining whether to lift a litigation stay in a receivership action, many federal

courts apply a test first articulated by the Ninth Circuit Court of Appeals.[2]  The test directs

courts to consider three factors:

> (1) whether refusing to lift the stay genuinely preserves the status quo or
> whether the moving party will suffer substantial injury if not permitted to
> proceed;
> (2) the time in the course of the receivership at which the motion for relief
> from the stay is made; and
> (3) the merit of the moving party's underlying claim.

*S.E.C. v. Wencke* (*Wencke II*), 742 F.2d 1230, 1231 (9th Cir. 1984) (citing *S.E.C. v. Wencke*

(*Wencke I*), 622 F.2d 1363, 1364 (9th Cir. 1980)).

The Court recently considered these factors and declined to lift the litigation stay for

investor lawsuits against the Stanford entities and former employees.  *See generally* Order

of Mar. 8, 2010 [1030].  The Court found that, as a general matter, the balance of the *Wencke*

factors weighs against lifting the litigation stay at this time.  In Walton's case, however, the

balance tips in the other direction.

---

[2]*See, e.g., United States v. Acorn Tech. Fund*, 429 F.3d 438, 443 (3d Cir. 2005);
*F.T.C. v. NHS Sys., Inc.*, 2009 WL 3072475, at *12 (E.D. Pa. 2009); *S.E.C. v. Madison Real
Estate Group, LLC*, 647 F. Supp. 2d 1271, 1275 (D. Utah 2009); *United States v. Petters*,
2008 WL 5234527, at *3 (D. Minn. 2008); *S.E.C. v. Byers*, 592 F. Supp. 2d 532, 536
(S.D.N.Y. 2008); *F.T.C. v. 3R Bancorp*, 2005 WL 497784, at *2 (N.D. Ill. 2005); *United
States v. ESIC Capital, Inc.*, 685 F. Supp. 483, 485 (D. Md. 1988).

ORDER – PAGE 2

It is the first *Wencke* factor — impact on the receivership status quo weighed against potential prejudice to the moving party — that tips the scales in favor of allowing Walton to assert its counterclaims in the state court action. Walton would suffer substantial injury if not allowed to proceed with its counterclaims. First, Walton's counterclaims may be compulsory counterclaims pursuant to Texas Rule of Civil Procedure 97(a). If they are compulsory counterclaims and Walton does not assert them in the state court action, it may be barred from asserting them later when the Court lifts the litigation stay from the receivership order. Even if Walton is not barred from asserting its claims later, it will at a minimum be forced to litigate issues arising from the same contract twice. The Receiver argues that the Court should not allow Walton to proceed because the receivership status quo will be disrupted by allowing the counterclaims to go forward. But the Receiver and the Stanford entities have *chosen* to continue with the state court action (which began before the receivership). The Receiver has not demonstrated that adding counterclaims arising from the same transaction would substantially increase the receivership's expenses in litigating the state court action. Accordingly, any potential burden to the receivership cannot outweigh the substantial prejudice to Walton in not allowing it to fully defend itself.

Signed March 15, 2010.

David C. Godbey
United States District Judge

ORDER – PAGE 3

**EXHIBIT 3**

NO. 2005-72230

| | | |
|---|---|---|
| STANFORD GROUP HOLDINGS, INC<br>and THE STANFORD GALLERIA<br>BUILDINGS, LP, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| Plaintiffs/Counter-Defendants | §<br>§ | HARRIS COUNTY, TEXAS |
| v. | §<br>§ | |
| WALTON HOUSTON GALLERIA<br>OFFICE, L.P., | §<br>§<br>§ | |
| Defendants/Counter-Plaintiff | § | 113th  JUDICIAL DISTRICT |

**SETTLEMENT AGREEMENT BETWEEN
STANFORD GROUP HOLDINGS, INC., THE STANFORD GALLERIA
BUILDINGS, LP, RALPH S. JANVEY, RECEIVER, AND
WALTON HOUSTON GALLERIA OFFICE, L.P.**

This Full and Final Release and Settlement Agreement (the "Agreement") is made and entered into by Stanford Group Holdings, Inc., the Stanford Galleria Buildings, LP (collectively the "Stanford Parties"), Ralph S. Janvey, as the Court-Appointed Receiver (the "Receiver") and Walton Houston Galleria Office, L.P. ("Walton"). The Stanford Parties, the Receiver, and Walton are the "Settling Parties." The basis and terms of the Agreement are as follows:

<u>RECITALS</u>

1.     The Stanford Parties initiated a lawsuit in Harris County, Texas district court captioned *Stanford Group Holdings, Inc. and the Stanford Galleria Buildings, LP v. Walton Houston Galleria Office, L.P.*, No. 2005-72230. Walton has brought counterclaims against the Stanford Parties in the same proceeding. All proceedings in that matter are collectively referred to as the "Lawsuit."

