IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § | |
| Defendants. | § § | |

## ORDER

This Order addresses matters related to the Receiver's notice of request for discovery hearing [1224].  At a hearing held on February 28, 2011, the Court took under advisement the Receiver's request to proceed with discovery against nonparty Société Générale Private Banking (Suisse) S.A. ("SG Suisse") under the Federal Rules of Civil Procedure.  *See* Tr. of Hr'g of Feb. 28, 2011 [1280].  Because the Court finds discovery conducted pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[1] (the "Convention") reasonable under the circumstances, the Court denies the Receiver's request and directs him to obtain discovery from SG Suisse under the Convention.  Should that method prove unfruitful, the Receiver may renew his request under the Federal Rules to obtain documents that the Court considers to be property of the Receivership.

---

[1]Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444.

## I. ORIGINS OF THE RECEIVER'S DISCOVERY REQUEST

This international discovery dispute concerns matters related to the Securities and Exchange Commission's (the "SEC") ongoing securities fraud action against R. Allen Stanford, his associates, and various entities under Stanford's control (the "Stanford Defendants"). As part of that litigation, this Court "assume[d] exclusive jurisdiction and t[ook] possession of the" "Receivership Assets" and "Receivership Records," (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"). The Court appointed Ralph S. Janvey to serve as Receiver of the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3.

Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5. The Court also ordered that,

"[u]pon presentment of [the Receivership] Order, all persons, including financial institutions, shall provide account balance information, transaction histories, all account records and any other Receivership Records to the Receiver or his agents, in the same manner as they would be provided were the Receiver the signatory on the account." *Id.* at 10.

The Receiver now seeks to obtain documents and information concerning the Stanford Defendants and their related entities from SG Suisse, which apparently holds accounts in the Stanford Defendants and entities' names. SG Suisse incorporated under Swiss law and maintains its headquarters in Geneva, Switzerland. Resp. at 3 [1266]. It operates one office in the United States, an "international representative office" in Miami, Florida. *Id.* In that capacity, the "Miami office merely markets the products and services of the SG Suisse home office in Switzerland and acts as a liaison between SG Suisse's Latin American customers and the SG Suisse home office." *Id.* SG Suisse claims that "[n]o banking activities are conducted through the Miami office" because Florida law limits the office to "solicit[ing] new business and perform[ing] informational, marketing, and promotional activities on behalf of the SG Suisse home office in Geneva." *Id.* & n.7. SG Suisse avers that the Miami office does not have any "documents responsive to the" Receiver's request and lacks "the ability to obtain customer records from" or to "access the [computer and email] systems" of the home office. *Id.* at 5. According to SG Suisse, "any responsive documents, if they exist, would be located in Switzerland and are governed by Swiss financial privacy laws." *Id.*

Nonetheless, the Receiver contends that the Court has the authority to order SG Suisse to comply with his request through the Federal Rules. SG Suisse objects on several grounds,

ORDER – PAGE 3

but primarily because it contends that compliance will subject it and its employees to criminal, civil, and administrative penalties under Swiss law.  SG Suisse argues that the Receiver should utilize instead the procedures in the Convention, of which Switzerland is a signatory.  At this juncture, then, the Court need only decide the limited question of whether the Receiver should seek discovery first under the Federal Rules or the Convention.[2]

## II. THE COURT MAY ORDER THAT DISCOVERY PROCEED UNDER THE CONVENTION

The Convention's text, "as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish optional procedures that would facilitate the taking of evidence abroad." *Société Nationale Industrielle Aérospatiale v. United States District Court*, 482 U.S. 522, 538 (1987) [hereinafter *Aérospatiale*] (citing Amram, *The Proposed Convention on the Taking of Evidence Abroad*, 55 A.B.A. J. 651, 655 (1969); President's Letter of Transmittal, *in* S. EXEC. DOC. A, 92d Cong., 2d Sess. (1972)).  And, it "draws no distinction between evidence obtained from third parties and that obtained from the litigants themselves; nor does it purport to draw any sharp line between evidence that is 'abroad' and evidence that is within the control of a party subject to the jurisdiction of the requesting court." *Id.* at 541.  The Supreme Court has "conclude[d] accordingly that the . . . Convention d[oes] not deprive [a]

---

[2]SG Suisse has pending a motion to dismiss for lack of personal jurisdiction and failure to state a claim in a related case, *Rotstain v. Trustmark Nat'l Bank*, Civil Action No. 3:09-CV-2384, (N.D. Tex. removed Nov. 13, 2009) [32].  SG Suisse's jurisdictional arguments in that case almost exclusively concern objections to the exercise of personal jurisdiction under Texas law.  Those arguments have no relevance here, and SG Suisse has made no specific objection to the Court's exercising personal jurisdiction in this matter.

District Court of the jurisdiction it otherwise possesse[s] to order a foreign national party before it to produce evidence physically located within a signatory nation," *id.* at 539-40, and has refused to "require first resort to Convention procedures whenever discovery is sought from a foreign litigant." *Id.* at 542.

*Aérospatiale*, however, did not create a system that allows litigants to obtain discovery under the Federal Rules as of right. Rather, the Supreme Court made clear that district courts have the discretion to order discovery under the Convention,[3] and provided a three prong test to guide courts' comity analyses.[4] But, in practice, courts often cite the *Aérospatiale* Court's observation that the Convention serves as a "permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad,"[5] *id.* at 536, as a green light to generally "discard[] the treaty as an unnecessary hassle." *In re Automotive Refinishing*, 358 F.3d at 306 (Roth, J., concurring);[6] *see, e.g.*, *Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525, 530 (D.N.J. 2009) ("It has been the experience of

---

[3]"Although these procedures are not mandatory, the Hague Convention does 'apply' to the production of evidence in a litigant's possession in the sense that it is one method of seeking evidence that a court may elect to employ." *Aérospatiale*, 482 U.S. at 541.

[4]Courts should not order discovery pursuant to "Convention procedures without prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Aérospatiale*, 482 U.S. at 544.

[5]*See, e.g.*, *In re Automotive Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 300 (3d Cir. 2004).

[6]"[T]he Hague Convention is only as 'optional' as deciding to use the Federal Rules is 'optional' in such a case. The Convention does not overwrite the Federal Rules of Civil Procedure, but it is in no way inferior to them." *In re Automotive Refinishing*, 358 F.3d at 306 (Roth, J., concurring).

ORDER – PAGE 5

this and many other courts that utilization of Hague procedures are slow and cumbersome
and usually take far longer than discovery procedures under the Federal Rules.").

