IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff | § § | |
| v. | § § | |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT AND LEROY KING, | § § § § § § § § | CASE NO. 3:09-cv-0298-N |
| Defendants, | § § § | |
| and | § § | |
| STANFORD FINANCIAL GROUP COMPANY and THE STANFORD FINANCIAL GROUP BLDG INC., | § § § | |
| Relief Defendants. | § | |

**SUPPLEMENTAL APPENDIX IN SUPPORT OF BDO USA, LLP'S REPLY TO THE
RECEIVER'S AND THE OFFICIAL STANFORD INVESTORS COMMITTEE'S JOINT
RESPONSE TO BDO USA, LLP'S MOTION TO QUASH SUBPOENA OR,
IN THE ALTERNATIVE, MOTION TO MODIFY SUBPOENA**

Respectfully submitted,

/s/ Robert W. Kantner
Robert W. Kantner
Texas State Bar No. 11093900
DLA Piper LLP (US)
1717 Main Street
Suite 4600
Dallas, TX  75201
Phone:  214-743-4544
Fax:  972-813-6256
robert.kantner@dlapiper.com

ATTORNEY FOR BDO USA LLP

**SUPPLEMENTAL APPENDIX IN SUPPORT OF BDO USA, LLP'S REPLY TO THE
RECEIVER'S AND THE OFFICIAL STANFORD INVESTORS COMMITTEE'S JOINT
RESPONSE TO BDO USA, LLP'S MOTION TO QUASH SUBPOENA OR,
IN THE ALTERNATIVE, MOTION TO MODIFY SUBPOENA**   Page 1

EAST\44855249.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of May, 2011, a copy of the foregoing Appendix was served as follows:

Ben Krage (via e-mail and hand delivery)
Krage & Janvey L.L.P.
2100 Ross Avenue
Dallas, TX 75201

Attorney for Receiver

T. Wade Jefferies (via e-mail and overnight delivery)
Hohmann, Taube & Summers, L.L.P.
100 Congress Avenue, 18th Floor
Austin, TX 78701

Attorney for the Official Stanford Investors Committee

/s/ Robert W. Kantner
Robert W. Kantner

**SUPPLEMENTAL APPENDIX IN SUPPORT OF BDO USA, LLP'S REPLY TO THE RECEIVER'S AND THE OFFICIAL STANFORD INVESTORS COMMITTEE'S JOINT RESPONSE TO BDO USA, LLP'S MOTION TO QUASH SUBPOENA OR, IN THE ALTERNATIVE, MOTION TO MODIFY SUBPOENA**     **Page 2**

INDEX

1.   Declaration of Lisa A. Morris..............................................................................1

2.   Original Complaint filed in *The Official Stanford Investors Committee v. Cort & Cort and Cort & Associates*, Case No. 3:11-cv-00298-N (N.D. Tex.)..................3

# BPO SUPPLEMENTAL APPENDIX – ITEM 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § | |
| Plaintiff | § § | |
| v. | § § | |
| STANFORD INTERNATIONAL BANK, LTD., STANFORD GROUP COMPANY, STANFORD CAPITAL MANAGEMENT, LLC, R. ALLEN STANFORD, JAMES M. DAVIS, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT AND LEROY KING, | § § § § § § § | CASE NO. 3:09-cv-0298-N |
| Defendants, | § § § | |
| and | § § | |
| STANFORD FINANCIAL GROUP COMPANY and THE STANFORD FINANCIAL GROUP BLDG INC., | § § § § | |
| Relief Defendants. | § | |

## SUPPLEMENTAL DECLARATION OF LISA A. MORRIS

I, Lisa A. Morris, hereby declare and state under penalty of perjury as follows:

1.     I am over 18 years of age and am competent to testify as to the matters stated herein. I make the following statements based upon my personal knowledge unless expressly stated otherwise.

2.     I provide this Declaration to supplement the Declaration I signed on April 14, 2011 in support of BDO USA, LLP's Motion to Quash Subpoena or, in the Alternative to Modify Subpoena.

3.     As I stated previously, I am a Senior Paralegal for BDO USA, LLP ("BDO"). Among other things, I work on litigation matters for BDO.  In particular, I work on document holds and productions by BDO in litigation matters.

