IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § § | |
| Defendants. | § | |

**ORDER**

This Order addresses nonparty movants Katherine Burnell, Ursula Mesa, Marcelo Avila-Orejuela, and Steven Graham's (collectively, "Movants") motion to intervene and for appointment to the Official Stanford Investors Committee (the "Committee") [1393].[1] Because the Court finds that several parties already adequately represent the Movants' interests, the Court denies the motion.

**I. ORIGINS OF THE MOVANTS' MOTION TO INTERVENE**

The Movants, four former investors in an alleged Ponzi scheme run by R. Allen Stanford, his associates, and various entities under Stanford's control (the "Stanford Defendants"), seek intervention and "appointment to the Committee on behalf of themselves and as representatives for investors with over 500 Stanford accounts," styled collectively as the "KLS Stanford Victims."[2] Mot. at 2. The Movants request intervention for two broad

---

[1] The Court references the Movants as identified on the first page of their motion.

[2] KLS is short for "Kachroo Legal Services," a law firm representing the Movants.

ORDER – PAGE 1

reasons. The Movants first attack the Receivership's efficiency. According to the Movants, the Receiver has failed in his asset recovery efforts, instead lavishing exorbitant payments on his lawyers, forensic accountants, and other retained professionals to the detriment of the Movants' hopes for recovery. *See, e.g.*, *id.* at 3-4. Second, the Movants argue that the Committee suffers from several conflicts of interest that preclude it from adequately representing the Movants and other former Stanford investors' interests. As examples, the Movants point to, among other things, the fact that other investors' attorneys comprise a majority of the Committee's membership and that the same attorneys have entered into a contingency fee arrangement with the Receiver to prosecute certain asset-recovery actions on his behalf. *See, e.g.*, *id.* at 4-6. The Movants now request intervention as of right under Federal Rule of Civil Procedure 24(a)(2) or, alternatively, for permissive intervention under Rule 24(b). The Court addresses these potential grounds for intervention in turn below.

## II. THE EXISTING PARTIES ADEQUATELY PROTECT THE MOVANTS' INTERESTS

A putative intervenor under Rule 24(a)(2) must meet four requirements: "(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; [and] (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *Haspel & Davis Milling & Planting Co. Ltd. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007) (citation omitted). A movant's failure to satisfy any one of the requirements precludes intervention as a matter of right. *Id.*

(citation omitted). The party seeking to intervene bears the burden of establishing inadequate representation. *Id.*

Even if the Movants' request meets the first three requirements, it founders on the last. The Court finds that the SEC, the Receiver, the Examiner, and the Committee all adequately represent the Movants' interests. The Movants make no credible showing to the contrary.

### *A. The Movants Fail to Rebut the Presumption of Adequate SEC Representation*

As an initial matter, the SEC's presence as Plaintiff in this action creates a presumption of adequate representation. *See Baker v. Wade*, 743 F.2d 236, 241 (5th Cir. 1984) (holding that when a government entity is a party, it is presumed that the government adequately represents the interests of the public); *see also Johnson v. City of Dallas*, 155 F.R.D. 581, 586 (N.D. Tex. 1994) (holding that "where, as here, the existing representative in the suit is the government, there is a presumption of adequate representation which may be overcome . . . only upon a showing of adversity of interest, the representative's collusion with the opposing party, or nonfeasance by the representative"). Although the Movants lodge a litany of allegations against the Receiver, the Examiner, and the Committee, they make no specific allegations explaining how the SEC provides inadequate representation. The Movants do conclusorily argue that the adequate-representation presumption does not apply because they have "effectively allege[d] substantial waste and nonfeasance." *See* Mot. at 10. But, they fail to connect those generic allegations to the SEC, let alone show that it has engaged in nonfeasance, collusion, and waste, or somehow stands adverse to the Movants. The Court therefore finds that the SEC adequately represents the Movants' interests.

### *B. The Movants Fail to Show Inadequate Representation as to Other Parties*

The Movants aim their waste, nonfeasance, and adversity allegations at the Receiver, the Examiner, and the Committee. The Movants, however, also fail to carry their burden as to those parties.

