IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § § | |
| Defendants. | § § | |

**<u>ORDER</u>**

This Order addresses Defendant R. Allen Stanford's motion to dismiss [1018].  For the following reasons, the Court denies the motion.

### I. ORIGINS OF THE SEC ACTION

On February 17, 2009, the Securities and Exchange Commission ("SEC") filed this federal securities enforcement action.  Compl. [1].  Among others, the SEC named as a Defendant R. Allen Stanford, the chairman of the board and sole owner of Stanford International Bank, Ltd. ("SIB") and sole owner and director of Stanford Financial Group Co. ("SFG"), parent company of Stanford Group Co. ("SGC").  Second Am. Compl. 5, 7 [952].  The SEC alleges that Stanford, "through entities under [his] control," executed a massive Ponzi scheme.  *Id.* at 1.  As part of that scheme, Stanford allegedly sold "self-styled" certificates of deposit ("CDs") to investors by providing them materially false and misleading information, *id.* at 1-2, took more than $1.6 billion of company monies as personal "loans"

even as few, if any, payments were made, *id.* at 10-11, and bribed the chief executive officer of Antigua's Financial Services Regulatory Commission ("FSRC") to "look[] the other way" in lieu of examining SIB's investment portfolio. *Id*. at 2-3. The SEC contends that as a result of the alleged scheme, Stanford was able to misappropriate billions of dollars of investors' money for his personal use. *Id.* at 10.

Stanford now moves to dismiss for lack of subject matter jurisdiction, failure to state a claim, failure to plead fraud with particularity, and improper venue. The Court addresses each in turn.

## II. THE COURT HAS SUBJECT MATTER JURISDICTION

Stanford first moves to dismiss under Rule 12(b)(1), contending that SIB's CDs are not "securities" under the federal securities laws and therefore do not fall under the SEC's regulatory power or the Court's subject matter jurisdiction. Stanford's Mem. Law Supp. Mot. Dismiss Pl.'s Second Am. Compl. 4-5 [1019].

The Fifth Circuit has held that "a question of whether certain transactions are securities within the meaning of the federal securities laws should not be determined on a motion to dismiss for lack of subject matter jurisdiction unless the complaint fails to meet the standards of *Bell v. Hood*[, 327 U.S. 678 (1946)]." *Meason v. Bank of Miami*, 652 F.2d 542, 547 (5th Cir. 1981). Under *Bell v. Hood*, "a complaint should not be dismissed for lack of subject matter jurisdiction unless the federal claim is 'immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Id.* at 546 (quoting *Bell*, 327 U.S. at 682-83, omission in *Meason*). Where a claim meets the *Bell v.*

*Hood* standard, a court should assume jurisdiction and then proceed to examine the substantive merits of the claim, essentially converting the issue into a Rule 12(b)(6) challenge.[1]

The Court finds that the SEC's claims meet the *Bell v. Hood* standard. They are not immaterial and made solely for the purpose of obtaining federal jurisdiction and are not wholly insubstantial and frivolous. Accordingly, the Court assumes subject matter jurisdiction and addresses the security status of the CDs in its Rule 12(b)(6) discussion below.

### III. THE SEC STATES VALID CLAIMS

Stanford next moves to dismiss under Rule 12(b)(6). As discussed above, he argues that SIB's CDs are not securities under the federal securities laws. He also argues that the SEC has failed to state claims under section 10(b) and Rule 10b-5 of the Securities Exchange Act, section 17(a) of the Securities Act, and sections 206(1) and 206(2) of the Investment Advisers Act because it has failed to allege scienter and failed to show that Stanford is an "investment adviser." Stanford's Mem. 10-11.

---

[1]*See Garcia v. Copenhaver*, *Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1258 (11th Cir. 1997) ("[T]he proper procedure for a district court is to assume jurisdiction and utilize the standards associated with a [Rule] 12(b)(6) motion . . . ."); *see also Rhoades v. United States*, 950 F. Supp 623, 628-29 (1996) ("The Supreme Court has made it clear that in that situation no purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim." (quoting *Williamson*, 645 F.2d 404, 415 (5th Cir. 1981)).

