**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § | |
| | § | |
| Defendants. | § | |

_____

## RECEIVER'S MOTION FOR APPROVAL OF INTERIM DISTRIBUTION PLAN

_____

BAKER BOTTS L.L.P.
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, TX  78701-4078
Tel: 512.322.2500
Fax: 512.322.2501

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

I.      Introduction ............................................................................................................... 1

II.     Background ................................................................................................................ 2

        A.      The Stanford Ponzi scheme. ........................................................................... 2

        B.      The Receiver's asset recovery efforts. ............................................................ 4

        C.      The claims process and the Interim Plan. ........................................................ 7

                1.      Claims received. .................................................................................... 7

                2.      Claims reconciled. ................................................................................. 8

                3.      Net loss approach. ................................................................................. 9

                4.      Recipients of payments under the Interim Plan. .................................. 9

                5.      Pro rata distribution calculation. ....................................................... 10

                6.      Treatment of unresolved objections to notices of determination and
                        claim deficiencies. .............................................................................. 10

                7.      Treatment of payments from collateral sources. ................................ 11

                8.      Publication of payment schedules. ..................................................... 12

III.    Argument & Authorities ......................................................................................... 13

        A.      The Court may approve any distribution plan that is fair and reasonable. ........... 13

        B.      The Receiver's Interim Plan is fair and reasonable. ..................................... 14

                1.      The Interim Plan compensates the Investor CD Claimants, who are
                        the primary victims of the Stanford Ponzi scheme. ........................... 14

                2.      A pro rata distribution among Investor CD Claimants is the most
                        equitable relief available. ................................................................... 15

                3.      Distribution should be pro rata and based on the Investor CD
                        Claimants' net losses. ......................................................................... 16

                4.      The Receivership Entities should be aggregated for distribution
                        purposes. ............................................................................................. 21

5.      Neither defendants sued by the Receiver or the Investors Committee, nor Stanford employees, independent contractors, or insiders should receive payments under the Interim Plan........................ 23

6.      Other general and secured creditors of the Receivership Entities should receive no payments under the Interim Plan, but might receive distributions under future plans.................................................... 25

IV.     Conclusion ...................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................................ 28

CERTIFICATE OF CONFERENCE ..................................................................................... 29

TABLE OF AUTHORITIES

**Page(s)**

CASES

*CFTC v. Barki, LLC*,
    No. 3:09-CV-106-MU, 2009 WL 3839389 (W.D.N.C. Nov. 12, 2009)......................17, 20

*CFTC v. Capitalstreet Fin., LLC*,
    No. 3:09-CV-387-RJC-DCK, 2010 WL 2572349 (W.D.N.C. June 18, 2010).................17

*CFTC v. Equity Fin. Grp., Inc.*,
    No. Civ. 04-1512 RBK AMD, 2005 WL 2143975 (D.N.J. Sept. 2, 2005)........................20

*CFTC v. Eustace*,
    No. 05-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008) .........................13, 21, 22, 23, 24

*CFTC v. Hoffberg*,
    No. 93-C-3106, 1993 WL 441984 (N.D. Ill. Oct. 28, 1993) ............................................20

*CFTC v. PrivateFX Global One*,
    778 F. Supp. 2d 775 (S.D. Tex. 2011) ..................................................................13, 16, 25

*CFTC v. Topworth Int'l, Ltd.*,
    205 F.3d 1107 (9th Cir. 2000) .......................................................................16, 17, 18, 21

*Cunningham v. Brown*,
    265 U.S. 1 (1924)........................................................................................................15, 16

*Donell v. Kowell*,
    533 F.3d 762 (9th Cir. 2008) .......................................................................................18, 19

*Gordon v. Dadante*,
    No. 1:05-CV-2726, 2010 WL 4137289 (N.D. Ohio Oct. 14, 2010)................................16

*In re Bernard Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)...........................................................................................17

*In re Dennis Greenman Sec. Litig.*,
    829 F.2d 1539 (11th Cir. 1987) ......................................................................................16

*In re Tedlock Cattle Co., Inc.*,
    552 F.2d 1351 (9th Cir. 1977) ........................................................................................17

*Nw. Bank Wis., N.A. v. Malachi Corp.*,
    245 F. App'x 488 (6th Cir. 2007) ...................................................................................26

*Quilling v. Schonsky*,
    247 F. App'x 583 (5th Cir. 2007) ...................................................................................18

*Quilling v. Trade Partners Inc.*,
No. 1:03-CV-236, 2007 WL 107669 (W.D. Mich. Jan. 9, 2007) ...............................21, 25

*SEC v. Amerifirst*,
No. 3:08-CV-1188-D, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008).............13, 17, 21, 22

*SEC v. Basic Energy & Affiliated Res., Inc.*,
273 F.3d 657 (6th Cir. 2001) ...................................................................................13, 24

*SEC v. Black*,
163 F.3d 188 (3d Cir. 1998)............................................................................................13

*SEC v. Byers*,
637 F. Supp. 2d 166 (S.D.N.Y. 2009).....................................13, 15, 16, 17, 20, 21, 22, 24

*SEC v. Capital Consultants, LLC*,
397 F.3d 733 (9th Cir. 2005) ...............................................................................15, 16, 17

*SEC v. Credit Bancorp, Ltd.*,
290 F.3d 80 (2d Cir. 2002).....................................................................................13, 15, 16

*SEC v. Credit Bancorp*,
No. 99-CIV-11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) ................................18

*SEC v. Elliott*,
953 F.2d 1560 (11th Cir. 1992) ...........................................................................13, 15, 16

*SEC v. Forex Asset Mgmt. LLC*,
242 F.3d 325 (5th Cir. 2001) ........................................................................13, 15, 16, 21

*SEC v. Forte*,
No. 2:02-CV-39, 2012 WL 1719145 (E.D. Pa. May 16, 2012).......................................24

*SEC v. Hardy*,
803 F.2d 1034 (9th Cir. 1986) ......................................................................................13

*SEC v. HKW Trading LLC*,
No. 8:05-CV-1076-T-24-TBM, 2009 WL 2499146 (M.D. Fla. Aug. 14, 2009)...............25

*SEC v. Infinity Grp. Co.*,
226 F. App'x 217 (3d Cir. 2007) ...................................................................................15

*SEC v. Merrill Scott & Assocs., Ltd.*,
No. 2:02-CV-39, 2006 WL 3813320 (D. Utah Dec. 26, 2006) ...................................13, 24

*SEC v. Parish*,
No. 2:07-CV-00919, 2010 WL 5394736 (D.S.C. Feb. 10, 2010)....................................19

*SEC v. Prater*,
No. 3:03-CV-01524, 2005 WL 2585269 (D. Conn. Aug. 24, 2005)................................17

*SEC v. Res. Dev. Int'l, LLC*,
487 F.3d 295 (5th Cir. 2007) ...........................................................................18

*SEC v. Sunwest Mgmt., Inc.*,
No. 6:09-CV-6056, 2009 WL 3245879 (D. Or. Oct. 2, 2009)..........................................21

*SEC v. Wang*,
944 F.2d 80 (2d Cir. 1991).............................................................................13

*SEC v. Wealth Mgmt. LLC*,
628 F.3d 323 (7th Cir. 2010) ................................................................13, 15, 21, 22, 25

