**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | Civil Action No.:  3:09-CV-0298-N |
| | § | |
| **STANFORD INTERNATIONAL** | § | |
| **BANK, LTD.,** *et al.* | § | |
| | § | |
| Defendants, | § | |
| _____ | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Dated:  February 19, 2013          Respectfully submitted,

*s/ David B. Reece*
DAVID B. REECE
Texas Bar No. 242002810
JANIE FRANK
Texas Bar No. 07363050
U.S. Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6476 (dbr)
(817) 978-4927 (fax)

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................ii-iii

TABLE OF AUTHORITIES ..............................................................................................iv-ix

Introduction............................................................................................................................1

I. ESTABLISHED FACTS THAT CANNOT BE DISPUTED ......................................................1

     A.    The Commission alleges that Stanford engaged in a long-running fraud scheme......2

     B.    In a parallel criminal action, Stanford was charged and convicted based on the same scheme, and Davis entered a guilty plea..............................................................3

     C.    As alleged in both the civil and criminal cases, Stanford was the sole shareholder of SIB and SGC, which he used to sell the CD.......................................5

     D.    As alleged in this case and as confirmed in the criminal trial, Stanford and Davis orchestrated a long-running fraud scheme...............................................................7

     E.    As alleged in this case and as confirmed in the criminal trial, Stanford's fraud scheme included multiple misrepresentations regarding investment strategy............9

     F.    As alleged in this case and as confirmed in the criminal trial, Stanford also falsified SIB's financial statements ..........................................................................10

     G.    As alleged in this case and as confirmed in the criminal trial, Stanford misrepresented that he invested his personal money in SIB.....................................11

     H.    As alleged in this case and as confirmed in the criminal trial, Stanford also misrepresented the oversight provided by the Antiguan regulatory authorities and an outside auditor ...............................................................................................12

II. ARGUMENT ...........................................................................................................13

     A.    Summary of the Argument........................................................................................13

     B.    A criminal conviction arising from the same facts establishes liability as a matter of law in a related civil proceeding...............................................................14

     C.    Stanford, Davis, SIB, and SGC are liable as a matter of law for violating the antifraud provisions of the Securities Act and the Exchange Act ...........................17

          1.   The civil fraud claims hinge on the same conduct required to support the criminal conviction ........................................................................................17

2. Stanford had a full and fair opportunity to refute the criminal charges...........19

3. It is undisputed that Stanford owned and controlled SIB and SGC, making those entities liable for his fraudulent actions...................................................19

4. Summary Judgment Against Davis Is Also Appropriate................................20

D. Stanford's Criminal Conviction Establishes His Liability, and that of SGC, Under the Adviser's Act .........................................................................................21

E. SIB and SGC are liable under Section 7(d) of this Investment Company Act.........22

F. The Commission is Entitled to the Relief Requested in the Complaint ...................25

1. Injunction ........................................................................................................26

2. Disgorgement...................................................................................................27

3. Prejudgment Interest .......................................................................................30

4. Civil Penalty....................................................................................................31

III. CONCLUSION.....................................................................................................................33

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A.J. White v. SEC*,
　556 F.2d 619 (1st Cir.), *cert. denied*, 434 U.S. 969 (1977) .......................................20

*Aaron v. SEC*,
　446 U.S. 680 (1980)......................................................................................................17

*Allen v. McCurry*,
　449 U.S. 90 (1980)........................................................................................................14

*Anderson v. Liberty Lobby Inc.*,
　477 U.S. 242 (1986).......................................................................................................14

*Andrews v. Dairy Farmers of America, Inc.*,
　2011 U.S. Dist. LEXIS 130109 (S.D. Mississippi Nov. 9, 2011)................................18

*In re Brown*,
　951 F.2d 564 (3d Cir. 1991)..........................................................................................16

*Chris-Craft Industrial, Inc. v. Piper Aircraft Corp.*,
　516 F.2d 172 (2d Cir. 1975), *rev'd on other grounds*, 430 U.S. 1 (1977) ..................30

*Emich Motors Corp. v. GMC*,
　340 U.S. 558 (1951)..........................................................................................15, 16, 19

*In re GMC*,
　110 F.3d 1003 (4th Cir.), *cert. denied*, 522 U.S. 814 (1997)......................................28

*Glantz v. United States*,
　837 F.2d 23 (1st Cir. 1988)............................................................................................21

*Hinkle Northwest, Inc. v. SEC*,
　641 F.2d 1304 (9th Cir. 1981) ......................................................................................14

*Inv. Funds Institute of Canada, SEC No-Action Letter*,
　1996 WL 102167 (March 4, 1996) ...............................................................................23

*Janvey v. Democratic Senatorial Campaign Committee, Inc.*,
　793 F.Supp.2d 825, 856 (N.D. Tex. 2011) ..................................................................25

*Maietta v. Artuz*,
　84 F.3d 100 (2d Cir. 1996).............................................................................................15

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,*
    904 F.2d 786 (1st Cir.), *cert. denied*, 498 U.S. 992 (1990) ........................................18

*Municipality of Anchorage v. Hitachi Cable, Ltd.,*
    547 F. Supp. 633 (D. Ala. 1982)............................................................................14

*Neder v. U.S.,*
    527 U.S. 1 (1999)......................................................................................................18

*Parklane Hosiery Co., Inc. v. Shore,*
    439 U.S. 322 (1979)............................................................................................14, 15

*Point Developers, Inc. v. FDIC,*
    961 F. Supp. 449 (E.D.N.Y. 1997) ...........................................................................16

*SEC v. AbsoluteFuture.com,*
    393 F.3d 94 (2d Cir. 2004)........................................................................................28

*SEC v. Banner Fund Int'l,*
    211 F.3d 602 (D.C. Cir. 2000) ..................................................................................23

*SEC v. Bilzerian,*
    29 F.3d 689 (D.C. Cir. 1994), *cert. denied*, 514 U.S. 1011 (1995) ...........................15

*SEC v. Bilzerian,*
    814 F. Supp. 116 (D.D.C. 1993) ...............................................................................27

*SEC v. Blackwell,*
    477 F. Supp. 2d 891 (S.D. Ohio 2007) ........................................................15, 16, 20

*SEC v. CMKM Diamonds, Inc.,*
    635 F. Supp. 2d 1185 (D. Nev. 2009)........................................................................32

*SEC v. Calvo,*
    378 F.3d 1211 (11th Cir. 2004) ................................................................................28

*SEC v. Cavanagh,*
    155 F.3d 129 (2d Cir.1998)........................................................................................27

*SEC v. Contorinis,*
    2012 U.S. Dist. LEXIS 19961 (S.D.N.Y. Feb. 3, 2012)............................................28

*SEC v. Dimensional Entm't Corp.,*
    493 F. Supp. 1270 (S.D.N.Y. 1980).................................................................... 14, 16

*SEC v. First City Fin. Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989)..........................................................................27, 28

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir.1996), *cert. denied*, 522 U.S. 812 (1997)..............26, 29, 30, 31

*SEC v. First Pacific Bancorp*,
    142 F.3d 1186 (9th Cir. 1998), *cert. denied*, 525 U.S. 1121 (1999)...........................30

*SEC v. Gordon*,
    822 F. Supp. 2d 1144 (N.D. Okla. 2011)..........................................................28

*SEC v. Grossman*,
    887 F. Supp. 649 (S.D.N.Y.), *aff'd,* 101 F.3d 109 (2d Cir. 1996) ..............................15

*SEC v. Haligiannis*,
    470 F. Supp. 2d 373 (S.D.N.Y. 2007)..............................................................15

*SEC v. Hughes Capital*, *aff'd w/o opinion*, 1997 U.S. App. LEXIS 24480 (3d Cir.
    July 9, 1997)
    917 F. Supp. 1080 (D.N.J. 1996) ................................................................28, 31

*SEC v. Kimmes*,
    799 F. Supp. 852 (N.D. Ill. 1992), *aff'd*, 997 F.2d 287 (7th Cir. 1993)......................17

*SEC v. MacDonald*,
    699 F.2d 47 (1st Cir. 1983).......................................................................28

*SEC v. Mgmt Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975)......................................................................20

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972)...............................................................20, 26

*SEC v. Marker*,
    427 F. Supp. 2d 583 (M.D. N.C. 2006) ..........................................................27

*SEC v. Pros Int'l, Inc.*,
    994 F.2d 767 (10th Cir. 1993) ...................................................................27

*SEC v. Research Automation Corp.*,
    585 F.2d 31 (2d Cir. 1978)........................................................................26

*SEC v. Resnick*,
    604 F. Supp. 2d 773 ..............................................................15, 16, 26, 27

*SEC v. Roor*,
  2004 U.S. Dist. LEXIS 17416, 2004 WL 1933578 (S.D.N.Y. Aug.30, 2004)............20

*SEC v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968), *cert. denied sub nom Coates v. SEC*, 394 U.S.
  976 (1969) .......................................................................................................................17

