# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| In re: | § § | |
| STANFORD INTERNATIONAL BANK, LTD., | § § | Civil Action No. 3:09-CV-0721-N |
| Debtor in a Foreign Proceeding. | § § § | |

_____

**AMENDED JOINT MOTION OF THE SEC, RECEIVER, EXAMINER, AND OFFICIAL STANFORD INVESTORS COMMITTEE TO APPROVE SETTLEMENT AGREEMENT AND CROSS-BORDER PROTOCOL AND BRIEF IN SUPPORT**[1]
_____

---

[1] This Amendment is submitted solely to modify the title of the motion. No changes have been made to the body of the motion.

## INTRODUCTION

The SEC, the Receiver, the Examiner, and the Official Stanford Investors Committee respectfully submit this Joint Motion to Approve the Settlement Agreement and Cross-Border Protocol.  For several years the Movants, on the one hand, and the Antiguan Joint Liquidators, on the other, have been engaged in difficult, complex, and costly litigation for control of the Stanford assets.  Most of this litigation is not close to being finally resolved.  So long as it continues, millions of dollars in assets that could otherwise be distributed to the victims of the Stanford Ponzi scheme will remain tied up in the courts.  To avoid this undesirable outcome, the parties have negotiated a global settlement agreement.  Before that agreement can be implemented, however, it must be approved by this Court, the Antiguan Court, and the Central Criminal Court in London.  This Court should approve the Settlement Agreement because doing so is indisputably in the best interests of the victims and the receivership.

The Settlement Agreement will settle pending litigation between the Movants and the Antiguan Joint Liquidators, ending costly and protracted disputes over Stanford assets located inside and outside of the United States, and will expedite the distribution of a substantial portion of $300 million in foreign Stanford assets to the creditor-victims of the Stanford Ponzi scheme.  The Settlement Agreement will also facilitate cooperation and coordination between the U.S. Receiver and the Antiguan Joint Liquidators, thereby reducing administrative costs and increasing the probability of successful outcomes in the efforts of the two estates.  Without the Settlement Agreement, the Movants will be forced to expend substantial time, energy and money fighting over the Stanford assets.  For these reasons, the Movants request the Court set a hearing on this Motion and, following that hearing, approve the Settlement Agreement so that the parties may implement it as quickly as possible.

## FACTUAL BACKGROUND

The Securities and Exchange Commission ("SEC") filed its lawsuit on February 17, 2009, against defendants R. Allen Stanford, James M. Davis, Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC. (*See* Doc. 1.)[2] With the help of others, the defendants had created and carried out a global, multi-billion dollar Ponzi scheme. Tens of thousands of customers were induced to purchase certificates of deposit and/or to deposit funds with Stanford International Bank, Ltd. ("SIB"). This money was then funneled by Mr. Stanford and his co-conspirators to more than 130 companies located in at least 14 countries, and used to fund Mr. Stanford's lavish lifestyle and to maintain and further the fraud scheme. (*See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009).)

When this massive Ponzi scheme was uncovered, it became necessary to locate and gather the many Stanford assets dispersed around the world so that they could be preserved and eventually distributed to the victims of the fraud. To this end, and at the request of the SEC, this Court appointed Ralph S. Janvey as equity receiver ("Receiver") for the Stanford entities on February 17, 2009. (*See* Doc. 10.) Pursuant to the Second Amended Order Appointing Receiver ("Receivership Order"), the Receiver is authorized to take possession, custody and control of the Stanford Receivership Estate, including all domestic and foreign assets of R. Allen Stanford, SIB, Stanford Group Company, and other Stanford entities.[3] (Doc. 157 at ¶¶ 4-5.) The Eastern Caribbean Supreme Court in Antigua and Barbuda ("Antiguan Court"), where SIB is located, also undertook measures in response to SIB's collapse. In 2009 the Antiguan Court issued an

---

[2] Unless otherwise stated, citations to court records herein reference the docket numbers from *SEC v. Stanford Int'l Bank, et al.*, No. 3:09-CV-298-N (N.D. Tex., filed Feb. 17, 2009).

