**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No.: 3:09-CV-0298-N |
| **STANFORD INTERNATIONAL BANK, LTD., et al.** | § § § | |
| Defendants, | § § § | |

**DEFENDANT ALLEN R. STANFORD'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Allen R. Stanford, by and through counsel, files his opposition to Plaintiff's

Motion for Partial Summary Judgment.

**I.      Introduction**

Mr. Stanford admits that he was convicted of various charges brought by the United

States of America in a criminal trial conducted in the Southern District of Texas. However, Mr.

Stanford rejects any suggestion that the criminal proceedings were fair in his case or that the

criminal conviction should collaterally estop him from challenging the evidence in this case.

**II.     Collateral Estoppel and Use of Criminal Convictions**

To establish collateral estoppel under federal law, one must show: (1) that the issue at

stake be identical to the one involved in the prior litigation; (2) that the issue has been actually

litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation

has been a critical and necessary part of the judgment in that earlier action. *Rabo Agrifinance,*

*Inc. v. Terra XXI, Ltd.*, 583 F. 3d 348 (5th Cir. 2009) (citing *Wehling v. CBS*, 721 F.2d 506, 508

(5th Cir.1983)). However, the doctrine of collateral estoppel <u>cannot</u> apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case. *Montana v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328-29 (1971). A "redetermination of the issues is warranted, if there is reason to doubt the <u>quality</u>, <u>extensiveness</u>, or <u>fairness</u> of procedures followed in prior litigation." *Montana v. United States*, 440 U.S. at 164, n. 11. (emphasis supplied). As set out below, there is reason to doubt the quality, extensiveness or fairness of procedures following in the litigation.

The SEC's reliance on a district court case from Maryland is misplaced. SEC Brief at 15-16, *citing SEC v. Resnick*, 604 F. Supp. 2d 773 (D. Md. 2009). In *Resnick*, the appellant Kaiser sought to demonstrate that he lacked a "full and fair" opportunity to litigate his case. *Resnick*, 604 F. Supp. 2d at 781-82. According to the District Court, Kaiser was afforded "every opportunity" to submit evidence and to call and cross-examine witnesses, and the "perceived unfair events" that he deprived him of the opportunity to fully and fairly litigate his claim were mere "procedural deficiencies," namely, "(1) improper jury instructions, (2) incorrect evidentiary rulings under Federal Rule of Evidence 404(b), and (3) improper admission of hearsay statements."

In contrast, Mr. Stanford's criminal case was filled with far more than mere "procedural deficiencies." Indeed, Mr. Stanford's trial is riddled with multiple errors that either separately or collectively deprived him of a fair trial. There are numerous pleadings from the Stanford trial outlining the issues. Rather than "re-invent the wheel," counsel incorporates Stanford's Motion for New Trial filed in the criminal case in its entirety as Exhibit A and will amplify some

additional issues in the arguments set out below. Defendant's Motion for New Trial,[1] S.D. Tex. Case No. 4:09-CR-00342, ECF No. 829.[2] Unlike counsel for the Receiver, the undersigned counsel has not been paid funds to represent his client. Accordingly, counsel requests the Court allow incorporation of Mr. Stanford's Motion for New Trial in the criminal case, with supporting exhibits. Alternatively, counsel requests the Court grant funds to Mr. Stanford for defense of this matter, and further grant leave to file a supplemental brief on his behalf.

As set out in his Motion for New Trial, the following constitutional errors render his conviction infirm for purposes of applying the doctrine of collateral estoppel.

1. Stanford was deprived of his Sixth Amendment right to a fair trial because pre-trial publicity precluded the assembly of an impartial jury. [S.D. Tex. ECF No. 829 at 3-13]

2. Stanford was deprived of his Sixth Amendment right to a fair trial because the intense publicity during the trial prevented the maintenance of an impartial jury if one had been impaneled. [*Id*. at 13-27].

