IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff | § § | |
| v. | § § | Cause No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § | |
| Defendants. | § § | |

## EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1] AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH ADAMS & REESE PARTIES, BREAZEALE, SACHSE & WILSON, LLP, CORDELL HAYMON AND LYNETTE FRAZER, BAR ORDER, NOTICE AND ATTORNEYS' FEES

COME NOW Receiver Ralph S. Janvey (the "Receiver") and the Official Stanford

Investors Committee ("OSIC"), Plaintiffs in Civil Action No. 3:12-CV-00495-B, *Ralph S.

Janvey, et al. v. Adams & Reese, LLP, et al.* (N.D. Tex.)  (the "Receiver Lawsuit"), and Philip

Wilkinson and Horacio Mendez, plaintiffs (the "Investor Plaintiffs") along with OSIC in Civil

Action No. 3:11-CV-00329-BL, *The Official Stanford Investors Committee, et al. v. Adams &

Reese, et al.* (N.D. Tex.) (the "Investor Lawsuit") (together with the Receiver Lawsuit, the "STC

Lawsuits") (the Receiver, OSIC and Investor Plaintiffs are collectively referred to as the

"Movants") and move the Court to approve the Amended Stipulation and Settlement Agreement

(the "Settlement Agreement") (attached as Exhibit 1 to the Appendix in Support of this Motion)

with Defendants Adams & Reese, LLP ("A&R"), Robert C. Schmidt ("Schmidt") and James R.

Austin ("Austin") (collectively, the "A&R Parties"), Breazeale, Sachse & Wilson, LLP

---

[1]  Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, since such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

("BSW"), Cordell Haymon ("Haymon") and Lynette Frazer, individually and as independent executrix of the estate of Thomas L. Frazer ("Frazer") (the A&R Parties, BSW, Haymon and Frazer are collectively referred to herein as the "Settling Defendants"), which settles and releases all claims against the A&R Parties, BSW, Haymon and Frazer in consideration of A&R's payment to the Receivership Estate of $1 million, BSW's payment to the Receivership Estate of $1,530,000, BSW's release to the Receivership Estate of the $198,165.49 currently being held in escrow by BSW, pursuant to the terms of that certain Escrow Agreement between Stanford Group Company and SBL Capital Corporation dated March 27, 2008, which designates BSW as Escrow Agent, Haymon's payment to the Receivership Estate of $2 million, and Frazer's payment to the Receivership Estate of $175,000.[2]  The Settlement Agreement further includes the release of all claims against Defendant Claude F. Reynaud, Jr. ("Reynaud") that are based upon, arise out of, are attributable to, or result from any act, error, omission, circumstance, personal injury, or breach of duty in the rendition of legal services for others (including, but not limited to, The Stanford Trust Company, The Stanford Group Company, The Stanford Financial Group Company, and any other affiliated entity or individual) in Reynaud's capacity as a lawyer. The Settlement Agreement does not include the release of claims against Reynaud that are based upon, arise out of, are attributable to, or result from Reynaud's activities as an officer or director of the Stanford Trust Company.  Movants jointly request that this Court find the settlements are in the best interest of the Stanford Estate and the Stanford investors, and approve the settlements. Movants request that the Court approve the form and procedure for notice of this settlement to the Stanford investors and other interested parties, enter a scheduling order setting a final hearing date for approval of this Motion and deadlines for objections and responses to those objections, and upon final hearing approve the settlement, enter the bar order that is required by the

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning set forth in the Settlement Agreement.

settlement, and approve the payment of attorneys' fees in accordance with the contingency fee agreements between Movant's counsel and OSIC.   In support thereof, Movants would respectfully show the Court the following:

## I.   **INTRODUCTION**

1.      As part of their lengthy and thorough investigation of the Stanford Ponzi scheme and after many years of investigating and pursuing claims against third parties, including the Defendants in the STC Lawsuits, Movants have reached a settlement with the Settling Defendants: (1) the A&R Parties, being the law firm A&R and two A&R lawyers (Schmidt and Austin) that provided legal services to Stanford Trust Company ("STC"); (2) BSW, the law firm that employs Reynaud, (3) Haymon, one of the directors of STC from 2003 to 2008; and (4) Lynette Frazer, the independent executrix of the estate of Thomas L. Frazer, another one of the directors of STC from 2003 to 2008.  Haymon has agreed to pay $2 million, BSW has agreed to pay $1,530,000 and to release an additional $198,165.49 from funds held in escrow upon written request from the Receiver, A&R has agreed to pay $1 million, and Lynette Frazer has agreed to pay $175,000, to the Receiver, for distribution to the Stanford investors who have allowed claims against the Stanford Receivership Estate in consideration for: a) a global release of the A&R Parties, BSW, Haymon and Frazer; b) a partial release of Reynaud as set forth and defined in the Settlement Agreement; c) a bar order precluding other parties from asserting claims against the Settling Defendants; d) a bar order precluding other parties from asserting certain claims against Reynaud as set forth and defined in the Settlement Agreement; e) a dismissal with prejudice of the STC Lawsuits as to the A&R Parties, BSW, Haymon and Frazer; and f) a partial dismissal with prejudice of the STC Lawsuits as to Reynaud as set forth and defined in the Settlement Agreement.  Movants request the Court to approve the agreement and enter the bar order.  Movants further request that the Court approve payment of attorneys' fees to the counsel

whose efforts resulted in this settlement consistent with their contractual twenty-five percent (25%) contingency fee agreements with the Receiver, OSIC and the Investor Plaintiffs.

## II.   BACKGROUND

### A.   Authority of the Receiver and OSIC

2.     On February 17, 2009, the Securities & Exchange Commission ("SEC") filed this action and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver ¶ 4 [Doc. 10].[3] The Second Amended Order Appointing Receiver is the current order setting forth the Receiver's rights and duties (the "Second Order" [Doc. 1130]).  The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants."  Second Order ¶ 5.

3.     The Receiver is not only authorized but required to pursue outstanding liabilities and claims for the Estate.  *Id.* ¶¶ 3, 5(b).  The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court.  *Id.* ¶ 2.  The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."  *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011).  This includes the "responsibility of tracking down and collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately, defrauded investors."  *Id.* at 331.  The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate.  Second Order ¶ 5(i).

---

[3]     All Docket Items are from *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-298-N (N.D. Tex.), unless otherwise noted.

4.     On August 10, 2010, this Court entered its order creating the Official Stanford Investors Committee ("OSIC").  Doc. No. 1149 (the "Committee Order").  The Committee Order directs OSIC to represent the creditors of the Receivership Estate "who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL."  Committee Order at 2.  The Committee Order confers upon OSIC the right to investigate and pursue claims on behalf of the Stanford investor victims and the Receivership Estate (by assignment from the Receiver).  This Court has recognized OSIC's standing to pursue litigation claims such as the claims against the Settling Defendants that are the subject of the settlement.  *See* September 24, 2012 Order, Dkt. No. 33, in *Janvey & Official Stanford Investors Committee v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N, at pp. 4-6 (OSIC has standing to pursue claims based on the Court's grant of such authority to OSIC as an association representing the interests of the Stanford investors).

