IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § | |
| Defendants. | § § | |
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 3:12-cv-01447-N |
| BDO USA, LLP, *et al.*, | § § | |
| Defendants. | § § | |

**EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1]
AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH BDO
USA, LLP, TO APPROVE THE PROPOSED NOTICE OF SETTLEMENT
WITH BDO USA, LLP, TO ENTER THE BAR ORDER, TO ENTER THE FINAL
JUDGMENT AND BAR ORDER, AND FOR PLAINTIFFS' ATTORNEYS' FEES**

COME NOW Ralph S. Janvey, the Receiver for the Receivership Estate in *Securities and*

*Exchange Commission v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-

0298-N (the "SEC Action"); the Official Stanford Investors Committee (the "Committee"), as a

---

[1] Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

party to the SEC Action and as plaintiff in *The Official Stanford Investors Committee v. BDO USA, LLP, et al.*, Civil Action No. 3:12-cv-01447-N (the "Committee Litigation"); and Philip A. Wilkinson and Pam Reed (the "Investor Plaintiffs"), the plaintiffs in *Philip Wilkinson, et al. v. BDO USA, LLP, et al.*, Civil Action No. 3:11-CV-01115-N (the "Investor Litigation") (movants are, collectively, the "Plaintiffs"), and move the Court to approve the settlement (the "BDO Settlement") among and between Plaintiffs and BDO USA, LLP and other BDO entities[2] (the "BDO Entities") as defendants in the Committee Litigation and the Investor Litigation. Plaintiffs further request, as more fully set out below, that the Court enter the Scheduling Order, approve the Notices, and enter the Bar Order and the Judgment and Bar Order attached to and incorporated by reference into the BDO Settlement Agreement, attached as Exhibit 1 to the Appendix in Support of this Motion.[3] Plaintiffs jointly request this Court to find the BDO Settlement is in the best interest of all involved, and to approve the BDO Settlement. Plaintiffs further request that the Court approve payment of Plaintiffs' attorneys' fees in accordance with the contingency fee agreements between Plaintiffs' counsel and the Committee. In support thereof, Plaintiffs respectfully state the following:

## I. INTRODUCTION

1.      As part of their lengthy and thorough investigation of the Stanford Ponzi scheme and after many years of investigating and pursuing claims against third parties, including the BDO Entities, Plaintiffs have reached a major settlement with BDO USA, the auditor of Stanford

---

[2] BDO International Ltd. ("BDO International"), BDO Global Coordination, B.V. ("BDO Global"), and Brussels Worldwide Services BVBA ("Brussels Worldwide").

[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the BDO Settlement Agreement. To the extent of any conflict between this Motion and the terms of the BDO Settlement Agreement, the BDO Settlement Agreement shall control.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                    2

Group Company and certain other Stanford companies, as well as BDO USA's foreign affiliates

BDO International, BDO Global, and Brussels Worldwide. Under the agreement, once approved

and effective, BDO USA has agreed to pay $40 million to the Receiver for distribution to

customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had

funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford

Investors") who have submitted claims that have been allowed by the Receiver.

2.       In return, the BDO Entities seek a global release and settlement of all claims that

have been asserted, or could have been asserted, against the BDO Released Parties[4] arising from

or relating to Allen Stanford, the Stanford Entities, or any conduct by the BDO Entities and other

BDO Released Parties relating to Allen Stanford or the Stanford Entities. Accordingly, the BDO

Settlement is conditioned, in significant part, on the Court in the SEC Action entering the Bar

Order attached to the BDO Settlement Agreement, and in the Committee Litigation entering the

Judgment and Bar Order. These bar orders would bar and enjoin other parties from asserting

against the BDO Released Parties any action, lawsuit, cause of action, claim, investigation,

demand, complaint, or proceeding of any nature, including but not limited to litigation,

arbitration, or other proceeding, in any Forum, whether individually, derivatively, on behalf of a

class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is

---

[4] "BDO Released Parties" means the BDO Entities, and each of their respective past, present, and future directors, officers, legal and equitable owners, shareholders, members, managers, principals, employees, associates, representatives, distributees, agents, attorneys, trustees, general and limited partners, lenders, insurers and reinsurers, direct and indirect parents, subsidiaries, affiliates, related entities, divisions, partnerships, corporations, executors, administrators, heirs, beneficiaries, assigns, predecessors, predecessors in interest, successors, and successors in interest.  "BDO Released Parties" shall not include any Person, other than the BDO Entities, who is on the Agreement Date a named defendant in any litigation filed by any of the Plaintiffs, and shall not include any Person who becomes employed by, related to, or affiliated with the BDO Entities after the Agreement Date and whose liability, if any, arises out of or derives from actions or omissions before becoming employed by, related to, or affiliated with the BDO Entities.

based upon, arises from, or is connected with the Stanford Entities; the SEC Action; the Investor Litigation; the Committee Litigation; the subject matter of the SEC Action, the Investor Litigation, or the Committee Litigation; or any Settled Claim.[5] The foregoing specifically would include any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise.

3.      Plaintiffs request the Court to approve the BDO Settlement Agreement and enter the Bar Order in the SEC Action and the Judgment and Bar Order in the Committee Litigation.

4.      Plaintiffs further request that the Court approve payment of attorneys' fees to the counsel whose efforts resulted in the BDO Settlement consistent with their contractual twenty-five percent (25%) contingency fee agreements with the Committee and the Investor Plaintiffs.

---

[5] "Settled Claim" means any action, cause of action, suit, liability, claim, right of action, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any certificate of deposit, CD, depository account, or investment of any type with any one or more of the Stanford Entities; (iii) any one or more of the BDO Entities' relationship with any one or more of the Stanford Entities; (iv) the BDO Entities' provision of services to the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the Investor Litigation, the Committee Litigation, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. *See* Paragraph 19 of the BDO Settlement Agreement for a complete definition of Settled Claim.

## II. BACKGROUND

### A.   *Authority of the Receiver and the Committee*

5.      On February 17, 2009, the Securities & Exchange Commission ("SEC") filed this action and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver ¶ 4 [SEC Action ECF No. 10].[6] The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order"). [SEC Action ECF No. 1130]. The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

6.      The Receiver is not only authorized but required to pursue outstanding liabilities and claims for the Estate. *Id.* ¶¶ 3, 5(b)-(c). The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court. *Id.* ¶ 2. The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate. Second Order ¶ 5(i).

7.      On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures

---

[6]      All Docket Items are from *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-298-N (N.D. Tex.), unless otherwise noted.

sponsored, promoted or sold by any Defendant in this action." [SEC Action ECF No. 322]. Although he is not a party to the Committee Litigation or the Investor Litigation, the Examiner signed the BDO Settlement Agreement as chair of the Committee, and as Examiner solely to evidence his support and approval of the BDO Settlement and the obligation to post Notice of the BDO Settlement on his website.

8.      On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors. [SEC Action ECF No. 1149]. The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver). *Id.* ¶ 8(d). This Court has recognized the Committee's standing to pursue litigation claims such as the claims against the BDO Entities that are the subject of the BDO Settlement. *See* September 24, 2012 Order, Dkt. No. 33, in *Janvey & Official Stanford Investors Committee v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N, at pp. 4-6 (the Committee has standing to pursue claims based on the Court's grant of such authority to the Committee as an unincorporated association representing the interests of the Stanford Investors).

