IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | Cause No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | §<br>§<br>§ | |
| Defendants. | § | |

## EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER AND MOTION FOR ORDER APPROVING PROPOSED SETTLEMENT WITH KROLL AND FOR ANCILLARY ORDERS AND BRIEF IN SUPPORT

TO THE HONORABLE COURT:

COME NOW Receiver Ralph S. Janvey (the "Receiver") and the Official Stanford Investors Committee ("OSIC") (collectively "Movants") and respectfully present to the Court the attached settlement agreement (the "Settlement Agreement")[1] with Kroll, LLC (formerly known as Kroll Inc.) and Kroll Associates, Inc. ("Kroll Associates" and, together with Kroll, LLC, "Kroll"), which settles and releases all claims against Kroll in consideration of a cash payment to the Receiver of **$24 million**, and jointly request this Court to find the settlement is in the best interest of the Stanford Estate and the Stanford creditors, and to approve it. In support thereof, Movants would respectfully show the Court the following:

---

[1]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the Settlement Agreement. The summary of the Settlement Agreement provided herein is qualified in its entirety by the actual terms of the Settlement Agreement. To the extent that there is any inconsistency between the summary provided herein and the actual terms of the Settlement Agreement, the actual terms of the Settlement Agreement shall control.

## INTRODUCTION

1.      As part of their lengthy and thorough investigation of the Stanford fraud and after many years of investigating and pursuing claims against those persons and entities they contend assisted or participated in it, the Receiver, OSIC, and the Antiguan Liquidators have reached a settlement with Kroll, which intermittently provided outside consulting services to certain Stanford entities and persons.  The Settlement Amount is **$24 million.**

2.      In return, Kroll receives a release of all claims, as well as a bar order that would prohibit litigation against it by anyone asserting claims related to Stanford.  Movants request the Court to approve the Settlement Agreement, and enter the bar order (the "Bar Order") attached to the Settlement Agreement as Exhibit D.  The settlement is conditioned on this Court's approval and entry of the Bar Order.  By separate application, Movants also request that the Court approve payment of attorneys' fees to the counsel that obtained this settlement.

3.      The Bar Order and relief Movants request the Court to approve here is materially indistinguishable from the bar orders the Court has already approved in connection with settlements reached in the BDO and Adams & Reese lawsuits.  *See* Doc. Nos. 2230, 2248.[2]

4.      There are compelling reasons supporting Movants' determination that the **$24 million** settlement payment is fair and reasonable.  In addition to the other reasons discussed below, Kroll, along with its parent company Altegrity, Inc. (now known as Corporate Risk Holdings, LLC), filed a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in February 2015.  The Bankruptcy Court has approved this settlement, subject to this Court's approval.

---

[2]      All Docket Items are from *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-298-N (N.D. Tex.), unless otherwise noted.

5.     Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, since such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

## BACKGROUND

### *Authority of the Receiver and OSIC*

6.     On February 17, 2009, the Securities & Exchange Commission ("SEC") filed this action and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver, Doc. No. 10 ¶ 4. That order was amended – the current order setting forth the Receiver's rights and duties is the Second Amended Order Appointing Receiver (the "Second Order" [Doc. No. 1130]) – but the Receiver's essential task remains marshaling and preserving the assets of the Receivership Estate, and minimizing expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

7.     The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court. *Id.* ¶ 2. The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). This includes the "responsibility of tracking down and collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately, defrauded investors." *Id.* at 331. The Court has directed the Receiver to institute, prosecute,

defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate.  Second Order ¶ 5(i).

8.      On August 10, 2010, this Court entered its order creating the Official Stanford Investors Committee ("OSIC").  Doc. No. 1149 (the "Committee Order").    The Committee Order directs OSIC to represent the creditors of the Receivership Estate "who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL."  Committee Order at 2.  The Committee Order confers upon OSIC the right to investigate and pursue claims on behalf of the Stanford investor victims in the manner set forth in the Committee Order.  This Court has recognized OSIC's standing to pursue litigation claims such as the claims against Kroll that are the subject of the settlement.  *See* September 24, 2012 Order, Doc. No. 33, *Janvey & Official Stanford Investors Committee v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N, at 4-6 (OSIC has standing to pursue claims based on the Court's grant of such authority to OSIC as an association representing the interests of the Stanford investors).

