IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff | § § | |
| v. | § | Cause No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § | |
| Defendants. | § § | |

## APPLICATION FOR PAYMENT OF ATTORNEYS' FEES FROM KROLL SETTLEMENT

TO THE HONORABLE COURT:

Receiver Ralph S. Janvey (the "Receiver") and the Official Stanford Investors Committee ("OSIC") (collectively, "Movants") file this Application for Payment of Attorneys' Fees from Kroll Settlement (the "Application") and respectfully request that the Court approve the payment of attorneys' fees from the settlement of claims against Kroll, LLC (f/k/a Kroll Inc.) and Kroll Associates, Inc. (collectively, "Kroll") pursuant to the contingent fee agreements in place between the Receiver, OSIC and the law firms they retained to investigate and prosecute claims against Kroll, and, in support, would respectfully show:

## I.     REQUEST FOR APPROVAL OF ATTORNEYS'  FEES

1.     Contemporaneously with this filing, the Receiver and the OSIC filed a Motion for Order Approving Proposed Settlement with Kroll and for Ancillary Orders (the "Motion"), which seeks the Court's approval of a settlement with Kroll in consideration of Kroll's payment to the Receivership Estate of $24 million (the "Settlement Payment").

2.      In addition to seeking the approval of the Kroll settlement, the Receiver and OSIC also request that the Court approve an award of attorneys' fees to: (1) Davis & Santos, P.C. ("D&S");[1] (2) Castillo Snyder, P.C. ("CS"); (3) Strasburger & Price, LLP ("S&P"); (4) Neligan Foley LLP ("NF"); and (5) Butzel Long LLP ("BL") (collectively, the "Attorneys"), pursuant to the terms of the fee agreements between OSIC and the Attorneys.

In support of this Application, Movants attach an Appendix with the following Exhibits:

**Exhibit 1**:      Declaration of Mark Murphy;

**Exhibit 2**:      Declaration of Edward Snyder;

**Exhibit 3**:      Declaration of Edward Valdespino;

**Exhibit 4**:      Declaration of Peter Morgenstern;

**Exhibit 5**:      Declaration of Douglas J. Buncher; and

**Exhibit 6**:      Declaration of John J. Little.

### A.      *Terms of the Attorneys' Engagement*

3.      The Receiver and OSIC retained their respective Attorneys on a contingent fee basis to investigate and prosecute claims against Kroll (the "Fee Agreement"). *See* Ex. 1.  The firms CS, S&P, NF and BL have worked on the Stanford case and related third party litigation since its inception in 2009,[2] including the appeal of the SLUSA decision to the Fifth Circuit and the U.S. Supreme Court.   *See* Declarations of Edward Snyder, Edward Valdespino, Peter Morgenstern, Douglas J. Buncher, and John Little, attached to the Appendix as Exhibits 2-6. D&S was hired in late 2011 specifically to be lead litigation counsel on the Kroll matter.  *See* Ex.

---

[1]      The fee agreement identifies this firm by its former name, The Davis Group, Attorneys & Counselors, P.C.

[2]      These four firms are currently handling the vast majority of the Stanford-related third party litigation before this Court, including the following cases:  *OSIC et al. v. Willis of Colorado, Inc. et al.*; *OSIC v. Greenberg Traurig, LLP et al.*; *Janvey v. Proskauer Rose, LLP et al.*; *OSIC v. Antigua and Barbuba*; *OSIC v. Bank of Antigua et al.*; *OSIC v. BDO USA, LLP, BDO International, Ltd., BDO Global Coordination, B.V., and Brussels Worldwide Services BVBA*; and *Turk v. Pershing.*

1.

4.     Pursuant to the Fee Agreement, and for the reasons set forth below, OSIC and the Receiver seek Court approval to pay attorneys' fees to the Attorneys equal to an aggregate of 25% of the Net Recovery from the Settlement Payment (the "Fee Award").

5.      Movants seek Court approval to pay the Attorneys a fee equal to an aggregate of 25 percent of the Net Recovery of the Kroll settlement. The Net Recovery is the gross recovery minus reimbursed expenses. The Receiver has reimbursed or will reimburse a total of $22,947 to the Attorneys, so the Net Recovery is $23,977,053. This means the requested Fee Award is $5,994,263. *See* Exs. 1-3.

### B.     *The Fee Award as a Percentage of the Kroll Settlement is Reasonable*

6.     While trial courts can use various methods when determining attorneys' fee awards in common fund cases,[3] the Fifth Circuit has stated a preference for the percentage method. *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012). The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable." *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). Thus, when considering fee awards in the class action context, "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check." *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K, 2005 WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[4]

---

[3]     The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr. S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[4]     While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District have recognized that the percentage method is the preferred method

7.      In another Stanford litigation settlement, this Court analyzed the pertinent fee requests under both the common fund and *Johnson* approaches. *Id.* at 3. *See The Official Stanford Investors Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG, [Doc. 80] (N.D. Tex. Sep. 23, 2015) (approving a 25% contingency fee on a $40 million settlement).

