**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § | |
| Defendants. | § § | |
| | § § | |
| RALPH S. JANVEY, *et al.*, | § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. 3:13-cv-00477 |
| PROSKAUER ROSE, LLP, *et al.*, | § § § | |
| Defendants. | § | |

**EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1]
AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH
CHADBOURNE & PARKE LLP, TO ENTER THE BAR ORDER, TO ENTER
THE FINAL JUDGMENT AND BAR ORDER, AND FOR PLAINTIFFS'
ATTORNEYS' FEES AND EXPENSES**

COME NOW Ralph S. Janvey, the Receiver for the Receivership Estate in *Securities and*

*Exchange Commission v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-

0298-N (the "SEC Action"); the Official Stanford Investors Committee (the "Committee"), as a

party to the SEC Action and as plaintiffs in *Ralph S. Janvey, in his Capacity as Court-appointed*

---

[1]     Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21)
days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling
Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final
approval of the Settlement Agreement.

1

*Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, et al.* Civil Action No. 3:13-cv-0047-N (the "Receiver Litigation"); and Samuel Troice, Punga Punga Financial, Ltd., Pam Reed, Horacio Mendez, and Annalisa Mendez, individually and, in the case of Pam Reed, Samuel Troice, and Punga Punga Financial, Ltd., on behalf of a putative class of Stanford investors (collectively, the "Investor Plaintiffs") in the class action lawsuit styled *Troice v. Proskauer Rose et al.*, Civil Action No. 3:09-cv-01600 (the "Investor Litigation")[2] (the Receiver, the Committee, and the Investor Plaintiffs are collectively the "Plaintiffs") and move the Court to approve the settlement (the "Chadbourne Settlement") among and between Plaintiffs and Chadbourne & Parke LLP ("Chadbourne") as defendant in the Receiver Litigation and the Investor Litigation.

Plaintiffs further request, as more fully set out below, that the Court enter the Scheduling Order, approve the Notices, and enter the Bar Order and the Judgment and Bar Order attached to and incorporated by reference into the Chadbourne Settlement Agreement, attached as **Exhibit 1** to the Appendix in Support of this Motion.[3]

Plaintiffs jointly request this Court to find the Chadbourne Settlement is fair, equitable, necessary, and in the interests of the Receivership Estate and all its Claimants, and to approve the Chadbourne Settlement. Plaintiffs further request that the Court approve payment of Plaintiffs' attorneys' fees in accordance with the contingency fee agreements between Plaintiffs' Counsel and the Receiver and the Committee. In support thereof, Plaintiffs respectfully state the

---

[2]      The Investor Litigation was recently dismissed on March 10, 2016 by the Fifth Circuit Court of Appeals, when it issued its decision reversing this Court's denial of Chadbourne's and co-Defendant Proskauer Rose's Motions to Dismiss based on the defense of attorney immunity. *Troice v. Proskauer Rose LLP*, ___ F.3d ___, No. 15-10500, 2016 WL 929476 (5th Cir. Mar. 10, 2016) (the "*Troice* Decision").

[3]      Capitalized terms not otherwise defined herein shall have the meaning set forth in the Chadbourne Settlement Agreement. To the extent of any conflict between this Motion and the terms of the Chadbourne Settlement Agreement, the Chadbourne Settlement Agreement shall control.

following:

# I.  INTRODUCTION

1.     As part of their lengthy and thorough investigation of the Stanford Ponzi scheme, and after many years of investigating and pursuing claims against third parties, including Chadbourne, Plaintiffs have reached a settlement with Chadbourne, one of the law firms that provided legal representation to Stanford with respect to the SEC's investigation of Stanford. Under the agreement, once approved and effective, Chadbourne has agreed to pay $35 million to the Receiver for distribution to customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford Investors") and who have submitted claims that have been allowed by the Receiver.

2.     In return, Chadbourne seeks a global release of all Settled Claims[4] against Chadbourne and the Chadbourne Released Parties, and has conditioned the Chadbourne Settlement on the Court in the SEC Action entering the Bar Order attached to the Chadbourne Settlement Agreement, and in the Receiver Litigation entering the Judgment and Bar Order. These bar orders would permanently bar, restrain, and enjoin the Receiver, the Plaintiffs, the

---

[4]     "Settled Claim" means any action, cause of action, suit, liability, claim, right of action, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any CD, depository account, or investment of any type with any one or more of the Stanford Entities; (iii) Chadbourne's relationship with any one or more of the Stanford Entities and/or any of their personnel; (iv) Chadbourne's provision of services to or for the benefit of or on behalf of the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the Investor Litigation, the Receiver Litigation, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. "Settled Claims" specifically includes, without limitation, all claims each Releasor does not know or suspect to exist in his, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to this Agreement and the Settlement ("Unknown Claims"). *See* Paragraph 17 of the Chadbourne Settlement Agreement for a complete definition of Settled Claim.

Claimants, the Interested Parties, and all other Persons or entities anywhere in the world, whether acting in concert with the foregoing or claiming by, through, or under the foregoing, or otherwise, all and individually, from directly, indirectly, or through a third party, instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, or otherwise prosecuting, against Chadbourne or any of the Chadbourne Released Parties, the Investor Litigation, the Receiver Litigation, any of the actions listed in Exhibit E to the Chadbourne Settlement Agreement, or any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature commenced after the issuance of the U.S. Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (Feb. 26, 2014), including but not limited to litigation, arbitration, or other proceeding, in any Forum, including, without limitation, any court of first instance or any appellate court (other than in an appeal from the Bar Order or the Judgment and Bar Order) whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is based upon, arises from, or is connected with the Stanford Entities; the SEC Action; the Investor Litigation; the Receiver Litigation; the subject matter of the SEC Action, the Investor Litigation, or the Receiver Litigation; or any Settled Claim.  The foregoing would specifically include, without limitation, the claims filed against Chadbourne in *ARCA Investments v. Proskauer Rose LLP*, Civil Action No. 3:15-CV-02423-D (N.D. Tex.).  The foregoing also would specifically include any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in

whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise.

3.      Plaintiffs request the Court to approve the Chadbourne Settlement and enter the Bar Order in the SEC Action and the Judgment and Bar Order in the Receiver Litigation.

4.      Plaintiffs further request that the Court approve payment of attorneys' fees to counsel for the Receiver, the Committee, and the Investor Plaintiffs ("Plaintiffs' Counsel"), whose efforts were necessary to achieve the Chadbourne Settlement, in an amount consistent with their contractual twenty-five percent (25%) contingency fee agreements with the Receiver, Committee, and the Investor Plaintiffs.

## II. BACKGROUND

### A.     *Authority of the Receiver and the Committee*

5.      On February 16, 2009, the Securities & Exchange Commission ("SEC") filed the SEC Action, and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver ¶ 4 [SEC Action, ECF No. 10].

6.       The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order"). [SEC Action, ECF No. 1130]. The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

7.      The Receiver is not only authorized but required to pursue outstanding liabilities

and claims for the Estate. *Id.* ¶¶ 3, 5(b)-(c).  The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court.  *Id.* ¶ 2.  The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."  *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011).  The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate.  Second Order ¶ 5(i).

8.     On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action."  [SEC Action, ECF No. 322]. Although he is not a party to the Receiver Litigation or the Investor Litigation, the Examiner signed the Chadbourne Settlement Agreement as chair of the Committee, and as Examiner solely to evidence his support and approval of the Chadbourne Settlement and the obligation to post Notice of the Chadbourne Settlement on his website.

9.     On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors.  [SEC Action, ECF No. 1149].  The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver).  *Id.* ¶ 8(d).  This Court has recognized the Committee's standing to pursue litigation claims such as the claims against Chadbourne that are the subject of the Chadbourne Settlement.  *See* Order 4–6, *Janvey & Official Stanford Inv'rs Comm. v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N (Sept. 24, 2012 (N.D. Tex.), ECF No. 33 (the Committee has

standing to pursue claims based on the Court's grant of such authority to the Committee as an unincorporated association representing the interests of the Stanford Investors).

