# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
|     Plaintiff, | § | |
| v. | § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § | |
|     Defendants. | § § | |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, *et al.*, | § § § § | |
|     Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:09-cv-01736-N |
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT APPOINTED RECEIVER FOR STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § § | |
|     Defendants. | § § | |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, *et al.*, | § § § § | |
|     Plaintiffs | § § | Civil Action No. 3:13-CV-2226-N |
| v. | § § | |
| PABLO M. ALVARADO, *et al.*, | § § | |
|     Defendants. | § § | |

|  | § |  |
|---|---|---|
| | § | |
| CERTAIN UNDERWRITERS AT LLOYD'S OF | § | |
| LONDON, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 3:15-cv-1997-N |
| | § | |
| v. | § | |
| | § | |
| PAUL D. WINTER, *et al.*, | § | |
| | § | |
| Defendants. | § | |

|  | § |  |
|---|---|---|
| CLAUDE F. REYNAUD, *et al.*, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-3731-N |
| | § | |
| CERTAIN UNDERWRITERS AT LLOYD'S OF | § | |
| LONDON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1] AND TO STAY RELATED LITIGATION AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, LEXINGTON INSURANCE CO., AND ARCH SPECIALTY INSURANCE CO., TO ENTER THE BAR ORDER, TO ENTER THE COVERAGE ACTION JUDGMENT AND BAR ORDER, TO ENTER THE THIRD-PARTY COVERAGE ACTIONS JUDGMENTS AND BAR ORDERS, AND FOR THE MOVANTS' ATTORNEYS' FEES

COMES NOW Ralph S. Janvey, in his capacity as the court appointed receiver for

Stanford International Bank, Ltd., et al. (the "Receiver") and the Official Stanford Investors'

Committee (the "Committee) (the Receiver and Committee are collectively the "Movants"), and

move the Court to approve the settlement (the "Insurance Settlement") among and between the

---

[1] Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order does not constitute a final approval of the Settlement Agreement.  Instead, the proposed Scheduling Order approves the notice and objection procedure for approval, temporarily stays certain litigation that would be affected by the settlement, and sets a final hearing.

Movants and Certain Underwriters at Lloyd's of London,[2] Lexington Insurance Company, and Arch Specialty Insurance Co. (collectively "Underwriters").

Movants further request, as more fully set out below, that the Court enter the Scheduling Order, stay certain litigation that would be affected by final approval of the Insurance Settlement, approve the Notice of the Insurance Settlement, and enter the following bar orders and judgments attached to and incorporated by reference into the Insurance Settlement Agreement and its Amendment, attached as **Exhibit 1** and **Exhibit 2** respectively to the Appendix in Support of this Motion ("App."): (1) Final Bar Order in *SEC v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-cv-00298-N (the "SEC Action");   (2) Final Judgment and Bar Order in *Underwriters, et al. v. Janvey*, Civil Action No. 3:09-1736 (the "Coverage Action"); and (3) Final Judgments and Bar Orders in the Third-Party Coverage Actions as defined by Insurance Settlement Agreement (collectively the "Bar Orders").[3]

Movants ask this Court to find that the Insurance Settlement is fair, equitable, and reasonable, and in the best interests of the Receivership Estate and all of its Claimants, and to approve the Insurance Settlement.

Finally, Movants request that the Court approve payment of attorneys' fees to the Receiver's counsel, Kuckelman, Torline, Kirkland & Lewis LLC ("Kuckelman Torline") and to the Movants' counsel[4] in Movants' litigation against Claude Reynaud, which would be resolved as a consequence of, and according to the terms of, the Insurance Settlement.  In support of this

---

[2] Certain Underwriters at Lloyd's of London refers to Lloyd's of London Syndicates 2987, 2488, 1084, 1886, 4000, 1183, and 1274.

[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Settlement Agreement.  To the extent of any conflict between this Motion and the terms of the Settlement Agreement, the Settlement Agreement shall control.

[4] Movants are represented by several different law firms with respect to the claims against Reynaud; those firms would split any fee awarded to them pursuant to an agreement among the firms.

Motion, Movants respectfully state the following:

## I. <u>INTRODUCTION</u>

1.      As part of their lengthy and thorough investigation of the Stanford Ponzi scheme, Movants investigated and asserted claims against Underwriters in connection with insurance policies issued by Underwriters, including claims against former Stanford directors, officers, and employees for which insurance coverage might be available under those policies. After protracted litigation and settlement negotiations with Underwriters, Movants have reached a settlement with Underwriters.  Under the terms of the Insurance Settlement, once approved and effective, Underwriters will pay $65 million to the Receiver for distribution to customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford Investors") and who have submitted claims that have been allowed by the Receiver.

2.      In return, Underwriters seek a global release of all Settled Claims[5] against Underwriters and the Underwriters Released Parties, and thus the Insurance Settlement is

---

[5] "Settled Claim" means any action, cause of action, suit, liability, claim, right of action or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Policies; (ii) the Stanford Entities; (iii) any actual or potential claim of coverage under the Policies in connection with the SEC Action, the Receivership, the Indirect Claims, the Direct Claims, the Stanford Investor Claims, or any claim asserted against any of Underwriters' Insureds or any Stanford Defendant or any other Person who has ever had any affiliation with any Stanford Defendant; (iv) any certificate of deposit, CD, depository account, or investment of any type with any one or more of the Stanford Entities; (v) any one or more of the Underwriters' relationship with any one or more of Underwriters' Insureds; (vi) the Coverage Action; (vii) the Third-Party Coverage Actions; (viii) the Indirect Claims; and (ix) all matters that were asserted in, could have been asserted in, or relate to the SEC Action, the Coverage Action, the Indirect Claims, the Coverage Action, the Third-Party Coverage Actions, the Stanford Investor Claims, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. "Settled Claims" specifically includes, without limitation, all claims each Releasor does not know or suspect to exist in his, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to this Insurance Settlement Agreement ("<u>Unknown Claims</u>").  *See* Paragraph 18 of the Insurance Settlement Agreement for a complete definition of Settled Claim.

conditioned on the following: (1) the Court entering the Bar Orders; (2) Movants agreeing to dismiss claims against certain former Stanford directors, officers, and employees seeking coverage under the Policies upon fulfillment of conditions identified in the Insurance Settlement Agreement;[6] and (3) the Receiver agreeing to file notices of satisfaction of judgment with the Court for the judgments obtained against the Estate of Robert Winter and Patricia Maldonado upon the fulfillment of conditions identified in the Insurance Settlement Agreement.[7]   The Insurance Settlement Agreement provides that the Insurance Settlement will not affect any of the Movants' claims against any person other than Underwriters, Underwriters' Released Parties, Maldonado, the Winter Estate, or the former Stanford directors, officers, and employees who are identified in footnote 6 below.[8]

3.       The Bar Orders would permanently bar, restrain, and enjoin the Receiver, the Receivership Estate, the Committee, the Claimants, the Stanford Investors, Underwriters' Insureds, the Interested Parties, and all other Persons or entities, whether acting in concert with the foregoing or claiming by, through, under the foregoing, or otherwise, all and individually, from directly, indirectly, or through a third party, instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, or otherwise prosecuting, against any of the Underwriters or any of the Underwriters Released Parties, any action, lawsuit, cause of action, claim, investigation, demand, complaint or proceeding of any nature, including but not limited to

---

[6] The individuals subject to dismissal upon fulfillment of conditions are: Rebecca Hamric, Glen Rigby, Linda Wingfield, Gilbert Lopez, Mark Kuhrt, Luis Garcia, Henry Amadio, Daniel Bogar, Bernerd Young, Jay Comeaux, Jason Green, Suzanne Hamm, Jack Staley, and Claude Reynaud.

[7] The judgment against the Estate of Robert S. Winter was entered in this Court in *Janvey v. Hamric*, Civil Action No. 3:13-cv-775.  The judgment against Ms. Maldonado was entered in *Janvey v. Maldonado*, Civil Action No. 3:14-cv-2826, also in this Court.

[8] Without limiting the generality of the statement above, the Insurance Settlement will not affect any of the claims identified in Exhibit B to the Insurance Settlement Agreement.

litigation, arbitration, or other proceeding, in any Forum, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way related to, or is connected with (i) the Insurance Policies; (ii) the Stanford Entities; (iii) any certificate of deposit, CD, depository account, or investment of any type with any one or more of the Stanford Entities; (iv) any one or more of Underwriters' relationships with any one or more of the Stanford Entities; (v) any actual or potential claim of coverage under the Insurance Policies in connection with the SEC Action, the Receivership, the Indirect Claims, the Stanford Investor Claims, or any claim asserted against any Stanford Defendant or any other Person who has ever had any affiliation with any Stanford Defendant; (vi) the Coverage Action; (vii) the Third-Party Coverage Actions; (viii) the Indirect Claims; (ix) the Stanford Investor Claims; and (x) all matters that were or could have been asserted in SEC Action, the Coverage Action, the Indirect Claims, the Stanford Investor Claims, and/or the Third-Party Coverage Actions, or any proceeding concerning the Stanford Entities pending or commenced in any Forum.

4.      Movants ask the Court to approve the Insurance Settlement and enter the Bar Orders because:

a.      The Insurance Settlement, which is contingent on entry of the Bar Orders, would result in the payment of $65 million by Underwriters for the benefit of Stanford Investors;

b.      In the absence of the Insurance Settlement, there is a meaningful risk that factual or legal issues could be resolved adversely to those claiming coverage under the Insurance Policies, which could result in no recovery or a recovery that is substantially smaller than the recovery made possible through the Insurance Settlement; and

c.      Continuing the litigation that would otherwise be resolved by the Insurance Settlement would result in the expenditure of Receivership assets for payment of

attorneys' fees, expert witness fees, and other litigation expenses and would result in a risk that any remaining insurance policy limits would be subject to erosion through payment of defense costs for litigation against former Stanford directors, officers, and employees.

