IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:09-cv-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., et al., | § § § | |
| Defendants. | § § | |
| RALPH S. JANVEY, et al. | § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:13-cv-03980-N |
| WILLIS OF COLORADO INC., et al. | § § § | |
| Defendants. | § | |

**EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1] AND MOTION TO APPROVE PROPOSED SETTLEMENT OF CLAIMS AGAINST THE BMB DEFENDANTS, TO ENTER THE BAR ORDER AND TO ENTER THE FINAL JUDGMENTS AND BAR ORDERS**

COME NOW Ralph S. Janvey, the Receiver for the Receivership Estate in *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-0298-N (the "SEC Action"); the Official Stanford Investors Committee (the "Committee"), as a party to the SEC Action and as plaintiff in *Ralph S. Janvey, in his Capacity as Court-appointed Receiver for the Stanford Receivership Estate, The Official Stanford Investors Committee, and Samuel Troice and Manuel Canabal, on their own behalf and on behalf of a class of all others*

---

[1] Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

*similarly situated v. Willis of Colorado Inc., et al.* (the "Janvey Litigation"), Civil Action No. 3:13-cv-03980-N-BG; and Samuel Troice, Martha Diaz, Paula Gilly Flores, Punga Punga Financial Ltd., Manuel Canabal, Daniel Gomez Ferreiro and Promotora Villa Marina, C.A., on behalf of a putative class of Stanford investors (collectively, the "Investor Plaintiffs") in the class action Civil Action No. 3:09-cv-01274-N-BG, *Samuel Troice, Martha Diaz, Paula Gilly-Flores and Punga Punga Financial, Ltd. v. Willis of Colorado, Inc., et al.* (the "Troice Litigation") (the Receiver, the Committee, and the Investor Plaintiffs are collectively the "Plaintiffs") and move the Court to approve the settlement (the "BMB Settlement") involving Plaintiffs and Bowen, Miclette & Britt, Inc. ("BMB") and Paul D. Winter, Dependent Executor for the Estate of Robert S. Winter, deceased ("Winter")[2] (BMB and Winter are collectively referred to as the "BMB Defendants") as defendants in the Janvey Litigation and the Troice Litigation.

Plaintiffs further request, as more fully set out below, that the Court enter the Scheduling Order, approve the Notices, and enter the Bar Order and the Judgments and Bar Orders attached to and incorporated by reference into the BMB Settlement Agreement, attached as **Exhibit 1** to the Appendix in Support of this Motion.[3]

Plaintiffs jointly request this Court to find the BMB Settlement is fair, equitable, reasonable, and in the best interests of the Receivership Estate and all its Claimants, and to approve the BMB Settlement.

---

[2] Paul D. Winter, Dependent Executor for the Estate of Robert S. Winter, Deceased, has not executed the BMB Settlement Agreement. It is anticipated that he will do so after obtaining authority to execute the BMB Settlement Agreement from the Probate Court No. 4 of Harris County, Texas, and that he will obtain that authority in advance of any hearing addressing the Court's final approval of the BMB Settlement. If Winter fails to sign the BMB Settlement Agreement, Plaintiffs have the option of proceeding with the BMB Settlement Agreement in his absence, as set forth in further detail in the BMB Settlement Agreement.

[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the BMB Settlement Agreement. To the extent of any conflict between this Motion and the terms of the BMB Settlement Agreement, the BMB Settlement Agreement shall control.

# I.  INTRODUCTION

1.      As part of their lengthy and thorough investigation of the Stanford Ponzi scheme, and after many years of investigating and pursuing claims against third parties, including the BMB Defendants, Plaintiffs have reached a settlement with the BMB Defendants. Under the agreement, once approved and effective, BMB will pay or cause to be paid $12,850,000 to the Receiver for distribution to customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford Investors") and who have submitted claims that have been allowed by the Receiver.

2.      In return, the BMB Defendants seek a global release of all Settled Claims[4] against the BMB Defendants and the BMB Released Parties (subject to certain exceptions applicable to Winter as described in paragraphs 38 and 41 of the BMB Settlement Agreement), and have conditioned the BMB Settlement on the Court, among other things, entering the Bar Order in the SEC Action, and entering the Judgments and Bar Orders in the Janvey Litigation and the Casanova Litigation (as defined in Paragraph 20 below). The Bar Order and the Judgments and Bar Orders, if entered, will bar the continued prosecution of all pending cases against any of the

---

[4] "Settled Claim," as defined in the BMB Settlement Agreement, generally means any action, cause of action, suit, liability, claim, right of action, debt, sums of money, covenants, contracts, controversies, agreements, promises, damages, contribution, indemnity, specific performance, attorney's fees and demands whatsoever, whether or not currently asserted, known, suspected, existing or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford entities, (ii) any certificate of deposit, depository account, or investment of any type with any one or more of the Stanford Entities, (iii) any one or more of the BMB Defendants' relationship(s) with any one or more of the Stanford Entities, (iv) the BMB Defendants' provision of services to any of the Stanford Entities; and any other acts, errors or omissions by the BMB Defendants for or related to the Stanford Entities, or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the Troice Litigation, the Janvey Litigation, the Other BMB Litigation (as defined in paragraph 20 below), or any proceeding concerning the Stanford Entities pending or commenced in any Forum. "Settled Claims" specifically includes, without limitation, all claims each Releasor does not know or suspect to exist in her, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to this Agreement and the Settlement ("Unknown Claims").

