# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>STANFORD INTERNATIONAL BANK, LTD, *et al.*,<br><br>     Defendants. | Civil Action No. 3:09-cv-00298-N |
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ,<br><br>     Defendants. | Civil Action No. 3:12-cv-04641-N |

**EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1]
AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH
HUNTON & WILLIAMS, LLP, TO ENTER THE BAR ORDER,
TO ENTER THE FINAL JUDGMENT AND BAR ORDER,
AND FOR PLAINTIFFS' ATTORNEYS' FEES**

COME NOW Ralph S. Janvey, in his capacity as the Court-appointed Receiver for the

Stanford Receivership Estate (the "Receiver"), the Official Stanford Investors Committee (the

"Committee"), and Pam Reed, Samuel Troice, and Michoacan Trust, individually and on behalf

of a putative class of Stanford investors (collectively, the "Investor Plaintiffs," and with the

Receiver and the Committee, the "Plaintiffs") and move the Court to approve the settlement (the

"Hunton Settlement") among and between Plaintiffs and defendant Hunton & Williams LLP

("Hunton").

Plaintiffs further request, as more fully set out below, that the Court enter the Scheduling

Order, approve the Notices, and enter the Bar Order and the Judgment and Bar Order attached to

and incorporated by reference into the Hunton Settlement Agreement, attached as **Exhibit 1** to

the Appendix in Support of this Motion.[2]  Movants also request that, if convenient for the Court,

the Final Approval Hearing requested as part of the Scheduling Order be set for a date at least 90

days after the entry of the Scheduling Order and either (a) before December 1, 2017 or (b) after

January 11, 2018 to accommodate long-standing plans of one of Hunton's lead counsel to be out

of the country.  Both Movants and Hunton agree that the hearing should not be scheduled for a

time when one of Hunton's lead counsel is absent.

---

[1]     Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

[2]     Capitalized terms not otherwise defined herein shall have the meaning set forth in the Hunton Settlement Agreement.  To the extent of any conflict between this Motion and the terms of the Hunton Settlement Agreement, the Hunton Settlement Agreement shall control.

Plaintiffs jointly request this Court to find that the Hunton Settlement is fair, equitable, and in the interests of the Receivership Estate and all its Claimants, and to approve the Hunton Settlement.  Plaintiffs further request that the Court approve payment of Plaintiffs' attorneys' fees in accordance with the contingency fee agreements between Plaintiffs' Counsel and the Plaintiffs.  In support thereof, Plaintiffs respectfully state the following:

## I.  INTRODUCTION

1.     As part of their lengthy and thorough investigation of the Stanford Ponzi scheme, and after many years of investigating and pursuing claims against third parties, including Hunton, Plaintiffs have reached a settlement with Hunton, one of the law firms that provided legal representation to Stanford for many years.   Under the agreement, once approved and effective, Hunton has agreed to pay $34 million to the Receiver for distribution to customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford Investors") and who have submitted claims that have been allowed by the Receiver.

2.     In return, Hunton seeks a global release of all Settled Claims[3] against Hunton and the Hunton Released Parties, and has conditioned the Hunton Settlement on the Court entering

---

[3]     "Settled Claim" means any action, cause of action, suit, liability, claim, right of action, right of levy or attachment, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any CD, depository account, or investment of any type with any one or more of the Stanford Entities; (iii) Hunton's relationship with any one or more of the Stanford Entities and/or any of their personnel; (iv) Hunton's provision of services to or for the benefit of or on behalf of the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, *Janvey v. Greenberg Traurig LLP*, or any proceeding concerning the Stanford Entities pending or commenced in any Forum.  "Settled Claims" specifically includes, without limitation, all claims each Releasor does not know or suspect to exist in his, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to this Agreement and the Settlement ("Unknown Claims").  *See* Paragraph 17 of the Hunton Settlement Agreement for a complete definition of Settled Claim.

the Bar Order attached to the Hunton Settlement Agreement in Civil Action No. 3:09-cv-00298-N (the "SEC Action") and entering a Judgment and Bar Order in Civil Action No. 3:12-cv-04641-N, *Janvey v. Greenberg Traurig, LLP, et al.* (the "Hunton Action").   These bar orders would permanently bar, restrain, and enjoin the Receiver, the Plaintiffs, the Claimants, the Interested Parties, and all other Persons or entities anywhere in the world, whether acting in concert with the foregoing or claiming by, through, or under the foregoing, or otherwise, all and individually, from directly, indirectly, or through a third party, instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, or otherwise prosecuting, against Hunton or any of the Hunton Released Parties, the Hunton Action, or any action, lawsuit, cause of action, claim, investigation, demand, levy, complaint, or proceeding of any nature, including, without limitation, in any Forum (other than in an appeal from the Bar Order or the Judgment and Bar Order) whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is based upon, arises from, or is connected with the Stanford Entities; the SEC Action; the subject matter of the SEC Action; the Hunton Action; or any Settled Claim. The foregoing also would specifically include any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise.

3.     Plaintiffs request the Court to approve the Hunton Settlement and enter the Bar Order in the SEC Action and the Judgment and Bar Order in the Hunton Action.

4.     Plaintiffs further request that the Court approve payment of attorneys' fees to counsel for the Receiver, the Committee, and the Investor Plaintiffs ("Plaintiffs' Counsel"), whose efforts were necessary to achieve the Hunton Settlement, in an amount consistent with their contractual twenty-five percent (25%) contingency fee agreements with the Receiver, Committee, and the Investor Plaintiffs.

## II.  BACKGROUND

### A.    *Authority of the Receiver and the Committee*

5.     On February 16, 2009, the Securities & Exchange Commission ("SEC") filed the SEC Action, and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."  *See* Order Appointing Receiver ¶ 4 [SEC Action, ECF No. 10].

6.      The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order").  [SEC Action, ECF No. 1130].  The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants."  Second Order ¶ 5.

7.     The Receiver is not only authorized but required to pursue outstanding liabilities and claims for the Estate.  *Id.* ¶¶ 3, 5(b)-(c).  The Court vested the Receiver with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court.  *Id.* ¶ 2.  The Receiver can assert claims against third parties and "recover judgment with respect

to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate. Second Order ¶ 5(i).

8.      On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action." [SEC Action, ECF No. 322]. Although he is not a party to the Hunton Action, the Examiner signed the Hunton Settlement Agreement as chair of the Committee, and as Examiner solely to evidence his support and approval of the Hunton Settlement and the obligation to post Notice of the Hunton Settlement on his website.

9.      On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors. [SEC Action, ECF No. 1149]. The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver). *Id.* ¶ 8(d). This Court has recognized the Committee's standing to pursue litigation claims such as the claims against Hunton that are the subject of the Hunton Settlement. *See* Order 4–6, *Janvey & Official Stanford Inv'rs Comm. v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N (Sept. 24, 2012 (N.D. Tex.), ECF No. 33 (the Committee has standing to pursue claims based on the Court's grant of such authority to the Committee as an unincorporated association representing the interests of the Stanford Investors).

