IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

v.                                                    Civil Action No. 3:09-cv-00298-N

STANFORD INTERNATIONAL BANK, LTD,
*et al.*,

                              Defendants.

**APPENDIX TO EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1]
AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH
TD BANK, TO APPROVE THE PROPOSED NOTICE OF
SETTLEMENT WITH TD BANK, TO ENTER THE BAR
ORDER, AND FOR PLAINTIFFS' ATTORNEYS' FEES AND EXPENSES**

Ralph S. Janvey (the "Receiver") and the Official Stanford Investors Committee (the

"OSIC"), file this appendix (the "Appendix") in support of the *Expedited Request for Entry of*

*Scheduling Order and Motion to Approve Proposed Settlement with TD Bank, to Approve the*

*Proposed Notice of Settlement with TD Bank, to Enter the Bar Order, and for Plaintiffs' Attorneys'*

*Fees and Expenses* (the "Motion").

---

[1]    Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

| Exhibit | Description |
|---------|-------------|
| **Appendix Materials** ||
| 1. | Settlement Agreement with Exhibits |
| 2. | Declaration of Peter D. Morgenstern |
| 3. | Declaration of Scott M. Berman |
| 4. | Declaration of Scott Powers |
| 5. | Order Approving Attorneys' Fees |
| 6. | Declaration of John J. Little |

Dated:  March 8, 2023                 Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Kevin M. Sadler*

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304-1007
T: (650) 739-7500
F: (650) 739-7699

Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
401 South 1st Street, Suite 1300
Austin, Texas 78704-1296
T: (512) 322-2500
F: (512) 322-2501

**ATTORNEYS FOR THE RECEIVER
RALPH S. JANVEY**

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

By: */s/ Scott M. Berman*
    Scott M. Berman (PHV)
    Philippe Adler (PHV)
    David J. Ranzenhofer (PHV)
    Geoffrey Cajigas (PHV)
    7 Times Square
    New York, NY 10036-6516
    T: (212) 833-1120
    F: (212) 833-1250
    sberman@fklaw.com
    padler@fklaw.com
    dranzenhofer@fklaw.com
    gcajigas@fklaw.com

**BUTZEL LONG, A PROFESSIONAL CORPORATION**

By: */s/ Peter D. Morgenstern*
    Peter D. Morgenstern (PHV)
    Joshua E. Abraham (PHV)
    477 Madison Avenue, Suite 1230
    New York, NY 10022
    T: (212) 818-1110
    F: (212) 818-0494
    morgenstern@butzel.com
    abraham@butzel.com

**ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**

## CERTIFICATE OF SERVICE

On March 8, 2023, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I will serve the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

On March 8, 2023, I served a true and correct copy of the foregoing document and the notice of electronic filing by United States Postal Certified Mail, Return Receipt required to the persons noticed below who are non-CM/ECF participants:

> R. Allen Stanford, Pro Se
> Inmate #35017183
> Coleman II USP
> Post Office Box 1034
> Coleman, FL 33521

> */s/ Kevin M. Sadler*
> Kevin M. Sadler

# Exhibit 1

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (the "Settlement Agreement") is made and entered into between and among, on the one hand, (i) Ralph S. Janvey, solely in his capacity as the court-appointed receiver for the Stanford Receivership Estate (the "Receiver"); (ii) the Official Stanford Investors Committee (the "Committee"); (iii) individual plaintiffs Guthrie Abbott, Steven Queyrouze, Sarah Elson-Rogers, Salim Estefenn Uribe, Ruth Alfille de Penhos, and Diana Suarez (collectively, the "Rotstain Investor Plaintiffs"); and, on the other hand, (iv) The Toronto-Dominion Bank ("TD Bank"). The Receiver, the Committee, and the Rotstain Investor Plaintiffs are collectively referred to as the "Plaintiffs." The Plaintiffs, on the one hand, and TD Bank, on the other hand, are referred to in this Settlement Agreement individually as a "Party" and together as the "Parties".

**WHEREAS**, on February 16, 2009, the United States Securities and Exchange Commission (the "SEC") initiated *SEC v. Stanford International Bank, Ltd.*, Civil Action No. 3:09-cv-00298-N (N.D. Tex.) (the "SEC Action"), alleging that Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford International Bank, Ltd. ("SIBL"), Stanford Group Company, and Stanford Capital Management, LLC (collectively, the "Stanford SEC Defendants") had engaged in a fraudulent scheme affecting tens of thousands of customers from over one hundred countries;

**WHEREAS**, in an order dated February 16, 2009, in the SEC Action (ECF No. 10), the United States District Court for the Northern District of Texas assumed exclusive jurisdiction and took possession of (i) the assets, and other tangible and intangible monies and property, as further set forth in that order, of the Stanford SEC Defendants and all entities they owned or controlled as of February 16, 2009, including but not limited to Stanford Financial Group Limited ("SFGL"),

Bank of Antigua Limited, and Stanford Bank (Panama), S.A.[1] (all such entities are collectively, with the Stanford SEC Defendants, the "Stanford Entities"), which comprise the "Receivership Assets," and (ii) the books and records, client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers, telephones, personal digital devices, and other informational resources of or in possession of the Stanford SEC Defendants, or issued by the Stanford SEC Defendants and in possession of any agent or employee of the Stanford SEC Defendants (collectively, the "Receivership Records");

**WHEREAS**, in that same order (ECF No. 10), Ralph S. Janvey was appointed Receiver for the Receivership Assets and the Receivership Records (collectively, the "Receivership Estate") with the full power of an equity receiver under common law as well as such powers as are enumerated in that order, as amended by orders in that same matter dated March 12, 2009 (ECF No. 157, Case No. 3:09-cv-00298-N (N.D. Tex.)), and dated July 19, 2010 (ECF No. 1130, Case No. 3:09-cv-00298-N (N.D. Tex.)) (collectively, the "Receivership Orders");

**WHEREAS**, in the Receivership Orders the Court "empowered and directed the Receiver to, among other things . . . devise a mechanism for addressing outstanding claims and liabilities and satisfying valid investor/creditor claims" (ECF No. 96, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.)), and "to bring actions for the benefit of the Receivership Estate and investors in SIBL CDs." ECF No. 734, ¶ 18, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.);

**WHEREAS**, Ralph S. Janvey has served as Receiver continuously since his appointment and continues to so serve;

---

[1]    The full list of entities that the Stanford SEC Defendants owned or controlled as of February 16, 2009 is attached as **Exhibit C**.

2

**WHEREAS**, John J. Little was appointed to serve as examiner (the "Examiner") by an order entered in the SEC Action, dated April 20, 2009 (ECF No. 322, Case No. 3:09-cv-00298-N (N.D. Tex.)), to assist the United States District Court for the Northern District of Texas in considering the interests of the worldwide investors in any financial products, accounts, vehicles, or ventures sponsored, promoted, or sold by any defendants in the SEC Action;

**WHEREAS**, John J. Little has served as Examiner continuously since his appointment and continues to so serve;

**WHEREAS**, the Committee was created pursuant to an order entered in the SEC Action dated August 10, 2010 (ECF No. 1149, Case No. 3:09-cv-00298-N (N.D. Tex.)) (the "Committee Order"), to represent "the customers of SIBL, who, as of February 16, 2009, had funds on deposit at SIBL, and/or were holding certificates of deposit ("CDs") issued by SIBL" (the "Stanford Investors") "in [the SEC Action] and related matters," and was "authorized and approved" by the United States District Court for the Northern District of Texas "to represent the interests of SIBL investors in these and related proceedings and, under certain circumstances, to bring and take legal actions for the benefit of SIBL investors and on behalf of the Receiver and the Receivership Estate." (ECF No. 734, ¶ 19, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.));

**WHEREAS**, by the Committee Order, the Examiner was named as the initial Chairperson of the Committee;

**WHEREAS**, the Examiner has served as Chairperson of the Committee continuously since his appointment and continues to so serve;

**WHEREAS**, on August 23, 2009, Guthrie Abbott, Steven Queyrouze, Peggy Roif Rotstain, Juan Olano, Catherine Burnell, and Jamie Alexis Arroyo Bornstein (the latter four of whom were later replaced by substitute plaintiffs Sarah Elson-Rogers, Salim Estefenn Uribe, Ruth

Alfille de Penhos, and Diana Suarez) filed a petition in Harris County District Court—a putative class action captioned *Rotstain, et al. v. Trustmark National Bank, et al.* (the "*Rotstain Litigation*")—naming five banks, including TD Bank, as defendants. (The bank defendants named as defendants in the *Rotstain* Litigation are referred to collectively as the "Bank Defendants");

**WHEREAS,** on November 13, 2009, the *Rotstain* Litigation was removed to the United States District Court for the Southern District of Texas (the "Transferor Court") where it was assigned Civil Action No. 4:09-cv-03673 and then transferred to and consolidated with the Stanford multidistrict litigation proceeding in the United States District Court for the Northern District of Texas (the "MDL Court") and assigned Civil Action No. 3:09-cv-02384-N;

**WHEREAS**, on December 5, 2011, the Committee moved to intervene in the *Rotstain* Litigation to "represent[] the interests of *all* Stanford investors," (ECF No. 96, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.)), which motion the MDL Court granted on December 6, 2012 (ECF No. 129, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.));

**WHEREAS**, on February 15, 2013, the Committee filed an Intervenor Complaint against TD Bank and other defendants (ECF No. 133, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.));

**WHEREAS**, on June 23, 2015, the Rotstain Investor Plaintiffs filed the Rotstain Investor Plaintiffs' Second Amended Class Action Complaint (ECF No. 279, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.));

**WHEREAS**, on November 7, 2017, the MDL Court denied the Rotstain Investor Plaintiffs' motion for class certification (ECF No. 428), and the U.S. Court of Appeals for the Fifth Circuit later declined interlocutory review of the class-certification denial in a matter captioned *Rotstain, et al. v. Trustmark National Bank, et al.*, No. 17-90038 (5th Cir.) (Order; Apr. 20, 2018);

**WHEREAS**, on November 1, 2019, plaintiffs Paul Blaine Smith, Carolyn Bass Smith, and a group of 1,286 Stanford Investors, filed a petition in Harris County, Texas, District Court against Trustmark National Bank, Independent Bank f/k/a Bank of Houston, TD Bank, HSBC Bank plc, Société Générale Private Banking (Suisse) S.A., and Blaise Friedli, which was thereafter removed to the United States District Court for the Southern District of Texas (the "_Smith_ Court"), where it was captioned _Smith, et al. v. Independent Bank, et al._, CA No. 4-20-CV-00675 (S.D. Tex.) (the "_Smith_ Litigation");

**WHEREAS**, the _Smith_ Litigation is duplicative of the _Rotstain_ Litigation;

**WHEREAS**, on June 15, 2020, the Committee filed the Second Amended Intervenor Complaint against TD Bank and other defendants (ECF No. 735, Case No. 3:09-cv-02384-N-BQ (N.D. Tex.)) (collectively with the Rotstain Investor Plaintiffs' Second Amended Class Action Complaint, the "Complaints");

**WHEREAS**, on January 28, 2022, the MDL Court transferred the _Rotstain_ Litigation back to the Transferor Court where it was re-captioned _Abbott, et al. v. Trustmark National Bank, et al._, Case No. 4:22-cv-00800 (S.D. Tex.);

**WHEREAS**, on November 10, 2022, the Transferor Court entered the Fifth and Final Amended Scheduling Order, which set the _Rotstain_ Litigation for trial on February 27, 2023 (ECF No. 1326, Case No. 4:22-cv-00800 (S.D. Tex.));

**WHEREAS**, TD Bank expressly denies any and all allegations of wrongdoing, fault, liability, or damages whatsoever and is entering into this Settlement Agreement solely to avoid the burden, very substantial expense, and risks of litigation;

**WHEREAS**, the Plaintiffs have conducted an investigation into the facts and the law relating to the _Rotstain_ Litigation and after considering the results of that investigation and the

5

benefits of this Settlement Agreement, as well as the burden, expense, and risks of litigation, have concluded that a settlement with TD Bank under the terms set forth below is fair, reasonable, adequate, and in the best interests of the Plaintiffs, the Interested Parties (defined below), and all Persons (defined below) affected by the Stanford Entities or entitled to make claims against the Receivership Assets, and have agreed to enter into the Settlement and this Settlement Agreement and to use their best efforts to effectuate the Settlement and this Settlement Agreement;

**WHEREAS**, the Parties desire to fully, finally, and forever compromise and effect a global settlement and discharge of all claims against TD Bank arising from or in any way related to Robert Allen Stanford and the Stanford Entities (the "Stanford-Related Claims");

**WHEREAS**, the Parties have engaged in extensive, good-faith, and arm's-length negotiations, including participation in a mediation on January 2 and 3, 2023, in Dallas, Texas, with mediator Robert A. Meyer;

**WHEREAS**, subsequent to their mediation, the Parties continued to engage in pretrial practice, as well as proceedings in the U.S. Court of Appeals for the Fifth Circuit relating to petitions for writs of mandamus that TD Bank and other defendants filed, and continued to engage in extensive, good-faith, and arm's-length settlement negotiations, leading to this Settlement Agreement;

**WHEREAS**, absent approval of this Settlement, the *Rotstain* Litigation and other Stanford-Related Claims against TD Bank will likely take many more years and cost millions of dollars to litigate to final judgment and through appeals, and the outcome of all such litigation would have been uncertain;

**WHEREAS**, in *Zacarias v. Stanford Int'l Bank, Ltd.*, 931 F.3d 382, 387 (5th Cir. 2019), the Fifth Circuit confirmed approval of a settlement that was conditioned on the entry of bar orders enjoining Stanford-related suits filed against the defendants in that litigation;

**WHEREAS**, the Examiner, both in his capacity as Chairperson of the Committee and in his capacity as the Court-appointed Examiner, participated in the negotiation of the Settlement;

**WHEREAS**, the Committee has approved this Settlement Agreement and the terms of the Settlement, as evidenced by the signature hereon of the Examiner in his capacity as Chairperson of the Committee;

**WHEREAS**, the Examiner, in his capacity as Examiner, has reviewed this Settlement Agreement and the terms of the Settlement and, as evidenced by his signature hereon, has approved this Settlement Agreement and the terms of the Settlement and will recommend that this Settlement Agreement and the terms of the Settlement be approved by the MDL Court and implemented;[2]

**WHEREAS**, the Receiver has reviewed and approved this Settlement Agreement and the terms of the Settlement, as evidenced by his signature hereon; and

**WHEREAS**, the Rotstain Investor Plaintiffs have reviewed and approved this Settlement Agreement and the terms of the Settlement, as evidenced by their signatures hereon.

**NOW, THEREFORE**, in consideration of the agreements, covenants, and releases set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

---

[2] The Examiner has also executed this Settlement Agreement to confirm his obligation to post Notice (defined below) on his website, as required herein, but is not otherwise a party to the Settlement or the Litigation in his capacity as Examiner.

7

I.      **Agreement Date**

1.      This Settlement Agreement shall be binding once all Parties have signed the Settlement Agreement as of the date of the last signature to the Settlement Agreement (the "Agreement Date").

II.     **Terms Used in this Settlement Agreement**

The following terms, as used in this Settlement Agreement and the Bar Order (defined below), have the following meanings:

2.      "Attorneys' Fees" means those fees awarded by the MDL Court to Plaintiffs' counsel from the Settlement Amount pursuant to the terms of the applicable engagement agreements.

3.      "Bar Order" means an order entered in the SEC Action including findings under Federal Rule of Civil Procedure 54(b) and in substantially the form attached hereto as **Exhibit B**.

4.      "Claim" means a Person's potential or asserted right to receive funds from the Receivership Estate or the funds and assets subject to the authority of the Joint Liquidators (defined below).

5.      "Claimant" means any Person who has submitted a Claim to the Receiver or to the Joint Liquidators.  Where a Claim has been transferred to a third party and such transfer has been acknowledged by the Receiver or the Joint Liquidators, the transferee is a Claimant, and the transferor is not a Claimant unless the transferor has retained a Claim that has not been transferred. Where the Receiver or the Joint Liquidators have disallowed a Claim and the disallowance has become Final, then the submission of the disallowed Claim does not make the Person who submitted it a Claimant.

6.      "Confidential Information" means the communications and discussions in connection with the negotiations and mediations that led to the Settlement and this Settlement

8

Agreement.  Confidential Information also includes the existence and terms of the Settlement and this Settlement Agreement, but only until the filing of this Settlement Agreement and related documents with the MDL Court.

7.      "<u>Distribution Plan</u>" means the plan hereafter approved by the MDL Court for the distribution of the Settlement Amount (net of any attorneys' fees or costs that are awarded by the MDL Court) to Stanford Investors who have had their Claims allowed by the Receiver.

8.      "<u>Final</u>" means unmodified after the conclusion of, or expiration of any right of any Person to pursue, any and all possible forms and levels of appeal, reconsideration, or review, judicial or otherwise, including by a court or Forum of last resort, wherever located, whether automatic or discretionary, whether by appeal or otherwise.  The Bar Order shall include findings under Federal Rule of Civil Procedure 54(b) and will become Final as set forth in this paragraph as though such order was entered as a judgment at the end of a case, and the continuing pendency of the SEC Action, the *Rotstain* Litigation, or any other litigation or other dispute shall not be construed as preventing such Bar Order from becoming Final.

9.      "<u>Forum</u>" means any court, adjudicative body, tribunal, or jurisdiction, whether its nature is federal, foreign, state, administrative, regulatory, arbitral, local, or otherwise.

10.     "<u>Hearing</u>" means a formal proceeding in open court before the MDL Court.

11.     "<u>Interested Parties</u>" means the Receiver; the Receivership Estate; the Committee; the members of the Committee; the Rotstain Investor Plaintiffs; the Stanford Investors; the Claimants; the Examiner; the Joint Liquidators; or any Person or Persons alleged by the Receiver, the Committee, or other Person or entity on behalf of the Receivership Estate to be liable to the Receivership Estate, whether or not a formal proceeding has been initiated.

12.    "<u>Joint Liquidators</u>" means Hugh Dickson and Mark McDonald, in their capacities as the joint liquidators appointed by the Eastern Caribbean Supreme Court in Antigua and Barbuda to take control of and manage the affairs and assets of SIBL and Stanford Trust Company Limited (including any rights that may be determined to have been validly assigned to SIBL by SFGL) or any of their successors or predecessors.

13.    "<u>Notice</u>" means a communication, in substantially the form attached hereto as **Exhibit A**, describing (a) the material terms of the Settlement; (b) the material terms of this Settlement Agreement; (c) the rights and obligations of the Interested Parties with regard to the Settlement and this Settlement Agreement; (d) the deadline for the filing of objections to the Settlement, the Settlement Agreement, and the Bar Order; and (e) the date, time, and location of the Hearing to consider final approval of the Settlement, this Settlement Agreement, and the Bar Order.

14.    "<u>Person</u>" means any individual, entity, governmental authority, agency or quasi-governmental person or entity, worldwide, of any type, including, without limitation, any individual, partnership, corporation, limited liability company, estate, trust, committee, fiduciary, association, proprietorship, organization, or business, regardless of location, residence, or nationality.

15.    "<u>Plaintiffs Released Parties</u>" means the Plaintiffs and each of their counsel. Plaintiffs Released Parties also includes each of the foregoing persons' respective past, present, and future directors, officers, legal and equitable owners, shareholders, members, managers, principals, employees, associates, representatives, distributees, agents, attorneys, trustees, general and limited partners, lenders, insurers and reinsurers, direct and indirect parents, subsidiaries, affiliates, related entities, divisions, partnerships, corporations, executors, administrators, heirs,

10

beneficiaries, assigns, predecessors, predecessors-in-interest, successors, and successors-in-interest.

16.    "Releasor" means any Person granting a release of any Settled Claim.

17.    "Settled Claim" means any action, cause of action, suit, liability, claim, right of action, right of levy or attachment, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any CD, depository account, or investment of any type associated with any of the Stanford Entities; (iii) TD Bank's relationships with any of the Stanford Entities and/or any of their personnel; (iv) TD Bank's provision of services to or for the benefit of or on behalf of any of the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the *Rotstain* Litigation, the *Smith* Litigation, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. "Settled Claims" includes all claims arising out of or related to the facts, circumstances, and allegations in the Complaints. "Settled Claims" specifically includes, without limitation, all claims each Releasor does not know or suspect to exist in his, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to this Settlement Agreement and the Settlement ("Unknown Claims"). Each Releasor expressly waives, releases, and relinquishes any and all provisions, rights, and benefits conferred by any law or principle, in the United States or elsewhere, that governs or limits

11

the release of unknown or unsuspected claims, including, without limitation, California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each Releasor acknowledges that he, she, or it may hereafter discover facts different from, or in addition to, those which such Releasor now knows or believes to be true with respect to the Settled Claims, but nonetheless agrees that this Settlement Agreement, including the releases granted herein, will remain binding and effective in all respects notwithstanding such discovery. Unknown Claims include contingent and non-contingent claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of different or additional facts. These provisions concerning unknown and unsuspected claims and the inclusion of Unknown Claims in the definition of Settled Claims were separately bargained for and are an essential element of this Settlement Agreement and the Settlement.

18.     "Settlement" means the agreed resolution of the Settled Claims in the manner set forth in this Settlement Agreement.

19.     "Settlement Amount" means One Billion Two Hundred Five Million Dollars ($1,205,000,000.00) in United States currency.

20.     "Settlement Effective Date" means the date on which the last of all of the following has occurred: (i) the Bar Order becomes Final; (ii) the Transferor Court dismisses with prejudice the claims against TD Bank in the *Rotstain* Litigation; and (iii) the *Smith* Court dismisses with prejudice the claims against TD Bank in the *Smith* Litigation.

21.     "Taxes" means any and all taxes, whether federal, state, local, or other taxes related to the Settlement or the Settlement Amount, and costs incurred in connection with such taxation including, without limitation, the fees and expenses of tax attorneys and accountants.

22.     "TD Bank Released Parties" means TD Bank and its counsel.  TD Bank Released Parties also includes each of the foregoing persons' respective past, present, and future directors, officers, legal and equitable owners, shareholders, members, managers, principals, employees, associates, representatives, distributees, agents, attorneys, trustees, general and limited partners, lenders, insurers and reinsurers, direct and indirect parents, subsidiaries, affiliates, related entities, divisions, partnerships, corporations, executors, administrators, heirs, beneficiaries, assigns, predecessors, predecessors-in-interest, successors, and successors-in-interest.  Notwithstanding the foregoing, "TD Bank Released Parties" shall not include (a) any Person, other than TD Bank, who is, as of the Agreement Date, a party to the *Rotstain* Litigation; (b) any Person, other than TD Bank, who is a party to and has been served, or who has waived service and appeared, in one or more of the actions or proceedings listed in **Exhibit F** and (i) against whom, on the Agreement Date, the Receiver or the Committee is asserting claims or causes of action in any such action or proceeding, or (ii) with whom, as of the Agreement Date, the Receiver or the Committee has entered into a settlement agreement relating to any such action or proceeding and such Person's obligations to the Receiver or the Committee remain outstanding in whole or in part; (c) any Person, other than TD Bank, against whom the Receiver or Committee holds a judgment or other court award that remains unsatisfied in whole or in part as of the Agreement Date; or (d) any Person who is, as of the Agreement Date, a party to one or more of the proceedings identified in **Exhibit G**.

13

### III.    <u>Delivery of Settlement Amount</u>

23.    <u>Stay of *Rotstain* Litigation as to TD Bank</u>: Within three (3) business days of the Agreement Date, the Rotstain Investor Plaintiffs, the Committee, and TD Bank shall file a joint motion in the *Rotstain* Litigation to stay the *Rotstain* Litigation as to TD Bank, pending a final determination concerning approval of the Settlement and the Bar Order.

24.    <u>Dismissal of *Rotstain* Litigation</u>: Within five (5) business days after the Bar Order becomes Final, the Committee and the Rotstain Investor Plaintiffs shall file with the Transferor Court an agreed motion to fully and finally dismiss with prejudice without costs or attorneys' fees all claims against TD Bank in the *Rotstain* Litigation.  It being agreed that there would be no just reason for delay, if claims by the Committee and the Rotstain Investor Plaintiffs against parties other than TD Bank remain pending in the *Rotstain* Litigation at the time the agreed motion is to be filed, the judgment that is requested by the agreed motion and required under this paragraph will be a final judgment under Federal Rule of Civil Procedure 54(b).

25.    <u>Dismissal of *Smith* Litigation</u>: Within five (5) business days after the Bar Order becomes Final, the Receiver and the Committee shall file with the *Smith* Court a motion to enforce the Bar Order and to dismiss with prejudice all claims against TD Bank in the *Smith* Litigation.  If claims in the *Smith* Litigation remain pending against parties other than TD Bank at the time the motion is to be filed, the judgment that is requested by the motion and required under this paragraph will be a final judgment under Federal Rule of Civil Procedure 54(b).

26.    <u>Delivery of Settlement Amount</u>: Within five (5) business days after the Settlement Effective Date, the Receiver shall provide to TD Bank's counsel wiring instructions for payment of the Settlement Amount to the Receiver.  Thereafter, if and to the extent TD Bank needs additional information to allow TD Bank to execute the wire transfer of the Settlement Amount to the Receiver, then the Receiver agrees to make reasonable efforts to provide such information.

14

Within thirty (30) days after the later of the Settlement Effective Date or receipt of the wiring instructions for payment of the Settlement Amount to the Receiver, TD Bank shall deliver or cause to be delivered the Settlement Amount to the Receiver.

## IV.    Use and Management of Settlement Amount

27.    Management and Distribution of Settlement Amount: If and when the Settlement Amount is delivered to the Receiver pursuant to the terms of this Settlement Agreement, the Receiver shall receive and take custody of the Settlement Amount and shall maintain, manage, and distribute the Settlement Amount in accordance with the Distribution Plan and under the supervision and direction and with the approval of the MDL Court.  The Receiver shall be responsible for all Taxes, fees, and expenses that may be due with respect to the Settlement Amount or the management, use, administration, or distribution of the Settlement Amount.

28.    No Liability: TD Bank and the TD Bank Released Parties shall have no liability, obligation, or responsibility whatsoever with respect to the investment, management, use, administration, or distribution of the Settlement Amount or any portion thereof, including, but not limited to, the costs and expenses of such investment, management, use, administration, or distribution of the Settlement Amount, and any Taxes, fees, and expenses arising therefrom or relating thereto.  Nothing in this paragraph shall alter TD Bank's obligations to deliver the Settlement Amount to the Receiver pursuant to the terms of this Settlement Agreement.

## V.    Motion for Scheduling Order and Bar Order, and Form and Procedure for Notice

29.    Motion: On a date mutually acceptable to the Parties that is not more than twenty (20) days from the Agreement Date, unless otherwise agreed by the Parties in writing, via e-mail or otherwise, the Plaintiffs shall submit to the MDL Court a motion requesting entry of a scheduling order substantially in the form attached as **Exhibit D** (a) preliminarily approving the Settlement; (b) approving the content and plan for publication and dissemination of Notice;

15

(c) setting the date by which any objection to the Settlement or this Settlement Agreement must be filed; and (d) scheduling a Hearing to consider final approval of the Settlement and entry of the Bar Order required by Paragraph 20 of this Settlement Agreement. With respect to the content and plan for publication and dissemination of Notice, the Plaintiffs will propose that Notice be sent via electronic mail, first-class mail or international delivery service to all Interested Parties; sent via electronic service to all counsel of record for any Person who is, at the time of Notice, a party in any case included in the MDL (*In re Stanford Entities Sec. Litig.*, Case No. 3:09-md-02099-N-BQ (N.D. Tex. Oct. 6, 2009)), the SEC Action, the *Rotstain* Litigation, or the *Smith* Litigation, each of whom is deemed to have consented to electronic service through the CM/ECF System; sent via electronic mail, first-class mail or international delivery service, to any other counsel of record for any other Person who is, at the time of service, a party in any case included in the MDL (*In re Stanford Entities Sec. Litig.*, Case No. 3:09-md-02099-N-BQ (N.D. Tex. Oct. 6, 2009)), the SEC Action, the *Rotstain* Litigation, or the *Smith* Litigation; and posted on the websites of the Receiver and the Examiner along with complete copies of this Settlement Agreement and all filings with the MDL Court relating to the Settlement, this Settlement Agreement, and approval of the Settlement. The Plaintiffs will further propose that Notice in substantially the form attached hereto as **Exhibit E** be published once in the national edition of *The Wall Street Journal* and once in the international edition of *The New York Times*. In advance of filing the motion papers to accomplish the foregoing, the Plaintiffs shall provide TD Bank with a reasonable opportunity to review and comment on such motion papers.