2.     The Receiver has been appointed Receiver over the Stanford Parties pursuant to order of the United States District Court for the Northern District of Texas (the "Receivership Court").

3.     The Settling Parties also have certain disputes related to a *lis pendens* filed in the Harris County Real Property Records and to the lease of office space at 5051 Westheimer in Houston, Texas including disputes over whether any lease payments are owed to Walton, any harm suffered by Walton as a result of the termination of the lease, and which party may assert rights to furniture and other equipment, including electronic equipment, that resided or resides at 5051 Westheimer.  These issues are collectively referred to as "the Property Dispute."

4.     There is uncertainty and disagreement as to the existence and extent, if any, of the liabilities in the Lawsuit and the Property Dispute.

5.     The Settling Parties wish to compromise and settle the Lawsuit and Property Dispute and any and all other disputed or disputable matters among them.

6.     The Settling Parties do not wish or intend this Agreement to be an admission by any of them concerning any matter whatsoever.

<u>AGREEMENTS AND RELEASES</u>

7.     This Agreement is subject in all respects to approval by the Receivership Court and, except as otherwise expressly stated, shall not be deemed to have any force or effect on any of the Settling Parties until such approval occurs and all other terms and conditions herein are satisfied.  Within five business days of the approval of this Agreement by the Receivership Court, in exchange for the releases and other consideration set forth below, Walton shall pay the Receiver the sum of three hundred and eighty-five thousand dollars ($385,000), with $150,000 allocated to the receipt of clear title by Walton of the furniture and materials described more fully in paragraph 13 and the remainder as consideration for the settlement of the Lawsuit.

8.      Upon approval by the Receivership Court and in consideration of the releases, representations and other agreements by the Stanford Parties and the Receiver in this Agreement, including but not limited to the payments set forth in paragraph 7, the Stanford Parties and the Receiver, on behalf of themselves, their corporate parents and subsidiaries, successors, assigns, affiliates, agents, employees, predecessors, heirs, partners, independent contractors, joint venturers, attorneys, and legal representatives, release and discharge Walton, its present and former corporate parents, subsidiaries, affiliates, predecessors, and successors; its present and former directors, officers, employees, agents, attorneys, affiliates, successors, heirs, assigns, partners, independent contractors, joint venturers, and legal representatives; and the respective heirs, administrators, executors, successors, assigns, affiliates, officers, directors, employees, agents, attorneys, partners, independent contractors, joint venturers, and legal representatives of any of the foregoing (collectively the "Walton Group"), from any and all claims, causes of action, suits, rights, disputes, liabilities, costs, expenses, damages, or demands, accrued or to accrue in the future, known or unknown, foreseen or unforeseen, contingent or vested, arising by subrogation, assignment, reimbursement, operation of law, or otherwise, relating to, arising out of, or in any way connected with the Lawsuit and/or the Property Dispute, the disputes at issue in the Lawsuit and/or the Property Dispute, any aspect of any dealings between the Stanford Parties, the Receiver, and the Walton Group, and any actions that the Walton Group took or failed to take at any time up to and including the date of this Agreement.

9.      Upon approval by the Receivership Court and in consideration of the releases, representations and other agreements by the Stanford Parties and the Receiver in this Agreement, Walton, on behalf of itself, its corporate parents and subsidiaries, its successors, assigns, affiliates, agents, employees, predecessors, heirs, partners, independent contractors, joint venturers, attorneys, and legal representatives, releases and discharges the Stanford Parties and

the Receiver; the Stanford Receivership Estate; their present and former corporate parents, subsidiaries, affiliates, predecessors, and successors; their present and former directors, officers, employees, agents, attorneys (except for claims the Walton Group may have against Andrews Kurth LLP, relating solely to its former representation of Walton), affiliates, successors, heirs, assigns, partners, independent contractors, joint venturers, and legal representatives; and the respective heirs, administrators, executors, successors, assigns, affiliates, officers, directors, employees, agents, attorneys, partners, independent contractors, joint venturers, and legal representatives of any of the foregoing (collectively the "Receivership Group"), from any and all claims, causes of action, suits, rights, disputes, liabilities, costs, expenses, damages, or demands, accrued or to accrue in the future, known or unknown, foreseen or unforeseen, contingent or vested, arising by subrogation, assignment, reimbursement, operation of law, or otherwise, relating to, arising out of, or in any way connected with the Lawsuit and/or the Property Dispute, the disputes at issue in the Lawsuit and/or the Property Dispute, any aspect of any dealings between Walton and the Receivership Group, and any actions that the Receivership Group took or failed to take at any time up to and including the date of this Agreement.