That approach ignores *Aérospatiale*'s admonition to "exercise special vigilance" in
international discovery disputes, 482 U.S. at 546, and exemplifies courts' intrinsic "pro-
forum bias" warned against by both the *Aérospatiale* minority and the Fifth Circuit.[7] *Id.* at
553 & n.4 (Blackmun, J., concurring in part and dissenting in part);[8] *In re Anschuetz & Co.,
GmbH*, 838 F.2d 1362, 1364 (5th Cir. 1988) [hereinafter *Anschuetz II*], *modifying* 754 F.2d
602 (1985) [hereinafter *Anschuetz I*], *vacated sub nom. Anschuetz & Co., GmbH v.
Mississippi River Bridge Auth.*, 483 U.S. 1002 (1987) (mem. op.) (remanding in light of
*Aérospatiale*).  "[M]any foreign countries, particularly civil law countries, do not subscribe
to our open-ended views regarding pretrial discovery, and in some cases may even be
offended by our pretrial procedures."  *Anschuetz II*, 838 F.2d at 1364.  "American courts
should therefore take care to demonstrate due respect for any special problem confronted by
the foreign litigant on account of its nationality or the location of its operations, and for any
sovereign interest expressed by a foreign state."  *Aérospatiale*, 482 U.S. at 546; *see also
Anschuetz II*, 838 F.2d at 1364 ("We would note, however, as the Supreme Court noted, that
sensitive interests of sovereign powers are involved and that it would be a serious mistake

---

[7]Although the term "pro-forum bias" does not appear in the *Aérospatiale* majority
opinion or either *Anschuetz* opinion, the courts all shared similar concerns.  *See Aérospatiale*,
482 U.S. at 546; *Anschuetz II*, 838 F.2d at 1364; *Anschuetz I*, 754 F.2d at 614.

[8]The justices unanimously agreed that the Convention does not "provide[] the
*exclusive* means for discovery involving signatory countries."  *See Aérospatiale*, 482 U.S.
at 548 (Blackmun, J., concurring in part and dissenting in part) (emphasis in original).

for the district court not to respect properly such interests in the course of deciding the appropriate discovery techniques to be applied.").

Beyond the three broad comity prongs, however, the *Aérospatiale* Court did not "articulate specific rules to guide this delicate task of adjudication."[9] 482 U.S. at 546. That task falls within the "complete discretion" of the district courts. *Anschuetz II*, 838 F.2d at 1363 (citing *Aérospatiale*, 482 U.S. 522). And, in exercising that discretion, courts should remain mindful that possessing the "power to impose discovery under the Federal Rules" does not mitigate their responsibility to show "self-restraint" in using that power. *Aérospatiale*, 482 U.S. at 553 n.4 (Blackmun, J., concurring in part and dissenting in part) (emphasis removed); *see also Anschuetz I*, 754 F.2d at 614 ("[T]o say what is proper and permitted as an exercise of power by an American court acting under the federal rules is not necessarily to say that such power should always be employed. Particularly in the realm of international discovery we believe the exercise of judicial power should be tempered by a healthy respect for the principles of comity.").[10]

---

[9]*See also Anschuetz II*, 838 F.2d at 1364 ("In weighing the respective rights of the parties before it, and in determining the need for granting discovery requests, the 'exact line between reasonableness and unreasonableness' is clearly a matter for the trial court (quoting *Aérospatiale*, 482 U.S. at 546)).

[10]*Cf. Pierburg GmbH & Co. KG v. Superior Court*, 186 Cal. Rptr. 876, 880 (Cal. Ct. App. 2d Dist. 1982) ("Rulings based in this concept of international comity are dictated not by technical principles of jurisdiction of the parties to or subject-matter of particular lawsuits, but rather by exercise of judicial self-restraint in furtherance of policy considerations which transcend individual lawsuits." (quoting *Volkswagenwerk Aktiengesellschaft v. Superior Court*, 176 Cal. Rptr. 874, 884 (Cal. Ct. App. 1st Dist. 1981))). Although *Aérospatiale* abrogated the central holdings of these California state cases, this observation remains apt.

Although the *Aérospatiale* Court declined to mandate that courts follow a particular mode of analysis, it did suggest that five factors are relevant to any comity analysis:

> (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

482 U.S. at 544 n.28 (quoting the RESTATEMENT OF FOREIGN RELATIONS LAW OF THE UNITED STATES (REVISED) § 437(1)(c) (Tentative Draft No. 7, 1986) (approved May 14, 1986), *adopted sub nom.* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442(1)(c) [hereinafter RESTATEMENT (THIRD)]).  Courts have, to varying degrees, looked to these factors in analyzing international discovery disputes.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 314-15 (E.D.N.Y. 2006) (using the five Restatement (Third) factors); *In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d 45 (D.D.C. 2000) (weaving Restatement factors into *Aérospatiale*'s three prong analysis); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987) [hereinafter *Minpeco I*] (looking to four "principal factors" distilled from caselaw and the RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 40 (1965)).[11]

---

[11]The Restatement (Second) contained the following five factors:
(a) vital national interests of each of the states, (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person, (c) the extent to which the required conduct is to take place in the territory of the other state, (d) the nationality of the person, and (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

The Receiver draws the Court's attention to *Strauss v. Crédit Lyonnais, S.A.*, 242 F.R.D. 199 (E.D.N.Y. 2007) as particularly instructive.  *See* Tr. of Hr'g at 3:15-19.  *Crédit Lyonnais* concerned a discovery dispute between a group of American plaintiffs and a French bank that, according to the plaintiffs, violated the Antiterrorism Act of 1992 by facilitating financing for groups engaged in "international terrorism."  *See* 18 U.S.C. § 2331, *et seq.*; 242 F.R.D. at 203-05.  In granting the plaintiffs' request to conduct discovery under the Federal Rules, the *Crédit Lyonnais* Court used a seven factor analysis that "follow[ed] Second Circuit cases which apply all five factors enumerated by the Supreme Court and the Restatement [(Third)], and the two additional 'principal' factors identified in *Minpeco*."  242 F.R.D. at 211 (collecting cases).