4.     In my previous Declaration, I stated that BDO has put a document hold in place regarding Stanford matters.  I hereby supplement that statement by stating that this hold was put in place very shortly after BDO learned of this case.

5.     In my previous declaration, I stated that BDO, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company and that BDO does not have possession, custody or control of documents of BDO International Limited.  I hereby supplement that statement by stating that BDO is independent of and does not have possession, custody or control of documents of other members of BDO International Limited.

6.     Finally, BDO's available work papers for audits of financial statements of Stanford Group Company, Stanford Capital Management LLC and their holding company, Stanford Group Holdings, Inc. ("SGH") and other Stanford Companies owned, directly or indirectly by SGH, do not contain any work product of or communications with counsel.  With the possible exception of e-mail between BDO auditors and in-house attorneys, which are not part of the work papers, I am not aware of any privileged documents relating to said audits that predate BDO's retention of DLA Piper LLP (US) to advise BDO with regard to Stanford matters.

7.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20th day of May 2011.

*/s/ Lisa A. Morris*
Lisa A. Morris

# BPO SUPPLEMENTAL APPENDIX – ITEM 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

THE OFFICIAL STANFORD INVESTORS     §
COMMITTEE,     §
    §
    Plaintiff,     §
    §
v.     §     Case No. _____
    §
CORT & CORT and     §
CORT & ASSOCIATES,     §
    §
    Defendants.     §
    §

## ORIGINAL COMPLAINT AGAINST
## CORT & CORT AND
## CORT & ASSOCIATES

### SUMMARY

1.     Revenue from the sale of fraudulent certificates of deposit ("CD Proceeds") generated substantially all of the income for the Stanford Defendants and the many related Stanford Entities (collectively, the "Stanford Parties") that were part of a massive Ponzi scheme.

2.     The Official Stanford Investors Committee (the "Committee) has identified payments of CD Proceeds totaling at least $1,113,553.53 from the Stanford Defendants to Cort & Cort and Cort & Associates (collectively, the "Cort Defendants").

3.     Through this lawsuit, the Committee[1] seeks the return of the CD Proceeds received directly or indirectly by the Cort Defendants in order to return the funds to the Receivership Estate and to make an equitable distribution to claimants. The Committee's investigation is

---

[1]     The Court-appointed Receiver, Ralph S. Janvey, has assigned all of the Receivership's claims against the Cort Defendants to the Official Stanford Investors Committee. The Committee's claims in this Complaint are related to claims on file in Case No. 03:09-CV-0724-N before this Court. Pursuant to Local Rule 3.3(a), the Committee has filed a notice of related case concurrently with this Complaint.

continuing, and should more payments of CD Proceeds to the Cort Defendants be discovered, the Committee will amend this Complaint to assert claims regarding such additional payments.

4.    The Cort Defendants either performed no services for the CD Proceeds they received; performed services that did not constitute reasonably equivalent value in exchange for the CD Proceeds they received; or performed only services that were in furtherance of the Ponzi scheme, which cannot be reasonably equivalent value as a matter of law. The Cort Defendants, further, cannot establish that they are good-faith transferees.

5.    Upon information and belief, at various times during the period in question, while the Cort Defendants received over $1 million of stolen CD Proceeds, Dr. Errol Cort ("Cort")acted as both an attorney with the Cort Defendants and served as a senior official in the government of Antigua and Barbuda, which purportedly was "regulating" Stanford's operations. Upon information and belief, from March 2004 until March 2009, Cort served as Antigua's Finance Minister and had direct oversight of the government's offshore banking regulator, the Financial Services Regulatory Commission ("FSRC"). Antigua's "regulation" of the Stanford entities was a sham.  In fact, FSRC Chairman Leroy King has been indicted by the U.S. Department of Justice and is currently awaiting extradition to the U.S.

6.    Cort has also served as the Chairman of the Eastern Caribbean Bank's Monetary Counsel, which approved the takeover of the Stanford-owned Bank of Antigua, and the subsequent distribution of ownership shares to the government of Antigua and Barbuda and 5 ECCB member banks—with no compensation to Stanford investors.  Ironically, it was Cort who made public statements reassuring the region of the financial stability of the Bank of Antigua in the days following the SEC's lawsuit against Stanford in February 2009.  Cort continues to serve

as an elected official in the Antiguan and Barbudan government and as the Minister of National Security.