*1. The Receiver Has Competently Discharged His Duties.* — To begin with, the Movants' allegations against the Receiver lack merit. The Court does not dispute that the Receivership has spent a substantial amount of money. But, the Movants are simply wrong that the "Receiver has generously expended $118.2 million upon attorneys and himself, among others," yet only "recovered for investors $119.7 million." Mot. at 1. Based on the Receiver's last-filed interim report [1236], the Receivership Estate had $94.7 million in cash deposits and an additional $26.5 million in other assets on hand as of January 31, 2011. *See* Interim Report App. Ex.1 at 2 [1237]. Since its inception, the Receivership has had total cash inflows of $188.3 million. *Id.* Contrary to the Movants' claim, only about 25% of that amount, or $46.2 million, has been spent on professional fees and expenses. *Id.* Moreover, the rate of expenditures on professional fees has decreased markedly over time, with the bulk of such expenses incurred relatively early in the Receivership. *See, e.g.*, Examiner and Committee's Resp. at 16 (the "Joint Response") (noting that, as of March 31, 2011, approximately 85% of professional fees and expenses were incurred before the Committee's formation in August 2010); Interim Report at 15 (noting that the Receiver reduced the Stanford entities' average monthly operating expenses from over $30 million per month pre-Receivership to less than $500,000 per month by late 2009 and to approximately $250,000 by January 2011).

The Movants make much of the Receiver's obtaining $63.1 million simply by taking control of various Stanford accounts upon his appointment. Interim Report App. at 2. They, however, ignore that he then was forced to spend $47.4 million just in winding down the Stanford empire, *id.*; *see also* Interim Report at 15, which consisted of "130 separate Stanford entities employing over 3,000 employees located across the U.S., Europe, the Caribbean, Canada, and Latin America." Receiver's Resp. at 2 [1423]. As the Receiver notes, that process necessarily entailed making expenditures that the Receivership Estate was legally obligated to pay, including "taxes, payroll obligations, lease obligations, maintenance fees for various personal and real property holdings, and other [mandatory] expenditures." *Id.* at 1. Had the Receiver opted against paying those expenses, the money saved would not have redounded to the Receivership Estate's benefit. The most likely outcome would have been to create additional – almost certainly meritorious – claims against the Estate that would have required the Receiver futilely to expend even more funds in litigation.

The Court, moreover, has reviewed the Receiver's fee applications and ultimately found that each claimed an amount justified under the fee-review factors outlined in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).[3] From the beginning, the Receivership has been involved in litigation, and the amount of litigation

---

[3] (1) the time and labor required to litigate the case, (2) the novelty and difficulty of the questions involved, (3) the skill required to litigate the case, (4) whether taking the case precluded the attorney from other employment, (5) the customary fee for similar work in the community, (6) the fee or percentage of recovery the attorney quoted to the client, (7) whether the client or case required expedited legal work, (8) the amount involved and results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirabilty" of the case, (11) the nature and length of the attorney-client relationship, and (12) awards made in similar cases.

continues to grow. The Court now has pending before it almost one hundred Stanford-related cases. Despite the Movants' protestations about "boilerplate actions," *see, e.g.*, Mot. at 11, several of those cases raise complex legal issues, sometimes of first impression or for which little authority exists. *See, e.g.*, *Janvey v. Democratic Senatorial Campaign Committee*, 2011 WL 2466156 (N.D. Tex. 2011) (Godbey, J.) (addressing unsettled limitations issues under the Texas Uniform Fraudulent Transfer Act and novel federal campaign finance-related preemption arguments).[4] Even so, the Receiver's retained professionals discount their fees, and the Court has ordered a 20% holdback on top of that amount. Plus, as the Receiver and Committee prosecute asset-recovery actions, there remains the possibility that some defendants will pay a portion of the Receiver's attorneys fees and expenses in those cases.

The Receiver's professionals, furthermore, collectively have spent tens of thousands of hours on Receivership-related business. In addition to pursuing litigation, the Receiver continues tracking down Receivership Estate assets across the globe and taking actions to secure those funds for ultimate distribution to the Stanford Defendants' alleged victims. *See, e.g.*, Order of Apr. 6, 2011 [1315] (directing the Receiver to use Hague Convention procedures to identify contents of some of the Stanford Defendants' Swiss bank accounts); *Janvey v. Libyan Investment Auth.*, Civil Action No. 3:11-CV-1177-N (N.D. Tex. filed June 3, 2011) (action to recover nearly $55 million in assets allegedly traceable to the Estate and in the possession of investment firms related to the Libyan government). Among other things,[5] that process involves the use of significant forensic accounting resources, and the

---

[4]The Receiver obtained a $1.7 million judgment in that case.