### *A. Rule 12(b)(6) Standard*

When faced with a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). According to the Supreme Court, a viable complaint must include "enough facts to state a claim to relief that is plausible on its face," i.e., "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). A plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

As the Supreme Court recently observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*,] 490 F.3d 143, 157-158 [(2d Cir. 2007)]. But where the well-pleaded

> facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).
>
> In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949-50.

In ruling on a Rule 12(b)(6) motion, the Court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

### B. SIB's CDs Are Securities Under the Federal Securities Laws

The plain language of the federal securities laws states that a CD is a security "unless the context otherwise requires."[2] The Supreme Court found such a context in *Marine Bank v. Weaver*, 455 U.S. 551 (1982), where it held that CDs issued by a U.S. bank were not securities because they were subject to a "comprehensive set of regulations." *Id.* at 558. The Court reasoned that it was "unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of [the] bank certificates . . . [were] abundantly protected under the federal banking laws." *Id.* at 559.

---

[2] 15 U.S.C. § 78c(a)(10) ("When used in this chapter, unless the context otherwise requires – . . . (10) The term 'security' means any . . . certificate of deposit . . ."); *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990) ("We have consistently held that '[t]he definition of a security in § 3(a)(10) of the 1934 Act . . . is virtually identical [to the definition in the Securities Act of 1933] and . . . the coverage of the two Acts may be considered the same.'" (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1975))).

But, the Court reminded, "[i]t does not follow that a certificate of deposit . . . invariably falls outside the definition of a 'security' . . . . Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Id.* at 561 n.11. The Supreme Court later specifically articulated the four-factor family resemblance test that the Court applies here[3]: (1) the motivation of the parties, (2) the plan of distribution, (3) the reasonable expectations of the investing public, and (4) the existence of factors which would reduce the risk of the instrument. *Reves*, 494 U.S. at 66-67. The Court addresses each factor in turn.[4]

---

[3]Stanford argues that *Reves* did not displace *Weaver*'s test for certificates of deposit since the *Reves* test was articulated in the context of "notes." *See* Stanford's Reply 2-3. However, in adopting the family resemblance test, the *Reves* Court noted that that test followed "the same general approach" as the "investment versus commercial" test. The Fifth Circuit had previously held in *Meason* that the commercial versus investment test should be applied to certificates of deposit. *Meason*, 652 F.2d at 551. Accordingly, in this Circuit post-*Reves*, the family resemblance test is to be applied to both notes and certificates of deposit.

[4]In support of his motion to dismiss, Stanford makes much of the fact that the CDs were issued by a foreign-regulated bank, arguing that under *Weaver* and various circuits' caselaw this is dispositive. Stanford's Mem. 5-6; Stanford's Reply 3 (citing *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 827 (9th Cir. 1987); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1125 n.33 (5th Cir. 1985); *Wolf v. Banco Nacional de Mexico*, 739 F.2d 1458, 1462 (9th Cir. 1984)). The Court disagrees. In holding that CDs in a U.S.-regulated bank were not securities in *Weaver*, the Supreme Court found it significant that the CDs were "abundantly protected under the [U.S.] federal banking laws." *Weaver*, 455 U.S. at 559. Although the Ninth Circuit, in *Wolf*, extended *Weaver*'s holding to a foreign-regulated bank – holding that the CDs at issue there were not securities because the issuing bank was subject to Mexico's regulatory system – this does not mean that every CD issued by a foreign-regulated bank is not a security. The *Wolf* Court did not question the level of protection afforded by foreign regulation in that case because "it was *conceded* that the Mexican government's regulation . . . provides its certificate holders the same degree of protection against insolvency as does the federal system in this country." *Wolf*, 739 F.2d at 1463 (emphasis added). A later Ninth Circuit case supports the idea that courts must look into the

The first consideration is "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]." *Lebrun v. Kuswa*, 24 F. Supp. 2d 641, 646 (E.D. La. 1998). "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit that the note is expected to generate, then the instrument is likely to be a 'security.'" *Id.* (quoting *Reves*, 455 U.S. at 66). Here, the SEC has alleged that Stanford, by and through his companies, solicited investors to buy SIB CDs, touting abnormally high returns purportedly due to SIB's reinvestment in a "globally diversified portfolio" of assets. *See* Second Am. Compl. 8, 13. It is clear from the pleadings that the buyers' purposes in purchasing SIB CDs