*United States v. Durham*,
86 F.3d 70 (5th Cir. 1996) .................................................................13, 16, 21

*Warfield v. Byron*,
436 F.3d 551 (5th Cir. 2006) ...........................................................................18

*Warfield v. Carnie*,
No. 3:04-CV-633-R, 2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) ...............................19

**STATUTES**

Tex. Bus. & Com. Code Ann. § 24.009(a) (West 2009)...............................................19

**OTHER AUTHORITIES**

3 RALPH EWING CLARK, A TREATISE ON THE LAW AND PRACTICE OF RECEIVERS §§ 662.1,
667 (3d ed. 1959) ......................................................................................25

Kathy B. Phelps, *Handling Claims in Ponzi Scheme Bankruptcy and Receivership Cases*,
42 Golden Gate U. L. Rev. 567 (2012)...............................................................25

# I.     Introduction

The Receiver requests that the Court order a first interim distribution of funds from the Receivership Estate for the benefit of defrauded investors in certificates of deposit ("CDs") issued by Stanford International Bank, Ltd. ("SIB").  These investors were the primary source of both the funds that fueled the Stanford Ponzi scheme and the funds recovered by the Receiver.  They are also the primary victims of the Stanford fraud by both value and number of claims.

The Receiver's proposed Interim Distribution Plan (the "Interim Plan"), which is contained in the proposed order attached as Exhibit A, would distribute $55 million to defrauded CD investors (the "Interim Distribution Amount").  Specifically, the distribution would be limited to holders of claims for losses caused by investment in SIB CDs[1] (a) who have not been sued by the Receiver or the Official Stanford Investors Committee (the "Investors Committee") to recover funds they received from the Stanford Ponzi scheme and (b) who have never been a Stanford employee, independent contractor, or insider (the "Investor CD Claimants").[2]  The distribution would be pro rata and based on the Investor CD Claimants' net losses.  The net loss would be calculated on a "money-in-money-out" basis—*i.e.*, money paid into the scheme minus any money returned to the investor.  Because SIB CDs were not legitimate investments with real returns, any interest earned on the CDs is fictitious and would not be compensable under the Interim Plan or any other future distribution plan.  The Receiver proposes that any future

---

[1]     The vast majority of SIB CD claims were correctly identified by claimants as "Stanford International Bank, Ltd. CD Claim[s]," pursuant to the Bar Date Order.  [*See* Doc. 1584 at 3 (the "Bar Date Order").]  Some claimants also identified SIB CD claims as "Other Stanford International Bank, Ltd. Claims."

[2]     However, the Receiver would retain the right to compensate former Stanford employees for CD losses on the same terms as other investors if the former employees have, in the Receiver's discretion, materially assisted the Receiver and were not involved in sales or marketing of CDs.

distributions to Investor CD Claimants likewise be pro rata and based on the Investor CD Claimants' net losses.

The interim distribution process would begin within ninety (90) days of the Court's approval of the Interim Plan. The Estate would retain sufficient cash and other assets to fund the Receiver's remaining wind-down activities and ongoing asset recovery efforts. Depending on the outcome of those efforts, the Receiver anticipates making future distributions. The Receiver proposes to defer any distributions to claimants other than the Investor CD Claimants until the time of such future distributions.

## II.     Background

### A.     The Stanford Ponzi scheme.

R. Allen Stanford was the sole owner, directly or indirectly, of more than 130 separate Stanford Entities. [Case No. 3:09-CV-0721-N, Doc. 176 at 28 (the "COMI Order").] These Entities made up a financial services network known as Stanford Financial Group ("SFG"). [*Id.*] Stanford operated the entire network of Stanford Entities as an integrated unit to perpetrate a global, multibillion-dollar Ponzi scheme. [*Id.* at 19 n.23, 36; *see also* Case No. 3:11-CV-0117-N-BL, Doc. 33 at 6.] SIB was one of the Stanford entities in this network. [COMI Order at 28.]

SIB was nothing like a typical commercial bank. It had one principal product line—CDs—and one principal source of funds—customer deposits from CD purchases. [*Id.* at 27-28.] SIB offered CD rates of return that were significantly higher than those offered by banks in the United States. [Doc. 1514 at 9 ("KVT 2011").] The purported yields from SIB CDs were suspiciously consistent over the years, ranging from a high of 388% of the US yield in 2002 to a low of 140% of the US yield in 2006. [*Id.* at 9-10.] SIB CDs were marketed through financial advisors employed by other Stanford entities. [*Id.* at 12.] The financial advisors were heavily

incentivized by above-market commissions and bonuses to steer their clients, including the Investor CD Claimants, to SIB CDs rather than other investments.  [*Id.*]

Instead of investing the proceeds from CD sales in a diversified portfolio of highly marketable securities, as was represented to customers, SIB used those funds to (a) pay purported interest and redemptions to prior investors; (b) cover the operating expenses of the more than 130 Stanford Entities involved in the Ponzi scheme; (c) invest in real estate, private equity deals, and other illiquid and speculative ventures; and (d) finance the lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.) of R. Allen Stanford, the sole owner of all the Stanford Entities.  [*Id.* at 15.]

A tipping point was reached in October 2008.  That month and every month thereafter, incoming funds from investors were insufficient to offset outgoing payments to existing investors.  [*Id.*]  Continuing CD sales could no longer cover purported redemptions, interest payments, and operating expenses.  [*Id.*]  This cash crisis caused a rapid depletion of liquid assets, which were worth only a fraction of SIB's CD obligations even before the crisis. [*Id.*]

SIB investments were divided into three tiers, each managed differently, although all ultimately controlled by Stanford, Davis, and—at least to the extent of Tier 2 assets—Holt. [Doc. 1513-2 at 7 ("KVT 2009").]  On September 30, 2008, the value of Tier I and Tier II assets was $1.86 billion.  [*See* Apr. 4, 2012 Tr. of Hr'g at Exhibit 1 ("KVT 2012").]  By the time the Receivership was instituted on February 16, 2009, the value of Tier I and Tier II assets had fallen to $567.1 million.[3]  Tier III assets consisted primarily of worthless notes receivable from R.

---

[3]     Approximately $300 million of the Tier I and Tier II assets are located in accounts in Canada, Switzerland, and the United Kingdom.  The Receiver cannot ascertain the exact current value of these assets, which are subject to forfeiture proceedings, because those funds are not currently subject to the Receiver's control or direct monitoring.

Allen Stanford and fraudulently overvalued merchant banking assets and Antiguan real estate. [KVT 2009 at 8-9.]

At the Receivership's inception, SIB's records reflected total obligations to CD holders of approximately $7.2 billion, more than $1.3 billion of which the Receiver has estimated was fictitious interest. [Doc. 1469 at 3.] Even though SIB had already suspended redemptions for certain investors and the Stanford Entities had stopped paying many of their obligations, CD sales continued until February 16, 2009, when the SEC and this Court intervened. [KVT 2011 at 15-16.]