*SEC v. United Energy Partners, Inc.,* 88 Fed. Appx. 744, 747 (5th Cir.), *cert.
  denied*, 2004 U.S. LEXIS 8188 (2004)......................................................................32

*Sedlack v. Braswell Services Group. Inc.*,
  134 F.3d 219 (4th Cir. 1998) .....................................................................................16

*Sharp v. Coopers & Lybrand*,
  649 F.2d 175 (3d Cir. 1981), *cert. denied*, 455 U.S. 938 (1982)...............................20

*Touche, Remnant & Co., SEC No-Action Letter*,
  1984 WL 45636 (July 27, 1984) .................................................................................23

*U.S. v. Mihaly*,
  67 F.3d 894 (10th Cir. 1995) ......................................................................................27

*U.S. v. Naftalin*,
  441 U.S. 768 (1979)....................................................................................................17

*U.S. v. Finney*,
  714 F.2d 420 (5th Cir. 1983) ......................................................................................18

*U.S. v. Lucas*,
  516 F.3d 316 (5th Cir. 2008) ......................................................................................18

*U.S. v. Massey*,
  827 F.2d 995 (5th Cir. 1987) ......................................................................................18

*U.S. v. Mihaly*,
  67 F.3d 894 (10th Cir. 1995) ...................................................................................27

*U.S. v. Podell*,
  572 F.2d 31 (2d Cir.1978)...........................................................................................20

*U.S. v. Quadro Corp.*,
  928 F. Supp. 688 (E.D. Tex. 1996) ............................................................................18

# DOCKETED CASES

*United States of America v. Davis,*
   Crim. No. 4:09-CR00335, (S.D. Tex. June 18, 2009) .................................................5

*United States of America v. Stanford*,
   Crim. No. 4:09CR00342-001, (S.D. Tex. June 18, 2009) ....................1, 3, 4, 5, 19, 29

In re: Stanford International Bank, Ltd., Debtor in a Foreign Proceeding,
   Civ. No. 09-0721-N .............................................................................................24

# FEDERAL STATUTES

Section 17(a) of the Securities Act of 1933
   [15 U.S.C. §77q(a)]...............................................................................17, 19, 21, 26

Section 20(b) of the Securities Act of 1933
   [15 U.S.C. § 77t(b)] .............................................................................................26

Section 20(d) of the Securities Act of 1933
   [15 U.S.C. § 77t(d)] .............................................................................................31

Section 20(d) of the Securities Act of 1933
   [15 U.S.C. § 77t(d)(2)]...........................................................................................32

Section 10(b) of the Exchange Act of 1934
   [15 U.S.C. § 78j(b)] .............................................................................17, 20, 21, 26

Section 21(d) of the Securities Exchange Act of 1934
   [15 U.S.C. § 78u(d)] .............................................................................................26, 31

Section 21(d) of the Securities Exchange Act of 1934
   [15 U.S.C. § 78u(d)(3)(B)] .....................................................................................32

Section 21A of the Securities Exchange Act of 1934
   [15 U.S.C. § 78u-1]...............................................................................................26

Section 2 of the Investment Company Act of 1940
   [15 U.S.C. § 80a-2(40)] .........................................................................................25

Section 3 of the Investment Company Act of 1940
   [15 U.S.C. § 80a-3(a)(1)(A)] .................................................................................23

Section 41 of the Investment Company Act of 1940
   [15 U.S.C. § 80a-41(d)] .........................................................................................26

Section 41 of the Investment Company Act of 1940
[15 U.S.C. § 80a-41(e)(2)(C)]....................................................................32

Section 7 of the Investment Company Act of 1940
[15 U.S.C. § 80a-7(d)] .....................................................................23, 25

Section 202(11) of the Investment Advisers Act of 1940
[15 U.S.C. § 80b-2(11)] ...........................................................................22

Section 206(1) of the Investment Advisers Act of 1940
[15 U.S.C. § 80b-6]....................................................................21, 22, 26

Section 206(2) of the Investment Advisers Act of 1940
[15 U.S.C. § 80b-6]....................................................................21, 22, 26

Section 209(e) of the Investment Advisers Act of 1940
[15 U.S.C. § 80b-9(e)] ............................................................................31

Section 209 of the Investment Advisers Act of 1940
[15 U.S.C. § 80b-9(d)] ...........................................................................26

Section 209 of the Investment Advisers Act of 1940
[15 U.S.C. § 80b-9(e)(2)(C)] ...................................................................32

Section 270.3a-6 of the Investment Company Act of 1940
[17 C.F.R. 270.3a-6(b)(1)(i) ....................................................................23

Section 270.3a-6 of the Investment Company Act of 1940
[17 C.F.R. 270.3a-6(b)(2)]....................................................................23, 24

Rule 10b-5 of the Securities Exchange Act of 1934
[17 CFR 240.10b-5].............................................................17, 20, 21, 26

## Introduction

Plaintiff Securities and Exchange Commission moves under Rule 56(a) of the Federal Rules of Civil Procedure for summary judgment against defendants R. Allen Stanford ("Stanford"), James Davis ("Davis"), Stanford International Bank, Ltd. ("SIB"), and Stanford Group Company ("SGC") liable for each claim alleged against them by the Commission in the Second Amended Complaint and liable for disgorgement, prejudgment interest, and monetary civil penalties. [*See* Dkt. 952].[1]

In the parallel criminal case, *United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 1 (S.D. Tex.), a jury convicted R. Allen Stanford of 13 counts of criminal violations. Stanford has been sentenced to serve 1320 months in federal prison and ordered to forfeit $5.9 billion in assets.  The same facts that led to his conviction conclusively establish his civil liability and the liability of the companies he owned.  In addition, James Davis pled guilty to the same basic conduct that supported Stanford's criminal conviction.  The results of these criminal proceedings conclusively confirm the defendants' liability.  Therefore, the Commission asks the Court to enter a partial summary judgment against them.

## I.

## ESTABLISHED FACTS THAT CANNOT BE DISPUTED[2]

The overlap between the factual predicates to civil liability in this case and the factual

---

1        The Commission is not seeking at this time partial summary judgment against Stanford Capital Management, Laura Pendergest-Holt, Gilberto Lopez, Mark Kurht, or Leroy King.

2        As discussed in this brief, most of the material facts center on the overlap of this case's allegations with the facts established in the criminal case.  Therefore, many citations are to materials in the public record.  Where necessary, cites to specific materials are to the Appendix in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl's MSJ App."), filed by the Commission simultaneously with this Brief in Support and fully incorporated as if set forth *verbatim* herein.  Other references are to court documents in the public record, identified by case name and number and docket number within that case.  The Court may take judicial notice of these publicly available judicial records.

findings underlying the jury's verdict in the criminal case is overwhelming.  [*See* Dkt. 948, Order

Granting Motion of Department of Justice to Intervene and to Stay Discovery ("[t]his case and

the parallel criminal case involve allegations based on substantially the same set of facts.

Allegations in both cases arise from the same alleged Ponzi scheme involving the Stanford

entities and their officers and directors.")].  For the Court's convenience, we have set out below a

brief summary of the civil and criminal actions, followed by a more detailed discussion of the

underlying facts that have been established.

> **A.    The Commission alleges that Stanford engaged in a long-running fraud scheme.**

The Commission filed this action against Stanford and others on February 17, 2009. [*See*

Dkt. 1.]  It amended the Complaint on February 27, 2009 and January 8, 2010, after obtaining the

Court's leave.  The Second Amended Complaint alleges:

- that for at least a decade, Stanford and Davis executed a massive Ponzi scheme through entities under their control, including SIB and its affiliated Houston-based broker-dealer and investment adviser SGC, and through that scheme fraudulently obtained billions of dollars of investor funds and falsified SIB's financial statements in an effort to conceal their fraudulent conduct.  The scheme centered on marketing self-styled certificates of deposits issued by SIB ("the CD") through, among others, SGC. [Second Am. Complaint at ¶ 1-2.]

- By year-end 2008, SIB had sold more than $7.2 billion in CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.  [Second Am. Complaint at ¶ 2.]

- Contrary to SIB's public statements, Stanford and Davis, by February 2009, had misappropriated billions of dollars of investor money and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled by Stanford. [Second Am. Complaint at ¶ 3.]

- In an effort to conceal their fraudulent conduct and maintain the flow of investor money to SIB's coffers, Stanford and Davis fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio. [Second Am. Complaint at ¶ 4.]

- Using a pre-determined return on investment number, typically provided by Stanford or Davis, accountants Gil Lopez and Mark Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn. [Second Am. Complaint at ¶ 4.]

- Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments. SIB's financial statements and annual reports to investors were prepared, drafted, and approved by Stanford and Davis, and they signed these falsified financial statements. [Second Am. Complaint at ¶¶ 4, 38, 53 and 54.]