[3] Some of the Receiver's responsibilities have also been delegated by order of this Court to the Official Stanford Investors Committee ("OSIC").

order appointing two Joint Liquidators of SIB ("JLs"), and specifying that the JLs' powers extend over the assets and affairs of SIB and the Stanford Trust Company.[4] (Case No. 3:09-CV-721-N, Doc. 176 at 2-3 (N.D. Tex., filed Apr. 20, 2009).) Ultimately, the court-appointed U.S. Receiver and Antiguan JLs share many of the same goals: to collect all of the Stanford assets and to develop and pursue legal claims related to those assets, in order to maximize the victims' recoveries.

Despite their common purposes, the Receiver's and JLs' overlapping duties and authorities have resulted in numerous conflicts between them. Both parties allege, based on orders issued by courts in separate jurisdictions, that they are entitled to exclusive control over many of the same assets located in the United States and abroad. As a result, complex multi-jurisdictional litigation to resolve these competing claims has consistently burdened the Stanford receivership. For example, the Receiver's and JLs' dispute over which party should control assets located in the United States started four years ago. On July 30, 2012, this Court issued an Order resolving the dispute, which remains subject to litigation before the United States Court of Appeals for the Fifth Circuit. (*See* Case No. 3:09-CV-721-N, Docs 176, 177; Case No. 12-10157, Doc. 00512151810 (5th Cir. 2013).) Without approval of the Settlement Agreement, final resolution of the dispute over assets in the United States is at best months, and perhaps years, away.

Long-standing disagreements over control of Stanford assets outside of the United States have also spawned lengthy and complex litigation. On June 14, 2012, the U.S. District Court for the Southern District of Texas issued a judgment against R. Allen Stanford forfeiting assets to the United States, including more than $300 million in 29 international accounts located

---

[4] The current JLs, Marcus A. Wide and Hugh Dickson, were appointed by the Antiguan Court to replace the former JLs on May 12, 2011. *See* Case No. 3:09-CV-721-N, Doc. 176 at 3 (N.D. Tex., filed Apr. 20, 2009).

in the United Kingdom, Canada, and Switzerland. (*See* Case No. H-09-342-01-S, Docs. 862, 878 (S.D. Tex., filed June 18, 2009).) None of these international assets, however, has been turned over to the DOJ or distributed to the victims of the Stanford scheme. Instead, since 2009 these assets have been the subject of costly litigation between the Receiver and the DOJ, on the one hand, and the JLs, on the other. As detailed below, those proceedings are still on-going, and the assets remain under the control of foreign authorities pending resolution of the litigation.

The dispute for control over Stanford's UK assets is currently pending before the UK Central Criminal Court. In 2009, the DOJ successfully moved to freeze approximately $100 million worth of SIB assets located in the UK. The JLs subsequently obtained a court order entrusting all of SIB's UK assets to them as SIB's representatives, although the assets nevertheless remain frozen. The parties' competing claims to this property were first adjudicated by the Central Criminal Court, and then by the Court of Appeal of England and Wales in 2010 and 2011. Those decisions have been appealed and cross-appealed to the UK Supreme Court. Further, the UK Central Criminal Court is now considering a request by the JLs to remove the freeze over the UK Assets. These proceedings are currently stayed in consideration of the parties' settlement discussions. However, if the stays were lifted, the DOJ and the JLs would be returned to engaging in protracted and costly litigation.

The Receiver's and JLs' competing claims to approximately $23.5 million worth of Stanford's assets in Canada are also currently being litigated. The Ontario Court of Justice initially recognized the JLs as SIB's Receivers-Managers in April 2009, but reversed itself and issued an order recognizing the Receiver as SIB's representative in September 2009. The recognition of the Receiver and the disposition of the assets in Canada continues to be a subject of active litigation, with proceedings pending in both Québec and Ontario. The proceedings are

currently stayed in consideration of the parties' settlement efforts, but in the absence of an agreed resolution, the proceedings will continue for the foreseeable future.

Finally, the JLs, the DOJ, and the Swiss authorities are all currently involved in multiple criminal and civil actions in Switzerland related to Stanford assets that are worth approximately $208 million. In 2009, the Swiss authorities froze these assets pursuant to a domestic money laundering investigation, and to a request by the DOJ under the Mutual Legal Assistance Treaty ("MLAT"). Since then, there have been parallel domestic criminal proceedings and MLAT-based proceedings operating in Switzerland. The JLs have also actively sought control of the Swiss assets. In 2010, the JLs successfully petitioned the Swiss Financial Market Supervisory Authority to recognize them as the office holders of SIB, and to deny recognition of the Receiver. They are currently pursuing claw-back claims against funds held by various Stanford entities in Switzerland, including entities that are under the Receiver's control.