3. Stanford was deprived of his Sixth Amendment right to a fair trial because the court breached its obligation to put adequate safeguards in place to shield the jury from potential prejudicial publicity and Permitting live courtroom broadcasting. [*Id*. at 27-33].

4. Stanford should have been granted a continuance after being restored to competence. Instead, he was forced to trial a month after regaining competence. [*Id*. at 33-52]

5. Stanford was deprived of funds necessary to adequately defend himself. [*Id*. at 53-71].

Without comment, Judge Hittner entered an order denying the motion barely a day after this extensive Motion for New Trial was filed. [S.D. Tex. ECF No. 837].

---

1   Counsel notes that some of the exhibits cited in the Motion for New Trial were filed under seal. Counsel requests additional time to obtain copies of these documents for the Court's consideration.

2   This motion will refer to Docket Entries in the Criminal Matter, *United States of America v. Stanford*, Southern District of Texas Case 4:09-CR-00342, as "S.D. Tex. ECF No. ___"

**III.    The Criminal Conviction is Constitutionally Infirm and Cannot Form the Basis for a Finding by this Court that the Conviction Relieves the SEC of its Burden of Proof in This Case.**

Mr. Stanford requests the Court take judicial notice of the proceedings in the criminal case. The pre-trial and trial proceedings were, to put it diplomatically, unusual and unprecedented in several ways.

**A.   Public Hatred Stoked by a Media Frenzy Deprived Mr. Stanford of a Fair Trial.**

As a threshold matter, there was almost unprecedented pre-trial publicity and a media frenzy preceding the trial. Unrestrained pronouncements of Mr. Stanford's guilt were made almost every day by the press, by alleged victims, and by the Receiver in this case in various pleadings and court statements. In contrast, Mr. Stanford, his lawyers and his family were gagged "to protect the trial process." [S.D. Tex. ECF No. 307] Judge David Hittner has a reputation for especially harsh penalties for violations of his orders, including a potential visit to the local jail. This counsel and counsel for Mr. Stanford observed the order to a fault despite the avalanche of prejudicial publicity against Mr. Stanford. The reasons for the publicity must be placed in context.

In the instant case, Mr. Stanford was civilly charged barely four months after the Bernie Madoff Scandal. The SEC scrambled to defend itself against Congress and the avalanche of criticism that the SEC was inept and incompetent for failing to detect Madoff's Ponzi scheme. Madoff immediately confessed and pled guilty. This did not satisfy lawmakers and others with an interest in showing themselves as being tough on white collar criminals. At times, the public and Congressional reaction was akin to a lynch mob out to get Madoff, the SEC, or both.

The SEC had investigated Mr. Stanford in the past, but had held off on filing suit because of problems with jurisdiction. A report filed by the SEC's Office of the Inspector General found

that "Immediately after the revelations of the Madoff Ponzi scheme became public in December 2008, the Stanford investigation became more urgent for the FWRO [The SEC's Fort Worth Regional Office] …" SEC Office of Inspector General, *Case No. OIG-516: Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation* at 10 (June 19, 2009). (Exhibit B). As a result, the SEC dusted off years of investigative reports and reversed prior decisions not to prosecute Mr. Stanford for lack of jurisdiction. A subsequent SEC Inspector General Report, requested by Senators Richard Shelby and David Vitter, included the following testimony from "IA Examiner 1":

> I have a general recollection that our office, after the Madoff situation, said, hey, is there anything that we have any concern about that we haven't done something about, and I believe Stanford was one of them. …
>
> And, so, we decided we need to pick this up and run with it and see if we can do something because, you know, the game has changed. The risk of losing is a whole lot less now. We -- <u>we're going to be punished more for not doing something</u> than for doing something and ending up being unsuccessful or whatever.

SEC Office of Inspector General, *Case No. OIG-526: Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme* at 127 (March 31, 2010) (Exhibit C) (emphasis added). Mr. Stanford, viewed as a flamboyant offshore banker, was the "answer" to their media problems.