**B.     The Investigation and Prosecution of Claims Against STC Directors, A&R and BSW**

5.     Counsel to the Movants have spent several years and thousands of hours investigating and pursuing claims against the former directors and law firms of STC on behalf of the Stanford Receivership Estate and the Stanford investors.  As part of their investigation of these claims, Movants' counsel have reviewed voluminous documents and emails, including hundreds of boxes of former STC records in the possession of the Receiver, as well thousands of pages of documents and emails produced in discovery in the STC Lawsuits.

6.     In addition to preparing the lengthy and factually detailed Complaints in the STC Lawsuits, Movant's counsel researched relevant case law and prepared and filed responses to comprehensive Motions to Dismiss filed by the Defendants in the STC Lawsuits.  However, on September 11, 2013, the Court ruled on Defendants' Motions to Dismiss in the Receiver

Lawsuit, holding that Louisiana law applied to the case and dismissing Plaintiffs' legal malpractice claims against A&R and BSW, but permitting Plaintiffs' claims for breach of fiduciary duty against Haymon and the other director Defendants Reynaud and Frazer to proceed. The Court also allowed Plaintiffs' claim for vicarious liability against BSW to proceed, since Defendant Reynaud was employed as a partner with BSW at the time he was serving as a director of STC. Although the malpractice claims against A&R and BSW were dismissed in the Receiver Lawsuit, the Court's order is not a final order and could still be appealed at the conclusion of the Receiver Lawsuit, and the A&R Parties and BSW remain Defendants in the Investor Lawsuit.

7.      Defendant Thomas Frazer died on July 4, 2012. By Order entered October 3, 2014, the Court granted Plaintiffs' motion to substitute Lynette Frazer, the executrix of his estate, as a Defendant. This Motion seeks approval of a settlement with Ms. Frazer in that capacity.

8.      This Motion also seeks approval of a settlement with Defendants A&R, BSW and Haymon. The STC Lawsuits will continue to proceed against Defendant Reynaud, but only as to claims that are based upon, arise out of, are attributable to, or result from Defendant Reynaud's activities as an officer or director of STC.

9.      Since September 11, 2013, Movants' counsel has participated in approximately one and a half years of an extensive discovery process in the Receiver Lawsuit. Discovery has included drafting and sending extensive written discovery to Defendants, responding to multiple sets of interrogatories and document requests from Defendants, and reviewing and producing hundreds of boxes of former STC records in the possession of the Receiver. Counsel has also taken the depositions of two senior officials with the Louisiana Office of Financial Institutions ("OFI"), the regulator of STC in Louisiana, a corporate representative of Whitney Bank, where STC formerly had its banking relationship, and Edward Martin, a lawyer at Jones Walker, a New

Orleans law firm that represented STC.

10.     Discovery is ongoing and continuing in the Receiver Lawsuit, with approximately 10 to 15 more depositions to occur over the next several months, and trial is currently set for August 3, 2015.

11.     Plaintiffs' prosecution of the claims against the STC directors and law firm Defendants also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationship and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities. Over the course of the last 6 years, counsel for Movants have performed an extensive investigation of Stanford and have prosecuted multiple lawsuits against third parties on behalf of the Receivership Estate and the Stanford investors, all of which work has benefitted and provided value to the STC Lawsuits. Without a comprehensive investigation and understanding of the Stanford factual background and the legal framework for the types of claims asserted in the STC Lawsuits, it would not have been possible to formulate viable claims against the STC directors and law firms.   OSIC counsel have also spent thousands of hours since OSIC's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against the Defendants in the STC Lawsuits, pursuant to an agreement between the Receiver and OSIC.

12.     The Receiver and OSIC and the undersigned law firms have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of this receivership case, all of which allowed the Receiver, OSIC and the undersigned counsel to formulate and file the claims against the STC directors and law firm,

which led to the settlement for which approval is sought by this Motion.  But for the diligent efforts of the Receiver, OSIC and their counsel since the commencement of this receivership proceeding, the settlement with A&R, BSW, Haymon and Frazer would never have been achieved and the Receivership Estate would not be in a position to receive approximately $4.9 million in settlement proceeds.

13.     Movants and their counsel have conducted a thorough analysis of the potential claims against the Settling Defendants, considering:

    a.   claims available under both state and federal law;

    b.   the viability of those claims considering the facts underlying the Settling Defendants' roles with Stanford Trust Company, Stanford Group Company, and Stanford Financial Group Company, and this Court's previous rulings; and

    c.   the success of similar claims in other Ponzi scheme and investment fraud cases, both in the Fifth Circuit and elsewhere.

14.     The investigation has revealed that Haymon and Frazer were directors of STC for five years, during which time STC was sharing in referral fees received by Stanford Group Company ("SGC"), Stanford's U.S. broker dealer, from Stanford International Bank, Ltd. ("SIBL") for the investment of STC IRA customers' money into SIBL CDs.  However, neither were directors in 2001 when the OFI issued its directive to STC that it was not to receive any fees for the placement of its IRA customers' funds into SIBL CDs due to concerns over self-dealing and potential violations of Internal Revenue Code § 4975.  Defendant Reynaud, on the other hand, was a director in 2001 and throughout the entire time that STC was earning fees from the placement of its IRA customers' funds in SIBL CDs.

15.     Although the A&R Parties remain Defendants in the Investor Lawsuit, they have been dismissed from the Receiver Lawsuit.  Although BSW remains a Defendant in the Receiver Lawsuit, the sole remaining claim against BSW in the Receiver Lawsuit is for vicarious liability

as the employer of Reynaud.  The Receiver's legal malpractice claims against BSW and the A&R Parties have been dismissed.

16.     Insurance coverage has proven to be a thorny issue in the cases.  Since the Receiver's malpractice claims against A&R were dismissed, arguably A&R's insurance policies no longer provided coverage for the remaining claims asserted by Plaintiffs.  While claims against Haymon may be covered by STC's insurance with Lloyds, coverage under the Lloyds policies is hotly contested by Lloyds, who has denied coverage.  As a result, Haymon and Reynaud have filed declaratory judgment actions against Lloyds, and Lloyds' Motion to Dismiss those claims are pending.  The claims and issues in the declaratory judgment actions may not be resolved when the Receiver Lawsuit goes to trial in August, so it is unknown whether any insurance would be available to pay a judgment against Haymon or Reynaud.

17.     BSW's carrier has filed a declaratory judgment action against BSW, arguing that the remaining claims against BSW are not covered by BSW's professional liability policy.