### B.      The Investigation of Claims Against the BDO Entities

9.      Counsel to the Receiver, the Committee and the Investor Plaintiffs have spent several years and thousands of hours investigating and pursuing claims against the BDO Entities on behalf of the Stanford Receivership Estate and Stanford Investors. As part of their investigation of the claims against the BDO Entities, counsel to the Receiver, the Committee and the Investor Plaintiffs have reviewed voluminous documents, emails, audit work papers and

depositions obtained from the SEC during its investigation of BDO, which the Receiver obtained through a cooperation agreement with the SEC. The materials reviewed by Plaintiffs' counsel included, among other materials, thousands of pages of the SEC and other investigation materials, thousands of pages of deposition testimony of BDO personnel and other relevant witnesses together with all of the exhibits to those depositions, thousands of emails of BDO personnel, and the audited financial statements and the detailed audit work papers of BDO for all of the relevant audit years. Counsel was also required to research all relevant case law and GAAS standards governing the potential audit malpractice claims belonging to the Receivership Estate, as well as the potential Texas Securities Act ("TSA") and other claims belonging to the Stanford Investors, to determine how the facts surrounding BDO's audits supported those claims. Because the potential claims against the BDO Entities involved claims of professional negligence, counsel was also required to retain and work with a consulting audit malpractice expert to formulate the basis of the potential claims to be asserted against the BDO Entities. The investigation further required formulation of viable damage models and causation theories for both the Receivership Estate and Stanford Investor claims.

10.     Investigation and prosecution of the Receivership Estate and Stanford Investor claims against the BDO Entities also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationship and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities. Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against the BDO

Entities. The Committee's counsel have also spent thousands of hours since the Committee's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against the BDO Entities, pursuant to an agreement between the Receiver and the Committee. The Receiver, the Committee and the undersigned law firms have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of this receivership case, all of which allowed the Receiver, the Committee and the undersigned counsel to formulate and file the claims against the BDO Entities that led to the BDO Settlement for which approval is sought by this Motion. But for the diligent efforts of the Receiver, the Committee and their counsel since the commencement of this receivership proceeding, the BDO Settlement would never have been achieved, and the Receivership Estate and the Stanford Investors would not have achieved this $40 million settlement.

11.    Plaintiffs and their counsel have conducted a thorough analysis of the potential claims against the BDO Entities, considering:

      a.    claims available under both state and federal law;

      b.    the viability of those claims considering the facts underlying the BDO Entities' business dealings with Stanford and this Court's previous rulings; and

      c.    the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

**C.    *The Investor Litigation***

12.    Investor Plaintiffs' Original Complaint in the Investor Litigation was filed on May 26, 2011, against BDO USA and BDO International. Philip Wilkinson and Pam Reed were the named Investor Plaintiffs, suing individually and on behalf of a putative class of Stanford

Investors. Pam Reed is also a member of the Committee.[7] The Investor Plaintiffs asserted claims against the BDO Entities for aiding and abetting violations of the TSA, aiding and abetting breach of fiduciary duty, aiding and abetting a fraudulent scheme, civil conspiracy, single business enterprise, alter ego and respondeat superior.

13.     On August 12, 2011, BDO USA filed its Motion to Dismiss the claims asserted in the Investor Litigation, alleging primarily that SLUSA[8] preempted all causes of action asserted. BDO USA also contended that Plaintiffs' fraud allegations were not pled with specificity pursuant to Rule 9(b), that Plaintiffs' TSA claims were barred by limitations, and that Plaintiffs failed to plead the requisite scienter by BDO USA necessary to establish aider and abettor liability under the TSA. BDO USA's motion also urged that Plaintiffs' TSA claims were based upon non-existent co-conspirator theories of liability, and that Plaintiffs had failed to allege sufficient facts to demonstrate that BDO USA knowingly aided and assisted SGC's and STC's breaches of fiduciary duty. BDO USA also took issue with Plaintiffs' conspiracy claims, arguing that Texas does not recognize a cause of action for aiding and abetting a fraudulent scheme separate from conspiracy, that Plaintiffs had failed to allege particularized facts establishing BDO USA knowingly aided and assisted in the Stanford Ponzi scheme, that Plaintiffs' conspiracy claim was barred by a two-year limitations period and that Plaintiffs failed to allege particularized facts to demonstrate BDO USA had the requisite meeting of the minds with the alleged co-conspirators to engage in a Ponzi scheme.

14.     BDO International filed a separate Motion to Dismiss the Investor Plaintiffs'

---

[7] Pam Reed became a member of OSIC in July 2013.
[8] The Securities Litigation Uniform Standards Act of 1998 forbids the bringing of large securities class actions "based upon the statutory or common law of any State" in which the plaintiffs allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

claims on August 22, 2011, asserting that it was not subject to personal jurisdiction and should therefore be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. BDO International also asserted that it did not exist as an entity at the time of the events giving rise to the Investor Plaintiffs' claims and therefore should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. BDO International also contested the adequacy of Plaintiffs' vicarious liability allegations attempting to hold it liable for the actions of BDO USA through theories of joint enterprise, alter ego or respondeat superior. BDO International further incorporated all of the dismissal arguments made in BDO USA's Motion to Dismiss.

15.     Plaintiffs filed a First Amended Complaint in the Investor Litigation on September 2, 2011, adding BDO Global and Brussels Worldwide as Defendants.

16.     On August 31, 2011, the Court issued a Final Judgment and Order in a related case, *Roland v. Green*, No. 3:10-cv-00224-N (N.D. Tex., Aug. 31, 2011) (Godbey) [Docket # 72 and # 73] that dismissed the *Roland* plaintiffs' claims with prejudice based on the Court's interpretation and application of SLUSA (the "*Roland* Order"). Therefore, on September 15, 2011, the parties to the Investor Litigation filed an Agreed Motion to Stay Proceedings for a 120-day period in anticipation that some of the questions relating to the application of SLUSA and the *Roland* Order to the Investor Plaintiffs' claims against the BDO Entities might be clarified or resolved during this period. An Agreed Order granting the requested stay was entered on September 16, 2011.

17.     On January 6, 2012, the parties filed an Agreed Motion to Extend Stay of Proceedings, based upon the appeal of the *Roland* Order to the Fifth Circuit, along with similar orders entered in *Troice v. Proskauer Rose, LLP,* No. 3:09-cv-01600-N, and *Troice v. Willis of*

*Colorado, Inc., et al.*, No. 3:09-cv-01274-N. All three matters were consolidated for appeal at the Fifth Circuit. The parties sought to stay the Investor Litigation until May 31, 2012, which the parties believed would give them time to consider the ruling of the Fifth Circuit and its impact on this case. An Agreed Order staying the case until May 31, 2012 was entered on January 13, 2012.

18.     On May 25, 2012, the parties filed another Agreed Motion to Extend the Stay until October 12, 2012, because the Fifth Circuit had reversed the *Roland* Order on March 19, 2012, and had denied appellees' Petition for Rehearing En Banc. It was understood that one or more of the appellees intended to file a Petition for Writ of Certiorari with the United States Supreme Court. The Court granted the stay on May 30, 2012, staying the proceedings until October 12, 2012.

19.     Beginning on October 12, 2012, the parties filed a series of agreed motions to extend the stay, ultimately agreeing to extend the stay until 30 days after the Supreme Court's determination on the SLUSA issue.

20.     All of the counsel involved in the prosecution of the litigation against the BDO Entities were also involved in the successful appeals of the SLUSA issue to the Fifth Circuit and the United States Supreme Court. But for counsel's efforts to win the SLUSA appeal, the Investor Litigation against the BDO Entities could not have proceeded. Fortunately, the SLUSA appeal was won by the investor plaintiffs in the *Roland*, *Willis* and *Proskauer* cases, allowing the Investor Litigation to proceed. *See Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014).

21.     Following the Supreme Court's SLUSA decision allowing the Stanford class action cases to proceed, the parties entered into a Stipulated Order regarding the time for the

BDO Entities to respond to the First Amended Complaint and a briefing schedule.

22.     BDO USA, BDO International, BDO Global and Brussels Worldwide filed their Motions to Dismiss Plaintiffs' First Amended Complaint on July 11, 2014. BDO USA's Motion raised the same arguments in support of dismissal as their Motion to Dismiss Plaintiffs' Original Complaint. BDO International, BDO Global and Brussels Worldwide each moved to dismiss under Rule 12(b)(2) alleging they were not subject to the Court's personal jurisdiction, and BDO International and Brussels Worldwide sought dismissal under Rule 12(b)(6) on the ground that they did not exist at the time of the events giving rise to Plaintiffs' causes of action. They also incorporated all of the arguments made by BDO USA in favor of dismissal.