### *The Receiver and OSIC's Investigation of Kroll*

9.      Kroll Associates is a professional services firm that provided outside consulting services to certain Stanford entities and persons, between 1996 and 2009, with the work substantially decreasing after 2004.  Kroll has informed Movants that Kroll, LLC is a holding company, which holds Kroll Associates, but does not itself provide any services.  Based on a massive investigation of Stanford's far-flung business operations performed by counsel for OSIC beginning in 2009, including Stanford's business relationships and interactions with various third party service providers, Movants concluded in late 2011 that enough facts existed to warrant further investigation of Kroll and potential damage claims against Kroll.  Greenberg Traurig,

LLP ("Greenberg") initially retained Kroll Associates to work on Stanford matters, and Kroll Associates worked from time to time with Greenberg and subsequently with the law firm Hunton & Williams ("Hunton") during the time Kroll Associates was providing services to Stanford. Effective on August 26, 2011, Movants and Kroll entered into a Tolling Agreement to toll limitations while Movants completed their investigation.

10.     Movants and their counsel's ongoing investigation of Stanford led to the Receiver serving a subpoena on Kroll on November 30, 2011 for documents related to its business relationship with Stanford.  Following motion practice on a motion to compel, Kroll's rolling production began on October 12, 2012, and Kroll eventually produced over 23,000 pages of documents that were reviewed by Movants.  This production supplemented the voluminous documents and information concerning Stanford already possessed by the Receiver.  The Receiver obtained from Stanford entities and persons that are part of the Receivership Estate more than 60 terabytes of documents.  The Antiguan Liquidators, who are parties to the proposed settlement with Kroll, have obtained more than 2 terabytes of documents from the Stanford entities and persons under their supervision.  In addition, the Receiver, the Antiguan Liquidators, and OSIC have acquired from third parties hundreds of thousands of documents, including tens of thousands of pages each from Greenberg and Hunton.

11.     The Receiver has spent more than six years investigating the Stanford fraud.  *See supra* ¶ 6. The Receiver received extensive assistance in this regard from numerous experts and consultants, including Karyl Van Tassel and FTI, Malcolm Lovett, Jr. and Strategic Capital Corporation, Ernst & Young, and many law firms.  OSIC, its law firms, and its experts and consultants, and the Antiguan Liquidators, and their counsel, experts, and consultants also have done extensive work generally investigating the Stanford Ponzi scheme.  In particular, over a

5

three year period beginning in late 2009 and culminating in the mediated settlement agreement reached in May 2013, OSIC's counsel investigated the conduct of Kroll and its relationship with and services provided to Stanford.  In addition, Movants have been assisted by the results of the investigation of the U.S. government into the Stanford Ponzi scheme.

12.     Movants and their counsel have conducted a thorough analysis of the potential claims against Kroll, considering:

> a. claims available under both state and federal law;
>
> b. the viability of those claims considering the facts underlying Kroll's business dealings with Stanford and this Court's previous rulings; and
>
> c. the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

13.     The claims that Movants investigated and would have filed against Kroll absent the settlement include the same types of claims and causes of action Movants have pursued against other third parties.  Thus the claims that Movants investigated and would have filed against Kroll include the following:

| Category | Claim |
|---|---|
| Estate Claims | Negligence |
| | Aiding and Abetting Breach of Fiduciary Duty |
| | Breach of Contract |
| | Fraudulent Transfer / Unjust Enrichment |
| | Negligent Retention / Negligent Supervision |
| Class Claims | Aiding and Abetting Violations of the Texas Securities Act |
| | Aiding and Abetting / Participating in Breach of Fiduciary Duty |
| | Aiding and Abetting / Participating in a Fraudulent Scheme |
| | Civil Conspiracy |

14.     Some of the facts that would support such claims against Kroll include that two individuals affiliated with Kroll served on the commission that Allen Stanford established in Antigua to help re-write Antiguan banking laws.  Kroll personnel also assisted Stanford to investigate Stanford's opponents and some individuals that criticized Stanford, including certain

U.S. and foreign government officials.  Finally, Kroll endorsed and vouched for Stanford on a handful of occasions, including with foreign governments and even (on limited occasions) with investors.  Kroll vigorously denies any knowledge of Stanford's wrongdoing during any of these activities.