8.      While the Kroll settlement is not technically a class action settlement, it is appropriate to analyze the award of attorneys' fees to the Attorneys under the law applicable to class action settlements.  As explained below, irrespective of whether the attorneys' fees analysis is conducted under the common fund approach or utilizing the *Johnson* framework, the requested Fee Award sought by the Receiver and OSIC is reasonable and should be approved.

## C.      The Fee Award is Reasonable Under the Johnson Framework

9.      Under the common fund approach, the proposed 25% amount is a reasonable percentage of the common fund (i.e. the $24 million settlement).  The "vast majority of Texas federal courts and courts in this District have awarded fees of 25%–33% in securities class actions." *Schwartz*, 2005 WL 3148350, at *31.  In fact, "courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the-recovery method."[5]  Here, the 25% Fee Award is within the range, and in fact, at the lower end

---

of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25. In *Schwartz*, the court found that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25. The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case. *Id.* Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery." *Id.* at *26.

[5]      *Id.* As set forth in *Schwartz*, courts in the Northern District have routinely approved such awards. *See, e.g, Southland Secs. Corp. v. INSpire Ins. Solutions, Inc*., No. 4:00–CV–355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% fee in securities class action); *Scheiner v. i2 Techs., Inc., et al.*, Civil Action No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc. et al*., Civil Action No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig*., Master File No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc., et al*., Civil Action No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI, et al*., No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in

4

of the range of fee awards routinely recognized and approved.

       **D.**     *The Fee Award is Reasonable Under the Johnson Framework*

      10.     The *Johnson* analysis set forth below also further confirms that the Fee Award is reasonable and appropriate.  The *Johnson* factors consider:

      (1)     the time and labor required;

      (2)     the novelty and difficulty of the questions;

      (3)     the skill requisite to perform the legal service properly;

      (4)     the preclusion of other employment by the attorney due to acceptance of the case;

      (5)     the customary fee;

      (6)     whether the fee is fixed or contingent;

      (7)     time limitations imposed by the client or the circumstances;

      (8)     the amount involved and the results obtained;

      (9)     the experience, reputation, and ability of the attorneys;

      (10)     the "undesirability" of the case;

      (11)     the nature and length of the professional relationship with the client; and

      (12)     awards in similar cases.

*Johnson*, 488 F.2d at 717–19.

      11.     "[O]f all the *Johnson* factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the results obtained, and the experience, reputation and ability of counsel."  *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006).  The Fifth Circuit generally reviews the award of attorneys' fees under an abuse of discretion standard and determines "whether 'the record clearly indicates that

securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig.*, No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc.*, No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.'" *Dell,* 669 F.3d at 642 (internal citations omitted).

12.     Here, the *Johnson* factors support the requested Fee Award.

     *1)     The time and labor required.*

13.     The Attorneys have spent a tremendous amount of time and labor on this case. Over the past five years, the Attorneys collectively spent 3,566 hours performing the following types of tasks: (1) investigating the Stanford fraud; (2) researching, investigating, and discovering claims against Kroll; and (3) researching and establishing viable theories of liability and damages against Kroll; (4) negotiating the Kroll settlement, including extensive negotiation of the written documents memorializing the settlement, and (5) addressing issues arising from Kroll's bankruptcy and its effects on the settlement, including revising the settlement documents to address the same.  The Attorneys' invoices are attached to each of their declarations.

14.     Specifically, as part of the investigation of the claims, the Attorneys spent substantial time and energy investigating Stanford's business operations and relationships with Kroll, which involved the review of hundreds of thousands documents and thousands of hours trying to decipher and understand the Stanford web of fraud, and in particular its transactions and relationship with Kroll.  The documents reviewed included documents from the Receivership Estate (which required weeks of review at the Receiver's document warehouse in Houston), documents obtained from various law firms, and documents eventually produced by Kroll pursuant to a Court order (which the Attorneys successfully fought for) on a rolling basis, beginning in late 2011 and continued throughout 2012 and into early 2013.

15.     The Attorneys also spent substantial time working with private investigators,

interviewing witnesses across the globe, and working with and coordinating efforts with the Receiver, Examiner, SEC and Department of Justice.

16.     The Attorneys also spent thousands of additional hours investigating and understanding the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship and dealings between and among the various Stanford entities, and the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities.  The Attorneys' comprehensive investigation and understanding of this background was invaluable and assisted with the formulation of claims against Kroll and the successful negotiation and settlement of such claims.