**B.      The Investigation of Claims Against Chadbourne**

10.      Plaintiffs' counsel have spent several years and thousands of hours investigating and pursuing claims against Chadbourne on behalf of the Stanford Receivership Estate and Stanford Investors.  As part of their investigation of the claims against Chadbourne, Plaintiffs' Counsel have reviewed voluminous documents, emails, and depositions and trial testimony obtained in multiple collateral lawsuits and the criminal prosecution of Allen Stanford, James Davis, Laura Pendergest-Holt, and other former Stanford insiders.  The materials reviewed by Plaintiffs' Counsel included, among other materials, thousands of pages of the SEC and other investigation materials, thousands of pages of deposition and trial testimony, thousands of emails of Stanford and Chadbourne personnel, and literally hundreds of boxes of documents including Chadbourne documents that the Receiver secured from Stanford's various offices and law firms.

11.      Counsel was also required to, and did, research all relevant case law to support liability and damages claims belonging to the Receiver and Committee—including the Texas Securities Act ("TSA") and other claims belonging to the Stanford Investors—to determine how the facts surrounding Chadbourne's conduct supported those claims.  The investigation further required formulation of viable damage models and causation theories for both the Receivership Estate and Stanford Investor claims.

12.      Investigation and prosecution of the Receivership Estate and Stanford Investor claims against Chadbourne also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationship and dealings between and among the various Stanford

entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities.  Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against Chadbourne.  The Committee's counsel have also spent thousands of hours since the Committee's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against Chadbourne, pursuant to an agreement between the Receiver and the Committee.  The Receiver, the Committee and the undersigned law firms have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of the SEC Action, all of which allowed the Receiver, the Committee, and the undersigned counsel to formulate and file the claims against Chadbourne that led to the Chadbourne Settlement for which approval is sought by this Motion.  But for the diligent efforts of the Receiver, the Committee, and their counsel since the commencement of this receivership proceeding, the Chadbourne Settlement would never have been achieved, and the Receivership Estate and the Stanford Investors would not have achieved this $35 million settlement.

13.     In summary, Plaintiffs and their counsel have conducted a thorough analysis of, and heavily litigated on multiple fronts, a series of claims against Chadbourne considering:

    a.  claims available under both state and federal law;

    b.  the viability of those claims considering the facts underlying Chadbourne's role as counsel for Stanford and this Court's previous rulings; and

    c.  the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

## C.     *The Investor Litigation*

14.     As this Court is aware, the Investor Litigation has been heavily litigated for some 6 ½ years.  On August 27, 2009, counsel for the Stanford Investors filed the Investor Litigation as a putative class action.  [Investor Litigation, ECF No. 1].  The Defendants (Chadbourne,

Proskauer Rose LLP ("Proskauer"), Thomas Sjoblom, and P. Mauricio Alvarado) filed motions to dismiss the Investor Litigation in December 2009.  [Investor Litigation, ECF Nos. 31, 36, 44]. On October 21, 2011, this Court granted the various motions to dismiss, finding that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") precluded the action.  [Investor Litigation, ECF No. 96].  The Investor Plaintiffs appealed that decision to the Fifth Circuit.  On March 19, 2012, the Fifth Circuit issued its opinion reversing this Court's order of dismissal. *Roland v. Green*, 675 F.3d 503 (5th Cir. 2012).  The Defendants then petitioned for *certiorari* with the United States Supreme Court, which granted the petition.  On February 26, 2014, the Supreme Court issued its opinion affirming the Fifth Circuit and concluding that SLUSA did not preclude the state law-based class action lawsuits brought against Defendants in the Investor Litigation.  *Chadbourne & Parke, LLP v. Troice*, 134 S. Ct. 1058 (2014).

15.     On September 16, 2014 this Court issued its Order denying the Investor Plaintiffs' request for entry of a scheduling order to permit merits discovery and granting Defendants' request to permit additional briefing on their attorney immunity defense, which Defendants had addressed in their Motions to Dismiss.  [Investor Litigation, ECF No. 141].  On the same day the Court issued its Class Action Scheduling Order and the parties thereafter engaged in roughly six months of class certification discovery and fact and expert witness depositions.  [Investor Litigation, ECF No. 142].  The parties filed all of their class certification evidence and briefing with this Court on April 20, 2015.  [Investor Litigation, ECF Nos. 192-99].

16.     By Order dated March 4, 2015, the Court granted in part and denied in part Chadbourne's motion to dismiss the Investor Litigation, dismissing the claim against Chadbourne for negligent retention/negligent supervision, dismissing with prejudice the claims against Chadbourne for aiding and abetting TSA violations with respect to the alleged sale of

unregistered securities and the sale of securities by unregistered dealers to the extent they are based on sales taking place prior to October 9, 2006, and declining to dismiss the other claims against Chadbourne, including other claims for aiding and abetting TSA violations, for aiding and abetting/participation in a fraudulent scheme, and for civil conspiracy.  [Investor Litigation, ECF No. 176].  Thereafter, on April 1, 2015, defendants Proskauer, Chadbourne, and Sjoblom filed Rule 59(e) Motions for Reconsideration of the Court's denial of their Motions to Dismiss under the attorney immunity doctrine.  [Investor Litigation, ECF No. 187].  On May 15, 2015 the Court denied those motions.  [Investor Litigation, ECF No. 217].

17.     Defendants Proskauer, Chadbourne, and Sjoblom then appealed the Court's denial of their Motions for Reconsideration to the Fifth Circuit in June 2015.  A month later the Texas Supreme Court issued its decision in *Cantey Hanger LLP v. Byrd*, 467 S.W. 3d 477 (Tex. 2015).  On March 10, 2016, and based on *Cantey Hanger* and a finding that the Investor Plaintiffs had waived certain arguments, the Fifth Circuit reversed this Court's ruling and rendered judgment in favor of the Defendants in the *Troice* Decision.

18.     Prior to the Fifth Circuit's *Troice* Decision, Plaintiffs reached the settlement with Chadbourne that is now presented to this Court for approval.

**D.      *The Receiver Litigation***

19.     On January 27, 2012, the Receiver and Committee commenced an action against Defendants Proskauer, Chadbourne, and Sjoblom in the United States District Court for the District of Columbia (the "D.C. Court") based on Sjoblom's long-time connection with that district. *See Janvey v. Proskauer Rose LLP*, No. 1:12-cv-00155, (D.D.C. Jan. 27, 2012) [ECF No. 1] ("*Janvey I*").  Defendants requested that the case be transferred to this Court by the Judicial Panel on Multidistrict Litigation (the "JPML").   On March 1, 2012, the JPML

transferred Janvey I from the D.C. Court to this Court.  *See Janvey I*, No. 3:12-cv-00644-N, (N.D. Tex. Mar. 2, 2012) [ECF No. 13].  On October 24, 2012, Defendants asserted that neither this Court nor the D.C. Court had jurisdiction over the case.  *See id.* at ECF Nos. 49-50, 53. Plaintiffs then moved this Court to recommend that the JPML remand *Janvey I* to the D.C. Court so that Plaintiffs could move the D.C. Court to transfer *Janvey I* back to this Court under 28 U.S.C. § 1631.  *See id.* at ECF No. 55.  In an abundance of caution, Plaintiffs also filed the Receiver Litigation in this Court as a "back up" action to be prosecuted in the event *Janvey I* was dismissed rather than transferred by the D.C. Court.  *See Janvey v. Proskauer Rose LLP*, 3:13-cv-00477-N (N.D. Tex. Jan. 31, 2013) [ECF No. 1].

20.     By order dated August 21, 2013, the Court granted Plaintiffs' motion and recommended that *Janvey I* be remanded back to the D.C. Court.  Order at 6, *Janvey I*, No. 3:12-cv-0644 (N.D. Tex. Aug. 21, 2013) [ECF No. 71] (the "Transfer Order").  Upon remand of *Janvey I* back to the D.C. Court, Plaintiffs filed a motion to transfer the case back to this Court under 28 U.S.C. § 1631.  *See Janvey I*, No. 1:12-cv-00155, (D.D.C. Feb. 5, 2014) [ECF No. 15]. Defendants Proskauer, Chadbourne, and Sjoblom opposed the motion to transfer on the ground that the D.C. Court lacked jurisdiction over the case in the first instance.  On July 24, 2014, the D.C. Court denied Plaintiffs' motion to transfer and dismissed the case.  *Janvey v. Proskauer Rose, LLP*, Civil Action No. 12-155 (CKK), 2014 WL 3668578, at \*5 (D.D.C. July 24, 2014).