5.    Movants further request that the Court approve payment of attorneys' fees to Kuckelman Torline, whose efforts were necessary to achieve the Insurance Settlement, in the amount of $14 million.  This amount represents a fair and reasonable amount – 21.5% of the Insurance Settlement – which is less than what the Court has approved for other Stanford settlements (25%) and is a significant discount from the one-third (33 1/3%) contingency fee agreement between the Receiver and Kuckelman Torline.  *See* Motion for Order Approving Receiver's Agreement with Counsel to Handle Insurance-Related Litigation, Exhibit B [SEC Action, ECF No. 1953-3]; *see also*, Order, ECF No. 1976.

6.    Movants also request that the Court approve payment of attorneys' fees in the amount of $100,000 to Movants' counsel who are handling Movants' litigation against Claude Reynaud, the resolution of which was an important element of the Insurance Settlement.

## II. BACKGROUND

### A.    *Authority of the Receiver and the Committee*

7.    On February 16, 2009, the Securities & Exchange Commission ("SEC") filed the SEC Action, and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."  *See* Order Appointing Receiver ¶ 4 [SEC Action, ECF No. 10].

8.    The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order").  [SEC Action,

ECF No. 1130]. The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

9. The Receiver is not only authorized but required to pursue outstanding liabilities and claims for the Estate. *Id.* ¶¶ 3, 5(b)-(c). The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court. *Id.* ¶ 2. The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate. Second Order ¶ 5(i).

10. On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action." [SEC Action, ECF No. 322]. Although he is not a party to the coverage litigation between Movants and Underwriters, the Examiner signed the Insurance Settlement Agreement as chair of the Committee, and as Examiner solely to evidence his support and approval of the Insurance Settlement and the obligation to post Notice of the Insurance Settlement on his website.

11. On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors. [SEC Action, ECF No. 1149]. The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver). *Id.* ¶ 8(d). This

Court has recognized the Committee's standing to pursue litigation claims such as the claims against Claude Reynaud that are subject to resolution under the terms outlined in the Insurance Settlement. *See* Order 4–6, *Janvey & Official Stanford Inv'rs Comm. v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N (Sept. 24, 2012 (N.D. Tex.), ECF No. 33 (the Committee has standing to pursue claims based on the Court's grant of such authority to the Committee as an unincorporated association representing the interests of the Stanford Investors).

12.     On February 27, 2014, this Court approved the Receiver's contract with Kuckelman Torline to handle insurance-related litigation, with the qualification that the Court would review any fee award pursuant to that agreement "for reasonableness, giving due regard to the risks undertaken by [Kuckelman Torline], the lodestar amount, and the other customary factors." *See* Order, [SEC Action, ECF No. 1976].

**B.      *The Insurance Settlement settles all disputes between Movants and Underwriters related to direct and indirect claims for insurance coverage.***

13.     Underwriters issued three insurance policies to Stanford: (1) Directors' and Officers' Liability and Company Indemnity Policy, number 576/MNK558900 ("D&O Policy"), attached as **Exhibit 3** to the App. at pp. 116-163; (2) Financial Institutions Crime and Professional Indemnity Policy, number 576/MNA851300 ("Crime and Professional Indemnity Policy"), attached as **Exhibit 4** to the App. at pp. 165-250; and (3) Excess Blended 'Wrap' Policy, number 576/MNA831400 ("Excess Policy"), attached as **Exhibit 5** to the App. at pp. 252-273 (collectively the "Insurance Policies").

14.     The Crime and Professional Indemnity Policy provides two types of insurance coverage: (1) first party fidelity coverage for employee theft ("Fidelity Coverage"), App. at pp.

174-198; and (2) third-party coverage for professional indemnity ("PI Coverage"), App. at pp. 217-250.

15.     Each Insurance Policy and type of coverage is subject to its own policy limits, insuring agreements, terms, conditions, exclusions, and definitions, although the Excess Policy follows the underlying policies.   Thus, for example, to have D&O coverage under the Excess Policy, one must consider the D&O Policy's insurance, agreements, terms, conditions, exclusions and definitions.   App. at pp. 257 (¶ 7).   The same is true for both Fidelity Coverage and PI Coverage.  *Id*.

16.     The Insurance Policies have the following limits of liability:

| | **Stanford Bank Entities** | **Stanford Brokerage Entities** |
|---|---|---|
| **D&O Policy** | $5 million | $5 million |
| **Fidelity Coverage** | $5 million per Loss/$10 million aggregate | $5 million per Loss/$10 million aggregate |
| **PI Coverage** | $5 million per Claim/$10 million aggregate | $5 million per Claim/$10 million aggregate |
| **Excess** | $45 million each Claim or Loss/$90 million aggregate | |

17.     Underwriters have taken the position that the D&O Policy has been fully eroded by attorneys' fees paid on behalf of various insureds for criminal and administrative matters, and that the Excess Policy has been eroded by approximately $19 million, also for Insureds' attorneys' fees.   Underwriters have also taken the position that the PI Coverage has been eroded by approximately $25,000 for Insureds' attorneys' fees.

18.     Movants and Underwriters dispute the amount of the remaining policy limits. Movants assert that, assuming the Underwriters' position concerning erosion is correct, $101 million in policy limits remains based on the sum of the aggregate limits for the relevant insurance coverages.   Underwriters contend that all of Movants' potential claims for coverage,

both direct and indirect, relate to the same subject matter and constitute a single claim/loss. Underwriters, therefore, assert that the per claim/loss limits apply rather than the aggregate limits.  Accordingly after the claimed erosion to date, Underwriters assert that only $46 million in limits remain.

19.    Following his appointment, the Receiver made claims for coverage (the "Direct Claims") under each of the Insurance Policies.  The Direct Claims are pending in the Coverage Action.  Underwriters dispute that there is coverage for the Direct Claims and filed the Coverage Action, seeking a declaration of no coverage under the Insurance Policies.   The Receiver counterclaimed, alleging, inter alia, breach of contract, breach of the duty of good faith and fair dealing, bad faith under the Texas Insurance Code, and violation of the Texas Deceptive Trade Practices Act.

20.    In addition to the Coverage Action, the Insurance Policies are or may be implicated in numerous other disputes.  Movants filed numerous lawsuits against Underwriters' Insureds (the "Indirect Claims"), who in turn made or may make claims for coverage under the Policies. Stanford Investors also made numerous claims against Underwriters Insureds (the "Stanford Investor Claims"), who in turn made or may make claims for coverage under the Insurance Policies.  Underwriters contend that the Insurance Policies do not provide coverage for the Indirect Claims or the Stanford Investor Claims, and they are involved in numerous lawsuits relating to the various claims for coverage under the Policies (the "Third-Party Coverage Actions").  The Receiver has intervened or sought to intervene in the Third-Party Coverage Actions.

21.    Under the terms of the Insurance Settlement Agreement, Underwriters will pay $65 million to the Receivership Estate, which (less attorneys' fees and expenses) will be

distributed to Stanford Investors with allowed claims. In return, Underwriters seek global peace, through entry of the Bar Orders, with respect to all claims that have been asserted, or could have been asserted, against Underwriters arising out of, in connection with, or relating to: the events leading to this Receivership, the Coverage Action, the Third-Party Coverage Actions, the Indirect Claims, and the Stanford Investor Claims; all matters that were or could have been asserted in the Coverage Action, the Third-Party Coverage Actions, the Indirect Claims, and the Stanford Investor Claims; the Insurance Policies; Underwriters' relationship with the Stanford Entities; and any actual or potential claim of coverage under the Insurance Policies in connection with the SEC Action, the Receivership, the Indirect Claims, the Stanford Investor Claims, or any claim asserted against any person who has ever had any affiliation with any of the Stanford Entities.

**C.**   ***Movants have spent several years and thousands of hours thoroughly investigating and pursuing recovery of insurance proceeds, through the investigation and assertion of both direct claims against Underwriters and indirect claims against former Stanford directors, officers, and employees, through which insurance proceeds might be obtained.***

22.   Movants have actively investigated and litigated all Stanford-related insurance coverage issues.  Specifically, Movants have investigated and/or litigated coverage for three types of recovery under the Insurance Policies:

 a)  Recovery under the Fidelity Coverage for Stanford's direct losses due to the misconduct of Allen Stanford, James Davis, Mark Kuhrt, Gilbert Lopez, Daniel Bogar, Jay Comeaux, and Bernerd Young (the "Fidelity Losses");

 b)  Recovery through the D&O Policy and PI Coverage in connection with Movants' claims for breach of fiduciary duty against former Stanford directors, officers, and employees (the "Movants' Breach of Fiduciary Duty Lawsuits"); and

 c)  Recovery for extra-contractual claims based on Underwriters' failure to act in good faith and violations of the Texas Insurance Code (collectively the "Extra-Contractual Claims").

23.   As part of the Receiver's investigation and litigation of insurance related issues

with Underwriters, the Receiver's counsel has reviewed and analyzed voluminous internal Stanford documents and emails, Underwriters' document productions, and documents received by third-party Willis.   Additionally, the Receiver's counsel took numerous depositions of Underwriters' representatives in London, focusing on underwriting, coverage, and claims handling issues.   The Receiver's counsel prepared for and defended the Receiver's deposition taken by Underwriters.   The Receiver's counsel also took the depositions of James Davis and Mauricio Alvarado.   Finally, the Receiver's counsel reviewed and analyzed depositions and trial testimony obtained in multiple collateral lawsuits and the criminal prosecution of Allen Stanford, James Davis, Laura Pendergest-Holt, and other former Stanford insiders.