BMB Defendants relating to Stanford and will also bar the commencement of any additional litigation against any of the BMB Defendants and any of the BMB Released Parties relating to Stanford (subject to the aforementioned exceptions applicable to Winter), as described in more detail below.  The Bar Order and the Judgments and Bar Orders reflect an essential term of the BMB Settlement and a condition precedent to the payment of the $12,850,000 to the Receiver for distribution to Claimants. In the event the Bar Order and the Judgments and Bar Orders are not approved by the Court, the BMB Settlement becomes null and void, no payment will be made to the Receivership Estate for the benefit of Claimants; and any recovery from continued litigation against the BMB Defendants would be uncertain and, at minimum, take years of additional, costly litigation.[5]

3.      The Bar Order and Judgments and Bar Orders would permanently bar, restrain, and enjoin the Receiver, the Plaintiffs, the Claimants, the Interested Parties, and all other Persons or entities, whether acting in concert with the foregoing or claiming by, through, or under the foregoing, or otherwise, all and individually, from directly, indirectly, or through a third party, instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, or otherwise prosecuting, against any of the BMB Defendants or any of the BMB Released Parties, any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature, including but not limited to litigation, arbitration, or other proceeding, in any Forum, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is based upon, arises from, or is connected with the Stanford Entities;

---

[5] BMB has two insurance policies (a primary and an excess) which would potentially cover the claims asserted by Plaintiffs.  Both policies erode as defense costs are incurred within their layers of coverage.  The amount of coverage that might be available at a later date to pay a settlement or judgment will almost certainly be substantially less than the proposed settlement amount.

the SEC Action; the Troice Litigation; the Janvey Litigation; the Other BMB Litigation; or the subject matter of the SEC Action, the Troice Litigation, the Janvey Litigation, the Other BMB Litigation or any Settled Claim. The foregoing specifically includes any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise. Notwithstanding the foregoing, the Bar Order and Judgments and Bar Orders do not extend to, shall not include, and shall not alter, limit, or otherwise affect the Receiver's right or ability to pursue and collect the full amount of the final judgment entered in favor of the Receiver against Winter in *Janvey v. Hamric*, Case No. 3:13-cv-00775-N-BG, Doc. No. 257 (the "Winter Final Judgment") or make any recovery pursuant thereto in accordance with and to the maximum extent permitted by the Order Granting Application for Turnover Order, *In re Robert S. Winter, deceased*, Case No. 435,100 in the Probate Court No. 4 of Harris County, Texas (the "Turnover Order"). Further, nothing in the Bar Order or Judgments and Bar Orders or the BMB Settlement Agreement or the BMB Settlement shall be construed to impair or limit the Receiver's rights to collect the full amount of the Winter Final Judgment or make any recovery pursuant thereto in accordance with the terms of the Turnover Order.

4.      Plaintiffs request the Court to approve the BMB Settlement and enter the Bar Order in the SEC Action and the Judgments and Bar Orders in the Janvey Litigation and the Casanova Litigation.

## II.  BACKGROUND

### A.      Authority of the Receiver and the Committee

5.      On February 16, 2009, the Securities & Exchange Commission ("SEC") filed the SEC Action, and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver ¶ 4 [SEC Action, ECF No. 10].

6.      The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order"). [SEC Action, ECF No. 1130]. The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

7.      The Receiver is not only authorized but also required to pursue outstanding liabilities and claims for the Estate. *Id*. ¶¶ 3, 5(b)-(c). The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court. *Id*. ¶ 2. The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd*., 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The Court has directed the Receiver to institute, prosecute, defend, and compromise

actions that the Receiver deems necessary and advisable to carry out his mandate. Second Order ¶ 5(i).

8.      On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action."  [SEC Action, ECF No. 322]. Although he is not a party to the Janvey Litigation or the Troice Litigation, the Examiner signed the BMB Settlement Agreement, as chair of the Committee and as Examiner, solely to evidence his support and approval of the BMB Settlement and the obligation to post Notice of the BMB Settlement on his website.

9.      On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors. [SEC Action, ECF No. 1149]. The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver). *Id.* ¶ 8(d). This Court has recognized the Committee's standing to pursue litigation claims such as the claims against the BMB Defendants that are the subject of the BMB Settlement. *See* Order 4–6, *Janvey & Official Stanford Inv'rs Comm. v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N (Sept. 24, 2012 (N.D. Tex.), ECF No. 33 (the Committee has standing to pursue claims based on the Court's grant of such authority to the Committee as an unincorporated association representing the interests of the Stanford Investors).

B.      **The Investigation of Claims Against the BMB Defendants**

10.     Plaintiffs' counsel have spent several years and thousands of hours investigating and pursuing claims against the BMB Defendants on behalf of the Stanford Receivership Estate

and Stanford Investors.  These claims are based on the BMB Defendants' alleged involvement in providing certain insurance letters to Stanford which Stanford allegedly used as part of its marketing schemes to convince investors to purchase and to retain the SIBL CDs.  As part of their investigation of the claims against the BMB Defendants, Plaintiffs' counsel have reviewed voluminous documents, emails, and depositions and trial testimony obtained in multiple collateral lawsuits and the criminal prosecution of Allen Stanford, James Davis, Laura Pendergest-Holt, and other former Stanford insiders. The materials reviewed by Plaintiffs' counsel included, among other materials, thousands of pages of the SEC and other investigation materials, thousands of pages of deposition and trial testimony, emails between Stanford and the BMB Defendants' personnel, and literally hundreds of boxes of documents including documents that Plaintiffs received from the BMB Defendants or that the Receiver secured from Stanford's various offices.

11.    Counsel was also required to, and did, research all relevant case law to support liability and damage claims belonging to the Receiver and Committee—including the Texas Securities Act ("TSA") and other claims belonging to the Stanford Investors—to determine how the facts surrounding the BMB Defendants' conduct supported those claims. The investigation further required formulation of viable damage models and causation theories for both the Receivership Estate and Stanford Investor claims.

12.    Investigation and prosecution of the Receivership Estate and Stanford Investor claims against the BMB Defendants also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationships and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through

the various Stanford entities. Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against the BMB Defendants. The Committee's counsel have also spent thousands of hours since the Committee's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against the BMB Defendants, pursuant to an agreement between the Receiver and the Committee. The Receiver, the Committee and the undersigned law firms have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of the SEC Action, all of which allowed the Receiver, the Committee, and the undersigned counsel to formulate, file and prosecute the claims against the BMB Defendants that led to the BMB Settlement for which approval is sought by this Motion. But for the diligent efforts of the Receiver, the Committee, and their counsel since the commencement of this receivership proceeding, the Receivership Estate and the Stanford Investors would not have achieved this $12,850,000 settlement.