### B.     The Investigation of Claims Against Hunton

10.     Plaintiffs' counsel have spent several years and thousands of hours investigating and pursuing claims against Hunton on behalf of the Stanford Receivership Estate and Stanford Investors.  As part of their investigation of the claims against Hunton, Plaintiffs' Counsel have reviewed voluminous documents, emails, and depositions and trial testimony obtained in multiple collateral lawsuits and the criminal prosecution of Allen Stanford, James Davis, Laura Pendergest-Holt, and other former Stanford insiders.  The materials reviewed by Plaintiffs' Counsel included, among other materials, thousands of pages of SEC and other investigative materials, thousands of pages of deposition and trial testimony, thousands of emails of Stanford and Hunton personnel, and hundreds of boxes of documents, including Hunton documents that the Receiver secured from Stanford's various offices and law firms and from Hunton itself.

11.     Counsel was also required to, and did, research all relevant case law to support liability and damages claims belonging to the Receiver and Committee—including the Texas Securities Act ("TSA") and other claims belonging to the Stanford Investors—to determine how the facts surrounding Hunton's conduct supported those claims.  The investigation further required formulation of viable damage models and causation theories for both the Receivership Estate and Stanford Investor claims.

12.     Investigation and prosecution of the Receivership Estate and Stanford Investor claims against Hunton also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationships and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities.  Without a comprehensive investigation and understanding of this

background, it would not have been possible to formulate viable claims against Hunton.  The Committee's counsel have also spent thousands of hours since the Committee's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against Hunton, pursuant to an agreement between the Receiver and the Committee.  The Receiver, the Committee and the undersigned law firms have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of the SEC Action, all of which allowed the Receiver, the Committee, and the undersigned counsel to formulate and file the claims against Hunton that led to the Hunton Settlement for which approval is sought by this Motion.  But for the diligent efforts of the Receiver, the Committee, and their counsel since the commencement of this receivership proceeding, the Hunton Settlement would never have been achieved, and the Receivership Estate and the Stanford Investors would not have achieved this $34 million settlement.

13.    In summary, Plaintiffs and their counsel have conducted a thorough analysis of, and heavily litigated on multiple fronts, a series of claims against Hunton considering:

    a.   claims available under both state and federal law;

    b.   the viability of those claims considering the facts underlying Hunton's role as counsel for Stanford and this Court's previous rulings; and

    c.   the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

**C.    *The Hunton Action***

14.    As this Court is aware, the Hunton Action has been heavily litigated over the last 5 years.

15.    On November 15, 2012, and as the result of a thorough investigation, counsel for the Plaintiffs filed their very detailed 165 page Original Complaint [Hunton Action, ECF No. 1].

The Complaint asserts claims against Hunton for negligence, aiding and abetting breaches of fiduciary duties, breaches of fiduciary duties, fraudulent transfer/unjust enrichment, aiding and abetting fraudulent transfers, negligent retention, aiding and abetting violations of the Texas Securities Act ("TSA"), aiding and abetting a fraudulent scheme, and civil conspiracy

16.     The Defendants subsequently filed separate motions to dismiss the claims asserted by the Receiver/Committee and the claims asserted by the Investor Plaintiffs [Hunton Action, ECF Nos. 27, 49, 56, 90].[4]

17.     By Orders dated December 17, 2014 [Hunton Action, ECF No. 114] and February 4, 2015 [Hunton Action, ECF No. 123], the Court granted in part and denied in part Hunton's motions to dismiss the Complaint, dismissing with prejudice (i) the Receiver and Committee's claims for aiding and abetting fraudulent transfer; (ii) the Investor Plaintiffs' TSA claims for aiding and abetting and civil conspiracy for the sale of unregistered securities and the sale of securities by an unregistered dealer arising from sales taking place prior to February 1, 2008; (iii) the Investor Plaintiffs' TSA claims for aiding and abetting and civil conspiracy for the sale of securities through untruth or omission arising from sales taking place prior to February 1, 2006; dismissing without prejudice the Receiver and Committee's claims for breach of fiduciary duty, and declining to dismiss the Plaintiffs' other claims against Hunton.  The Court stated several times that Hunton's arguments did not warrant dismissal of the claims at "this stage," but left the door open for those arguments to be re-asserted on summary judgment.

18.     The Defendants then filed a motion to certify the Court's December 17, 2014 Order for interlocutory appeal [Hunton Action, ECF No. 118].  The Court denied this motion on February 10, 2015 [Hunton Action, ECF No. 125].

---

[4]      Hunton filed two of the motions to dismiss [Hunton Action, ECF Nos. 49, 90].

19.     The Defendants also filed motions to join the Antiguan Joint Liquidators as required parties [Hunton Action, ECF Nos. 30, 51, 55].   These motions were denied on December 2, 2014 [Hunton Action, ECF No. 113].

20.     Hunton denied any liability in the Hunton Action.   On March 2, 2015, Hunton filed an answer to the Complaint, asserting numerous defenses to the claims asserted by the Receiver, Committee, and Investor Plaintiffs [Hunton Action, ECF 128].

21.     On August 11, 2015, the Court issued its Class Certification Scheduling Order [Hunton Action, ECF No. 142].   The parties thereafter engaged in six months of class certification discovery and briefing.   The parties filed all of their class certification evidence and briefing with this Court on February 26, 2016.   [Hunton Action, ECF Nos. 174-184].

22.     More recently, the Defendants have filed motions to dismiss and for judgment on the pleadings on the claims asserted by the Investor Plaintiffs, the Committee, and portions of the claims asserted by the Receiver based on the applicability of the attorney immunity doctrine [Hunton Action, ECF No. 193, 195].   These motions, and the motion for class certification, are fully briefed and *sub judice*.

### D.     Mediation

23.     Mediation was held with Hunton on two occasions.   The first mediation was held prior to the filing of the Complaint in 2012, with McGowan Dispute Resolution, and lasted two days.   The parties were unable to reach resolution at that time.   Following the Court's decisions on Hunton's motions to dismiss, and the parties' submission of class certification briefing and evidence in the Hunton Action, the parties convened a second mediation with the Hon. Layn R. Phillips in New York in October 2016.   Despite a full day mediation, the parties were once again unable to reach a resolution.   However, negotiations continued and, in May 2017, the Parties

reached agreement resulting in the Hunton Settlement. The parties executed the Hunton Settlement Agreement on August 16, 2017.

24.     Without the tireless effort of the Receiver, the Committee, Investor Plaintiffs, and their counsel in investigating and prosecuting these claims as part of the overall effort to recover money from third parties for the benefit of Stanford Investors, the settlement could never have been achieved, and the Hunton Action would have lasted for years with an uncertain outcome and at great expense to the parties.

25.     Since the settlement was reached, the Parties have spent considerable time and effort drafting, revising, and negotiating the form and terms of the Hunton Settlement Agreement, the Bar Order, the Judgment and Bar Order, the Notice, and the Scheduling Order, for which the Plaintiffs now move for approval.