30. <u>Notice Preparation and Dissemination</u>: The Receiver shall be solely responsible for the preparation and dissemination of the Notice pursuant to this Settlement Agreement and as directed by the MDL Court. In the absence of intentional refusal by the Receiver to prepare and

16

disseminate Notice pursuant to this Settlement Agreement or a court order, no Interested Party or any other Person shall have any recourse against the Receiver with respect to any claims that may arise from or relate to the Notice process. In the case of intentional refusal by the Receiver to prepare and disseminate Notice pursuant to this Settlement Agreement or a court order, TD Bank shall not have any claim against the Receiver other than the ability to seek specific performance. The Parties do not intend to give any other Person any right or recourse against the Receiver in connection with the Notice process.

31.    No Recourse Against TD Bank: No Interested Party or any other Person shall have any recourse against TD Bank or the TD Bank Released Parties with respect to any claims that may arise from or relate to the Notice process.

32.    Motion Contents: In the motion papers referenced in Paragraph 29 above, the Plaintiffs shall request that the MDL Court, *inter alia*:

        a.        approve the Settlement and its terms as set out in this Settlement Agreement;

        b.        enter an order finding that this Settlement Agreement and the releases set forth herein are final and binding on the Parties; and

        c.        enter in the SEC Action the Bar Order.

33.    Parties to Advocate: The Parties shall take all reasonable steps to advocate for and encourage the MDL Court to approve the terms of this Settlement Agreement and to advocate for and encourage the MDL Court to apply the releases and Bar Order to as broad a population as possible.

34.    No Challenge: No Party shall challenge the approval of the Settlement, and no Party will encourage or assist any Interested Party in challenging the Settlement.

**VI.**    **Rescission if the Settlement is Not Finally Approved, or the Bar Order or Judgments of Dismissal in the *Rotstain* or *Smith* Litigation are Not Entered**

35.    <u>Right to Withdraw</u>: The Parties represent and acknowledge each of the following terms was necessary to the Parties' agreement to this Settlement, is an essential term of the Settlement and this Settlement Agreement, and that the Settlement would not have been reached in the absence of these terms: (a) MDL Court approval of the Settlement and the terms of this Settlement Agreement without material modification or limitation; (b) entry by the MDL Court of the Bar Order in the SEC Action in substantially the form attached hereto as **Exhibit B**; (c) all such approvals and orders becoming Final, pursuant to Paragraphs 8 and 20 of this Settlement Agreement; and (d) the subsequent Final dismissal with prejudice of all claims against TD Bank in the *Rotstain* Litigation and the *Smith* Litigation. If the MDL Court refuses to provide the approvals described in (a); if the MDL Court refuses to enter the Bar Order described in (b) without material modification; if the final result of any appeal from the approvals and order described in (a) or (b) is that any of the approvals or order are not affirmed in their entirety and without material modification or limitation; or if the claims against TD Bank in the *Rotstain* Litigation or the *Smith* Litigation are not fully and finally dismissed with prejudice, then any of the Receiver, the Committee and TD Bank has the right to withdraw its agreement to the Settlement and to this Settlement Agreement by providing to all other Parties written notice of such withdrawal within fourteen (14) days of the order or judicial determination giving rise to the right to withdraw. The effective date of the withdrawal will be twenty-one (21) days after the notice of same, during which time the Parties agree to work together in good faith to attempt to negotiate an alternative settlement.

36.    In the event that any Party withdraws its agreement to the Settlement or this Settlement Agreement pursuant to Paragraph 35, this Settlement Agreement will be null and void

and of no further effect whatsoever, shall not be admissible in any ongoing or future proceedings for any purpose whatsoever (except for the provisions of Paragraph 35 and this paragraph, which shall survive), and shall not be the subject or basis for any claims or defenses by any Party against any other Party other than to enforce the surviving terms of this Settlement Agreement.  If any Party withdraws from this Settlement Agreement pursuant to the terms of Paragraph 35, then each Party shall be returned to such Party's respective position immediately prior to such Party's execution of the Settlement Agreement except as set forth in the surviving terms of this Settlement Agreement listed in Paragraph 37.

37.    The Parties do not have the right to withdraw from, or otherwise terminate, the Settlement Agreement for any reason other than the reasons identified in Paragraph 35.  The following paragraphs of this Settlement Agreement shall survive termination due to withdrawal of the Settlement Agreement: 35, 36, 37, 48, and 49.

## VII.    Distribution Plan

38.    <u>Duties</u>: The Receiver, with the approval and guidance of the MDL Court, shall be solely responsible for preparing, filing a motion seeking approval of, and implementing the Distribution Plan including, without limitation, receiving, managing, and disbursing the Settlement Amount.  The Receiver owes no duties to TD Bank or the TD Bank Released Parties in connection with the distribution of the Settlement Amount or the Distribution Plan, and if the Receiver complies with this Settlement Agreement and all orders issued by the MDL Court relating to the Distribution Plan neither TD Bank nor the TD Bank Released Parties may assert any claim or cause of action against the Receiver in connection with the distribution of the Settlement Amount or the Distribution Plan.  In no event will the Receiver or the Receivership Estate be liable for damages or the payment or re-payment of funds of any kind as a result of any deficiency associated with the distribution of the Settlement Amount or the Distribution Plan.

39.   <u>Distribution by Check</u>:  The Receiver will make all payments to Claimants pursuant to the Distribution Plan by check where reasonably possible to do so.  The Receiver must include the following statement, without alteration (except that additional releasees may be included if the Receiver includes in the distribution check funds from settlements with such other releasees), on the reverse of all checks sent to Claimants pursuant to the Distribution Plan, above where the endorser will sign:

> BY ENDORSING THIS CHECK, I RELEASE ALL CLAIMS, KNOWN OR NOT, AGAINST THE TORONTO-DOMINION BANK, ITS AGENTS, HEIRS, ASSIGNS, AND EMPLOYEES (WHETHER CURRENT OR PAST), ARISING FROM OR RELATING TO STANFORD INTERNATIONAL BANK, LTD. OR ANY OF ITS RELATED ENTITIES AND ACCEPT THIS PAYMENT IN FULL SATISFACTION THEREOF.

The Receiver will use commercially reasonable efforts to cause distributions paid electronically to be conditioned on agreement to the same language.

40.   <u>No Responsibility</u>: TD Bank and the TD Bank Released Parties shall have no responsibility, obligation, or liability whatsoever with respect to the terms, interpretation, or implementation of the Distribution Plan; the administration of the Settlement; the management, investment, or distribution of the Settlement Amount or any other funds paid or received in connection with the Settlement; the payment or withholding of Taxes that may be due or owing by the Receiver or any recipient of funds from the Settlement Amount; the determination, administration, calculation, review, or challenge of claims to the Settlement Amount, any portion of the Settlement Amount, or any other funds paid or received in connection with the Settlement or this Settlement Agreement; or any losses, attorneys' fees, expenses, vendor payments, expert payments, or other costs incurred in connection with any of the foregoing matters.  As of the Settlement Effective Date, the Plaintiffs, the Plaintiffs Released Parties, the Interested Parties, and all other individuals, persons, or entities Plaintiffs represent or on whose behalf Plaintiffs have

been empowered to act by any court fully, finally, and forever release, relinquish, and discharge, with prejudice, TD Bank and the TD Bank Released Parties from any and all such responsibility, obligation, and liability.

## VIII.    Releases and Covenant Not to Sue

41.    <u>Release of the TD Bank Released Parties</u>: As of the Settlement Effective Date, each of the Plaintiffs, the Plaintiffs Released Parties, the Interested Parties, and all other individuals, persons, or entities Plaintiffs represent or on whose behalf Plaintiffs have been empowered to act by any court, fully, finally, and forever release, relinquish, and discharge, with prejudice, all Settled Claims against TD Bank and the TD Bank Released Parties.

42.    <u>Release of Plaintiffs Released Parties</u>: As of the Settlement Effective Date, TD Bank fully, finally, and forever releases, relinquishes, and discharges, with prejudice, all Settled Claims against the Plaintiffs Released Parties.

43.    <u>No Release of Obligations Under Settlement Agreement</u>: Notwithstanding anything to the contrary in this Settlement Agreement, the releases and covenants contained in this Settlement Agreement do not release the Parties' rights and obligations under this Settlement Agreement or the Settlement, nor do they bar the Parties from enforcing or effectuating this Settlement Agreement or the Settlement.

44.    <u>Covenant Not to Sue</u>: Effective as of the Agreement Date, the Plaintiffs, including, without limitation, the Receiver on behalf of the Receivership Estate (including the Stanford Entities), covenant not to, directly or indirectly, or through a third party, institute, reinstitute, initiate, commence, maintain, continue, file, encourage, solicit, support, participate in, collaborate in, or otherwise prosecute against any of the TD Bank Released Parties any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever,

21

concerning or relating to the Settled Claims, whether in a court or any other Forum.  Effective as of the Agreement Date, TD Bank covenants not to, directly or indirectly, or through a third party, institute, reinstitute, initiate, commence, maintain, continue, file, encourage, solicit, support, participate in, collaborate in, or otherwise prosecute against any of the Plaintiffs Released Parties any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, concerning or relating to the Settled Claims, whether in a court or any other Forum.  Notwithstanding the foregoing, however, the Parties retain the right to sue for alleged breaches of this Settlement Agreement.

## IX.    **Representations and Warranties**

45.    No Assignment, Encumbrance, or Transfer: The Plaintiffs, other than the Receiver, represent and warrant that they are the owners of the Settled Claims that they are releasing under this Settlement Agreement and that they have not, in whole or in part, assigned, encumbered, sold, pledged as security, or in any manner transferred or compromised any of the Settled Claims that they are releasing under this Settlement Agreement.  The Receiver represents and warrants that he is the owner of the Settled Claims that he is releasing under this Settlement Agreement and that, other than the assignment of the Settled Claims against TD Bank that the Receiver transferred to the Committee, he has not, in whole or in part, assigned, encumbered, sold, pledged as security, or in any manner transferred or compromised any of the Settled Claims that he is releasing under this Settlement Agreement.  TD Bank represents that it is the owner of the Settled Claims that it is releasing under this Settlement Agreement and that it has not, in whole or in part, assigned, encumbered, sold, pledged as security, or in any manner transferred or compromised any of the Settled Claims that it is releasing under this Settlement Agreement.

22

46.    <u>No Additional Claims.</u> The Parties represent and warrant to each other that, other than the *Rotstain* Litigation, the *Smith* Litigation, claims filed by the Joint Liquidators against TD Bank in Canada (case number CV-12-9780-00CL), and any claims by any Stanford Investors filed with the Joint Liquidators or the Receiver, they are not presently aware of (a) any undismissed or otherwise extant claim or action against any of the TD Bank Released Parties concerning (i) the Settled Claims or (ii) the wrongdoing of the Stanford Entities that was the subject of the Complaints, or (b) any person or entity intending to file such an action. The Parties further represent and warrant to each other that they are not aware of a current decision of the Fifth Circuit or Supreme Court invalidating the Bar Order.

47.    <u>Authority</u>: Each person executing this Settlement Agreement or any related documents represents and warrants that he or she has the full authority to execute the documents on behalf of the Person each represents and that each has the authority to take appropriate action required or permitted to be taken pursuant to this Settlement Agreement to effectuate its terms. The Committee represents and warrants that the Committee has approved this Settlement Agreement in accordance with the by-laws of the Committee.

## X.    **No Admission of Fault or Wrongdoing**

48.    The Settlement, this Settlement Agreement, and the negotiation and mediation thereof shall in no way constitute, be construed as, or be evidence of an admission or concession of any violation of any statute or law; of any fault, liability, or wrongdoing; or of any infirmity in the claims or defenses of the Parties with regard to any of the Complaints, claims, allegations, or defenses asserted or that could have been asserted in the *Rotstain* Litigation or any other proceeding relating to any Settled Claim, or any other proceeding in any Forum. The Settlement and this Settlement Agreement are a resolution of disputed claims in order to avoid the risk and very substantial expense of protracted litigation. The Settlement, this Settlement Agreement, and

23

evidence thereof shall not be used, directly or indirectly, in any way, in the *Rotstain* Litigation, the SEC Action, the *Smith* Litigation, the Joint Liquidators' action in Canada captioned *McDonald and Dickson v. TD Bank* (case number CV-12-9780-00CL), or in any other proceeding, other than to enforce the terms and/or intent of the Settlement and this Settlement Agreement or to defend against or facilitate a dismissal of the Joint Liquidators' action or any other proceeding against TD Bank.

## XI.    Confidentiality

49.    Confidentiality: Except as necessary to obtain MDL Court approval of this Settlement Agreement, to provide the Notices as required by this Settlement Agreement, or to enforce the terms of the Settlement and this Settlement Agreement, the Parties and their counsel will keep confidential and shall not publish, communicate, or otherwise disclose, directly or indirectly, in any manner whatsoever, Confidential Information to any Person except that (i) a Party may disclose Confidential Information to a person or entity to whom disclosure is required pursuant to law or regulation, but only after providing prompt notice to the other Parties; (ii) TD Bank shall be permitted to disclose to its own officers, shareholders, current or former employees, affiliates, current and potential insurers, insurance brokers, regulators, lawyers, auditors, or accountants, on a confidential or attorney-client basis, the Settlement, the Settlement Agreement, its terms, the amount of the Settlement, and information about the Settlement negotiations; and (iii) a Party may disclose Confidential Information to a person or entity if the Party has obtained prior written consent from all other Parties.  Notwithstanding anything else in this Settlement Agreement or otherwise, such consent may be transmitted by e-mail.  Notwithstanding any provision to the contrary in the foregoing, the Parties agree that the TD Bank Released Parties may make public disclosures regarding the Settlement and the Settlement Agreement as required by applicable securities and other laws and regulations, as well as conduct ancillary stakeholder

24

communications, and communications with any tax authority, and they need not meet and confer with or provide notice to Plaintiffs before making such disclosure(s).

## XII.    Non-Disparagement

50.    In connection with the Settlement and this Settlement Agreement, the Plaintiffs and their counsel shall not make, disseminate, or publish any statement outside of court, including a statement in the press, that would denigrate or embarrass the TD Bank Released Parties, or that is otherwise negative or derogatory towards the TD Bank Released Parties.  Nothing in this paragraph shall prevent the Receiver or his counsel from reporting the Receiver's activities to the MDL Court, the Examiner, or the SEC; from responding as necessary to inquiries from the MDL Court or other governmental authorities; or from carrying out any of the Receiver's duties under any order addressing the scope of the Receiver's duties, including but not limited to the Second Amended Receivership Order (SEC Action, ECF No. 1130) or other order addressing the scope of the Receiver's duties.

51.    In connection with the Settlement and this Settlement Agreement, the members of the TD Bank Board of Directors shall not make, disseminate, or publish any statement outside of court, including a statement in the press, which would denigrate or embarrass the Plaintiffs. Nothing in this paragraph shall prevent TD Bank from reporting its activities to the Transferor Court, the *Smith* Court, or the MDL Court; from responding as necessary to inquiries from the Transferor Court, the *Smith* Court, or the MDL Court or other governmental authorities; from taking any step it believes, in its sole and absolute discretion, is necessary to enforce the Settlement or this Settlement Agreement; from responding to any request by the Plaintiffs or any other person for discovery from TD Bank in any other litigation related to the Stanford Entities or any subpoena or request for production; or from discussing the Settled Claims, the Settlement, and this Settlement Agreement with its own officers, shareholders, current or former employees, affiliates,

current and potential insurers, insurance brokers, regulators, lawyers, auditors or accountants. Notwithstanding the foregoing, however, TD Bank does not have a duty to cooperate in responding to discovery requests and/or trial subpoenas (except as required by law) in any other action relating to the Stanford Ponzi scheme. Any violation of the terms of this paragraph shall not be a basis to withdraw from the Settlement Agreement. The relief available for any violation of the terms of this paragraph shall be limited to money damages.

## XIII.  **Miscellaneous**

52.    <u>Final and Complete Resolution</u>: The Parties intend this Settlement Agreement and the Settlement to be and constitute, to the greatest extent possible, a final, complete, and worldwide resolution of all matters and disputes between (1) the Plaintiffs Released Parties, and the Interested Parties, on the one hand, and (2) the TD Bank Released Parties on the other hand, and this Settlement Agreement, including its exhibits, shall be interpreted to effectuate this purpose.

53.    <u>Binding Agreement</u>: As of the Agreement Date, this Settlement Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, administrators, successors, and assigns. No Party may assign any of its rights or obligations under this Settlement Agreement without the express written consent of the other Parties.

54.    <u>Incorporation of Recitals</u>: The Recitals (*i.e.* "whereas" clauses) contained in this Settlement Agreement are essential terms of this Settlement Agreement and are incorporated herein for all purposes.

55.    <u>Disclaimer of Reliance</u>: The Parties affirmatively represent and warrant that in negotiating and entering into the Settlement and this Settlement Agreement they have not relied on, and have not been induced by, any representation, warranty, statement, estimate, communication, or information, of any nature whatsoever, whether written or oral, by, on behalf of, or concerning any Party, any agent of any Party, or otherwise, except as expressly set forth in

26

this Settlement Agreement. To the contrary, each of the Parties affirmatively represents and warrants that the Party is relying solely on the express terms contained within this Settlement Agreement. The Parties have negotiated the Settlement and this Settlement Agreement at arm's length, and each consulted with legal counsel and advisors regarding the contents and legal consequences of the Settlement and this Settlement Agreement, have considered the advantages and disadvantages of entering into the Settlement and this Settlement Agreement, and have relied solely on their own judgment and the advice of their respective legal counsel in negotiating and entering into the Settlement and this Settlement Agreement.

56.    <u>Third-Party Beneficiaries</u>: This Settlement Agreement is not intended to and does not create rights enforceable by any Person other than the Parties (or their respective heirs, executors, administrators, successors, and assigns, as provided in Paragraph 53 of this Settlement Agreement), except that the TD Bank Released Parties and the Plaintiff Released Parties are third-party beneficiaries of and may enforce the release or covenant not to sue in Section VIII of this Settlement Agreement as it relates to said Person.

57.    <u>Negotiation, Drafting, and Construction</u>: The Parties agree and acknowledge that they each have reviewed and cooperated in the preparation of this Settlement Agreement, that no Party should or shall be deemed the drafter of this Settlement Agreement or any provision hereof, and that any rule, presumption, or burden of proof that would construe this Settlement Agreement, any ambiguity, or any other matter, against the drafter shall not apply and is waived. The Parties are entering into this Settlement Agreement freely, after good-faith, arm's-length negotiation, with the advice of counsel, and in the absence of coercion, duress, and undue influence. The titles and headings in this Settlement Agreement are for convenience only, are not part of this Settlement Agreement, and shall not bear on the meaning of this Settlement Agreement. The words "include,"

"includes," or "including" shall be deemed to be followed by the words "without limitation." The words "and" and "or" shall be interpreted broadly to have the most inclusive meaning, regardless of any conjunctive or disjunctive tense. Words in the masculine, feminine, or neuter gender shall include any gender. The singular shall include the plural and vice versa. "Any" shall be understood to include and encompass "all," and "all" shall be understood to include and encompass "any."

58.    <u>Cooperation</u>: The Parties agree to execute any additional documents reasonably necessary to finalize and carry out the terms of this Settlement Agreement. In the event a third party or any Person other than a Party at any time challenges any term of this Settlement Agreement or the Settlement, including the Bar Order, the Parties agree to cooperate with each other, including using reasonable efforts to make documents or personnel available as needed to defend any such challenge. Further, the Parties shall reasonably cooperate to defend and enforce the Bar Order required under Paragraph 20 of this Settlement Agreement.

59.    <u>Notice</u>: Any notices, documents, or correspondence of any nature required to be sent pursuant to this Settlement Agreement shall be transmitted by both e-mail and overnight delivery to the following recipients, and will be deemed transmitted upon receipt by the overnight delivery service.

> To TD Bank:
>
> Lynn K. Neuner
> Peter E. Kazanoff
> Linton Mann III
> Simpson Thacher & Bartlett LLP
> 425 Lexington Avenue
> New York, NY 10017
> Telephone: (212) 455-2000
> Fax: (212) 455-2502
> E-mail: lneuner@stblaw.com, pkazanoff@stblaw.com,
> lmann@stblaw.com

To the Committee and Rotstain Investor Plaintiffs:

John J. Little
John J. Little Law, PLLC
8150 N. Central Expressway, 10th Floor
Dallas, TX 75206
Telephone:  (214) 989-4180
Cell:  (214) 573.2307
Fax:  (214) 367-6001
E-mail: john@johnjlittlelaw.com

and

Kevin Sadler
Baker Botts LLP
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304-1007
Telephone:  650.739.7518
Fax:  650.739.7618
E-mail: kevin.sadler@bakerbotts.com

and

Scott M. Berman
Friedman Kaplan Seiler Adelman & Robbins LLP
7 Times Square (28th Floor)
New York, NY 10036
Telephone: (212) 833-1100
Fax: (212) 373-7920
E-mail: sberman@fklaw.com

and

Peter D. Morgenstern
Butzel Long, a professional corporation
477 Madison Avenue, Suite 1230
New York, NY 10022
Telephone: (212) 818-1110
Fax: (212) 898-0123
E-mail: morgenstern@butzel.com

To Receiver:

Ralph S. Janvey
Krage & Janvey, L.L.P.

App. 34

2100 Ross Ave
Suite 2600
Dallas, TX 75201
Telephone: 214.397.1912
Fax: 214.220.0230
E-mail: rjanvey@kjllp.com

Each Party shall provide notice of any change to the service information set forth above to all other Parties by the means set forth in this paragraph.

60.    Choice of Law: This Settlement Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to the choice-of-law principles of Texas or any other jurisdiction.

61.    Mandatory, Exclusive Forum Selection Clause: Any dispute, controversy, or claim arising out of or related to the Settlement or this Settlement Agreement, including breach, interpretation, effect, or validity of this Settlement Agreement, whether arising in contract, tort, or otherwise, shall be brought exclusively in the United States District Court for the Northern District of Texas.  Solely with respect to any such action, the Parties irrevocably stipulate and consent to personal and subject matter jurisdiction and venue in such court, and waive any argument that such court is inconvenient, improper, or otherwise an inappropriate forum.

62.    Costs to Enforce Settlement Agreement: Each Party shall bear its own costs and fees for any action to enforce the Settlement or this Settlement Agreement.

63.    United States Currency: All dollar amounts in this Settlement Agreement are expressed in United States dollars.

64.    Timing: If any deadline imposed by this Settlement Agreement falls on a non-business day, then the deadline is extended until the next business day.

65.    Waiver: The waiver by a Party of any right or breach of this Settlement Agreement by another Party shall not be deemed a waiver of any other right or prior or subsequent breach of

this Settlement Agreement.  Any waiver by a Party of any right or breach of this Settlement Agreement by another Party must be in writing and signed by all Parties.

66.    Exhibits: The exhibits annexed to this Settlement Agreement are incorporated by reference as though fully set forth in this Settlement Agreement.

67.    Integration and Modification: This Settlement Agreement sets forth the entire understanding and agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations, and communications, whether oral or written, with respect to such subject matter.  Neither this Settlement Agreement, nor any provision or term of this Settlement Agreement, may be amended, modified, revoked, supplemented, waived, or otherwise changed except by a writing signed by all of the Parties.

68.    Counterparts and Signatures: This Settlement Agreement may be executed in one or more counterparts, each of which for all purposes shall be deemed an original but all of which taken together shall constitute one and the same instrument.  A signature delivered by fax or other electronic means shall be deemed to be, and shall have the same binding effect as, a handwritten, original signature.

IN WITNESS HEREOF, the Parties have executed this Settlement Agreement signifying their agreement to the foregoing terms.

Ralph S. Janvey, in his capacity as the Receiver for the Stanford Receivership Estate

_____    Date: 3/6/2023

31

John J. Little, in his capacity as Examiner

_____    Date: March 6, 2023

Official Stanford Investors Committee

_____    Date: March 6, 2023
By:  John J. Little, Chairperson

Guthrie Abbott

_____    Date:_____
By:  James R. Swanson, Attorney-in-Fact

Steven Queyrouze

_____    Date:_____
By:  James R. Swanson, Attorney-in-Fact

Sarah Elson-Rogers

_____    Date:_____
By:  James R. Swanson, Attorney-in-Fact

Salim Estefenn Uribe

_____    Date:_____
By:  James R. Swanson, Attorney-in-Fact

Ruth Alfille de Penhos

_____    Date:_____
By:  James R. Swanson, Attorney-in-Fact

John J. Little, in his capacity as Examiner

_____    Date: _____

Official Stanford Investors Committee

_____    Date: _____

By:   John J. Little, Chairperson

Guthrie Abbott

_____    Date: March 6, 2023

By:  James R. Swanson, Attorney-in-Fact

Steven Queyrouze

_____    Date: March 6, 2023

By:  James R. Swanson, Attorney-in-Fact

Sarah Elson-Rogers

_____    Date: March 6, 2023

By:  James R. Swanson, Attorney-in-Fact

Salim Estefenn Uribe

_____    Date: March 6, 2023

By:  James R. Swanson, Attorney-in-Fact

Ruth Alfille de Penhos

_____    Date: March 6, 2023

By:  James R. Swanson, Attorney-in-Fact

32

Diana Suarez

_____    Date: _March 6, 2023_
By:  James R. Swanson, Attorney-in-Fact


The Toronto-Dominion Bank


_____    Date:_____
By:
Title:

33

Diana Suarez

_____          Date:_____
By:  James R. Swanson, Attorney-in-Fact


The Toronto-Dominion Bank

_____          Date: March 7, 2023
By:  Kelvin Vi Luan Tran
Title:  Senior Executive Vice President and
        Chief Financial Officer

33

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## NOTICE OF SETTLEMENT AND BAR ORDER PROCEEDINGS

PLEASE TAKE NOTICE that Ralph S. Janvey, in his capacity as the Court-appointed Receiver for the Stanford Receivership Estate (the "Receiver") and the Official Stanford Investors Committee (the "Committee") (the Receiver and the Committee, collectively, the "Movants"), have reached an agreement (the "Settlement Agreement") to settle all claims asserted or that could have been asserted against The Toronto-Dominion Bank ("TD Bank") in *Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 4:22-cv-00800 (S.D. Tex.) (the "Rotstain Litigation").

PLEASE TAKE FURTHER NOTICE that the Movants have filed an Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with TD Bank, to Approve the Proposed Notice of Settlement with TD Bank, to Enter the Bar Order, and For Plaintiffs' Attorneys' Fees and Expenses (the "Motion"), filed in *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-0298-N (N.D. Tex.) (the "SEC Action"). Copies of the Settlement Agreement, the Motion, and other supporting papers may be obtained from the Court's docket in the SEC Action (ECF No. ____), and are also available on the websites of the Receiver

**TD BANK SETTLEMENT**
**EXHIBIT A**

**App. 42**

(http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-stanford-financial-group/).  Copies of these documents may also be requested by email, by sending the request to Peter Morgenstern at morgenstern@butzel.com; or by telephone, by calling (212) 818-1110.  All capitalized terms not defined in this Notice of Settlement and Bar Order Proceedings are defined in the Settlement Agreement, attached as Exhibit 1 of the Appendix to the Motion.

PLEASE TAKE FURTHER NOTICE that the Motion requests that the Court approve the Settlement and enter a bar order permanently enjoining, among others, Interested Parties,[1] including Stanford Investors,[2] Plaintiffs,[3] Claimants,[4] and Joint Liquidators[5] from pursuing Settled Claims,[6] including claims you may possess, against TD Bank.

---

[1] "Interested Parties" means the Receiver; the Receivership Estate; the Committee; the members of the Committee; the Plaintiffs; the Rotstain Investor Plaintiffs; the Stanford Investors; the Claimants; the Examiner; the Joint Liquidators; or any Person or Persons alleged by the Receiver, the Committee, or other Person or entity on behalf of the Receivership Estate to be liable to the Receivership Estate, whether or not a formal proceeding has been initiated.

[2] "Stanford Investors" means the customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL, and/or were holding certificates of deposit issued by SIBL.

[3] "Plaintiffs" means the Receiver, the Committee, and the Rotstain Investor Plaintiffs.  The Rotstain Investor Plaintiffs are the individual plaintiffs in the *Rotstain* Litigation (Guthrie Abbott, Steven Queyrouze, Salim Estefenn Uribe, Sarah Elson-Rogers, Diana Suarez, and Ruth Alfille de Penhos).