      10.    The releases contained in paragraphs 8 and 9 include, without limitation, the release and discharge of any and all claims, causes of action, suits, rights, disputes, liabilities, costs, expenses, damages, or demands based on any foreign, federal, state, or local constitution, statute, ordinance, rule, or regulation, any and all claims of personal injury, tort, or contract breach (including any claim related in any way to breach of any lease agreements by the Stanford Parties at 5051 Westheimer) and any and every other claim arising under the common law of the states and territories of the United States of America, including the State of Texas, or the laws of any foreign jurisdiction, whether statutory or common law. For purposes of clarity, nothing in

the releases contained in paragraphs 8 and 9 shall constitute a release of the Parties' respective rights and obligations under this Agreement.

11.    Other *than the claims that are released and discharged by this Agreement*, the Walton Group and the Receivership Group represent that they are not aware of any claims any party may have against one another.  The Walton Group and the Receivership Group acknowledge that—under the laws of certain jurisdictions—a general release may not extend to claims that the settling party does not suspect or know exists in his or its favor at the time of executing the release, which if known to him or it might have materially affected his or its settlement. The Walton Group and the Receivership Group agree to expressly waive any rights that they may have under the foregoing principle, as well as under any other statutory or common law principles of similar effect.  The Walton Group and the Receivership Group understand that this provision is an important and material term of this Agreement and that evidence that the representations contained in this provision were false when made, or attempts by the Walton Group or the Receivership Group to avoid compliance with the agreements in this provision, shall be a breach of the Agreement.

12.    The releases contained in this Agreement are to be construed as the broadest type of general release.  Walton, the Stanford Parties, and the Receiver expressly waive and assume the risk of any and all actions, claims, demands, damages and costs, rights or causes of action which exist as of this date, but of which Walton, the Stanford Parties, and/or the Receiver do not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect their decision to enter into this Agreement.  Walton, the Stanford Parties, and the Receiver assume the risk that the facts or law may be other than they believe.  This release includes, but is not limited to, any claim

growing out of or connected in any way with the matters underlying the Lawsuit and/or the Property Dispute which was or could have been alleged in any lawsuit or other proceedings.

13.     The Settling Parties further agree that all furniture and other fixtures located at 5051 Westheimer as of the date of this Agreement (the "5051 Material") shall become the exclusive property of Walton once this Agreement is approved by the Receivership Court *and* Walton makes the payment described in paragraph 7. Once those conditions are met, neither the Stanford Parties not the Receiver shall have or assert any claim of interest or ownership in the 5051 Material, which shall be deemed transferred and conveyed to Walton "free and clear" of any and all Party liens, claims and/or encumbrances, and/or any and all third-party liens, claims and/or encumbrances, by Order of the Receivership Court. To the extent that any third-party liens, claims and/or encumbrances are made as to the 5051 Material hereafter, such liens, claims and/or encumbrances shall attach solely and exclusively to the $150,000 paid to the Receiver as described in paragraph 7, and not to the 5051 Material. All furniture, fixtures, computers, servers, and other electronics removed by the Receiver from 5051 Westheimer prior to the date of this Agreement (the "Estate Material") shall become the property of the Receivership Estate as of the date this Agreement is approved by the Receivership Court. Once that condition is met, Walton shall not have or assert any claim of interest or ownership, including without limitation any landlord's liens, in the Estate Material, which shall be deemed transferred and conveyed to the Receivership Estate "free and clear" of any and all Party claims, and/or third party claims, liens and/or encumbrances by Order of the Receivership Court.

14.     No Party to this Agreement makes any representations or warranties about either the Estate Material or the 5051 Material. The Settling Parties understand and agree that the Estate Material and the 5051 Material is taken "as is and where is" with no representations or warranties of any kind made by either party including, without limitation, any representations

regarding the condition, value, or quality of the Estate Material or the 5051 Material, except for the Order of the Receivership Court referred to in paragraph 13 relating to a transfer of "free and clear" title.