The Court finds that the *Crédit Lyonnais* approach adequately addresses the complexity and scope of interests at issue in this dispute.  Accordingly, the Court will look to the following seven factors: "(1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information," *Crédit Lyonnais*, 242 F.R.D. at 210 (citing sources quoting RESTATEMENT (THIRD)); (5) "the competing interests of the nations whose laws are in

---

*Minpeco I*, 116 F.R.D. at 522 (quoting RESTATEMENT (SECOND) § 40).  The *Minpeco* Court also noted two other "significant" factors: (1) "the importance of the information and documents requested to the conduct of the litigation" and (2) "the good or bad faith of the party resisting discovery."  *Id.* (collecting cases including *Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958) [hereinafter *Rogers*]).

conflict"; (6) "the hardship of compliance on the party or witnesses from whom discovery is sought"; and (7) "the good faith of the party resisting discovery" under the Federal Rules. *Minpeco*, 116 F.R.D. at 523.  In line with Second Circuit caselaw, the Court places greater emphasis on the factors concerning the countries' competing interests and the hardships associated with compliance.  *Id.* at 522 (collecting cases).  The party invoking the Convention bears the burden of showing its applicability to the disputed discovery matters. *See, e.g.*, *In re Automotive Refinishing*, 358 F.3d at 305 (collecting cases and quoting *Aérospatiale*, 482 U.S. at 547 ("stating that the court should give 'the foreign litigant a full and fair opportunity to *demonstrate* appropriate reasons for employing Convention procedures in the first instance'") (emphasis in original)).

### III. THE COURT FINDS UTILIZING THE CONVENTION APPROPRIATE AND REASONABLE

The Court now turns to analyze and balance the seven *Crédit Lyonnais* factors. Although several factors weigh in the Receiver's favor, the weightiest factors support SG Suisse.  The Court, therefore, finds that discovery through the Convention initially presents the more reasonable and appropriate route.

#### A. The Receiver Seeks Important Information

The documents and information sought by the Receiver fall within the ambit of the Receivership Order and are vital to the Receivership proceedings.  This Court previously determined that the Stanford Defendants operated a massive Ponzi scheme that stole approximately $8 billion from an estimated 50,000 investors scattered over more than 100 countries.  *See Janvey v. Alguire*, Civil Action No. 3:09-CV-0724 (N.D. Tex. filed Apr. 20,

2009) [456] (Order granting preliminary injunction), *aff'd*, 628 F.3d 164 (5th Cir. 2010);

SEC's Second Am. Compl. at 5, 8 [952].  The Fifth Circuit considers Ponzi schemes

"insolvent from [their] inception." *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

Thus, the Stanford Defendants' SG Suisse accounts almost certainly contain, or served as a

conduit for, a large amount of fraudulently obtained funds.

This Court has charged the Receiver with the responsibility of tracking down and

collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately,

defrauded investors.  That task has been complicated by the Ponzi scheme's complexity.  So

far, the Receiver has traced only approximately $950 million of the Stanford Defendants'

suspected assets; almost $7 billion apparently has vanished.  *See* App. in Support of

Receiver's Second Interim Report Ex. 1 [1237].  The Receiver has recovered only a fraction

of the $950 million in traceable funds; after expenses; the Receivership holds less than $100

million in cash on hand.  *Id.*  Of that amount, over $60 million consists of cash found in

various Stanford accounts at the Receivership's inception.  *Id.*

The Stanford Defendants' penchant for using and managing offshore banking

resources strongly suggests that much of the unaccounted-for funds are stashed in or passed

through foreign banks.  Indeed, the Receiver suspects that over $100 million in Receivership

Estate funds are traceable to the Stanford Defendants' SG Suisse accounts alone.  *See*

Receiver's Br. at 2 [1259].  Under the Receivership Order's terms, the Receiver owns and

exercises control over such offshore accounts.  But, if the Receiver remains unable to access

information related to those accounts, there is very little realistic chance of tracking down

the lost funds and returning them to defrauded investors, creditors, and others taken advantage of by the Stanford Defendants' scheme.

That would have a host of consequences for this and similar enforcement proceedings in the future. Disallowing the Receiver to access his own overseas records makes effective enforcement next to impossible. Moreover, it gives future would-be Ponzi schemers a strong incentive to place the bulk, if not all, of their fraudulently-obtained funds in foreign banks and, in this case, essentially rewards the Stanford Defendants' efforts to conceal their misdeeds. In the end, the greatest hardship would fall the Ponzi schemes' victims, who may be able to recover only pennies on the dollar.

"The Receiver is in an unenviable position: although the Stanford estate has many thousands of claimants, there are [as yet] startlingly few assets to disperse to the Stanford victims." *Alguire*, 628 F.3d at 185. Because documents and information concerning the Stanford Defendants' SG Suisse accounts will aid the Receiver in discovering the disposition of the Ponzi scheme funds obtained and used by the Stanford Defendants, the Receiver seeks discovery of relevant and highly important materials. Accordingly, the Court finds that this factor weighs in the Receiver's favor.

**B. The Discovery Requests, Though Broad, Are Appropriate Under the Circumstances**

The Receiver requests that SG Suisse produce a large amount of documents and information, essentially all documents and materials in SG Suisse's control that are related to the Stanford Defendants and their affiliates' activities since January 1, 2000. *See* Notice

App. Ex. A at 5-6 [1225].  Despite the broad scope of the Receiver's request, the Court finds it reasonably tailored to the circumstances of this case.

The Receiver's unique position underscores the reasonableness and appropriateness of his request.  The Receivership Order explicitly provides that "*[t]his Court* assume[d] exclusive jurisdiction and [took] possession of the assets, monies, properties, real and personal, tangible and intangible, of whatever kind and description, *wherever located*, and the legally recognized privileges (with regard to the entities), of the Defendants *and all entities they own or control*" as well as all records related to those assets.  Receivership Order ¶ 1 (emphasis added).  The Court appointed the Receiver as its representative in managing the Receivership Estate.  *Id.* at ¶ 2.  In that capacity, the Receiver stands in the shoes of the Stanford Defendants and related entities and represents defrauded creditors in their recovery efforts.  *See Alguire*, 628 F.3d at 183 (noting that receivers are "legal hybrids" who "'stand[] in the shoes of the person for whom [they] ha[ve] been appointed,'" serve as "'instrument[s] of the court . . . acting also for the stockholders . . . and creditors of the corporation,'" and "are imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner" (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 89 (2d Cir. 1983); *Drennen v. S. States Fire Ins. Co.*, 252 F. 776, 788 (5th Cir. 1918))).[12]  Accordingly, this Court considers the Receiver to be SG

_____

[12]Notably, the *Alguire* Court also cited *United States v. Setser*, a case that supported "the ability of a receiver to enter and search [receivership] estate property without a warrant and relinquish property to law enforcement officials."  628 F.3d at 183 (citing 568 F.3d 482, 487-88 (5th Cir. 2009)).