7.     With the exception of the Bank of Antigua, at all times relevant to this complaint, the Stanford Parties were insolvent, and defendant R. Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme.  Each payment of CD Proceeds from the Stanford Parties to the Cort Defendants was made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

8.     The Committee was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities and after reviewing documents relating to the Stanford Entities.

9.     The Committee seeks an order that: (a) CD Proceeds received directly or indirectly by the Cort Defendants were fraudulent transfers under applicable law or, in the alternative, unjustly enriched the Cort Defendants; (b) CD Proceeds received directly or indirectly by the Cort Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Cort Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

### JURISDICTION & VENUE

10.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

11.     Within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Court-appointed Receiver filed the original SEC Complaint and the Order

Appointing Receiver in the United States District Court for the districts in Texas and in the United States District Court for the Western District of Tennessee, pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other district where the Complaint and Order have been filed.

12.    This Court has personal jurisdiction over the Cort Defendants pursuant to FED. R. CIV. P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

13.    Further, this Court has personal jurisdiction over Cort & Cort and Cort & Associates because they regularly conduct business in Texas and/or have engaged in continuous and systematic activities within Texas.

## THE PARTIES

14.    Plaintiff Official Stanford Investors Committee was formed by this Court on August 10, 2010. *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order)." As stated in the terms of the Committee Order, the Committee, through this Complaint, is prosecuting this action against the Cort Defendants for the benefit of the Receivership Estate and the Stanford Investors.

15.    Defendant Cort & Cort's principal place of business is in Antigua. It also has continuous and systematic contacts with Texas. Cort & Cort will be served pursuant to the Federal Rules of Civil Procedure, other rules for serving foreign entities, or by other means approved by the Court.

16.    Defendant Cort & Associates' principal place of business is in Antigua. It also has continuous and systematic contacts with Texas. Cort & Associates will be served pursuant to the Federal Rules of Civil Procedure, other rules for serving foreign entities, or by other means approved by the Court.

## STATEMENT OF FACTS

17.     On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. "Jim" Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB," "SIBL," or "the Bank"), Stanford Group Company, and Stanford Capital Management, LLC (collectively the "Stanford Defendants").

### I.     *Stanford Defendants Operated a Ponzi Scheme.*

18.     As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors through SGC financial advisors pursuant to a Regulation D private placement. SEC's Second Amended Complaint (Doc. 952), ¶ 27.[2] The CDs were sold by Stanford International Bank, Ltd. *Id.*

19.     The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning. Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio"). In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

---

[2]     Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.*, Civil Action No. 3-09-CV-0298-N.

20.     In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's

findings that the Stanford fraud was a Ponzi scheme. *See Janvey v. Alguire*, No. 10-10617, 2010

WL 5095506, at *1, *17 (5th Cir. Dec. 15, 2010) (upholding this Court's Order). In particular,

the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the
> Stanford enterprise operated as a Ponzi scheme.
>
>         *   *   *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient
> evidence to support a conclusion that there is a substantial
> likelihood of success on the merits that the Stanford enterprise
> operated as a Ponzi scheme. . . . The Davis Plea, when read as a
> whole, provides sufficient evidence for the district court to assume
> that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
>         *   *   *
>
> The Receiver carried his burden of proving that he is likely to
> succeed in his prima facie case by providing sufficient evidence
> that a Ponzi scheme existed . . . .
>
>         *   *   *
>
> Here, the Receiver provided evidence of a massive Ponzi
> scheme . . . The record supports the fact that Stanford, when it
> entered receivership, was grossly undercapitalized.

*Id.* at *9-13.

21.     In marketing, selling, and issuing CDs to investors, the Stanford Defendants

repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its

investment portfolio. SEC's Second Amended Complaint (Doc. 952), ¶¶ 32-33.

22.     In its brochure, SIB told investors, under the heading "Depositor Security," that

its investment philosophy is "anchored in time-proven conservative criteria, promoting stability

in [the Bank's] certificate of deposit." SIB also emphasized that its "prudent approach and

methodology translate into deposit security for our customers." *Id.* ¶ 34. Further, SIB stressed

*9*

the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors." *Id.*

23.    In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." *Id.* ¶ 35.  More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. *Id.*

24.    Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id.* ¶ 36.  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 49.