[5]Such as managing the Estate's investment portfolio and arranging asset sales.

ORDER – PAGE 6

Receiver's forensic accountants have produced voluminous reports concerning their analyses of the Stanford Defendants' cash flows. Given the alleged scheme's long history, international scope, and deliberate complexity, that has meant poring over records related to millions of transactions spanning at least two decades and dozens of countries. Notably, the Fifth Circuit and another district court have commended the Receiver's forensic accounting professionals, stating that their work "provide[s] clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme," *Janvey v. Alguire*, 2011 WL 2937949, at *10 (5th Cir. 2011), and reflects an "extraordinarily detailed analysis." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 751 F. Supp. 2d 876, 881 n.10 (S.D. Tex. 2010). Among other things, that evidence is crucial to the Receiver's ability to prosecute asset recovery actions successfully.

In light of the above – and many other matters that the Court has omitted – whatever other courts might have to say about the reasonableness of other professional fees in other receivership cases,[6] the Court reiterates, as it implicitly has in almost every fee application order, that the Receiver's professional fees and expenses generally have been spent gainfully and billed reasonably. Although the Receivership process has yet to reach the point where the Receiver will distribute funds to the Stanford Defendants' alleged victims,[7] the Receiver and his professionals continue to work toward that end. If precedent is any indication, their work remains far from over. *See, e.g., SEC v. Wencke*, 742 F.2d 1230 (9th Cir. 1984) (case

---

[6]*See* Mot. at 11 (citing *United States v. Petters*, U.S. Dist. LEXIS 44177, at *5-6 (D. Minn. 2010)). *Petters* disapproved of attorneys' fees in the $500 per hour range.

[7]Though the Court is optimistic that the Receiver may soon be able to commence interim distributions to creditors.

ORDER – PAGE 7

concerning receivership then in its seventh year). Accordingly, the Court finds no support for the Movants' waste- and nonfeasance-related grounds for intervention.

***2. The Receiver, the Examiner, and the Committee Are Not Adverse to the Movants' Interests.*** — The Movants' adversity-related complaints focus primarily on the Committee's composition. The Committee has seven members: the Examiner, two former Stanford investors, and four attorneys representing large groups of former Stanford investors (the "Attorney Members"). According to the Movants, the fact that the Committee consists of five attorneys,[8] some of whom depend in various ways on the Receivership process for compensation,[9] prevents it from providing "disinterested and independent" representation of the Movants' interests. Mot. at 7. Because at least three of the Movants have international connections, the Movants also contend that they will add a currently-missing international perspective to the Committee's deliberations.

The Court disagrees. The manner in which the Examiner and the Attorney Members are paid is of no moment. The Examiner receives payment only after first garnering Court approval of periodic fee applications. Although three of the Attorney Members do receive compensation directly from the Receivership process – via a 25% contingency fee earned by successfully prosecuting various asset recovery actions[10] – they represent the interests of all

---

[8]The Examiner, John J. Little, is also an attorney.

[9]Attorney Member Pinto Tabini neither prosecutes actions for the Receivership Estate nor receives compensation for his Committee service. *See* Joint Resp. at 17.

[10]The Court finds the 25% contingency fee reasonable not only because it is earned upon the successful conclusion of asset recovery actions benefitting the Receivership Estate, but also because it represents a significant downward departure from contingency fees charged by attorneys of like skill in cases of similar scope and complexity. None of the

ORDER – PAGE 8

Stanford investors in a fiduciary capacity. *See* Order of Aug. 10, 2010, at 4 (authorizing the Committee's formation and imposing fiduciary duties on its members) (the "Committee Order") [1149]. The Attorney Members' own clients also have several legal remedies at their disposal should they feel that the Attorney Members engage in self-dealing or provide subpar representation. To the Court's knowledge, none of the Attorney Members' numerous clients has felt the need to resort to such measures. Moreover, to the extent the Movants' believe that some Attorney Members' reliance on the Receivership process for compensation has silenced their opposition to the Receiver's fee applications, the Committee Order specifically gives responsibility for policing the Receiver's fees to the Examiner. *See* Committee Order at 5 ("[T]he Examiner has responded to each of the Receiver's previous fee applications and will, in consultation with the Committee, continue to file responses to future fee applications, when he considers it appropriate to do so; therefore, the Committee will not lodge separate responses or objections to the Receiver's future fee applications.").