---

adequacy of foreign regulatory systems to determine whether CDs are securities. *See West*, 807 F.2d at 828. Although in *West* the Ninth Circuit, citing the Act of State Doctrine, declined to "examine the actual operations of the regulatory system to the extent that such inquiry would directly implicate the failure . . . of officers of the foreign state to enforce their own laws," *id.*, the *West* Court made clear that "'the trial court must hear evidence on the *degree of protection that [foreign regulatory] structure* offers a depositor against insolvency.'" *Id.* (citing *Wolf*, 739 F.2d at 1463) (emphasis added). Thus, in determining the security status of CDs, courts must at minimum analyze the adequacy of the foreign regulatory structure, and once finding the structure inadequate to protect purchasers, should apply the appropriate test of security status.

On the basis of the Second Amended Complaint and the evidentiary record, this case falls within *West*'s carve-out for inadequate foreign regulation. Although the SEC alleges that SIB bribed an Antiguan regulator to "look[] the other way," Second Am. Compl. 2, it also argues that "Antiguan regulation is a far cry from providing the 'virtual guarantee'" central to the Supreme Court's decision in *Weaver* and the Ninth Circuit's decisions in the Mexican bank cases. Pl.'s Opp'n 7 n.4. As an example, it points to the FSRC oversight policy which did not include independent verification of SIB's financials. *Id.* at 7. This sufficiently calls into question the degree of protection that the Antiguan regulatory system offered SIB's investors. As such, the Court goes on to apply the family resemblance test.

The Court also notes that it is not entirely clear that the Act of State Doctrine applies, but that even if it does, at this early stage, the SEC has sufficiently questioned the adequacy of the Antiguan regulatory system (and not just the Antiguan officials' enforcement).

was to make a profit – i.e., to take advantage of the abnormally high returns. Additionally, Stanford's purported purpose in selling the CDs was to reinvest the money into a "globally diversified portfolio." Thus, factor one favors security status.[5]

Factor two requires an analysis of the plan of distribution. The Court notes that it is not determinative that the CDs were not publicly distributed. In fact, "[a] debt instrument may be distributed to but one investor, yet still be a security . . . ." *Lebrun*, 24 F. Supp. 2d at 647 (quoting *Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1489 (5th Cir. 1997)). "[A]n offering and sale to a 'broad segment of the public' [is] all that [is] necessary to establish the requisite 'common trading' in an instrument . . . ." *Id.* (quoting *Reves*, 494 U.S. at 68). Here, the SEC alleges that Stanford, through SIB, sold more than $7.2 billion in CDs by the end of 2008. Second Am. Compl. 1. It also alleges that Stanford, through SIB, marketed the CDs to U.S. investors through SGC advisers with the aid of a CD marketing brochure. *See id.* at 7, 9. Upon sale of the CDs, SIB allegedly filed Form Ds with the SEC.[6] *Id.* at 7. This

---

[5]*Cf. Reves*, 455 U.S. at 68 (finding it important to its analysis of factor one that "one of the primary inducements offered purchasers was an interest rate constantly revised to keep it slightly above the rate paid by local banks and savings and loans").

[6]Stanford argues that "the Forms cannot be dispositive here because the SEC did not attach them to any version of its Complaint, such that those documents are not properly before the Court on this Motion." Stanford's Reply Supp. Mot. Dismiss Pl.'s Second Am. Compl. 4 [1049]. Stanford is correct in arguing that these Forms are not "dispositive" of the question currently before the Court. Indeed, the Forms are merely a factor in the Court's analysis. However, Stanford is incorrect in arguing that the Court cannot take the existence of the Forms into consideration. In deciding a Rule 12(b)(6) challenge, a court must accept as true all facts in the Complaint. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The SEC has alleged in its Second Amended Complaint that the Forms were filed. Accordingly, the Court is free to consider the existence of the Forms in its analysis.

ORDER – PAGE 8

Regulation D private placement mechanism, along with the solicitation of individuals via the CD marketing brochure, is indicative of "common trading." Accordingly, factor two also weighs in favor of security status.