James Davis, Chief Financial Officer for SIB and a long-time business associate and confidant of R. Allen Stanford, pleaded guilty in August 2009 to charges that he conspired with R. Allen Stanford and others to run a Ponzi scheme in violation of federal securities laws. [*Id.* at 8.] In connection with his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds." [*Id.*] At his arraignment, Davis also admitted that the Stanford enterprise was a Ponzi scheme from the beginning. [*Id.*] On March 6, 2012, a jury in Houston, Texas convicted R. Allen Stanford of four counts of wire fraud, one count of conspiracy to commit wire and mail fraud, five counts of mail fraud, one count of conspiracy to obstruct an SEC proceeding, one count of obstruction of an SEC proceeding, and one count of conspiracy to commit money laundering, all related to his Ponzi scheme. [COMI Order at 26.]

## B.    The Receiver's asset recovery efforts.

On February 16, 2009, the SEC filed suit against R. Allen Stanford, his co-conspirators, and several Stanford Entities, alleging extensive violations of federal securities

---

The Receiver is working with the Department of Justice and the Joint Liquidators in Antigua in an effort to reach agreement concerning the release and distribution of these assets.

laws.  [Doc. 1.]  That same day, the Receiver was appointed [Doc. 10], and the Court froze all assets owned or controlled by the defendants in the SEC suit.  [Doc. 8].

Although SIB's records reflect that, as of December 31, 2008, it supposedly held $8.3 billion in "financial assets," the reality was much different.  [KVT 2011 at 11.]  As of the end of 2008, SIB held less than $500 million in securities—less than 7% of total CD obligations.  [*Id.*]  These securities were depleted even further in early 2009 before the Receivership was instituted.  Another $3.174 billion of SIB's supposed 2008 assets consisted of two real estate holding entities that had been purchased that same year for only $63.5 million and whose assets were tracts of undeveloped Antiguan real estate.  [*Id.*]  The value of those assets had been fraudulently inflated 50 times the purchase price through a series of paper transactions involving other Stanford Entities.  [*Id.*]  Private equity investments were recorded on SIB's books as being worth $1.2 billion as of June 30, 2008.  [*Id.* at 12.]  But because these investments were highly speculative and mostly illiquid, the Estate has been able to realize only a fraction of this amount from the liquidation of these investments.  [Doc. 1630 at 3.]  An additional $1.8 billion in SIB assets consisted of fictitious notes receivable from R. Allen Stanford, which he had no ability to repay.  [KVT 2011 at 11.]  Simply stated, the Stanford Entities owed billions of dollars more than the fair value of their combined assets.  [*Id.*]

Following his appointment, the Receiver and his team immediately began to secure what remained of the Stanford assets.  Over the next several weeks, the Receiver closed and ceased operations at over 35 Stanford offices in 29 U.S. cities, four offices in Mexico, and one office in St. Croix.  The Receiver also ceased all known transfers of assets out of the Estate so that its holdings could be inventoried.  Accordingly, dozens of banks and bank branches

inside and outside the U.S. holding Stanford cash and assets were advised of the freeze order and directed to cease electronic transfers.

The Receiver also commenced an investigation into the circumstances surrounding the Stanford enterprise and the transfer or disposition of its assets before the Receivership commenced.  Numerous key Stanford employees who worked in the U.S., the U.S. Virgin Islands, and Mexico were interviewed to collect information about data systems, the location of assets, and corporate structure.  The Receiver's efforts resulted in the collection of many terabytes of data regarding the Stanford enterprise.  The Receiver immediately undertook to use this data to identify all known Stanford accounts, trace the flow of funds throughout the sprawling Stanford enterprise, and locate Estate assets and potential sources of recovery.

The Receiver has pursued a number of successful asset recovery efforts, including, but not limited to, recovery of millions of dollars in each of the following categories: (a) cash balances held by Stanford Entities in numerous different financial institutions; (b) litigation against former financial advisors, former Stanford employees, and "net winner" investors; (c) proceeds from the liquidation of private equity investments; (d) proceeds from the liquidation of real estate; (e) proceeds from the liquidation of assets in Panama, Ecuador, and Peru; (f) proceeds from the disposition of airplanes and boats owned or leased by R. Allen Stanford; (g) proceeds from the liquidation of investment accounts held on behalf of Stanford; and (h) proceeds from the sales of additional miscellaneous assets, such as furniture, vehicles, and assorted equipment.  [Doc. 1630 at 2-5.]

Targeted litigation has been a major part of the Receiver's asset recovery efforts. He filed suit against former financial advisors and other Stanford employees involved in the sale of fraudulent CDs, seeking the return of more than $265 million in commissions and other

tainted compensation.   The Receiver also brought fraudulent-transfer claims against several hundred investors/investor groups whom the Receiver identified as "net winner" investors—*i.e.*, those who received more in payments from SIB than they invested.   The Receiver asserts that these investors received a total of approximately $1.2 billion in CD proceeds, over $200 million of which constitutes net winnings.   In addition to these claims, the Receiver and the Investors Committee have filed fraudulent-transfer claims against a variety of other third parties, including: (a) additional former Stanford employees and insiders; (b) the wife and former girlfriends of R. Allen Stanford, including Andrea Stoelker, against whom the Receiver recently obtained a judgment for approximately $600,000; (c) recipients of charitable and political donations from R. Allen Stanford and the Stanford Entities, including five national congressional political committees, against which the Receiver obtained a judgment that was recently affirmed on appeal and which has resulted in payments to the Receivership of over $2.2 million; (d) recipients of sports-sponsorship and related payments from the Stanford Entities; and (e) third party vendors, service providers, and investment vehicles that received payments from the Stanford Entities.   Although the majority of the lawsuits initiated by the Receiver and the Investors Committee are still in their initial stages, the Receiver has recovered in excess of $15 million through litigation to date.

As a result of these successful asset recovery efforts, the Receiver hereby proposes to distribute $55 million of cash on hand to Investor CD Claimants at this time pursuant to the proposed Interim Plan attached as Exhibit A.

## C.   The claims process and the Interim Plan.

### 1.   Claims received.

Shortly after his appointment, the Receiver established an informal process by which parties could submit claims to the Receivership Estate.   Then, on May 4, 2012, the Court

entered a Bar Date Order establishing a formal process for the submission of claims to the Receivership.   [Doc. 1584.]   Under that Order, the Bar Date for submission of claims was September 1, 2012.   [*Id.* at 5.]

The Receivership received a total of 30,289 claims submitted through both the Court-approved claims process and the prior informal claims process.   The Receiver has determined that 9,236 of the submitted claims were duplicative, and that another 380 of the claims were submitted after the September 1, 2012 Bar Date and, therefore, are ineligible for payment.   Of the remaining 20,673 claims, 18,400 were SIB CD or other SIB investor claims. The other 2,273 claims received include claims from employees, independent contractors, and insiders, as well as purported secured claims, tax claims, and real estate claims.

### 2.      Claims reconciled.

All CD claims submitted by Investor CD Claimants (the "Investor CD Claims"), except those claims that are duplicative or currently deficient pursuant to the terms of the Bar Date Order, have been reconciled by the Receivership.   In total, the Receivership has reconciled approximately 17,000 Investor CD Claims (excluding deficient and duplicative claims), which were submitted for an aggregate Total Claimed Amount[4] of approximately $6.3 billion.   Through reconciliation, the Receivership determined that the total aggregate Allowed Claim Amount[5] for those claims is $4,237,737,851.75.   The overwhelming majority of the difference between the aggregate Total Claimed Amount and aggregate Allowed Claim Amount (totaling approximately $2.1 billion) is attributable to Investor CD Claimants seeking fictitious interest as part of their claims.