- Leroy King, the administrator and chief executive officer of Antigua's Financial Services Regulatory Commission ("FSRC" or "Antiguan Regulatory Commission"), facilitated the Ponzi scheme by ensuring that FSRC "looked the other way" and conducted sham audits and examinations of SIB's books and records. In exchange for bribes paid to him over a period of several years, King made sure that FSRC did not examine SIB's investment portfolio. King also provided Stanford with access to FSRC's confidential regulatory files, including requests by the Commission for assistance in investigating SIB as a possible Ponzi scheme. King further obstructed the Commission's investigation by allowing Stanford to dictate the substance, and even content, of FSRC's responses to the Commission that relayed false assurances that there was no cause for concern as to SIB and by withholding information requested by the Commission that would have revealed Stanford's fraud. [Second Am. Complaint at ¶¶ 6, 85, 87, 88, 89, 90 and 91.]

After the Commission's civil case was filed, the Court appointed a Receiver over, among others, Stanford, SGC, SIB and other entities Stanford controlled. In the three years since then, the Court has been presented with extensive evidence confirming that Stanford orchestrated a Ponzi scheme.

**B.   In a parallel criminal action, Stanford was charged and convicted based on the same scheme, and Davis entered a guilty plea.**

In June 2009, a grand jury in the Southern District of Texas indicted Stanford for perpetrating a scheme to defraud in connection with the CD program to advance his own personal interest and those of his companies (the "Criminal Action"). [*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 1 (S.D. Tex. June 18, 2009) ("Stanford

Indictment"), attached at Pl's MSJ App. at 1-57].  In a superseding indictment based on the same conduct, Stanford was charged with violations of the statutes prohibiting conspiracy to commit wire fraud and mail fraud, 18 U.S.C. § 1349, wire fraud, 18 U.S.C. §§ 1342, 1343, mail fraud, 18 U.S.C. §§ 1341, 1342, conspiracy to obstruct an SEC investigation, 18 U.S.C. § 371, obstruction of an SEC investigation, 18 U.S.C. §§ 1502, 1505, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h). Furthermore, the prosecution gave notice to Stanford that in the event of his conviction of any of the offenses charged, pursuant to Title 28, United States Code, Sections 981(a)(1)(C), 982(a)(1), and 2461(c), the United States intended to forfeit certain property. [*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 422 (S.D. Tex. May 4, 2011) ("Superseding Indictment") (Pl's MSJ App. at 58-87).]

On March 6, 2012, a jury convicted Stanford on 13 of 14 possible counts, finding him guilty of conspiracy to commit mail and wire fraud, four counts of wire fraud, five counts of mail fraud, one count of conspiracy to obstruct an SEC investigation, one count of obstruction of an SEC proceeding, and one count conspiracy to commit money laundering. [*See United States of America v. Stanford*, Crim. No. H-09-342, Dkt. 808 (S.D. Tex. March 6, 2012) ("Jury Verdict") (Pl's MSJ App. at 88-92).]

Following the criminal conviction, a forfeiture trial was conducted.  The jury found that assets in various Stanford-related accounts were the proceeds of Stanford's scheme to defraud and therefore found that all funds on deposit in 27 of the 29 foreign accounts were proceeds of both the conspiracy and the scheme to defraud and were therefore subject to forfeiture. [*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 862 (S.D. Tex. June 1, 2012) ("Amended Order of Forfeiture") (Pl's MSJ App. at 93-99).]

On June 14, 2012, the trial court sentenced Stanford to 110 years in federal prison, and

ordered him to forfeit more than $5.9 billion. [*See United States of America v. Stanford*, Crim. No. 4:09CR00342-001, Dkt. 878 (S.D. Tex. June 14, 2012) ("Judgment in a Criminal Case"); Dkt. 881 ("Order of Forfeiture at Sentencing") (Pl's MSJ App. at 100-103).] Stanford has filed a notice of appeal.

Davis was also criminally charged in June 2009. On August 27, 2009, Davis entered a Plea Agreement in which he agreed to plead to the three counts he had been charged with in the original information. His Plea Agreement contains a factual recitation as the basis for the charges of conspiracy to commit mail, wire and securities fraud, mail fraud, and conspiracy to obstruct an SEC investigation. [See *United States of America v. James M. Davis*, Crim. No. H-09-335, Dkt. 30 (S.D. Tex. August 27, 2009) ("Plea Agreement" at ¶¶17(a)-17(ll)), (Pl's MSJ App. at 104-134).] That factual recitation contains in essence the same facts alleged in the Commission's Second Amended Complaint, as well as the facts on which Stanford was later convicted. On January 2013, Davis was sentenced to serve sixty months in federal prison and to serve three years under supervised release. [See Case No. 4:09-cr-335, Doc. No. 89 (Pl's MSJ App. at 134A].

### C. As alleged in both the civil and criminal cases, Stanford was the sole shareholder of SIB and SGC, which he used to sell the CD.

Stanford was, until his fraudulent scheme was halted, the chairman of the board and the sole shareholder of SIB, and the sole shareholder of SGC's parent company. [Superseding Indictment at ¶ 6; Stanford's Answer to First Amended Complaint at ¶ 15 ("Stanford's Answer"), Dkt. 249 (Stanford admits these allegations by the Commission).][3]

SIB purported to be a private international bank domiciled in St. John's, Antigua, West Indies, with over 50,000 clients in over 100 countries and with assets under management of

---

3    Stanford filed an Answer to the Commission's First Amended Complaint, but has not answered the Second Amended Complaint. Regardless, he cannot avoid his own admissions.

approximately $8 billion.  Unlike a commercial bank, SIB did not make commercial loans. Instead its primary product was a self-styled certificate of deposit which SIB marketed to investors by promising substantially higher rates of return than were generally offered at banks in the United States.  [See Superseding Indictment at 2.]

SIB sold the CD to investors through, among other entities, its affiliate SGC. [Second Am. Complaint at 13; First Am. Complaint at ¶ 12, Dkt. 48, and Stanford's Answer at ¶ 12, Dkt. 249 (Stanford admitting that allegation in the First Amended Complaint); see also Superseding Indictment at ¶18.] Furthermore, SIB's primary product was the CD which the bank marketed to investors by promising substantially higher rates of return than were generally offered at banks in the United States. [Superseding Indictment at ¶ 2; Second Am. Complaint at ¶2.]  SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts. [First Am. Complaint at ¶19, Dkt. 48, and Stanford's Answer at ¶ 19, Dkt. 249 (Stanford admits these allegations by the Commission).]

SGC, a Houston-based entity, is registered with the Commission as a broker-dealer and investment adviser. [Second Am. Complaint at 13; Superseding Indictment at 3].  SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by R. Allen Stanford. [First Am. Complaint at ¶ 13, Dkt. 48, and Stanford's Answer at ¶ 13, Dkt. 249 (Stanford admits these allegations by the Commission); Superseding Indictment at 6 (Stanford was the sole shareholder of SGC and SIB).]  It had multiple offices located throughout the United States (including an office in Dallas). SGC, through its financial advisors, marketed and sold the CD.  [Second Am. Complaint at 14; Superseding Indictment at 4].  As an incentive to sell the CDs, the commissions that SGC's financial advisors earned from sales of the CDs were substantially higher than those earned from the sale of other financial products. [Superseding

Incitement at ¶ 4; Second Am. Complaint at ¶¶ 28 and 29.]

Although SIB was not a commercial bank and was selling its securities (i.e., the CD) in the United States through SGC, it never registered as an investment company under the Investment Company Act of 1940.  [See Affidavit of Curtis Francisco, Pl's MSJ App. at 135].

> **D.**    **As alleged in this case and as confirmed in the criminal trial, Stanford and Davis orchestrated a long-running fraud scheme.**

From at least 1990 through February 17, 2009, Stanford and Davis, together with others, perpetrated a scheme to defraud investors who purchased SIB CDs of billions of dollars by soliciting funds under false pretenses, failing to invest those funds as promised, misappropriating funds for personal use, creating and disseminating false and fraudulent documents to investors falsely showing how their funds had been invested, and funneling bribes to an Antiguan regulator and an outside auditor to conceal the scheme. [Superseding Indictment at ¶ 13; *see also* Complaint at ¶¶ 1, 3, 4 and 39; Plea Agreement at ¶¶17(a)-17(ll).]

In order to execute their scheme, Stanford and his co-conspirators disseminated and caused others to disseminate various representations falsely describing SIB CDs to potential existing investors. According to those representations, which Stanford reviewed and approved, SIB invested the proceeds from the sales of its CDs in a portfolio consisting of various assets, and the performance of that investment portfolio generated returns that SIB then paid to the purchasers of the CDs. Therefore, the return earned by investors who purchased the CDs depended on SIB's strategy in investing proceeds from the sale of the CDs.  [Superseding Indictment at ¶ 14; *see also* Complaint at ¶¶ 4 and 38.] Stanford and his co-conspirators disseminated documents, which falsely described the make-up and performance of SIB's investment portfolio, including SIB's financial statements and other periodic reports, to current SIB CD investors as well as to prospective investors. [Superseding Indictment at ¶ 15; *see also*

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
*SEC v. Stanford Int'l Bank, Ltd., et al.*

Complaint at ¶¶ 4 and 38; Plea Agreement at ¶¶17(c)-17(n).]