The litigation between the Movants and the DOJ, on the one hand, and the JLs, on the other, over control of the Stanford assets is difficult, complex and costly. And despite the parties' substantial investments of time and money, these lawsuits are likely to continue for years. So long as they do, hundreds of millions of dollars in assets will remain out of reach of Stanford's victims, while the funds that are available for distribution will be diminished by the costs of the litigation. In order to avoid these costs and burdens and to further the best interests of the victims, the Movants, the DOJ, and the JLs engaged in a series of discussions to attempt to resolve all pending disputes through a negotiated resolution. After lengthy and complex negotiations, the parties have reached agreement on a Settlement and Cross-Border Protocol that — if approved by this Court, the Antiguan Court, and the UK Court — will end four years of

conflict and litigation, and expedite distribution of a substantial portion of the $300 million in assets located in the UK, Canada and Switzerland.

## ARGUMENT

The proposed Settlement Agreement is the product of months of intensive negotiations among the Receiver, the JLs, the DOJ, the SEC, the Examiner, and OSIC. Until May 2012, the parties to the Agreement were litigating issues concerning the control, liquidation and distribution of Stanford assets in no less than eight countries on three continents. Although the Receiver, the JLs, the SEC, the Examiner, and OSIC had diligently pursued efforts to negotiate a settlement, their efforts had been unsuccessful. At that point, in the absence of the DOJ's direct participation, a global resolution proved difficult to achieve, as any settlement would have left open the possibility of continued litigation over assets in at least the UK and Switzerland. In the summer of 2012, the DOJ joined the negotiation efforts, and the parties to the Settlement Agreement engaged in an extensive series of settlement discussions. Over the course of six months, the parties agreed to stay much of the pending litigation, participated in numerous in-person meetings, written communications, and telephone calls, solicited input and advice from key members of the Stanford victim community, and ultimately negotiated a framework for cooperation and asset distribution.

In December 2012, the Receiver and the JLs drafted a formal settlement agreement based on the parties' negotiations. During this process, they continued to seek input from the DOJ, SEC, and Examiner, and discussed with OSIC the details of the proposed agreement. All of these parties have approved the final Settlement Agreement, concluding it is in the best interests of the creditor-victims and the Stanford receivership. Before it can be implemented, however, the Settlement Agreement expressly requires that it be presented to this

AMENDED JOINT MOTION TO APPROVE SETTLEMENT
AGREEMENT AND CROSS-BORDER PROTOCOL                                                              6

conflict and litigation, and expedite distribution of a substantial portion of the $300 million in assets located in the UK, Canada and Switzerland.

## ARGUMENT

The proposed Settlement Agreement is the product of months of intensive negotiations among the Receiver, the JLs, the DOJ, the SEC, the Examiner, and OSIC. Until May 2012, the parties to the Agreement were litigating issues concerning the control, liquidation and distribution of Stanford assets in no less than eight countries on three continents. Although the Receiver, the JLs, the SEC, the Examiner, and OSIC had diligently pursued efforts to negotiate a settlement, their efforts had been unsuccessful. At that point, in the absence of the DOJ's direct participation, a global resolution proved difficult to achieve, as any settlement would have left open the possibility of continued litigation over assets in at least the UK and Switzerland. In the summer of 2012, the DOJ joined the negotiation efforts, and the parties to the Settlement Agreement engaged in an extensive series of settlement discussions. Over the course of six months, the parties agreed to stay much of the pending litigation, participated in numerous in-person meetings, written communications, and telephone calls, solicited input and advice from key members of the Stanford victim community, and ultimately negotiated a framework for cooperation and asset distribution.

In December 2012, the Receiver and the JLs drafted a formal settlement agreement based on the parties' negotiations. During this process, they continued to seek input from the DOJ, SEC, and Examiner, and discussed with OSIC the details of the proposed agreement. All of these parties have approved the final Settlement Agreement, concluding it is in the best interests of the creditor-victims and the Stanford receivership. Before it can be implemented, however, the Settlement Agreement expressly requires that it be presented to this

Court, the Antiguan Court, and the Central Criminal Court in London, and that these courts approve the Settlement Agreement by May 15, 2013. Review and consideration of the Settlement Agreement in a public forum will give all interested parties the opportunity to study it, and to voice any concerns that they may have by attending this Court's hearing or by filing an objection to the Settlement Agreement.