The media pilloried Stanford while the criminal court "gagged" him from responding to any allegations. Indeed, on one occasion, the undersigned filed a brief with this Court and was <u>misquoted</u> as having made a public statement to the media. Without so much as a phone call, an inquiry, or a show cause order, the criminal judge *immediately* found counsel in contempt of the gag order and prohibited any visits between counsel and Mr. Stanford at FDC Houston. [S.D. Tex. ECF No. 510] Counsel immediately notified the Court of the Court's error, and filed several

motions to set aside the preclusion order [S.D. Tex. ECF Nos. 520, 612] but no relief was granted until the eve of the criminal trial. [S.D. Tex. ECF No. 646] At that time, the criminal trial judge simply vacated the order without admitting error or recognizing that counsel did not violate his order. *Id*.

**IV.     The Inspector General's Report on the SEC Investigation Revealed That the SEC Declined to Prosecute Mr. Stanford for Lack of Jurisdiction and Doubts About the Strength of their Case.**

The Inspector General of the SEC issued a scathing report that partially probed into the periodic investigations of Stanford entities. There is and was a serious question as to whether the CDs marketed were "securities" within the jurisdiction of the SEC. Exhibit C, *SEC Investigative Report OIG-526* at 39. The SEC declined to prosecute or pursue further investigation of Mr. Stanford. Nevertheless, the SEC internally reversed its position that the CDs were not securities to rehabilitate itself in the public eye in the wake of the Madoff scandal. Exhibit C, *SEC Investigative Report OIG-526*. Charles Rawl, a key witness for the SEC testified before Congress that the SEC conducted some investigation in mid-June, 2009, and then apparently dropped the matter:

> The SEC was **awakened** when news of the Madoff Ponzi scheme broke in December 2008. **Within days of Madoff's arrest, the SEC contacted us in a panic, wanting to meet immediately after many months of silence.** The SEC was <u>so anxious</u> at this point, they asked to meet over the Christmas weekend. We met with the SEC the first week of January 2009. At this point, the SEC <u>expressed its concerns about lacking jurisdiction over the Antigua-based bank.</u> We helped the SEC design the legal strategy to implicate the domestic U.S. broker-dealer in the offshore bank fraud.

Charles Rawl, *Written Testimony, House Financial Services Subcommittee on Oversight & Investigations Hearing: "The Stanford Ponzi Scheme: Lessons for Protecting Investors from the*

*Next Securities Fraud"* (May 13, 2011) (Exhibit D) (emphasis supplied) In sum, the SEC was in a panic and scrambling to find a scapegoat to deflect criticism of the agency.

### A.  Denial of Bail Denied Mr. Stanford a Fair Trial.

Mr. Stanford was denied bail. Bail was essential in a white-collar criminal case that involved millions of documents and a sequence of events dating back to the 1980s. The trial judge denied bail to Mr. Stanford and repeatedly denied motions that would have allowed Mr. Stanford to have access to the hundreds of thousands of documents necessary for him to participate in reviewing documents in preparation for trial. [S.D. Tex. ECF Nos. 71, 175, 180, 203, 510]. Mr. Stanford was not a flight risk. Mr. Stanford repeatedly offered to surrender and did, in fact, surrender immediately to the FBI upon indictment. Mr. Stanford *wanted* to defend himself at trial because he believed he was innocent.

**There is no other reported federal prosecution in modern times where a criminal defendant was denied bail in a white collar case where the defendant was not a danger to society, had substantial business and personal ties to the community, and surrendered himself to the authorities.** An electronic leg bracelet, or security much like that given to Madoff would have sufficed. The inability to freely meet with counsel and review the hundreds of thousands of documents impaired Mr. Stanford's ability to prepare for trial. Obviously, Mr. Stanford would not have been subjected to Klonopin treatment if he had not been put in jail with access limited to prison doctors.