## C.     Mediation

18.     Two mediation sessions were held with Christopher Nolland presiding as mediator, one on June 30, 2014, and a second session on September 3, 2014.[4]  The June 30, 2014 mediation did not result in any settlements being reached; the September 3, 2014 mediation resulted in the settlement with A&R, but no other parties.  However, continued discussions between Plaintiffs and Haymon ultimately resulted in the settlement with Haymon.  After the Court granted Plaintiffs' motion to substitute Lynette Frazer as a Defendant in place of Thomas Frazer, subsequent negotiations between counsel resulted in the settlement with Ms. Frazer.  Continued negotiations with BSW also resulted in the proposed settlement with BSW.

19.     Negotiations were arms-length, and at times contentious.  Defendants denied any

---

[4]     A&R did not participate in the mediation session held on June 30, 2014.

wrongdoing in connection with STC, and are not admitting any wrongdoing in entering into the settlement.

**D.      Movants and Examiner Support of Settlement**

20.     Movants are confident that the investigation of the Settling Defendants' activities related to Stanford performed by their counsel has been thorough and are confident that the investigation has provided them with sufficient information to enter into and endorse this settlement.   Movants are also confident that the settlement is fair and reasonable taking into consideration not only the merits of the claims, but also the risks, uncertainties, and expenses associated with litigation.    Further, Movants believe that the settlement fairly balances considerations of collectability of any judgment that could be obtained.   Therefore, Movants believe that the settlement is in the best interests of the Stanford Receivership Estate and its investors and should be approved by the Court.   The Chairman of the OSIC, who oversaw the OSIC Lawsuit and participated in the settlement negotiations and mediations, is also the court-appointed Examiner, and he supports this Motion in both capacities, as does the Receiver, who assigned certain of the claims to OSIC for prosecution.   See Declaration of Examiner John J. Little, attached as Exhibit 5 to the Appendix in support of this Motion.

21.     The Investor Plaintiffs also support the settlement and believe it is in the best interests of all Stanford investors, and request that the Court approve it.   As part of the settlement, the Investor Plaintiffs have agreed to dismiss the Investor Lawsuit with prejudice. All Stanford investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution process.   The settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013). There would be

uncertainty and delay in certifying a settlement class involving all Stanford investors who reside in multiple countries throughout the world, and such a class would, at any rate, be duplicative of the investors who are already participating in the Receivership claims and distribution process. It is far more efficient and saves substantial costs to distribute the settlement funds through the court-approved Receivership distribution process rather than create an entirely separate and parallel class action settlement distribution process. Moreover, a class action settlement process would result in substantial delay and less money flowing to investors. The Receivership settlement and bar order, together with a dismissal of the Investor Lawsuit, protects all interested parties, both the Defendants and the Stanford investors.

**E.      The Settlement**

22.     The proposed settlement is the result of many years and thousands of hours of work by the Receiver, OSIC, Investor Plaintiffs and the undersigned counsel, and was negotiated and entered into as a result of arms-length negotiations during and after mediations with Christopher Nolland.

23.     The essential terms of the Settlement Agreement, attached as Exhibit 1 to the Appendix in Support of this Motion, are as follows:

> (1)     A&R will pay $1 million, BSW will pay $1,530,000 and release an additional $198,165.49 from funds held in escrow, Haymon will pay $2 million and Frazer will pay $175,000 (a total gross settlement amount of $4,903,165.49) to settle all claims in the STC Lawsuits;

> (2)     A&R, BSW, Haymon and Frazer will each pay their pro rata share of $4,000 to Horacio Mendez and $6,667 to Phillip A. Wilkinson out of the above settlement payments in consideration of Mendez and Wilkinson's settlement and release of their individual claims;

> (3)     The gross settlement amounts less the payments to Mendez and Wilkinson shall be paid to the Receiver;

> (4)     The Receiver, OSIC and Named Plaintiffs will fully release the Settling

Defendants from any and all claims asserted in or related to the STC Lawsuits;

(5)     The Receiver, OSIC and Named Plaintiffs will further fully release Reynaud from any and all claims asserted in or related to the STC Lawsuits that are based upon, arise out of, are attributable to, or result from any act, error, omission, circumstance, personal injury, or breach of duty in the rendition of legal services for others (including, but not limited to, The Stanford Trust Company, The Stanford Group Company, The Stanford Financial Group Company, and any other affiliated entity or individual) in Reynaud's capacity as a lawyer.  The Receiver, OSIC and Named Plaintiffs do not release any claims, including but not limited to claims for breach of fiduciary duty against Reynaud that are based upon, arise out of, are attributable to, or result from Reynaud's activities as an officer or director of STC.

(6)     The Receiver and OSIC will seek entry of the proposed bar order (the "Bar Order") attached to the Settlement Agreement as Exhibit A enjoining any Stanford-Related Litigation against the Settling Defendants;

(7)     The Receiver will provide notice of this settlement to the Stanford investors and other claimants in the Estate, through electronic mail, if known, or otherwise by mail, and by posting a notice on the Receiver, claims agent and Examiner websites;

(8)     The Net Recovery [the gross settlement amount, less litigation expenses, less the 25% contingency fees, and less the amounts paid to Mendez and Wilkinson] will be included with other funds and distributed by the Receiver for the benefit of the Stanford investors pursuant to a distribution plan that is expected to be similar to other pro rata distribution plans approved by the Court; and

(9)     The STC Lawsuits will be dismissed with prejudice, with each party bearing their own costs and attorneys' fees.

24.     This motion and all exhibits will be posted on the Receiver's websites at www.stanfordfinancialreceivership.com, and www.stanfordfinancialclaims.com and on the Examiner's website at www.lpf-law.com/examiner-stanford-financial-group[5] within fifteen (15) calendar days after entry of the Scheduling Order.  A copy of this motion and all exhibits will also be provided to any interested party upon request, which can be directed to:

---

[5]     These three websites are referred to collectively as the "Official Stanford Websites."

rclark@neliganlaw.com

25.     For the reasons described herein, the settlement with the A&R Parties, BSW, Haymon and Frazer is fair, equitable, and reasonable, and is in the best interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets. Movants request the Court to approve it.

### III.     EXPEDITED REQUEST FOR APPROVAL OF NOTICE AND ENTRY OF SCHEDULING ORDER

26.     Pursuant to Paragraph 6 of the Settlement Agreement, Movants seek entry of the Scheduling Order in the form attached as Exhibit B to the Settlement Agreement, which preliminarily approves the Settlement Agreement as fair and reasonable based upon the Court's review of this Motion and the Settlement Agreement, sets a final hearing date a date at least sixty (60) calendar days after entry of the Scheduling Order, and sets deadlines for the filing of objections and responses to objections to the Settlement Agreement.  The purposes of the final hearing will be:  (i) to determine whether the Agreement, and the Settlement it describes, should be finally approved by the Court; (ii) to determine whether the Order Approving Settlement and Entering Final Bar Order and Injunction attached as Exhibit A to the Settlement Agreement should be entered by the Court; (iii) to rule upon any objections to the Settlement, the Settlement Agreement or the Bar Order and Injunction and (iv) to rule upon such other matters as the Court may deem appropriate.