23.     Before the deadline for Plaintiffs to respond to the Motions to Dismiss, counsel for the BDO Entities contacted Plaintiffs' counsel to indicate they would be seeking to compel arbitration of the claims in the Committee Litigation pursuant to the engagement agreements between BDO USA and the Stanford audit clients, which engagement agreements also required the parties to mediate in advance of arbitration. Thus, the parties agreed that it made sense to mediate all of the claims asserted in the Investor Litigation and Committee Litigation simultaneously to attempt to reach a global resolution of the issues between all Plaintiffs and the BDO Entities.

24.     That mediation, which resulted in the BDO Settlement, occurred on August 28, 2014, and is discussed in more detail below. The BDO Settlement resolves both the Investor Litigation and the Committee Litigation.

## D.     *The Committee Litigation*

25.     The Committee's Original Complaint in the Committee Litigation was filed on

May 9, 2012. The same four BDO entities named in the Investor Litigation were named in the Original Complaint in the Committee Litigation. The primary claim asserted by the Committee against the BDO Entities was the audit malpractice (negligence) claim; however, the Committee also asserted claims against the BDO Entities for aiding, abetting or participation in breaches of fiduciary duty, aiding, abetting or participation in fraudulent transfers, aiding, abetting or participation in conversion, and civil conspiracy. The Committee asserted all claims against the BDO Entities pursuant to an Assignment of such claims from the Receiver to the Committee. Additionally, the Committee asserted the claims as a representative of the Stanford Investors, pursuant to this Court's holdings that the Committee has independent standing as an unincorporated association.

26.     The Committee Litigation was not reassigned within the Northern District to this Court until September 5, 2012.

27.     On October 12, 2012, the parties filed an Agreed Motion for Extension of Time for the BDO Entities to answer or otherwise respond to the Complaint. On October 19, 2012, the Court entered a Stipulated Order setting a deadline of February 15, 2013, for the BDO Entities to respond to the Complaint.

28.     The Committee then determined that the Complaint would be amended, so the Court entered a Joint Stipulation and Order relieving the BDO Entities of the obligation to respond until the Committee filed an Amended Complaint. The Committee filed a First Amended Complaint on May 13, 2014.

29.     Before the BDO Entities' deadline to respond to the First Amended Complaint, Defendant BDO USA informed the Committee that it intended to file a motion to compel

arbitration pursuant to the terms of the engagement letters between BDO and the Stanford audit clients SGC, STC and SGH. After careful consideration of the pros and cons of arbitration, the Committee agreed to arbitrate the Committee claims against BDO USA, as the Committee believed the claims were meritorious and that arbitration would result in a quicker and more efficient resolution of the claims.

30.     Pursuant to the BDO USA engagement agreements, the parties were required to mediate before going to arbitration. Thus, the parties selected former United States District Judge Layn Phillips to mediate the dispute, and the Investor Plaintiffs agreed to participate in an effort to achieve a global resolution of the Investor Litigation and the Committee Litigation.

### E.     *Mediation*

31.     Mediation was held with the Hon. Layn Phillips in New York on August 28, 2014. Former Judge Phillips, then with the law firm Irell & Manella, has extensive experience mediating accounting and audit malpractice cases, having mediated and successfully resolved some of the largest accounting and audit malpractice cases in recent U.S. history.

32.     Prior to mediation, Plaintiffs' counsel continued its investigation of both the Committee's and Investor Plaintiffs' claims against the BDO Entities, including review of the BDO depositions, documents, emails and work papers obtained by the SEC, as well as other investigation materials. Counsel also worked with an audit malpractice expert to further evaluate, refine and formulate the basis of Plaintiffs' claims against the BDO Entities, including the applicable GAAS principles that Plaintiffs contended were violated. That led to the production of a draft expert report that was confidentially shared with the mediator and was instrumental in the settlement process.

33.      Layn Phillips required the parties to exchange mediation position papers, together with exhibits and supporting authorities on July 22, 2014, so that each side could see the other side's arguments, evidence and authorities in support of their claims and defenses in advance of the mediation. He also required the parties to exchange reply papers with supporting exhibits and authorities on August 19, 2014. Finally, he required that the parties exchange proposed "term sheets" to identify issues that would need to be addressed in any final settlement agreement.

34.      The mediation lasted a full day with numerous back and forth offers and demands, ultimately resulting in the $40 million settlement for which approval is sought in this motion. Without the tireless effort of the Receiver, the Committee, Investor Plaintiffs and their counsel in investigating and prosecuting these claims as part of the overall effort to recover money from third parties for the benefit of Stanford Investors, the settlement could never have been achieved, and the Committee and Investor Litigation would have dragged on for years with an uncertain outcome and great expense to the parties.

35.      But for the BDO Settlement, the parties had agreed that the Committee Litigation would be dismissed and an arbitration complaint filed with AAA in Houston, Texas, as required by the BDO USA engagement letters. While arbitration might be more efficient in terms of getting to trial more quickly, arbitration would also have involved the substantial expense of paying three arbitrators (the agreement called for one arbitrator to be selected by each side and a third to be selected by those two) as well as the administrative fees of AAA. The Investor Litigation would almost certainly have taken several years to resolve, with an uncertain outcome.

36.      Since mediation on August 28, 2014, the Parties have spent over 8 months drafting, revising and negotiating the form and terms of the BDO Settlement Agreement, the Bar

Order, the Judgment and Bar Order, the Notice and the Scheduling Order, for which the Parties now move for approval.

### F.      Plaintiffs' and Examiner's Support of Settlement

37.     Plaintiffs are confident that the investigation of the BDO Entities' activities related to Stanford performed by their counsel has been thorough and are confident that said investigation has provided them with sufficient information to enter into and endorse the BDO Settlement. Plaintiffs are also confident that the BDO Settlement is fair and reasonable taking into consideration not only the merits of the claims, but also the risks, uncertainties, and expenses associated with litigation. Further, due to the limits of BDO's insurance, and the competing demands on the same insurance from other sources, Plaintiffs believe that the BDO Settlement fairly balances considerations of collectability of any judgment that could be obtained. Therefore, Plaintiffs believe that the BDO Settlement is in the best interests of the Stanford Receivership Estate and the Stanford Investors and should be approved by the Court. The Chairman of the Committee, who oversaw the Committee Litigation and participated in the settlement negotiations and mediation, is also the Court-appointed Examiner, and he supports this Motion in both capacities, as does the Receiver, who assigned the Receiver's claims to the Committee for prosecution.

38.     The Investor Plaintiffs also support the BDO Settlement and believe it is in the best interests of all Stanford Investors, and request that the Court approve it. As part of the BDO Settlement, the Investor Plaintiffs have agreed to dismiss the Investor Litigation with prejudice. All Stanford Investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution

process. Furthermore, Stanford Investors who wish to participate in a distribution of the proceeds of the BDO Settlement but have not submitted claims to the Receiver or to the Antiguan Joint Liquidators as of the date of the Notice ("Outstanding Claims") are being provided the opportunity to submit Outstanding Claims to the Receiver for review and consideration. The BDO Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013). The BDO Settlement, Bar Order, Judgment and Bar Order, and the dismissal of the Investor Litigation, protects all interested parties, both the BDO Released Parties and the Stanford Investors.

39.     There would be uncertainty and delay in certifying a settlement class involving all Stanford Investors who reside in multiple countries throughout the world, and such a class would be duplicative with respect to the Stanford Investors who are already participating in the Receivership claims and distribution process.  All Stanford Investors have been given years to file claims with the Receiver, and the Receiver is giving the Outstanding Claims another opportunity to file a claim for review and consideration by the Receiver.  It is far more efficient and saves substantial costs to distribute the settlement funds through the court-approved Receivership distribution process rather than create an entirely separate and parallel class action claims and settlement distribution process.  A class action settlement process would result in substantial delay and less money flowing to investors.  The Receivership settlement and bar order, together with a dismissal of the Investor Lawsuit, protects all interested parties, both the Defendants and the Stanford investors.