15.    Movants presented their potential claims to Kroll, and the parties subsequently engaged in discussions concerning a potential resolution.  Kroll denied and continues to deny all wrongdoing or liability, including any knowledge whatsoever of Stanford's wrongdoing, but ultimately evinced its desire to avoid the expense of protracted litigation and to secure global resolution of Stanford-related matters.

16.    Movants are confident that the investigation of Kroll's activities related to Stanford performed by their counsel has been thorough and are confident that said investigation, coupled with Movants' other investigatory and litigation efforts, has provided them with sufficient information to enter into and endorse this settlement.

### The Settlement

17.    The proposed settlement is the result of over three years of arms-length settlement negotiations with Kroll, including a two-day, in-person mediation that was attended by Movants' counsel as well as by members of OSIC and by representatives from Kroll Associates and Kroll Inc., followed by two more years of negotiating the structure and terms of the settlement documents, and another year dealing with the effect of the bankruptcy filing by Kroll and its parent company and obtaining bankruptcy court approval of this settlement.

18.    The Movants began discussions with Kroll in December 2011.  Those discussions concerned the viability of the claims, additional documents necessary to investigate the claims, and the possibility of settlement.  Those discussions continued throughout 2012, while Movants'

counsel was analyzing documents produced by Kroll on a rolling basis and spending time preparing a complaint against Kroll.  Those negotiations eventually led to a two-day, in-person mediation conducted in New York in May 2013 that was attended by Movants' counsel as well as by members of OSIC and by representatives from Kroll Associates and Kroll Inc.

19.    The mediation was conducted with the Hon. Judge E. Leo Milonas, a former Chief Administrative Judge of the State of New York, Justice of the Appellate Division of the New York Supreme Court, and President of the Association of the Bar of the City of New York. Together with twenty-six years of judicial service, Judge Milonas has extensive experience working as an arbitrator and mediator.  At the end of the second day of mediation the parties were able to reach an agreement with Kroll in principle to settle all claims against Kroll for $24 million, conditioned on Kroll being able to secure funding for the settlement payment and final documentation of the settlement agreement.

20.    Because this was the very first significant settlement of a third-party dispute,[3] and because Kroll demanded a global release from all Stanford-related liability, the parties engaged in protracted negotiations developing the structure of the Settlement Agreement and Bar Order. The Bar Order settlement structure adopted for the Kroll settlement eventually became the structure utilized for the subsequent settlements in the Adams & Reese and BDO litigations.

21.    The Settlement Agreement, attached as Exhibit 1 to the Appendix, includes the following components:

> (1)    Kroll will transmit or cause the transmission to the Receiver via wire of $24 million;
>
> (2)    The Receiver, OSIC, and the Antiguan Liquidators will fully release Kroll

---

[3]    This settlement was reached before the Adams & Reese and BDO settlements, but was not presented for court approval until now because in February 2015, Kroll and its parent company Altegrity, Inc. filed chapter 11 petitions in Delaware, which resulted in additional negotiations and revisions to documents as well as adding the additional hurdle of seeking approval of the settlement by the Bankruptcy Court.

from any and all claims concerning Stanford;

(3)     The Receiver and OSIC will seek entry of the proposed Bar Order enjoining Stanford creditors and all others from bringing any legal proceeding and/or asserting or prosecuting any cause of action against Kroll in connection with Kroll's involvement with Stanford, including contribution claims.  The Settlement Agreement is conditioned upon entry of the Bar Order and final approval of the settlement;

(4)     The Receiver will provide notice of this settlement through mail, email and newspaper and website publication;

(5)     Kroll will transmit or cause the transmission to the Receiver up to $35,000 for mailing and translation costs associated with the provision of notice of the settlement;

(6)     The court overseeing the Antiguan liquidation proceedings will be requested to enter an order also approving the Settlement Agreement; and

(7)     Kroll has the ability to terminate this settlement if certain contingencies occur, including if the Bar Order is not entered.