17.     As information was revealed during the investigation, the Attorneys spent substantial hours researching relevant case law to determine how the facts surrounding Kroll's involvement could support claims against Kroll.  The Attorneys conducted a thorough analysis of the potential claims against Kroll, considering: claims available under both state and federal law; the viability of those claims considering the facts underlying Kroll's business dealings with Stanford and this Court's previous rulings; the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere; as well as the defenses Kroll would have asserted (and did assert in settlement negotiations).  The attorneys also evaluated and developed which claims belonged to the Stanford investors, as well as claims those that could be asserted by the Receiver and OSIC.  The investigation of claims further required formulation of viable damage models and causation theories for both the Receivership Estate claims and the Stanford investor claims.

18.     As a result of their prolonged and thorough investigation, the Attorneys worked extensively on a lengthy draft complaint against Kroll alleging causes of action for: (1) breach of

contract; (2) negligence/gross negligence; (3) participatory liability including aiding and abetting breaches of fiduciary duties; (4) participatory liability, including aiding and abetting a fraudulent scheme; (5) fraudulent transfer/unjust enrichment; (6) participatory liability, including aiding and abetting fraudulent transfers; (7) participatory liability, including aiding and abetting conversion; (8) negligent retention/supervision; (9) civil conspiracy; (10) participatory liability, including aiding and abetting violations of the Texas Securities Act; and (11) tortious interference with a contract. While the complaint was not filed, the argument and substance of the draft complaint paved the way to settlement discussions and negotiations with Kroll.

19. After negotiating and entering into several tolling agreements with Kroll, the Attorneys spent hundreds of hours discussing the claims that they had developed with Kroll's attorneys and then negotiating a settlement with Kroll. Preliminary settlement negotiations began with Kroll in 2012, while the Attorneys continued to investigate and refine the claims against Kroll. As part of the settlement negotiations in 2012, Kroll provided additional confidential financial information which reflected the precarious financial condition of Kroll and its parent company, Altegrity, Inc. (now known as Corporate Risk Holdings, LLC) at that time. The Attorneys retained and worked with an experienced accountant to assist in analyzing Kroll and Altegity's financial condition in order to evaluate the collectability of any potential judgment.

20. The Attorneys also obtained and spent a considerable amount of time reviewing Kroll's applicable insurance policies. These two policies are depleting or "wasting" policies, under which defense costs reduce the amount of coverage. The total maximum amount of coverage was $30 million, which amount had, by 2013, already been depleted by defense costs related to Stanford.

21.     Eventually, the Attorneys agreed with Kroll to hold a two-day mediation in New York in May 2013 before the Hon. Judge E. Leo Milonas, a former Chief Administrative Judge of the State of New York, Justice of the Appellate Division of the New York Supreme Court, and President of the Association of the Bar of the City of New York.  At the end of the second day of mediation, the Attorneys were able to reach an agreement in principle with Kroll to settle all claims against Kroll for $24 million, conditioned on Kroll being able to secure funding for the settlement and final documentation of the settlement agreement.

22.     Kroll subsequently held a separate mediation with its insurance carriers and, several months later in September 2013, Kroll's counsel reported that Kroll was ready to proceed with the drafting of formal settlement documents.  At that time, the Attorneys began to structure and finalize this complicated settlement, ultimately interrupted by Kroll's bankruptcy filing.  The preparation of settlement documents in this case has been a challenge that has spanned years and hundreds of hours of negotiation, drafting, and re-drafting.   Because this was the first significant settlement of a Stanford-related third party case,[6] and because Kroll demanded a global release from all Stanford-related liability, the Attorneys spent months researching authorities, negotiating the structure of the settlement, and consulting with foreign law experts. Eventually, the parties negotiated and agreed on a Receiver Bar Order structure.  The majority of 2014 was then spent negotiating, revising, and re-drafting the settlement documents, which went through literally dozens of iterations.  The Bar Order structure adopted for the Kroll settlement eventually became the structure utilized for the subsequent settlement with BDO Seidman.  The Attorneys' efforts in researching and crafting the Bar Order settlement structure provided

---

[6]     While settlements in other cases were considered and approved by this Court before the Kroll settlement, such as BDO Seidman, and Adams and Reese, the Kroll settlement was negotiated and structured first and became the model for the others. Kroll's bankruptcy substantially delayed the timing of bringing the Kroll settlement to the Court's attention.

additional value for the other Stanford cases.

23.     Further, the settlement process was not without pitfalls and time-consuming delays.  Negotiations broke down on approximately a half dozen occasions, prompting the Attorneys to return to the drafting and preparation of the complaint to be filed against Kroll.  But by the end of 2014, the parties had worked through the settlement structure and were close to being ready to sign the settlement documents.

24.     Then the Attorneys received news in early 2015 that Kroll and its parent company Altegrity had filed for bankruptcy in Delaware.  This news changed the dynamics of the settlement process and threatened the entire agreement.  Through continued hard work, research, and contemplated filings within the Kroll bankruptcy, the Attorneys were able to salvage the settlement.  Nevertheless, this new development resulted in another year of negotiations and revisions to documents and the added hurdle of seeking approval of the settlement by the Bankruptcy Court.