21.     Defendants Proskauer and Chadbourne then filed Motions to Dismiss the Receiver Litigation on October 3, 2014.  [Receiver Litigation, ECF No. 22, 58].  Defendant Sjoblom filed a Motion to Dismiss on November 13, 2014.  [Receiver Litigation, ECF No. 61]. The Receiver and Committee filed a Joint Response to Defendants' Motions to Dismiss on December 2, 2014.  [Receiver Litigation, ECF No. 63].

22.     The claim asserted by the Receiver against Chadbourne is for legal malpractice (negligence); however, the Committee also asserted claims against Chadbourne for aiding, abetting, or participation in breaches of fiduciary duties; aiding, abetting, or participation in a fraudulent scheme; aiding, abetting, or participation in fraudulent transfers; aiding, abetting, or participation in conversion; civil conspiracy; and negligent retention/negligent supervision.  The Committee asserted all claims against Chadbourne, except for the Receiver's legal malpractice claim, pursuant to an Assignment of such claims from the Receiver to the Committee. Additionally, the Committee asserted the claims as a representative of the Stanford Investors, pursuant to this Court's holdings that the Committee has independent standing as an unincorporated association.

23.     Certain defendants tried to disqualify the Receiver's counsel Neligan Foley. [Receiver Litigation, ECF No. 34].  The Court permitted limited discovery regarding the disqualification issue in October 2014.  [Receiver Litigation, ECF No. 60].  The Defendants filed their Motions to Dismiss the Receiver Litigation in October 2014, and the Receiver and Committee responded in December 2014.  [Receiver Litigation, ECF Nos. 55, 58, 63].  On June 23, 2015, the Court granted in part and denied in part Chadbourne's motion to dismiss the Original Complaint in the Receiver Litigation, dismissing the claim for aiding and abetting fraudulent transfers but declining to dismiss the other claims against Chadbourne.  [Receiver Litigation, ECF No. 79].  Defendants filed their Answers in the Receiver Litigation in August 2015.  [Receiver Litigation, ECF Nos. 83, 85, 87].

### E.     Mediation

24.     Mediation was held with Chadbourne on two occasions.  The first mediation was held in in 2014, before the retired Honorable Harlan Martin, and lasted several hours.  However

the parties were unable to reach resolution at that time.  Following the Court's decisions on Chadbourne's Motions to Dismiss in both the Investor and Receiver Litigations, and the parties' submission of class certification briefing and evidence in the Investor Litigation, the parties convened a second mediation with the Hon. Layn R. Phillips and Gregory Lindstrom, Esq., in California in December 2015.  Despite a full day mediation that went late into the night, the parties were once again unable to reach a resolution.  However, negotiations continued and, in February 2016, the Parties reached agreement resulting in the Chadbourne Settlement.  The parties executed the Chadbourne Settlement Agreement on February 25, 2016.

25.     Without the tireless effort of the Receiver, the Committee, Investor Plaintiffs, and their counsel in investigating and prosecuting these claims as part of the overall effort to recover money from third parties for the benefit of Stanford Investors, the settlement could never have been achieved, and the Receiver Litigation would have dragged on for years with an uncertain outcome and at great expense to the parties.

26.     Since the settlement was reached in early 2016, the Parties spent considerable time and effort drafting, revising, and negotiating the form and terms of the Chadbourne Settlement Agreement, the Bar Order, the Judgment and Bar Order, the Notice, and the Scheduling Order, for which the Plaintiffs now move for approval.

## F.     Plaintiffs' and Examiner's Support of Settlement

27.     Plaintiffs are confident that the investigation of Chadbourne's activities related to Stanford performed by their counsel and the litigation of the Investor and Receivership Estate claims has been thorough.  Plaintiffs are confident that they have sufficient information to enter into and endorse the Chadbourne Settlement.  Plaintiffs are also confident that the Chadbourne Settlement is fair and reasonable taking into consideration not only the merits of the claims, but

also the risks, uncertainties, and expenses associated with litigation.  Therefore, Plaintiffs believe that the Chadbourne Settlement is in the best interests of the Stanford Receivership Estate and the Stanford Investors and should be approved by the Court.  The Chairman of the Committee, who oversaw the Receiver Litigation and participated in the settlement negotiations and mediation, is also the Court-appointed Examiner, and he supports this Motion in both capacities, as does the Receiver.

28.     The Investor Plaintiffs also support the Chadbourne Settlement and believe it is in the best interests of all Stanford Investors, and request that the Court approve it.  All Stanford Investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution process. The Chadbourne Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'"  *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013).  The Chadbourne Settlement, the Bar Order, and the Judgment and Bar Order protect both the Chadbourne Released Parties and the Stanford Investors.

### G.    The Chadbourne Settlement

29.     The proposed Chadbourne Settlement is the result of many years and thousands of hours of work by the Receiver, the Committee, Investor Plaintiffs, and the undersigned counsel, and was negotiated and entered into as a result of arm's-length negotiation both during and following mediation facilitated by the Hon. Layn R. Phillips and Gregory Lindstrom, Esq.

30.     The essential terms of the Chadbourne Settlement Agreement, attached as Exhibit 1 to the Appendix, are that:

> a)  Chadbourne will pay $35 million, which will be deposited with the Receiver as required pursuant to the Settlement Agreement;

b) Plaintiffs, including, without limitation, the Receiver on behalf of the Receivership Estate (including the Stanford Entities but not including the natural persons listed in Paragraph 21 of the Chadbourne Settlement Agreement), will fully release the Chadbourne Released Parties from Settled Claims, e.g., claims arising from or relating to Allen Stanford, the Stanford Entities, or any conduct by the Chadbourne Released Parties relating to Allen Stanford or the Stanford Entities, with prejudice, except that the release will not extend to claims against former Chadbourne partner Thomas Sjoblom arising out of any work performed by Mr. Sjoblom during the time of his affiliation with Proskauer;

c) The Chadbourne Settlement requires entry of a Judgment and Bar Order in the Receiver Litigation and entry of a Bar Order in the SEC Action, each of which permanently enjoins, among others, Interested Parties, including all Stanford Investors and Claimants, from bringing, encouraging, assisting, continuing, or prosecuting, against Chadbourne or any of the Chadbourne Released Parties, the Investor Litigation, the Receiver Litigation, any of the actions listed in Exhibit E to the Chadbourne Settlement Agreement, or any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature commenced after the issuance of the U.S. Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (Feb. 26, 2014), including, without limitation, contribution or indemnity claims or the claims filed against Chadbourne in *ARCA Investments v. Proskauer Rose LLP*, Civil Action No. 3:15-CV-02423-D (N.D. Tex.), arising from or relating to a Settled Claim;

d) The Receiver will disseminate notice of the Chadbourne Settlement to Interested Parties, through one or more of the following as set forth in the Chadbourne Settlement Agreement, ¶¶ 29-30: mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and Receiver (http://www.stanford financialreceivership.com) web sites;

e) The Receiver will develop and submit to the Court for approval a plan for disseminating the Settlement Amount ("Distribution Plan");[5]

f) Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted claims that have been allowed by the Receiver;

---

[5]     In the motion seeking approval of the Distribution Plan, the Receiver will seek authority to distribute $15,000 each to the three Investor Plaintiffs Samuel Troice, Punga Punga Financial, Ltd., and Pam Reed from the settlement amount in acknowledgement of their participation and the work they performed as the named, putative class representative plaintiffs in the Investor Litigation, including responding to discovery and appearing for depositions and mediation.  The Receiver will also seek authority to distribute $5,000 to the former named, putative class representative plaintiff in the Investor Litigation, Horacio Mendez, in acknowledgement of his prior participation in the case.

g) Persons who accept funds from the Chadbourne Settlement Amount will, upon accepting the funds, fully release the Chadbourne Released Parties from any and all Settled Claims;

h) The Fifth Circuit has already dismissed the Investor Litigation, but the Receiver Litigation will be dismissed with prejudice as to Chadbourne, with each party bearing its own costs and attorneys' fees, by entry of the Judgment and Bar Order in that action; and

i) Each of the actions listed in Exhibit E to the Settlement Agreement, if not previously dismissed, will be dismissed with prejudice as to Chadbourne, with each party bearing its own costs and attorneys' fees.