24.   The Receiver's counsel also researched all relevant case law to support coverage under the Insurance Policies and Underwriters' liability for extra-contractual damages and engaged in extensive motion practice and briefing in litigation with Underwriters.

25.   In addition to direct claims against Underwriters, Movants asserted breach of fiduciary duty claims against numerous former Stanford directors, officers, and employees, the ultimate liability for which Movants contend would have fallen on Underwriters.   Movants' counsel spent thousands of hours investigating and prosecuting such claims, including reviewing and analyzing myriad documents, interviewing and deposing numerous witnesses, retaining expert witnesses, engaging in extensive motion practice, proceeding to trial in one case, and preparing for trial in other cases.   As a result of these efforts, the Receiver obtained a $2 billion judgment against the estate of Robert Winter and a $57 million judgment against Patricia Maldonado.   With respect to the judgment against the Winter estate, the Receiver obtained from the probate court handling Mr. Winter's estate, a turnover of Mr. Winter's rights against Underwriters.   As of the date of the Insurance Settlement Agreement, Movants were asserting

13

claims against numerous other defendants, pursuant to which Movants were prepared to obtain additional judgments that Movants would contend would have ultimately required payment by Underwriters.

26. Investigation and prosecution of the foregoing insurance-related issues and claims, both direct and indirect, also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationship and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities. Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate claims against Underwriters. Movants and their counsel have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of the SEC Action, all of which allowed the Receiver and his counsel to formulate and assert claims against Underwriters and others that ultimately led to the Insurance Settlement. But for the diligent efforts of Movants and their counsel, the Insurance Settlement would never have been achieved, and the Receivership Estate and the Stanford Investors would not have achieved this $65 million settlement.

27. In summary, Movants and their counsel have conducted a thorough analysis of, and heavily litigated on multiple fronts, a series of coverage claims against Underwriters taking into consideration the Insurance Policies and their varied insuring agreements, terms, conditions and exclusions as applied to the facts and law to determine the probability of recovering under the Insurance Policies.

**D.** ***The Coverage Action has been actively litigated.***

28. On September 17, 2009, Underwriters instituted a Declaratory Judgment against

the Receiver, Civil Action No. 3:09-cv-1736 (the "Coverage Action").  The parties agreed to stay

the litigation and little activity took place in the Coverage Action until the Receiver hired

Kuckelman Torline and the parties asked the Court to lift the stay during the summer 2014.  *See*

*generally*, Docket Report in Coverage Action; Motion to Lift Stay [Coverage Action, ECF No.

40, 46].

29.     After the Court lifted the stay, the parties began discovery.

30.     Immediately after the Court lifted the stay, Underwriters also filed a Motion for

Judgment on the Pleadings.  [Coverage Action, ECF Nos. 50-51].  In their Motion for Judgment

on the Pleadings, Underwriters argued that the fraud and money laundering exclusions in the

D&O Policy and PI Coverage precluded all coverage because Stanford was a "massive fraud"

and the Receiver could not argue otherwise.  *Id*.

31.     The Receiver responded to the Motion for Judgment on the Pleadings, arguing

that the non-imputation provisions in the fraud and money laundering exclusions required a

claim-by-claim analysis to determine coverage.  [Coverage Action, ECF No. 58-59].

32.     The Court denied Underwriters' Motion for Judgment on the Pleadings, holding

that the "nonimputation provisions in both the D&O Policy and the PI Policy dictate that each of

the Receiver's claims be evaluated individually to determine if the exclusions apply."  Order

[Coverage Action, ECF No. 93].

33.     Both the Receiver and Underwriters filed amended pleadings after the Court

denied Underwriters' Motion for Judgment on the Pleadings.  [Coverage Action, ECF No. 101-

102].  The Receiver's Amended Counterclaim sought a declaration of coverage for Stanford's

Fidelity Losses, breach of contract for refusing to pay the Fidelity Losses, breach of the duty of

good faith and fair dealing, bad faith under the Texas Insurance Code Annotated, and violations

of the Texas Deceptive Trade Practices Act.  [Coverage Action, ECF No. 101].  Underwriters' sought declarations of non-coverage in their Amended Complaint based on various exclusions and conditions, which are discussed further below.  [Coverage Action, ECF No. 102]; *see* 64-70, *infra*.

34.     The Coverage Action trial was scheduled to start in February 2016.

**E.     *Movants and Underwriters mediated twice over three days and actively negotiated the Insurance Settlement for seven months.***

35.     The first mediation occurred in New York on June 10-11, 2015.  JAMS' mediator Jed Melnick, Esq. and his assistant, Simone Lelchuk, Esq., facilitated the mediation.  No settlement resulted.

36.     The third day of mediation occurred on November 4, 2015 with Mr. Melnick and Ms. Lelchuk in Texas; again, no resolution resulted.

37.     The Parties continued negotiating, however, and in December 2015, pursuant to the parties' request, the Court stayed the February 2016 trial setting while the parties continued to work toward finalizing a settlement agreement.  *See*, *e.g.*, Various Filings [Coverage Action, ECF Nos. 133-141].  Over the next seven months, the parties engaged in extensive negotiations over numerous difficult issues, ultimately reaching a resolution on all material terms.  The parties executed the Insurance Settlement Agreement on June 3, 2016.

38.     Without the tireless effort of Movants and their counsel in investigating and prosecuting these claims as part of the overall effort to recover money from third parties for the benefit of Stanford Investors, the Insurance Settlement could never have been achieved, and the Coverage Action, Third-Party Coverage Actions, and Indirect Claims would have dragged on for years with an uncertain outcome and at great expense to the parties and possible continued

erosion of the Insurance Policies' remaining limits of liability.   *See* Section III, ¶¶ 60-75.

**F.      *The Insurance Settlement is fair, equitable, reasonable, and in the best interests of the Receivership Estate.***

39.      The proposed Insurance Settlement is the result of many years and thousands of hours of work by Movants and their counsel, and was negotiated and entered into as a result of arm's-length negotiation both during and following mediation facilitated by JAMS' mediator Jed Melnick, Esq.

40.      The essential terms of the Insurance Settlement Agreement, attached as **Exhibit 1** to the Appendix, are that:

a)   Underwriters will pay $65 million, which will be paid to the Receiver as required pursuant to the Insurance Settlement Agreement;

b)   The Receiver and the Committee will fully release Underwriters and the Underwriters Released Parties from Settled Claims, *e.g.* claims arising from or relating to Allen Stanford, the Stanford Entities, or any conduct by Underwriters or Underwriters' Released Parties relating to Allen Stanford or the Stanford Entities;

c)   The Insurance Settlement Agreement requires entry of a Judgment and Bar Order in the Coverage Action and the Third-Party Coverage Actions; [9] and entry of a Bar Order in the SEC Action, each of which permanently enjoins Interested Parties and other Persons, including all Stanford Investors and Claimants, from bringing or continuing any legal proceeding and/or asserting, encouraging, assisting, or prosecuting any cause of action arising from, relating to, or in connection with the Settled Claims or the Insurance Policies against Underwriters or the Underwriters Released Parties, including claims for contribution, breach of contract, bad faith, and statutory violations;

d)   Following the entry of the proposed judgments and bar orders, Underwriters will have no further obligations or liability arising under, relating to, or in connection with the Policies to any of Underwriters' Insureds,[10] Stanford Investors, Claimants, or any other

---

[9] The "Third-Party Coverage Actions" are identified in paragraph 23 of the Agreement and Amended Exhibit J to the Agreement.

[10] "Underwriters' Insureds" means any Person who is insured under any of the insurance policies Underwriters issued to the Stanford Entities, including (1) any Persons who were, now are, or shall be directors or officers of any of the Stanford Entities; (2) any Persons who were foreign titled equivalents of directors and officers in U.S. corporations of any of the Stanford Entities; (3) employees of any of the Stanford Entities; (4) the lawful spouse or domestic partner of any director, officer, or employee of any of the Stanford Entities, solely to the extent that such Person is a party to any Claim solely in his or her capacity as spouse or domestic partner; (5) the estates, heirs, legal

Person;

e) Subject to conditions specified in the Insurance Settlement Agreement, Movants will dismiss their claims against certain former Stanford directors, officers, and employees (such individuals are identified in footnote 6 to this Motion), and they will further file notices of satisfaction of judgment as to Patricia Maldonado and the Estate of Robert Winter; otherwise, neither the Agreement nor the proposed judgments and bar orders affect the Receiver's or Committee's pursuit of their claims against Underwriters' Insureds, nor do the Agreement or proposed judgments and bar orders affect the pursuit of claims against any of Underwriters' Insureds by any other person;

f) The Receiver will disseminate notice of the Insurance Settlement to Interested Parties, through one or more of the following:  mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the Examiner's and Receiver's web sites and newspaper publication;

g) The Receiver will develop and submit to the Court for approval a plan for disseminating the Settlement Amount ("Distribution Plan"); and

h) Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted Claims that have been allowed by the Receiver.

41.    Movants are confident that they have thoroughly investigated the insurance coverage issues, the claims that are to be dismissed pursuant to the Insurance Settlement, and the extra-contractual claims against Underwriters.  Movants are confident that they have sufficient information to enter into and endorse the Insurance Settlement.  Movants are also confident that the Insurance Settlement is fair and reasonable taking into consideration not only the merits of the claims, but also the risks, uncertainties, and expenses associated with continued litigation. Therefore, Movants believe that the Insurance Settlement is in the best interests of the Stanford Receivership Estate and the Stanford Investors and should be approved by the Court.

42.    The Chairman of the Committee, who participated in the settlement negotiations and mediations, is also the Court-appointed Examiner, and he supports this Motion in both

representatives or assigns of any director, officer, or employee of any of the Stanford Entities; and (6) the Stanford Entities.

capacities, as does the Receiver.