13.    In summary, Plaintiffs and their counsel have conducted a thorough analysis of, and heavily litigated on multiple fronts, a series of claims against the BMB Defendants considering:

  a.    claims available under both state and federal law;

  b.    the viability of those claims in light of the BMB Defendants' role as insurance brokers for Stanford and this Court's previous rulings; and

  c.    the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

## C.    The Troice Litigation

14.    As this Court is aware, the Troice Litigation has been heavily litigated for more than 7 years. On July 2, 2009, counsel for the Stanford Investors filed the Troice Litigation as a

putative class action. [Troice Litigation, ECF No. 1]. The BMB Defendants filed motions to dismiss the Troice Litigation on February 25, 2010 [Troice Litigation, ECF Nos. 39, 47-48] and again on May 2, 2011 in response to the Investor Plaintiffs' Third Amended Complaint [Troice Litigation, ECF Nos. 124, 127-129]. On October 27, 2011, this Court granted the motions to dismiss, finding that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") precluded the action. [Troice Litigation, ECF Nos. 155, 156]. The Investor Plaintiffs appealed that decision to the Fifth Circuit. On March 19, 2012, the Fifth Circuit issued its opinion reversing this Court's order of dismissal. *Roland v. Green*, 675 F.3d 503 (5th Cir. 2012). The BMB Defendants then petitioned for *certiorari* with the United States Supreme Court, which granted the petition. On February 26, 2014, the Supreme Court issued its opinion affirming the Fifth Circuit and concluding that SLUSA did not preclude the state law-based class action claims brought against the BMB Defendants in the Troice Litigation. *Chadbourne & Parke, LLP v. Troice*, 134 S. Ct. 1058 (2014).

15.    On September 16, 2014 this Court issued its Order denying the Investor Plaintiffs' request for entry of a scheduling order to permit merits discovery and granting Defendants' request to permit additional briefing on their motions to dismiss. [Troice Litigation, ECF No. 193]. On the same day, the Court issued its Class Certification Scheduling Order. The parties thereafter engaged in extensive class certification discovery and fact and expert witness depositions. [Troice Litigation, ECF No. 192]. Plaintiffs defended the depositions of class representatives Samuel Troice, Martha Karras, Isaac Green, Manuel Canabal, and Daniel Gomez Ferreiro in Dallas. Plaintiffs retained expert witnesses on class certification issues including proof of foreign law and the appropriateness of certification and presented one of those experts—

Prof. Alejandro Garro—for deposition. The parties filed their class certification evidence and briefing with this Court on April 20, 2015. [Troice Litigation, ECF Nos. 226-48].

16.     By Order dated December 15, 2014, the Court granted in part and denied in part the BMB Defendants' motion to dismiss the Troice Litigation, dismissing the claims against the BMB Defendants for primary violations of the TSA, co-conspirator liability under the TSA, and for civil conspiracy, and declining to dismiss the other claims against the BMB Defendants, including claims for aiding and abetting TSA violations, for aiding and abetting/participation in a fraudulent scheme, and individual claims for insurance code violations, common law fraud, negligent misrepresentation, gross negligence, negligent retention and negligent supervision. [Troice Litigation, ECF No. 208].

**D.      The Janvey Litigation**

17.     On October 1, 2013, the Receiver, the Committee, Troice and Canabal, individually and on behalf of the class, commenced the Janvey Litigation against Defendants Willis of Colorado, Inc., Willis, Ltd., Willis Group Holdings, Ltd. and Willis North America, Inc. (collectively, the "Willis Defendants").  [Janvey Litigation, ECF No. 1].  On November 15, 2013, a First Amended Complaint was filed in the Janvey Litigation adding the BMB Defendants.  [Janvey Litigation, ECF No. 7].

18.     The BMB Defendants then filed Motions to Dismiss the Janvey Litigation on February 28, 2014. [Janvey Litigation, ECF No. 30-32]. Plaintiffs filed a Response to Defendants' Motions to Dismiss on April 29, 2014. [Janvey Litigation, ECF No. 47].

19.     On December 5, 2014, the Court granted in part and denied in part the BMB Defendants' motion to dismiss, dismissing claims for civil conspiracy, and primary liability under the TSA, but declining to dismiss the other claims against the BMB Defendants. [Janvey

Litigation, ECF No. 64]. Defendant BMB filed its Answer in the Janvey Litigation on January 16, 2015.[6] [Janvey Litigation, ECF No. 74].

### E.      Other BMB Litigation

20.      Four other cases have been filed against the BMB Defendants in the United States by Stanford investors: (i) *Rupert v. Winter, et al.*, Case No. 20090C116137, filed on September 14, 2009 in Texas state court (Bexar County); (ii) *Casanova v. Willis of Colorado, Inc., et al.*, C.A. No. 3:10-CV-1862-O, filed on September 16, 2010 in the United States District Court for the Northern District of Texas (the "Casanova Litigation"); (iii) *Rishmague v. Winter, et al.*, Case No. 2011C12585, filed on March 11, 2011 in Texas state court (Bexar County); and (iv) *MacArthur v. Winter, et al.*, Case No. 2013-07840, filed on February 8, 2013 in Texas state court (Harris County) (collectively, these four lawsuits are referred to herein and in the BMB Settlement Agreement as the "Other BMB Litigation").   The Casanova Litigation is pending before this Court. *Rupert*, *Rishmague* and *MacArthur* were all filed in state court, removed to this Court, and subsequently remanded to state court and indefinitely stayed.

### F.      Settlement

21.      Plaintiffs reached a settlement through mediation with the Willis Defendants on March 31, 2016.   The Plaintiffs' claims against the BMB Defendants were similar to those asserted against the Willis Defendants.   Following the Willis settlement, counsel for Plaintiffs and counsel for the BMB Defendants engaged in negotiations that resulted in a May 2016 agreement in principle to settle the claims against the BMB Defendants for $12,850,000.