### E.     Plaintiffs' and Examiner's Support of the Settlement

26.     Plaintiffs are confident that the investigation of Hunton's activities related to Stanford performed by their counsel and the litigation of the Investor and Receivership Estate claims has been thorough. Plaintiffs are confident that they have sufficient information to enter into and endorse the Hunton Settlement. Plaintiffs are also confident that the Hunton Settlement is fair and reasonable taking into consideration not only the merits of the claims, but also the risks, uncertainties, and expenses associated with litigation. Therefore, Plaintiffs believe that the Hunton Settlement is in the best interests of the Stanford Receivership Estate and the Stanford Investors and should be approved by the Court. The Chairman of the Committee, who oversaw the Hunton Action and participated in the settlement negotiations and mediation, is also the Court-appointed Examiner, and he supports this Motion in both capacities, as does the Receiver.

27.     The Investor Plaintiffs also support the Hunton Settlement and believe it is in the best interests of all Stanford Investors, and request that the Court approve it.   All Stanford Investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution process. The Hunton Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'"  *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013).   The Hunton Settlement, the Bar Order, and the Judgment and Bar Order protect both the Hunton Released Parties and the Stanford Investors.

### F.     *The Hunton Settlement*

28.     The proposed Hunton Settlement is the result of many years and thousands of hours of work by the Receiver, the Committee, Investor Plaintiffs, and the undersigned counsel, and was negotiated and entered into as a result of arm's-length negotiation both during and following mediation facilitated by the Hon. Layn R. Phillips.

29.     The essential terms of the Hunton Settlement Agreement, attached as Exhibit 1 to the Appendix, are that:

a)  Hunton will pay $34 million, which will be deposited with the Receiver as required pursuant to the Settlement Agreement;

b)  Plaintiffs, including, without limitation, the Receiver on behalf of the Receivership Estate (including the Stanford Entities but not including the natural persons listed in Paragraph 21 of the Hunton Settlement Agreement), will fully release the Hunton Released Parties and Carlos Loumiet from Settled Claims, e.g., claims arising from or relating to Allen Stanford, the Stanford Entities, or any conduct by the Hunton Released Parties relating to Allen Stanford or the Stanford Entities, with prejudice;

c)  The Hunton Settlement requires entry of a Judgment and Bar Order in the Hunton Action and entry of a Bar Order in the SEC Action, each of which permanently

enjoins, among others, Interested Parties, including all Stanford Investors and Claimants, from bringing, encouraging, assisting, continuing, or prosecuting, against Hunton or any of the Hunton Released Parties, the Hunton Action, or any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature arising from or relating to a Settled Claim;

d)   The Receiver will disseminate notice of the Hunton Settlement to Interested Parties, through one or more of the following as set forth in the Hunton Settlement Agreement, ¶¶ 27-28: mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and Receiver (http:// www.stanford financialreceivership.com) web sites;

e)   The Receiver will develop and submit to the Court for approval a plan for distributing the Net Settlement Amount ("Distribution Plan");[5]

f)   Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted claims that have been allowed by the Receiver;

g)   Persons who accept funds from the Hunton Settlement Amount will, upon accepting the funds, fully release the Hunton Released Parties from any and all Settled Claims; and

h)   The Hunton Action will be dismissed with prejudice as to Hunton, with each party bearing its own costs and attorneys' fees, by entry of the Judgment and Bar Order in that action.

Copies of the Hunton Settlement Agreement, this Motion, and other supporting papers may be obtained from the Court's docket, and will also be available on the websites of the Receiver (http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-stanford-financial-group/).  Copies of these documents may also be requested by email or phone by contacting Peter D. Morgenstern, Esq. (morgenstern@butzel.com, 212-374-5379), Joshua E. Abraham, Esq. (abraham@butzel.com, 212-374-5370), or Ivonne M. Soler, Esq. (soler@butzel.com, 313-225-7048).

---

[5]      In the motion seeking approval of the Distribution Plan, the Receiver will seek authority to distribute $15,000 each to the three Investor Plaintiffs from the Settlement Amount in acknowledgement of their participation and the work they performed as the named, putative class representative plaintiffs in the Hunton Action, including responding to discovery and appearing for depositions and mediation.

30.     For the reasons described herein, the Hunton Settlement is fair, equitable, reasonable, and in the interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets.  Plaintiffs urge the Court to approve it.

### III.     REQUEST FOR APPROVAL OF THE HUNTON SETTLEMENT

#### A.     *Legal Standards*

31.     "'[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.'"  *Kaleta*, 530 F. App'x at 362  (quoting *SEC v. Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)); *see also Certain Underwriters at Lloyd's of London, et al. v. Janvey et al.*, Case No. 3:09-cv-1736-N (ECF No. 200) pp. 5-6 (N.D. Tex. May 16, 2017) (order approving settlement with Receiver).   "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'"  *Kaleta* at 362 (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)); *Lloyd's of London, supra*.  "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership."  *Kaleta* at 362 (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)).  "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate."  *SEC v. Kaleta*, No. CIV.A. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012) (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).   Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation."  *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

32.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors.  *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d).  "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors."  *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

33.     The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants.  Second Order ¶ 5; *see supra* ¶¶ 2-3.

34.     The ability to compromise claims is critical to this Receivership.  Courts have long emphasized that public policy favors settlement.  *See, e.g.*, *Lydondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010).  That is especially true here, where the victims of Stanford's Ponzi scheme await recovery, further costs would come directly out of the Receivership Estate, and the Hunton Settlement would allow the Receiver to make a significant distribution.

35.     Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases. *See Lloyd's of London, supra*, at 5-6*; see also Kaleta*, 530 F. App'x. at 362-63 (approving bar order). Bar orders have been used in this and in other receivership cases to achieve these purposes. *See, e.g.*, *SEC v. DeYoung*, 850 F.3d 1172, 1180-81 (10th Cir. 2017); *Gordon*, 336 F. App'x at 549; *SEC*

*v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4-5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

36.     The Bar Order and the Judgment and Bar Order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2 (E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

37.     In fact, the Fifth Circuit in *Kaleta* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary . . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate"; and (iii) the scope of the bar order is appropriately tailored to achieve these objectives.  *See Kaleta*, 530 F. App'x at 362-63.  The Hunton Settlement satisfies each of these requirements.