[4] "Claimants" means any Persons who have submitted a Claim to the Receiver or to the Joint Liquidators.  Where a Claim has been transferred to a third party and such transfer has been acknowledged by the Receiver or the Joint Liquidators, the transferee is a Claimant, and the transferor is not a Claimant unless the transferor has retained a Claim that has not been transferred.  Where the Receiver or the Joint Liquidators have disallowed a Claim and the disallowance has become Final, then the submission of the disallowed Claim does not make the Person who submitted it a Claimant.

[5] "Joint Liquidators" means Hugh Dickson and Mark McDonald, in their capacities as the joint liquidators appointed by the Eastern Caribbean Supreme Court in Antigua and Barbuda to take control of and manage the affairs and assets of SIBL or any of their successors or predecessors.

[6] "Settled Claim" generally means any action, cause of action, suit, liability, claim, right of action, right of levy or attachment, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in

2

PLEASE TAKE FURTHER NOTICE that the settlement amount is one billion two hundred five million U.S. dollars ($1,205,000,000.00) (the "Settlement Amount"). The Settlement Amount, less any fees and costs awarded by the Court to the attorneys for Plaintiffs and expenses paid by the Receiver (the "Net Settlement Amount"), will be deposited with and distributed by the Receiver pursuant to a Distribution Plan hereafter to be approved by the Court in the SEC Action (*see* subparagraph f below).

**This matter may affect your rights and you may wish to consult an attorney.**

The material terms of the Settlement Agreement include the following:

    a) TD Bank will pay one billion two hundred five million U.S. dollars, which will be deposited with the Receiver as required pursuant to the Settlement Agreement;

    b) Plaintiffs will fully release the TD Bank Released Parties[7] from Settled Claims, *e.g.*, claims arising from or relating to Robert Allen Stanford, the Stanford

---

any manner connected with (i) the Stanford Entities; (ii) any CD, depository account, or investment of any type associated with any of the Stanford Entities; (iii) TD Bank's relationships with any of the Stanford Entities and/or any of their personnel; (iv) TD Bank's provision of services to or for the benefit of or on behalf of any of the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the *Rotstain* Litigation, the *Smith* Litigation, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. "Settled Claims" includes all claims arising out of or related to the facts, circumstances, and allegations in the Complaints. "Settled Claims" specifically includes, without limitation, all claims each Releasor does not know or suspect to exist in his, her, or its favor at the time of release, which, if known by that Person, might have affected their decisions with respect to the Settlement Agreement and the Settlement ("Unknown Claims"). Each Releasor expressly waives, releases, and relinquishes any and all provisions, rights, and benefits conferred by any law or principle, in the United States or elsewhere, that govern or limit the release of unknown or unsuspected claims, including, without limitation, California Civil Code § 1542. *See* Paragraph 17 of the Settlement Agreement for a complete definition of Settled Claim. (ECF No. __.)

[7] "TD Bank Released Parties" means TD Bank and its counsel. TD Bank Released Parties also includes each of the foregoing persons' respective past, present, and future directors, officers, legal and equitable owners, shareholders, members, managers, principals, employees, associates, representatives, distributees, agents, attorneys, trustees, general and limited partners, lenders, insurers and reinsurers, direct and indirect parents, subsidiaries, affiliates, related entities, divisions, partnerships, corporations, executors, administrators, heirs, beneficiaries, assigns, predecessors, predecessors-in-interest, successors, and successors-in-interest. *See* Paragraph 22 of the Settlement Agreement for a complete definition of TD Bank Released Parties. (ECF No. __.)

**TD BANK SETTLEMENT
EXHIBIT A**

Entities,[8] or any conduct by the TD Bank Released Parties relating to Robert Allen Stanford or the Stanford Entities, with prejudice;

c)    The Settlement Agreement seeks entry of a Bar Order in the SEC Action, which permanently enjoins, among others, Interested Parties, including all Stanford Investors, Rotstain Investor Plaintiffs, and Claimants, from bringing, encouraging, assisting, continuing, or prosecuting, against TD Bank or any of the TD Bank Released Parties, the *Rotstain* Litigation, the *Smith* Litigation, or any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature, including, without limitation, contribution or indemnity claims, arising from or relating to a Settled Claim;

d)    The Committee and the Rotstain Investor Plaintiffs will fully and finally dismiss their claims against TD Bank in the *Rotstain* Litigation with prejudice. The *Smith* Litigation will be dismissed as against TD Bank with prejudice pursuant to the Bar Order in the SEC Action.

e)    The Receiver will disseminate notice of the Settlement Agreement (*i.e.*, this Notice) to Interested Parties, through one or more of the following:  mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the websites maintained by the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and the Receiver (http://www.stanfordfinancialreceivership.com);

---

[8]    "Stanford Entities" means Robert Allen Stanford; James M. Davis; Laura Pendergest-Holt; Gilbert Lopez; Mark Kuhrt; Leroy King; SIBL; Stanford Group Company; Stanford Capital Management, LLC (collectively, the "Stanford SEC Defendants"); Stanford Financial Group Ltd.; Bank of Antigua Limited; Stanford Bank (Panama), S.A.; the entities listed in Exhibit C to the Settlement Agreement (ECF No. __); and all entities the Stanford SEC Defendants owned or controlled as of February 16, 2009.

4

f)   The Receiver will develop and submit to the Court for approval a plan for distributing the Net Settlement Amount (the "Distribution Plan");

g)   Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted Claims that have been allowed by the Receiver;

h)   Persons who accept funds from the Settlement Amount will, upon accepting the funds, further evidence their release of the TD Bank Released Parties from any and all Settled Claims; and

i)   The *Rotstain* Litigation and the *Smith* Litigation will be dismissed with prejudice as to TD Bank, with each party bearing its own costs and attorneys' fees.

Attorneys for the Plaintiffs seek a fee award of $100 million, which represents 8.3% of the Settlement Amount.

The final hearing on the Motion is set for [_____] (the "Final Approval Hearing"). Any objection to the Settlement Agreement or its terms, the Motion, the Bar Order, or the request for approval of the Plaintiffs' attorneys' fees must be filed, in writing, with the Court in the SEC Action no later than [insert date of 21st day before Final Approval Hearing] with such written objection complying with the requirements of Paragraph 4 of the Scheduling Order (ECF No. __) in the SEC Action. Any objections not filed by this date will be deemed waived and will not be considered by the Court. Those wishing to appear and to orally present their written objections at the Final Approval Hearing must include a request to so appear within their written objections.

**TD BANK SETTLEMENT**
**EXHIBIT A**

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

```
------------------------------------------------------------  x
                                                              :
SECURITIES AND EXCHANGE                                       :
COMMISSION,                                                   :
                                                              :
                              Plaintiff,                      :
                                                              :   Case No. 3:09-cv-00298
v.                                                            :
                                                              :
STANFORD INTERNATIONAL BANK, LTD, et                          :
al.,                                                          :
                                                              :
                              Defendants.                     :
                                                              :
------------------------------------------------------------  x
```

**FINAL BAR ORDER**

Before the Court is the Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with TD Bank, to Approve the Proposed Notice of Settlement with TD Bank, and to Enter the Bar Order (ECF No. ____, the "Motion") filed by Ralph S. Janvey, in his capacity as the Court-appointed Receiver for the Stanford Receivership Estate (the "Receiver"), and the Court-appointed Official Stanford Investors Committee (the "Committee"), the latter being a plaintiff in *Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 4:22-cv-00800 (S.D. Tex.) (the "*Rotstain* Litigation").[1]  The Motion concerns a proposed settlement (the "Settlement") between and among, on the one hand, the Receiver, the Committee, and the *Rotstain* Investor Plaintiffs, and on the other hand, The Toronto-Dominion Bank ("TD Bank").  The

---

[1]  Terms used in this Final Bar Order that are defined in the settlement agreement that is attached as Exhibit 1 of the Appendix to the Motion (ECF No. __) (the "Settlement Agreement"), unless expressly otherwise defined herein, have the same meaning as in the Settlement Agreement (which is deemed incorporated herein by reference).

**TD BANK SETTLEMENT**
**EXHIBIT B**

**App. 48**

Receiver, the Committee, and the *Rotstain* Investor Plaintiffs are collectively referred to as "Plaintiffs." Plaintiffs, on the one hand, and TD Bank, on the other hand, are referred to individually as a "Party" and together as the "Parties." John J. Little signed the Settlement Agreement as chair of the Committee. Mr. Little, the Court-appointed Examiner (the "Examiner"), also signed the Settlement Agreement in his capacity as Examiner solely to evidence his support and approval of the Settlement and to confirm his obligation to post the Notice on his website; but Mr. Little as Examiner is not otherwise individually a party to the Settlement Agreement, this litigation, or the *Rotstain* Litigation.

Following notice and a hearing, and having considered the filings and heard the arguments of counsel, the Motion is hereby GRANTED.

## I.    INTRODUCTION

This litigation and the *Rotstain* Litigation arise from a series of events leading to the collapse of Stanford International Bank, Ltd. ("SIBL") and other companies owned or controlled by Robert Allen Stanford (with SIBL, the "Stanford Entities").[2]  On February 16, 2009, this Court appointed Ralph S. Janvey to be the Receiver for the Receivership Estate. (ECF No. 10.)  After years of investigation, Plaintiffs believe that they have identified claims against a number of third parties, including TD Bank, which Plaintiffs allege enabled the Stanford Ponzi scheme. In the *Rotstain* Litigation, some or all of Plaintiffs assert claims against TD Bank and other defendants for (i) aiding, abetting, or participation in violations of the Texas Securities Act; and (ii) knowing

---

[2]    All references in this Order to the *Rotstain* Litigation and the action titled *Smith, et al. v. Independent Bank, et al.*, CA No. 4-20-CV-00675 (S.D. Tex.) (the "*Smith* Litigation") shall also apply to any actions severed from those cases.

participation in breach of fiduciary duty.[3]  TD Bank denies that it is liable under those claims and asserts numerous defenses to each of those claims.

The Parties have engaged in extensive, good-faith, arm's-length negotiations, including by participating in a mediation on January 2 and 3, 2023, in Dallas, Texas and additional mediation discussions.  In these negotiations, potential victims of the Stanford Ponzi scheme were well-represented.  The Committee—which the Court appointed to "represent[] in this case and related matters" the "customers of SIBL who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL (the 'Stanford Investors')" (ECF No. 1149)—the Receiver, and the Examiner—who the Court appointed to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action" (ECF No. 322)—all participated in these extensive, arm's-length negotiations.  On February 24, the Parties reached an agreement-in-principle resulting in the Settlement.  The Parties continued negotiating in order to document the exact terms of the Settlement in the written Settlement Agreement.

Under the terms of the Settlement Agreement, TD Bank will pay one billion two hundred five million U.S. dollars ($1,205,000,000.00) (the "Settlement Amount") to the Receivership Estate, which (less Attorneys' Fees and expenses) will be distributed to Stanford Investors.  In return, TD Bank is to obtain total peace with respect to all claims that have been, or could have been, asserted against TD Bank or any other of the TD Bank Released Parties, arising in any respect out of the events leading to these proceedings.  Accordingly, the Settlement is conditioned

---

[3]  Claims were also brought against TD Bank for (1) aiding, abetting, or participation in fraudulent transfers; (2) aiding, abetting, or participation in a fraudulent scheme; (3) aiding, abetting, or participation in conversion; (4) civil conspiracy; and (5) avoidance and recovery of fraudulent transfers under the Texas Uniform Fraudulent Transfer Act.  Those claims were either dismissed by the Court or abandoned by Plaintiffs over the course of the litigation.

on the Court's approval and entry of this Final Bar Order enjoining Interested Parties and other Persons holding any potential claim against TD Bank relating to these proceedings from asserting or prosecuting claims against TD Bank or any of the TD Bank Released Parties.

On [DATE], 2023, Plaintiffs filed the Motion. (ECF No. ___). The Court thereafter entered a Scheduling Order on ____ __, 2023 (ECF No. ____), which, *inter alia*, authorized the Receiver to provide notice of the Settlement, established a briefing schedule on the Motion, and set the Motion for a hearing. On [_____], the Court held the scheduled hearing. For the reasons set forth herein, the Court finds that the terms of the Settlement Agreement are adequate, fair, reasonable, and equitable, and that the Settlement should be and is hereby **APPROVED**. The Court further finds that entry of this Final Bar Order is appropriate and necessary.

## II.    ORDER

It is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.    The Court has "broad powers and wide discretion to determine the appropriate relief in [this] equity receivership," including the authority to enter the Final Bar Order. *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (internal quotations omitted); *see also Zacarias v. Stanford Int'l Bank, Ltd.,* 945 F.3d 883, 897 (5th Cir. 2019) (receivership court authority includes entering "bar orders foreclosing suit against third-party defendants with whom the receiver is also engaged in litigation"). Moreover, the Court has jurisdiction over the subject matter of this action, and the Receiver and the Committee are proper parties to seek entry of this Final Bar Order.

2.    The Court finds that the methodology, form, content, and dissemination of the Notice: (i) were implemented in accordance with the requirements of the Scheduling Order; (ii) constituted the best practicable notice; (iii) were reasonably calculated, under the circumstances, to apprise all Interested Parties of the Settlement, the releases and dismissal therein,

and the injunctions provided for in this Final Bar Order; (iv) were reasonably calculated, under the circumstances, to apprise all Interested Parties of the right to object to the Settlement and this Final Bar Order, and to appear at the final approval Hearing; (v) were reasonable and constituted due, adequate, and sufficient notice; (vi) met all applicable requirements of law, including, without limitation, the Federal Rules of Civil Procedure, the United States Constitution (including Due Process), and the Rules of the Court; and (vii) provided to all Persons a full and fair opportunity to be heard on these matters.

3.    The Court finds that the Settlement, including, without limitation, the Settlement Amount, was reached following an extensive investigation of the facts and resulted from vigorous, good faith, arm's-length negotiations involving experienced and competent counsel.  The Court further finds that (i) significant issues exist as to the merits and value of the claims asserted against TD Bank by Plaintiffs and by others whose potential claims are foreclosed by this Final Bar Order; (ii) such claims contain complex and novel issues of law and fact that would require a substantial amount of time and expense to litigate, with uncertainty regarding whether such claims would be successful; (iii) a significant risk exists that future litigation costs would dissipate Receivership Assets and that Plaintiffs and Claimants may not ultimately prevail on their claims; (iv) Plaintiffs and other Claimants will receive partial satisfaction of their claims from the Settlement Amount being paid pursuant to the Settlement; and (v) TD Bank would not have agreed to the terms of the Settlement in the absence of this Final Bar Order and assurance of "total peace" with respect to all claims that have been, or could be, asserted by any Persons arising from any aspect of TD Bank's relationship with the Stanford Entities.  *See SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), *aff'd*, 530 F. App'x 360 (5th Cir. 2013) (approving these factors for consideration in evaluating whether a settlement and bar order are sufficient, fair, and necessary).

The injunction against such claims as set forth herein is therefore a necessary and appropriate order ancillary to the relief obtained for victims of the Stanford Ponzi scheme pursuant to the Settlement. *See Kaleta*, 530 F. App'x at 362 (affirming a bar order and injunction against investor claims as "ancillary relief" to a settlement in an SEC receivership proceeding). After careful consideration of the record and applicable law, the Court concludes that the Settlement is the best option for maximizing the net amount recoverable from TD Bank for the Receivership Estate, Plaintiffs, and the Claimants.

4.      Pursuant to the Settlement Agreement and upon motion by the Receiver, this Court will approve a Distribution Plan that will fairly and reasonably distribute the net proceeds of the Settlement to Stanford Investors who have Claims approved by the Receiver. The Court finds that the Receiver's claims process and the Distribution Plan contemplated in the Settlement Agreement have been designed to ensure that all Stanford Investors have received an opportunity to pursue their Claims through the Receiver's claims process previously approved by the Court (ECF No. 1584).

5.      The Court further finds that the Parties and their counsel have at all times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure.

6.      Accordingly, the Court finds that the Settlement is, in all respects, fair, reasonable, and adequate, and in the best interests of all Persons claiming an interest in, having authority over, or asserting a claim against TD Bank, the Stanford Entities, or the Receivership Estate, including but not limited to Plaintiffs and the Interested Parties. The Court also finds that this Final Bar Order is a necessary component to achieve the Settlement. The Settlement, the terms of which are set forth in the Settlement Agreement, is hereby fully and finally approved. The Parties are

directed to implement and consummate the Settlement in accordance with the terms and provisions of the Settlement Agreement and this Final Bar Order.

7.     Pursuant to the provisions of paragraph 41 of the Settlement Agreement, as of the Settlement Effective Date, TD Bank and the TD Bank Released Parties shall be completely released, acquitted, and forever discharged from any action, cause of action, suit, liability, claim, right of action, right of levy or attachment, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that Plaintiffs, including without limitation the Receiver on behalf of the Receivership Estate (including the Stanford Entities); the Committee; the Claimants; and the Persons, entities and interests represented by those parties ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any certificate of deposit, depository account, or investment of any type with any one or more of the Stanford Entities; (iii) TD Bank's or any of the TD Bank Released Parties' relationships with any one or more of the Stanford Entities and/or any of their personnel or any Person acting by, through, or in concert with any Stanford Entity; (iv) TD Bank's or any of the other TD Bank Released Parties' provision of services to or for the benefit of or on behalf of any one or more of the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates in any respect to the subject matter of this action, the *Rotstain* Litigation, the *Smith* Litigation, or any other proceeding concerning any of the Stanford Entities pending or commenced in any Forum.

8.      Pursuant to the provisions of paragraph 42 of the Settlement Agreement, as of the Settlement Effective Date, Plaintiffs Released Parties shall be completely released, acquitted, and forever discharged from all Settled Claims by TD Bank.

9.      Notwithstanding anything to the contrary in this Final Bar Order, the foregoing releases do not release the Parties' rights and obligations under the Settlement or the Settlement Agreement or bar the Parties from enforcing or effectuating the terms of the Settlement or the Settlement Agreement.  Further, the foregoing releases do not bar or release any claims, including but not limited to the Settled Claims, that TD Bank may have against any TD Bank Released Party, including but not limited to TD Bank's insurers, reinsurers, employees, and agents.

10.     The Court hereby permanently bars, restrains, and enjoins Plaintiffs, the Claimants, the Interested Parties, and all other Persons or entities anywhere in the world, whether acting in concert with the foregoing or claiming by, through, or under the foregoing, or otherwise, all and individually, from directly, indirectly, or through a third party, instituting, reinstituting, intervening in, initiating, commencing, maintaining, continuing, filing, encouraging, soliciting, supporting, participating in, collaborating in, or otherwise prosecuting, against TD Bank or any of the TD Bank Released Parties, the *Rotstain* Litigation, the *Smith* Litigation, or any action, lawsuit, cause of action, claim, investigation, demand, levy, complaint, or proceeding of any nature in any Forum, including, without limitation, any court of first instance or any appellate court, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is based upon, arises from, or is connected with the Stanford Entities; this case; the subject matter of this case; the *Rotstain* Litigation; the *Smith* Litigation; or any Settled Claim.  The foregoing specifically includes any claim, however denominated and whether brought in the *Rotstain* Litigation, the *Smith* Litigation, or any other Forum, seeking

contribution, indemnity, damages, or other remedy where the alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise. Notwithstanding the foregoing, there shall be no bar of any claims, including but not limited to the Settled Claims, that TD Bank may have against any TD Bank Released Party, including but not limited to TD Bank's insurers, reinsurers, employees, and agents. Further, the Parties retain the right to sue for alleged breaches of the Settlement Agreement.

11. Nothing in this Final Bar Order shall impair, affect, or be construed to impair or affect in any way whatsoever, any right of any Person, entity, or Interested Party to (i) claim a credit or offset, however determined or quantified, if and to the extent provided by any applicable statute, code, or rule of law, against any judgment amount, based upon the Settlement or payment of the Settlement Amount; (ii) designate a "responsible third party" or "settling person" under Chapter 33 of the Texas Civil Practice and Remedies Code; or (iii) take discovery under applicable rules in litigation; provided for the avoidance of doubt that nothing in this paragraph shall be interpreted to permit or authorize any action or claim seeking to impose any liability of any kind (including but not limited to liability for contribution, indemnification or otherwise) upon TD Bank or any other TD Bank Released Party.

12. TD Bank and the TD Bank Released Parties have no responsibility, obligation, or liability whatsoever with respect to the content of the Notice; the notice process; the Distribution Plan; the implementation of the Distribution Plan; the administration of the Settlement; the

management, investment, distribution, allocation, or other administration or oversight of the Settlement Amount, any other funds paid or received in connection with the Settlement, or any portion thereof; the payment or withholding of Taxes; the determination, administration, calculation, review, or challenge of claims to the Settlement Amount, any portion of the Settlement Amount, or any other funds paid or received in connection with the Settlement or the Settlement Agreement; or any losses, attorneys' fees, expenses, vendor payments, expert payments, or other costs incurred in connection with any of the foregoing matters. No appeal, challenge, decision, or other matter concerning any subject set forth in this paragraph shall operate to terminate or cancel the Settlement, the Settlement Agreement, or this Final Bar Order.

13.    Nothing in this Final Bar Order or the Settlement Agreement and no aspect of the Settlement or negotiation or mediation thereof is or shall be construed to be an admission or concession of any violation of any statute or law; of any fault, liability, or wrongdoing; or of any infirmity in the claims or defenses of the Parties with regard to any of the complaints, claims, allegations, or defenses in the *Rotstain* Litigation, the *Smith* Litigation, or any other proceeding.

14.    The Committee and the *Rotstain* Investor Plaintiffs are hereby ordered to file the agreed motion to dismiss and motion for final judgment in the *Rotstain* Litigation as specified in paragraph 24 of the Settlement Agreement by the deadline set forth in that paragraph. The Receiver and the Committee are hereby ordered to file the agreed motion to enforce the Bar Order and to dismiss all claims against TD Bank in the *Smith* Litigation as specified in paragraph 25 of the Settlement Agreement by the deadline set forth in that paragraph. TD Bank is hereby ordered to deliver or cause to be delivered the Settlement Amount (one billion two hundred five million U.S. dollars) pursuant to the terms and subject to the conditions in paragraph 26 of the Settlement

Agreement. Further, the Parties are ordered to act in conformity with all other provisions of the Settlement Agreement.

15.     Without in any way affecting the finality of this Final Bar Order, the Court retains continuing and exclusive jurisdiction over the Parties for purposes of, among other things, the administration, interpretation, consummation, and enforcement of the Settlement, the Settlement Agreement, the Scheduling Order, and this Final Bar Order, including, without limitation, the injunctions, bar orders, and releases herein, and to enter orders concerning implementation of the Settlement, the Settlement Agreement, the Distribution Plan, and any payment of Attorneys' Fees and expenses to Plaintiffs' counsel.

16.     The Court expressly finds and determines, pursuant to Federal Rule of Civil Procedure 54(b), that there is no just reason for any delay in the entry of this Final Bar Order, which is both final and appealable, and immediate entry by the Clerk of the Court is expressly directed.

17.     This Final Bar Order shall be served by counsel for Plaintiffs, via email, first class mail or international delivery service, on any person or entity that filed an objection to approval of the Settlement, the Settlement Agreement, or this Final Bar Order.

Signed on _____

                                        _____
                                        DAVID C. GODBEY
                                        UNITED STATES DISTRICT JUDGE

# EXHIBIT C

**Receivership Entities**

| | |
|---|---|
| 16NE Huntington, LLC | International Fixed Income Stanford Fund, Ltd. |
| 20/20 Ltd. | The Island Club, LLC |
| Antigua Athletic Club Limited | The Islands Club, Ltd. |
| The Antigua Sun Limited | JS Development, LLC |
| Apartment Household, Inc. | Maiden Island Holdings Ltd. |
| Asian Village Antigua Limited | Miller Golf Company, L.L.C. |
| Bank of Antigua Limited | Parque Cristal Ltd. |
| Boardwalk Revitalization, LLC | Pelican Island Properties Limited |
| Buckingham Investments A.V.V. | Pershore Investments S.A. |
| Caribbean Aircraft Leasing (BVI) Limited | Polygon Commodities A.V.V. |
| Caribbean Airlines Services Limited | Porpoise Industries Limited |
| Caribbean Airlines Services, Inc. | Productos y Servicios Stanford, C.A. |
| Caribbean Star Airlines Holdings Limited | R. Allen Stanford, LLC |
| Caribbean Star Airlines Limited | Robust Eagle Limited |
| Caribbean Sun Airlines Holdings, Inc. | Sea Eagle Limited |
| Casuarina 20 LLC | Sea Hare Limited |
| Christiansted Downtown Holdings, LLC | SFG Majestic Holdings, LLC |
| Crayford Limited | SG Ltd. |
| Cuckfield Investments Limited | SGV Asesores C.A. |
| Datcom Resources, Inc. | SGV Ltd. |
| Devinhouse, Ltd. | Stanford 20*20, LLC |
| Deygart Holdings Limited | Stanford 20/20 Inc. |
| Foreign Corporate Holdings Limited | Stanford Acquisition Corporation |

| | |
|---|---|
| Guardian International Investment Services No. One, Inc. | Stanford Aerospace Limited |
| Guardian International Investment Services No. Three, Inc. | Stanford Agency, Ltd. [Louisiana][i] |
| Guardian International Investment Services No. Two, Inc. | Stanford Agency, Inc. [Texas] |
| Guardian One, Ltd. | Stanford Agresiva S.A. de C.V. |
| Guardian Three, Ltd. | Stanford Aircraft, LLC |
| Guardian Two, Ltd. | Stanford American Samoa Holding Limited |
| Guiana Island Holdings Limited | Stanford Aviation 5555, LLC |
| Harbor Key Corp. | Stanford Aviation II, LLC |
| Harbor Key Corp. II | Stanford Aviation III, LLC |
| Idea Advertising Group, Inc. | Stanford Aviation Limited |
| Stanford Bank Holdings Limited | Stanford Aviation LLC |
| Stanford Bank, S.A. Banco Comercial | Stanford Bank (Panama), S.A.[ii] |
| Stanford Capital Management, LLC | Stanford Galleria Buildings Management, LLC |
| Stanford Caribbean Investments, LLC | Stanford Gallows Bay Holdings, LLC |
| Stanford Caribbean Regional Management Holdings, LLC | Stanford Global Advisory, LLC |
| Stanford Caribbean, LLC | Stanford Group (Antigua) Limited |
| Stanford Casa de Valores, S.A. | Stanford Group (Suisse) AG |
| Stanford Cobertura, S.A. de C.V. | Stanford Group Aruba, N.V. |
| Stanford Coins & Bullion, Inc. | Stanford Group Bolivia |
| The Stanford Condominium Owners' Association, Inc. | Stanford Group Casa de Valores, S.A. |
| Stanford Corporate Holdings International, Inc. | Stanford Group Company |

2

| | |
|---|---|
| Stanford Corporate Services (BVI) Limited | Stanford Group Company Limited |
| Stanford Corporate Services (Venezuela), C.A. | Stanford Group Holdings, Inc. |
| Stanford Corporate Services, Inc. | Stanford Group Mexico, S.A. de C.V. |
| Stanford Corporate Ventures (BVI) Limited | Stanford Group Peru, S.A., Sociedad Agente de Bolsa |
| Stanford Corporate Ventures, LLC | Stanford Group Venezuela Asesores de Inversion, C.A. |
| Stanford Crecimiento Balanceado, S.A. de C.V. | Stanford Group Venezuela, C.A. |
| Stanford Crecimiento, S.A. de C.V. | Stanford Holdings Venezuela, C.A. |
| Stanford Development Company (Grenada) Ltd. | Stanford International Bank Holdings Limited |
| Stanford Development Company Limited | Stanford International Bank Limited |
| Stanford Development Corporation | Stanford International Holdings (Panama) S.A. |
| Stanford Eagle, LLC | Stanford International Management Ltd. |
| Stanford Family Office, LLC | Stanford International Resort Holdings, LLC |
| The Stanford Financial Group Building, Inc. | Stanford Investment Advisory Services, Inc. |
| Stanford Financial Group Company | Stanford Leasing Company, Inc. |
| Stanford Financial Group Global Management, LLC | Stanford Management Holdings, Ltd. |
| Stanford Financial Group (Holdings) Limited | Stanford Real Estate Acquisition, LLC |
| Stanford Financial Group Limited | Stanford S.A. Comisionista de Bolsa |
| Stanford Financial Group Ltd. | Stanford Services Ecuador, S.A. |
| Stanford Financial Partners Advisors, LLC | Stanford South Shore Holdings, LLC |
| Stanford Financial Partners Holdings, LLC | Stanford Sports & Entertainment Holdings, LLC |

3

| | |
|---|---|
| Stanford Financial Partners Securities, LLC | Stanford St. Croix Marina Operations, LLC |
| Stanford Financial Partners, Inc. | Stanford St. Croix Resort Holdings, LLC |
| Stanford Fondos, S.A. de C.V. | Stanford St. Croix Security, LLC |
| The Stanford Galleria Buildings, LP | Stanford Trust Company |
| Stanford Trust Holdings Limited | Stanford Trust Company Administradora de Fondos y Fideicomisos S.A. |
| Stanford Venture Capital Holdings, Inc. | Stanford Trust Company Limited |
| The Sticky Wicket Limited | Torre Oeste Ltd. |
| Sun Printing & Publishing Limited | Torre Senza Nome Venezuela, C.A. |
| Sun Printing Limited | Trail Partners, LLC |
| Stanford Puerto Rico, Inc | Two Islands One Club (Grenada) Ltd. |
| Stanford Latin America LLC | Two Islands One Club Holdings Ltd. |
| Stanford Casa de Valores Panama | Stanford Financial Group Services, LLC |
| Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A. | Stanford Group Columbia a/k/a Stanford Bolsa Y Banca |
| Stanford Bank Venezuela | Guardian International Bank Ltd. |
| Stanford Trust Company Limited d/b/a Stanford Fiduciary Investment Services | Guardian Trust Company |
| Stanford Advisory Board | Guardian Development Corporation |
| Two Islands One Club (Antigua) Ltd. | Guardian International Investment Services |
| Stanford Caribbean Investment Partners, LP | Casuarina Holdings, Inc. |
| Stanford Caribbean Advisors | Stanford Caribbean Investment Fund |
| Stanford Group Panama a/k/a Stanford Bank Panama | Stanford Caribbean Investment Fund I, LP |

4

---

[i] Locations in brackets are included to differentiate between legal entities with the same name but different locations or other identifying information.