15.     Walton, the Stanford Parties, and the Receiver understand and agree that the releases and property agreements contained in paragraphs 8, 9, and 13 of this Agreement shall have no effect on any Party hereto unless and until this Agreement is approved by the Receivership Court.   The releases in paragraphs 8 and 9 shall become effective once the Receivership Court approves the Agreement *and* Walton delivers the consideration described in paragraph 7.   Should the Receivership Court not approve this Agreement in its entirety, the Agreement and the releases and property agreements contained herein (with the exception of paragraph 16) shall have no force or effect.  The Agreement (with the exception of paragraph 16) shall also have no force or effect should it be modified in any way after it is signed by the Parties but prior to approval by the Receivership Court.   In such event, the releases and other understandings contained in the Agreement (with the exception of paragraph 16) shall be considered void.

16.     In the event the Agreement is not approved by the Receivership Court, the Settling Parties agree that the Agreement, and any topic related to the Agreement, including all issues surrounding its negotiation, shall be deemed inadmissible in the Lawsuit.  The contractual agreement contained in this paragraph shall be binding on the Settling Parties as of the date the Agreement is signed and shall be deemed enforceable regardless of whether the Agreement is ultimately approved by the Receivership Court.

17.     This Agreement is entered into with full consideration of any and all rights that the Settling Parties hereto may have.  The Settling Parties have relied upon their own knowledge and judgment and upon the advice of the attorneys of their choosing.  The Settling

Parties have received independent legal advice, have conducted such investigation as they and their counsel thought appropriate, and have consulted with such other independent advisors as they and their counsel deemed appropriate regarding the Agreement and their rights and asserted rights in connection therewith.   Walton is not relying upon any representations or statements made by the Stanford Parties or the Receiver or by their employees, agents, representatives, or attorneys regarding the disputes between the parties or this Agreement, nor are the Stanford Parties or the Receiver relying upon any representations or statements made by Walton, or Walton's agents, representatives, or attorneys, except to the extent such representations are expressly incorporated herein.   Walton, the Stanford Parties, and the Receiver are not relying upon a legal duty, if one exists, on the part of any other party (or such other party's employees, agents, representatives, or attorneys) to disclose any information in connection with the execution of this Agreement or its preparation, it being expressly understood that no Settling Party shall ever assert any failure to disclose information on the part of any other party as a ground for challenging this Agreement.

18.   Walton, the Stanford Parties, and the Receiver warrant that they have read this Agreement and fully understand it to be a release of all claims, known or unknown, present or future, that they have or may have against one another (as more fully described in paragraphs 8 and 9 of the Agreement).   Walton further warrants that it is legally competent to execute this Agreement; that it does so of its own free will, in good faith, and without duress; that it realizes and desires that this Agreement be final, conclusive and forever binding on it and anyone claiming through it; and that the Agreement is supported by sufficient consideration. The Stanford Parties and the Receiver further warrant that they are legally competent to execute this Agreement; that they do so of their free will, in good faith, and without duress; that they

realize and desire that this Agreement be final, conclusive and forever binding on them and anyone claiming through them; and that the Agreement is supported by sufficient consideration.

19.     Upon the approval of the Receivership Court, which shall be sought within ten (10) business days of the execution of this Agreement, and the delivery of the consideration described in paragraph 7, both the Stanford Parties and Walton will file a joint motion to dismiss with prejudice all claims brought by or against Walton and/or the Stanford Parties and providing the following language:

"Walton is hereby relieved from any prospective application of the *lis pendens*, filed in the Harris County Real Property Records under Clerk's File No. Y893032 and Film Code No. 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 and 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, attached hereto as Exhibit A. The *lis pendens* is declared null and void and of no further force and effect. This order shall be filed and/or recorded in the Harris County Real Property Records as a release and nullification of the *lis pendens*."

20.     The Settling Parties agree that the filing of a lawsuit in which the lawsuit as a whole, or any individual claim or cause of action therein, is deemed to be barred by the releases contained in this Agreement shall constitute a material breach of this Agreement and that the legal fees and costs expended in defending against such lawsuit, claim, or cause of action shall be recoverable as damages for the breach.

21.     The Settling Parties understand and agree that their compliance with the terms and conditions specified in this Agreement is all that they or their attorneys will ever receive from the opposing party, and that under no circumstances will they, or their attorneys ever receive any other consideration from the opposing party. The parties agree that any costs and fees incurred by them, shall be paid by the party incurring those costs and fees, except as otherwise stated in this Agreement.