ORDER – PAGE 13

Suisse's customer. And, as such, the Receiver's request constitutes no more than a bank customer asking for a copy of its own records.

Even if the Swiss authorities ultimately disagree with the Court that the Receiver merely seeks his own records, the Receiver still brings a reasonable and appropriate discovery request based on the facts of this case. The Stanford Defendants' Ponzi scheme collected and dissipated billions of dollars over its long existence. Coupled with the scheme's Byzantine structure, the process of recouping any fraudulently obtained funds necessarily includes weeding through a massive number of individual transactions and any documents and information related to those transactions. Access to the records of and related to the Stanford Defendants' own bank accounts directly relates to that task. And, because the transactions in the SG Suisse accounts were integral to the Stanford Defendants' scheme, the Receiver's request does not implicate civil law countries' traditional concerns with pretrial "fishing expeditions." Accordingly, the Court finds that this factor weighs in the Receiver's favor.

### C. The Requested Documents and Information Will Originate in Switzerland

The Receiver appears to imply that requiring SG Suisse to comply with his discovery request will not infringe upon Swiss sovereignty because caselaw treats such production as occurring within the United States. Receiver's Br. at 1-2. The Court agrees with the Receiver's reading of precedent. *Aérospatiale* interpreted the Convention to not "draw any sharp line between evidence that is 'abroad' and evidence that is within the control of a party subject to the jurisdiction of the requesting court." 422 U.S. at 541. And, the Fifth Circuit

has observed that "'discovery does not take place within [a state's] borders' [sic] merely because documents to be produced somewhere else are located there.'" *Anschuetz I*, 754 F.2d at 611 (quoting *Graco v. Kremlin, Inc.*, 101 F.R.D. 503, 521 (N.D. Ill. 1984)) (additional internal quotation marks omitted). "In essence," according to the Fifth Circuit, "matters preparatory to compliance with discovery orders in the United States, even where the preparatory acts occur in foreign nations, do not constitute discovery in the foreign nation as addressed by the Hague Convention." *Id.*

Courts, however, need not apply this "geographic fiction" as a hard and fast rule that supplants comity-related concerns. *S & S Screw Mach. Co. v. Cosa Corp.*, 647 F. Supp. 600, 614 (M.D. Tenn. 1986). As *Crédit Lyonnais* makes clear, this factor focuses on "whether the 'information *originated* in the United States,' not whether the information currently is *located*" there. 242 F.R.D. at 209 (emphasis in original). Thus, even if caselaw treats the sought-after documents and information as having been produced – and thus ultimately located – in the United States, the Court's comity analysis cannot elide whether the materials in fact are of international origin.

Here, that principle mandates that the Court consider the Receiver's request in light of Swiss law. Unlike the laws at issue in the *Graco* case cited in *Anschuetz I*, Swiss law apparently criminalizes the preparatory acts of "select[ing] the relevant documents which [the litigant] will reveal . . . in the forum state" and requires "participation by a[] [Swiss] judicial authority." 754 F.2d at 611 (quoting *Adidas (Canada) Ltd. v. S/S Seatrain Bennington*, 1984

WL 423, at *2 (S.D.N.Y. 1984) (French law context)).[13]  SG Suisse's Swiss law expert

concludes that Article 271 of the Swiss Penal Code prohibits Swiss bank employees from

"turning over the [sought-after] documents to their colleagues in the United States for

purposes of 'production' in [Switzerland], because it is the act of facilitating the improper

production abroad that constitutes the violation of Article 271."  SG Suisse App. at 8 (Ex.

A) (Frick Decl.) [1264].[14]  Although the Court is reluctant to interpret Swiss law, the Court

finds the expert's reading accurate.  *See id.* ("[W]hoever takes actions, which are reserved

to the public authorities, on Swiss territory without authorization for a foreign state, . . .

whoever facilitates such actions, shall be punished by a prison sentence . . . ." (quoting

Article 271)).[15]

SG Suisse insists that the materials responsive to the Receiver's request may only be

found in Switzerland.  Because complying with the Receiver's request would require SG

Suisse employees to take at least preparatory actions on Swiss territory in apparent violation

---

[13]A recent French Supreme Court decision casts doubt on the nonprosecution assumption underlying the *Adidas* decision.  *See* Marc J. Gottridge & Thomas Rouhette, *France Puts Some Muscle Behind Its Blocking Statute*, 239 N.Y. L.J. 4 (April 2008) (citing Cour de Cassation Chambre Criminelle [Cass. Crim.], Paris, Dec. 12, 2007, Juris-Data no. 2007-332254).  This underscores the Court's reluctance to speculate whether SG Suisse or its employees will face prosecution for complying with the Receiver's request outside of the Convention's procedures.

[14]Schweizerisches Strafgesetzbuch [StGB] [Criminal Code] Dec. 21, 1937, SR 311.0, art. 271 (Switz.).

[15]"In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  FED. R. CIV. P. 44.1.  The Receiver has not objected to SG Suisse's proffered translations of Swiss law.

of Swiss law,[16] the Court finds *Anschuetz*'s geographic fiction inappropriate in this case.[17] Thus, no basis exists for finding that the sought-after documents and information will originate anywhere but Switzerland.[18] Accordingly, this factor weighs in SG Suisse's favor.

### D. Only SG Suisse Has Access to the Sought-After Documents and Information

Only SG Suisse can produce the documents and information sought by the Receiver, so no alternative means of securing the information are available. SG Suisse avers that its Miami office lacks access to these materials and that no documents or information responsive to the Receiver's request may be found in the Miami office. Although the Department of Justice and the SEC may obtain discovery under applicable Mutual Legal Assistance Treaties, the SEC claims that the law prohibits it from sharing any produced documents or

---

[16]*Cf. Schindler Elevator*, 657 F. Supp. 2d at 531 (interpreting Article 271 to apply to acts that will "occur in Switzerland").

[17]The Swiss government has long maintained that the geographic fiction "that discovery takes place only in the country requesting the evidence, and not at all in the country where the evidence is located, is irreconcilable with the concept of territorial jurisdiction and has no basis in international law." Brief of the Government of Switzerland as Amicus Curiae Supporting Petitioners, *Aérospatiale*, 482 U.S. 522 (1987), 1986 WL 727499, at *3, *12-13 [hereinafter Swiss Amicus]. The United States and the SEC shared the same opinion, at least prior to *Aérospatiale*. *See* Brief of the United States and the SEC as Amicus Curiae, *Aérospatiale*, 482 U.S. 522 (1987), 1986 WL 727504, at *9-10 [hereinafter American Amicus].