25.    Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities."  Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" – *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.).  In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least $1.6 billion in undocumented "loans" to Defendant R. Allen Stanford. *See id.* ¶¶ 39-40.

26. In an effort to conceal their fraud and ensure that investors continued to purchase the CDs, the Stanford Defendants fabricated the performance of SIB's investment portfolio. *Id.* ¶ 4.

27. SIB's financial statements, including its investment income, were fictional. *Id.* ¶¶ 4, 53. In calculating SIB's investment income, Stanford Defendants R. Allen Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.* Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id.*

28. For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs. *See id.* ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

29. Most of the above facts discovered from Stanford's records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

## II. The Stanford Parties Transferred CD Proceeds from the Ponzi Scheme to the Cort Defendants.

30. CD Proceeds from the Ponzi scheme described above were transferred by or at the direction of the Stanford Parties to the Cort Defendants. The Cort Defendants did not provide reasonably equivalent value for the transfers of CD Proceeds to them and cannot establish that they are good-faith transferees.

31.     The Committee has identified payments of CD Proceeds totaling at least $1,113,553.53 from the Stanford Parties to the Cort Defendants.

32.     The transfers of CD Proceeds to the Cort Defendants from the Stanford Parties consisted of at least the following: $227,746.00 in 2006; $305,828.77 in 2007; $529,978.76 in 2008; and $50,000.00 in 2009. *See* App.[3] at 1 (listing the dates and amounts of payments to the Cort Defendants from the Stanford Parties). The Committee's investigation is continuing, and should more payments of CD Proceeds to the Cort Defendants be discovered, the Committee will amend this Complaint to assert claims regarding such additional payments.

### REQUESTED RELIEF

33.     The Court appointed the Committee to represent Stanford investors in the case *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N and in related matters. Committee Order (Doc. 1149) at ¶ 2. The Committee Order, signed by the Court on August 10, 2010, states that "[t]he Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code" and that the Committee may bring actions for the benefit of the Receivership Estate and the Stanford Investors. *See* Committee Order (Doc. 1149) at ¶¶ 2, 7-8. The Committee seeks the relief described herein in this capacity.

### *COUNT I:* *The Committee is Entitled to Disgorgement of CD Proceeds Fraudulently Transferred to the Cort Defendants.*

34.     The Committee is entitled to disgorgement of the CD Proceeds transferred from the Stanford Parties to the Cort Defendants because such payments constitute fraudulent transfers under applicable law. The Stanford Parties made the payments to the Cort Defendants with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Committee is

---

[3]      The Appendix in Support of this Complaint is referred to herein as the "Appendix" or by the abbreviation "App." The Appendix is incorporated by reference into this Complaint.

entitled to the disgorgement of those payments. Additionally, the Stanford Parties transferred the funds to the Cort Defendants at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

35.     The Committee may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Alguire*, 2010 WL 5095506, at *9 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . . [P]roof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

36.     The Stanford Parties were running a Ponzi scheme and paid the Cort Defendants with funds taken from unwitting SIB CD investors. The Committee is, therefore, entitled to disgorgement of the CD Proceeds the Stanford Parties fraudulently transferred to the Cort Defendants.

37.     Consequently, the burden is on the Cort Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 ("A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration.") (emphasis in original); *see also Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly."). The Committee is, therefore, entitled to recover the full amount of the payments

that the Cort Defendants received — either directly or indirectly — unless they prove *both* objective good faith *and* reasonably equivalent value.

38.　　The good-faith element of this affirmative defense requires that the Cort Defendants prove objective, rather than subjective, good faith. *See Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard. The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted).

39.　　There is no evidence that the Cort Defendants provided any value — much less reasonably equivalent value — in exchange for the fraudulent transfers they received. Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value. *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'"). Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value." *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000). The Cort Defendants cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, they should be entitled to keep the over $1.1 million in CD Proceeds they received from the Stanford Parties. Because the Cort Defendants cannot meet

their burden to establish that they provided reasonably equivalent value for the payments of CD Proceeds to them, the Committee is entitled to the disgorgement of those funds.

40.     Moreover, under applicable fraudulent-transfer law, the Committee is entitled to attorneys' fees and costs for its claims against the Cort Defendants. *See, e.g.*, TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just."). As a result, the Committee requests reasonable attorneys' fees and costs for prosecuting its fraudulent-transfer claims against the Cort Defendants.