In lumping all attorneys on the Committee into one group, the Movants also unjustifiably discount the protective role played by the Court's appointed Examiner. The Court has directed the Examiner to present neutrally to the Court the interests of all Stanford investors. In that capacity, the Examiner may seek relief on behalf of the investors by making reports and recommendations to the Court, filing briefs in any Stanford-related action,[11] and conducting investigations. In doing so, the Examiner may utilize the full

---

Movants, furthermore, filed objections to the Receiver and the Committee's litigation arrangement when it was proposed [1207 & 1208].

[11]*See, e.g.*, Examiner's *Amicus* Brief [67] *in Roland v. Green*, Civil Action No. 3:10-CV-0224-N (N.D. Tex. transferred from MDL Panel Feb. 4, 2010) (discussing legislative

ORDER – PAGE 9

panoply of discovery mechanisms available under the Federal Rules of Civil Procedure. Other than criticizing the Examiner's modest fee requests, the Movants neither offer a substantive objection to his representation nor provide any argument as to how their presence will augment the Examiner's duties.

Finally, the Court finds no substance to the Movants' assertion that the Committee somehow shortchanges the viewpoints of non-U.S. former Stanford investors. Angela Shaw Kogutt, one of the Committee's investor members, founded and currently directs the Stanford Victims Coalition ("SVC"). *See* Joint Resp. App. Ex. E at 33 (Kogutt Decl.) [1422]. "[M]ore than 4,000 registered members (all Stanford CD investor victims) in 38 states . . . and in 50 countries" make up the SVC. *Id.* And, as noted above, the Examiner acts as an ombudsman for *all* former Stanford investors.

The Attorney Members also all represent international perspectives. Among other places, Attorney Member Morgenstern's nearly 750 former investor clients hail "from the countries of Mexico, Venezuela, Colombia, and Peru" and lost nearly $330 million to the Stanford Defendants' alleged scheme. *Id.* Ex. B. at 25. "Roughly 90% or 95%" of Attorney Member Snyder's almost 430 clients "reside in Mexico or are of Mexican nationality" and have claims totaling over $250 million. *Id.* Ex. C at 28. Attorney Member Valdespino represents over 2,300 clients in "Mexico, Venezuela, Colombia, Peru, Costa Rica, the Dominican Republic, Ecuador, and Spain" who collectively lost about $519 million. *Id.* Ex. D. at 30-31. Finally, the Committee avers that Attorney Member Pinto Tabini "represents

---

history of the Securities Litigation Uniform Standards Act ("SLUSA") and urging the Court to not dismiss under SLUSA a state-law securities fraud action filed by former Stanford investors in Louisiana).

ORDER – PAGE 10

several hundred Stanford investors who are citizens of Peru, Ecuador and other South American countries," Joint Resp. at 15, and the Movants do not argue otherwise.

Against this, the Movants fail to present any evidence suggesting that the current Committee members are incapable of representing international investors' interests, let alone what different perspectives the Movants intend to provide. Instead, they simply assert that they will provide "needed voice[s] to the Committee." Mot. at 7. That is not sufficient to justify granting the Movants' request.

In sum, the Movants present no evidence suggesting that the SEC, the Receiver, the Examiner, and the Committee provide inadequate representation of the Movants' interests. Accordingly, the Movants fail to show that they are entitled to intervention under Rule 24(a).[12]

### III. THE MOVANTS DO NOT QUALIFY FOR PERMISSIVE INTERVENTION

The Movants also contend that they qualify for permissive intervention under Rule 24(b) because no one else has "rais[ed] the significant concerns shared by Movants and all