Factor three similarly favors security status. Stanford's CDs were sold through U.S.-based investment advisors at SGC, a registered broker-dealer and investment adviser. *Id.* at 5. SIB further filed a Form D "Notice of Sale of Securities" with the SEC, effectively assuring investors that the offer and sale of CDs were subject to the antifraud provisions of the federal securities laws. *See id.* at 7. Therefore, it is reasonable to believe that the objective expectations of the investing public were such that they believed the CDs to be securities.[7]

Finally, factor four too weighs in favor of classifying the CDs as securities. As pled, there is absolutely no indication that Stanford took efforts to reduce the CDs' risk. Indeed, the SEC alleges that the CDs were highly speculative debt instruments with virtually no backing in a "globally diversified portfolio." *See* Second Am. Compl. 8-10. Stanford himself allegedly took investor money in the form of "loans," the majority of which were never repaid. *Id.* at 10-12. In sum, SIB CDs were nowhere near the equivalent of the average U.S.-based, U.S.-regulated bank CD. *See id.* at 13-14.

The pled facts thus militate in favor of finding that the CDs are securities under the federal securities laws. As the Court states in *Reves*, "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever

---

[7]*See Lebrun*, 24 F. Supp. 2d at 648 (noting that factor three is an objective factor).

name they are called." *Reves*, 494 U.S. at 61 (emphasis in original). Accordingly, the Court finds that the CDs are securities under the federal securities laws.

### *C. The Complaint Adequately Alleges Scienter*

Sections 17(a)(1) of the Securities Act, 206(1) of the Advisers Act, and 10(b) and Rule 10b-5 of the Exchange Act require scienter. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Steadman v. SEC*, 603 F.2d 1126, 1143 (5th Cir. 1979). Scienter is defined as "the mental state embracing intent to deceive, manipulate, or defraud," *Aaron*, 446 U.S. at 686 n.5 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)), and may be shown by intentional or severely reckless conduct. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 409 (5th Cir. 2001) (holding that severe recklessness satisfies section 10(b) and Rule 10b-5's scienter requirement); *Meadows v. SEC*, 119 F.3d 1219, 1226 (5th Cir. 1997) (holding that severe recklessness satisfies section 17(a)(1)'s scienter requirement). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson*, 267 F.3d at 408.

The SEC has alleged numerous instances of Stanford acting with at least severe recklessness, if not entirely intentional conduct. As an example, it alleges that Stanford fabricated the performance of the bank's investment portfolio by providing to SIB's internal accountant a predetermined return on investment in order to reverse engineer SIB's financial

statements. Second Am. Compl. 13. The SEC additionally alleges that Stanford admitted to misappropriating investor funds and fabricating SIB's financial statements. *Id.* at 14. Accordingly, the Court finds that the SEC has adequately pled scienter.

### D. The Complaint Adequately Alleges That Stanford Was an "Investment Adviser"

Section 202(a)(11) of the Investment Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11).

In its Second Amended Complaint, the SEC alleges that Stanford personally approved the issuance of publications designed to advise investors as to the value of and the advisability of investing in SIB's CDs. Second Am. Compl. 9-10. The SEC further alleges that Stanford controlled SGC and its investment advisers, *id.* at 1, and that Stanford directly received more than $1.6 billion of the CD investors' money.[8] *Id.* at 10. Accordingly, the

---

[8]Stanford argues that the SEC has failed to plead that Stanford was "compensated" for his alleged investment advising. He argues that the Second Amended Complaint alleges only that SIB paid commissions to SGC and its advisers and fails to allege that such commissions should be imputed to Stanford. *See* Stanford's Reply 5-6. He similarly contends that Stanford's alleged "control" over SGC and its advising activities is not enough to establish liability. Specifically, he argues that the Second Amended Complaint does not allege that Stanford or his various corporations are each others' alter egos. *Id.* at 6.

However, the entire premise of the SEC's Second Amended Complaint is that Stanford used various entities – including SGC and SIB – for his own personal purposes. The SEC alleges that the way that SGC made money was through investment services, and Stanford received at least $1.6 billion of investors' money. Accordingly, the SEC has argued

ORDER – PAGE 11

Court finds that the SEC adequately alleges that Stanford is an "investment adviser" under the Act.

## IV. THE SEC STATES ITS CLAIMS WITH PARTICULARITY

Stanford also moves to dismiss under Rule 9(b). He argues that the SEC has failed to plead its fraud allegations with the requisite particularity.