---

[4]      "Total Claimed Amount" refers to a claimant's or claimants' claimed amount submitted to the Receivership prior to the Receiver's claim reconciliation activities.

[5]      "Allowed Claim Amount" refers to the maximum amount of funds that the Receiver has determined that a claimant or claimants may be entitled to receive from the Estate.   Claimants entitled to payment pursuant to the Interim Plan will receive less than their respective Allowed Claim Amounts.

There are approximately 950 deficient Investor CD Claims that remain unresolved, despite the Receiver's requests for information and/or Notices of Deficiency sent to those claimants. These claims cannot yet be reconciled, so the Allowed Claim Amount for those claims cannot yet be determined. Nonetheless, based on the Receivership Records and information received from the claimants thus far, the Receiver estimates that these claims will have an aggregate Allowed Claim Amount of $893,487,080.90.[6]

### 3. Net loss approach.

Many Investor CD Claimants asserted Total Claimed Amounts in their proofs of claim equal to the ending balances on their SIB CD accounts as of February 17, 2009, and such ending balances were inflated by fictitious interest that had not yet been paid to them. In determining the Allowed Claim Amounts, however, the Receiver has used the net loss approach, which is calculated on a "money in, money out" basis—*i.e.*, money paid into the scheme minus any money returned to the investor. Under the net loss approach, any fictitious, unpaid interest that has accrued on SIB CDs is not recognized.

### 4. Recipients of payments under the Interim Plan.

The Receiver proposes to make a distribution according to the Interim Plan, which is contained in Exhibit A. The Interim Plan would distribute $55 million to Investor CD Claimants. The Receiver anticipates that future distributions will be made using amounts from the Estate's retained funds and additional amounts ultimately recovered through litigation, class action settlements, and other asset recovery efforts.[7]

---

[6]    *See infra* footnote 8 for more details regarding how this estimate was calculated.

[7]    The Receiver, the Examiner, and the Antiguan Joint Liquidators have reached an agreement, in principle, that would result in cooperation with respect to asset recovery and the resolution of pending disputes concerning funds currently frozen overseas. The Receiver and Antiguan Joint Liquidators are consulting with the Department of Justice concerning the agreement. The parties expect to present a final settlement agreement in the near future for

The Receiver's Interim Plan would provide funds only to the defrauded Investor CD Claimants. The extent of any distributions to other claimants (including purported secured creditors and general creditors other than Investor CD Claimants) will be determined in connection with future distribution plans, taking into account the result of the Receiver's asset recovery efforts and the final reconciliation of those creditors' claims.

**5.      Pro rata distribution calculation.**

Under the Interim Plan, the Receiver would distribute funds to the defrauded Investor CD Claimants on a pro rata basis according to their Allowed Claim Amounts, which are reflected in the Notices of Determination being sent by the Receiver to the Investor CD Claimants. Specifically, the Investor CD Claimants would receive one percent (1%) (the "Distribution Percentage") of their Allowed Claim Amounts in this interim distribution.[8]

**6.      Treatment of unresolved objections to notices of determination and claim deficiencies.**

The proposed interim distribution will be based on the Investor CD Claimants' Allowed Claim Amounts as calculated by the Receiver. If an Investor CD Claimant serves and files a timely objection to a Notice of Determination, the Investor CD Claimant is not disqualified from receiving a distribution under the Interim Plan. However, the Investor CD Claimant will initially participate in the interim distribution based solely on the Allowed Claim

---

public comment and Court approval. If approved, the agreement would make available additional funds for future distributions by the Receiver.

[8]      The Distribution Percentage was calculated by dividing the total amount of money set aside to be distributed pursuant to the Interim Plan by the sum of: (a) all Allowed Claim Amounts for non-deficient Investor CD Claims as of the filing of this Motion (the "Investors' Allowed Claim Amounts"), and (b) the Receiver's estimates of the Allowed Claim Amounts for all Investor CD Claims that are deficient (the "Investors' Deficient Claim Amounts"). The Distribution Percentage is calculated using estimated amounts for deficient claims because such claims cannot yet be reconciled to determine Allowed Claim Amounts. These estimates are based on a two-tiered approach: (i) if a proof of claim contained a Total Claimed Amount, the Receiver has used the Total Claimed Amount as the Deficient Claim Amount for that claim, although the ultimate Allowed Claim Amount may actually be less; (ii) if the proof of claim did not contain a Total Claimed Amount, the Receiver has used the Receivership Records to calculate the Deficient Claim Amount for that claim. This approach ensures that sufficient funds are available for deficient claims whose deficiency is resolved prior to conclusion of distribution under the Interim Plan.

Amount in the Notice of Determination.  If the Investor CD Claimant ultimately succeeds in increasing the Allowed Claim Amount (either by stipulation with the Receiver or by final court order sustaining the claimant's objection), the claimant will receive a supplemental payment representing 1% of the difference between the Allowed Claim Amount in the Notice of Determination and the Allowed Claim Amount after final resolution of the claimant's objection.

Investor CD Claimants whose claims are deficient likewise would have the opportunity to participate in the interim distribution.  If the deficiencies in a proof of claim are timely cured,[9] the Receiver will send the Investor CD Claimant a Notice of Determination which states their Allowed Claim Amount.  The Investor CD Claimant would then receive an interim distribution payment equal to the Distribution Percentage multiplied by that Allowed Claim Amount.  However, if the deficiencies are not timely cured, the Investor CD Claimant would have no right to a distribution under the Interim Plan (or any other plan).

### 7.    Treatment of payments from collateral sources.

A claimant will not be allowed to receive a disproportionate or double recovery under the Interim Plan.  Before the Receiver sends out payments under the Interim Plan, the distribution recipients will receive a notice from the Receiver which requires the claimant to certify, as a condition of receiving payment, whether they have applied for or received any compensation for their claimed losses from sources other than the Receivership and, if so, the amounts of such compensation actually received.  The forms of such notice and certification will be substantially the same as Exhibit B.  The claimants will not receive payment under the Interim Plan unless they return the certification and provide the appropriate information regarding

---

[9]       As set forth in more detail in the Court's Order approving the claims procedures, a deficiency is timely cured when the claimant submits an adequate response to a notice of deficiency within 60 days following issuance of the notice of deficiency.  [Doc. No. 1584 at 16.]

collateral recoveries.[10]  To the extent a claimant receives one or more collateral recoveries, the Receiver will reduce payments to such a claimant to the extent necessary to ensure that all the Investor CD Claimants are treated equally with respect to the percentage of their Allowed Claim Amounts they recover from all sources as of the date of the payments.

**8.      Publication of payment schedules.**

Because the processing of deficient claims is ongoing and requests for certification concerning collateral source recoveries will be sent after the Court approves the Interim Plan, the Receiver has not attached to this Motion a schedule showing the dollar amount that each Investor CD Claimant will receive under the Interim Plan.  However, once the Interim Plan is approved, the Receiver expects to begin making payments, on a rolling basis, as certifications concerning collateral source recoveries are received.  The Receiver proposes to file, also on a rolling basis, schedules of payments to be made under the Interim Plan, and such schedules will be filed at least ten (10) days prior to the subject payments being made.  The Receiver is aware that confidentiality concerns exist concerning the identity of those who will receive payments under the Interim Plan, and the Receiver has discussed such concerns with the Examiner, the Investors Committee, and the Antiguan Joint Liquidators, among others.  The Receiver does not propose to include in any public filing the names or other information that will individually identify those who receive payments. Instead, the schedules will, subject to the Court's approval, include claim ID numbers and the amount of the associated payments but will not contain information from which the individual claimant can be identified.