The representations that Stanford and his co-conspirators made regarding the operation and nature of SIB CDs, as well as the roles played by the outside auditor and Antiguan regulators to protect investors, were false. Specifically, Stanford and his co-conspirators executed their scheme by making and causing others to make to investors the following misrepresentations, among others:

1. All of the proceeds from the sales of the CDs would be invested with professional money managers in conservative highly liquid assets, such as stocks, bonds, and foreign currencies, when, in fact, as Stanford and his co-conspirators knew, billions of dollars were funneled to Stanford in the form of undisclosed personal "loans";

2. SIB was earning substantial rates of return on its investment portfolio, when, in fact, as Stanford and his co-conspirators knew, SIB was steadily losing money because its investment portfolio was not invested in profitable assets as represented, and because Stanford did not repay the loans he had made to himself from SIB;

3. Stanford had personally invested hundreds of millions of dollars of cash into SIB to provide capital, when, in fact, as Stanford and his co-conspirators knew, no such investment ever took place and in fact Stanford had borrowed approximately $2 billion from SIB; and

4. The Antiguan Regulatory Commission regulated SIB, and the outside auditor verified the accuracy of the disclosures in SIB's financial statements, when, in fact, as Stanford and his co-conspirators knew, Stanford bribed both King and the outside auditor to conceal his fraudulent scheme from investors and the SEC.

[Superseding Indictment at ¶ 16; *see also* Complaint 32-47 and 84-93; Plea Agreement at ¶¶17(d)-17(t).]

Contrary to their representations to investors, Stanford and his co-conspirators fraudulently obtained investor funds and diverted those funds in myriad ways, including financing Stanford's personal business ventures and lavish lifestyle. By December 2008, SIB represented to investors that it had approximately $8.5 billion in assets when in fact approximately $2 billion of that total consisted of undisclosed personal "loans" to Stanford, who

had merely fraudulently obtained funds from investors and then spent those funds, contrary to what was told to investors, to finance his personal, failing business ventures and for his own use and enjoyment, including personal living expenses, several yachts and private jet airplanes, and numerous residences around the world. [Superseding Indictment at ¶ 17; *see also* Complaint at ¶¶ 31, 39, 40, 41 and 46; Plea Agreement at ¶¶17(n), 17(cc).]

> **E.    As alleged in this case and as confirmed in the criminal trial, Stanford's fraud scheme included multiple misrepresentations regarding investment strategy.**

Stanford and his co-conspirators reviewed and caused the issuance of SIB's periodic annual, quarterly, and monthly financial reports, which were provided to investors and used by SGC's financial advisors in marketing SIB CDs, together with various other SIB documents and brochures that claimed to describe SIB's investment portfolio. The periodic reports and other documents falsely represented that the CDs were safe and secure investments. For example, the SIB December 2008 Monthly Report emphasized that SIB was "strong, safe and fiscally sound" and that its investment strategy for the CDs consisted of a "conservative approach" that was "long term, hands on and globally diversified with strong liquidity and minimal leverage." [Superseding Indictment at ¶ 18; *see also* Complaint at ¶¶ 2, 31, 33, 34, 35, 36, 47 and 54; Plea Agreement at ¶17(n).]

Specifically, Stanford and his co-conspirators made false and misleading statements regarding the management of SIB's investment portfolio. According to those false statements, SIB's entire investment portfolio was closely managed by a global network of independent money managers who worked outside the bank. In fact, as Stanford and his co-conspirators knew, only a fraction of SIB's reported investment portfolio was invested as SIB represented. [Superseding Indictment at ¶ 19; *see also* Complaint at ¶¶ 3, 32, 68, 69, 70 and 71; Plea

Agreement ¶17(cc).]

Stanford and his co-conspirators made similarly false and misleading representations concerning SIB's investment strategy. For example, SIB's CD Disclosure Statement described SIB's investment strategy as seeking to "minimize risk and achieve liquidity" through asset diversification in "readily marketable" securities. In various periodic reports issued by SIB, Stanford and his co-conspirators falsely represented the different types of asset classes into which investor proceeds had purportedly been invested, specifically misidentifying the percentages held in stocks, bonds, foreign currencies, and other financial assets. [Superseding Indictment at ¶ 20; *see also* Complaint at ¶¶ 33, 34 and 35.]

> **F.    As alleged in this case and as confirmed in the criminal trial, Stanford also falsified SIB's financial statements.**

To induce investors to purchase the CDs and to conceal their fraud, Stanford and his co-conspirators falsified the financial statements for SIB that were disseminated to potential and existing CD investors, misrepresenting, among other material facts, the value and performance of SIB's investment portfolio. [Superseding Indictment at ¶ 21; *see also* Complaint at ¶¶ 4 and 54; Plea Agreement ¶¶17(f)-17(n).] Beginning at least as early as 1990, when SIB was still known as Guardian Bank, the value and performance of the bank's assets were less than it reported to CD investors. Over time, that gap steadily grew. To conceal this discrepancy, Stanford and his co-conspirators misrepresented the nature and value of the assets in SIB's investment portfolio. For example, in June 2008, Stanford and his co-conspirators caused SIB to report that SIB's investment portfolio contained approximately $8 billion in assets consisting of stocks, bonds, foreign currencies, and other financial assets. In fact, SIB had only invested a fraction of this amount in such assets, and the balance of the portfolio had been misappropriated by Stanford in the form of undisclosed personal loans to finance his various personal business ventures.

[Superseding Indictment at ¶ 22; *see also* Complaint at ¶¶ 3, 31, 37, 39, 40, 46 and 48; Plea Agreement ¶¶17(c)-17(n).]

Stanford and his co-conspirators also made and caused to be made false and misleading representations concerning SIB's financial condition by touting year-by-year percentage and dollar amount increases in the supposed value of its earnings, revenue, and assets. According to SIB's fabricated financial disclosures, the purported value of SIB's assets rose from approximately $1.2 billion in 2001 to approximately $8.5 billion in December 2008. In fact, as Stanford and his co-conspirators knew, those values were entirely fictional and designed to deceive investors into believing that SIB's investment portfolio was performing as represented. [Superseding Indictment at ¶ 23; *see also* Complaint at ¶¶ 31, 49 and 53.]

> **G.     As alleged in this case and as confirmed in the criminal trial, Stanford misrepresented that he invested his personal money in SIB.**

Stanford also misrepresented to investors that he provided his own money to buttress SIB. As the financial crisis grew in 2008, investors began to redeem their CDs. Between May and December 2008, Stanford directed SGC's financial advisors to inform their clients that Stanford had increased SIB's capital to approximately $1 billion by investing hundreds of millions of dollars into the bank's capital. In fact, as Stanford and his co-conspirators knew, Stanford never made any such investments in SIB. [Superseding Indictment at ¶¶ 24, 32, 58 and 65; *see also* Complaint at ¶ 58.]   In fact, Stanford had no funds other than those obtained from investors to invest.

Stanford and his co-conspirators repeatedly represented to investors that he had invested hundreds of millions of dollars in SIB, and they caused the internal records of SIB to be falsified to reflect the non-existent investments. For example, Stanford caused to be sent to investors SIB's monthly report for December 2008, which falsely represented that SIB had received a

"contribution" of approximately $541 million from Stanford. Similarly, on or about February 12, 2009, Stanford sent an email to SGC's financial advisors in which Stanford made representations that SIB "remains a strong institution" and that he had recently made "two capital infusions" into SIB, which the financial advisors then relayed to investors. [Superseding Indictment at ¶ 25; *see also* Complaint at ¶¶ 32, 58, 65 and 73.]

In late 2008 and early 2009, Stanford and his co-conspirators began formulating a plan to engage in a fraudulent revaluation of real estate in an attempt to generate artificial bookkeeping entries to support Stanford's supposed 2008 capital infusions and to offset the more than $2 billion in loans Stanford owed to SIB by this time. The plan contemplated using a series of related-party transactions between Stanford, SIB, and other Stanford-entities that would result in ascribing a value of $3.2 billion to real estate SIB had purchased only a few months earlier for $67.5 million. [Superseding Indictment at ¶ 26; *see also* Complaint at ¶¶ 62, 63, 64 and 65]

**H.     As alleged in this case and as confirmed in the criminal trial, Stanford also misrepresented the oversight provided by the Antiguan regulatory authorities and an outside auditor.**

Stanford and his co-conspirators also misrepresented the nature and extent of regulatory oversight of SIB. Specifically, they misrepresented that SIB's operations and financial condition were being closely overseen by FSRC and that SIB's financial statements were subject to annual audits and regulatory inspections by Antiguan regulators. Similarly, Stanford and his co-conspirators falsely represented that an outside auditor periodically reviewed and approved the accuracy of SIB's financial statements. In fact, as Stanford and his co-conspirators knew, they bribed Leroy King and an outside auditor to ensure that they did not accurately audit SIB's financial statements by verifying the existence or value of SIB's purported assets. [Superseding Indictment at ¶ 27; s*ee also* Complaint at ¶¶ 6, 54, 87, 92 and 93; see also Case No. 3:09-cv-

00721, Doc. No. 116-11, Direct Testimony of Ralph S. Janvey at pp. 11-20 [attached as Pl's MSJ App. at 136-165] and the attachments referenced in that testimony ("Janvey Testimony"), describing King's role in the fraud scheme].