The benefits of the Settlement Agreement include the following:

**(1)** **The Settlement Agreement resolves four years of expensive and time-consuming litigation in the United States, United Kingdom, Canada, and Switzerland. Without the Settlement Agreement, this burdensome litigation will continue for years and reduce the assets available for distribution to the victims.**

In the Settlement Agreement, the parties agree to terminate several major pieces of litigation. The JLs will dismiss their pending Fifth Circuit appeal of this Court's July 30, 2012 Order. (*See* Appendix, Art. IX at 32.) In addition, the parties have agreed to resolve their competing legal claims in the UK, Canada and Switzerland. (*See* Appendix, Arts. V-VII at 22-25.) The litigation over control of Stanford assets has been on-going for four years. Without the Settlement Agreement, the litigation will almost certainly last for years longer, consume significant assets that would otherwise be available for distribution, and subject the parties to an uncertain outcome. By approving the Settlement Agreement, the Court will enable the parties to end these disputes amicably and in a manner that is consistent with the Movants' goals in litigating these issues in the first place, including but not limited to ensuring that the Stanford victims are protected, that Stanford assets are distributed in accordance with United States law and principles of equity, and that Stanford assets are not put at risk of expropriation by government authorities.

**(2)** **The Settlement Agreement creates a plan for the distribution of almost 90% of the frozen assets from the UK, Canada, and Switzerland, from which distributions will be made as soon as the necessary approvals are obtained from the pertinent authorities in those countries.**

The Settlement Agreement sets forth a plan to expeditiously and fairly distribute a substantial majority of the assets frozen in the UK, Canada, and Switzerland. Once the pending litigation in these countries has been terminated, the Receiver, the JLs and the DOJ will work together to encourage the foreign authorities to release the assets as quickly as possible. These assets will only be distributed to the creditor-victims of the Stanford Ponzi scheme, and not to other parties such as the Antiguan government or the Internal Revenue Service. (*See* Appendix, Arts. V-VII at 22-25.)

Under the Settlement Agreement, the Receiver will receive for distribution all of the proceeds from the monetization of the Canada assets, while the JLs will receive all of the proceeds from the UK assets. The Swiss assets will be allocated between the Receiver and the JLs according to a 2.2 to 1 ratio. (Appendix, Art. VIII at 26-29.) The proceeds from these assets will then be distributed to eligible creditor-victims, in accordance with the Receiver's and JLs' claims distribution processes. Furthermore, the Settlement Agreement allocates $18 million of the remaining UK Assets to the JLs to fund litigation that the parties believe will produce a substantial positive return for that estate. If necessary, an additional $18 million of the remaining UK Assets may be allocated for this purpose, subject to supervision by the Central Criminal Court in London. (Appendix, Art. V at 23; Art. VIII at 26-27.) Every effort will be made to minimize the amount actually used for working capital, and any funds not actually used for working capital will be released for distribution.

Ultimately, this plan ensures that the funds will be distributed efficiently and cost-effectively, and guarantees that the creditor-victims will receive some recovery from Stanford assets located outside of the United States.

**(3)   The Settlement Agreement facilitates cooperation and coordination of efforts between the parties with respect to litigation, asset recovery efforts, and monetization of these assets. Without the Settlement Agreement, the parties will be unable to achieve similar efficiencies in administering the receivership, or to maximize the funds available for distribution to the victims.**

The Settlement Agreement also establishes protocols to be followed by the parties in pursuing litigation and sharing information. The parties will give each other unrestricted access to discovery and other materials. They will also assist one another in obtaining materials from third parties and from other jurisdictions. (*See* Appendix, Art. IV at 19-22.) In addition, the Receiver and JLs will cooperate in preparing and prosecuting legal actions on behalf of their respective estates and the victims, and in monetizing the recovered assets so they may be distributed to the victims. (Appendix, Art. III at 17-19.) This enhanced collaboration will improve the parties' ability to successfully complete these tasks at reduced costs.