### B.  Mr. Stanford Was Forced To Trial Barely a Month After Being Restored to Competence.

To assist his attorneys at trial, Mr. Stanford had to remember or, at least, be in a position to review hundreds of transactions in an effort to recall events dating back decades in order to take the stand and testify in his own defense. That was impossible under the circumstances of

this case, where it would have taken a fully competent and capable defendant months to review

the documents with counsel. As Dr. Pollock testified, "Mr. Stanford would have a very difficult

time assisting an attorney with preparing for a trial … he is not able to sustain concentration,

focus, and attention on one topic and stay relevant long enough to even conduct a good clinical

interview." Testimony of Dr. Pollock, Dec. 20, 2011 [S.D. Tex. ECF No. 834 at 1-218] (Exhibit

E). Both Dr. Lilly[3] and Dr. Scarano[4] testified that Mr. Stanford would be <u>unable</u> to assist his

lawyers in preparing his defense in a complex fraud case.

> Dr. Axelrad testified that:
>
> But as a general rule, if you have a patient who is moderately impaired or severely
> impaired in more than four or five areas -- and there are 13 areas in the report –
> then generally that implies that the person's mental disorder, if it's serious, would
> render him incompetent to stand trial.
>
> And if you go through my -- the checklist and you look at my report, you will find
> that he is <u>moderately to severely impaired in a number of areas that would be
> required to assist counsel in defending himself</u>.

Testimony of Dr. Axelrad, Dec. 22, 2011 [S.D. Tex. ECF No. 836 at 3-48] (Exhibit H).

The trial started on January barely a month after Stanford was found to have been

restored to competence. Mr. Stanford was incompetent for a substantial period of time after

prescribed and addicted to Klonopin in the months leading up to trial, during which he was not

able to communicate with his defense attorneys or to *competently* assist them in pre-trial

preparations, selection of exhibits and identification of potential witnesses. In a case of this

---

3  "**Q** Do you feel like Mr. Stanford is able to assist his lawyers in preparing his defense in a complex fraud case?
   **A** No, he is not, sir.
   **Q** Do you think he would be -- recover enough in the next month or two that he would be able to assist his
   lawyers in preparing for his defense?
   **A** I can't say for sure but I would have some doubt about that.
   **Q** But not at this time?
   **A** That's correct."
   Testimony of Dr. Lilly, Dec. 21, 2011 [S.D. Tex. ECF No. 835 at 2-31—2-32 ] (Exhibit F)
4  "**Q** Will he be able to assist his counsel should he go to trial today?
   **A** No."
   Testimony of Dr. Scarano, Dec. 21, 2011 [S.D. Tex. ECF No. 835 at 2-140] (Exhibit G)

magnitude, the number of exhibits and witnesses, and the sheer complexity of the facts spanning more than a decade, no court has forced a defendant in a criminal case to trial who has just returned from an eight-month hospitalization for treatment of loss of memory and loss of cognitive ability. Even the Government prosecutor supported a brief continuance for the defendant; yet, the trial judge denied any time to allow Mr. Stanford to participate in preparing for his case. [S.D. Tex. ECF Nos. 562, 566 at 15]

As if the dilemma of representing an incompetent client was not enough, further disaster befell the defense team in two ways: (1) an essential member of the team, the lawyer-computer coordinator in charge of the electronic documents during pre-trial preparation and trial, became seriously ill immediately prior to trial and was hospitalized; and (2) the Fifth Circuit denied counsel the fees necessary to take the case to trial [S.D. Tex. ECF Nos. 572-574].

The effect of denial of fees on expert witnesses being told that they are not going to be paid for their efforts and ordered to work for free through trial was devastating to any defense team effort. At the very least, the order undermined the experts' enthusiasm and, at the very least, created an irreconcilable conflict between the expert and the defendant facing criminal charges. Unlike attorneys, who have a *constitutional* duty to provide an effective defense to their clients, forensic accountants and litigation support companies and personnel are not required to work for free. The denial of fees to the experts and support personnel immediately prior to trial were severely prejudicial to the defense.