27.     Pursuant to Paragraph 8 of the Settlement, Movants are required to (a) send a Notice in the form attached as Exhibit D to the Settlement Agreement to all Claimants personally by electronic mail, if known, or otherwise by First Class United States or international mail; and (b) post a Notice in the form attached as Exhibit D to the Settlement Agreement on the Official Stanford Websites.  Movants contend this notice, together with ECF notices that counsel who

have appeared in the Receivership Proceeding and the STC Lawsuits will receive upon the filing

of this Motion, is reasonable and sufficient to satisfy due process and to notify interested parties

wishing to file an objection to or be heard with respect to the terms of the Settlement Agreement,

the proposed Bar Order and Injunction, the objection deadline and the final hearing on this

Motion.

28.     Therefore, Movants request that the Court promptly enter the Scheduling Order,

without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested

parties to respond to this Motion, since such Scheduling Order merely approves the notice and

objection procedure, and does not constitute a final approval of the Settlement Agreement.

## IV.     REQUEST FOR APPROVAL OF THE SETTLEMENT AGREEMENT

### A.     Legal Standards

29.     "'[T]he district court has broad powers and wide discretion to determine the

appropriate relief in an equity receivership.'"   *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir.

2013) (quoting *Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)).   "These powers include

the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in

actions brought by the SEC to enforce the federal securities laws.'"   *Id.* (quoting *SEC v. Wencke*,

622 F.2d 1363, 1369 (9th Cir. 1980)).   "Such 'ancillary relief' includes injunctions to stay

proceedings by non-parties to the receivership."   *Id.* (citing *Wencke* and *SEC v. Stanford Int'l

Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)).   "[N]o federal rules prescribe a particular

standard for approving settlements in the context of an equity receivership; instead, a district

court has wide discretion to determine what relief is appropriate."   *Id.* (quoting *Gordon v.

Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009)).   Congress enacted a "loose scheme" for

federal equity receivers "on purpose" and "wished to expand the reach and power of federal

equity receivers, especially in the context of consolidation."   *Janvey v. Alguire*, No. 3:09-cv-

00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

30.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act "as a court in equity" for the "benefit of defrauded investors." *Id.* at 35 (internal quotation marks omitted); *see* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 190 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995))).

31.     "The federal equity receivership statutory framework also can – and, in the situation of the current Stanford receivership, does – interact with another federal statutory scheme:  federal multidistrict litigation ('MDL')." *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 26 (N.D. Tex. July 30, 2014).  "[I]n the Stanford receivership, cases brought, not involving the Receiver, in other federal courts across the country are also being transferred to this Court through the MDL statute, highlighting once again the congressional goal of consolidation." *Id.*

32.     "The purpose of federal equity receiverships" – "to marshal assets, preserve value, equitably distribute to creditors, and . . . orderly liquidate" – is thus supported by "the added context of the Stanford receivership being a multidistrict litigation SEC receivership over a Ponzi scheme." *Id.* at 41.

33.     Furthermore, the institution of the Receivership and consolidation of Stanford related litigation in this Court are particularly apt because the Stanford Ponzi scheme, though international in scope, in reality operated "as a single enterprise" centered in Texas.  *Id.* at 10;

*see also In re Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00721, slip op. at 50 (N.D. Tex. July 30, 2012).

34.     The Receivership Order in this case closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants.  Second Order ¶ 5; see supra ¶¶ 2-3.

35.     The ability to compromise claims is critical to this Receivership.  Courts have long emphasized that public policy favors settlement.  *See, e.g.*, *Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010).  That is especially true here, where the victims of Stanford's Ponzi scheme await recovery, further costs would come directly out of those victims' pockets, and the settlement would allow Movants to make a distribution now as a result of the partial settlement of the STC Lawsuits.

36.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases.  *Kaleta*, 530 F. App'x. at 362 (approving bar order).  Bar orders are commonly used in receivership cases to achieve these purposes.  *See, e.g.*, *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009); *SEC. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010) (Norton, C.J.), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

37.     The bar order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation

of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. April 16, 2014) (following *Kaleta* and approving bar order).

38.     In determining whether to issue a receivership bar order, courts may consider factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).

39.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4.  The Fifth Circuit's opinion noted that, like the settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

40.     "[A] district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC actions." *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340–41 (5th Cir. 2011) (citing *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985); *SEC v. Wencke*, 622 F.2d 1363, 1372 (9th Cir. 1980)). "It is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372 (5th Cir. 1982) (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978); *SEC v. Arkansas Loan & Thrift Corp.*, 427 F.2d 1171, 1172 (8th Cir. 1970)) (internal quotation marks omitted).  "Any action by a trial court in supervising an equity receiver is

committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse." *Arkansas Loan & Thrift Corp.*, 427 F.2d at 1171. "An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership." *SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069, at *3 (S.D. Tex. 2012).

41.     Entry of the Bar Order is in the best interests of the Receivership Estate. "The authority of the receiver is subject in every respect to the control of the court, limited only by the *best interests of the estate* and its creditors." *In re State Fin. Servs., Inc.*, 432 F. Supp. 129, 132 (M.D. La. 1977) (emphasis added) (citing 8 COLLIER ON BANKRUPTCY (14th ed.) P 6.35(3), p. 954; 14 COLLIER ON BANKRUPTCY (14th ed.) P 11-23.02, p. 11-23-2; *Urban Props. Corp. v. Benson*, 116 F.2d 321 (9th Cir. 1946)). To that end, this Court is well within its discretion to enter the proposed Bar Order because its entry will promptly secure a substantial sum of money for the Receivership Estate and the estate's claimants. *Id.* at 133. Though barred from individual actions, claimants to the Receivership Estate would be permitted to pursue claims through the process that has already been established by the Receiver, and the settlement amount will provide immediate funds for such claims.

**B.     Value of the Proposed Settlement**

42.     The settlement payments to be made by each of the Settling Defendants are reasonable given the inherent risks of litigation, the time value of money, what discovery has revealed with respect to the role of A&R and BSW and the Court's dismissal of the Receiver's malpractice claims against A&R and BSW, the time period of Haymon's service on the STC board of directors in relation to actions taken by the OFI, and the death of Thomas Frazer and the fact that the only claims remaining are against his widow in her capacity as the independent executrix of his estate. "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant

circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549. The settlement amounts clearly satisfy the business judgment and "fair and adequate" standards applicable to the Movants' decision to settle with the Settling Defendants.

## C.     Value and Merits of the Claims

43.     Movants believe that the claims filed against the Settling Defendants in the STC Lawsuits are meritorious, and that Movants would be successful if those claims were tried. However, they are not without substantial risk and uncertainty, and the ability to collect a judgment on those claims is also not without risk and uncertainty.