### G.   *The BDO Settlement*

40.   The proposed BDO Settlement is the result of many years and thousands of hours of work by the Receiver, the Committee, Investor Plaintiffs and the undersigned counsel, and was negotiated and entered into as a result of arm's-length negotiation at mediation facilitated by the Hon. Layn Phillips.

41.   The essential terms of the BDO Settlement Agreement, attached as Exhibit 1 to the Appendix, are that:

   a)   BDO USA will pay $40 million, which will be deposited with the Receiver as required pursuant to the Settlement Agreement;

   b)   Plaintiffs will fully release the BDO Released Parties from Settled Claims, e.g. claims arising from or relating to Allen Stanford, the Stanford Entities, or any conduct by the BDO Released Parties relating to Allen Stanford or the Stanford Entities;

   c)   The BDO Settlement requires entry of a Judgment and Bar Order in the Committee Litigation and entry of a Bar Order in the SEC Action, each of which permanently enjoins Interested Parties, including all Stanford Investors and Claimants, as well as Stanford Investors with Outstanding Claims (see Paragraph f), from bringing any legal proceeding and/or asserting, encouraging, assisting, or prosecuting any cause of action, including contribution claims, arising from or relating to a Settled Claim against the BDO Released Parties;

   d)   The Receiver will disseminate notice of the BDO Settlement to Interested Parties, through one or more of the following as set forth in the BDO Settlement Agreement, ¶¶ 29-30: mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and Receiver (http:// www.stanford financialreceivership.com) web sites;

   e)   The Receiver will develop and submit to the Court for approval a plan for disseminating the Settlement Amount ("Distribution Plan"); [9]

---

[9] In the motion seeking approval of the Distribution Plan, the Receiver will seek authority to distribute $5,000 of the settlement amount to Philip Wilkinson and $21,500 of the settlement amount to Pam Reed in acknowledgement of their participation as named plaintiffs.  To the extent these amounts exceed the amounts distributed to other investors in the same distribution, the excess amounts will be treated as advances towards future distributions to Mr.

f) Any Stanford Investor who has not submitted a claim to either the Receiver or to the Joint Liquidators as of the date of the Notice ("Outstanding Claims"), may seek to participate in the Distribution Plan, and potentially to participate in future distributions of funds obtained by the Receivership as a result of future litigation settlements or recoveries, by submitting a Proof of Claim Form within 75 days of the Court's entry of the Scheduling Order, which Proof of Claim will be subject to review and determination by the Receiver.

g) Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted claims that have been allowed by the Receiver;

h) Stanford Investors who accept funds from the BDO Settlement Amount will, upon accepting the funds, fully release the BDO Released Parties from any and all Settled Claims; and

i) The Investor Litigation will be dismissed with prejudice, with each party bearing their own costs and attorneys' fees, and the Judgment and Bar Order will be entered in the Committee Litigation.

Copies of the BDO Settlement Agreement, this Motion, and other supporting papers may be obtained from the Court's docket, and are also available on the websites of the Receiver (http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-stanford-financial-group/). Copies of these documents may also be requested by email to Ruth Clark, at rclark@neliganlaw.com, or by calling Ruth Clark at 214-840-5315.

42.     For the reasons described herein, the BDO Settlement is fair, equitable, and reasonable, and is in the best interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets. Plaintiffs urge the Court to approve it.

## III. REQUEST FOR APPROVAL OF THE BDO SETTLEMENT AGREEMENT

A.   *Legal Standards*

43.     "'[T]he district court has broad powers and wide discretion to determine the

---

Wilkinson and Ms. Reed.

appropriate relief in an equity receivership.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (quoting *Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)). "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" *Id.* (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)). "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership." *Id.* (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)). "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *Id.* (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009)). Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation." *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

44.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors. *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

45.     The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants. Second Order ¶ 5; see supra ¶¶ 2-3.

46.     The ability to compromise claims is critical to this Receivership. Courts have long emphasized that public policy favors settlement. *See, e.g.*, *Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010). That is especially true here, where the victims of Stanford's Ponzi scheme await recovery, further costs would come directly out of those victims' pockets, and the BDO Settlement would allow the Receiver to make a significant distribution.

47.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases. *Kaleta*, 530 F. App'x. at 362-63 (approving bar order). Bar orders are commonly used in receivership cases to achieve these purposes. *See, e.g.*, *Gordon*, 336 F. App'x at 549; *SEC v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010) (Norton, C.J.), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4-5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

48.     The bar order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                        21

(E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

49.     In fact, the Fifth Circuit in *Kaleta* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary . . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate'"; and (iii) the scope of the bar order is appropriately tailored to achieve these objectives. *See Kaleta*, 530 F. App'x at 362-63. The BDO Settlement satisfies each of these requirements.

50.     District courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).[10]

51.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4. The

---

[10] This is neither a class action nor a case under Title 11 of the United States Code. Thus, though they are not binding here, both class action and Title 11 cases define tests for approving the aggregate settlements that may be tailored for a receivership case such as this one. *See, e.g., Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (class action); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (Title 11 bankruptcy). Broadly speaking, before approving a global settlement the Court must determine that the settlement (i) is reached after arm's-length negotiations; (ii) provides relief commensurate with the risks and expenses of litigating the claim to judgment; and (iii) represents the considered opinions of the parties and their counsel, and has the support of persons appointed to represent those who ultimately benefit from the settlement. For the same reasons that the BDO Settlement satisfies the factors set forth in the decision of the district court in *Kaleta*, and as set forth herein, the BDO Settlement easily satisfies the tests set out in *Newby* or *Moore*.

Fifth Circuit's opinion noted that, like the BDO Settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

**B.      The BDO Settlement Satisfies the Factors for Settlement Approval**

**(1)      Value of the Proposed Settlement**

52.      The $40 million payment in the BDO Settlement is substantial, representing the largest Stanford litigation settlement to date. "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549. The value of the BDO Settlement to the Receivership Estate and Stanford's victims is significant.

**(2)      Value and Merits of the Receiver and Stanford Investors' Potential Claims**

53.      Plaintiffs of course believe that the claims filed against the BDO Entities in the Committee and Investor Litigation are meritorious and would be successful. However, they are not without substantial risk and uncertainty, and the ability to collect a judgment is also not without risk and uncertainty, particularly in light of the BDO Entities' diminishing insurance proceeds. Needless to say, the BDO Entities vigorously dispute the validity of the claims asserted in the Committee and Investor Litigation, and have filed motions to dismiss those claims on

which there have been no rulings.

54.     The primary claim in the Committee Litigation is a negligence claim for audit malpractice.  While the Receiver and the Committee believe strongly in the viability of the audit malpractice claim because of the interrelationship and size of transactions between the BDO audit clients (SGC, STC and SGH) and their affiliate bank in Antigua, SIBL, BDO disputes liability on those claims because it was not the auditor for SIBL,

55.     BDO further contended, despite the Committee's contention that the discovery rule applied to toll the two-year statute of limitations, that the audit malpractice claim was time barred.  While the Committee takes comfort in this Court and the Fifth Circuit's prior decisions with regard to the applicability of the discovery rule with respect to the Receiver's claims, the factual issue of when the Receiver in the exercise of reasonable diligence should have discovered the basis of the claims asserted against BDO creates some uncertainty and risk with respect to the audit malpractice claims.

56.     Finally, even if the Committee obtained a favorable judgment on its claims, there are issues as to the collectability of the judgment.  Because accounting firms, like law firms, distribute their income to the partners annually and only make money by the partners and employees continuing to work to generate additional revenue and receivables, the only assets of an accounting firm other than insurance that are really available to satisfy a judgment are furniture, fixtures and equipment of limited value, cash, and receivables that are uncollected at the time of execution on a judgment.  Thus, availability of insurance is the primary driver of collectability of any judgment in a case such as this.