The Antiguan Liquidators have approved and are parties to this settlement.  The Examiner supports this Court's approval of the settlement and entry of the Bar Order.  This motion and all exhibits will be posted on the Receivership Estate's website at www.stanfordfinancial receivership.com.

22.     Courts have long emphasized that public policy favors settlement.  *See, e.g.*, *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010).  For the reasons described in greater detail below, the settlement with Kroll is fair, equitable, and reasonable, and is in the best interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets.  Movants urge the Court to approve it.

## REQUEST FOR APPROVAL OF THE SETTLEMENT AGREEMENT

### *Legal Standards*

23.     "'[T]he district court has broad powers and wide discretion to determine the

appropriate relief in an equity receivership.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (quoting *SEC v. Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)). "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" *Id.* (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)). "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership." *Id.* (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)). "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *Id.* (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009)). Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation." July 30, 2014 Order, Doc. No. 1093, *Janvey v. Alguire*, Civ. Action No. 3:09-cv-00724 ("July 30, 2014 Order"), at 31, 34.

24.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act "as a court in equity" for the "benefit of defrauded investors." *Id.* at 35 (internal quotation marks omitted); *see* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." July 30, 2014 Order at 44 (quoting *Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 190 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995))).

25.     "The federal equity receivership statutory framework also can – and, in the

10

situation of the current Stanford receivership, does – interact with another federal statutory scheme: federal multidistrict litigation ('MDL')."  July 30, 2014 Order at 26.  "[I]n the Stanford receivership, cases brought, not involving the Receiver, in other federal courts across the country are also being transferred to this Court through the MDL statute, highlighting once again the congressional goal of consolidation."  *Id.*

26.    "The purpose of federal equity receiverships" – "to marshal assets, preserve value, equitably distribute to creditors, and . . . orderly liquidate" – is thus supported by "the added context of the Stanford receivership being a multidistrict litigation SEC receivership over a Ponzi scheme."  *Id.* at 41.

27.    Furthermore, the institution of the Receivership and consolidation of Stanford related litigation in this Court are particularly apt because the Stanford Ponzi scheme, though international in scope, in reality operated "as a single enterprise" centered in Texas.  *Id.* at 10; *see also, e.g.*, May 12, 2015 Order, Doc. No. 191, *Janvey v. Libyan Inv. Auth.*, Civ. Action No. 3:11-cv-01177, at 10, 13, 25 ("this Court has repeatedly recognized" the "well established" fact that the "Stanford Ponzi scheme in reality operated as a single entity from Houston, Texas"); April 21, 2015 Order, Doc. No. 234, *Rotstain v. Trustmark Nat'l Bank*, Civ. Action No. 3:09-CV-2384-N, at 12 (the Stanford Ponzi scheme "was organized and operated in Houston, Texas . . . Stanford's headquarters"); July 30, 2012 Order, Doc. No. 176, *In re Stanford Int'l Bank, Ltd.*, Civ. Action No. 3:09-cv-00721, at 50 ("this Court is the jurisdictional locus of the entire Stanford Entities enterprise and estate" and the location of the "Stanford Entities' nerve center (center of direction, control, and coordination)").

28.    The Receivership Order in this case closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to

maximize timely distributions to claimants.  Second Order ¶ 5; *see supra* ¶¶ 6-7.

29.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases.  *Kaleta*, 530 F. App'x. at 362 (approving bar order).[4]  The Bar Order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

30.     In determining whether to issue a receivership bar order, courts may consider factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).  In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of non-parties, against the settling parties. *Id.* at *4.  This Court has done so in connection with the BDO and Adams & Reese, et al. settlements.