25.     Overall, the Attorneys collectively spent three years and thousands of hours investigating and preparing the basis for claims against Kroll on behalf of the Stanford Receivership Estate and the Stanford investors prior to reaching the mediated settlement in May 2013.   The Attorneys then spent an additional two and a half years and thousands of hours of attorney time negotiating, salvaging and documenting the structure of the settlement and steering this settlement through a bankruptcy process in order to present the $24 million settlement to this Court, including a two-day mediation in New York.  The settlement negotiations were complex and lengthy, requiring over two years to negotiate and resolve all the details.

26.      The total fees the Attorneys would have billed on an hourly rate would have exceeded $1.8 million.  D&S specifically spent over 1,900 hours on the Kroll matter; CS over

1,000; S&P over 330; NF nearly 150; and BL 117.   Those firms' time records are reflected in the Declarations of Mark Murphy (D&S), Edward Snyder (CS), Edward Valdespino (S&P), Doug Buncher (BL), and Peter Morgenstern (NF), which are attached hereto as Exhibits 1-5 and incorporated by reference.

27.     The attorney declarations demonstrate substantial work performed in this matter and support the Fee Award.  Moreover, the Kroll settlement cannot be viewed in a vacuum, and the underlying work on other Stanford litigation unquestionably also promoted the successful resolution of this matter.   With the exception of D&S, who was hired in October 2011 as special lead litigation counsel for the Kroll matter, the other Attorneys have been actively involved in investigating and prosecuting litigation against third parties accused of aiding or assisting Stanford since the inception of the Stanford case in 2009.  Given the inherent overlap of factual and legal issues in third party litigation arising from the Stanford fraud, the substantial amounts of work performed by the four firms in related Stanford litigation since 2009 laid the groundwork for the successful investigation, prosecution, and ultimate resolution of the claims against Kroll in this matter.[7]

28.     In light of the substantial amount of time and labor spent on the Kroll matter, and the other Stanford cases, which promoted a successful resolution in this case, the time and labor

---

[7]     For example, since 2009, the Attorneys have been involved in prosecuting class action lawsuits against third parties on behalf of Stanford investors, as well as companion litigation on behalf of OSIC, including the following cases: *Troice v. Willis of Colorado et al*, Case No. 3:09-cv-01274; *Janvey v. Willis of Colorado, Inc.*, Case No. 3:13-cv-03980; *Troice v. Proskauer Rose et al*., Case No. 3:09-cv-01600; *Janvey v. Proskauer Rose, LLP*, Case No. 3:13-cv-477; *Janvey v. Greenberg Traurig, LLP*, Case No. 3:12-cv-04641; *Philip Wilkinson, et al v. BDO USA, LLP, et al*, Case No. 3:11-cv-1115; *The Official Stanford Investors Committee v. BDO USA, LLP, et al*, Case No. 3:12-cv-01447; *Turk v. Pershing, LLC*, Case No. 3:09-cv-02199; *Wilkinson, et al. v. Breazeale, Sachse, & Wilson, LLP*, Case No. 3:11-cv-00329; and *Janvey v. Adams & Reese, LLP, et al*., Case No. 3:12-cv-00495 (collectively, the "Stanford Cases").

Similarly, the Attorneys' familiarity with and involvement in the successful appeal of the dismissal of the related *Troice* class action cases under SLUSA to the Fifth Circuit and the U.S. Supreme Court ("SLUSA Appeal") also aided in the settlement negotiations with Kroll.  Indeed, the successful settlement with Kroll was based in part and influenced by the successful prosecution of the other Stanford Cases.

included amply support the Fee Award of 25% of the Settlement Payment.

(2)     *The novelty and difficulty of the questions.*

29.     The second *Johnson* factor looks to the novelty and difficulty of the questions and also supports the Fee Award in this case.  This Court and others have noted the complexity of unraveling Stanford's convoluted and far-flung enterprises.  *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009) (describing the Stanford operations as a "multi-billion-dollar Ponzi scheme perpetrated by the Stanford companies[,] a network of some 130 entities in 14 countries[.]").  Investigating, researching, and unraveling Kroll's role in the scheme added to the complexity of an already intricate and convoluted scheme.

30.     Kroll Associates is a professional services firm that provided outside consulting services to certain Stanford entities and persons, between 1996 and 2009.  During the pre-suit negotiations with Kroll, Kroll produced documents evidencing that Kroll Inc. is a holding company, which owns Kroll Associates, but does not itself provide any services.  Based on the massive investigation of Stanford's business operations, Movants and the Attorneys discovered that Kroll Associates worked on Stanford matters over many years, including from time to time with law firms hired by Stanford that are currently defendants in pending litigation.[8]

31.     The Attorneys' and Movants' ongoing investigation of Stanford led to the Receiver serving a subpoena on Kroll on November 30, 2011 for documents related to its business relationship with Stanford.  Kroll's rolling production began in late 2011, and Kroll eventually produced over 23,000 pages of documents that were thoroughly reviewed and evaluated by the Attorneys.  This production supplemented the voluminous documents and information concerning Stanford already possessed by the Receiver and reviewed, with specific

---

[8]     OSIC's investigation of the law firm eventually led to the filing of a 165-page complaint against those law firms in November 2012.  *See* Civ. Action No. 3:12-cv-04641, *Janvey, et al. v. Greenberg Traurig, LLP*, Doc. 1.

reference to Kroll, by the Attorneys.