Copies of the Chadbourne Settlement Agreement, this Motion, and other supporting papers may be obtained from the Court's docket, and are also available on the websites of the Receiver (http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-stanford-financial-group/). Copies of these documents may also be requested by email to Sandy Rivas, at srivas@casnlaw.com, or by calling Sandy Rivas at 210-630-4200.

31.     For the reasons described herein, the Chadbourne Settlement is fair, equitable, reasonable, necessary, and in the interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets.  Plaintiffs urge the Court to approve it.

## III.     REQUEST FOR APPROVAL OF THE CHADBOURNE SETTLEMENT

### A.     *Legal Standards*

32.     "'[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.'"  *Kaleta*, 530 F. App'x at 362  (quoting *SEC v. Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)).   "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'"  *Id.* (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)).   "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership."  *Id.* (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F.

App'x 338, 340 (5th Cir. 2011)). "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *SEC* v. *Kaleta*, No. CIV.A. 4:09-3674, 2012 WL 401069, at \*4 (S.D. Tex. Feb. 7, 2012) (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009), *aff'd*, 530 F. App'x 360 (5th Cir. 2013). Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation." *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

33.    Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors. *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

34.    The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants. Second Order ¶ 5; *see supra* ¶¶ 2-3.

35.    The ability to compromise claims is critical to this Receivership. Courts have long emphasized that public policy favors settlement. *See, e.g.*, *Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010). That is especially true here,

where the victims of Stanford's Ponzi scheme await recovery, further costs would come directly out of the Receivership Estate, and the Chadbourne Settlement would allow the Receiver to make a significant distribution.

36.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases.  *Kaleta*, 530 F. App'x. at 362-63 (approving bar order).  Bar orders are commonly used in receivership cases to achieve these purposes.  *See, e.g.*, *Gordon*, 336 F. App'x at 549; *SEC v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010) (Norton, C.J.), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4-5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

37.     The Bar Order and the Judgment and Bar Order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

38.     In fact, the Fifth Circuit in *Kaleta* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary . . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate"; and (iii) the

scope of the bar order is appropriately tailored to achieve these objectives. *See Kaleta*, 530 F. App'x at 362-63. The Chadbourne Settlement satisfies each of these requirements.

39.     District courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *Kaleta*, 2012 WL 401069, at *4.[6]

40.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4. The Fifth Circuit's opinion noted that, like the Chadbourne Settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

**B.      *The Chadbourne Settlement Satisfies the Factors for Settlement Approval***

      *(1)      Value of the Proposed Settlement*

41.     The $35 million payment in the Chadbourne Settlement is substantial, representing the second largest Stanford litigation settlement to date. "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be

---

[6]      This is neither a class action nor a case under Title 11 of the United States Code. Thus, though they are not binding here, both class action and Title 11 cases define tests for approving the aggregate settlements that may be tailored for a receivership case such as this one. *See, e.g., Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (class action); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (Title 11 bankruptcy). Broadly speaking, before approving a global settlement the Court must determine that the settlement (i) is reached after arm's-length negotiations; (ii) provides relief commensurate with the risks and expenses of litigating the claim to judgment; and (iii) represents the considered opinions of the parties and their counsel, and has the support of persons appointed to represent those who ultimately benefit from the settlement. For the same reasons that the Chadbourne Settlement satisfies the factors set forth in the decision of the district court in *Kaleta*, and as set forth herein, the Chadbourne Settlement easily satisfies the tests set out in *Newby* or *Moore*.

fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549. The value of the Chadbourne Settlement to the Receivership Estate and Stanford's victims is significant.

### (2)    *Value and Merits of the Receiver and Stanford Investors' Potential Claims*

42.    Plaintiffs of course believe that the claims filed against Chadbourne in the Receiver Litigation are meritorious and would be successful. However, they are not without substantial risk and uncertainty. Indeed the Investor Litigation was recently dismissed by the Fifth Circuit soon after Plaintiffs and Chadbourne executed the Chadbourne Settlement Agreement, which was not conditioned on the result of Chadbourne's appeal with respect to the attorney immunity issue. Moreover, the ability to collect the maximum value of a judgment from Chadbourne is also not without risk and uncertainty. Needless to say, Chadbourne vigorously disputes the validity of the claims asserted in the Receiver Litigation and the Investor Litigation, and in fact prevailed in obtaining the dismissal of the Investor Litigation in the Fifth Circuit based on the defense of attorney immunity.

43.    The claims in the Receiver Litigation are for legal malpractice ; aiding, abetting, or participation in breaches of fiduciary duties; aiding, abetting, or participation in a fraudulent scheme; aiding, abetting, or participation in fraudulent transfers; aiding, abetting, or participation in conversion; civil conspiracy; and negligent retention/negligent supervision.[7]   While the

---

[7] By Order dated June 23, 2015, the Court dismissed the claim for aiding, abetting, or participation in fraudulent

Receiver and the Committee believe strongly in the viability of the remaining claims, Chadbourne disputes liability on those claims and Chadbourne has further contended, among other things, that despite the Receiver's contention that the discovery rule applies to toll the two-year statute of limitations, the legal malpractice claim is time barred.  While the Receiver takes comfort in this Court and the Fifth Circuit's prior decisions with regard to the applicability of the discovery rule with respect to the Receiver's claims, the factual issue of when the Receiver in the exercise of reasonable diligence should have discovered the basis of the claims asserted against Chadbourne creates some uncertainty and risk with respect to the legal malpractice claim. Moreover, unresolved choice-of-law issues in this Receiver Litigation create additional risks and uncertainties.  [*See* Receiver Litigation, ECF No. 79 at 5-9 & n.4].

44.    Among others, the following issues are hotly contested and promise years of uncertain litigation:

a.  whether the Receiver could prevail on his legal malpractice claim and whether the discovery rule tolled – and for how long – the limitations periods applicable to said claims;

b.  whether the New York's *in pari delicto* doctrine would apply to bar the claims asserted in the Receiver Litigation;

c.  whether Chadbourne had sufficient knowledge to meet the standard for the Committee's aiding-and-abetting breach of fiduciary claim;

d.  whether the Receiver and/or Committee have valid, supportable damage models;

e.  whether the Stanford Investors would be able to successfully mount a new

---

transfers.  [Receiver Litigation, ECF No. 79.]

class action investor case against Chadbourne in light of the Fifth Circuit's decision in *Troice*;

f.   whether the Stanford Investors would be able to certify a class action;

g.   whether at trial the Stanford Investors would be able to prove that Chadbourne had general awareness of Stanford's wrongful conduct and provided substantial assistance to Stanford; and

h.   whether, after a successful judgment in any of the cases, Plaintiffs would be able to collect any more than the Settlement already offers.

45.     For these and other reasons, but for the Chadbourne Settlement, the Receiver Litigation would be vigorously defended by Chadbourne, its prosecution would be expensive and protracted, and the ultimate outcome of such litigation would be uncertain.  In light of these issues, Plaintiffs believe that the Chadbourne Settlement reflects a fair and reasonable compromise between the parties.

46.     While Plaintiffs believe they would ultimately prevail on both liability and damages in the Receiver Litigation, success is far from assured and would only be possible after years of litigation.  The settlement payment represents a significant recovery for the Stanford Investors, while avoiding the burden, costs, delay, and risks incident to continued litigation.

### *(3)     The Risk that Litigation Would Dissipate Receivership Assets*

47.     Plaintiffs believe that litigation against Chadbourne would most likely go on for years, with no guarantee of a recovery.  While Plaintiffs' Counsel have entered into contingent fee arrangements with Plaintiffs to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation.  The Chadbourne Settlement avoids

further expense associated with the prosecution of the Receiver Litigation and continued monitoring and oversight of the case by the Receiver and the Committee Chairman/Examiner.