43.     All Stanford Investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution process.  The Insurance Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'"  *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (for ease of reference *Kaleta I*).  The Insurance Settlement and Bar Orders protect both the Underwriters Released Parties and the Stanford Investors.

44.     For the reasons described herein, the Insurance Settlement is fair, adequate, equitable, reasonable, and in the interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets.  Movants urge the Court to approve it.

## III.   REQUEST FOR APPROVAL OF NOTICE AND ENTRY OF SCHEDULING ORDER, INCLUDING STAY OF CERTAIN COVERAGE-RELATED LITIGATION

45.     Pursuant to Paragraph 29 of the Insurance Settlement Agreement, Movants seek entry of the Scheduling Order in the form attached as Exhibit I to the Insurance Settlement Agreement, which preliminarily approves the Insurance Settlement Agreement as fair and reasonable based upon the Court's review of this Motion and the Insurance Settlement Agreement, sets a final hearing date a date at least ninety (90) calendar days after entry of the Scheduling Order, and sets deadlines for the filing of objections and responses to objections to the Insurance Settlement Agreement.  The purposes of the final hearing will be:  (i) to determine whether the Insurance Settlement Agreement, and the settlement it describes, should be finally approved by the Court; (ii) to determine whether the Bar Orders attached as Exhibits C, D, and E to the Insurance Settlement Agreement should be entered by the Court; (iii) to rule upon any

objections to the Settlement, the Insurance Settlement Agreement or the Bar Orders; and (iv) to rule upon such other matters as the Court may deem appropriate.

46.     Pursuant to Paragraphs 29 and 30 of the Insurance Settlement Agreement, Movants propose that Notice in substantially the form as Exhibit F to the Insurance Settlement Agreement, be sent via electronic service to all counsel of record (who are deemed to have consented to electronic service) for any Person who is, at the time of the Notice, a party in any matter in (i) MDL No. 2099, *In re: Stanford Entities Securities Litigation* (N.D. Tex.) (the "MDL"); (ii) the SEC Action; (iii) the Indirect Claims; and (iv) the Third-Party Coverage Actions.  Movants further propose that notice be sent via facsimile transmission and/or first class mail to any other counsel of record for any other Person who is, at the time of service, a party in any case included in the foregoing sentence, and via electronic mail, first-class mail or international delivery service to all Interested Parties not served via one of the other foregoing methods, except that Movants propose that the Receiver not be required to individually provide notice to any Person who is an Underwriters' Insured but is not included in any of the following groups: Stanford Investors; Claimants; or parties to one or more of the MDL, the SEC Action, the Indirect Claims, and the Third-Party Coverage Actions.  Movants further propose that notice be posted on the websites of the Receiver and the Examiner along with complete copies of the Insurance Settlement Agreement, including all exhibits.  Movants further propose that Notice in substantially the form attached as Exhibit G to the Insurance Settlement Agreement be published once in the national edition of *The Wall Street Journal* and once in the international edition of *The New York Times*.  This proposed notice is reasonable and sufficient to satisfy due process and to notify interested parties wishing to file an objection to or be heard with respect to the terms of the Insurance Settlement Agreement, the proposed Bar Orders, the objection deadline

20

and the final hearing on this Motion.

47.     If the Court approves the Insurance Settlement and enters the Bar Orders, then all insurance coverage litigation connected to the Stanford Receivership will be concluded.  Further, as part of the Insurance Settlement, Movants have agreed to dismiss their claims against the following persons on fulfillment of conditions identified in the Insurance Settlement Agreement: Rebecca Hamric, Glen Rigby, Linda Wingfield, Gilbert Lopez, Mark Kuhrt, Luis Garcia, Henry Amadio, Daniel Bogar, Bernerd Young, Jay Comeaux, Jason Green, Suzanne Hamm, Jack Staley, and Claude Reynaud.

48.     To avoid any unnecessary expenditure of resources by the Court, the parties to the Coverage Action and the Third-Party Coverage Actions, or the defendants identified in the preceding paragraph, who may be dismissed as a consequence of the Insurance Settlement, Movants respectfully request that, as part of entering the proposed scheduling order, the Court stay the Coverage Action and the Third-Party Coverage Actions except to the extent necessary to give effect to the Insurance Settlement Agreement.  Movants' further request that Movants' claims against the individuals identified in the foregoing paragraph (who are the same defendants identified in Exhibit A to the Insurance Settlement Agreement) be stayed, and that where such defendants are included in cases with defendants not identified in Exhibit A to the Insurance Settlement Agreement, the stay be applied only to the claims against the defendants identified in Exhibit A to the Insurance Settlement Agreement.  Movants request that the stays expire on the earlier of the Insurance Settlement Agreement Effective Date or the date of any termination of the Insurance Settlement Agreement pursuant to Paragraph 35 of the Insurance Settlement Agreement.

49.     Therefore, Movants request that the Court promptly enter the Scheduling Order,

without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, since such Scheduling Order does not constitute final approval of the Insurance Settlement Agreement.   Instead, the proposed Scheduling Order approves the Notice and objection procedure, temporarily stays certain litigation that would be affected by the Insurance Settlement, and sets a final hearing on the requested final approval of the Insurance Settlement.

## IV.   REQUEST FOR APPROVAL OF THE INSURANCE SETTLEMENT

50.   "'[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.'" *Kaleta I*, 530 F. App'x at 362 (quoting *SEC v. Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)).   "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" *Id.* (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)).   "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership." *Id.* (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)).   "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *SEC* v. *Kaleta*, No. CIV.A. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012) (for ease of reference only *Kaleta II*) (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).   Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation." *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

51.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors.  *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d).  "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors."  *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

52.     The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants.  Second Order ¶ 5.

53.     The ability to compromise claims is critical to this Receivership.  Courts have long emphasized that public policy favors settlement.  *See, e.g.*, *Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010).  That is especially true here because, while Stanford's Ponzi scheme victims await recovery, the remaining policy limits may continue to be eroded and further costs would come directly out of the Receivership Estate.  Undeniably, the Insurance Settlement is the only way to guarantee that the Stanford victims benefit from the Insurance Policies.

54.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases.  *Kaleta I*, 530 F. App'x. at 362-63 (approving bar order).  Bar orders are commonly used in receivership cases to achieve these purposes.  *See, e.g.*, *Gordon*, 336 F. App'x at 549; *SEC v. Parish*, No. 2:07-cv-

00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010) (Norton, C.J.), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4-5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

55.     Bar Orders "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014) (following the *Kaleta* line of cases and approving bar order).

56.     In fact, the Fifth Circuit in *Kaleta I* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary . . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate"; and (iii) the scope of the bar order is appropriately tailored to achieve these objectives.  *See Kaleta I*, 530 F. App'x at 362-63.

57.     Additionally, district courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the

situation.  *Kaleta II*, 2012 WL 401069, at *4.[11]

58.     Judge Atlas' opinion in the May 2013 decision in *SEC v. Kaleta* ("*Kaleta III*") is instructive.  Civil Action no. H-09-3674, 2013 WL 2408017 (S.D. Tex. May 31, 2013).  In *Kaleta III*, the SEC filed suit against the defendants for alleged fraud surrounding promissory – note securities and a receiver was appointed.  *Id*. at *1.  The receiver sought approval for a settlement with some of the defendants' insurers.  *Id*. at *2.  The insurance policy at issue had a $1 million limit, of which approximately $60,000 had eroded; the settlement was $800,000, representing a discount off of the remaining and undisputed policy limits of liability.  *Id*.  The Court approved the settlement and broad bar order after finding that the potential coverage defenses, expense to litigate coverage, and inadequate policy limits all supported that the settlement was fair, equitable, reasonable, and in the best interests of the receivership.  *Id*. at *4- 5.  Further, Judge Atlas found that the settlement benefited not only the claimants (investors) but also the insureds because it reduced the claimants' "potential damages against and thus mitigates the claims against the [insureds]."  *Id*. at *7.

**A.      The Insurance Settlement meets all the equitable factors necessary for approval.**

**(1)      The value of the Insurance Settlement is significant when compared to the remaining policy limits.**

59.     "A proposed settlement need not obtain the largest conceivable recovery . . . to be

---

[11] This is neither a class action nor a case under Title 11 of the United States Code.  Thus, though they are not binding here, both class action and Title 11 cases define tests for approving the aggregate settlements that may be tailored for a receivership case such as this one.  *See, e.g., Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (class action); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (Title 11 bankruptcy).  Broadly speaking, before approving a global settlement the Court must determine that the settlement (i) is reached after arm's-length negotiations; (ii) provides relief commensurate with the risks and expenses of litigating the claim to judgment; and (iii) represents the considered opinions of the parties and their counsel, and has the support of persons appointed to represent those who ultimately benefit from the settlement.  For the same reasons that the Insurance Settlement satisfies the factors set forth in the decision of the district court in *Kaleta*, and as set forth herein, the Insurance Settlement easily satisfies the tests set out in *Newby* or *Moore*.

worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010).   In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient.   *Kaleta II*, 2012 WL 401069, at *4.   Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate.   *Gordon*, 336 F. App'x at 549.

60.     The Insurance Policies are a limited fund, the amount of which the Receiver and Underwriters do not agree.   *See* ¶¶ 16-18, *supra*.   If Underwriters are correct and only $46 million remains in policy limits, the Insurance Settlement is unquestionably fair, adequate, and reasonable because it represents 138% of the remaining policy limits.

61.     If the Receiver is correct and the remaining total policy limits are at least $101 million, then the $65 million settlement represents a recovery of as much as 64% of the remaining policy limits, still a substantial portion of the remaining limits.