22.      Without the effort of the Receiver, the Committee, Investor Plaintiffs, and their counsel in investigating and prosecuting these claims as part of the overall effort to recover

---

[6] Defendant Winter never filed an answer in the Janvey Litigation.

money from third parties for the benefit of Stanford Investors, the BMB Settlement could never have been achieved, and the Troice and Janvey Litigations against the BMB Defendants would likely have lasted for years with an uncertain outcome and at great expense to the parties.

23.     After the settlement was reached in May 2016, the parties spent considerable time and effort drafting, revising, and negotiating the form and terms of the BMB Settlement Agreement, the Bar Order, the Judgments and Bar Orders, the Notice, and the Scheduling Order. Plaintiffs now seek approval of the BMB Settlement.

**G.     Plaintiffs' and Examiner's Support of Settlement**

24.     Plaintiffs are confident that the investigation of the BMB Defendants' activities related to Stanford performed by their counsel and the litigation of the Investor and Receivership Estate claims has been thorough. As a result, Plaintiffs are confident that they have sufficient information to enter into and endorse the BMB Settlement.  Plaintiffs are also confident that the BMB Settlement is fair and reasonable, taking into consideration not only the merits of the claims, but also the risks, uncertainties, and expenses associated with litigation, as well as the potential amount that might be recovered from a judgment. Therefore, Plaintiffs believe that the BMB Settlement is in the best interests of the Stanford Receivership Estate and the Stanford Investors and should be approved by the Court.

25.     The Chairman of the Committee, who oversaw the Janvey Litigation and participated in the settlement negotiations, is also the Court-appointed Examiner.  He supports this Motion in both capacities, as does the Receiver.

26.     The Investor Plaintiffs, who were each deposed as part of the class certification discovery process also support the BMB Settlement and believe it is in the best interests of all Stanford Investors, and request that the Court approve it. All Stanford Investors have been given

notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution process. The BMB Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013). The BMB Settlement, the Bar Order, and the Judgments and Bar Orders protect both the BMB Released Parties and the Stanford Investors.

### H.     The BMB Settlement

27.     The proposed BMB Settlement is the result of many years and thousands of hours of work by the Receiver, the Committee, Investor Plaintiffs, and the undersigned counsel, and was negotiated and entered into as a result of arm's-length negotiation.

28.     The essential terms of the BMB Settlement Agreement, attached as Exhibit 1 to the Appendix, are that:

   a.     BMB will pay or cause to be paid $12,850,000, which will be deposited with the Receiver as required pursuant to the BMB Settlement Agreement;

   b.     Plaintiffs, and each of the Plaintiffs' respective past and present, direct and indirect, parent entities, subsidiaries, affiliates, heirs, executors, administrators, predecessors, successors and assigns, in their capacities as such, and anyone who can claim through any of them, including, without limitation, the Receiver on behalf of the Receivership Estate, will fully, finally, and forever release, relinquish, and discharge, with prejudice, all Settled Claims against the BMB Defendants and the BMB Released Parties (subject to the aforementioned exceptions applicable to Winter);

   c.     The BMB Defendants will fully, finally, and forever, release, relinquish, and discharge, with prejudice, all Settled Claims against the Plaintiff Released Parties;

   d.     Each of Plaintiffs will covenant not to, directly or indirectly, or through a third party, institute, reinstitute, initiate, commence, maintain, continue, file, encourage, solicit, support, participate in, collaborate in, or otherwise prosecute, now or at any time in the future, against any of the BMB Defendants or any of the BMB Released Parties any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding, whether

individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, concerning the Settled Claims, whether in a court or any other Forum (subject to the aforementioned exceptions applicable to Winter);

e.   Each of the BMB Defendants will covenant not to, directly or indirectly, or through a third party, institute, reinstitute, initiate, commence, maintain, continue, file, encourage, solicit, support, participate in, collaborate in, or otherwise prosecute, now or at any time in the future, against any of the Plaintiffs or any of the Plaintiffs Released Parties any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, concerning the Settled Claims, whether in a court or any other Forum;

f.   The BMB Settlement requires entry of a Bar Order in the SEC Action and entry of Judgments and Bar Orders in the Janvey Litigation and the Casanova Litigation, each of which permanently enjoins any Person, including, but not limited to, Interested Parties, including all Stanford Investors and Claimants, from bringing, encouraging, assisting, continuing, or prosecuting, against any of the BMB Defendants or any of the BMB Released Parties, the Troice Litigation, the Janvey Litigation, the Other BMB Litigation, or any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature concerning the Settled Claims (subject to the aforementioned exceptions applicable to Winter).   In addition, the Bar Order in the SEC Action, among other things, requires the BMB Defendants to file dispositive motions in all of the Other BMB Litigation not pending before this Court, and further prohibits the plaintiffs in those actions from opposing such motions. Entry of the Bar Order and the Judgments and Bar Orders is an essential term of the BMB Settlement and a condition precedent to the BMB Defendants' payment of $12,850,000 to the Receiver for distribution to Claimants. In the event the Bar Order and the Judgments and Bar Orders are not approved by the Court, the BMB Settlement becomes null and void, and no payment will be made to the Receivership Estate;

g.   The Receiver will disseminate notice of the BMB Settlement to Claimants, through one or more of the following as set forth in the BMB Settlement Agreement, ¶¶ 29-30: mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and Receiver (http:// www.stanfordfinancialreceivership.com) web sites;

h.   The Receiver will develop and submit to the Court for approval a plan for disseminating the Settlement Amount ("Distribution Plan");

      i.     Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted claims that have been allowed by the Receiver;

      j.     Claimants who accept funds from the BMB Settlement Amount will, upon accepting the funds, fully release the BMB Released Parties from any and all Settled Claims; and

      k.     The Troice Litigation will be dismissed with prejudice as to the BMB Defendants, with each party bearing its own costs and attorneys' fees.

Copies of the BMB Settlement Agreement, this Motion, and other supporting papers may be obtained from the Court's docket, and will also be available on the websites of the Receiver (http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-stanford-financial-group/). Copies of these documents may also be requested by email to Margaret Hagelman, at margaret.hagelman@strasburger.com or by calling 210-250-6001.