38.     This Court and other district courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities

incident to the situation. *Kaleta*, 2012 WL 401069, at *4 (citations omitted); *Lloyd's of London, et al., supra*, at 6.[6]

39.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4.  The Fifth Circuit's opinion noted that, like the Hunton Settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

**B.      *The Hunton Settlement Satisfies the Factors for Settlement Approval***

   **(1)      *Value of the Proposed Settlement***

40.     The $34 million payment in the Hunton Settlement is substantial, putting the Hunton Settlement among the larger Stanford litigation settlements to date.  "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010).  In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4.  Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549.  The value of the Hunton Settlement to the

---

[6]     The Hunton Action has not yet been certified as a class action nor is it a case under Title 11 of the United States Code.  Though they are not binding here, both class action and Title 11 cases define tests for approving the aggregate settlements that may be tailored for a receivership case such as the Hunton Action. *See, e.g., Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (class action); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (Title 11 bankruptcy).  Broadly speaking, before approving a global settlement the Court must determine that the settlement (i) is reached after arm's-length negotiations; (ii) provides relief commensurate with the risks and expenses of litigating the claim to judgment; and (iii) represents the considered opinions of the parties and their counsel, and has the support of persons appointed to represent those who ultimately benefit from the settlement.  For the same reasons that the Hunton Settlement satisfies the factors set forth in the decision of the district court in *Kaleta*, and as set forth herein, the Hunton Settlement easily satisfies the tests set out in *Newby* or *Moore*.

Receivership Estate and Stanford's victims is significant, and the Court recently approved a settlement for a similar amount with another law firm that also provided legal services to the Stanford Entities. See *Janvey v. Proskauer Rose LLP*, Case No. 3:13-cv-00477-N-BQ (ECF No. 127) (Bar Order in connection with $35 million settlement with Chadbourne & Parke, LLP).

### (2)    *Value and Merits of the Receiver and Stanford Investors' Potential Claims*

41.    Plaintiffs of course believe that the claims filed against Hunton in the Hunton Action are meritorious and would be successful. However, they are not without substantial risk and uncertainty. Moreover, the ability to collect the maximum value of a judgment from Hunton is also not without risk and uncertainty. Hunton vigorously disputes the validity of the claims asserted in the Hunton Action. Among others, the following issues are hotly contested and promise years of uncertain litigation:

a.   whether the attorney immunity doctrine bars all of the Stanford Investors' and Committee's claims, and some of the Receiver's claims, against Hunton, in light of the Texas Supreme Court's decision in *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015); [7]

b.   whether the Stanford Investors would be able to certify a class action;

c.   whether at trial the Stanford Investors would be able to prove that Hunton had general awareness of Stanford's wrongful conduct and provided substantial assistance to Stanford for purposes of proving their claims for aiding and abetting violations of the TSA;

d.   whether Hunton had sufficient knowledge to meet the standards for the

---

[7]    In raising this and other issues herein, Plaintiffs do not concede that these issue have been finally determined.

Plaintiffs' claims for aiding-and-abetting breach of fiduciary and fraud;

e.   whether the Receiver and Committee have valid, supportable damage models;

f.   whether the Receiver's and Committee's claims for avoidance and recovery under the Texas Uniform Fraudulent Transfer Act ("TUFTA") are time-barred; and

g.   whether, after a successful judgment in the Hunton Action, Plaintiffs would be able to collect any more than the Hunton Settlement already offers.

42.     For these and other reasons, but for the Hunton Settlement, the Hunton Action would be vigorously defended by Hunton, its prosecution would be expensive and protracted, and the ultimate outcome of such litigation would be uncertain.  In light of these issues, Plaintiffs believe that the Hunton Settlement reflects a fair and reasonable compromise between the parties.

### (3)     *The Risk that Litigation Would Dissipate Receivership Assets*

43.     Plaintiffs believe that litigation against Hunton would most likely go on for years, with no guarantee of a recovery.  While Plaintiffs' Counsel have entered into contingent fee arrangements with Plaintiffs to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation.  The Hunton Settlement avoids further expense associated with the prosecution of the Hunton Action and continued monitoring and oversight of the case by the Receiver and the Committee Chairman/Examiner.

44.     Furthermore, as part of their fee agreement with their counsel, the Committee has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with the Committee's litigation against Hunton, including, *inter alia*, expert fees and out-of-pocket

litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.). Although the Hunton Action will continue with respect to defendants Greenberg Traurig, LLP ("Greenberg") and Yolanda Suarez ("Suarez"), without the Hunton Settlement Agreement, the Receiver would incur substantial *additional* expenses in order to prosecute the claims against Hunton.   The claims against Hunton involve alleged conduct from a period after Greenberg served as counsel to Stanford Financial Group and its affiliates.   Therefore, absent the Hunton Settlement, the Plaintiffs would have to take discovery from Hunton that would be substantially different from the anticipated discovery from Greenberg.   Moreover, because the case against Hunton involves claims of professional malpractice, expert witness testimony as to Hunton is necessary, and would be a significant expense going forward if the Hunton Action is not settled with respect to Hunton.   Expert testimony would be needed to prove the details of the Stanford Ponzi scheme, as well as the legal malpractice, causation and damages.   Absent the Hunton Settlement, expert witness fees as to Hunton's alleged liability and damages could easily have run into the hundreds of thousands of dollars, with added costs for working with expert witnesses, taking and defending expert depositions, and examining expert witnesses at trial. Other out-of-pocket litigation costs could have been substantial (given that formal discovery has not even begun in the Hunton Action) without the Hunton Settlement, including costs of oral and video depositions of all Hunton fact and expert witnesses, production of voluminous records and emails and other electronically stored information, travel associated with depositions, preparation of expert witness reports, trial graphics, cost of reproduction of documents and trial exhibits, retrieval and storage of email and other electronically stored information, and attendance of experts at trial.   Total out-of-pocket costs to prosecute the claims against Hunton could easily

reach $1 million or more due to the complex nature of the claims, the need for expert testimony, and the voluminous nature of the records involved.

### (4)     The Complexity and Costs of Future Litigation

45.     The prosecution of the Hunton Action would undoubtedly be challenging and expensive, as discussed above.  As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex, as evidenced by the Direct Testimony of Karyl Van Tassel in the Chapter 15 proceeding, as well as all of the lengthy Declarations with voluminous supporting exhibits that she has filed with this Court to prove the facts of the Stanford Ponzi scheme.  There is no question that the Hunton Action, involving claims of legal malpractice, among others, billions of dollars in claimed damages, and an international Ponzi scheme operated through a complex web of interrelated international companies that spanned nearly 20 years, is extraordinarily complex, and would cause the Receivership Estate to incur substantial expense to litigate to final judgment.  Although the Hunton Action will continue as to Greenberg and Suarez, continuing to keep Hunton involved would add a layer of complexity onto an already-complex case.  As stated above, litigation expenses alone could easily exceed $1 million.

### (5)     The Implications of Hunton's Settlement Payment on Other Claimants

46.     As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'"  530 F. App'x at 362.  The Receiver is not collecting Hunton's settlement payment for Allen Stanford or for Mr. Janvey, but for the Stanford Investors.  Thus, the relief Plaintiffs request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities."  *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order).