[ii] Locations in parentheses are included in the legal name of an entity or other identifying information.

5

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § § § | |
| Defendants. | § | |

## SCHEDULING ORDER

This matter is before the Court on the Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with TD Bank,[1] to Approve the Proposed Notice of Settlement with TD Bank, to Enter the Bar Order, and for Plaintiffs' Attorneys' Fees and Expenses (the "Motion") of Ralph S. Janvey (the "Receiver"), as Receiver for the Receivership Estate in *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-0298-N (N.D. Tex.) (the "SEC Action"), and the Official Stanford Investors Committee (the "Committee"), as a party to the SEC Action and as a plaintiff in *Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 4:22-cv-00800 (S.D. Tex.) (the "*Rotstain* Litigation"). The Receiver and the Committee are referred to herein collectively as the "Movants."

---

[1] Terms used in this Scheduling Order that are defined in the settlement agreement that is attached as Exhibit 1 of the Appendix to the Motion (ECF No. ☐) (the "Settlement Agreement"), unless expressly otherwise defined herein, have the same meaning as in the Settlement Agreement (which is deemed incorporated herein by reference).

**TD BANK SETTLEMENT**
**EXHIBIT D**

The Motion concerns a proposed settlement (the "Settlement") among and between, on the one hand, the Receiver, the Committee, and the Rotstain Investor Plaintiffs;[2] and, on the other hand, The Toronto-Dominion Bank ("TD Bank"), as a defendant in the *Rotstain* Litigation.

In the Motion, the Movants seek the Court's approval of the terms of the Settlement, including entry of a bar order in the SEC Action (the "Bar Order"). After reviewing the terms of the Settlement and considering the arguments presented in the Motion, the Court preliminarily approves the Settlement as adequate, fair, reasonable, and equitable. Accordingly, the Court enters this scheduling order to: (i) provide for notice of the terms of the Settlement, including the proposed Bar Order in the SEC Action; (ii) set the deadline for filing objections to the Settlement, the Bar Order, or Movants' request for approval of Plaintiffs' attorneys' fees; (iii) set the deadline for responding to any objection so filed; and (iv) set the date of the final approval hearing regarding the Settlement, the Bar Order in the SEC Action, and Movants' request for approval of Plaintiffs' attorneys' fees (the "Final Approval Hearing"), as follows:

1.    Preliminary Findings on Potential Approval of the Settlement:  Based upon the Court's review of the terms of the Settlement Agreement, the arguments presented in the Motion, and the Motion's accompanying appendices and exhibits, the Court preliminarily finds that the Settlement is fair, reasonable, and equitable; has no obvious deficiencies; and is the product of serious, informed, good-faith, and arm's-length negotiations. The Court, however, reserves a final ruling with respect to the terms of the Settlement until after the Final Approval Hearing referenced below in Paragraph 2.

---

[2] John J. Little signed the Settlement Agreement as chair of the Committee.  Mr. Little, the Court-appointed Examiner (the "Examiner"), also signed the Settlement Agreement in his capacity as Examiner solely to evidence his support and approval of the Settlement and to confirm his obligation to post the Notice on his website, but Mr. Little as Examiner is not otherwise individually a party to the Settlement Agreement or any of the above-referenced litigation.

**TD BANK SETTLEMENT**
**EXHIBIT D**

2.    <u>Final Approval Hearing</u>:  The Final Approval Hearing will be held before the Honorable David C. Godbey of the United States District Court for the Northern District of Texas, United States Courthouse, 1100 Commerce Street, Dallas, Texas 75242, in Courtroom 1505, at __:__ _.m. on _____, which is a date at least ninety (90) calendar days after entry of this Scheduling Order.  The purposes of the Final Approval Hearing will be to:  (i) determine whether the terms of the Settlement should be approved by the Court; (ii) determine whether the Bar Order attached as Exhibit B to the Settlement Agreement should be entered by the Court in the SEC Action; (iii) rule upon any objections to the Settlement or the Bar Order; (iv) rule upon Movants' request for approval of Plaintiffs' attorneys' fees; and (v) rule upon such other matters as the Court may deem appropriate.

3.    <u>Notice</u>:  The Court approves the form of Notice attached as Exhibit A to the Settlement Agreement and finds that the methodology, distribution, and dissemination of Notice described in the Motion:  (i) constitute the best practicable notice; (ii) are reasonably calculated, under the circumstances, to apprise all Interested Parties of the Settlement, the releases therein, and the injunctions provided for in the Bar Order; (iii) are reasonably calculated, under the circumstances, to apprise all Interested Parties of the right to object to the Settlement or the Bar Order and to appear at the Final Approval Hearing; (iv) constitute due, adequate, and sufficient notice; (v) meet all requirements of applicable law, including the Federal Rules of Civil Procedure, the United States Constitution (including Due Process), and the Rules of the Court; and (vi) will provide to all Persons a full and fair opportunity to be heard on these matters.  The Court further approves the form of the publication Notice attached as Exhibit E to the Settlement Agreement. Therefore:

3

a.    The Receiver is hereby directed, no later than twenty-one (21) calendar days after entry of this Scheduling Order, to cause the Notice in substantially the same form attached as Exhibit A to the Settlement Agreement to be sent via electronic mail, first class mail, or international delivery service to all Interested Parties; to be sent via electronic service to all counsel of record for any Person who is, at the time of Notice, a party in any case included in *In re Stanford Entities Securities Litigation*, MDL No. 2099 (N.D. Tex.) (the "MDL"), the SEC Action, the *Rotstain* Litigation, or *Smith, et al. v. Independent Bank, et al.*, Civil Action No. 4:20-cv-00675 (S.D. Tex.) (the "*Smith* Litigation"), who are deemed to have consented to electronic service through the CM/ECF System; and to be sent via facsimile transmission and/or first class mail to any other counsel of record for any other Person who is, at the time of service, a party in any case included in the MDL, the SEC Action, the *Rotstain* Litigation, or the *Smith* Litigation.

b.    The Receiver is hereby directed, no later than twenty-one (21) calendar days after entry of this Scheduling Order, to cause the notice in substantially the same form attached as Exhibit E to the Settlement Agreement to be published once in the national edition of *The Wall Street Journal* and once in the international edition of *The New York Times*.

c.    The Receiver is hereby directed, no later than fourteen (14) calendar days after entry of this Scheduling Order, to cause the Settlement Agreement, the Motion, this Scheduling Order, the Notice, and all exhibits and appendices attached to these documents, to be posted on the Receiver's website (http://stanfordfinancialreceivership.com).  The Examiner is hereby directed, no later than fourteen (14) calendar days after entry of this Scheduling Order, to cause the Settlement Agreement, the Motion, this Scheduling Order, the Notice, and all exhibits and appendices attached to these documents, to be posted on the Examiner's website (http://lpf-law.com/examiner-stanford-financial-group).

4

d.     The Receiver is hereby directed promptly to provide the Settlement Agreement, the Motion, this Scheduling Order, the Notice, and all exhibits and appendices attached to these documents, to any Person who requests such documents via email to Peter Morgenstern at morgenstern@butzel.com, or via telephone by calling (212) 818-1110. The Receiver may provide such materials in the form and manner that the Receiver deems most appropriate under the circumstances of the request.

e.     No less than ten (10) days before the Final Approval Hearing, the Receiver shall cause to be filed with the Clerk of this Court written evidence of compliance with subparts (a) through (d) of this Paragraph, which may be in the form of an affidavit or declaration.

4.     <u>Objections and Appearances at the Final Approval Hearing</u>:  Any Person who wishes to object to the terms of the Settlement, the Bar Order, or Movants' request for approval of Plaintiffs' attorneys' fees, or who wishes to appear at the Final Approval Hearing, must do so by filing an objection, in writing, with the Court in the SEC Action (3:09-CV-0298-N), by ECF or by mailing the objection to the Clerk of the United States District Court for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242, no later than [insert date of 21st day before Final Approval Hearing].  All objections filed with the Court must:

a.     contain the name, address, telephone number, and (if applicable) an email address of the Person filing the objection;

b.     contain the name, address, telephone number, and email address of any attorney representing the Person filing the objection;

c.     be signed by the Person filing the objection, or his or her attorney;

d.     state, in detail, the basis for any objection;

5

e.    attach any document the Court should consider in ruling on the Person's objection, the Settlement, the Bar Order, or Movants' request for approval of Plaintiffs' attorneys' fees; and

f.    if the Person filing the objection wishes to appear at the Final Approval Hearing, make a request to do so.

No Person will be permitted to appear at the Final Approval Hearing without filing a written objection and request to appear at the Final Approval Hearing as set forth in subparts (a) through (f) of this Paragraph.  Copies of any objections filed must be served by ECF, or by email or first class mail, upon each of the following:

> Lynn K. Neuner
> Simpson Thacher & Bartlett LLP
> 425 Lexington Avenue
> New York, NY 10017
> Telephone: (212) 455-2000
> Fax: (212) 455-2502
> E-mail: lneuner@stblaw.com
>
> and
>
> Scott M. Berman
> Friedman Kaplan Seiler Adelman & Robbins LLP
> 7 Times Square
> New York, New York 10036-6516
> Telephone: (212) 833-1120
> Fax: (212) 833-1250
> E-mail: sberman@fklaw.com
>
> and
>
> Peter D. Morgenstern
> Butzel Long, P.C.
> 477 Madison Avenue, Suite 1230
> New York, New York 10022
> Telephone: (212) 818-1110
> Fax: (212) 898-0123

6

E-mail: morgenstern@butzel.com

and

John J. Little
John J. Little Law, PLLC
8150 N. Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone: (214) 989-4180
Fax: (214) 367-6001
E-mail: john@johnjlittlelaw.com

and

Ralph Janvey
Krage & Janvey, L.L.P.
2100 Ross Ave
Suite 2600
Dallas, Texas 75201
Telephone:
Fax:
E-mail: rjanvey@kjllp.com

and

Kevin Sadler
Baker Botts LLP
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304-1007
Telephone: (650) 739-7518
Fax: (650) 739-7618
E-mail: kevin.sadler@bakerbotts.com

Any Person filing an objection shall be deemed to have submitted to the jurisdiction of this

Court for all purposes of that objection, the Settlement, and the Bar Order.  Potential objectors who

do not present opposition by the time and in the manner set forth above shall be deemed to have

waived the right to object (including any right to appeal) and to appear at the Final Approval

Hearing and shall be forever barred from raising such objections in this action or any other action

7

**TD BANK SETTLEMENT
EXHIBIT D**

or proceeding. Persons do not need to appear at the Final Approval Hearing or take any other action to indicate their approval.

5.    <u>Responses to Objections</u>:  Any Party to the Settlement may respond to an objection filed pursuant to Paragraph 4 by filing a response in the SEC Action no later than [<mark>insert date of 7th day before the Final Approval Hearing</mark>].  To the extent any Person filing an objection cannot be served by action of the Court's CM/ECF system, a response must be served to the email and/or mailing address provided by that Person.

6.    <u>Adjustments Concerning Hearing and Deadlines</u>:  The date, time, and place for the Final Approval Hearing, and the deadlines and date requirements in this Scheduling Order, shall be subject to adjournment or change by this Court without further notice other than that which may be posted by means of ECF in the MDL, the SEC Action, *Rotstain* Litigation, and the *Smith* Litigation.

7.    <u>Retention of Jurisdiction</u>:  The Court shall retain jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.

8.    <u>Entry of Injunction</u>:  If the Settlement is approved by the Court, the Court will enter the Bar Order in the SEC Action.  If entered, the Bar Order will permanently enjoin, among others, Interested Parties, including Stanford Investors and Claimants, from bringing, encouraging, assisting, continuing, or prosecuting, against TD Bank or any of the TD Bank Released Parties, the *Rotstain* Litigation, the *Smith* Litigation, or any other action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature, including, without limitation, contribution or indemnity claims, arising from or relating to a Settled Claim.

9.    <u>Use of Order</u>:  Under no circumstances shall this Scheduling Order be construed, deemed, or used as an admission, concession, or declaration by or against TD Bank of any fault,

**TD BANK SETTLEMENT
EXHIBIT D**

wrongdoing, breach or liability.  Nor shall the Order be construed, deemed, or used as an admission, concession, or declaration by or against Plaintiffs that their claims lack merit or that the relief requested is inappropriate, improper, or unavailable, or as a waiver by any party of any defenses or claims he or she may have.  Neither this Scheduling Order, nor the proposed Settlement Agreement, or any other settlement document shall be filed, offered, received in evidence, or otherwise used in these or any other actions or proceedings or in any arbitration, other than to enforce the terms and/or intent of the Settlement and the Settlement Agreement or to defend against or facilitate a dismissal of any other proceeding against TD Bank.

      10.    <u>Entry of This Order</u>:  This Scheduling Order shall be entered on the docket in the SEC Action.  The Committee shall cause a notice of the Scheduling Order to be entered on the docket of the *Rotstain* Litigation and the *Smith* Litigation.

      **IT IS SO ORDERED.**

Signed on _____, 2023

_____
DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

9

# EXHIBIT E

**<u>Publication Notice</u>**

To be published once in the national edition of *The Wall Street Journal* and once in the

international edition of *The New York Times*:

> PLEASE TAKE NOTICE that the Court-appointed Receiver for Stanford International Bank, Ltd. ("SIBL") and related entities ("Stanford Entities"), and certain Plaintiffs, have reached an agreement to settle all claims asserted or that could have been asserted against The Toronto-Dominion Bank relating to or in any way concerning SIBL (the "Settlement Agreement"). As part of the Settlement Agreement, the Receiver and Plaintiffs have requested an order that permanently enjoins, among others, all Interested Parties, including Stanford Investors (i.e., customers of SIBL, who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL), and all other Persons from bringing any legal proceeding or cause of action arising from or relating to the Stanford Entities against The Toronto-Dominion Bank or the TD Bank Released Parties.

> Complete copies of the Settlement Agreement, proposed Bar Order, and settlement documents are available on the Receiver's website http://www.stanfordfinancialreceivership.com. All capitalized terms not defined in this Notice are defined in the Settlement Agreement.

> Interested Parties may file written objections with the United States District Court for the Northern District of Texas on or before [insert date of 21st day before Final Approval Hearing].

# EXHIBIT F

## EXHIBIT F

1.  *Janvey v. Alguire, et al.*, No. 3:09-cv-0724 (N.D. Tex.)

2.  *Janvey v. Venger et al.,* No. 3:10-cv-00366 (N.D. Tex.)

3.  *Janvey v. Rodriguez Posada, et al.,* No. 3:10-cv-00415 (N.D. Tex.)

4.  *Janvey v. Gilbe Corp., et al., ,* No. 3:10-cv-00478 (N.D. Tex.)

5.  *Janvey v. Buck's Bits Service, Inc., et al.,* No. 10-cv-00528 (N.D. Tex.)

6.  *Janvey v. Johnson, et al.,* No. 10-cv-00617 (N.D. Tex)

7.  *Janvey v. Barr, et al.,* No. 10-cv-00725 (N.D. Tex.)

8.  *Janvey v. Indigo Trust, et al.,* No. 3:10-cv-00844 (N.D. Tex.)

9.  *Janvey v. Dokken, et al.,* No. 3:10-cv-00931 (N.D. Tex.)

10. *Janvey v. Fernandez et al.,* No. 3:10-cv-01002 (N.D. Tex.)

11. *Janvey v. Wieselberg, et al.*, No. 3:10-cv-1394 (N.D. Tex.)

12. *Janvey & OSIC v. Giusti*, No. 3:11-cv-292 (N.D. Tex.)

13. *Janvey v. Stanford*, No. 3:11-cv-1199 (N.D. Tex.)

# EXHIBIT G

## **EXHIBIT G**

1. *Janvey v. GMAG, L.L.C., et al.*, No. 22-10235 (5th Cir.)

2. *GMAG, L.L.C., et al. v. Janvey*, No. 22-10429 (5th Cir.)

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br><div align="center">Plaintiff,</div><br>v.<br><br>STANFORD INTERNATIONAL BANK, LTD, et al.,<br><br><div align="center">Defendants.</div> | Civil Action No. 3:09-cv-00298-N |

**DECLARATION OF PETER D. MORGENSTERN IN SUPPORT
OF RECEIVER AND OSIC'S MOTION FOR ORDER APPROVING
PROPOSED SETTLEMENT WITH THE TORONTO-DOMINION BANK,
TO ENTER THE BAR ORDER, AND TO APPROVE APPLICATION FOR
ATTORNEYS' FEES AND EXPENSES**

Pursuant to 28 U.S.C. § 1746, I, Peter D. Morgenstern, hereby declare under penalty of perjury that I have personal knowledge of the following facts:

<div align="center">

**I.    OVERVIEW**

</div>

I am submitting this Declaration in support of the Receiver and the Official Stanford Investors Committee's ("OSIC") Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with The Toronto-Dominion Bank ("TD"), to Approve the Proposed Notice of Settlement with TD, to Enter the Bar Order, and for Plaintiffs' Attorneys' Fees and Expenses (the "Motion").[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**Declaration of Peter D. Morgenstern**

### A.    The Toronto-Dominion Bank

1.    The settlement for which approval is sought in the Motion (the "TD Settlement") settles all claims against TD in exchange for payment of $1.205 billion ($1,205,000,000) by TD to the Receiver for ultimate distribution to the Stanford investor victims.

2.    My law firm, Butzel Long, a professional corporation ("Butzel Long"),[2] along with co-counsel at Friedman Kaplan Seiler Adelman & Robbins LLP ("Friedman Kaplan" and, together with Butzel Long, "Plaintiffs' Counsel"), have been litigating claims against TD on behalf of OSIC since 2011. From that time through the present, Butzel Long and Friedman Kaplan have been co-lead counsel for OSIC with respect to its claims against TD, as well as against defendants HSBC Bank plc ("HSBC"), Société Générale Private Banking (Suisse), S.A. ("SG Suisse"), and Blaise Friedli ("Friedli") (collectively the "Foreign Bank Defendants"). Additionally, from 2011 through September 2019, Butzel Long and Friedman Kaplan were co-lead counsel for OSIC with respect to its claims against Trustmark National Bank ("Trustmark") and Independent Bank f/k/a Bank of Houston ("IB" and, collectively with Trustmark and the Foreign Bank Defendants, the "Bank Defendants"). Even earlier, beginning in 2009 and 2010 respectively, co-counsel at Friedman Kaplan and Butzel Long were litigating claims against the Bank Defendants on behalf of a putative class of Stanford investors.[3]

### B.    Curriculum Vitae

3.    I am an attorney and have been duly admitted to practice law in the state of New York since 1983. I am also admitted to practice before the U.S. District Courts for the

---

[2] From 2009 through 2011, I was a partner at Morgenstern & Blue, LLC. In 2011, I joined Butzel Long. For simplicity, I refer to the representation by me of plaintiffs in the case against the Bank Defendants, which was continuous, as representation by Butzel Long.

[3] Friedli was not a defendant until OSIC intervened.

**Declaration of Peter D. Morgenstern**                                                    2

Southern and Eastern Districts of New York. By Order dated May 26, 2009, I was admitted pro hac vice to practice before this Court in connection with litigation related to the Stanford receivership cases. I am currently a shareholder in the law firm Butzel Long, which is a Michigan-based firm with additional branch offices in New York and Washington, D.C. I am a shareholder in Butzel Long's New York office. Butzel Long has a broad nationwide legal practice, including groups of attorneys who practice in the areas of corporate law, litigation, and, like me, attorneys who practice in the areas of complex commercial litigation, bankruptcy and insolvency law. For forty years, I have concentrated my practice exclusively in the areas of commercial litigation and insolvency-related matters. I was previously a partner at a large full-service international law firm, and headed the bankruptcy and insolvency practice at one of its regional offices. After relocating from Florida back to New York, I started and managed a mid-size boutique litigation firm, and then joined Butzel Long in 2011 as a shareholder.

4.      I began work on Stanford-related investigations and litigation shortly after the commencement of the receivership case in February 2009, at the request of a group of former clients. I have continued my work on Stanford-related matters with a team of other professionals after joining Butzel Long in 2011 through today and have acted as lead counsel or co-lead counsel on several Stanford-related matters, including *Janvey, et al. v. Greenberg Traurig, LLP, et al.*, No. 3:12-cv-04641-N (N.D. Tex.), *Wilkinson, et al. v. BDO USA, LLP, et al.*, No. 3:11-cv-01115-N (N.D. Tex.), and *OSIC v. Bank of Antigua, et al.*, No. 3:13-cv-00762-N. I also personally serve as a member of OSIC appointed by this Court by Order dated August 10, 2010 (the "Committee Order") and have done so since its inception.

5.      As more fully discussed below, the effort to maximize recoveries for Stanford victims through litigation and other legal efforts, has consumed me, my team, and co-counsel for

**Declaration of Peter D. Morgenstern**                                                      3

well over a decade, largely to the exclusion of other matters. Also as discussed below, this representation was undertaken at considerable financial risk to me, my firm, and to co-counsel as a consequence of the contingent nature of our representation of individual Stanford investors and eventually the OSIC.

6.      I have extensive experience representing creditors and other stakeholders in litigation relating to or arising from significant insolvencies (including bankruptcy cases, state court liquidation proceedings and out of court restructurings), major frauds, and Ponzi schemes, on behalf of injured investors and creditors. I have participated as the lead attorney and as part of teams of attorneys who successfully prosecuted actions against third parties that were alleged to have been involved in, or profited from, such frauds and Ponzi schemes. For instance, I was the lead attorney who represented the court-appointed equity committee in the Chapter 11 case of Adelphia Communications, Inc. (a massive fraud scheme); the class action plaintiffs in In re Bennett Funding, Inc. (another massive Ponzi scheme); a large investor group in the case of Tyco, Inc. (a major fraud case); a major investor group in Askin Capital Management (fraud and Chapter 11 case); special counsel to the court-appointed equity committee of Calpine, Inc. (Chapter 11 case); counsel to the Official Court-Appointed Retiree Committee in connection with Outboard Marine, Inc. (Chapter 11 case), and represented major creditors in connection with the insolvency proceedings arising from the massive Madoff fraud, among many other notable representations during my career. A detailed description of Butzel Long's practice, and my biography, background and experience, can be found on Butzel Long's website at www.butzel.com.

## C.    Involvement with the Case Against the Bank Defendants Since 2009

7.      Butzel Long began work on investigations and litigation relating to Stanford shortly after the commencement of the Stanford Receivership in February 2009. In 2010, Butzel Long

asked Friedman Kaplan to act as co-counsel in the case against the Bank Defendants. Friedman Kaplan, led by Scott Berman, then joined in the investigation and litigation against the Bank Defendants.

8.      As noted above, Butzel Long, led by me, is co-lead counsel with Friedman Kaplan in this matter, particularly with respect to the Foreign Bank Defendants. I have been actively involved in every facet of the case, including the investigation of the facts and legal theories that form the bases for the case, responding to motions to dismiss, moving to intervene on behalf of OSIC, conducting fact and expert discovery, making and responding to motions for summary judgment and *Daubert* motions, and preparing for trial. These efforts are set forth in greater detail below.

9.      I believe that Butzel Long's (and Friedman Kaplan's) involvement in this case has greatly contributed to the successful resolution of the claims against TD, as set forth in greater detail below.

## II.      THE CLAIMS AGAINST TD AND SETTLEMENT

A.      **The Claims Against TD and Procedural History of the Litigation**

10.      Plaintiffs' Counsel have zealously prosecuted and pursued claims against TD on behalf of OSIC (and, originally, the putative class). The operative claims against TD include aiding and abetting violations of the Texas Securities Act ("TSA"), and knowing participation in breach of fiduciary duty.

11.      The case against the Bank Defendants was originally filed in Harris County District Court as a putative class action on August 23, 2009. (*Rotstain* Docs. 1-4.)[4] The case was removed

---

[4] Citations to "*Rotstain* Doc." refer to the docket for the case against the Bank Defendants, *Rotstain v. Trustmark Nat'l Bank*, No. 4:22-cv-00800 (S.D. Tex.) (and previously 3:09-cv-02384 (N.D. Tex.)).

**Declaration of Peter D. Morgenstern**                                                    5

to the U.S. District Court for the Southern District of Texas and subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation. (*Rotstain* Docs. 1, 5-7.) In 2011, OSIC moved to intervene (*Rotstain* Doc. 96), and the Court granted OSIC's motion in 2012 (*Rotstain* Doc. 129). OSIC then filed its intervenor complaints against SG Suisse and Friedli (*Rotstain* Doc. 130) and TD, HSBC, Trustmark, and IB (*Rotstain* Doc. 133). The defendants all moved to dismiss OSIC's intervenor complaints (*Rotstain* Docs. 154, 155, 157, 159, 160, 162), and OSIC filed a lengthy omnibus response (*Rotstain* Doc. 166). The Court largely denied TD's and the other Bank Defendants' motion to dismiss for failure to state a cause of action in 2015 (*Rotstain* Doc. 234). TD filed a motion seeking reconsideration, to which OSIC responded, and which was denied. (*Rotstain* Docs. 373, 379, 387.)

12.    In November 2017, the Court denied the putative class plaintiffs' motion for class certification and lifted a discovery stay that had been in place while the Court considered class certification. (*Rotstain* Doc. 428.) Thereupon, Plaintiffs' Counsel began extensive discovery efforts. In July 2018, the parties filed an agreed order regarding document production from OSIC and the Receiver, as well as an amended confidentiality order, both of which were approved by the Court. (*Rotstain* Docs. 480-483.) Plaintiffs' Counsel led the process of responding and objecting to all defendants' discovery requests, including all defendants' requests for production of documents from the Receiver's electronic and physical files and from other sources, which involved extensive meeting and conferring with the defendants, coordinating with the Receiver, and negotiations with third-parties who provided documents to OSIC and the Receiver and the Antiguan joint liquidators for SIBL. In total, we produced millions of pages of documents. Plaintiffs' Counsel also undertook to obtain fact discovery from TD and the other Foreign Bank Defendants, including obtaining and reviewing hundreds of thousands of pages of documents,

**Declaration of Peter D. Morgenstern**                                                          6

propounding interrogatories and requests for admissions, and taking dozens of fact and expert depositions, with most fact depositions of TD witnesses being taken in person in Canada. Plaintiffs' Counsel also litigated two motions to compel discovery from TD and an appeal of one of the Magistrate Judge's rulings to the District Judge. (Rotstain Docs. 583, 673, 767, 770.) OSIC largely prevailed on those motions. (Rotstain Docs. 651, 692, 801.)