22.     The Settling Parties warrant that the consideration provided for by this Agreement shall constitute full, complete, and sole satisfaction for any and all claims for any attorneys' fees arising out of the representation of the parties in this matter.

23.     Walton, the Stanford Parties, and the Receiver each represent and warrant that they have not assigned, pledged, or otherwise in any manner sold or transferred, either by instrument in writing or otherwise, any right, title, interest, lien, security interest, or claim in any alleged contracts between the Settling Parties or the disputes that have arisen between the Settling Parties, and that they are fully authorized and empowered to fully release and extinguish all rights, claims, and disputes between the Settling Parties, including, without limitation, all actions, causes of action, claims, demands, rights, disputes, or liability relating in any way to the Lawsuit and the Property Dispute.

24.     The Settling Parties agree that the terms of this settlement are contractual, and that the agreements made herein are for the compromise of disputed claims.

25.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

26.     In the event that any material provision of this Agreement is held invalid, the remainder of this Agreement shall remain fully enforceable. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

27.     The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

28.     The interpretation and construction of this Agreement and any amendment hereof, and waivers and consents hereunder, shall, to the extent the particular subject matter is controlled by state law, be governed by and be construed in accordance with the substantive law of the State of Texas without regard to the conflicts of law principles thereof, except that United States federal law shall govern any particular subject matter controlled thereby.

29.     Any disputes regarding the settlement agreement or the Settling Parties' performance or non-performance thereunder shall be resolved by proceedings in the Receivership Court.

30.     The parties agree that if either party is compelled to bring an action to enforce obligations pursuant to this Agreement, the prevailing party will be reimbursed for its reasonable attorneys' fees and costs.

31.     The parties agree that they hereby irrevocably waive the right to trial by jury in any action to enforce or interpret the provisions of this Agreement.

32.     This Agreement constitutes the complete and final agreement among the parties with regard to the subject matter hereof and supersedes and cancels all prior or contemporaneous agreements, understandings, discussions, or representations regarding the subject matter hereof. This Agreement may not be modified or amended, nor any of its terms waived, except by a writing signed by each of the parties hereto.

**WALTON HOUSTON GALLERIA OFFICE, L.P.,**
a Delaware limited partnership

By:  Walton Houston Galleria Office Holdings, L.L.C.,
a Delaware limited liability company,
its General Partner

    By:  Walton Houston Galleria Office Mezzanine, L.L.C.,
a Delaware limited liability company,
its Sole Member

        By:  Walton Galleria Umbrella Holdings, L.P.,
a Delaware limited partnership,
its Sole Member

            By:  Walton Galleria Umbrella Managers, L.L.C.,
a Delaware limited liability company,
its General Partner

                By:  Walton Street Real Estate Fund II, L.P.,
a Delaware limited partnership,
a Managing Member

                    By:  Walton Street Managers II, L.P.,
a Delaware limited partnership,
its General Partner

                        By:  WSC Managers II, Inc.,
a Delaware corporation,
its General Partner

                        By: _____
Name: _____
Title: _____

        By:  Walton Street Real Estate Fund III, L.P.,
a Delaware limited partnership,
a Managing Member

            By:  Walton Street Managers III, L.P.,
a Delaware limited partnership,
its General Partner

                By:  WSC Managers III, Inc.,
a Delaware corporation,
its General Partner

                By: _____
Name: _____
Title: _____

STATE OF _Illinois_ §
§
COUNTY OF _Cook_ §

BEFORE ME, the undersigned authority, on this day personally appeared _Howard Brody_, on behalf of WSC Managers III, Inc., known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _24th_ day of _August_, 2010.

OFFICIAL SEAL
IRENE SUTHAROJANA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/16/13

Notary Public, State of _Illinois_

HOU02:1202468.7

13

61

RALPH S. JANVEY
STANFORD GROUP HOLDINGS, INC.
STANFORD GALLERIA BUILDINGS, LP

By: _____

Title: _____

STATE OF TEXAS      §
       DALLAS       §
COUNTY OF ~~HARRIS~~     §

       BEFORE ME, the undersigned authority, on this day personally appeared Ralph S. Janvey, on behalf of Stanford Group Holdings, Inc., the Stanford Galleria Buildings, LP, and himself, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

       Given under my hand and seal of office this 16th day of August, 2005.



_____
Notary Public, State of Texas

Cheryl L. Wilson
Notary Public
State of Texas
My Comm. Exp. 09-22-2014