[18]The Court, however, notes that the sought-after materials are ministerial documents evidencing transactions that originated in the United States or Antigua at the Stanford Defendants' direction. Thus, at least some of the information contained in the Stanford Defendants' SG Suisse records "originated" in the United States. This nexus supports the Receiver's position, but not to an extent sufficient to tilt the balance in his favor at this time.

information with the Receiver in this action.  *See* Tr. of Hr'g at 11:21-12:24.  Accordingly, this factor weighs in the Receiver's favor.

### E. The Receiver's Request Implicates Important American and Swiss Interests

"In the matter of comity analysis, the extent to which court-ordered discovery is perceived to infringe upon foreign interests is not an 'all or nothing' proposition." *Minpeco I*, 116 F.R.D. at 525.[19]  As this factor concerns other countries, the inquiry consists of more than determinating whether it is "a general policy of the foreign state to resist 'intrusion upon its sovereign interests,' or to prefer its own system of litigation." RESTATEMENT (THIRD) § 442 cmt. c.  Instead, courts generally look to "whether producing the requested information would affect important substantive policies or interests of the foreign state" by using a variety of data points including "expressions of interest by the foreign state, as contrasted with expressions by the parties; . . . the significance of disclosure in the regulation by the foreign state of the activity in question; and . . . indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought." *Id.*  In weighing the United States' interests, courts, among other things, "should take into account not merely the interest of the prosecuting or investigating agency in the particular case, but the long-term interests of the United States generally in

---

[19]The *Crédit Lyonnais* Court considered this factor "of the greatest importance" in comity analyses.  242 F.R.D. at 213 (internal quotation marks and citation omitted).  This does not mean that the factor should be dispositive.  The Supreme Court urged lower courts "to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, *and* for any sovereign interest expressed by a foreign state." *Aérospatiale*, 482 U.S. at 546 (emphasis added).

international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in giving effect to formal or informal international agreements, and in orderly international relations." *Id.*

Although neither the United States nor Switzerland have submitted formally their views on the Receiver's discovery request,[20] both countries have opined on such requests in similar cases.[21]  "[T]he United States has 'a substantial interest in fully and fairly adjudicating matters before its courts,'" *Crédit Lyonnais*, 242 F.R.D. at 214 (citing, *inter alia*, *Minpeco I*, 116 F.R.D. at 523-24), and in "ensur[ing] the integrity of its financial

_____

[20]At hearing, counsel for the SEC noted without elaboration that "the interests here are very strong on the United States' side."  Tr. of Hr'g at 13:4-5.  Courts generally should "'accord some deference to the determination of the Executive Branch – the arm of the government charged with primary responsibility for formulating and effectuating foreign policy –" concerning the balance between the "diplomatic consequences of the discovery request" and "the benefits of disclosure."  *Minpeco I*, 116 F.R.D. at 523 (collecting cases); *see also Aérospatiale*, 482 U.S. at 535 n.19 (citing *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-185 (1982)).  The SEC, however, has not apprised the Court of those concerns in this case.  Indeed, it is unclear what, if any, communications have taken place between the SEC and Swiss authorities.  *See* Tr. of Hr'g at 13:14-18.

Additionally, the Court finds it significant that the SEC, the plaintiff in this action, is not "the party moving to compel."  *Minpeco I*, 116 F.R.D. at 523.  The SEC apparently may obtain discovery of the same information through channels unavailable to the Receiver.  Tr. of Hr'g at 11-13.  And, per the SEC's representations, the laws governing those methods distinguish between the SEC and the Receiver's respective "enforcement proceedings."  *See* Tr. of Hr'g at 12:12-25.  Accordingly, the SEC's opinion in this matter neither controls the Court's decision nor compels the Court to consider it weightier authority.

[21]The Court finds looking to expressions of interest in prior cases appropriate because "it simply is not reasonable to expect the Federal Government or the foreign state in which the discovery will take place to participate in every individual case in order to articulate the broader international and foreign interests that are relevant to the decision whether to use the Convention.  *Aérospatiale*, 482 U.S. at 553-54 & n.5 (Blackmun, J., concurring in part and dissenting in part) (noting that "the opportunities for such participation are limited").

markets." *Minpeco I*, 116 F.R.D. at 523 (citing *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117 (S.D.N.Y. 1981)). Additionally, "[t]he United States has a strong interest in avoiding conflict with foreign nations." American Amicus, 1986 WL 727504, at *7. The Court, for its part, has a strong interest in enforcing its orders and in seeing that the cases before it proceed to a "'just, speedy, and inexpensive determination.'" *Aérospatiale*, 482 U.S. at 543 (quoting FED. R. CIV. P. 1); *Waffenschmidt v. Mackay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Courts possess the inherent authority to enforce their own injunctive decrees." (citing *United States v. Hall*, 472 F.2d 261, 267 (5th Cir. 1972))).[22]

The Swiss interest is similarly substantial. Switzerland has a long-standing "national political tradition that places great value on the sovereign independence of the nation and the individual autonomy of its citizens." Swiss Amicus, 1986 WL 727499, at *10 & n.11. That tradition "is embodied in . . . bank secrecy statutes" that "have the legitimate purpose of protecting commercial privacy inside and outside Switzerland." *Minpeco I*, 116 F.R.D. at 524.[23] Additionally, "Switzerland subscribes to the typical civil law view that the taking of

---

[22]"[W]hether [the Receiver] [is] correct that foreign nations have no sovereign interests in protecting admitted" – at least for some Defendants – "[security law] violators is irrelevant, since those nations retain a separate and important sovereign interest in ensuring that discovery involving their citizens be taken in accord with their traditions and accepted practices." *In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d at 54; *see also* Tr. of Hr'g at 7:21-8:2. That "interest . . . in the sanctity and respect of their laws is both important and deserving of significant respect." *In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d at 54.

[23]Because bank customers can waive the "bank secrecy privilege," the *Minpeco I* Court reasoned that "Swiss bank secrecy law primarily protects the right of commercial privacy of bank clients, not the Swiss government itself or some other public institution or interest." 116 F.R.D. at 525 (citing *Banca Della Svizzera*, 92 F.R.D. at 118) (further citations omitted). In the *Minpeco I* Court's view, this "cut against the Swiss national interest at

evidence is essentially a domestic judicial function."  Swiss Amicus, 1986 WL 727499, at

*8.  In this view, "only the state in which the requested evidence is located has the authority

to enforce and execute the gathering of that evidence." *Id.*.  Thus, the Swiss government has

long maintained that, when "a U.S. court orders a party to produce evidence from

Switzerland, and backs that order with its coercive powers, the U.S. court, in effect,

substitutes its own authority for that of the competent Swiss court, and therefore violates

Swiss sovereignty and international law," *id.*, even "when [the] U.S. court has personal

jurisdiction over the party." *Id.* at *12.