41.     The Cort Defendants cannot meet their burden to establish that they provided reasonably equivalent value for the CD Proceeds they directly or indirectly received from the Stanford Parties and that they received such payments in good faith. Accordingly, the Committee is entitled to the disgorgement of those funds.

42.     In order to carry out its duties, the Committee seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the Cort Defendants for the benefit of the Receivership Estate.

43.     The Committee was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities and after reviewing documents relating to the Stanford entities. Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See, e.g.*, *Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

44. The Stanford Parties, who orchestrated the Ponzi scheme, transferred the CD Proceeds to the Cort Defendants with actual intent to hinder, delay, or defraud their creditors. The Committee is, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to the Cort Defendants. Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by the Cort Defendants were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by the Cort Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Cort Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

**COUNT II: In the Alternative, the Committee is Entitled to Disgorgement of CD Proceeds from the Cort Defendants under the Doctrine of Unjust Enrichment.**

45. In the alternative, the Committee is entitled to disgorgement of the CD Proceeds paid to the Cort Defendants pursuant to the doctrine of unjust enrichment under applicable law. The Cort Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors. The Cort Defendants have been unjustly enriched by such funds, and it would be unconscionable for them to retain the funds.

46. In order to carry out its duties, the Committee seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the Cort Defendants for the benefit of the Receivership Estate.

47. The Cort Defendants have been unjustly enriched by their receipt of CD Proceeds from the Stanford Parties. The Committee is, therefore, entitled to disgorgement of all CD Proceeds the Cort Defendants received. Pursuant to the equity powers of this Court, the

Committee seeks an order that: (a) CD Proceeds received directly or indirectly by the Cort Defendants unjustly enriched the Cort Defendants; (b) CD Proceeds received directly or indirectly by the Cort Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the Cort Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

## PRAYER

48.     The Committee respectfully requests an Order providing that:

    (a)   CD Proceeds received directly or indirectly by the Cort Defendants were fraudulent transfers under applicable law or, in the alternative, unjustly enriched the Cort Defendants;

    (b)   CD Proceeds received directly or indirectly by the Cort Defendants are property of the Receivership Estate;

    (c)   CD Proceeds received directly or indirectly by the Cort Defendants are subject to a constructive trust for the benefit of the Receivership Estate;

    (d)   the Cort Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received;

    (e)   The Committee is awarded attorneys' fees, costs, and prejudgment and post-judgment interest; and

    (f)   The Court grants such other and further relief as the Court deems proper under the circumstances.

Dated: February 15, 2011                 Respectfully submitted,

                                         **STRASBURGER & PRICE, LLP**

                                         By: /s/ Edward F. Valdespino
                                             Edward F. Valdespino
                                             Texas Bar No. 20424700
                                             Edward.valdespino@strasburger.com
                                             300 Convent St., Suite 900
                                             San Antonio, Texas 78205
                                             (210) 250-6061
                                             (210) 258-2703 (Facsimile)

                                         **ATTORNEYS FOR**
                                         **THE OFFICIAL STANFORD INVESTORS COMMITTEE**


                                         **MORGENSTERN & BLUE, LLC**

                                             Peter D. Morgenstern (*admitted pro hac vice*)
                                             pmorgenstern@mfbnyc.com
                                             885 Third Avenue
                                             New York, New York 10022
                                             (212) 750-6776
                                             (212) 750-3128 (Facsimile)

                                         **ATTORNEYS FOR**
                                         **THE OFFICIAL STANFORD INVESTORS COMMITTEE**


                                         **CASTILLO SNYDER, P.C.**

                                             Edward C. Snyder
                                             Texas Bar No. 00791699
                                             esnyder@casnlaw.com
                                             Bank of America Plaza, Suite 1020
                                             300 Convent Street
                                             San Antonio, Texas 78205
                                             (210) 630-4200
                                             (210) 630-4210 (Facsimile)

                                         **ATTORNEYS FOR**
                                         **THE OFFICIAL STANFORD INVESTORS COMMITTEE**

# CERTIFICATE OF SERVICE

On February 15, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve Cort & Cort and Cort & Associates individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Edward F. Valdespino____
Edward F. Valdespino