---

[12]As this Court has noted in denying other former Stanford investors' motions to intervene, the Receiver's interests inherently align with the interests of putative intervenors who are also creditors of Stanford or potential victims of fraud. *See SEC v. Cook*, 2001 WL 256172, at *2 (N.D. Tex. 2001) (holding that "receiver represents not only the entity in receivership, but also the interests of its creditors" because "the very purpose of receivership is to secure the assets of the corporation for ultimate payment to the creditors") (citations omitted). Those assets will eventually be paid out in the Receivership's administrative claims process, which remains an avenue of recovery for the Movants. *Cf. SEC v. Funding Res. Grp.*, 2000 WL 1468823, at *4 n.9 (5th Cir. 2000) (noting, in post-Ponzi scheme receivership, that the availability of an orderly claims disposition procedure militates against intervention); *United States v. Alisal Water Corp.*, 370 F.3d 915, 924 (9th Cir. 2004) (affirming denial of intervention in part because of claim procedures established by receiver). If the Movants believe that the administrative claims process inadequately protects their interests, they remain free to petition the Examiner to present their arguments to the Court.

ORDER – PAGE 11

KLS Stanford Victims regarding the substantial fees that are draining the estate" or "challeng[ed] the contingency fee arrangement, the operation of the receivership and otherwise voic[ed] concern over the ineffectiveness of this receivership." Mot. at 12. Under Rule 24(b), a court may allow a party to intervene if it meets three requirements. The movant must (1) timely apply to intervene; (2) bring a claim or defense that shares a common question of law or fact with the main action; and (3) show that intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(1), (3). "In acting on a request for permissive intervention, it is proper to consider, among other things, whether the intervenors' interests are adequately represented by other parties and whether they will significantly contribute to full development of the underlying factual issues in the suit." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 472 (5th Cir. 1984) (citations and internal quotation marks omitted). "Rule 24(b) necessarily vests broad discretion in the district court to determine the fairest and most efficient method of handling a case with multiple parties and claims." *SEC v. Everest Mgmt. Co.*, 475 F.2d 1236, 1240 (2d Cir. 1972).

As a general matter, the Movants' failure to show inadequate representation under Rule 24(a) also disposes of their permissive intervention request. The Movants also do not establish that intervention will enhance the protections already built into the Receivership process and not unduly delay this proceeding. Significantly, the Examiner and a large number of investors, acting through their representatives, oppose the Movants' request. In addition to the Examiner and the Committee's Joint Response, two groups representing several hundred former Stanford investors independently filed objections to the Movants'

ORDER – PAGE 12

motion. *See* Opp'n filed by Malouf & Nockels, LLP, and Joined by the "Louisiana Retiree" Investors [1426 & 1427]. Among other things, these investors note that they previously have raised some of the same issues underlying the Movants motion, that the current parties' responses have been satisfactory, and that the Movants' need not be part of the Committee to have their concerns addressed.

The Court agrees. The Movants essentially demand intervention and appointment to the Committee based on disagreements apparently shared by few other investors.[13] To allow intervention on that basis would justify intervention – with its Estate asset-draining concomitant rounds of briefing – and enlargement of the Committee anytime a faction of investors becomes displeased with some aspect of the Receivership. The Receivership process is unwieldy enough as it stands, and it has been slowed by a variety of factors beyond the parties' control. An additional layer of overhead will not help. The Court therefore finds that "the fairest and most efficient method" of addressing the issues raised by the Movants' requires that the Movants channel their concerns through the SEC, the Receiver, the Examiner, or the Committee, any one of which stands in a position to address the Movants' concerns.

## CONCLUSION

The Court sympathizes with the Movants' desire that the Receivership recover the greatest amount of funds and conclude at the earliest possible date. But that desire – shared by all investors and the Court – cannot serve by itself as the basis for intervention or

---

[13]Indeed, no investors have notified the Court that they support the Movants' and "KLS Stanford Victims" request.

ORDER – PAGE 13

appointment to the Committee. Those things depend on the Movants demonstrating that the multiple layers of representation provided already by the SEC, the Receiver, the Examiner, and the Committee provide inadequate protection of the Movants' interests. Because the Movants fail to make that showing, the Court finds that the established Receivership process and existing parties adequately protect and represent the Movants' interests. Accordingly, the Court denies the Movants' motion.

Signed November 14, 2011.

_____
David C. Godbey
United States District Judge

ORDER – PAGE 14