To establish liability under sections 17(a), 10(b), and Rule 10b-5 of the federal securities laws, the SEC must allege: (1) a fraudulent device, material misrepresentation or omission, or an act that operated as fraud or deceit, (2) in connection with the purchase or sale of securities, and (3) scienter. *SEC v. Gann*, 2008 WL 857633, at *9, Fed. Sec. L. Rep. P 94,631 (N.D. Tex. 2008) (Lindsay, J.) (citing *SEC v. Hopper*, 2006 WL 778640, at *9 n.15 (S.D. Tex. 2006)). Rule 9(b) of the Federal Rules of Civil Procedure requires allegations of fraud to be stated with particularity. FED. R. CIV. P. 9(b). "Pleading fraud with particularity in [the Fifth] [C]ircuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (last alteration in original). In essence, Rule 9(b) requires "the who, what, when, where, and how" to be stated. *Id.* at 179. "What constitutes 'particularity' will necessarily differ with the facts of each case." *Id.* (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)).

---

that Stanford acted through SGC. As such, he advised investors, and any money SGC received as a result of the investors so investing may be imputed to Stanford.

ORDER – PAGE 12

The Court finds that the SEC satisfies Rule 9(b).  In its Second Amended Complaint, the SEC points to numerous instances where Stanford allegedly committed various acts of fraud.  *See, e.g.*, Second Am. Compl. ¶¶ 34-40, 48, 57-66, 72-78, 79-83, 85-87, 89.  Rule 9(b) does not require "punctilious pleading detail," *SEC v. Brady*, 2006 WL 1310320, at *3 (N.D. Tex. 2006) (Fitzwater, C.J.) (quoting *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, C.J.)).  Stanford's alleged Ponzi scheme spanned at least a decade and involved myriad actors and entities largely owned or controlled by Stanford.  Given the complexity of this case, the SEC's allegations are enough to satisfy the "who, what, when, where, and how" of the alleged fraud and are more than sufficient to provide Stanford the ability to respond and prepare a defense.  *See* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1296 at 39 (3d ed. 2004) [hereinafter WRIGHT & MILLER] (stating that the purpose of Rule 9(b) is to enable the defendant to understand the claim and effectively prepare a responsive pleading and overall defense).

## V. VENUE IS PROPER IN THE NORTHERN DISTRICT OF TEXAS

### *A. Rule 12(b)(3) Standard*

Under Rule 12(b)(3), venue is proper in a particular district if substantial activities relating to a claim took place in that district. *Feline Instincts, LLC v. Feline Future Cat Food Co., Inc.*, 2010 WL 4942188, at *4 (N.D. Tex. 2010) (Means, J.) (citing *Terra Nova Scis., LLC v. JOA Oil and Gas Hous.*, 2010 WL 2671584, at *3 (S.D. Tex. 2010)). This holds true "even if the activities in another district happen to be 'more substantial, or even the most substantial.'" *Terra Nova*, 2010 WL 2671584, at *3 (citing *Tex. Marine & Brokerage, Inc. v. Tex. Marine of Beaumont, Inc.*, 120 F. Supp. 2d 612 (E.D. Tex. 2000)). Plaintiffs have the burden of proving that venue is proper. *Psarros v. Avior Shipping, Inc.*, 192 F. Supp. 2d 751, 753 (S.D. Tex. 2002). "[P]laintiffs may carry their burden by presenting facts that, taken as true, establish venue." *EnviroGLAS Prods., Inc. v. EnviroGLAS Prods., LLC*, 705 F. Supp. 2d 560, 567 (N.D. Tex. 2010) (Fish, J.) (citing *Optimum Return LLC v. CyberKatz Consulting, Inc.*, 2004 WL 827835, at *4 (N.D. Tex. 2004) (Fitzwater, C.J.)). "The court may look outside of the complaint and its attachments and review the complaint supplemented by the undisputed facts evidenced in the record or by undisputed facts plus the court's resolution of disputed facts." *Id.* (citing *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009), *cert. den.* 130 S.Ct. 1054 (2010)). "The Court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Id.* (quoting *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007).