---

[10]      The Receiver proposes in the attached order that claimants be required to respond to the certification notice within sixty (60) days of the date they receive the certification notice.  *See* Ex. A at ¶ C.2.

### III.    Argument & Authorities

**A.    The Court may approve any distribution plan that is fair and reasonable.**

Federal district courts have broad discretion in fashioning relief in equity receiverships. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 91 (2d Cir. 2002); *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001); *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 328 (5th Cir. 2001); *SEC v. Elliott*, 953 F.2d 1560, 1566-67 (11th Cir. 1992); *SEC v. Hardy*, 803 F.2d 1034, 1037-39 (9th Cir. 1986).  Pursuant to these broad powers, courts may authorize any distribution of receivership assets that is "fair and reasonable." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332-33 (7th Cir. 2010); *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (quoting *Wang*, 944 F.2d at 81).  So long as a court divides the assets "in a logical way," the court's distribution will not be disturbed on appeal. *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996).  Appellate review of distribution orders is "narrow," *Forex*, 242 F.3d at 331 (quotation omitted), as appellate courts must not "chain the hands of the court in Equity" nor "rob the lower court of the discretion essential to its function." *Durham*, 86 F.3d at 73.  District courts frequently order interim or preliminary distributions. *See, e.g.*, *Credit Bancorp*, 290 F.3d at 85; *SEC v. Black*, 163 F.3d 188, 193 (3d Cir. 1998); *CFTC v. PrivateFX Global One*, 778 F. Supp. 2d 775, 778 (S.D. Tex. 2011); *SEC v. Amerifirst*, No. 3:08-CV-1188-D, 2008 WL 919546, at *6-7 (N.D. Tex. Mar. 13, 2008); *CFTC v. Eustace*, No. 05-2973, 2008 WL 471574, at *7 (E.D. Pa. Feb. 19, 2008); *SEC v. Merrill Scott & Assocs., Ltd.*, No. 2:02-CV-39, 2006 WL 3813320, at *1 (D. Utah Dec. 26, 2006).

**B.      The Receiver's Interim Plan is fair and reasonable.**

**1.      The Interim Plan compensates the Investor CD Claimants, who are the primary victims of the Stanford Ponzi scheme.**

The Interim Plan is designed to compensate the Investor CD Claimants, which is fair and reasonable for at least two reasons.  First, virtually all of the money that came into the scheme was ill-gotten funds supplied by this group of victims.  [*See* KVT 2009 at 13.]  Second, they were the group of victims most directly and substantially harmed by Stanford's worldwide fraud.  Many of these people entrusted their entire life savings to the scheme and have received a pittance or nothing at all from it.  Moreover, because many of the Investor CD Claimants have represented that they are elderly and retired and have no other significant sources of income, this class of creditors has the most immediate and compelling need for equitable relief from the Court via an interim distribution.

The Interim Plan is not intended to be the final distribution by the Receivership. It merely seeks to distribute an initial $55 million to Investor CD Claimants.  It does not purport to distribute all remaining assets of the Receivership Estate.  Sufficient cash will remain on-hand to fund the winding down of the Receivership, ongoing administrative responsibilities with respect to assets and evidence, and the Receiver's (and the expenses of the Investors Committee's) ongoing asset recovery efforts, which the Receiver expects will result in additional amounts for distribution to claimants.  Any future distributions will result in minimal incremental cost to the Estate, since the fees and expenses relating to the reconciliation and determination activities of the claims process will already have been incurred.  Nor does the Interim Plan foreclose the possibility that claimants other than Investor CD Claimants will participate in future distributions.  Rather, a decision regarding the extent to which such claimants should be compensated would be reserved for a later date.

### 2.     A pro rata distribution among Investor CD Claimants is the most equitable relief available.

In equity receiverships, federal courts overwhelmingly order pro rata distribution. *See Wealth Mgmt.*, 628 F.3d at 333; *SEC v. Infinity Grp. Co.*, 226 F. App'x 217, 218 (3d Cir. 2007); *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 737, 746-47 (9th Cir. 2005); *Credit Bancorp*, 290 F.3d at 87-89; *Forex*, 242 F.3d at 331-32; *Elliott*, 953 F.2d at 1569-70; *Byers*, 637 F. Supp. 2d at 176.   "Courts have favored *pro rata* distribution of assets where . . . the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *Credit Bancorp*, 290 F.3d at 88-89.  Pro rata distribution is "especially appropriate for fraud victims of a 'Ponzi scheme.'"  *Id.* at 89.  Such cases "'call strongly for the principle that equality is equity.'"  *Byers*, 637 F. Supp. 2d at 176 (quoting C*unningham v. Brown*, 265 U.S. 1, 13 (1924), the original "Ponzi" scheme case).

The equitable prerequisites for a pro rata distribution all exist in this case.  The Court has previously found that: "Stanford operated a Ponzi scheme"; "as a Ponzi scheme, all assets and liabilities are difficult to segregate and ascertain"; "commingling of funds among the Stanford Entities was the norm"; and funds deposited by investors to purchase SIB CDs were dispersed among the Stanford Entities.  [COMI Order at 19 n.23, 34, 42-43.]  Moreover, the Investor CD Claimants are similarly situated insofar as they purchased the same product from the same enterprise and were subjected to similar misrepresentations.  [*Id.* at 27-28 (finding that SIB "had one principal product line—certificates of deposit"); *id.* at 49 (finding that "[i]nvestors … dealt only with their financial advisors," who "were essentially the face of the Stanford enterprise to investors" and "disseminated reports prepared by Stanford, Davis, Pendergest-Holt, and others").]

The Receiver expects that certain Investor CD Claimants may argue that their investments should be traced to particular assets in the Estate.  But tracing principles are "subject to the equitable discretion of the court."  *Durham*, 86 F.3d at 72 (internal quotation omitted).  The Court should disregard tracing in this case for two reasons.

First, tracing would be impractical, if not impossible.  Proceeds from the sale of SIB CDs were commingled in SIB's bank accounts.  [KVT 2009 at 14-17.]  Moreover, funds in those accounts were disbursed to make purported CD interest and redemption payments [*id.* at 17-18]; pay commissions, bonuses, loans, and other amounts to financial advisors [*id.* at 21-23]; make speculative investments [*id.* at 7]; fund other Stanford Entities [*id.*]; and finance R. Allen Stanford's lavish lifestyle [*id.*].

Second, tracing would be inequitable.  In particular, it would reward some investors based on "the merely fortuitous fact that the defrauders spent the money of the other victims first."  *Durham*, 86 F.3d at 72 (internal quotation omitted).  Courts have repeatedly refused to distribute receivership assets on such an arbitrary basis.  *See, e.g.*, *Credit Bancorp*, 290 F.3d at 88-89; *Forex*, 242 F.3d at 331-32; *Elliott*, 953 F.2d at 1569-70; *Byers*, 637 F. Supp. 2d at 176-77.  Because a distribution based on a tracing analysis would arbitrarily favor some CD depositors over others, such a distribution would violate the equitable maxim that "equality is equity."  *See Cunningham*, 265 U.S. at 13.