In addition to ensuring that Antiguan regulators whom he supervised did not effectively scrutinize SIB, King also assisted Stanford in obstructing the Commission's investigation.  The Commission initiated an investigation of Stanford Financial in 2005 and began making official inquiries with FSRC, headed by King, regarding the value and content of SIB's purported investments. As part of that investigation, the Commission confidentially requested King's assistance in determining whether SIB and Stanford had perpetrated a fraud upon investors. [Superseding Indictment at ¶ 28; *see also* Complaint at ¶¶ 6, 87, 88, 89, 90 and 91; Janvey Testimony].

In September 2006, the Commission wrote to FSRC, confidentially requesting copies of FSRC's exam reports on SIB.  King provided the Commission's confidential requests for information to Stanford and his co-conspirators. King then made false representations in response to the Commission's official inquiries and allowed employees of Stanford-related entities employees to assist in preparing FSRC's response to the Commission's confidential inquiry. [Superseding Indictment at ¶ 29; *see also* Complaint at ¶¶ 6, 88, 89, 90 and 91; Janvey Testimony]

## II.
## ARGUMENT

### A.   Summary of the Argument

Stanford has been indicted, tried, convicted, and sentenced for criminal violations based on the same facts in the Commission's Second Amended Complaint.  Although Stanford's scheme involved elaborate "window-dressing," it was based on a simple premise:    Stanford

engaged in a long-running fraudulent scheme to defraud investors who purchased SIB CDs of billions of dollars by: (1) soliciting funds under false pretenses; (2) failing to invest those funds as promised; (3) misappropriating funds for personal use; (4) creating and disseminating false and fraudulent documents to investors falsely showing how their funds had been invested; and (5) funneling bribes to Antiguan regulators and an outside auditor to conceal the scheme. Because these necessary facts have already been judicially established, there are no genuine issues of material fact to be tried.   Consequently, summary judgment against Stanford is appropriate, and because Stanford perpetrated this fraud through and on behalf of SIB and SGC, summary judgment is appropriate against those entities.[4] Summary judgment is also appropriate against Davis based on his Plea Agreement.

> **B.     A criminal conviction arising from the same facts establishes liability as a matter of law in a related civil proceeding.**

Courts recognize that summary judgment is particularly appropriate in cases like this one, where the defendant has already been found guilty of crimes arising from the same acts.[5]     See generally *Hinkle Northwest, Inc. v. SEC*, 641 F.2d 1304, 1308-09 (9th Cir. 1981); *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F. Supp. 633, 641 (D. Ala. 1982); *SEC v. Dimensional Entertainment Corp.*, 493 F. Supp. 1270, 1274 (S.D.N.Y. 1980). That is because the doctrine of collateral estoppel provides that a prior judgment "precludes relitigation [in a second suit] of issues [of fact or law] actually litigated and necessary to the outcome of the first action." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.5 (1979); *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980). The doctrine applies even where the asserting party was not a party to

---

4       The Receiver appointed to manage the two entities concurs with the Commission that the facts set out in this motion are true and does not contest the entry of partial summary judgment against the entities.

5       Rule 56(a) provides that a Court should enter summary judgment when the movant demonstrates that there is no genuine issue of material fact, and it is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).

the first action, as long as its application does not offend principles of fairness and serves the interests of judicial economy. *Parklane Hosiery Co., Inc.*, 439 U.S. at 331; *see also SEC v. Resnick*, 604 F. Supp. 2d 773, 778 (collateral estoppel applies even if the second action differs significantly from the first action, and can be used by a non-party to the prior action against a defendant in that action).

The doctrine is especially applicable in a civil context to findings made in a criminal matter because of the higher burden of proof borne in the criminal proceeding. It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel against a defendant in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case. *See Maietta v. Artuz*, 84 F.3d 100, 103 n.1 (2d Cir. 1996); *see also Emich Motors Corp. v. GMC*, 340 U.S. 558, 568 (1951) ("It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding."). As observed by one court: "The prevalence of estoppel in civil cases following their criminal counterparts is due in part to the court's desire to avoid inconsistent verdicts in light of the higher burden of proof required in the prior criminal case." *SEC v. Blackwell*, 477 F. Supp. 2d 891, 899 (S.D. Ohio 2007); *see also SEC v. Grossman*, 887 F. Supp. 649, 659 (S.D.N.Y.), *aff'd,* 101 F.3d 109 (2d Cir. 1996); *SEC v. Bilzerian*, 29 F.3d 689, 693-95 (D.C. Cir. 1994), *cert. denied*, 514 U.S. 1011 (1995); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007).

Collateral estoppel is proper if: (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue was actually determined in the prior proceeding; (3) determination of the issue was critical and necessary to the decision in the prior proceeding; (4) the prior judgment is final and valid; and (5) the party against whom preclusion is asserted had a full and fair opportunity to litigate the issue in the previous forum. *Resnick*, 604 F. Supp. 2d at

778 (citing *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998)); *see also Emich*, 340 U.S. at 568-69.

With respect to the fifth factor, the court must examine whether the party against whom preclusion is asserted had the chance to present evidence and mount a defense against the criminal charges. *Blackwell*, 477 F. Supp. 2d at 901; *see also Resnick*, 604 F. Supp. 2d 779-80 (for purposes of collateral estoppel, the key is the fullness and fairness of the opportunity to litigate). This is found where the non-moving party had the incentive to litigate vigorously in the prior proceeding, and was able in that proceeding to examine the evidence against him, present his own evidence, cross-examine witnesses, be represented by competent counsel, and otherwise enjoy the protections of due process as relates to the issues under dispute. *Resnick*, 604 F. Supp. 2d at 780. Furthermore, while "the moving party has the burden of demonstrating the identity of the issues,…the opposing party has the burden of showing lack of a full and fair opportunity to litigate the issue in the prior action." *Point Developers, Inc. v. FDIC*, 961 F. Supp. 449, 460 (E.D.N.Y. 1997). For the purpose of collateral estoppel, a judgment can be final and valid even if it remains appealable. *Id.* at 779, n.5; *see also In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991); *Blackwell*, 477 F. Supp. 2d at 901 (the majority of courts have concluded that a pending criminal appeal does not bar the court from applying principles of claim preclusion to the plaintiff's case).

Finally, the criminal indictment underlying the conviction does not need to exactly match the civil complaint in order to have a preclusive effect. Even if the statutory violations differ, the issue is whether the factual allegations underlying the criminal convictions are sufficient to establish the civil allegations. *SEC v. Dimensional Entertainment Corp.*, 493 F. Supp. 1270, 1277 (S.D.N.Y. 1980); *see also Blackwell*, 477 F. Supp. 2d at 900 (the issue is whether the indictment and the civil complaint involved the same conduct with respect to the alleged

violations).

**C.      Stanford, Davis, SIB, and SGC are liable as a matter of law for violating the antifraud provisions of the Securities Act and the Exchange Act.**

Stanford's criminal conviction establishes his liability for securities fraud under the Exchange Act and the Securities Act.  Similarly, SIB and SGC are liable under those provisions because of Stanford's conduct. Davis is liable based on the facts established in his Plea Agreement.

**1.      The civil fraud claims hinge on the same conduct required to support the criminal conviction.**

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, prohibit the employment of fraudulent devices in connection with the offer, purchase, or sale of securities. *See U.S. v. Naftalin*, 441 U.S. 768, 778 (1979) (The Supreme Court has recognized that the antifraud provisions of the Securities Act and the Exchange Act prohibit essentially the same conduct.).  The Commission must show that Stanford: (1) by the use of the mails or an instrumentality of interstate commerce; (2) made false and misleading statements or omissions of material fact or otherwise employed any device, scheme, or artifice to defraud or engage in any transaction, practice or course of business which operates as a fraud or deceit; (3) in connection with the offer, purchase or sale of securities; and (4) acted with the requisite intent or *scienter. Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968), *cert. denied sub nom Coates v. SEC*, 394 U.S. 976 (1969); *SEC v. Kimmes*, 799 F. Supp. 852, 858 (N.D. Ill. 1992), *aff'd*, 997 F.2d 287 (7th Cir. 1993).