**(4)   The Settlement Agreement provides for coordination of the Receiver's and JLs' claims and distribution processes. Without this Settlement Agreement, the Receiver and the JLs will incur significantly higher administrative costs and the victims' recoveries will be smaller and less consistent.**

Both the Receiver and the JLs have established a claims and distribution process to evaluate creditor-victims' claims for compensation, and to distribute available funds. Because the laws applicable to the Receiver's and JLs' respective distributions are similar but not identical, a single distribution process is impractical. The Receiver and JLs have agreed, however, to coordinate their efforts to the maximum extent possible to minimize duplication. The Settlement Agreement will also increase the efficiencies and accuracy of these processes by allowing the Receiver and JLs to exchange data on and information about their respective claims

and distributions. (*See* Appendix, Art. II at 15-17.) Finally, the Settlement Agreement will improve the fairness of the process by, to the extent possible, ensuring that creditor-victims are treated similarly regardless of whether they pursue their claim through the Receiver's or the JLs' process. (*Id.*)

## CONCLUSION AND PRAYER FOR RELIEF

The Settlement Agreement and Cross-Border Protocol is the result of careful and considered compromise between the parties, and reflects their common goal of maximizing recovery for the victims of the Stanford Ponzi scheme as quickly and as cost-effectively as possible. It is a reasonable compromise that ensures that Stanford assets located in the United States and abroad will be distributed in a manner that is consistent with United States law and the principles of equity. The Settlement Agreement also protects the parties and the victims from the significant costs and uncertainties inherent in complex, multi-jurisdictional litigation. Its implementation is in the best interests of the victims and the court-appointed receivership. For these reasons and for all other reasons outlined herein, the Movants request that the Court hold a hearing on this Motion, that the Court give the widest possible latitude in giving victims an opportunity to express their views regarding the Settlement Agreement, and that the Court enter an order approving the terms and conditions of the Settlement Agreement. The Movants further request that the Court grant to them such other or further relief to which they may be justly entitled.

Dated: March 12, 2013.

Respectfully submitted,

BAKER BOTTS L.L.P.

*/s/ Kevin M. Sadler*
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
(512) 322.2500 (Telephone)
(512) 322.2501 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

Respectfully submitted,

*/s/ David B. Reece*
David B. Reece
Texas Bar No. 242002810
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978.6476 (Telephone)
(817) 978.4927 (Facsimile)

**SECURITIES AND EXCHANGE COMMISSION**

Respectfully submitted,

LITTLE PEDERSEN FANKHAUSER, LLP

*/s/ John J. Little*
John J. Little
Texas Bar No. 12424230
jlittle@lpf-law.com
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573.2300 (Telephone)
(214) 573-2323 (Facsimile)

**COURT-APPOINTED EXAMINER AND CHAIRMAN OF THE OFFICIAL STANFORD INVESTORS COMMITTEE**

# CERTIFICATE OF CONFERENCE

We have conferred with counsel for the United States, and the United States consents to the motion.

The Antiguan Joint Liquidators are signatories to the Settlement Agreement and therefore support the relief requested.

On March 12, 2013, we attempted to confer via email with Stephen Cochell, counsel for R. Allen Stanford. Mr. Cochell did not respond to our inquiries.

On March 12, 2013, we attempted to confer via email with Jeff Tillotson, counsel for Laura Holt. Mr. Tillotson did not respond to our inquiries.

On March 12, 2013, we conferred via email with Kenneth Johnston, counsel for Trustmark National Bank. Trustmark reserves the right to object to the motion.

On March 12, 2013, we attempted to confer via email with Jason Brookner, counsel for HP Financial Services Venezuela C.C.A. Mr. Brookner did not respond to our inquiries.

On March 12, 2013, we attempted to confer via email with Gregg Anderson, counsel for Mark Kuhrt. Mr. Anderson did not respond to our inquiries.

On March 12, 2013, we attempted to confer via email with John Helms, counsel for Gilberto Lopez. Mr. Helms did not respond to our inquiries.

On March 12, 2013, we attempted to confer via email with Stephanie Curtis, counsel for INX, Inc. Ms. Curtis did not respond to our inquiries.

On March 12, 2013, we attempted to confer via email with David Finn, counsel for James Davis. Mr. Finn did not respond to our inquiries.

On March 12, 2013, we attempted to confer via email with Gregg Anderson, counsel for Mark Kuhrt. Mr. Anderson did not respond to our inquiries.

Therefore, this motion is opposed.

*/s/ Kevin M. Sadler*
Kevin M. Sadler

**CERTIFICATE OF SERVICE**

On March 12, 2013, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Kevin M. Sadler*
Kevin M. Sadler