The criminal defense attorneys appointed to represent Mr. Stanford were experienced criminal lawyers who were hamstrung by the fact that they were representing a client who was adjudged legally incompetent and being treated in North Carolina. They timely requested a continuance from Judge Hittner on the basis that they could not perform their constitutional

duties to provide Mr. Stanford with effective assistance of counsel under the Sixth Amendment where (1) he was being forced to trial after barely being restored to competence, (2) their experts were not going to be adequately compensated, and (3) their client did not have a meaningful opportunity to participate in pre-trial preparation and did not have the ability or the time necessary to prepare to testify at trial [S.D. Tex. ECF No. 552, 564]. The motion was denied by the judge, the trial went forward, and Mr. Stanford was convicted.

## V.    Stanford Had No Access to Funds for His Defense in the SEC Case.

After periodic funding from Lloyds' of London, Judge Atlas ruled that he was not entitled to funding under the policy. The SEC refused to allow any funding for Mr. Stanford's civil defense and his representation has been limited to one lawyer willing to represent him without an assured source of funding. While the papers and media blamed Mr. Stanford for a succession of lawyers, the *real* reason for the revolving door of lawyers was funding, and the fact that the lawyers could not secure sustained funding from Lloyds' of London.

Both the Receiver's and the SEC's efforts were fully funded. Thus, between the SEC, the Receiver, and the Government, Mr. Stanford's defense was <u>massively</u> out-manned and out-spent. Counsel requested funds to pay Mr. Stanford's experts from this Court when it became apparent that the Fifth Circuit would not pay the experts in the criminal case. However, that request was denied. The burden was placed squarely on Mr. Stanford to show that he had funds that were not part of the alleged fraud. It was impossible for Mr. Stanford to prove a negative proposition when he had no funds in a case involving international transactions with numerous companies located overseas and an unpaid lawyer. The inability to obtain limited funding to investigate and represent Mr. Stanford on the issue of defense funding, such as retaining an expert witness, funds

to interview witnesses, cannot be overlooked as part of an overall picture of a one-sided parallel prosecution of Mr. Stanford by the SEC and the United States Department of Justice.

As the Court may recall, the Receiver's expert forensic accountant, Karyl Van Tassel, failed to conduct any investigation of the Antiguan companies and simply <u>assumed</u> that they were all part of a fraud. The forensic accountant's *assumptions* about the Island Club being a fraud were simply unfounded. She admitted that she did not conduct any investigation to determine the value of the Islands Club project. Indeed, hundreds of millions were invested in the Islands Club with *real* improvements to valuable Antiguan real estate including a power plant, desalinization plant and architectural and other infrastructure supporting a multi-billion investment. Neither the Government, the Receiver nor the SEC knew or cared to know about the Islands Club. The value of the *developed* real estate itself negated the proposition that the investors were defrauded. The return on investment from the Islands Club would have been measured in the billions.[5]

In *Janvey v. Alguire*, the Receiver moved for summary judgment. Mr. Stanford incorporates as Exhibit I the Expert Report of Alton Davis. [N.D. Tex. Case No. 3:09-0724, ECF No. 703-1]. In that report, Mr. Davis set out an analysis of the Islands Club and other issues that should have been, but were not conducted by the Receiver's expert witness. Mr. Davis concluded that Ms. Van Tassel's conclusion that SIB was insolvent was "ill-founded," "critically flawed," and that Stanford International Bank was solvent at the time of the SEC takeover. *Id*. at 5, 6 & 18.

---

5 Ironically, while the Receiver turned a blind eye to the value of the property for purposes of litigating liability in the receivership, the Receiver feuded and fought turf wars with the Conservator appointed in Antigua, wasting precious time and resources when he should have cooperated with the authority appointed in Antigua to protect property located in Antigua. As a result, hundreds of millions of dollars have been lost to the receivership estate. It remains to be seen whether the new working relationship with the Antiguan liquidator will show any benefit to claimants.