44.     Needless to say, the Settling Defendants vigorously dispute the validity of the claims asserted in the STC Lawsuits, A&R has been dismissed from the Receiver Lawsuit, and BSW remains in the Receiver suit only a claim of vicarious liability. Haymon and Frazer were not directors of STC in 2001 when the OFI issued its directive to STC that STC could not receive any fees from the investment of STC customer's IRA accounts in SIBL CDs. Further complicating matters with respect to Frazer is that he died during the pendency of the Lawsuits, and only his widow remains as a substitute Defendant. Reynaud is the only Defendant who was a director in 2001 when the OFI instructed STC not to receive fees from the SIBL CD products, so Movants view Reynaud as the Defendant with the most culpability, and the claims against Reynaud have not been settled and will remain pending.

45.     Lloyds, Stanford's D&O insurance carrier, has denied coverage for the claims asserted in the STC Lawsuits against the STC directors Haymon, Frazer and Reynaud. Haymon

and Reynaud recently filed a Declaratory Judgment action against Lloyds.[6]  Lloyds has filed a motion to dismiss the claims in that proceeding, and that motion remains pending.   Absent insurance, recovery against Haymon and Frazer is limited to their non-exempt personal assets. Complicating collection against Frazer is the fact the assets of her husband have already been distributed to a number of beneficiaries, including charities, pursuant to a Louisiana succession proceeding, and she is merely the recipient of a portion of her husband's estate.

46.    Absent the settlement with the Settling Defendants, they would continue to vigorously defend the STC Lawsuits, the litigation would be expensive and protracted, and the ultimate outcome of such litigation would be uncertain.   Thus, Movants believe that the settlement very much reflects a fair and reasonable compromise between the parties, particularly given the uncertainties inherent in the litigation as well as the collectability issues.

47.    While Movants believe they could ultimately prevail on both liability and damages, success is far from assured and would only be possible after years of litigation, including appeals.  The settlement payment represents a significant recovery for the Stanford investors, while avoiding the burden, costs, delay, and risks incident to continued litigation, with an uncertain outcome.

**D.    The Risk that Litigation Would Dissipate Receivership Assets**

47.    The Settling Defendants have vigorously defended themselves in the STC Lawsuits, and would undoubtedly continue to do so absent settlement.   Trial is not set until August in the Receiver case, and many depositions and expert witness discovery remain to be completed.   Summary judgment motions will almost certainly be filed, which will require significant time and effort to respond to on the part of Movants' counsel.   Assuming such

---

[6]     That action is *Reynaud, et al., v. Certain Underwriters at Lloyd's of London*, Civil Action No. 3:14-CV-03731-N, pending in this Court.

motions are denied, substantial additional time and resources would be required for trial and a possible appeal from any favorable judgment. While Movants' litigation counsel have entered into contingent fee arrangements with the Movants to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation. The settlement avoids further expense associated with the continued monitoring and oversight of this case as it relates to the Settling Defendants by the Receiver and the OSIC Chairman/Examiner.

48.     Furthermore, as part of their fee agreement with their counsel, OSIC has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with OSIC's litigation against the STC Defendants, including, *inter alia*, expert fees and out of pocket litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.). Because the STC Lawsuits involve legal malpractice and other professional negligence claims, and technical issues related to IRS and other regulations governing IRA accounts, expert witness testimony has been and remains necessary. While expert witness expenses will continue to be necessary with respect to the remaining claims against Reynaud, those expenses will be reduced as a result of the settlement.

### E.     The Complexity and Costs of Future Litigation

49.     The prosecution of the litigation against the Settling Defendants would undoubtedly be challenging and expensive, as discussed above. As the Court is aware, the facts and legal analysis of Stanford's fraud are extraordinarily complex. There is no question that the STC Lawsuits involve extraordinarily complex facts and claims, and would cause the Receivership estate to incur substantial expense to litigate to final judgment. While litigation costs related to the STC Lawsuits will not be eliminated as a result of this partial settlement, the

reduction of the number of parties and claims will necessarily save time and expense going forward in the STC Lawsuits.

## F.      The Implications of Settlement Payment on Other Claimants

50.      As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'"  *Kaleta*, 530 F. App'x at 362.  The Receiver is not collecting the settlement payments for Allen Stanford or for his own account, but for the Stanford investors.  The relief Movants request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities."  *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).  For the reasons stated, the Investor Plaintiffs support the structure of the settlement, as it saves substantial time and expense over a class settlement which would involve class certification issues when the same Stanford investors are participating in the Receivership and are receiving the benefit of the Receivership settlement through the court-approved distribution process.

## G.      The Value and Merits of Any Foreclosed Parties' Potential Claims

51.      Movants are conscious of the fact that the Bar Order they are requesting will preclude Stanford's investors and others from asserting claims against the Settling Defendants in connection with their involvement in the Stanford enterprise.  However, no investors (other than the Investor Plaintiffs) have asserted any claims against the Settling Defendants in the 6 years since the Receivership was created, the cost of doing so in any individual investor lawsuit would be prohibitive, and any such investors asserting claims would face the same legal, factual and collectability challenges faced by the Investor Plaintiffs, as discussed above.

52.      Given that all Stanford investors have been put on notice of the Receivership, have been given the opportunity to file claims in the Receivership, and that the vast majority of

the investors have filed claims and are already participating in the distribution process, the investors' rights are not being prejudiced in any way by this settlement.  They have all had the opportunity to participate through the pre-existing receivership claims process.  It would be detrimental to the investors to reinvent the wheel through a class settlement procedure, which would result in the same pool of investors having the right they already have through the Receivership claims and distribution process to participate in the settlement.

53.     Movants believe that the Bar Order should be approved because it is in the collective best interest of all Stanford investors.  The Bar Order should not be rejected solely based upon the theoretical possibility that some individual investor(s) or counsel might have otherwise wished to pursue individual claims against the Settling Defendants in the future, particularly given that no such claims have been filed for six years since the Receivership was created.  *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").
It should also be noted that the Receiver, and OSIC as assignee of the Receiver's claims, is the only party with standing to pursue the primary claims in the case, those for breach of the STC directors' fiduciary duties, and those are the only claims remaining in the Receiver Lawsuit.  No potential individual litigant owns or could assert those claims.

54.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit as many aggrieved investors as stand to be benefited under the Settlement Agreement." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

55.     It also is unlikely that any potential claimant could or would spend the time and resources necessary to pursue an individual claim against the Settling Defendants, especially considering the expense of such an action would far outweigh any likely individual recovery against the Settling Defendants.  The Movants believe that enjoining these speculative and unlikely claims is, on balance, fair and appropriate to all interested parties, especially when necessary to gain an immediate and substantial recovery for the Receivership Estate and the Stanford investors.

56.     The proposed settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses or a "race to the courthouse" by various counsel.

## H.     Other Equities Attendant to the Situation

57.     Entering the Bar Order is a material term under the Settlement Agreement to the Settling Defendants.  The Settling Defendants "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [the Settling Defendants], potentially in other, including foreign, jurisdictions."  *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

58.     The Settling Defendants have made clear that in consideration of paying the settlement amounts, they must achieve "global peace" with respect to all Stanford-related claims through this settlement, wholly and finally.  The Settling Defendants have stated that they would not enter into the settlement without securing global peace and the avoidance of the expense of further litigation. The Receiver and OSIC were appointed to protect the interests of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants.  The proposed Bar Order will help maximize the eventual distribution to Estate claimants and provide the Settling Defendants the

global resolution of Stanford-related litigation that is a necessary condition for their settlement payments.