57.     BDO's insurance policies and limits were confidentially disclosed to the

Committee's counsel and the mediator prior to the mediation, and the settlement amount represents a significant portion of BDO's available insurance limits when taking into consideration competing claims against BDO, which claims were made within the same insurance policy period applicable to the Committee's claims.  One of the competing claims against BDO during the same policy period involved an alleged claim of $20 million in damages and was set for trial in December 2014 at the time of the mediation. While that case has been reset for trial later this year, it remains pending.  In contrast, the Investor Litigation has not yet been set for trial and the Committee Litigation would have to be filed with AAA in Houston if there were no settlement, with an uncertain final hearing date.  Even in arbitration, it is unlikely the Committee could get to a final hearing sooner than a year from now.  Furthermore, dismissal motions remain pending in the Committee and Investor Litigation, with uncertain outcomes. Thus, there was substantial risk that an adverse judgment in the competing case, together with defense costs of several hundred thousand dollars per month being incurred by BDO, would significantly deplete the insurance available to pay the Committee's claims if and when they resulted in a favorable judgment.  All of these factors favored settlement at the amount achieved, and Movants believe they obtained in settlement every available dollar of the insurance that BDO and its insurers would be willing to devote to the settlement of the Committee and Investor Litigation without leaving themselves exposed with no remaining insurance to cover other claims and defense costs that fall within the same policy period.

58.    Among others, the following issues are hotly contested and promise years of uncertain litigation:

a.   whether the Committee could prevail on its audit malpractice claim even

though the BDO Entities were not the auditor for SIBL;

    b.   whether the discovery rule tolled the limitations periods applicable to Plaintiffs' claims and for how long after the receivership was filed;

    c.   whether the BDO Entities had sufficient knowledge under the TSA to meet the recklessness standard for an aiding-and-abetting claim; and

    d.   whether, after a successful judgment, Plaintiffs would be able to collect any more than the Settlement already offers.

59.    For these and other reasons, but for the BDO Settlement, the Investor Litigation and the Committee Litigation would be vigorously defended, they would be expensive and protracted further depleting available insurance, and the ultimate outcome of such litigation would be uncertain. In light of these issues, Plaintiffs believe that the BDO Settlement very much reflects a fair and reasonable compromise between the parties.

60.    While Plaintiffs believe they would ultimately prevail on both liability and damages, success is far from assured and would only be possible after years of litigation. The settlement payment represents a significant recovery for the Stanford Investors, while avoiding the burden, costs, delay, and risks incident to continued litigation, with an uncertain outcome.

*(3)*    ***The Risk that Litigation Would Dissipate Receivership Assets***

61.    The BDO Entities would undoubtedly vigorously defend themselves in the Committee and Investor Litigation. Plaintiffs believe that litigation against the BDO Entities would most likely go on for years, with no guaranty of a recovery. Arbitration of the Committee's claims would dissipate Receivership assets due to the expense of paying three arbitrators at their hourly rates as well as the AAA administration fees. While Plaintiffs'

litigation counsel have entered into contingent fee arrangements with Plaintiffs to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation. The BDO Settlement avoids further expense associated with the arbitration and continued monitoring and oversight of this case by the Receiver and the Committee Chairman/Examiner.

62.    Furthermore, as part of their fee agreement with their counsel, the Committee has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with the Committee's litigation against the BDO Entities, including, inter alia, expert fees and out of pocket litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.). Because the case against the BDO Entities involves claims of professional malpractice, expert witness testimony is necessary, and would be significant going forward if the Lawsuits are not settled. Expert testimony would be needed to prove the details of the Stanford Ponzi scheme, as well as the audit malpractice, causation and damages. Absent the BDO Settlement, expert witness fees could easily have run into the hundreds of thousands of dollars. Other out of pocket litigation costs would be substantial (given that formal discovery has not even begun in these Lawsuits ) if the Lawsuits are not settled, including costs of oral and video depositions of all fact and expert witnesses, production of voluminous records and emails and other electronically stored information, travel associated with depositions, preparation of expert witness reports, trial graphics, cost of reproduction of documents and trial exhibits, retrieval and storage of email and other electronically stored information, and attendance of experts at trial. Total out of pocket costs to prosecute the litigation could easily reach $1 million or more due to the complex nature

of the claims, the need for expert testimony and the voluminous nature of the records involved.

### (4)     The Complexity and Costs of Future Litigation

63.     The prosecution of the Committee and Investor Litigation would undoubtedly be challenging and expensive, as discussed above. As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex, as evidenced by the Direct Testimony of Karyl Van Tassel in the Chapter 15 proceeding, as well as all of the lengthy Declarations with voluminous supporting exhibits that she has filed with this Court to prove the facts of the Stanford Ponzi scheme. There is no question that the Committee and Investor Litigation involving claims of audit malpractice and aiding and abetting under the TSA, involving billions of dollars in damages and an international Ponzi scheme involving a complex web of interrelated international companies that spanned nearly 20 years, is extraordinarily complex, and would cause the Receivership Estate to incur substantial expense to litigate to final judgment. As stated above, litigation costs could easily exceed $1 million.

### (5)     The Implications of the BDO Entities' Settlement Payment on Other Claimants

64.     As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'" *Kaleta*, 530 F. App'x at 362. The Receiver is not collecting the BDO Entities' settlement payment for Allen Stanford or for Mr. Janvey, but for the Stanford Investors. Indeed, as part of the BDO Settlement, the Receiver has agreed to give notice to Stanford Investors with Outstanding Claims who wish to participate in a distribution of the proceeds from the BDO Settlement of a deadline by which they must submit a claim to the Receiver for review and consideration, so that they have a potential opportunity to participate in the BDO settlement and future receivership litigation settlements and recoveries.

---

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                            28

Thus, the relief Plaintiffs request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order). For the reasons stated, the Investor Plaintiffs support the structure of the settlement, as it saves substantial time and expense over a class settlement which would require a duplicative claims and distribution process.

### *(6)       The Value and Merits of Any Foreclosed Parties' Potential Claims*

65.     Plaintiffs are conscious of the fact that the Bar Order they are requesting, and which is a condition to the BDO Settlement, will preclude Stanford Investors and others from asserting claims against the BDO Entities in connection with its involvement with the Stanford enterprise. However, no investors (other than the Investor Plaintiffs) have asserted any claims against the BDO Entities in the six years since the Receivership was created, the cost of doing so in any individual investor lawsuit would be prohibitive, and any such investors asserting claims would face the same legal, factual and collectability challenges faced by the Plaintiffs, as discussed above.

66.     Given that all Stanford Investors have been put on notice of the Receivership, have been given the opportunity to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process, the Stanford Investors' rights are not being prejudiced in any way by the BDO Settlement. They have all had the opportunity to participate through the pre-existing receivership claims process. It would be detrimental to the Stanford Investors to reinvent the wheel through a class settlement procedure, which would result in the same pool of Stanford Investors having the right they

already have through the Receivership claims and distribution process to participate in the BDO Settlement.

67.     Plaintiffs believe that the Bar Order should be approved because it is in the collective best interest of all Stanford Investors. The Bar Order should not be rejected based upon the theoretical possibility that some individual investor(s) or counsel might have otherwise wished to pursue individual claims against the BDO Entities in the future, particularly given that no such claims have been filed for six years since the Receivership was created. *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").

68.     It should also be noted that the Receiver, and the Committee as assignee of the Receiver's claims and as the Court-appointed representative of the Stanford Investors, is the only party with standing to pursue the most valuable claim, with the lowest burden of proof, in this litigation: the negligence claim based on the BDO Entities' alleged audit malpractice. No potential individual litigant owns or could assert that claim. Any such litigant would be required to bring a TSA or other fraud based claim involving a significantly greater burden of proof. It is primarily, if not entirely, the threat of the Receiver's audit malpractice claim, which involves a simple negligence standard, that has caused the BDO Entities to agree to settle for $40 million.

69.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit as many aggrieved investors as stand to be benefited under the Settlement Agreement."

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                    30

*Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order)

70.     It also is unlikely that any potential claimant could or would spend the time and resources necessary to pursue an individual claim against the BDO Entities, especially considering the expense of such an action would far outweigh any likely individual recovery against the BDO Entities. Plaintiffs believe that enjoining these speculative and unlikely claims is, on balance, fair and appropriate to all interested parties, especially when necessary to gain an immediate and substantial recovery for the Receivership Estate.