### *Value of the Proposed Settlement*

31.     The $24 million payment in this settlement is substantial.  "A proposed settlement

---

[4]     Bar orders are commonly used in receivership cases to achieve these purposes. *See, e.g.*, *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009); *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014); *SEC v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010) (Norton, C.J.), *modified in part*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549. The value of this settlement to the Receivership and Stanford's victims is significant, and is rendered more so by Kroll's chapter 11 case.

### *Value and Merits of the Receiver's Potential Claims*

32.     At the time that Movants agreed in principle to a settlement with Kroll, Movants had thoroughly investigated the facts surrounding Kroll's involvement with Stanford, and had spent time drafting a complaint against Kroll asserting the claims described above. As described above, the legal causes of action that Movants would have asserted against Kroll absent the settlement included causes of action to recover payments Kroll received from Stanford,[5] as well as other tort claims based on negligence and aiding and abetting. Movants of course believe that any and all claims that they might assert against Kroll would be successful.

33.     Kroll, however, equally believes that it has factual and legal defenses to any and all such claims that would be successful, and indicated that it would vigorously defend itself. It is important to note that, given Kroll's 2015 chapter 11 filing in the Bankruptcy Court, *In re Altegrity, Inc.*, Case No. 15-10226 (Bankr. D. Del. Feb. 8, 2015) ("*In re Altegrity, Inc.*"), Movants' putative claims are subject to Kroll's chapter 11 plan and the discharge of claims

---

[5]     In response to the Receiver's subpoena, Kroll produced materials showing it had received $2,894,161 for its work. Movants could seek to recover this amount from Kroll as a fraudulent transfer, subject to Kroll's defenses, including the defense of reasonably equivalent value and good faith.

thereunder. Absent a settlement, any claim of the Movants against Kroll would have to be litigated in the context of Kroll's chapter 11 case, and, even if ultimately allowed, any portion of that claim that is not paid by insurance or a third party would be a general unsecured claim in Kroll's chapter 11 case, where unsecured creditors will share in total distributions of only $1.25 million and therefore will only receive cents on the dollar.

34. Accordingly, any litigation between Movants and Kroll would be contested and protracted, and the ultimate outcome of such litigation would be uncertain. In this regard, Movants believe that the settlement reflects a fair and reasonable compromise between the parties, particularly given the uncertainties inherent in litigation and Kroll's chapter 11 case.

35. It is also worth reiterating that the settlement has already been thoroughly reviewed and approved by the Bankruptcy Court. By motion dated December 17, 2015, Kroll sought Bankruptcy Court approval of the settlement pursuant to Section 363(b) of the Bankruptcy Code, Rule 9019 of the Federal Rules of Bankruptcy Procedure, and Section 8.1(c) of Kroll's chapter 11 plan. After a hearing on January 7, 2016, Judge Silverstein of the Bankruptcy Court found that the settlement was reasonable and entered the order approving the settlement, attached as Exhibit 2 to the Appendix.[6] That order is now final and not appealable.

36. Although Movants believe they would ultimately prevail on both liability and damages if this case were to be fully litigated, success is not assured and would likely only be possible after years of litigation. The settlement payment represents a significant recovery, while avoiding the burden, costs, delay, and risks associated with contested litigation and the risk of collection from a bankrupt entity.

37. In considering the settlement, Movants also analyzed the risks associated with

---

[6] As required by the Bankruptcy Court approval order and agreed to in the Settlement Agreement, the $24 million settlement payment must be funded entirely by an indemnitor of Kroll or insurance and not by Kroll, any of the other debtors in the chapter 11 case or the general unsecured claims pool under Kroll's chapter 11 plan.

their ability to collect on any judgment they might eventually obtain against Kroll. Kroll has two relevant insurance policies that provide $30 million in total coverage. One, a professional liability (or errors and omissions) policy with AIG, has policy limits of $15 million. The other, an excess liability policy with ACE American Insurance Company, also has policy limits of $15 million. Both policies are depleting or "wasting" policies, under which defense costs reduce the coverage amount. In other words, if Kroll spends $3 million on eligible defense costs, the amount available to pay claimants under the policies would be reduced by $3 million. In fact, Movants believe that with the settlement they will be recovering *all* or substantially all of the insurance funds remaining available on the policies. Approving the settlement would avoid risking that Kroll would substantially deplete the insurance proceeds in vigorously defending litigation.