32.     The Attorneys' and Movants' thorough analysis of the documents and other data received during the investigation allowed the Attorneys to identify several potential claims against Kroll, considering:

>    a.   claims available under both state and federal law;
>
>    b.   the viability of those claims considering the facts underlying Kroll's business dealings with Stanford and this Court's previous rulings; and
>
>    c.   the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

33.     This effort accelerated in early 2011 after the Attorneys gained access to records produced to the Receiver by Greenberg Traurig ("Greenberg") and Hunton & Williams ("Hunton").  Those firms had acted as Stanford's primary outside counsel since the late 1980s and had enlisted Kroll in to assist in providing services to Stanford in the 1990s.  The Attorneys' review of the massive quantity of Greenberg and Hunton records provided more detail of Kroll's involvement with Stanford.  The Attorneys also conducted various interviews of Stanford witnesses in 2010 and 2011 during the course of their investigation.

34.     The Attorneys' investigation also revealed that Kroll also served on the commission that Allen Stanford created in Antigua to help him re-write Antiguan banking laws. Kroll personnel also assisted Stanford by investigating and attacking Stanford's opponents and anyone that criticized Stanford, including U.S. and foreign government officials.  Finally, Kroll endorsed and vouched for Stanford on repeated occasions, including with foreign governments and even investors.

35.     Had a complaint been filed, the claims against Kroll would have included claims by the Receivership Estate and claims by the Stanford investors, which would have included among others, the following:

| Category | Claim |
|---|---|
| Estate Claims | Negligence |
| | Aiding and Abetting Breach of Fiduciary Duty |
| | Breach of Contract |
| | Fraudulent Transfer / Unjust Enrichment |
| | Negligent Retention / Negligent Supervision |
| Class Claims | Aiding and Abetting Violations of the TSA |
| | Aiding and Abetting / Participating in Breach of Fiduciary Duty |
| | Aiding and Abetting / Participating in a Fraudulent Scheme |
| | Civil Conspiracy |

These claims were not straight-forward in light of the complex and convoluted facts surrounding the Stanford operation and its relationship with Kroll. The development of a damages model was equally as challenging.

36.     Further, there have been difficult questions raised at every stage of the settlement process. As described above, the Attorneys learned that Kroll and its parent company, Altegrity, were in a precarious financial condition. This caused the Attorneys to have to retain and work with an experienced accountant to assist in analyzing Kroll and Altegity's financial condition in order to evaluate the collectability of any potential judgment. The Attorneys also had to review difficult question regarding Kroll's applicable insurance policies, and the effect of continued litigation on the depleting policy. The Attorneys thoroughly reviewed Kroll's intricate financials, the depleting insurance policies, and scenarios that could have led to diminished returns and/or the potential collectability of a judgment

37.     Once a settlement was reached in principal, the preparation of settlement documents in this case has been complex and extremely challenging. As described above, because this was the first significant settlement of a Stanford-related third party case, there were difficult questions that the Attorneys had to resolve and work through, including the structure of the settlement, the scope of the releases, the interplay of foreign law with the settlement and the settlement obligations, and the structure of the Bar Order.

38.     Finally, Kroll's bankruptcy added an unforeseen layer of complexity to the settlement.   The Attorneys had to research how to salvage the settlement within the bankruptcy and were ultimately successful in doing so.

39.     Overall, investigating and unraveling Kroll's relationship with and transactions with Stanford was complicated, and required the Attorneys to evaluating difficult issues in order to support the claims against Kroll on behalf of the Stanford Receivership Estate and the Stanford investors prior to reaching the mediated settlement in May 2013.   The Attorneys then spent an additional two and a half years and thousands of hours of attorney time negotiating, salvaging and documenting a very complex structure of the settlement and steering this settlement through a bankruptcy process in order to present the $24 million settlement to this Court.

*(3)     The requisite skill to perform the legal service properly.*

40.     "The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson*, 488 F.2d at 718.   Investigating claims against Kroll and arriving at a favorable settlement involved extensive expertise in the area of fraud investigations, securities law, international law, complex business law, and bankruptcy law.