48.     Furthermore, as part of their fee agreement with their counsel, the Committee has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with the Committee's litigation against Chadbourne, including, *inter alia*, expert fees and out of pocket litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.). Although the Receiver Litigation will continue with respect to Proskauer and Mr. Sjoblom, without the Chadbourne Settlement Agreement, the Receiver would incur substantial *additional* expenses in order to prosecute the claims against Chadbourne. As an initial matter, the claims against Chadbourne involve alleged conduct from an earlier period, prior to when Proskauer served as counsel to Stanford Financial Group and its affiliates. Therefore, absent the Chadbourne Settlement, the Receiver would have to take discovery from Chadbourne that would be substantially different from the anticipated discovery from Proskauer. Moreover, because the case against Chadbourne involves claims of professional malpractice, expert witness testimony as to Chadbourne is necessary, and would be a significant expense going forward if the Receiver Litigation is not settled with respect to Chadbourne. Expert testimony would be needed to prove the details of the Stanford Ponzi scheme, as well as the legal malpractice, causation and damages. Absent the Chadbourne Settlement, expert witness fees as to Chadbourne's alleged liability and damages could easily have run into the hundreds of thousands of dollars, with added costs for working with expert witnesses, taking and defending expert depositions, and examining expert witnesses at trial. Other out of pocket litigation costs could have been substantial (given that formal discovery has not even begun in the Receiver Litigation) without the Chadbourne Settlement, including costs of oral and video depositions of all fact and expert witnesses,

production of voluminous records and emails and other electronically stored information, travel associated with depositions, preparation of expert witness reports, trial graphics, cost of reproduction of documents and trial exhibits, retrieval and storage of email and other electronically stored information, and attendance of experts at trial.  Total out of pocket costs to prosecute the litigation could easily reach $1 million or more due to the complex nature of the claims, the need for expert testimony, and the voluminous nature of the records involved.

### (4)     *The Complexity and Costs of Future Litigation*

49.     The prosecution of the Receiver and any Investor Litigation would undoubtedly be challenging and expensive, as discussed above.  As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex, as evidenced by the Direct Testimony of Karyl Van Tassel in the Chapter 15 proceeding, as well as all of the lengthy Declarations with voluminous supporting exhibits that she has filed with this Court to prove the facts of the Stanford Ponzi scheme.  There is no question that the Receiver Litigation involving claims of legal malpractice, among others, billions of dollars in claimed damages, and an international Ponzi scheme operated through a complex web of interrelated international companies that spanned nearly 20 years, is extraordinarily complex, and would cause the Receivership Estate to incur substantial expense to litigate to final judgment.  Although the Receiver Litigation will continue as to Proskauer and Mr. Sjoblom, continuing to keep Chadbourne involved as an additional subject of scrutiny in the case would add an additional layer of complexity onto an already-complex case.  As stated above, litigation expenses alone could easily exceed $1 million.

### *(5)* *The Implications of Chadbourne's Settlement Payment on Other Claimants*

50.     As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'"  530 F. App'x at 362.  The Receiver is not collecting Chadbourne's settlement payment for Allen Stanford or for Mr. Janvey, but for the Stanford Investors.  Thus, the relief Plaintiffs request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities."  *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

### *(6)* *The Value and Merits of Any Foreclosed Parties' Potential Claims*

51.     Plaintiffs are conscious of the fact that the Bar Order and Judgment and Bar Order they are requesting, and the entry of which are conditions to the Chadbourne Settlement, will preclude Stanford Investors and others from asserting claims against Chadbourne in connection with its involvement with the Stanford enterprise. However, very few investors have asserted any claims against Chadbourne in the seven years since the Receivership was created, and any such investors asserting claims face the same legal and factual challenges faced by the Plaintiffs, as discussed above.

52.     Plaintiffs are aware of only one other case that has been filed against Chadbourne in the United States by Stanford investors, which was filed in 2015 as essentially a pre-class certification opt-out case:  *ARCA Investments v. Proskauer Rose LLP*, Civil Action No. 3:15-CV-02423-D (N.D. Tex.).  While the Bar Order that Plaintiffs request the Court to enter would bar that suit to the extent it alleges claims against Chadbourne (but not as to Proskauer), equity favors the Court approving the settlement and entering the Bar Order because the Chadbourne Settlement will provide compensation to *all* Stanford victims and not just a few.  In any event,

the *ARCA* case, which was filed recently and is basically a copy of the Investor Litigation, is still in the very preliminary motion to dismiss stage and will face the same attorney immunity defense that resulted in the *Troice* Decision dismissing the Investor Litigation. There is a substantial risk that case could be dismissed, and the plaintiff investors in that case could end up with nothing, whereas, with the Chadbourne Settlement, these plaintiff investors will receive a benefit along with Stanford Investors.

53.     In addition, no individual investor-litigant has standing to pursue the legal malpractice claim against Chadbourne. The Receiver is the only party that has been recognized as having standing to pursue such a claim in this Court.

54.     Given that all Stanford Investors have been put on notice of the Receivership and have been given opportunities to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process and will receive a distribution from the Chadbourne Settlement, the Stanford Investors' rights are not being unduly prejudiced by the Chadbourne Settlement. They have all had the opportunity to participate through the pre-existing receivership claims process.

55.     Plaintiffs believe that the Bar Order and Judgment and Bar Order should be approved because they are in the collective best interest of <u>all</u> Stanford Investors. The Bar Order and Judgment and Bar Order should not be rejected based upon the possibility that some individual investor(s) or counsel might otherwise wish to pursue individual claims against Chadbourne now or in the future. *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other

vindictive or improper reason").

56.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit *as many* aggrieved investors as stand to be benefited under the Settlement Agreement." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order) (emphasis added).

57.     The proposed Chadbourne Settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses or a race to the courthouse by various counsel.  Against this backdrop, the Court should approve the Chadbourne Settlement and enter the Bar Order and Judgment and Bar Order.

### *(7)     Other Equities Attendant to the Situation*

58.     The entry of the Bar Order and the Judgment and Bar Order is a material term under the Chadbourne Settlement Agreement, and a necessary condition to the obligations set forth in the Chadbourne Settlement Agreement.  The bottom line is that there is no Chadbourne Settlement without the these bar orders.  Chadbourne "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [Chadbourne], potentially in other, including foreign, jurisdictions."  *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

59.     Chadbourne has made clear that in consideration of paying $35 million, it must achieve "peace" through the Chadbourne Settlement, wholly and finally, with respect to all Stanford-related claims commenced after the issuance of the U.S. Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (Feb. 26, 2014).  Chadbourne has stated that it would not enter into the Chadbourne Settlement without securing the avoidance of the

expense of further such litigation, particularly given what it believes are its strong factual and legal defenses.

60.     The Receiver and the Committee were appointed to protect the interests of *all* of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants.  The proposed Bar Order and Judgment and Bar Order will help maximize the eventual distribution to Receivership Estate claimants of Chadbourne's $35 million payment and provide Chadbourne the resolution of Stanford-related litigation that is a necessary condition for that settlement payment by Chadbourne.  Plaintiffs believe that the entry of the Bar Order and Judgment and Bar Order are fully justified by the Settlement Amount being paid by Chadbourne.  The Court has already enjoined and barred all claims against the settling defendants and related parties pursuant to the settlements in the BDO lawsuit and the Adams & Reese lawsuit.  [ECF Nos. 2230, 2248].  Movants ask the Court to similarly enjoin and bar all claims and potential claims against the Chadbourne Released Parties in order to effectuate the Chadbourne Settlement.

61.     Plaintiffs and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors.  Plaintiffs firmly believe that they could prosecute viable causes of action against Chadbourne, though Chadbourne vigorously denies any wrongdoing or liability, and has indicated that it firmly believes it would successfully defend any claims against it.  Chadbourne also has the resources to defend itself and to litigate the issues through a final trial court judgment, and appeal if necessary, which means the litigation would take years to be resolved without a settlement.

62.     Plaintiffs believe that the terms of the Chadbourne Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

63.     The overall context of the MDL and Stanford Receivership also is relevant to the equities of the situation.  The Stanford Ponzi scheme collapsed in February 2009, and the seven years since have yielded numerous motions, dismissals, appeals, and a delay in any substantial recovery for Stanford's victims.  The parties – on both sides – are confronted by uncertainty, risk, and delay.  In this circumstance, the example of settlement is to be encouraged.

64.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging.  For many of Stanford's victims, recovery delayed is recovery denied.  If possible, the time that Stanford's victims have waited to date should not be extended further.