62.     Underwriters have made it clear that, in the absence of the proposed $65 million Insurance Settlement, they would contest all factual and legal issues relating to coverage, including the amount of available policy limits and whether coverage exists at all for the types of injuries caused by the Stanford Ponzi scheme.   Given the real risk of losing all coverage based on policy exclusions, the risk of an unfavorable ruling as to the available policy limits, the expense of litigating coverage issues, and the risk of further erosion of policy limits, all discussed below, the Insurance Settlement is fair, reasonable, and adequate.

> **(2)** *Movants' claims for coverage for the Fidelity Losses, Movants' Breach of Fiduciary Duty Lawsuits, and Extra-Contractual Claims are meritorious; however, continued pursuit of the claims is not without significant risk.*

63.    Movants of course believe that their arguments for coverage of the Fidelity Losses, Movants' Breach of Fiduciary Duty Lawsuits, and Extra Contractual Claims are meritorious and would be successful.    However, there is no guarantee of success and Underwriters have vigorously disputed all of Movants' claims against them.

64.    Among others, the following coverage issues are hotly contested and promise years of uncertain litigation and, if decided in favor of Underwriters, could prevent the Receivership Estate from benefiting from the applicable insurance coverage:

a.    <u>Coverage for Fidelity Losses</u>:

- Did the Receiver fail to make timely sworn proofs of loss and, if so, does such failure waive or destroy coverage?  *See* App. at p. 194.[12]

- Did the Receiver's proofs of loss identify direct financial loss by Stanford, i.e., trigger the Fidelity Coverage's insuring agreement?  *See* App. at p. 177.[13]

- Does the fortuity doctrine preclude coverage for the Fidelity losses?  *See* Plaintiff's Reply in Support of Motion for Judgment on the Pleadings at pp. 8-9 [Coverage Action, ECF No. 60]; Defendants Sur-Reply in Opposition to Movants' Motion for Judgment on the Pleadings at pp. 4-7 [Coverage Action, ECF No. 74].

- Does the Fidelity Coverage's prior knowledge exclusion apply?  *See* App. at p. 191; *see also* ¶ 65, *infra*.

---

[12] The Receiver maintains that he gave sufficient notice of the Fidelity Losses but Underwriters dispute this assertion.  Further, the Receiver maintains that Underwriters had a duty to provide him with the proof of loss form and Underwriters suffered no prejudice as a result of the timing of the proofs of loss.

[13] Underwriters argue that the Fidelity Losses were not direct losses to Stanford because the investors, not Stanford, suffered the loss.  The Receiver counters, among other things, that the direct loss requirement is meant to prevent insurance for investment losses due to market conditions.  In contrast, in this case, the Fidelity Losses asserted by the Receiver occurred because certain Stanford directors, officers, and employees actually took money or conspired with others to take money directly from the Stanford entities, resulting in direct losses to those entities.

      b.      <u>Coverage for Movants' Breach of Fiduciary Duty Lawsuits</u>

      i.      <u>D&O Coverage</u>

- Does the D&O Policy's money laundering exclusion apply?  *See* App. at p. 131; *see also* ¶ 66, *infra*.

- Does the D&O Policy's fraud exclusion apply? *See* App. at pp. 128-129; *see also* ¶ 66, *infra*.

- Does the D&O Policy's insured v. insured exclusion apply? *See* App. at p. 128; *see also* Motion to Dismiss Cordell Haymon's First Amended Complaint and Brief in Support and responsive briefing [Case No. 3:12-cv-495, ECF No. 52-53, 57, 60-62].

      ii.      <u>PI Coverage</u>

- Does the PI Coverage's money laundering exclusion apply?  *See* App. at pp. 225-226; *see also* ¶ 66, *infra*.

- Does the PI Coverage's fraud exclusion apply?  *See* App. at p. 224; *see also* ¶ 66, *infra*.

- Does the PI Coverage's so-called insured v. insured clause apply?  *See* App. at p. 231; *see also* Motion to Dismiss Cordell Haymon's First Amended Complaint and Brief in Support and responsive briefing [Case No. 3:12-cv-495, ECF No. 52-53, 57, 60-62].

- Does the PI Coverage's prior knowledge exclusion apply?  *See* App. at p. 223; *see also* ¶ 65, *infra*.

- Does the PI Coverage's intentional corporate business policy apply?  *See* App. at p. 225.[14]

65.    Underwriters' coverage defenses present fact-intensive inquiries, increasing the likelihood of a full trial on the merits.  Other coverage defenses would require resolution of threshold legal issues that would likely involve lengthy, expensive appeals.  For example, the prior knowledge exclusion in the Fidelity Coverage:

---

[14]The Receiver will argue, among other things, that the exclusion does not apply because the Receiver has sued Stanford's former directors, officers, and employees for their grossly negligent acts and omissions of others, such as Patricia Maldonado, which caused injuries to the Stanford entities, not for an "intentional corporate or business policy."

This Section 1 [Fidelity Coverage] of the Policy does not cover:

(x) loss:

**\*\*\*\***

(ii) arising out of or in connection with any circumstances or occurrences <u>known to the Insured</u> at inception of this Policy which could reasonably be expected to give rise to Loss of more than USD100,000 under this Section 1 of the Policy.

Solely for purposes of knowledge as required by point (ii) above, the term "Insured" shall mean:

The first named Insured's General Counsel or Corporate Risk Manager.[15]

Thus, the application of the prior knowledge exclusion requires a fact-finder to determine if Mauricio Alvarado, former Stanford General Counsel, or Barbara Fortin, Corporate Risk Manager, knew about the Fidelity Losses before the policy incepted on August 15, 2008.  The PI Coverage's known loss exclusion is similar.

66.     Finally, as this Court has previously held, application of the D&O Policy's and PI Coverage's fraud and money laundering exclusions requires a case-by-case, factual analysis of the knowledge or involvement of each Director, Officer, or Employee sued by the Receiver.  *See* ¶¶ 30-32, *supra*.

67.     In deciding to enter the Insurance Settlement, Movants analyzed each of the outstanding coverage issues, as well as the costs, uncertainty, and delay associated with continuing to litigate the claims that would be resolved by the Insurance Settlement.  Because the Insurance Settlement provides for recovery of at least 64% of the available policy limits in the near term and without expenditure of additional Receivership resources, Movants believe that the Insurance Settlement is fair and reasonable.

68.     In deciding whether to accept the proposed settlement, the Receiver worked

---

[15] Fidelity Coverage, Exclusions, ¶ (x) (App. at p. 191).

29

closely with his counsel to analyze and consider the issues affecting coverage and the settlement.

69.     For these reasons, and similar to *Kaleta III*, the Insurance Settlement is fair, equitable, reasonable, and in the best interest of the Receivership Estate and the Stanford Investors.

   *(3)     Continuing to litigate insurance coverage would dissipate Receivership assets and could result in the erosion of the remaining limits of liability.*

70.     According to documents provided by Underwriters, payments for attorneys' fees for former Stanford directors, officers, and employees have completely eroded the D&O Policy and approximately $19 million of the Excess Policy's limits.

71.     If the litigation involving Underwriters' liability under the Insurance Policies is not resolved in the near term, the Policies may continue to erode.  Underwriters' Insureds have laid claim to the Insurance Policies to pay for their attorneys' fees generated to defend against criminal and administrative claims, Movants' Breach of Fiduciary Duty Lawsuits, and other individual lawsuits.  Underwriters have paid a substantial amount in response to these demands, in some cases voluntarily and in other cases by Court order.  Underwriters have in some cases entered agreements with some of their Insureds to provide them with attorneys' fees if they waive further coverage under the Insurance Policies for the defense of Movants' Breach of Fiduciary Duty Lawsuits.  By entering such agreements, Underwriters not only claim erosion of the policies' limits but also claim the ability to prevent Movants from reaching the Insurance Policies' coverage for future judgments in the Movants' Breach of Fiduciary Duty Lawsuits.

72.     Additionally, without the Insurance Settlement, the litigation against Underwriters would most likely go on for years, with no guarantee of a recovery.  While Kuckelman Torline has entered into contingent fee arrangements with the Receiver to prosecute all litigation directly

against Underwriters on a contingency fee basis, the Receiver and his lead counsel are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation. Additionally, the Receiver's Breach of Fiduciary Duty Lawsuits that would be resolved by the Insurance Settlement are being handled by Baker Botts, which is paid on an hourly basis. The Insurance Settlement avoids further expense associated with the prosecution of the Receiver's Breach of Fiduciary Duty Lawsuits that would be resolved by the Insurance Settlement.

73. Furthermore, in both the direct litigation with Underwriters and Movants' Breach of Fiduciary Duty Lawsuits, the Receiver is responsible for reimbursing all litigation-related expenses, including, *inter alia*, expert fees and out of pocket litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.). Without the Insurance Settlement, the Receiver would incur substantial *additional* expenses in order to prosecute the claims against Underwriters as well as the related Breach of Fiduciary Duty Lawsuits. For example, expert testimony would be needed to prove the details of the Stanford Ponzi scheme, the Underwriters' duties as they relate to coverage and claims handling, and the duties of Stanford directors, officers, and employees. Absent the Insurance Settlement, expert witness fees as to Underwriters' alleged liability and damages could easily have run into the hundreds of thousands of dollars, with added costs for working with expert witnesses, taking and defending expert depositions, and examining expert witnesses at trial. Other out of pocket litigation costs could have been substantial without the Insurance Settlement, including costs of oral and video depositions of additional fact witnesses and all expert witnesses, travel associated with depositions, preparation of expert witness reports, trial graphics, cost of reproduction of documents and trial exhibits, retrieval and storage of email and other electronically stored

information, attendance of experts at trial, and travel and hotel expenses for the Receiver's counsel at trial.

74.    Total out of pocket costs, including hourly attorneys' fees, to prosecute the litigation that would be resolved by the Insurance Settlement could easily reach several million dollars due to the complex nature of the claims, the need for expert testimony, and the voluminous nature of the records involved.