      29.     For the reasons described herein, the BMB Settlement is fair, equitable, reasonable, and in the best interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets. Plaintiffs urge the Court to approve it.

### III.  REQUEST FOR APPROVAL OF THE BMB SETTLEMENT

**A.**    **Legal Standards**

      30.     "'[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.'" *Kaleta*, 530 F. App'x at 362 (quoting *SEC v. Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)). "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" *Id*. (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)). "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership." *Id*. (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338,

340 (5th Cir. 2011)). "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *SEC v. Kaleta*, No. CIV.A. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012) (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009), aff'd, 530 F. App'x 360 (5th Cir. 2013). Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation." *Janvey v. Alguire*, No. 3:09-cv- 00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

31.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors. *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

32.     The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants. Second Order ¶ 5; *see supra* ¶¶ 2-3.

33.     The ability to compromise claims is critical to this Receivership. Courts have long emphasized that public policy favors settlement. *See, e.g., Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010). That is especially true here, where the

victims of Stanford's Ponzi scheme await recovery and further costs would come directly out of the Receivership Estate. The BMB Settlement would aid the Receiver in making a significant distribution.

34. Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases. *Kaleta*, 530 F. App'x. at 362-63 (approving bar order). Bar orders are commonly used in receivership cases to achieve these purposes. Every Circuit to consider the question has upheld blanket anti-litigation orders against non-parties in circumstances affecting the assets of a receivership estate as part of a court of equity's inherent power to fashion effective relief. *SEC v. Byers*, 609 F.3d 87, 91 (2d Cir. 2010) (district courts may issue anti-litigation injunctions as part of their broad equitable powers in the context of an SEC receivership); *SEC v. Kaleta*, 530 Fed. Appx. 360 (5th Cir. 2013) (inherent equitable authority to issue ancillary relief includes injunctions to stay proceedings by non-parties to the receivership); *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC actions"); *Liberte Capital Grp, LLC v. Capwill*, 462 F.3d 543, 551-52 (6th Cir. 2006) (receivership court may issue a blanket injunction staying litigation); *SEC v. Wencke*, 662 F.2d 1363, 1369 (9th Cir. 1980) (authority of district court to issue an order staying a non-party from bringing litigation derives from the inherent power of a court of equity to fashion effective relief); *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (upholding the validity of settlement bar order). Settlements in receiverships routinely incorporate bar orders such as the one at issue in this case. *SEC v. Temme*, No. 4:11-CV-655, 2014 U.S. Dist. LEXIS 53545 (E.D. Tex. 2014) *adopted by SEC v. Temme*, 2014 U.S. Dist. LEXIS 52815 (E.D. Tex. Apr. 16, 2014)

(recommending entry of bar order to prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the receivership estate and thus reduce the amounts ultimately distributed by the receiver to the claimants); *SEC v. Kaleta*, No. H 09-3674; 2013 U.S. Dist. LEXIS 77171 (S.D. Tex. ) *aff'd* 2013 U.S. App. LEXIS 12471 (5th Cir. June 19, 2013) (affirming entry of a bar order enjoining other investors from commencing or continuing any legal action against settling defendants arising from underlying fraud); *Stern v. Legent Clearing LLC*, No. 09-C-794, 2011 U.S. Dist. LEXIS 103156 (N.D. Ill. 2011) (holding that entry of a bar order that is required by a proposed settlement is within a court's authority and discretion); *SEC v. Parrish,* No. 2:07-CV-00919-DCN, 2008 U.S. Dist. LEXIS 113241 (D.S.C. May 12, 2008) (holding the court has the power to issue a bar order precluding third-party claims under the All Writs Act); *Harmelin v. Man Financial, Inc.*; No. 06-1944, 05-2973, 2007 U.S. Dist. LEXIS 95022 (E.D. Pa. Dec. 28, 2007) (finding entry of bar order essential for success of settlement); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 U.S. Dist. LEXIS 53310 (D.N.J. July 23, 2007) (holding that federal law and public policy favor entry of a bar order to facilitate settlement); *State of Wisconsin Investment Board v. Ruttenberg*, 300 F.Supp.2d 1212, 1218 (N.D. Ala. 2004) (holding that bar order extinguishing any claims arising out of same facts as the settled action did not impermissibly divest objectors of valuable property rights).

35.     The Bar Order and the Judgments and Bar Orders will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

36.     In fact, the Fifth Circuit in *Kaleta* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary. . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate"; and (iii) the scope of the bar order is appropriately tailored to achieve these objectives. *See Kaleta*, 530 F. App'x at 362-63. The BMB Settlement satisfies each of these requirements.

37.     District courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *Kaleta*, 2012 WL 401069, at *4.

38.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4. The Fifth Circuit's opinion noted that, like the BMB Settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

39.     Further, this Court also has the inherent power to order the plaintiffs in the Other BMB Litigation that is pending before other courts not to oppose motions to dismiss those actions filed by the BMB Defendants. *See, e.g., United States v. Hall*, 472 F.2d 261, 268, 266 (5th Cir. 1972) (upholding district court's imposition of sanctions against non-party in light of district court's inherent authority "to protect its ability to render a binding judgment between the

original parties," and stating that "[a] court entering a decree binding on a particular piece of property is necessarily faced with the danger that its judgment may be disrupted in the future by members of an undefinable class—those who may come into contact with the property. The in rem injunction protects the court's judgment."); *see also United States v. Paccione*, 964 F.2d 1269, 1274-75 (2d Cir. 1992) ("A court may bind non-parties to the terms of an injunction or restraining order to preserve its ability to render a judgment in a case over which it has jurisdiction.").

**B.     The BMB Settlement Satisfies the Factors for Settlement Approval**

       **(1)     Value of the Proposed Settlement**

       40.     The $12,850,000 payment is substantial, particularly given the difficulties that Plaintiffs would encounter in seeking to collect any judgment entered against the BMB Defendants.   BMB is a relatively small company, and its most significant, tangible resource to pay a settlement or satisfy a judgment is its insurance policies.   Importantly, with this settlement, Plaintiffs will recover virtually all of the remaining limits of BMB's insurance policies, which had been whittled down over the years by defense costs – including costs incurred defending the collateral lawsuits filed by individual Stanford investors in the Other BMB Litigation.   "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549.