### (6) The Value and Merits of Any Foreclosed Parties' Potential Claims

47.     Plaintiffs are conscious of the fact that the Bar Order and Judgment and Bar Order they are requesting, and the entry of which are conditions to the Hunton Settlement, will preclude Stanford Investors and others from asserting claims against Hunton in connection with its involvement with the Stanford enterprise. However, no investors have asserted any claims against Hunton in the eight (8) years since the Receivership was created, and any such investors asserting claims face the same legal and factual challenges faced by the Plaintiffs, as discussed above.  In addition, no individual investor-litigant has standing to pursue the legal malpractice claim against Hunton.  The Receiver is the only party that has been recognized as having standing to pursue such a claim in this Court.

48.     Given that all Stanford Investors have been put on notice of the Receivership and have been given opportunities to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process and will receive a distribution from the Hunton Settlement, the Stanford Investors' rights are not being unduly prejudiced by the Hunton Settlement.  They have all had the opportunity to participate through the pre-existing receivership claims process.

49.     Plaintiffs believe that the Bar Order and Judgment and Bar Order should be approved because they are in the collective best interest of _all_ Stanford Investors.  The Bar Order and Judgment and Bar Order should not be rejected based upon the possibility that some individual investor(s) or counsel might otherwise wish to pursue individual claims against Hunton now or in the future.  _See Harmelin v. Man Fin. Inc._, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace

and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").

50. For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit **as many** aggrieved investors as stand to be benefited under the Settlement Agreement." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order) (emphasis added).

51. The proposed Hunton Settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses or a race to the courthouse by various counsel. Against this backdrop, the Court should approve the Hunton Settlement and enter the Bar Order and Judgment and Bar Order.

### *(7)   Other Equities Attendant to the Situation*

52. The entry of the Bar Order and the Judgment and Bar Order is a material term under the Hunton Settlement Agreement, and a necessary condition to the obligations set forth in the Hunton Settlement Agreement. The bottom line is that there is no Hunton Settlement without these bar orders. Hunton "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [Hunton], potentially in other, including foreign, jurisdictions." *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

53. Hunton has made clear that in consideration of paying $34 million, it must achieve "peace" through the Hunton Settlement, wholly and finally, with respect to all Stanford-related claims. Hunton has stated that it would not enter into the Hunton Settlement without securing the avoidance of the expense of further such litigation, particularly given what it

believes are its strong factual and legal defenses.

54.     The Receiver and the Committee were appointed to protect the interests of *all* of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants.   The proposed Bar Order and Judgment and Bar Order will help maximize the eventual distribution to Receivership Estate claimants of Hunton's $34 million payment and provide Hunton the resolution of Stanford-related litigation that is a necessary condition for that settlement payment by Hunton.   Plaintiffs believe that the entry of the Bar Order and Judgment and Bar Order are fully justified by the Settlement Amount being paid by Hunton.   The Court has already enjoined and barred all claims against the settling defendants and related parties pursuant to the settlements in the BDO lawsuit (Case No. 3:12-cv-01447-N-BG), the Adams & Reese lawsuit (Case No. 3:12-cv-0495-N), the Chadbourne lawsuit (Case No. 3:13-cv-00477-N-BQ), the Lloyd's of London lawsuits (e.g., Case No. 3:09-cv-1736-N), and pursuant to the settlement with Kroll (SEC Action, ECF No. 2363).   Movants ask the Court to similarly enjoin and bar all claims and potential claims against the Hunton Released Parties in order to effectuate the Hunton Settlement.

55.     Plaintiffs and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors.   Plaintiffs firmly believe that they could prosecute viable causes of action against Hunton, though Hunton vigorously denies any wrongdoing or liability, and has indicated that it firmly believes it would successfully defend any claims against it.   Hunton also has the resources to defend itself and to litigate the issues through a final trial court judgment, and appeal if necessary, which means the litigation would take years to be resolved without a settlement.

56.     Plaintiffs believe that the terms of the Hunton Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

57.     The overall context of the MDL and Stanford Receivership also is relevant to the equities of the situation.  The Stanford Ponzi scheme collapsed in February 2009, and the eight years since have yielded numerous motions, dismissals, appeals, and a delay in any substantial recovery for Stanford's victims.  The parties – on both sides – are confronted by uncertainty, risk, and delay.  In this circumstance, the example of settlement is to be encouraged.

58.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging.  For many of Stanford's victims, recovery delayed is recovery denied.  If possible, the time that Stanford's victims have waited to date should not be extended further.

59.     The equities of the Hunton Settlement, including its necessary Bar Order and Judgment and Bar Order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims.  The Receiver, the Examiner, the Committee, and the Investor Plaintiffs have cooperated and joined together in the Hunton Settlement.  In this complex international fraud, this level of coordination and quality of resolution are eminently desirable.  The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation.  The result of this coordination will be the most orderly distribution to Stanford's victims that possibly can be achieved.

60.     The Court is well within its discretion to approve the Hunton Settlement.  In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities

laws and defrauding investors.  2012 WL 401069, at *1.  The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants."  *Id*.  The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership.  The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed.  *Kaleta*, 530 F. App'x at 362-63.

61.     In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the Receivership Estate.  *Kaleta*, 2012 WL 401069, at *7.  "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances."  *Id*.

62.     In another case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties.  *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014).  The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities."  *Id.* at *2;[8] *see also SEC v. DeYoung*, 850 F.3d 1172, 1183 (10th Cir. 2017) ("the district court found that the settlement offered the highest potential recovery for the Receivership Estate and the IRA Account Owners, and that the Claims Bar Order was necessary to that settlement") (affirming district court bar order) (citing *Kaleta*).

---

[8]       The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against another settling party. *See SEC v. Temme*, No. 4:11–cv–655, [ECF No. 162] (E.D. Tex. Nov. 21, 2012).

## IV.  REQUEST FOR APPROVAL OF ATTORNEYS' FEES

### A.    *Terms of Plaintiffs' Counsel's Engagement*

63.    In addition to approving the Hunton Settlement, Plaintiffs also request that the Court approve an award of attorneys' fees to Plaintiffs' Counsel, consisting of Castillo Snyder, P.C. ("Castillo Snyder"), Butzel Long, P.C. ("Butzel Long") Strasburger & Price, LLP ("Strasburger"), and Neligan LLP ("Neligan") under the terms of the fee agreement between Plaintiffs' Counsel and the Receiver, the Committee, and the Investor Plaintiffs, as well as reimbursement of expenses incurred in the prosecution of the Hunton Action.  As reflected in the Declaration of Edward C. Snyder, attached as **Exhibit 2** to the Appendix in Support of this Motion, Plaintiffs' Counsel have been handling this action pursuant to 25% contingency fee agreements with the Receiver, the Committee, and the Investor Plaintiffs.  *See also* Declarations of Peter Morgenstern and Doug Buncher attached to the Appendix as **Exhibits 3 and 4** respectively.