13.     Plaintiffs' Counsel also defended depositions taken by TD (and the other Bank Defendants), took and participated in non-party depositions, and managed expert discovery relating to TD (and the other Foreign Bank Defendants). The latter included working with experts on their reports and analyzing the opposing experts' reports, taking and defending expert depositions relating to TD (and the other Foreign Bank Defendants), and working with a Canadian law expert on various issues relating to OSIC's case against TD.

14.     In September 2019, OSIC moved to amend its intervenor complaints. (*Rotstain* Doc. 557.) In June 2020, the Court granted OSIC's motion and OSIC filed its amended intervenor complaints. (*Rotstain* Docs. 733-735.) Plaintiffs' Counsel also responded to TD's principal summary judgment motion (*Rotstain* Doc. 992-993), and made and responded to *Daubert* motions relating to OSIC's case against TD (*Rotstain* Docs. 913, 1027). Plaintiffs' Counsel participated in these efforts on OSIC's behalf.

15.     On January 20, 2022, this Court denied TD's motion for summary judgment. (*Rotstain* Doc. 1150.) Shortly thereafter, on January 28, the Judicial Panel on Multidistrict Litigation issued a conditional remand order returning this case to the U.S. District Court for the Southern District of Texas. (*Rotstain* Doc. 1152.) Following remand, TD, along with its co-defendants, filed new motions to dismiss raising issues that had previously been decided against them in their earlier motions to dismiss or for summary judgment (*Rotstain* Docs. 1166, 1168,

1173, 1175), and OSIC responded to those motions (*Rotstain* Docs. 1231, 1233, 1235.) The Court

denied those motions. (*Rotstain* Docs. 1327, 1328.) The Court also denied TD's Daubert motion

to exclude OSIC's expert witness relating to its case against TD (Rotstain Doc. 1308) and granted

OSIC's *Daubert* motion regarding an expert witness specific to TD. (*Rotstain* Doc. 1441.)

## B.    Settlement Negotiations

16.    In January 2023, OSIC attended a mediation with TD, however, that mediation was

unsuccessful. Settlement negotiations resumed during the week preceding the scheduled trial in

February 2023. In these negotiations, potential victims of the Stanford Ponzi scheme were well-

represented. OSIC, the Receiver, and the Examiner all participated in these extensive, arm's-length

negotiations. OSIC had been appointed by the Court to "represent[] in this case and related

matters" the "customers of SIBL who, as of February 16, 2009, had funds on deposit at SIBL

and/or were holding certificates of deposit issued by SIBL (the 'Stanford Investors')." (ECF No.

1149.)[5] The Examiner had been appointed by the Court to advocate on behalf of "investors in any

financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant

in this action." (ECF No. 322.) On February 24, 2023, the Parties reached an agreement in principle

resulting in the TD Settlement. For a short time thereafter, the Parties continued negotiating in

order to document the exact terms of the TD Settlement in the written TD Settlement Agreement.

The parties executed the TD Settlement Agreement on March 7, 2023.

## C.    Plaintiffs' Counsel Have Sufficient Basis
   to Evaluate and Recommend this Settlement

17.    Plaintiffs' Counsel have spent substantial time and energy since 2009 investigating

Stanford's business operations and relationships with third parties, including TD, which involved

---

[5] "ECF No." refers to docket entries in this action.

the review of hundreds of thousands of pages of documents, depositions of dozens of witnesses across the globe, coordination of efforts with the Receiver and Examiner, and researching case law to establish viable theories of liability and damages and then defending those theories through dispositive motion practice before this Court and the U.S. District Court for the Southern District of Texas. All that work paved the way for the proposed TD Settlement, which could not have been achieved without the substantial amount of time expended by Plaintiffs' Counsel and their tireless efforts.

18.    Plaintiffs' Counsel collectively have spent over a decade and thousands of hours zealously pursuing claims against TD on behalf of the Stanford Receivership Estate and the Stanford investors prior to the execution of the TD Settlement Agreement in March 2023. As part of the investigation of claims against TD, we reviewed voluminous documents, including tens of thousands of pages of bank statements, transaction records, wire records, account monitoring data, internal and external correspondence, internal reviews and policies, and account opening records detailing TD's relationship with and services provided to Stanford for nearly two decades. The documents reviewed included documents from the Receivership, documents obtained from TD and other Bank Defendants, and documents from third parties. We researched relevant case law, as well as Canadian law, to develop claims against TD and to determine how the facts regarding TD's conduct supported such claims. Such claims included claims under the TSA and common law claims belonging to the Receiver and/or Stanford investors that could be asserted by OSIC. The investigation of claims further required formulation of viable damage models and causation theories for both the Receivership Estate claims and the investor claims.

19.    Plaintiffs' Counsel could not have successfully prosecuted and resolved the claims asserted against TD without having spent thousands of additional hours investigating and

**Declaration of Peter D. Morgenstern**                                                                                                    9

understanding the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship, and dealings between and among the various Stanford entities, and the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities. Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against TD and prosecute them successfully to conclusion.

20.     Finally, Plaintiffs' Counsel have diligently and aggressively litigated the claims for the last decade by investigating the claims and amending the complaint as additional details emerged which merited further refinement of the claims. Plaintiffs' Counsel further engaged in extensive fact and expert discovery, as discussed above, and discovery-related motion practice. Plaintiffs' Counsel also worked on and largely prevailed on TD's and its co-defendants' motions to dismiss, motions for summary judgment, and *Daubert* motions. Plaintiffs' Counsel are uniquely qualified to evaluate the merits of the claims against TD and the value of this settlement. Plaintiffs' Counsel have acquired knowledge and expertise regarding TD's involvement with Stanford sufficient to provide a sound basis for their recommendation of approval of the instant settlement.

## D.    The Settlement Is Fair and Reasonable and Should Be Approved

21.     It is my opinion based upon years of experience prosecuting and settling complex litigation matters, including large sophisticated fraud and Ponzi scheme matters, that the TD Settlement is fair and reasonable and in the best interests of the Stanford Receivership Estate and the Stanford investors and should be approved by the Court.

22.     More importantly, I believe that the TD Settlement represents the best result that could be achieved given all the circumstances. Indeed, and as evidenced by the district court's denial of class certification after intense effort and the defendants' wave after wave of dismissal

and summary judgment motions, this was by no means an "easy" case. Consequently, the result obtained should be considered highly favorable. Considering all the factors outlined in the Motion, the TD Settlement represents an extremely good result for the Stanford Receivership estate and its investors. Therefore, I believe the TD Settlement is in the best interests of the Stanford Receivership estate and its investors and should be approved.

### III.    ATTORNEYS' FEES

**A.    The Contingency Fee Agreement**

23.    Plaintiffs' Counsel have been jointly handling OSIC's claims against TD pursuant to a twenty-five percent (25%) contingency fee agreement with OSIC.

24.    As stated in the Motion, the Movants seek Court approval to pay Plaintiffs' Counsel a fee of $100 million, which is approximately 8.3% of the settlement amount. This fee is substantially below twenty-five percent (25%) of the Net Recovery (*i.e.*, the settlement amount less allowable expense disbursements) in the TD Settlement, which is the fee agreed to be paid to Plaintiffs' Counsel by the Receiver and OSIC, as acknowledged by the Receiver and Examiner. Following the settlement, for the benefit of the Receivership estate and Stanford's victims, Plaintiffs' Counsel agreed to seek Court approval of a fee of $100 million, which is approximately 8.3% of the settlement amount, and which is substantially below the amount which the Receiver and OSIC agreed to pay Plaintiffs' Counsel.

**B.    The $100 Million Fee Is Fair and Reasonable**

25.    It is my opinion that the fee requested in the Motion is reasonable in comparison to the total net amount to be recovered for the benefit of the Stanford investors. The twenty-five percent (25%) contingency fee was heavily negotiated between OSIC and Plaintiffs' Counsel and is substantially below the typical market rate contingency fee percentage of 33% to 40% that most

**Declaration of Peter D. Morgenstern**                                                11

law firms typically require to handle cases of this complexity and magnitude. For the benefit of the Receivership estate and Stanford's victims, Plaintiffs' Counsel have agreed to a substantial reduction in the fee to which they are contractually entitled. Additionally, the claims against TD and the other Foreign Bank Defendants are extraordinarily complex, involving voluminous records and electronic data and requiring many years of investigation, discovery, and dispositive motions to get to trial.

26.     Moreover, as described above, the litigation against TD has been hard-fought and has gone on for over 13 years. As a result, Plaintiffs' Counsel have collectively invested thousands of hours of time; indeed, Butzel Long has invested time worth over $14.3 million over the last decade working on this matter. Butzel Long began its efforts pursuing this matter as a putative class action on behalf of all investors against the Bank Defendants.  Plaintiffs' Counsel has, for many years now, borne significant risk of loss, that is, the risk of performing substantial amounts of work for no compensation. A sampling of the detailed work that Plaintiffs' Counsel performed is listed in the Motion to Approve the TD Settlement at Section IV.C.1. A $100 million fee (approximately 8.3% of the settlement amount) is reasonable given the time and effort that was expended, the complexity of the matter and the risks involved.

## C.     Time and Effort of Plaintiffs' Counsel

27.     Since 2009, Butzel Long, led by me, has dedicated thousands of hours to the prosecution of claims against the Bank Defendants on a contingent fee basis. This includes time spent investigating and understanding the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship, and dealings between and among the various Stanford entities and the Bank Defendants, the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities, and the involvement of

the Bank Defendants. Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against the Bank Defendants and prosecute them successfully.

28.     Even a cursory review of the case docket, which runs to over 1,400 entries, reveals the immense amount of work that Plaintiffs' Counsel have put into the prosecution of this lawsuit. However, the docket and pleadings only reveal the work that is filed with the Court. As discussed further herein, and as the Court is aware, the prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the case, conduct fact and expert discovery, prepare various briefs and motions (including multiple motions to dismiss and summary judgment motions), attempt to negotiate settlements, and prepare for trial. Plaintiffs' Counsel have collectively spent thousands of hours in their investigation and prosecution of claims against the Bank Defendants and in particular the Foreign Bank Defendants, a significant portion of which has been devoted to investigation and pursuit of the claims against TD.

29.     Over the last decade, Butzel Long's lawyers, led by me, have devoted thousands of hours, worth millions of dollars, to investigating and prosecuting the case against the Bank Defendants. Butzel Long's lawyers, myself included, have worked through many late nights, weekends, and holidays on the case against the Bank Defendants, without compensation.

30.     From the inception of the case and through February 28, 2023, Butzel Long, led by me, has spent over **21,914** hours of attorney and litigation support staff time, worth approximately **$14,392,239** at our applicable hourly rates. For complex cases of this nature, these rates are consistent with the prevailing hourly rates for similarly qualified attorneys.

**Declaration of Peter D. Morgenstern**                                                              13

31.     A substantial portion of Butzel Long's time on this case has been dedicated to pursuit of the claims against TD. Plaintiffs' Counsel anticipate investing additional time dedicated to the finalization of the instant TD Settlement, including finalizing the motion for approval documents, monitoring and responding to any objections where applicable, and attending the approval hearing. Therefore, I believe that my law firm's total time dedicated to the case against the Bank Defendants will exceed **$14.4** million, of which a substantial portion will have been dedicated to the claims against TD.

32.     The proposed settlement is the result of many years of effort and thousands of hours of work by the Receiver, OSIC, and Plaintiffs' Counsel as described herein. But for the efforts of these parties, and the efforts of Butzel Long, led by me, as described herein, there would be no TD Settlement. The TD Settlement will net the Receivership estate and the Stanford investors approximately **$1.105 billion** (should the Court approve the attorneys' fee request) that they would not have otherwise received.

33.     Tremendous amounts of time and effort were devoted by Butzel Long, led by me, as well as by the other Plaintiffs' Counsel, to recover monies for the Stanford Receivership Estate and the investors. All of this was necessary to the successful prosecution and resolution of the case against TD, in order to yield the best recovery for the Stanford Receivership Estate and the investors. It is my opinion that the $100 million fee (which is approximately 8.3% of the settlement amount) to be paid to counsel for OSIC for the settlement of the matter as to TD is reasonable and well merited.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 7, 2023.

_____

Peter D. Morgenstern

**Declaration of Peter D. Morgenstern**

14

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>v.<br><br>STANFORD INTERNATIONAL BANK, LTD, *et al.*,<br><br>               Defendants. | Civil Action No. 3:09-cv-00298-N |

**DECLARATION OF SCOTT M. BERMAN IN SUPPORT OF RECEIVER AND OSIC'S MOTION FOR ORDER APPROVING PROPOSED SETTLEMENT WITH THE TORONTO-DOMINION BANK, TO ENTER THE BAR ORDER, AND TO APPROVE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES**

Pursuant to 28 U.S.C. § 1746, I, Scott M. Berman, hereby declare under penalty of perjury that I have personal knowledge of the following facts:

## I.    OVERVIEW

I am submitting this Declaration in support of the Receiver and the Official Stanford Investors Committee's ("OSIC") Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with The Toronto-Dominion Bank ("TD"), to Approve the Proposed Notice of Settlement with TD, to Enter the Bar Order, and for Plaintiffs' Attorneys' Fees and Expenses (the "Motion").[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

A.    **The Toronto-Dominion Bank**

1.    The settlement for which approval is sought in the Motion (the "TD Settlement") settles all claims against TD in exchange for payment of **$1.205 billion ($1,205,000,000)** by TD to the Receiver for ultimate distribution to the Stanford investor victims.

2.    My law firm, Friedman Kaplan Seiler Adelman & Robbins LLP ("Friedman Kaplan"), along with co-counsel at Butzel Long, a professional corporation ("Butzel Long"[2] and, together with Friedman Kaplan, "Plaintiffs' Counsel"), have been litigating claims against TD on behalf of OSIC since 2011. From that time through the present, Friedman Kaplan and Butzel Long have been co-lead counsel for OSIC with respect to its claims against TD, as well as against defendants HSBC Bank plc ("HSBC"), Société Générale Private Banking (Suisse), S.A. ("SG Suisse"), and Blaise Friedli ("Friedli") (TD, HSBC, SG Suisse, and Friedli are collectively the "Foreign Bank Defendants"). Additionally, from 2011 through September 2019, Friedman Kaplan and Butzel Long were co-lead counsel for OSIC with respect to its claims against Trustmark National Bank ("Trustmark") and Independent Bank f/k/a Bank of Houston ("IB" and, collectively with Trustmark and the Foreign Bank Defendants, the "Bank Defendants"). Even earlier, beginning in 2009 and 2010 respectively, co-counsel at Butzel Long and Friedman Kaplan were litigating claims against the Bank Defendants on behalf of a putative class of Stanford investors.[3]

B.    **Curriculum Vitae**

3.    I am a partner at Friedman Kaplan, which is based in New York City, and I have been practicing law for over forty (40) years. Since the beginning of Friedman Kaplan's

---

[2] From 2009 through 2011, co-counsel at Butzel Long were at Morgenstern & Blue, LLC.

[3] Friedli was not a defendant until OSIC intervened.

involvement in this case in 2010, I have led Friedman Kaplan's work as co-lead counsel for OSIC with respect to OSIC's claims against TD (as well as against the other Foreign Bank Defendants and, prior to October 2019, IB and Trustmark). I have actively participated in all material aspects regarding OSIC's case against TD (as well as against the other Foreign Bank Defendants and, prior to October 2019, IB and Trustmark).

4.      Friedman Kaplan is a law firm providing commercial litigation, white collar defense, and corporate transaction/securities services from offices in New York City and Newark, New Jersey. Friedman Kaplan's litigation department handles a variety of large, sophisticated, and complex commercial litigation matters, including securities, bankruptcy and creditors' rights, real estate, professional liability, and employment litigation, as well as other complex commercial and business disputes. We have tried numerous complex commercial matters to verdict and judgment, in both state and federal courts and before arbitral tribunals.

5.      I received my law degree from New York University School of Law in 1982 and was admitted to practice law in New York in February 1983. Since entering private practice in 1983, I have been involved principally in complex commercial disputes and trial work, particularly in securities, investment fund, and bankruptcy litigation. My experience includes representing and advising large institutional investors, bankruptcy trustees, receivers, family offices, funds of funds, investment advisors, officers and directors, and other individuals as both plaintiff's and defendant's counsel in high-profile matters involving investment funds and their auditors, administrators, prime brokers, and other professionals. I am admitted to practice in the U.S. District Courts for the Southern and Eastern Districts of New York and the District of Columbia, as well as the U.S. Courts of Appeals for the Second, Third, and Fifth Circuits.

6.      For more than 25 years, I have specialized in bringing actions on behalf of investors in failed hedge funds and other vehicles as well as on behalf of U.S. Securities and Exchange Commission Receivers and offshore liquidators to recover monies lost in a variety of complex financial frauds. Many of these cases involved Ponzi schemes not that different than the one committed by R. Allen Stanford and James Davis. I have prosecuted cases against banks, auditors, administrators, and investment funds, among others, and have recovered many hundreds of millions of dollars for my clients. These cases involve many of the most well-known and substantial frauds and Ponzi schemes in the last 25 years, including the Granite Funds, Manhattan Investment Fund, Wood River, Lipper Funds, Beacon Hill Funds, Lancer Funds, Bayou Funds, Carlyle Capital, Madoff feeder funds, and, of course, Stanford. These cases involved a variety of cutting-edge and novel issues of federal securities law under Sections 10 and 20 of the Securities Exchange Act of 1934 and common law claims in a variety of U.S. and offshore jurisdictions, including theories sounding in fraud, breach of fiduciary duty, and aiding and abetting these torts.

7.      For example, I represented large groups of institutional investors in Lancer Offshore, Inc. and The Omnifund, Ltd., two offshore hedge funds managed by Michael Lauer, in asserting securities and common law claims following the demise of the funds. We brought claims against the funds' third-party service providers, including their auditor (PWC), prime broker (Bank of America), and administrator (Citco), alleging that they either committed fraud, participated in the manager's fraud, or both. Our work in this case led to numerous published cutting-edge opinions regarding a variety of legal issues, including, among other things, the Securities Litigation Uniform Standards Act of 1998 (SLUSA), pleading standards for scienter,

extraterritoriality, personal jurisdiction, and painting the tape. Our efforts led to very substantial

settlements for our clients, totaling tens of millions of dollars

8.      As another example, I represented a large group of investors in feeder funds of

Beacon Hill Master Fund, as well as the joint official liquidators and receiver for the fund,

following its demise. We brought claims against the funds' managers and parent company, as

well as its third-party service providers, including its auditor, prime brokers, and administrator,

alleging that they aided and abetted the fund managers' fraud and breaches of fiduciary duty. Our

work in this case led to numerous cutting-edge decisions on Section 20 control person liability,

scienter, and Cayman law. Our work again led to a substantial recovery totaling many millions of

dollars for our clients.

9.      My representations in cases involving complex financial fraud also include:

representation of the liquidators of Carlyle Capital Corporation Limited, a failed residential

mortgage-backed securities fund, in connection with litigation against the manager and directors

of the fund alleging breach of fiduciary duty; representation of investors in the Granite Funds in

litigation against three major banks in a case arising out of the mis-valuation of collateralized

mortgage obligations; and representation of a fund of funds that was a sub-investor in Madoff

feeder funds managed by Tremont in litigation against Tremont, its parent company,

Oppenheimer & Co., Inc., and the fund's auditors; representation of several individual investors

in connection with the distribution of assets related to the Lipper Convertibles Fund liquidation;

and representation of investors in the failed Wood River and Bayou Funds.

10.      I am an industry leader in prosecuting financial fraud and Ponzi scheme cases.

Because of my experience and expertise in complex financial fraud cases, I am often invited to

speak at seminars on complex fraud and related issues by the American Bankruptcy Institute, the

International Association of Restructuring, Insolvency & Bankruptcy Professionals, the

Recovery and Insolvency Specialists Association, the Alliance of Alternative Asset

Professionals, and the New York County Lawyers Association ("NYCLA"), as well as numerous

hedge funds and hedge fund industry groups and conferences, such as Asset Recovery

International and the Asset Recovery Americas Conference. I have also written various articles

on federal court litigation and authored a chapter on hedge fund litigation in a book published by

Wiley in 2012 titled *The Fundamentals of Hedge Fund Management*, by Daniel A. Strachman. I

also am a member of NYCLA's Board of Directors, the treasurer for NYCLA's foundation, and

the former chair of NYCLA's Committee on Federal Courts.

**C.    Involvement with the Case Against the Bank Defendants Since 2010**

11.    Friedman Kaplan lawyers, led by me, have been involved with Stanford, and

specifically with the case against the Bank Defendants, since 2010.

12.    Co-counsel at Butzel Long began work on investigations and litigation relating to

Stanford shortly after the commencement of the Stanford Receivership in February 2009. In

2010, co-counsel at Butzel Long asked me to act as co-counsel in the case against the Bank

Defendants. Friedman Kaplan, led by me, then joined in the investigation and litigation against

the Bank Defendants.

13.    As noted above, Friedman Kaplan, led by me, is co-lead counsel with Butzel

Long in this matter, particularly with respect to the Foreign Bank Defendants. I have been

actively involved in every facet of the case, including the investigation of the facts and legal

theories that form the bases for the case, responding to motions to dismiss, moving to intervene

on behalf of OSIC, conducting fact and expert discovery, making and responding to motions for

summary judgment and *Daubert* motions, and preparing for trial. These efforts are set forth in greater detail below.

14.    I believe that Friedman Kaplan's (and Butzel Long's) involvement in this case has greatly contributed to the successful resolution of the claims against TD, as set forth in greater detail below.

## II.    THE CLAIMS AGAINST TD AND SETTLEMENT

A.    **The Claims Against TD and Procedural History of the Litigation**

15.    Plaintiffs' Counsel have zealously prosecuted and pursued claims against TD on behalf of OSIC (and, originally, the putative class). The operative claims against TD include aiding and abetting violations of the Texas Securities Act ("TSA") and knowing participation in breach of fiduciary duty.

16.    The case against the Bank Defendants was originally filed in Harris County District Court as a putative class action on August 23, 2009. (*Rotstain* Docs. 1-4.)[4] The case was removed to the U.S. District Court for the Southern District of Texas and subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation. (*Rotstain* Docs. 1, 5-7.) In 2011, OSIC moved to intervene (*Rotstain* Doc. 96), and the Court granted OSIC's motion in 2012 (*Rotstain* Doc. 129). OSIC then filed its intervenor complaints against SG Suisse and Friedli (*Rotstain* Doc. 130) and TD, HSBC, Trustmark, and IB (*Rotstain* Doc. 133). The defendants all moved to dismiss OSIC's intervenor complaints (*Rotstain* Docs. 154, 155, 157, 159, 160, 162), and OSIC filed a lengthy omnibus response (*Rotstain* Doc. 166). The Court largely denied TD's and the other Bank Defendants' motion to dismiss for failure to state a cause

---

[4] Citations to "*Rotstain* Doc." refer to the docket for the case against the Bank Defendants, *Rotstain v. Trustmark Nat'l Bank*, No. 4:22-cv-00800 (S.D. Tex.) (and previously 3:09-cv-02384 (N.D. Tex.)).

Declaration of Scott M. Berman                                                                7

of action in 2015 (*Rotstain* Doc. 234). TD filed a motion seeking reconsideration, to which OSIC

responded, and which was denied. (*Rotstain* Docs. 373, 379, 387.)

17.     In November 2017, the Court denied the putative class plaintiffs' motion for class

certification and lifted a discovery stay that had been in place while the Court considered class

certification. (*Rotstain* Doc. 428.) Thereupon, Plaintiffs' Counsel began extensive discovery

efforts. In July 2018, the parties filed an agreed order regarding document production from OSIC

and the Receiver, as well as an amended confidentiality order, both of which were approved by

the Court. (*Rotstain* Docs. 480-483.) Plaintiffs' Counsel led the process of responding and

objecting to all defendants' discovery requests, including all defendants' requests for production

of documents from the Receiver's electronic and physical files and from other sources, which

involved extensive meeting and conferring with the defendants, coordinating with the Receiver,

and negotiations with third-parties who provided documents to OSIC and the Receiver and the

Antiguan joint liquidators for SIBL. In total, we produced millions of pages of documents.

Plaintiffs' Counsel also undertook to obtain fact discovery from TD and the other Foreign Bank

Defendants, including obtaining and reviewing hundreds of thousands of pages of documents,

propounding interrogatories and requests for admissions, and taking dozens of fact and expert

depositions, with most fact depositions of TD witnesses being taken in person in Canada.

Plaintiffs' Counsel also litigated two motions to compel discovery from TD and an appeal of one

of the Magistrate Judge's rulings to the District Judge. (*Rotstain* Docs. 583, 673, 767, 770.)

OSIC largely prevailed on those motions. (*Rotstain* Docs. 651, 692, 801.)

18.     Plaintiffs' Counsel also defended depositions taken by TD (and the other Bank

Defendants), took and participated in non-party depositions, and managed expert discovery

relating to TD (and the other Foreign Bank Defendants). The latter included working with

**App. 104**

experts on their reports and analyzing the opposing experts' reports, taking and defending expert depositions relating to TD (and the other Foreign Bank Defendants), and working with a Canadian law expert on various issues relating to OSIC's case against TD.

19.     In September 2019, OSIC moved to amend its intervenor complaints. (*Rotstain* Doc. 557.) In June 2020, the Court granted OSIC's motion and OSIC filed its amended intervenor complaints. (*Rotstain* Docs. 733-735.) Plaintiffs' Counsel also responded to TD's principal summary judgment motion (*Rotstain* Doc. 992-993) and made and responded to *Daubert* motions relating to OSIC's case against TD (*Rotstain* Docs. 913, 1027). Plaintiffs' Counsel participated in these efforts on OSIC's behalf.

20.     On January 20, 2022, this Court denied TD's motion for summary judgment. (*Rotstain* Doc. 1150.) Shortly thereafter, on January 28, the Judicial Panel on Multidistrict Litigation issued a conditional remand order returning this case to the U.S. District Court for the Southern District of Texas. (*Rotstain* Doc. 1152.) Following remand, TD, along with its co-defendants, filed new motions to dismiss raising issues that had previously been decided against them in their earlier motions to dismiss or for summary judgment (*Rotstain* Docs. 1166, 1168, 1173, 1175), and OSIC responded to those motions (*Rotstain* Docs. 1231, 1233, 1235). The Court denied those motions. (*Rotstain* Docs. 1327, 1328.) The Court also denied TD's *Daubert* motion to exclude OSIC's expert witness relating to its case against TD (*Rotstain* Doc. 1308) and granted OSIC's *Daubert* motion regarding an expert witness specific to TD. (*Rotstain* Doc. 1441.)

## B.     Settlement Negotiations

21.     In January 2023, OSIC attended a mediation with TD, however, that mediation was unsuccessful. Settlement negotiations resumed during the week preceding the scheduled trial

in February 2023. In these negotiations, potential victims of the Stanford Ponzi scheme were well-represented. OSIC, the Receiver, and the Examiner all participated in these extensive, arm's-length negotiations. OSIC had been appointed by the Court to "represent[] in this case and related matters" the "customers of SIBL who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL (the 'Stanford Investors')." (ECF No. 1149.)[5] The Examiner had been appointed by the Court to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by any Defendant in this action." (ECF No. 322.) On February 24, 2023, the Parties reached an agreement in principle resulting in the TD Settlement. For a short time thereafter, the Parties continued negotiating in order to document the exact terms of the TD Settlement in the written TD Settlement Agreement. The parties executed the TD Settlement Agreement on March 7, 2023.

C.    **Plaintiffs' Counsel Have Sufficient Basis to Evaluate and Recommend this Settlement**

22.    Plaintiffs' Counsel have spent substantial time and energy since 2009 investigating Stanford's business operations and relationships with third parties, including TD, which involved the review of hundreds of thousands of pages of documents, depositions of dozens of witnesses across the globe, coordination of efforts with the Receiver and Examiner, and researching case law to establish viable theories of liability and damages and then defending those theories through dispositive motion practice before this Court and the U.S. District Court for the Southern District of Texas. All that work paved the way for the proposed TD Settlement,

---

[5] "ECF No." refers to docket entries in this action.

Declaration of Scott M. Berman                                                                                10

which could not have been achieved without the substantial amount of time expended by Plaintiffs' Counsel and their tireless efforts.