---

stake." *Id.*

The Court declines to adopt this view.  As an initial matter, the Swiss government considers discovery requests such as the Receiver's to implicate issues related to judicial sovereignty. *See* Swiss Amicus, 1986 WL 727499, at *9.  The United States previously has taken the position that "foreign assertions of 'judicial sovereignty'" that "embody legitimate concerns . . . merit accommodation from United States courts." American Amicus, 1986 WL 727504, at *25.  And, "[c]ourts should understand that assertions of 'judicial sovereignty' often incorporate legitimate notions of territorial integrity – a reluctance to permit foreign litigants to invade one's borders, literally or figuratively, for the purpose of seizing evidence." *Id.* at *22-23.  As described elsewhere, Switzerland considers court-ordered discovery to violate its sovereignty, and that "violation of sovereignty [to be] compounded when . . . Swiss law specifically prohibits release of the information." Swiss Amicus, 1986 WL 727499, at *9.

Additionally, the Swiss bank secrecy laws reflect the high value that Swiss society places on personal privacy.  SG Suisse App. at 5-6 (Frick Decl.).  Viewed in this light, the Swiss bank secrecy laws codify and protect important Swiss governmental and public interests.  *Cf.* American Amicus, 1986 WL 727504, at *25 ("[F]oreign nations will often have more specific and concrete interests that merit accommodation" such as "laws [that] may provide particular protection to various liberty, property, and privacy interests, according business secrets or confidential communications (for example) special immunity from disclosure.").  These interests are not devalued because some individuals may choose to waive the laws' protections.

The Court finds that both the United States and Switzerland have compelling interests at stake in this dispute. The Court, however, will refrain from conducting a more searching – and inherently political – balancing of these interests. In this exercise of self-restraint the Court is mindful of the D.C. Circuit's observation in *Laker Airways*:

> Despite the real obligation of courts to apply international law and foster comity, domestic courts do not sit as internationally constituted tribunals. Domestic courts are created by national constitutions and statutes to enforce primarily national laws. The courts of most developed countries follow international law only to the extent it is not overridden by national law. Thus, courts inherently find it difficult neutrally to balance competing foreign interests. When there is any doubt, national interests will tend to be favored over foreign interests. This partially explains why there have been few times when courts have found foreign interests to prevail.

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 950-51 (D.C. Cir. 1984) (antitrust jurisdiction context).[24] Thus, although courts may accurately identify the sovereign interests at play in a particular case, they generally are not the proper bodies to weigh which sovereign's interests are more meritorious. *See Laker Airways*, 731 F.2d at 949-50; *In re Uranium Antitrust Litigation*, 480 F. Supp. 1138, 1148-49 (N.D. Ill. 1979).

Such balancing seems especially inapposite in this case, where the legislative authorities of both nations essentially have spoken by adopting the Convention. In this respect, adopting the Convention not only establishes a procedure for conducting discovery

---

[24]*See also In re Vitamins Antitrust Litigation*, 120 F. Supp. 2d at 53 ("[T]he lower courts which have considered the issue of whether to proceed under Hague or the Federal Rules appear to have given considerably less deference to the foreign nations' sovereign interests than this Court believes is warranted." (citing William H. Baker, *Obtaining Evidence: International Discovery Techniques – The Taking of Evidence Abroad for Use in American Courts*, 624 PLI/LIT. 427, 468-80 (Feb. 2000) (App'x A))).

among its signatories, it implicitly recognizes "the basic principle which animated all the discussion" at the Convention Conference in 1968: that "[a]ny system of obtaining evidence or securing the performance of other judicial acts internationally must be 'tolerable' in the State of execution and must also be 'utilizable' in the forum of the State of origin where the action is pending." Philip W. Amram, *Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters*, 12 I.L.M. 324, 327 (1973) (Rapporteur's Report on the Convention enclosed with the Secretary of State's Letter of Submittal).[25]  The Swiss government has previously represented that "[i]f evidence is requested through the intergovernmental procedures of the Convention, the procedure is 'tolerable' in Switzerland because the evidence will be collected under the auspices of the Swiss judiciary." Swiss Amicus, 1986 WL 727499, at *11. Accordingly, the Convention inherently, and adequately, balances the competing sovereign interests here because its "use will benefit U.S. interests by providing the needed evidence, and protect Swiss interests by avoiding intrusions upon Swiss sovereignty." *Id.*  The Court therefore finds this comity factor neutral.

### F. SG Suisse May Face Substantial Hardship If It Complies with the Discovery Request

In determining whether a litigant will endure hardship in complying with a discovery request, courts generally have looked to three elements: whether foreign law creates penalties

---

[25]*See also* Report of the United States Delegation to the Eleventh Session of the Hague Conference on Private International Law, 8 I.L.M. 785, 804 (1969) (discussing "Taking Evidence Abroad").

for complying with discovery requests of U.S. origin, the likelihood that foreign authorities will enforce those laws, and the party/nonparty status of the litigant resisting discovery.  *See Crédit Lyonnais*, 242 F.R.D. at 224-26; *Minpeco I*, 116 F.R.D. 525-27.

The existence of foreign laws regulating a litigant's ability to comply with discovery requests generally militates in favor of finding hardship.  But, courts do not treat foreign discovery laws equally.  "The prospect that the foreign litigant would face criminal penalties rather than civil liabilities weighs in favor of the objecting party."  *Crédit Lyonnais*, 242 F.R.D. at 225 (collecting cases "according the possibility of civil sanctions less weight than the possibility of criminal prosecution").  After all, "[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign."  *Rogers*, 357 U.S. at 211.[26]  "'The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information,'" however, "'does not automatically bar a domestic court from compelling production . . . .  Rather what is required is a sensitive balancing of the competing interests at stake."  *Crédit Lyonnais*, 242 F.R.D. at 225 (quoting *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345 (7th Cir. 1983)).

SG Suisse presents evidence suggesting that complying with the Receiver's discovery request would subject it to criminal, civil, and administrative penalties.  *See* SG Suisse App.

---

[26]*Rogers* considered the effect of foreign discovery laws in the sanctions context, *see Arthur Andersen & Co. v. Finesilver*, 546 F.2d 338, 341 (10th Cir. 1976), but the concern it identifies applies equally to the production stage, especially after *Aérospatiale* endorsed the Restatement (Third) approach to comity analysis.