496835.2/SPSA/23832/0101/021511

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. _____ |
| CORT & CORT and CORT & ASSOCIATES, | § § § | |
| Defendants. | § § § § | |

---

**APPENDIX IN SUPPORT OF**
**ORIGINAL COMPLAINT AGAINST**
**CORT & CORT AND**
**CORT & ASSOCIATES**

---

Dated: February 15, 2011

Respectfully submitted,

**STRASBURGER & PRICE, LLP**

By: /s/ Edward F. Valdespino
   Edward F. Valdespino
   Texas Bar No. 20424700
   Edward.valdespino@strasburger.com
   300 Convent St., Suite 900
   San Antonio, Texas 78205
   (210) 250-6061
   (210) 258-2703 (Facsimile)

**ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE**


**MORGENSTERN & BLUE, LLC**

   Peter D. Morgenstern (*admitted pro hac vice*)
   pmorgenstern@mfbnyc.com
   885 Third Avenue
   New York, New York 10022
   (212) 750-6776
   (212) 750-3128 (Facsimile)

**ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE**


**CASTILLO SNYDER, P.C.**

   Edward C. Snyder
   Texas Bar No. 00791699
   esnyder@casnlaw.com
   Bank of America Plaza, Suite 1020
   300 Convent Street
   San Antonio, Texas 78205
   (210) 630-4200
   (210) 630-4210 (Facsimile)

**ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE**

## CERTIFICATE OF SERVICE

On February 15, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve Cort & Cort and Cort & Associates individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Edward F. Valdespino
Edward F. Valdespino

**Payments to Cort & Cort and Cort & Associates:**

| | | |
|---|---|---|
| 5/12/2006 | $ | 25,000.00 |
| 8/10/2006 | $ | 75,000.00 |
| 8/18/2006 | $ | 1,700.00 |
| 8/23/2006 | $ | 1,046.00 |
| 9/1/2006 | $ | 25,000.00 |
| 9/28/2006 | $ | 25,000.00 |
| 11/1/2006 | $ | 25,000.00 |
| 12/1/2006 | $ | 25,000.00 |
| 12/19/2006 | $ | 25,000.00 |
| 1/5/2007 | $ | 5,130.19 |
| 1/12/2007 | $ | 25,000.00 |
| 1/19/2007 | $ | 416.71 |
| 2/1/2007 | $ | 25,000.00 |
| 2/16/2007 | $ | 148.82 |
| 2/21/2007 | $ | 148.82 |
| 3/1/2007 | $ | 25,000.00 |
| 3/14/2007 | $ | 133.45 |
| 3/30/2007 | $ | 25,000.00 |
| 5/1/2007 | $ | 25,000.00 |
| 6/1/2007 | $ | 25,000.00 |
| 7/4/2007 | $ | 25,000.00 |
| 8/1/2007 | $ | 25,000.00 |
| 9/3/2007 | $ | 25,000.00 |
| 10/1/2007 | $ | 25,000.00 |
| 11/2/2007 | $ | 25,000.00 |
| 12/4/2007 | $ | 25,000.00 |
| 1/11/2008 | $ | 185.52 |
| 1/31/2008 | $ | 25,000.00 |
| 2/11/2008 | $ | 25,000.00 |
| 3/10/2008 | $ | 25,000.00 |
| 4/7/2008 | $ | 25,000.00 |
| 5/8/2008 | $ | 25,000.00 |
| 6/2/2008 | $ | 25,000.00 |
| 7/9/2008 | $ | 25,000.00 |
| 8/1/2008 | $ | 225,361.02 |
| 8/7/2008 | $ | 25,000.00 |
| 9/10/2008 | $ | 1,222.22 |
| 9/15/2008 | $ | 25,000.00 |
| 11/19/2008 | $ | 25,000.00 |
| 11/21/2008 | $ | 810.00 |
| 11/24/2008 | $ | 25,000.00 |
| 12/4/2008 | $ | 25,000.00 |

4

| | | |
|---|---|---:|
| 12/17/2008 | $ | 2,400.00 |
| 1/5/2009 | $ | 25,000.00 |
| 2/4/2009 | $ | 25,000.00 |
| **TOTAL** | **$** | **1,113,553.53** |

496837.1/SPSA/23832/0101/021511