### *B. Stanford Has Waived His Venue Argument*

A litigant waives his Rule 12(b)(3) improper venue defense by making an earlier motion that fails to raise the same defense. FED. R. CIV. P. 12(g)(2); 5C WRIGHT & MILLER

ORDER – PAGE 14

§ 1361, at 96; 14D WRIGHT & MILLER § 3826, at 554-55 (3d ed. 2007). Stanford failed to raise a venue objection in his earlier motion to dismiss [500]. He argues, however, that he is now free to present a Rule 12(b)(3) motion since he alleged it in his Answer to the SEC's First Amended Complaint [249]. Stanford's Reply 10. But, by objecting to venue in his Answer, Stanford merely preserved the defense for his first motion to dismiss. By failing to raise the venue argument in that motion, he has waived his right to assert it now.[9]

### C. Venue Is Proper In the Northern District of Texas

Even if Stanford had not waived his objection to venue, venue is nonetheless proper in the Northern District of Texas. The federal securities laws provide that cases can be brought in a district "wherein any act or transaction constituting the violation occurred" or

---

[9]It makes no difference that the instant motion to dismiss is directed to the SEC's Second Amended Complaint while Stanford's first motion to dismiss was directed to the SEC's First Amended Complaint. Although the courts are divided on this issue, the most relevant caselaw has held that "a Rule 12(b) motion made after an amended complaint can be directed only toward the amended portion of the pleading when the ground for the motion was available and should have been consolidated with a motion that was asserted against the original pleading." 5C WRIGHT & MILLER § 1361, at 98 (citing *Keefe v. Derounian*, 6 F.R.D. 11, 13 (N.D. Ill. 1946)); *see also Morrison v. Amway Corp.*, 421 B.R. 381 (Bankr. S.D. Tex. 2009) (analyzing, among other circuits, Fifth Circuit caselaw).

Further, "Stanford has participated vigorously in the enforcement action in the Northern District and the associated receivership. He has made countless appearances . . . and has appealed this Court's orders without complaining as to venue." Pl.'s Opp'n 18. If this case were to be transferred to another forum, there would be much wasted judicial effort. Accordingly, the conventional principles of waiver or equitable estoppel also block Stanford's venue challenge. *See Am. Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt., Ltd.*, 364 F.3d 884, 887-88 (7th Cir. 2004) ("If the defendant tells the plaintiff that he is content with the venue of the suit, or by words or actions misleads the plaintiff into thinking this, or misleads the court into becoming involved in the case so that there would be wasted judicial effort were the case to be dismissed to another forum, or if he stalls in pleading improper venue because he wants to find out which way the wind is blowing, then conventional principles of waiver or equitable estoppel come into play, and if invoked by the plaintiff block the challenge to venue.").

ORDER – PAGE 15

where the defendant "transacts business."[10]  15 U.S.C. § 78aa; 15 U.S.C. § 77v(a); 15 U.S.C. § 80b-14.  Additionally, "in a multidefendant securities proceeding in which a common scheme of acts or transactions to violate the securities statutes is alleged, if any of the defendants performed an act or transaction in furtherance of the conspiracy in the forum district, then venue may be proper . . . as to all defendants."  14D WRIGHT & MILLER § 3824, at 522.  This is so "even in the absence of any contact or substantial contact with that district by one or more of the other defendants."  *Id.*  In its Second Amended Complaint, the SEC alleges that "[c]ertain of the transactions, acts, practices and courses of business occurred in the Northern District of Texas."  Second Am. Compl. 5.  Additionally, it is undisputed that SGC had an office in Dallas, Texas.  *See* App. TRO 945 [13-40].  The SEC also argues that various defendants falsely communicated with SEC staff who were located in the Northern District of Texas and that victims of the alleged scheme reside in the District.  Pl.'s Opp'n 17-18.  Accordingly, the Court finds that the SEC has met its burden of showing that venue is proper.

## CONCLUSION

Contrary to Stanford's arguments, the Court finds that it has subject matter jurisdiction, that the SEC has not failed to state a claim upon which relief can be granted, that the SEC has pled fraud with particularity, and that venue is proper in the Northern District of Texas.  Accordingly, the Court denies Stanford's motion to dismiss.

---

[10]Although there are variations as to venue among the relevant securities laws, all three of the laws that the SEC relies upon provide for venue as stated.

Signed November 30, 2011.

_____
David C. Godbey
United States District Judge

ORDER – PAGE 17