### 3. Distribution should be pro rata and based on the Investor CD Claimants' net losses.

Courts routinely order that a pro rata distribution be based on the claimants' net losses.[11]  A claimant's net loss equals the amount paid into the scheme by the claimant minus the

---

[11]     *See, e.g.*, *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 737 (9th Cir. 2005); *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 2000); *In re Dennis Greenman Sec. Litig.*, 829 F.2d 1539, 1541 (11th Cir. 1987); *CFTC v. PrivateFX Global One*, 778 F. Supp. 2d 775, 778 (S.D. Tex. 2011); *Gordon v. Dadante*, No. 1:05-

total amount paid to the claimant.  *See Capital Consultants*, 397 F.3d at 737; *Capitalstreet*, 2010 WL 2572349, at *3.  This approach is sometimes referred to as a "money in, money out" (or "MIMO") formula.  *See, e.g.*, *Capital Consultants*, 397 F.3d at 737.

Pro rata distribution based on net loss is equitable because it ensures that all investors who suffered an out-of-pocket loss receive compensation from the Receivership.  *See CFTC v. Barki*, 2009 WL 3839389, at *1-2 (W.D.N.C. 2009) (favoring net loss method because it compensates a large percentage of defrauded investors); *Byers*, 637 F. Supp. 2d at 182 (same).  It also ensures that compensation is proportional to the size of investors' losses.

Two features of the net loss approach are particularly appropriate for investors in a Ponzi scheme.  First, investors are only allowed to recover on the basis of money they actually paid into the scheme; interest reported to investors but never paid is fictitious and thus given no weight in the net loss calculation.  *See In re Bernard Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011) (affirming court order distributing Ponzi scheme's assets based on net losses rather than customers' account balances because "the profits recorded over time were after-the-fact constructs"); *Topworth*, 205 F.3d at 1110, 1115-16 (affirming distribution plan based on net loss method where "[t]o allow claims based on profits made in the illegal trading operations would tend to legitimize those illegal trading operations contrary to public policy" (quoting district court order)); *In re Tedlock Cattle Co., Inc.*, 552 F.2d 1351, 1352-53 (9th Cir. 1977) (affirming distribution of Ponzi scheme's assets based on net losses because permitting recovery

---

CV-2726, 2010 WL 4137289, at *1 (N.D. Ohio Oct. 14, 2010); *CFTC v. Capitalstreet Fin., LLC*, No. 3:09-CV-387-RJC-DCK, 2010 WL 2572349, at *1 (W.D.N.C. June 18, 2010); *SEC v. Byers*, 637 F. Supp. 2d 166, 171-72 (S.D.N.Y. 2009); *CFTC v. Barki, LLC*, No. 3:09-CV-106-MU, 2009 WL 3839389, at *1-2 (W.D.N.C. Nov. 12, 2009); *SEC v. Amerifirst*, No. 3:08-CV-1188-D, 2008 WL 919546, at *6-7 (N.D. Tex. Mar. 13, 2008); *SEC v. Prater*, No. 3:03-CV-01524, 2005 WL 2585269, at *1-2 (D. Conn. Aug. 24, 2005).  Although some cases use the terms "net equity" or "net investment" rather than "net loss," the terms are substantively identical.  *See, e.g.*, *In re Bernard Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011) ("net equity"); *Capitalstreet*, 2010 WL 2572349, at *1 ("net investment").

of fake profits would unfairly benefit early investors at the expense of later investors); *SEC v. Credit Bancorp*, No. 99-CIV-11395, 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000) (adopting net loss method in part for the reason that "recognizing claims to profits from an illegal financial scheme is contrary to public policy because it serves to legitimate the scheme") (citing *Topworth*, 205 F.3d at 1110).   Second, any purported payments of interest are considered "money out" to be deducted from the claimant's net loss.   Although a claimant may argue that purported payments of interest should have no effect on the amount of principal owed the investor, such payments "are generated not from legitimate business activity but, rather, through the influx of resources from new customers."  *Id.* at *40; *cf. Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) ("If investors receive more than they invested, payments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity." (citation and internal quotation omitted)).

This treatment of unpaid interest and purported interest payments is consistent with the law of fraudulent transfer, which requires investors to return amounts they received in excess of their investments in the scheme, regardless of the investor's alleged good faith or ignorance of the Ponzi scheme.   "Under the [Uniform Fraudulent Transfer Act], transfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007) (citing *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006)); *see also SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In [the Fifth] circuit, proving that [the debtor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." (citing *Byron*, 436 F.3d at 558)).   In order to defeat a fraudulent-transfer claim, investors must show that they provided "reasonably equivalent value" for the funds received and that they

received those funds in good faith.  *See* Tex. Bus. & Com. Code Ann. § 24.009(a) (West 2009). As a matter of law, however, investors cannot prove that they provided reasonably equivalent value for their net winnings because "investors in illegal Ponzi schemes have only provided reasonably equivalent value up to the portion of their actual investment in the scheme." *Warfield v. Carnie*, No. 3:04-CV-633-R, 2007 WL 1112591, at *12 (N.D. Tex. Apr. 13, 2007); *see also Donell*, 533 F.3d at 772 ("Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."). Thus, any claim to a payment, regardless of how it was characterized, in excess of the amount of a claimant's investment would constitute a fraudulent transfer as a matter of law. [*See also* Case No. 3:09-CV-0724-N, Doc. 615-1 at 20-25.] For this reason, any claimant's purported right to interest is illegitimate and contrary to the law against fraudulent transfers. In fashioning an equitable distribution plan, the Court should therefore disregard any claim based on unpaid interest and offset losses by the amount of purported interest payments actually received by a claimant.[12]

Some courts have chosen to distribute receivership assets according to the "rising tide" method rather than the net loss method. *See, e.g.*, *SEC v. Parish*, No. 2:07-CV-00919, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010). Under the rising tide method, a claimant would receive nothing if the amount that had been returned to the claimant exceeded the amount of the claimant's pro rata share, even if the claimant suffered an out-of-pocket loss. *Id.* at *3. The rising tide method is frequently used in cases involving far fewer claimants than the +20,000 claimants involved in this case, such that it is practical and efficient to deal with investors on an

---

[12]     This same issue is also addressed by the Receiver's pending motion for partial summary judgment against net winners, which seeks to recover the fraudulently-transferred net winnings. [*See, e.g.*, Case No. 3:09-CV-0724-N-BL, Docs. 615, 616.]

individual basis.  *See, e.g.*, *CFTC v. Equity Fin. Grp., Inc.*, No. Civ. 04-1512 RBK AMD, 2005 WL 2143975, at *1 (D.N.J. Sept. 2, 2005) (rising tide distribution to 103 claimants); *CFTC v. Hoffberg*, No. 93-C-3106, 1993 WL 441984, at *1 (N.D. Ill. Oct. 28, 1993) (rising tide distribution to 39 investors).   In this case, however, the rising tide method would create inefficiencies and result in a less equitable distribution than the net loss method.