Stanford's conviction of wire and mail fraud violations required the same factual findings necessary to establish Stanford's liability under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.  Specifically, the criminal jury necessarily found:   (1) the existence

of a scheme to defraud; (2) use of mails or interstate wires in furtherance of the scheme; and (3) the specific intent to defraud. *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983); *Andrews v. Dairy Farmers of America, Inc.*, 2011 U.S. Dist. LEXIS 130109, *17-18 (S.D. Mississippi Nov. 9, 2011) (citing *United States v. Lucas*, 516 F.3d 316, 319 (5th Cir. 2008)); *United States v. Quadro Corp.*, 928 F. Supp. 688, 695 (E.D. Tex. 1996); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.), *cert. denied*, 498 U.S. 992 (1990) ("[T]he scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct."). A misrepresentation must be material to constitute fraud under the statute. *Andrews*, 2011 U.S. Dist. LEXIS 130109, *18; *see also Neder v. U.S.*, 527 U.S. 1, 25 (1999) (holding that materiality is an element of mail fraud). All required elements must be established "beyond a reasonable doubt." *See*, *e.g., United States v. Massey*, 827 F.2d 995, 999 (5th Cir. 1987).

This legal standard was properly reflected in the jury instructions. Those instructions made it clear that: "For you to find a defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

1.  That the defendant knowingly created a scheme to defraud or to obtain money and property by means of materially false or fraudulent pretenses, representations, or promises;

2.  That the defendant acted with a specific intent to defraud;

3.  That the defendant used interstate or foreign wire communications or caused another person to use interstate or foreign wire communications for the purpose of carrying out the scheme; [or in the mail fraud instruction, 'That the defendant mailed something through the United States Postal Service or a private or

commercial interstate carrier for the purpose of carrying out the scheme';] and

4.   That the scheme to defraud employed false material representations."

[*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 807, pg. 24-28 ("Jury

Instructions")(Pl's MSJ App. at 166-211).]

The jury's verdict underlying Stanford's criminal conviction resolves all of the elements

needed to establish the Commission's securities fraud claims except, arguably, the "in

connection with a security" element. *See Emich*, 340 U.S. at 568-69 (in the case of a criminal

conviction based on a jury verdict of guilty, issues which were essential to the verdict must be

regarded as having been determined by the judgment).   It cannot be disputed, however, that the

entire criminal trial hinged on Stanford's fraudulent conduct in connection with marketing and

selling the CD.   And this Court has already ruled that the SIB CDs were securities for purposes

of the Commission's allegations in the Second Amended Complaint. [Dkt. 1483, pg. 10.]

Therefore, that element has also already been conclusively determined.

> ### 2.   Stanford had a full and fair opportunity to refute the criminal charges.

The only remaining element necessary to apply collateral estoppel is whether Stanford

had a full and fair opportunity to refute these criminal charges. He did. Throughout the criminal

proceedings, Stanford was represented by competent counsel. He and his attorneys mounted a

vigorous defense.   His trial lasted approximately six weeks.   Thus, all of the elements of

collateral estoppel are present, and it is appropriate to grant summary judgment on the

Commission's civil complaints.

> ### 3.   It is undisputed that Stanford owned and controlled SIB and SGC, making those entities liable for his fraudulent actions.

Having established Stanford's liability for fraud under Section 17(a) of the Securities Act

and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, SIB and SGC, as Stanford's principals, are responsible for that same fraud. This is because Stanford, acting as SIB's and SGC's agent, defrauded investors, and therefore SIB and SGC should be held liable as Stanford's principals. *See, e.g., A.J. White v. SEC*, 556 F.2d 619, 624 (1st Cir.), *cert. denied*, 434 U.S. 969 (1977) ("A firm …, can act only through its agents and is accountable for the actions of its responsible officers."); *see generally Sharp v. Coopers & Lybrand*, 649 F.2d 175, 180-85 (3d Cir. 1981), *cert. denied*, 455 U.S. 938 (1982) (where it is a function of the firm to influence the investing public, the firm will also be accountable for its employee's antifraud activities); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 813 (2d Cir. 1975) (holding brokerage firm accountable for its officer's illegal trading done in the firm's name during the course of the officer's employment); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972) (scienter of an individual who controls a business entity may be imputed to that entity); *Blackwell*, 477 F. Supp. 2d at 902 (imputing the fraudulent conduct underlying an individual's conviction to a trust, where the individual controlled and dominated the trust). Because there is no serious dispute that Stanford was the sole owner of and ultimately controlled SGC and SIB, those entities are liable for the fraud he committed.

### 4.  Summary Judgment Against Davis Is Also Appropriate.

Davis entered a Plea Agreement in the criminal case. For reasons similar to those stated above, the Plea Agreement establishes Davis's liability as to the Commission's antifraud claims against him in the Second Amended Complaint. *See United States v. Podell,* 572 F.2d 31, 35 (2d Cir.1978) ("It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case."); *SEC v. Roor,* 2004 U.S. Dist. LEXIS

17416, 2004 WL 1933578, at *7 (S.D.N.Y. Aug.30, 2004) (granting summary judgment in an

SEC enforcement action based on collateral estoppel following the defendant's guilty plea);

*Glantz v. United States*, 837 F.2d 23, 25 (1st Cir. 1988).

Specifically, Davis admitted in his Plea Agreement:  to conspiring with Stanford to solicit

investor funds and misappropriate them for personal use; to falsely telling investors that SIB's

investments were well-managed, safe and secure, invested in a strategy to minimize risk and

achieve liquidity; to falsely telling investors that SIB's returns increased year by year through the

investment strategy; to falsely telling investors that SIB had certain returns when he and others

were fabricating the returns; to creating and disseminating false and fraudulent documents to

investors that misrepresented how their funds were invested; and to concealing the lack of

regulatory scrutiny by the Antiguan regulators and outside auditor.  The facts alleged in Davis's

Plea Agreement conclusively prove the claims alleged against him in the Second Amended

Complaint for violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

and Rule 10b-5 thereunder such that the Commission is entitled to summary judgment against

him as a matter of law.

### D.      Stanford's Criminal Conviction Establishes His Liability, and that of SGC, Under the Adviser's Act.

Stanford's conviction also establishes his liability under Sections 206(1) and 206(2) of

the Advisers Act. Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6] prohibits investment

advisers from employing "any device, scheme, or artifice to defraud any client or prospective

client." Likewise, Section 206(2) of the Advisers Act prohibits investment advisers from

engaging "in any transaction, practice, or course of business which operates as a fraud or deceit

upon any client or prospective client."

As discussed above, Stanford's mail and wire fraud convictions necessarily included a

finding that he orchestrated a scheme to defraud CD investors, that he sold those CDs to them through the investment advisor (SGC) that he owned and controlled, and that he acted with the specific intent to defraud. [*See* Dkt. 807 (Jury Instructions)(Pl's MSJ App. at 166-211); Dkt. 808 (Jury Verdict)(Pl's MSJ App. at 88-92.]

It is undisputed that the scheme to defraud in this case was intended to, and did in fact, defraud clients. It is also undisputed that Stanford and SGC were investment advisers. Stanford admitted that SGC was a registered investment adviser. [First Amended Complaint at ¶¶ 13 and 14, Dkt. 48, and Stanford's Answer at ¶¶ 13 and 14, Dkt. 249 (Stanford admits these allegations by the Commission).] In addition, SGC meets the definition of investment adviser in Section 202(11) of the Adviser Act [15 U.S.C. § 80b-2(11)]: "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities…." Additionally, insofar as Stanford conducted fraudulent activities as an agent of SGC and in the course of such agency, and for the reasons set forth above, Stanford's liability under Sections 206(1) and 206(2) extends to SGC. Accordingly, there is no dispute as to material fact regarding Stanford's and SGC's violations of Sections 206(1) and 206(2) of the Advisers Act.

**E.     SIB and SGC are liable under Section 7(d) of the Investment Company Act.**

The Commission is entitled to summary judgment on its cause of action that SIB and SGC violated the Investment Company Act of 1940 ("the 1940 Act") by failing to register before

offering securities for sale.[6] Section 7(d) of the 1940 Act requires a foreign investment company to obtain an order from the Commission permitting it and its underwriter to publicly offer securities for sale in this country before doing so. 15 U.S.C. § 80a-7(d); *see SEC v. Banner Fund International*, 211 F.3d 602, 610 (D.C. Cir. 2000) (foreign entity may not sell unregistered interests without first obtaining an SEC order permitting such offers); *Investment Funds Institute of Canada*, SEC No-Action Letter, 1996 WL 102167 (March 4, 1996). Foreign investment companies are also subject to the 1940 Act if, upon completion of the offering, more than 100 U.S. residents are beneficial owners of its securities. *Touche, Remnant & Co.*, SEC No-Action Letter, 1984 WL 45636 at *1 (July 27, 1984).

SIB was unquestionably a foreign investment company, as defined in the statute. 15 U.S.C. § 80a-3(a)(1)(A). It offered its securities for sale and was organized in Antigua. Thousands of United States residents became beneficial owners of SIB's securities, the CDs. SIB did not first obtain an SEC order permitting its offering.  [See Affidavit of Curtis Francisco, Pl's MSJ App. at 135].  Therefore, it violated the 1940 Act.