IV.    **Conclusion**

Neither the Government nor the Receiver appreciated, or cared to analyze the Antiguan businesses and, as a result, forged ahead in a parallel prosecution without a full understanding of the facts. The resulting criminal prosecution was initiated without the facts and pursued for the wrong reasons.

But for the Madoff case, and the need for a scapegoat, the SEC would have probably not prosecuted Mr. Stanford and certainly would have allowed him to try and resolve their allegations without a costly receivership and wholesale liquidation of assets that have only enriched the Receiver's lawyers to the loss of claimants.

In the last analysis, the United States Constitution and Bill of Rights are designed to protect the life and liberty of individuals accused of criminal offenses. When an individual is accused of a criminal offense and faces over a hundred years of imprisonment---essentially a life sentence---the courts must take every step necessary to ensure that a defendant whose memory and mental health was destroyed by government over-medication, is adequately prepared to proceed to trial. In the instant case, it is *objectively* difficult to conclude that a trial *had* to be held barely a month after Mr. Stanford was restored to competence. Indeed, the Court could have set the trials of the co-defendants before setting the trial of Mr. Stanford. Instead, Mr. Stanford was forced to trial before he was restored to competence, before he could *competently* review the evidence against him and before he could assist his lawyers before and during trial. Combined with the pre-trial and publicity during trial, Stanford was deprived of a fair trial.

Mr. Stanford respectfully submits that the criminal judgment cannot be used as a source of authority to establish liability in this case, because his criminal conviction was obtained in violation of the United States Constitution.

Accordingly, R. Allen Stanford requests the Court deny the Receiver's Motion for Partial

Summary Judgment.

Very respectfully,


  /s/Stephen R. Cochell
Stephen R. Cochell
The Cochell Law Firm, P.C.
Texas Bar No. 24044255
7026 Old Katy Rd., Ste 259
Houston, Texas 77096
(713)980-8796 (phone)
(713)980-1179 (facsimile)
srcochell@cochellfirm.com


**CERTIFICATE OF SERVICE**


I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic on March 25, 2013.


*/s/ Stephen R. Cochell*

## <u>Index of Exhibits</u>

**Exhibit A:** Defendant's Motion for New Trial, S.D. Tex. ECF No. 829, with Exhibits:

    **Exhibit A, Appendix 1: Exhibit E**

    **Exhibit A, Appendix 2: Exhibit I**

    **Exhibit A, Appendix 3: Exhibit K**

    **Exhibit A, Appendix 4: Exhibit L**

    **Exhibit A, Appendix 5: Exhibit M**

**Exhibit B:** SEC Office of Inspector General, *Case No. OIG-516: Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation* (June 19, 2009).

**Exhibit C:** SEC Office of Inspector General, *Case No. OIG-526: Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme* (March 31, 2010).

**Exhibit D:** Charles Rawl, *Written Testimony, House Financial Services Subcommittee on Oversight & Investigations Hearing: "The Stanford Ponzi Scheme: Lessons for Protecting Investors from the Next Securities Fraud"* (May 13, 2011).

**Exhibit E:** Extract of Testimony of Dr. Richard Pollock, Dec. 20, 2011, S.D. Tex. ECF No. 834.

**Exhibit F:** Extract of Testimony of Dr. Ralph Lilly, Dec. 21, 2011, S.D. Tex. ECF No. 835.

**Exhibit G:** Extract of Testimony of Dr. Victor Scarano, Dec. 21, 2011 S.D. Tex. ECF No. 835.

**Exhibit H:** Extract of Testimony of Dr. Allan Axelrad, Dec. 22, 2012, S.D. Tex. ECF No. 836.

**Exhibit I:** Expert report of Alton Davis, Docket No. 703-1, N.D. Tex. Case No. 3:09-CV-00724-N.