59.     This Court has already enjoined actions against the Stanford Defendants, the Receiver, and the Receivership Estate, ordering that "all ... persons are hereby restrained and enjoined from" without leave:

> . . . commenc[ing] or continu[ing] . . . any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, **or any agent, officer, or employee** related to the Receivership Estate, arising from the subject matter of this civil action . . . .

Second Order ¶ 9(a).  Movants ask the Court to extend this stay to all claims and potential claims against the Settling Defendants, and to do so permanently, in order to effectuate the present settlement.

60.     Movants and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford investors.  The Movants firmly believe that the terms of the Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

61.     The overall context of the MDL and Stanford Receivership also are relevant to the equities of the situation.  The Stanford Ponzi scheme collapsed in February 2009, and the six years since have yielded numerous motions to dismiss, numerous appeals including to the U.S. Supreme Court, and a delay in any recovery for Stanford's victims.  The parties – on both sides – are confronted by uncertainty, risk and delay.  In this circumstance, the example of settlement is to be encouraged.

62.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging.  For many of Stanford's victims, recovery delayed is recovery denied.  The time that Stanford's victims have waited to date should not be extended further in pursuit of additional uncertainty and delay.

63.     The equities of this settlement, including its necessary bar order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims.  The Receiver, the OSIC and the Investor Plaintiffs have cooperated and joined together in this settlement.  The Examiner endorses this settlement and bar order structure.  In this complex international fraud, this level of coordination and quality of resolution are eminently desirable.  The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation. The result of this coordination will be the most orderly distribution to Stanford's victims that possibly can be achieved.

64.     The Court is well within its discretion to approve this settlement.  In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities laws and defrauding investors.  *Kaleta*, 2012 WL 401069, at *1.  The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id*.  The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership.  The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed.  *Kaleta*, 530 F. App'x at 362-63.

65.     In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the receivership estate.  *Kaleta*, 2012 WL

401069, at *7.  "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id*.

66.     In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties.  *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. April 16, 2014).  The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities."  *Id.* at *2.[7]

67.     In *Harmelin,* the district court approved a bar order in a receivership case involving foreign investors and foreign joint liquidators.  2007 WL 4571021, at *1. The receiver in *Harmelin* settled with a third party alleged to have aided an international financial scheme involving fraud and violations of federal securities laws.[8]  Like this case, *Harmelin* involved both receivership assets and investors located outside of the U.S.

## IV. REQUEST FOR APPROVAL OF ATTORNEYS' FEES

### A.     Terms of Plaintiffs' Counsel's Engagement

68.     In addition to approving the settlement, Movants also request that the Court approve an award of attorneys' fees to Movants' counsel Neligan Foley LLP ("Neligan Foley"), Castillo Snyder, P.C. ("Castillo Snyder"), and Butzel Long ("Butzel Long") (collectively "Plaintiffs' Counsel") under the terms of the fee agreement between Plaintiffs' Counsel and

---

[7]     The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party.  *See SEC v. Temme*, No. 4:11–cv–655, [Doc. 162] (E.D. Tex. November 21, 2012).

[8]     *Second Amended Complaint* at 2, *Harmelin v. Man Financial Inc.*, No. 06–CV–1944 (MMB) (E.D. Pa. July 6, 2007).

OSIC.  As reflected in the Declaration of Douglas J. Buncher (the "Buncher Declaration"), (attached as Exhibit 2 to Appendix in Support of this Motion), Plaintiffs' Counsel have been jointly handling the STC Lawsuits pursuant to 25% contingency fee agreements with OSIC (in the OSIC Lawsuit) and the Investor Plaintiffs (in the Investor Lawsuit).  *See* Exhibit 2-B to Buncher Declaration [Copy of OSIC fee agreement with Movants' counsel].  *See also* Declarations of Edward Snyder and Peter Morgenstern attached to Appendix as Exhibits 3 and 4, respectively.  Neligan Foley also has a 25% contingency fee agreement directly with the Receiver with respect to the Receiver Lawsuit, as the Receiver is a named Plaintiff in that suit. *See* Exhibit 2-C to Buncher Declaration.

69.     Pursuant to the fee agreements, Movants seek Court approval to pay attorneys' fees to Plaintiffs' Counsel equal to an aggregate of 25% of the Net Recovery from the settlement with the Settling Defendants (i.e., the settlement amount less allowable disbursements).  The gross amount of the settlement payment to be paid by Settling Defendants is $4,903,165.49.  The disbursements to be deducted from the settlement amount to calculate the Net Recovery from the settlement total $40,965.95.  Thus, the Net Recovery from Settling Defendants is $4,862,199.54, and 25% of the Net Recovery is $1,215,549.89.  This is the fee agreed to be paid to Plaintiffs' Counsel by the Receiver, OSIC and the Investor Plaintiffs, and this is the amount of the fee for which approval is sought in this Motion.

**B.     The Proposed Fee is Reasonable as a Percentage of the Overall Recovery**

70.     Trial courts can determine attorneys' fee awards in common fund cases such as this one[9] using different methods.  One is the percentage method, under which a court awards

---

[9] The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr.S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

fees based on a percentage of the common fund.  *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012).  The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable."  *Dell*, 669 F.3d at 643 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).[10]  Thus, when considering fee awards in class action cases "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check."  *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K (lead case), 2005 WL 3148350, at *25 (N.D. Tex. 2005) (collecting cases).[11]

71.     While the settlement is not a class action settlement, because the settlement is structured as a settlement with OSIC and the Receiver, with a Bar Order and dismissal of the Investor Lawsuit, this Motion analyzes the award of attorneys' fees to Plaintiffs' Counsel under the law applicable to class action settlements in an abundance of caution.  Whether analyzed under the common fund approach, the *Johnson* framework, or both, the 25 percent fee sought by Plaintiffs' Counsel pursuant to their fee agreements is reasonable and should be approved by the Court.

72.     The proposed 25% amount is a reasonable percentage of the common fund (i.e. the approximate $4.9 million settlement).  "The vast majority of Texas federal courts and courts in this District have awarded fees of 25%–33% in securities class actions."  *Schwartz*, 2005 WL 3148350, at *31 (collecting cases).  "Indeed, courts throughout this Circuit regularly award fees

---

[10] The *Johnson* factors are discussed in Subsection C below.

[11] While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District have recognized that the percentage method is the preferred method of many courts. Dell, 669 F.3d at 643; Schwartz, 2005 WL 3148350, at *25. In Schwartz, the court observe that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25. The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case. Id. Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery." Id. at *26.

of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method." *Id.*   Combined with the *Johnson* analysis set forth below, the proposed fee award is reasonable and appropriate under the common fund doctrine as applied in the Fifth Circuit.