71.     The proposed BDO Settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses or a race to the courthouse by various counsel. Against this backdrop, the Court should approve the BDO Settlement and enter the Bar Order.

### (7)     *Other Equities Attendant to the Situation*

72.     The entry of the bar orders is a material term under the BDO Settlement Agreement to the BDO Entities, and a necessary condition to the obligations set forth in the BDO Settlement Agreement. The bottom line is that there is no BDO Settlement without it. The BDO Entities "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [the BDO Entities], potentially in other, including foreign, jurisdictions." *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

73.     The BDO Entities have made clear that in consideration of paying $40 million, they must achieve "global peace" with respect to all Stanford-related claims through the BDO Settlement, wholly and finally. The BDO Entities have stated that they would not enter into the BDO Settlement without securing global peace and the avoidance of the expense of further

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                          31

litigation, particularly given what it believes are its strong factual and legal defenses. The Receiver and the Committee were appointed to protect the interests of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants. The proposed Bar Order will help maximize the eventual distribution to Estate claimants of BDO USA's $40 million payment and provide the BDO Entities the global resolution of Stanford-related litigation that is a necessary condition for that settlement payment by BDO USA. Plaintiffs believe that the entry of the Bar Order is fully justified by the settlement amount being paid by BDO USA.

74.     This Court has already enjoined actions against the Stanford Defendants, the Receiver, and the Receivership Estate, ordering that "all ... persons are hereby restrained and enjoined from" without leave:

> . . . commenc[ing] or continu[ing] . . . any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action . . . .

Second Order ¶ 9(a). Plaintiffs ask the Court to extend this stay into a permanent injunction and bar of all claims and potential claims against the BDO Released Parties in order to effectuate the BDO Settlement.

75.     Plaintiffs and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors. Plaintiffs firmly believe that they could prosecute viable causes of action against the BDO Entities, though the BDO Entities vigorously deny any wrongdoing or liability, and have indicated that they firmly believe they would successfully defend any claims against them. The

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                             32

BDO Entities also have the resources to defend themselves and to litigate the issues through a final trial court judgment or arbitration award, and appeal if necessary, which means the litigation would take years to be resolved without a settlement.

76.     Plaintiffs believe that the terms of the BDO Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

77.     The overall context of the MDL and Stanford Receivership also are relevant to the equities of the situation. The Stanford Ponzi scheme collapsed in February 2009, and the six years since have yielded numerous motions and a delay in any substantial recovery for Stanford's victims. The parties – on both sides – are confronted by uncertainty, risk and delay. In this circumstance, the example of settlement is to be encouraged.

78.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging. For many of Stanford's victims, recovery delayed is recovery denied. The time that Stanford's victims have waited to date should not be extended further in pursuit of additional uncertainty and delay.

79.     The equities of the BDO Settlement, including its necessary bar order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims. The Receiver, the Examiner, the Committee, and the Investor Plaintiffs have cooperated and joined together in the BDO Settlement.  In this complex international fraud, this level of coordination and quality of resolution are eminently desirable. The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation. The result of this coordination will be the

most orderly distribution to Stanford's victims that possibly can be achieved.

80.      The Court is well within its discretion to approve the BDO Settlement. In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities laws and defrauding investors. *Kaleta*, 2012 WL 401069, at *1. The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id.* The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership. The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed. *Kaleta*, 530 F. App'x at 362-63.

81.      In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the Receivership Estate. *Kaleta*, 2012 WL 401069, at *7. "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id.*

82.      In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties. *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014). The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities." *Id.* at *2.[11]

---

[11]      The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against

## IV. REQUEST FOR APPROVAL OF ATTORNEYS' FEES

*A.*      *Terms of Plaintiffs' Counsel's Engagement*

83.      In addition to approving the BDO Settlement, Plaintiffs also request that the Court approve an award of attorneys' fees to Neligan Foley LLP ("Neligan Foley"), Castillo Snyder, P.C. ("Castillo Snyder"), Strasburger & Price, LLP ("Strasburger"), and Butzel Long ("Butzel Long") (collectively "Plaintiffs' Counsel") under the terms of the fee agreement between Plaintiffs' Counsel and the Committee. As reflected in the Declaration of Douglas J. Buncher (the "Buncher Declaration"), attached as Exhibit 2 to the Appendix in Support of this Motion, Plaintiffs' counsel have been jointly handling the Committee and Investor Litigation pursuant to 25% contingency fee agreements with the Committee (in the Committee Litigation) and the Investor Plaintiffs (in the Investor Litigation). *See also* Declarations of Edward Snyder, Edward Valdespino and Peter Morgenstern attached to the Appendix as Exhibits 3, 4 and 5, respectively.

84.      Pursuant to the fee agreements, the Committee and Investor Plaintiffs seek Court approval to pay attorneys' fees to Plaintiffs' Counsel equal to an aggregate of 25% of the Net Recovery from the BDO Settlement (*i.e.*, the settlement amount less allowable disbursements). The gross amount of the settlement to be paid by BDO USA is $40,000,000.00. The disbursements to be deducted from the settlement amount to calculate the Net Recovery from the BDO Settlement are $174,938.07, which are expenses previously reimbursed by the Receiver pursuant to the parties' fee agreement. Thus, the Net Recovery from the BDO Entities is $39,825,061.93. 25% of the Net Recovery is $9,956,265.48. This is the fee agreed to be paid to Plaintiffs' Counsel by the Committee and the Investor Plaintiffs, and this is the amount of the fee

---

another settling party. *See SEC v. Temme*, No. 4:11–cv–655, [Doc. 162] (E.D. Tex. November 21, 2012).

for which approval is sought in this Motion.

**B.      *The Proposed Fee is Reasonable as a Percentage of the Overall Recovery***

85.      Trial courts can determine attorneys' fee awards in common fund cases such as this one[12] using different methods. One is the percentage method, under which a court awards fees based on a percentage of the common fund. *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012). The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable." *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).[13] Thus, when considering fee awards in class action cases "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check." *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K (lead case), 2005 WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[14]

86.      While the BDO Settlement is not a class action settlement, because the settlement is structured as a settlement with the Committee, with a Bar Order and dismissal of the Investor Litigation, this Motion analyzes the award of attorneys' fees to Plaintiffs' Counsel under the law applicable to class action settlements in an abundance of caution. Whether analyzed under the

---

[12]      The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr.S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[13] The *Johnson* factors are discussed in Subsection C below.

[14] While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District have recognized that the percentage method is the preferred method of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25. In *Schwartz*, the court observe that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25. The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case. *Id.* Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery." *Id.* at *26.

common fund approach, the *Johnson* framework, or both, the 25 percent fee sought by Plaintiffs' Counsel pursuant to their fee agreements is reasonable and should be approved by the Court.

87.     The proposed 25% amount is a reasonable percentage of the common fund (i.e. the $40 million settlement). "The vast majority of Texas federal courts and courts in this District have awarded fees of 25%–33% in securities class actions." *Schwartz*, 2005 WL 3148350, at *31 (collecting cases). "Indeed, courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method." *Id*.[15] Combined with the *Johnson* analysis set forth below, the proposed fee award is reasonable and appropriate under the common fund doctrine as applied in the Fifth Circuit.

## C.     *The Proposed Fee is Reasonable Under the Johnson Factors*

88.     The *Johnson* factors include: (1) time and labor required; (2) novelty and difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19. A review of these factors also reveals that the proposed 25% fee is reasonable and should be approved.