38.     Furthermore, during the lengthy negotiations that led to the settlement, Kroll and its parent company Altegrity, Inc. provided to the Movants certain materials reflecting their consolidated financial condition. These financial materials reflected that Kroll Associates – the entity which provided the services on Stanford-related matters – had very limited assets. Even if Movants were able to overcome Kroll's veil piercing defenses, the financial materials also reflected that Kroll's parent company was highly-leveraged with structured debt and had its credit rating downgraded significantly.

39.     Consistent with that grim financial picture, Kroll and its parent company ultimately filed for chapter 11 bankruptcy protection, further complicating any effort to litigate and recover a judgment against Kroll.

40.     Kroll and Altegrity, Inc. commenced their case under the Bankruptcy Code on February 8, 2015. Petition, Doc. No. 1, *In re Altegrity, Inc.* On April 30, 2015, the Receiver and

15

OSIC filed a proof of claim in the chapter 11 case.  Claim No. 1283, *In re Altegrity, Inc.*  On August 14, 2015, the Bankruptcy Court confirmed the chapter 11 plan of Kroll and Altegrity, Inc., and on August 31, 2015, the chapter 11 plan became effective.  Confirmation Order, Doc. No. 835, *In re Altegrity, Inc.*; Notice, Doc. No. 903, *In re Altegrity, Inc.*  The chapter 11 plan provides, among other things, that claims against Kroll that arose before February 8, 2015 are discharged and subject to resolution and payment solely pursuant to the chapter 11 plan.  *See* Amended Joint Chapter 11 Plan of Altegrity, Inc., et al., Doc. 835-2, *In re Altegrity, Inc.* (Aug. 14, 2015), art. VII.  Persons who did not timely file a proof of claim in the chapter 11 case are barred from receiving any distribution from Kroll on account of their claims.  *See* Bar Date Order, Doc. No. 238, *In re Altegrity, Inc.*

41.     Thus Movants' decision to settle with Kroll proved to be auspicious.  If Movants had filed claims against Kroll in 2013, Kroll's insurance policies could have been significantly eroded by defense costs by the time Kroll filed for chapter 11 in February 2015, and any such litigation would eventually have been stayed when Kroll filed for chapter 11 relief, leaving an uncertain result for Movants and the Stanford creditors.  Thus in evaluating the claims against Kroll, and their potential outcomes, against Kroll's financial condition, the Movants had to make, and did make, realistic assessments of all factors weighing in favor of settlement versus extended litigation.  Based on their review of Kroll's financial information and the chapter 11 case, Movants believe that the settlement is fair and reasonable.

### *The Risk that Litigation Would Dissipate Receivership Assets*

42.     Kroll would undoubtedly vigorously defend itself in litigation.  Movants believe that litigation against Kroll would most likely go on for years, with no guarantee of a recovery.  Obviously the risks to recovery were compounded by Kroll's chapter 11 case.

43.     Movants have entered into a contingent fee arrangement with the litigation counsel responsible for investigating and pursuing claims against Kroll, and therefore Movants would avoid attorneys' fees that the Estate would otherwise incur paying counsel by the hour in protracted litigation.  As part of their fee agreement with their counsel, however, Movants have agreed that the Receiver would fund all expenses associated with litigation against Kroll, including, *inter alia*, expert fees and expenses, which in a case such as this one would likely be quite substantial.  The Receiver therefore would incur substantial fees and expenses to litigate claims against Kroll, costs which would come out of the Receivership Estate.

### *The Complexity and Costs of Future Litigation*

44.     As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex.  Based on their experience with other cases filed against third parties who are alleged to have facilitated Stanford's fraud, Movants believe that any litigation with Kroll would require years to complete, including through the appellate courts.  Given the insurance resources available to Kroll and the potential impact of an adverse judgment, Movants believe that a vigorous defense would be mounted.