41.     Given the complexity of the factual and legal issues presented with Kroll's involvement in the Stanford Ponzi scheme, all steps in this matter have required significant skill and effort on the part of the Attorneys, including (1) the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship and dealings between and among the various Stanford entities, and the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities, (2) the investigation of the Stanford

operation and its relationship with Kroll, (3) the review of complex financial and foreign documents, (4) the investigation and interview of witnesses around the globe, (5) the evaluation and development of claims and viable damage models for the Receivership Estate and the Stanford investors against Kroll, (6) the negotiations with Kroll and Kroll's insurance carriers, (7) the work and navigation through Kroll's bankruptcy, and (8) the development and memorialization of the settlement

42.     The fact that the Attorneys were able to successfully reach a resolution of such a large and complex matter, even after Kroll's bankruptcy, evidences the Attorney's requisite skills to satisfy the *Johnson* factor concerning whether the lawyers demonstrate the requisite skill to properly carry out the representation.  The legal skill needed to master these inherently difficult subjects coupled with the favorable settlement weighs in favor of approval of the Fee Award.

> (4)     *The preclusion of other employment by the attorney due to acceptance of the case.*

43.     This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes."  *Johnson*, 488 F.2d at 718.

44.     As evidenced by the Attorneys' time sheets attached to Exhibits 1-3 and 5, the Attorneys have spent a considerable amount of time in this matter.  The thousands of hours spent on this matter over several years have precluded other opportunities for the Attorneys, and the amount of time and resources involved in investigating and evaluating the claims, presenting and discussing the claims with Kroll, preparing the complaint, and negotiating the settlement significantly reduced the Attorneys' ability to devote time and effort to other matters.

16

*(5) The customary fee.*

45.     With respect to common fund cases, trial courts commonly award fees between 25% and 33% of recoveries. *Schwartz*, 2005 WL 3148350, at *31 (collecting cases). "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund." *Klein*, 705 F. Supp. 2d at 675 (citing *Manual for Complex Litigation (Fourth)* § 14.121 (2010)); *see, e.g.*, *SEC v. Temme*, No.4:11-cv-00655-ALM, [Doc. 162] at *4–5 (E.D. Tex. November 21, 2012) (25% contingent fee for a $1,335,000 receivership settlement); *Billitteri v. Securities America, Inc.*, No. 3:09–cv–01568–F (lead case), 2011 WL 3585983, *4–9 (N.D. Tex. 2011) (25% fee for a $80 million settlement); *Klein*, 705 F. Supp. 2d at 675–81 (30% fee for a $110 million settlement).

46.     This matter and the other third-party lawsuits are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery and dispositive motions to get to trial. The lawsuits involve significant financial outlay and risk by the Attorneys, the risk of loss at trial after years of work for no compensation, and an almost certain appeal following any victory at trial. The Attorneys submit that these factors warrant a contingency fee of more than 25%. Nonetheless, the Attorneys agreed to handle this matter on a 25% contingency basis, and that percentage is reasonable given the time and effort required to litigate these cases, their complexity and the risks involved.

47.     As stated in the Motion, the Movants seek Court approval to pay the Attorneys a fee equal to twenty-five percent (25%) of the Net Recovery (i.e., the Settlement Payment less allowable disbursements) in the Kroll Settlement.  This is the fee agreed to be paid to the Attorneys by the Receiver, OSIC and the Investor plaintiffs, and this is the amount of the fee for

17

which approval is sought in the Motion, and in this Application.

48.     The requested Fee Award falls on the lower end of the customary fee charged by law firms to handle matters of this complexity and magnitude.   This factor supports the Fee Award.

> (6)     *Whether the fee is fixed or contingent.*

49.     Another *Johnson* factor considers whether the fee is fixed or contingent.   In examining the contingent nature of a fee agreement, courts should assess the riskiness of litigation.  *Skelton v. General Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988).  The Attorneys agreed to pursue claims against Kroll on a purely contingent basis.   Litigation against Kroll would no doubt be risky and time-consuming.

50.      The Attorneys have taken a significant risk in pursuing claims against Kroll on a contingent basis.  Indeed the thousands of hours spent over several years without compensation evidence the type of risk inherent in accepting this type of arrangement.   Further, had Kroll decided to litigate, this type of case would have required thousands of hours over the course of years through the trial and/or appellate processes and substantial expenses.  When counsel take risks like these, as the Attorneys did, and then secure a strong result for the Receivership Estate, it is important that they be compensated with a fair and reasonable fee.  The bankruptcy filing further demonstrated the real risk posed that no recovery would occur, and therefore no fee. This factor weighs heavily in favor of approval.

> (7)     *Time limitations imposed by the client or the circumstances.*

51.     Another *Johnson* factor looks to the time limitations imposed by the client or the circumstances.  "Priority work that delays the lawyer's other legal work is entitled to some premium."  *Johnson*, 488 F.2d at 718.  While the complaint was never filed against Kroll,

Movants and the Attorneys invested significant time in preparing it. The case would have likely taken – and did in fact take – years to resolve, with an uncertain recovery even if a judgment was obtained due to the effects of Kroll's bankruptcy filing.  A favorable judgment would have only resulted in an unsecured claim in Kroll's bankruptcy case.  Given the magnitude and complexity of any case against Kroll, the Attorneys would have been under a significant time pressure in preparing the case for trial.