65.     The equities of the Chadbourne Settlement, including its necessary Bar Order and Judgment and Bar Order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims.  The Receiver, the Examiner, the Committee, and the Investor Plaintiffs have cooperated and joined together in the Chadbourne Settlement.  In this complex international fraud, this level of coordination and quality of resolution are eminently desirable.  The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation. The result of this coordination will be the most orderly distribution to Stanford's victims that possibly can be achieved.

66.     The Court is well within its discretion to approve the Chadbourne Settlement.  In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities

laws and defrauding investors. 2012 WL 401069, at *1. The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id.* The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership. The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed. *Kaleta*, 530 F. App'x at 362-63.

67. In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the Receivership Estate. *Kaleta*, 2012 WL 401069, at *7. "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id.*

68. In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties. *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014). The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities." *Id.* at *2.[8]

### IV. REQUEST FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES

*A.* *Terms of Plaintiffs' Counsel's Engagement*

69. In addition to approving the Chadbourne Settlement, Plaintiffs also request that

---

[8] The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party. *See SEC v. Temme*, No. 4:11–cv–655, [ECF No. 162] (E.D. Tex. Nov. 21, 2012).

the Court approve an award of attorneys' fees to Plaintiffs' Counsel, consisting of Castillo Snyder, P.C. ("Castillo Snyder"), Strasburger & Price, LLP ("Strasburger"), and Neligan Foley LLP ("Neligan Foley") under the terms of the fee agreement between Plaintiffs' Counsel and the Receiver, the Committee, and the Investor Plaintiffs, as well as reimbursement of expenses incurred in the prosecution of the Receiver Litigation and the Investor Litigation.  As reflected in the Declaration of Edward C. Snyder (the "Snyder Declaration"), attached as **Exhibit 2** to the Appendix in Support of this Motion, Plaintiffs' Counsel have been jointly handling the Receiver Litigation and the Investor Litigation pursuant to 25% contingency fee agreements with the Receiver and the Committee (in the Receiver Litigation) and the Investor Plaintiffs (in the Investor Litigation).  *See also* Declarations of Edward Valdespino and Doug Buncher attached to the Appendix as **Exhibits 3 and 4,** respectively.

70.     Pursuant to the fee agreements, the Committee and Investor Plaintiffs seek Court approval to pay attorneys' fees to Plaintiffs' Counsel equal to an aggregate of 25% of the Net Recovery from the Chadbourne Settlement (i.e., the settlement amount less allowable disbursements), and to reimburse Plaintiffs' Counsel as well as the Receiver for expenses they have incurred and carried in the Receiver Litigation and the Investor Litigation.  The gross amount of the settlement to be paid by Chadbourne is $35,000,000.00.   The expense disbursements for which Plaintiffs seek reimbursement and which are to be deducted from the settlement amount to calculate the Net Recovery from the Chadbourne Settlement are **$191,455.86**, which are expenses either (i) previously incurred in the prosecution of the Investor Litigation since 2009 and carried by Plaintiffs' Counsel or (ii) expenses that were incurred in the Receiver Litigation and paid by the Receiver directly or reimbursed by the Receiver to Plaintiffs' Counsel pursuant to a fee agreement.  See Snyder Decl., Ex. 2 at ¶ 44 (testifying to $89,252.15 in

expenses carried by his firm); Valdespino Decl., Ex. 3 at ¶ 41 (testifying to $52,664.00 in expenses carried by Strasburger);  Buncher Decl., Ex. 4 at ¶ 19 (testifying to $16,593.82 in expenses carried by Neligan); Scott Powers Decl., **Exhibit 5** at ¶ 10 (testifying that the Receiver advanced $32,945.89 in expenses for the Receiver Litigation).

71.    Thus, the Net Recovery from Chadbourne after reimbursement of expenses is $34,808,544.10, and 25% of the Net Recovery is **$8,702,136.04**.  This is the fee agreed to be paid to Plaintiffs' Counsel by the Receiver, the Committee, and the Investor Plaintiffs, and this is the amount of the fee for which approval is sought in this Motion.

### B.    *The Proposed Fee is Reasonable as a Percentage of the Overall Recovery*

72.    Trial courts can determine attorneys' fee awards in common fund cases such as this one[9] using different methods.  One is the percentage method, under which a court awards fees based on a percentage of the common fund.  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012).  The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable."  *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc*., 488 F.2d 714 (5th Cir. 1974)).[10]  Thus, when considering fee awards in class action cases, "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check."  *Id*. (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K (lead case), 2005 WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[11]

---

9      The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr. S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

10     The *Johnson* factors are discussed in Subsection C below.

11     While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District of Texas have recognized that the percentage method is the preferred method of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25. In *Schwartz*, the

73.     While the Chadbourne Settlement is not a class action settlement, because the settlement is structured as a settlement with the Receiver and the Committee, with the Bar Order and the Judgment and Bar Order, this Motion analyzes the award of attorneys' fees to Plaintiffs' Counsel under the law applicable to class action settlements in an abundance of caution.   In another Stanford litigation settlement, this Court analyzed the pertinent fee requests under both the common fund and *Johnson* approaches.  *Id.* at 3; *see Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80 (approving a 25% contingency fee on a $40 million settlement).

74.     Whether analyzed under the common fund approach, the *Johnson* framework, or both, the 25% fee sought by Plaintiffs' Counsel pursuant to their fee agreements is reasonable and should be approved by the Court.

75.     The proposed 25% amount is a reasonable percentage of the common fund (i.e., the $35 million settlement).  "The vast majority of Texas federal courts and courts in this District have awarded fees of 25%–33% in securities class actions."  *Schwartz*, 2005 WL 3148350, at *31 (collecting cases).  "Indeed, courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method." *Id.*[12]  Combined with the *Johnson* analysis set forth below, the proposed fee award is reasonable and appropriate under the common fund doctrine as applied in the Fifth Circuit.

---

court observe that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25.  The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case.  *Id*.  Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."  *Id*. at *26.

[12]     As set forth in *Schwartz*, courts in the Northern District of Texas have routinely approved such awards. *See, e.g*, *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc*., No. 4:00–CV–355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% fee in securities class action); *Scheiner v. i2 Techs., Inc.*, Civil Action No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class

**C.      The Proposed Fee is Reasonable Under the Johnson Factors**

76.      The *Johnson* factors include: (1) time and labor required; (2) novelty and difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.  A review of these factors also reveals that the proposed 25% fee is reasonable and should be approved.

**(1)      Time and Labor Required**

77.      As reflected in the Snyder, Valdespino, and Buncher Declarations, Plaintiffs' Counsel invested a tremendous amount of time and labor in the Chadbourne cases over the last seven years.  Even a cursory review of the Court's docket in all of these cases reveals the immense amount of work that Plaintiffs' Counsel have put into the prosecution of the lawsuits since 2009 (for example, there are 240 docket entries in the Investor Litigation alone).  The Investor Litigation was appealed twice to the Fifth Circuit as well as to the U.S. Supreme Court. The Receiver Litigation was filed and litigated both in the District Court for the District of Columbia and in this Court.

78.      Moreover, as the Court is aware, the prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort to investigate the facts,

---

action); *Hoeck v. Compusa, Inc.*, Civil Action No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig*., Master File No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc.*, Civil Action No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI*, No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig*., No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc*., No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the cases, conduct discovery, prepare the briefs and motions, attempt to negotiate settlements, and prepare cases for summary judgment and/or trial. Plaintiffs' Counsel have spent thousands of hours since 2009 in their investigation and prosecution of the Receiver Litigation and the Investor Litigation that are the subjects of the settlement.

79. Plaintiffs' Counsel have spent roughly 7 years and thousands of hours investigating and pursuing claims against third parties, including Chadbourne, on behalf of the Stanford Receivership Estate and the Stanford Investors. Castillo Snyder served as lead counsel among Plaintiffs' Counsel for the Committee in the Receiver Litigation and for the Stanford Investors in the Investor Litigation. Castillo Snyder has close to $7 million invested in the Stanford cases overall since 2009, and **2,945 hours** of time worth **$1,742,718.00** at Castillo Snyder's applicable hourly rates invested specifically in the Receiver Litigation and the Investor Litigation. *See* Snyder Decl., at ¶ 42. Strasburger & Price also has thousands of hours and millions of dollars of time invested in pursuing claims against third parties related to the Stanford Receivership, and **2,150.5 hours** of attorney and paralegal time worth **$1,250,720.00** attributable to the Receiver Litigation and the Investor Litigation. *See* Valdespino Decl., at ¶ 41. Neligan Foley served as lead counsel for the Receiver in the Receiver Litigation. Neligan Foley has nearly 7,000 hours and over $2.8 million worth of attorney and paralegal time invested in the Stanford lawsuits, including the Receiver Litigation and the Investor Litigation. Neligan Foley has over **800 hours** of unpaid attorney and paralegal time worth **$406,470.50** invested specifically in the Receiver Litigation and the Investor Litigation. *See* Buncher Decl., at ¶ 18.