       *(4)*    ***Continuing to litigate insurance coverage would be complex and costly.***

75.    The prosecution of the coverage-related lawsuits would undoubtedly be challenging and expensive, as discussed above.

       *(5)*    ***The Stanford investors and insureds will benefit from the Insurance Settlement.***

76.    As the Fifth Circuit stressed in *Kaleta I*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'" 530 F. App'x at 362. The Receiver is not collecting the Insurance Settlement payment for Allen Stanford or for Mr. Janvey, but for the Stanford Investors. Thus, the relief Movants request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

77.    Additionally, numerous putative insureds will benefit from the Insurance Settlement. As set forth above, as part of the Insurance Settlement, the Receiver has agreed, on satisfaction of certain conditions identified in the Agreement, to file a satisfaction of judgment with respect to two judgments totaling $2.057 billion. Further, Movants have agreed, on satisfaction of certain conditions identified in the Insurance Settlement Agreement, to dismiss their claims against fourteen of Underwriters' Insureds. *See* ¶ 3, n. 6, *supra*.

78.     The putative insureds who are not released will also benefit from the Insurance Settlement because their liability to the investors will be reduced by the Insurance Settlement. *See Kaleta III*, 2013 WL 2408017 at *7, discussed above.

### (6)     *The value and merit of the foreclosed parties' claims do not outweigh the benefit the Insurance Settlement provides the Stanford Investors.*

79.     Movants are conscious of the fact that the Bar Orders they are requesting, the entry of which are conditions to the Insurance Settlement, will preclude Stanford Investors and Underwriters' Insureds from asserting claims against Underwriters in connection with their insurance of the Stanford enterprise.   However, any claims against Underwriters by Stanford Investors or Underwriters' Insureds face the same factual and legal challenges faced by the Movants, as discussed above.   *See* ¶¶ 63-71, *supra*.   Further, the proceeds of the Insurance Policies represent a finite pool of resources.   In the absence of a settlement, there is no guarantee that the policy proceeds would be available to satisfy all potential claims.   In fact, the opposite is true:  it is certain that the policy proceeds would be insufficient to satisfy all claims against them. The Insurance Settlement represents a fair and reasonable compromise with respect to the amount of the available insurance proceeds and their allocation.

80.     Given that all Stanford Investors have been put on notice of the Receivership and have been given opportunities to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process and will receive a distribution from the Insurance Settlement, the Stanford Investors' rights are not being unduly prejudiced by the Insurance Settlement.   They have all had the opportunity to participate with respect to seeking recovery from Underwriters through the pre-existing Receivership claims process.

81.     The Bar Orders should not be rejected based upon the possibility that some individual investor(s) or insured might otherwise wish to pursue individual claims against Underwriters now or in the future.  *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").

82.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the [Insurance] Settlement Agreement, nor one that could benefit *as many* aggrieved investors as stand to be benefited under the [Insurance] Settlement Agreement."  *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order) (emphasis added).

83.     As discussed above, the policy proceeds are necessarily limited, and there is never a guarantee, even in the absence of a settlement, that coverage will remain available for every insured.  *See Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 315 (Tex. 1994) (recognizing that, in order to promote settlements, an insurer may enter a reasonable settlement with an insured even though such settlement exhausts or diminishes the available insurance for other insureds) (citing *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex. 1986)).  Nevertheless, numerous putative insureds will benefit from the Insurance Settlement as a result of Movants' agreement with respect to satisfaction of two existing judgments and the agreement to dismiss claims against certain putative insureds.  Further, as discussed above, the putative insureds will benefit by having their liability to Stanford Investors reduced by the amount of the Insurance Settlement.  *See* ¶ 78, *supra*.

34

84.     Additionally, the merits and value of the putative insureds' claims for coverage suffer from the same uncertainty and risks associated with the Receiver's coverage claims.  *See* ¶ 63-71, *supra*.

85.     In sum, the Insurance Settlement should be approved because it will fairly and equitably distribute the benefits of the Insurance Policies.  The proposed Insurance Settlement represents the best opportunity to provide funds to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses or the further erosion of the remaining limits of liability.  In fact, the Insurance Settlement may represent the only mechanism for the Stanford Investors to receive proceeds from the policy limits of the Insurance Policies because claims for attorneys' fees and costs by Insureds threaten to erode the Insurance Policies, as discussed above.  *See* ¶¶ 70-74, *supra*.  Against this backdrop, the Court should approve the Insurance Settlement and enter the Bar Orders.

### *(7)     It is equitable to approve the Insurance Settlement.*

86.     The entry of the Bar Orders is a material term under the Insurance Settlement Agreement, and a necessary condition to the obligations set forth in the Insurance Settlement Agreement.  The bottom line is that there is no Insurance Settlement without these bar orders. Underwriters "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [Underwriters], potentially in other, including foreign, jurisdictions." *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

87.     Underwriters have made clear that in consideration of paying $65 million, they must achieve "peace" through the Insurance Settlement, wholly and finally, with respect to all Stanford-related claims.  Underwriters have stated that they would not enter into the Insurance Settlement without securing the avoidance of the expense of further such litigation, particularly

given what they believe are their strong coverage defenses.

88.     The Receiver and the Committee were appointed to protect the interests of _all_ of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants.  The proposed Bar Orders will help maximize the eventual distribution to Receivership Estate claimants of Underwriters' $65 million payment and provide Underwriters the resolution of Stanford-related litigation that is a necessary condition for that settlement payment by Underwriters.  The entry of the Bar Orders is fully justified by the settlement amount being paid by Underwriters, especially when weighed against the substantial risks of non-coverage and erosion of the remaining limits of liability.

89.     The Court has already enjoined and barred all claims against the settling defendants and related parties pursuant to the settlements in the BDO lawsuit and the Breazeale, Sachse & Wilson, LLP ("BSW") lawsuits.  [SEC Action, ECF Nos. 2230, 2248].  Movants ask the Court to similarly enjoin and bar all claims and potential claims against the Underwriters Released Parties in order to effectuate the Insurance Settlement.

90.     Movants spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors.  Movants firmly believe that they could prosecute viable causes of action against Underwriters, though Underwriters vigorously deny coverage and have indicated that they firmly believe they would successfully defend any claims against them.  Underwriters also have the resources to defend themselves and to litigate the issues through a final trial court judgment, and appeal if necessary, which means that the litigation would take years to be resolved without a settlement.

91.     The overall context of the MDL and Stanford Receivership also is relevant to the equities of the situation.  The Stanford Ponzi scheme collapsed in February 2009, and the seven

36

years since have yielded numerous motions, dismissals, appeals, and a delay in any substantial recovery for Stanford's victims.  The parties – on both sides – are confronted by uncertainty, risk, and delay.  In this circumstance, the example of settlement is to be encouraged.

92.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging.  For many of Stanford's victims, recovery delayed is recovery denied.  If possible, the time that Stanford's victims have waited to date should not be extended further.

93.     The equities of the Insurance Settlement, including its Bar Orders, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims.  The Receiver, the Examiner, and the Committee have cooperated and joined together in the Insurance Settlement.  In this complex international fraud, this level of coordination and quality of resolution are eminently desirable.  The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation.  The result of this coordination will be the most orderly distribution to Stanford's victims that possibly can be achieved.

**B.      *Equity strongly favors approving the Insurance Agreement because, absent the settlement, the Stanford Investors may not receive any insurance proceeds.***

94.     The terms of the Insurance Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing the Receivership assets and minimizing the expense to obtain them.

95.     Success for the Receiver is far from assured and would only be possible after years of litigation.  The Insurance Settlement represents a significant recovery for the Stanford Investors, while avoiding the burden, costs, delay, and risks incident to continued litigation.

96.     The Court is well within its discretion to approve the Insurance Settlement because it advances the Receiver's goal of "arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Kaleta II*, 2012 WL 401069, at *7.  In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties.  *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014).  The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities."  *Id.* at *2.[16]

97.     For these reasons, Movants respectfully request that the Court approve the Insurance Settlement because it is fair, equitable, reasonable, necessary, and in the best interest of the Receivership Estate and the Stanford Investors.

## V.    REQUEST FOR APPROVAL OF THE RECEIVER'S AND OSIC'S ATTORNEYS' FEES

98.     Movants request that the Court approve an award of attorneys' fees to Kuckelman Torline of $14 million, which is a significant discount on the 33 1/3% contingency fee contract between the Receiver and Kuckelman Torline.  *See* Motion for Order Approving Receiver's Agreement with Counsel to Handle Insurance-Related Litigation, Exhibit B [SEC Action, ECF No. 1953-3]; *see also*, Order [SEC Action, ECF No. 1976].

99.     Specifically, the fee contract allows Kuckelman Torline to recover 33 1/3% of the

---

[16] The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party. *See SEC v. Temme*, No. 4:11–cv–655, [ECF No. 162] (E.D. Tex. Nov. 21, 2012).

"Net Recovery," defined as the settlement amount after deducting expenses and disbursements. *See* Motion for Order Approving Receiver's Agreement with Counsel to Handle Insurance-Related Litigation, Exhibit B [SEC Action, ECF No. 1953-3].

100.   The expenses as of this filing are $177,114.08.   *See* Declaration of Michael J. Kuckelman ("Kuckelman Dec."), attached as **Exhibit 6** to the App. at ¶ 26, App. at p. 282 (testifying to $168,769.48 in expenses paid by the Receivership to date and $8,344.60 carried by his firm to date).   Application of the fee contract, therefore, results in a fee of $21,607,628.60.

101.   Kuckelman Torline agreed to reduce its net fee to $14 million.  The Receiver and Examiner, after giving due regard to the risks undertaken by Kuckelman Torline, the lodestar amount, the percentage precedent, and the *Johnson* factors, agreed to the reduced fee because it was reasonable for the reasons discussed below.