### (2)  Value and Merits of the Receiver and Stanford Investors' Potential Claims

41.     Plaintiffs believe that the claims filed against BMB in the Troice Litigation and Janvey Litigation are meritorious and would be successful. But they are not without substantial risk and uncertainty. The BMB Defendants vigorously dispute the validity of the claims asserted in the Janvey Litigation and the Troice Litigation.

42.     The Janvey Litigation alleges that the BMB Defendants aided, abetted or participated in breaches of fiduciary duty, aided, abetted or participated in fraudulent transfers, were negligent and grossly negligent, negligently retained personnel, and negligently supervised personnel. While the Receiver and the Committee believe strongly in the viability of the claims, the BMB Defendants dispute liability on those claims.

43.     The Troice Litigation alleges, *inter alia*, that the BMB Defendants aided and abetted violations of the Texas Securities Act, participated in a fraudulent scheme and a conspiracy, were negligent and grossly negligent, negligently retained personnel, and negligently supervised personnel.   As discussed above, at the time of settlement the parties had fully briefed complex issues of class certification.

44.     The following issues, among others, are contested and promise years of uncertain litigation:

> a.      whether the Court would certify a class of Stanford Investors;
>
> b.      whether the Court would certify a class of *all* Stanford Investors, or only those investors who received or saw copies of the insurance letters;
>
> c.      whether the Court would certify a class that included class members from foreign countries;
>
> d.      whether the Stanford Investors would be able to prove that the BMB Defendants had general awareness of Stanford's wrongful conduct and provided substantial assistance to Stanford;

e.      whether the Stanford Investors could establish actionable misrepresentations and omissions by the BMB Defendants;

f.      whether the Receiver and Committee would be able to prove that the BMB Defendants had sufficient knowledge to meet the standard for aiding-and-abetting a breach of fiduciary duty claim;

g.      whether the Receiver and/or Committee have valid, supportable damage models;

h.      whether the Receiver and Committee could prove that the BMB Defendants were negligent;

i.      whether the Receiver and Committee could establish causation; and

j.      whether, after a successful judgment in any of the cases, Plaintiffs would be able to collect any more than the BMB Settlement already offers.

45.     For these and other reasons, but for the BMB Settlement, the Janvey and Troice Litigations would be vigorously defended by BMB.  The prosecution would be expensive and protracted, and the ultimate outcome of such litigation would be uncertain. In light of these issues, Plaintiffs believe that the BMB Settlement reflects a fair and reasonable compromise between the parties.

46.     Plaintiffs believe they would ultimately prevail on both liability and damages in the Janvey and Troice Litigations, but success is far from assured and would be possible only after years of litigation. The settlement payment represents a significant recovery for the Stanford Investors, while avoiding the burden, costs, delay, and risks incident to continued litigation.

47.     Most importantly, the settlement represents at least 95% of the insurance coverage available to the BMB Defendants.  Moreover, the insurance policy limits decrease as additional expenses are incurred.  Therefore, the amount of coverage available today for settlement will continue to decrease if the litigation continues.

        **(3)**      **The Risk that Litigation Would Dissipate Receivership Assets**

48.     Plaintiffs believe that, absent a settlement, litigation against the BMB Defendants would likely go on for years, with no guarantee of a recovery. While Plaintiffs' counsel have entered into contingent fee arrangements with Plaintiffs to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation. The BMB Settlement avoids further expense associated with the prosecution of the Janvey and Troice Litigations and continued monitoring and oversight of the cases by the Receiver and the Committee Chairman/Examiner.

49.     Furthermore, as part of its fee agreement with counsel, the Committee has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with the Janvey Litigation, including, *inter alia*, expert fees and out of pocket litigation expenses (e.g. depositions, court reporters, videographers, travel and copy expenses). Without the BMB Settlement, the Receiver would incur substantial *additional* expenses to prosecute the claims against the BMB Defendants. Moreover, expert witness testimony as to the BMB Defendants would be a significant expense going forward if the Janvey and Troice Litigations are not settled. Expert testimony would be needed to prove the details of the Stanford Ponzi scheme, as well as the negligence, causation and damages. Without the BMB Settlement, expert witness fees as to the BMB Defendants' alleged liability and damages could easily run into the hundreds of thousands of dollars, including costs for working with expert witnesses, taking and defending expert depositions, and examining expert witnesses at trial. Other out of pocket litigation costs could be substantial without the BMB Settlement, including costs of oral and video depositions of all fact and expert witnesses, production of voluminous records and emails and other

electronically stored information, travel associated with depositions, preparation of expert witness reports, trial graphics, cost of reproduction of documents and trial exhibits, retrieval and storage of email and other electronically stored information, and attendance of experts at trial. Total out of pocket costs to prosecute the litigation could easily exceed $1 million due to the complex nature of the claims, the need for expert testimony, and the voluminous nature of the records involved.

### (4)     The Complexity and Costs of Future Litigation

50.     The prosecution of the Janvey and Troice Litigations would undoubtedly be challenging and expensive, as discussed above. As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex, as evidenced by the direct testimony of Karyl Van Tassel in the Chapter 15 proceeding, as well as all of the lengthy declarations with voluminous supporting exhibits that she has filed with this Court to prove the facts of the Stanford Ponzi scheme. There is no question that the Janvey and Troice Litigations involving billions of dollars in claimed damages, and an international Ponzi scheme operated through a complex web of interrelated international companies that spanned nearly 20 years, is extraordinarily complex, and would cause the Receivership Estate to incur substantial expense to litigate to final judgment.