64.    Pursuant to the fee agreements, the Plaintiffs seek Court approval to pay attorneys' fees to Plaintiffs' Counsel equal to an aggregate of 25% of the Net Recovery from the Hunton Settlement (*i.e.*, the settlement amount less allowable disbursements), and to reimburse Plaintiffs' Counsel as well as the Receiver for expenses they have incurred and carried in the Hunton Action.  The gross amount of the settlement to be paid by Hunton is $34,000,000.00. The expense disbursements which are to be deducted from the settlement amount to calculate the Net Recovery from the Hunton Settlement are $57,521.11, which are expenses either (i) previously incurred in the prosecution of the Hunton Action since 2012 and carried by Plaintiffs' Counsel or (ii) expenses that were incurred in the Hunton Action and paid by the Receiver

directly or reimbursed by the Receiver to Plaintiffs' Counsel pursuant to a fee agreement.[9]  *See* Powers Decl., **Exhibit 6** at ¶¶ 4,5 (testifying that the Receiver advanced $57,521.11 in expenses for the Hunton Action).

65.    Thus, the Net Recovery from Hunton after reimbursement of expenses is $33,942,478.90, and 25% of the Net Recovery is $8,485,619.72.  This is the fee agreed to be paid to Plaintiffs' Counsel by the Receiver, the Committee, and the Investor Plaintiffs, and this is the amount of the fee for which approval is sought in this Motion.

**B.    *The Proposed Fee is Reasonable as a Percentage of the Overall Recovery***

66.    Trial courts can determine attorneys' fee awards in common fund cases such as this one[10] using different methods.  One is the percentage method, under which a court awards fees based on a percentage of the common fund.  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012).  The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable."  *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).[11]  Thus, when considering fee awards in class action cases, "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check."  *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K (lead case), 2005

---

[9]    The total expenses incurred by the Plaintiffs in connection with the Hunton Action is expected to increase as a result of costs related to the Plaintiffs' settlement notice obligations and other expenses.  Plaintiffs will provide the Court with their final expense figure at the hearing to be held on this matter.

[10]    The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr. S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[11]    The *Johnson* factors are discussed in Subsection C below.

WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[12]

67.     While the Hunton Settlement is not a class action settlement, because the settlement is structured as a settlement with the Receiver and the Committee, with the Bar Order and the Judgment and Bar Order, this Motion analyzes the award of attorneys' fees to Plaintiffs' Counsel under the law applicable to class action settlements in an abundance of caution.  In other Stanford litigation settlements, this Court analyzed the pertinent fee requests under both the common fund and *Johnson* approaches.  *Id.* at 3; *see, e.g., Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80 (approving a 25% contingency fee on a $40 million settlement); *see also* SEC Action, ECF No. 2366 (order approving 25% contingency fee on a $35 million settlement with Chadbourne & Parke LLP).

68.     Whether analyzed under the common fund approach, the *Johnson* framework, or both, the 25% fee sought by Plaintiffs' Counsel pursuant to their fee agreements is reasonable and should be approved by the Court.

69.     The proposed 25% amount is a reasonable percentage of the common fund (*i.e.*, the $34 million settlement).  "The vast majority of Texas federal courts and courts in this District have awarded fees of 25%–33% in securities class actions."  *Schwartz*, 2005 WL 3148350, at *31 (collecting cases).  "Indeed, courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method."

---

[12]      While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District of Texas have recognized that the percentage method is the preferred method of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25.  In *Schwartz*, the court observed that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25.  The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case.  *Id.*  Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery." *Id.* at *26.

*Id.*[13]  Combined with the *Johnson* analysis set forth below, the proposed fee award is reasonable and appropriate under the common fund doctrine as applied in the Fifth Circuit.

### C.      *The Proposed Fee is Reasonable Under the Johnson Factors*

70.     The *Johnson* factors include: (1) time and labor required; (2) novelty and difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *See Johnson*, 488 F.2d at 717-19.  A review of these factors also reveals that the proposed 25% fee is reasonable and should be approved.

### (1)      Time and Labor Required

71.     As reflected in the Snyder, Morgenstern, Buncher, and Valdespino Declarations, Plaintiffs' Counsel invested a tremendous amount of time and labor in the Hunton Action over the last five years.  Even a cursory review of the Court's docket (there are 231 entries) reveals the immense amount of work that Plaintiffs' Counsel have put into the prosecution of the Hunton Action since 2012.

72.     Moreover, as the Court is aware, the prosecution of a lawsuit of this magnitude

---

[13]      As set forth in *Schwartz*, courts in the Northern District of Texas have routinely approved such awards. *See, e.g*, *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc*., No. 4:00–CV–355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% in securities class action); *Scheiner v. i2 Techs., Inc.*, Civil Action No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc.*, Civil Action No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig.*, Master File No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc.*, Civil Action No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI*, No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig.*, No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc*., No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

and complexity requires a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the cases, conduct discovery, prepare the briefs and motions, attempt to negotiate settlements, and prepare cases for summary judgment and/or trial. Plaintiffs' Counsel have spent thousands of hours since 2011 in their investigation and prosecution of the Hunton Action.

73.    Plaintiffs' Counsel have spent roughly 8 years and thousands of hours investigating and pursuing claims against third parties, including Hunton, on behalf of the Stanford Receivership Estate and the Stanford Investors. Castillo Snyder, P.C. has close to $8 million invested in the Stanford cases overall since 2009, and over 3,000 hours of time worth $1,790,897.50 at Castillo Snyder's applicable hourly rates invested specifically in the Hunton Action. *See* Snyder Decl., at ¶¶ 40, 41. Butzel Long, P.C. also has thousands of hours and millions of dollars of time invested in pursuing claims against third parties related to the Stanford Receivership, and 1,203.80 hours of attorney and paralegal time worth $709,323.00 attributable to the Hunton Action. *See* Morgenstern Decl., at ¶ 15. Neligan LLP has 805.9 hours and $414,010.50 million worth of attorney and paralegal time invested in the Hunton Action. *See* Buncher Decl. (**Exhibit 4**), at ¶ 17. Strasburger & Price, LLP has over 214 hours of unpaid attorney and paralegal time worth $121,335.00 invested specifically in the Hunton Action. *See* Valdespino Decl. (**Exhibit 5**), at ¶ 36.

74.    The tremendous amount of work required by Plaintiffs' Counsel to prosecute the Hunton Action is described in the Snyder, Morgenstern, Buncher, and Valdespino Declarations, and this Motion. *See, e.g.*, Mot. ¶¶ 10-26.[14]

---

[14]    Unlike certain prior settlements, the instant Hunton Settlement does not fully and finally resolve the litigation as Plaintiffs continue to prosecute claims against Greenberg and Suarez. For that reason Plaintiffs' counsel is not submitting their time records to the Court as part of this Motion. Should the Court request Plaintiffs' counsel

### (2)     Novelty and Difficulty of the Issues

75.     The factual and legal issues presented in the Hunton Action were difficult and complex.   Plaintiffs' Counsel's investigation from 2010 through 2012 revealed Hunton's involvement in representing Stanford's sprawling group of companies and Stanford's control over Caribbean nation of Antigua and persistent evasion of regulatory authorities around the world.