23.    Plaintiffs' Counsel collectively have spent over a decade and thousands of hours zealously pursuing claims against TD on behalf of the Stanford Receivership Estate and the Stanford investors prior to the execution of the TD Settlement Agreement in March 2023. As part of the investigation of claims against TD, we reviewed voluminous documents, including tens of thousands of pages of bank statements, transaction records, wire records, account monitoring data, internal and external correspondence, internal reviews and policies, and account opening records detailing TD's relationship with and services provided to Stanford for nearly two decades. The documents reviewed included documents from the Receivership, documents obtained from TD and other Bank Defendants, and documents from third parties. We researched relevant case law, as well as Canadian law, to develop claims against TD and to determine how the facts regarding TD's conduct supported such claims. Such claims included claims under the TSA and common law claims belonging to the Receiver and/or Stanford investors that could be asserted by OSIC. The investigation of claims further required formulation of viable damage models and causation theories for both the Receivership Estate claims and the investor claims.

24.    Plaintiffs' Counsel could not have successfully prosecuted and resolved the claims asserted against TD without having spent thousands of additional hours investigating and understanding the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship, and dealings between and among the various Stanford entities, and the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities. Without a comprehensive investigation and understanding of this

background, it would not have been possible to formulate viable claims against TD and prosecute them successfully to conclusion.

25.    Finally, Plaintiffs' Counsel have diligently and aggressively litigated the claims for the last decade by investigating the claims and amending the complaint as additional details emerged which merited further refinement of the claims. Plaintiffs' Counsel further engaged in extensive fact and expert discovery, as discussed above, and discovery-related motion practice. Plaintiffs' Counsel also worked on and largely prevailed on TD's and its co-defendants' motions to dismiss, motions for summary judgment, and *Daubert* motions. Plaintiffs' Counsel are uniquely qualified to evaluate the merits of the claims against TD and the value of this settlement. Plaintiffs' Counsel have acquired knowledge and expertise regarding TD's involvement with Stanford sufficient to provide a sound basis for their recommendation of approval of the instant settlement.

**D.    The Settlement Is Fair and Reasonable and Should Be Approved**

26.    It is my opinion based upon years of experience prosecuting and settling complex litigation matters, including large sophisticated fraud and Ponzi scheme matters, that the TD Settlement is fair and reasonable and in the best interests of the Stanford Receivership Estate and the Stanford investors and should be approved by the Court.

27.    More importantly, I believe that the TD Settlement represents the best result that could be achieved given all the circumstances. Indeed, and as evidenced by the district court's denial of class certification after intense effort and the defendants' wave after wave of dismissal and summary judgment motions, this was by no means an "easy" case. Consequently, the result obtained should be considered highly favorable. Considering all the factors outlined in the Motion, the TD Settlement represents an extremely good result for the Stanford Receivership

estate and its investors. Therefore, I believe the TD Settlement is in the best interests of the Stanford Receivership estate and its investors and should be approved.

## III.    ATTORNEYS' FEES

### A.    The Contingency Fee Agreement

28.    Plaintiffs' Counsel have been jointly handling OSIC's claims against TD pursuant to a twenty-five percent (25%) contingency fee agreement with OSIC.

29.    As stated in the Motion, the Movants seek Court approval to pay Plaintiffs' Counsel a fee of $100 million, which is approximately 8.3% of the settlement amount. This fee is substantially below twenty-five percent (25%) of the Net Recovery (*i.e.*, the settlement amount less allowable expense disbursements) in the TD Settlement, which is the fee agreed to be paid to Plaintiffs' Counsel by the Receiver and OSIC, as acknowledged by the Receiver and Examiner. Following the settlement, for the benefit of the Receivership estate and Stanford's victims, Plaintiffs' Counsel agreed to seek Court approval of a fee of $100 million, which is approximately 8.3% of the settlement amount, and which is substantially below the amount which the Receiver and OSIC agreed to pay Plaintiffs' Counsel.

### B.    The $100 Million Fee Is Fair and Reasonable

30.    It is my opinion that the fee requested in the Motion is reasonable in comparison to the total net amount to be recovered for the benefit of the Stanford investors. The twenty-five percent (25%) contingency fee was heavily negotiated between OSIC and Plaintiffs' Counsel and is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms typically require to handle cases of this complexity and magnitude. For the benefit of the Receivership estate and Stanford's victims, Plaintiffs' Counsel have agreed to a substantial reduction in the fee to which they are contractually entitled. Additionally, the claims

against TD and the other Foreign Bank Defendants are extraordinarily complex, involving voluminous records and electronic data and requiring many years of investigation, discovery, and dispositive motions to get to trial.

31.    Moreover, as described above, the litigation against TD has been hard-fought and has gone on for over 13 years. As a result, Plaintiffs' Counsel have collectively invested thousands of hours of time; indeed, Friedman Kaplan has invested time worth over $16.6 million over the last decade working on this matter. Friedman Kaplan began its efforts pursuing this matter as a putative class action on behalf of all investors against the Bank Defendants.[6] Plaintiffs' Counsel has, for many years now, borne significant risk of loss, that is, the risk of performing substantial amounts of work for no compensation. A sampling of the detailed work that Plaintiffs' Counsel performed is listed in the Motion to Approve the TD Settlement at Section IV.C.1. A $100 million fee (approximately 8.3% of the settlement amount) is reasonable given the time and effort that was expended, the complexity of the matter and the risks involved.

**C.    Time and Effort of Plaintiffs' Counsel**

32.    Since 2010, Friedman Kaplan, led by me, has dedicated thousands of hours to the prosecution of claims against the Bank Defendants on a contingent fee basis. This includes time spent investigating and understanding the background and history of the complex web of Stanford companies, the operations, financial transactions, interrelationship, and dealings between and among the various Stanford entities and the Bank Defendants, the facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities, and the involvement of the Bank Defendants. Without a comprehensive investigation and understanding

---

[6] As noted above, Friedli was not a defendant until OSIC intervened.

of this background, it would not have been possible to formulate viable claims against the Bank Defendants and prosecute them successfully.

33.    Even a cursory review of the case docket, which runs to over 1,400 entries, reveals the immense amount of work that Plaintiffs' Counsel have put into the prosecution of this lawsuit. However, the docket and pleadings only reveal the work that is filed with the Court. As discussed further herein, and as the Court is aware, the prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the case, conduct fact and expert discovery, prepare various briefs and motions (including multiple motions to dismiss and summary judgment motions), attempt to negotiate settlements, and prepare for trial. Plaintiffs' Counsel have collectively spent thousands of hours in their investigation and prosecution of claims against the Bank Defendants and in particular the Foreign Bank Defendants, a significant portion of which has been devoted to investigation and pursuit of the claims against TD.

34.    Over the last decade, Friedman Kaplan lawyers, led by me, have devoted thousands of hours, worth millions of dollars, to investigating and prosecuting the case against the Bank Defendants. Friedman Kaplan lawyers, myself included, have worked through many late nights, weekends, and holidays on the case against the Bank Defendants, without compensation.

35.    From the inception of the case and through February 28, 2023, Friedman Kaplan, led by me, has spent **24,131** hours of attorney and litigation support staff time, worth approximately **$16,648,894.50** at our applicable hourly rates. For complex cases of this nature, these rates are consistent with the prevailing hourly rates for similarly qualified attorneys.

36.    A substantial portion of Friedman Kaplan's time on this case has been dedicated to pursuit of the claims against TD. Plaintiffs' Counsel anticipate investing additional time dedicated to the finalization of the instant TD Settlement, including finalizing the motion for approval documents, monitoring and responding to any objections where applicable, and attending and arguing at the approval hearing. Therefore, I believe that my law firm's total time dedicated to the case against the Bank Defendants will exceed **$16.7 million**, of which a substantial portion will have been dedicated to the claims against TD.

37.    The proposed settlement is the result of many years of effort and thousands of hours of work by the Receiver, OSIC, and Plaintiffs' Counsel as described herein. But for the efforts of these parties, and the efforts of Friedman Kaplan, led by me, as described herein, there would be no TD Settlement. The TD Settlement will net the Receivership estate and the Stanford investors approximately $1.1 billion (should the Court approve the attorneys' fee request) that they would not have otherwise received.

38.    Tremendous amounts of time and effort were devoted by Friedman Kaplan, led by me, as well as by the other Plaintiffs' Counsel, to recover monies for the Stanford Receivership Estate and the investors. All of this was necessary to the successful prosecution and resolution of the case against TD, in order to yield the best recovery for the Stanford Receivership Estate and the investors. It is my opinion that $100 million fee (which is approximately 8.3% of the settlement amount) to be paid to counsel for OSIC for the settlement of the matter as to TD is reasonable and well merited.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 7, 2023.

Scott M. Berman

# Exhibit 4

## DECLARATION OF SCOTT D. POWERS

Pursuant to 28 U.S.C. § 1746, I, Scott D. Powers, hereby declare under penalty of perjury that I have personal knowledge of the following facts:

1.      My name is Scott D. Powers.  I am over the age of eighteen (18) and am competent to make this Declaration.

2.      I am admitted to practice law in the State of Texas, and am admitted to practice before various federal courts, including the U.S. Court of Appeals for the Fifth Circuit and the U.S. District Court for the Northern District of Texas.  I have been licensed to practice law since 2000, and I am a partner in the law firm of Baker Botts L.L.P. ("Baker Botts").

3.      Baker Botts has served as lead counsel to Ralph S. Janvey, in his capacity as the Court-appointed Receiver in the Stanford Financial Group SEC receivership proceedings, since those proceedings were initiated in 2009 in the case styled *SEC v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-0298-N.  In its role as lead counsel, Baker Botts has reviewed litigation-related fees and expenses incurred by, and paid to, the Receiver, counsel for the Receiver, the Official Stanford Investors Committee, counsel for the Official Stanford Investors Committee, and expert witnesses and/or related firms, including fees and expenses related to lawsuits such as *Rotstain et al. v. Trustmark National Bank et al.*, No. 4:22-CV-000800 (the "Rotstain Litigation").

4.      I have reviewed records of the Receivership related to the litigation fees and expenses incurred by the Receiver, counsel for the Receiver, the Official Stanford Investors Committee, counsel for the Official Stanford Investors Committee, and expert witnesses and/or related firms in the Rotstain Litigation, which are summarized in the following tables.  Because The Toronto-Dominion Bank ("TD Bank") is only one of several defendants in the Rotstain

1

Litigation, the following allocation has been applied: (1) for fees and expenses attributable to the Rotstain Litigation as a whole, 20% is allocated to TD Bank, because TD Bank is one of five bank defendants in the Rotstain Litigation; (2) for fees and expenses that are either (i) clearly attributable to one of the three banks that did not settle with Plaintiffs in January or (ii) clearly attributable only to the three foreign bank defendants in the Rotstain Litigation—TD Bank, Société Générale Private Banking (Suisse) S.A., and HSBC Bank plc—33% is allocated to TD Bank; and (3) for fees and expenses that are directly attributable solely to TD Bank, 100% is allocated to TD Bank.

5. The following table presents fees and expenses that are 20% allocable to TD Bank, based on the above-described allocation methodology.

| Amount | Notes |
|---:|---|
| 475.00 | **The Legal Connection expenses – May 2022 (Invoice No. 168705)** |
| 395.00 | **Planet Depos LLC expenses – July 2022 (Invoice No. 509713)** |
| 2,515.00 | **Planet Depos LLC expenses– August 2022 (Invoice Nos. 520510, 520526)** |
| 475.00 | **JAMS/Robert Meyer expenses - December 2022** |
| 27,605.03 | **JAMS/Robert Meyer expenses - January 2023** |
| 10,000.00 | **IMS Consulting & Expert Services (Jason Barnes) expenses – April 2022 (Invoice No. 0168)** |
| 13,142.49 | **IMS Consulting & Expert Services (Jason Barnes) expenses – May 2022 (Invoice No. 1006)** |
| 30,977.46 | **IMS Consulting & Expert Services (Jason Barnes) expenses – June 2022 (Invoice No. 1384)** |
| 69,210.43 | **IMS Consulting & Expert Services (Jason Barnes) expenses – July 2022 (Invoice No. 1862)** |
| 117,023.74 | **IMS Consulting & Expert Services (Jason Barnes) expenses – August 2022 (Invoice No. 2239)** |
| 111,423.83 | **IMS Consulting & Expert Services (Jason Barnes) expenses – September 2022 (Invoice No. 2640)** |
| 3,977.15 | **IMS Consulting & Expert Services (Jason Barnes) expenses – October 2022 (Invoice No. 3107)** |
| 8,576.82 | **IMS Consulting & Expert Services (Jason Barnes) expenses – November 2022 (Invoice No. 3565)** |
| 80,000.00 | **CSI Litigation Psychology LLC expenses – April 2022 (Invoice No. 2022/0175)** |
| 111,170.95 | **CSI Litigation Psychology LLC expenses – December 2022 (Invoice No. 2022/0536)** |

| Amount | Notes |
|---|---|
| 56.40 | **David S Smith, Official US Court Reporter expenses – May 2022 (Invoice No. 202200034)** |
| 22,521.64 | **TSG Reporting Inc. – October 2019-December 2019 (numerous invoice numbers)** |
| 22,093.72 | **TSG Reporting Inc. expenses – December 2019 (numerous invoice numbers)** |
| 27,784.38 | **TSG Reporting Inc. expenses – January 2020 (numerous invoice numbers)** |
| 3,962.70 | **TSG Reporting Inc. expenses – January 2020 (numerous invoice numbers)** |
| 6,857.00 | **TSG Reporting Inc. expenses – January 2020 (numerous invoice numbers)** |
| 26,928.98 | **TSG Reporting Inc. expenses – January 2020 (numerous invoice numbers)** |
| 250.00 | **TSG Reporting Inc. expenses – July 2020 (Invoice No. 2024416)** |
| 250.00 | **TSG Reporting Inc. expenses – July 2020 (Invoice No. 2024585)** |
| 250.00 | **TSG Reporting Inc. expenses – October 2020 (Invoice No. 2031957)** |
| 250.00 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2038954)** |
| 250.00 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2038967)** |
| 250.00 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2038977)** |
| 1,139.25 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2037559)** |
| 521.67 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2037562)** |
| 2,191.42 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2038172)** |
| 510.94 | **TSG Reporting Inc. expenses – January 2021  (Invoice No. 2038177)** |
| 1,635.27 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038619)** |
| 361.67 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038624)** |
| 1,263.20 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038642)** |
| 632.65 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038951)** |
| 2,225.35 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038954)** |
| 474.69 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038958)** |
| 544.90 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038963)** |
| 1,071.90 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038967)** |
| 418.75 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038970)** |
| 2,025.45 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038977)** |
| 522.45 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038978)** |
| 458.75 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2038984)** |
| 1,687.29 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039500)** |
| 375.01 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039505)** |
| 2,038.70 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039573)** |
| 463.34 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039581)** |
| 1,700.65 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039652)** |
| 491.67 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039657)** |

| Amount | Notes |
|---:|---|
| 1,365.10 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039909)** |
| 264.37 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2039914)** |
| 1,891.55 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2040095)** |
| 460.84 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2040100)** |
| 1,522.55 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2040113)** |
| 451.67 | **TSG Reporting Inc. expenses – February 2021  (Invoice No. 2040118)** |
| 512.92 | **TSG Reporting Inc. expenses – December 2020 (Invoice No. 2036783)** |
| 2,564.52 | **TSG Reporting Inc. expenses – April 2021 (Invoice No. 2046624)** |
| 505.84 | **TSG Reporting Inc. expenses – April 2021 (Invoice No. 2046629)** |
| 450.00 | **TSG Reporting Inc. expenses – April 2021 (Invoice No. 2046632)** |
| 221.87 | **TSG Reporting Inc. expenses – April 2021 (Invoice No. 2046637)** |
| 2,919.02 | **TSG Reporting Inc. expenses – May 2021 (Invoice No. 2048527)** |
| 531.67 | **TSG Reporting Inc. expenses – May 2021 (Invoice No. 2048530)** |
| 2,482.90 | **TSG Reporting Inc. expenses – May 2021 (Invoice No. 2050855)** |
| 646.67 | **TSG Reporting Inc. expenses – May 2021 (Invoice No. 2050861)** |
| 5,525.00 | **James C. Spindler fees – October 2019 (No Invoice No.)** |
| 4,550.00 | **James C. Spindler fees – November 2019 (No Invoice No.)** |
| 6,987.50 | **James C. Spindler fees – December 2019 (No Invoice No.)** |
| 13,812.50 | **James C. Spindler fees – January 2020 (No Invoice No.)** |
| 37,375.00 | **James C. Spindler fees – February 2020 (No Invoice No.)** |
| 34,775.00 | **James C. Spindler fees – March 2020 (No Invoice No.)** |
| 27,787.50 | **James C. Spindler fees – April 2020 (No Invoice No.)** |
| 41,437.50 | **James C. Spindler fees – May 2020 (No Invoice No.)** |
| 11,050.00 | **James C. Spindler fees – September 2020 (No Invoice No.)** |
| 18,525.00 | **James C. Spindler fees – October 2020 (No Invoice No.)** |
| 27,950.00 | **James C. Spindler fees – November 2020 (No Invoice No.)** |
| 38,675.00 | **James C. Spindler fees – December 2020 (No Invoice No.)** |
| 44,200.00 | **James C. Spindler fees – March 2021 (No Invoice No.)** |
| 7,475.00 | **James C. Spindler fees – April 2021 (No Invoice No.)** |
| 4,712.50 | **James C. Spindler fees – June 2021-July 2021 (No Invoice No.)** |
| 7,475.00 | **James C. Spindler fees – September 2021-May 2022 (No Invoice No.)** |
| 9,262.50 | **James C. Spindler fees – October 2022 (No Invoice No.)** |
| 23,562.50 | **James C. Spindler fees – November 2022-December 2022 (No Invoice No.)** |
| 86,552.06 | **Ankura fees and expenses – August 2018 (Invoice No. 2400000680)** |
| 69,659.17 | **Ankura fees and expenses – September 2018 (Invoice No. 2400000725)** |
| 104,192.50 | **Ankura fees – October 2018 (Invoice No. 2400000759)** |
| 52,425.51 | **Ankura fees and expenses – November 2018 (Invoice No. 2400000763)** |
| 10,924.26 | **Ankura fees and expenses – December 2018-January 2019 (Invoice No. 2400000921)** |
| 416.00 | **Navigant fees – February 2016 (Invoice No. 494908)** |

| Amount | Notes |
|---:|:---|
| 5,980.00 | **Navigant fees – December 2017 (Invoice No. 2400000238)** |
| 27,223.59 | **Navigant fees and expenses – January 2018 (Invoice No. 2400000339)** |
| 17,546.00 | **Navigant fees – February 2018 (Invoice No. 2400000350)** |
| 20,768.50 | **Navigant fees – March 2018 (Invoice No. 2400000418)** |
| 10,736.00 | **Navigant fees – April 2018 (Invoice No. 2400000508)** |
| 5,220.00 | **Navigant fees – May 2018 (Invoice No. 2400000603)** |
| 3,800.00 | **Navigant fees – June 2018 (Invoice No. 2400000602)** |
| 51,319.72 | **Navigant fees and expenses – July 2018 (Invoice No. 2400000604)** |
| 3,486.00 | **FTI fees – April 2015 (Invoice No. 7381071)** |
| 218.00 | **FTI fees – May 2015 (Invoice No. 7383366)** |
| 2,441.60 | **FTI fees – June 2015 (Invoice No. 7385480)** |
| 4,846.40 | **FTI fees – July 2015 (Invoice No. 7388536)** |
| 14,287.43 | **FTI fees and expenses – August 2015 (Invoice No. 7390924)** |
| 17,737.03 | **FTI fees and expenses – September 2015 (Invoice No. 7392725)** |
| 728.00 | **FTI fees – November 2015 (Invoice No. 7398443)** |
| 2,740.40 | **FTI fees – December 2015 (Invoice No. 7401391)** |
| 870.00 | **FTI fees – January 2016 (Invoice No. 7403841)** |
| 9,705.20 | **FTI fees – February 2016 (Invoice No. 7407298)** |
| 2,507.60 | **FTI fees – March 2016 (Invoice No. 7410771)** |
| 1,032.00 | **FTI fees – April 2016 (Invoice No. 7413391)** |
| 1,432.00 | **FTI fees – May 2016 (Invoice No. 7415841)** |
| 2,068.00 | **FTI fees – September 2016 (Invoice No. 7426729)** |
| 3,948.00 | **FTI fees – November 2016 (Invoice No. 7432302)** |
| 4,714.00 | **FTI fees – December 2016 (Invoice No. 7434499)** |
| 8,024.00 | **FTI fees – January 2017 (Invoice No. 7437774)** |
| 360.00 | **FTI fees – February 2017 (Invoice No. 7440402)** |
| 6,926.40 | **FTI fees – March 2017 (Invoice No. 7442705)** |
| 176.00 | **FTI fees – June 2017 (Invoice No. 7451623)** |
| 11,264.40 | **FTI fees – December 2017 (Invoice No. 7467133)** |
| 1,702.00 | **FTI fees – January 2018 (Invoice No. 7469947)** |
| 3,706.00 | **FTI fees – February 2018 (Invoice No. 7472495)** |
| 8,066.00 | **FTI fees – March 2018 (Invoice No. 7475447)** |
| 9,380.40 | **FTI fees – April 2018 (Invoice No. 7478511)** |
| 15,543.60 | **FTI fees – May 2018 (Invoice No. 7485189)** |
| 3,735.60 | **FTI fees – June 2018 (Invoice No. 7483974)** |
| 3,470.00 | **FTI fees – July 2018 (Invoice No. 7486619)** |
| 11,734.00 | **FTI fees – August 2018 (Invoice No. 7489034)** |
| 2,523.60 | **FTI fees – September 2018 (Invoice No. 7491856)** |
| 21,026.00 | **FTI fees – October 2018 (Invoice No. 7494649)** |
| 14,441.20 | **FTI fees – November 2018 (Invoice No. 7497727)** |

| Amount | Notes |
|---:|---|
| 17,868.40 | **FTI fees – December 2018 (Invoice No. 7501095)** |
| 14,347.20 | **FTI fees – January 2019 (Invoice No. 7502675)** |
| 8,485.60 | **FTI fees – February 2019 (Invoice No. 7505311)** |
| 5,531.20 | **FTI fees – March 2019 (Invoice No. 7508909)** |
| 10,804.00 | **FTI fees – April 2019 (Invoice No. 7511619)** |
| 21,318.80 | **FTI fees – May 2019 (Invoice No. 7515448)** |
| 22,412.00 | **FTI fees – June 2019 (Invoice No. 7518546)** |
| 4,997.60 | **FTI fees – July 2019 (Invoice No. 7519989)** |
| 7,468.00 | **FTI fees – August 2019 (Invoice No. 7522894)** |
| 10,346.80 | **FTI fees – September 2019 (Invoice No. 7525910)** |
| 10,703.20 | **FTI fees – October 2019 (Invoice No. 7528713)** |
| 22,713.20 | **FTI fees – November 2019 (Invoice No. 7532157)** |
| 86,825.60 | **FTI fees – December 2019 (Invoice No. 7535752)** |
| 51,445.60 | **FTI fees – January 2020 (Invoice No. 7538411)** |
| 137,925.60 | **FTI fees – February 2020 (Invoice No. 7541325)** |
| 217,361.20 | **FTI fees – March 2020 (Invoice No. 7544630)** |
| 284,561.20 | **FTI fees – April 2020 (Invoice No. 7546716)** |
| 165,366.40 | **FTI fees – May 2020 (Invoice No. 7549535)** |
| 230,995.20 | **FTI fees – June 2020 (Invoice No. 7552794)** |
| 392,019.20 | **FTI fees – July 2020 (Invoice No. 7555639)** |
| 283,462.00 | **FTI fees – August 2020 (Invoice No. 7558724)** |
| 381,780.00 | **FTI fees – September 2020 (Invoice No. 7561736)** |
| 310,612.00 | **FTI fees – October 2020 (Invoice No. 7564266)** |
| 23,476.00 | **FTI fees – November 2020 (Invoice No. 7566935)** |
| 6,668.00 | **FTI fees – December 2020 (Invoice No. 7570428)** |
| 13,575.60 | **FTI fees – January 2021 (Invoice No. 7573353)** |
| 754.00 | **FTI fees – February 2021 (Invoice No. 7576189)** |
| 7,989.60 | **FTI fees – March 2021 (Invoice No. 7580037)** |
| 10,396.40 | **FTI fees – April 2021 (Invoice No. 7582378)** |
| 2,027.20 | **FTI fees – May 2021 (Invoice No. 7586222)** |
| 251.20 | **FTI fees – June 2021 (Invoice No. 7589264)** |
| 451.20 | **FTI fees – April 2022 (Invoice No. 7625181)** |
| 16,057.60 | **FTI fees – May 2022 (Invoice No. 7628936)** |
| 3,407.20 | **FTI fees – August 2022 (Invoice No. 7640024)** |
| 1,348.80 | **FTI fees – September 2022 (Invoice No. 7643861)** |
| 3,680.80 | **FTI fees – October 2022 (Invoice No.7648505)** |
| 48,462.80 | **FTI fees – November 2022 (Invoice No. 7652130)** |
| 9,272.80 | **FTI fees – December 2022 (Invoice No. 7656222)** |
| 3,262.50 | **BDO fees – December 2018 (Invoice No. 001162342)** |
| 9,776.25 | **BDO fees – January 2019 (Invoice No. 001087015)** |

| Amount | Notes |
|---:|---|
| 712.50 | **BDO fees – February 2019 (Invoice No. 001094287)** |
| 1,325.00 | **BDO fees – March 2019 (Invoice No. 001133895)** |
| 20,356.25 | **BDO fees – April 2019 (Invoice No. 001134082)** |
| 24,537.50 | **BDO fees – May 2019 (Invoice No. 001163314)** |
| 56,426.25 | **BDO fees – June 2019 (Invoice No. 001172664)** |
| 237,675.00 | **BDO fees – July 2019 (Invoice No. 001181910)** |
| 90,802.50 | **BDO fees – August 2019 (Invoice No. 001196423)** |
| 86,015.00 | **BDO fees – September 2019 (Invoice No. 001232607)** |
| 62,197.50 | **BDO fees – October 2019 (Invoice No. 001251695)** |
| 133,995.00 | **BDO fees – November 2019 (Invoice No. 001279020)** |
| 159,918.07 | **BDO fees and expenses – December 2019 (Invoice No. 001283615)** |
| 196,432.50 | **BDO fees – January 2020 (Invoice No. 001302746)** |
| 580,140.79 | **BDO fees and expenses – February 2020 (Invoice No. 001317337)** |
| 894,932.28 | **BDO fees and expenses – March 2020 (Invoice No. 001337448)** |
| 734,025.00 | **BDO fees – April 2020 (Invoice No. 001338165)** |
| 810,771.25 | **BDO fees – May 2020 (Invoice No. 001406904)** |
| 190,772.50 | **BDO fees – June 2020 (Invoice No. 001372932)** |
| 262,695.00 | **BDO fees – July 2020 (Invoice No. 001381977)** |
| 273,192.50 | **BDO fees – August 2020 (Invoice No. 001393127)** |
| 358,220.00 | **BDO fees – September 2020 (Invoice No. 001408802)** |
| 537,093.75 | **BDO fees – October 2020 (Invoice No. 001437334)** |
| 177,772.50 | **BDO fees – November 2020 (Invoice No. 001454113)** |
| 136,350.00 | **BDO fees – December 2020 (Invoice No. 001454453)** |
| 249,875.00 | **BDO fees – January 2021 (Invoice No. 001482286)** |
| 54,172.50 | **BDO fees – February 2021 (Invoice No. 001487622)** |
| 57,577.50 | **BDO fees – March 2021 (Invoice No. 001541227)** |
| 15,432.50 | **BDO fees – April 2021 (Invoice No. 001541228)** |
| 9,215.00 | **BDO fees – May 2021 (Invoice No. 001577071)** |
| 33,237.00 | **JS Held fees – June 2022 (Invoice No. 1404907)** |
| 26,871.50 | **JS Held fees – July 2022 (Invoice No. 1416523)** |
| 42,422.50 | **JS Held fees – August 2022 (Invoice No. 1429891)** |
| 9,744.00 | **JS Held fees – September 2022 (Invoice No. 1436023)** |
| 4,752.00 | **JS Held fees – October 2022 (Invoice No. 1454746)** |
| 12,649.00 | **JS Held fees – November 2022 (Invoice No. 1469234)** |
| 68,096.00 | **JS Held fees – December 2022 (Invoice No. 1488617)** |
| 2,204.45 | **Baker Botts expenses – April 2018 (Invoice No. 1599233)** |
| 250.82 | **Baker Botts expenses – September 2018 (Invoice No. 1620841)** |
| 94.72 | **Baker Botts expenses – October 2018 (Invoice No. 1628260)** |
| 2,491.53 | **Baker Botts expenses – November 2018 (Invoice No. 1629635)** |
| 2,351.11 | **Baker Botts expenses – January 2019 (Invoice No. 1634792)** |