ORDER – PAGE 24

at 5-9 (Frick Decl.).  SG Suisse's Swiss law expert specifically points to three financial privacy statutes that provide for criminal liability: Article 47 of the Swiss Banking Act and Articles 271 and 273 of the Swiss Penal Code.  Article 47, also at issue in *Minpeco I*, *see* 116 F.R.D. at 525-26, applies to anyone who intentionally or negligently "divulges a secret entrusted to him in his capacity as a[n] . . . employee . . . of a bank" or "seeks to induce others to such violation of professional secrecy."  SG Suisse App. at 6 (Frick Decl.).[27] Article 47 provides that

> a banker's duty of confidentiality prohibits, among other things, the disclosure of the existence of the relationship between the bank and its customer, the type of accounts held, any transactions involving the bank, any information provided by the customer to the bank on personal or financial matters, and any additional disclosures that could facilitate the determination of the customer's identity or other confidential information about the customer.

*Id.* at 6-7.  Violating Article 47 carries a penalty of up to three years incarceration or a 250,000 Swiss franc fine, and, except "in very limited circumstances" the decision to prosecute is nondiscretionary.  *Id.* at 7.

Article 273 creates criminal liability for "[a]ny person who has sought to discover a trade or business secret in order to make it accessible to" or "who has made a trade or business secret accessible to an official or private foreign body, or a private foreign company, or to their agents."[28]  *Id.* at 9.  "Information that a bank receives from its customers falls

---

[27]Schweizerisches Bankengesetz [BankG] [Banking Code] Nov. 8, 1934, SR 952.0, art. 47 (Switz.).

[28]Schweizerisches Strafgesetzbuch [StGB] [Criminal Code] Dec. 21, 1937, SR 311.0, art. 273 (Switz.).

within the scope of Article 273's prohibition.  In particular it is well-established that the identities, and account- and transaction-related information of bank customers are protected by Article 273."  *Id.*  Like Article 271,[29] Article 273 provides for a maximum "prison sentence of up to three years or by a monetary sentence, and in serious cases by a prison sentence not below one year."  *Id.*

The Court finds that Swiss law provides criminal, civil, and administrative penalties that might possibly apply to at least some of the acts that the Receiver's discovery request would require SG Suisse and its employees to perform.  This finding comports with caselaw going back at least to the *Rogers* Court.  *See Rogers*, 357 U.S. at 211 ("[T]he findings below establish that the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws.").  And, as the *Minpeco II* Court observed, the penalties authorized by those laws are "potentially draconian."  *Minpeco v. Conticommodity Servs., Inc.*, 118 F.R.D. 331, 332 (S.D.N.Y. 1988).  This portion of the hardship analysis, then, weighs in SG Suisse's favor.

The Court, however, reiterates that it considers the Receiver to be SG Suisse's customer and the Receiver's discovery request to consist of nothing more than a bank customer demanding that a bank produce his own records.  Under this view, SG Suisse could unilaterally produce the documents and information responsive to the Receiver's discovery request without violating Swiss law.  SG Suisse argues that the Court's view fails under Swiss law, but ultimately the Swiss authorities must decide that issue.  The authorities may

---

[29]The Court described Article 271 in *supra* part III.C.

agree with the Court, allow judicially-supervised discovery, or reject the Receiver's request outright.    But, because SG Suisse shows that unilateral compliance runs the risk of prosecution, the Court finds that comity counsels deference to SG Suisse's potentially well-founded fear.

"[I]n examining the hardship on the party from whom compliance is sought, courts also look at the likelihood that enforcement of the foreign law will be successful." *Minpeco I*, 116 F.R.D. at 526; *Crédit Lyonnais*, 242 F.R.D. at 224.    The Court, however, declines to estimate the chances that Swiss authorities will prosecute SG Suisse or its employees should the Court order that they comply with the Receiver's request under the Federal Rules.    SG Suisse claims that compliance will subject it to criminal, civil, and administrative penalties under Swiss law and provides evidence to that end.    Courts have noted Switzerland's historical interest in promoting privacy in the bank-customer relationship.    *See, e.g.*, *Minpeco I*, 116 F.R.D. at 524 ("The Swiss national interest in this matter is embodied in that country's bank secrecy statutes.").[30]    Swiss authorities have prosecuted individuals and entities for failing to heed laws designed to promote that interest, SG Suisse App. at 7 (Frick Decl.), and predicting whether Swiss litigants may successfully invoke certain defenses to those statutes is a "highly speculative" exercise.    *Minpeco I*, 116 F.R.D. at 526.

---

[30]*See also* SG Suisse App. at 5 (Frick Decl.) (noting that "[t]he privacy right protected by Swiss financial privacy laws is one that the Swiss Federal Supreme Court has deemed fundamental to all persons" and "has been part of the Swiss Civil Code since its first enactment in 1914 (Article 28 Swiss Civil Code)"); Swiss Amicus, 1986 WL 727499.

In the absence of any evidence suggesting that Switzerland crafted its laws specifically to impede United States courts' discovery orders,[31] the Court finds that the interests of comity counsel in favor of taking the duly enacted laws of Switzerland at face value. Those laws potentially encompass the actions that the Receiver demands SG Suisse perform. Accordingly, the Court finds that this part of the hardship factor weighs in SG Suisse's favor.

Finally, "where the party sought to be compelled to produce documents in violation of foreign secrecy laws is merely a neutral source of information, and not itself a target of a criminal investigation or an adverse party in litigation, some courts have found the hardship to weigh more heavily in the balance." *Minpeco I*, 116 F.R.D. at 526-27 (citing *First Nat'l Bank of Chicago*, 699 F.2d at 346; *Banca Della Svizzera*, 92 F.R.D. at 114); *accord Anschuetz I*, 754 F.2d at 609 (noting that, although the United States "'has a clear interest in facilitating the manner in which foreign citizens doing business in the United States are available for litigation here,'" that interest is "less compelling" as it concerns nonparty litigants (quoting *Murphy v. Reifenhauser KG Maschinenfabrik*, 101 F.R.D. 360, 373 (D. Vt.