First, the net loss method leads to a more equitable outcome by distributing funds to every Investor CD Claimant who suffered a loss.  *See Barki*, 2009 WL 3839389, at *1-2; *Byers*, 637 F. Supp. 2d at 182.  The rising tide method, on the other hand, would exclude from the distribution an entire class of equally innocent investors who have undeniably suffered a loss. For example, consider two hypothetical investors, both of whom suffered a $70,000 loss from the Stanford scheme.  One invested $70,000 and received no payments during the life of the scheme.  The second invested $100,000 but received $30,000 in payments from the scheme. Because the two investors both suffered the same out-of-pocket loss ($70,000), the net loss method would treat both investors equally for purposes of distribution.  However, the rising tide method would deny the second investor any recovery unless and until the first investor's pro rata share exceeded $30,000.  *Cf. Byers*, 637 F. Supp. 2d at 182 (using a hypothetical to show the inequity that can result from the rising tide method).  In fact, an investor with a large out-of-pocket loss could receive *less* under the rising tide method than an investor with a smaller out-of-pocket loss.  These inequities militate in favor of the net loss method and its more even-handed treatment of losses.

Second, the financial records of the Stanford enterprise, as well as the nature of the information being submitted by claimants in the claims process, make the net loss method far more cost-effective.  And every dollar that is saved by simplifying the distribution process is an

additional dollar that can be distributed to claimants.  In determining whether a distribution method is fair and reasonable, courts often take into account the costliness of alternative methods.  *See, e.g.*, *Wealth Mgmt.*, 628 F.3d at 336 (rejecting distribution method proposed by claimant because receiver had "duty to avoid overly costly investigations"); *SEC v. Sunwest Mgmt., Inc.*, No. 6:09-CV-6056, 2009 WL 3245879, at *8-10 (D. Or. Oct. 2, 2009) (rejecting distribution method that "would be extremely difficult, time consuming and costly to the Receivership Estate").

4.    **The Receivership Entities should be aggregated for distribution purposes.**

The Interim Plan proposes that Investor CD Claimants share pro rata in the Interim Distribution Amount, regardless of which Stanford Entity may have been the nominal source of the distributed funds.  For purposes of distribution in an equity receivership, courts may ignore the separate identities of entities that are part of "a unified scheme to defraud." *Byers*, 637 F. Supp. 2d at 180-81; *see also Topworth*, 205 F.3d at 1110-11 (treating entities as one fund because "each entity appeared to be the alter ego of the other"); *Sunwest Mgmt.*, 2009 WL 3245879, at *8-10 (holding that receivership entities were to be considered a "unitary enterprise" for distribution purposes due to extensive commingling of funds); *Amerifirst*, 2008 WL 919546, at *4 (holding that "a pooled distribution is equitable when the separate legal entities were involved in a unified scheme to defraud"); *Eustace*, 2008 WL 471574, at *7-8 (pooling assets for distribution due to evidence of commingling and joint marketing among entities); *Quilling v. Trade Partners Inc.*, No. 1:03-CV-236, 2007 WL 107669, at *2 (W.D. Mich. Jan. 9, 2007); *see also Forex*, 242 F.3d at 331 (affirming plan adopted by district court which pooled assets of entities for distribution); *Durham*, 86 F.3d at 71-73 (same).

The Court recently determined that the United States is the Stanford Entities' center of main interest for Chapter 15 purposes.  [COMI Order at 36.]  The Court based this

determination in part on its decision to pierce SIB's corporate veil and aggregate the Stanford Entities. [*Id.*] The Court ruled that, regardless of the standard to be applied (whether jurisdictional veil-piercing, non-jurisdictional veil-piercing, or substantive consolidation under the Bankruptcy Code), the separate identities of the Stanford Entities should be disregarded. [*Id.* at 19-36.] The Court reasoned that "Stanford operated the entire network of Stanford Entities *as an integrated unit* in order to perpetrate a massive worldwide fraud." [*Id.* at 36 (emphasis added).][13] Accordingly, the Court refused to "elevate form over substance" and "legitimiz[e] the corporate structure that Stanford utilized to perpetrate his fraud," which would "ru[n] afoul of Fifth Circuit precedent cautioning courts to look beyond the surface." [*Id.*]

For the same reasons, the Court should disregard the separate identities of the Stanford Entities for purposes of distribution. The Receiver has clearly shown that the Stanford Entities were part of "a unified scheme to defraud." *See Byers*, 637 F. Supp. 2d at 180-81. Moreover, the Court's power to disregard the corporate form is greater in the context of distribution because the Court may exercise its broad equitable powers to approve any distribution plan that is "fair and reasonable." *Wealth Mgmt.*, 628 F.3d at 332-33; *see Amerifirst*, 2008 WL 919546, at *4 (corporate form may be disregarded for distribution purposes so long as "an equitable basis" exists).

The district court's holding in *Eustace* is instructive. In that case, a receiver was appointed for an asset management firm and the investment funds it controlled, each of which had a nominally separate legal identity. 2008 WL 471574, at *1. The receiver sought to distribute recovered assets among investors in all the various funds on a pro rata basis. *Id.* at *3. The district court approved the receiver's plan based on evidence showing (i) commingling of

---

[13] [*See also* COMI Order at 27 ("[T]his Court has previously recognized that Stanford and his affiliates operated as one, and there is substantial evidence in the record … to support that finding."); *id.* at 28 ("The Stanford Entities comprised a single financial services network referred to as SFG.").]

money among the funds, which created a "blurring of the distinction between the Receivership Funds," and (ii) "joint marketing of the funds," which "encouraged investors to perceive the funds as part of a whole." *Id.* at *7-8.  The same result should be reached in this case, where commingling and joint marketing by the Stanford entities were rampant.  [*See* COMI Order at 34, 43, 47, 49-50 (discussing joint marketing efforts by the Stanford Entities and commingling of assets and business functions among them).]

5.   **Neither defendants sued by the Receiver or the Investors Committee, nor Stanford employees, independent contractors, or insiders should receive payments under the Interim Plan.**

As discussed above, the overwhelming majority of funds received or utilized by the Stanford Entities were proceeds from the sale of SIB CDs.  [*See* KVT 2009 at 9.]  These funds were therefore the primary source of compensation and other payments to Stanford employees, independent contractors, and insiders.  In addition, such funds were also used to pay the many defendants—including such employees, independent contractors, and insiders, as well as net-winner investors and other third parties who received funds from the Ponzi scheme—who have been sued by the Receiver and the Investors Committee.  Moreover, Investor CD Claimants who never worked for a Stanford Entity and who lost money in the Ponzi scheme are the primary (and most desperate) victims of the Stanford scheme.  Given the scarcity of resources available for distribution, the Receiver recommends that the Court exclude both (a) any former Stanford employees, independent contractors, and insiders,[14] and (b) any defendants who have been sued

---

[14]    As noted above, the Interim Plan would authorize the Receiver to compensate a former Stanford employee for CD losses on the same terms as other investors if the Receiver determines, in his discretion, that the former employee has materially assisted the Receiver and was not involved in sales or marketing of CDs.

by the Receiver or the Investors Committee from receiving compensation under the Interim Plan.[15]

The Court may exercise its equitable powers to subordinate the claims of those who bear some responsibility for furthering the fraudulent scheme. *See Basic Energy*, 273 F.3d at 660 (affirming distribution plan that denied payment to defendants and reduced payment to investors based on level of marketing undertaken by investors on behalf of fraudulent scheme); *SEC v. Forte*, No. 2:02-CV-39, 2012 WL 1719145, at *3 (E.D. Pa. May 16, 2012) ("Those Investors who, by their reckless behavior, furthered Forte's Ponzi scheme plainly are not 'innocent' and so are not entitled to the same relief as truly innocent Investors."); *Byers*, 637 F. Supp. 2d at 184 ("The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw."); *Eustace*, 2008 WL 4534154, at *3 ("Disqualifying those who took the business over the edge is the most common feature, and the least contested aspect, of distribution plans."); *Merrill Scott*, 2006 WL 3813320, at *11-12 (approving distribution plan that excluded investor who solicited on behalf of scheme and disregarded receivership order). The Interim Plan would not necessarily preclude former Stanford employees, independent contractors, insiders, or certain defendants sued by the Receiver or the Investors Committee from participating in future distributions.