SIB might argue that it was a "foreign bank" and therefore exempt from 1940 Act registration requirements. The rules define a "foreign bank" as a banking institution that is:

1.  Regulated as a bank by the government of the country in which it was organized;

2.  Engaged substantially in commercial banking activity; and

3.  Not operated for the purpose of evading the provisions of the 1940 Act.

17 C.F.R. 270.3a-6(b)(1)(i). SIB fails all three prongs of the definition.

SIB was not regulated by Antigua.  The Criminal Action and other evidence establishes

---

[6]     In addition to facts established in the criminal trial, evidence in the record, including the Appendix filed in support of the Commission's motion for summary judgment, demonstrate summary judgment is proper on this claim.

that Allen Stanford "captured" SIB's Antiguan regulator, FSRC, through bribes and other favors to Leroy King, such that the agency was not truly regulating SIB (*see supra* Section I, at pages 12-13.)[7]

Also, SIB admittedly did not engage in any commercial banking activity. Commercial banking activity is defined as including the extension of credit and taking deposits. 17 C.F.R. 270.3a-6(b)(2). In a marketing brochure, SIB stated it provided "Depositor Security" because it "does not expose its customers to the risks associated with commercial loans. Our only form of lending is done on a cash-secured basis solely to existing customers." Ex. A, p. 6, Pl's MSJ App. at 217. The same brochure also stated that SIB was able to pay higher interest to depositors because of its "global investments." "Diversified global investments, not loans, are the *primary source* of Bank earnings." Ex. A, p. 7 (emphasis added), Pl's MSJ App. at 218. In fact, internal training materials categorically stated that SIB "is not a commercial bank." Ex. B, p. 16, Pl's MSJ App. at 242.

Moreover, Karyl Van Tassel, the forensic accountant employed by the Receiver, testified that SIB was not a true bank. In her December 5, 2011, written testimony, filed in the related matter 3:09-CV-0721-N (the "Debtor in Foreign Possession Proceeding"), Van Tassel stated:

> SIB was nothing like a typical commercial bank. It had one principal product line—certificates of deposit—and one principal source of funds—customer deposits from CD purchases. SIB's two principal activities—selling CDs and otherwise directing the proceeds of such sales—were controlled and conducted from the United States, with no meaningful management input from Antigua. SIB, although incorporated in Antigua, was controlled and managed by Stanford and [Jim] Davis, with assistance from [Laura Pendergest-] Holt, from various places within the U.S.

---

[7] Stanford was found not guilty on one count of wire fraud based on an allegation that he purchased Super Bowl tickets for King. Nevertheless, the criminal trial established that Stanford's illegal conspiracy – of which he was convicted – was based in part on his payment of various bribes to King. [See Superseding Indictment at paragraph 27]. In any event, the evidence presented in this and ancillary cases conclusively establishes that Stanford bribed King to help hide his fraudulent scheme. [See, e.g., Janvey Testimony, Pl's MSJ at 136-165].

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
*SEC v. Stanford Int'l Bank, Ltd., et al.*

Ex. C, Dec. 5, 2011 Van Tassel testimony, p. 7, Pl's MSJ App. at 314.

Finally, SIB was not a "foreign bank" because it was a Ponzi scheme. The reason it did not register is obvious: it needed to evade registration to further the scheme.  This Court has already judicially found that "Stanford operated a Ponzi scheme".  Ex. D, July 30, 2012 Order in Debtor in Possession Proceeding, p. 19, note 23 [Page ID 13199], Pl's MSJ App. at 374. *Janvey v. Democratic Senatorial Campaign Committee, Inc.,* 793 F.Supp.2d 825, 856 (N.D. Tex. 2011) ("[t]he evidence [the Receiver] provides establishes that the [R. Allen Stanford, his associates, and various entities under Stanford's control] operated a Ponzi scheme and were therefore insolvent at least as early as 1999 and perhaps much earlier.").  Because SIB was a Ponzi scheme, it was therefore created to evade the registration requirement. All three requirements are necessary for SIB to be considered an exempt "foreign bank": it meets none.

SGC also violated the 1940 Act. It meets the definition of an "underwriter" under the 1940 Act, as it was selling securities for an issuer in connection with their distribution.[8]  15 U.S.C. § 80a-2(40).  SGC was also required to comply with the Act, and it also failed to do so. 15 U.S.C. § 80a-7(d).

Based on the foregoing evidence, there is no genuine issue as to any material fact.  SIB and SGC were required to comply with the 1940 Act requirements. They failed to do so. The Commission is entitled to summary judgment on this cause of action.

## F.     The Commission is Entitled to the Relief Requested in the Complaint

Because the Commission has demonstrated that no material fact remains for determination in regard to the first through sixth claims of the Complaint against Stanford,

---

8        Stanford admitted that SIB sold the CDs to U.S. investors through SGC, and that SGC's principal business consisted of sales of SIB-issued securities, the CDs. [First Amended Complaint at ¶¶ 12 and 13, Dkt. 48, and Stanford's Answer at ¶¶ 12 and 13, Dkt. 249 (Stanford admits these allegations by the Commission).]

Davis, SIB, and SGC, the Commission moves this Court to enter judgment in its favor and to enter an order imposing upon Stanford, Davis, SIB, and SGC equitable and monetary relief as further set forth below. A district court has "broad equitable power to fashion appropriate remedies" upon finding a violation of federal securities laws. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474 (2d Cir.1996).

### 1.    Injunction

The Commission requests that the Court permanently enjoin Stanford, Davis, SIB, and SGC from violating, or aiding and abetting violations of, Section 10(b) and Rule 10b-5 of the Exchange Act, and Section 17(a) of the Securities Act. Furthermore, the Commission requests that the Court permanently enjoin Stanford and SGC from violating, and enjoin Stanford and Davis from aiding and abetting violations of, Sections 206(1) and 206(2) of the Advisers Act. Finally, the Commission requests that the Court permanently enjoin SIB and SCG from violating Section 7(d) of the Investment Company Act. A permanent injunction may be granted at summary judgment. *SEC v. Research Automation Corp.*, 585 F.2d 31, 36 (2d Cir. 1978) (affirming and noting propriety of injunctive relief on summary judgment); *see also Resnick*, 640 F. Supp. 2d at 781-82 (enjoining defendant upon motion for summary judgment). The Securities Act, the Exchange Act, the Advisers Act, and the Investment Company Act provide for the issuance of a permanent injunction following a violation of any of their provisions. 15 U.S.C. § 77t(b); 15 U.S.C. §§ 78u(d), and 78u-1; 15 U.S.C. § 80b-9(d); 15 U.S.C. § 80a-41(d).

To obtain an injunction, the Commission must show that there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct. *Manor Nursing*, 458 F.2d at 1100; *see also Resnick*, 604 F. Supp. 2d at 781. Factors to consider are: (1) the seriousness of the original violation; (2) the isolated or recurrent nature of the infraction; (3) the

degree of scienter involved on the part of the defendant; (4) the defendant's recognition of his or her wrongful conduct and the sincerity of assurance against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations. *Resnick*, 604 F. Supp. 2d at 782 (citing *SEC v. Marker*, 427 F. Supp. 2d 583, 590 (M.D. N.C. 2006)); *see also SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.1998).

The undisputed facts set forth above easily establish that the first four factors weigh heavily in favor of ordering injunctive relief.  The Commission acknowledges that Stanford's prison sentence (and Davis's, once it is assessed) cuts against the remaining factor, opportunities for future violations.  But prison inmates can and do commit fraud while incarcerated.  *See, e.g., U.S. v. Mihaly*, 67 F.3d 894 (10th Cir. 1995) (committing wire and mail fraud while serving federal prison term).  An injunction would also provide some protection against the possibility that others in prison might work in concert with them to commit violations.  And of course, no single factor is determinative in analyzing the propriety of an injunction, but the degree of scienter "bears heavily" on the decision.  *See SEC v. Pros International, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).  The factors similarly apply to SIB and SGC, which, although inactive, continue to exist and could resume activity through Stanford or otherwise.

## 2. Disgorgement

Disgorgement is an equitable remedy intended to prevent unjust enrichment and to deter others from violating securities laws by making violations unprofitable. *Resnick*, 604 F. Supp. 2d at 782 (*citing Marker*, 427 F. Supp. 2d at 591); *see also SEC v. First City Financial Corp.*, 890 F.2d 1215, 1230-31 (D.C. Cir. 1989); *SEC v. Bilzerian*, 814 F. Supp. 116, 120 (D.D.C. 1993). To justify a particular amount of disgorgement, the Commission must simply establish a reasonable approximation of the amount of gains causally connected to the fraud. *Resnick*, 604 F. Supp. 2d

at 782; *cf. In re GMC*, 110 F.3d 1003, 1019 n. 16 (4th Cir.), *cert. denied*, 522 U.S. 814 (1997) ("where a 'harm' amount is difficult to calculate, a court is wholly justified in requiring the party in contempt to disgorge any profits it may have received that resulted in whole or in part from the contemptuous conduct"); *see also First City Financial Corp.*, 890 F.2d at 1231. All doubts concerning the approximation are to be resolved against the defendant. *SEC v. Hughes Capital*, 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd w/o opinion*, 1997 U.S. App. LEXIS 24480 (3d Cir. July 9, 1997); *see also First City Financial Corp.*, 890 F.2d at 1232; *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983). Once the Commission has shown that the disgorgement amount is a reasonable approximation of ill-gotten gains, the burden of proof shifts to the defendant. *First City Financial Corp.*, 890 F.2d at 1232.