## C.   The Proposed Fee is Reasonable Under the *Johnson* Factors

73.   The Johnson factors include: (1) time and labor required; (2) novelty and difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.   *See Johnson*, 488 F.2d at 717-19.   A review of these factors also reveals that the proposed 25% fee is reasonable and should be approved.

### (1)   Time and Labor Required

74.   As reflected in the Buncher, Snyder and Morgenstern Declarations, Plaintiffs' Counsel invested a tremendous amount of time and labor in this case.  Even a cursory review of the Court's docket in all of these cases reveals the immense amount of work that Plaintiffs' counsel have put into the prosecution of all of the Stanford-related third party lawsuits since 2009.  However, the docket and pleadings only reveal the work that is filed with the Court.  As discussed further herein, and as the Court is aware, the prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients (and government agencies such as the SEC and the Department of Justice) regarding the handling of the cases, conduct discovery, prepare the briefs and motions, attempt to negotiate settlements, and prepare cases for summary judgment and/or trial.  Plaintiffs' counsel have spent thousands

of hours since 2009 in their investigation and prosecution of the lawsuits referenced above, including the STC Lawsuits that are the subject of the settlement.

75.     Plaintiffs' counsel have spent **6 years** and thousands of hours investigating and pursuing claims against third parties, including Settling Defendants, on behalf of the Stanford Receivership Estate and the investors in Stanford.  **Neligan Foley has nearly 7,000 hours and over $2.8 million worth of attorney and paralegal time invested in the Stanford lawsuits, including the STC Lawsuits.  Neligan Foley has over 2,400  hours and over $1.1 million of unpaid attorney and paralegal time invested in the STC Lawsuits alone.  See Buncher Declaration (Appendix Exhibit 2) and Neligan Foley invoice attached thereto (Appendix Exhibit 2-A).  Castillo Snyder similarly has thousands of hours and approximately $7 million worth of uncompensated attorney and paralegal time invested in the Stanford lawsuits, including the STC Lawsuits.  Castillo Snyder has over 1,200 hours and nearly $700,000 of unpaid attorney and paralegal time invested in the STC Lawsuits alone.  See Snyder Declaration (Appendix Exhibit 3).  Butzel Long has thousands of hours  and several million dollars of attorney and paralegal time invested in the Stanford lawsuits, including the STC Lawsuits.  Butzel Long has approximately 46.5 hours in the STC Lawsuits (Appendix Exhibit 4).**

76.     As part of their investigation of the claims against Settling Defendants, Plaintiffs' counsel reviewed voluminous documents and emails, both in the possession of the Receiver and those produced by Defendants in the discovery process, and have interviewed dozens of witnesses.  Counsel also spent thousands of hours researching and preparing the Complaints and Amended Complaints, researching, briefing and responding to Defendants' Motions to Dismiss, preparing and serving written discovery, reviewing responses to written discovery, preparing for

and taking depositions, and attending hearings in federal district court in Baton Rouge related to motions to compel the OFI to produce its records, and reviewing the OFI records produced and previous depositions of OFI representatives.   Counsel also conducted informal discovery by interviewing potential witnesses.

77.   Plaintiff's Counsel could not have successfully prosecuted and resolved the claims against the Settling Defendants without having spent thousands of additional hours investigating and understanding the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship and dealings between and among the various Stanford entities, and the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities.   Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against the Defendants in the STC Lawsuits, and prosecute them successfully to conclusion.

### (2)   Novelty and Difficulty of the Issues

78.   The issues presented in this lawsuit were difficult and complex, involving questions related to the nature and extent of the fiduciary duties owed by directors of a Louisiana trust company under Louisiana law, as well issues related to Internal Revenue Code section 4975 relating to IRA accounts and fiduciaries, complex claims under the Texas Securities Act, and the nature and extent of damages suffered by STC and the investors.   A review of the legal issues raised in the dismissal pleadings illustrate the novelty, difficulty and complexity of the issues in the STC Lawsuits and supports the approval of the proposed fee.

### (3)   Skill Required

79.   Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution, and settlement of this case required significant skill and effort on the

part of Plaintiffs' Counsel.  Plaintiffs' Counsel have represented receivership and bankruptcy estates on numerous occasions, as well as investors in similar offshore securities fraud schemes, and are currently serving as counsel for both the Receiver, OSIC and other investor plaintiffs, both individually and as representatives of putative classes of Stanford investors, in multiple other lawsuits pending before the Court.  Buncher Decl. ¶¶ 5-9.  Movants submit that the favorable results achieved to date in this and the other cases in which Plaintiffs' counsel are involved are indicative of Plaintiff's counsel's skill and expertise in matters of this nature, and the skill that is required to achieve those results.  Id. at ¶¶ 1, 4.

### (4)    Whether Other Employment is Precluded

80.    Although participation in the STC Lawsuits did not necessarily preclude Plaintiffs' Counsel from accepting other employment, the sheer amount of time and resources involved in investigating, preparing, and prosecuting the STC Lawsuits, as well as the other Stanford lawsuits, as reflected by the hours and dollars invested by the law firms in the STC Lawsuits and the Stanford case generally, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters.

### (5)    The Customary Fee

81.    The 25% fee requested is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude. See *Schwartz*, 2005 WL 3148350, at *31 (collecting cases and noting that 30% is standard fee in complex securities cases).  In some cases, OSIC interviewed other potential counsel who refused to take on the lead counsel role without a higher percentage fee. Buncher Decl. at ¶ 34.  In fact, Plaintiffs' Counsel initially requested a larger percentage in all of the Stanford lawsuits because of the complexity and magnitude of the lawsuits, the length of time

that it could take to prosecute the cases to conclusion, the thousands of hours Plaintiffs' counsel would have to invest in these cases, and the risk that there might ultimately be no recovery.  Id. The STC Lawsuits and the other third-party lawsuits are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery and dispositive motions to get to trial.  The lawsuits involve significant financial outlay and risk by Plaintiffs' Counsel, the risk of loss at trial after years of work for no compensation, and an almost certain appeal following any victory at trial.  Plaintiffs' Counsel submit that these factors warrant a contingency fee of more than 25%.  Nonetheless, Plaintiffs' Counsel agreed to handle the STC Lawsuits on a 25% contingency basis, and that percentage is reasonable given the time and effort required to litigate these cases, their complexity and the risks involved.

### (6)   Whether the Fee is Fixed or Contingent

82.   As set forth above, the fee was a contingency fee.  As a result, Movants' counsel bore significant risk in accepting the engagement.

### (7)   Time Limitations

83.   Trial is set for August 3, 2015.  Therefore, had Movants not settled with the Settling Defendants, all of the remaining discovery and trial preparation related to the claims against the Settling Defendants would be necessary between now and then.  Thus, Plaintiffs' Counsel is under some time pressure to either obtain approval of the settlement or complete all the discovery to prepare the case for trial against the Settling Defendants by August 3, 2015.