---

[15] As set forth in *Schwartz*, courts in the Northern District have routinely approved such awards. *See, e.g, Southland Secs. Corp. v. INSpire Ins. Solutions, Inc*., No. 4:00–CV–355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% fee in securities class action); *Scheiner v. i2 Techs., Inc., et al*., Civil Action No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc. et al*., Civil Action No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig*., Master File No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc., et al*., Civil Action No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI, et al*., No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig*., No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc*., No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

<u>**MOTION TO APPROVE SETTLEMENT WITH BDO**</u>                                                          37

**(1)     Time and Labor Required**

89.     As reflected in the Buncher, Snyder, Valdespino and Morgenstern Declarations, Plaintiffs' Counsel invested a tremendous amount of time and labor in this case. Even a cursory review of the Court's docket in all of these cases reveals the immense amount of work that Plaintiffs' counsel have put into the prosecution of all of these lawsuits since 2009. However, the docket and pleadings only reveal the work that is filed with the Court. As discussed further herein, and as the Court is aware, the prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the cases, conduct discovery, prepare the briefs and motions, attempt to negotiate settlements, and prepare cases for summary judgment and/or trial. Plaintiffs' counsel have spent thousands of hours since 2009 in their investigation and prosecution of the lawsuits referenced above, including the Committee and Investor Litigation that are the subject of the settlement.

90.     Plaintiffs' counsel have spent over six years and thousands of hours investigating and pursuing claims against third parties, including the BDO Entities, on behalf of the Stanford Receivership Estate and the Stanford Investors. Neligan Foley has nearly 7,000 hours and over $2.8 million worth of attorney and paralegal time invested in the Stanford lawsuits, including the Committee and Investor Litigation. Neligan Foley was lead counsel among Plaintiffs' Counsel in the Committee and Investor Litigation. Neligan Foley has almost 1,200 hours and over $600,000 of unpaid attorney and paralegal time invested in the Committee and Investor Litigation, alone. *See* Buncher Declaration.   Strasburger & Price also has thousands of hours and millions of dollars of time invested in pursuing claims against third parties related to the Stanford

Receivership, and 1,507 hours of attorney and paralegal time worth $818,652 attributable to the BDO litigation. *See* Valdespino Declaration. Castillo Snyder has over $7 million invested in the Stanford cases overall, and 696 hours and $402,430 in time invested in the BDO litigation. *See* Snyder Declaration. Butzel Long has devoted thousands of hours of time worth several million dollars to Stanford-related matters since 2009, and has 78.6 hours of time worth $56,500 invested in the BDO cases alone. *See* Morgenstern Declaration.

91.     The tremendous amount of work required by Plaintiffs' counsel to successfully prosecute the Committee and Investor Litigation against BDO is described in the Buncher, Snyder, Valdespino and Morgenstern Declarations, the billing records accompanying those Declarations, and this Motion [*See, e.g.*, Motion ¶¶ 9-11].

### (2)     Novelty and Difficulty of the Issues

92.     The issues presented in this lawsuit were difficult and complex. Plaintiffs' Counsel's investigation revealed that since 1995, BDO USA was the auditor of the most important businesses of the Stanford empire, including Stanford Group Company ("SGC"), Stanford's NASD registered broker-dealer that marketed and sold the SIBL CDs in the United States, Stanford Trust Company (Louisiana) ("STC"), which Stanford used to sell the CDs to IRA account holders, and Stanford Group Holdings ("SGH"), the holding company that owned both SGC and STC. The investigation revealed that while BDO USA conducted an operational review of Stanford International Bank Ltd. ("SIBL") in the 1990s in an effort to secure business from SIBL, and several BDO partners served on the Stanford Antiguan Task Force that was involved in re-writing the financial regulations of Antigua, BDO USA was not hired for the business it had solicited from SIBL, and BDO USA was never the auditor for SIBL.

Investigation further revealed that BDO International, BDO Global, and Brussels Worldwide were foreign affiliates of BDO USA that formulated policies and procedures for BDO member firms worldwide, including BDO USA.

93.      As part of their investigation, Plaintiffs' Counsel conducted a thorough analysis of the potential claims against the BDO Entities, considering: claims available under both state and federal law; the viability of those claims considering the facts underlying the BDO Entities' business dealings with Stanford and this Court's previous rulings; the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere; as well as defenses raised by the BDO Entities in their motions to dismiss and mediation position papers. The Investor Plaintiffs and the Committee commenced their actions by filing their Original Complaints in this Court on May 26, 2011 (the Investor Litigation) and May 9, 2012 (the Committee Litigation), respectively. Among other claims, Plaintiffs asserted causes of action against the BDO Entities for negligence, aiding and abetting violations of the Texas Securities Act (the "TSA"), aiding and abetting breaches of fiduciary duty, participation in a fraudulent scheme, and conspiracy. These claims raised complicated and novel issues of law and fact and would have required intensive discovery and voluminous briefing had they been litigated, many of which were the subject to the BDO Entities' comprehensive motions to dismiss in the Investor Litigation.  The BDO Entities had also stated their intention to file similar motions to dismiss in the Committee Litigation, as well as a motion to compel arbitration, had the Committee Litigation moved forward.

94.      The foregoing summary of the issues identified in Plaintiff's Counsel's investigation of the claims against the BDO Entities, as well as the legal issues raised in the

dismissal pleadings, illustrate the novelty, difficulty and complexity of the issues in the Committee and Investor Litigation and supports the approval of the proposed fee.

### (3)    Skill Required

95.    Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution, and settlement of this case required significant skill and effort on the part of Plaintiffs' Counsel. Plaintiffs' Counsel have represented receivership and bankruptcy estates on numerous occasions, and are currently serving as counsel for both the Receiver, the Committee and other investor plaintiffs, both individually and as representatives of putative classes of Stanford Investors, in multiple other lawsuits pending before the Court. Buncher Decl. ¶¶ 7-9. Plaintiffs submit that the favorable result in this case is indicative of Plaintiff's counsel's skill and expertise in matters of this nature. *Id*. at ¶¶ 1, 4.

### (4)    Whether Other Employment is Precluded

96.    Although participation in the Committee and Investor Litigation did not necessarily preclude Plaintiffs' Counsel from accepting other employment, the sheer amount of time and resources involved in investigating, preparing, and prosecuting the Committee and Investor Litigation, as reflected by the hours invested in the Committee and Investor Litigation and the Stanford case generally, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters.

### (5)    The Customary Fee

97.    The 25% fee requested is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude. *See Schwartz*, 2005 WL 3148350, at *31 (collecting cases and noting

that 30% is standard fee in complex securities cases). In certain instances, including the Committee and Investor Litigation prior to the retention of Neligan Foley, the Committee interviewed other potential counsel who refused to take on the lead counsel role in the Committee and Investor Litigation without a higher percentage fee. Buncher Decl. at ¶ 34. In fact, Plaintiffs' Counsel initially requested a larger percentage in all of the Stanford lawsuits because of the complexity and magnitude of the lawsuits, the length of time that it could take to prosecute the cases to conclusion, the thousands of hours Plaintiffs' counsel would have to invest in these cases, and the risk that there might ultimately be no recovery. *Id*. The Committee and Investor Litigation and the other third-party lawsuits are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery and dispositive motions to get to trial. The lawsuits involve significant financial outlay and risk by Plaintiffs' Counsel, the risk of loss at trial after years of work for no compensation, and an almost certain appeal following any victory at trial. Plaintiffs' Counsel submit that these factors warrant a contingency fee of more than 25%. Nonetheless, Plaintiffs' Counsel agreed to handle the Committee and Investor Litigation on a 25% contingency basis, and that percentage is reasonable given the time and effort required to litigate these cases, their complexity and the risks involved.

### (6)     Whether the Fee is Fixed or Contingent

98.     As set forth above, the fee was contingent upon success against the BDO Entities. As a result, Plaintiffs' counsel bore significant risk in accepting the engagement.

### (7)     Time Limitations

99.     At the time of the BDO Settlement, Plaintiffs were not subject to significant time

limitations in the Committee and Investor Litigation, as the lawsuits were at the dismissal stage. However, had the cases not settled, the BDO Entities intended to compel arbitration of the Committee case [Buncher Decl. at ¶¶ 17-18], and arbitration would have proceeded on a much faster track to a final hearing. However, the class action case would have remained pending before the Court and would likely have taken years to resolve. Furthermore, given the magnitude and complexity of the cases, even if a final arbitration in the Committee Litigation was set a year in the future, Plaintiffs' Counsel would have been under significant time pressure to complete all the investigation and discovery to prepare the case for final hearing within a year.