### *The Implications of Kroll's Settlement Payment on Other Claimants*

45.     As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'"  *Kaleta*, 530 F. App'x at 362.  The Receiver is not collecting Kroll's settlement payment for Allen Stanford or his own account, but for the Stanford creditors.  *See supra* ¶ 24.  The relief Movants request is to further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities."  *SEC v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *6 (D.S.C. Feb. 10, 2010) (Norton, C.J.)

(approving settlement and bar order), *modified in part*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010).

### *The Value and Merits of Any Foreclosed Parties' Potential Claims*

46.     Movants are conscious of the fact that the Bar Order they are requesting, and which is a condition to settlement, will preclude Stanford's investor-creditors and others from asserting claims against Kroll in the future.   Movants believe that the Bar Order should nevertheless be approved.   Any potential individual claims would face the defenses, risks, uncertainties, and expense considered by Movants in reaching the proposed settlement, as well as the even larger impediment of Kroll's chapter 11 case.   Further, collectively resolving Kroll's liability for its involvement with Stanford is the only way to ensure that Kroll's limited available assets are distributed in a fair and thoughtful manner.   Movants believe that the settlement is in the collective best interest of all Stanford investor-creditors and should be approved. *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").

47.     In addition, the Receiver has standing to pursue claims based on the Estate's business and contractual relationship with Kroll and based on negligence.   No individual investor-litigant has that standing.

48.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit as many aggrieved investors as stand to be benefited under the Settlement Agreement." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

49.     It also is unlikely that any potential claimant could or would spend the time and

resources necessary to pursue such a claim against Kroll, especially considering the passage of time since the events in question, the expense of such an action and Kroll's present financial circumstances.  Movants believe that enjoining these individual claims is, on balance, fair and appropriate to all interested parties, especially when necessary to gain an immediate and substantial recovery for the Estate.

50.     The proposed settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses associated with litigation by individual investors.

### *Other Equities Attendant to the Situation*

51.     Against this backdrop, the Court should approve the settlement and enter the Bar Order.

52.     Approval of the Settlement Agreement and entry of the Bar Order are material terms under the Settlement Agreement, and a necessary condition to the effectiveness of the Settlement Agreement.  The bottom line is that there is no settlement without approval of the Settlement Agreement and entry of the Bar Order.  Kroll "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [Kroll], potentially in other, including foreign, jurisdictions."  *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

53.     Kroll has made clear that in consideration of the $24 million cash payment, it must achieve "global peace" with respect to all Stanford-related claims through this settlement, wholly and finally.  Kroll has stated that it would not enter into the settlement without securing global peace and the avoidance of the expense of further litigation, particularly given what it believes are its strong factual and legal defenses.  The Movants were appointed to protect the

interests of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants. The proposed Bar Order will help maximize the eventual distribution to Estate claimants through the $24 million payment and provide Kroll the global resolution of Stanford-related litigation that is a necessary condition for the settlement payment by Kroll. Movants believe that the entry of the Bar Order is fully justified by the Settlement Amount.

54.     This Court has already enjoined actions against the Stanford Defendants, the Receiver, and the Receivership Estate, ordering that "all . . . persons are hereby restrained and enjoined from" without leave:

> . . . commenc[ing] or continu[ing] . . . any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action . . . .

Second Order ¶ 9(a). The Court has also enjoined and barred all claims against the settling defendants and related parties pursuant to the settlements in the BDO lawsuit and the Adams & Reese lawsuit. Doc. Nos. 2230, 2248. Movants ask the Court to similarly enjoin and bar all claims and potential claims against Kroll, and to do so permanently, in order to effectuate the present settlement.

55.     Movants and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford creditors. The Movants firmly believe that they could prosecute viable causes of action against Kroll, though Kroll vigorously denies any wrongdoing or liability, and has indicated that it firmly believes it would successfully defend any claims against it.