(8)     *The amount involved and the results obtained.*

52.     Another factor looks to the amount involved and the results obtained.  This factor is the most critical factor in making an attorneys' fee award.  *Saizan*, 448 F.3d at 799.  "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances."  *Klein*, 705 F. Supp. 2d at 649.

53.     The settlement represents a substantial and immediate net recovery for the Receivership Estate.  Moreover, recovery in excess of the settlement amount is highly unlikely even if the Receivership Estate would receive a favorable verdict.

54.     First and foremost, the bankruptcy would have significantly reduced and delayed any recovery for the Receivership Estate, if there was a recovery at all. The Attorneys were successful in reaching and salvaging the entire settlement even after Kroll filed bankruptcy.

55.     Also, through this settlement the Receivership Estate is receiving nearly all of Kroll's available insurance coverage.  Kroll has two relevant insurance policies that add up to $30 million in total coverage.  During the course of the negotiations, the Attorneys learned that the remaining amount of coverage left under the depleting insurance policies was approximately $24 million – which represents the amount of the Settlement Payment.  Both policies are

depleting or "wasting" policies, under which defense costs reduce the coverage amount.  Based on the Movants' and Attorneys' understanding and belief, Kroll had spent a significant portion of its policy limits by the time the parties reached settlement in May 2013, and the settlement amount achieved represents virtually all of Kroll's remaining coverage.  Further, Kroll's bankruptcy reduces the chances that the Receivership Estate could ever collect on any judgment in excess of Kroll's policy limits.  The Receiver believes that $24 million settlement payment is a fair and reasonable settlement, taking into consideration all of the relevant factors, as further discussed in the motion to approve the settlement.  Therefore, the factor analyzing the settlement amount involved and results obtained highly favor approval of the attorneys' fees.

(9)     <em>The experience, reputation, and ability of the attorneys.</em>

56.     Another <em>Johnson</em> factor analyzes the experience, reputation, and ability of the attorneys.   "Most fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation."  <em>Johnson</em>, 488 F.2d at 718–19.

57.     The Attorneys have an extensive background in civil litigation, bankruptcy, and complex fraud and Ponzi schemes.   The Attorneys have represented numerous receivers, bankruptcy trustees, and other parties in complex fraud cases and litigation matters related to equity receiverships and bankruptcy proceedings   similar to the Stanford receivership proceeding.  <em>See</em> Exs. 1-5.

58.     D&S, which was hired by the Receiver and OSIC in the summer of 2011 to assist in the investigation of Kroll and to take the lead litigation counsel role in the prosecution of claims against Kroll, is led by Jason Davis, an experienced former federal prosecutor and trial lawyer with proven success in complex and hard-fought cases involving fraud, often in the context of parallel federal criminal proceedings.  His team is comprised of other attorneys who

also have expertise in fraud investigations, and who have worked on other Ponzi-scheme cases. D&S immediately joined the other Attorneys in researching and evaluating potential claims, reviewing voluminous discovery, and aggressively pursuing the Kroll investigation and developing the claims against Kroll.

59.     Further, other than D&S, the Attorneys have been actively engaged in the Stanford litigation since its inception.  D&S contributed specialized knowledge in complex fraud cases – both in criminal and civil contexts. Together, the team of Attorneys and their qualifications weighs heavily in favor of approving the fee application.

(10)     The "undesirability" of the case.

60.     This representation was not undesirable.

(11)     The nature and length of the professional relationship with the client.

61.     The Court should consider the nature and length of the Attorneys' relationship with the Receiver, another *Johnson* factor.  As the Court is aware, the Attorneys, other than D&S, have represented the Receiver and OSIC, and Investor Plaintiffs in numerous actions pending before the Court before 2009.  *See* Ex. 2.  They have handled all of these cases on the same 25% contingency fee arrangement that has previously been approved by the Court.  *See* SEC Action ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action ECF No. 1208, p. 3 (providing a "contingency fee" of twenty-five percent (25%) of any Net Recovery in actions prosecuted by the Committee's designated professionals).  This factor should be viewed favorably as well in support of the Fee Award.

(12)     Awards in similar cases.

62.     The last *Johnson* factor considers awards in similar cases.  The 25% contingency

fee arrangement that was approved by the Court in the context of the OSIC-Receiver Agreement became the framework for all of the 25% contingency fee agreements that the OSIC entered into with the Attorneys.  Further, this Court recently approved a 25% contingency fee arrangement in the BDO case, as well as, the settlement with the Settling Defendants in the Adams & Reese case.  *See The Official Stanford Investors Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG, [Doc. 80] (N.D. Tex. Sep. 23, 2015); and Order Approving Attorneys' Fees in *Ralph S. Janvey, et al. v. Adams & Reese, LLP, et al.*, Civil Action No. 3:12-CV-00495-B [Doc. No. 2231 in Case No. 3:09-CV-0298-N].