80. Furthermore, the law firm of Hohman Taube & Summers previously represented the Receiver with respect to the Receiver Litigation against Chadbourne, and said firm purports

to have several hundred hours of time worth several hundred thousand dollars invested specifically in the Receiver Litigation.

81.     Finally, Plaintiffs' Counsel retained Washington-based U.S. Supreme Court appellate counsel Tom Goldstein to assist them and serve as lead Supreme Court appellate counsel with respect to the SLUSA appeal before the U.S. Supreme Court and are contractually obligated to pay Mr. Goldstein's firm, Goldstein & Russell P.C., the sum of **$334,000.00** in compensation for the work he performed on said appeal.

82.     The tremendous amount of work required by Plaintiffs' Counsel to prosecute the Receiver Litigation and the Investor Litigation against Chadbourne is described in the Snyder, Valdespino, and Buncher Declarations, and this Motion.  [*See, e.g.*, Mot. ¶¶ 10-26].[13]

### (2)     Novelty and Difficulty of the Issues

83.     The factual and legal issues presented in this lawsuit were difficult and complex. Plaintiffs' Counsel's investigation from 2009 through 2013 revealed Chadbourne's involvement in representing Stanford's sprawling group of companies with respect to an ongoing SEC investigation of Stanford and Stanford's persistent evasion and obstruction of regulatory authorities including the SEC.

84.     Plaintiffs' Counsel conducted a thorough analysis of the potential claims against Chadbourne, considering: claims available under both state and federal law; the viability of those claims considering the facts underlying Chadbourne' business dealings with Stanford and this Court's previous rulings; the success of similar claims in other Ponzi scheme cases, both in the

---

[13]     Unlike prior settlements, the instant Chadbourne Settlement does not fully and finally resolve the litigation as Plaintiffs continue to prosecute claims against Proskauer and Mr. Sjoblom.  For that reason Plaintiffs' counsel is not submitting their time records to the Court as part of this Motion.  Should the Court request Plaintiffs' counsel to do so, Plaintiffs' counsel will seek leave to file said time records under seal as they contain privileged and confidential attorney-client and attorney work product information related to the still-pending claims against Proskauer and Mr. Sjoblom.

Fifth Circuit and elsewhere; as well as defenses raised by Chadbourne in their motions to dismiss and mediation position papers.

85.     The Investor Plaintiffs commenced their action by filing their Original Complaint in this Court on August 27, 2009.  The Investor Litigation was immediately confronted by complex and novel issues concerning SLUSA, which were raised by Defendants via their Motions to Dismiss, along with (1) other complex and novel issues related to securities and dealer registration and other liability issues under the TSA, and (2) limitations and joint and several liability issues under the Investor Plaintiffs' TSA, conspiracy, and related causes of action.  The SLUSA issue was litigated all the way to the U.S. Supreme Court.  The Investor Plaintiffs then fully litigated and briefed the question of class certification, which involved extremely complex and novel issues of res judicata under the foreign laws of multiple countries. Finally, the Investor Plaintiffs also had to contend with the new law on attorney immunity as applicable to this case, and, specifically, had to handle the recently decided appeal in the Fifth Circuit.  The Receiver Litigation similarly involves complex issues of liability and damages for the Estate claims against Chadbourne.

86.     The foregoing summary of the issues identified in Plaintiff's Counsel's investigation of the claims against Chadbourne illustrates the novelty, difficulty, and complexity of the issues in the Investor Litigation and Receiver Litigation and supports the approval of the proposed fee.

### (3)     Skill Required

87.     Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution, and settlement of this case required significant skill and effort on the part of Plaintiffs' Counsel.  Plaintiffs' Counsel have represented investor classes as well as

receivership and bankruptcy estates on numerous occasions, and are currently serving as counsel for the Receiver, the Committee, and other investor plaintiffs, both individually and as representatives of putative classes of Stanford Investors, in multiple other lawsuits pending before the Court.  Snyder Decl., ¶¶ 5-11; Valdespino Decl., at ¶¶ 5-9; Buncher Decl., at ¶¶ 3-5. Plaintiffs submit that the favorable result in this case is indicative of Plaintiff's Counsel's skill and expertise in matters of this nature.

### (4)   Whether Other Employment is Precluded

88.    Although participation in the Receiver Litigation and the Investor Litigation did not necessarily preclude Plaintiffs' Counsel from accepting other employment, the sheer amount of time and resources involved in investigating, preparing, and prosecuting the Receiver Litigation and the Investor Litigation, as reflected by the hours invested in the Receiver Litigation and the Investor Litigation and the Stanford case generally, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters.  Snyder Decl. at ¶ 40; Valdespino Decl., at ¶ 15.

### (5)   The Customary Fee

89.    The 25% fee requested is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude.  *See Schwartz*, 2005 WL 3148350, at *31 (collecting cases and noting that 30% is standard fee in complex securities cases).  "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund."  *Klein*, 705 F. Supp. 2d at 675 (citing *Manual for Complex Litig. (Fourth)* § 14.121 (2010)); *see, e.g.*, *SEC v. Temme*, No.4:11-cv-00655-ALM, at *4–5 (E.D. Tex. November 21, 2012), ECF No. 162 (25% contingent fee for a $1,335,000 receivership settlement); *Billitteri v. Sec. Am., Inc.*, No. 3:09–cv–01568–F (lead

case), 2011 WL 3585983, *4–9 (N.D. Tex. 2011) (25% fee for a $80 million settlement); *Klein*, 705 F. Supp. 2d at 675–81 (30% fee for a $110 million settlement).

90.     The Receiver Litigation, the Investor Litigation, and the other third-party lawsuits are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery, and dispositive motions to get to trial. Indeed the Investor Litigation was filed almost 7 years ago and still had not reached the merits discovery phase at the time of its dismissal by the Fifth Circuit. The lawsuits have involved significant financial outlay and risk by Plaintiffs' Counsel, the risk of loss at trial after years of work for no compensation, and an almost certain appeal following any victory at trial. Plaintiffs' Counsel submit that these factors warrant a contingency fee of more than 25%. Nonetheless, Plaintiffs' Counsel agreed to handle the Receiver Litigation and the Investor Litigation on a 25% contingency fee basis, and that percentage is reasonable given the time and effort required to litigate these cases, their complexity and the risks involved.

### (6)     Whether the Fee is Fixed or Contingent

91.     As set forth above, the fee was contingent upon success against Chadbourne. As a result, Plaintiffs' counsel bore significant risk in accepting the engagement.

### (7)     Time Limitations

92.     At the time of the Chadbourne Settlement, Plaintiffs were not subject to significant time limitations in the Receiver Litigation and the Investor Litigation, as the Receiver Litigation has been essentially stayed while the parties awaited this Court's ruling on class certification and litigated the issue of attorney immunity in the Investor Litigation. However, and given the breadth and scope of activity in the Investor Litigation over the last 7 years, including almost non-stop heavy briefing and motion practice, including class certification

discovery and briefing, two appeals to the Fifth Circuit, and an appeal to the U.S. Supreme Court, Plaintiffs' Counsel has been consistently under deadlines and time pressure for over 6 years.  Had an investor class been certified, the Investor Litigation would have remained pending before the Court and would likely have taken years to resolve. Furthermore, given the magnitude and complexity of the cases, even if a trial in the Receiver Litigation was set a year in the future, Plaintiffs' Counsel would have been under significant time pressure to complete all the investigation and discovery to prepare the case for final hearing within a year.

### (8)    The Amount Involved and Results Obtained

93.    As discussed further herein, $35 million represents a substantial settlement and value to the Receivership Estate. This factor also supports approval of the requested fee.