102.   This fee request represents a $7,607,628.64 discount from the fee contract.

103.   As of the date of this filing, Kuckelman Torline has invested 3,926 hours in the insurance-related issues and litigation since being retained.  *See* Kuckelman Decl. at ¶ 25, App. at pp. 281-282.

104.   Kuckelman Torline's reduced fee is 21.5% of the Insurance Settlement.  This is significantly below the contract rate and the 25% approved for fraudulent transfer cases handled by OSIC's counsel and in prior settlements requiring court approval.[17]

105.   The Receiver and the Examiner, in his capacity as the Examiner and as the Chairperson of the Committee, have agreed that a $14 million fee is reasonable considering the circumstances that lead to the Insurance Settlement.  *See* Declaration of Ralph J. Janvey, attached

---

[17] The Receiver and Kuckelman Torline have agreed that the $14 million attorneys' fee agreement applies only if the Insurance Settlement is approved and is not intended to be a modification of the fee contract.

as **Exhibit 7** to the App.; Declaration of Examiner John J. Little, attached as **Exhibit 8** to the App.

106.    Movants further request that the Court approve an award of attorneys' fees of $100,000.00 to Movants' counsel handling Movants' claims against Claude Reynaud.   The Insurance Settlement is intended to resolve the Committee's claims against Reynaud, which were originally part of Movants' lawsuit against Breazeale, Sachse & Wilson, LLP.   That lawsuit was handled by Committee counsel on a contingent fee basis, as further described in Movants' motion to approve the settlement with BSW and other defendants.   *See generally* [SEC Action, ECF No. 2134, 2135].   Using the 25% contingent fee approved in the BSW settlement as a starting point and allocating an appropriate portion of the $65 million settlement to the resolution of the Reynaud claims (approximately $500,000), Movants are proposing a $100,000 fee, or approximately 20% of the amount attributed to the value of the resolution of the Reynaud claims, for the Committee's counsel in connection with the Insurance Settlement.

## A.    *The proposed fee awards are reasonable.*

107.    Trial courts can determine attorneys' fee awards in common fund cases such as this one[18] using different methods.   One is the percentage method, under which a court awards fees based on a percentage of the common fund.   *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012).   The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable."   *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc*., 488 F.2d 714 (5th Cir.

---

[18] The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr. S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

1974)).[19]  Thus, when considering fee awards in class action cases, "district courts in [the Fifth]

Circuit regularly use the percentage method blended with a *Johnson* reasonableness check."  *Id.*

(internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K (lead case), 2005

WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[20]

108.    While the Insurance Settlement is not a class action settlement, because the

settlement is a settlement to benefit the Stanford Investors as a whole, this Motion analyzes the

award of attorneys' fees to Kuckelman Torline under the law applicable to class action

settlements in an abundance of caution.  In another Stanford litigation settlement, this Court

analyzed the pertinent fee requests under both the common fund and *Johnson* approaches.  *Id.* at

3; *see Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG, ECF No. 80

(approving a 25% contingency fee on a $40 million settlement).

109.    Whether analyzed under the common fund approach, the *Johnson* framework, or

both, a 21.5% fee to Kuckelman Torline pursuant is reasonable and should be approved by the

Court.   Similarly, the proposed fee for the Movants' counsel in the *Reynaud* litigation is

reasonable and should be approved by the Court.

**B.**    ***The proposed fee awards are a reasonable percentage of the overall recovery.***

110.    "The vast majority of Texas federal courts and courts in this District have awarded

fees of 25%–33% in securities class actions."  *Schwartz*, 2005 WL 3148350, at *31 (collecting

---

[19] The *Johnson* factors are discussed in Subsection C, *infra*.

[20] While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District of Texas have recognized that the percentage method is the preferred method of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25.  In *Schwartz*, the court observe that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25.  The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case.  *Id.*  Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."  *Id.* at *26.

cases). "Indeed, courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method." *Id.*; *see also, e.g.*, *Klein*, 705 F. Supp. 2d at 675, 675-81 (citing *Manual for Complex Litig. (Fourth)* § 14.121 (2010)) (30% fee for a $110 million settlement)l *SEC v. Temme*, No.4:11-cv-00655-ALM, at *4– 5 (E.D. Tex. November 21, 2012), ECF No. 162 (25% contingent fee for a $1,335,000 receivership settlement); *Billitteri v. Sec. Am., Inc.*, No. 3:09–cv–01568–F (lead case), 2011 WL 3585983, *4–9 (N.D. Tex. 2011) (25% fee for a $80 million settlement).[21]

111.     Kuckelman Torline has agreed to accept $14 million, or 21.5%,[22] rather than the 25%-33% fee regularly awarded in this Circuit. The proposed fee award, therefore, is more than reasonable and appropriate under the common fund doctrine as applied in the Fifth Circuit.

112.     Similarly, the fee proposed to Movants' counsel in the Reynaud litigation, at 20%, is below the 25%-33% awards that are often approved in this Circuit. It is also below the 25% approved in connection with the resolution of the claims against the other defendants in the BSW lawsuit. [SEC Action, ECF No. 2231].

**C.     The proposed fee to Kuckelman Torline is reasonable based on a consideration of the Johnson factors.**

113.     The *Johnson* factors include: (1) time and labor required; (2) novelty and

---

[21] As set forth in *Schwartz*, courts in the Northern District of Texas have routinely approved such awards. *See, e.g.*, *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, No. 4:00–CV–355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% fee in securities class action); *Scheiner v. i2 Techs., Inc.*, Civil Action No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc.*, Civil Action No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig.*, Master File No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc.*, Civil Action No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI*, No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig.*, No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc.*, No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

[22] Applying a deduction for the amount of the Insurance Settlement attributed to resolution of the Reynaud claims, the fee award, at 21.7%, would still remain well below the percentage frequently approved in this Court.

difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.  A review of these factors reveals that the proposed fee award to Kuckelman Torline is reasonable and should be approved.

### (1)   *Kuckelman Torline invested a significant amount of time and labor in their representation of the Receiver on all insurance-related issues.*

114.   As reflected in the Kuckelman Declaration, Kuckelman Torline invested a tremendous amount of time and labor analyzing and litigating insurance-related issues for the Receiver, including but not limited to the Coverage Action and Third-Party Coverage Actions. In the over two-and-a-half years that Kuckelman Torline has worked on the insurance-related issues and litigation they have invested 3,926 hours as of the date of this filing. *See* Kuckelman Decl. at ¶ 25, App. at pp. 281-282 (testifying to hours dedicated to insurance-related work for the Receiver to date).[23]

115.   The prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort.  While the Coverage Action was filed before Kuckelman

---

[23]As of the date of this filing, Kuckelman Torline has $2.25 million in time invested in the insurance claims and litigation.  Kuckelman Decl. at ¶ 25, App. at pp. 281-282. Courts regularly award lodestar multipliers in a range of 6.  *Newby v. Enron Corp.*, 586 F.Supp.2d 732, 799 (S.D. Tex. 2008) (multiplier of 5.2); *Waste Management Inc. Sec. Litig.*, H-99-2183, slip op. at 64 (approving a multiplier of 5.3); *In re Cardinal Health,* 528 F.Supp.2d 752, at 768 (S.D. Ohio 2007) (multiplier of 6); *In re Charter Commc'n Inc. Sec. Litig.,* No. 4:02-CV-1186, 2005 U.S. Dist. LEXIS 14772, *56 (E.D. Mo. June 30, 2005) (multiplier of 5.6); *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 198 (S.D.N.Y. 1997) (multiplier of 5.5); *In re RJR Nabisco, Inc. Sec. Litig.*, No. 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. August. 24, 1992) (multiplier of 6.0); *Di Giacomo*, 2001 U.S. Dist. LEXIS 25532 (S.D. Tex. 2001) (multiplier of 5.3); *In re Rite Aid Corp. Sec. Litig.*, 362 F.Supp.2d 587, 590 (E.D. Pa. 2005) (multiplier of 6.96).

Torline was retained, it had been stayed for many years without any activity. *See* Coverage Action, ECF No. 32]. The only substantive activity that occurred before Kuckelman Torline took over was the filing of pleadings, which were ultimately replaced by amended pleadings filed by Kuckelman Torline. [Coverage Action, ECF Nos. 97, 101-102, 104-105].

116. The coverage-related fact and legal issues, and the litigation itself were extraordinarily large and complex, involving voluminous records and electronic data and requiring over two years of investigation, researching and drafting briefs and motions, written discovery, deposition discovery, settlement negotiations, expert witness retention and preparation, and preparations for the Coverage Action trial, which was scheduled to start in February 2016.

117. For example, Kuckelman Torline invested significant time and effort on the following targeted activities:

      a.      Preparing and serving proofs of loss under the Fidelity Coverage;

      b.      Responding to dispositive motions filed by Underwriters in the Coverage Action and other Third Party Coverage Actions [Coverage Action, ECF Nos. 50-51,58-59, 60, and 93];

      c.      Preparing for and taking multiple depositions of Underwriters, requiring international travel and time in London adding to over two weeks;

      d.      Reviewing Stanford documents requested by Underwriters in discovery; and

      e.      Settlement strategy meetings with the Receiver.

     *(2)*     ***The issues surrounding Stanford's insurance cover were novel and difficult.***

118. As discussed above, the factual and legal issues presented in the coverage-related

lawsuits were difficult and complex.  *See*, *supra*, ¶¶ 63-71.  For example, the Receiver and Underwriters could not even agree on the total amount of limits of liability under the Insurance Policies.  *Id*. at ¶¶ 16-18.