### (5)     The Implications of the BMB Settlement Payment on Other Claimants

51.     As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'" 530 F. App'x at 362. The Receiver is collecting the BMB Settlement payment for the Stanford Investors. Thus, the relief Plaintiffs request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors

of the receivership entities." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

### (6)   The Value and Merits of Any Foreclosed Parties' Potential Claims

52.   Plaintiffs are conscious of the fact that the Bar Order and the Judgments and Bar Orders they are requesting, and the entry of which is a condition to the BMB Settlement, will preclude Stanford Investors and others from asserting claims against the BMB Defendants in connection with their involvement with the Stanford enterprise. But any such investors asserting their own claims face the same legal and factual challenges faced by the Plaintiffs, as set forth above.

53.   Plaintiffs are aware of only four other cases that have been filed against the BMB Defendants in the United States by Stanford investors - the "Other BMB Litigation". (*See* paragraph 20, *supra*.)   While the Bar Order and the Judgments and Bar Orders that Plaintiffs request the Court to enter (and that are a condition to the BMB Settlement) would bar those suits as to the BMB Defendants, equity favors the Court approving the BMB Settlement and entering the Bar Order and the Judgments and Bar Orders because the BMB Settlement will provide compensation to _all_ Stanford victims and not just a few, including the plaintiffs in those cases. The Other BMB Litigation has been pending for years with little progress and would face years of further delay and uncertainty and could result in the plaintiff investors in those cases ending up with nothing because all insurance coverages will have been exhausted.   With the BMB Settlement, those plaintiff investors will (if the Settlement is approved in the near term) soon receive a benefit along with all Stanford Investors without awaiting the outcome of protracted litigation which, again, might yield a monetary recovery that is substantially less than the payment promised by the BMB Settlement or might not yield any monetary recovery at all.

54.     Given that all Stanford Investors have been put on notice of the Receivership and afforded the opportunity to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process and will receive a distribution from the BMB Settlement, the Stanford Investors' rights are not being unduly prejudiced by the BMB Settlement. Stanford Investors have all had the opportunity to participate through the pre-existing receivership claims process and those whose claims have been approved will share in the proceeds of the Receiver's distribution that will result from the BMB Settlement.

55.     Plaintiffs believe that the Bar Order and Judgments and Bar Orders should be approved because they are in the collective best interest of *all* Stanford Investors. The Bar Order and Judgments and Bar Orders should not be rejected based upon the possibility that some individual investor(s) or counsel might otherwise wish to pursue individual claims against the BMB Defendants now or in the future. *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order).

56.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit *as many* aggrieved investors as stand to be benefited under the Settlement Agreement." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order) (emphasis added).

57.     Importantly, the Anti-Injunction Act does not prohibit entry of the Bar Order and the Judgments and Bar Orders insofar as they will bar the pending state court actions against the BMB Defendants. The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

28 U.S.C. § 2283. Here, however, the Committee represents the interests of all Stanford Investors, including the individual plaintiffs in the Other BMB Litigation. Thus, the BMB Settlement will resolve the claims of those plaintiffs by preclusion. In this situation, the Anti-Injunction Act, which governs "injunction[s] to stay proceedings in a State court," does not apply. *See Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 157 (S.D. Ohio 1992) (approving settlement that would bar related state court action: because the court's order "would not stay" the state court action but rather "pre-empt" it, "the Anti-Injunction Act is not applicable."); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1414 (D. Ariz. 1989) (the Anti-Injunction Act "is no more a barrier to the Court's approval of this agreement than it would be to any other where further litigation of claims in related actions pending in state courts are circumscribed, through collateral estoppel or res judicata, as an outcome of settlement. Such effects are common. The state court action would not be restrained by approval of this Agreement; it would be resolved. The Act is simply not implicated."), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992).

58.     Even if the Anti-Injunction Act were implicated here, the Bar Order and the Judgments and Bar Orders would be proper under the Act's exception permitting injunctions "necessary in aid of [a federal court's] jurisdiction." 28 U.S.C. § 2283. As the Fifth Circuit and other courts have recognized, injunctions against related state court litigation may be necessary in aid of a federal court's jurisdiction in managing and settling complex multidistrict litigation such as this. *See, e.g., In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334-35 (5th Cir. 1981) (upholding MDL transferee court's injunction preventing MDL class plaintiff from pursuing a similar lawsuit in any other state court when "[t]his complicated . . . action has required a great deal of the district court's time and necessitates its ability to maintain a flexible

approach in resolving the various claims of the many parties").[4] As the Third Circuit explained, in reasoning that applies here with full force:

> maintaining the federal court's flexibility and authority to decide such complex nationwide cases makes special demands on the court that may justify an injunction otherwise prohibited by the Anti–Injunction Act . . . . It is in the nature of complex litigation that the parties often seek complicated, comprehensive settlements to resolve as many claims as possible in one proceeding. These cases are especially vulnerable to parallel state actions that may frustrate the district court's efforts to craft a settlement in the multi-district litigation before it, thereby destroying the ability to achieve the benefits of consolidation. In complex cases where certification or settlement has received conditional approval, or perhaps even where settlement is pending, the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court.

*In re Diet Drugs*, 282 F.3d 220, 235-36 (3d Cir. 2002) (quotations and citations omitted).

59.     Here, enjoining the existing and future state court litigation against the BMB Defendants and the BMB Released Parties is a necessary condition precedent to the BMB Settlement and, thus, the immediate recovery of $12,850,000 by the Receivership Estate for the benefit of all Stanford Investors. Therefore, the Bar Order and the Judgments and Bar Orders are necessary to this Court's ability to manage the settlement of this litigation and to prevent the Receivership Estate from losing a significant recovery. *See Parish*, 2010 WL 8347143 ("[T]he bar order is necessary to preserve and aid this court's jurisdiction over the receivership estate, such that the Anti–Injunction Act would not prohibit the bar order even if there were pending state court actions, which there are not.").

60.     The proposed BMB Settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses. Indeed, it may be the only opportunity for any significant

---

[4] *See also Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 848 (6th Cir. 2009) ("[T]he district court's injunction is necessary in aid of its jurisdiction because [plaintiff's] state-court claims threaten the district court's ability to administer the class settlement fund . . . .").

recovery from the BMB Defendants.  The Court should approve the BMB Settlement and enter the Bar Order and Judgments and Bar Orders.