76.     Plaintiffs' Counsel conducted a thorough analysis of the potential claims against Hunton, considering: claims available under both state and federal law; the viability of those claims considering the facts underlying Hunton' business dealings with Stanford and this Court's previous rulings; the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere; as well as defenses raised by Hunton in their motions to dismiss, motion for judgment on the pleadings, and mediation position papers.

77.     The Plaintiffs commenced the Hunton Action by filing their Original Complaint in this Court on November 15, 2012.  The case was then confronted by complex and novel issues raised by the defendants via their motions to dismiss, including issues related to liability under the TSA, the timeliness of the TSA and TUFTA claims, the applicability of the attorney immunity doctrine, the viability of the breach of fiduciary duty claims, and the sufficiency of the pleading related to the conspiracy and aiding and abetting causes of action. The Investor Plaintiffs then fully litigated and briefed the question of class certification, which involved extremely complex and novel issues of res judicata under the foreign laws of multiple countries, damages, and causation.  Finally, the Plaintiffs also had to contend with the new law on attorney

---

to do so, Plaintiffs' counsel will seek leave to file said time records under seal as they contain privileged and confidential attorney-client and attorney work product information related to the still-pending claims against Greenberg and Suarez.

immunity as applicable to this case and as raised in Defendants' motion to dismiss and motion for judgment on the pleadings.

78.     The foregoing summary of the issues identified in Plaintiffs' Counsel's investigation of the claims against Hunton illustrates the novelty, difficulty, and complexity of the issues in the Hunton Action and supports the approval of the proposed fee.

### (3)     Skill Required

79.     Given the complexity of the factual and legal issues presented in the Hunton Action, the preparation, prosecution, and settlement of that Action required significant skill and effort on the part of Plaintiffs' Counsel. Plaintiffs' Counsel have represented investor classes as well as receivership and bankruptcy estates on numerous occasions, and are currently serving as counsel for the Receiver, the Committee, and other investor plaintiffs, both individually and as representatives of putative classes of Stanford Investors, in multiple other lawsuits pending before the Court. Snyder Decl., ¶¶ 15-17; Morgenstern Decl., at ¶¶ 7-10; Buncher Decl., at ¶¶ 6-10; Valdespino Decl., at ¶¶ 10-18. Plaintiffs submit that the favorable result in the Hunton Action is indicative of Plaintiff's Counsel's skill and expertise in matters of this nature.

### (4)     Whether Other Employment is Precluded

80.     Although participation in the Hunton Action did not necessarily preclude Plaintiffs' Counsel from accepting other employment, the sheer amount of time and resources involved in investigating, preparing, and prosecuting the Hunton Action, as reflected by the hours invested in the case and the Stanford cases generally, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters. Snyder Decl. at ¶ 39; Morgenstern Decl., at ¶ 7.

### (5)     The Customary Fee

81.     The 25% fee requested is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude.  *See Schwartz*, 2005 WL 3148350, at *31 (collecting cases and noting that 30% is standard fee in complex securities cases).  "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund."  *Klein*, 705 F. Supp. 2d at 675 (citing *Manual for Complex Litig. (Fourth)* § 14.121 (2010)); *see, e.g.*, *SEC v. Temme*, No.4:11-cv-00655-ALM, at *4–5 (E.D. Tex. November 21, 2012), ECF No. 162 (25% contingent fee for a $1,335,000 receivership settlement); *Billitteri v. Sec. Am., Inc.*, No. 3:09–cv–01568–F (lead case), 2011 WL 3585983, *4–9 (N.D. Tex. 2011) (25% fee for a $80 million settlement); *Klein*, 705 F. Supp. 2d at 675–81 (30% fee for a $110 million settlement).

82.     The Hunton Action, and the other third-party actions being prosecuted for the benefit of the Receivership Estate, are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery, and dispositive motions to get to trial.  Indeed, the Hunton Action was filed almost 5 years ago and still has not reached the merits discovery phase.  The Hunton Action has involved significant financial outlay and risk by Plaintiffs' Counsel, the risk of loss at trial after years of work for no compensation, and an almost certain appeal following any victory at trial.  Plaintiffs' Counsel submit that these factors warrant a contingency fee of more than 25%.  Nonetheless, Plaintiffs' Counsel agreed to handle the Hunton Action on a 25% contingency fee basis, and that percentage is reasonable given the time and effort required to litigate the Action, its complexity and the risks involved.

### (6)     Whether the Fee is Fixed or Contingent

83.     As set forth above, the fee was contingent upon success against Hunton.  As a

result, Plaintiffs' counsel bore significant risk in accepting the engagement.

### (7) Time Limitations

84.     At the time of the Hunton Settlement, Plaintiffs were not subject to significant time limitations in the Hunton Action, as the case has been essentially stayed while the parties awaited this Court's ruling on class certification and litigated the issue of attorney immunity. However, and given the breadth and scope of activity in the Hunton Action over the last 5 years, including almost non-stop heavy briefing and motion practice, including class certification briefing, Plaintiffs' Counsel has been consistently under deadlines and time pressure.  Had an investor class been certified, the Hunton Action would have remained pending before the Court and would likely have taken many more years to resolve. Furthermore, given the magnitude and complexity of the cases, even if a trial in the Hunton Action was set a year in the future, Plaintiffs' Counsel would have been under significant time pressure to complete all the investigation and discovery to prepare for final hearing within a year.

### (8) The Amount Involved and Results Obtained

85.     As discussed further herein, $34 million represents a substantial settlement and value to the Receivership Estate. This factor also supports approval of the requested fee.

### (9) The Attorneys' Experience, Reputation, and Ability

86.     As noted above, Plaintiffs' Counsel have represented numerous investor classes, receivers, bankruptcy trustees, and other parties in complex litigation matters related to equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding.  *See* Snyder Decl., at ¶¶ 7-10; Morgenstern Decl. at ¶ 2; Buncher Decl. at ¶¶ 3-5.  Moreover, Plaintiffs' Counsel have been actively engaged in the Stanford proceeding since its inception. Given the complexity of the issues in the Hunton Action, Plaintiffs submit that the Hunton

Settlement is indicative of Plaintiffs' Counsel's ability to obtain a favorable result in such proceedings.

**(10)    The Undesirability of the Case**

87.    The Hunton Action is not *per se* undesirable, although suing other lawyers does generate some level of stigma within the legal community, which can in certain circumstances result in fewer referrals of new matters.

**(11)    Nature and Length of Professional Relationship with the Client**

88.    As the Court is aware, Plaintiffs' Counsel have represented the Receiver, the Committee, and Investor Plaintiffs in numerous actions pending before the Court since 2009. Plaintiffs' Counsel has handled all of these cases on the same 25% contingency fee arrangement that has previously been approved by the Court.  *See* SEC Action, ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action, ECF No. 1208, p. 3 (providing a "contingency fee" of twenty-five percent (25%) of any Net Recovery in actions prosecuted by the Committee's designated professionals).  This factor also weighs in favor of approval of the requested fee.