| Amount | Notes |
|---:|---|
| 2,059.00 | **Baker Botts expenses – March 2019 (Invoice No. 1645041)** |
| 21,470.83 | **Baker Botts expenses – April 2019 (Invoice No. 1650669)** |
| 28,883.65 | **Baker Botts expenses – May 2019 (Invoice No. 1653747)** |
| 36,959.10 | **Baker Botts expenses – June 2019 (Invoice No. 1656707)** |
| 108,924.90 | **Baker Botts expenses – July 2019 (Invoice No. 1661796)** |
| 127,695.52 | **Baker Botts expenses – August 2019 (Invoice No. 1666662)** |
| 86,280.44 | **Baker Botts expenses – September 2019 (Invoice No. 1671446)** |
| 64,695.98 | **Baker Botts expenses – October 2019 (Invoice No. 1674607)** |
| 67,741.05 | **Baker Botts expenses – November 2019 (Invoice No. 1681337)** |
| 76,889.78 | **Baker Botts expenses – December 2019 (Invoice No. 1684626)** |
| 87,846.74 | **Baker Botts expenses – January 2020 (Invoice No. 1688050)** |
| 105,978.74 | **Baker Botts expenses – February 2020 (Invoice No. 1690270)** |
| 90,502.13 | **Baker Botts expenses –March 2020 (Invoice No. 1697398)** |
| 115,606.50 | **Baker Botts expenses – April 2020 (Invoice No. 1698767)** |
| 102,571.50 | **Baker Botts expenses – May 2020 (Invoice No. 1705148)** |
| 126,539.25 | **Baker Botts expenses – June 2020 (Invoice No. 1709866)** |
| 132,780.86 | **Baker Botts expenses – July 2020 (Invoice No. 1711821)** |
| 82,434.40 | **Baker Botts expenses – August 2020 (Invoice No. 1717394)** |
| 73,797.64 | **Baker Botts expenses – September 2020 (Invoice No. 1721749)** |
| 74,792.20 | **Baker Botts expenses – October 2020 (Invoice No. 1726397)** |
| 70,897.05 | **Baker Botts expenses – November 2020 (Invoice No. 1730323)** |
| 67,007.29 | **Baker Botts expenses – December 2020 (Invoice No. 1732893)** |
| 73,905.23 | **Baker Botts expenses – January 2021 (Invoice No. 1736544)** |
| 71,860.52 | **Baker Botts expenses – February 2021 (Invoice No. 1740251)** |
| 74,717.00 | **Baker Botts expenses – March 2021 (Invoice No. 1745510)** |
| 65,765.60 | **Baker Botts expenses – April 2021 (Invoice No. 1748097)** |
| 51,748.00 | **Baker Botts expenses – May 2021 (Invoice No. 1754075)** |
| 48,163.20 | **Baker Botts expenses – June 2021 (Invoice No. 1756439)** |
| 47,321.70 | **Baker Botts expenses – July 2021 (Invoice No. 16000288)** |
| 45,221.70 | **Baker Botts expenses – August 2021 (Invoice No. 16000275)** |
| 43,778.87 | **Baker Botts expenses – September 2021 (Invoice No. 16000736)** |
| 42,161.70 | **Baker Botts expenses – October 2021 (Invoice No. 16000738)** |
| 41,981.70 | **Baker Botts expenses – November 2021 (Invoice No. 16000743)** |
| 40,901.70 | **Baker Botts expenses – December 2021 (Invoice No. 16000744)** |
| 40,901.70 | **Baker Botts expenses – January 2022 (Invoice No. 16001112)** |
| 41,684.25 | **Baker Botts expenses – February 2022 (Invoice No. 16001113)** |
| 42,210.17 | **Baker Botts expenses – March 2022 (Invoice No. 16001114)** |
| 42,819.36 | **Baker Botts expenses – April 2022 (Invoice No. 16001367)** |
| 43,391.43 | **Baker Botts expenses – May 2022 (Invoice No. 16001368)** |
| 41,739.35 | **Baker Botts expenses – June 2022 (Invoice No. 16001369)** |

| Amount | Notes |
|---|---|
| 43,728.00 | **Baker Botts expenses – July 2022 (Invoice No. 16001655)** |
| 45,130.04 | **Baker Botts expenses – August 2022 (Invoice No. 16001656)** |
| 63,030.70 | **Baker Botts expenses – September 2022 (Invoice No. 16001657)** |
| 47,219.00 | **Baker Botts expenses – October 2022 (Invoice No. 16001999)** |
| 47,479.01 | **Baker Botts expenses – November 2022 (Invoice No. 16002000)** |
| 118,373.14 | **Baker Botts expenses – December 2022** |
| $14,260,552.19 | **Total** |

6.      Using the 20% allocation noted above for these fees and expenses, TD is allocated $2,852,110.44.

7.      The following table presents fees and expenses that are 33% allocable to TD, based on the above-described allocation methodology.

| Amount | Notes |
|---|---|
| 102,849.90 | **JS Held fees and expenses – January 2023 (Invoice No. 1496928)** |
| 142,531.20 | **FTI fees – January 2023 (Invoice No. 7659691)** |
| 88,907.26 | **Friedman Kaplan Seiler & Adelman LLP expenses – October 2019 (No Invoice No.)** |
| 24,968.45 | **Friedman Kaplan Seiler & Adelman LLP expenses – November 2019-December 2019 (No Invoice No.)** |
| 19,189.08 | **Friedman Kaplan Seiler & Adelman LLP expenses – January 2020-June 2020 (No Invoice No.)** |
| 1,776.45 | **Friedman Kaplan Seiler & Adelman LLP expenses – October 2020-December 2020 (No Invoice No.)** |
| 1,484.54 | **Friedman Kaplan Seiler & Adelman LLP expenses – December 2020-February 2020 (No Invoice No.)** |
| 29,194.96 | **Friedman Kaplan Seiler & Adelman LLP expenses – March 2021-October 2021 (No Invoice No.)** |
| 8,506.45 | **Friedman Kaplan Seiler & Adelman LLP expenses – March 2022 (No Invoice No.)** |
| 1,661.69 | **Friedman Kaplan Seiler & Adelman LLP expenses – May 2022 (No Invoice No.)** |
| 571.80 | **Friedman Kaplan Seiler & Adelman LLP expenses – July 2022 (No Invoice No.)** |
| 1,370.43 | **Friedman Kaplan Seiler & Adelman LLP expenses – August 2022 (No Invoice No.)** |
| 5,882.98 | **Friedman Kaplan Seiler & Adelman LLP expenses – August 2022 (No Invoice No.)** |

| Amount | Notes |
|---|---|
| 1,470.40 | **Friedman Kaplan Seiler & Adelman LLP expenses – August 2022 (No Invoice No.)** |
| 21,775.00 | **James C. Spindler fees – January 2023 (No Invoice No.)** |
| 79,625.00 | **James C. Spindler fees – February 2023 (No Invoice No.)** |
| 9,248.85 | **Array expenses - February 2023 (Invoice No. X63454)** |
| 2,476.54 | **Exact Legal expenses – January 2023 (Invoice No. 10320)** |
| 2,006.95 | **IMS Consulting & Expert Services (Jason Barnes) expenses – December 2022 (Invoice No. 3947)** |
| 21,514.09 | **IMS Consulting & Expert Services (Jason Barnes) expenses – January 2023 (Invoice No. 4462)** |
| 2,712.00 | **JAMS/Robert Meyer expenses - March 2023** |
| 5,917.16 | **Marriott Cancellation Charges - February 2023 (No Invoice No.)** |
| 647.35 | **Mayra Malone, Court Reporter (Invoice No. 2023-023)** |
| 4,531.67 | **Protiviti expenses - February 2023 (Invoice No. 200648824)** |
| 334.43 | **Protiviti expenses - February 2023 (Invoice No. 200648825)** |
| 23.99 | **Protiviti expenses - February 2023 (Invoice No. 200648826)** |
| 188,444.02 | **IMS Consulting & Expert Services (Jason Barnes) expenses – February 2023 (Invoice No. 4782)** |
| 173,110.91 | **JS Held fees – February 2023 (Invoice No. 1503870)** |
| 85,827.70 | **Baker Botts expenses – January 2023** |
| 89,595.79 | **Baker Botts expenses – February 2023** |
| 36,656.80 | **FTI fees – February 2023** |
| 39,511.60 | **CSI Litigation Psychology LLC expenses – February 2023** |
| $1,194,325.44 | **Total** |

8.      Using the 33% allocation noted above for these fees and expenses, TD Bank is allocated $398,108.48.

9.      The following table presents fees and expenses that are 100% allocable to TD Bank, based on the above-described allocation methodology.

| Amount | Notes |
|---|---|
| 14,227.89 | **White Collar Consultants & Investigative Group Inc. fees and expenses – November 2019-December 2019  (No Invoice No.)** |
| 9,900.00 | **White Collar Consultants & Investigative Group Inc. fees – December 2019-January 2020 (Invoice No. 2020/12008)** |
| 6,800.00 | **White Collar Consultants & Investigative Group Inc. fees – February 2020  (Invoice No. 2020/12011)** |
| 4,500.00 | **White Collar Consultants & Investigative Group Inc. fees – March 2020 (Invoice No. 2020/12021)** |

| Amount | Notes |
|---:|---|
| 1,700.00 | **White Collar Consultants & Investigative Group Inc. fees – April 2020 (Invoice No. 2020/12028)** |
| 825.00 | **White Collar Consultants & Investigative Group Inc. fees – December 2020  (Invoice No. 2020/12060)** |
| 1,200.00 | **IMS Expert Services - Nicolas Burbidge fees – November 2019 (Invoice No. 39529)** |
| 23,600.00 | **IMS Expert Services - Nicolas Burbidge fees – December 2019 (Invoice No. 39747)** |
| 15,600.00 | **IMS Expert Services - Nicolas Burbidge fees – January 2020 (Invoice No. 40082)** |
| 10,800.00 | **IMS Expert Services - Nicolas Burbidge fees – February 2020 (Invoice No. 40425)** |
| 9,200.00 | **IMS Expert Services - Nicolas Burbidge fees – March 2020 (Invoice No. 40707)** |
| 3,000.00 | **IMS Expert Services - Nicolas Burbidge fees – April 2020 (Invoice No. 41034)** |
| 12,050.00 | **IMS Expert Services - Nicolas Burbidge fees – May 2020 (Invoice No. 41240)** |
| 2,000.00 | **IMS Expert Services - Nicolas Burbidge fees – September 2020 (Invoice No. 42431)** |
| 4,150.00 | **IMS Expert Services - Nicolas Burbidge fees – October 2020 (Invoice No. 42746)** |
| 9,200.00 | **IMS Expert Services - Nicolas Burbidge fees – November 2020 (Invoice No. 43032)** |
| 7,650.00 | **IMS Expert Services - Nicolas Burbidge fees – January 2023 (Invoice No. 04323)** |
| 1,600.00 | **IMS Expert Services - Nicolas Burbidge fees – February 2023 (Invoice No. 04631)** |
| 21,543.91 | **Babin Bessner Spry (TD) fees and expenses – September 2019 (Invoice No. 4701)** |
| 8,357.58 | **Babin Bessner Spry (AML) fees and expenses – October 2019-November 2019 (Invoice No. 4832)** |
| 3,757.43 | **Babin Bessner Spry (AML) fees and expenses – December 2019 (Invoice No. 4881)** |
| 13,678.47 | **Babin Bessner Spry (TD) fees and expenses – December 2019 (Invoice No. 4834)** |
| 1,119.55 | **Babin Bessner Spry (AML) fees and expenses – January 2020 (Invoice No. 5081)** |
| 1,668.21 | **Babin Bessner Spry (AML) fees and expenses – February 2020 (Invoice No. 5057)** |
| 5,434.30 | **Babin Bessner Spry (TD) fees and expenses – February 2020 (Invoice No. 5064)** |
| 2,266.48 | **Babin Bessner Spry (AML) fees and expenses – April 2020 (Invoice No. 5152)** |

| Amount | Notes |
|---:|---|
| 561.58 | **Babin Bessner Spry (AML) fees and expenses – August 2020 (Invoice No. 5347)** |
| 3,980.54 | **Babin Bessner Spry (AML) fees and expenses – January 2021 (Invoice No. 5644)** |
| 2,398.21 | **Babin Bessner Spry (AML) fees and expenses – February 2021 (Invoice No. 5708)** |
| 656.21 | **Babin Bessner Spry (AML) fees and expenses – March 2021 (Invoice No. 5827)** |
| 1,295.83 | **Babin Bessner Spry (AML) fees and expenses – April 2021 (Invoice No. 5963)** |
| 204,721.19 | |

10.     Using the 100% allocation noted above for these fees and expenses, TD Bank is allocated $204,721.19.

11.     The total amount of expenses allocated to TD Bank—from the 20%, 33%, and 100% categories noted above—is $3,454,940.11.

Executed on March 8, 2023

_____
Scott D. Powers

# **Exhibit 5**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 3:09-cv-00298-N |
| STANFORD INTERNATIONAL BANK, LTD, *et al.*, | |
| Defendants. | |

## <u>ORDER APPROVING ATTORNEYS' FEES</u>

Before the Court is the Movants' Expedited Request for Entry of Scheduling Order and Motion to Approve Proposed Settlement with The Toronto-Dominion Bank ("TD Bank"), to Approve the Proposed Notice of Settlement with TD Bank, to Enter the Bar Order, and for Plaintiffs' Attorneys' Fees and Expenses (the "Motion") of the Receiver and the Official Stanford Investors Committee (the "Committee") (the Receiver and the Committee, collectively, the "Movants"). This Order addresses the request for approval of Plaintiffs' Counsel's (as defined in the Motion) attorneys' fees contained within the Motion. All relief requested in the Motion, other than the request for approval of attorneys' fees, was addressed in the Court's Final Bar Order entered on the same date.

Having considered the Motion, the Declarations submitted in support of the Motion, the arguments and the applicable legal authorities, the Court finds that the Movants' request for approval of attorneys' fees contained within the Motion should be granted. The Court finds that

the requested $100 million fee (representing approximately 8.3% of the net recovery) is reasonable and consistent with the percentage charged and approved by courts in other cases of this magnitude and complexity. The Stanford Receivership and the litigation are extraordinarily complex and time-consuming and have involved a great deal of risk and capital investment by Plaintiffs' Counsel as evidenced by the Declarations of Plaintiffs' Counsel submitted in support of the request for approval of their fees. The Motion and the Declarations provide ample evidentiary support for the award of Plaintiffs' Counsel's attorneys' fees set forth in this Order.

Trial courts can determine attorneys' fee awards in common fund cases such as this one using different methods. The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr. S.D. Tex. Apr. 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

One method for analyzing the appropriateness of an award for plaintiffs' attorneys' fees is the percentage method, under which the court awards fees based on a percentage of the common fund. *Union Asset Management Holding A.G. v. Dell, Inc*., 669 F.3d 632, 642-43 (5th Cir. 2012). The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable." *Id*. at 643 (citing *Johnson v. Georgia Hwy. Express, Inc*, 488 F.2d 714 (5th Cir. 1974)). The *Johnson* factors include: (1) time and labor required; (2) novelty and difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the "undesirability" of the case; (11) the nature and length of the professional

**App. 128**

relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.

Thus, when considering fee awards in class action cases "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check." *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K (lead case), 2005 WL 3148350, at \*25 (N.D. Tex. Nov. 8, 2005) (collecting cases). While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and district courts in the Northern District have recognized that the percentage method is the preferred method of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at \*25.

In *Schwartz*, the court observed that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at \*25. The court also observed that, because it is calculated based on the number of attorney-hours spent on the case, the lodestar method deters early settlement of disputes. *Id.* Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery." *Id.* at \*26.

While the TD Bank Settlement is not a class action settlement, because the settlement is structured as a settlement with the Receiver and the Committee, and as a bar order precluding other litigation against TD Bank arising from Stanford, this Court has analyzed the award of attorneys' fees to Plaintiffs' Counsel under both the common fund and the *Johnson* approach. Whether analyzed under the common fund approach, the Johnson framework, or both, the $100 million fee sought by Plaintiffs' Counsel is reasonable and is hereby approved by the Court. The $100 million fee proposed by Plaintiffs' Counsel also represents a substantial discount from its contracted rate of 25%. Having reviewed the Declarations of Plaintiffs' Counsel reflecting the investment of

**App. 129**

thousands of hours and millions of dollars of attorney time by Plaintiffs' Counsel in the Stanford Receivership as a whole and in the TD Bank litigation specifically, the Court finds that the proposed $100 million fee for Plaintiffs' Counsel represents a reasonable percentage of the common fund (*i.e.* the $1.205 billion settlement).

"The vast majority of Texas federal courts and courts in this District have awarded fees of 25%-33% in securities class actions." *Schwartz*, 2005 WL 3148350, at *31 (collecting cases). "Indeed, courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the-recovery method." *Id.*

The Court further finds that the fee is reasonable based upon the Court's analysis of the *Johnson* factors. A review of the *Johnson* factors that are discussed at length in the Motion and supported by Plaintiffs' Counsel's Declarations also demonstrates that the proposed $100 million fee is reasonable and should be approved. With respect to the time and labor required, Plaintiffs' Counsel invested a tremendous amount of time and labor in this case as reflected in the Morgenstern and Berman Declarations filed in support of the Motion. Through December 31, 2022, Mr. Morgenstern's firm Butzel Long, a professional corporation ("Butzel Long"), spent over **21,900 hours** of attorney time, worth approximately **$14.3 million at Butzel Long's applicable hourly rates for complex cases of this nature,** on the litigation against TD Bank and its co-defendants and uncompensated time in related litigations and OSIC activities that supported this litigation and this successful settlement  [Morgenstern Decl., at ¶ 30], while Mr. Berman's firm, Friedman Kaplan Seiler Adelman & Robbins LLP ("Friedman Kaplan") spent 24,131 hours of attorney time, worth over **$16.6 million at Friedman Kaplan's applicable hourly rates for complex cases of this nature,** in the litigation against TD Bank and its co-defendants. *See* Berman Decl., at ¶ 35.

**App. 130**

The issues presented in the litigation were novel, difficult and complex. Several of the complex legal and factual issues are outlined in the Motion. Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution and settlement of this case required significant skill and effort on the part of Plaintiffs' Counsel.

Although participation in the litigation did not necessarily preclude Plaintiffs' Counsel from accepting other employment, the Declarations reveal that the sheer amount of time and resources involved in investigating, preparing, and prosecuting the litigation, as reflected by the hours invested by Plaintiffs' Counsel, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters.

The discounted $100 million fee requested (representing approximately 8.3% of the net recovery) is also substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude. See *Schwartz,* 2005 WL 3148350, at *31 (collecting cases and noting that 30% is standard fee in complex securities cases). "Attorney fees awarded under the percentage method are often between 25% and 30% of the fund." *Klein*, 705 F. Supp. 2d at 675-81 (30% fee for a $110 million settlement, (citing Manual for Complex Litig. (Fourth) § 14.121 (2010)); *see, e.g., SEC v. Temme*, No. 4:11-cv-00655-ALM, at *4-5 (E.D. Tex. November 21, 2012), ECF No. 162 (25% contingent fee for a $1,335,000 receivership settlement); *Billitteri v. Sec. Am., Inc*., No. 3:09-cv-01568-F (lead case), 2011 WL 3585983, *4-9 (N.D. Tex. 2011) (25% fee for an $80 million settlement).

At the time of the TD Bank Settlement, Plaintiffs' Counsel were subject to significant time limitation in the litigation, as Plaintiffs' Counsel were preparing the case against TD Bank and other banks for trial. Given the breadth and scope of activity in the TD Bank litigation as described in the Declarations of Plaintiffs' Counsel, including extensive document production and review,

**App. 131**

numerous fact and expert witness depositions, and the preparation of briefs in response to comprehensive motions for summary judgment and *Daubert* motions to exclude the Committee's experts and preparation of trial pleadings and materials, Plaintiffs' Counsel has been consistently under deadlines and time pressure in the litigation against TD Bank.

As set forth in the Declarations, the litigation against TD Bank and its co-defendants has consumed a substantial portion of Plaintiffs' Counsel's time over the last several years. The $1.205 billion to be paid by TD Bank represents a substantial settlement and value to the Receivership Estate and the Stanford investors. Thus, the amount involved and results obtained also support approval of the requested fee. The Declarations of Plaintiffs' Counsel further reflect that Plaintiffs' Counsel have represented numerous receivers, bankruptcy trustees, and other parties in complex litigation matters related to equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding. Plaintiffs' Counsel have also been actively engaged in the Stanford proceeding since its inception. Thus, the attorneys' experience, reputation and ability also support the fee award. Given the complexity of the issues in the TD Bank litigation, the TD Bank Settlement is indicative of Plaintiffs' Counsel's abilities to obtain favorable results in these proceedings.

The nature and length of Plaintiffs' Counsel's professional relationship with the client also supports the fee award. Butzel Long has represented the Receiver, the Committee, and investor plaintiffs in numerous actions pending before the Court in connection with the Stanford Receivership since 2009, all on a significantly larger 25% contingency fee arrangement, and Friedman Kaplan has represented the Committee in litigation against TD Bank and other banks since 2011. Finally, awards in similar cases, with which this Court is familiar, as well as those discussed in the *Schwarz* opinion, all support the fee award. A substantially larger 25%

6

contingency fee has also previously been approved as reasonable by this Court in its order approving the Receiver's agreement with the Committee regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and the Committee (the "OSIC-Receiver Agreement"). *See* SEC Action ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement SEC Action ECF No. 1208, Ex. A, p. 3 (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by the Committee's designated professionals). This Court has also approved 25% contingency fees in connection with the Court's approval of the settlement of the other cases brought by the Receiver and/or the Committee against the law firms Greenberg Traurig, Adams & Reese, Chadbourne & Park, Hunton & Williams and Proskauer Rose, as well as the settlements with BDO, Kroll, and Bowen Mclette & Britt ('BMB"). *See* Order approving attorneys' fees in connection with the Adams & Reese settlement [SEC Action ECF. No. 2231]; Order approving attorneys' fees in connection with the Chadbourne & Parke settlement [SEC Action ECF 2366]; Order approving attorneys' fees in connection with the Hunton settlement [SEC Action ECF No. 2702]; and Order approving attorneys' fees in connection with the Proskauer settlement [SEC Action ECF No. 2820]; *see also Official Stanford Inv'rs Comm. v. BDO USA, LLP*, No. 3:12-cv01447-N-BG (N.D. Tex. Sept. 23, 2015) [ECF No. 80] (order approving 25% contingency fee in connection with BDO settlement); Order approving attorneys' fees for Kroll settlement [SEC Action, ECF No. 2364]; and Order approving attorneys' fees for BMB settlement [SEC Action, ECF No. 2567].

For these reasons, the Court finds the $100 million fee requested in connection with the TD Bank Settlement is well within the range of reasonableness for cases of the magnitude and complexity as the TD Bank litigation. The Court therefore hereby approves the award of attorneys' fees to Plaintiffs' Counsel in the amount of **$100,000,000.00** as requested in the Motion. The Court

also hereby authorizes the Receiver to reimburse the Receivership Estate from the settlement proceeds the total sum of **$3,454,940.11** for expenses advanced by the Receiver in the TD Bank litigation.

The Receiver is, therefore: ORDERED to pay Plaintiffs' Counsel attorneys' fees in the amount of **$100,000,000.00** upon receipt of the Settlement Amount in accordance with the terms of the TD Bank Settlement Agreement.

IT IS FURTHER ORDERED that the Receiver shall reimburse expenses paid by the Receivership Estate from the settlement proceeds in the amount of **$3,454,940.11**.

Signed on _____, 2023

_____
DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

# Exhibit 6

## DECLARATION OF EXAMINER JOHN J. LITTLE

Pursuant to 28 U.S.C. § 1746, I, John J. Little, hereby declare under penalty of perjury that I have personal knowledge of the following facts:

1.     My name is John J. Little.  I am over the age of eighteen (18) and am competent to make this Declaration.

2.     I am admitted to practice law in the State of Texas, and am admitted to practice before various federal courts, including the United States Supreme Court, the U.S. Court of Appeal for the Fifth Circuit, the United States Tax Court and the U.S. District Courts for the Northern and Eastern Districts of Texas.  I have been practicing law in Dallas, Texas since 1983.  From 1983 until January 1991, I was employed by Hughes & Luce, LLP (n/k/a K&L Gates, LLP) and was a partner in that firm from January 1991 until January 1994.  I was one of the founding partners of the Dallas law firm Little Pedersen Fankhauser, LLP, in January 1994 and practiced with that firm until its closure in August 2020.  I formed John J. Little Law, PLLC and have practiced with that firm since September 1, 2020.

3.     By Order dated April 20, 2009, I was appointed by Judge David C. Godbey (the "Court") to serve as the Examiner in the Stanford Financial Group receivership proceedings.  *SEC v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-0298-N (the "SEC Action"), ECF No. 322 (the "Examiner Order").  Pursuant to the Examiner Order, I was directed to "convey to the Court such information as the Examiner, in his sole discretion, shall determine would be useful to the Court in considering the interests of the investors in any financial products, accounts, vehicles or ventures

sponsored, promoted or sold by any Defendants[1] in this action (the "Investors")."

4.      By Order dated August 10, 2010, the Court created the Official Stanford Investors Committee (the "OSIC") to represent Stanford Investors in the Stanford Financial Receivership proceedings and all related matters.  SEC Action, ECF No. 1149 (the "OSIC Order").  The OSIC Order defined "Stanford Investors" as "the customers of SIBL who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL."  OSIC Order at 2.  The OSIC Order conferred upon the OSIC "rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case."  The OSIC Order appointed me, as Examiner, to serve as a member of the OSIC and as its initial Chair.  I have served as the Chair of the OSIC since its formation and continue to so serve.

5.      The OSIC Order specifically contemplated that the OSIC would cooperate with the Receiver, Ralph Janvey, "in the identification and prosecution of actions and proceedings for the benefit of the Receivership Estate and the Stanford Investors."  OSIC Order at 6.  Through a series of assignments, the Receiver assigned to the OSIC all claims that the Receivership had against certain banks, including SG Private Banking (Suisse) S.A. ("SG Suisse"), Trustmark National Bank ("TM"), The Toronto-Dominion Bank ("TD

---

[1]      The Defendants include Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, The Stanford Financial Group Bldg. Inc.  The Receivership encompasses Defendants and all entities they own or control.

**DECLARATION OF EXAMINER JOHN J. LITTLE**

2

Bank"), Independent Bank ("Independent"), and HSBC Bank PLC ("HSBC") (collectively, the "Bank defendants").

### A.    OSIC Retains Counsel

6.    In my capacity as Chair of the OSIC, I negotiated and executed a fee agreement dated December 12, 2012, pursuant to which the OSIC retained Butzel Long, P.C. ("BL") and Friedman Kaplan Seiler & Adelman LLP ("FK")[2] to represent the OSIC in connection with the prosecution of claims against TM, TD Bank, Independent, HSBC and SG Suisse.  The December 12, 2012 engagement agreement contemplated that the two law firms would be compensated for their services through a contingent fee of twenty-five percent (25%) of the Net Recovery realized in respect of any claims asserted against the five banks identified in the December 12, 2012 engagement agreement.

7.    In my capacity as Chair of the OSIC, I negotiated and executed a revised fee agreement dated April 15, 2014, with BL and FK concerning their representation of the OSIC in connection with the prosecution of claims against TM, TD Bank, Independent, HSBC and SG Suisse.  The April 15, 2014 revised fee agreement contemplated that the two law firms would be compensated for their services through a contingent fee of twenty-five percent (25%) of the Net Recovery realized in respect of the any claims asserted against TM, TD Bank, Independent, HSBC and SG Suisse.

---

[2]    FK has recently changed its name to Friedman Kaplan Seiler Adelman & Robbins, LLP. *See Rotstain* ECF No. 1402.