---

[31]"[T]he bank secrecy laws involved here have the legitimate purpose of protecting commercial privacy inside and outside Switzerland. In this respect, Article 47 is to be distinguished from a number of other foreign anti-disclosure laws whose purposes courts have determined do not warrant deference." *Minpeco I*, 116 F.R.D. at 524 (collecting cases involving "'blocking statute[s]' designed to frustrate discovery"). In any case, "American unhappiness with blocking statutes in other nations should be tempered by the fact that [the United States] ha[s] adopted blocking statutes as well." Joseph E. Weis, Jr., *The Federal Rules and the Hague Conventions: Concerns of Conformity and Comity*, 50 U. PITT. L. REV. 903, 922 n.102 (1988-1989) (citing statutes and Douglas E. Rosenthal & Stephen Yale-Loehr, *Two Cheers for the ALI Restatement's Provisions on Foreign Discovery*, 16 N.Y.U. J. INT'L L. & POL. 1075, 1080 (1984))

1984))).  SG Suisse is not a party to this action.  And, the fact that the Stanford Defendants used their SG Suisse accounts to facilitate their scheme does not transform SG Suisse into a culpable party absent evidence of its complicity.  Thus, this portion of the hardship analysis also weighs in SG Suisse's favor.

The Receiver's discovery request asks nonparty SG Suisse and its employees potentially to act contrary to Swiss law.  Although the Court declines to guess at the likelihood of successful prosecution, the probability is nonzero.  Accordingly, the Court finds that SG Suisse may face substantial hardship should the Court order it to comply with the Receiver's request.  This factor weighs in SG Suisse's favor.

### G. SG Suisse Has Acted in Good Faith

The Court finds that SG Suisse has acted in good faith.  Although the Receiver suggests that SG Suisse has invoked the Convention as a delay tactic and "pretext,"[32] SG Suisse long ago suggested that the Receiver pursue his discovery request "through appropriate international channels."  SG Suisse App. at 34 (Ex. D) (Letter from SG Suisse's Counsel to Receiver dated Mar. 12, 2009).  The Receiver apparently did not renew his request until a few months ago.  *See* Notice App. Ex. A.  In the intervening time, SG Suisse had no obligation to affirmatively "apply to the appropriate governmental authority for an exemption to [the potentially applicable Swiss] statute[s]."  *Minpeco I*, 116 F.R.D. at 528 (citing *Remington Prods., Inc. v. N. Am. Philips Corp., N.V.*, 107 F.R.D. 642, 653 (D. Conn. 1985)).  Because only a short amount of time has passed since the Receiver served his

---

[32]*See* Receiver's Br. at 2 ("pretext"); Tr. of Hr'g at 9:18-23; 11:5-7 (delay).

subpoena, the Court does not consider SG Suisse's failure to make inquiry of Swiss authorities as a sign of bad faith.

Additionally, the Swiss laws relied upon by SG Suisse have been on the books for decades, suggesting that this case does not present "a situation in which the party resisting discovery has relied on a sham law such as a blocking statute to refuse disclosure." *Id.* (citing *Compagnie Francaise d'Assurance pour le Commerce Extérieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984) (citing cases and quoting *Graco*, 101 F.R.D. at 508 ("The [French] Blocking Statute obviously is a manifestation of French displeasure with American pre-trial discovery procedures.")).[33] And, the Receiver has presented no evidence showing that SG Suisse operated its Miami office intending "'to use foreign law to shield it from the reach of [U.S.] laws.'" *Id.* (quoting *Banca Della Svizzera*, 92 F.R.D. at 119). Accordingly, this factor currently weighs in SG Suisse's favor. The Court, however, expects that SG Suisse will use all reasonably available efforts to secure the assistance of the appropriate Swiss authorities to the full extent allowed under Swiss law. *See* RESTATEMENT (THIRD) § 442(2)(a) ("If disclosure of information located outside the United States is prohibited by a law . . . of the state in which the information . . . is located . . . a court . . . may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available.").

---

[33]The nonprosecution assumption underlying *Compagnie Francaise* and *Graco* may require reexamination in light of recent developments in France. *See supra* note 13.

### H. The Comity Factors Weigh in SG Suisse's Favor

On balance, the Court finds that the comity factors weigh in SG Suisse's favor at least in the first instance. The Receiver seeks discovery of highly relevant and important documents and information that only SG Suisse can produce. His request, while broad, is reasonably tailored under the circumstances. In light of the other, more persuasive comity factors in SG Suisse's favor, however, the Court finds that these factors speak more to the specific need for SG Suisse to produce the documents and information rather than a more general concern that discovery proceed under a particular "method of seeking evidence." *Aérospatiale*, 482 U.S. at 541. Although subsequent events may force the Court to order SG Suisse to produce the sought-after materials under the Federal Rules, that possibility does not counsel ignoring the availability and appropriateness of utilizing the Convention in this case. *See id.* at 542 ("We therefore do not believe that an American court should refuse to make use of Convention procedures because of a concern that it may ultimately find it necessary to order the production of evidence that a foreign tribunal permitted a party to withhold.").

Similarly, the possibility that discovery under the Convention may prove somewhat less effective in obtaining evidence than under the Federal Rules does not override the Court's comity analysis. "Resort to the Convention will inevitably entail some measure of added expense and inconvenience, whether i[n] the form of translator's costs, foreign legal fees, or the inability to obtain evidence in precisely the form that one could secure it in domestic discovery." American Amicus, 1986 WL 727504, at *26. But "[i]f," as here, "these transaction costs are minor relative to the scope of the underlying litigation and the

volume of the evidence sought, they provide little basis for forgoing use of the Convention." *Id.* at *26-27.

"Switzerland and the United States have a long and successful history of cooperation in resolving legal disputes. This pattern of friendly cooperation has produced significant benefits in such areas as crime control and securities law, as well as the collection of evidence for use in civil cases." Swiss Amicus, 1986 WL 727499, at *5 -6 & nn.2-4. The Swiss government took an "extremely liberal" approach to granting discovery requests prior to joining the Convention, *id.* at *6 n.4, and the Receiver points to no case showing that the Swiss government has abandoned that policy.

## CONCLUSION

The Court directs the Receiver to pursue his discovery request under the Convention. In doing so, the Court is not precluding ever using the Federal Rules of Civil Procedure to obtain discovery from SG Suisse. The Court is requiring only that the Receiver in the first instance avail himself of the Convention's procedures in the interest of comity. If the Swiss authorities agree with this Court that the Receiver is simply seeking production of his own banking records, then the Receiver may easily obtain what he needs. Even if the Swiss authorities disagree on that point, they may find that the exigencies of this case and comity cause them to allow the Receiver to obtain the vital information he seeks via the procedures applicable under Swiss law. Alternatively, if the Receiver fails to obtain the needed discovery through the Convention, the Court is prepared to revisit the balancing of factors it has reached today.

Signed April 6, 2011.

David C. Godbey
United States District Judge