---

[15]     The Receiver estimates that the defendants will have an aggregate Allowed Claim Amount not exceeding $106 million in connection with their CD claims.  The Receiver estimates that the former Stanford employees, independent contractors, and insiders will have an aggregate Allowed Claim Amount not exceeding $26 million in connection with their CD claims.

**6.    Other general and secured creditors of the Receivership Entities should receive no payments under the Interim Plan, but might receive distributions under future plans.**

The Receiver believes that the interim distribution should direct resources where they are needed most—to the Investor CD Claimants.  However, the Receiver intends to continue increasing the assets of the Receivership Estate as a result of ongoing asset recovery efforts.  It may therefore become appropriate for claimants in addition to Investor CD Claimants to participate in future distribution plans.  Accordingly, the Receiver recommends that the Court postpone a decision regarding the extent of recovery to be distributed to general and secured creditors (other than Investor CD Claimants) until the time of such future distribution plans.

This treatment of creditors is fair and reasonable.  *See Wealth Mgmt.*, 628 F.3d at 332-33 (court may approve any distribution plan that is "fair and reasonable").  First, the Court has the power to subordinate the claims of general creditors to the claims of defrauded investors, even if the result would be to deny general creditors any compensation at all.  *See, e.g.*, *PrivateFX*, 778 F. Supp. 2d at 786-87; *SEC v. HKW Trading LLC*, No. 8:05-CV-1076-T-24-TBM, 2009 WL 2499146, at *3 (M.D. Fla. Aug. 14, 2009) ("Payment to claimants whose property was unlawfully taken from them is given a higher priority than payment to the general creditors.") (citing 3 RALPH EWING CLARK, A TREATISE ON THE LAW AND PRACTICE OF RECEIVERS §§ 662.1, 667 (3d ed. 1959)); *Quilling*, 2007 WL 107669, at *3 ("In receivership proceedings arising out of securities fraud, the class of fraud victims takes priority over the class of general creditors with respect to proceeds traceable to the fraud.") (citing 3 CLARK, *supra*, § 662.1); *see also* Kathy B. Phelps, *Handling Claims in Ponzi Scheme Bankruptcy and Receivership Cases*, 42 Golden Gate U. L. Rev. 567, 572-73 (2012).  If the Court can deny general creditors any compensation at all, which may ultimately be the appropriate result in this case, it can surely postpone a decision on whether and upon what basis to compensate them until

the time is ripe for considering future distributions. *See Nw. Bank Wis., N.A. v. Malachi Corp.*, 245 F. App'x 488, 495 (6th Cir. 2007) (affirming partial distribution to bondholders over trade creditors as "within the broad powers and wide discretion" of receivership court (internal quotation omitted)). Second, the Receiver anticipates that the aggregate Allowed Claim Amount for all purported secured claims filed with the Estate will be far less than the value of the assets retained by the Receivership Estate, even without any future increase in the assets of the Receivership Estate. Whether any particular secured claim is valid and whether any valid secured claim should be paid or subordinated to Investor CD Claims are issues that can thus be addressed in a future distribution plan without prejudice to the purported secured claimants.

## IV.    Conclusion

For the foregoing reasons, the Receiver respectfully requests that the Court approve the Receiver's Interim Plan and grant the Receiver any other relief to which he is justly entitled.

Dated:  January 11, 2013                    Respectfully submitted,

                                            **BAKER BOTTS L.L.P.**

                                            By:____/s/ Kevin M. Sadler_____
                                                Kevin M. Sadler
                                                Texas Bar No. 17512450
                                                kevin.sadler@bakerbotts.com
                                                Scott D. Powers
                                                Texas Bar No. 24027746
                                                scott.powers@bakerbotts.com
                                                David T. Arlington
                                                Texas Bar No. 00790238
                                                david.arlington@bakerbotts.com
                                                98 San Jacinto Blvd., Suite 1500
                                                Austin, TX  78701-4078
                                                Tel: 512.322.2500
                                                Fax: 512.322.2501

                                            **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

### CERTIFICATE OF SERVICE

On January 11, 2013, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I will serve all counsel of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

 /s/ Kevin M. Sadler
Kevin M. Sadler

## CERTIFICATE OF CONFERENCE

Counsel for the Receiver conferred with the parties to this case.

Counsel for the Receiver conferred with David Reece, counsel for the SEC, who stated that the SEC is unopposed to this motion and the relief requested herein.

Counsel for the Receiver conferred with John Little, the Court-appointed Examiner, who stated that he is unopposed to this motion and the relief requested herein.

Counsel for the Receiver conferred with Stephen Cochell, counsel for R. Allen Stanford, who did not provide a response regarding Mr. Stanford's position on this motion or the relief requested herein.

Counsel for the Receiver conferred with Jeff Tillotson, counsel for Laura Pendergest-Holt, who did not provide a response regarding Ms. Pendergest-Holt's position on this motion or the relief requested herein.

Counsel for the Receiver conferred with Gordon Russell, counsel for Trustmark National Bank, who stated that Trustmark is opposed to this motion and the relief requested herein.

Counsel for the Receiver conferred with Manuel P. Lena, Jr., counsel for the DOJ (Tax Division), who stated that the DOJ (Tax Division) is unopposed to this motion and the relief requested herein.

Counsel for the Receiver conferred with David Finn, who is listed on the docket sheet as attorney to be noticed for James Davis, who did not provide a response regarding Mr. Davis's position on this motion or the relief requested herein.

Counsel for the Receiver conferred with Jason Brookner, counsel for HP Financial Services Venezuela C.C.A., who did not provide a response regarding HPFS's position on this motion or the relief requested herein.

Counsel for the Receiver conferred with Andrew Warren, counsel for the DOJ (Fraud Division), who stated that the DOJ (Fraud Division) takes no position on this motion or the relief requested herein.

Counsel for the Receiver conferred with Stephanie Curtis, counsel for INX, Inc., who did not provide a response regarding INX's position on this motion or the relief requested herein.

Counsel for the Receiver conferred with John Helms, Jr., counsel for Mark Kuhrt, who did not provide a response regarding Mr. Kuhrt's position on this motion or the relief requested herein.

The motion, therefore, is opposed.

/s/ Kevin M. Sadler
Kevin M. Sadler