In civil cases, courts have held that the criminal money judgment is a reasonable approximation of the ill-gotten gains and will establish the defendant's liability for disgorgement. *SEC v. Gordon*, 822 F. Supp. 2d 1144 (N.D. Okla. 2011) (the court relied on the amount of the criminal money judgment, less any amounts recovered by the government in forfeiture proceedings, to establish the defendant's liability for disgorgement); *see also SEC v. AbsoluteFuture.com*, 393 F.3d 94, 97 (2d Cir. 2004); *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004). Furthermore, courts have held that a reasonable approximation of ill-gotten gains may be based on collateral estoppel and the findings in the criminal action. *SEC v. Contorinis*, 2012 U.S. Dist. LEXIS 19961, at *12-16 (S.D.N.Y. Feb. 3, 2012) (the criminal action convicted the defendant of engaging in insider trading that resulted in profits of $7.3 million, in the civil action the court held him liable for disgorgement in the amount of $7.3 million minus certain costs).

In the Criminal Action, the United States gave notice to Stanford of its intent to seek

forfeiture of certain assets if he was convicted. [*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 422 (S.D. Tex. May 4, 2011) ("Superseding Indictment")(Pl's MSJ App. at 58-87).] After the jury returned a guilty verdict, the forfeiture phase of the trial began with respect to 29 specific foreign accounts that had been listed in the Superseding Indictment. The jury heard two half-days of sworn testimony about the connection between the criminal offenses and the accounts; furthermore, numerous bank records and other financial documents were received in evidence.

On March 8, 2012, a jury returned a verdict for the Government, finding that all funds on deposit in 27 of the 29 foreign accounts, and certain requested amounts in the two remaining accounts, were proceeds of both the conspiracy and the scheme to defraud, and thus subject to forfeiture. [*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 862 (S.D. Tex. June 1, 2012) ("Amended Order of Forfeiture")(Pl's MSJ App. at 93-99.]

Subsequently, the court in the Criminal Action ordered Stanford to forfeit $5.9 billion. Stanford, with vigorous and competent counsel, had a full and fair opportunity to refute the forfeiture amount.  In light of the large amount of forfeiture that Stanford faced, he was incentivized to put up a vigorous defense. After an adversarial proceeding, Stanford was ordered to forfeit $5.9 billion. [*See United States of America v. Stanford*, Crim. No. H-09-342-01-S, Dkt. 862 ("Amended Order of Forfeiture")(Pl's MSJ App. at 93-99); Dkt. 878 ("Judgment in a Criminal Case")(Pl's MSJ App. at 416-422); Dkt. 881 ("Order of Forfeiture at Sentencing")(Pl's MSJ App. at 100-103).] In sum, Stanford had a full and fair opportunity to litigate all issues necessary to the forfeiture order and is now collaterally estopped from contesting those issues.

Further, where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for

the disgorgement of illegally obtained proceeds.  *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191-92 (9th Cir. 1998), *cert. denied*, 525 U.S. 1121 (1999); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997). As described *supra*, Stanford controlled and used SIB and SGC to engage in the multiple violations of security laws established above in this action.  Davis admitted in his Plea Agreement to the same violations. Thus, Stanford, Davis, SIB, and SGC should be held jointly and severally liable for the disgorgement of illegally obtained proceeds.

Accordingly, the Commission seeks $5.9 billion as a reasonable approximation of unjust enrichment attributable to the fraud. Stanford, Davis, SIB, and SGC should be held jointly and severally liable for $5.9 billion, which represents the proceeds of the scheme to defraud, because they acted in concert as one economic unit.9

### 3.      Prejudgment Interest

"An award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness."  *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir. 1975), *rev'd on other grounds*, 430 U.S. 1 (1977).  In deciding whether an award of prejudgment interest is warranted, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered; (ii) considerations of fairness and relative equities of the award; (iii) the remedial purpose of the statute involved; and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey*, 101 F.3d at 1476. Where a securities law violator has enjoyed access to funds over a period of time as a result of his or her wrongdoing, requiring the wrongdoer to pay prejudgment interest is consistent with the equitable purpose of the remedy of

---

9       In the event it becomes necessary, the Commission recognizes it would be appropriate to offset any disgorgement owed by the defendants by any recovery obtained against them by the Receiver and by any assets obtained by the Department of Justice in forfeiture proceedings if those assets are distributed to harmed investors.

disgorgement.  *See Hughes*, 917 F. Supp. at 1090.  In *Hughes Capital,* the district court explained its decision to require prejudgment interest as part of the disgorgement amount:

> It comports with the fundamental notions of fairness to award prejudgment interest. The defendants had the benefit of nearly $2 million dollars [sic] for the nine and one-half years between the fraud and today's disgorgement order.  In order to deprive the defendants of their unjust enrichment, the court orders the defendants to disgorge . . . prejudgment interest.

*Id.* An order for prejudgment interest against Stanford, Davis, SIB, and SGC is proper for the same reasons.

The IRS underpayment of federal income tax rate as set forth in 26 U.S.C. § 6621(a)(2) is appropriate for calculating prejudgment interest in SEC enforcement actions such as this one.  That rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey*, 101 F.3d at 1476.

Thus, the Commission seeks prejudgment interest from the time of the illegal conduct through the date of judgment on the disgorged funds, at the IRS underpayment rate, because Stanford had the opportunity to use and benefit from the fraudulently obtained funds since the fraud. Prejudgment interest on the disgorgement amount, calculated from the time of the illegal conduct through December 31, 2012 is $861,189,969.06. [See Affidavit of Rebecca R. Fairchild, Pl's MSJ App. at 423-424].

### 4.      Civil Penalty

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 41(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] set three tiers of civil money penalties in Commission civil actions. Third tier penalties are proper if the violation involved

"fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and] directly or indirectly resulted in substantial losses or created a significant risk of substantial loss to other persons." *SEC v. United Energy Partners, Inc.,* 88 Fed. Appx. 744, 747 (5th Cir.), *cert. denied*, 2004 U.S. LEXIS 8188 (2004); 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 80a-41(e)(2)(C); 15 U.S.C. § 80b-9(e)(2)(C). As set forth at length above, Stanford, Davis, SIB, and SGC's fraud was egregious, deliberate, and resulted in substantial losses (billions of dollars) to tens of thousands of investors. Accordingly, third-tier penalties are appropriate.

At the time of the conduct alleged in the Complaint, the relevant authority provided that the amount of third-tier penalty should not, for an individual defendant, exceed the greater of: (1) $130,000 for each violation or (2) the gross amount of the defendant's pecuniary gain. 15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1004, Table III to Subpart E. Furthermore, the amount of third-tier penalty should not, for any other person, such as an entity, exceed the greater of: (1) $650,000 for each violation or (2) the gross amount of the defendant's pecuniary gain. *Id.* In view of the egregiousness of the fraud as further described above, the deliberation and disregard of the law, and the resulting substantial losses, the Commission respectfully requests that the Court enter a maximum third-tier penalty against Stanford and Davis.  At a minimum, this would result in a civil penalty equal to the gross pecuniary gain reflected in Stanford's forfeiture order, i.e., $5.9 billion. *See SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009) (where, considering the difficulty of determining the number of violations, the court calculates third-tier civil penalties by imposing a flat penalty equal to each defendant's gross pecuniary gain). The Commission further respectfully requests that the Court enter a third-tier penalty against SIB and SGC, which acted, at all relevant times,

through Stanford and Davis.

## III.

## <u>CONCLUSION</u>

For the reasons set forth above, the Commission respectfully requests that the Court grant the Commission's Motion for Summary Judgment and enter the Proposed Judgment submitted with this Memorandum.

Dated:  February 19, 2013                    Respectfully submitted,


                                             <u>s/ David B. Reece</u>
                                             DAVID B. REECE
                                             Texas Bar No. 242002810
                                             JANIE FRANK
                                             Texas Bar No. 07363050
                                             U.S. Securities and Exchange Commission
                                             Fort Worth Regional Office
                                             Burnett Plaza, Suite 1900
                                             801 Cherry Street, Unit #18
                                             Fort Worth, TX  76102-6882
                                             (817) 978-6476 (dbr)
                                             (817) 978-4927 (fax)


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2013, I electronically filed the foregoing *Plaintiff's Brief in Support of Motion for Partial Summary Judgment* with the Clerk of the court using the CM/ECF system which will send notification of such filing to all counsel of record.

                                             <u>s/ David B. Reece</u>