### (8)   The Amount Involved and Results Obtained

84.   While there were over $300 million invested in SIBL CDs at STC, the approximate $4.9 million obtained from the Setting Defendants represents a reasonable

settlement given the dismissal of A&R from the Receiver Lawsuit, the dismissal of the legal malpractice claims against BSW, the death of Mr. Frazer, and the timing of Mr. Haymon's service as a director of STC in relation to the directive given to STC by the OFI with respect to earning fees from the SIBL CDs.  This factor also supports approval of the requested fee.

### (9)    The Attorneys' Experience, Reputation and Ability

85.    As noted above, Plaintiffs' Counsel have represented numerous securities investors, receivers, bankruptcy trustees, and other parties in complex litigation matters related to securities frauds, equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding.   See Buncher Decl. ¶¶ 1-2.   See also Snyder and Morgenstern Declarations.  Indeed, Plaintiffs' Counsel have been actively engaged in the Stanford proceeding since its inception in 2009.  Given the complexity of the issues in the Stanford case, Movants also submit that the results obtained by Plaintiffs' counsel in all of the Stanford cases to date is indicative of Plaintiff's Counsel's ability to obtain a favorable result in such proceedings.

### (10)    The Undesirability of the Case

86.    The STC Lawsuits are not undesirable, but do require a large amount of time, expense and risk that few firms are willing to accept.    Very few firms will simultaneously prosecute multiple highly complex cases without compensation for 6 years.

### (11)    Nature and Length of Professional Relationship with the Client

87.    As the Court is aware, Plaintiffs' Counsel have represented the Receiver, OSIC, and Investor Plaintiffs in numerous actions pending before the Court since 2009.  See Buncher Decl. at ¶¶ 5-9.  Movants' counsel has handled all of these cases on the same 25% contingency fee arrangement that has previously been approved by the Court.  See Doc. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); see also

Agreement [Doc. 1208] p. 3 (providing a "contingency fee" of twenty-five percent (25%) of any Net Recovery in actions prosecuted by OSIC's designated professionals).  This factor also weighs in favor of approval of the requested fee.

### (12)    Awards in Similar Cases

88.    As noted above, a 25% contingency fee has previously been approved as reasonable by this Court in its order approving the Receiver's agreement with OSIC regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and OSIC (the "OSIC-Receiver Agreement").  See Doc. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); see also Agreement [Doc. 1208] p. 3 (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by OSIC's designated professionals).  The Court's order approving the OSIC-Receiver Agreement also provided that OSIC need not submit a fee application seeking an award of fees consistent with the percentage authorized under the Court's previous order unless required by Rule 23.   See Doc. 1267, p. 2.

89.    The OSIC-Receiver Agreement further provided that OSIC "would prosecute certain fraudulent transfer claims and other actions for the benefit of Stanford investors/creditors in cooperation with Ralph S. Janvey, as receiver."  See Doc. 1208, p. 1 ¶ 1.  The Agreement further provided that "this proposal will apply to the litigation of all fraudulent transfer and similar claims that may be brought under common law, statute … or otherwise…" and "unless otherwise agreed, the terms of this agreement will likewise apply to the pursuit of any other claims and causes of action that the Receiver and the Committee determine to jointly pursue." Id. at pp. 1-2.

90.    The contingency fee agreements with Plaintiffs in the STC Lawsuits similarly provide for a fee of 25% of the Net Recovery (defined as the total recovery after deducting

allowable expenses and disbursements), and were modeled after the OSIC-Receiver Agreement since the parties knew that the Court had already approved a 25% contingency fee agreement.

91.     The 25% contingency fee arrangement that was approved by the Court in the context of the OSIC-Receiver Agreement became the framework for all of the 25% contingency fee agreements that OSIC entered into with Plaintiffs' Counsel in the STC Lawsuits, as well as the twenty-five prevent (25%) contingency fee agreements that the Receiver entered into with Neligan Foley in certain of the other third party lawsuits.

92.     As set forth in *Schwartz*, courts in this district have routinely approved 25%, and more often 30%, fee awards in complex securities class actions.  2005 WL 3148350, at *31 (collecting cases).  Under the circumstances of this case, such an award is appropriate here as well.

**D.     The Proposed Fee Should Be Approved**

93.     For the same reasons the Court previously found the 25% contingency fee OSIC-Receiver Agreement to be reasonable, see Doc. 1267, p. 2, the Court should find the 25% contingency fee applicable to the settlement with the Settling Defendants in the STC Lawsuits to be reasonable and approve it for payment.  Here, there is at least as much reason to find the 25% fee to be reasonable in the context of the STC Lawsuits as there is to find that fee reasonable for fraudulent transfer cases, as the STC Lawsuits and the other larger third-party cases are extraordinarily complex, time consuming and risky, involving numerous factual and legal issues and claims.  Thus, Movants submit that an award of attorneys' fees equal to 25% of the net recovery from the STC settlement, as requested, is reasonable and appropriate and should be approved under applicable Fifth Circuit law, whether using a common fund approach, the *Johnson* factor approach, or a blended approach.

**E.      Examiner Support for Fee Award**

94.      John J. Little in his capacity as Court-appointed Examiner also supports the award of Plaintiffs' attorneys' fees, and requests that the Court approve them.  *See* Declaration of Examiner John J. Little, attached as Exhibit 5 to the Appendix to this Motion.

## CONCLUSION

95.      This settlement represents a substantial and important recovery for the Receivership Estate and the Stanford investors.  The amount of the recovery, the time and costs involved in pursuing litigation against the Settling Defendants, and the uncertainty associated with obtaining and then recovering a judgment against the Settling Defendants all weigh heavily toward approving this settlement and entering the Bar Order.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Movants respectfully request this Court:

a.      Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

b.      Grant this Motion;

c.      Approve the Settlement Agreement;

d.      Enter the Bar Order and Judgment;

e.      Approve the attorneys' fees as requested; and

e.      Grant the Movants all other relief to which they are entitled.

Date:   May 12, 2015

Respectfully Submitted,

**NELIGAN FOLEY LLP**

By: */s/ Douglas J. Buncher_____*
Nicholas A. Foley
nfoley@neliganlaw.com
Douglas J. Buncher
dbuncher@neliganlaw.com
John D. Gaither
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
(214) 840-5320
(214) 840-5301 (Facsimile)

**ATTORNEYS FOR RALPH S. JANVEY IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD RECEIVERSHIP ESTATE**

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder_____*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
300 Convent Street, Suite 1020
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

`

**BUTZEL LONG PC**

By: */s/ Peter D. Morgenstern_____*
Peter D. Morgenstern
*Admitted Pro Hac Vice*
morgenstern@butzel.com
380 Madison Avenue, 22nd Floor
New York, New York 10017
(212) 818-1110
(212) 818-0494 (Facsimile

**ATTORNEYS FOR THE OSIC AND INVESTOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all counsel of record via the Court's ECF system on May 12, 2015.


*/s/ Douglas J. Buncher*
Douglas J. Buncher

80895v.6