### (8)     The Amount Involved and Results Obtained

100.    As discussed further herein, $40 million represents a substantial settlement and value to the receivership. This factor also supports approval of the requested fee.

### (9)     The Attorneys' Experience, Reputation and Ability

101.    As noted above, Plaintiffs' Counsel have represented numerous receivers, bankruptcy trustees, and other parties in complex litigation matters related to equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding. *See* Buncher Decl. ¶¶ 1, 4. See also Snyder, Valdespino and Morgenstern Declarations. Indeed, Plaintiffs' Counsel have been actively engaged in the Stanford proceeding since its inception. Given the complexity of the issues in the Committee and Investor Litigation, Plaintiffs submit that the BDO Settlement is indicative of Plaintiffs' Counsel's ability to obtain a favorable result in such proceedings.

### (10)    The Undesirability of the Case

102.    The Commercial and Investor Litigation are not undesirable.

### (11)    Nature and Length of Professional Relationship with the Client

103.    As the Court is aware, Plaintiffs' Counsel have represented the Receiver, the Committee, and Investor Plaintiffs in numerous actions pending before the Court since 2009. *See* Buncher Decl. at ¶¶ 6-8. Plaintiffs' counsel has handled all of these cases on the same 25% contingency fee arrangement that has previously been approved by the Court. *See* SEC Action ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action ECF No. 1208, p. 3 (providing a "contingency fee" of twenty-five percent (25%) of any Net Recovery in actions prosecuted by the Committee's designated professionals). This factor also weighs in favor of approval of the requested fee.

### (12)    Awards in Similar Cases

104.    As noted above, a 25% contingency fee has previously been approved as reasonable by this Court in its order approving the Receiver's agreement with the Committee regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and the Committee (the "OSIC-Receiver Agreement"). *See* SEC Action ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement SEC Action ECF No. 1208, Ex. A, p. 3 (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by the Committee's designated professionals). The Court's order approving the OSIC-Receiver Agreement also provided that the Committee need not submit a fee application seeking an award of fees consistent with the percentage authorized under the Court's previous order unless required by Rule 23. *See* SEC Action ECF No. 1267, p. 2.

105.    The OSIC-Receiver Agreement further provided that the Committee "would prosecute certain fraudulent transfer claims and other actions for the benefit of Stanford investors/creditors in cooperation with Ralph S. Janvey, as receiver." *See* OSIC-Receiver Agreement, SEC Action ECF No. 1208, Ex. A, p. 1. The Agreement further provided that "this proposal will apply to the litigation of all fraudulent transfer and similar claims that may be brought under common law, statute … or otherwise…" and "unless otherwise agreed, the terms of this agreement will likewise apply to the pursuit of any other claims and causes of action that the Receiver and the Committee determine to jointly pursue." *Id*. at pp. 1-2.

106.    The contingency fee agreements with Plaintiffs in the Committee and Investor Litigation similarly provide for a fee of 25% of the Net Recovery (defined as the total recovery after deducting allowable expenses and disbursements), and were modeled after the OSIC-Receiver Agreement since the parties knew that the Court had already approved a 25% contingency fee agreement.

107.    The 25% contingency fee arrangement that was approved by the Court in the context of the OSIC-Receiver Agreement became the framework for all of the 25% contingency fee agreements that the Committee entered into with Plaintiffs' Counsel in the Committee and Investor Litigation, as well as the twenty-five prevent (25%) contingency fee agreements that the Receiver entered into with Neligan Foley in certain of the other third party lawsuits.

108.    As set forth in *Schwartz*, courts in this district have routinely approved 25%, and more often 30%, fee awards in complex securities class actions. 2005 WL 3148350, at *27 (collecting cases). Under the circumstances of this case, such an award is appropriate here as well.

### D.      *The Proposed Fee Should Be Approved*

109.    For the same reasons the Court previously found the 25% contingency fee OSIC-Receiver Agreement to be reasonable, *see* SEC Action No. 1267, p. 2, the Court should find the 25% contingency fee applicable to the settlement of the Committee and Investor Litigation to be reasonable and approve it for payment. Here, there is even more reason to find the fee to be reasonable than in the fraudulent transfer lawsuit context, as the Committee and Investor Litigation and the other larger third-party cases are extraordinarily more complex, time consuming and risky, involving numerous factual and legal issues and claims when compared to the relatively straight-forward fraudulent transfer claims. The settlement of the Committee and Investor Litigation has yielded an enormous benefit to the Stanford Receivership Estate and the Stanford Investors and is the largest settlement of a third-party lawsuit in the over six-year history of the Stanford receivership. Thus, Plaintiffs submit that an award of attorneys' fees equal to 25% of the net recovery from the BDO Settlement, as requested, is reasonable and appropriate and should be approved under applicable Fifth Circuit law, whether using a common fund approach, the *Johnson* factor approach, or a blended approach.  A proposed form of Order Approving Attorneys' Fees is attached as Exhibit 6 to the Appendix to this Motion.

### E. Examiner Support for Fee Award

110.    John J. Little in his capacity as Court-appointed Examiner also supports the award of Plaintiffs' attorneys' fees, and requests that the Court approve them.  *See* Declaration of Examiner John J. Little, attached as Exhibit 7 to the Appendix to this Motion.

## V. CONCLUSION & PRAYER

111.    The BDO Settlement represents a substantial and important recovery for the

Receivership Estate and the Stanford Investors. The large amount of the recovery, the time and costs involved in pursuing litigation against the BDO Entities, and the uncertain prospects for obtaining and then recovering a judgment against the BDO Entities, all weigh heavily toward approving the BDO Settlement, entering the Bar Order and approving the attorneys' fees of Plaintiffs' Counsel.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request this Court:

    a.    Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

    b.    Grant this Motion;

    c.    Approve the BDO Settlement Agreement;

    d.    Enter the Bar Order in the SEC Action;

    e.    Enter the Judgment and Bar Order in the Committee Litigation;

    f.    Approve the attorneys' fees of Plaintiffs' Counsel; and

    g.    Grant Plaintiffs all other relief to which they are entitled.

Date:  May 15, 2015.

Respectfully submitted:

**NELIGAN FOLEY, LLP**

By: ___*/s/ Douglas J. Buncher*_____

     Douglas J. Buncher
     dbuncher@neliganlaw.com
     Patrick J. Neligan
     pneligan@neliganlaw.com

     Republic Center
     325 N. St. Paul, Suite 3600
     Dallas, Texas 75201
     Telephone: (214) 840-5320
     Facsimile: (214) 840-5301

**ATTORNEYS FOR RALPH S. JANVEY,
IN HIS CAPACITY AS RECEIVER FOR
THE STANFORD RECEIVERSHIP ESTATE**

**CASTILLO SNYDER, P.C.**

By: ___*/s/ Edward C. Snyder*_____
     Edward C. Snyder
     esnyder@casnlaw.com
     Jesse R. Castillo
     jcastillo@casnlaw.com
     300 Convent Street, Suite 1020
     San Antonio, Texas 78205
     (210) 630-4200
     (210) 630-4210 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: *ic/ Edward F. Valdespino*_____
     Edward F. Valdespino
     Texas Bar No. 20424700
     edward.valdespino@strasburger.com
     300 Convent Street, Suite 900
     San Antonio, Texas 78205
     Telephone: (210) 250-6000

Facsimile: (210) 250-6100

**BUTZEL LONG PC**

By:     */s/ Peter D. Morgenstern*
       Peter D. Morgenstern (*admitted pro hac vice*)
       morgenstern@butzel.com
       380 Madison Ave
       22nd Floor
       New York, NY 10017
       (212) 818-1110
       (212) 818-0494 (Facsimile)


**ATTORNEYS FOR THE OFFICIAL
STANFORD INVESTORS COMMITTEE**


## CERTIFICATE OF SERVICE

On May 15, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. All parties who have appeared in this proceeding will be served via ECF. Investors and other interested parties will be served and given notice of the hearing on this Motion as approved by the Court.


       /s/ Douglas J. Buncher
       Douglas J. Buncher

80802v.12