56.     The Movants believe that the terms of the Settlement Agreement are fair and

20

reasonable and in the best interests of the Receivership Estate.

57.     The equities of this settlement, including its necessary bar order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims. The Receiver, OSIC, and Antiguan Liquidators have cooperated to join together in this settlement. The Examiner endorses this settlement and bar order structure. This level of coordination and quality of resolution are eminently desirable. The equitable mandates and/or fiduciary duties of each of the foregoing specially constituted parties enhance the equities attending this outstanding conclusion of arms-length negotiation.

58.     The Court is well within its discretion to approve this settlement. In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities laws and defrauding investors. *Kaleta*, 2012 WL 401069, at *1. The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id*. The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership. The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed. *Kaleta*, 530 F. App'x at 362-63.

59.     In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the receivership estate. *Kaleta*, 2012 WL 401069, at *7. "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id*.

60.     In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties. *SEC v.*

*Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. April 16, 2014).  The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities."  *Id.* at *2.[7]

61.     In *Harmelin,* the district court approved a bar order in a receivership case involving foreign investors and foreign joint liquidators.  2007 WL 4571021, at *1.  The receiver in *Harmelin* settled with a third party alleged to have aided an international financial scheme involving fraud and violations of federal securities laws.[8]  Like this case, *Harmelin* involved both receivership assets and investors located outside of the U.S.[9]

### CONCLUSION

62.     This settlement represents a substantial and important recovery for the Estate and the Stanford investors.  The large amount of the recovery, the time and costs involved in pursuing litigation against Kroll, the uncertain prospects for obtaining and then recovering a judgment against Kroll – all of these factors weigh in favor of approving this settlement and entering the Bar Order.

---

[7]     The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party.  *See SEC v. Temme*, No. 4:11–cv–655, [Doc. 162] (E.D. Tex. November 21, 2012).

[8]     Second Amended Complaint at 2, *Harmelin v. Man Financial Inc.*, No. 06–CV–1944 (MMB) (E.D. Pa. July 6, 2007).

[9]     In *Harmelin*, Joint Official Liquidators were appointed by the Grand Court of the Cayman Islands.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Movants respectfully request this Court:

      a.   Enter the proposed Scheduling Order;

      b.   Grant this Motion;

      c.   Approve the Settlement Agreement;

      d.   Enter the Bar Order and Judgment; and

      e.   Grant the Movants all other relief to which they are entitled.

Date:   March 7, 2016

Respectfully submitted:

**DAVIS & SANTOS, P.C.**

By:   */s/ Jason Davis*
        Jason Davis
        jdavis@dslawppc.com
        State Bar No. 00793592
        Mark Murphy
        mmurphy@dslawpc.com
        State Bar No. 24002667
        112 E. Pecan, Suite 900
        San Antonio, Texas  78205
        (210) 853-5882
        (210) 200-8395 (Facsimile)

***SPECIAL COUNSEL TO RECEIVER
RALPH JANVEY***

**CASTILLO SNYDER, P.C.**

By:  */s/ Edward C. Snyder*

Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
300 Convent Street, Suite 1020
San Antonio, Texas  78205
(210) 630-4200
(210) 630-4210 (Facsimile)

*COUNSEL FOR THE OFFICIAL STANFORD
INVESTORS COMMITTEE*

**STRASBURGER & PRICE, LLP**

Judith R. Blakeway
judith.blakeway@strasburger.com
2301 Broadway Street
San Antonio, Texas 78215
(210) 250-6000
(210) 250-6100 (Facsimile)

**BUTZEL LONG, P.C.**

Peter D. Morgenstern
(*admitted pro hac vice*)
morgenstern@butzel.com
380 Madison Avenue
New York, New York 10017
(212) 818-1110
(212) 818-0494 (Facsimile)

**NELIGAN FOLEY, LLP**

Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
(214) 840-5320
(214) 840-5301 (Facsimile)

*COMMITTEE COUNSEL*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all counsel of record via the Court's ECF System on March 7, 2016.

*/s/ Mark Murphy*
Mark Murphy