63.     Further, as set forth in *Schwartz*, courts in this district have routinely approved 25%, and more often 30%, fee awards in complex securities class actions.   2005 WL 3148350 at *27 (collecting cases).  Under the circumstances of this case, such an award is appropriate here as well.

### E.  This Court Has Pre-Approved a 25% Contingency Fee

64.     This Court has authorized the Receiver to "[e]nter into such agreements in connection with the administration of the Receivership Estate, including, but not limited to, the employment of . . . attorneys . . . as Receiver judges necessary to perform the duties set forth in this Order and to compensate them from the Receivership Assets[.]"  *Second Amended Order Appointing Receiver*, at ¶ 5(h).

65.     The Attorneys were retained to "negotiate, sue for, and collect or settle all sums" attributable to the Receiver's claims against Kroll.  See Ex. 1.

66.     While OSIC signed the Fee Agreement, the Receiver and OSIC agreed to work together to pursue claims for the benefit of the Receivership Estate, including the claims against Kroll.  *See Agreed Motion for Order Authorizing and Approving Receiver's Agreement with*

*Official Investors Committee Concerning Prosecution of Certain Fraudulent Transfer and Other Claims* [the "Claims Agreement," Doc. 1207], and this Court's order approving it [Doc. 1267].

67.     The Claims Agreement governs how the Receiver and the Committee prosecute fraudulent transfer and other similar claims against third parties.  [Doc. 1207; 1208].  The Claims Agreement says they will hire attorneys to pursue these claims on a 25% contingency basis:

> designated professionals will prosecute the [fraudulent transfer and similar claims] on a 'contingency fee' basis, meaning that such professionals will receive as a fee twenty-five percent (25%) of the 'net recovery[.]'

[Doc. 1208].

68.     In approving the Claims Agreement, this Court found that the 25% contingency fee arrangement was reasonable.  [Doc. 1267, pg. 2].

69.     The Attorneys pursued the settled claims against Kroll pursuant to both the Fee Agreement and the Claims Agreement.  All parties agreed that the Attorneys would receive 25% of any recovery against Kroll.

### F.  The Proposed Fee Should be Approved

70.     The Court should find the 25% contingency fee applicable to the settlement with Kroll to be reasonable and approve it for payment.  This and other large third-party cases (such as BDO) are extraordinarily more complex, time consuming and risky, involving numerous factual and legal issues and claims.  The settlement with Kroll has yielded a considerable benefit to the Receivership Estate.  The Declaration of the Examiner, John J. Little, is attached as Exhibit 6 and requests approval of the Fee Award.

71.     Thus, the Movants submit that an award of attorneys' fees equal to 25% of the Net Recovery from the $24 million settlement with Kroll, as requested, is reasonable, appropriate, and should be approved under applicable Fifth Circuit law, whether using a

common fund approach, the *Johnson* factor approach, or a blended approach.

## II.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Movants and the Attorneys respectfully request this Court approve the Fee Award to the Attorneys in the amount of $5,994,263 and grant all other relief to which they are entitled.

Dated:   March 7, 2016.

Respectfully submitted:

**DAVIS & SANTOS, P.C.**

By:   */s/ Jason Davis*_____
　　　Jason Davis
　　　jdavis@dslawpc.com
　　　State Bar No. 00793592
　　　Mark Murphy
　　　mmurphy@dslawpc.com
　　　State Bar No. 24002667
　　　112 E. Pecan, Suite 900
　　　San Antonio, Texas  78205
　　　(210) 853-5882
　　　(210) 200-8395 (Facsimile)

***SPECIAL COUNSEL TO RECEIVER
RALPH JANVEY***

**CASTILLO SNYDER, P.C.**

By:   */s/ Edward C. Snyder*_____
　　　Edward C. Snyder
　　　esnyder@casnlaw.com
　　　Jesse R. Castillo
　　　jcastillo@casnlaw.com
　　　300 Convent Street, Suite 1020
　　　San Antonio, Texas  78205
　　　(210) 630-4200
　　　(210) 630-4210 (Facsimile)

***COUNSEL FOR THE OFFICIAL STANFORD
INVESTORS COMMITTEE***

**STRASBURGER & PRICE, LLP**

Judith R. Blakeway
2301 Broadway Street
San Antonio, TX 78215
judith.blakeway@strasburger.com
(210) 250-6004
(210) 258-2706 (Facsimile)

**BUTZEL LONG, P.C.**

Peter D. Morgenstern
(*admitted pro hac vice*)
morgenstern@butzel.com
380 Madison Avenue
New York, New York 10017
(212) 818-1110
(212) 818-0494 (Facsimile)

**NELIGAN FOLEY, LLP**

Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
(214) 840-5320
(214) 840-5301 (Facsimile)

***COMMITTEE COUNSEL***

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all counsel of record via the Court's ECF System on March 7, 2016.


                          /s/ Mark Murphy_____
                          Mark Murphy