### (9)    The Attorneys' Experience, Reputation, and Ability

94.    As noted above, Plaintiffs' Counsel have represented numerous investor classes, receivers, bankruptcy trustees, and other parties in complex litigation matters related to equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding.  *See* Snyder Decl., at ¶¶ 5-11; Valdespino Decl., at ¶¶ 5-9; Buncher Decl., at ¶¶ 3-5.   Indeed, Plaintiffs' Counsel have been actively engaged in the Stanford proceeding since its inception. Given the complexity of the issues in the Receiver Litigation and the Investor Litigation, Plaintiffs submit that the Chadbourne Settlement is indicative of Plaintiffs' Counsel's ability to obtain a favorable result in such proceedings.

### (10)    The Undesirability of the Case

95.    The Receiver Litigation and the Investor Litigation are not *per se* undesirable, although suing other lawyers does generate some level of stigma within the legal community, which can in certain circumstances result in fewer referrals of new matters.

**(11)     Nature and Length of Professional Relationship with the Client**

96.     As the Court is aware, Plaintiffs' Counsel have represented the Receiver, the Committee, and Investor Plaintiffs in numerous actions pending before the Court since 2009. Plaintiffs' Counsel has handled all of these cases on the same 25% contingency fee arrangement that has previously been approved by the Court.  *See* SEC Action, ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action, ECF No. 1208, p. 3 (providing a "contingency fee" of twenty-five percent (25%) of any Net Recovery in actions prosecuted by the Committee's designated professionals).  This factor also weighs in favor of approval of the requested fee.

**(12)     Awards in Similar Cases**

97.     As noted above, a 25% contingency fee has previously been approved as reasonable by this Court in its order approving the Receiver's agreement with the Committee regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and the Committee (the "OSIC-Receiver Agreement").  *See* SEC Action, ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action, ECF No. 1208, Ex. A, p. 3 (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by the Committee's designated professionals). The Court's order approving the OSIC-Receiver Agreement also provided that the Committee need not submit a fee application seeking an award of fees consistent with the percentage authorized under the Court's previous order unless required by Rule 23.  *See* SEC Action, ECF No. 1267, p. 2.

98.     The OSIC-Receiver Agreement further provided that the Committee "would prosecute certain fraudulent transfer claims and other actions for the benefit of Stanford

investors/creditors in cooperation with Ralph S. Janvey, as receiver." *See* OSIC-Receiver Agreement, SEC Action, ECF No. 1208, Ex. A, p. 1.  The Agreement further provided that "this proposal will apply to the litigation of all fraudulent transfer and similar claims that may be brought under common law, statute . . . or otherwise . . ." and "unless otherwise agreed, the terms of this agreement will likewise apply to the pursuit of any other claims and causes of action that the Receiver and the Committee determine to jointly pursue." *Id*. at pp. 1-2.

99.     The contingency fee agreements with Plaintiffs in the Receiver Litigation and the Investor Litigation similarly provide for a fee of 25% of the Net Recovery (defined as the total recovery after deducting allowable expenses and disbursements), and were modeled after the OSIC-Receiver Agreement since the parties knew that the Court had already approved a 25% contingency fee agreement.

100.    The 25% contingency fee arrangement that was approved by the Court in the context of the OSIC-Receiver Agreement became the framework for the 25% contingency fee agreements that the Receiver and Committee entered into with Plaintiffs' Counsel in the Receiver Litigation as well as in other third party lawsuits.

101.    Further, this Court recently approved a 25% contingency fee arrangement in the BDO case, as well as, the settlement with the Settling Defendants in the Adams & Reese case. *See Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80; and Order Approving Attorneys' Fees in *Ralph S. Janvey v. Adams & Reese, LLP*, Civil Action No. 3:12-CV-00495-B [SEC Action, ECF. No. 2231].

102.    As set forth in *Schwartz*, courts in this district have routinely approved 25%, and more often 30%, fee awards in complex securities class actions.  2005 WL 3148350, at *27 (collecting cases).  Under the circumstances of this case, such an award is appropriate here as

well.

### D.    *The Proposed Fee Should Be Approved*

103.    For the same reasons the Court previously found the 25% contingency fee OSIC-Receiver Agreement to be reasonable, *see* SEC Action, ECF No. 1267, p. 2; *Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80; and Order Approving Attorneys' Fees in *Ralph S. Janvey v. Adams & Reese, LLP*, Civil Action No. 3:12-CV-00495-B [SEC Action, ECF No. 2231]; the Court should find the 25% contingency fee applicable to the settlement of the Receiver Litigation and the Investor Litigation to be reasonable and approve it for payment. Here, there is even more reason to find the fee to be reasonable given the vast amount of work and risk undertaken by Plaintiffs' counsel over the last 6 ½ years. The settlement of the Receiver Litigation and the Investor Litigation has yielded an enormous benefit to the Stanford Receivership Estate and the Stanford Investors and compares favorably to the other settlements of third-party lawsuits in the over seven-year history of the Stanford receivership. Thus, Plaintiffs submit that an award of attorneys' fees equal to 25% of the net recovery from the Chadbourne Settlement, as requested, is reasonable and appropriate and should be approved under applicable Fifth Circuit law, whether using a common fund approach, the *Johnson* factor approach, or a blended approach.

104.    Plaintiffs therefore request that the Court approve the reimbursement, from the Settlement Amount, of expenses advanced by the Receiver and Plaintiffs' Counsel as described herein in the total amount of $191,455.86, and that the Court approve attorneys' fees in the total amount of $8,702,136.04. A proposed form of Order Approving Attorneys' Fees is attached as Exhibit 6 to the Appendix to this Motion.

*E.*      *Examiner Support for Fee Award*

105.      John J. Little in his capacity as Court-appointed Examiner also supports the award of Plaintiffs' attorneys' fees, and requests that the Court approve them.  *See* Declaration of Examiner John J. Little, attached as **Exhibit 6** to the Appendix to this Motion.

## V.      CONCLUSION & PRAYER

106.      The Chadbourne Settlement represents a substantial and important recovery for the Receivership Estate and the Stanford Investors.  The large amount of the recovery, the time and costs involved in pursuing litigation against Chadbourne, and the uncertain prospects for obtaining and then recovering a judgment against Chadbourne, all weigh heavily toward approving the Chadbourne Settlement, entering the Bar Order, entering the Judgment and Bar Order, and approving the attorneys' fees of Plaintiffs' Counsel.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request this Court:

a.      Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

b.      Grant this Motion;

c.      Approve the Chadbourne Settlement;

d.      Enter the Bar Order in the SEC Action;

e.      Enter the Judgment and Bar Order in the Receiver Litigation;

f.      Approve the reimbursement of expenses to the Receiver and Plaintiffs' Counsel in the total amount of $191,455.86 and payment of attorneys' fees to Plaintiffs' Counsel in the total amount of $8,702,136.04; and

g.      Grant Plaintiffs all other relief to which they are entitled.

Date:   April 20, 2016.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
   Edward C. Snyder
   esnyder@casnlaw.com
   Jesse R. Castillo
   jcastillo@casnlaw.com
   300 Convent Street, Suite 1020
   San Antonio, Texas  78205
   (210) 630-4200
   (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By: */s/ Douglas J. Buncher*
   Douglas J. Buncher
   dbuncher@neliganlaw.com
   Republic Center
   325 N. St. Paul, Suite 3600
   Dallas, Texas  75201
   (214) 840-5320
   (214) 840-5301 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ David N. Kitner*
   David N. Kitner
   david.kitner@strasburger.com
   901 Main Street, Suite 4400
   Dallas, Texas  75202
   (214) 651-4300
   (214) 651-4330 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ Judith Blakeway*
   Judith R. Blakeway
   judith.blakeway@strasburger.com
   Merritt Clements
   merritt.clements@strasburger.com
   2301 Broadway
   San Antonio, Texas  78215
   (210) 250-6000
   (210) 250-6100 (Facsimile)

**COUNSEL FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

     On April 20, 2016, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. All parties who have appeared in this proceeding will be served via ECF. Investors and other interested parties will be served and given notice of the hearing on this Motion as approved by the Court.


               /s/ Edward C. Snyder
               Edward C. Snyder

84265v.1