119.    This dispute between Movants and Underwriters does not present a garden variety insurance coverage dispute.  The novelty of the legal and factual issues adds to difficulty of the insurance issues and litigation.

> **(3)    The Insurance Settlement required great skill to obtain because of the complex factual and legal issues bearing upon coverage under the Insurance Policies.**

120.    Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution, and settlement of this case required skill and effort on the part of Kuckelman Torline.   The Receiver retained Kuckelman Torline because its attorneys had significant experience with insurance coverage issues, including skills and knowledge of the Lloyd's of London market and its insurance policies.  Kuckelman Decl., at ¶¶ 4-8, 11-12, App. at p. 277-278.

121.    The favorable result in overcoming Underwriters' Motion for Judgment on the Pleadings, [*see* Coverage Action, ECF Nos. 50-51,58-59, 60, and 93], and the favorable settlement are indicative of, and a direct result of, Kuckelman Torline's skill and expertise litigating insurance coverage matters.

> **(4)    Kuckelman Torline was precluded from other employment because of the time necessary to represent the Receiver.**

122.    Kuckelman Torline is a small law firm.  Due to the time and resources involved in investigating, preparing, and prosecuting the insurance-related issues and actively litigating the Coverage Action, Kuckelman Torline necessarily had to divert time and effort that would have

been available for handling other matters.  Kuckelman Decl. at ¶ 25, 27, App. at pp. 281-282.

123.    Additionally, because Kuckelman Torline's attorneys historically represented some of the Lloyd's of London insurers, taking the Receiver's case has certainly impacted Kuckelman Torline's ability to receive coverage work from Lloyd's of London insurers.

*(5)    Kuckelman Torline had a contingency fee contract and accepted the risk of not being paid for their work.*

124.    The fee was contingent upon success against Underwriters.  Given the novelty and difficulty of the coverage issues, Kuckelman Torline bore significant financial risk in accepting the engagement.

*(6)    Although trial was not imminent when Kuckelman Torline was retained, the volume of accumulated information about the Stanford operation meant that Kuckelman Torline would necessarily be dealing with significant time limitations.*

125.    At the time Kuckelman Torline took on this engagement, the Stanford Receivership had been in place for nearly five years.  It was therefore necessary for Kuckelman Torline to very quickly review and analyze a highly complex and voluminous factual record. Accordingly, Kuckelman Torline faced significant time limitations in accepting the representation.

*(7)    The Insurance Settlement is significant.*

126.    As discussed further herein, $65 million represents a substantial settlement and value to the Receivership Estate.

127.    The remaining policy limits fall somewhere between $46 million (Underwriters' position) and $101 million (the Receiver's position), assuming acceptance of Underwriters' erosion figures.  *See* ¶¶ 16-18, *supra*.

128.     The Insurance Settlement, therefore, is more than the remaining policy limits if Underwriters succeed on their argument, or 141%, and as much as 64% if the Receiver succeeds.

### (8)     *Kuckelman Torline's attorneys have significant experience representing insurers on coverage matters.*

129.     Kuckelman Torline's attorneys have represented Lloyd's of London insurers on numerous coverage matters, both in litigation and pre-litigation.  *See* Kuckelman Decl., at ¶¶ 4-8, App. at pp. 277.  This experience gave Kuckelman Torline the ability to quickly understand the insurance issues and effectively represent the Receiver.

130.     For example, Michael J. Kuckelman spent almost 9 years in London working on legal matters with Lloyd's of London insurers and he successfully completed the Bar exam and was licensed to practice in the United Kingdom.  *See* Kuckelman Decl., at ¶¶ 3, 6, App. at pp. 276-277.

131.     Given the novelty and complexity of the insurance issues, Movants submit that the Insurance Settlement is indicative of Kuckelman Torline's experience, ability, and reputation on insurance coverage matters.

### (9)     *The Receiver's insurance claims, while not undesirable, were novel and difficult.*

132.     The Receiver's insurance claims and issues are not *per se* undesirable, although the novelty and difficulty of the issues, coupled with the contingent nature of the fee, creates meaningful financial risk for any firm choosing to accept the representation.

### (10)     *Kuckelman Torline represents the Receiver on insurance-related issues only, so the Insurance Settlement is their only opportunity to recover attorneys' fees.*

133.     Kuckelman Torline represents the Receiver on insurance-related issues only. Thus, unlike other counsel retained by the Receiver, Kuckelman Torline's only opportunity to

47

recover the time and labor invested in the Stanford Receivership is through its work on the claims resolved by the Insurance Settlement.

> **(11)** **Kuckelman Torline's reduced fee is <u>less than</u> the customary fee and awards in similar cases.**

134. As discussed above, Kuckelman Torline's fee is 21.5% of the Insurance Settlement, which is less than the customary fee awarded in this Circuit for similar cases. *See* ¶ 110, *supra*.

135. The requested fee is also less than the 25% fee previously awarded by this Court for other counsel representing the Receiver and the Committee. *See* Order Approving Attorneys' Fees in *Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N, ECF No. 80; and Order Approving Attorneys' Fees in *Ralph S. Janvey v. Adams & Reese, LLP*, Civil Action No. 3:12-CV-00495-B [SEC Action, ECF. No. 2231].

136. Although the time and effort required to understand, analyze, litigate, and resolve Stanford's complex insurance-related issues, especially when coupled with the significant risk of no recovery, warrants the standard 25%-30% fee, Kuckelman Torline seeks a fee that is only 21.5% of the Insurance Settlement.

**D.** **The proposed fee award to Movants' counsel handling the Reynaud litigation is reasonable based on a consideration of the Johnson factors.**

137. Movants have previously briefed the *Johnson* factors related to the litigation against Reynaud in connection with the motion to approve the BSW settlement. [SEC Action, ECF No. 2134]. Rather than restating that discussion here, Movants instead incorporate it by reference here, with two additional observations.

138. First, as discussed in the prior briefing, the value of attorney time spent on the BSW cases, including the claims against Claude Reynaud, exceeded $1.7 million. [SEC Action,

ECF No. 2134 at ¶75].  Combining the fee awarded in connection with the BSW settlement with the fee award proposed in connection with the Insurance Settlement still results in a fee award that is less than would obtain based purely on application of a standard hourly rate.

139.    Second, in connection with the BSW settlement, the Court approved a 25% contingency fee.  Movants estimate that resolution of the Claude Reynaud claims contributed approximately $500,000 in value to the Insurance Settlement.  Accordingly, the $100,000 fee award represents approximately a 20% fee, which is less than that approved for the BSW settlement.

***E.     The proposed fee awards are reasonable and should be approved.***

140.    For the reasons stated above, the *Johnson* factors weigh heavily in favor of the reasonableness of the proposed fee awards and the Court, therefore, should approve them for payment.  The settlement of the insurance-related claims has yielded an enormous benefit to the Stanford Receivership Estate and the Stanford Investors.

141.    Movants, therefore, respectfully request that the Court approve an award of $14 million in attorneys' fees for Kuckelman Torline and an award of $100,000.00 to the Movants' counsel handling the claims against Claude Reynaud.  A proposed form of Order Approving Attorneys' Fees is attached as **Exhibit 9** to the App. pp. 296-302.

## V.    <u>CONCLUSION & PRAYER</u>

142.    The Insurance Settlement represents a substantial and important recovery for the Receivership Estate and the Stanford Investors.  The large amount of the recovery, the time and costs involved in pursuing litigation against Underwriters, and the uncertain prospects for obtaining a judgment against Underwriters, all weigh heavily toward approving the Insurance Settlement, entering the Bar Orders, and approving the proposed attorneys' fees award.

WHEREFORE, PREMISES CONSIDERED, Movants respectfully request this Court:

    a.    Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

    b.    Grant this Motion;

    c.    Approve the Insurance Settlement;

    d.    Enter the Bar Order in the SEC Action;

    e.    Enter the Final Judgment and Bar Order in the Coverage Action;

    f.    Enter the Final Judgments and Bar Orders in the Third Party Coverage Actions;

    g.    Approve payment of attorneys' fees to Kuckelman Torline in the total amount of $14 million;

    h.    Approve payment of attorneys' fees to the Movants' counsel handling the claims against Claude Reynaud in the total amount of $100,000.00; and

    i.    Grant Movants all other relief to which they are entitled.

Date:   June 27, 2016.

Respectfully submitted,


/s/Kathryn A. Lewis
Michael J. Kuckelman         KS #14587
Stephen J. Torline           KS #18292
Kathryn A. Lewis             KS #20690
KUCKELMAN TORLINE KIRKLAND & LEWIS,
LLC
10740 Nall, STE 250
Overland Park, KS 66211
Phone: 913-948-8610
Fax:    913-948-8611
mkuckelman@ktklattorneys.com
storline@ktklattorneys.com
klewis@ktklattorneys.com
**ATTORNEYS FOR RECEIVER**
**RALPH S. JANVEY**


/s/ Scott D. Powers
Kevin M. Sadler, TX # 17512450
Scott D. Powers, TX # 24027746
BAKER BOTTS L.L.P.
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4078
Phone: 512-322-2500
Fax: 512-322-2501
Kevin.sadler@bakerbotts.com
Scott.powers@bakerbotts.com
**ATTORNEYS FOR RECEIVER**
**RALPH S. JANVEY**

and

/s/ Judith R. Blakeway
Judith R. Blakeway, TX #02434400
STRASBURGER & PRICE, LLP
2301 Broadway Street
San Antonio, Texas 78215-1157
Phone: 210-250-6000
Fax: 210-250-6100
Judith.blakeway@strasburger.com
**COUNSEL FOR THE OFFICIAL STANFORD
INVESTORS COMMITTEE**

## CERTIFICATE OF SERVICE

On June 27, 2016, I electronically submitted the foregoing document with the clerk of the court of the U. S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Kathryn A. Lewis