(7)     **Other Equities**

61.     The requirement of entry of the Bar Order and the Judgments and Bar Orders is a material term under the BMB Settlement Agreement, and a necessary condition to the obligations set forth in the BMB Settlement Agreement. The bottom line is that there is no BMB Settlement without these bar orders. The BMB Defendants "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [the BMB Defendants], potentially in other, including foreign, jurisdictions." *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

62.     The BMB Defendants have made clear that in consideration of paying $12,850,000, they must achieve "peace" through the BMB Settlement, wholly and finally, with respect to all Stanford-related claims (subject only to certain limited exceptions applicable to Winter as described herein). The BMB Defendants have stated that they would not enter into the BMB Settlement without securing the avoidance of the expense of such further litigation, particularly given what they believe are their strong factual and legal defenses.

63.     The Receiver and the Committee were appointed to protect the interests of *all* of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate Claimants. The proposed Bar Order and Judgments and Bar Orders will help maximize the eventual distribution to Receivership Estate Claimants of the BMB Defendants' $12,850,000 payment and provide the BMB Defendants the resolution of Stanford-related litigation that is a necessary condition for that settlement payment. Plaintiffs believe that the entry of the Bar Order and Judgments and Bar Orders are fully justified

by the Settlement Amount being paid by the BMB Defendants. The Court has already enjoined and barred all claims against the settling defendants and related parties pursuant to the settlements in the BDO lawsuit and the Adams & Reese lawsuit. [SEC Action, ECF Nos. 2230, 2248].[7]  The Court should similarly enjoin and bar all claims and potential claims against the BMB Released Parties in order to effectuate the BMB Settlement (subject only to certain limited exceptions applicable to Winter as described herein).

64.     Plaintiffs and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors. Plaintiffs could prosecute viable causes of action against the BMB Defendants.  On the other hand, the BMB Defendants deny any wrongdoing or liability, and believe they would successfully defend any claims against them. Because of the limited insurance coverage and the fact that costs of defense decrease the policy limits, even a successful prosecution may not result in more money to the Stanford Investors than is offered by the BMB Settlement.

65.     Plaintiffs believe that the BMB Settlement offers the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

66.     The overall context of the MDL and Stanford Receivership also is relevant to the equities of the situation. The Stanford Ponzi scheme collapsed over seven and a half years ago. Further litigation means that the parties – on both sides – are confronted by uncertainty, risk, and delay. In this circumstance, settlement is to be encouraged.

67.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging. For many of Stanford's victims, recovery delayed is recovery

---

[7]   More recently, the Court has enjoined and barred all claims in connection with the settlements with Kroll and Chadbourne & Parke, LLP.  [SEC Action, ECF Nos. 2363, 2365.]

denied. If possible, the time that Stanford's victims have waited to date should not be extended further.

68.     The equities of the BMB Settlement, including its necessary Bar Order and Judgments and Bar Orders, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims. The Receiver, the Examiner, the Committee, and the Investor Plaintiffs have cooperated and joined together in the BMB Settlement.  This coordination will result in the most orderly distribution to Stanford's victims that possibly can be achieved.

69.     The Court is well within its discretion to approve the BMB Settlement. In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities laws and defrauding investors. 2012 WL 401069, at *1. The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id*. The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership. The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed. *Kaleta*, 530 F. App'x at 362-63.

70.     In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the Receivership Estate. *Kaleta*, 2012 WL 401069, at *7. "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id.*

71.     In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties. *SEC v.*

*Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014). The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities." *Id.* at *2.[8]

### IV.  CONCLUSION & PRAYER

72.     The BMB Settlement represents a substantial and important recovery for the Receivership Estate and the Stanford Investors. The large settlement amount, the time and costs involved in continuing to pursue litigation against the BMB Defendants, the uncertain prospects for obtaining a judgment against the BMB Defendants and the further uncertainty of any actual recovery because of depleting insurance coverage, all weigh heavily toward approving the BMB Settlement, entering the Bar Order and entering the Judgments and Bar Orders.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request this Court:

a.     Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

b.     Grant this Motion;

c.     Approve the BMB Settlement;

d.     Enter the Bar Order in the SEC Action;

e.     Enter the Judgments and Bar Orders in the Janvey Litigation and the Casanova Litigation; and

f.     Grant Plaintiffs all other relief to which they are entitled.

---

[8] The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party. See *SEC v. Temme*, No. 4:11–cv–655, [ECF No. 162] (E.D. Tex. Nov. 21, 2012).

Dated: September 28, 2016


Respectfully submitted,


**STRASBURGER & PRICE, LLP**
2301 Broadway
San Antonio, Texas 78215
Telephone:    (210) 250-6004
Facsimile:    (210) 258-2706

BY: /s/ Judith R. Blakeway
      JUDITH R. BLAKEWAY
      State Bar No. 02434400
      judith.blakeway@strasburger.com


**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone:    (214) 651-4300
Facsimile:    (214) 651-4330
DAVID N. KITNER
State Bar No. 11541500
david.kitner@strasburger.com


**COUNSEL FOR THE PLAINTIFFS**

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas 78205
Telephone:    (210) 630-4200
Facsimile:    (210) 630-4210
EDWARD C. SNYDER
State Bar No. 00791699
esnyder@casnlaw.com
JESSE R. CASTILLO
State Bar No. 03986600
jcastillo@casnlaw.com


**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:      (214) 840-5320
Facsimile:      (214) 840-5301
DOUGLAS J. BUNCHER
State Bar No. 03342700
dbuncher@neliganlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2016, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

I further certify that on this 28th day of September, 2016, I served a true and correct copy of the foregoing document via United States Postal Certified Mail, Return Receipt required to the persons noticed below who are non-CM/ECF participants:

R. Allen Stanford, Pro Se     Certified Mail Return Receipt Req.
Inmate #35017183
Coleman II USP
Post Office Box 1034
Coleman, FL 33521

By: /s/ Judith R. Blakeway
    Judith R. Blakeway