**(12)    Awards in Similar Cases**

89.    As noted above, a 25% contingency fee has previously been approved as reasonable by this Court in its order approving the Receiver's agreement with the Committee regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and the Committee (the "OSIC-Receiver Agreement").  *See* SEC Action, ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action, ECF No. 1208, Ex. A, p. 3 (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by the Committee's designated professionals).

The Court's order approving the OSIC-Receiver Agreement also provided that the Committee need not submit a fee application seeking an award of fees consistent with the percentage authorized under the Court's previous order unless required by Rule 23. *See* SEC Action, ECF No. 1267, p. 2.

90.     The OSIC-Receiver Agreement further provided that the Committee "would prosecute certain fraudulent transfer claims and other actions for the benefit of Stanford investors/creditors in cooperation with Ralph S. Janvey, as receiver." *See* OSIC-Receiver Agreement, SEC Action, ECF No. 1208, Ex. A, p. 1. The Agreement further provided that "this proposal will apply to the litigation of all fraudulent transfer and similar claims that may be brought under common law, statute . . . or otherwise . . ." and "unless otherwise agreed, the terms of this agreement will likewise apply to the pursuit of any other claims and causes of action that the Receiver and the Committee determine to jointly pursue." *Id*. at pp. 1-2.

91.     The contingency fee agreements with Plaintiffs in this case similarly provide for a fee of 25% of the Net Recovery (defined as the total recovery after deducting allowable expenses and disbursements), and were modeled after the OSIC-Receiver Agreement since the parties knew that the Court had already approved a 25% contingency fee agreement.

92.     Further, this Court has approved a 25% contingency fee arrangement in the BDO, Adams & Reese, and Chadbourne cases. *See Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80; Order Approving Attorneys' Fees in *Ralph S. Janvey v. Adams & Reese, LLP*, Civil Action No. 3:12-CV-00495-B [SEC Action, ECF. No. 2231]. Order Approving Attorneys' Fees, SEC Action, ECF No. 2366 (approving 25% contingency fee on a $35 million settlement with Chadbourne & Parke LLP).

93.     As set forth in *Schwartz*, courts in this district have routinely approved 25%, and

more often 30%, fee awards in complex securities class actions.  2005 WL 3148350, at *27 (collecting cases).  Under the circumstances of this case, such an award is appropriate here as well.

### D. The Proposed Fee Should Be Approved

94.     For the same reasons the Court previously found the 25% contingency fee OSIC-Receiver Agreement to be reasonable, *see* SEC Action, ECF No. 1267, p. 2; *Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv-01447-N-BG (N.D. Tex. Sep. 23, 2015), ECF No. 80; and Order Approving Attorneys' Fees in *Ralph S. Janvey v. Adams & Reese, LLP*, Civil Action No. 3:12-CV-00495-B [SEC Action, ECF No. 2231]; the Court should find the 25% contingency fee applicable to the Hunton Settlement to be reasonable and approve it for payment.  Here, there is even more reason to find the fee to be reasonable given the vast amount of work and risk undertaken by Plaintiffs' counsel over the last 5 years.  The settlement of the claims against Hunton has yielded an enormous benefit to the Stanford Receivership Estate and the Stanford Investors and compares favorably to the other settlements of third-party lawsuits in the over eight-year history of the Stanford receivership.  Thus, Plaintiffs submit that an award of attorneys' fees equal to 25% of the net recovery from the Hunton Settlement, as requested, is reasonable and appropriate and should be approved under applicable Fifth Circuit law, whether using a common fund approach, the *Johnson* factor approach, or a blended approach.

95.     Plaintiffs therefore request that the Court approve the payment, from the Settlement Amount, of attorneys' fees in the total amount of $8,485,619.72.

### E. Examiner Support for Fee Award

96.     John J. Little in his capacity as Court-appointed Examiner also supports the award of Plaintiffs' attorneys' fees, and requests that the Court approve them.  *See* Declaration of

Examiner John J. Little, attached as **Exhibit 7** to the Appendix to this Motion.  A proposed form of Order Approving Attorneys' Fees is attached as **Exhibit 8** to the Appendix to this Motion.

## V.     CONCLUSION & PRAYER

97.    The Hunton Settlement represents a substantial and important recovery for the Receivership Estate and the Stanford Investors.  The large amount of the recovery, the time and costs involved in pursuing litigation against Hunton, and the uncertain prospects for obtaining and then recovering a judgment against Hunton, all weigh heavily toward approving the Hunton Settlement, entering the Bar Order, entering the Judgment and Bar Order, and approving the attorneys' fees of Plaintiffs' Counsel.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request this Court:

    a.    Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

    b.    Set the Final Approval Hearing for a date at least 90 days after the entry of the Scheduling Order and, if convenient for the Court, either (a) before December 1, 2017 or (b) after January 11, 2018;

    c.    Grant this Motion;

    d.    Approve the Hunton Settlement;

    e.    Enter the Bar Order in the SEC Action;

    f.    Enter the Judgment and Bar Order in the Hunton Action;

    g.    Approve the payment of attorneys' fees to Plaintiffs' Counsel in the total amount of $8,485,619.72; and

    h.    Grant Plaintiffs all other relief to which they are entitled.

Dated: August 16, 2017.

**CASTILLO SNYDER, P.C.**

By: ___/s/ Edward C. Snyder_____
    Edward C. Snyder
    esnyder@casnlaw.com
    Jesse R. Castillo
    jcastillo@casnlaw.com
    700 N. St. Mary's Street, Suite 405
    San Antonio, Texas  78205
    (210) 630-4200
    (210) 630-4210 (Facsimile)

**NELIGAN, LLP**

By: ___/s/ Douglas J. Buncher_____
    Douglas J. Buncher
    dbuncher@neliganlaw.com
    Republic Center
    325 N. St. Paul, Suite 3600
    Dallas, Texas  75201
    (214) 840-5320
    (214) 840-5301 (Facsimile)

**BUTZEL LONG, P.C.**

By: /s/ Peter D. Morgenstern_____
    Peter D. Morgenstern (*pro hac vice*)
    morgenstern@butzel.com
    Joshua E. Abraham (*pro hac vice*)
    abraham@butzel.com
    477 Madison Avenue, Suite 1230
    New York, New York 10022
    (212) 818-1110
    (212) 898-0123 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: /s/ Judith R. Blakeway____
    Judith R. Blakeway
    judith.blakeway@strasburger.com
    Merritt Clements
    merritt.clements@strasburger.com
    2301 Broadway
    San Antonio, Texas  78215
    Telephone: (210) 250-6000
    Facsimile: (210) 250-6100

**COUNSEL FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

On August 16, 2017, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. All parties who have appeared in this proceeding will be served via ECF. Investors and other interested parties will be served and given notice of the hearing on this Motion as approved by the Court.

          /s/ *Peter D. Morgenstern*____
           Peter D. Morgenstern