8.    In my capacity as Chair of the OSIC, I negotiated and executed two additional agreements dated as of October 1, 2019, concerning the OSIC's prosecution of claims against TM, TD Bank, Independent, HSBC and SG Suisse.

9.    The first was a Fee Agreement Regarding Claims against Trustmark National Bank and Independent Bank pursuant to which the OSIC retained the services of Castillo Snyder P.C. ("CS")[3] and Fishman Haygood, LLP ("FH") to represent the OSIC in the prosecution of claims asserted against TM and Independent.  The October 1, 2019 fee agreement contemplated that CS and FH would be compensated for their services through a contingent fee of twenty-five percent (25%) of the Net Recovery realized in respect of the claims asserted against TM and Independent.  The Fee Agreement Regarding Claims against Trustmark National Bank and Independent Bank was acknowledged by the Receiver, Ralph Janvey, and by BL and FK.

10.    The second was a Joint Prosecution Agreement entered into by BL, FK, CS and FH.  In the Joint Prosecution Agreement, the four law firms addressed how those firms would divide the work to be done in prosecuting the claims asserted against TM, TD Bank, Independent, HSBC and SG Suisse and any fees paid with respect to any Net Recovery realized in respect of such claims.  In particular, the four law firms agreed that CS and FH would be compensated for their services solely from the Net Recovery realized in respect

---

[3]    It is my understanding that Castillo Snyder, P.C. is winding up its existence and that Castillo Snyder, P.C. has assigned, or will assign, all of its rights and obligations with respect to its representation of the OSIC to Edward C. Snyder Attorney at Law, PLLC.

DECLARATION OF EXAMINER JOHN J. LITTLE

4

**App. 139**

of the claims asserted by the OSIC against TM and Independent, and that BL and FK would be compensated for their services solely from the Net Recovery realized in respect of the claims asserted by the OSIC against TD Bank, HSBC and SG Suisse.  Both the Receiver and I executed the Joint Prosecution Agreement to acknowledge its terms.

11.    In February 2022, I negotiated and executed an additional Engagement Agreement for the case against the Bank defendants pursuant to which the OSIC retained the services of Baker Botts, LLP ("BB") as special trial counsel with respect to the OSIC's claims against TM, Independent, TD Bank, HSBC and SG Suisse.  The OSIC's agreement with BB made clear that it was "not intended to alter or amend" the existing engagement agreements between the OSIC and BL, FK, CS and/or FH.  The OSIC's agreement with BB also made clear that BB's work for the OSIC would be billed on an hourly basis and would be submitted for approval by the Receiver as a part of the Receiver's periodic fee applications.  The OSIC's engagement agreement with BB was effective as of February 25, 2022 when it was executed by me, in my capacity as Chair of the OSIC, by BB, and by the Receiver.

### B.    Pleadings in the *Rotstain* Action and Related Matters

12.    On August 23, 2009, Guthrie Abbott, Steven Queyrouze, Peggy Roif Rotstain, Juan Olano, Catherine Burnell, and Jaime Alexis Arroyo Bornstein (the latter four of whom were replaced by substitute plaintiffs Sarah Elson-Rogers, Salim Estefenn Uribe, Ruth Alfille de Penhos, and Diana Suarez on May 1, 2015, *Rotstain* ECF No. 237) (the "*Rotstain* Investor Plaintiffs") filed their Original Petition in the state district court of Harris County, Texas (*Rotstain* ECF No. 1-4) commencing a putative class action

captioned *Rotstain v. Trustmark National Bank, et al.* and naming as defendants TM, HSBC, TD Bank, SG Suisse and Independent (the "*Rotstain* Action"). The Original Petition asserted claims for fraudulent transfer, conspiracy to commit fraud, and aiding and abetting fraud. *Rotstain* ECF No. 1-4.

13.    The *Rotstain* Action was removed to the U.S. District Court for the Southern District of Texas (the "Transferor Court") on November 13, 2009. *Rotstain* ECF No. 1. It was then transferred to and consolidated with the Stanford Multidistrict Litigation proceeding in the U.S. District Court of the Northern District of Texas under Civil Action No. 3:09-cv-02384. *Rotstain* ECF No. 6.

14.    The Receiver assigned to the OSIC any and all causes of action the Receivership Estate may have had against TD Bank and the other Bank defendants on January 4, 2011. *Rotstain* ECF No. 865, Ex. 10.

15.    The OSIC filed a motion to intervene in the *Rotstain* Action on December 5, 2011. *Rotstain* ECF No. 96. The Court entered its Order granting the OSIC leave to intervene on December 6, 2012. *Rotstain* ECF No. 129. The OSIC filed its Intervenor Complaint against TD Bank, TM, HSBC and Independent on February 15, 2013. *Rotstain* ECF No. 133.[4]

16.    The *Rotstain* Investor Plaintiffs filed their Second Amended Class Action Complaint against TD Bank and other defendants seeking actual damages, costs, and attorneys' fees on November 15, 2015. *Rotstain* ECF No. 350. That Second Amended

---

[4]    On December 14, 2012, the OSIC filed a separate Intervenor Complaint against SG Suisse and Blaise Friedli, an employee of SG Suisse.

**DECLARATION OF EXAMINER JOHN J. LITTLE**

6

Class Action Complaint is the *Rotstain* Investor Plaintiffs' live pleading against TD Bank in the *Rotstain* Action.

17.    On November 7, 2017, the Court denied the *Rotstain* Investor Plaintiffs' motion for class certification. *Rotstain* ECF No. 428. The U.S. Court of Appeals for the Fifth Circuit later declined interlocutory review of that denial. *Rotstain, et al., v. Trustmark National Bank, et al.*, No. 17-90038 (5th Cir.) (Order, April 20, 2018).

18.    Following the denial of the motion for class certification, hundreds of Stanford CD Investors, and putative class members, sought to intervene in the *Rotstain* Action. *See Rotstain* ECF No. 492. The Court entered its Order denying leave to intervene on September 18, 2019. *Rotstain* ECF No. 562.

19.    The denial of the motion for leave to intervene caused a large number of Stanford CD Investors to file a separate action against TD Bank and other defendants in the state district court of Harris County, Texas, styled *Smith v. Independent Bank, et al.*, (the "*Smith* Action"). The *Smith* Action was removed to the U.S. District Court for the Southern District of Texas and assigned Civil Action No. 4:20-cv-00675. *Smith* ECF No. 1. The *Smith* Action was stayed without opposition from the *Smith* investor plaintiffs in accordance with an order issued in the main SEC Action. *Smith* ECF No. 10.

20.    Other would-be intervenors sought immediate review of the denied motions to intervene in the U.S. Court of Appeals for the Fifth Circuit. *Rotstain* ECF No. 574. On February 3, 2021, the Fifth Circuit affirmed this Court's denial of the motion to intervene. *Rotstain v. Mendez*, 986 F.3d 931 (5th Cir. 2021).

21.    On June 15, 2020, the OSIC filed its Second Amended Intervenor Complaint against TD Bank seeking actual damages, punitive damages, costs and attorneys' fees. *Rotstain* ECF No. 735.  The Second Intervenor Complaint is the OSIC's live pleading against TD in the *Rotstain* Action.

22.    The OSIC and the *Rotstain* Investor Plaintiffs filed a notice on March 19, 2021 abandoning all of their respective claims against TD Bank with the exception of (a) their claims for aiding, abetting or participation in violations of the Texas Securities Act ("TSA"), (b) their claims for knowing participation in breaches of fiduciary duty, and (c) their claims to recover fraudulent transfers pursuant to the Texas Uniform Fraudulent Transfer Act ("TUFTA").  *Rotstain* ECF No. 976.

23.    Those remaining claims were set for trial in the Transferor Court beginning on February 27, 2023.

### C.    Efforts to Obtain Class Certification

24.    On March 2, 2015, the Court entered its Class Certification Scheduling Order, *Rotstain* ECF No. 228, pursuant to which the Court established a schedule for discovering and briefing the *Rotstain* Investor Plaintiffs' motion for class certification, and staying all other discovery in the *Rotstain* Action.

25.    As a part of the class certification discovery process, each of the *Rotstain* Investor Plaintiffs was deposed by counsel for the Bank defendants, including TD Bank.

26.    The *Rotstain* Investor Plaintiffs' Motion for Class Certification, *Rotstain* ECF No. 364, was supported by a brief, *Rotstain* ECF No. 364-1, and an extensive appendix, *Rotstain* ECF Nos. 364-2 through 364-20.  The *Rotstain* Investor Plaintiffs' reply

in support of their Motion for Class Certification, *Rotstain* ECF No. 365, was similarly supported by an extensive appendix, *Rotstain* ECF Nos. 365-2 through 365-20.

### D.    Dispositive Motions Involving TD Bank

27.    Throughout the course of the *Rotstain* Action, TD Bank has filed multiple motions to dismiss or for summary judgment.  Generally speaking, TD Bank was joined by some or all of the other Bank defendants in every round of dispositive motion practice such that the *Rotstain* Investor Plaintiffs and/or the OSIC were responding to multiple motions to dismiss and/or motions for summary judgment at the same time.

28.    TD Bank filed its first motion to dismiss on May 26, 2010.  *Rotstain* ECF Nos. 31, 34.  The *Rotstain* Investor Plaintiffs responded to that first motion to dismiss (and motions to dismiss filed by other Bank defendants) on December 5, 2011, *Rotstain* ECF No. 94, and TD Bank filed a reply brief on December 22, 2011.  *Rotstain* ECF No. 100.

29.    TD Bank filed a motion to dismiss the OSIC's Intervenor Complaint on July 10, 2013.  *Rotstain* ECF Nos. 159.  The OSIC responded to that motion to dismiss on October 25, 2013, *Rotstain* ECF Nos. 166-167, and TD Bank filed its reply on December 4, 2013.  *Rotstain* ECF No. 172.

30.    On April 21, 2015, the Court entered its Order granting in part and denying in part the motions to dismiss filed by TD Bank and others.  *Rotstain* ECF No. 234.  While the Court dismissed certain fraudulent transfer claims asserted by the *Rotstain* Investor Plaintiffs and by the OSIC, it denied TD Bank's motions in all other respects.

31.    On July 14, 2015, TD Bank (and Independent) filed a motion to dismiss the *Rotstain* Investor Plaintiff's Second Amended Class Complaint.  *Rotstain* ECF Nos. 296-

297.  The *Rotstain* Investor Plaintiffs filed a response to that motion (and to similar motions filed by other Bank defendants).  *Rotstain* ECF No. 304.  TD Bank (and Independent) filed a reply in support of the motion on August 18, 2015.  *Rotstain* ECF No. 309.

32.    On April 22, 2016, TD Bank (and the other Bank defendants) filed a motion to reconsider the Court's April 21, 2015 order (*Rotstain* ECF No. 234) denying their motions to dismiss.  *Rotstain* ECF No. 373.  The OSIC filed a response to that motion, *Rotstain* ECF No. 379, and TD Bank (and the other Bank defendants) filed a reply. *Rotstain* ECF No. 380.

33.    On July 27, 2016, the Court entered an Order denying TD Bank's motion to dismiss the *Rotstain* Investor Plaintiffs' Second Amended Class Complaint and also denying TD Bank's motion to reconsider the Court's prior order denying its initial motion to dismiss.  *Rotstain* ECF No. 387.

34.    On February 28, 2019, TD Bank and the other Bank defendants filed a motion for judgment on the pleadings with respect to three of the claims asserted by the OSIC.  *Rotstain* ECF Nos. 488-489.  The OSIC filed a response to that motion, *Rotstain* ECF No. 490, and TD Bank and the other Bank defendants filed a reply.  *Rotstain* ECF No. 491.  TD Bank and the other Bank defendants ultimately withdrew the motion for judgment on the pleadings.  *Rotstain* ECF Nos. 738, 761.

35.    On September 10, 2019, the OSIC filed a motion seeking leave to amend its Intervenor Complaints.  *Rotstain* ECF No. 557.  That motion was opposed by TD Bank, *Rotstain* ECF No. 567, but granted by the Court on June 15, 2020.  *Rotstain* ECF No. 733.

The OSIC filed its Second Amended Intervenor Complaint against HSBC, TD Bank, TM and Independent that same day. *Rotstain* ECF No. 735.

36.    On February 12, 2021, TD Bank filed motions for summary judgment as to all claims and causes of action asserted by the OSIC and the *Rotstain* Investor Plaintiffs.[5] *Rotstain* ECF Nos. 858, 864-865 and 877-878.   The OSIC and the *Rotstain* Investor Plaintiffs filed responses to the motions filed by TD Bank, *Rotstain* ECF Nos. 977-979, 992-994, and TD Bank filed replies in support of its motions.   *Rotstain* ECF Nos. 1060-1061.   On January 20, 2022, this Court issued its Memorandum Opinion and Order in which it largely denied the motions for summary judgment filed by TD Bank and the other Bank defendants. *Rotstain* ECF No. 1150.

37.    TD Bank sought leave to file a second motion for summary judgment on August 9, 2021.   *Rotstain* ECF Nos.  1138-1139.   The OSIC responded to that motion, *Rotstain* ECF No. 1142, and TD Bank filed a reply.   *Rotstain* ECF No. 1143.   Following the remand of the *Rotstain* Action to the Transferor Court, the Transferor Court granted TD Bank leave to file a second motion for summary judgment during a status conference held on May 12, 2022.   TD Bank filed its second motion for summary judgment on May 23, 2022.   *Rotstain* ECF Nos. 1249-1250.   OSIC responded to that second motion for summary judgment, and filed a cross-motion for summary judgment, on June 13, 2022. *Rotstain* ECF No. 1270-1272.   TD Bank filed a reply in support of its motion and a response to OSIC's cross-motion, *Rotstain* ECF No. 1279-1280, and OSIC filed its reply.   *Rotstain*

---

[5]    Each of the other Bank defendants also filed motions for summary judgment on that date.

ECF No. 1289.  On November 10, 2022, the Transferor Court entered its Order denying TD Bank's second motion for summary judgment and granting OSIC's cross-motion. *Rotstain* ECF No. 1325.

38.    Also following the remand of the *Rotstain* Action to the Transferor Court, TD Bank and the other Bank defendants filed two additional sets of motions to dismiss. The first asserted that the OSIC lacked standing to bring the claims it was bringing. *Rotstain* ECF Nos. 1166-1167.  The second asserted that Plaintiffs' TSA claims were barred by the TSA statute of repose.  *Rotstain* ECF Nos. 1168-1169.  The Plaintiffs filed responses to those motions, *Rotstain* ECF Nos. 1231-1232, 1235-1236, and TD Bank filed its replies.  *Rotstain* ECF Nos. 1258-1260.

39.    On November 17, 2022, the Transferor Court entered its order denying the motion to dismiss for lack of standing.  *Rotstain* ECF No. 1327.  On that same date, the Transferor Court also entered its order denying the motions to dismiss the TSA claims. *Rotstain* ECF No. 1328.

### E.    Discovery Efforts in the *Rotstain* Action

40.    The Plaintiffs and TD Bank conducted an enormous amount of discovery over the course of the *Rotstain* Action.  The parties exchanged hundreds of thousands of pages of documents, and extensive written discovery requests and responses.

41.    Counsel for the Plaintiffs in the *Rotstain* Action took at least fifteen (15) fact witness depositions of TD Bank witnesses, deposed four (4) of TD Bank's expert witnesses, and defended the depositions of three (3) of Plaintiffs' experts.  Counsel for the

Plaintiffs also participated in the defense of the depositions of OSIC Chair John J. Little and the Receiver, and counsel for the Plaintiffs participated in third-party depositions.[6]

42.    Plaintiffs and TD Bank also engaged in significant motion practice relating to discovery.  For example, on November 5, 2019, OSIC filed a motion to compel TD Bank to produce certain documents that TD Bank had withheld based upon a claim that they were protected by US and Canadian bank secrecy laws.  *Rotstain* ECF No. 583.  TD Bank filed a response to that motion, *Rotstain* ECF No. 596, and the Magistrate Judge entered an order dated January 21, 2022, directing TD Bank to either produce the documents to the OSIC or to submit them for *in camera* review.  *Rotstain* ECF No. 651.  TD Bank responded to that order by moving to stay it, *Rotstain* ECF No. 662, and filing objections to it. *Rotstain* ECF No. 671.  The OSIC opposed the motion to stay, *Rotstain* ECF No. 666, and responded to TD Bank's objections.  *Rotstain* ECF No. 671.  This Court granted the motion to stay, *Rotstain* ECF No. 669, but overruled TD Bank's objections.  *Rotstain* ECF No. 692.  OSIC and TD Bank thereafter engaged in further conferences with the Magistrate Judge, the end result of which was an order dated October 15, 2020, granting OSIC's motion in part and directing TD Bank to produce certain documents.  *Rotstain* ECF No. 801.

---

[6]    Overall, Plaintiffs' counsel took or defended the depositions of 76 fact witnesses and 21 expert witnesses, including depositions that were relevant to other Bank defendants and not specific to TD Bank.

**F.      Motion Practice Concerning Experts in the *Rotstain* Action.**

43.      Plaintiffs and TD Bank engaged in considerable motion practice concerning the experts designated by each of the parties, with Plaintiffs and TD Bank each filing *Daubert* challenges to the parties' respective experts.

44.      TD Bank filed *Daubert* challenges concerning Plaintiffs' experts Nicolas Choules-Burbidge, *Rotstain* ECF Nos. 935-936, James C. Spindler, *Rotstain* ECF Nos. 937-938, and Karyl Van Tassel, *Rotstain* ECF Nos. 958-959.  The Plaintiffs filed responses to each of those *Daubert* challenges, *see Rotstain* ECF Nos. 1027-1028 (Choules-Burbidge), 1035-1036 (Spindler), and 1037, 1039 (Van Tassel).  TD Bank filed reply briefs with respect to each of its *Daubert* challenges.  *See Rotstain* ECF Nos. 1076 (Van Tassel), 1081 (Choules-Burbidge), and 1099-1100 (Spindler).

45.      The OSIC filed *Daubert* challenges concerning TD Bank's experts Stephen Scott, *Rotstain* ECF Nos. 913-915, Robert A. Ragazzo, *Rotstain* ECF Nos. 916-918, and Kenneth M. Lehn, *Rotstain* ECF No. 939-941.  TD Bank (and other Bank defendants) filed responses to those *Daubert* challenges, *see Rotstain* ECF Nos. 1029 (Ragazzo), 1030 (Scott) and 1032 (Lehn), and the OSIC filed a reply in support of its *Daubert* challenges as to Mr. Ragazzo, *Rotstain* ECF No. 1068, Mr. Lehn, *Rotstain* ECF No. 1070, and Mr. Scott *Rotstain* ECF No. 1077.

46.      On September 29, 2022, the Transferor Court entered an order denying the *Daubert* challenge as to Plaintiffs' expert Karyl Van Tassel.  *Rotstain* ECF No. 1305.  On October 3, 2022, the Transferor Court entered orders denying the *Daubert* challenge as to

Plaintiffs' experts Nicolas Choules-Burbidge, *Rotstain* ECF No. 1308, and James S. Spindler, *Rotstain* ECF No. 1309.

47.    On October 20, 2022, the Transferor Court provisionally granted the OSIC's *Daubert* challenges as to Robert A. Ragazzo, *Rotstain* ECF No. 1314.  The Transferor Court granted in part and denied in part the OSIC's *Daubert* challenge as to Kenneth M. Lehn.  *Rotstain* ECF No. 1316.  On February 23, 2023, the Transferor Court entered an order granting the OSIC's *Daubert* challenge as to Mr. Scott.  *Rotstain* ECF No. 1441.

### G.    Motion Practice Concerning Responsible Third Parties

48.    On March 16, 2021, TD Bank, Independent, TM, and SG Suisse filed a motion for leave to designate responsible third parties.  *Rotstain* ECF No. 971.  The OSIC filed a response to that motion on March 31, 2021, *Rotstain* ECF No. 1012, and the moving Defendants filed a reply.  *Rotstain* ECF No. 1067.

49.    In its Suggestion of Remand, this Court expressly left the pending motions for leave to designate potentially responsible third parties undecided, opining that the judge who presides over the trial should decide the motion.  *Rotstain* ECF No. 1151.

50.    On December 12, 2022, TD Bank (with the other Bank defendants) filed a supplemental brief in support of the motion for leave to designate responsible third parties. *Rotstain* ECF No. 1330.  The OSIC filed a response to that supplemental brief on December 13, 2022.  *Rotstain* ECF No. 1332.

51.    On January 17, 2023, the Transferor Court entered its Order denying TD Bank's motion to designate responsible third parties. *Rotstain* ECF No. 1356.

## H.    Petitions for Writs of Mandamus

52.    On December 16, 2022, TD Bank filed a petition for writ of mandamus with the Fifth Circuit Court of Appeals challenging the Transferor Court's Order denying TD Bank's second motion for summary judgment.  That petition also challenged this Court's and the Transferor Court's decisions holding that OSIC had standing to bring the claims it was bringing and that OSIC's TSA claims were not barred by the TSA statute of repose. OSIC filed a response to that petition on February 6, 2023, and TD Bank filed a reply on February 13, 2023.

53.    TD Bank (with HSBC and Independent) filed a second petition for writ of mandamus with the Fifth Circuit Court of Appeals on January 31, 2023, in which they sought an order directing the Transferor Court to grant the motion for leave to designate responsible third parties.  The OSIC responded to that petition for writ of mandamus on February 8, 2023.  On February 14, 2023 – less than two weeks before trial was to begin – the 5th Circuit denied both petitions.

## I.    Pre-Trial Activities

54.    On November 10, 2022, the Transferor Court entered its Fifth and Final Amended Scheduling Order, setting the *Rotstain* Action for trial on February 27, 2023, and establishing various pre-trial deadlines.  *Rotstain* ECF No. 1326.

55.    On January 20, 2023, TD Bank filed a joint motion in limine (with HSBC and Independent), *Rotstain* ECF No. 1342, and its own motion in limine.  *Rotstain* ECF Nos. 1344-1345.  The OSIC responded to those motions, *Rotstain* ECF Nos. 1380-1381, 1386-1387.  On February 14, 2023, the Transferor Court entered its order granting in part

and denying in part both the joint motion in limine, *Rotstain* ECF No. 1412, and granting in part and denying in part TD Bank's motion in limine.  *Rotstain* ECF No. 1414.

56.    The OSIC also filed motions in limine on January 20, 2023.  *See Rotstain* ECF Nos. 1348, 1349, 1350, 1351, 1352, 1353 and 1354.  TD Bank, joined by HSBC and Independent, filed joint responses to certain of those motions in limine on February 7, 2023. *See Rotstain* ECF No. 1393, 1394, 1396, 1397, 1398, 1399 and 1400.  TD Bank, joined by HSBC, also filed separate responses to two of the OSIC's motions in limine.  *Rotstain* ECF Nos. 1394, 1399.  The OSIC filed a joint reply in support of its motions in limine on February 13, 2023.  *Rotstain* ECF No. 1408.  On February 14, 2023, the Transferor Court entered orders granting three of the OSIC's motions in limine, *Rotstain* ECF Nos. 1410, 1419 and 1420, and granting in part and denying in part the remaining motions.  *Rotstain* ECF Nos. 1415, 1416, 1417, and 1418.

57.    On January 23, 2023, the Transferor Court Clerk's office inadvertently issued a notice "suspending" the February 27, 2023 trial date.  *Rotstain* ECF No. 1357. The OSIC filed a motion to reinstate the trial setting the next day.  *Rotstain* ECF No. 1358. On January 26, 2023, the Transferor Court entered its order reinstating the February 27, 2023 trial date.  *Rotstain* ECF No. 1365.  TD Bank (with HSBC and Independent) moved to reconsider that order on January 27, 2023.  *Rotstain* ECF No. 1366.  The OSIC responded to that motion, *Rotstain* ECF No. 1368, and the Transferor Court held a telephonic hearing on January 30, 2023.  During that hearing, the Transferor Court denied the motion to reconsider.  *Rotstain* ECF No. 1369.

### J.   Examiner Involvement in the *Rotstain* Action

58.    In my capacity as the OSIC Chair, I have worked closely with the Receiver, his counsel, OSIC's counsel, and counsel for the *Rotstain* Investor Plaintiffs to coordinate the prosecution of claims against third parties for the benefit of the Receivership Estate and Stanford Investors, including the claims asserted in the *Rotstain* Action.

59.    In that regard, I have been involved, as Chair of OSIC, in the OSIC's prosecution of its claims in the *Rotstain* Action, and have conferred regularly with counsel for the Receiver, the OSIC and the *Rotstain* Investor Plaintiffs concerning every aspect of the *Rotstain* Action.

60.    The OSIC's counsel with respect to TD Bank, BL and FK, have spent many years and thousands of hours investigating and pursuing the claims asserted against TD Bank in the *Rotstain* Action.  The materials reviewed included, among other materials, thousands of pages of SEC and other investigation materials, thousands of pages of deposition and trial testimony from the prosecution of Allen Stanford and others, thousands of emails of Stanford and TD Bank personnel, and thousands of pages of bank records, including TD Bank materials and files, that the Receiver secured from Stanford's various offices and law firms.

61.    For the last four or five years, the OSIC's counsel at BL and FK have worked full time, or nearly so, to prepare the *Rotstain* Action for trial.  That work is described, in part, in paragraphs 24-57, *supra*.

**K.      Settlement Efforts**

62.      Settlement discussions with TD Bank were infrequent and of limited value. On February 13 and 14, 2017, the Receiver and I, along with the Receiver's counsel, the OSIC's counsel and the *Rotstain* Investor Plaintiffs counsel, traveled to Toronto, Canada and participated in a two-day mediation with TD Bank and the Antiguan Joint Liqidators. No agreements were reached as a result of that mediation.

63.      The Receiver and I, along with counsel, participated in a mediation with TD Bank (and the other Banks) on January 2 and 3, 2023. No agreement was reached with TD Bank during that mediation.

64.      Later discussions between and among the OSIC's lead counsel, TD Bank's counsel, and the mediator led to an agreement in principle on Friday, February 24, 2023, the last business day before trial was to begin.

65.      The parties fully executed the TD Bank Settlement Agreement as of March 7, 2023. The TD Bank Settlement Agreement calls for TD Bank to pay $1.205 billion to settle and resolve the *Rotstain* Action and the *Smith* Action, and for the entry of a Final Bar Order that will bar any further claims against TD Bank and related persons and entities.[7]

**L.      Examiner's Opinion Concerning the TD Bank Settlement and
The Payment of Attorneys' Fees**

66.      It is my opinion that the settlement the Receiver and the OSIC reached with TD Bank is fair and reasonable, in the best interests of the Stanford Receivership Estate

---

[7]      The TD Bank Settlement Agreement includes a definition of the "TD Bank Released Parties" at paragraph 22.

and the Stanford Investors, and should be approved by the Court. My opinion is based upon my involvement in the investigation and prosecution of the claims asserted against TD Bank in the *Rotstain* Action, the risks and uncertainty inherent in any jury trial, and the length of time it would likely take to resolve the appeals that would inevitably follow any jury verdict and judgment.

67.     Any net proceeds recovered from the TD Bank Settlement will be distributed through the Receiver's existing (and already approved and operating) mechanism for identifying and approving claims and making distributions. Using the Receiver's existing process will be far more efficient, and likely result in larger distributions to Stanford Investors.

68.     As noted above, the OSIC entered into a fee agreement with BL and FK that provided for the payment of a contingent fee of twenty-five percent (25%) of the Net Recovery realized in respect of the claims asserted against TD Bank.

69.     For the benefit of the Stanford Investors, BL and FK have agreed to a substantial reduction from the fee contemplated by their fee agreement. BL and FK have agreed to reduce their attorneys' fees in respect of the TD Bank settlement to $100 million, which is approximately 8.3% of the net recovery anticipated from the TD Bank settlement.

70.     It is my opinion that the attorneys' fee requested, $100 million, is reasonable in comparison to the total net amount to be recovered for the benefit of the Stanford Investors. The fee is substantially below the twenty-five percent (25%) contingent fee that was initially negotiated between and among the Receiver, OSIC and counsel, which itself

is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude.

71.    I respectfully submit that an award of attorneys' fees of $100 million from the settlement with TD Bank is reasonable, necessary and appropriate considering the significant time, effort, and resources which BL and FK have invested in investigating the Stanford fraud, prosecuting and resolving the *Rotstain* Action with respect to TD Bank, and prosecuting the other Stanford-related litigation.

Executed on March 8, 2023.

_____
John J. Little

DECLARATION OF EXAMINER JOHN J. LITTLE

21